11/18/21, 11:15 AM    Case 4:21-cv-03369    Document 10    Filed on 11/19/21 in TXSD    Page 1 of 500
ECF CM/ECF LIVE - U.S. Bankruptcy Court-Texas Southern

000001

APPEAL, CLOSED, APPEAL_NAT

# U.S. Bankruptcy Court
## Southern District of Texas (Houston)
## Adversary Proceeding #: 20-03309

*Assigned to:* Bankruptcy Judge David R Jones
*Lead BK Case:* 20-30336
*Lead BK Title:* McDermott International, Inc.
*Lead BK Chapter:* 11
*Demand:*

*Date Filed:* 07/17/20
*Date Terminated:* 10/12/21
*Date Removed From State:* 07/17/20

*Nature[s] of Suit:*  01 Determination of removed claim or cause
02 Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy)

### Plaintiff
-----------------------
**Michael Van Deelen**
16215 Friar Circle
Spring, Tx 77379

represented by **Michael Van Deelen**
PRO SE

V.

### Defendant
-----------------------
**David Dickson**

represented by **Jamie Alan Aycock**
Kirkland & Ellis LLP
609 Main
Houston, TX 77002
713-835-3600
Email: jamie.aycock@kirkland.com
*LEAD ATTORNEY*

**Matthew D Cavenaugh**
Jackson Walker LLP
1401 McKinney Street
Ste 1900
Houston, TX 77010
713-752-4200
Email: mcavenaugh@jw.com
*LEAD ATTORNEY*

**Anna Rotman**
Kirkland and Ellis LLP
609 Main St
Suite 4500
Houston, TX 77002
713-836-3748

000902

Email: anna.rotman@kirkland.com
*LEAD ATTORNEY*

**Defendant**
----------------------
**Scott Lamb**                    represented by **Jamie Alan Aycock**
                                              (See above for address)
                                                *LEAD ATTORNEY*

                                                **Matthew D Cavenaugh**
                                                (See above for address)
                                                *LEAD ATTORNEY*

                                                **Anna Rotman**
                                                (See above for address)
                                                *LEAD ATTORNEY*

**Defendant**
----------------------
**Stuart Spence**                  represented by **Jamie Alan Aycock**
                                                (See above for address)
                                                *LEAD ATTORNEY*

                                                **Matthew D Cavenaugh**
                                                (See above for address)
                                                *LEAD ATTORNEY*

                                                **Anna Rotman**
                                                (See above for address)
                                                *LEAD ATTORNEY*

**Defendant**
----------------------
**10 John/Jane Does**             represented by **10 John/Jane Does**
                                                PRO SE

**Defendant**
----------------------
**Joshua Sussberg**              represented by **David J. Beck**
                                                Beck Redden LLP
                                                One Houston Center
                                                1221 McKinney Street, Suite 4500
                                                Houston, TX 77010
                                                713-951-3700
                                                Email: dbeck@beckredden.com

| **Filing Date** | **#** | **Docket Text** |
| --- | --- | --- |

11/18/21, 11:15 AM | Case 4:21-cv-03369   Document 10   Filed on 11/19/21 in TXSD   Page 3 of 500 | CM/ECF LIVE - U.S. Bankruptcy Court - Texas Southern

000003

| | | |
|---|---|---|
| 07/17/2020 | ⬤1<br>(55 pgs; 2 docs) | Adversary case 20-03309. Nature of Suit: (01 (Determination of removed claim or cause)),(02 (Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy))) Notice of Removal Michael Van Deelen. Fee Amount $350 (Attachments: # 1 Adversary Cover Sheet) (Cavenaugh, Matthew) (Entered: 07/17/2020) |
| 07/17/2020 | | Receipt of Notice of Removal(20-03309) [cmp,ntcrmvl] ( 350.00) Filing Fee. Receipt number 22284839. Fee amount $ 350.00. (U.S. Treasury) (Entered: 07/17/2020) |
| 07/18/2020 | ⬤2<br>(1 pg) | Notice and Order regarding exchanging of exhibits and witness lists in all contested matters and adversary proceedings. (Entered: 07/18/2020) |
| 07/22/2020 | ⬤3<br>(2 pgs) | BNC Certificate of Mailing. (Related document(s):2 Order Regarding the Exchange of Exhibits and Witness lists in all contested matters and adversary proceedings) No. of Notices: 4. Notice Date 07/22/2020. (Admin.) (Entered: 07/22/2020) |
| 07/23/2020 | ⬤4<br>(26 pgs) | Motion for Remand. Objections/Request for Hearing Due in 21 days., Motion to Recuse Judge Filed by Michael Van Deelen (than) (Entered: 07/24/2020) |
| 07/25/2020 | ⬤5<br>(31 pgs; 2 docs) | Motion *to Dismiss Plaintiff's Original Petition* Filed by David Dickson, Scott Lamb, Stuart Spence (Attachments: # 1 Proposed Order) (Cavenaugh, Matthew) (Entered: 07/25/2020) |
| 07/27/2020 | ⬤6<br>(10 pgs; 3 docs) | Plaintiff's Motion to Continuance or Alternatively Motion for Extension of Time to Respond to the Defendants' Motion to Dismiss Plaintiff's Original Petition; Plaintiff's Motion to Recuse Bankruptcy Judge David Jones (related document(s):5 Generic Motion). Filed by Plaintiff Michael Van Deelen (Attachments: # 1 Proposed Order for continuance # 2 Proposed Order to Recuse) (rcas) Modified on 7/28/2020 (rcas). (Entered: 07/28/2020) |
| 07/27/2020 | ⬤7<br>(8 pgs; 3 docs) | Addendum to Motion *to Remand; Motion to Recuse* Filed by Plaintiff Michael Van Deelen (Attachments: # 1 Proposed Order to Remand # 2 Proposed Order to Recuse) (rcas) Modified on 7/28/2020 (rcas). (Entered: 07/28/2020) |
| 07/31/2020 | ⬤8<br>(9 pgs; 3 docs) | Motion to Recuse Judge, Motion To Stay. Filed by Michael Van Deelen (Attachments: # 1 Proposed Order # 2 Proposed Order) (sgue) (Entered: 07/31/2020) |
| 08/03/2020 | ⬤9<br>(3 pgs) | Request for Hearing (Filed By Michael Van Deelen ).(Related document(s):4 Motion for Remand, Motion to Recuse Judge, 5 Generic Motion, 6 Motion to Continue/Reschedule Hearing, 8 Motion to Recuse Judge, Motion To Stay) (sgue) (Entered: 08/05/2020) |
| 08/12/2020 | ⬤10<br>(37 pgs; 3 docs) | Response (related document(s):5 Generic Motion). Filed by Michael Van Deelen (Attachments: # 1 Exhibit # 2 Proposed Order) (sgue) (Entered: 08/12/2020) |
| 08/13/2020 | ⬤11<br>(34 pgs) | Response *in Opposition to Plaintiff's Motion to Remand His State Law Cause of Action and Motion to Recuse* (related document(s):4 Motion for Remand, Motion to Recuse Judge, 8 Motion to Recuse Judge, |

| | | |
|---|---|---|
| | | Motion To Stay). Filed by David Dickson, Scott Lamb, Stuart Spence (Cavenaugh, Matthew) (Entered: 08/13/2020) |
| 08/17/2020 | ⬤ 12 (35 pgs) | *Reply to Defts' Response (#11) to Pltf's Motion to Remand (#4) and* (related document(s):8 Motion to Recuse Judge, Motion To Stay). Filed by Michael Van Deelen (sgue) (Entered: 08/18/2020) |
| 09/21/2020 | ⬤ 13 (3 pgs) | Notice of Appearance and Request for Notice Filed by Jamie Alan Aycock Filed by on behalf of David Dickson, Scott Lamb, Stuart Spence (Aycock, Jamie) (Entered: 09/21/2020) |
| 09/21/2020 | ⬤ 14 (3 pgs) | Notice of Appearance and Request for Notice Filed by Anna Rotman Filed by on behalf of David Dickson, Scott Lamb, Stuart Spence (Rotman, Anna) (Entered: 09/21/2020) |
| 09/22/2020 | ⬤ 15 (1 pg) | Order Setting Scheduling Conference (Related document(s):1 Notice of Removal) **Scheduling Conference set for 10/26/2020 at 03:00 PM by telephone and video conference.** (aalo) (Entered: 09/22/2020) |
| 09/24/2020 | ⬤ 16 (2 pgs) | BNC Certificate of Mailing. (Related document(s):15 Adversary Order Setting Conference) No. of Notices: 1. Notice Date 09/24/2020. (Admin.) (Entered: 09/24/2020) |
| 09/24/2020 | ⬤ 17 (5 pgs; 2 docs) | Clerk's Entry of Default against Stuart Spence (Related document(s):1 Notice of Removal). (Attachments: # 1 Clerk's Entry of Default) (than) (Entered: 09/25/2020) |
| 09/24/2020 | ⬤ 18 (8 pgs) | Affidavit in Support Re: (related document(s):17 Clerk's Entry of Default). (Filed By Michael Van Deelen ).(Related document(s):17 Clerk's Entry of Default) (than) (Entered: 09/25/2020) |
| 09/24/2020 | ⬤ 19 (7 pgs; 2 docs) | Clerk's Entry of Default against Scott Lamb (Related document(s):1 Notice of Removal). (Attachments: # 1 Clerk's Entry of Default) (than) (Entered: 09/25/2020) |
| 09/24/2020 | ⬤ 20 (6 pgs) | Affidavit in Support Re:(related document(s):19 Clerk's Entry of Default). (Filed By Michael Van Deelen ).(Related document(s):19 Clerk's Entry of Default) (than). (Entered: 09/25/2020) |
| 09/24/2020 | ⬤ 21 (13 pgs; 3 docs) | Motion for Default Judgment. Filed by Michael Van Deelen (Attachments: # 1 Affidavit in Support of his Request for Clerk's Entry of Default Against Defendant David Dickson # 2 Clerk's Entry of Default Against Defendant David Dickson) (JesusGuajardo) (Entered: 09/28/2020) |
| 09/25/2020 | ⬤ 22 (14 pgs; 3 docs) | Corrected Motion for Default Judgment. Filed by Michael Van Deelen (Attachments: # 1 Plaintiff's Corrected Affidavit in Support of his Request for Clerk's Entry of Default Against Defendant David Dickson # 2 Proposed Order Clerk's Entry of Default Against Defendant David Dickson) (JesusGuajardo) (Entered: 09/28/2020) |
| 10/07/2020 | ⬤ 23 (4 pgs) | *Response Defendants' Response to Plaintiff's Motion for Default Judgment and Requests for Entry of Default* (related document(s):21 Motion for Default Judgment, 22 Motion for Default Judgment). Filed by David Dickson, Scott Lamb, Stuart Spence (Cavenaugh, Matthew) (Entered: 10/07/2020) |

| 10/08/2020 | ⬤ 24<br>(6 pgs; 2 docs) | Motion to Continue Hearing On (related document(s):15 Adversary Order Setting Conference). Filed by Michael Van Deelen (Attachments: # 1 Proposed Order) (JacquelineMata) (Entered: 10/15/2020) |
|---|---|---|
| 10/08/2020 | ⬤ 26<br>(5 pgs) | Reply *to Deft's Response* 23 *to* (related document(s):21 Motion for Default Judgment, 22 Motion for Default Judgment). Filed by Michael Van Deelen (hler) (Entered: 10/15/2020) |
| 10/15/2020 | ⬤ 25<br>(1 pg) | Motion to Appear pro hac vice *John Christian*. Filed by David Dickson, Scott Lamb, Stuart Spence (Aycock, Jamie) (Entered: 10/15/2020) |
| 10/19/2020 | ⬤ 27<br>(1 pg) | Order Granting Plaintiff's Motion for Continuance of Scheduling Conference (Related Doc # 24) Signed on 10/19/2020. **Scheduling Conference set for 1/25/2021 at 09:30 AM at Houston, Courtroom 400 (DRJ).** (emiller) (Entered: 10/19/2020) |
| 10/20/2020 | ⬤ 28<br>(1 pg) | Order Granting Motion To Appear pro hac vice - John Christian (Related Doc # 25) Signed on 10/20/2020. (emiller) (Entered: 10/20/2020) |
| 10/22/2020 | ⬤ 29<br>(3 pgs) | BNC Certificate of Mailing. (Related document(s):28 Order on Motion to Appear pro hac vice) No. of Notices: 1. Notice Date 10/22/2020. (Admin.) (Entered: 10/23/2020) |
| 10/22/2020 | ⬤ 30<br>(3 pgs) | BNC Certificate of Mailing. (Related document(s):27 Order on Motion to Continue/Reschedule Hearing) No. of Notices: 1. Notice Date 10/22/2020. (Admin.) (Entered: 10/23/2020) |
| 01/08/2021 | ⬤ 31<br>(6 pgs; 2 docs) | Second Motion to Continue Scheduling Conference (related document(s):1 Notice of Removal). Filed by Michael Van Deelen (than). Additional attachment(s) added on 1/11/2021 (than). (Entered: 01/11/2021) |
| 01/14/2021 | ⬤ 32<br>(4 pgs) | PLAINTIFF'S Witness and Exhibit List (Filed By Michael Van Deelen ). (jdav) (Entered: 01/14/2021) |
| 01/19/2021 | ⬤ 33<br>(8 pgs) | Rule 26 Initial Disclosures (Filed By David Dickson, Scott Lamb, Stuart Spence, Michael Van Deelen ). (than) (Entered: 01/20/2021) |
| 01/24/2021 | ⬤ | Certificate of Email Notice. Contacted Michael Van Deelen. The Court has rescheduled the Motion to Recuse as well as the Scheduling Conference. Movant to notice all interested parties and file a certificate of service with the court (Related document(s):1 Notice of Removal, 8 Motion to Recuse Judge, Motion To Stay) **Hearing scheduled for 3/10/2021 at 09:00 AM by telephone and video conference.** (aalo) (Entered: 01/24/2021) |
| 01/25/2021 | ⬤ 34<br>(3 pgs) | Notice of Hearing (Related document(s):1 Notice of Removal, 7 Generic Motion, 8 Motion to Recuse Judge, Motion To Stay). (aalo) (Entered: 01/25/2021) |
| 01/27/2021 | ⬤ 35<br>(5 pgs) | BNC Certificate of Mailing. (Related document(s):34 Notice of Hearing (Adversary)) No. of Notices: 1. Notice Date 01/27/2021. (Admin.) (Entered: 01/28/2021) |

| 02/04/2021 | doc<br>(3 pgs) | Amended Notice of Hearing scheduled for 3/10/2021 at 09:00 AM at telephone and video conference. (mmap) (Entered: 02/08/2021) |
| 03/08/2021 | 36<br>(7 pgs; 2 docs) | Emergency Motion *to Seal* Filed by David Dickson, Scott Lamb, Stuart Spence (Attachments: # 1 Proposed Order) (Cavenaugh, Matthew) (Entered: 03/08/2021) |
| 03/08/2021 | 37 | Receipt of Sealed Document retained in Clerk's office. Forwarded Copy to Chambers for review. (gkel) (Entered: 03/08/2021) |
| 03/08/2021 | 38<br>(2 pgs) | Certificate *of Service* (Filed By David Dickson, Scott Lamb, Stuart Spence ).(Related document(s):36 Emergency Motion (Adversary)) (Cavenaugh, Matthew) (Entered: 03/08/2021) |
| 03/08/2021 | 39 | PLAINTIFF'S ADDENDUM TO PLAINTIFF'S MOTION PURSUANT TO 28 U.S.C. SECTI(;)S 455(a) AND 455(b)(l) TO DISQUALIFY BANKRUPTCY COURT JUDGE DAVID JONES FROM PRESIDING OVER THE ABOVE-CAPTIONED ADVERSARY PROCEEDING; MOTION FOR STAY OF PROCEEDING; PROPOSED ORDERS (DOCUMENT 8) Michael Van Deelen (Related document(s):8 Motion to Recuse Judge, Motion To Stay) (gkel) (Entered: 03/09/2021) |
| 03/09/2021 | 40<br>(1 pg) | Order Reassigning Motion to Recuse, Signed on 3/9/2021 (LinhthuDo) (Related document(s):8 Motion to Recuse) (Entered: 03/09/2021) |
| 03/10/2021 | 41 | Courtroom Minutes. Time Hearing Held: 9:00 am - 9:39 am. Hearing heard before Bankruptcy Judge Marvin Isgur. Telephonic Appearances: Plaintiff Michael Van Deelen present, sworn in and testimony given. Anna Rotman for the Defendants. The motion to recuse 8 is denied on the record, order to be entered by the Court as stated on the record. (Related document(s):8 Motion to Recuse Judge, Motion To Stay, Certificate of Notice) (TylerLaws) (Entered: 03/10/2021) |
| 03/10/2021 | 42<br>(1 pg) | Order Denying Motion to Recuse (Related Doc # 8) Signed on 3/10/2021. (TylerLaws) (Entered: 03/10/2021) |
| 03/10/2021 | 43 | Courtroom Minutes. Time Hearing Held: 9:50 AM. Appearances: Jamie Aycock, Michael Van Deelen. (Related document(s):1 Notice of Removal) Plaintiff to amend his complaint by 4/12/2021, Response due by 5/3/2021, Reply due by 5/24/2021. **Hearing scheduled for 6/7/2021 at 09:00 AM by telephone and video conference.** Note: All pending matters are continued to 6/7/2021 at 9:00 AM. (aalo) (Entered: 03/10/2021) |
| 03/10/2021 | 44<br>(5 pgs; 2 docs) | Response *to Defendant's Emergency Motion to Seal* (related document(s):36 Emergency Motion (Adversary)). Filed by Michael Van Deelen (Attachments: # 1 Proposed Order) (JosephWells) (Entered: 03/10/2021) |
| 03/10/2021 | 45<br>(2 pgs) | Request for Hearing (Filed By Michael Van Deelen ).(Related document(s):36 Emergency Motion (Adversary)) (JosephWells) (Entered: 03/10/2021) |
| 03/10/2021 | 46<br>(1 pg) | 🔊 PDF with attached Audio File. Court Date & Time [ 3/10/2021 9:50:34 AM ]. File Size [ 13064 KB ]. Run Time [ 00:27:13 ]. (admin). |

| | | (Entered: 03/10/2021) |
|---|---|---|
| 03/10/2021 | 47 (1 pg) | PDF with attached Audio File. Court Date & Time [ 3/10/2021 8:59:54 AM ]. File Size [ 18689 KB ]. Run Time [ 00:38:56 ]. (Motion to Recuse 8 , heard before Bankruptcy Judge Marvin Isgur 900 am - 938 am 3-10-21). (admin). (Entered: 03/10/2021) |
| 03/11/2021 | 48 (3 pgs) | BNC Certificate of Mailing. (Related document(s):40 Generic Order (Adversary)) No. of Notices: 1. Notice Date 03/11/2021. (Admin.) (Entered: 03/12/2021) |
| 03/12/2021 | 49 (3 pgs) | BNC Certificate of Mailing. (Related document(s):42 Order on Motion to Recuse Judge) No. of Notices: 1. Notice Date 03/12/2021. (Admin.) (Entered: 03/12/2021) |
| 04/08/2021 | 50 (47 pgs) | Amended Complaint (Related document(s):1 Notice of Removal) (mmap) (Entered: 04/08/2021) |
| 05/03/2021 | 51 (24 pgs) | Motion *Defendants' Motion to Dismiss Plaintiff's First Amended Petition* Filed by Defendants David Dickson, Scott Lamb, Stuart Spence (Cavenaugh, Matthew) (Entered: 05/03/2021) |
| 05/20/2021 | 52 (41 pgs; 2 docs) | Response *to Motion to Dismiss Pltf's First Amended Complaint* (related document(s):51 Generic Motion). Filed by Michael Van Deelen (Attachments: # 1 Exhibit 1) (sgue) (Entered: 05/20/2021) |
| 05/24/2021 | | Certificate of Email Notice. Due to the Courts schedule the starting time for the hearing on June 7, 2021 has been moved back. The hearing will now begin at 11:00 AM. Plaintiff and Counsel for the defendant have confirmed no conflicts with the time change. (Related document(s):1 Notice of Removal) **Hearing scheduled for 6/7/2021 at 11:00 AM by telephone and video conference.** (aalo) (Entered: 05/24/2021) |
| 06/03/2021 | 53 (15 pgs) | Reply *in Support of Defendants' Motion to Dismiss Plaintiff's First Amended Complaint* (related document(s):51 Generic Motion). Filed by David Dickson, Scott Lamb, Stuart Spence (Cavenaugh, Matthew) (Entered: 06/03/2021) |
| 06/04/2021 | 54 (49 pgs; 2 docs) | Emergency Motion , Motion to Amend (related document(s):50 Amended Complaint). Filed by Michael Van Deelen (Attachments: # 1 Continuation) (than) (Entered: 06/04/2021) |
| 06/07/2021 | 55 | Courtroom Minutes. Time Hearing Held: 11:00 AM. Appearances: Jamie Aycock; Michael Van Deelen; Matthew Cavenaugh. (Related document(s):1 Notice of Removal, Certificate of Notice) Today's hearing is continued to 8/9/2021 at 11:00 AM by telephone and video conference. Mr. Van Deelen to file an amended complaint by 06/21/2021; Mr. Aycock to file an amended pleading by 07/12/2021; response due by 07/26/2021. (VrianaPortillo) (Entered: 06/07/2021) |
| 06/07/2021 | 56 (1 pg) | PDF with attached Audio File. Court Date & Time [ 6/7/2021 11:00:05 AM ]. File Size [ 5896 KB ]. Run Time [ 00:12:17 ]. (In ref to doc no. 1. Hearing held June 7, 2021.). (admin). (Entered: 06/07/2021) |
| 06/18/2021 | 57 | Third Amended Complaint (Related document(s):1 Notice of Removal) |

| | | |
|---|---|---|
| | (53 pgs) | (ckrus) (Entered: 06/29/2021) |
| 07/12/2021 | 58 (3 pgs) | Notice of Appearance and Request for Notice Filed by David J. Beck Filed by on behalf of Joshua Sussberg (Beck, David) (Entered: 07/12/2021) |
| 07/12/2021 | 59 (37 pgs; 4 docs) | Motion to Dismiss/Withdraw Document (related document(s):57 Amended Complaint). Filed by Joshua Sussberg (Attachments: # 1 Exhibit A - Declaration of Joshua A. Sussberg # 2 B - Declaration of Christopher T. Greco # 3 C - Declaration of Damian S. Schaible) (Beck, David) (Entered: 07/12/2021) |
| 07/12/2021 | 60 (15 pgs; 2 docs) | Motion *of Defendants David Dickson, Stuart Pence, and Scott Lamb to Dismiss Plaintiff's Third Amended Petition* Filed by David Dickson, Scott Lamb, Stuart Spence (Attachments: # 1 Proposed Order) (Cavenaugh, Matthew) (Entered: 07/12/2021) |
| 07/21/2021 | 61 (39 pgs) | Answer to Complaint (Related document(s):57 Amended Complaint) Filed by Joshua Sussberg (Beck, David) (Entered: 07/21/2021) |
| 07/26/2021 | 62 (23 pgs; 2 docs) | Response (related document(s):60 Generic Motion). Filed by Michael Van Deelen (Attachments: # 1 Proposed Order) (than) (Entered: 07/26/2021) |
| 07/26/2021 | 63 (44 pgs; 2 docs) | Response (related document(s):59 Motion to Dismiss/Withdraw Document). Filed by Michael Van Deelen (Attachments: # 1 Proposed Order) (than) (Entered: 07/26/2021) |
| 07/26/2021 | 64 (2 pgs) | Notice *of Hearing*. (Related document(s):59 Motion to Dismiss/Withdraw Document) Filed by Michael Van Deelen (than) (Entered: 07/26/2021) |
| 07/30/2021 | 65 (4 pgs) | Plaintiff's Witness and Exhibit Lists by Michael Van Deelen (ClaudiaGutierrez) (Entered: 07/30/2021) |
| 07/30/2021 | 66 (5 pgs) | Notice *of Subpoena*. Filed by Michael Van Deelen (ClaudiaGutierrez) (Entered: 07/30/2021) |
| 07/30/2021 | 67 (1 pg) | CD Exhibit by Michael Van Deelen (Related document(s):65 Plaintiff's Witness and Exhibit Lists, 66 Notice of Subpoena) (ClaudiaGutierrez) (Entered: 07/30/2021) |
| 08/06/2021 | 68 (141 pgs; 19 docs) | Motion *to Take Judicial Notice* Filed by Defendant Joshua Sussberg (Attachments: # 1 Exhibit A1 # 2 Exhibit A2 # 3 Exhibit A3 # 4 Exhibit A4 # 5 Exhibit A5 # 6 Exhibit A6 # 7 Exhibit A7 # 8 Exhibit A8 # 9 Exhibit A9 # 10 Exhibit B # 11 Exhibit C # 12 Exhibit D # 13 Exhibit E # 14 Exhibit F # 15 Exhibit G # 16 Exhibit H # 17 Exhibit I # 18 Proposed Order) (Beck, David) (Entered: 08/06/2021) |
| 08/06/2021 | 69 (38 pgs; 5 docs) | Reply *in Support of Motion to Dismiss Plaintiff's Third Amended Petition and for Sanctions* (related document(s):59 Motion to Dismiss/Withdraw Document). Filed by Joshua Sussberg (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Proposed Order) (Beck, David) (Entered: 08/06/2021) |
| 08/06/2021 | 70 | Reply *in Support of Motion of Defendants David Dickson, Stuart Pence,* |

| | (11 pgs) | *and Scott Lamb to Dismiss Plaintiff's Third Amended Petition* (related document(s):60 Generic Motion). Filed by David Dickson, Scott Lamb, Stuart Spence (Cavenaugh, Matthew) (Entered: 08/06/2021) |
|---|---|---|
| 08/09/2021 | ● | Courtroom Minutes. Time Hearing Held: 11:00 AM. Appearances: Beck Redden; Veronica Polnick; Michael Van Deelen; Jamie Aycock (Related document(s):1 Notice of Removal, 55 Courtroom Minutes, 59 Motion to Dismiss/Withdraw Document) The Court heard from all interested parties. The Court will take this matter under advisement. (VrianaPortillo) (Entered: 08/09/2021) |
| 08/09/2021 | ● 71 (1 pg) | 🔊 PDF with attached Audio File. Court Date & Time [ 8/9/2021 11:00:08 AM ]. File Size [ 14351 KB ]. Run Time [ 00:29:54 ]. (admin). (Entered: 08/09/2021) |
| 08/13/2021 | ● 72 (7 pgs) | Supplemental Motion For Sanctions for Other Reason. Objections/Request for Hearing Due in 21 days. Filed by Defendant Joshua Sussberg (Beck, David) (Entered: 08/13/2021) |
| 08/16/2021 | ● 73 (21 pgs) | Response (related document(s):72 Motion for Sanctions). Filed by Michael Van Deelen (MelissaMorgan) (Entered: 08/16/2021) |
| 08/16/2021 | ● 74 (23 pgs; 2 docs) | Motion to Strike. Objections/Request for Hearing Due in 21 days (related document(s):72 Motion for Sanctions). Filed by Michael Van Deelen (Attachments: # 1 Proposed Order) (MelissaMorgan) This entry was made for case management purposes. Modified on 8/16/2021 (MelissaMorgan). (Entered: 08/16/2021) |
| 08/16/2021 | ● 75 (5 pgs; 2 docs) | Motion to Dismiss Party - *defendant Joshua Sussberg*. Objections/Request for Hearing Due in 21 days. Filed by Michael Van Deelen (Attachments: # 1 Proposed Order) (MelissaMorgan) (Entered: 08/16/2021) |
| 08/16/2021 | ● 76 (2 pgs) | Request for Hearing (Filed By Michael Van Deelen ).(Related document(s):68 Generic Motion, 72 Motion for Sanctions, 74 Motion to Strike, 75 Motion to Dismiss Party) (MelissaMorgan) (Entered: 08/16/2021) |
| 08/23/2021 | ● 77 (10 pgs; 3 docs) | Reply *in Support of Supplemental Motion for Sanctions, Response to Motion to Dismiss, and Response to Motion to Strike* (related document(s):72 Motion for Sanctions, 74 Motion to Strike, 75 Motion to Dismiss Party). Filed by Joshua Sussberg (Attachments: # 1 Proposed Order Proposed Order Denying Plaintiff's Motions # 2 Proposed Order Proposed Order Granting Defendant's Motion to Dismiss and for Sanctions) (Beck, David) (Entered: 08/23/2021) |
| 09/08/2021 | ● 78 (2 pgs) | Order Granting Defendants' Emergency Motion to Seal (Related Doc # 36) Signed on 9/8/2021. (VrianaPortillo) (Entered: 09/08/2021) |
| 09/10/2021 | ● 79 (4 pgs) | BNC Certificate of Mailing. (Related document(s):78 Order on Emergency Motion (Adversary)) No. of Notices: 1. Notice Date 09/10/2021. (Admin.) (Entered: 09/10/2021) |
| 10/08/2021 | ● 80 (2 pgs) | Notice of Appeal filed. (related document(s):36 Emergency Motion (Adversary)). Receipt Number O,Fee Amount $298. Not paid. |

| | | |
|---|---|---|
| | | Appellant Designation due by 10/22/2021. (SamanthaWarda ) (Entered: 10/08/2021) |
| 10/12/2021 | 🔵 81<br>(13 pgs) | Order Signed on 10/12/2021 (aalo) (Entered: 10/12/2021) |
| 10/12/2021 | 🔵 82<br>(2 pgs) | Certificate *of No Transcript Order* (Filed By Michael Van Deelen ). (BrendaLacy) (Entered: 10/12/2021) |
| 10/12/2021 | 🔵 | Receipt Number 190667, Fee Amount $298.00 . (Related document(s):80 Notice of Appeal). (BrendaLacy) (Entered: 11/09/2021) |
| 10/14/2021 | 🔵 83 | Election to Appeal to District Court . (SamanthaWarda) (Entered: 10/14/2021) |
| 10/14/2021 | 🔵 84<br>(1 pg) | Clerk's Notice of Filing of an Appeal. On 10/08/2021, Michael Van Deelen filed a notice of appeal. The appeal has been assigned to U.S. District Judge Andrew S Hanen, Civil Action 4:21-cv-03369. Parties notified (Related document(s):80 Notice of Appeal) (SamanthaWarda) (Entered: 10/14/2021) |
| 10/14/2021 | 🔵 85<br>(32 pgs) | BNC Certificate of Mailing. (Related document(s):81 Order Dismissing Adversary Case) No. of Notices: 1. Notice Date 10/14/2021. (Admin.) (Entered: 10/14/2021) |
| 10/14/2021 | 🔵 87<br>(3 pgs) | Amended Notice of Appeal and Amended Certificate of No Transcript Order, filed. (related document(s):42 Order on Motion to Recuse Judge, Order on Motion To Stay, 78 Order on Emergency Motion (Adversary), 81 Order Dismissing Adversary Case). Receipt Number 0,Fee Amount $298. Appellant Designation due by 10/28/2021. (jdav) (Entered: 10/19/2021) |
| 10/16/2021 | 🔵 86<br>(3 pgs) | BNC Certificate of Mailing. (Related document(s):84 Clerk's Notice of Filing of an Appeal) No. of Notices: 1. Notice Date 10/16/2021. (Admin.) (Entered: 10/16/2021) |
| 10/20/2021 | 🔵 88<br>(23 pgs) | Appellant Designation of Contents For Inclusion in Record On Appeal (related document(s):80 Notice of Appeal, 87 Notice of Appeal). (jdav) (Entered: 10/20/2021) |
| 10/20/2021 | 🔵 89<br>(20 pgs) | Second Amended Notice of Appeal and Second Amended Certificate of No Transcript Order, filed. (related document(s):42 Order on Motion to Recuse Judge, Order on Motion To Stay, 78 Order on Emergency Motion (Adversary), 81 Order Dismissing Adversary Case). Receipt Number o,Fee Amount $298. Appellant Designation due by 11/3/2021. (jdav) (Entered: 10/20/2021) |
| 10/21/2021 | 🔵 90 | Election to Appeal to District Court . (hler) (Entered: 10/21/2021) |
| 10/21/2021 | 🔵 91 | Election to Appeal to District Court . (hler) (Entered: 10/21/2021) |
| 10/27/2021 | 🔵 92<br>(7 pgs; 2 docs) | Motion To Stay Pending Appeal and Request for Hearing. Filed by Michael Van Deelen (Attachments: # 1 Proposed Order) (than) (Entered: 10/28/2021) |
| 11/03/2021 | 🔵 93 | Appellee Designation of Contents for Inclusion in Record of Appeal |

| | | |
|---|---|---|
| | (5 pgs) | (related document(s):80 Notice of Appeal, 87 Notice of Appeal). (Cavenaugh, Matthew) (Entered: 11/03/2021) |
| 11/12/2021 | 94 (8 pgs; 2 docs) | Response *in Opposition to Plaintiff's Motion for Stay Pending Appeal and Request for Hearing* (related document(s):92 Motion To Stay Pending Appeal). Filed by Joshua Sussberg (Attachments: # 1 Proposed Order) (Beck, David) (Entered: 11/12/2021) |

# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| MCDERMOTT INTERNATIONAL, INC., *et al.*,[1] | § | Case No. 20-30336 (DRJ) |
| | § | |
| Reorganized Debtors. | § | (Jointly Administered) |
| | § | |
| MICHAEL VAN DEELEN | § | |
| | § | |
| Plaintiff, | § | Adv. Proc. No. 20-___ |
| | § | |
| v. | § | |
| | § | |
| DAVID DICKSON, | § | |
| and STUART SPENCE, | § | |
| and SCOTT LAMB, | § | |
| and 10 JOHN/JANE DOES | § | |
| | § | |
| Defendants. | § | |
| | § | |

## NOTICE OF REMOVAL

TO THE U.S. BANKRUPTCY CLERK:

Please take notice that pursuant to 28 U.S.C. § 1452(a), Federal Rule of Bankruptcy Procedure 9027 and Local Rule 9027-1, Defendants David Dickson ("***Dickson***"), Stuart Spence ("***Spence***"), and Scott Lamb ("***Lamb***") (collectively "***Defendants***") hereby remove the above-captioned civil action, and all claims and causes of action therein, from the 284th Judicial District Court of Montgomery County, Texas, to the United States Bankruptcy Court for the Southern District of Texas (the "Court").

---

[1] A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://cases.primeclerk.com/McDermott. The location of Debtor McDermott International, Inc.'s principal place of business and the Debtors' service address in these chapter 11 cases is 757 North Eldridge Parkway, Houston, Texas 77079.

## I.   JURISDICTION AND BASIS FOR REMOVAL

1.      Three months after the Court issued its Confirmation Order confirming McDermott International, Inc.'s plan of reorganization, on June 23, 2020 (D.I. 651) Michael Van Deelen ("***Van Deelen***"), filed suit against Defendants in Texas state court alleging conversion, common and statutory fraud, negligent misrepresentation, breach of fiduciary duty, and conspiracy (the "***State Court Lawsuit***").[2]

2.      Removal of the State Court Lawsuit is proper under 28 U.S.C. § 1452(a) because the claims being removed are pending in "a civil action other than a proceeding before the United States Tax Court or a civil action by a governmental unit to enforce such governmental unit's police or regulatory power," and this Court has subject matter jurisdiction under 28 U.S.C. § 1334.

3.      Federal subject matter jurisdiction exists under 28 U.S.C. § 1334 because the State Court Lawsuit is "related to" the Debtors' bankruptcy proceeding. The entry of a final judgment against Defendants would directly and substantially affect the Debtors, their operations, and/or the implementation or execution of the Plan.  Moreover, adjudication of the claims requires interpretation and enforcement of this Court's Confirmation Order, which releases and exculpates Defendants from certain claims that have been brought.

4.      Likewise, federal subject matter jurisdiction also exists under 28 U.S.C. § 1334 because the State Court Lawsuit "arises in" the Debtors' bankruptcy proceedings and

---

[2] The State Court Lawsuit is Cause No. 20-06-07348 in the 284th Judicial Court of the State of Texas, Montgomery County, styled *Michael Van Deelen v. David Dickson, and Stuart Spence, and Scott Lamb, and 10 John/Jane Does.*

adjudication of the claims would require interpretation and enforcement of this Court's Confirmation Order, including the release and exculpation provisions.[3]

5.     Venue is proper in the Southern District of Texas under 28 U.S.C. § 1452(a) because the Texas state court where the State Court Lawsuit is pending is located in this district.

## II.     THE PARTIES

6.     Pursuant to Local Rule 9027-1(a), the following is a list of the names and addresses of all parties to the State Court Lawsuit, and the name, address, and telephone number of counsel of record for each party.

7.     Plaintiff Michael Van Deelen is a *pro se* party in the State Court Lawsuit, and his current contact information is:

Michael Van Deelen
16215 Friar Circle
Spring, TX 77379
832-562-0723
michaelvandeelen@gmail.com

8.     Defendants David Dickson, Stuart Spence, and Scott Lamb are represented by:

Matthew D. Cavenaugh, mcavenaugh@jw.com
Jennifer F. Wertz, jwertz@jw.com
Kristhy M. Peguero, kpeguero@jw.com
Veronica A. Polnick, vpolnick@jw.com

Jackson Walker L.L.P.
1401 McKinney Street, Suite 1900
Houston, TX 77010

Anna G. Rotman, anna.rotman@kirkland.com
Jamie Alan Aycock, jamie.aycock@kirkland.com
John Christian, john.christian@kirkland.com

---

[3] *See, e.g.*, *In re ABC Dentistry, P.A.*, No. H-19-0682, 2019 WL 6894775, *4-7 (S.D. Tex. Dec. 17, 2019) ("[Bankruptcy] jurisdiction extends to matters that impact compliance with or completion of the reorganization plan. A bankruptcy court plainly has jurisdiction to interpret and enforce its own prior orders.") (internal citations and quotation marks omitted).

KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS INTERNATIONAL LLP
609 Main Street
Houston, TX 77002

## III.    COMPLIANCE WITH RULE 9027

13.    Bankruptcy Rule 9027(a)(1) requires that this Notice of Removal "contain a statement that upon removal of the claim or cause of action the party filing the notice does or does not consent to the entry of final orders or judgment by the bankruptcy court." Defendants respectfully state that they consent to the entry of final orders or judgments by the Bankruptcy Court.

9.    Local Rule 9027-1(b) further requires that this Notice of Removal "be accompanied by copies of all papers that have been filed in the court from which the case is removed." Attached are copies of all such papers.

DATED:  July 17, 2020                          Respectfully submitted,
Houston, Texas


/s/ Matthew D. Cavenaugh
**JACKSON WALKER L.L.P.**                      **KIRKLAND & ELLIS LLP**
Matthew D. Cavenaugh (TX Bar No. 24062656)     **KIRKLAND & ELLIS INTERNATIONAL LLP**
Jennifer F. Wertz (TX Bar No. 24072822)        Anna G. Rotman, P.C. (TX Bar No. 24046761)
Kristhy M. Peguero (TX Bar No. 24102776)       Jamie Alan Aycock (TX Bar No. 24050241)
Veronica A. Polnick (TX Bar No. 24079148)      John Christian (TX Bar No. 24109727)
1401 McKinney Street, Suite 1900               609 Main Street
Houston, TX 77010                              Houston, TX 77002
Telephone: (713) 752-4200                      Telephone:  (713) 836-3600
Facsimile:  (713) 752-4221                     Facsimile:  (713) 836-3601
Email:      mcavenaugh@jw.com                  Email:      anna.rotman@kirkland.com
            jwertz@jw.com                                  jamie.aycock@kirkland.com
            kpeguero@jw.com                                john.christian@kirkland.com
            vpolnick@jw.com

*Co-Counsel to Defendants*                     *Co-Counsel for Defendants*

4

## **CERTIFICATE OF SERVICE**

I hereby certify that on July 17, 2020, a true and correct copy of the foregoing Notice of Removal was served via the Court's ECF notification system to the parties listed below at the email addresses listed.

Michael Van Deelen, *Pro Se*
16215 Friar Circle
Spring, TX 77379
832-562-0723
michaelvandeelen@gmail.com


*/s/ Matthew D. Cavenaugh*
Matthew D. Cavenaugh

000017

# Document 1

Received and E-Filed for Record
6/23/2020 9:44 AM
000018
Melisa Miller, District Clerk
Montgomery County, Texas
Deputy Clerk, Kayla Adams

**CAUSE NO.** 20-06-07348 _____

| | | |
|---|---|---|
| MICHAEL VAN DEELEN | § | IN THE DISTRICT COURT |
| Plaintiff, | § | |
| | § | **Montgomery County - 284th Judicial District Court** |
| | § | |
| v. | § | OF MONTGOMERY COUNTY, |
| | § | TEXAS |
| DAVID DICKSON, | § | |
| and STUART SPENCE, | § | |
| and SCOTT LAMB, | § | _____JUDICIAL DISTRICT |
| and 10 JOHN/JANE DOES | § | |
| Defendants. | § | |

## PLAINTIFF'S ORIGINAL PETITION

COMES NOW Michael Van Deelen, plaintiff in the above-styled cause of action, and for his cause of action shows as follows:

### DISCOVERY CONTROL PLAN

1. Plaintiff intends to conduct discovery under Level 2 of the Texas Rules of Civil Procedure 190.3.

### PARTIES

2. Defendant Scott Lamb is an individual residing in Montgomery County, Texas, who can be served at his residence: 29 Watermill Ct, The Woodlands, Tx, 77380. At all times material herein, defendant Lamb was McDermott International's Vice President of Investor Relations.

Unofficial Copy

3.  Defendant David Dickson is an individual believed to be residing in either Montgomery County, Texas, or Harris County, Texas, who can be served at McDermott International, 757 N. Eldridge Pkwy, Houston, Tx, 77079.  At all times material herein, defendant Dickson was the President and Chief Executive Officer of McDermott International.

4.  Defendant Stuart Spence is an individual residing in Harris County, Texas, who can be served at his residence: 301 Hedwig Street, Houston, Tx, 77024.  At all times material herein, until 11/4/2019, defendant Spence was the Executive Vice President and Chief Financial Officer of McDermott International.

5.  The 10 John/Jane Doe defendants, if any, will be identified through the process of discovery.

## JURISDICTION AND VENUE

6.  This Court has personal jurisdiction over the defendants because they (a) have, at all material times, conducted business in Texas; (b) have committed tortuous actions, in whole or in part, in Texas; and (c) have sufficient minimum contact with Texas such that the assumption of jurisdiction will not offend traditional notions of fair play and substantial justice.

7.  Plaintiff seeks monetary relief of $180,000.00, plus exemplary damages, and the damages sought are therefore within the jurisdictional limit of this Court.

Unofficial Copy

8.   Venue is proper in Montgomery County, Texas, pursuant to Section 15.002(a)(2) of the TEX. CIV. PRAC. & REM. CODE because it was the residence of one or more of the defendants at the time plaintiff's causes of action accrued.

## FACTUAL ALLEGATIONS

**Defendants Dickson and Spence Have a History of Being Accused of Making Material Misrepresentations and Omissions in Their Communications to McDermott Shareholders.**

9.   The following is alleged on information and belief.

10.   On November 15, 2018, a complaint was filed in the United States District Court for the Southern District of Texas seeking class action status on behalf of purchasers of McDermott International ("McDermott") common stock and alleging damages on their behalf arising from McDermott's allegedly false and misleading statements during the class period from January 24, 2018, to October 30, 2018.  The case is captioned *Edwards v. McDermott International, Inc., et al,* No. 4:18-cv-04330.  The defendants in the case are McDermott; David Dickson, McDermott's President and CEO; and Stuart Spence, McDermott's Chief Financial Officer (who left McDermott on 11/4/2019).  The plaintiff in that case has alleged that the defendants made material misrepresentations and omissions about the integration of the CB&I (Chicago Bridge and Iron) business, certain CB&I projects and their fair values, and McDermott's business, prospects and operations.

Unofficial Copy

11.  On January 14, 2019, a related action was filed in the United States District Court for the Southern District of Texas seeking class action status on behalf of all shareholders of McDermott common stock as of April 4, 2018, who had the right to vote on the McDermott/CB&I Combination, captioned: *The Public Employees Retirement System of Mississippi v. McDermott International, Inc., et al,* No.4:19-cv-00135.  The plaintiff in that case has alleged the defendants, which include Mr. Dickson and Mr. Spence, made material misrepresentations and omissions in the proxy statement McDermott used in connection with the Combination. The court granted McDermott's motion to consolidate the two actions on February 22, 2019.  The case is ongoing.

12.  On July 26, 2019, the Securities and Exchange Commission ('SEC') sent a letter, accompanied by subpoenas, notifying McDermott International that it is under investigation for failing to properly disclose projected losses on its Cameron LNG (Hackberry) project (which was part of CB&I when McDermott acquired that company).  Furthermore, McDermott failed to disclose the SEC investigation to any of its lenders before they had agreed to provide $1.7 billion of additional financing to the company on or about October 21, 2019, as discussed below.

Unofficial Copy

## Timeline of Events

13.  The following is alleged on information and belief.

14.  On March 22, 2019, 2019 Proxy materials were sent to McDermott shareholders.  The materials contained a letter from Mr. Gary Luquette, McDermott's Independent Chairman of the Board.  The letter, which was reviewed and approved by the defendants herein prior to being published, contained glowing statements concerning McDermott's outlook.  For example:

"Today, we are a fundamentally different and much larger company, as compared to where we were at the end of 2017, with a formidable new presence in significant onshore markets."

"Thanks to the tremendous amount of hard work and dedication of our Board, executive management and employees during 2018, we are ahead of schedule in becoming a premier, fully integrated, global engineering, procurement, construction and installation ("EPCI") provider, with product solutions spanning onshore and offshore from concept to commissioning."

"Looking forward to 2019, our end markets are growing.  We are continuing to see recovery in the offshore and subsea, LNG and downstream markets, with the highest McDermott revenue opportunity pipeline in our history.  Today, McDermott is well-positioned to offer the technology-led, vertically-integrated solutions that we know our customers are seeking.  We believe that McDermott

Unofficial Copy

has the right strategy in place to play a major role in the next chapter of global energy solutions."

15.  At the time the letter was published, the defendants were aware that McDermott's Cameron LNG (liquefied natural gas) project had estimated probable losses of over $1 billion (approximately $3.50 per share) that would need to be recognized in the coming quarters.

16.  Nowhere did the proxy materials warn of any impending danger to the outlook for McDermott.  However, even though McDermott management was being exceedingly well compensated (e.g.- defendant Dixon's total remuneration in 2018 exceeded $11 million, most of which came from stock awards, and defendant Spence's total 2018 remuneration was $3.6 million, most of which also came from stock awards), the Board recommended a substantial increase in the company's Long-Term Incentive Plan which would further enrich company insiders through stock grants.

17.  On April 29, 2019, barely a month after Chairman Luquette's March 22, 2019, letter and  just days before McDermott's May 2, 2019, annual shareholder meeting, the company released its first quarter 2019 report.  The report, reviewed and approved by the defendants before being published, was effusive in its praise for the results the company had achieved and provided no commentary or evidence that anything was amiss at McDermott.  In part, the report stated:

Unofficial Copy

18.   "More broadly, the company continues to exhibit commercial success in a steadily improving market.  In particular, McDermott reported a book-to-bill ratio of 3.0x, a new award total of $6.7 billion and a 41% sequential-quarter improvement in backlog."

19.   In the report, management released its full-year 2019 earnings guidance, which predicted strong second-half 2019 results.  The guidance predicted that McDermott's full year earnings per share would be $.90

20.   Nowhere in the first quarter report or the full-year guidance were shareholders informed of the significant losses being accrued by the company's Cameron LNG project.  These losses were not included in the first quarter results or in the full-year projections.

21.   McDermott held its annual shareholders meeting on May 2, 2019.  All reports, slides and presentations given to shareholders at the meeting were reviewed and approved in advance of the meeting by the defendants.  The meeting continued the good-news reporting that had taken place in prior months.  For example, the company showed a slide to shareholders which stated:

"Post-Combination, McDermott is a fundamentally different and much larger company as compared to where we were in 2017, with significant earnings potential."

Unofficial Copy

22.  The slide showed dramatic increase in revenues, backlog and order intake from the prior year.

23.  At no time during the meeting were the company's shareholders informed of the significant losses being accrued by the company's Cameron LNG project.  These losses were not discussed during the meeting by the defendants or in any report, slide or presentation given during the meeting.

24.  **During the meeting, the shareholders approved the Board-recommended change to the company's long-term incentive plan which significantly increased the potential remuneration of the defendants and other company insiders.**

25.  In July, 2019, just weeks after the May 2, 2019, annual shareholder meeting in which McDermott shareholders approved a substantial increase in the company's long-term incentive plan, McDermott management undertook a study (the "Financing Case") the purpose of which was to consider a change in the capital structure of the company.  This study, though material, was not disclosed to shareholders or the SEC.

26.  The "Financing Case" was undertaken because the company, with the prior knowledge and at the direction of  the defendants, was about to start reporting the huge losses that had been accruing on the Cameron LNG project.  Reporting said losses would significantly impair the company's cash flow and would threaten

Unofficial Copy

the company's loan covenants.  The company therefore decided to look for sources of capital to "finance" increases in working capital and serve as a buffer to its loan covenants.

27.  The undertaking of the "Financing Case" and the reasons for it were highly material but, with the prior knowledge and at the direction of the defendants, no public announcement was made and company's shareholders were left in the dark about the Financing Case and very serious earnings, cash flow and loan covenant issues the company faced.

28.  On July 29, 2019, McDermott released its second quarter 2019 results which unexpectedly showed the company lost $146 million during second quarter 2019 versus a net income of $47 million during the prior year period.  In addition, the company, with the prior knowledge and at the direction of the defendants, reduced its full year guidance which now predicted the company would **lose** $1.65 per share instead of making $.90 a share in 2019, a negative swing of $2.55 a share from the first quarter, 2019, guidance.

29.  The decline in full-year 2019 guidance would have been even greater but for the company's unexplained announcement, approved in advance of publication by the defendants, that operating income was going to achieve a "sharp improvement" during the fourth quarter of 2019.  The company's anticipated

Page 9

Unofficial Copy

improvement was therefore shifted by the defendants from second-half 2019 to fourth quarter 2019.

30.  In a statement made in the second quarter report, defendant Dickson gave no indication that McDermott faced significant difficulty in the months ahead, including impending earnings, cash flow and loan covenant problems.  To the contrary, Mr. Dickson stated in the July 29, 2019, second quarter report:

 "Although the company reported mixed results for the second quarter of 2019, we are encouraged by the record-setting level of backlog and new awards. We are also pleased with the visibility we have into expected 2020 revenues, of which $7.4 billion was already in backlog as of the end of the second quarter of 2019. This is well above the $4.2 billion of 2019 revenues we had in backlog this time last year. This strong market posture continues to demonstrate the benefits of our combination with CB&I and the opportunities available in a strong market environment. McDermott has booked more than $19 billion of awards since the May 2018 combination with CB&I, demonstrating continued customer confidence and healthy end markets. Importantly, as of the end of the second quarter of 2019, legacy CB&I projects represented only about 14% of the current backlog. All the awards we've won since the combination were booked under McDermott's stringent risk management protocols, which we believe pave the way for us to deliver consistent margin performance through the application of the One McDermott Way in the execution of this backlog. The company continues to remain on schedule executing the Cameron and Freeport LNG projects. The Cameron settlement agreement we signed earlier this month is a testament to the mutually productive relationship we have built with this customer since the combination – and the associated incentives provided a meaningful contribution to our second quarter results."

"...we expect to see a sharp improvement in the company's operating income by the fourth quarter of this year, as we build momentum heading into 2020."

"Looking ahead, our revenue opportunity pipeline remains near a historic high and, more specifically, we are seeing steady upward momentum in a number of key areas. For example, in the strategic area of front end engineering design (FEED), our awards through the first half of 2019 are already more than double what we

Page 10

Unofficial Copy

won in all of 2018 – in terms of both man-hours and dollar value – and that's especially important as FEED work positions us for EPC opportunities. This year we have booked $1.5 billion of EPC work as a result of FEED work that's been done since the combination. Further, in our Technology business, we are forecasting the number of license sales to increase by 25% this year versus 2018. One of the recent highlights was our selection as the Master Licensor by S-OIL, an affiliate of Saudi Aramco, in support of its ethylene cracker and downstream petrochemicals complex, being developed as a major expansion of S-OIL's existing refinery in South Korea. Our Technology business gives us unparalleled insight into upcoming EPC opportunities, and we see roughly $40 billion of potential EPC pull-through opportunities in the refining and petrochemical markets over the next five years. We believe the petrochemical market, in particular, is poised for another wave of investment in the next 12 to 24 months, with world ethylene capacity expected to increase by more than 40% between 2019 and 2028."

31.   The July 29, 2019, second quarter report was reviewed and approved by the defendants in advance of its publication.  Nowhere in the July 29, 2019, second quarter report did the defendants alert shareholders to the fact that McDermott had already begun a material analysis (the "Financing Case") designed to consider a change in the capital structure of the company.  And nowhere in the July 29, 2019, second quarter report did the defendants alert shareholders to the fact that they were aware that the Cameron LNG project, and other legacy projects as well, were going to continue experiencing substantial losses in the months ahead which would cause the company to incur huge losses, a cash flow drain and loan covenant problems.

32.   Sometime before mid-September, 2019, the Financing Case had been concluded and its result was that McDermott had an avenue to cure its impending financial problems without the need to declare Chapter 11 bankruptcy (business

Unofficial Copy

reorganization).  It is likely the Financing Case included the selling of valuable

company assets such as Lummus Technology to shore up McDermott's balance

sheet.  (McDermott has reported that Lummus is worth upwards of $3 billion.)

"Likely" is used herein because the company never reported the actual details of

the Financing Case.  Neither did the company, with the prior knowledge and at the

direction of the defendants, report to shareholders the highly material fact that the

Financing Plan represented a path to salvation for the company and its

shareholders.

33.  The Financing Case, if implemented, would have prevented McDermott

from having to seek Chapter 11 bankruptcy reorganization.  Why wasn't it

implemented?  Because shortly after the Financing Case was finished, rumors

began to fly in the press that the company was facing financial difficulty and its

stock price collapsed from $6.08 on September 16, 2019, immediately before the

rumors, to $2.16 on September 18, 2019, after the rumors came out.

34.  Literally within hours of the company's stock price losing approximately

two-thirds of its value, McDermott, with the prior knowledge and at the direction

of the defendants, decided to scrap the Financing Plan and declare Chapter 11

bankruptcy.  At the company's Chapter 11 bankruptcy plan confirmation hearing in

the U.S. District Court for the Southern District of Texas, Southern Division, on

March 12, 2020, a company insider with intimate knowledge of the decision-

Unofficial Copy

making process, testified that the reason the company decided to declare Chapter

11 **was because its stock price had collapsed.**

35.  Even though the implementation of the Financing Case would have

saved the company, the company, with the prior knowledge and at the direction of

the defendants, chose Chapter 11 and the subsequent losses, pain and suffering that

would cause for its thousands of McDermott shareholders because the company's

stock price had collapsed.  Why?  Because, as has been noted herein, the majority

of defendant Dickson's and defendant Spence's compensation, as well as a large

part of other insider compensation, at McDermott comes from the award of

McDermott shares.  Declaring bankruptcy would cancel the outstanding shares of

every McDermott shareholder, including the shares owned by the defendants.  But

new shares would be issued in the reorganized company (which would come out of

bankruptcy with a high share value) and the bankruptcy plan calls for defendant

Dickson and other corporate insiders to be granted 7.5% of the new shares.

Assuming the number of pre-bankruptcy shares outstanding (193 million), a

conservative post-bankruptcy share price of $25 and 10% of the post-bankruptcy

7.5% insider share allotment goes to defendant Dickson, defendant Dixon stands to

gain over $36,000,000 from a McDermott bankruptcy (193,000,000 x $25 x .10 x .

075 = $36,187,000), not including his annual salary.  So the plan implemented by

defendants Dickson and Spence was, "Company goes bankrupt, we get rich."

Unofficial Copy

36.  Going bankrupt so company insiders can dramatically improve their financial positions on the backs of regular shareholders who lose their life savings is not a legitimate reason for declaring Chapter 11.  There is no statute or case law that allows a company to declare bankruptcy because its stock price has gone down.

37.  Even though the company had decided in mid-September to declare Chapter 11, the company, with the prior knowledge and at the direction of the defendants, made no notice of its intentions to shareholders or anyone else.  The company, with the prior knowledge and at the direction of the defendants, hid the fact that it had made the decision to declare Chapter 11 bankruptcy from its shareholders.  And while they were doing this, shareholders were buying shares of the company at what they considered to be bargain-basement prices because the company had not disclosed its decision to go bankrupt or the extent of its financial problems.

38.  On September 18, 2019, the company, with the prior knowledge and at the direction of the defendants, issued a terse press release stating that::

"McDermott International, Inc., routinely hires external advisors to evaluate opportunities for the Company.  The Company is taking positive and proactive measures, as we have done in the past, intended to improve its capital structure and the long-term health of its balance sheet."

39.  The press release made no mention of the highly material fact that the company was actively considering or had already decided to declare bankruptcy.

Unofficial Copy

40.  On September 20, 2019, the company, with the prior knowledge and at the direction of the defendants, issued a press release stating that the company had hired Evercore to help it sell Lummus Technology.  The press release made no mention of the highly material fact that the company had already decided to declare bankruptcy.

41.  On October 21, 2019, McDermott, with the prior knowledge and at the direction of the defendants, issued a press release that it had secured financing of $1.7 billion, subject to certain terms, that the company would use to finance working capital and support the issuance of required performance guarantees on new projects.  The tone and tenor of the press release was that the company's liquidity problems had been solved.  Nowhere in the press release was the possibility of bankruptcy even raised.  The press release included a statement from David Dickson, McDermott President and CEO, that:

"This new credit agreement is a continued signal from our lenders that they support McDermott, our underlying business growth strategy and ability to achieve a long-term balance sheet solution.  The Agreement provides near-term liquidity for the Company to manage working capital and provide performance guarantees on expected new awards.  We remain focused on serving our customers' needs, supporting our dedicated employees and maintaining our valued relationships with our subcontractors, suppliers and other business counterparties, all as part of our efforts to enhance out position as a premier, fully integrated provider to technology, engineering and construction solutions to the energy industry."

42.  The press release reiterated McDermott's plan to sell Lummus Technology.

Unofficial Copy

43.  The press release also announced that McDermott had withdrawn it previously stated guidance for full-year 2019.  No new guidance for full-year 2019 was given.  Nowhere in the press release was the highly material fact that McDermott had already decided to declare bankruptcy.

44.  **McDermott failed to disclose that the company was under investigation by the SEC, as noted above, to any of its lenders before they had agreed to provide the $1.7 billion of additional financing to the company.**

45.  On November 4, 2019, McDermott, with the prior knowledge and at the direction of the defendants, released its third quarter results in which it reported a net loss of $1.887 billion, or $10.37 per share.  Most of the loss was due to goodwill and intangible asset write-downs of $1.513 billion recommended by its financial advisors to completely eliminate shareholder retained earnings in advance of McDermott's now planned, but unannounced, Chapter 11 bankruptcy filing. After the write-downs, shareholders' equity in the company was a negative $1.380 billion.  Absent the write-downs, the company reported a loss of $1.80 per share.

46.  The write-down of goodwill and intangible assets was unnecessary and done only for the purpose of fraudulently wiping out shareholder equity so that shareholders could not claim they had a stake in the company or any ownership claims during the planned (but unannounced) bankruptcy filing.

Unofficial Copy

47.  Even though the company had enough liquidity to make the payment, the third quarter report also notified shareholders that the company declined to make the $69 million November 1, 2019, interest payment on its 10.625% senior notes due in 2024.  Instead, the company elected to enter into the 30-day grace period with respect to the payment.

48.  Prior to the third quarter report, the company, with the prior knowledge and at the direction of the defendants, had not made any announcement to shareholders that the third quarter results were going to be terrible.  As noted herein, on October 21, 2019, the company, with the prior knowledge and at the direction of the defendants, issued a press release which, among other things, withdrew the company's full-year, 2019, guidance without updating said guidance even though the company, with the prior knowledge and at the direction of the defendants, had forecast a "sharp improvement" for the fourth quarter just weeks earlier.  Up until two weeks before the November 4, 2019, earnings report, shareholders had no idea that the company was going to wipe out shareholders' equity and instead relied on the misleading and fraudulent full-year 2019 earnings guidance and other fraudulent and misleading statements that they had received with the prior knowledge and at the direction of the defendants.

49.  On November 4, 2019, the day of the third quarter earnings announcement, McDermott reported that defendant Stuart Spence, the company's

Unofficial Copy

Chief Financial Officer whose compensation was $3.6 million in 2018 had resigned "to pursue other opportunities".  Mr. Spence's resignation date was actually November 4, 2019, the date of the disastrous third quarter earnings announcement.  As discussed above, defendant Spence was already the defendant in litigation against him, David Dickson and McDermott which, among other things, accused him of making false and misleading statements relating to McDermott's finances.

50.  Defendant Spence also received a severance payment of $866 thousand and other benefits from McDermott in return for his release of all claims against McDermott and its employees and agents, **including any such matter arising from the negligence, gross negligence or reckless, willful or wanton misconduct of any of the Releasees**.

51.  The release does not include any claims for indemnification for suits filed against Defendant Spence by outside parties during his tenure at McDermott.

52.  The release has a non-disparagement agreement:

"Employee shall refrain from making, directly or indirectly, in any public or private communication (whether oral, written or electronic), any criticisms or negative or disparaging comments or other statements about the Company or any of the other Releasees, or about any aspect of the respective businesses, operations, financial results or prospects of any of the Company Entities, including comments relating to Employee's termination of employment. Notwithstanding the foregoing, it is understood and agreed that nothing in this Section 4(b) or in Section 5 hereof is intended to: (i) prevent Employee from testifying truthfully in any legal proceeding brought by any governmental authority or other third party or interfere with any obligation Employee may have to cooperate with or provide information

Unofficial Copy

to any government agency or commission, subject to compliance with the provisions of Section 5(c) hereof, if applicable; (ii) prevent Employee from advising Employee's spouse of the terms and conditions of this Agreement; or (iii) prevent Employee from consulting with Employee's own legal counsel, as contemplated by Section 7 of this Agreement."

53. Most importantly, the release has a non-disclosure agreement

prohibiting defendant Spence from disclosing any information to McDermott

analysts or shareholders:

" Employee will not disclose any of the Confidential Information to any securities analysts, shareholders, prospective investors, customers, competitors or any other third party, including any third party who has or may express an interest in acquiring any of the Company Entities or all or any significant portion of their respective outstanding equity securities or assets. If Employee is legally required to disclose any Confidential Information, Employee shall, to the extent not prohibited by applicable law or legal process, promptly notify the Company in writing of such requirement so that the Company or any of the other Company Entities may seek an appropriate protective order or other relief or waive compliance with the nondisclosure provisions of this Section 5 with respect to such Confidential Information. To the extent not prohibited by applicable law, Employee agrees to cooperate with and not to oppose any effort by the Company or any other Company Entity to resist or narrow such request or to seek a protective order or other appropriate remedy. In any such case, Employee will: (i) disclose only that portion of the Confidential Information that, according to written advice of Employee's counsel, is required to be disclosed; (ii) use reasonable best efforts to obtain assurances that such Confidential Information will be treated confidentially; and (iii) to the extent not prohibited by applicable law, promptly notify the Company in writing of the items of Confidential Information so disclosed."

54. Defendant Spence may have to pay back McDermott for any payments made to him if he breaches the agreement or even if a court or arbitrator finds it invalid or unenforceable:

"Employee agrees that in the event that (i) Employee breaches any term of Sections 3 or 4 hereof or this Section 5, or (ii) Employee challenges the validity of all or any part of this Section 5, and all or any part of this Section 5 is found invalid or unenforceable for any reason whatsoever by a court of competent

Unofficial Copy

jurisdiction or an arbitrator in a proceeding between Employee and a Company Entity, in addition to any other remedies at law or in equity the Company may have available to it, the Company shall not be obligated to make any of the payments and may cease to make such payments or to provide for any of the benefits specified in Section 2 hereof, and shall be entitled to recoup from Employee any and all of the value of the payments and benefits provided pursuant to Section 2 hereof that have vested or been paid pursuant to that Section."

55.  It can be inferred from the above that McDermott may not want the details of its financial operations to become public and that Defendant Spence may know something that McDermott is paying him not to discuss.

56.  McDermott did not release fourth quarter 2019 results.  However, McDermott advisors Evercore, Kirkland & Ellis and AlixPartners estimated that McDermott experienced a fourth quarter operating loss of $141 million, or approximately $.77 per share, even though the defendants had been saying as late as July 29, 2019, (second quarter 2019 earnings release) that operating income was going to achieve a **"sharp improvement"** during the fourth quarter of 2019.

57.  On January 21, 2020, McDermott announced that it was filing a Prepackaged Chapter 11 proceeding in the United States Bankruptcy Court for the Southern District of Texas (Case number 20-30336).  As part of the filing, the company announced that it was proposing that all of the existing outstanding shares of McDermott would be cancelled (declared worthless).

58.  Part of McDermott's bankruptcy Plan filed with the court called for the issuance of new common stock.  **The Management Incentive Plan included in**

Page 20

**the company's bankruptcy Plan calls for the reservation of 7.5% of the new**

**stock to be used in grants to McDermott management and the company's**

**Board of Directors.  In one fell swoop, McDermott management wiped out all**

**the current shareholders and gave itself and its Board 7.5% of the**

**recapitalized company. As discussed above, a conservative estimate of**

**defendant Dickson's windfall from receiving shares of the recapitalized**

**company is approximately $36,000,000.**

59.  Prior to the January 21, 2020, announcement, McDermott, with the prior

knowledge and at the direction of the defendants, had made no announcements to

shareholders that it was even considering bankruptcy or that it had decided to

declare bankruptcy in mid-September, 2020.  Throughout the entirety of 2019 and

up until the January 21, 2020, bankruptcy announcement, the company, with the

prior knowledge and at the direction of the defendants, produced and published a

continuous stream of positive press releases touting the continued and unparalleled

success of the company and its operations.  Not one press release informed

shareholders of difficulties the company was experiencing or of the company's

decision to declare bankruptcy in mid-September, 2019.

60.  After the January 21, 2020, announcement, McDermott's share price fell

to a low of $.01 per share.

Unofficial Copy

61.  On February 27, 2020, plaintiff filed a pleading ("plaintiff's pleading") asking the bankruptcy court to order a criminal inquiry pursuant to 18 U.S.C. Section 158(d) and 18 U.S.C. Section 3057 into alleged improper, criminal, activities pursued by McDermott and its advisors before and during the pendency of the bankruptcy proceedings.  The defendants were made aware of the pleading by their bankruptcy attorneys.  Plaintiff's pleading states, in part:

"....Van Deelen alleges that McDermott, certain members of its management and its advisors, violated 18 U.S.C. Section 152 when they made various false oaths and accounts to the bankruptcy court, including when they claimed that McDermott had to re-equitize the company as part of its bankruptcy plan and that certain documents filed with the court were accurate; violated 18 U.S.C. Section 154 when they failed to provide the U.S. Trustee documents which showed that they had previously concluded that the company did not have to file for Chapter 11 bankruptcy and documents which showed that, once Chapter 11 bankruptcy was filed, the company did not have to re-equitize; and violated 18 U.S.C. Section157 when they filed documents with the bankruptcy court purporting to show that McDermott had to re-equitize the company in order to satisfactorily exit bankruptcy when they knew that the reason they claimed the need to re-equitize was so that they could be granted 7.5% of the company's new shares upon emergence from bankruptcy.

Van Deelen alleges that McDermott's bankruptcy plan has not been proposed in good faith and has been proposed by a means forbidden by law in violation of 11 U.S.C. Section 1129(3) because the plan calls for the cancellation of existing shares, the elimination of virtually all of the company's outstanding debt and the re-equitization of the company for the sole purpose of enriching McDermott's management and Board and not because said cancellation of shares, elimination of all debt and re-equitization of the company is necessary for the satisfactory emergence of the company from bankruptcy.

Van Deelen alleges that McDermott's bankruptcy plan discriminates unfairly and is not fair and equitable with respect to current shareholders in violation of 11 U.S.C. Section 1129 (b)(1) because it is not necessary to cancel the shares of the existing shareholders, to eliminate virtually all of the company's outstanding debt

Page 22

Unofficial Copy

and to re-equitize the company in order for the plan to be viable.  The plan calls for the cancellation of existing shares, the elimination of virtually all of the company's outstanding debt and the re-equitization of the company for the sole purpose of enriching McDermott's management and Board and not because said cancellation of shares, elimination of all debt and re-equitization of the company is necessary for the satisfactory emergence of the company from bankruptcy.

Van Deelen, pursuant to 18 U.S.C. 158(d) and 18 U.S.C. Section 3057, moves the court to refer for investigation the claims of McDermott, certain members of its management and its advisors that McDermott has to re-equitize the company in order to satisfactorily exit bankruptcy.

WHEREFORE, Van Deelen respectfully requests that the Court sustain his opposition and objection to the confirmation of the Debtor's Plan, that the Court grant Van Deelen's proposed Modified Plan, in whole or in part, that the Court order an investigation pursuant to 18 U.S.C. Section 158(d) and 18 U.S.C. Section 3057, and that the Court enter the Order, substantially in the form attached to this Motion (Exhibit 31), granting the relief requested in this Motion and granting such other and further relief as is appropriate under the circumstances."


62.  On March 12, 2020, Shortly after plaintiff's pleading was filed, plaintiff

attended McDermott's Plan Confirmation Hearing.  Also in attendance were

defendants Dickson and Spence.  After the hearing, plaintiff informed defendant

Dickson that plaintiff was going to file suit against him in state court concerning

the improprieties defendant Dickson had engaged in with respect to his

fraudulently directing and engaging in McDermott's inappropriate, unlawful,

bankruptcy petition.

63.  On March 17, 2020, McDermott, with the knowledge and prior approval

by defendant Dickson, filed a motion with the bankruptcy court seeking an order

asking that shareholder plaintiff be "prohibited from further contact with the

debtors [i.e. - McDermott International], their current or former officers, directors,

Unofficial Copy

and employees, their counsel or other professionals and their families."  Said

motion was made in retaliation for plaintiff's pleading filed on February 27, 2020,

in the U.S. Bankruptcy Court for the Southern District of Texas and for plaintiff's

informing defendant Dickson on March 12, 2020, that plaintiff intended to sue him

in state court.  The motion was intended to prevent and chill plaintiff from

pursuing plaintiff's pleading and plaintiff's planned state court suit against

defendant Dixon.  The motion has in fact chilled plaintiff from pursuing his

plaintiff's pleading.  Plaintiff has not pursued his plaintiff's pleading and plaintiff

has not attempted to contact McDermott's management team since McDermott's

March 17, 2020, motion was filed even though the bankruptcy court subsequently

denied the motion.  Neither has plaintiff attempted to contact McDermott's current

or former officers, directors, employees, counsel or other professionals, even

though other McDermott shareholders are afforded the right to do so.

64.  The defendants owed and owe a fiduciary duty to plaintiff which

includes, but is not limited to, not to fraudulently manipulate McDermott's

financial statements and results; not to fraudulently cause the company to file for

bankruptcy protection; not to fail to disclose to the company's lenders that

McDermott was under investigation by the SEC before accepting $1.7 billion of

additional financing from the lenders; to keep plaintiff informed concerning any

adverse factors which are expected to negatively impact earnings; to keep plaintiff

Page 24

Unofficial Copy

informed concerning any bankruptcy plans the company has and not to attempt to

chill and effectively prevent plaintiff from contacting McDermott International and

its management team.

## COUNT 1
## CONVERSION

65.  Plaintiff repeats and realleges each and every allegation contained above

as if fully set forth herein.

66.  At all times material, the plaintiff owned 30,000 shares of McDermott

International common stock.

67.  The defendants unlawfully and without authorization assumed and

exercised dominion or control over plaintiff's shares to the exclusion of, or

inconsistent with, the plaintiff's rights as a shareholder.

68.  The conversion included, but was not limited to, unnecessarily writing

down goodwill and intangible assets for no other purpose than destroying

shareholder equity in advance of a planned, but unannounced, bankruptcy filing;

unnecessarily declaring Chapter 11 bankruptcy for no other purpose than enriching

defendant Dixon and other company insiders; announcing that the company was

going to cancel the stock of plaintiff and other shareholders in connection with the

unnecessary Chapter 11 bankruptcy; and chilling plaintiff from exercising his

rights as a shareholder to contact company management and other personnel by

asking the bankruptcy court to prevent plaintiff from doing so.

Unofficial Copy

69.  Plaintiff was injured by the conversion which impaired plaintiff's rights as a shareholder and destroyed the value of plaintiff's shares.

70.  Plaintiff seeks actual damages of $180,000.00 and exemplary damages in an amount determined by the trier of fact.

### COUNT 2
### COMMON LAW FRAUD

71.  Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.  Count 2 is brought pursuant to Texas common law.

72.  The defendants made or caused to be made statements about McDermott International, its performance and its financial condition which they knew were false, inaccurate or misleading.

73.  The defendants failed to disclose the material facts necessary to make the statements they and their representatives made, in light of the circumstances under which they were made, not misleading.

74.  The defendants did not have a reasonable basis for their alleged false statements and omissions and engaged in practices and a course of business that operated as a fraud and deceit upon the purchasers of McDermott International common stock.

75.  The defendants and their representatives, with prior knowledge and approval of the defendants, individually and in concert, directly and indirectly, engaged and participated in a continuous course of conduct to conceal adverse

Unofficial Copy

material information about McDermott International, its serious problems, and its effect on McDermott's financial condition.

76.  The defendants and their representatives, with prior knowledge and approval of the defendants, individually and in concert, directly and indirectly, engaged and participated in a continuous course of conduct to conceal the fact that the implementation of the "Financing Case" would solve the company's cash flow, loan covenant and other problems and avoid the need for the company to declare bankruptcy.

77.  Such material misrepresentations and omissions were done knowingly or with recklessness, and without a reasonable basis, for the purpose and effect of concealing the true status of McDermott's financial condition and of the "Financing Case".

78.  The defendants and their representatives, with prior knowledge and approval of the defendants, made the misrepresentations and omissions of material facts set forth herein with the intent to induce others, including the plaintiff, to rely on such misrepresentations and omissions of material fact.

79.  Plaintiff reasonably relied on the defendants' fraudulent and reckless misstatements and omissions in connection with his purchases and retention of McDermott International common stock.  Plaintiff relied on these statements both directly to the extent they were personally made to plaintiff and indirectly to the

Unofficial Copy

extent they artificially inflated the market price.  But for the defendants' wrongful conduct, plaintiff would not have purchased and retained his McDermott International stock.

80.  As a direct and proximate result of defendants' wrongful conduct, plaintiff suffered damages in connection with his purchases and his retention of McDermott International common stock in excess of the jurisdictional limits of this Court.

81.  Pursuant to Section 41.003 of the Texas Civil Practice and Remedies Code, plaintiff is entitled to recover exemplary damages in an amount to be determined by the trier of fact.

## COUNT 3
## STATUTORY FRAUD

82.  Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.  Count 3 is brought pursuant to Texas Business & Commercial Code Section 27.01.

83.  The defendants made or caused to be made statements about McDermott International, its performance, its financial condition and its outlook which they knew were false.

84.  The defendants made these misrepresentations of material fact to investors, including plaintiff, for the purpose of inducing them to rely on such

Unofficial Copy

misrepresentations of material fact to purchase and/or retain McDermott International stock.

85.  Despite knowing that these statements were false, the defendants failed to disclose the falsity of these statements to plaintiff, investors and regulatory authorities.

86.  Plaintiff reasonably relied on the defendants fraudulent misstatements in connection whit his purchases of McDermott stock.  Plaintiff relied on these statements both directly to the extent they were personally made to plaintiff and indirectly to the extent they artificially inflated the market price.  But for the defendants' wrongful conduct, plaintiff would not have purchased and retained his McDermott International stock.

87.  The defendants made or caused to be made statements about McDermott's need to declare bankruptcy which they knew were false.

88.  The defendants made these misrepresentations of material fact to investors and regulatory authorities so that they could reap tens of millions of dollars in inappropriate, unearned, windfall stock grants and salary increases as the result of the bankruptcy and recapitalization of McDermott International.

89.  Despite knowing that these statements were false, the defendants failed to disclose the falsity of these statements to plaintiff, investors and regulatory authorities.

Unofficial Copy

90.  As a direct and proximate result of the defendants' wrongful conduct, plaintiff suffered damages in connection with his purchases and retention of McDermott International stock in excess of the jurisdictional limits of this Court.

91.  As a direct and proximate result of their false statements, the individual defendants benefitted, or will benefit, from the inflated stock price and the inappropriate, unearned, windfall stock grants and salary increases they received, or will receive, as the result of the bankruptcy and recapitalization of McDermott International.

92.  Pursuant to Texas Business & Commercial Code Sections 27.01(c)-(d), plaintiff is entitled to recover exemplary damages in an amount to be determined by the trier of fact.

93.  Pursuant to Texas  Business & Commercial Code Section 27.01(e), plaintiff is entitled to recover reasonable and necessary attorney's fees, expert witness fees, costs for copies of depositions and costs of court.

## COUNT 4
## NEGLIGENT MISREPRESENTATION

94.  Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.  Count 4 is brought pursuant to Texas common law.

95.  The defendants, individually and through their representatives, negligently made false and misleading representations to the plaintiff and failed to disclose material facts to the plaintiff.

Page 30

96.  The defendants made these negligent misrepresentations and omissions of material fact to plaintiff for the purpose of inducing plaintiff to rely on such misrepresentations and omissions of material fact to purchase and/or to retain McDermott International common stock.

97.  Plaintiff justifiably relied on the defendants' misrepresentations and omissions of material fact in purchasing and retaining his McDermott International common stock.

98.  Plaintiff would not have purchased McDermott International stock if plaintiff had been provided accurate and not misleading information by the defendants about the company, its outlook, its financial condition and the defendants plan to wrongly take the company into bankruptcy.

99.  As a direct and proximate result of the defendants' misrepresentations and omissions of material fact, plaintiff suffered damages in connection with his purchase and/or retention of McDermott International common stock in excess of the jurisdictional limits of this Court.

## COUNT 5
## BREACH OF FIDUCIARY DUTY

100.  Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

101.  The plaintiff and each defendant had a fiduciary relationship.

102.  The defendants breached their fiduciary duties to the plaintiff.

Unofficial Copy

103.  The defendants' breaches proximately caused injury to the plaintiff.

104.  The defendants' breaches resulted in benefits to the defendants.

105.  Plaintiff seeks actual damages in excess of the jurisdictional limits of this Court and exemplary damages in an amount to be determined by the trier of fact.

## COUNT 6
## CONSPIRACY

106.  Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

107.  The defendants were members of a combination of two or more persons.

108.  The object of the combination was to accomplish an unlawful purpose and/or a lawful purpose by unlawful means.

109.  The members had a meeting of the minds on the object or course of action.

110.  One of the members committed an unlawful, overt act to further the object or course of action.

111.  The plaintiff suffered injury as a proximate result of the wrongful act.

112.  Plaintiff seeks actual damages in excess of the jurisdictional limits of this Court and exemplary damages in an amount to be determined by the trier of fact.

Unofficial Copy

## DISCOVERY RULE AND FRAUDULENT CONCEALMENT

113.  Plaintiff asserts all applicable state statutory, common law and contractual rights and theories related to the tolling and/or extension of any applicable statute of limitations, including equitable tolling, delayed discovery, discovery rule, and/or fraudulent concealment.

## JURY DEMAND

114.  Plaintiff demands a trial by jury on all issues so triable.

## PRAYER

WHEREFORE, Plaintiff prays that defendants be cited to appear herein and, after a trial on the merits, that the Court enter judgment awarding plaintiff the following:

1.  actual damages;

2.  exemplary damages;

3.  costs;

4.  pre-judgment and post-judgment interest as allowed by law; and

5.  all such other and further relief, both general and special, at equity and at law, to which plaintiff may be justly entitled.

Unofficial Copy

Respectfully submitted,


/s/ Michael Van Deelen
Michael Van Deelen
16215 Friar Circle
Spring, TX 77379
832-562-0723
michaelvandeelen@gmail.com

Plaintiff

Unofficial Copy

# Document 2

Received and E-Filed for Record
6/23/2020 11:16 AM
000033
Melisa Miller, District Clerk
Montgomery County, Texas
Deputy Clerk, Kristan Weesner-Malo



# Request for Service
## Montgomery County District Clerk

CASE NUMBER: 20-06-07348   CURRENT COURT: Montgomery County - District Clerk

Name(s) of Documents to be served: 1. Plaintiff's Original Petition   2. Citation

FILE DATE of document(s) to be served: 6/23/2020  Month/Day/Year

SERVICE TO BE ISSUED ON (Please List Exactly as The Name Appears in The Pleading to Be Served):

Issue Service to: Scott Lamb

Address of Service: 29 Watermill Ct

City, State & Zip: The Woodlands, TX 77380

Agent (if applicable): _____

☒ Check here to have citation addressed to wherever the addressee may be found.

TYPE OF SERVICE/PROCESS TO BE ISSUED: (Check the appropriate box)

☒ Citation for Personal Service
☐ Citation by Posting
☐ Citation by Publication
☐ Citation Scire Facias
☐ Writ of Garnishment
☐ Writ of Sequestration
☐ Writ of Attachment
☐ Writ of Habeas Corpus
☐ Notice of Foreign Judgment (UIFSA)
☐ Notice of Foreign Judgment (UCCJEA)     (by certified mail service)
☐ Writ of Withholding   ($15.00 - certified mail by District Clerk only)
☐ Notice of Termination of Child Support ($15.00 - certified mail by District Clerk only)

☐ Secretary of State Citation ($12.00)
☐ Highway Commission ($12.00)
☐ Commissioner of Insurance ($12.00)
☐ Capias (not an E-Issuance)
☐ Temporary Restraining Order (Family)
☐ Temporary Ex Parte Protective Order
☐ Notice of Appl. For Protective Order
☐ Notice of Hearing/Show Cause

☐ Civil Injunction/TRO
☐ Precept
☐ Subpoena
☐ Other (Please describe)

_____
_____
_____

(See additional forms for
Post Judgment Service)

SERVICE BY: (Check the appropriate box.)

☒ E-Issuance by District Clerk (No Service Copy Fees Charged) (Note:) CAPIAS is not an E-Issuance Option
*Citations returned electronically will be e-served through E-file Texas to requesting attorney/pro se.
☐ ATTORNEY PICK-UP (phone or email contact): _____
☐ MAIL to attorney at Attorney of Record's address on file in case record.
☐ CERTIFIED MAIL by District Clerk
☐ Regular Mail (only available for Expedited Foreclosures and UIFSA Foreign Judgments
☐ CIVIL PROCESS SERVER - Authorized Person to Pick-up: _____   Phone: _____
☐ OTHER, explain: _____

Issuance of Service requested by:

Attorney/Party Name: Michael Van Deelen   Bar# or ID: N/A (Pro Se)

Mailing Address: 16215 Friar Circle, Spring, TX 77379

Phone Number: 832-562-0723

Unofficial Copy



# Request for Service

## Montgomery County District Clerk

CASE NUMBER: 20-06-07348   CURRENT COURT: Montgomery County - District Clerk

Name(s) of Documents to be served: 1. Plaintiff's Original Petition
2. Citation

FILE DATE of document(s) to be served: 6/23/2020   Month/Day/Year

SERVICE TO BE ISSUED ON (Please List Exactly as The Name Appears in The Pleading to Be Served):

Issue Service to: David Dickson

Address of Service: C/o McDermott International, 757 N. Eldridge Pkwy

City, State & Zip: Houston, TX 77079

Agent (if applicable): _____

☒ Check here to have citation addressed to wherever the addressee may be found.

TYPE OF SERVICE/PROCESS TO BE ISSUED: (Check the appropriate box)

☒ Citation for Personal Service
☐ Citation by Posting
☐ Citation by Publication
☐ Citation Scire Facias
☐ Writ of Garnishment
☐ Writ of Sequestration
☐ Writ of Attachment
☐ Writ of Habeas Corpus
☐ Notice of Foreign Judgment (UIFSA)
☐ Notice of Foreign Judgment (UCCJEA)   (by certified mail service)
☐ Writ of Withholding   ($15.00 - certified mail by District Clerk only)
☐ Notice of Termination of Child Support ($15.00 - certified mail by District Clerk only)

☐ Secretary of State Citation ($12.00)
☐ Highway Commission ($12.00)
☐ Commissioner of Insurance ($12.00)
☐ Capias (not an E-Issuance)
☐ Temporary Restraining Order (Family)
☐ Temporary Ex Parte Protective Order
☐ Notice of Appl. For Protective Order
☐ Notice of Hearing/Show Cause

☐ Civil Injunction/TRO
☐ Precept
☐ Subpoena
☐ Other (Please describe)

_____
_____
_____

(See additional forms for Post Judgment Service)

SERVICE BY: (Check the appropriate box.)

☒ E-Issuance by District Clerk (No Service Copy Fees Charged) (Note:) CAPIAS is not an E-Issuance Option
*Citations returned electronically will be e-served through E-file Texas to requesting attorney/pro se.
☐ ATTORNEY PICK-UP (phone or email contact): _____
☐ MAIL to attorney at Attorney of Record's address on file in case record.
☐ CERTIFIED MAIL by District Clerk
☐ Regular Mail (only available for Expedited Foreclosures and UIFSA Foreign Judgments
☐ CIVIL PROCESS SERVER - Authorized Person to Pick-up: _____ Phone: _____
☐ OTHER, explain: _____

Issuance of Service requested by:

Attorney/Party Name: Michael Van Deelen   Bar# or ID: N/A (Pro Se)

Mailing Address: 16215 Friar Circle, Spring, TX 77379

Phone Number: 832-562-0723

Unofficial Copy



# Request for Service
## Montgomery County District Clerk

CASE NUMBER: _20-06-07348_   CURRENT COURT: _Montgomery County - District Clerk_

Name(s) of Documents to be served: _1. Plaintiff's Original Petition_
_2. Citation_

FILE DATE of document(s) to be served: _6/23/2020_  Month/Day/Year

SERVICE TO BE ISSUED ON (Please List Exactly as The Name Appears in The Pleading to Be Served):

Issue Service to: _Stuart Spence_

Address of Service: _301 Hedwig Street_

City, State & Zip: _Houston, TX 77024_

Agent (if applicable): _____

☑ Check here to have citation addressed to wherever the addressee may be found.

TYPE OF SERVICE/PROCESS TO BE ISSUED: (Check the appropriate box)

☑ Citation for Personal Service        ☐ Secretary of State Citation ($12.00)        ☐ Civil Injunction/TRO
☐ Citation by Posting                  ☐ Highway Commission ($12.00)                ☐ Precept
☐ Citation by Publication              ☐ Commissioner of Insurance ($12.00)         ☐ Subpoena
☐ Citation Scire Facias                ☐ Capias (not an E-Issuance)                 ☐ Other (Please describe)
☐ Writ of Garnishment                  ☐ Temporary Restraining Order (Family)
☐ Writ of Sequestration                ☐ Temporary Ex Parte Protective Order
☐ Writ of Attachment                   ☐ Notice of Appl. For Protective Order
☐ Writ of Habeas Corpus                ☐ Notice of Hearing/Show Cause              (See additional forms for
☐ Notice of Foreign Judgment (UIFSA)                                               Post Judgment Service)
☐ Notice of Foreign Judgment (UCCJEA)    (by certified mail service)
☐ Writ of Withholding   ($15.00 - certified mail by District Clerk only)
☐ Notice of Termination of Child Support ($15.00 - certified mail by District Clerk only)

SERVICE BY: (Check the appropriate box.)

☑ E-Issuance by District Clerk (No Service Copy Fees Charged) (Note:) **CAPIAS is not an E-Issuance Option**
*Citations returned electronically will be e-served through E-file Texas to requesting attorney/pro se.
☐ ATTORNEY PICK-UP (phone or email contact): _____
☐ MAIL to attorney at Attorney of Record's address on file in case record.
☐ CERTIFIED MAIL by District Clerk
☐ Regular Mail (only available for Expedited Foreclosures and UIFSA Foreign Judgments
☐ CIVIL PROCESS SERVER - Authorized Person to Pick-up: _____   Phone: _____
☐ OTHER, *explain:* _____

Issuance of Service requested by:

Attorney/Party Name: _Michael Van Deelen_  Bar# or ID: _N/A (Pro Se)_

Mailing Address: _16215 Friar Circle, Spring, TX 77379_

Phone Number: _832-562-0723_

Unofficial Copy

000056

# Document 3

Received and E-Filed for Record
00009 7
6/29/2020 1:09 PM
Melisa Miller, District Clerk
Montgomery County, Texas
Deputy Clerk, Vanessa Medina

# CITATION

**Cause Number: 20-06-07348**

Clerk of the Court                          Attorney Requesting Service
Melisa Miller                               Michael Van Deelen
P.O. Box 2985                               16215 Friar Circle
Conroe, Texas 77305                         Spring TX  77379

## THE STATE OF TEXAS

**NOTICE TO DEFENDANT:** You have been sued.  You may employ an attorney.  If you or your attorney does not file a written answer with the clerk who issued this citation by 10:00 a.m. on the Monday next following the expiration of twenty days after you were served this citation and petition, a default judgment may be taken against you.

To:     Scott Lamb
        29 Watermill Ct
        The Woodlands TX  77380
        **OR WHEREVER THE ADDRESSEE MAY BE FOUND**

You are hereby commanded to appear by filing a written answer to the Plaintiff's Original Petition at or before 10:00 A.M. of the Monday next after the expiration of twenty days after the date of service of this citation before the Honorable 284th Judicial District Court Montgomery County, Texas at the Courthouse of said County in Conroe, Texas.

Said Plaintiff's Original Petition was filed in said court on this the 23rd day of June, 2020 numbered 20-06-07348 on the docket of said court, and styled, Michael Van Deelen VS. David Dickson, and Stuart Spence, and Scott Lamb, and 10 John/Jane Does

The nature of plaintiff's demand is fully shown by a true and correct copy of the  Plaintiff's Original Petition accompanying this citation and made a part hereof.

The officer executing this writ shall promptly serve the same according to requirements of law, and the mandates thereof, and make due return as the law directs.

Issued and given under my hand and seal of said Court at Conroe, Texas on this the 23rd day of June, 2020.

Melisa Miller, District Clerk
Montgomery County, Texas



By: _Patricia Morrill_____
Patricia Morrill, Deputy          6/23/2020 2:07:46 PM

Unofficial Copy

# OFFICER'S RETURN

Cause No. 20-06-07348                    Court No: 284th Judicial District Court

Style: Michael Van Deelen VS. David Dickson, and Stuart Spence, and Scott Lamb, and 10 John/Jane Does

To:          Scott Lamb
Address:     29 Watermill Ct
             The Woodlands TX  77380
             OR WHEREVER THE ADDRESSEE MAY BE FOUND

Came to hand the  24 day of   June        , 20 20, at   1:31PM o'clock, and executed in   Montgomery
County, Texas by delivering to each of the within named defendants in person, a true copy of this citation with the date of delivery endorsed thereon, together with the accompanying copy of the  Plaintiff's Original Petition at the following times and places, to wit:

| Name | Date/Time | Place, Course and distance from Courthouse |
|------|-----------|---------------------------------------------|
| Scott Lamb | 6/27/2020  10:38AM | 29 Watermill Ct. The Woodlands, Texas 77380 |

Manner of service:   Personal Delivery

*And not executed as to the defendants(s)  _____
The diligence used in finding said defendant(s) being:
_____

And the cause of failure to execute this process is:
_____

And information received as to the whereabouts of said defendant(s) being:
_____

FEES:
Serving Petition and Copy   $_____              _____OFFICER

TOTAL                       $_____              _____County, Texas

                                                     By: _____, Deputy

AFFIANT
Complete if you are a person other than a Sheriff, Constable, or Clerk of the Court. In accordance with Rule 107: the officer, or authorized person who services, or attempts to serve a citation shall sign and return. The return must either be verified or be signed under penalty of perjury.

A return signed under penalty of perjury must contain the statement below in substantially the following form:
My full name is  Douglas Greene
My date of birth is   01/ 04 / 1968, and my address is
4008 Louetta Rd. #622 Spring, Texas 77388                .
I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT
Executed in  Harris                , County, State of
Texas          , on the  29  day of  June        , 20  20 .

_____
Declarant/Authorized Process Server
 PSC# 11914  Exp 3/31/2021
ID# & Exp. Of Certification

_____
Declarant/Authorized Process Server

ID# & Exp. Of Certification

SWORN AND SUBSCRIBED ON

_____
DATE

_____
NOTARY

Unofficial Copy

# Document 4

Received and E-Filed for Record
000060
7/2/2020 4:40 PM
Melisa Miller, District Clerk
Montgomery County, Texas
Deputy Clerk, Kristan Weesner-Malo

# CITATION

### Cause Number: 20-06-07348

Clerk of the Court      Attorney Requesting Service
Melisa Miller        Michael Van Deelen
P.O. Box 2985        16215 Friar Circle
Conroe, Texas 77305     Spring TX  77379

## THE STATE OF TEXAS

**NOTICE TO DEFENDANT:** You have been sued.  You may employ an attorney.  If you or your attorney does not file a written answer with the clerk who issued this citation by 10:00 a.m. on the Monday next following the expiration of twenty days after you were served this citation and petition, a default judgment may be taken against you.

To: David Dickson
   McDermott International
   757 N Eldridge Pkwy
   Houston TX  77079
   OR WHEREVER THE ADDRESSEE MAY BE FOUND

You are hereby commanded to appear by filing a written answer to the Plaintiff's Original Petition at or before 10:00 A.M. of the Monday next after the expiration of twenty days after the date of service of this citation before the Honorable 284th Judicial District Court Montgomery County, Texas at the Courthouse of said County in Conroe, Texas.

Said Plaintiff's Original Petition was filed in said court on this the 23rd day of June, 2020 numbered 20-06-07348 on the docket of said court, and styled, Michael Van Deelen VS. David Dickson, and Stuart Spence, and Scott Lamb, and 10 John/Jane Does

The nature of plaintiff's demand is fully shown by a true and correct copy of the  Plaintiff's Original Petition accompanying this citation and made a part hereof.

The officer executing this writ shall promptly serve the same according to requirements of law, and the mandates thereof, and make due return as the law directs.

Issued and given under my hand and seal of said Court at Conroe, Texas on this the 23rd day of June, 2020.

Melisa Miller, District Clerk
Montgomery County, Texas

By: *Patricia Morrill*
Patricia Morrill, Deputy    6/23/2020 2:08:01 PM

000061

# OFFICER'S RETURN

Cause No. 20-06-07348                    Court No: 284th Judicial District Court

Style: Michael Van Deelen VS. David Dickson, and Stuart Spence, and Scott Lamb, and 10 John/Jane Does

To:          **David Dickson**

Address:     **McDermott International**
             **757 N Eldridge Pkwy**
             **Houston TX  77079**

             **OR WHEREVER THE ADDRESSEE MAY BE FOUND**

Came to hand the 24 day of __June__, 20 20 at __1:31P__ o'clock, and executed in __Montgomery__ County, Texas by delivering to each of the within named defendants in person, a true copy of this citation with the date of delivery endorsed thereon, together with the accompanying copy of the  Plaintiff's Original Petition at the following times and places, to wit:

| Name | Date/Time | Place, Course and distance from Courthouse |
|---|---|---|
| David Dickson | 6/30/2020  3:05PM | 1925 Hughes Landing Blvd Parking Lot Whole Foods The Woodlands, |

Manner of service: Personally Delivered to Stephen A. Stallings Authorized Person and Sr. Director of Litigation and Disputes

**\*And not executed as to the defendants(s)** _____

**The diligence used in finding said defendant(s) being:**

_____

**And the cause of failure to execute this process is:**

_____

**And information received as to the whereabouts of said defendant(s) being:**

_____

**FEES:**

**Serving Petition and Copy**   $_____

                                                      _____**OFFICER**

**TOTAL**                       $_____

                                                      _____**County, Texas**

                                     **By:** _____**, Deputy**


**AFFIANT**

Complete if you are a person other than a Sheriff, Constable, or Clerk of the Court. In accordance with Rule 107: the officer, or authorized person who services, or attempts to serve a citation shall sign and return. The return must either be verified or be signed under penalty of perjury.

A return signed under penalty of perjury must contain the statement below in substantially the following form:

My full name is  Douglas Greene

My date of birth is  01 / 04 / 1968 , and my address is
 4008 Louetta Rd. #622 Spring, Texas 77388 .

**I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT**

Executed in Harris , County, State of
 Texas , on the  2nd day of  July , 20 20 .

**Declarant/Authorized Process Server**
 PSC#11914 Exp 3/31/2021

**ID# & Exp. Of Certification**

_____

**Declarant/Authorized Process Server**

**ID# & Exp. Of Certification**

**SWORN AND SUBSCRIBED ON**

_____

**DATE**

_____

**NOTARY**

Unofficial Copy

000062

# Document 5

Received and E-Filed for Record
000063
7/2/2020 4:41 PM
Melisa Miller, District Clerk
Montgomery County, Texas
Deputy Clerk, Kristan Weesner-Malo

# CITATION

**Cause Number: 20-06-07348**

Clerk of the Court                          Attorney Requesting Service
Melisa Miller                               Michael Van Deelen
P.O. Box 2985                               16215 Friar Circle
Conroe, Texas 77305                         Spring TX  77379

## THE STATE OF TEXAS

**NOTICE TO DEFENDANT: You have been sued.  You may employ an attorney.  If you or your attorney does not file a written answer with the clerk who issued this citation by 10:00 a.m. on the Monday next following the expiration of twenty days after you were served this citation and petition, a default judgment may be taken against you.**

To:     Stuart Spence
        301 Hedwig St
        Houston TX  77024
        **OR WHEREVER THE ADDRESSEE MAY BE FOUND**

You are hereby commanded to appear by filing a written answer to the Plaintiff's Original Petition at or before 10:00 A.M. of the Monday next after the expiration of twenty days after the date of service of this citation before the Honorable 284th Judicial District Court Montgomery County, Texas at the Courthouse of said County in Conroe, Texas.

Said Plaintiff's Original Petition was filed in said court on this the 23rd day of June, 2020 numbered 20-06-07348 on the docket of said court, and styled, Michael Van Deelen VS. David Dickson, and Stuart Spence, and Scott Lamb, and 10 John/Jane Does

The nature of plaintiff's demand is fully shown by a true and correct copy of the  Plaintiff's Original Petition accompanying this citation and made a part hereof.

The officer executing this writ shall promptly serve the same according to requirements of law, and the mandates thereof, and make due return as the law directs.

Issued and given under my hand and seal of said Court at Conroe, Texas on this the 23rd day of June, 2020.

Melisa Miller, District Clerk
Montgomery County, Texas



By: _Patricia Morrill_____
Patricia Morrill, Deputy   6/23/2020 2:08:16 PM

Unofficial Copy

# OFFICER'S RETURN

**Cause No. 20-06-07348**                    **Court No: 284th Judicial District Court**

**Style:** Michael Van Deelen VS. David Dickson, and Stuart Spence, and Scott Lamb, and 10 John/Jane Does

**To:**          **Stuart Spence**
**Address:**     **301 Hedwig St**
                 **Houston TX  77024**
                 **OR WHEREVER THE ADDRESSEE MAY BE FOUND**

**Came to hand the** _24_ day of _June_ , 20 _20_, at _1:31 P_ o'clock, and executed in _Harris_ County, Texas by delivering to each of the within named defendants in person, a true copy of this citation with the date of delivery endorsed thereon, together with the accompanying copy of the  Plaintiff's Original Petition at the following times and places, to wit:

| Name | Date/Time | Place, Course and distance from Courthouse |
|------|-----------|--------------------------------------------|
| Stuart Spence | 6/30/2020  10:25AM | 301 Hedwig St. Houston, Texas 77024 |

**Manner of service:**   _Personal Delivery_

**\*And not executed as to the defendants(s)** _____
**The diligence used in finding said defendant(s) being:**
_____
**And the cause of failure to execute this process is:**
_____
**And information received as to the whereabouts of said defendant(s) being:**
_____

**FEES:**
**Serving Petition and Copy**   $_____

                                          _____**OFFICER**
**TOTAL**                       $_____
                                          _____**County, Texas**
                                          **By:** _____, **Deputy**

**AFFIANT**
Complete if you are a person other than a Sheriff, Constable, or Clerk of the Court. In accordance with Rule 107: the officer, or authorized person who services, or attempts to serve a citation shall sign and return. The return must either be verified or be signed under penalty of perjury.

A return signed under penalty of perjury must contain the statement below in substantially the following form:

My full name is _Douglas Greene_                    _____
My date of birth is _01 / 04 / 1968_, and my address is   **Declarant/Authorized Process Server**
_4008 Louetta Rd. #622 Spring, Texas 77388_ .
**I DECLARE UNDER PENALTY OF PERJURY THAT THE**    **ID# & Exp. Of Certification**
**FOREGOING IS TRUE AND CORRECT**
Executed in _Harris_ , County, State of                **SWORN AND SUBSCRIBED ON**
_Texas_ , on the _2nd_ day of _July_ , 20 _20_ .
                                                      _____
                                                      **DATE**
**Declarant/Authorized Process Server**
_PSC#11914 Exp 3/31/2021_
**ID# & Exp. Of Certification**                        _____
                                                      **NOTARY**

Unofficial Copy

FORM 104 (10/06)

| ADVERSARY PROCEEDING COVER SHEET<br>(Instructions on Reverse) | ADVERSARY PROCEEDING NUMBER<br>(Court Use Only) |
|---|---|

| PLAINTIFFS<br>Michael Van Deelen | DEFENDANTS<br>David Dickson, Stuart Spence, Scott Lamb |
|---|---|
| ATTORNEYS (Firm Name, Address, and Telephone No.)<br>Michael Van Deelen, pro se<br>16215 Friar Circle, Spring, TX 77379 (832) 562-0723 | ATTORNEYS (If Known)<br>Matthew D. Cavenaugh, Jackson Walker LLP, 1401<br>McKinney Street, Suite 1900, Houston, TX 77010 |
| PARTY (Check One Box Only)<br>☐ Debtor   ☐ U.S. Trustee/Bankruptcy Admin<br>☐ Creditor   ☑ Other<br>☐ Trustee | PARTY (Check One Box Only)<br>☐ Debtor   ☐ U.S. Trustee/Bankruptcy Admin<br>☐ Creditor   ☑ Other<br>☐ Trustee |

**CAUSE OF ACTION** (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED)
Notice of Removal

### NATURE OF SUIT
(Number up to five (5) boxes starting with lead cause of action as 1, first alternative cause as 2, second alternative cause as 3, etc.)

**FRBP 7001(1) – Recovery of Money/Property**
☐ 11-Recovery of money/property - §542 turnover of property
☐ 12-Recovery of money/property - §547 preference
☐ 13-Recovery of money/property - §548 fraudulent transfer
☐ 14-Recovery of money/property - other

**FRBP 7001(2) – Validity, Priority or Extent of Lien**
☐ 21-Validity, priority or extent of lien or other interest in property

**FRBP 7001(3) – Approval of Sale of Property**
☐ 31-Approval of sale of property of estate and of a co-owner – §363(h)

**FRBP 7001(4) – Objection/Revocation of Discharge**
☐ 41-Objection / revocation of discharge - §727(c),(d),(e)

**FRBP 7001(5) – Revocation of Confirmation**
☐ 51-Revocation of confirmation

**FRBP 7001(6) – Dischargeability**
☐ 66-Dischargeability - §523(a)(1),(14),(14A) priority tax claims
☐ 62-Dischargeability - §523(a)(2), false pretenses, false representation, actual fraud
☐ 67-Dischargeability - §523(a)(4), fraud as fiduciary, embezzlement, larceny

**(continued next column)**

**FRBP 7001(6) – Dischargeability (continued)**
☐ 61-Dischargeability - §523(a)(5), domestic support
☐ 68-Dischargeability - §523(a)(6), willful and malicious injury
☐ 63-Dischargeability - §523(a)(8), student loan
☐ 64-Dischargeability - §523(a)(15), divorce or separation obligation (other than domestic support)
☐ 65-Dischargeability - other

**FRBP 7001(7) – Injunctive Relief**
☐ 71-Injunctive relief – reinstatement of stay
☐ 72-Injunctive relief – other

**FRBP 7001(8) Subordination of Claim or Interest**
☐ 81-Subordination of claim or interest

**FRBP 7001(9) Declaratory Judgment**
☐ 91-Declaratory judgment

**FRBP 7001(10) Determination of Removed Action**
☒ 01-Determination of removed claim or cause

**Other**
☐ SS-SIPA Case – 15 U.S.C. §§78aaa et.seq.
☒ 02-Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy case)

| ☐ Check if this case involves a substantive issue of state law | ☐ Check if this is asserted to be a class action under FRCP 23 |
|---|---|
| ☐ Check if a jury trial is demanded in complaint | Demand $ |

Other Relief Sought

**FORM 104 (10/06), Page 2**

| BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES | | |
|---|---|---|
| NAME OF DEBTOR<br>McDermott International, Inc., et al. | | BANKRUPTCY CASE NO.<br>20-30336 |
| DISTRICT IN WHICH CASE IS PENDING<br>Southern | DIVISIONAL OFFICE<br>Houston | NAME OF JUDGE<br>Jones |
| RELATED ADVERSARY PROCEEDING (IF ANY) | | |
| PLAINTIFF | DEFENDANT | ADVERSARY PROCEEDING NO. |
| DISTRICT IN WHICH ADVERSARY IS PENDING | DIVISIONAL OFFICE | NAME OF JUDGE |
| SIGNATURE OF ATTORNEY (OR PLAINTIFF) | | |
| DATE<br>07/17/2020 | PRINT NAME OF ATTORNEY (OR PLAINTIFF)<br>Matthew D. Cavenaugh | |

## INSTRUCTIONS

The filing of a bankruptcy case creates an "estate" under the jurisdiction of the bankruptcy court which consists of all of the property of the debtor, wherever that property is located. Because the bankruptcy estate is so extensive and the jurisdiction of the court so broad, there may be lawsuits over the property or property rights of the estate. There also may be lawsuits concerning the debtor's discharge. If such a lawsuit is filed in a bankruptcy court, it is called an adversary proceeding.

A party filing an adversary proceeding must also must complete and file Form 104, the Adversary Proceeding Cover Sheet, if it is required by the court. In some courts, the cover sheet is not required when the adversary proceeding is filed electronically through the court's Case Management/Electronic Case Files (CM/ECF) system. (CM/ECF captures the information on Form 104 as part of the filing process.) When completed, the cover sheet summarizes basic information on the adversary proceeding. The clerk of court needs the information to process the adversary proceeding and prepare required statistical reports on court activity.

The cover sheet and the information contained on it do not replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court. The cover sheet, which is largely self-explanatory, must be completed by the plaintiff's attorney (or by the plaintiff if the plaintiff is not represented by an attorney). A separate cover sheet must be submitted to the clerk for each complaint filed.

**Plaintiffs** and **Defendants.** Give the names of the plaintiffs and the defendants exactly as they appear on the complaint.

**Attorneys.** Give the names and addresses of the attorneys, if known.

**Party.** Check the most appropriate box in the first column for the plaintiffs and in the second column for the defendants.

**Demand.** Enter the dollar amount being demanded in the complaint.

**Signature.** This cover sheet must be signed by the attorney of record in the box on the second page of the form. If the plaintiff is represented by a law firm, a member of the firm must sign. If the plaintiff is pro se, that is, not represented by an attorney, the plaintiff must sign.

# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

United States Courts
Southern District of Texas
F I L E D

JUL 2 3 2020

David J. Bradley, Clerk of Court

| | |
|---|---|
| In re: | ) |
| | ) |
| | ) Chapter 11 |
| MCDERMOTT INTERNATIONAL, INC, *et al* | ) |
| | ) Case No. 20-30336 |
| Reorganized Debtor(s). | ) |
| | ) (Jointly Administered) |
| _____ | ) |
| | ) |
| MICHAEL VAN DEELEN | ) |
| | ) |
| Plaintiff, | ) Adv. Proc. No. 20-3309 |
| | ) |
| v. | ) |
| | ) |
| DAVID DICKSON, | ) |
| and STUART SPENCE, | ) |
| and SCOTT LAMB, | ) |
| and 10 JOHN/JANE DOES | ) |
| | ) |
| Defendants. | ) |

**PLAINTIFF'S MOTIONS TO REMAND HIS STATE LAW CAUSE OF ACTION AGAINST THE DEFENDANTS TO MONTGOMERY COUNTY, TEXAS, DISTRICT COURT BECAUSE THE FEDERAL BANKRUPTCY COURT DOES NOT HAVE JURISDICTION OVER PLAINTIFF'S MONTGOMERY COUNTY CAUSE OF ACTION, BECAUSE REMAND IS REQUIRED PURSUANT TO 28 U.S.C. SECTION 1334(c)(2) AND BECAUSE REMAND IS PERMISSIVE PURSUANT TO U.S.C. SECTION 1334(c)(1); PLAINTIFF'S MOTION TO RECUSE BANKRUPTCY JUDGE DAVID JONES; AND PLAINTIFF'S STATEMENT OF COMPLIANCE WITH BANKRUPTCY RULE 927(e)(3)**

COMES NOW, the Plaintiff, Michael Van Deelen, and for his Plaintiff's Motions to Remand His State Law Cause of Action Against the Defendants to Montgomery County, Texas, District Court Because the Federal Bankruptcy Court Does Not Have Jurisdiction Over Plaintiff's Montgomery County Cause of Action, Because Remand Is Required Pursuant to 28 U.S.C. Section 1334(c)(2) and Because Remand Is Permissive Pursuant to U.S.C. Section 1334(c)(1); for his Plaintiff's Motion to Recuse Bankruptcy Judge David Jones and for his Plaintiff's Statement of Compliance With Bankruptcy Rule 927(e)(3) states as follows:

## **BACKGROUND**

Plaintiff represented himself as a Party In Interest during McDermott International's Chapter 11 bankruptcy proceeding in the U.S. District Court for the Southern District of Texas (case number 20-30336).

On June 23, 2020, Plaintiff filed a civil action in Montgomery County, Texas, District Court (Case number 20-06-07348) alleging only state-law causes of action (fraud, conversion, negligent misrepresentation, breach of fiduciary duty and conspiracy) against defendants David Dickson, Stuart Spence and Scott Lamb, all current or former employees of McDermott International.  All three defendants are residents of Texas and at least one of the defendants, Mr. Lamb, is a resident of Montgomery County, Texas.

Plaintiff's Montgomery County suit against the defendants is incorporated in the defendants Notice of Removal filed in this Court on July 17, 2020.

## PLAINTIFF'S MOTION TO RECUSE BANKRUPTCY JUDGE DAVID JONES

Plaintiff respectfully moves this Court to recuse bankruptcy court Judge David Jones from deciding the removal/remand controversy briefed herein.

On or about June 2, 2020, Plaintiff filed his Petition for Writ of Mandamus Against the Honorable David R. Jones in the Fifth Circuit Court of Appeals (case no. 20-20286). Plaintiff subsequently filed his Notice of Filing (Document 939) in this case (20-30336) on June 3, 2020. The Notice of Filing, which contains Plaintiff's Writ, was docketed on June 4, 2020. Said Writ, which is presently before the Fifth Circuit Court of Appeals, is incorporated herein by reference.

In his Writ, Plaintiff shows incidents to the Court of Appeals in which Judge Jones has shredded Plaintiff's Constitutional rights by, among other things, refusing to hear Plaintiff's motions in the McDermott International bankruptcy case, by falsely accusing Plaintiff of improper acts during the pendency of the bankruptcy case, by telling the attorneys for the Defendants herein that they "were the smartest people in the country" while accusing Plaintiff in open court of "knowing nothing", and, most notably, by unconstitutionally issuing a permanent injunction against the Plaintiff without affording Plaintiff a hearing or trial.

Among other things, Plaintiff has asked the Court of Appeals to disqualify Judge Jones from presiding over a trial on the actions unconstitutionally prohibited by Judge Jones' March, 23, 2020, Order, should the Court of Appeals order said trial to be held. In requesting this, plaintiff stated to the Court of Appeals that "The trial court's [Judge Jones'] animosity toward Petitioner is so great that Petitioner is concerned that the trial

court will simply continue to make unlawful, unconstitutional rulings during a trial on the actions prohibited by its March 23, 2020, Order."

Plaintiff is similarly convinced that, should Judge Jones decide the removal/remand controversy briefed herein, it will not be possible to get a fair hearing given the animosity and unconstitutional behavior Judge Jones has demonstrated with respect to the plaintiff in the McDermott International bankruptcy case.

WHEREFORE, in the interest of justice, Plaintiff respectfully requests this Court to recuse Judge Jones from deciding the removal//remand controversy briefed herein.


## THIS COURT DOES NOT HAVE JURISDICTION TO HEAR REMOVED CASE

28 U.S.C. Section 1478(a) does not permit removal of this action due to lack of Jurisdiction.

Under 28 U.S.C. §1478(a) "any claim or cause of action in a civil action, other than a proceeding before the United States Tax Court or a civil action by a Government unit to enforce [a] . . . regulatory or police power" may be removed "if the bankruptcy courts have jurisdiction over such claim or cause of action."

First of all, McDermott International's Plan had been confirmed and the Effective Date of the Plan occurred on June 30, 2020.  Plaintiff received notice of these events.  On July 17, 2020, defendants Dickson, Spence and Lamb (hereinafter, 'Defendants') filed their Notice of Removal in this Court.

The Fifth Circuit has held that "[a]fter a plan is confirmed, the bankruptcy court's jurisdiction is limited to maters pertaining to the implementation or execution of the plan" or in other words, "matters that impact compliance with or completion of the

4

reorganization plan." *Highland Capital Mgmt., LP v. Chesapeake Energy Corp. (In re Seven Seas Petroleum, Inc.)*, 522 F.3d 575, 589 (5th Cir. 2008) (citing to *Bank of La. v. Craig's Stores of Tex., Inc. (In re Craig's Stores of Tex., Inc.)*, 266 F.3d 388, 390 (5th Cir. 2001), and *United States Brass Corp. v. Travelers Ins. Group, Inc. (In re United States Brass Corp.)*, 301 F.3d 296, 305 (5th Cir. 2002)).  Because no "if related" jurisdiction existed at the time of removal, this Court does not have jurisdiction of the Defendants.  See *Newby v. Enron Corp. (In re Enron Corp. Sec.)*, 534 F.3d 325, 335 (5th Cir. 2008).

     *In re Craig's Stores, Supra*, the Fifth Circuit stated:

     'Once the bankruptcy court confirms a plan of reorganization, the debtor may go about its business without further supervision or approval. The firm also is without the protection of the bankruptcy court. It may not come running to the bankruptcy judge every time something unpleasant happens. *Pettibone Corp. v. Easley*, 935 F.2d 120, 122 (7th Cir. 1991). **After a debtor's reorganization plan has been confirmed, the debtor's estate, and thus bankruptcy jurisdiction, ceases to exist, other than for matters pertaining to the implementation or execution of the plan** (emphasis added). *In re Fairfield Communities, Inc.*, 142 F.3d 1093, 1095 (8th Cir. 1998); *In re Johns-Manville Corp.*, 7 F.3d 32, 34 (2d Cir. 1993). No longer is expansive bankruptcy court jurisdiction required to facilitate "administration" of the debtor's estate, for there is no estate left to reorganize. This theory has antecedents in our court's jurisprudence, which has observed that the reorganization provisions of the former Bankruptcy Act "envisage [] that out of the proceedings will come a newly reorganized company capable of sailing forth in the cold, cruel business world with no longer the protective wraps of the federal Bankruptcy Court." *In re Seminole Park & Fairgrounds, Inc.*, 502 F.2d 1011, 1014 (5th Cir. 1974). Because it comports more closely with the effect of a successful reorganization under the Bankruptcy Code than the expansive jurisdiction cases, we adopt this more exacting theory of post-confirmation bankruptcy jurisdiction.'

     The Defendants are individuals who were not debtors or defendants in the McDermott International bankruptcy action in this Court.  They were sued only for state-law causes of action in Montgomery County, Texas, District Court (case 20-06-07348). The Montgomery County case has nothing to do with "matters pertaining to the implementation or execution of the plan" or "matters that impact compliance with or

completion of the reorganization plan." and the Defendants provide no evidence in their

Notice of Removal that it does. The post-confirmation dispute at issue herein has nothing

to do with any obligation created by the debtor's reorganization plan. See *In re Craig's*

*Stores, Supra.*

Secondly, 28 U.S.C. section 1471(b) states:

"(b) Notwithstanding an Act of Congress that confers exclusive jurisdiction on a
court or courts other than the district courts, the district courts shall have original but not
exclusive jurisdiction of all civil proceedings arising under title 11 or arising in or **related
to** cases under title 11 (emphasis added)."

The Fifth Circuit has stated that "it is not necessary to distinguish between

proceedings 'arising under,' 'arising in a case under,' or 'related to a case under,' title 11 "

as the real necessary determination is "whether a matter is at least 'related to' the

bankruptcy" when determining if a matter falls within bankruptcy subject matter

jurisdiction. *Wood v. Wood (In re Wood)*, 825 F.2d 90, 93 (5th Cir. 1987). Proceedings

that are "arising under" are those in which the matter "involve[s] a cause of action

created or determined by a statutory provision of title 11." *Id.* at 96. Those are

distinguishable from proceedings that are "arising in," which involve matters "that are

not based on any right expressly created by title 11, but nevertheless, would have no

existence outside of the bankruptcy," such as "[p]roceedings invoking the bankruptcy

court's statutory authority to enter orders necessary for the consummation of a confirmed

plan..." *United States Brass Corp. v. Travelers Ins. Group, Inc. (In re United States*

*Brass Corp.)*, 301 F.3d 296, 306 (5th Cir. 2002)."

The Fifth Circuit in *In re Wood, Supra,* went on to adopt a "related to" test

articulated by the Third Circuit, which enjoys broad support, that looks at "whether the

outcome of that proceeding could conceivably have any effect on the estate being

administered in bankruptcy." 825 F.2d at at 93, n.15 (citing to *Pacor, Inc. v. Higgins*, 743 F.2d 984, 994 (3d Cir. 1984)). In applying the test, the Fifth Circuit looked to see whether the proceeding was "sufficiently related to the pending bankruptcy to allow the district court to exercise jurisdiction under section 1334," which is to say that "plaintiff's claims must affect the estate, **not just the debtor** (emphasis added)." *Id.* at 93-94.

In *Pacor, Supra*, the court stated:

"In enacting section 1471(b), Congress intended to grant comprehensive jurisdiction to the bankruptcy courts so that they might deal efficiently and expeditiously with all matters connected with the bankruptcy estate. *See* H.Rep. No. 598, 95th Cong., 2d Sess., 43-48, *reprinted in* 1978 U.S.Code Cong. & Ad.News 5963, 6004-08. *See also Young v. Sultan, Ltd. (In re Lucasa International, Ltd.),* 6 B.R. 717, 719 (Bankr.S.D.N.Y.1980) (§ 1471(b) jurisdiction is "pervasive"); *Westinghouse Credit Corp. v. Yeary (In re Brothers Coal Co.),* 6 B.R. 567, 570-71 (Bankr.W.D.Va.1980) (§ 1471(b) jurisdiction is "broad."). The jurisdiction of the bankruptcy courts to hear cases related to bankruptcy is not without limit, however, and there is a statutory, and eventually constitutional, limitation to the power of a bankruptcy court. For subject matter jurisdiction to exist, therefore, there must be some nexus between the "related" civil proceeding and the title 11 case. *See In re Hall,* 30 B.R. 799, 802 (M.D.Tenn.1983); 1 *Collier on Bankruptcy* ¶ 3.01, at 3-48 to 3-49 (15th ed. 1982).

The usual articulation of the test for determining whether a civil proceeding is related to bankruptcy is whether *the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy. E.g., In re Hall,* 30 B.R. at 802; *In re General Oil Distributors, Inc.,* 21 B.R. 888, 892 n. 13 (Bankr.E.D.N.Y.1982); *In re U.S. Air Duct Corp.,* 8 B.R. 848, 851 (Bankr.N.D.N.Y. 1981); 1 *Collier on Bankruptcy* ¶ 3.01 at 3-49. Thus, the proceeding need not necessarily be against the debtor or against the debtor's property. An action is related to bankruptcy if the outcome could alter the debtor's rights, liabilities, options, or freedom of action (either positively or negatively) and which in any way impacts upon the handling and administration of the bankrupt estate.

On the other hand, the mere fact that there may be common issues of fact between a civil proceeding and a controversy involving the bankruptcy estate does not bring the matter within the scope of section 1471(b). Judicial economy itself does not justify federal jurisdiction. *See generally Aldinger v. Howard,* 427 U.S. 1, 15, 96 S.Ct. 2413, 2420, 49 L.Ed.2d 276 (1976). "[J]urisdiction over nonbankruptcy controversies with third parties who are otherwise strangers to the civil proceeding and to the parent bankruptcy does not exist." *In re Haug,* 19 B.R. 223, 224-25 (Bankr.D.Ore.1982); *See also In re McConaghy,* 15 B.R. 480, 481 (Bankr.E.D.Va.1981) (Bankruptcy court lacks jurisdiction to decide disputes between third parties in which the estate of the debtor has no interest)."

The outcome of Plaintiff's Montgomery County, Texas, state-law case against the individual, non-debtor defendants, two of whom did not even work for McDermott International at the time of Plaintiff's suit against them (Spence and Lamb), has no conceivable effect on the estate (McDermott International) that *was* administered in bankruptcy and whose plan confirmation and effective date was before the Defendants' Notice of Removal. The Montgomery County suit has no bearing on the liabilities or assets of the bankrupt debtor or the debtor's discharge. The estate simply has no interest in the Plaintiff's Montgomery County, Texas, suit against the Defendants and the Defendants do not present evidence otherwise in their Notice of Removal.

In their Notice of removal, the Defendants state:

"3. ..............The entry of a final judgment against Defendants would directly and substantially affect the Debtors, their operations, and/or the implementation or execution of the Plan. Moreover, adjudication of the claims requires interpretation and enforcement of this Court's Confirmation Order [Plan], which releases and exculpates Defendants from certain claims that have been brought.

4. .................adjudication of the claims would require interpretation and enforcement of this Court's Confirmation Order [Plan], including the release and exculpation provisions."

The Defendants make the above statements without evidence. They state that the Confirmation Plan 'releases and exculpates Defendants from certain claims that **have been brought** (emphasis added).' Plaintiff's Montgomery County suit was brought after the Confirmation Plan, as noted herein. It is therefore not possible that the claims 'that have been brought' cited by the Defendants can refer to the Plaintiff's Montgomery County suit against the Defendants.

What 'Defendants' are the Defendants talking about? It is seems unlikely that defendants Lamb and Spence had any release and exculpation provisions as they both left

their employment with McDermott International before the company declared

bankruptcy.  Furthermore, defendant Spence has a separation agreement that plaintiff, on

information and belief, believes did not provide any indemnification for suits brought

against him after his employment for acts committed during his employment with the

company.

The release provisions of McDermott's Confirmation Plan do not apply to the

Plaintiff.  During the course of the bankruptcy proceedings, the debtors sought

affirmative releases from shareholders.  **Plaintiff did not release the debtors from**

**wrongdoing and is therefore not a "releasing party" with respect to the Plan**.

Exhibit 1 herein contains the opt out form Plaintiff submitted to the debtors that excluded

him from the Third-Party Release set forth in Article VIII.D  of the Plan.  There is

nothing for the Court to decide here.  Plaintiff is not a releasing party and he did not

release the debtors from wrongdoing.  See Article VIII of the Second Amended Joint

Prepackaged Chapter 11 Plan of Reorganization (Technical Modifications) of McDermott

International, Inc. and Its Debtor Affiliates (Document 651).

The Defendants in their Notice of Removal fail to tell this Court that the

Confirmation Plan (Document 651) does not provide exculpation "**for claims related to**

**any act or omission that is determined in a Final Order by a court of competent**

**jurisdiction to have constituted actual fraud, willful misconduct, or gross negligence**

(emphasis added)." (Document 651, page 58, 'Exculpation', incorporated by reference

herein).  These are the claims raised in Plaintiff's Montgomery County District Court

state law suit.  The Defendants are not therefore exculpated from the claims raised in

Plaintiff's Montgomery County suit and the Confirmation Plan allows the suit to be

brought in any 'court of competent jurisdiction', including Montgomery County, Texas, District Court. The 'exculpation provisions' that allegedly tie Plaintiff's Montgomery County suit to the Confirmation Plan actually do just the opposite: they release and remove Plaintiff's Montgomery County suit from the Confirmation Plan.

It is established case law that it is within the purview of the state court to interpret the releases and exculpations. As explained by the Supreme Court, "It is black letter law . . . that the mere grant of jurisdiction to a federal court does not operate to oust a state court from concurrent jurisdiction over the cause of action." Gulf Offshore Co. v. Mobil Oil Corp., 101 S. Ct. 2870, 2875-76 (1981). See also Malesovas v. Sanders, No. H-04-3122, 2005 WL 1155073, *3 n. 6 (S.D. Tex. May 16, 2005) ("Orders of bankruptcy courts, like those of other courts, can also be interpreted by other courts of competent jurisdiction. Thus, state courts are qualified to interpret the language of bankruptcy plans and orders and routinely engage in such interpretation.") (quoting Kmart Creditor Trust v. Conway (In re Kmart Corp.), 307 B.R. 586, 596 (Bankr. E.D. Mich. 2004)).

The Defendants need to provide to the Plaintiff and this Court evidence of any Confirmation Plan release and exculpation provisions that prevent Plaintiff from suing them in Montgomery County, Texas, District Court. Given the above, it does not appear that they have such evidence.

WHEREFORE, Plaintiff moves the Court to remand Plaintiff's Montgomery County, Texas, District Court case against the Defendants to Montgomery County District Court because the federal bankruptcy court does not have jurisdiction over Plaintiff's Montgomery County, Texas, suit against the Defendants.

## MANDATORY ABSTENTION PURSUANT TO 28 U.S.C. SECTION 1334(c)(2)

Even if this Court had jurisdiction to hear this removed case, remand would be appropriate under 28 U.S.C. Section 1334(c)(2).

The key distinction between mandatory abstention and equitable or discretionary remand is that mandatory abstention applies "only to non-core proceedings--that is, proceedings 'related to a case under title 11,' but not 'arising under title 11, or arising in a case under title 11.'" *In re Gober*, 100 F.3d at 1206 (comparing 28 U.S.C. §§ 157(b)(1) & 1334(c)(2)); *see also J.T. Thorpe Co.*, 2003 U.S. Dist. LEXIS 26016, at *10; *Ramirez*, 413 B.R. at 626-27. *Cf. Stern*, 131 S. Ct. at 2618.

Section 1334(c)(2) provides for mandatory abstention when:

"[u]pon timely motion of a party in a proceeding based upon a State law claim or State law cause of action, related to a case under title 11 but not arising under title 11 or arising in a case under title 11, with respect to which an action could not have been commenced in a court of the United States absent jurisdiction under this section, the district court shall abstain from hearing such proceeding if an action is commenced, and can be timely adjudicated, in a State forum of appropriate jurisdiction." 28 U.S.C. § 1334(c)(2).

A court must abstain from hearing the state law claim at issue when all of the following factors are met:

(1) a motion has been timely filed requesting abstention;
(2) the cause of action is essentially one that is premised on state law;
(3) the claim is a non-core proceeding, i.e., it is "related to" a case under title 11 but does not arise under or in a case under title 11;
(4) the proceeding could not otherwise have been commenced in federal court absent federal jurisdiction under § 1334(b);
(5) an action has been commenced in state court; and
(6) the action could be adjudicated timely in state court.

*J.T. Thorpe Co.*, 2003 U.S. Dist. LEXIS 26016, at *10 (citing to *Schuster v. Mims (In re Rupp & Bowman Co.)*, 109 F.3d 237, 239 (5th Cir. 1997); *In re Gober*, 100 F.3d at 1206; *Broyles v. U.S.Gypsum Co.*, 266 B.R. 778, 782-83 (E.D. Tex. 2001); *Lee v. Miller*, 263

11

B.R. 757, 763 (S.D. Miss. 2001); *Chickaway v. Bank One Dayton, N. A.*, 261 B.R. 646, 649 (S.D. Miss. 2001); *WRTCreditors Liquidation Trust v. C.I.B.C. Oppenheimer Corp.*, 75 F. Supp. 2d 596, 605 (S.D. Tex. 1999)). The determination of the status of a cause of action is rooted in the list of core proceedings in 28 U.S.C. § 157(b)(2). Although § 157(b)(2) is non-exhaustive, that does not mean that every cause of action that can be categorized as a "core proceeding" under § 157(b)(2) should be included, given decisions such as *Marathon* and *Stern. Ramirez*, 413 B.R. at 627; *see also Stern*, 131 S. Ct. at 2618; *Northern Pipeline Const. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50 (1982).

Plaintiff has satisfied the first factor given above in that he filed this pleading on July 23, 2020, four days after he was served the Defendants' Notice of Removal.

Plaintiff has satisfied the second, third and fifth factors given above in that the Montgomery County, Texas, District Court suit against the Defendants is entirely premised on state law and involves only claims of Fraud, Conversion, Negligent Misrepresentation, Breach of Fiduciary Duty and Civil Conspiracy and does not involve federal law.

Plaintiff has satisfied the fourth factor given above because there is no federal subject matter jurisdiction over Plaintiff's state law claims absent jurisdiction pursuant to Section 1334(b) and diversity of citizenship is lacking.

The sixth and final factor looks to whether "the action could be adjudicated timely in state court." *J.T. Thorpe Co.*, 2003 U.S. Dist. LEXIS 26016, at *10. The standard for timely adjudication in state court does not place a burden upon the movant to show a "*more timely* adjudicat[ion] in state court, but only that the matter can be timely

adjudicated..." *J.T. Thorpe Co.*, 2003 U.S. Dist. LEXIS 26016, at *12-13.  However, Plaintiff addresses this 'burden'.

On information and belief, Montgomery County is 'open' and not subject to a shelter-in-place order.  The Montgomery County District Court Clerk's office is currently fully staffed and open to the public during the COVID-19 pandemic.  The Clerk's office dockets cases and events on a normal basis.  Court 284, where the Defendants' case was removed from, is open for the hearing of motions, etc..  There is no indication that the Montgomery County Court or its staff is unable to efficiently and normally handle its case load during the pandemic.

On the other hand, on information and belief, Harris County is on lock-down status.  Federal in-court appearances have been deferred.  The federal Clerk's office is operating with a 'much reduced staff'.  The docketing of federal cases is being done remotely.  Furthermore, the Southern District of Texas Bankruptcy Court is SWAMPED with cases as Houston and Texas companies operating in the oil patch continue to file for bankruptcy at an alarming rate.

"[The] Covid-19 [pandemic] ....does not weigh in favor of retaining federal jurisdiction".  Southern District of Texas Chief Judge Lee H. Rosenthal in *American General Life Insurance Company v. Schahin II Finance Company (SPV) Limited*, Civil Action No. H-19-4025, U.S. District Court, S.D. Texas, Houston Division (June 16, 2020).

The above illustrates that there is an exceedingly high likelihood that Plaintiff's state-law case against the Defendants will be adjudicated much more quickly in Montgomery County District Court than it would be in the Southern District of Texas

13

Bankruptcy Court. This is amplified by the fact that state law causes of action against the individual Defendants were not raised during the pendency of the bankruptcy proceedings. If the bankruptcy court were to hear Plaintiff's state law claims against the Defendants, it would have to "start fresh" with a new case and would not have an advantage because it had previously heard the debtor's bankruptcy case.

Furthermore, since the Defendants have rendered no evidence to indicate that the state court could *not* adjudicate the matter in a timely fashion, the Court must presume that the state court will timely adjudicate the matter, given the immense policy interest in comity. *In re Doctors Hosp.*, 351 B.R. at 846 n.29. "While an affirmative showing of the possibility of timely adjudication in state court may be necessary where a movant seeks abstention from a proceeding originating in federal court, such a showing is not necessary where the movant is contesting the removal of his own state action." *In Re Treyson Dev., Inc.*, No. 14-70256, 2016 WL 1604347 (Bankr. S.D. Tex. Apr. 19, 2016) (citing *Abadie v. Poppin*, 154 B.R. 86, 90 (N.D. Cal. 1993)).

Given the above, Plaintiff has satisfied the sixth factor that the action could be adjudicated timely (or more timely) in state court.

WHEREFORE, Plaintiff moves the Court to remand Plaintiff's Montgomery County, Texas, District Court case against the Defendants to Montgomery County District Court because it is required to do so by 28 U.S.C. Section 1334(c)(2).


**PERMISSIVE ABSTENTION PURSUANT TO 28 U.S.C. SECTION 1334 (c)(1)**

Section 1334 provides the district courts with "original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases

14

under title 11." 28 U.S.C. Section 1334(b).  However, under most circumstances, there is

"nothing in this section [that] prevents a district court in the interest of justice, or in the

interest of comity with State courts or respect for State law, from abstaining from hearing

a particular proceeding arising under title 11 or arising in or related to a case under title

11." Section 1334 (c)(1).; *Treyson, Supra.*

　　　As noted herein, Plaintiff has filed a Writ of Mandamus against the bankruptcy

court judge, David Jones, which is currently before the Fifth Circuit Court of Appeals.  In

his Writ, Plaintiff shows incidents to the Court of Appeals in which Judge Jones has

shredded Plaintiff's Constitutional rights by, among other things, refusing to hear

Plaintiff's motions in the McDermott International bankruptcy case, by falsely accusing

Plaintiff of improper acts during the pendency of the bankruptcy case, by telling the

attorneys for the Defendants herein that they "were the smartest people in the country"

while accusing Plaintiff in open court of "knowing nothing", and, most notably, by

unconstitutionally issuing a permanent injunction against the Plaintiff without affording

Plaintiff a hearing or trial.

　　　Among other things, Plaintiff has asked the Court of Appeals to disqualify Judge

Jones from presiding over a trial on the actions unconstitutionally prohibited by Judge

Jones' March, 23, 2020, Order, should the Court of Appeals order said trial to be held.  In

requesting this, plaintiff stated to the Court of Appeals that "The trial court's [Judge

Jones'] animosity toward Petitioner is so great that Petitioner is concerned that the trial

court will simply continue to make unlawful, unconstitutional rulings during a trial on the

actions prohibited by its March 23, 2020, Order."

Plaintiff is similarly convinced that, should Judge Jones preside over Plaintiff's

Montgomery County, Texas, case, it will not be possible to get a fair hearing given the

animosity and unconstitutional behavior Judge Jones has demonstrated with respect to the

plaintiff in the McDermott International bankruptcy case.  Accordingly, in the interest of

justice, as well as interest of comity with State courts and respect for State law, Plaintiff

moves this Court to remand this case to Montgomery County, Texas, District Court,

where Plaintiff believes he will receive a fair trial.

WHEREFORE, Plaintiff moves the Court to remand Plaintiff's Montgomery

County, Texas, District Court case against the Defendants to Montgomery County

District Court because it may do so by 28 U.S.C. Section 1334(c)(1).


## THE DEFENDANTS ARE FORUM SHOPPING

The Defendants' attorneys are well aware of the animosity of the bankruptcy court

toward the plaintiff and its bias against him.  They are undoubtedly aware that the

bankruptcy court said during open court that the McDermott attorneys were "the smartest

people in the country".  They are also undoubtedly aware that the bankruptcy court in

open court accused Plaintiff of "knowing nothing".  (At least one of the Defendants'

attorneys was present during both statements.)  The Defendants hope to transfer

Plaintiff's Montgomery County case back to the bankruptcy court in order to gain a

perceived advantage in the  litigation.  They should not be allowed to do this.

## <u>STATEMENT OF COMPLIANCE WITH BANKRUPTCY RULE 927(e)(3)</u>

Bankruptcy Rule 9027(e)(3) requires that this pleading contain a statement that

Plaintiff "does or does not consent to entry of final orders or judgment by the bankruptcy

court."  Plaintiff does not consent to entry of final orders or judgment by the bankruptcy

court.

Dated July 23, 2020

Plaintiff
16215 Friar Circle
Spring, TX 77379
832-562-0723
michaelvandeelen@gmail.com

## CERTIFICATE OF SERVICE

I hereby certify that I have on this 23rd day of July, 2020, served a true and correct copy of the foregoing document on the defendants via the court-approved eFiling system, which will forward a copy thereof to all attorneys of record.

Michael Van Deelen

**EXHIBIT 1**

**PLAINTIFF'S OPT OUT FROM THIRD-PARTY RELEASE**

**EXHIBIT A**
**OPTIONAL: RELEASE OPT OUT FORM**

You are receiving this opt out form (the "Opt Out Form") because you are or may be a holder of a Claim or Interest that is not entitled to vote on the *Joint Chapter 11 Plan of Reorganization of McDermott International, Inc. and Its Debtor Affiliates* (as may be amended from time to time, the "Plan"). Holders of Claims and Interests are deemed to grant the Third-Party Release set forth in the Notice unless a holder affirmatively opts out or files an objection to the Third-Party Release with the Bankruptcy Court on or before the Plan Voting Deadline.

**If you believe you are a holder of a Claim or Interest with respect to McDermott International, Inc. or its affiliates and choose to opt out of the Third-Party Release set forth in Article VIII.D of the Plan, please complete, sign, and date this Opt Out Form and return it promptly** via first class mail (or in the enclosed reply envelope provided), overnight courier, via the Solicitation Agent's online E-Ballot Portal, or hand delivery to Prime Clerk LLC (the "Solicitation Agent") at the address set forth below. Holders are strongly encouraged to submit their Opt Out Form through the Solicitation Agent's online E-Ballot Portal. For the avoidance of doubt, if you hold Existing Interests through a broker nominee, you cannot submit your Opt-Out via E-Ballot; rather, you must complete and return the paper Opt-Out Form. Parties that submit their Opt Out Form using the E-Ballot Portal should NOT also submit a paper Opt Out Form.

> **Use of Hard Copy Opt Out Form.** To ensure that your hard copy Opt Out Form is counted clearly sign and return your Opt Out Form in the enclosed pre-addressed, pre-paid envelope or via first class mail, overnight courier, or hand delivery to: McDermott Opt Out Form Processing, c/o Prime Clerk, One Grand Central Place, 60 East 42nd Street, Suite 1440, New York, NY 10165.

**THIS OPT OUT FORM MUST BE ACTUALLY RECEIVED BY THE SOLICITATION AGENT BY WEDNESDAY, FEBRUARY 19, 2020, AT 4:00 P.M. PREVAILING CENTRAL TIME (THE "RESPONSE DEADLINE"). IF THE OPT OUT FORM IS RECEIVED AFTER THE RESPONSE DEADLINE, IT WILL NOT BE COUNTED.**

**Item 1. Amount of Claim or Interests.**

The undersigned hereby certifies that, as of Friday, January 17, 2020 (the "Voting Record Date"), the undersigned was the holder of either (a) Class 1 Other Secured Claims, (b) Class 2 Other Priority Claims, (c) Class 3 Other Prepetition Financing Claims, (d) Class 4 Bilateral Facility Claims, (e) Class 10 General Unsecured Claims, (d) Class 13 Existing Preferred Equity Interests in McDermott, or (e) Class 14 Existing Common Equity Interests in McDermott in the following aggregate amount (insert amount in box below)[1]:

---

Class 1 Other Secured Claims Amount $ _____

OR

Class 2 Other Priority Claims Amount $ _____

OR

Class 3 Other Prepetition Financing Claims Amount $ _____

OR

---

[1] To the extent there are any discrepancies between the applicable registers or records of holders and the amounts claimed on this opt-out form, the applicable registers or records shall govern.

| | |
|---|---|
| Class 4 Bilateral Facility Claims Amount $ _____ | |
| OR | |
| Class 10 General Unsecured Claims Amount $ _____ | |
| OR | |
| Class 13 Existing Preferred Equity Interests in McDermott Amount $ _____ | |
| OR | |
| Class 14 Existing Common Equity Interests in McDermott Amount $ _30,000 Shares_ | |

**Item 2.** Important information regarding the Third-Party Release.

**Article VIII.D of the Plan contains the following Third-Party Release:**

Except as otherwise expressly set forth in this Plan or the Confirmation Order, on and after the Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is, and is deemed hereby to be, fully, conclusively, absolutely, unconditionally, irrevocably and forever, released and discharged by each Releasing Party, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all Claims and Causes of Action, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, contingent or non-contingent, in law, equity, contract, tort, or otherwise, including any derivative claims asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim against, or Interest in, a Debtor or other Entity, or that any holder of any Claim against, or Interest in, a Debtor or other Entity could have asserted on behalf of the Debtors, based on or relating to, or in any manner arising from, in whole or in part:

1. the Debtors (including the capital structure, management, ownership, or operation thereof), the business or contractual arrangement between the Debtors and any Releasing Party, any Securities issued by the Debtors and the ownership thereof, the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in- or out-of-court restructuring efforts, any Avoidance Actions (but excluding Avoidance Actions brought as counterclaims or defenses to Claims asserted against the Debtors), intercompany transactions between or among a Company Party and another Company Party, the Superpriority Credit Agreement, the Credit Agreement, the 2021 LC Agreement, the Lloyds Letter of Credit Agreement, Senior Notes Indenture, the Senior Notes, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Restructuring Support Agreement, the Disclosure Statement, the DIP Credit Agreement, the Exit Facility Documents, or the Plan (including, for the avoidance of doubt, the Plan Supplement);

2. any Restructuring Transaction, contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Restructuring Support Agreement, the Rights

Offering, the Disclosure Statement, the DIP Credit Agreement, the New Warrants Agreements, the Exit Facility Documents, the Plan, or the Plan Supplement, before or during the Chapter 11 Cases,

3.  the Chapter 11 Cases, the filing of the Chapter 11 Cases, the Disclosure Statement, or the Plan, the solicitation of votes with respect to the Plan, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, the Rights Offering, or the distribution of property under the Plan or any other related agreement; or

4.  any related act or omission, transaction, agreement, event, or other occurrence related or relating to any of the foregoing taking place on or before the Effective Date, including all Avoidance Actions or other relief obtained by the Debtors in the Chapter 11 Cases.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (i) any party of any obligations related to customary banking products, banking services or other financial accommodations (except as may be expressly amended or modified by the Plan and the Exit Facility Documents, or any other financing document under and as defined therein), (ii) any post-Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Restructuring Transaction, or any document, instrument, any Definitive Document, or any agreement (including those set forth in the Plan Supplement) executed to implement the Plan, including the Exit Facility Documents, the New Warrants Agreements, or any Claim or obligation arising under the Plan, or (iii) the rights of holders of Allowed Claims to receive distributions under the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the foregoing third-party release, which includes by reference each of the related provisions and definitions contained herein, and, further, shall constitute the Bankruptcy Court's finding that the foregoing third-party release is:  (a) consensual; (b) essential to the Confirmation of the Plan; (c) given in exchange for a substantial contribution and for the good and valuable consideration provided by the Released Parties that is important to the success of the Plan; (d) a good faith settlement and compromise of the Claims released by the foregoing third-party release; (e) in the best interests of the Debtors and their Estates; (f) fair, equitable, and reasonable; (g) given and made after due notice and opportunity for hearing; and (h) a bar to any of the Releasing Parties asserting any claim or Cause of Action released pursuant to the foregoing third-party release.

Definitions Related to the Third-Party Release:

UNDER THE PLAN, "*RELEASED PARTY*" MEANS EACH OF THE FOLLOWING, SOLELY IN ITS CAPACITY AS SUCH:  (A) EACH DEBTOR; (B) EACH REORGANIZED DEBTOR; (C) EACH COMPANY PARTY; (D) EACH DIP LENDER AND EACH DIP LETTER OF CREDIT ISSUER; (E) EACH AGENT; (F) THE SENIOR NOTES TRUSTEE; (G) EACH CONSENTING STAKEHOLDER; (H) EACH HEDGE BANK; (I) EACH CASH MANAGEMENT BANK; (J) EACH LENDER UNDER THE SUPERPRIORITY CREDIT AGREEMENT, CREDIT AGREEMENT, THE 2021 LC AGREEMENT, AND THE LLOYDS LETTER OF CREDIT AGREEMENT; (K) EACH HOLDER OF AN OBLIGATION (AS DEFINED IN THE SUPERPRIORITY CREDIT AGREEMENT) UNDER THE SUPERPRIORITY CREDIT AGREEMENT; (L) EACH HOLDER OF AN OBLIGATION (AS DEFINED IN THE CREDIT AGREEMENT) UNDER THE CREDIT AGREEMENT; (M) EACH ISSUER (AS DEFINED IN THE SUPERPRIORITY CREDIT AGREEMENT) UNDER THE SUPERPRIORITY CREDIT AGREEMENT; (N) EACH ISSUER (AS DEFINED IN THE CREDIT AGREEMENT) UNDER THE CREDIT AGREEMENT; (O) THE TERM LOAN AD HOC GROUP, THE LIQUIDITY LENDER

STEERING COMMITTEE, AND THE SENIOR NOTES AD HOC GROUP; (P) EACH CURRENT AND FORMER AFFILIATE OF EACH ENTITY IN CLAUSE (A) THROUGH (O); AND (Q) EACH RELATED PARTY OF EACH ENTITY IN CLAUSE (A) THROUGH (O); PROVIDED THAT ANY HOLDER OF A CLAIM OR INTEREST THAT OPTS OUT OF THE RELEASES SHALL NOT BE A "RELEASED PARTY."

UNDER THE PLAN, "*RELEASING PARTIES*" MEANS EACH OF THE FOLLOWING, SOLELY IN ITS CAPACITY AS SUCH: (A) EACH DEBTOR; (B) EACH REORGANIZED DEBTOR; (C) EACH COMPANY PARTY; (D) EACH DIP LENDER AND EACH DIP LETTER OF CREDIT ISSUER; (E) EACH AGENT; (F) THE SENIOR NOTES TRUSTEE; (G) EACH CONSENTING STAKEHOLDER; (H) EACH HEDGE BANK; (I) EACH CASH MANAGEMENT BANK; (J) EACH LENDER UNDER THE SUPERPRIORITY CREDIT AGREEMENT, CREDIT AGREEMENT, THE 2021 LC AGREEMENT, AND THE LLOYDS LETTER OF CREDIT AGREEMENT; (K) EACH HOLDER OF AN OBLIGATION (AS DEFINED IN THE SUPERPRIORITY CREDIT AGREEMENT) UNDER THE SUPERPRIORITY CREDIT AGREEMENT; (L) EACH HOLDER OF AN OBLIGATION (AS DEFINED IN THE CREDIT AGREEMENT) UNDER THE CREDIT AGREEMENT; (M) EACH ISSUER (AS DEFINED IN THE SUPERPRIORITY CREDIT AGREEMENT) UNDER THE SUPERPRIORITY CREDIT AGREEMENT; (N) EACH ISSUER (AS DEFINED IN THE CREDIT AGREEMENT) UNDER THE CREDIT AGREEMENT; (O) THE TERM LOAN AD HOC GROUP, THE LIQUIDITY LENDER STEERING COMMITTEE, AND THE SENIOR NOTES AD HOC GROUP; (P) ALL HOLDERS OF CLAIMS OR INTERESTS THAT VOTE TO ACCEPT OR ARE DEEMED TO ACCEPT THE PLAN; (Q) ALL HOLDERS OF CLAIMS OR INTERESTS THAT ABSTAIN FROM VOTING ON THE PLAN AND WHO DO NOT AFFIRMATIVELY OPT OUT OF THE RELEASES PROVIDED BY THE PLAN BY CHECKING THE BOX ON THE APPLICABLE BALLOT INDICATING THAT THEY OPT NOT TO GRANT THE RELEASES PROVIDED IN THE PLAN; (R) ALL HOLDERS OF CLAIMS OR INTERESTS THAT VOTE TO REJECT THE PLAN OR ARE DEEMED TO REJECT THE PLAN AND WHO DO NOT AFFIRMATIVELY OPT OUT OF THE RELEASES PROVIDED BY THE PLAN BY CHECKING THE BOX ON THE APPLICABLE BALLOT INDICATING THAT THEY OPT NOT TO GRANT THE RELEASES PROVIDED IN THE PLAN; (S) EACH CURRENT AND FORMER AFFILIATE OF EACH ENTITY IN CLAUSE (A) THROUGH (R); AND (T) EACH RELATED PARTY OF EACH ENTITY IN CLAUSE (A) THROUGH (R).

**IMPORTANT INFORMATION REGARDING THE RELEASES:**

AS A HOLDER OF A CLAIM OR INTEREST, YOU ARE A "RELEASING PARTY" UNDER THE PLAN AND ARE DEEMED TO PROVIDE THE THIRD-PARTY RELEASE CONTAINED IN ARTICLE VIII.D OF THE PLAN, AS SET FORTH ABOVE. YOU MAY CHECK THE BOX BELOW TO ELECT NOT TO GRANT THE RELEASE CONTAINED IN ARTICLE VIII.D OF THE PLAN. YOU WILL NOT BE CONSIDERED A "RELEASING PARTY" UNDER THE PLAN ONLY IF (I) THE BANKRUPTCY COURT DETERMINES THAT YOU HAVE THE RIGHT TO OPT OUT OF THE RELEASES AND (II) YOU (A) CHECK THE BOX BELOW AND SUBMIT THE BALLOT BY THE VOTING DEADLINE, (B) FILE AN OBJECTION TO THE RELEASES CONTAINED IN THE PLAN WITH THE BANKRUPTCY COURT PRIOR TO THE PLAN OBJECTION DEADLINE, OR (C) VOTE TO REJECT THE PLAN AND SUBMIT THE BALLOT BY THE VOTING DEADLINE. THE ELECTION TO WITHHOLD CONSENT TO GRANT THE THIRD-PARTY RELEASE IS AT YOUR OPTION.

☑ **By checking this box, you elect to opt out of the Third-Party Releases.Item 3.**
Certifications.

By signing this Opt Out Form, the undersigned certifies:

(a) that, as of the Voting Record Date, either: (i) the Entity is the Holder of the Claim or Interests set forth in Item 1; or (ii) the Entity is an authorized signatory for an Entity that is a Holder of the Claim or Interests set forth in Item 1;

(b) that the Holder has received a copy of the *Notice of Non-Voting Status to Holders of (I) Unimpaired Claims Conclusively Presumed to Accept the Plan and (II) Impaired Claim Conclusively Presumed to Reject the Plan* and that this Opt Out Form is made pursuant to the terms and conditions set forth therein;

(a) that the Entity has submitted the same respective election concerning the releases with respect to all Claims or Interests in a single Class set forth in Item 1; and

(b) that no other Opt Out Form with respect to the amount(s) of Claims or Interests identified in Item 1 have been submitted or, if any other Opt Out Form have been submitted with respect to such Claims or Interests, then any such earlier Opt Out Forms are hereby revoked.

| | |
|---|---|
| Name of Holder: | Michael D. Van Deelen |
| | (Print or Type) |
| Signature: | Michael D. Van Deelen |
| Name of Signatory: | |
| | (If other than holder) |
| Title: | N/A |
| Address: | 16215 Frian Circle |
| | Spring, TX 77379 |
| Telephone Number: | 832-562-0723 |
| Email: | michaelvandeelen@gmail.com |
| Date Completed: | 2/13/20 |

## PLEASE SUBMIT YOUR OPT OUT FORM BY ONE OF THE FOLLOWING TWO METHODS:

**Via Paper Form. Complete, sign, and date this Opt Out Form and return it (with an original signature) promptly via first class mail (or in the enclosed reply envelope provided), overnight courier, or hand delivery to:**

<div align="center">

McDermott Opt Out Form Processing
c/o Prime Clerk LLC
One Grand Central Place
60 East 42nd Street, Suite 1440
New York, NY 10165

</div>

Michael Van Deelen
16215 Friar Circle
Spring, TX 77379

McDermott Opt out form Processing
c/o Prime Clerk LLC
One Grand Central Place
60 East 42nd Street, Suite 1440
New York, NY 10165



Address:              4656 FM 1960 RD W
                      HOUSTON
                      TX 77069
Location:             DWHK
Device ID:            ~BTC02
Transaction:          940256549995

FedEx Standard Overnight
390386463532    0.2 lbs. (S)        38.45
     Declared Value   100
Recipient Address:
     C/O Prime Clerk LLC
     McDermott Opt Out Form Processing
     60 East 42nd Street, Ste 1440
     One Grand Central Place
     New York, NY 10165
     0000000000

Scheduled Delivery Date 2/17/2020

Pricing option:
     ONE RATE

Package Information:
     FedEx Envelope

          Shipment subtotal:      $38.45

                  Total Due:      $38.45

            (S) CreditCard:       $38.45
          ************1248

# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

|  |  |  |
|---|---|---|
| In re: | § | Chapter 11 |
|  | § |  |
| MCDERMOTT INTERNATIONAL, INC., *et al.*,[1] | § | Case No. 20-30336 (DRJ) |
|  | § |  |
| Reorganized Debtors. | § | (Jointly Administered) |
|  | § |  |
|  | § |  |
| MICHAEL VAN DEELEN | § |  |
|  | § |  |
| Plaintiff, | § | Adv. Proc. No. 20-03309 |
|  | § |  |
| v. | § |  |
|  | § |  |
| DAVID DICKSON, | § |  |
| and STUART SPENCE, | § |  |
| and SCOTT LAMB, | § |  |
| and 10 JOHN/JANE DOES | § |  |
|  | § |  |
| Defendants. | § |  |
|  | § |  |

## DEFENDANTS' MOTION TO DISMISS
## PLAINTIFF'S ORIGINAL PETITION

**This motion seeks an order that may adversely affect you. If you oppose the motion, you should immediately contact the moving party to resolve the dispute. If you and the moving party cannot agree, you must file a response and send a copy to the moving party. You must file and serve your response within 21 days of the date this was served on you. Your response must state why the motion should not be granted. If you do not file a timely response, the relief may be granted without further notice to you. If you oppose the motion and have not reached an agreement, you must attend the hearing. Unless the parties agree otherwise, the court may consider evidence at the hearing and may decide the motion at the hearing.**

**Represented parties should act through their attorneys.**

---

[1] A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://cases.primeclerk.com/McDermott. The location of Debtor McDermott International, Inc.'s principal place of business and the Debtors' service address in these chapter 11 cases is 757 North Eldridge Parkway, Houston, Texas 77079.

# TABLE OF CONTENTS

**Page**

I.     PRELIMINARY STATEMENT ...................................................................... 1

II.    FACTUAL BACKGROUND ........................................................................... 2

       A.     McDermott's only viable option was to file for relief under chapter 11. ............... 2

       B.     The Court confirmed McDermott's value-maximizing Plan, which
              included release, exculpation, and injunction provisions. ...................................... 3

              i.     The Exculpation broadly released claims related to the bankruptcy
                     proceedings and related prepetition transactions. ......................................... 4

              ii.    Unless a party specifically objected to or properly opted out of the
                     Release, the Release broadly released all claims other than fraud
                     related to the Debtors and their business. ...................................... 5

              iii.   The Injunction Provision prohibits any parties from commencing
                     or continuing any action based on Released Claims................................ 9

       C.     Van Deelen objected to confirmation of McDermott's Plan but did not
              object to or properly opt out of the Release. ......................................................... 10

       D.     Van Deelen then filed suit in state court asserting Released Claims
              explicitly subject to the Exculpation, Release, and Injunction Provision. ............. 10

III.   STANDARD OF REVIEW .......................................................................... 11

IV.    ARGUMENT ............................................................................................... 11

       A.     Because the Confirmation Order expressly bars Van Deelen's claims for
              conversion, negligent misrepresentation, breach of fiduciary duty, and
              conspiracy, the Court should dismiss those claims................................. 11

              i.     The Exculpation bars all of Van Deelen's claims other than for
                     fraud. ........................................................................................ 12

              ii.    The Release also bars all of Van Deelen's claims other than for
                     fraud. ........................................................................................ 14

              iii.   Van Deelen violated the Injunction Provision in bringing his
                     claims. ....................................................................................... 16

       B.     The Court also should dismiss Van Deelen's claims because they fail to
              satisfy the basic pleading requirements of the Federal Rules. ............................. 16

i

i.      The conversion claim does not state a claim upon which relief may
        be    granted because it is based on share value Van Deelen lost
        pursuant to    a lawful chapter 11 plan. .......................................................... 16

ii.     Neither of the fraud claims meets the heightened pleading
        requirements of Federal Rule 9(b) because they do not state with
        particularity the circumstances giving rise to fraud. ................................. 19

iii.    The claims for negligent misrepresentation, breach of fiduciary
        duty, and conspiracy fail to state claims upon which relief can be
        granted because they do nothing more than generically recite their
        underlying elements without identifying any specific ways the
        elements are satisfied. ............................................................................... 21

V.      CONCLUSION.............................................................................................. 23

ii

# TABLE OF AUTHORITIES

**Cases**                                                                                                      **Page(s)**

*American Broad. Sys. v. Nugent (In re Betacom of Phoenix, Inc.)*,
   240 F.3d 823 (9th Cir. 2001) ........................................................................................18

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)......................................................................................................11

*United States ex rel. Barrett v. Johnson Controls, Inc.*,
   No. 3:01-CV-1641-M, 2003 U.S. Dist. LEXIS 5973 (N.D. Tex. Apr. 9, 2003) ....................19

*Bell Atlantic Corp. v. Twombly*,
   550 U.S. 544 (2007)................................................................................................11, 22

*In re Camp Arrowhead, Ltd.*,
   451 B.R. 678 (Bankr. W.D. Tex. 2011) ..........................................................................15

*Cole v. Nabors Corporate Servs., Inc. (In re CJ Holding Co.)*,
   2019 U.S. Dist. LEXIS 21199 (S.D. Tex. Feb. 8, 2019) ..................................................14

*In re CSMG Techs., Inc.*,
   No. 14-31320-hdh, 2014 WL 1682861 (Bankr. N.D. Tex. Apr. 29, 2014) ...........................18

*Devon Energy Corp. v. Westacott*,
   No. H-09-1689, 2011 WL 1157334 (S.D. Tex. March 24, 2011) .........................................16

*KIT Digital, Inc. v. Invigor Group Ltd. (In re KIT Digital, Inc.)*,
   497 B.R. 170 (Bankr. S.D.N.Y. 2013)............................................................................18

*Kougl v. Xspedius Mgmt. Co. of Dallas/Fort Worth, L.L.C.*,
   No. Civ.A.3:04CV2518-D, 2005 WL 1421446 (N.D. Tex. June 1, 2005)............................22

*Mesdag v. Nancy Sue Davis Trust (In re Davis Offshore, L.P.)*,
   644 F.3d 259 (5th Cir. 2011) ........................................................................................12

*Permian Petroleum Co. v. Petroleos Mexicanos*,
   934 F.2d 635 (5th Cir. 1991) ........................................................................................18

*Quantlab Techs. Ltd (BVI) v. Godlevsky*,
   719 F. Supp. 2d 766 (S.D. Tex. 2010) ...........................................................................17

*In re Sabine Oil & Gas Corp.*,
   555 B.R. 180 (Bankr. S.D.N.Y. 2016).............................................................................18

*In re Simmons Bedding Co.*,
   No. 09-14-037 (MFW), 2010 WL 2906458 (D. Del. Jan. 5, 2010)......................................18

*Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.*,
   365 F.3d 353 (5th Cir. 2004) ................................................................20

*Trevino v. HSBC Mortgs. Servs., Inc. (In re Trevino)*,
   535 B.R. 110 (Bankr. S.D. Tex. 2015) ................................................11

*Williams v. WMX Techs.*,
   112 F.3d 175 (5th Cir. 1997) .............................................19, 20, 22

**Rules**

Fed. R. Bankr. P. 7012 ...........................................................................1

Fed. R. Civ. P. 9(b) ...........................................................19, 20, 22, 23

Fed. R. Civ. P. 12 ....................................................................................1

Fed. R. Civ. P. 12(b)(6)....................................................................1, 22

iv

Defendants David Dickson, Stuart Spence, and Scott Lamb (collectively, "Defendants") hereby file this motion to dismiss Plaintiff Michael Van Deelen's ("Van Deelen") Original Petition (the "Complaint") (the "Motion") pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure (the "Federal Rules") and Rule 7012 of the Federal Rules of Bankruptcy Procedure (which incorporates by reference Federal Rule 12). In support of the Motion, Defendants respectfully state:

## I.       PRELIMINARY STATEMENT

1.       This Court should dismiss all of Mr. Van Deelen's claims because they are explicitly foreclosed by the Confirmation Order and/or suffer from pleading defects that either cannot or should not be allowed to be corrected.  Van Deelen actively participated in McDermott's bankruptcy proceedings in which he objected to confirmation of McDermott's chapter 11 plan of reorganization on the unsupported theory that McDermott never should have filed for chapter 11 and that its filing and the transactions leading up to and included as part of the plan were somehow fraudulent or otherwise wrongful.  Despite having the opportunity, he presented no evidence in support of his theory and McDermott's plan was confirmed over his objection.

2.       Van Deelen was made fully aware of the exculpation, release, and injunction provisions included in the confirmed plan that released and prohibited parties from bringing a wide range of claims.  But completely ignoring this Court's Confirmation Order, he then asserted the claims in this lawsuit against McDermott officers based on alleged conduct related to the chapter 11 proceedings and related transactions, conduct that was explicitly exculpated and released in the confirmation order.  While understandable that Van Deelen is upset about an investment that did not turn out well, flouting of this Court's order is not excusable.

3.       Many of Van Deelen's claims make no effort to meet the pleading requirements, simply reciting the elements of claims from a form book.  While minor pleading defects can be

1

addressed through amendment, here the defects must be viewed in the context in which the claims have been brought:  no effort was made whatsoever to articulate how any of these claims could go forward notwithstanding the exculpation, release, and injunction provisions in the Confirmation Order nor was any serious effort made to substantiate the specifics of the serious fraud allegations made here.  Every one of Van Deelen's claims should be dismissed with prejudice.

## II.     FACTUAL BACKGROUND

**A.     McDermott's only viable option was to file for relief under chapter 11.**

4.      McDermott was founded nearly a century ago in east Texas. Since that time, and through strategic acquisitions and business combinations, McDermott has become a premier upstream and downstream engineering procurement, construction, and installation company. In this capacity, McDermott has focused on delivering fixed and floating production facilities, pipelines, installations, and subsea systems which allow for the safe production and transportation of hydrocarbons. McDermott currently operates in 54 countries, has over 42,000 employees and independent contractors, and maintains a diverse fleet of specialty marine construction vessels and fabrication facilities.

5.      Notwithstanding this growth and success, McDermott was facing a severe liquidity problem in September 2019. Much of McDermott's cash was trapped within its joint venture operations, and McDermott had inherited from a previous combination certain legacy onshore projects that resulted in large, unanticipated losses. The confluence of these and other factors created an acute liquidity crisis that McDermott could no longer manage. McDermott had to restructure.

6.      In an effort to facilitate this restructuring and avoid liquidation, McDermott obtained, on an emergency basis, a liquidity infusion through a superpriority financing facility. McDermott received the first tranche of this superpriority financing in October 2019, and used the

additional runway to reassess its operations and financial condition. Specifically, over the next several months, McDermott engaged financial and legal advisors, shared a significant amount of information with its prepetition lenders, negotiated extensively with stakeholders, and considered all possible alternatives. Ultimately, McDermott determined that a pre-packaged balance sheet restructuring was the best way to maximize value for its stakeholders.

7.     To that end, on January 22, 2020, McDermott filed a voluntary petition for relief (Bankr. Dkt. 5) (the "<u>Petition</u>") under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "<u>Court</u>"). McDermott amended or supplemented the Petition and the plan of reorganization several times during the course of the bankruptcy proceedings (Bankr. Dkt. 121, 520, 620, 622, 647, 651) (collectively, the "<u>Plan</u>"). The Plan reflected substantial levels of support among McDermott's lenders--a difficult feat given the scale and complexity of McDermott's operations, the number of stakeholder constituencies and their divergent interests, and the urgent nature of McDermott's capital needs.

**B.     The Court confirmed McDermott's value-maximizing Plan, which included release, exculpation, and injunction provisions.**

8.     On March 14, 2020, the Court entered its *Amended Order Approving the Debtors' Disclosure Statement and Confirming the Second Amended Joint Prepackaged Chapter 11 Plan of Reorganization (Technical Modifications) of McDermott International, Inc. and Its Debtor Affiliates* (Bankr. Dkt. 684) (the "<u>Confirmation Order</u>").

9.     The Confirmation Order approving the Plan contains three provisions relevant to this dispute: an exculpation provision ("<u>Exculpation</u>"); a release provision ("<u>Release</u>"); and an injunction provision ("<u>Injunction Provision</u>").

### i.     The Exculpation broadly released claims related to the bankruptcy proceedings and related prepetition transactions.

10.     The Exculpation released and exculpated the "Exculpated Part[ies]"[2] from claims related to, among other things, McDermott's chapter 11 proceedings and administration and implementation of the Plan:

> 52. Except as otherwise specifically provided in the Plan or this Confirmation Order, no Exculpated Party shall have or incur liability for, and each Exculpated Party shall be released and exculpated from any Claims and Cause of Action for any claim related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, filing, or termination of the Restructuring Support Agreement and related prepetition transactions (including the Superpriority Credit Agreement, the Credit Agreement, the Senior Notes Indenture or Senior Notes, the 2021 LC Agreement, and the Lloyds Letter of Credit Agreement), the Disclosure Statement, the Plan, the DIP Credit Facility, the Exit Facility Documents, the New Warrants Agreements, the Plan Supplement, the Rights Offering, or any Restructuring Transaction, contract, instrument, release or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or this Confirmation Order in lieu of such legal opinion), including any Definitive Document, created or entered into before or during the Chapter 11 Cases, any preference, fraudulent transfer, or other avoidance claim arising pursuant to chapter 5 of the Bankruptcy Code or other applicable law, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the

---

[2]     The Plan defines "Exculpated Parties" to mean:

> collectively, and in each case in its capacity as such: (a) the Debtors; (b) any official committees appointed in the Chapter 11 Cases and each of their respective members; (c) the Consenting Stakeholders and any affiliated Hedge Banks; (d) each Agent and the Senior Notes Trustee, and (e) with respect to each of the foregoing, such Entity and its current and former Affiliates, and such Entity's and its current and former Affiliates' current and former equity holders, subsidiaries, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals.

*See* Plan, Art. I, § A.

4

issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, except for claims related to any act or omission that is determined in a Final Order by a court of competent jurisdiction to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.

53. The Exculpated Parties and other parties set forth above have, and upon confirmation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

(Bankr. Dkt. 684, Confirmation Order ¶¶ 52-53 (emphases added)).

**ii.     Unless a party specifically objected to or properly opted out of the Release, the Release broadly released all claims other than fraud related to the Debtors and their business.**

11.     The Release, for its part, broadly released and discharged claims other than for fraud against the "Released Part[ies]."[3] By its own terms, the Release discharged claims related to

---

[3]     McDermott's Plan defines "Released Parties" to mean:

> collectively, and in each case in its capacity as such: (a) each Debtor; (b) each Reorganized Debtor; (c) each Company Party; (d) each DIP Lender and each DIP Letter of Credit Issuer; (e) each Agent; (f) the Senior Notes Trustee; (g) each Consenting Stakeholder; (h) each Hedge Bank; (i) each Cash Management Bank; (j) each lender under the Superpriority Credit Agreement, Credit Agreement, the 2021 LC Agreement, and the Lloyds Letter of Credit Agreement; (k) each holder of an Obligation (as defined in the Superpriority Credit Agreement) under the Superpriority Credit Agreement; (l) each holder of an Obligation (as defined in the Credit Agreement) under the Credit Agreement; (m) each Issuer (as defined in the Superpriority Credit Agreement) under the Superpriority Credit Agreement; (n) each Issuer (as defined in the Credit Agreement) under the Credit Agreement; (o) the Term Loan Ad Hoc Group, the Liquidity Lender Steering Committee, and the Senior Notes Ad Hoc Group; (p) Illuminate Buyer LLC; (q) each current and former Affiliate of each Entity in clause (a) through (p); and (r) each Related Party

5

McDermott's prepetition business transactions or chapter 11 proceedings unless a party specifically objected to the Release:

48. Except as otherwise expressly set forth in the Plan or this Confirmation Order, on and after the Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, ***each Released Party is, and is deemed hereby to be, fully, conclusively, absolutely, unconditionally, irrevocably and forever, released and discharged by each Releasing Party***, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, ***from any and all Claims and Causes of Action***, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, contingent or non-contingent, in law, equity, contract, tort, or otherwise, including any derivative claims asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim against, or Interest in, a Debtor or other Entity, or that any holder of any Claim against, or Interest in, a Debtor or other Entity could have asserted on behalf of the Debtors, ***based on or relating to, or in any manner arising from, in whole or in part***:

(i) ***the Debtors (including the capital structure, management, ownership, or operation thereof)***, the business or contractual arrangement between the Debtors and any Releasing Party, ***any Securities issued by the Debtors and the ownership thereof,*** the assertion or enforcement of rights and remedies against the Debtors, ***the Debtors' in- or out-of-court restructuring efforts***, any Avoidance Actions (but excluding Avoidance Actions brought as counterclaims or defenses to Claims asserted against the Debtors), intercompany transactions between or among a Company Party and another Company Party, the Superpriority Credit Agreement, the Credit Agreement, the Hedge Agreements (as defined in the Hedging Order), the 2021

---

of each Entity in clause (a) through (p); *provided* that any holder of a Claim or Interest that opts out of the releases shall not be a "Released Party."

*See* Plan, Art. I, § A.

LC Agreement, the Lloyds Letter of Credit Agreement, Senior Notes Indenture, the Senior Notes, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Restructuring Support Agreement, the Disclosure Statement, the DIP Credit Agreement, the Exit Facility Documents, or the Plan (including, for the avoidance of doubt, the Plan Supplement);

(ii)     *any Restructuring Transaction, contract, instrument, release, or other agreement or document* (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or this Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Restructuring Support Agreement, the Rights Offering, the Disclosure Statement, the DIP Credit Agreement, the New Warrants Agreements, the Exit Facility Documents, the Plan, or the Plan Supplement, before or during the Chapter 11 Cases;

(iii)    *the Chapter 11 Cases, the filing of the Chapter 11 Cases, the Disclosure Statement, or the Plan*, the solicitation of votes with respect to the Plan, the pursuit of Confirmation, *the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, the Rights Offering, or the distribution of property under the Plan or any other related agreement*; or

(iv)    any related act or omission, transaction, agreement, event, or other occurrence related or relating to any of the foregoing taking place on or before the Effective Date, including all Avoidance Actions or other relief obtained by the Debtors in the Chapter 11 Cases.

49. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (i) any party of any obligations related to customary banking products, banking services or other financial accommodations (except as may be expressly amended or modified by the Plan and the Exit Facility Documents, or any other financing document under and as defined therein), (ii) any post-Effective Date obligations of any party or Entity under the Plan, this Confirmation Order, any

7

Restructuring Transaction, or any document, instrument, any Definitive Document, or any agreement (including those set forth in the Plan Supplement) executed to implement the Plan, including the Exit Facility Documents, the New Warrants Agreements, or any Claim or obligation arising under the Plan, (iii) the rights of holders of Allowed Claims to receive distributions under the Plan, or (iv) *current and former directors, officers, managers, or employees of the Debtors from any Claim or Cause of Action related to an act or omission that is determined in a Final Order by a court of competent jurisdiction to have constituted actual fraud*.

50. Entry of this Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the foregoing Third-Party Release, which includes by reference each of the related provisions and definitions contained herein, and, further, shall constitute the Bankruptcy Court's finding that the foregoing Third-Party Release is: (a) consensual; (b) essential to the Confirmation of the Plan; (c) given in exchange for a substantial contribution and for the good and valuable consideration provided by the Released Parties that is important to the success of the Plan; (d) a good faith settlement and compromise of the Claims released by the foregoing Third-Party Release; (e) in the best interests of the Debtors and their Estates; (f) fair, equitable, and reasonable; (g) given and made after due notice and opportunity for hearing; and (h) a bar to any of the Releasing Parties asserting any claim or Cause of Action released pursuant to the foregoing Third-Party Release.

51. For the avoidance of doubt, any Person who timely Filed an objection to the foregoing Third-Party Release, regardless of whether such objection was later withdrawn, shall not be deemed a "Released Party" or a "Releasing Party."

(Bankr. Dkt. 684, Confirmation Order ¶¶ 48-51 (emphases added)).

### iii.     The Injunction Provision prohibits any parties from commencing or continuing any action based on Released Claims.

12.     Last, the Injunction Provision permanently enjoined holders of "Released Claims"[4] from commencing or continuing any action against the "Exculpated[] or []Released Parties" in connection with such claims:

> 54. Except as otherwise expressly provided in the Plan or this Confirmation Order or for obligations or distributions issued or required to be paid pursuant to the Plan or this Confirmation Order, ***all Entities who have held, hold, or may hold the Released Claims are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties: (1) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any Released Claims***; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any Released Claims; (3) creating, perfecting, or enforcing any lien or encumbrance of any kind against such Entities or the property of such Entities on account of or in connection with or with respect to any Released Claims; (4) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property or the Estates of such Entities on account of or in connection with or with respect to any Released Claims unless such holder has filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a Claim or Interest or otherwise that such holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any Released Claims released or settled pursuant to the Plan.

> 55. Upon entry of this Confirmation Order, all holders of Claims and Interests and their respective current and former employees, agents, officers, directors, principals, and direct and indirect

---

[4]     The Plan defines "Released Claims" to mean "any Claims or Interests that have been released, discharged, or are subject to exculpation pursuant to this Plan." *See* Plan, Art. I, § A.

> Affiliates shall be enjoined from taking any actions to interfere
> with the implementation or Consummation of the Plan. Unless
> otherwise set forth in this Confirmation Order, each holder of an
> Allowed Claim or Allowed Interest, as applicable, by accepting,
> or being eligible to accept, distributions under or Reinstatement
> of such Claim or Interest, as applicable, pursuant to the Plan,
> shall be deemed to have consented to the injunction provisions
> set forth in Article VIII.F of the Plan.

(Bankr. Dkt. 684, Confirmation Order ¶¶ 54-55 (emphasis added).)

**C.     Van Deelen objected to confirmation of McDermott's Plan but did not object to or properly opt out of the Release.**

13.     Van Deelen does not even allege that he objected to or opted out of the Release. On February 27, 2020, Van Deelen filed a motion (Dkt. 510) (the "Motion") with this Court alleging that McDermott had improperly sought chapter 11 relief. Specifically, Van Deelen alleged that McDermott had proposed the Plan in bad faith because the Plan called for the cancellation of existing shares and the re-equitization of the company "for the sole purpose of enriching McDermott's management and Board." (Bankr. Dkt. 510, Motion at 6-15.) Based on these allegations, Van Deelen requested that the Court deny McDermott's Plan, but he did not--in the Motion or any other filing--object to or otherwise mention the Release Provision.

14.     The Court overruled and denied Van Deelen's Motion on March 14, 2020. (*See* Bankr. Dkt. 684, Confirmation Order ¶ 11.)

**D.     Van Deelen then filed suit in state court asserting Released Claims explicitly subject to the Exculpation, Release, and Injunction Provision.**

15.     Three months after the Court confirmed McDermott's Plan, on June 23, 2020, Van Deelen filed suit against Defendants in Texas state court asserting claims for (1) conversion; (2) common law fraud; (3) statutory fraud; (4) negligent misrepresentation; (5) breach of fiduciary duty; and (6) conspiracy. *See* Complaint ¶¶ 65-112. The gravamen of Van Deelen's Complaint is the same as his Motion:  he alleges that Defendants, as officers of McDermott, caused McDermott

10

to undergo an unnecessary chapter 11 restructuring for their own benefit and to the detriment of Van Deelen and other shareholders. *Id*. ¶¶ 13-60.

16.     For the reasons set forth in more detail below, the Court should dismiss these claims because they violate the Confirmation Order's Exculpation, Release, and/or Injunction Provision and because they fail to satisfy federal pleading standards.

## III.     STANDARD OF REVIEW

17.     To survive a motion to dismiss, a complaint "must contain sufficient factual matter, accepted as true, to state a claim that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted). "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id*. (internal quotation marks omitted). Though the court must accept the plaintiff's allegations as true, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id*. at 678; *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 545 (2007) (plaintiff required to provide more than "labels and conclusions, and a formulaic recitation of the elements of a cause of action"). Instead, the complaint "must provide the plaintiff's grounds for entitlement to relief -- including factual allegations that when assumed to be true raise a right to relief beyond the speculative level." *Trevino v. HSBC Mortgs. Servs., Inc. (In re Trevino)*, 535 B.R. 110, 126 (Bankr. S.D. Tex. 2015) (quoting *Lormand v. U.S. Unwired, Inc.*, 565 F.3d 228, 232 (5th Cir. 2009) (internal quotation marks omitted)).

## IV.     ARGUMENT

**A.     Because the Confirmation Order expressly bars Van Deelen's claims for conversion, negligent misrepresentation, breach of fiduciary duty, and conspiracy, the Court should dismiss those claims.**

18.     In asserting claims for conversion, negligent misrepresentation, breach of fiduciary duty, and conspiracy, Van Deelen violated the Confirmation Order's Exculpation, Release, and

11

Injunction Provision.   Van Deelen is using these claims to re-litigate his contention that McDermott never should have filed for chapter 11 or engaged in the transactions at the heart of the chapter 11 Plan for reorganization.   But the Exculpation expressly releases any such claims against the Defendants.   Further, because Van Deelen did not object to the Release, his claims other than fraud are likewise released by the Release.   The Injunction Provision bars bringing any such Released Claims.

<div align="center">

**i.**      **The Exculpation bars all of Van Deelen's claims other than for fraud.**

</div>

19.      The Exculpation "released and exculpated [the Exculpated Parties] from any [non-fraud] Claims and Cause[s] of Action . . . related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 cases, . . . the filing of the Chapter 11 Cases, the pursuit of Confirmation, [and] the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the plan[.]" (Bankr. Dkt. 684, Confirmation Order ¶ 52.)

20.      All of Van Deelen's claims other than for fraud fall squarely within the ambit of this provision and should be dismissed. *See Mesdag v. Nancy Sue Davis Trust (In re Davis Offshore, L.P.)*, 644 F.3d 259, 263 (5th Cir. 2011) (holding that reorganization plan's release and exculpation clauses barred equity holder's claims). As a threshold matter, Defendants are "Exculpated Parties" for purposes of the Confirmation Order because they are current or former officers of McDermott. (*See* Bankr. Dkt. 620, Plan, Art. I, § A.) Moreover, each of these claims is based on or related to McDermott's restructuring and administration of the Plan. This is no clearer than in Van Deelen's conversion claim, which repeatedly references McDermott's decision to file for relief under chapter 11:

> The conversion included, but was not limited to, unnecessarily writing down goodwill and intangible assets for no other purpose than destroying shareholder equity in advanced of a planned, but unannounced, bankruptcy filing; unnecessarily declaring Chapter 11 bankruptcy for no other purpose than enriching defendant Dixon and

<div align="center">12</div>

> other company insiders; announcing that the company was going to cancel the stock of plaintiff and other shareholders in connection with the unnecessary Chapter 11 bankruptcy; and chilling plaintiff from exercising his rights as a shareholder to contact company managements and other personnel by asking the bankruptcy court to prevent plaintiff from doing so.

*See* Complaint ¶ 68.

21.     Van Deelen's negligent misrepresentation and breach of fiduciary duty claims similarly relate to the chapter 11 restructuring because they turn on Defendants' alleged failure to disclose information regarding the restructuring. Specifically, with respect to his negligent misrepresentation claim, Van Deelen argues that he "suffered damages in connection with his purchase []of" McDermott stock because he would not have purchased the stock "if [he] had been provided accurate and not misleading information by the defendants about . . . the defendants [sic] plan to wrongly take the company into bankruptcy." *Id*. ¶ 98. Van Deelen's breach of fiduciary duty claim likewise is rooted in his contention that the chapter 11 filing should not have taken place in that he asserts that Defendants "owed and owe [him] a fiduciary duty . . . which includes . . . not to fraudulently cause the company to file for bankruptcy protection . . . [and] to keep plaintiff informed concerning any bankruptcy plans the company has[.]" *Id*. ¶ 64.

22.     Finally, though Van Deelen's conspiracy claim fails for lacking the specificity required under the Federal Rules and not alleging any specific wrongful act the Defendants allegedly conspired to commit, even giving this claim the benefit of the doubt, it must fail in any event because it also necessarily relates to the chapter 11 restructuring and Defendants' related alleged acts or omissions. Though Van Deelen does not allege any facts specifically describing the aim or scope of the conspiracy, and though his Complaint only includes "threadbare recitals" of the underlying elements for conspiracy, Van Deelen does allege that:

13

- Defendants "left [shareholders] in the dark about the Financing Case and very serious earnings, cash flow and loan covenant issues the company faced." *Id*. ¶ 27; *see also id*. ¶¶ 15, 20, 23, 30-31, 48.

- Defendants failed to "report to shareholders the highly material fact that the Financing Plan represented a path to salvation for the company and its shareholders." *Id*. ¶ 32; *see also id*. ¶ 33.

- Defendants "chose Chapter 11 and the subsequent losses, pain and suffering that would cause for its thousands of McDermott shareholders" because Defendants would "get rich." *Id*. ¶ 35; *see also id*. ¶¶ 36, 58.

- Defendants "hid the fact that [McDermott] had made the decision to declare Chapter 11 bankruptcy from its shareholders." *Id*. ¶ 37; *see also id*. ¶¶ 39-41, 43, 45-46, 59.

- "Defendant Spence" resigned from McDermott, received "a severance payment of $866 thousand," and signed a release, non-disparagement, and non-disclosure agreement with McDermott--facts from which "[i]t can be inferred" that "Defendant Spence may know something that McDermott is paying him not to discuss." *Id*. ¶¶ 49-55.

These and other similar allegations concern Defendants' participation in McDermott's restructuring efforts, and though not identified as such, are the only grounds on which Van Deelen could have asserted his conspiracy claim.

23.    Van Deelen's claims for conversion, negligent misrepresentation, breach of fiduciary duty, and conspiracy all directly "relate to" McDermott's restructuring and the "administration and implementation of the Plan," and are therefore subject to the Exculpation. The Court should dismiss these claims accordingly.

    ii.    **The Release also bars all of Van Deelen's claims other than for fraud.**

24.    The Release broadly releases and discharges the "Released Part[ies]" from claims, other than for "actual fraud", of anyone who did not object to the Release.  (Bankr. Dkt. 684, Confirmation Order ¶¶ 48-48, 51.)

25.    For purposes of the Confirmation Order, Defendants are "Released Parties" because they are current or former officers or employees of McDermott. (*See* Bankr. Dkt. 620,

14

Plan, Art. I, § A.) Van Deelen does not allege anywhere in his Complaint that he objected to or properly opt out of the Release.   Therefore, he is a "Releasing Party." *See Cole v. Nabors Corporate Servs., Inc. (In re CJ Holding Co.)*, 2019 U.S. Dist. LEXIS 21199, at *21-22 (S.D. Tex. Feb. 8, 2019) ("Allowing the bankruptcy court to approve the Plan releases, including construing Cole's silence as consent, serves the bankruptcy law's purpose of quick and efficient resolution of claims to permit a debtor's business to continue."); *In re Camp Arrowhead, Ltd.*, 451 B.R. 678, 701-02 (Bankr. W.D. Tex. 2011) (noting that "the Fifth Circuit does allow permanent injunctions so long as there is consent," and "[w]ithout an objection, [the bankruptcy court] was entitled to rely on [the creditor's] silence to infer consent").

26.      The Release, like the Exculpation, releases claims "based on or relat[ed] to . . . the Chapter 11 Cases, the filing of the Chapter 11 Cases, . . . the Plan, . . . the pursuit of Confirmation, . . . [and] the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan."  (Bankr. Dkt. 684, Confirmation Order ¶¶ 48-49, 51.)  But the Release is not limited only to claims related to the chapter 11 filing and related transactions, however.  Rather, the Release more broadly covers claims "based on or relating to, or in any manner arising from, in whole or in part:   (i) the Debtors (including the capital structure, management, ownership, or operation thereof), the business or contractual arrangement between the Debtors and any Releasing Party, any Securities issued by the Debtors and the ownership thereof . . ."  (Bankr. Dkt. 684, Confirmation Order ¶ 48(i).)

27.      Van Deelen's claims other than fraud on their face are "based on or relat[ed] to" McDermott's chapter 11 restructuring and administration of the Plan.  But even if any aspect of Van Deelen's claims were not based on or related to McDermott's chapter 11 restructuring and administration of the Plan, there can be no doubt that each of these claims is based on or related to

"the Debtors" more generally, the Debtors' "business or contractual arrangement" with Van Deelen or other Releasing Parties, or "Securities issued by the Debtors and the ownership thereof". Therefore, all of Van Deelen's claims other than for actual fraud are "Released Claims" under the Confirmation Order for which Van Deelen cannot recover.

### iii. Van Deelen violated the Injunction Provision in bringing his claims.

28.     The Injunction Provision--no less than the Exculpation and Release--provides a basis to dismiss the claims other than fraud. For its part, the Injunction Provision provides that the holders of any "Released Claims are permanently enjoined . . . from commencing or continuing in any manner any action or other proceeding of any kind [against the Exculpated or Released Parties] on account of or in connection with  . . .[such] Released Claims." (Bankr. Dkt. 684, Confirmation Order ¶ 54.)

29.      Van Deelen did not object to the Release or otherwise preserve his right to litigate matters falling within the scope of the Release following the Plan's effective date. Because Van Deelen's claims for conversion, negligent misrepresentation, breach of fiduciary duty, and conspiracy fall within the scope of the Release, these claims are "Released Claims" that the Injunction Provision bars Van Deelen from bringing.

**B.     The Court also should dismiss Van Deelen's claims because they fail to satisfy the basic pleading requirements of the Federal Rules.**

### i. The conversion claim does not state a claim upon which relief may be granted because it is based on share value Van Deelen lost pursuant to a *lawful* chapter 11 plan.

30.     Under Texas law, conversion has four elements: (1) the plaintiff owned or legally possessed the property or was entitled to its possession; (2) the defendant *unlawfully* and without authorization assumed and exercised dominion and control over the property *to the exclusion of, or inconsistent with, the plaintiff's ownership rights*; (3) the plaintiff demanded the property's

16

return; and (4) the defendant refused to return it. *Devon Energy Corp. v. Westacott*, No. H-09-1689, 2011 WL 1157334, *8 (S.D. Tex. March 24, 2011).

31.     First, Van Deelen asserts that Defendants converted company good will and intangible assets and his right to "contact company managements and other personnel[.]" *See* Complaint ¶ 68. But as a matter of law, these assets and rights cannot give rise to a conversion claim. *See, e.g.*, *Quantlab Techs. Ltd (BVI) v. Godlevsky*, 719 F. Supp. 2d 766, 778 (S.D. Tex. 2010) ("[C]ourts have held that conversion law does not apply to forms of intangible property which do not generally merge with a document.")

32.     Second, Van Deelen asserts that Defendants converted his McDermott shares.  But he has failed to plead any facts relating to the second, third, or fourth elements that would satisfy the federal plausibility standard.

33.     With respect to the second element, Van Deelen does not identify or describe any action the Defendants took that was "to the exclusion of" or "inconsistent with" his rights as a shareholder. Instead, Van Deelen repeatedly argues that Defendants somehow violated these rights by participating in McDermott's restructuring efforts under chapter 11--a process in which Van Deelen also had the right to participate, and *did participate*, as a shareholder. Defendants did not "exclude" Van Deelen from the bankruptcy proceedings or try to prevent him from objecting to such proceedings. Indeed, as previously discussed, Van Deelen filed a Motion with the Court alleging (as he does here) that McDermott wrongfully filed for relief under chapter 11 and requesting that the Court deny the Plan. This was entirely consistent with Van Deelen's rights as a shareholder. The mere fact that the Court overruled Van Deelen's Motion, or that the chapter 11 proceedings adversely affected Van Deelen's equity interests in McDermott, does not give rise to a conversion claim against Defendants.

34.     Moreover, there was nothing *unlawful* about the fact that his equity interest was extinguished as part of the confirmed Plan. By taking an equity interest in McDermott, Van Deelen assumed both the risks and rewards associated with McDermott's business. *See, e.g.*, *American Broad. Sys. v. Nugent (In re Betacom of Phoenix, Inc.)*, 240 F.3d 823, 829 (9th Cir. 2001) ("Shareholders expect to take more risk than creditors in return for the right to participate in firm profits. The creditor only expects repayment of a fixed debt."); *KIT Digital, Inc. v. Invigor Group Ltd. (In re KIT Digital, Inc.)*, 497 B.R. 170, 180 (Bankr. S.D.N.Y. 2013) ("Creditors and shareholders both take risks if a company heads south, but only shareholders get the benefit of the upside when a company succeeds."). One such risk was that, as part of any necessary restructuring or liquidation, his equity interests might be wiped out. *See, e.g.*, *In re Sabine Oil & Gas Corp.*, 555 B.R. 180, 316-17 (Bankr. S.D.N.Y. 2016) ("Class 11 (Sabine Equity Interests)[] . . . [will] receiv[e] no recovery and [is], therefore, deemed to reject the Plan."); *In re Simmons Bedding Co.*, No. 09-14-037 (MFW), 2010 WL 2906458, *3 (D. Del. Jan. 5, 2010) ("The Debtors also were not required to solicit votes from the holders of Equity Interests . . . as these Classes receive no recovery under the Plan[.]"); *In re CSMG Techs., Inc.*, No. 14-31320-hdh, 2014 WL 1682861, *3 (Bankr. N.D. Tex. Apr. 29, 2014) ("[T]he Holders of the Equity Interests in Class 7 receive no recovery under the Plan[.]"). If Van Deelen's conversion claim could survive, nearly every proceeding under chapter 11 would give rise to conversion claims against the debtor or its officers.

35.     Finally, and even if his claim somehow could satisfy the second element, Van Deelen does not plead *any* facts to support the third or fourth elements. Though courts have acknowledged that "formal demand and refusal are not necessary when the circumstances . . . authorize a finding . . . of a *clear repudiation* of the owner's rights," there was--for the reasons set forth above--no such "clear repudiation" here. *Permian Petroleum Co. v. Petroleos Mexicanos*,

18

934 F.2d 635, 651 (5th Cir. 1991) (emphasis added). Van Deelen was therefore obligated to plead

facts showing demand and refusal, which he failed to do. Accordingly, Van Deelen has failed to

satisfy the Federal Rule's basic pleading requirements as to his conversion claim, and the Court

should dismiss this claim.

> ii.     Neither of the fraud claims meets the heightened pleading requirements of Federal Rule 9(b) because they do not state with particularity the circumstances giving rise to fraud.

36.     Federal Rule 9(b) requires that the Complaint state "the who, what, when, and

where" of the alleged fraud. *Williams v. WMX Techs.*, 112 F.3d 175, 178 (5th Cir. 1997).  In other

words, "to plead fraud with particularity a plaintiff must include the 'time, place and contents of

the false representations, as well as the identity of the person making the misrepresentations and

what [the defendant] obtained thereby.'"  *United States ex rel. Barrett v. Johnson Controls, Inc.*,

No. 3:01-CV-1641-M, 2003 U.S. Dist. LEXIS 5973, at *32 (N.D. Tex. Apr. 9, 2003) (citing *United

States ex rel. Russell v. Epic Healthcare Mgmt. Group*, 193 F.3d 304, 308 (5th Cir.

1999)).  Further, courts are required to "apply the rule with force, without apology."  *Williams*,

112 F.3d at 178.

37.     Here, Van Deelen does not plead that Defendants personally made false statements

or show why such statements were false. Nor does he plead that Defendants "obtained" anything

from their own false statements. Instead, Van Deelen *repeatedly* excerpts various third-party

statements from letters, press releases, or reports, and then alleges, in conclusory fashion, that

Defendants "reviewed and approved" such statements or that third parties made the statements

"with the prior knowledge and at the direction of" Defendants. *See* Complaint ¶¶ 14 (reviewed and

approved), 17 (reviewed and approved), 21 (reviewed and approved), 26 (prior knowledge and

direction), 27 (prior knowledge and direction), 28 (prior knowledge and direction), 31 (reviewed

and approved), 32 (prior knowledge and direction), 34 (prior knowledge and direction), 35 (prior

19

knowledge and direction), 37 (prior knowledge and direction), 38 (prior knowledge and direction), 40 (prior knowledge and direction), 41 (prior knowledge and direction), 45 (prior knowledge and direction), 48 (prior knowledge and direction), 59 (prior knowledge and direction), 75 (prior knowledge and approval), 76 (prior knowledge and approval), and 78 (prior knowledge and approval).

38.     This does not satisfy Van Deelen's heightened pleading standard under Federal Rule 9(b). It is not enough for Van Deelen to excerpt third-party press releases, allege that Defendants "reviewed" or had "knowledge of" such statements, and then sue Defendants for fraud. *See Williams*, 112 F.3d at 179 ("These vague pleadings illustrate the practical basis for the requirement that a plaintiff point to specific statements made by the defendants. Many of the newspaper excerpts attached to [plaintiffs'] complaint . . . [do not] specify[] who gave information to the paper. These excerpts, standing alone, cannot satisfy the "who, what, when, where, and how" required by Rule 9(b).").

39.     Van Deelen must, at the very least, show either that Defendants adopted the statements or that Defendants represented the statements "were true or at least in accordance with [their] view[s]," or that Defendants "used the [third party] as a conduit, making false and misleading statements to the [third party] with the intent that the [third party] communicate those statements to the market." *Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353, 373-74 (5th Cir. 2004) (also holding that the pleading should "point to specific interactions between the [defendant] and the [third party] which allegedly gave rise to the entanglement [between the defendant's and third party's statements]," and state the dates on which these interactions occurred).

20

40.     Because Van Deelen has failed to allege any such facts, neither of his fraud claims satisfies the heightened pleading requirements of Federal Rule 9(b).

> **iii.     The claims for negligent misrepresentation, breach of fiduciary duty, and conspiracy fail to state claims upon which relief can be granted because they do nothing more than generically recite their underlying elements without identifying any specific ways the elements are satisfied.**

41.     Van Deelen's remaining claims fail to satisfy federal pleading standards for at least two reasons.

42.     *First*, with respect to Van Deelen's breach of fiduciary duty and conspiracy claims, Van Deelen merely recites the elements of these claims, making conclusory allegations in support thereof.  Indeed, his conspiracy claim reads like it was pulled from a form:

<div align="center">

**COUNT 6**
**CONSPIRACY**

</div>

106.  Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

107.  The defendants were members of a combination of two or more persons.

108.  The object of the combination was to accomplish an unlawful purpose and/or a lawful purpose by unlawful means.

109.  The members had a meeting of the minds on the object or course of action.

110.  One of the members committed an unlawful, overt act to further the object or course of action.

111.  The plaintiff suffered injury as a proximate result of the wrongful act.

112.  Plaintiff seeks actual damages in excess of the jurisdictional limits of this Court and exemplary damages in an amount to be determined by the trier of fact.

*See* Complaint ¶¶ 106-112; *see also, e.g.*, *id.* ¶¶ 100-105. Moreover, Van Deelen does not plead facts showing the purpose of Defendants' alleged conspiracy, the acts Defendants took in furtherance of such conspiracy, or the injuries he suffered in connection with any alleged conspiracy. This is not enough to survive dismissal under Federal Rule 12(b)(6). *See Twombly*, 550 U.S. at 545 (plaintiff required to provide more than "labels and conclusions, and a formulaic recitation of the elements of a cause of action").

43.    ***Second***, with respect to Van Deelen's negligent misrepresentation claim,[5] this claim is subject to the more stringent pleading standards of Federal Rule 9(b) because the "fraud averment[s] are so intertwined with the negligent misrepresentation claim that it is not possible to describe a simple redaction that removes the inadequate fraud averment while leaving behind a viable negligent misrepresentation claim." *Kougl v. Xspedius Mgmt. Co. of Dallas/Fort Worth, L.L.C.*, No. Civ.A.3:04CV2518-D, 2005 WL 1421446, *21-22 (N.D. Tex. June 1, 2005) ("If plaintiffs fail to distinguish their negligent misrepresentation claims from those based on fraud, the court will not separate the two when applying its Rule 9(b) analysis."); *see also Williams*, 112 F.3d at 177 ("[Defendant] contends that 9(b) also applies to the state law claims of common law fraud and negligent misrepresentation. Because [plaintiffs] do not attempt to distinguish these claims in their brief, and because the state law claims rely upon the same misrepresentations as the federal claims, we do not distinguish between them here.").

44.    Here, as in *Kougl* and *Williams*, the negligent misrepresentation claim is based on the very same factual allegations as are the fraud claims. Accordingly, and because these factual

---

[5]    This argument applies equally to Van Deelen's conspiracy claim to the extent Van Deelen alleges a conspiracy to commit fraud.

allegations do not satisfy the requirements of Federal Rule 9(b), this Court should dismiss Van Deelen's negligent misrepresentation claim.

## V.      **CONCLUSION**

Van Deelen's claims other than fraud are all explicitly foreclosed by the Confirmation Order and fail to meet the basic requirements for notice pleading under the Federal Rules and his fraud claims do not come anywhere close to meeting the heightened pleading standard mandated by Rule 9(b).  This Court should not allow Van Deelen to ignore this Court's Confirmation Order or allow his threadbare accusations of fraud to stand.  This Court should dismiss all of his claims.


Respectfully submitted,


July 25, 2020
Houston, TX


/s/ Matthew D. Cavenaugh
**JACKSON WALKER L.L.P.**
Matthew D. Cavenaugh (TX Bar No. 24062656)
Jennifer F. Wertz (TX Bar No. 24072822)
Kristhy M. Peguero (TX Bar No. 24102776)
Veronica A. Polnick (TX Bar No. 24079148)
1401 McKinney Street, Suite 1900
Houston, TX 77010
Telephone:      (713) 752-4200
Facsimile:      (713) 752-4221
Email:          mcavenaugh@jw.com
                jwertz@jw.com
                kpeguero@jw.com
                vpolnick@jw.com

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Anna G. Rotman, P.C. (TX Bar No. 24046761)
Jamie Alan Aycock (TX Bar No. 24050241)
John Christian (TX Bar No. 24109727)
609 Main Street
Houston, TX 77002
Telephone:      (713) 836-3600
Facsimile:      (713) 836-3601
Email:          anna.rotman@kirkland.com
                jamie.aycock@kirkland.com
                john.christian@kirkland.com

*Counsel to the Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 25, 2020, I caused a true and correct copy of the foregoing Motion to Dismiss to be served via the Court's ECF notification system to the parties listed below at the email addresses listed.

Michael Van Deelen, 16215 Friar Circle, Spring, TX 77379, michaelvandeelen@gmail.com

<div style="text-align: right;">

*/s/ Matthew D. Cavenaugh*
Matthew D. Cavenaugh

</div>

# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

|  |  |  |
|---|---|---|
| | § | |
| In re: | § | Chapter 11 |
| | § | |
| MCDERMOTT INTERNATIONAL, INC., *et al.*,[6] | § | Case No. 20-30336 (DRJ) |
| | § | |
| Reorganized Debtors. | § | (Jointly Administered) |
| | § | |
| | § | |
| MICHAEL VAN DEELEN | § | |
| | § | |
| Plaintiff, | § | Adv. Proc. No. 20-03309 |
| | § | |
| v. | § | |
| | § | |
| DAVID DICKSON, | § | |
| and STUART SPENCE, | § | |
| and SCOTT LAMB, | § | |
| and 10 JOHN/JANE DOES | § | |
| | § | |
| Defendants. | § | |
| | § | |

## ORDER GRANTING DEFENDANTS' MOTION TO DISMISS

The Court, having considered the Motion to Dismiss Plaintiff's Original Petition (the "Motion") in the above-captioned adversary proceeding (the "Adversary Proceeding"), as well as the evidence presented, the arguments of counsel, if any, is of the opinion that the Motion should be GRANTED. The Court:

---

[6] A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://cases.primeclerk.com/McDermott. The location of Debtor McDermott International, Inc.'s principal place of business and the Debtors' service address in these chapter 11 cases is 757 North Eldridge Parkway, Houston, Texas 77079.

FINDS that all of the claims alleged in the Plaintiff's Original Petition, other than claims for fraud, are barred by the Exculpation, Release and Injunction Provisions of the McDermott's confirmed plan of reorganization;

ORDERS that all of the claims alleged in the Plaintiff's Original Petition are dismissed with prejudice;

ORDERS that the Parties shall each bear their respective attorneys' fees and costs of court; and

ORDERS that the Clerk of Court to take all necessary steps to close this Adversary Proceeding.

Signed:

_____
DAVID R. JONES
UNITED STATES BANKRUPTCY COURT

000124

USDC SDTX RCVD
JUL 27 2020 AM10:20

# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| MCDERMOTT INTERNATIONAL, INC, *et al* | ) | |
| | ) | Case No. 20-30336 |
| Reorganized Debtor(s). | ) | |
| | ) | (Jointly Administered) |
| _____ | ) | |
| | ) | |
| MICHAEL VAN DEELEN | ) | |
| | ) | |
| Plaintiff, | ) | Adv. Proc. No. 20-3309 |
| | ) | |
| v. | ) | |
| | ) | |
| DAVID DICKSON, | ) | |
| and STUART SPENCE, | ) | |
| and SCOTT LAMB, | ) | |
| and 10 JOHN/JANE DOES | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF'S MOTION FOR CONTINUANCE OR ALTERNATIVELY
MOTION FOR EXTENSION OF TIME TO RESPOND TO THE DEFENDANTS'
MOTION TO DISMISS PLAINTIFF'S ORIGINAL PETITION (DOCKET 5);
PLAINTIFF'S MOTION TO RECUSE BANKRUPTCY JUDGE DAVID JONES;
PROPOSED ORDERS**

**This motion seeks an order that may adversely affect you. If you oppose the motion,
you should immediately contact the moving party to resolve the dispute. If you and
the moving party cannot agree, you must file a response and send a copy to the
moving party. You must file and serve your response within 21 days of the date this
was served on you. Your response must state why the motion should not be granted.
If you do not file a timely response, the relief may be granted without further notice
to you. If you oppose the motion and have not reached an agreement, you must**

**attend the hearing. Unless the parties agree otherwise, the court may consider evidence at the hearing and may decide the motion at the hearing.**

**Represented parties should act through their attorney.**

COMES NOW the Plaintiff, Michael Van Deelen, and for his Plaintiff's Motion For Continuance Or Alternatively Motion For Extension Of Time To Respond To The Defendants' Motion To Dismiss Plaintiff's Original Petition (Docket 5) and for his Plaintiff's Motion To Recuse Bankruptcy Judge David Jones states as follows:

**PLAINTIFF'S MOTION FOR CONTINUANCE OR ALTERNATIVELY MOTION FOR EXTENSION OF TIME TO RESPOND TO THE DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S ORIGINAL PETITION (DOCKET 5);**

The Defendants filed their Notice of Removal in the instant action (Docket 1) on July 17, 2020. Plaintiff was not served with said Notice until July 19, 2020. (The Court did not grant Plaintiff's request to use the Court's electronic filing system.)

Plaintiff filed his Motions to Remand the adversary proceeding back to Montgomery County, Texas, District Court on July 23, 2020. (Docket 4).

On July 25, 2020, the Defendants filed and served their Motion to Dismiss Plaintiff's Original Petition (Docket 5).

Plaintiff's Motions to Remand must be heard before the Defendants' Motion to Dismiss because:

1) Plaintiff's Motions to Remand challenge this Court's jurisdiction to hear this adversary proceeding. This challenge must be addressed before the Court hears the Defendants' Motion to Dismiss. The Court cannot lawfully hear the Defendants' Motion to Dismiss if it does not have jurisdiction over this adversary proceeding. The Supreme

Court has stated that jurisdiction must be considered at the outset of a case. *Steel Co. v.*

*Citizens for a Better Env't*, 523 U.S. 83, 118 S.Ct. 1003, 1012, 140 L.Ed.2d 210 (1998)

(majority opinion) (quoting *United States v. Troescher*, 99 F.3d 933, 934 n. 1 (9th

Cir.1996)).

In *Steel, Supra*, the U.S. Supreme Court stated:

"this Court has held that, without proper jurisdiction, a court cannot proceed at all, but
can only note the jurisdictional defect and dismiss the suit. See, *e. g., Capron* v. *Van
Noorden,* 2 Cranch 126; *Arizonans for Official English* v. *Arizona,* 520 U. S. 43, 73. *Bell*
v. *Hood, supra; National Railroad Passenger Corp.* v. *National Assn. of Railroad
Passengers,* 414 U. S. 453, 465, n. 13; *Norton* v. *Mathews,* 427 U. S. 524, 531; *Secretary
of Navy* v. *Avrech,* 418 U. S. 676, 678 *(per curiam); United States* v. *Augenblick,* 393 U.
S. 348; *Philbrook* v. *Glodgett,* 421 U. S. 707, 721; and *Chandler* v. *Judicial Council of
Tenth Circuit,* 398 U. S. 74, 86-88, distinguished. For a court to pronounce upon a law's
meaning or constitutionality when it has no jurisdiction to do so is, by very definition, an
ultra vires act. Pp. 93-102."

2)  This Court has already ordered that Objections/Requests for Hearings on

Plaintiff's Motions to Remand are due 21 days from July 23, 2020. Should this Court

remand this case to Montgomery County, it will cede its jurisdiction to that court.

3)  The Defendants' Motion to Dismiss relies on a federal law argument even

before this Court has determined if it must, or will, remand this adversary case to state

court to decide state law only causes of action. ".... jurisdiction exists if the right to

recover will be sustained under one reading of the Constitution and laws and defeated

under another", *Steel, Supra*.

Plaintiff has contacted Matthew Cavenaugh, counsel for the defendants, and

requested a continuance or extension of time to brief and hear the Defendants' Motion to

Dismiss. Counsel opposes Plaintiff's request.

WHEREFORE, Plaintiff respectfully requests that this Court either grant a continuance on the briefing and hearing of the Defendants' Motion to Dismiss (if necessary) until after Plaintiff's Motions to Remand are decided or alternatively grant Plaintiff an extension of time to brief and have heard his response to the Defendants' Motion to Dismiss (if necessary) until after Plaintiff's Motions to Remand have been heard.

## PLAINTIFF'S MOTION TO RECUSE BANKRUPTCY JUDGE DAVID JONES

Plaintiff respectfully moves this Court to recuse bankruptcy court Judge David Jones from deciding Plaintiff's Motion For Continuance Or Alternatively Motion For Extension Of Time To Respond To The Defendants' Motion To Dismiss Plaintiff's Original Petition briefed herein.

On or about June 2, 2020, Plaintiff filed his Petition for Writ of Mandamus Against the Honorable David R. Jones in the Fifth Circuit Court of Appeals (case no. 20-20286). Plaintiff subsequently filed his Notice of Filing (Document 939) in this case (20-30336) on June 3, 2020. The Notice of Filing, which contains Plaintiff's Writ, was docketed on June 4, 2020. Said Writ, which is presently before the Fifth Circuit Court of Appeals, is incorporated herein by reference.

In his Writ, Plaintiff shows incidents to the Court of Appeals in which Judge Jones has shredded Plaintiff's Constitutional rights by, among other things, refusing to hear Plaintiff's motions in the McDermott International bankruptcy case, by falsely accusing Plaintiff of improper acts during the pendency of the bankruptcy case, by telling the attorneys for the Defendants herein that they "were the smartest people in the

country" while accusing Plaintiff in open court of "knowing nothing", and, most notably, by unconstitutionally issuing a permanent injunction against the Plaintiff without affording Plaintiff a hearing or trial.

Among other things, Plaintiff has asked the Court of Appeals to disqualify Judge Jones from presiding over a trial on the actions unconstitutionally prohibited by Judge Jones' March, 23, 2020, Order, should the Court of Appeals order said trial to be held.  In requesting this, plaintiff stated to the Court of Appeals that "The trial court's [Judge Jones'] animosity toward Petitioner is so great that Petitioner is concerned that the trial court will simply continue to make unlawful, unconstitutional rulings during a trial on the actions prohibited by its March 23, 2020, Order."

Plaintiff is similarly convinced that, should Judge Jones decide Plaintiff's continuance/extension of time motion briefed herein, it will not be possible to get a fair hearing given the animosity and unconstitutional behavior Judge Jones has demonstrated with respect to the plaintiff in the McDermott International bankruptcy case.

WHEREFORE, in the interest of justice, Plaintiff respectfully moves this Court to recuse Judge Jones from deciding Plaintiff's Motion For Continuance Or Alternatively Motion For Extension Of Time To Respond To The Defendants' Motion To Dismiss Plaintiff's Original Petition briefed herein.

Michael Van Deelen
Plaintiff
16215 Friar Circle
Spring, TX 77379
832-562-0723
michaelvandeelen@gmail.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have on this 27th day of July, 2020, served a true and correct copy of the foregoing document on the defendants via the court-approved eFiling system, which will forward a copy thereof to all attorneys of record.

Michael Van Deelen
Michael Van Deelen

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | |
| | ) | |
| | ) | Chapter 11 |
| MCDERMOTT INTERNATIONAL, INC, *et al* | ) | |
| | ) | Case No. 20-30336 |
| Reorganized Debtor(s). | ) | |
| | ) | (Jointly Administered) |
| | ) | |
| | ) | |
| MICHAEL VAN DEELEN | ) | |
| | ) | |
| Plaintiff, | ) | Adv. Proc. No. 20-3309 |
| | ) | |
| v. | ) | |
| | ) | |
| DAVID DICKSON, | ) | |
| and STUART SPENCE, | ) | |
| and SCOTT LAMB, | ) | |
| and 10 JOHN/JANE DOES | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER GRANTING PLAINTIFF'S MOTION FOR CONTINUANCE OR ALTERNATIVELY MOTION FOR EXTENSION OF TIME TO RESPOND TO DEFENDANTS' MOTION TO DISMISS

The Court, having considered Plaintiff's Motion For Continuance Or Alternatively Motion For Extension Of Time To Respond To The Defendants' Motion To Dismiss Plaintiff's Original Petition, as well as the evidence presented, finds that the Motion be GRANTED. The Court:

ORDERS that Plaintiff's briefing of the Defendants' Motion to Dismiss (if necessary) will be due _____ days after Plaintiff's Motions to Remand are decided.

7

DAVID R. JONES
UNITED STATES BANKRUPTCY COURT

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| In re: | ) |
| | ) |
| | ) |
| MCDERMOTT INTERNATIONAL, INC, *et al* | ) |
| | ) |
| Reorganized Debtor(s). | ) |
| | ) |
| | ) |
| | ) |
| MICHAEL VAN DEELEN | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| DAVID DICKSON, | ) |
| and STUART SPENCE, | ) |
| and SCOTT LAMB, | ) |
| and 10 JOHN/JANE DOES | ) |
| | ) |
| Defendants. | ) |

Chapter 11

Case No. 20-30336

(Jointly Administered)

Adv. Proc. No. 20-3309

### ORDER GRANTING PLAINTIFF'S MOTION TO RECUSE BANKRUPTCY JUDGE DAVID JONES

The Court, having considered Plaintiff's Motion To Recuse Bankruptcy Judge David Jones from deciding Plaintiff's Motion For Continuance Or Alternatively Motion For Extension Of Time To Respond To The Defendants' Motion To Dismiss Plaintiff's Original Petition, as well as the evidence presented, finds that the Motion be GRANTED. The Court:

ORDERS that Bankruptcy Judge David Jones be recused from hearing the Plaintiff's Motion For Continuance Or Alternatively Motion For Extension Of Time To

Respond To The Defendants' Motion To Dismiss Plaintiff's Original Petition in the above-captioned adversary proceeding.

_____

DAVID R. JONES
UNITED STATES BANKRUPTCY COURT

USDC SDTX RCVD
JUL 27 2020 AM10:20
000

# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | |
| | ) | |
| | ) | Chapter 11 |
| MCDERMOTT INTERNATIONAL, INC, *et al* | ) | |
| | ) | Case No. 20-30336 |
| Reorganized Debtor(s). | ) | |
| | ) | (Jointly Administered) |
| | ) | |
| | ) | |
| MICHAEL VAN DEELEN | ) | |
| | ) | |
| Plaintiff, | ) | Adv. Proc. No. 20-3309 |
| | ) | |
| v. | ) | |
| | ) | |
| DAVID DICKSON, | ) | |
| and STUART SPENCE, | ) | |
| and SCOTT LAMB, | ) | |
| and 10 JOHN/JANE DOES | ) | |
| | ) | |
| Defendants. | ) | |

## ADDENDUM TO
**PLAINTIFF'S MOTIONS TO REMAND HIS STATE LAW CAUSE OF ACTION AGAINST THE DEFENDANTS TO MONTGOMERY COUNTY, TEXAS, DISTRICT COURT BECAUSE THE FEDERAL BANKRUPTCY COURT DOES NOT HAVE JURISDICTION OVER PLAINTIFF'S MONTGOMERY COUNTY CAUSE OF ACTION, BECAUSE REMAND IS REQUIRED PURSUANT TO 28 U.S.C. SECTION 1334(c)(2) AND BECAUSE REMAND IS PERMISSIVE PURSUANT TO U.S.C. SECTION 1334(c)(1); PLAINTIFF'S MOTION TO RECUSE BANKRUPTCY JUDGE DAVID JONES; AND PLAINTIFF'S STATEMENT OF COMPLIANCE WITH BANKRUPTCY RULE 927(e)(3)**

Please insert the following language below the above caption in Plaintiff's pleading filed in the above-captioned action on July 23, 2020, (Docket 4) :

**This motion seeks an order that may adversely affect you. If you oppose the motion, you should immediately contact the moving party to resolve the dispute. If you and the moving party cannot agree, you must file a response and send a copy to the moving party. You must file and serve your response within 21 days of the date this was served on you. Your response must state why the motion should not be granted. If you do not file a timely response, the relief may be granted without further notice to you. If you oppose the motion and have not reached an agreement, you must attend the hearing. Unless the parties agree otherwise, the court may consider evidence at the hearing and may decide the motion at the hearing.**

**Represented parties should act through their attorney.**

Michael Van Deelen
Plaintiff
16215 Friar Circle
Spring, TX 77379
832-562-0723
michaelvandeelen@gmail.com

## CERTIFICATE OF SERVICE

I hereby certify that I have on this 27th day of July, 2020, served a true and correct copy of the foregoing document on the defendants via the court-approved eFiling system, which will forward a copy thereof to all attorneys of record.

Michael Van Deelen

USDC SDTX RCVD
JAN 27 2020 AM10:20
20-30336

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| MCDERMOTT INTERNATIONAL, INC, *et al* | ) | |
| | ) | Case No. 20-30336 |
| Reorganized Debtor(s). | ) | |
| | ) | (Jointly Administered) |
| _____ | ) | |
| | ) | |
| MICHAEL VAN DEELEN | ) | |
| | ) | |
| Plaintiff, | ) | Adv. Proc. No. 20-3309 |
| | ) | |
| v. | ) | |
| | ) | |
| DAVID DICKSON, | ) | |
| and STUART SPENCE, | ) | |
| and SCOTT LAMB, | ) | |
| and 10 JOHN/JANE DOES | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER GRANTING PLAINTIFF'S MOTION TO REMAND

The Court, having considered Plaintiff's Motion To Remand His State Law Cause Of Action Against The Defendants To Montgomery County, Texas, District Court as well as the evidence presented, finds that the Motion be GRANTED.  The Court:

ORDERS that Plaintiff's State Law Cause Of Action Against The Defendants Is Remanded To Montgomery County, Texas, District Court.

DAVID R. JONES
UNITED STATES BANKRUPTCY COURT

## CERTIFICATE OF SERVICE

I hereby certify that I have on this 27th day of July, 2020, served a true and correct copy of the foregoing document on the defendants via the court-approved eFiling system, which will forward a copy thereof to all attorneys of record.

Michael Van Deelen

USDC SDTX RCVD
JUL 27 2020 AM10:20
000139

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| | ) | Chapter 11 |
| MCDERMOTT INTERNATIONAL, INC, *et al* | ) | |
| | ) | Case No. 20-30336 |
| Reorganized Debtor(s). | ) | |
| | ) | (Jointly Administered) |
| | ) | |
| | ) | |
| MICHAEL VAN DEELEN | ) | |
| | ) | |
| Plaintiff, | ) | Adv. Proc. No. 20-3309 |
| | ) | |
| v. | ) | |
| | ) | |
| DAVID DICKSON, | ) | |
| and STUART SPENCE, | ) | |
| and SCOTT LAMB, | ) | |
| and 10 JOHN/JANE DOES | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER GRANTING PLAINTIFF'S MOTION TO RECUSE BANKRUPTCY JUDGE DAVID JONES

The Court, having considered Plaintiff's Motion To Recuse Bankruptcy Judge David Jones from hearing the removal/remand controversy (Dockets 1 and 4), as well as the evidence presented, finds that the Motion be GRANTED. The Court:

ORDERS that Bankruptcy Judge David Jones be recused from hearing the removal/remand controversy (Dockets 1 and 4) in the above-captioned adversary proceeding.

_____

DAVID R. JONES
UNITED STATES BANKRUPTCY COURT

## **CERTIFICATE OF SERVICE**

I hereby certify that I have on this 27th day of July, 2020, served a true and correct copy of the foregoing document on the defendants via the court-approved eFiling system, which will forward a copy thereof to all attorneys of record.

Michael Van Deelen

United States Courts
Southern District of Texas
F I L E D

JUL 3 1 2020

David J. Bradley, Clerk of Court

UBOC SDTX RCVD
JUL 31 2020 AM10:58
000142

# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

|  |  |
|---|---|
| In re: | ) |
|  | ) |
|  | ) Chapter 11 |
| MCDERMOTT INTERNATIONAL, INC, *et al* | ) |
|  | ) Case No. 20-30336 |
| Reorganized Debtor(s). | ) |
|  | ) (Jointly Administered) |
|  | ) |
| _____ | ) |
|  | ) |
| MICHAEL VAN DEELEN | ) |
|  | ) |
| Plaintiff, | ) Adv. Proc. No. 20-3309 |
|  | ) |
| v. | ) |
|  | ) |
| DAVID DICKSON, | ) |
| and STUART SPENCE, | ) |
| and SCOTT LAMB, | ) |
| and 10 JOHN/JANE DOES | ) |
|  | ) |
| Defendants. | ) |

**PLAINTIFF'S MOTION PURSUANT TO 28 U.S.C. SECTIONS 455(a) AND
455(b)(1) AND FEDERAL RULES OF BANKRUPTCY PROCEDURE RULE 5004
TO DISQUALIFY BANKRUPTCY COURT JUDGE DAVID JONES FROM
PRESIDING OVER THE ABOVE-CAPTIONED ADVERSARY PROCEEDING;
MOTION FOR STAY OF PROCEEDINGS; PROPOSED ORDERS**

**This motion seeks an order that may adversely affect you. If you oppose the motion,
you should immediately contact the moving party to resolve the dispute. If you and
the moving party cannot agree, you must file a response and send a copy to the
moving party. You must file and serve your response within 21 days of the date this
was served on you. Your response must state why the motion should not be granted.
If you do not file a timely response, the relief may be granted without further notice
to you. If you oppose the motion and have not reached an agreement, you must**

**attend the hearing. Unless the parties agree otherwise, the court may consider evidence at the hearing and may decide the motion at the hearing.**

**Represented parties should act through their attorney.**

COMES NOW the Plaintiff, Michael Van Deelen, and for his Plaintiff's Motion Pursuant To 28 U.S.C. Sections 455(a) And 455(b)(1) And Federal Rules Of Bankruptcy Procedure Rule 5004To Disqualify Bankruptcy Court Judge David Jones From Presiding Over The Above-Captioned Adversary Proceeding and for his Motion For Stay Of Proceedings states as follows:

Plaintiff respectfully moves this Court to disqualify bankruptcy court Judge David Jones from presiding over the instant action (Adversary Proceeding No. 20-3309) pursuant to U.S.C. Sections 455(a) And 455(b)(1) and Federal Rules of Bankruptcy Procedure Rule 5004.  Plaintiff also respectfully requests that no further hearings be had or decisions made in the instant action until Plaintiff's Motion to Disqualify Bankruptcy Court Judge David Jones is heard and decided (stay of proceedings).

Judge Jones's impartiality may reasonably be questioned and he has a personal bias and/or prejudice against the plaintiff.

On or about June 2, 2020, Plaintiff filed his Petition for Writ of Mandamus Against the Honorable David R. Jones in the Fifth Circuit Court of Appeals (case no. 20-20286).  Plaintiff  subsequently filed his Notice of Filing (Document 939) in case 20-30336 on June 3, 2020.  The Notice of Filing, which contains Plaintiff's Writ, was docketed on June 4, 2020.  Said Writ, which is presently before the Fifth Circuit Court of Appeals, is incorporated herein by reference.

2

In his Writ, Plaintiff shows incidents to the Court of Appeals in which Judge Jones has shredded Plaintiff's Constitutional rights by, among other things, refusing to hear Plaintiff's motions in the McDermott International bankruptcy case, by falsely accusing Plaintiff of improper acts during the pendency of the bankruptcy case, by telling the attorneys for the debtors that they "were the smartest people in the country" while accusing Plaintiff in open court of "knowing nothing", and, most notably, by unconstitutionally issuing a permanent injunction against the Plaintiff without affording Plaintiff a hearing or trial.

Among other things, Plaintiff has asked the Court of Appeals to disqualify Judge Jones from presiding over a trial on the actions unconstitutionally prohibited by Judge Jones' March, 23, 2020, Order, should the Court of Appeals order said trial to be held.  In requesting this, plaintiff stated to the Court of Appeals that "The trial court's [Judge Jones'] animosity toward Petitioner is so great that Petitioner is concerned that the trial court will simply continue to make unlawful, unconstitutional rulings during a trial on the actions prohibited by its March 23, 2020, Order."

Plaintiff is similarly convinced that, should Judge Jones continue to preside over the instant action, it will not be possible to get a fair hearing given the animosity, impartiality, bias, prejudice and unconstitutional behavior Judge Jones has demonstrated with respect to the plaintiff in the McDermott International bankruptcy case.

Plaintiff has sought the approval for the motions herein from the attorney for the defendants, Matthew Cavenaugh.  Mr. Cavenaugh opposes the motions.

3

WHEREFORE, Plaintiff respectfully moves this Court to disqualify bankruptcy court Judge David Jones from presiding over the instant action (Adversary Proceeding No. 20-3309) pursuant to U.S.C. Sections 455(a) And 455(b)(1) and Federal Rules of Bankruptcy Procedure Rule 5004.  Plaintiff also respectfully requests that no further hearings be had or decisions made in the instant action until his Motion to Disqualify Bankruptcy Court Judge David Jones is heard and decided (stay of proceedings).

Michael Van Deelen
Plaintiff
16215 Friar Circle
Spring, TX 77379
832-562-0723
michaelvandeelen@gmail.com

4

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have on this 31st day of July, 2020, served a true and correct copy of the foregoing document on the defendants via the court-approved eFiling system, which will forward a copy thereof to all attorneys of record.

Michael Van Deelen
Michael Van Deelen

# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| MCDERMOTT INTERNATIONAL, INC, *et al* | ) | |
| | ) | Case No. 20-30336 |
| Reorganized Debtor(s). | ) | |
| | ) | (Jointly Administered) |
| | ) | |
| MICHAEL VAN DEELEN | ) | |
| | ) | |
| Plaintiff, | ) | Adv. Proc. No. 20-3309 |
| | ) | |
| v. | ) | |
| | ) | |
| DAVID DICKSON, | ) | |
| and STUART SPENCE, | ) | |
| and SCOTT LAMB, | ) | |
| and 10 JOHN/JANE DOES | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER GRANTING PLAINTIFF'S MOTION TO DISQUALIFY BANKRUPTCY COURT JUDGE DAVID JONES

The Court, having considered Plaintiff's Motion Pursuant To 28 U.S.C. Sections 455(a) And 455(b)(1) And Federal Rules Of Bankruptcy Procedure Rule 5004 To Disqualify Bankruptcy Court Judge David Jones From Presiding Over The Above-Captioned Adversary Proceeding, as well as the evidence presented, finds that the Motion be GRANTED.  The Court:

ORDERS that Bankruptcy Court Judge David Jones be disqualified from presiding over the above-captioned adversary proceeding.

6

_____

JUDGE
UNITED STATES BANKRUPTCY COURT

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| | ) | Chapter 11 |
| MCDERMOTT INTERNATIONAL, INC, *et al* | ) | |
| | ) | Case No. 20-30336 |
| Reorganized Debtor(s). | ) | |
| | ) | (Jointly Administered) |
| _____ | ) | |
| | ) | |
| MICHAEL VAN DEELEN | ) | |
| | ) | |
| Plaintiff, | ) | Adv. Proc. No. 20-3309 |
| | ) | |
| v. | ) | |
| | ) | |
| DAVID DICKSON, | ) | |
| and STUART SPENCE, | ) | |
| and SCOTT LAMB, | ) | |
| and 10 JOHN/JANE DOES | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER GRANTING PLAINTIFF'S MOTION FOR STAY OF PROCEEDINGS

The Court, having considered Plaintiff's Motion For Stay Of Proceedings until Plaintiff's Motion to Disqualify Bankruptcy Court Judge David Jones is heard and decided, as well as the evidence presented, finds that the Motion be GRANTED. The Court:

ORDERS that this action is stayed until the Court has heard and decided Plaintiff's Motion to Disqualify Bankruptcy Court Judge David Jones.

_____
JUDGE
UNITED STATES BANKRUPTCY COURT

000151

USDC SDTX RCVD
AUG 12 2020 AM10:24

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| MCDERMOTT INTERNATIONAL, INC, *et al* | ) | |
| | ) | Case No. 20-30336 |
| Reorganized Debtor(s). | ) | |
| | ) | (Jointly Administered) |
| _____ | ) | |
| | ) | |
| MICHAEL VAN DEELEN | ) | |
| | ) | |
| Plaintiff, | ) | Adv. Proc. No. 20-3309 |
| | ) | |
| v. | ) | |
| | ) | |
| DAVID DICKSON, | ) | |
| and STUART SPENCE, | ) | United States Courts |
| and SCOTT LAMB, | ) | Southern District of Texas |
| and 10 JOHN/JANE DOES | ) | F I L E D |
| | ) | **AUG 1 2 2020** |
| Defendants. | ) | David J. Bradley, Clerk of Court |

## PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION TO DISMISS
## PLAINTIFF'S ORIGINAL PETITION (DOCUMENT 5); PROPOSED ORDER

**This motion seeks an order that may adversely affect you. If you oppose the motion, you should immediately contact the moving party to resolve the dispute. If you and the moving party cannot agree, you must file a response and send a copy to the moving party. You must file and serve your response within 21 days of the date this was served on you. Your response must state why the motion should not be granted. If you do not file a timely response, the relief may be granted without further notice to you. If you oppose the motion and have not reached an agreement, you must attend the hearing. Unless the parties agree otherwise, the court may consider evidence at the hearing and may decide the motion at the hearing.**

**Represented parties should act through their attorney.**

COMES NOW the Plaintiff, Michael Van Deelen, and for his Plaintiff's Response to Defendants' Motion to Dismiss Plaintiff's Original Petition (Document 5) states as follows:

**It Is Premature To Hear The Defendants' Motion To Dismiss Plaintiff's Original Petition (Document 5) Before Plaintiff's Motion To Remand (Document 4) Is Heard And Decided**

The Defendants filed their Notice of Removal in the instant action (Document 1) on July 17, 2020.  Plaintiff was not served with said Notice until July 19, 2020.  (The Court did not grant Plaintiff's request to use the Court's electronic filing system.)

Plaintiff filed his Motions to Remand the adversary proceeding back to Montgomery County, Texas, District Court on July 23, 2020.  (Document 4).

On July 25, 2020, the Defendants filed and served their Motion to Dismiss Plaintiff's Original Petition (Document 5).

Plaintiff's Motions to Remand must be heard before the Defendants' Motion to Dismiss because:

1)  Plaintiff's Motions to Remand challenge this Court's jurisdiction to hear this adversary proceeding.  This challenge must be addressed before the Court hears the Defendants' Motion to Dismiss.  The Court cannot lawfully hear the Defendants' Motion to Dismiss if it does not have jurisdiction over this adversary proceeding.  The Supreme Court has stated that jurisdiction must be considered at the outset of a case. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 118 S.Ct. 1003, 1012, 140 L.Ed.2d 210 (1998) (majority opinion) (quoting *United States v. Troescher*, 99 F.3d 933, 934 n. 1 (9th Cir.1996)).

In *Steel, Supra*, the U.S. Supreme Court stated:

"this Court has held that, without proper jurisdiction, a court cannot proceed at all, but can only note the jurisdictional defect and dismiss the suit. See, *e. g., Capron* v. *Van Noorden,* 2 Cranch 126; *Arizonans for Official English* v. *Arizona,* 520 U. S. 43, 73. *Bell* v. *Hood, supra; National Railroad Passenger Corp.* v. *National Assn. of Railroad Passengers,* 414 U. S. 453, 465, n. 13; *Norton* v. *Mathews,* 427 U. S. 524, 531; *Secretary of Navy* v. *Avrech,* 418 U. S. 676, 678 *(per curiam); United States* v. *Augenblick,* 393 U. S. 348; *Philbrook* v. *Glodgett,* 421 U. S. 707, 721; and *Chandler* v. *Judicial Council of Tenth Circuit,* 398 U. S. 74, 86-88, distinguished. For a court to pronounce upon a law's meaning or constitutionality when it has no jurisdiction to do so is, by very definition, an ultra vires act. Pp. 93-102."

2) This Court has already ordered that Objections/Requests for Hearings on Plaintiff's Motions to Remand are due 21 days from July 23, 2020. Should this Court remand this case to Montgomery County, it will cede its jurisdiction to that court.

3) The Defendants' Motion to Dismiss relies on a federal law argument (including Rule 12(b)(6) and the Rule 9(b) enhanced pleading requirement for fraud) even before this Court has determined if it must, or will, remand this adversary case to state court to decide state law-only causes of action.

On July 27, 2020, Plaintiff filed his Plaintiff's Motion for Continuance or Alternatively Motion for Extension of Time to Respond to the Defendants' Motion to Dismiss Plaintiff's Original Petition (Docket 5). (Docket 6). On August 3, 2020, Plaintiff filed his Plaintiff's Request for Hearing (Document 9) seeking the earliest possible hearing date for Plaintiff's Motion for Continuance or Alternatively Motion for Extension of Time to Respond to the Defendants' Motion to Dismiss Plaintiff's Original Petition (Docket 5). No hearing date has been set by the Court.

**It Is Premature To Hear The Defendants' Motion To Dismiss Plaintiff's Original Petition (Document 5) Before Plaintiff's Motion Pursuant to 28 U.S.C. Sections 455(a) and 455(b)(1) and Federal Rules of Bankruptcy Procedure Rule 5004 to Disqualify Bankruptcy Court Judge David Jones From Presiding Over the Above-Captioned Adversary Proceeding and Plaintiff's Motion for Stay of Proceedings (Document 8) Are Heard and Decided**

In his motions, Plaintiff moves to disqualify bankruptcy court Judge David Jones from presiding over the instant action (Adversary Proceeding No. 20-3309) pursuant to U.S.C. Sections 455(a) And 455(b)(1) and Federal Rules of Bankruptcy Procedure Rule 5004. Plaintiff also moves that no further hearings be had or decisions made in the instant action until Plaintiff's Motion to Disqualify Bankruptcy Court Judge David Jones is heard and decided (stay of proceedings). In his motion, Plaintiff states:

"Judge Jones's impartiality may reasonably be questioned and he has a personal bias and/or prejudice against the plaintiff.

On or about June 2, 2020, Plaintiff filed his Petition for Writ of Mandamus Against the Honorable David R. Jones in the Fifth Circuit Court of Appeals (case no. 20-20286). Plaintiff subsequently filed his Notice of Filing (Document 939) in case 20-30336 on June 3, 2020. The Notice of Filing, which contains Plaintiff's Writ, was docketed on June 4, 2020. Said Writ, which is presently before the Fifth Circuit Court of Appeals, is incorporated herein by reference.

In his Writ, Plaintiff shows incidents to the Court of Appeals in which Judge Jones has shredded Plaintiff's Constitutional rights by, among other things, refusing to hear Plaintiff's motions in the McDermott International bankruptcy case, by falsely accusing Plaintiff of improper acts during the pendency of the bankruptcy case, by telling the attorneys for the debtors that they "were the smartest people in the country" while accusing Plaintiff in open court of "knowing nothing", and, most notably, by unconstitutionally issuing a permanent injunction against the Plaintiff without affording Plaintiff a hearing or trial.

Among other things, Plaintiff has asked the Court of Appeals to disqualify Judge Jones from presiding over a trial on the actions unconstitutionally prohibited by Judge Jones' March, 23, 2020, Order, should the Court of Appeals order said trial to be held. In requesting this, plaintiff stated to the Court of Appeals that "The trial court's [Judge Jones'] animosity toward Petitioner is so great that Petitioner is concerned that the trial court will simply continue to make unlawful, unconstitutional rulings during a trial on the actions prohibited by its March 23, 2020, Order."

Plaintiff is similarly convinced that, should Judge Jones continue to preside over the instant action, it will not be possible to get a fair hearing given the animosity, impartiality, bias, prejudice and unconstitutional behavior Judge Jones has demonstrated with respect to the plaintiff in the McDermott International bankruptcy case.

Plaintiff has sought the approval for the motions herein from the attorney for the defendants, Matthew Cavenaugh. Mr. Cavenaugh opposes the motions."

On August 3, 2020, Plaintiff filed his Plaintiff's Request for Hearing (Document 9) seeking the earliest possible hearing date for Plaintiff's Motion Pursuant to 28 U.S.C. Sections 455(a) and 455(b)(1) and Federal Rules of Bankruptcy Procedure Rule 5004 to Disqualify Bankruptcy Court Judge David Jones From Presiding Over the Above-Captioned Adversary Proceeding and Plaintiff's Motion for Stay of Proceedings (Document 8). No hearing date has been set by the Court.

## This Court Does Not Have Jurisdiction To Hear The Defendants' Motion To Dismiss Plaintiff's Original Petition (Document 5)

Under 28 U.S.C. §1478(a) "any claim or cause of action in a civil action, other than a proceeding before the United States Tax Court or a civil action by a Government unit to enforce [a] . . . regulatory or police power" may be removed "if the bankruptcy courts have jurisdiction over such claim or cause of action."

28 U.S.C. Section 1478(a) does not permit removal of this action due to lack of Jurisdiction. Because removal is not permitted, this Court does not have jurisdiction to hear the Defendants' Motion to Dismiss Plaintiff's Original Complaint (Document 5).

First of all, McDermott International's Plan had been confirmed and the Effective Date of the Plan occurred on June 30, 2020. Plaintiff received notice of these events. On July 17, 2020, defendants Dickson, Spence and Lamb (hereinafter, 'Defendants') filed their Notice of Removal in this Court.

The Fifth Circuit has held that "[a]fter a plan is confirmed, the bankruptcy court's jurisdiction is limited to matters pertaining to the implementation or execution of the plan" or in other words, "matters that impact compliance with or completion of the

5

reorganization plan." *Highland Capital Mgmt., LP v. Chesapeake Energy Corp. (In re Seven Seas Petroleum, Inc.)*, 522 F.3d 575, 589 (5th Cir. 2008) (citing to *Bank of La. v. Craig's Stores of Tex., Inc. (In re Craig's Stores of Tex., Inc.)*, 266 F.3d 388, 390 (5th Cir. 2001), and *United States Brass Corp. v. Travelers Ins. Group, Inc. (In re United States Brass Corp.)*, 301 F.3d 296, 305 (5th Cir. 2002)).  Because no "if related" jurisdiction existed at the time of removal, this Court does not have jurisdiction of the Defendants.  See *Newby v. Enron Corp. (In re Enron Corp. Sec.)*, 534 F.3d 325, 335 (5th Cir. 2008).

     *In re Craig's Stores, Supra*, the Fifth Circuit stated:

     'Once the bankruptcy court confirms a plan of reorganization, the debtor may go about its business without further supervision or approval. The firm also is without the protection of the bankruptcy court. It may not come running to the bankruptcy judge every time something unpleasant happens. *Pettibone Corp. v. Easley*, 935 F.2d 120, 122 (7th Cir. 1991). **After a debtor's reorganization plan has been confirmed, the debtor's estate, and thus bankruptcy jurisdiction, ceases to exist, other than for matters pertaining to the implementation or execution of the plan** (emphasis added). *In re Fairfield Communities, Inc.*, 142 F.3d 1093, 1095 (8th Cir. 1998); *In re Johns-Manville Corp.*, 7 F.3d 32, 34 (2d Cir. 1993). No longer is expansive bankruptcy court jurisdiction required to facilitate "administration" of the debtor's estate, for there is no estate left to reorganize. This theory has antecedents in our court's jurisprudence, which has observed that the reorganization provisions of the former Bankruptcy Act "envisage [] that out of the proceedings will come a newly reorganized company capable of sailing forth in the cold, cruel business world with no longer the protective wraps of the federal Bankruptcy Court." *In re Seminole Park & Fairgrounds, Inc.*, 502 F.2d 1011, 1014 (5th Cir. 1974). Because it comports more closely with the effect of a successful reorganization under the Bankruptcy Code than the expansive jurisdiction cases, we adopt this more exacting theory of post-confirmation bankruptcy jurisdiction.'

     The Defendants are individuals who were not debtors or defendants in the McDermott International bankruptcy action in this Court.  They were sued only for state-law causes of action in Montgomery County, Texas, District Court (case 20-06-07348).  The Montgomery County case has nothing to do with "matters pertaining to the implementation or execution of the plan" or "matters that impact compliance with or

completion of the reorganization plan." and the Defendants provide no evidence in their Notice of Removal that it does.  The post-confirmation dispute at issue herein has nothing to do with any obligation created by the debtor's reorganization plan.  See *In re Craig's Stores, Supra.*

Secondly, 28 U.S.C. section 1471(b) states:

"(b) Notwithstanding an Act of Congress that confers exclusive jurisdiction on a court or courts other than the district courts, the district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11 or arising in or **related to** cases under title 11 (emphasis added)."

The Fifth Circuit has stated that "it is not necessary to distinguish between proceedings 'arising under,' 'arising in a case under,' or 'related to a case under,' title 11 " as the real necessary determination is "whether a matter is at least 'related to' the bankruptcy" when determining if a matter falls within bankruptcy subject matter jurisdiction.  *Wood v. Wood (In re Wood)*, 825 F.2d 90, 93 (5th Cir. 1987).  Proceedings that are "arising under" are those in which the matter "involve[s] a cause of action created or determined by a statutory provision of title 11." *Id.* at 96. Those are distinguishable from proceedings that are "arising in," which involve matters "that are not based on any right expressly created by title 11, but nevertheless, would have no existence outside of the bankruptcy," such as "[p]roceedings invoking the bankruptcy court's statutory authority to enter orders necessary for the consummation of a confirmed plan…" *United States Brass Corp. v. Travelers Ins. Group, Inc. (In re United States Brass Corp.)*, 301 F.3d 296, 306 (5th Cir. 2002)."

The Fifth Circuit in *In re Wood, Supra,* went on to adopt a "related to" test articulated by the Third Circuit, which enjoys broad support, that looks at "whether the outcome of that proceeding could conceivably have any effect on the estate being

administered in bankruptcy." 825 F.2d at at 93, n.15 (citing to *Pacor, Inc. v. Higgins*, 743 F.2d 984, 994 (3d Cir. 1984)). In applying the test, the Fifth Circuit looked to see whether the proceeding was "sufficiently related to the pending bankruptcy to allow the district court to exercise jurisdiction under section 1334," which is to say that "plaintiff's claims must affect the estate, **not just the debtor** (emphasis added)." *Id.* at 93-94.

 In *Pacor, Supra*, the court stated:

"In enacting section 1471(b), Congress intended to grant comprehensive jurisdiction to the bankruptcy courts so that they might deal efficiently and expeditiously with all matters connected with the bankruptcy estate. *See* H.Rep. No. 598, 95th Cong., 2d Sess., 43-48, *reprinted in* 1978 U.S.Code Cong. & Ad. News 5963, 6004-08. *See also Young v. Sultan, Ltd. (In re Lucasa International, Ltd.)*, 6 B.R. 717, 719 (Bankr.S.D.N.Y.1980) (§ 1471(b) jurisdiction is "pervasive"); *Westinghouse Credit Corp. v. Yeary (In re Brothers Coal Co.)*, 6 B.R. 567, 570-71 (Bankr.W.D.Va.1980) (§ 1471(b) jurisdiction is "broad."). The jurisdiction of the bankruptcy courts to hear cases related to bankruptcy is not without limit, however, and there is a statutory, and eventually constitutional, limitation to the power of a bankruptcy court. For subject matter jurisdiction to exist, therefore, there must be some nexus between the "related" civil proceeding and the title 11 case. *See In re Hall,* 30 B.R. 799, 802 (M.D.Tenn.1983); 1 *Collier on Bankruptcy* ¶ 3.01, at 3-48 to 3-49 (15th ed. 1982).

 The usual articulation of the test for determining whether a civil proceeding is related to bankruptcy is whether *the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy. E.g., In re Hall,* 30 B.R. at 802; *In re General Oil Distributors, Inc.,* 21 B.R. 888, 892 n. 13 (Bankr.E.D.N.Y.1982); *In re U.S. Air Duct Corp.,* 8 B.R. 848, 851 (Bankr.N.D.N.Y. 1981); 1 *Collier on Bankruptcy* ¶ 3.01 at 3-49. Thus, the proceeding need not necessarily be against the debtor or against the debtor's property. An action is related to bankruptcy if the outcome could alter the debtor's rights, liabilities, options, or freedom of action (either positively or negatively) and which in any way impacts upon the handling and administration of the bankrupt estate.

 On the other hand, the mere fact that there may be common issues of fact between a civil proceeding and a controversy involving the bankruptcy estate does not bring the matter within the scope of section 1471(b). Judicial economy itself does not justify federal jurisdiction. *See generally Aldinger v. Howard,* 427 U.S. 1, 15, 96 S.Ct. 2413, 2420, 49 L.Ed.2d 276 (1976). "[J]urisdiction over nonbankruptcy controversies with third parties who are otherwise strangers to the civil proceeding and to the parent bankruptcy does not exist." *In re Haug,* 19 B.R. 223, 224-25 (Bankr.D.Ore.1982); *See also In re McConaghy,* 15 B.R. 480, 481 (Bankr.E.D.Va.1981) (Bankruptcy court lacks jurisdiction to decide disputes between third parties in which the estate of the debtor has no interest)."

8

The outcome of Plaintiff's Montgomery County, Texas, state-law case against the individual, non-debtor defendants, two of whom did not even work for McDermott International at the time of Plaintiff's suit against them (Spence and Lamb), has no conceivable effect on the estate (McDermott International) that *was* administered in bankruptcy and whose plan confirmation and effective date was before the Defendants' Notice of Removal.  The Montgomery County suit has no bearing on the liabilities or assets of the bankrupt debtor or the debtor's discharge.  The estate simply has no interest in the Plaintiff's Montgomery County, Texas, suit against the Defendants and the Defendants do not present evidence otherwise in their Notice of Removal.

In their Notice of removal, the Defendants state:

"3. ..............The entry of a final judgment against Defendants would directly and substantially affect the Debtors, their operations, and/or the implementation or execution of the Plan. Moreover, adjudication of the claims requires interpretation and enforcement of this Court's Confirmation Order [Plan], which releases and exculpates Defendants from certain claims that have been brought.

4. .................adjudication of the claims would require interpretation and enforcement of this Court's Confirmation Order [Plan], including the release and exculpation provisions."

The Defendants make the above statements without evidence.  They state that the Confirmation Plan 'releases and exculpates Defendants from certain claims that **have been brought** (emphasis added).'  Plaintiff's Montgomery County suit was brought after the Confirmation Plan, as noted herein.  It is therefore not possible that the claims 'that have been brought' cited by the Defendants can refer to the Plaintiff's Montgomery County suit against the Defendants.

What 'Defendants' are the Defendants talking about?  It is seems unlikely that defendants Lamb and Spence had any release and exculpation provisions as they both left

their employment with McDermott International before the company declared

bankruptcy.  Furthermore, defendant Spence has a separation agreement that Plaintiff, on

information and belief, believes does not provide any indemnification for suits brought

against him after his employment for acts committed during his employment with the

company.

The release provisions of McDermott's Confirmation Plan do not apply to the

Plaintiff.  During the course of the bankruptcy proceedings, the debtors sought

affirmative releases from shareholders.  **Plaintiff did not release the debtors from**

**wrongdoing and is therefore not a "releasing party" with respect to the Plan**.

Exhibit 1 herein contains the opt out form 'with respect to the releases, exculpation,

injunction and third-party releases provided in the Plan' (Exhibit 1, page 6) that Plaintiff

submitted to the debtors that excluded him from the Third-Party Release set forth in

Article VIII.D of the Plan.  There is nothing for the Court to decide here.  Plaintiff is not

a releasing party and he did not release the debtors from wrongdoing.  None of the

releases, including the exculpation and injunction, apply to the Plaintiff because Plaintiff

opted out of all of them.  See Article VIII of the Second Amended Joint Prepackaged

Chapter 11 Plan of Reorganization (Technical Modifications) of McDermott

International, Inc. and Its Debtor Affiliates (Case No. 20-30336, Document 651).

On August 3, 2020, Plaintiff filed his Plaintiff's Request for Hearing (Document

9) seeking the earliest possible hearing date for Plaintiff's Motions to Remand His State

Law Cause of Action Against the Defendants to Montgomery County, Texas, District

Court Because the Federal Bankruptcy Court Does Not Have Jurisdiction Over Plaintiff's

Montgomery County Cause of Action, Because Remand Is Required Pursuant to 28

U.S.C. Section 1334(c)(2) and Because Remand Is Permissive Pursuant to U.S.C. Section 1334(c)(1).  (Docket 4).  No hearing date has been set by the Court.

### Mandatory Abstention Pursuant To 28 U.S.C. Section 1334(c)(2) Applies To This Action

Even if this Court had jurisdiction to hear this removed case, remand would be mandatory under 28 U.S.C. Section 1334(c)(2).

The key distinction between mandatory abstention and equitable or discretionary remand is that mandatory abstention applies "only to non-core proceedings--that is, proceedings 'related to a case under title 11,' but not 'arising under title 11, or arising in a case under title 11.'" *In re Gober*, 100 F.3d at 1206 (comparing 28 U.S.C. §§ 157(b)(1) & 1334(c)(2)); *see also J.T. Thorpe Co.*, 2003 U.S. Dist. LEXIS 26016, at *10; *Ramirez*, 413 B.R. at 626-27. *Cf. Stern*, 131 S. Ct. at 2618.

Section 1334(c)(2) provides for mandatory abstention when:

"[u]pon timely motion of a party in a proceeding based upon a State law claim or State law cause of action, related to a case under title 11 but not arising under title 11 or arising in a case under title 11, with respect to which an action could not have been commenced in a court of the United States absent jurisdiction under this section, the district court shall abstain from hearing such proceeding if an action is commenced, and can be timely adjudicated, in a State forum of appropriate jurisdiction." 28 U.S.C. § 1334(c)(2).

A court must abstain from hearing the state law claim at issue when all of the following factors are met:

(1) a motion has been timely filed requesting abstention;
(2) the cause of action is essentially one that is premised on state law;
(3) the claim is a non-core proceeding, i.e., it is "related to" a case under title 11 but does not arise under or in a case under title 11;
(4) the proceeding could not otherwise have been commenced in federal court absent federal jurisdiction under § 1334(b);
(5) an action has been commenced in state court; and
(6) the action could be adjudicated timely in state court.

11

*J.T. Thorpe Co.*, 2003 U.S. Dist. LEXIS 26016, at *10 (citing to *Schuster v. Mims (In re Rupp & Bowman Co.)*, 109 F.3d 237, 239 (5th Cir. 1997); *In re Gober*, 100 F.3d at 1206; *Broyles v. U.S.Gypsum Co.*, 266 B.R. 778, 782-83 (E.D. Tex. 2001); *Lee v. Miller*, 263 B.R. 757, 763 (S.D. Miss. 2001); *Chickaway v. Bank One Dayton, N. A.*, 261 B.R. 646, 649 (S.D. Miss. 2001); *WRTCreditors Liquidation Trust v. C.I.B.C. Oppenheimer Corp.*, 75 F. Supp. 2d 596, 605 (S.D. Tex. 1999)). The determination of the status of a cause of action is rooted in the list of core proceedings in 28 U.S.C. § 157(b)(2). Although Section 157(b)(2) is non-exhaustive, that does not mean that every cause of action that can be categorized as a "core proceeding" under § 157(b)(2) should be included, given decisions such as *Marathon* and *Stern*. *Ramirez*, 413 B.R. at 627; *see also Stern*, 131 S. Ct. at 2618; *Northern Pipeline Const. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50 (1982).

Plaintiff has satisfied the first factor given above in that he filed this pleading on July 23, 2020, four days after he was served the Defendants' Notice of Removal.

Plaintiff has satisfied the second, third and fifth factors given above in that the Montgomery County, Texas, District Court suit against the Defendants is entirely premised on state law and involves only claims of Fraud, Conversion, Negligent Misrepresentation, Breach of Fiduciary Duty and Civil Conspiracy and does not involve federal law.

Plaintiff has satisfied the fourth factor given above because there is no federal subject matter jurisdiction over Plaintiff's state law claims absent jurisdiction pursuant to Section 1334(b) and diversity of citizenship is lacking.

The sixth and final factor looks to whether "the action could be adjudicated timely in state court." *J.T. Thorpe Co.*, 2003 U.S. Dist. LEXIS 26016, at *10. The standard for

timely adjudication in state court does not place a burden upon the movant to show a

"*more timely* adjudicat[ion] in state court, but only that the matter can be timely

adjudicated…" *J.T. Thorpe Co.*, 2003 U.S. Dist. LEXIS 26016, at *12-13.  However,

Plaintiff addresses this 'burden'.

On information and belief, Montgomery County is 'open' and not subject to a

shelter-in-place order.  The Montgomery County District Court Clerk's office is currently

fully staffed and open to the public during the COVID-19 pandemic.  The Clerk's office

dockets cases and events on a normal basis.  Court 284, where the Defendants' case was

removed from, is open for the hearing of motions, etc..  There is no indication that the

Montgomery County Court or its staff is unable to efficiently and normally handle its

case load during the pandemic.  Plaintiff is approved and is and has been able to

electronically file documents in his case.  The Montgomery County Court, including

Court 284, hears cases on a full-time basis in Montgomery County.

On the other hand, on information and belief, Harris County is on lock-down

status.  Federal in-court appearances have been deferred.  The federal Clerk's office is

operating with a 'much reduced staff'.  The docketing of federal cases is being done

remotely.  Plaintiff filed his Plaintiff's Request For Hearing (Document 9) in this action

on August 3, 2020, at 10:57 a.m..  It took two days for Plaintiff's Request to be docketed.

Plaintiff has been prohibited from electronically filing documents in the McDermott

bankruptcy case or this adversary proceeding by bankruptcy court judge David Jones.

Furthermore, the Southern District of Texas Bankruptcy Court is SWAMPED with cases

as Houston and Texas companies operating in the oil patch and other industries continue

to file for bankruptcy at an alarming rate.  The bankruptcy court judge overseeing this

action, Judge Jones, is only hearing Houston cases (including the instant action) on a part-time basis as he divides his time between physically hearing separate cases in Houston, Corpus Christi and Laredo.

"[The] Covid-19 [pandemic] ....does not weigh in favor of retaining federal jurisdiction". Southern District of Texas Chief Judge Lee H. Rosenthal in *American General Life Insurance Company v. Schahin II Finance Company (SPV) Limited*, Civil Action No. H-19-4025, U.S. District Court, S.D. Texas, Houston Division (June 16, 2020).

The above illustrates that there is an exceedingly high likelihood that Plaintiff's state-law case against the Defendants will be adjudicated much more quickly in Montgomery County District Court than it would be in the Southern District of Texas Bankruptcy Court. This is amplified by the fact that state law causes of action against the individual Defendants were not raised during the pendency of the bankruptcy proceedings. If the bankruptcy court were to hear Plaintiff's state law claims against the Defendants, it would have to "start fresh" with a new case and would not have an advantage because it had previously heard the debtor's bankruptcy case. (This is especially the case if Judge Jones is recused from this action.)

Furthermore, since the Defendants have rendered no evidence to indicate that the state court could *not* adjudicate the matter in a timely fashion, the Court must presume that the state court will timely adjudicate the matter, given the immense policy interest in comity. *In re Doctors Hosp.*, 351 B.R. at 846 n.29. "While an affirmative showing of the possibility of timely adjudication in state court may be necessary where a movant seeks abstention from a proceeding originating in federal court, such a showing is not

14

necessary where the movant is contesting the removal of his own state action." *In Re Treyson Dev., Inc.*, No. 14-70256, 2016 WL 1604347 (Bankr. S.D. Tex. Apr. 19, 2016) (citing *Abadie v. Poppin*, 154 B.R. 86, 90 (N.D. Cal. 1993)).

Given the above, Plaintiff has satisfied the sixth factor that the action could be adjudicated timely (or more timely) in state court.

On August 3, 2020, Plaintiff filed his Plaintiff's Request for Hearing (Document 9) seeking the earliest possible hearing date for Plaintiff's Motions to Remand His State Law Cause of Action Against the Defendants to Montgomery County, Texas, District Court Because the Federal Bankruptcy Court Does Not Have Jurisdiction Over Plaintiff's Montgomery County Cause of Action, Because Remand Is Required Pursuant to 28 U.S.C. Section 1334(c)(2) and Because Remand Is Permissive Pursuant to U.S.C. Section 1334(c)(1). (Docket 4). No hearing date has been set by the Court.

**Plaintiff's Montgomery County Claims Stand**

Plaintiff's Original Petition in the Montgomery County, Texas, District Court case is incorporated herein by reference.

Plaintiff's Montgomery County, Texas, claims are valid state-law claims which should be remanded, heard and decided in Montgomery County, Texas, District Court as detailed herein. As seen herein, Plaintiff opted-out of all of the Confirmation Plan's release provisions, including the exculpation, injunction and third-party release provisions. This Court simply has no jurisdiction to hear Plaintiff's state-law, individual, non-debtor defendant causes of action.

Furthermore, the Confirmation Plan (Case No. 20-30336, Document 651) does not provide exculpation "**for claims related to any act or omission that is determined**

15

**in a Final Order by a court of competent jurisdiction to have constituted actual fraud, willful misconduct, or gross negligence (**emphasis added)." (Document 651, page 58, 'Exculpation', incorporated by reference herein). These claims are 'carved out' by the Plan's exculpation provision.

So even if Plaintiff had not opted out of the releases, including the exculpation and injunction, he could have still brought the claims raised in Plaintiff's Montgomery County District Court state law suit and he could have brought them in Montgomery County District Court, "a court of competent jurisdiction" because those claims are carved out by the Plan's exculpation provision.

Plaintiff's Montgomery County case includes claims for Statutory Fraud, Common Law Fraud, Conversion and Conspiracy. Statutory Fraud and Common Law Fraud are directly included in the Plan's exculpation provision carve out.

The Fifth Circuit has decided that "an injury is willful if .....it is subjectively intended to cause injury, or if the injury was objectively substantially certain to result from the debtor's conduct." *In re Miller*, 156 F.3d 598, 606 (5th Cir. 1998). Applied to the Texas Conversion elements 2) "Defendant assumed and exercised dominion and control over the property in an unlawful and unauthorized manner." and 4) "Defendant refused to return the property." means that, in Texas, the tort of Conversion is 'willful' and is therefore permitted by the Confirmation Plan's exculpation provision carve out. Furthermore, in *In re Williams*, 337 F.3d 504 (2003), the Texas court decided that Conversion can be willful as well as malicious.

In addition, in Texas, the essential elements of a conspiracy are (1) two or more persons; (2) an object to be accomplished; (3) a meeting of minds on the object or course

16

of action; (4) one or more unlawful, overt acts; and (5) damages as the proximate result. Elements 1-4 impute a willfulness to the tort of Conspiracy and so Conspiracy is permitted by the Confirmation Plan's exculpation provision carve out as well.

It can be seen from the above that, even if Plaintiff had not opted out of the releases, including the exculpation and injunction provisions, his Montgomery County, Texas, causes of action would be carved out by the exculpation provision of the Confirmation Plan which allows a carved-out suit to be brought in any 'court of competent jurisdiction', including Montgomery County, Texas, District Court. The 'exculpation provisions' that allegedly (by the Defendants) tie Plaintiff's Montgomery County suit to the Confirmation Plan actually do just the opposite: they release and remove Plaintiff's Montgomery County suit from the Confirmation Plan.

It is established case law that it is within the purview of the state court to interpret the releases and exculpations. As explained by the Supreme Court, "It is black letter law . . . that the mere grant of jurisdiction to a federal court does not operate to oust a state court from concurrent jurisdiction over the cause of action." Gulf Offshore Co. v. Mobil Oil Corp., 101 S. Ct. 2870, 2875-76 (1981). See also Malesovas v. Sanders, No. H-04-3122, 2005 WL 1155073, *3 n. 6 (S.D. Tex. May 16, 2005) ("Orders of bankruptcy courts, like those of other courts, can also be interpreted by other courts of competent jurisdiction. Thus, state courts are qualified to interpret the language of bankruptcy plans and orders and routinely engage in such interpretation.") (quoting Kmart Creditor Trust v. Conway (In re Kmart Corp.), 307 B.R. 586, 596 (Bankr. E.D. Mich. 2004)).

## Federal Rules Of Civil Procedure Rules 12(b)(6) and 9(b)

As discussed herein, this Court does not have jurisdiction over this case and this case must be remanded to Montgomery County, Texas, District Court where it originated and where the Federal Rules of Civil Procedure do not apply.

Nevertheless, Plaintiff alleges that his Original Complaint satisfies the Federal Rules of Civil Procedure Rule 12(b)(6) and Rule 9(b) requirements as interpreted by the laws of this circuit.

Rule 8(a)(2) of the Federal Rules of Civil Procedure requires a plaintiff to present "a short and plain statement of the claim showing that the pleader is entitled to relief." The purpose of this notice-pleading requirement is to "give the defendant fair notice of what the claim is and the grounds upon which it rests." *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1288 (11th Cir. 2010) (alteration omitted). Accordingly, in order to survive a Rule 12(b)(6) motion to dismiss for failure to state a claim, a plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

Plaintiff's Original Petition (filed in Montgomery County, Texas, District Court) contains claims each of which state a claim upon which relief can be granted that more than satisfy the requirements of *Twombly, Supra.*

Plaintiff has pled that the Defendants committed statutory fraud as well as common law fraud. Fed. Rules Civ. Proc. Rule 9(b) requires a party alleging fraud to state with particularity the circumstances constituting fraud.

The claimant must allege specific facts that support an inference of fraud. *Tuchman v. DSC Communications Corp.* 14 F.3d at 1068 (5th Cir. 1994) (citing cases).

The claimant may sufficiently allege intent by pointing out circumstances or facts that reasonably indicate intent or motive to commit fraud. Id.

To state a claim for common-law fraud based on nondisclosure, Texas law requires the claimant to allege that the party concealed or failed to disclose a material fact that they knew the claimant was ignorant of or did not have the opportunity to discover, that they intended to induce the claimant to take some action by concealing or failing to disclose the material fact, and that the claimant suffered as a result of acting on the nondisclosure. *Dorsey v. Portfolio Equities, Inc.* 540 F.3d at 341 (citing *Bradford v. Vento*, 48 S.W.3d 749, 754–55 (Tex.2001)). However, "for there to be actionable nondisclosure fraud, there must be a duty to disclose." Id. (quoting *Newby v. Enron Corp.*, 388 F.Supp.2d 780, 788(S.D. Tex.2005) (citing Texas case law)). "A duty to disclose may arise where one makes a representation and fails to disclose new information that makes the earlier representation misleading or untrue...." Id. (internal quotation omitted).

Plaintiff's allegations of both statutory and common law fraud contain more than sufficient particularity for both causes of action to satisfy Rule 9(b). Indeed, Plaintiff's Original Petition contains over 80 paragraphs stating the particularity behind the Defendants' fraudulent actions towards the Plaintiff.

Should this case remain in Federal Court, Plaintiff moves this Court for leave to amend his Complaint to cure any deficiencies, particularly with respect to Federal pleading requirements. (Plaintiff has not yet amended his Complaint.)

WHEREFORE, Plaintiff respectfully moves this Court to deny in its entirety the

Defendants' Motion to Dismiss Plaintiff's Original Petition (Document 5).


Michael Van Deelen
Plaintiff
16215 Friar Circle
Spring, TX 77379
832-562-0723
michaelvandeelen@gmail.com

## **CERTIFICATE OF SERVICE**

I hereby certify that I have on this 12th day of July, 2020, served a true and correct copy of the foregoing document on the defendants via the court-approved eFiling system, which will forward a copy thereof to all attorneys of record.

Michael Van Deelen

# EXHIBIT 1

# PLAINTIFF'S OPT-OUT

SRF 39341

# UNITED STATES BANKRUPTCY COURT
# SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| MCDERMOTT INTERNATIONAL, INC., *et al.*,[1] | ) | Case No. 20-30336 (DRJ) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

## NOTICE OF (A) NON-VOTING STATUS
## TO HOLDERS OR POTENTIAL HOLDERS
## OF (I) UNIMPAIRED CLAIMS CONCLUSIVELY PRESUMED
## TO ACCEPT THE PLAN AND (II) IMPAIRED CLAIMS CONCLUSIVELY
## PRESUMED TO REJECT THE PLAN AND (B) OPPORTUNITY FOR HOLDERS
## OF CLAIMS AND INTERESTS TO OPT OUT OF THE THIRD-PARTY RELEASES

**PLEASE TAKE NOTICE THAT** McDermott International, Inc. and certain of its affiliates ("McDermott") commenced Chapter 11 Cases in the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court") on January 21, 2020 (the "Petition Date") and seek to consummate the Restructuring Transactions contemplated by the *Joint Chapter 11 Plan of Reorganization of McDermott International, Inc. and Its Debtor Affiliates* (the "Plan")[2] through the chapter 11 bankruptcy process and the Plan. The Company filed the Plan and the related *Disclosure Statement for the Joint Chapter 11 Plan of Reorganization of McDermott International, Inc. and Its Debtor Affiliates* (as may be amended, modified, or supplemented from time to time including all exhibits or supplements thereto, the "Disclosure Statement") with the Bankruptcy Court on January 22, 2020 [Docket Nos. 4, 121].

**PLEASE TAKE FURTHER NOTICE THAT** you are a holder or potential holder of a Claim against or Interest in McDermott that, due to the nature and treatment of such Claim or Interest under the Plan, *is **not** entitled to vote on the Plan*. Specifically, under the terms of the Plan, (i) a holder of a Claim in a Class that is not Impaired under the Plan and, therefore, conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, and (ii) a holder of a Claim or Interest in a Class that is Impaired under the Plan and, therefore, deemed to reject the Plan pursuant to section 1126(g), *is **not** entitled to vote on the Plan*.

**PLEASE TAKE FURTHER NOTICE THAT** if you would like to **obtain a copy of the Disclosure Statement, the Plan, or related documents at no additional cost**, you should contact

---

[1]   A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://cases.primeclerk.com/McDermott. The location of Debtor McDermott International, Inc.'s principal place of business and the Debtors' service address in these chapter 11 cases is 757 North Eldridge Parkway, Houston, Texas 77079.

[2]   Capitalized terms used but not defined herein have the meaning ascribed to such terms in the Plan.

*1*

Prime Clerk LLC, the Debtors' proposed solicitation agent in the chapter 11 cases (the "Solicitation Agent") by:    (a) visiting the Debtors' restructuring website at: https://cases.primeclerk.com/McDermott; (b) writing to Prime Clerk LLC, Re: McDermott, One Grand Central Place, 60 East 42nd Street, Suite 1440, New York, NY 10165; (c) emailing McDermottInfo@primeclerk.com; and/or (d) calling the Debtors' restructuring hotline at the following number:

<div align="center">

**US/CANADA TOLL FREE:  +1 (877) 426-7705**

**or**

**INTERNATIONAL: +1 (917) 994-8380**

</div>

All pleadings filed in the cases (i) may be inspected at the office of the Clerk of the Bankruptcy Court for the Southern District of Texas, P.O. Box 61010, Houston, Texas 77208 (the "Clerk's Office") and (ii) will also be available through the Court's electronic case filing system at https://www.txs.uscourts.gov/page/bankruptcy-court using a PACER password (to obtain a PACER password, go to the PACER website at http://pacer.psc.uscourts.gov), or on the website maintained by the Solicitation Agent at https://cases.primeclerk.com/McDermott.

<div align="center">

**PLEASE TAKE FURTHER NOTICE** of the following provisions in the Plan:

</div>

---

<div align="center">

**ARTICLE VIII OF THE PLAN CONTAINS RELEASE, EXCULPATION, AND INJUNCTION PROVISIONS, AND ARTICLE VIII.D CONTAINS THE FOLLOWING THIRD-PARTY RELEASE:**

</div>

**EXCEPT AS OTHERWISE EXPRESSLY SET FORTH IN THIS PLAN OR THE CONFIRMATION ORDER, ON AND AFTER THE EFFECTIVE DATE, IN EXCHANGE FOR GOOD AND VALUABLE CONSIDERATION, THE ADEQUACY OF WHICH IS HEREBY CONFIRMED, EACH RELEASED PARTY IS, AND IS DEEMED HEREBY TO BE, FULLY, CONCLUSIVELY, ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY AND FOREVER, RELEASED AND DISCHARGED BY EACH RELEASING PARTY, IN EACH CASE ON BEHALF OF THEMSELVES AND THEIR RESPECTIVE SUCCESSORS, ASSIGNS, AND REPRESENTATIVES, AND ANY AND ALL OTHER ENTITIES WHO MAY PURPORT TO ASSERT ANY CAUSE OF ACTION, DIRECTLY OR DERIVATIVELY, BY, THROUGH, FOR, OR BECAUSE OF THE FOREGOING ENTITIES, FROM ANY AND ALL CLAIMS AND CAUSES OF ACTION, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, MATURED OR UNMATURED, EXISTING OR HEREAFTER ARISING, CONTINGENT OR NON-CONTINGENT, IN LAW, EQUITY, CONTRACT, TORT, OR OTHERWISE, INCLUDING ANY DERIVATIVE CLAIMS ASSERTED ON BEHALF OF THE DEBTORS, THAT SUCH ENTITY WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT IN THEIR OWN RIGHT (WHETHER INDIVIDUALLY OR COLLECTIVELY) OR ON BEHALF OF THE HOLDER OF ANY CLAIM AGAINST, OR INTEREST IN, A DEBTOR OR OTHER ENTITY, OR THAT ANY HOLDER OF ANY CLAIM AGAINST, OR INTEREST IN, A DEBTOR OR OTHER ENTITY COULD HAVE ASSERTED ON BEHALF OF THE DEBTORS, BASED ON OR RELATING TO, OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART:**

---

<div align="center">

2

</div>

1. THE DEBTORS (INCLUDING THE CAPITAL STRUCTURE, MANAGEMENT, OWNERSHIP, OR OPERATION THEREOF), THE BUSINESS OR CONTRACTUAL ARRANGEMENT BETWEEN THE DEBTORS AND ANY RELEASING PARTY, ANY SECURITIES ISSUED BY THE DEBTORS AND THE OWNERSHIP THEREOF, THE ASSERTION OR ENFORCEMENT OF RIGHTS AND REMEDIES AGAINST THE DEBTORS, THE DEBTORS' IN- OR OUT-OF-COURT RESTRUCTURING EFFORTS, ANY AVOIDANCE ACTIONS (BUT EXCLUDING AVOIDANCE ACTIONS BROUGHT AS COUNTERCLAIMS OR DEFENSES TO CLAIMS ASSERTED AGAINST THE DEBTORS), INTERCOMPANY TRANSACTIONS BETWEEN OR AMONG A COMPANY PARTY AND ANOTHER COMPANY PARTY, THE SUPERPRIORITY CREDIT AGREEMENT, THE CREDIT AGREEMENT, THE 2021 LC AGREEMENT, THE LLOYDS LETTER OF CREDIT AGREEMENT, SENIOR NOTES INDENTURE, THE SENIOR NOTES, THE CHAPTER 11 CASES, THE FORMULATION, PREPARATION, DISSEMINATION, NEGOTIATION, OR FILING OF THE RESTRUCTURING SUPPORT AGREEMENT, THE DISCLOSURE STATEMENT, THE DIP CREDIT AGREEMENT, THE EXIT FACILITY DOCUMENTS, OR THE PLAN (INCLUDING, FOR THE AVOIDANCE OF DOUBT, THE PLAN SUPPLEMENT);

2. ANY RESTRUCTURING TRANSACTION, CONTRACT, INSTRUMENT, RELEASE, OR OTHER AGREEMENT OR DOCUMENT (INCLUDING ANY LEGAL OPINION REQUESTED BY ANY ENTITY REGARDING ANY TRANSACTION, CONTRACT, INSTRUMENT, DOCUMENT OR OTHER AGREEMENT CONTEMPLATED BY THE PLAN OR THE RELIANCE BY ANY RELEASED PARTY ON THE PLAN OR THE CONFIRMATION ORDER IN LIEU OF SUCH LEGAL OPINION) CREATED OR ENTERED INTO IN CONNECTION WITH THE RESTRUCTURING SUPPORT AGREEMENT, THE RIGHTS OFFERING, THE DISCLOSURE STATEMENT, THE DIP CREDIT AGREEMENT, THE NEW WARRANTS AGREEMENTS, THE EXIT FACILITY DOCUMENTS, THE PLAN, OR THE PLAN SUPPLEMENT, BEFORE OR DURING THE CHAPTER 11 CASES,

3. THE CHAPTER 11 CASES, THE FILING OF THE CHAPTER 11 CASES, THE DISCLOSURE STATEMENT, OR THE PLAN, THE SOLICITATION OF VOTES WITH RESPECT TO THE PLAN, THE PURSUIT OF CONFIRMATION, THE PURSUIT OF CONSUMMATION, THE ADMINISTRATION AND IMPLEMENTATION OF THE PLAN, INCLUDING THE ISSUANCE OR DISTRIBUTION OF SECURITIES PURSUANT TO THE PLAN, THE RIGHTS OFFERING, OR THE DISTRIBUTION OF PROPERTY UNDER THE PLAN OR ANY OTHER RELATED AGREEMENT; OR

4. ANY RELATED ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE RELATED OR RELATING TO ANY OF THE FOREGOING TAKING PLACE ON OR BEFORE THE EFFECTIVE

DATE, INCLUDING ALL AVOIDANCE ACTIONS OR OTHER RELIEF OBTAINED BY THE DEBTORS IN THE CHAPTER 11 CASES.

NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE FOREGOING, THE RELEASES SET FORTH ABOVE DO NOT RELEASE (I) ANY PARTY OF ANY OBLIGATIONS RELATED TO CUSTOMARY BANKING PRODUCTS, BANKING SERVICES OR OTHER FINANCIAL ACCOMMODATIONS (EXCEPT AS MAY BE EXPRESSLY AMENDED OR MODIFIED BY THE PLAN AND THE EXIT FACILITY DOCUMENTS, OR ANY OTHER FINANCING DOCUMENT UNDER AND AS DEFINED THEREIN), (II) ANY POST-EFFECTIVE DATE OBLIGATIONS OF ANY PARTY OR ENTITY UNDER THE PLAN, THE CONFIRMATION ORDER, ANY RESTRUCTURING TRANSACTION, OR ANY DOCUMENT, INSTRUMENT, ANY DEFINITIVE DOCUMENT, OR ANY AGREEMENT (INCLUDING THOSE SET FORTH IN THE PLAN SUPPLEMENT) EXECUTED TO IMPLEMENT THE PLAN, INCLUDING THE EXIT FACILITY DOCUMENTS, THE NEW WARRANTS AGREEMENTS, OR ANY CLAIM OR OBLIGATION ARISING UNDER THE PLAN, OR (III) THE RIGHTS OF HOLDERS OF ALLOWED CLAIMS TO RECEIVE DISTRIBUTIONS UNDER THE PLAN.

ENTRY OF THE CONFIRMATION ORDER SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO BANKRUPTCY RULE 9019, OF THE FOREGOING THIRD-PARTY RELEASE, WHICH INCLUDES BY REFERENCE EACH OF THE RELATED PROVISIONS AND DEFINITIONS CONTAINED HEREIN, AND, FURTHER, SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THE FOREGOING THIRD-PARTY RELEASE IS: (A) CONSENSUAL; (B) ESSENTIAL TO THE CONFIRMATION OF THE PLAN; (C) GIVEN IN EXCHANGE FOR A SUBSTANTIAL CONTRIBUTION AND FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY THE RELEASED PARTIES THAT IS IMPORTANT TO THE SUCCESS OF THE PLAN; (D) A GOOD FAITH SETTLEMENT AND COMPROMISE OF THE CLAIMS RELEASED BY THE FOREGOING THIRD-PARTY RELEASE; (E) IN THE BEST INTERESTS OF THE DEBTORS AND THEIR ESTATES; (F) FAIR, EQUITABLE, AND REASONABLE; (G) GIVEN AND MADE AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING; AND (H) A BAR TO ANY OF THE RELEASING PARTIES ASSERTING ANY CLAIM OR CAUSE OF ACTION RELEASED PURSUANT TO THE FOREGOING THIRD-PARTY RELEASE.

DEFINITIONS RELATED TO THE THIRD-PARTY RELEASE:

UNDER THE PLAN, "RELEASED PARTIES" MEANS, COLLECTIVELY, AND IN EACH CASE IN ITS CAPACITY AS SUCH: (A) EACH DEBTOR; (B) EACH REORGANIZED DEBTOR; (C) EACH COMPANY PARTY; (D) EACH DIP LENDER AND EACH DIP LETTER OF CREDIT ISSUER; (E) EACH AGENT; (F) THE SENIOR NOTES TRUSTEE; (G) EACH CONSENTING STAKEHOLDER; (H) EACH HEDGE BANK; (I) EACH CASH MANAGEMENT BANK; (J) EACH LENDER UNDER THE SUPERPRIORITY CREDIT AGREEMENT, CREDIT AGREEMENT, THE 2021 LC AGREEMENT, AND THE LLOYDS LETTER OF CREDIT AGREEMENT; (K) EACH HOLDER OF AN OBLIGATION (AS

DEFINED IN THE SUPERPRIORITY CREDIT AGREEMENT) UNDER THE SUPERPRIORITY CREDIT AGREEMENT; (L) EACH HOLDER OF AN OBLIGATION (AS DEFINED IN THE CREDIT AGREEMENT) UNDER THE CREDIT AGREEMENT; (M) EACH ISSUER (AS DEFINED IN THE SUPERPRIORITY CREDIT AGREEMENT) UNDER THE SUPERPRIORITY CREDIT AGREEMENT; (N) EACH ISSUER (AS DEFINED IN THE CREDIT AGREEMENT) UNDER THE CREDIT AGREEMENT; (O) THE TERM LOAN AD HOC GROUP, THE LIQUIDITY LENDER STEERING COMMITTEE, AND THE SENIOR NOTES AD HOC GROUP; (P) EACH CURRENT AND FORMER AFFILIATE OF EACH ENTITY IN CLAUSE (A) THROUGH (O); AND (Q) EACH RELATED PARTY OF EACH ENTITY IN CLAUSE (A) THROUGH (O); PROVIDED THAT ANY HOLDER OF A CLAIM OR INTEREST THAT OPTS OUT OF THE RELEASES SHALL NOT BE A "RELEASED PARTY."

UNDER THE PLAN, "RELEASING PARTIES" MEANS, COLLECTIVELY, AND IN EACH CASE IN ITS CAPACITY AS SUCH: (A) EACH DEBTOR; (B) EACH REORGANIZED DEBTOR; (C) EACH COMPANY PARTY; (D) EACH DIP LENDER AND EACH DIP LETTER OF CREDIT ISSUER; (E) EACH AGENT; (F) THE SENIOR NOTES TRUSTEE; (G) EACH CONSENTING STAKEHOLDER; (H) EACH HEDGE BANK; (I) EACH CASH MANAGEMENT BANK; (J) EACH LENDER UNDER THE SUPERPRIORITY CREDIT AGREEMENT, CREDIT AGREEMENT, THE 2021 LC AGREEMENT, AND THE LLOYDS LETTER OF CREDIT AGREEMENT; (K) EACH HOLDER OF AN OBLIGATION (AS DEFINED IN THE SUPERPRIORITY CREDIT AGREEMENT) UNDER THE SUPERPRIORITY CREDIT AGREEMENT; (L) EACH HOLDER OF AN OBLIGATION (AS DEFINED IN THE CREDIT AGREEMENT) UNDER THE CREDIT AGREEMENT; (M) EACH ISSUER (AS DEFINED IN THE SUPERPRIORITY CREDIT AGREEMENT) UNDER THE SUPERPRIORITY CREDIT AGREEMENT; (N) EACH ISSUER (AS DEFINED IN THE CREDIT AGREEMENT) UNDER THE CREDIT AGREEMENT; (O) THE TERM LOAN AD HOC GROUP, THE LIQUIDITY LENDER STEERING COMMITTEE, AND THE SENIOR NOTES AD HOC GROUP; (P) ALL HOLDERS OF CLAIMS OR INTERESTS THAT VOTE TO ACCEPT OR ARE DEEMED TO ACCEPT THE PLAN; (Q) ALL HOLDERS OF CLAIMS OR INTERESTS THAT ABSTAIN FROM VOTING ON THE PLAN AND WHO DO NOT AFFIRMATIVELY OPT OUT OF THE RELEASES PROVIDED BY THE PLAN BY CHECKING THE BOX ON THE APPLICABLE BALLOT INDICATING THAT THEY OPT NOT TO GRANT THE RELEASES PROVIDED IN THE PLAN; (R) ALL HOLDERS OF CLAIMS OR INTERESTS THAT VOTE TO REJECT THE PLAN OR ARE DEEMED TO REJECT THE PLAN AND WHO DO NOT AFFIRMATIVELY OPT OUT OF THE RELEASES PROVIDED BY THE PLAN BY CHECKING THE BOX ON THE APPLICABLE BALLOT INDICATING THAT THEY OPT NOT TO GRANT THE RELEASES PROVIDED IN THE PLAN; (S) EACH CURRENT AND FORMER AFFILIATE OF EACH ENTITY IN CLAUSE (A) THROUGH (R); AND (T) EACH RELATED PARTY OF EACH ENTITY IN CLAUSE (A) THROUGH (R).

**NOTWITHSTANDING THE FOREGOING, AN ENTITY SHALL BE NEITHER A RELEASING PARTY NOR A RELEASED PARTY IF IT: (X) VALIDLY OPTS OUT OF THE RELEASES CONTAINED IN ARTICLE VIII.D OF THE PLAN; OR (Y) TIMELY FILES WITH THE BANKRUPTCY COURT ON THE DOCKET OF THE CHAPTER 11 CASES AN OBJECTION TO THE RELEASES CONTAINED IN**

ARTICLE VIII.D OF THE PLAN THAT IS NOT RESOLVED BEFORE CONFIRMATION.

\*     \*     \*

THIS NOTICE IS BEING SENT TO YOU FOR INFORMATIONAL PURPOSES ONLY AND TO PROVIDE YOU WITH THE ATTACHED OPT-OUT FORM WITH RESPECT TO THE RELEASES, EXCULPATION, INJUNCTION, AND THIRD-PARTY RELEASES PROVIDED IN THE PLAN.  IF YOU HAVE QUESTIONS WITH RESPECT TO YOUR RIGHTS UNDER THE PLAN OR ABOUT ANYTHING STATED HEREIN OR IF YOU WOULD LIKE TO OBTAIN ADDITIONAL INFORMATION, CONTACT THE SOLICITATION AGENT.

## EXHIBIT A
## OPTIONAL: RELEASE OPT OUT FORM

You are receiving this opt out form (the "Opt Out Form") because you are or may be a holder of a Claim or Interest that is not entitled to vote on the *Joint Chapter 11 Plan of Reorganization of McDermott International, Inc. and Its Debtor Affiliates* (as may be amended from time to time, the "Plan"). Holders of Claims and Interests are deemed to grant the Third-Party Release set forth in the Notice unless a holder affirmatively opts out or files an objection to the Third-Party Release with the Bankruptcy Court on or before the Plan Voting Deadline.

**If you believe you are a holder of a Claim or Interest with respect to McDermott International, Inc. or its affiliates and choose to opt out of the Third-Party Release set forth in Article VIII.D of the Plan, please complete, sign, and date this Opt Out Form and return it promptly** via first class mail (or in the enclosed reply envelope provided), overnight courier, via the Solicitation Agent's online E-Ballot Portal, or hand delivery to Prime Clerk LLC (the "Solicitation Agent") at the address set forth below. Holders are strongly encouraged to submit their Opt Out Form through the Solicitation Agent's online E-Ballot Portal. For the avoidance of doubt, if you hold Existing Interests through a broker nominee, you cannot submit your Opt-Out via E-Ballot; rather, you must complete and return the paper Opt-Out Form. Parties that submit their Opt Out Form using the E-Ballot Portal should NOT also submit a paper Opt Out Form.

> **Use of Hard Copy Opt Out Form.** To ensure that your hard copy Opt Out Form is counted clearly sign and return your Opt Out Form in the enclosed pre-addressed, pre-paid envelope or via first class mail, overnight courier, or hand delivery to: McDermott Opt Out Form Processing, c/o Prime Clerk, One Grand Central Place, 60 East 42nd Street, Suite 1440, New York, NY 10165.

**THIS OPT OUT FORM MUST BE ACTUALLY RECEIVED BY THE SOLICITATION AGENT BY WEDNESDAY, FEBRUARY 19, 2020, AT 4:00 P.M. PREVAILING CENTRAL TIME (THE "RESPONSE DEADLINE"). IF THE OPT OUT FORM IS RECEIVED AFTER THE RESPONSE DEADLINE, IT WILL NOT BE COUNTED.**

<u>Item 1</u>.  **Amount of Claim or Interests.**

The undersigned hereby certifies that, as of Friday, January 17, 2020 (the "Voting Record Date"), the undersigned was the holder of either (a) Class 1 Other Secured Claims, (b) Class 2 Other Priority Claims, (c) Class 3 Other Prepetition Financing Claims, (d) Class 4 Bilateral Facility Claims, (e) Class 10 General Unsecured Claims, (d) Class 13 Existing Preferred Equity Interests in McDermott, or (e) Class 14 Existing Common Equity Interests in McDermott in the following aggregate amount (insert amount in box below)[1]:

> Class 1 Other Secured Claims Amount $ _____
>
> OR
>
> Class 2 Other Priority Claims Amount $ _____
>
> OR
>
> Class 3 Other Prepetition Financing Claims Amount $ _____
>
> OR

---

[1]   To the extent there are any discrepancies between the applicable registers or records of holders and the amounts claimed on this opt-out form, the applicable registers or records shall govern.

1



Class 4 Bilateral Facility Claims Amount $ _____

OR

Class 10 General Unsecured Claims Amount $ _____

OR

Class 13 Existing Preferred Equity Interests in McDermott Amount $ _____

OR

Class 14 Existing Common Equity Interests in McDermott Amount $ _20,000_ _Shares_

**Item 2.** Important information regarding the Third-Party Release.

Article VIII.D of the Plan contains the following Third-Party Release:

Except as otherwise expressly set forth in this Plan or the Confirmation Order, on and after the Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is, and is deemed hereby to be, fully, conclusively, absolutely, unconditionally, irrevocably and forever, released and discharged by each Releasing Party, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all Claims and Causes of Action, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, contingent or non-contingent, in law, equity, contract, tort, or otherwise, including any derivative claims asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim against, or Interest in, a Debtor or other Entity, or that any holder of any Claim against, or Interest in, a Debtor or other Entity could have asserted on behalf of the Debtors, based on or relating to, or in any manner arising from, in whole or in part:

1. the Debtors (including the capital structure, management, ownership, or operation thereof), the business or contractual arrangement between the Debtors and any Releasing Party, any Securities issued by the Debtors and the ownership thereof, the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in- or out-of-court restructuring efforts, any Avoidance Actions (but excluding Avoidance Actions brought as counterclaims or defenses to Claims asserted against the Debtors), intercompany transactions between or among a Company Party and another Company Party, the Superpriority Credit Agreement, the Credit Agreement, the 2021 LC Agreement, the Lloyds Letter of Credit Agreement, Senior Notes Indenture, the Senior Notes, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Restructuring Support Agreement, the Disclosure Statement, the DIP Credit Agreement, the Exit Facility Documents, or the Plan (including, for the avoidance of doubt, the Plan Supplement);

2. any Restructuring Transaction, contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Restructuring Support Agreement, the Rights

Offering, the Disclosure Statement, the DIP Credit Agreement, the New Warrants Agreements, the Exit Facility Documents, the Plan, or the Plan Supplement, before or during the Chapter 11 Cases,

3.   the Chapter 11 Cases, the filing of the Chapter 11 Cases, the Disclosure Statement, or the Plan, the solicitation of votes with respect to the Plan, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, the Rights Offering, or the distribution of property under the Plan or any other related agreement; or

4.   any related act or omission, transaction, agreement, event, or other occurrence related or relating to any of the foregoing taking place on or before the Effective Date, including all Avoidance Actions or other relief obtained by the Debtors in the Chapter 11 Cases.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (i) any party of any obligations related to customary banking products, banking services or other financial accommodations (except as may be expressly amended or modified by the Plan and the Exit Facility Documents, or any other financing document under and as defined therein), (ii) any post-Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Restructuring Transaction, or any document, instrument, any Definitive Document, or any agreement (including those set forth in the Plan Supplement) executed to implement the Plan, including the Exit Facility Documents, the New Warrants Agreements, or any Claim or obligation arising under the Plan, or (iii) the rights of holders of Allowed Claims to receive distributions under the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the foregoing third-party release, which includes by reference each of the related provisions and definitions contained herein, and, further, shall constitute the Bankruptcy Court's finding that the foregoing third-party release is:  (a) consensual; (b) essential to the Confirmation of the Plan; (c) given in exchange for a substantial contribution and for the good and valuable consideration provided by the Released Parties that is important to the success of the Plan; (d) a good faith settlement and compromise of the Claims released by the foregoing third-party release; (e) in the best interests of the Debtors and their Estates; (f) fair, equitable, and reasonable; (g) given and made after due notice and opportunity for hearing; and (h) a bar to any of the Releasing Parties asserting any claim or Cause of Action released pursuant to the foregoing third-party release.

Definitions Related to the Third-Party Release:

UNDER THE PLAN, "*RELEASED PARTY*" MEANS EACH OF THE FOLLOWING, SOLELY IN ITS CAPACITY AS SUCH: (A) EACH DEBTOR; (B) EACH REORGANIZED DEBTOR; (C) EACH COMPANY PARTY; (D) EACH DIP LENDER AND EACH DIP LETTER OF CREDIT ISSUER; (E) EACH AGENT; (F) THE SENIOR NOTES TRUSTEE; (G) EACH CONSENTING STAKEHOLDER; (H) EACH HEDGE BANK; (I) EACH CASH MANAGEMENT BANK; (J) EACH LENDER UNDER THE SUPERPRIORITY CREDIT AGREEMENT, CREDIT AGREEMENT, THE 2021 LC AGREEMENT, AND THE LLOYDS LETTER OF CREDIT AGREEMENT; (K) EACH HOLDER OF AN OBLIGATION (AS DEFINED IN THE SUPERPRIORITY CREDIT AGREEMENT) UNDER THE SUPERPRIORITY CREDIT AGREEMENT; (L) EACH HOLDER OF AN OBLIGATION (AS DEFINED IN THE CREDIT AGREEMENT) UNDER THE CREDIT AGREEMENT; (M) EACH ISSUER (AS DEFINED IN THE SUPERPRIORITY CREDIT AGREEMENT) UNDER THE SUPERPRIORITY CREDIT AGREEMENT; (N) EACH ISSUER (AS DEFINED IN THE CREDIT AGREEMENT) UNDER THE CREDIT AGREEMENT; (O) THE TERM LOAN AD HOC GROUP, THE LIQUIDITY LENDER

STEERING COMMITTEE, AND THE SENIOR NOTES AD HOC GROUP; (P) EACH CURRENT AND FORMER AFFILIATE OF EACH ENTITY IN CLAUSE (A) THROUGH (O); AND (Q) EACH RELATED PARTY OF EACH ENTITY IN CLAUSE (A) THROUGH (O); PROVIDED THAT ANY HOLDER OF A CLAIM OR INTEREST THAT OPTS OUT OF THE RELEASES SHALL NOT BE A "RELEASED PARTY."

UNDER THE PLAN, "*RELEASING PARTIES*" MEANS EACH OF THE FOLLOWING, SOLELY IN ITS CAPACITY AS SUCH: (A) EACH DEBTOR; (B) EACH REORGANIZED DEBTOR; (C) EACH COMPANY PARTY; (D) EACH DIP LENDER AND EACH DIP LETTER OF CREDIT ISSUER; (E) EACH AGENT; (F) THE SENIOR NOTES TRUSTEE; (G) EACH CONSENTING STAKEHOLDER; (H) EACH HEDGE BANK; (I) EACH CASH MANAGEMENT BANK; (J) EACH LENDER UNDER THE SUPERPRIORITY CREDIT AGREEMENT, CREDIT AGREEMENT, THE 2021 LC AGREEMENT, AND THE LLOYDS LETTER OF CREDIT AGREEMENT; (K) EACH HOLDER OF AN OBLIGATION (AS DEFINED IN THE SUPERPRIORITY CREDIT AGREEMENT) UNDER THE SUPERPRIORITY CREDIT AGREEMENT; (L) EACH HOLDER OF AN OBLIGATION (AS DEFINED IN THE CREDIT AGREEMENT) UNDER THE CREDIT AGREEMENT; (M) EACH ISSUER (AS DEFINED IN THE SUPERPRIORITY CREDIT AGREEMENT) UNDER THE SUPERPRIORITY CREDIT AGREEMENT; (N) EACH ISSUER (AS DEFINED IN THE CREDIT AGREEMENT) UNDER THE CREDIT AGREEMENT; (O) THE TERM LOAN AD HOC GROUP, THE LIQUIDITY LENDER STEERING COMMITTEE, AND THE SENIOR NOTES AD HOC GROUP; (P) ALL HOLDERS OF CLAIMS OR INTERESTS THAT VOTE TO ACCEPT OR ARE DEEMED TO ACCEPT THE PLAN; (Q) ALL HOLDERS OF CLAIMS OR INTERESTS THAT ABSTAIN FROM VOTING ON THE PLAN AND WHO DO NOT AFFIRMATIVELY OPT OUT OF THE RELEASES PROVIDED BY THE PLAN BY CHECKING THE BOX ON THE APPLICABLE BALLOT INDICATING THAT THEY OPT NOT TO GRANT THE RELEASES PROVIDED IN THE PLAN; (R) ALL HOLDERS OF CLAIMS OR INTERESTS THAT VOTE TO REJECT THE PLAN OR ARE DEEMED TO REJECT THE PLAN AND WHO DO NOT AFFIRMATIVELY OPT OUT OF THE RELEASES PROVIDED BY THE PLAN BY CHECKING THE BOX ON THE APPLICABLE BALLOT INDICATING THAT THEY OPT NOT TO GRANT THE RELEASES PROVIDED IN THE PLAN; (S) EACH CURRENT AND FORMER AFFILIATE OF EACH ENTITY IN CLAUSE (A) THROUGH (R); AND (T) EACH RELATED PARTY OF EACH ENTITY IN CLAUSE (A) THROUGH (R).

<u>**IMPORTANT INFORMATION REGARDING THE RELEASES**</u>:

AS A HOLDER OF A CLAIM OR INTEREST, YOU ARE A "RELEASING PARTY" UNDER THE PLAN AND ARE DEEMED TO PROVIDE THE THIRD-PARTY RELEASE CONTAINED IN ARTICLE VIII.D OF THE PLAN, AS SET FORTH ABOVE. YOU MAY CHECK THE BOX BELOW TO ELECT NOT TO GRANT THE RELEASE CONTAINED IN ARTICLE VIII.D OF THE PLAN. YOU WILL NOT BE CONSIDERED A "RELEASING PARTY" UNDER THE PLAN <u>ONLY IF</u> (I) THE BANKRUPTCY COURT DETERMINES THAT YOU HAVE THE RIGHT TO OPT OUT OF THE RELEASES AND (II) YOU (A) CHECK THE BOX BELOW AND SUBMIT THE BALLOT BY THE VOTING DEADLINE, (B) FILE AN OBJECTION TO THE RELEASES CONTAINED IN THE PLAN WITH THE BANKRUPTCY COURT PRIOR TO THE PLAN OBJECTION DEADLINE, OR (C) VOTE TO REJECT THE PLAN AND SUBMIT THE BALLOT BY THE VOTING DEADLINE. THE ELECTION TO WITHHOLD CONSENT TO GRANT THE THIRD-PARTY RELEASE IS AT YOUR OPTION.

☑ **By checking this box, you elect to opt <u>out</u> of the Third-Party Releases.**<u>Item 3.</u>
Certifications.

/0

By signing this Opt Out Form, the undersigned certifies:

(a) that, as of the Voting Record Date, either:  (i) the Entity is the Holder of the Claim or Interests set forth in Item 1; or (ii) the Entity is an authorized signatory for an Entity that is a Holder of the Claim or Interests set forth in Item 1;

(b) that the Holder has received a copy of the *Notice of Non-Voting Status to Holders of (I) Unimpaired Claims Conclusively Presumed to Accept the Plan and (II) Impaired Claim Conclusively Presumed to Reject the Plan* and that this Opt Out Form is made pursuant to the terms and conditions set forth therein;

(a) that the Entity has submitted the same respective election concerning the releases with respect to all Claims or Interests in a single Class set forth in Item 1; and

(b) that no other Opt Out Form with respect to the amount(s) of Claims or Interests identified in Item 1 have been submitted or, if any other Opt Out Forms have been submitted with respect to such Claims or Interests, then any such earlier Opt Out Forms are hereby revoked.

| | |
|---|---|
| Name of Holder: | *Michael D. Van Deelen* |
| | (Print or Type) |
| Signature: | *Michael D. Van Deelen* |
| Name of Signatory: | |
| | (If other than holder) |
| Title: | *N/A* |
| Address: | *16215 Friar Circle* |
| | *Spring, TX 77379* |
| Telephone Number: | *832-562-0723* |
| Email: | *michaelvandeelen@gmail.com* |
| Date Completed: | *2/13/20* |

**PLEASE SUBMIT YOUR OPT OUT FORM BY ONE OF THE FOLLOWING TWO METHODS:**

**Via Paper Form.** Complete, sign, and date this Opt Out Form and return it (with an original signature) promptly via first class mail (or in the enclosed reply envelope provided), overnight courier, or hand delivery to:

<div align="center">

**McDermott Opt Out Form Processing**
**c/o Prime Clerk LLC**
**One Grand Central Place**
**60 East 42nd Street, Suite 1440**
**New York, NY 10165**

</div>



...an Deelen
...iar Circle
...TX 77379

Mc Dermott Opt Out Form processing
c/o prime clerk LLC
One Grand central place
60 East 42nd Street, Suite 1440
New York, NY 10165

12

Address:              4656 FM 1960 RD W
                      HOUSTON
                      TX 77069
Location:             DWHK
Device ID:            -BTC02
Transaction:          940256549995

FedEx Standard Overnight
390386463532    0.2 lbs. (S)      38.45
    Declared Value   100
Recipient Address:
    C/O Prime Clerk LLC
    McDermott Opt Out Form Processing
    60 East 42nd Street, Ste 1440
    One Grand Central Place
    New York, NY 10165
    0000000000

Scheduled Delivery Date 2/17/2020

Pricing option:
    ONE RATE

Package Information:
    FedEx Envelope

        Shipment subtotal:      $38.45

            Total Due:          $38.45

        (S) CreditCard:         $38.45
        ************1248

/3

**IMPORTANT!**
We are continuing to respond to the impact of COVID-19 around the world. See our latest updates. For COVID-19-related recipient
closures, you can redirect packages, Ask FedEx, or contact the shipper.

390386463532

# Delivered
## Monday 2/17/2020 at 9:13 am

**DELIVERED**

Signed for by: O.OBEE

**GET STATUS UPDATES**

**OBTAIN PROOF OF DELIVERY**

| FROM | TO |
|---|---|
| SPRING, TX US | NEW YORK, NY US |

## Shipment Facts

| TRACKING NUMBER | SERVICE | SPECIAL HANDLING SECTION |
|---|---|---|
| 390386463532 | FedEx Standard Overnight | Deliver Weekday, No Signature Required |

| SHIP DATE | ACTUAL DELIVERY | |
|---|---|---|
| | Mon 2/17/2020 9:13 am | |
| Fri 2/14/2020 | | |

## Travel History

Local Scan Time

**Monday , 2/17/2020**

| 9:13 am | NEW YORK, NY | Delivered |
|---|---|---|

*14*

# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| MCDERMOTT INTERNATIONAL, INC, *et al* | ) | |
| | ) | Case No. 20-30336 |
| Reorganized Debtor(s). | ) | |
| | ) | (Jointly Administered) |
| | ) | |
| | ) | |
| MICHAEL VAN DEELEN | ) | |
| | ) | |
| Plaintiff, | ) | Adv. Proc. No. 20-3309 |
| | ) | |
| v. | ) | |
| | ) | |
| DAVID DICKSON, | ) | |
| and STUART SPENCE, | ) | |
| and SCOTT LAMB, | ) | |
| and 10 JOHN/JANE DOES | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER DENYING DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S ORIGINAL PETITION (DOCUMENT 5)

The Court, having considered the Defendants' Motion to Dismiss Plaintiff's Original Petition (Document 5), as well as the evidence presented, finds that the Motion be DENIED.  The Court:

ORDERS that the Defendants' Motion to Dismiss Plaintiff's Original Petition (Document 5) is denied.

_____
JUDGE
UNITED STATES BANKRUPTCY COURT

# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| MCDERMOTT INTERNATIONAL, INC., *et al.*,[1] | § | Case No. 20-30336 (DRJ) |
| | § | |
| Reorganized Debtors. | § | (Jointly Administered) |
| | § | |
| | § | |
| MICHAEL VAN DEELEN | § | |
| | § | |
| Plaintiff, | § | Adv. Proc. No. 20-03309 |
| | § | |
| v. | § | |
| | § | |
| DAVID DICKSON, | § | |
| and STUART SPENCE, | § | |
| and SCOTT LAMB, | § | |
| and 10 JOHN/JANE DOES | § | |
| | § | |
| Defendants. | § | |
| | § | |

## DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION TO REMAND HIS STATE LAW CAUSE OF ACTION AND MOTION TO RECUSE

---

[1]     A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://cases.primeclerk.com/McDermott. The location of Debtor McDermott International, Inc.'s principal place of business and the Debtors' service address in these chapter 11 cases is 757 North Eldridge Parkway, Houston, Texas 77079.

KE 70412634.4

## TABLE OF CONTENTS

**Page**

I.   **PRELIMINARY STATEMENT** ................................................................. 1

II.  **FACTUAL BACKGROUND** ..................................................................... 2

    A.   Mcdermott's only viable option was to file for relief under chapter 11. ............... 2

    B.   Van Deelen objected to McDermott's Plan, advancing many of the same allegations as his current claims. ................................................. 3

    C.   Over Van Deelen's objection, the Court confirmed McDermott's value-maximizing Plan, which included release, exculpation, and injunction provisions. ........................................................................ 3

        i.    The Exculpation broadly released claims related to the bankruptcy proceedings and related prepetition transactions. ....................... 4

        ii.   Unless a party specifically objected to the Release or properly opted out, the Release broadly released all claims other than fraud related to the Debtors and their business. ................................. 5

        iii.  The Injunction Provision prohibits any parties from commencing or continuing any action based on Released Claims................................ 9

    D.   Van Deelen then filed suit in state court asserting Released Claims based on actions taken in association with McDermott's bankruptcy proceedings and related transactions. ......................................................... 10

III. **LEGAL STANDARD** ............................................................................ 10

    A.   Subject matter jurisdiction. ............................................................. 10

    B.   Mandatory Abstention. .................................................................. 12

    C.   Permissive Abstention. .................................................................. 13

    D.   Recusal. .................................................................................. 14

IV.  **ARGUMENT** ..................................................................................... 15

    A.   The Court has subject matter jurisdiction because this action is a core proceeding that requires the Court to interpret and enforce its Confirmation Order. ..................................................................... 15

B.      The Court also has subject matter jurisdiction because the *Craig's Stores* factors weigh in favor of such jurisdiction and because this action relates to the implementation or execution of the Plan. .................................................... 18

C.      Mandatory abstention does not apply here because Van Deelen's claims arise in the bankruptcy proceedings and cannot be timely adjudicated in state court. ......................................................................................................... 21

D.      The Court should deny Van Deelen's request for permissive abstention and his recusal because Van Deelen cannot show prejudice or that fair judgment is impossible. ....................................................................................... 23

**V.      CONCLUSION ........................................................................................... 26**

KE 70412634.4

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Andrade v. Chojnacki*,
   338 F.3d 448 (5th Cir. 2003) ..................................................14

*Cano v. GMAC Mortg. Corp. (In re Cano)*,
   410 B.R. 506 (Bankr. S.D. Tex. 2009) ..................................12, 15, 21

*Faulkner v. Eagle View Capital Mgt. (In re Heritage Org., L.L.C.)*,
   454 B.R. 353 (Bankr. N.D. Tex. 2011) ..................................12

*Haskett v. Orange Energy Corporation*,
   161 F. Supp. 3d 471 (S.D. Tex. 2015) ..................................25

*In Matter of Galaz*,
   841 F.3d 316 (5th Cir. 2016) ..................................15, 18, 21

*In re ABC Dentistry, P.A.*,
   No. H-16-34221-11, 2019 WL 6894775 (S.D. Tex. Dec. 17, 2019) ...........12, 15, 21

*In re Blast Energy Servs., Inc.*,
   396 B.R. 676 (Bankr. S.D. Tex. 2008) ..................................19

*In re Craig's Stores of Texas, Inc.*,
   266 F.3d 388 (5th Cir. 2001) .............................. *passim*

*In re Doctors Hosp. 1997, L.P.*,
   351 B.R. 813 (Bankr. S.D. Tex. 2006) ..................................22

*In re Hallwood Energy, L.P.*,
   No. 09-31253-H4-11, 2009 WL 2601294 (Bankr. S.D. Tex. Aug. 24, 2009).........22

*In re Lorax Corp.*,
   295 B.R. 83 (Bankr. N.D. Tex. 2003) ..................................13, 21, 23

*In re Martinez-Catala*,
   129 F.3d 213 (1st Cir. 1997)..................................25

*In re Montalvo*,
   559 B.R. 825 (Bankr. S.D. Tex. 2016) ..................................13, 23

*In re MSB Energy, Inc.*,
   438 B.R. 571 (Bankr. S.D. Tex. 2010) ..................................11, 19, 20

*In re Mugica*,
362 B.R. 782 (Bankr. S.D. Tex. 2007) ...................................................................22

*In re Petroleum Prod. & Servs., Inc.*,
561 B.R. 662 (Bankr. S.D. Tex. 2016) .................................................................22

*In re SBMC Healthcare, LLC*,
519 B.R. 172 (Bankr. S.D. Tex. 2014), *aff'd*, Civil Action No. H-16-2947,
2017 WL 2062992 (S.D. Tex. May 11, 2017) .................................................13, 23

*In re Talsma*,
509 B.R. 535 (Bankr. N.D. Tex. 2014)..........................................................11, 18

*In re TXNB Internal Case*,
483 F.3d 292 (5th Cir.), *cert. denied*, 552 U.S. 1022, 128 S. Ct. 613 (2007)...................13, 21

*In re U.S. Brass Corp.*,
301 F.3d 296 (5th Cir. 2002) ...................................................................10, 11, 12

*In re Wilborn*,
401 B.R. 848 (Bankr. S.D. Tex. 2009) ...................................................................24

*Kinnear-Weed Corp. v. Humble Oil & Ref. Co.*,
441 F.2d 631 (5th Cir. 1971) ...................................................................14, 24

*Liteky v. United States*,
510 U.S. 540 (1994)...................................................................15, 23, 24, 25

*LoCascio v. United States*,
473 F.3d 493 (2d Cir. 2007)...................................................................25

*Newby v. Enron Corp. (In re Enron Corp. Sec.)*,
535 F.3d 325 (5th Cir. 2008) ...................................................................11, 18, 20

*Silva v. Spring Branch Independent School District*,
No. H-16-0545, 2016 WL 7441709 (S.D. Tex. Dec. 22, 2016) ............................................25

*Smith v. Houston EEOC*,
No. 4:20-CV-1664, 2020 WL 3542433 (S.D. Tex. June 30, 2020)........................................25

*Travelers Indem. Co. v. Bailey*,
129 S. Ct. 2195 (2009)...................................................................12, 15

*United States v. Pearson*,
203 F.3d 1234 (10th Cir. 2000) ...................................................................25

**Statutes**

11 U.S.C. § 550...................................................................12

iv

28 U.S.C. § 157 .................................................................................................................10

28 U.S.C. § 157(a)-(c)(1) ..............................................................................................11

28 U.S.C. § 455 .................................................................................................................14

28 U.S.C. § 455(a) ..........................................................................................................14

28 U.S.C. § 455(b)(1) ....................................................................................................14

28 U.S.C. § 1334 ...............................................................................................................10

28 U.S.C. § 1334(b) .................................................................................................11, 21

28 U.S.C. § 1334(c)(1) ..................................................................................................13

**Rules**

Fed. R. Bankr. P. 9019 .....................................................................................................8

**Other Authorities**

Texas Supreme Court Twenty-Second Emergency Order Regarding the Covid-19
    State of Disaster, Misc. Dkt. 20-9095
    https://www.txcourts.gov/media/1449564/209095.pdf .........................................22

KE 70412634.4

Defendants David Dickson, Stuart Spence, and Scott Lamb (collectively, "Defendants") hereby file this Response to Plaintiff's Motion to Remand His State Law Cause of Action ("Motion to Remand") and Motion to Recuse Bankruptcy Judge David Jones ("Motion to Recuse").

## I.      PRELIMINARY STATEMENT

1.      Mr. Van Deelen has put forth no legitimate basis for this Court to remand his case or recuse itself from considering his claims.  First, each of Van Deelen's claims is based on actions taken in conjunction with McDermott's bankruptcy proceeding and related transactions, claims that directly implicate and are largely foreclosed by this Court's Confirmation Order.  Van Deelen actively participated in McDermott's bankruptcy proceedings in which he objected to confirmation of McDermott's chapter 11 plan of reorganization on the unsupported theory that McDermott never should have filed for chapter 11 and that its filing and the transactions leading up to and included as part of the confirmed plan were somehow fraudulent or otherwise wrongful.  Van Deelen was made fully aware of the provisions included in the confirmed plan that released a wide range of claims.  But completely ignoring this Court's Confirmation Order, he asserted claims in this lawsuit against McDermott officers and employees based on alleged conduct related to the chapter 11 proceedings and related transactions, conduct that was explicitly exculpated and released in the confirmation order.  There is no question that this Court has jurisdiction over such claims that so directly flout the Court's order.

2.      Second, Van Deelen asks this Court to recuse itself from considering his claims because during the chapter 11 proceedings, the Court curtailed Van Deelen's vulgar and disrespectful actions, which included making a false statement under oath to the Court. A litigant cannot use his own improper behavior as a basis to obtain a new forum. Here, the Court's appropriate response to Van Deelen's conduct, both in Court on the record and through public pleadings, is no basis for recusal.

1

## II.    FACTUAL BACKGROUND

**A.    McDermott's only viable option was to file for relief under chapter 11.**

3.    McDermott was founded nearly a century ago in east Texas. Since that time, and through strategic acquisitions and business combinations, McDermott has become a premier upstream and downstream engineering procurement, construction, and installation company. In this capacity, McDermott has focused on delivering fixed and floating production facilities, pipelines, installations, and subsea systems which allow for the safe production and transportation of hydrocarbons. McDermott currently operates in 54 countries, has over 42,000 employees and independent contractors, and maintains a diverse fleet of specialty marine construction vessels and fabrication facilities.

4.    Notwithstanding this growth and success, McDermott was facing a severe liquidity problem in September 2019. Much of McDermott's cash was trapped within its joint venture operations, and McDermott had inherited from a previous combination certain legacy onshore projects that resulted in large, unanticipated losses. The confluence of these and other factors created an acute liquidity crisis that McDermott could no longer manage. McDermott would have to restructure.

5.    In an effort to facilitate this restructuring and avoid liquidation, McDermott obtained on an emergency basis a liquidity infusion through a superpriority financing facility. McDermott received the first tranche of this superpriority financing in October 2019, and used the additional runway to reassess its operations and financial condition. Specifically, over the next several months, McDermott engaged financial and legal advisors, shared a significant amount of information with its prepetition lenders, negotiated extensively with stakeholders, and considered all possible alternatives. Ultimately, McDermott determined that a pre-packaged balance sheet restructuring was the best way to maximize value for its stakeholders.

2

6.      To that end, on January 21, 2020, McDermott filed a voluntary petition for relief (Bankr. Dkt. 1) (the "Petition") under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "Court"). On January 22, 2020, McDermott filed a chapter 11 plan of reorganization, which it subsequently amended or supplemented several times during the course of the bankruptcy proceedings (Bankr. Dkt. 121, 520, 620, 622, 647, 651) (collectively, the "Plan"). The Plan reflected substantial levels of support among McDermott's lenders--a difficult feat given the scale and complexity of McDermott's operations, the number of stakeholder constituencies and their divergent interests, and the urgent nature of McDermott's capital needs.

**B.      Van Deelen objected to McDermott's Plan, advancing many of the same allegations as his current claims.**

7.      On February 27, 2020, Van Deelen filed a motion (Dkt. 510) (the "Motion") with this Court alleging that McDermott had improperly sought chapter 11 relief. Specifically, Van Deelen alleged that McDermott had proposed the Plan in bad faith because the Plan called for the cancellation of existing shares and the re-equitization of the company "for the sole purpose of enriching McDermott's management and Board." (Bankr. Dkt. 510, Motion at 6-15.) Based on these allegations, Van Deelen requested that the Court deny McDermott's Plan.

8.      The Court overruled and denied Van Deelen's Motion on March 12, 2020. (*See* Bankr. Dkt. 665, Confirmation Order ¶ 11, later amended at Bankr. Dkt. 684.)

**C.      Over Van Deelen's objection, the Court confirmed McDermott's value-maximizing Plan, which included release, exculpation, and injunction provisions.**

9.      On March 14, 2020, the Court entered its *Amended Order Approving the Debtors' Disclosure Statement and Confirming the Second Amended Joint Prepackaged Chapter 11 Plan of Reorganization (Technical Modifications) of McDermott International, Inc. and Its Debtor Affiliates* (Bankr. Dkt. 684) (the "Confirmation Order").

3

10.     The Confirmation Order approving the Plan contains three provisions relevant to this dispute: an exculpation provision ("Exculpation"); a release provision ("Release"); and an injunction provision ("Injunction Provision").

> i.     **The Exculpation broadly released claims related to the bankruptcy proceedings and related prepetition transactions.**

11.     The Exculpation released and exculpated the "Exculpated Part[ies]"[2] from claims related to, among other things, McDermott's chapter 11 proceedings and administration and implementation of the Plan:

> 52. Except as otherwise specifically provided in the Plan or this Confirmation Order, no Exculpated Party shall have or incur liability for, and each Exculpated Party shall be released and exculpated from any Claims and Cause of Action for any claim related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, filing, or termination of the Restructuring Support Agreement and related prepetition transactions (including the Superpriority Credit Agreement, the Credit Agreement, the Senior Notes Indenture or Senior Notes, the 2021 LC Agreement, and the Lloyds Letter of Credit Agreement), the Disclosure Statement, the Plan, the DIP Credit Facility, the Exit Facility Documents, the New Warrants Agreements, the Plan Supplement, the Rights Offering, or any Restructuring Transaction, contract, instrument, release or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or this Confirmation Order in lieu of such legal opinion), including any Definitive

---

[2]     The Plan defines "Exculpated Parties" to mean:

> collectively, and in each case in its capacity as such: (a) the Debtors; (b) any official committees appointed in the Chapter 11 Cases and each of their respective members; (c) the Consenting Stakeholders and any affiliated Hedge Banks; (d) each Agent and the Senior Notes Trustee, and (e) with respect to each of the foregoing, such Entity and its current and former Affiliates, and such Entity's and its current and former Affiliates' current and former equity holders, subsidiaries, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals.

*See* Plan, Art. I, § A.

4

Document, created or entered into before or during the Chapter 11 Cases, any preference, fraudulent transfer, or other avoidance claim arising pursuant to chapter 5 of the Bankruptcy Code or other applicable law, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, except for claims related to any act or omission that is determined in a Final Order by a court of competent jurisdiction to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.

53. The Exculpated Parties and other parties set forth above have, and upon confirmation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

(Bankr. Dkt. 684, Confirmation Order ¶¶ 52-53 (emphases added)).

ii.     **Unless a party specifically objected to the Release or properly opted out, the Release broadly released all claims other than fraud related to the Debtors and their business.**

12.     The Release, for its part, broadly released and discharged claims other than for fraud against the "Released Part[ies]."[3] By its own terms, the Release discharged claims related to

---

[3]     McDermott's Plan defines "Released Parties" to mean:

> collectively, and in each case in its capacity as such: (a) each Debtor; (b) each Reorganized Debtor; (c) each Company Party; (d) each DIP Lender and each DIP Letter of Credit Issuer; (e) each Agent; (f) the Senior Notes Trustee; (g) each Consenting Stakeholder; (h) each Hedge Bank; (i) each Cash Management Bank; (j) each lender under the Superpriority Credit Agreement, Credit Agreement, the 2021 LC Agreement, and the Lloyds Letter of Credit Agreement; (k) each holder of an Obligation (as defined in the Superpriority Credit Agreement) under the Superpriority Credit Agreement; (l) each holder of an Obligation (as defined in

5

McDermott's prepetition business transactions or chapter 11 proceedings unless a party specifically objected to or opted out of the Release:

48. Except as otherwise expressly set forth in the Plan or this Confirmation Order, on and after the Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, *each Released Party is, and is deemed hereby to be, fully, conclusively, absolutely, unconditionally, irrevocably and forever, released and discharged by each Releasing Party*, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, *from any and all Claims and Causes of Action*, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, contingent or non-contingent, in law, equity, contract, tort, or otherwise, including any derivative claims asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim against, or Interest in, a Debtor or other Entity, or that any holder of any Claim against, or Interest in, a Debtor or other Entity could have asserted on behalf of the Debtors, *based on or relating to, or in any manner arising from, in whole or in part*:

(i) *the Debtors (including the capital structure, management, ownership, or operation thereof)*, the business or contractual arrangement between the Debtors and any Releasing Party, *any Securities issued by the Debtors and the ownership thereof,* the assertion or enforcement of rights and remedies against the Debtors, *the Debtors' in- or out-of-court restructuring efforts*, any Avoidance Actions (but excluding Avoidance Actions brought as counterclaims or defenses

---

the Credit Agreement) under the Credit Agreement; (m) each Issuer (as defined in the Superpriority Credit Agreement) under the Superpriority Credit Agreement; (n) each Issuer (as defined in the Credit Agreement) under the Credit Agreement; (o) the Term Loan Ad Hoc Group, the Liquidity Lender Steering Committee, and the Senior Notes Ad Hoc Group; (p) Illuminate Buyer LLC; (q) each current and former Affiliate of each Entity in clause (a) through (p); and (r) each Related Party of each Entity in clause (a) through (p); *provided* that any holder of a Claim or Interest that opts out of the releases shall not be a "Released Party."

*See* Plan, Art. I, § A.

to Claims asserted against the Debtors), intercompany transactions between or among a Company Party and another Company Party, the Superpriority Credit Agreement, the Credit Agreement, the Hedge Agreements (as defined in the Hedging Order), the 2021 LC Agreement, the Lloyds Letter of Credit Agreement, Senior Notes Indenture, the Senior Notes, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Restructuring Support Agreement, the Disclosure Statement, the DIP Credit Agreement, the Exit Facility Documents, or the Plan (including, for the avoidance of doubt, the Plan Supplement);

(ii)     ***any Restructuring Transaction, contract, instrument, release, or other agreement or document*** (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or this Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Restructuring Support Agreement, the Rights Offering, the Disclosure Statement, the DIP Credit Agreement, the New Warrants Agreements, the Exit Facility Documents, the Plan, or the Plan Supplement, before or during the Chapter 11 Cases;

(iii)    ***the Chapter 11 Cases, the filing of the Chapter 11 Cases, the Disclosure Statement, or the Plan***, the solicitation of votes with respect to the Plan, the pursuit of Confirmation, ***the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, the Rights Offering, or the distribution of property under the Plan or any other related agreement***; or

(iv)     any related act or omission, transaction, agreement, event, or other occurrence related or relating to any of the foregoing taking place on or before the Effective Date, including all Avoidance Actions or other relief obtained by the Debtors in the Chapter 11 Cases.

49.   Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (i) any party of any obligations related to customary banking products, banking

7

services or other financial accommodations (except as may be expressly amended or modified by the Plan and the Exit Facility Documents, or any other financing document under and as defined therein), (ii) any post-Effective Date obligations of any party or Entity under the Plan, this Confirmation Order, any Restructuring Transaction, or any document, instrument, any Definitive Document, or any agreement (including those set forth in the Plan Supplement) executed to implement the Plan, including the Exit Facility Documents, the New Warrants Agreements, or any Claim or obligation arising under the Plan, (iii) the rights of holders of Allowed Claims to receive distributions under the Plan, or (iv) *current and former directors, officers, managers, or employees of the Debtors from any Claim or Cause of Action related to an act or omission that is determined in a Final Order by a court of competent jurisdiction to have constituted actual fraud*.

50. Entry of this Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the foregoing Third-Party Release, which includes by reference each of the related provisions and definitions contained herein, and, further, shall constitute the Bankruptcy Court's finding that the foregoing Third-Party Release is: (a) consensual; (b) essential to the Confirmation of the Plan; (c) given in exchange for a substantial contribution and for the good and valuable consideration provided by the Released Parties that is important to the success of the Plan; (d) a good faith settlement and compromise of the Claims released by the foregoing Third-Party Release; (e) in the best interests of the Debtors and their Estates; (f) fair, equitable, and reasonable; (g) given and made after due notice and opportunity for hearing; and (h) a bar to any of the Releasing Parties asserting any claim or Cause of Action released pursuant to the foregoing Third-Party Release.

51. For the avoidance of doubt, any Person who timely Filed an objection to the foregoing Third-Party Release, regardless of whether such objection was later withdrawn, shall not be deemed a "Released Party" or a "Releasing Party."

(Bankr. Dkt. 684, Confirmation Order ¶¶ 48-51 (emphases added)).

KE 70412634.4

iii.      **The Injunction Provision prohibits any parties from commencing or continuing any action based on Released Claims.**

13.      Finally, the Injunction Provision permanently enjoined holders of "Released Claims"[4] from commencing or continuing any action against the "Exculpated[] or []Released Parties" in connection with such claims:

> 54. Except as otherwise expressly provided in the Plan or this Confirmation Order or for obligations or distributions issued or required to be paid pursuant to the Plan or this Confirmation Order, ***all Entities who have held, hold, or may hold the Released Claims are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties: (1) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any Released Claims***; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any Released Claims; (3) creating, perfecting, or enforcing any lien or encumbrance of any kind against such Entities or the property of such Entities on account of or in connection with or with respect to any Released Claims; (4) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property or the Estates of such Entities on account of or in connection with or with respect to any Released Claims unless such holder has filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a Claim or Interest or otherwise that such holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any Released Claims released or settled pursuant to the Plan.

> 55. Upon entry of this Confirmation Order, all holders of Claims and Interests and their respective current and former employees, agents, officers, directors, principals, and direct and indirect

---

[4]   The Plan defines "Released Claims" to mean "any Claims or Interests that have been released, discharged, or are subject to exculpation pursuant to this Plan." *See* Plan, Art. I, § A.

9

> Affiliates shall be enjoined from taking any actions to interfere with the implementation or Consummation of the Plan. Unless otherwise set forth in this Confirmation Order, each holder of an Allowed Claim or Allowed Interest, as applicable, by accepting, or being eligible to accept, distributions under or Reinstatement of such Claim or Interest, as applicable, pursuant to the Plan, shall be deemed to have consented to the injunction provisions set forth in Article VIII.F of the Plan.

(Bankr. Dkt. 684, Confirmation Order ¶¶ 54-55 (emphasis added).)

**D.   After the Confirmation Order was entered, Van Deelen filed suit in state court asserting Released Claims based on actions taken in association with McDermott's bankruptcy proceedings and related transactions.**

14.   Three months after the Court confirmed McDermott's Plan, on June 23, 2020, Van Deelen filed suit against Defendants in Texas state court asserting claims for (1) conversion; (2) common law fraud; (3) statutory fraud; (4) negligent misrepresentation; (5) breach of fiduciary duty; and (6) conspiracy. *See* Complaint ¶¶ 65-112. The gravamen of Van Deelen's Complaint is the same as his Motion:  he alleges that Defendants, as officers of McDermott, caused McDermott to undergo an unnecessary chapter 11 restructuring for their own benefit and to the detriment of Van Deelen and other shareholders. *Id*. ¶¶ 13-60.

15.   These claims undeniably are based on actions that McDermott officers or employees took in association with McDermott's bankruptcy proceedings and related transactions.

## III.   LEGAL STANDARD

**A.   Subject matter jurisdiction.**

16.   Bankruptcy courts derive their subject matter jurisdiction from 28 U.S.C. §§ 1334 and 157. *See In re U.S. Brass Corp.*, 301 F.3d 296, 303-05 (5th Cir. 2002). Together, and "[b]y way of district-court referral," these sections provide bankruptcy courts with the power to hear (1) cases under title 11; (2) core proceedings "arising under" title 11; (3) core proceedings "arising in"

a case under title 11; and (4) non-core proceedings "related to" a case under title 11. *See* 28 U.S.C.

§§ 1334(b), 157(a)-(c)(1).

17.     The fourth category -- "related to" proceedings -- is the broadest, and encompasses

any proceeding for which "the outcome . . . could *conceivably* have any effect . . . on the estate

being administered in bankruptcy." *In re U.S. Brass Corp.*, 301 F.3d at 304 (emphasis in original).

Moreover, and because "the second, third, and fourth categories . . . operate conjunctively to define

the scope of jurisdiction," bankruptcy courts often just need "to determine whether a matter is . . .

'related to' the bankruptcy." *Id*.

18.     Still, the distinction between these categories becomes more important after the

bankruptcy court has confirmed the debtor's plan of reorganization. The Fifth Circuit has held that,

following confirmation, and as far as non-core, "related to" proceedings are concerned,

"bankruptcy jurisdiction[] ceases to exist, other than for matters pertaining to the implementation

or execution of the plan[,]" if: (1) the claims primarily arise from post-confirmation relations

between the parties; (2) no claims or antagonisms were pending between the parties on the date of

plan confirmation; and (3) no facts or law deriving from the bankruptcy are necessary to the claims.

*Newby v. Enron Corp. (In re Enron Corp. Sec.)*, 535 F.3d 325, 335 (5th Cir. 2008) (quoting *In re

Craig's Stores of Texas, Inc.*, 266 F.3d 388, 390 (5th Cir. 2001)). But "the Fifth Circuit has

emphasized that  . . . all three factors [need] not weigh heavily in the bankruptcy court's favor" for

there to be jurisdiction. *In re MSB Energy, Inc.*, 438 B.R. 571, 586 (Bankr. S.D. Tex. 2010); *In re

Enron Corp. Sec.*, 535 F.3d at 335-36.

19.     The Fifth Circuit has not similarly limited post-confirmation bankruptcy

jurisdiction over "core" (i.e., "arising under" or "arising in") proceedings. *See, e.g.*, *In re Talsma*,

509 B.R. 535 (Bankr. N.D. Tex. 2014) ("*Craig's Stores* involved claims that invoked only "related

to" jurisdiction. . . . [C]ourts have treated core proceedings differently post-confirmation than the "related to" proceedings within the scope of *Craig's Stores*."); *Faulkner v. Eagle View Capital Mgt. (In re Heritage Org., L.L.C.)*, 454 B.R. 353, 364-65 (Bankr. N.D. Tex. 2011) (concluding that *Craig's Stores* did not apply to an "arising under" proceeding brought pursuant to 11 U.S.C. 550 post-confirmation).

20.     In this context, "core proceedings" are those that "invoke[] a substantive right provided by title 11" or "could arise only in the context of a bankruptcy case." *In re U.S. Brass Corp.*, 301 F.3d at 304, and include proceedings which would require interpretation of bankruptcy court orders. For example, "bankruptcy courts retain significant jurisdiction after a discharge order is issued and a case is closed over matters concerning the interpretation and enforcement of bankruptcy court orders . . . Such matters fall within the Court's 'arising in' and arising under' jurisdiction." *Cano v. GMAC Mortg. Corp. (In re Cano)*, 410 B.R. 506, 548-49 (Bankr. S.D. Tex. 2009); *see also In re ABC Dentistry, P.A.,* No. H-16-34221-11, 2019 WL 6894775, at *6 (S.D. Tex. Dec. 17, 2019) (because the removed action would require the bankruptcy court to interpret rights associated with its order dividing settlement proceeds, "the Bankruptcy Court did not err in determining that it had 'arising in or under jurisdiction' over the removed action"); *see also Travelers Indem. Co. v. Bailey*, 129 S. Ct. 2195, 2205 (2009) (a bankruptcy court "plainly ha[s] jurisdiction to interpret and enforce its own prior orders").

## B.     Mandatory Abstention.

21.     The party seeking mandatory abstention must show that: (1) the claim has no independent basis for federal jurisdiction, other than section 1334(b); (2) the claim is a non-core proceeding, *i.e.*, it is related or in a case under title 11; (3) an action has been commenced in state

court; and (4) the action could be adjudicated timely in state court. *In re TXNB Internal Case*, 483 F.3d 292, 300 (5th Cir.), *cert. denied*, 552 U.S. 1022, 128 S. Ct. 613 (2007).

22.     Specifically, the party seeking mandatory abstention must prove the existence of each element by a preponderance of the evidence. *In re Lorax Corp.*, 295 B.R. 83, 90 (Bankr. N.D. Tex. 2003). A party is not entitled to mandatory abstention if it fails to prove any one of the statutory requirements. *Id*.; *see also In re Montalvo*, 559 B.R. 825, 842 (Bankr. S.D. Tex. 2016) (the bankruptcy court refused to abstain because the fourth factor was not demonstrated).

## C.     Permissive Abstention.

23.     28 U.S.C. § 1334(c)(1) provides that a bankruptcy court may permissively abstain "from hearing a proceeding arising under title 11 or arising in or related to a case under title 11." 28 U.S.C. § 1334(c)(1).

24.     In determining whether to "permissively abstain," a court may consider a number of factors, including: (1) the effect or lack thereof on the efficient administration of the estate if the court remands or abstains; (2) the extent to which state law issues predominate over bankruptcy issues; (3) the difficult or unsettled nature of applicable law; (4) the presence of a related proceeding commenced in state court or other nonbankruptcy proceeding; (5) the jurisdictional basis, if any, other than section 1334; (6) the degree of relatedness or remoteness from a proceeding to the main bankruptcy case; (7) the substance rather than the form of an asserted core proceeding; (8) the feasibility of severing state law claims from core bankruptcy matters to allow judgments to be entered in state court with enforcement left to bankruptcy court; (9) the burden on the bankruptcy court's docket; (10) the likelihood that the commencement of the proceeding in bankruptcy court involves forum shopping by one of the parties; (11) the existence of a right to a jury trial; (12) the presence in the proceeding of nondebtor parties; (13) comity; and (14) the possibility of prejudice to other parties in the action. *See In re SBMC Healthcare, LLC*, 519 B.R.

172, 190 (Bankr. S.D. Tex. 2014), *aff'd*, Civil Action No. H-16-2947, 2017 WL 2062992 (S.D. Tex. May 11, 2017).

**D.    Recusal.**

25.      28 U.S.C. § 455 provides that a party may request a judge recuse himself if "his impartiality might reasonably be questioned," *id*. § 455(a), or "he has a personal bias or prejudice concerning a party," *id*. § 455(b)(1).

26.      In interpreting this statute, the Fifth Circuit has held that "the standard for bias is not subjective," and that "it is with reference to the well-informed, thoughtful and objective observer, rather than the hypersensitive, cynical, and suspicious person that the objective standard is currently established." *Andrade v. Chojnacki*, 338 F.3d 448, 454-455 (5th Cir. 2003). The Fifth Circuit has also held that the relevant context for purposes of 28 U.S.C. § 455 is "the entire course of judicial proceedings, rather than isolated incidents," *id*. at 455, and that the movant bears the burden of proving bias or partiality by clear and convincing evidence. *Kinnear-Weed Corp. v. Humble Oil & Ref. Co.*, 441 F.2d 631, 634 (5th Cir. 1971).

27.      Finally, the Supreme Court has applied the "extrajudicial source rule" to disputes concerning the interpretation of § 455. This rule "divides events occurring or opinions expressed in the course of judicial proceedings from those that take place outside of the litigation context and holds that the former rarely require recusal," *id*.:

>    ***First, judicial rulings alone almost never constitute a valid basis for a bias or partiality motion***. In and of themselves (*i.e.*, apart from surrounding comments or accompany opinion), they cannot possibly show reliance on  an extrajudicial source; and can only in the rarest circumstances evidence the degree of favoritism or antagonism required (as discussed below) when no extrajudicial source is involved. Almost invariably, they are proper grounds for appeal, not recusal. ***Second, opinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-***

14

*seated favoritism or antagonism that would make fair judgment impossible. Thus, judicial remarks during the course of a trial that are disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge.* They *may* do so if they reveal an opinion that derives from an extrajudicial source; and they *will* do so if they reveal such a high degree of favoritism or antagonism as to make fair judgment impossible. . . . *Not establishing bias or partiality, however, are expressions of impatience, dissatisfaction, annoyance, and even anger*, that are within the bounds of what imperfect men and women, even after having been confirmed as federal judgments, sometimes display. *A judge's ordinary efforts at courtroom administration--even a stern and short-tempered judge's ordinary efforts at courtroom administration--remain immune*.

*Liteky v. United States*, 510 U.S. 540, 555 (1994) (emphases added).

## IV.    ARGUMENT

**A.    The Court has subject matter jurisdiction because this action is a core proceeding that requires the Court to interpret and enforce its Confirmation Order.**

28.    Following confirmation of the debtor's reorganization plan, the bankruptcy court retains jurisdiction over core proceedings. This includes proceedings that would require the court to interpret or enforce its orders. *See, e.g.*, *In re Cano*, 410 B.R. at 548-49; *In re ABC Dentistry, P.A.*, 2019 WL 6894775 at *6; *see also Travelers Indem. Co.*, 129 S. Ct. at 2205.

29.    In this case, the Court will have to interpret and enforce its Confirmation Order -- specifically, the Exculpation and Injunction Provision. *See, e.g.*, *In Matter of Galaz*, 841 F.3d 316 (5th Cir. 2016) (holding that bankruptcy court had post-confirmation jurisdiction over removed state court action seeking to recover on pre-confirmation claims in violation of debtor's discharge rights).

30.    As previously discussed, the Confirmation Order contains an Exculpation that "released and exculpated [the Exculpated Parties] from any [non-fraud] Claims and Cause[s] of Action . . . related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 cases, . . . the filing of the Chapter 11 cases, the pursuit of Confirmation, [and] the

15

administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the plan[.]" (Bankr. Dkt. 684, Confirmation Order ¶ 52.). It also contains an Injunction Provision that "permanently enjoin[s]" holders of "Released Claims" from "commencing or continuing . . . any action [against the Exculpated Parties] on account of . . . [such] Released Claims." (Bankr. Dkt. 684, Confirmation Order ¶ 54.).

31.     The Exculpation and Injunction Provision apply here because, as a threshold matter, Defendants are current or former officers and/or employees of McDermott and are therefore "Exculpated Parties" for purposes of the Confirmation Order. (Bankr. Dkt. 620, Plan, Art. I, § A). Moreover, Van Deelen's conversion, negligent misrepresentation, breach of fiduciary duty, and conspiracy claims are "related to" actions Defendants allegedly took in connection with McDermott's restructuring and administration of the Plan. This is no clearer than in Van Deelen's conversion claim, which repeatedly references McDermott's decision to file for relief under chapter 11:

> The conversion included, but was not limited to, unnecessarily writing down goodwill and intangible assets for no other purpose than destroying shareholder equity in advanced of a planned, but unannounced, bankruptcy filing; unnecessarily declaring Chapter 11 bankruptcy for no other purpose than enriching defendant Dixon and other company insiders; announcing that the company was going to cancel the stock of plaintiff and other shareholders in connection with the unnecessary Chapter 11 bankruptcy; and chilling plaintiff from exercising his rights as a shareholder to contact company managements and other personnel by asking the bankruptcy court to prevent plaintiff from doing so.

*See* Complaint ¶ 68

32.     Van Deelen's negligent misrepresentation and breach of fiduciary duty claims similarly relate to the chapter 11 restructuring because they turn on Defendants' alleged failure to disclose information regarding the restructuring. Specifically, with respect to his negligent misrepresentation claim, Van Deelen argues that he "suffered damages in connection with his

16

purchase []of" McDermott stock because he would not have purchased the stock "if [he] had been provided accurate and not misleading information by the defendants about . . . the defendants [sic] plan to wrongly take the company into bankruptcy." *Id.* ¶ 98. Van Deelen's breach of fiduciary duty claim likewise is rooted in his contention that the chapter 11 filing should not have taken place in that he asserts that Defendants "owed and owe [him] a fiduciary duty . . . which includes . . . not to fraudulently cause the company to file for bankruptcy protection . . . [and] to keep plaintiff informed concerning any bankruptcy plans the company has[.]" *Id.* ¶ 64.

33.     Finally, though Van Deelen does not allege any facts specifically describing the aim or scope of the conspiracy, Van Deelen does allege that:

- Defendants "left [shareholders] in the dark about the Financing Case and very serious earnings, cash flow and loan covenant issues the company faced." *Id.* ¶ 27; *see also id.* ¶¶ 15, 20, 23, 30-31, 48.

- Defendants failed to "report to shareholders the highly material fact that the Financing Plan represented a path to salvation for the company and its shareholders." *Id.* ¶ 32; *see also id.* ¶ 33.

- Defendants "chose Chapter 11 and the subsequent losses, pain and suffering that would cause for its thousands of McDermott shareholders" because Defendants would "get rich." *Id.* ¶ 35; *see also id.* ¶¶ 36, 58.

- Defendants "hid the fact that [McDermott] had made the decision to declare Chapter 11 bankruptcy from its shareholders." *Id.* ¶ 37; *see also id.* ¶¶ 39-41, 43, 45-46, 59.

- "Defendant Spence" resigned from McDermott, received "a severance payment of $866 thousand," and signed a release, non-disparagement, and non-disclosure agreement with McDermott--facts from which "[i]t can be inferred" that "Defendant Spence may know something that McDermott is paying him not to discuss." *Id.* ¶¶ 49-55.

KE 70412634.4

These and other similar allegations concern Defendants' participation in McDermott's restructuring efforts, and though not identified as such, are the only grounds on which Van Deelen could have asserted his conspiracy claim.

34.     As such, Van Deelen's claims for conversion, negligent misrepresentation, breach of fiduciary duty, and conspiracy all directly "relate to" McDermott's restructuring and the "administration and implementation of the Plan," and will require that the Court interpret and enforce the Exculpation and Injunction Provision. This is therefore a core proceeding over which the Court has subject matter jurisdiction. *See In Matter of Galaz*, 841 F.3d at 322 ("Galaz's suit in state court is arguably a violation of Katona's discharge rights, directly implicating the bankruptcy court's 'arising under' jurisdiction."); *id*. ("Even though Katona's bankruptcy case was closed, the bankruptcy court retains jurisdiction to consider violations of the discharge order; the order of discharge necessarily implicates the implementation or execution of the plan."); *In re Talsma*, 509 B.R. at 550 ("[D]etermining whether a provision of a Plan or Plan Document has been breached necessarily requires interpreting that provision.").

**B.      The Court also has subject matter jurisdiction because the *Craig's Stores* factors weigh in favor of such jurisdiction and because this action relates to the implementation or execution of the Plan.**

35.     Even if this action were a non-core, "related to" proceeding, the Court would still have jurisdiction. In determining whether post-confirmation "related to" jurisdiction exists, courts first examine the *Craig's Stores* factors, which are whether: (1) the claims primarily arise from pre-confirmation or post-confirmation relations between the parties; (2) any claims or antagonisms were pending between the parties on the date of plan confirmation; and (3) any facts or law deriving from the bankruptcy are necessary to the claims. *In re Enron Corp. Sec.*, 535 F.3d at 335;

*In re MSB Energy, Inc.*, 438 B.R. 571 (applying factors and finding that post-conformation "related to" bankruptcy jurisdiction existed).

36.     In this case, Van Deelen's conversion, negligent misrepresentation, breach of fiduciary duty, and conspiracy claims arise from pre-confirmation relations between the parties. As previously discussed, Van Deelen based these claims on actions that Defendants allegedly took and misrepresentations Defendants allegedly made in connection with and in the months leading up to McDermott's petition for relief under chapter 11. *See, e.g.*, Complaint ¶¶ 27, 32, 35, 37. The first *Craig's Stores* factor therefore weighs in favor of the bankruptcy court's jurisdiction. *See, e.g.*, *In re Blast Energy Servs., Inc.*, 396 B.R. 676, 684 (Bankr. S.D. Tex. 2008) ("[A]lthough the dispute arose post-confirmation, the claims against Hallwood . . . arose pre-confirmation. Thus, the claims at issue primarily deal with pre-confirmation relations between the parties[.]"); *In re MSB Energy, Inc.*, 438 B.R. at 586 (holding that the first factor "weighs heavily in favor of bankruptcy court jurisdiction" because "the subject of the Adversary Proceeding" occurred before the confirmation date).

37.     With regard to the second factor, there were clear "antagonisms" pending between the parties on the date of confirmation. At that time, Van Deelen had already filed his Motion objecting to McDermott's plan of reorganization, and had accused the company and Defendants of acting in bad faith "for the sole purpose of enriching McDermott's management and Board." (Bankr. Dkt. 510, Motion at 6-15.). Moreover, during the confirmation hearing itself, Van Deelen made certain threatening and vulgar remarks to counsel for the Debtors, such that the Debtors sought emergency relief from this Court to prohibit Van Deelen from further direct contact with the Debtors, their current or former officers, directors and employees, and their counsel. (Bankr. Dkt. 694 ¶¶ 7, 16.). This is more than enough to satisfy the second factor. *See, e.g.*, *In re MSB*

*Energy, Inc.*, 438 B.R. at 586 (second factors "weighs heavily in favor" of bankruptcy court jurisdiction because the plaintiffs had filed a motion to lift the automatic stay and objected the reorganization plan prior to the confirmation hearing).

38.     Finally, the third factor is also satisfied because the resolution of this action turns, at least in part, on the Confirmation Order's Exculpation and Injunction Provision. *But see id*. at 586-87 ("At this point, pursuant to the analysis presented in *Enron*, the Court retains its jurisdiction even if the third factor fails."). As previously discussed, Van Deelen's non-fraud claims fall squarely within the ambit of these provisions, and will require that the Court interpret and enforce these provisions as the case proceeds. The Confirmation Order is therefore "necessary to the claims," such that the third factor weighs in favor of bankruptcy court jurisdiction. *Id*. at 589 ("The Complaint represents a formal lawsuit reflecting the pre-confirmation conflict between the parties, the resolution of which assuredly hinges on an evaluation of facts and law derived from the underlying Chapter 11 case, as well as the language presented in the Plan and Confirmation Order. Under all of these circumstances, this third factor also weighs heavily in favor of this Court having jurisdiction over the Adversary Proceeding.").

39.     Furthermore, and even if the *Craig's Stores* factors were not satisfied here (though they unequivocally are), the Court would still have jurisdiction. The absence of such factors does not strip bankruptcy courts of all "related to" jurisdiction -- it just limits such jurisdiction to actions that would affect "the implementation or execution of the plan." *In re Enron Corp. Securities*, 535 F.3d at 335. In this case, as previously discussed, Van Deelen's action *would* affect the "execution of the [P]lan." Specifically, it would affect the Debtors' ability to enforce the Plan's exculpation and injunction provisions, as incorporated in the Confirmation Order. This is enough to establish

20

the Court's jurisdiction. *In Matter of Galaz*, 841 F.3d at 322 ("[T]he order of discharge necessarily implicates the implementation or execution of the plan.").

40. For these reasons, the Court should deny Van Deelen's Motion to Remand.

**C. Mandatory abstention does not apply here because Van Deelen's claims arise in the bankruptcy proceedings and cannot be timely adjudicated in state court.**

41. As the party seeking mandatory abstention, Van Deelen had the burden to show, by a preponderance of the evidence, that: (1) his action has no independent basis for federal jurisdiction, other than section 1334(b); (2) his action is a non-core proceeding, i.e., it is "related to" a case under title 11; (3) he commenced his action in state court; and (4) his action could be adjudicated timely in state court. *In re TXNB Internal Case*, 483 F.3d at 300; *In re Lorax Corp.*, 295 B.R. at 90.

42. Van Deelen did not satisfy his burden to show that his action is non-core or could be adjudicated timely in state court. As discussed above, this action is a "core proceeding" because it requires that the Court interpret and enforce its Confirmation Order and the Exculpation and Injunction Provision provided therein. *See, e.g.*, *In Matter of Galaz*, 841 F.3d at 322 ("Galaz's suit in state court is arguably a violation of Katona's discharge rights, directly implicating the bankruptcy court's 'arising under' jurisdiction."); *In re Cano*, 410 B.R. at 548-49 ("[B]ankruptcy courts retain significant jurisdiction after a discharge order is issued and a case is closed over matters concerning the interpretation and enforcement of bankruptcy court orders . . . Such matters fall within the Court's 'arising in' and arising under' jurisdiction."); *In re ABC Dentistry, P.A.*, 2019 WL 6894775 at *6 ("the Bankruptcy Court did not err in determining that it had 'arising in or under jurisdiction' over the removed action" because it would require the court to interpret rights associated with the court's order dividing settlement proceeds).

43.     Nor could this action be adjudicated timely in state court. Factors relevant to this prong include "(a) the extent to which the suit has already been prosecuted in state court, (b) the expectation of when the state court trial will commence, and (c) evidence in contravention that the state court could adjudicate the case timely." *In re Hallwood Energy, L.P.*, No. 09-31253-H4-11, 2009 WL 2601294, at *8 (Bankr. S.D. Tex. Aug. 24, 2009).

44.     Here, Van Deelen has presented no evidence of prosecution, nor could he -- Van Deelen has not prosecuted this action beyond filing his original petition in state court less than two months ago. He has not served or otherwise engaged in any discovery, he has not filed any motions or set such motions for hearing, and he has not sought or obtained any orders from the state court. *See, e.g.*, *In re Doctors Hosp. 1997, L.P.*, 351 B.R. 813, 846 n.29 (Bankr. S.D. Tex. 2006) ("[T]he record reflects that during the 41 days that the suit was pending in [state] court, virtually nothing occurred. No hearings were held, no motions were filed, no discovery was conducted, and no orders were entered on the docket. Thus, unlike this Court, the Harris County District Court has no background at all about the nature of this lawsuit or the substantive issues to be adjudicated.").

45.     Neither was this case set for trial. *See, e.g.*, *In re Petroleum Prod. & Servs., Inc.*, 561 B.R. 662, 666 (Bankr. S.D. Tex. 2016) (courts in this circuit view a docket-control order setting dates for trial as evidence "sufficient to show that the state court will be familiar with the case and prosecute it efficiently"); *see also In re Mugica*, 362 B.R. 782, 793 (Bankr. S.D. Tex. 2007) (mandatory abstention was required when the plaintiffs demonstrated a history of prosecution in state court, including a trial setting).

46.     Further, this Court can take judicial notice that due to the Covid-19 situation, the Texas Supreme Court has repeatedly issued orders prohibiting state courts from conducting jury trials, which even if not further extended may not resume before October 1, 2020.  (Texas Supreme

22

Court Twenty-Second Emergency Order Regarding the Covid-19 State of Disaster, Misc. Dkt. 20-9095 https://www.txcourts.gov/media/1449564/209095.pdf.)  Further, the delay of jury trials has led to a backlog that assure no trial would be set in this case for some time, unlike in this Court that has continued to operate albeit pursuant to emergency procedures.

47.     In the absence of any evidence that he has prosecuted his action or that trial is to commence on a given date, the fourth prong of the mandatory abstention analysis weighs against abstention, and the Court should deny Van Deelen's request. *See In re Lorax Corp.*, 295 B.R. at 90 (party not entitled to mandatory abstention if it fails to prove any one of the statutory requirements); *In re Montalvo*, 559 B.R. 825, 842 (Bankr. S.D. Tex. 2016) (the bankruptcy court refused to abstain because the fourth factor was not demonstrated).

**D.     The Court should deny Van Deelen's request for permissive abstention and his recusal because Van Deelen cannot show prejudice or that fair judgment is impossible.**

48.     Van Deelen has based his requests for permissive abstention and recusal on the same arguments:  that the Court "shredded" his Constitutional rights by "refusing to hear Plaintiff's motions in the McDermott International bankruptcy case"; "by falsely accusing Plaintiff of improper acts during the pendency of the bankruptcy case"; "by telling the attorneys for the Defendants herein that they 'were the smartest people in the country' while accusing Plaintiff in open court of 'knowing nothing'"; and "by unconstitutionally issuing a permanent injunction against the Plaintiff without affording a hearing or trial." (Bankr. Dkt. 4 at 3, 15).

49.     These arguments do not demonstrate *any* prejudice or antagonism, much less what would be required for permissive abstention or recusal. *See, e.g.*, *In re SBMC Healthcare, LLC*, 519 B.R. at 190 (identifying prejudice as one factor courts can consider when determining permissive abstention); *Liteky*, 510 U.S. at 555 (holding that movant for recusal would need to show "a deep-seated . . . antagonism that would make fair judgment impossible").

23

50.     As a threshold matter, Van Deelen fails to provide any evidence in support of his arguments--much less the "clear and convincing" evidence he would need for his recusal motion. *See Kinnear-Weed Corp.*, 441 F.2d at 634. Van Deelen fails to explain the context in which the Court's alleged actions or statements arose. Such context is important because "[t]he judge who presides [over the proceedings] may, upon completion of the evidence, be exceedingly ill disposed towards [a party], who has been shown to be a thoroughly reprehensible person. But the judge is not thereby recusable for bias or prejudice, since his knowledge and the opinion it produced were properly and necessarily acquired in the course of the proceedings, and are indeed sometimes . . . necessary to the completion of the judge's task." *Liteky*, 510 U.S. at 550-51.

51.     In this case, for example, Van Deelen repeatedly acted in an unprofessional manner toward the Court and Debtors' counsel. As previously discussed, Van Deelen made certain threatening and vulgar remarks to Debtors' counsel during the confirmation hearing, prompting the Debtors to seek emergency relief from this Court prohibiting Van Deelen from further direct contact with the Debtors, their current or former officers, directors and employees, and their counsel. Bankr. Dkt. 694 ¶¶ 7, 16. Van Deelen also made vulgar remarks toward the Court during the confirmation hearing and later appeared unannounced and uninvited at one of the Defendants' homes. *Id*.  ¶¶ 7-8.  Most significantly, Van Deelen denied under oath that any such comments were made, even though they were overheard by court staff and audible via microphone.  (Bankr. Dkt. 719 at 1.)  As this Court observed, "the Court was willing to overlook the insult" but it could not "overlook a false statement."  (*Id.*)

52.     Thus, any "critical or disapproving" remarks arising from this context are to be expected, not the sort that could not give rise to recusal. *See In re Wilborn*, 401 B.R. 848, (Bankr. S.D. Tex. 2009) ("A judge's comments that form the basis of a recusal motion should not be

24

viewed in isolation, but rather must be viewed in context."); *LoCascio v. United States*, 473 F.3d 493, 497 (2d Cir. 2007) (judge's comments during a scheduling hearing, when read in context, "revealed neither 'an opinion that derives from an extrajudicial source' nor 'such a high degree of favoritism or antagonism as to make fair judgment impossible'"): *United States v. Pearson*, 203 F.3d 1234, 1277 (10th Cir. 2000) (holding that recusal based on the judge's comments relating to a party's pleadings was not warranted "after reviewing the judge's comments in context"); *In re Martinez-Catala*, 129 F.3d 213, 221 (1st Cir. 1997) (judge's remark that the plaintiffs were "political sweet potatoes" did not warrant recusal when viewed in context).

53.     Finally, Van Deelen fails to show how the Court's alleged actions represent anything more than "critical or disapproving" remarks, "expressions of impatience, dissatisfaction, annoyance, [or] anger," or "ordinary efforts at courtroom administration." *Liteky*, 510 U.S. at 555-56. In short, Van Deelen fails to show the prejudice or antagonism necessary to support his requests for permissive abstention or recusal. *See, e.g., Smith v. Houston EEOC*, No. 4:20-CV-1664, 2020 WL 3542433, at *5 (S.D. Tex. June 30, 2020) (unsupported allegations that the court "spent an eternity degrading and attac[k]ing people [and] stating on the record that [the Court had no regard for anything the Plaintiff had to say" did not set forth legally recognizable basis for recusal); *Silva v. Spring Branch Independent School District*, No. H-16-0545, 2016 WL 7441709, at *2 (S.D. Tex. Dec. 22, 2016) (unsupported allegations that magistrate judge "repeatedly yelled" at pro se Plaintiff and refused to let her argue any of the facts in her motions did not support recusal); *Haskett v. Orange Energy Corporation*, 161 F. Supp. 3d 471, 474 (S.D. Tex. 2015) (no bias or impartiality where movant alleged that the court "permitted the defendants . . . to engage in an extensive campaign of *ad hominem* personal attacks having no relevance to the merits of the cases whatsoever, but which appear to have palpably prejudiced [the Court] against Plaintiff").

## V.   CONCLUSION

Given that Van Deelen alleges that actions taken in the bankruptcy proceedings and related transactions give rise to his claims, this Court has subject matter jurisdiction over this action and should not abstain.  Moreover, recusal is not warranted in the context of a litigant who repeatedly failed to demonstrate respect for the Court or its fellow officers and ultimately made a false statement to the Court under oath. Van Deelen cannot use his own poor behavior as a basis for obtaining a different forum.

KE 70412634.4

Houston, Texas
Dated:  August 13, 2020

Respectfully submitted,

| | |
|---|---|
| */s/ Matthew D. Cavenaugh* | */s/ Anna G. Rotman* |

**JACKSON WALKER L.L.P.**
Matthew D. Cavenaugh (TX Bar No. 24062656)
Jennifer F. Wertz (TX Bar No. 24072822)
Veronica A. Polnick (TX Bar No. 24079148)
1401 McKinney Street, Suite 1900
Houston, TX 77010
Facsimile:   (713) 752-4221
Email:        mcavenaugh@jw.com
                jwertz@jw.com
                kpeguero@jw.com
                vpolnick@jw.com

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Anna G. Rotman, P.C. (TX Bar No. 24046761)
Jamie Alan Aycock (TX Bar No. 24050241)
609 Main Street
Houston, TX 77002
Telephone:   (713) 836-3600
Facsimile:   (713) 836-3601
Email:        anna.rotman@kirkland.com
                jamie.aycock@kirkland.com

-and-

John Christian (TX Bar No. 24109727)
1601 Elm Street
Dallas, TX 75201
Telephone:   (214) 972-1770
Facsimile:   (214) 972-1771
Email:         john.christian@kirkland.com

*Counsel to the Defendants*

27

## **CERTIFICATE OF SERVICE**

I hereby certify that on August 13, 2020, I caused a true and correct copy of the foregoing document to be served via the Court's ECF notification system to the parties listed below at the email addresses listed.

Michael Van Deelen,
16215 Friar Circle
Spring, TX 77379
michaelvandeelen@gmail.com

*/s/ Matthew D. Cavenaugh*
Matthew D. Cavenaugh

1

000222

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

USDC SDTX RCVD
AUG 17 2020 PM2:59

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| | ) | Chapter 11 |
| MCDERMOTT INTERNATIONAL, INC, *et al* | ) | |
| | ) | Case No. 20-30336 |
| Reorganized Debtor(s). | ) | |
| | ) | (Jointly Administered) |
| _____ | ) | |
| | ) | |
| MICHAEL VAN DEELEN | ) | |
| | ) | |
| Plaintiff, | ) | Adv. Proc. No. 20-3309 |
| | ) | |
| v. | ) | |
| | ) | |
| DAVID DICKSON, | ) | |
| and STUART SPENCE, | ) | |
| and SCOTT LAMB, | ) | |
| and 10 JOHN/JANE DOES | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF'S REPLY TO DEFENDANTS' RESPONSE (DOCUMENT 11) TO
PLAINTIFF'S MOTION TO REMAND (DOCUMENT 4) AND PLAINTIFF'S
MOTION TO DISQUALIFY BANKRUPTCY COURT JUDGE DAVID JONES
(DOCUMENT 8)**

COMES NOW the Plaintiff, Michael Van Deelen, and for his Plaintiff's Reply to

Defendants' Response (Document 11) to Plaintiff's Motion to Remand (Document 4) and

Plaintiff's Motion to disqualify Bankruptcy Court Judge David Jones (Document 8) states

as follows:

## Plaintiff State Law Claims Are Valid Because He Has Opted Out

Exhibit 1 herein contains Plaintiff's Opt-Out which he validly and timely submitted.

By submitting the Opt-Out form, Plaintiff, among other things, opted out of 'the plan' and 'the administration and implementation of the plan' (Exhibit 1, page 3, paragraph 3). Because Plaintiff opted out of the Plan and its administration and implementation, Plaintiff by definition opted out of the Plan's provisions, including all of its release, exculpation, injunction and third-party release provisions. (The Defendants admit this on page 9 of their Response [Document 11] when they state: 'The Plan defines "Released Claims" to mean "any Claims or Interests that have been released, discharged, **or are subject to exculpation** (emphasis added) pursuant to this Plan." *See* Plan, Art. I, § A.') It is simply not possible to be part of these Plan provisions if Plaintiff has opted out of the Plan. Furthermore, the opt-out documentation specifically states (Exhibit 1, page 6): 'This notice is been sent to you .... to provide you with the attached opt-out form with respect to the releases, exculpation, injunction, and third-party releases provided in the plan.'

Since Plaintiff's opt-out excluded him from the Plan's injunction and exculpation provisions, the Defendants' Response (Document 11) which argues that Plaintiff violated the Plan's injunction and exculpation provisions fails.

Plaintiff is not a releasing party because he validly opted out of the releases contained in the plan. (Exhibit 1, last paragraph). Since release is 'A bar to any of the releasing parties asserting any claim or cause of action released pursuant to the foregoing third-party release' (Exhibit 1, page 4, paragraph H), Plaintiff, not a releasing party, is not

2

barred by the plan from asserting claims or causes of actions against these Defendants in either state of federal court. These claims may include breach of fiduciary duty, personal injury, and torts, among other claims. (See, for example, Jason Binford, *Beware of Third-Party Releases in Bankruptcy*, HOTEL NEWS Now (Dec. 14, 2015)). In 2002, the U.S. Supreme Court stated it had long viewed the right to sue in court as a form of petition. *BE & K Constr. Co. v. NLRB*, 536 U.S. 516, 524-25 (2002). Denying Plaintiff, not a releasing party, his right to sue those he refused to release would be a violation of Plaintiff's First Amendment right of petition.

Accordingly, because Plaintiff opted out, his Montgomery County, Texas, District Court state law claims of Conversion, Common Law Fraud, Statutory Fraud, Negligent Misrepresentation, Breach of Fiduciary Duty and Conspiracy are valid.

## This Court Does Not Have Jurisdiction Over This Adversary Proceeding

The Plaintiff is 1) a third party (non-debtor); 2) who has opted out of the Plan, its administration and implementation, and its third-party release, injunction and exculpation provisions; 3) who filed a state law-only lawsuit against the Defendants in Montgomery County, Texas, District Court; 4) after the Plan Confirmation had occurred. The defendants are 1) third parties (non-debtors); 2) who have not been released by the Plaintiff.

**The Defendants do not present a single case covering such a scenario**. All cases cited by the Defendants deal with actions that have at least one of these elements: 1) federal, as opposed to state-law adversary proceedings; and/or 2) debtor plaintiff(s); and/or 3) debtor defendant(s); and/or 4) released parties. In their Response (Document 11), the Defendants attempt to cobble together multiple cases which are not on point with

3

the instant action in order to prove that Plaintiff's action should not be remanded. Plaintiff will address the relevant, on point, case law below.

Under 28 U.S.C. §1478(a) "any claim or cause of action in a civil action, other than a proceeding before the United States Tax Court or a civil action by a Government unit to enforce [a] . . . regulatory or police power" may be removed "if the bankruptcy courts have jurisdiction over such claim or cause of action."

28 U.S.C. Section 1478(a) does not permit removal of this action due to lack of Jurisdiction.

First of all, McDermott International's Plan had been confirmed and the Effective Date of the Plan occurred on June 30, 2020.  Plaintiff received notice of these events.  On July 17, 2020, defendants Dickson, Spence and Lamb (hereinafter, 'Defendants') filed their Notice of Removal in this Court.

The Fifth Circuit has held that "[a]fter a plan is confirmed, the bankruptcy court's jurisdiction is limited to matters pertaining to the implementation or execution of the plan" or in other words, "matters that impact compliance with or completion of the reorganization plan." *Highland Capital Mgmt., LP v. Chesapeake Energy Corp. (In re Seven Seas Petroleum, Inc.)*, 522 F.3d 575, 589 (5th Cir. 2008) (citing to *Bank of La. v. Craig's Stores of Tex., Inc. (In re Craig's Stores of Tex., Inc.)*, 266 F.3d 388, 390 (5th Cir. 2001), and *United States Brass Corp. v. Travelers Ins. Group, Inc. (In re United States Brass Corp.)*, 301 F.3d 296, 305 (5th Cir. 2002)).  Because no "if related" jurisdiction existed at the time of removal, this Court does not have jurisdiction of the Defendants.  See *Newby v. Enron Corp. (In re Enron Corp. Sec.)*, 534 F.3d 325, 335 (5th Cir. 2008).

4

*In re Craig's Stores, Supra*, the Fifth Circuit stated:

'Once the bankruptcy court confirms a plan of reorganization, the debtor may go about its business without further supervision or approval. The firm also is without the protection of the bankruptcy court. It may not come running to the bankruptcy judge every time something unpleasant happens. *Pettibone Corp. v. Easley*, 935 F.2d 120, 122 (7th Cir. 1991). **After a debtor's reorganization plan has been confirmed, the debtor's estate, and thus bankruptcy jurisdiction, ceases to exist, other than for matters pertaining to the implementation or execution of the plan** (emphasis added). *In re Fairfield Communities, Inc.*, 142 F.3d 1093, 1095 (8th Cir. 1998); *In re Johns-Manville Corp.*, 7 F.3d 32, 34 (2d Cir. 1993). No longer is expansive bankruptcy court jurisdiction required to facilitate "administration" of the debtor's estate, for there is no estate left to reorganize. This theory has antecedents in our court's jurisprudence, which has observed that the reorganization provisions of the former Bankruptcy Act "envisage [] that out of the proceedings will come a newly reorganized company capable of sailing forth in the cold, cruel business world with no longer the protective wraps of the federal Bankruptcy Court." *In re Seminole Park & Fairgrounds, Inc.*, 502 F.2d 1011, 1014 (5th Cir. 1974). Because it comports more closely with the effect of a successful reorganization under the Bankruptcy Code than the expansive jurisdiction cases, we adopt this more exacting theory of post-confirmation bankruptcy jurisdiction.'

The Defendants are third party individuals who were not debtors or defendants in the McDermott International bankruptcy action in this Court. They were sued only for state-law causes of action in Montgomery County, Texas, District Court (case 20-06-07348). The Montgomery County case has nothing to do with "matters pertaining to the implementation or execution of the plan" or "matters that impact compliance with or completion of the reorganization plan." and the Defendants provide no evidence in their Notice of Removal that it does. The post-confirmation dispute at issue herein has nothing to do with any obligation created by the debtor's reorganization plan. See *In re Craig's Stores, Supra*.

The Defendants incorrectly claim that the Plan's injunction and exculpation provisions free them from Plaintiff's state law suit because 1) Plaintiff is subject to the injunction and exculpation provisions and 2) because the injunction and exculpation provisions somehow affect the implementation, execution, compliance or completion of

5

the plan.  As discussed above,  because Plaintiff opted out of all releases, he is not subject

to the injunction and exculpation provisions.  On page 9 of their Response, the

Defendants state: 1) " Finally, the Injunction Provision permanently enjoined holders of

"Released Claims" from commencing or continuing any action against the "Exculpated or

Released Parties" in connection with such claims."; and 2) 'The Plan defines "Released

Claims" to mean "any Claims or Interests that have been released, discharged, **or are**

**subject to exculpation** (emphasis added) pursuant to this Plan. (*See* Plan, Art. I, § A.)".

The injunction and exculpation provisions only apply to holders of "released claims" and

Plaintiff did not release any claims.

Furthermore, the Defendants present no case law stating that plan injunction and

exculpation provisions allow a bankruptcy court to retain jurisdiction after plan

confirmation.  If this were the case, common plan injunction and exculpation provisions

would allow bankruptcy courts to retain jurisdiction of *every* case after plan confirmation.

The defendants cite one primary case in support of their argument that plan injunction

and exculpation provisions allow a bankruptcy court to retain jurisdiction after plan

confirmation: *In Matter of Galaz*, 841 F.3d 316 (5th Cir. 2016).  *Galaz* does not once

mention plan injunction or exculpation provisions affecting the implementation,

execution, compliance or completion of a plan.  *Galaz* does not even mention plan

injunction or exculpation provisions at all.

Secondly, 28 U.S.C. section 1471(b) states:

"(b) Notwithstanding an Act of Congress that confers exclusive jurisdiction on a
court or courts other than the district courts, the district courts shall have original but not
exclusive jurisdiction of all civil proceedings arising under title 11 or arising in or **related
to** cases under title 11 (emphasis added)."

6

The Fifth Circuit has stated that "it is not necessary to distinguish between proceedings 'arising under,' 'arising in a case under,' or 'related to a case under,' title 11 " as the real necessary determination is "whether a matter is at least 'related to' the bankruptcy" when determining if a matter falls within bankruptcy subject matter jurisdiction. *Wood v. Wood (In re Wood)*, 825 F.2d 90, 93 (5th Cir. 1987). Proceedings that are "arising under" are those in which the matter "involve[s] a cause of action created or determined by a statutory provision of title 11." *Id.* at 96. Those are distinguishable from proceedings that are "arising in," which involve matters "that are not based on any right expressly created by title 11, but nevertheless, would have no existence outside of the bankruptcy," such as "[p]roceedings invoking the bankruptcy court's statutory authority to enter orders necessary for the consummation of a confirmed plan…" *United States Brass Corp. v. Travelers Ins. Group, Inc. (In re United States Brass Corp.)*, 301 F.3d 296, 306 (5th Cir. 2002)."

The Fifth Circuit in *In re Wood, Supra,* went on to adopt a "related to" test articulated by the Third Circuit, which enjoys broad support, that looks at "whether the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy." 825 F.2d at at 93, n.15 (citing to *Pacor, Inc. v. Higgins*, 743 F.2d 984, 994 (3d Cir. 1984)). In applying the test, the Fifth Circuit looked to see whether the proceeding was "sufficiently related to the pending bankruptcy to allow the district court to exercise jurisdiction under section 1334," which is to say that **"plaintiff's claims must affect the estate, not just the debtor** (emphasis added)." *Id.* at 93-94.

In *Pacor, Supra*, a case involving a dispute between third parties, the court stated:

"The jurisdiction of the bankruptcy courts to hear cases related to bankruptcy is not without limit, however, and there is a statutory, and eventually constitutional, limitation to the power of a bankruptcy court. For subject matter jurisdiction to exist, therefore, there must be some nexus between the "related" civil proceeding and the title 11 case. *See In re Hall,* 30 B.R. 799, 802 (M.D.Tenn.1983); 1 *Collier on Bankruptcy* ¶ 3.01, at 3-48 to 3-49 (15th ed. 1982).

The usual articulation of the test for determining whether a civil proceeding is related to bankruptcy is whether *the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy. E.g., In re Hall,* 30 B.R. at 802; *In re General Oil Distributors, Inc.,* 21 B.R. 888, 892 n. 13 (Bankr.E.D.N.Y.1982); *In re U.S. Air Duct Corp.,* 8 B.R. 848, 851 (Bankr.N.D.N.Y. 1981); 1 *Collier on Bankruptcy* ¶ 3.01 at 3-49. Thus, the proceeding need not necessarily be against the debtor or against the debtor's property. An action is related to bankruptcy if the outcome could alter the debtor's rights, liabilities, options, or freedom of action (either positively or negatively) and which in any way impacts upon the handling and administration of the bankrupt estate.

On the other hand, the mere fact that there may be common issues of fact between a civil proceeding and a controversy involving the bankruptcy estate does not bring the matter within the scope of section 1471(b). Judicial economy itself does not justify federal jurisdiction. *See generally Aldinger v. Howard,* 427 U.S. 1, 15, 96 S.Ct. 2413, 2420, 49 L.Ed.2d 276 (1976). "[J]urisdiction over nonbankruptcy controversies with third parties who are otherwise strangers to the civil proceeding and to the parent bankruptcy does not exist." *In re Haug,* 19 B.R. 223, 224-25 (Bankr.D.Ore.1982); *See also In re McConaghy,* 15 B.R. 480, 481 (Bankr.E.D.Va.1981) **(Bankruptcy court lacks jurisdiction to decide disputes between third parties in which the estate of the debtor has no interest)."** (Emphasis added.)

As seen above, the only alleged nexus the Defendants claim between Plaintiff's state law suit against the Defendants herein (the Montgomery County, Texas, District Court suit) and the McDermott International bankruptcy is the Plan's exculpation and

8

injunction provisions, for which the Defendants provide no citations to law.  Plaintiff has discussed at length that the Plan exculpation and injunction provisions do not apply to him because he opted out of the Plan releases and is therefore not a releasing party.  There is nothing for the Court to decide here.  Plaintiff is not a releasing party and he did not release the debtors from wrongdoing.  None of the releases, including the exculpation and injunction provisions, apply to the Plaintiff because Plaintiff opted out of all of them. See Article VIII of the Second Amended Joint Prepackaged Chapter 11 Plan of Reorganization (Technical Modifications) of McDermott International, Inc. and Its Debtor Affiliates (Case No. 20-30336, Document 651).

The outcome of Plaintiff's Montgomery County, Texas, state-law case against the individual, third party, non-debtor defendants, two of whom did not even work for McDermott International at the time of Plaintiff's suit against them (Spence and Lamb), has no conceivable effect on the estate (McDermott International) that *was* administered in bankruptcy and whose plan confirmation and effective date was before the Defendants' Notice of Removal.  The Montgomery County suit has no bearing on the liabilities or assets of the bankrupt debtor or the debtor's discharge.  The estate simply has no interest in the Plaintiff's Montgomery County, Texas, suit against the Defendants and the Defendants do not present evidence otherwise in their Notice of Removal (Document 1) or in their Response (Document 11).

**Mandatory Abstention Pursuant To 28 U.S.C. Section 1334(c)(2) Applies To This Action**

Even if this Court had jurisdiction to hear this removed case, remand would be mandatory under 28 U.S.C. Section 1334(c)(2).

The key distinction between mandatory abstention and equitable or discretionary remand is that mandatory abstention applies "only to non-core proceedings--that is, proceedings 'related to a case under title 11,' but not 'arising under title 11, or arising in a case under title 11.'" *In re Gober*, 100 F.3d at 1206 (comparing 28 U.S.C. §§ 157(b)(1) & 1334(c)(2)); *see also J.T. Thorpe Co.*, 2003 U.S. Dist. LEXIS 26016, at *10; *Ramirez*, 413 B.R. at 626-27. *Cf. Stern*, 131 S. Ct. at 2618.

Section 1334(c)(2) provides for mandatory abstention when:

"[u]pon timely motion of a party in a proceeding based upon a State law claim or State law cause of action, related to a case under title 11 but not arising under title 11 or arising in a case under title 11, with respect to which an action could not have been commenced in a court of the United States absent jurisdiction under this section, the district court shall abstain from hearing such proceeding if an action is commenced, and can be timely adjudicated, in a State forum of appropriate jurisdiction." 28 U.S.C. § 1334(c)(2).

A court must abstain from hearing the state law claim at issue when all of the following factors are met:

(1) a motion has been timely filed requesting abstention;
(2) the cause of action is essentially one that is premised on state law;
(3) the claim is a non-core proceeding, i.e., it is "related to" a case under title 11 but does not arise under or in a case under title 11;
(4) the proceeding could not otherwise have been commenced in federal court absent federal jurisdiction under § 1334(b);
(5) an action has been commenced in state court; and
(6) the action could be adjudicated timely in state court.

*J.T. Thorpe Co.*, 2003 U.S. Dist. LEXIS 26016, at *10 (citing to *Schuster v. Mims (In re Rupp & Bowman Co.)*, 109 F.3d 237, 239 (5th Cir. 1997); *In re Gober*, 100 F.3d at 1206; *Broyles v. U.S.Gypsum Co.*, 266 B.R. 778, 782-83 (E.D. Tex. 2001); *Lee v. Miller*, 263 B.R. 757, 763 (S.D. Miss. 2001); *Chickaway v. Bank One Dayton, N. A.*, 261 B.R. 646, 649 (S.D. Miss. 2001); *WRTCreditors Liquidation Trust v. C.I.B.C. Oppenheimer Corp.*, 75 F. Supp. 2d 596, 605 (S.D. Tex. 1999)). The determination of the status of a cause of

action is rooted in the list of core proceedings in 28 U.S.C. § 157(b)(2). Although Section 157(b)(2) is non-exhaustive, that does not mean that every cause of action that can be categorized as a "core proceeding" under § 157(b)(2) should be included, given decisions such as *Marathon* and *Stern*. *Ramirez*, 413 B.R. at 627; *see also Stern*, 131 S. Ct. at 2618; *Northern Pipeline Const. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50 (1982).

Neither is Plaintiff's state law suit against the Defendants herein a core proceeding. Plaintiff has demonstrated above that his state law case against the Defendants is not related to the McDermott International bankruptcy case. Since the 'related to' category is the most inclusive one, Plaintiff's state law case cannot be a core proceeding. If the state law case is not 'related to' the bankruptcy case, it cannot be a core proceeding in the bankruptcy case.

Plaintiff has satisfied the first factor given above in that he filed this pleading on July 23, 2020, four days after he was served the Defendants' Notice of Removal.

Plaintiff has satisfied the second, third and fifth factors given above in that the Montgomery County, Texas, District Court suit against the Defendants is entirely premised on state law and involves only claims of Fraud, Conversion, Negligent Misrepresentation, Breach of Fiduciary Duty and Civil Conspiracy and does not involve federal law.

Plaintiff has satisfied the fourth factor given above because there is no federal subject matter jurisdiction over Plaintiff's state law claims absent jurisdiction pursuant to Section 1334(b) and diversity of citizenship is lacking.

The sixth and final factor looks to whether "the action could be adjudicated timely in state court." *J.T. Thorpe Co.*, 2003 U.S. Dist. LEXIS 26016, at *10. The standard for

timely adjudication in state court does not place a burden upon the movant to show a "*more timely* adjudicat[ion] in state court, but only that the matter can be timely adjudicated..." *J.T. Thorpe Co.*, 2003 U.S. Dist. LEXIS 26016, at *12-13. However, Plaintiff addresses this 'burden'.

On information and belief, Montgomery County is 'open' and not subject to a shelter-in-place order. The Montgomery County District Court Clerk's office is currently fully staffed and open to the public during the COVID-19 pandemic. The Clerk's office dockets cases and events on a normal basis. Court 284, where the Defendants' case was removed from, is open for the hearing of motions, etc.. There is no indication that the Montgomery County Court or its staff is unable to efficiently and normally handle its case load during the pandemic. Plaintiff is approved and is and has been able to electronically file documents in his case. The Montgomery County Court, including Court 284, hears cases on a full-time basis in Montgomery County.

On the other hand, on information and belief, Harris County is on lock-down status. Federal in-court appearances have been deferred. The federal Clerk's office is operating with a 'much reduced staff'. The docketing of federal cases is being done remotely. Plaintiff filed his Plaintiff's Request For Hearing (Document 9) in this action on August 3, 2020, at 10:57 a.m.. It took two days for Plaintiff's Request to be docketed. Plaintiff has been prohibited from electronically filing documents in the McDermott bankruptcy case or this adversary proceeding by bankruptcy court judge David Jones. Furthermore, the Southern District of Texas Bankruptcy Court is SWAMPED with cases as Houston and Texas companies operating in the oil patch and other industries continue to file for bankruptcy at an alarming rate. The bankruptcy court judge overseeing this

action, Judge Jones, is only hearing Houston cases (including the instant action) on a part-time basis as he divides his time between physically hearing separate cases in Houston, Corpus Christi and Laredo.  Furthermore, Judge Jones, with one exception, has refused to hear or even calendar Plaintiff's motions and/or requests for hearings in the instant action or in the McDermott International bankruptcy case.

"[The] Covid-19 [pandemic] ....does not weigh in favor of retaining federal jurisdiction".  Southern District of Texas Chief Judge Lee H. Rosenthal in *American General Life Insurance Company v. Schahin II Finance Company (SPV) Limited*, Civil Action No. H-19-4025, U.S. District Court, S.D. Texas, Houston Division (June 16, 2020).

The above illustrates that there is an exceedingly high likelihood that Plaintiff's state-law case against the Defendants will be adjudicated much more quickly in Montgomery County District Court than it would be in the Southern District of Texas Bankruptcy Court.  This is amplified by the fact that state law causes of action against the individual Defendants were not raised during the pendency of the bankruptcy proceedings.  If the bankruptcy court were to hear Plaintiff's state law claims against the Defendants, it would have to "start fresh" with a new case and would not have an advantage because it had previously heard the debtor's bankruptcy case.  (This is especially the case if Judge Jones is recused from this action.)

Furthermore, since the Defendants have rendered no evidence to indicate that the state court could *not* adjudicate the matter in a timely fashion, the Court must presume that the state court will timely adjudicate the matter, given the immense policy interest in comity. *In re Doctors Hosp.*, 351 B.R. at 846 n.29. "While an affirmative showing of

13

the possibility of timely adjudication in state court may be necessary where a movant

seeks abstention from a proceeding originating in federal court, such a showing is not

necessary where the movant is contesting the removal of his own state action." *In Re*

*Treyson Dev., Inc.*, No. 14-70256, 2016 WL 1604347 (Bankr. S.D. Tex. Apr. 19, 2016)

(citing *Abadie v. Poppin*, 154 B.R. 86, 90 (N.D. Cal. 1993)).

In their Response (Document 11), the Defendants incorrectly state:

"Further, the delay of jury trials [until October 1, 2020, in Montgomery County District
Court] has led to a backlog that assure no trial would be set in this case for some time,
unlike in this Court that has continued to operate albeit pursuant to emergency
procedures."

While it is true that Montgomery County District Court has delayed jury trials until

October 1, 2020, the Defendants' contention that the delay has led to a backlog is

unsupported.  Furthermore, the implication that all is well in the Southern Division

Bankruptcy Court is a fiction, also unsupported.  Pursuant to its General Orders,

including General Orders 2020-4 and 2020-19, the bankruptcy court is operating under a

'minimized hearings' schedule and is holding hearings by electronic means.

Furthermore, the Defendants in their Response have not controverted Plaintiff's

arguments in his Motion to Remand, repeated herein, that, among other things,

Montgomery County District Court is progressing at an almost-normal pace while the

bankruptcy court is not.  Even if all other factors could be considered equal (which they

cannot be as detailed herein), it is inconceivable that plaintiff would get a faster trial in

Judge Jones' bankruptcy-swamped Houston court when Judge Jones is responsible for

two other courtrooms outside of Houston.

Given the above, Plaintiff has satisfied the sixth factor that the action could be

adjudicated timely (or more timely) in state court.

14

**Permissive Abstention Pursuant To U.S.C. Section 1334(c)(1) Applies To This Case**

Section 1334 provides the district courts with "original but not exclusive

jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases

under title 11." 28 U.S.C. Section 1334(b). However, under most circumstances, there is

"nothing in this section [that] prevents a district court in the interest of justice, or in the

interest of comity with State courts or respect for State law, from abstaining from hearing

a particular proceeding arising under title 11 or arising in or related to a case under title

11." Section 1334 (c)(1).; *Treyson, Supra.*

Plaintiff has filed a Writ of Mandamus against the bankruptcy court judge, David

Jones, which is currently before the Fifth Circuit Court of Appeals. In his Writ, Plaintiff

shows incidents to the Court of Appeals in which Judge Jones has shredded Plaintiff's

Constitutional rights by, among other things, refusing to hear Plaintiff's motions in the

McDermott International bankruptcy case, by falsely accusing Plaintiff of improper acts

during the pendency of the bankruptcy case, by telling the attorneys for the Defendants

herein that they "were the smartest people in the country" while accusing Plaintiff in open

court of "knowing nothing", and, most notably, by unconstitutionally issuing a permanent

injunction against the Plaintiff without affording Plaintiff a hearing or trial.

Among other things, Plaintiff has asked the Court of Appeals to disqualify Judge

Jones from presiding over a trial on the actions unconstitutionally prohibited by Judge

Jones' March, 23, 2020, Order, should the Court of Appeals order said trial to be held. In

requesting this, plaintiff stated to the Court of Appeals that "The trial court's [Judge

Jones'] animosity toward Petitioner is so great that Petitioner is concerned that the trial

court will simply continue to make unlawful, unconstitutional rulings during a trial on the actions prohibited by its March 23, 2020, Order."

Plaintiff is similarly convinced that, should Judge Jones preside over Plaintiff's Montgomery County, Texas, case, it will not be possible to get a fair hearing given the animosity and unconstitutional behavior Judge Jones has demonstrated with respect to the plaintiff in the McDermott International bankruptcy case. Accordingly, in the interest of justice, as well as interest of comity with State courts and respect for State law, the Court should remand this case to Montgomery County, Texas, District Court, where Plaintiff believes he will receive a fair trial.

**Plaintiff's Motion To Disqualify Bankruptcy Court Judge David Jones**

Plaintiff incorporates herein his Plaintiff's Motion Pursuant to 28 U.S.C. Sections 455(a) and 455(b)(1) and Federal Rules of Bankruptcy Procedure Rule 5004 to Disqualify Bankruptcy Court Judge David Jones From Presiding Over the Above-Captioned Adversary Proceeding. (Document 8).

The Defendants in their Response (Document 11) engage in a lengthy discussion on why Judge Jones should not be removed from their case. However, the parties do not get to vote on whether or not to retain a judge. In his Motion to Disqualify (Document 8) Plaintiff has discussed more than ample reasons for Judge Jones to be removed from this action.

Canon 3 of the Code of Conduct for United States Judges states "A judge Should Perform the Duties of the Office Fairly, Impartially and Diligently." and "A judge shall disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned, including but not limited to instances in which (a) the judge

16

has a personal bias or prejudice concerning a party, or knowledge of disputed evidentiary facts concerning the proceeding."

Plaintiff's Motion to Disqualify sets out in detail evidence that Judge Jones has not been impartial towards the Plaintiff, including by issuing a permanent injunction against the plaintiff without providing Plaintiff a hearing even though Plaintiff requested one.  Violating Plaintiff's Constitutional due process right to be heard would certainly give an unbiased observer reason to question Judge Jones' impartiality.  See *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965).  ("A fundamental right of due process is 'the opportunity to be heard.'")

The Defendants' enthusiasm for retaining Judge Jones aside, Plaintiff will let the Courts decide his Motion to Disqualify.

**The Defendants' Conclusion**

In the Conclusion to their Response (page 26), the Defendants state:

"Given that Van Deelen alleges that actions taken in the bankruptcy proceedings and related transactions give rise to his claims, this Court has subject matter jurisdiction over this action and should not abstain."

This statement by the Defendants is false.  Nowhere has Plaintiff alleged that "actions taken in the bankruptcy proceedings and related transactions give rise to his claims".  The fact that the Defendants' conclusory statement concerning jurisdiction is false is quite telling.

WHEREFORE, Plaintiff respectfully moves this Court to grant his Motion to

Remand (Document 4) and his Motion to Disqualify (Document 8).

Michael Van Deelen
Plaintiff
16215 Friar Circle
Spring, TX 77379
832-562-0723
michaelvandeelen@gmail.com

## CERTIFICATE OF SERVICE

I hereby certify that I have on this 17th day of August, 2020, served a true and correct copy of the foregoing document on the defendants via the court-approved eFiling system, which will forward a copy thereof to all attorneys of record.

Michael Van Deelen

**EXHIBIT 1**

**PLAINTIFF'S OPT-OUT**

SRF 39341

# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| MCDERMOTT INTERNATIONAL, INC., *et al.*,[1] | ) Case No. 20-30336 (DRJ) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |

## NOTICE OF (A) NON-VOTING STATUS
## TO HOLDERS OR POTENTIAL HOLDERS
## OF (I) UNIMPAIRED CLAIMS CONCLUSIVELY PRESUMED
## TO ACCEPT THE PLAN AND (II) IMPAIRED CLAIMS CONCLUSIVELY
## PRESUMED TO REJECT THE PLAN AND (B) OPPORTUNITY FOR HOLDERS
## OF CLAIMS AND INTERESTS TO OPT OUT OF THE THIRD-PARTY RELEASES

**PLEASE TAKE NOTICE THAT** McDermott International, Inc. and certain of its affiliates ("McDermott") commenced Chapter 11 Cases in the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court") on January 21, 2020 (the "Petition Date") and seek to consummate the Restructuring Transactions contemplated by the *Joint Chapter 11 Plan of Reorganization of McDermott International, Inc. and Its Debtor Affiliates* (the "Plan")[2] through the chapter 11 bankruptcy process and the Plan.  The Company filed the Plan and the related *Disclosure Statement for the Joint Chapter 11 Plan of Reorganization of McDermott International, Inc. and Its Debtor Affiliates* (as may be amended, modified, or supplemented from time to time including all exhibits or supplements thereto, the "Disclosure Statement") with the Bankruptcy Court on January 22, 2020 [Docket Nos. 4, 121].

**PLEASE TAKE FURTHER NOTICE THAT** you are a holder or potential holder of a Claim against or Interest in McDermott that, due to the nature and treatment of such Claim or Interest under the Plan, *is **not** entitled to vote on the Plan*.  Specifically, under the terms of the Plan, (i) a holder of a Claim in a Class that is not Impaired under the Plan and, therefore, conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, and (ii) a holder of a Claim or Interest in a Class that is Impaired under the Plan and, therefore, deemed to reject the Plan pursuant to section 1126(g), is *not* entitled to vote on the Plan.

**PLEASE TAKE FURTHER NOTICE THAT** if you would like to **obtain a copy of the Disclosure Statement, the Plan, or related documents at no additional cost**, you should contact

---

[1]    A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://cases.primeclerk.com/McDermott.  The location of Debtor McDermott International, Inc.'s principal place of business and the Debtors' service address in these chapter 11 cases is 757 North Eldridge Parkway, Houston, Texas 77079.

[2]    Capitalized terms used but not defined herein have the meaning ascribed to such terms in the Plan.

*1*

Prime Clerk LLC, the Debtors' proposed solicitation agent in the chapter 11 cases (the "Solicitation Agent") by:   (a) visiting the Debtors' restructuring website at: https://cases.primeclerk.com/McDermott; (b) writing to Prime Clerk LLC, Re: McDermott, One Grand Central Place, 60 East 42nd Street, Suite 1440, New York, NY 10165; (c) emailing McDermottInfo@primeclerk.com; and/or (d) calling the Debtors' restructuring hotline at the following number:

<div align="center">

**US/CANADA TOLL FREE:  +1 (877) 426-7705**

**or**

**INTERNATIONAL: +1 (917) 994-8380**

</div>

All pleadings filed in the cases (i) may be inspected at the office of the Clerk of the Bankruptcy Court for the Southern District of Texas, P.O. Box 61010, Houston, Texas 77208 (the "Clerk's Office") and (ii) will also be available through the Court's electronic case filing system at https://www.txs.uscourts.gov/page/bankruptcy-court using a PACER password (to obtain a PACER password, go to the PACER website at http://pacer.psc.uscourts.gov), or on the website maintained by the Solicitation Agent at https://cases.primeclerk.com/McDermott.

<div align="center">

**PLEASE TAKE FURTHER NOTICE** of the following provisions in the Plan:

</div>

---

<div align="center">

**ARTICLE VIII OF THE PLAN CONTAINS RELEASE, EXCULPATION, AND INJUNCTION PROVISIONS, AND ARTICLE VIII.D CONTAINS THE FOLLOWING THIRD-PARTY RELEASE:**

</div>

**EXCEPT AS OTHERWISE EXPRESSLY SET FORTH IN THIS PLAN OR THE CONFIRMATION ORDER, ON AND AFTER THE EFFECTIVE DATE, IN EXCHANGE FOR GOOD AND VALUABLE CONSIDERATION, THE ADEQUACY OF WHICH IS HEREBY CONFIRMED, EACH RELEASED PARTY IS, AND IS DEEMED HEREBY TO BE, FULLY, CONCLUSIVELY, ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY AND FOREVER, RELEASED AND DISCHARGED BY EACH RELEASING PARTY, IN EACH CASE ON BEHALF OF THEMSELVES AND THEIR RESPECTIVE SUCCESSORS, ASSIGNS, AND REPRESENTATIVES, AND ANY AND ALL OTHER ENTITIES WHO MAY PURPORT TO ASSERT ANY CAUSE OF ACTION, DIRECTLY OR DERIVATIVELY, BY, THROUGH, FOR, OR BECAUSE OF THE FOREGOING ENTITIES, FROM ANY AND ALL CLAIMS AND CAUSES OF ACTION, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, MATURED OR UNMATURED, EXISTING OR HEREAFTER ARISING, CONTINGENT OR NON-CONTINGENT, IN LAW, EQUITY, CONTRACT, TORT, OR OTHERWISE, INCLUDING ANY DERIVATIVE CLAIMS ASSERTED ON BEHALF OF THE DEBTORS, THAT SUCH ENTITY WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT IN THEIR OWN RIGHT (WHETHER INDIVIDUALLY OR COLLECTIVELY) OR ON BEHALF OF THE HOLDER OF ANY CLAIM AGAINST, OR INTEREST IN, A DEBTOR OR OTHER ENTITY, OR THAT ANY HOLDER OF ANY CLAIM AGAINST, OR INTEREST IN, A DEBTOR OR OTHER ENTITY COULD HAVE ASSERTED ON BEHALF OF THE DEBTORS, BASED ON OR RELATING TO, OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART:**

---

<div align="center">

2

</div>

1. THE DEBTORS (INCLUDING THE CAPITAL STRUCTURE, MANAGEMENT, OWNERSHIP, OR OPERATION THEREOF), THE BUSINESS OR CONTRACTUAL ARRANGEMENT BETWEEN THE DEBTORS AND ANY RELEASING PARTY, ANY SECURITIES ISSUED BY THE DEBTORS AND THE OWNERSHIP THEREOF, THE ASSERTION OR ENFORCEMENT OF RIGHTS AND REMEDIES AGAINST THE DEBTORS, THE DEBTORS' IN- OR OUT-OF-COURT RESTRUCTURING EFFORTS, ANY AVOIDANCE ACTIONS (BUT EXCLUDING AVOIDANCE ACTIONS BROUGHT AS COUNTERCLAIMS OR DEFENSES TO CLAIMS ASSERTED AGAINST THE DEBTORS), INTERCOMPANY TRANSACTIONS BETWEEN OR AMONG A COMPANY PARTY AND ANOTHER COMPANY PARTY, THE SUPERPRIORITY CREDIT AGREEMENT, THE CREDIT AGREEMENT, THE 2021 LC AGREEMENT, THE LLOYDS LETTER OF CREDIT AGREEMENT, SENIOR NOTES INDENTURE, THE SENIOR NOTES, THE CHAPTER 11 CASES, THE FORMULATION, PREPARATION, DISSEMINATION, NEGOTIATION, OR FILING OF THE RESTRUCTURING SUPPORT AGREEMENT, THE DISCLOSURE STATEMENT, THE DIP CREDIT AGREEMENT, THE EXIT FACILITY DOCUMENTS, OR THE PLAN (INCLUDING, FOR THE AVOIDANCE OF DOUBT, THE PLAN SUPPLEMENT);

2. ANY RESTRUCTURING TRANSACTION, CONTRACT, INSTRUMENT, RELEASE, OR OTHER AGREEMENT OR DOCUMENT (INCLUDING ANY LEGAL OPINION REQUESTED BY ANY ENTITY REGARDING ANY TRANSACTION, CONTRACT, INSTRUMENT, DOCUMENT OR OTHER AGREEMENT CONTEMPLATED BY THE PLAN OR THE RELIANCE BY ANY RELEASED PARTY ON THE PLAN OR THE CONFIRMATION ORDER IN LIEU OF SUCH LEGAL OPINION) CREATED OR ENTERED INTO IN CONNECTION WITH THE RESTRUCTURING SUPPORT AGREEMENT, THE RIGHTS OFFERING, THE DISCLOSURE STATEMENT, THE DIP CREDIT AGREEMENT, THE NEW WARRANTS AGREEMENTS, THE EXIT FACILITY DOCUMENTS, THE PLAN, OR THE PLAN SUPPLEMENT, BEFORE OR DURING THE CHAPTER 11 CASES,

3. THE CHAPTER 11 CASES, THE FILING OF THE CHAPTER 11 CASES, THE DISCLOSURE STATEMENT, OR THE PLAN, THE SOLICITATION OF VOTES WITH RESPECT TO THE PLAN, THE PURSUIT OF CONFIRMATION, THE PURSUIT OF CONSUMMATION, THE ADMINISTRATION AND IMPLEMENTATION OF THE PLAN, INCLUDING THE ISSUANCE OR DISTRIBUTION OF SECURITIES PURSUANT TO THE PLAN, THE RIGHTS OFFERING, OR THE DISTRIBUTION OF PROPERTY UNDER THE PLAN OR ANY OTHER RELATED AGREEMENT; OR

4. ANY RELATED ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE RELATED OR RELATING TO ANY OF THE FOREGOING TAKING PLACE ON OR BEFORE THE EFFECTIVE

DATE, INCLUDING ALL AVOIDANCE ACTIONS OR OTHER RELIEF OBTAINED BY THE DEBTORS IN THE CHAPTER 11 CASES.

NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE FOREGOING, THE RELEASES SET FORTH ABOVE DO NOT RELEASE (I) ANY PARTY OF ANY OBLIGATIONS RELATED TO CUSTOMARY BANKING PRODUCTS, BANKING SERVICES OR OTHER FINANCIAL ACCOMMODATIONS (EXCEPT AS MAY BE EXPRESSLY AMENDED OR MODIFIED BY THE PLAN AND THE EXIT FACILITY DOCUMENTS, OR ANY OTHER FINANCING DOCUMENT UNDER AND AS DEFINED THEREIN), (II) ANY POST-EFFECTIVE DATE OBLIGATIONS OF ANY PARTY OR ENTITY UNDER THE PLAN, THE CONFIRMATION ORDER, ANY RESTRUCTURING TRANSACTION, OR ANY DOCUMENT, INSTRUMENT, ANY DEFINITIVE DOCUMENT, OR ANY AGREEMENT (INCLUDING THOSE SET FORTH IN THE PLAN SUPPLEMENT) EXECUTED TO IMPLEMENT THE PLAN, INCLUDING THE EXIT FACILITY DOCUMENTS, THE NEW WARRANTS AGREEMENTS, OR ANY CLAIM OR OBLIGATION ARISING UNDER THE PLAN, OR (III) THE RIGHTS OF HOLDERS OF ALLOWED CLAIMS TO RECEIVE DISTRIBUTIONS UNDER THE PLAN.

ENTRY OF THE CONFIRMATION ORDER SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO BANKRUPTCY RULE 9019, OF THE FOREGOING THIRD-PARTY RELEASE, WHICH INCLUDES BY REFERENCE EACH OF THE RELATED PROVISIONS AND DEFINITIONS CONTAINED HEREIN, AND, FURTHER, SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THE FOREGOING THIRD-PARTY RELEASE IS: (A) CONSENSUAL; (B) ESSENTIAL TO THE CONFIRMATION OF THE PLAN; (C) GIVEN IN EXCHANGE FOR A SUBSTANTIAL CONTRIBUTION AND FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY THE RELEASED PARTIES THAT IS IMPORTANT TO THE SUCCESS OF THE PLAN; (D) A GOOD FAITH SETTLEMENT AND COMPROMISE OF THE CLAIMS RELEASED BY THE FOREGOING THIRD-PARTY RELEASE; (E) IN THE BEST INTERESTS OF THE DEBTORS AND THEIR ESTATES; (F) FAIR, EQUITABLE, AND REASONABLE; (G) GIVEN AND MADE AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING; AND (H) A BAR TO ANY OF THE RELEASING PARTIES ASSERTING ANY CLAIM OR CAUSE OF ACTION RELEASED PURSUANT TO THE FOREGOING THIRD-PARTY RELEASE.

DEFINITIONS RELATED TO THE THIRD-PARTY RELEASE:

UNDER THE PLAN, "RELEASED PARTIES" MEANS, COLLECTIVELY, AND IN EACH CASE IN ITS CAPACITY AS SUCH: (A) EACH DEBTOR; (B) EACH REORGANIZED DEBTOR; (C) EACH COMPANY PARTY; (D) EACH DIP LENDER AND EACH DIP LETTER OF CREDIT ISSUER; (E) EACH AGENT; (F) THE SENIOR NOTES TRUSTEE; (G) EACH CONSENTING STAKEHOLDER; (H) EACH HEDGE BANK; (I) EACH CASH MANAGEMENT BANK; (J) EACH LENDER UNDER THE SUPERPRIORITY CREDIT AGREEMENT, CREDIT AGREEMENT, THE 2021 LC AGREEMENT, AND THE LLOYDS LETTER OF CREDIT AGREEMENT; (K) EACH HOLDER OF AN OBLIGATION (AS

DEFINED IN THE SUPERPRIORITY CREDIT AGREEMENT) UNDER THE SUPERPRIORITY CREDIT AGREEMENT; (L) EACH HOLDER OF AN OBLIGATION (AS DEFINED IN THE CREDIT AGREEMENT) UNDER THE CREDIT AGREEMENT; (M) EACH ISSUER (AS DEFINED IN THE SUPERPRIORITY CREDIT AGREEMENT) UNDER THE SUPERPRIORITY CREDIT AGREEMENT; (N) EACH ISSUER (AS DEFINED IN THE CREDIT AGREEMENT) UNDER THE CREDIT AGREEMENT; (O) THE TERM LOAN AD HOC GROUP, THE LIQUIDITY LENDER STEERING COMMITTEE, AND THE SENIOR NOTES AD HOC GROUP; (P) EACH CURRENT AND FORMER AFFILIATE OF EACH ENTITY IN CLAUSE (A) THROUGH (O); AND (Q) EACH RELATED PARTY OF EACH ENTITY IN CLAUSE (A) THROUGH (O); PROVIDED THAT ANY HOLDER OF A CLAIM OR INTEREST THAT OPTS OUT OF THE RELEASES SHALL NOT BE A "RELEASED PARTY."

UNDER THE PLAN, "RELEASING PARTIES" MEANS, COLLECTIVELY, AND IN EACH CASE IN ITS CAPACITY AS SUCH: (A) EACH DEBTOR; (B) EACH REORGANIZED DEBTOR; (C) EACH COMPANY PARTY; (D) EACH DIP LENDER AND EACH DIP LETTER OF CREDIT ISSUER; (E) EACH AGENT; (F) THE SENIOR NOTES TRUSTEE; (G) EACH CONSENTING STAKEHOLDER; (H) EACH HEDGE BANK; (I) EACH CASH MANAGEMENT BANK; (J) EACH LENDER UNDER THE SUPERPRIORITY CREDIT AGREEMENT, CREDIT AGREEMENT, THE 2021 LC AGREEMENT, AND THE LLOYDS LETTER OF CREDIT AGREEMENT; (K) EACH HOLDER OF AN OBLIGATION (AS DEFINED IN THE SUPERPRIORITY CREDIT AGREEMENT) UNDER THE SUPERPRIORITY CREDIT AGREEMENT; (L) EACH HOLDER OF AN OBLIGATION (AS DEFINED IN THE CREDIT AGREEMENT) UNDER THE CREDIT AGREEMENT; (M) EACH ISSUER (AS DEFINED IN THE SUPERPRIORITY CREDIT AGREEMENT) UNDER THE SUPERPRIORITY CREDIT AGREEMENT; (N) EACH ISSUER (AS DEFINED IN THE CREDIT AGREEMENT) UNDER THE CREDIT AGREEMENT; (O) THE TERM LOAN AD HOC GROUP, THE LIQUIDITY LENDER STEERING COMMITTEE, AND THE SENIOR NOTES AD HOC GROUP; (P) ALL HOLDERS OF CLAIMS OR INTERESTS THAT VOTE TO ACCEPT OR ARE DEEMED TO ACCEPT THE PLAN; (Q) ALL HOLDERS OF CLAIMS OR INTERESTS THAT ABSTAIN FROM VOTING ON THE PLAN AND WHO DO NOT AFFIRMATIVELY OPT OUT OF THE RELEASES PROVIDED BY THE PLAN BY CHECKING THE BOX ON THE APPLICABLE BALLOT INDICATING THAT THEY OPT NOT TO GRANT THE RELEASES PROVIDED IN THE PLAN; (R) ALL HOLDERS OF CLAIMS OR INTERESTS THAT VOTE TO REJECT THE PLAN OR ARE DEEMED TO REJECT THE PLAN AND WHO DO NOT AFFIRMATIVELY OPT OUT OF THE RELEASES PROVIDED BY THE PLAN BY CHECKING THE BOX ON THE APPLICABLE BALLOT INDICATING THAT THEY OPT NOT TO GRANT THE RELEASES PROVIDED IN THE PLAN; (S) EACH CURRENT AND FORMER AFFILIATE OF EACH ENTITY IN CLAUSE (A) THROUGH (R); AND (T) EACH RELATED PARTY OF EACH ENTITY IN CLAUSE (A) THROUGH (R).

**NOTWITHSTANDING THE FOREGOING, AN ENTITY SHALL BE NEITHER A RELEASING PARTY NOR A RELEASED PARTY IF IT: (X) VALIDLY OPTS OUT OF THE RELEASES CONTAINED IN ARTICLE VIII.D OF THE PLAN; OR (Y) TIMELY FILES WITH THE BANKRUPTCY COURT ON THE DOCKET OF THE CHAPTER 11 CASES AN OBJECTION TO THE RELEASES CONTAINED IN**

000247

ARTICLE VIII.D OF THE PLAN THAT IS NOT RESOLVED BEFORE CONFIRMATION.

\*  \*  \*

THIS NOTICE IS BEING SENT TO YOU FOR INFORMATIONAL PURPOSES ONLY AND TO PROVIDE YOU WITH THE ATTACHED OPT-OUT FORM WITH RESPECT TO THE RELEASES, EXCULPATION, INJUNCTION, AND THIRD-PARTY RELEASES PROVIDED IN THE PLAN.   IF YOU HAVE QUESTIONS WITH RESPECT TO YOUR RIGHTS UNDER THE PLAN OR ABOUT ANYTHING STATED HEREIN OR IF YOU WOULD LIKE TO OBTAIN ADDITIONAL INFORMATION, CONTACT THE SOLICITATION AGENT.

## EXHIBIT A
## OPTIONAL: RELEASE OPT OUT FORM

You are receiving this opt out form (the "Opt Out Form") because you are or may be a holder of a Claim or Interest that is not entitled to vote on the *Joint Chapter 11 Plan of Reorganization of McDermott International, Inc. and Its Debtor Affiliates* (as may be amended from time to time, the "Plan"). Holders of Claims and Interests are deemed to grant the Third-Party Release set forth in the Notice unless a holder affirmatively opts out or files an objection to the Third-Party Release with the Bankruptcy Court on or before the Plan Voting Deadline.

**If you believe you are a holder of a Claim or Interest with respect to McDermott International, Inc. or its affiliates and choose to opt out of the Third-Party Release set forth in Article VIII.D of the Plan, please complete, sign, and date this Opt Out Form and return it promptly** via first class mail (or in the enclosed reply envelope provided), overnight courier, via the Solicitation Agent's online E-Ballot Portal, or hand delivery to Prime Clerk LLC (the "Solicitation Agent") at the address set forth below. Holders are strongly encouraged to submit their Opt Out Form through the Solicitation Agent's online E-Ballot Portal. For the avoidance of doubt, if you hold Existing Interests through a broker nominee, you cannot submit your Opt-Out via E-Ballot; rather, you must complete and return the paper Opt-Out Form. Parties that submit their Opt Out Form using the E-Ballot Portal should NOT also submit a paper Opt Out Form.

> **Use of Hard Copy Opt Out Form.** To ensure that your hard copy Opt Out Form is counted clearly sign and return your Opt Out Form in the enclosed pre-addressed, pre-paid envelope or via first class mail, overnight courier, or hand delivery to: McDermott Opt Out Form Processing, c/o Prime Clerk, One Grand Central Place, 60 East 42nd Street, Suite 1440, New York, NY 10165.

**THIS OPT OUT FORM MUST BE ACTUALLY RECEIVED BY THE SOLICITATION AGENT BY WEDNESDAY, FEBRUARY 19, 2020, AT 4:00 P.M. PREVAILING CENTRAL TIME (THE "RESPONSE DEADLINE"). IF THE OPT OUT FORM IS RECEIVED AFTER THE RESPONSE DEADLINE, IT WILL NOT BE COUNTED.**

<u>Item 1</u>.  **Amount of Claim or Interests.**

The undersigned hereby certifies that, as of Friday, January 17, 2020 (the "Voting Record Date"), the undersigned was the holder of either (a) Class 1 Other Secured Claims, (b) Class 2 Other Priority Claims, (c) Class 3 Other Prepetition Financing Claims, (d) Class 4 Bilateral Facility Claims, (e) Class 10 General Unsecured Claims, (d) Class 13 Existing Preferred Equity Interests in McDermott, or (e) Class 14 Existing Common Equity Interests in McDermott in the following aggregate amount (insert amount in box below)[1]:

---

Class 1 Other Secured Claims Amount $ _____

OR

Class 2 Other Priority Claims Amount $ _____

OR

Class 3 Other Prepetition Financing Claims Amount $ _____

OR

---

[1]   To the extent there are any discrepancies between the applicable registers or records of holders and the amounts claimed on this opt-out form, the applicable registers or records shall govern.



Class 4 Bilateral Facility Claims Amount $ _____

OR

Class 10 General Unsecured Claims Amount $ _____

OR

Class 13 Existing Preferred Equity Interests in McDermott Amount $ _____

OR

Class 14 Existing Common Equity Interests in McDermott Amount $ _30,000_ _Shares_

**Item 2.**  **Important information regarding the Third-Party Release.**

Article VIII.D of the Plan contains the following Third-Party Release:

Except as otherwise expressly set forth in this Plan or the Confirmation Order, on and after the Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is, and is deemed hereby to be, fully, conclusively, absolutely, unconditionally, irrevocably and forever, released and discharged by each Releasing Party, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all Claims and Causes of Action, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, contingent or non-contingent, in law, equity, contract, tort, or otherwise, including any derivative claims asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim against, or Interest in, a Debtor or other Entity, or that any holder of any Claim against, or Interest in, a Debtor or other Entity could have asserted on behalf of the Debtors, based on or relating to, or in any manner arising from, in whole or in part:

1.  the Debtors (including the capital structure, management, ownership, or operation thereof), the business or contractual arrangement between the Debtors and any Releasing Party, any Securities issued by the Debtors and the ownership thereof, the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in- or out-of-court restructuring efforts, any Avoidance Actions (but excluding Avoidance Actions brought as counterclaims or defenses to Claims asserted against the Debtors), intercompany transactions between or among a Company Party and another Company Party, the Superpriority Credit Agreement, the Credit Agreement, the 2021 LC Agreement, the Lloyds Letter of Credit Agreement, Senior Notes Indenture, the Senior Notes, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Restructuring Support Agreement, the Disclosure Statement, the DIP Credit Agreement, the Exit Facility Documents, or the Plan (including, for the avoidance of doubt, the Plan Supplement);

2.  any Restructuring Transaction, contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Restructuring Support Agreement, the Rights

Offering, the Disclosure Statement, the DIP Credit Agreement, the New Warrants Agreements, the Exit Facility Documents, the Plan, or the Plan Supplement, before or during the Chapter 11 Cases,

3. the Chapter 11 Cases, the filing of the Chapter 11 Cases, the Disclosure Statement, or the Plan, the solicitation of votes with respect to the Plan, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, the Rights Offering, or the distribution of property under the Plan or any other related agreement; or

4. any related act or omission, transaction, agreement, event, or other occurrence related or relating to any of the foregoing taking place on or before the Effective Date, including all Avoidance Actions or other relief obtained by the Debtors in the Chapter 11 Cases.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (i) any party of any obligations related to customary banking products, banking services or other financial accommodations (except as may be expressly amended or modified by the Plan and the Exit Facility Documents, or any other financing document under and as defined therein), (ii) any post-Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Restructuring Transaction, or any document, instrument, any Definitive Document, or any agreement (including those set forth in the Plan Supplement) executed to implement the Plan, including the Exit Facility Documents, the New Warrants Agreements, or any Claim or obligation arising under the Plan, or (iii) the rights of holders of Allowed Claims to receive distributions under the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the foregoing third-party release, which includes by reference each of the related provisions and definitions contained herein, and, further, shall constitute the Bankruptcy Court's finding that the foregoing third-party release is: (a) consensual; (b) essential to the Confirmation of the Plan; (c) given in exchange for a substantial contribution and for the good and valuable consideration provided by the Released Parties that is important to the success of the Plan; (d) a good faith settlement and compromise of the Claims released by the foregoing third-party release; (e) in the best interests of the Debtors and their Estates; (f) fair, equitable, and reasonable; (g) given and made after due notice and opportunity for hearing; and (h) a bar to any of the Releasing Parties asserting any claim or Cause of Action released pursuant to the foregoing third-party release.

Definitions Related to the Third-Party Release:

UNDER THE PLAN, "*RELEASED PARTY*" MEANS EACH OF THE FOLLOWING, SOLELY IN ITS CAPACITY AS SUCH: (A) EACH DEBTOR; (B) EACH REORGANIZED DEBTOR; (C) EACH COMPANY PARTY; (D) EACH DIP LENDER AND EACH DIP LETTER OF CREDIT ISSUER; (E) EACH AGENT; (F) THE SENIOR NOTES TRUSTEE; (G) EACH CONSENTING STAKEHOLDER; (H) EACH HEDGE BANK; (I) EACH CASH MANAGEMENT BANK; (J) EACH LENDER UNDER THE SUPERPRIORITY CREDIT AGREEMENT, CREDIT AGREEMENT, THE 2021 LC AGREEMENT, AND THE LLOYDS LETTER OF CREDIT AGREEMENT; (K) EACH HOLDER OF AN OBLIGATION (AS DEFINED IN THE SUPERPRIORITY CREDIT AGREEMENT) UNDER THE SUPERPRIORITY CREDIT AGREEMENT; (L) EACH HOLDER OF AN OBLIGATION (AS DEFINED IN THE CREDIT AGREEMENT) UNDER THE CREDIT AGREEMENT; (M) EACH ISSUER (AS DEFINED IN THE SUPERPRIORITY CREDIT AGREEMENT) UNDER THE SUPERPRIORITY CREDIT AGREEMENT; (N) EACH ISSUER (AS DEFINED IN THE CREDIT AGREEMENT) UNDER THE CREDIT AGREEMENT; (O) THE TERM LOAN AD HOC GROUP, THE LIQUIDITY LENDER

STEERING COMMITTEE, AND THE SENIOR NOTES AD HOC GROUP; (P) EACH CURRENT AND FORMER AFFILIATE OF EACH ENTITY IN CLAUSE (A) THROUGH (O); AND (Q) EACH RELATED PARTY OF EACH ENTITY IN CLAUSE (A) THROUGH (O); PROVIDED THAT ANY HOLDER OF A CLAIM OR INTEREST THAT OPTS OUT OF THE RELEASES SHALL NOT BE A "RELEASED PARTY."

UNDER THE PLAN, "*RELEASING PARTIES*" MEANS EACH OF THE FOLLOWING, SOLELY IN ITS CAPACITY AS SUCH: (A) EACH DEBTOR; (B) EACH REORGANIZED DEBTOR; (C) EACH COMPANY PARTY; (D) EACH DIP LENDER AND EACH DIP LETTER OF CREDIT ISSUER; (E) EACH AGENT; (F) THE SENIOR NOTES TRUSTEE; (G) EACH CONSENTING STAKEHOLDER; (H) EACH HEDGE BANK; (I) EACH CASH MANAGEMENT BANK; (J) EACH LENDER UNDER THE SUPERPRIORITY CREDIT AGREEMENT, CREDIT AGREEMENT, THE 2021 LC AGREEMENT, AND THE LLOYDS LETTER OF CREDIT AGREEMENT; (K) EACH HOLDER OF AN OBLIGATION (AS DEFINED IN THE SUPERPRIORITY CREDIT AGREEMENT) UNDER THE SUPERPRIORITY CREDIT AGREEMENT; (L) EACH HOLDER OF AN OBLIGATION (AS DEFINED IN THE CREDIT AGREEMENT) UNDER THE CREDIT AGREEMENT; (M) EACH ISSUER (AS DEFINED IN THE SUPERPRIORITY CREDIT AGREEMENT) UNDER THE SUPERPRIORITY CREDIT AGREEMENT; (N) EACH ISSUER (AS DEFINED IN THE CREDIT AGREEMENT) UNDER THE CREDIT AGREEMENT; (O) THE TERM LOAN AD HOC GROUP, THE LIQUIDITY LENDER STEERING COMMITTEE, AND THE SENIOR NOTES AD HOC GROUP; (P) ALL HOLDERS OF CLAIMS OR INTERESTS THAT VOTE TO ACCEPT OR ARE DEEMED TO ACCEPT THE PLAN; (Q) ALL HOLDERS OF CLAIMS OR INTERESTS THAT ABSTAIN FROM VOTING ON THE PLAN AND WHO DO NOT AFFIRMATIVELY OPT OUT OF THE RELEASES PROVIDED BY THE PLAN BY CHECKING THE BOX ON THE APPLICABLE BALLOT INDICATING THAT THEY OPT NOT TO GRANT THE RELEASES PROVIDED IN THE PLAN; (R) ALL HOLDERS OF CLAIMS OR INTERESTS THAT VOTE TO REJECT THE PLAN OR ARE DEEMED TO REJECT THE PLAN AND WHO DO NOT AFFIRMATIVELY OPT OUT OF THE RELEASES PROVIDED BY THE PLAN BY CHECKING THE BOX ON THE APPLICABLE BALLOT INDICATING THAT THEY OPT NOT TO GRANT THE RELEASES PROVIDED IN THE PLAN; (S) EACH CURRENT AND FORMER AFFILIATE OF EACH ENTITY IN CLAUSE (A) THROUGH (R); AND (T) EACH RELATED PARTY OF EACH ENTITY IN CLAUSE (A) THROUGH (R).

**IMPORTANT INFORMATION REGARDING THE RELEASES:**

AS A HOLDER OF A CLAIM OR INTEREST, YOU ARE A "RELEASING PARTY" UNDER THE PLAN AND ARE DEEMED TO PROVIDE THE THIRD-PARTY RELEASE CONTAINED IN ARTICLE VIII.D OF THE PLAN, AS SET FORTH ABOVE. YOU MAY CHECK THE BOX BELOW TO ELECT NOT TO GRANT THE RELEASE CONTAINED IN ARTICLE VIII.D OF THE PLAN. YOU WILL NOT BE CONSIDERED A "RELEASING PARTY" UNDER THE PLAN ONLY IF (I) THE BANKRUPTCY COURT DETERMINES THAT YOU HAVE THE RIGHT TO OPT OUT OF THE RELEASES AND (II) YOU (A) CHECK THE BOX BELOW AND SUBMIT THE BALLOT BY THE VOTING DEADLINE, (B) FILE AN OBJECTION TO THE RELEASES CONTAINED IN THE PLAN WITH THE BANKRUPTCY COURT PRIOR TO THE PLAN OBJECTION DEADLINE, OR (C) VOTE TO REJECT THE PLAN AND SUBMIT THE BALLOT BY THE VOTING DEADLINE. THE ELECTION TO WITHHOLD CONSENT TO GRANT THE THIRD-PARTY RELEASE IS AT YOUR OPTION.

☑  **By checking this box, you elect to opt <u>out</u> of the Third-Party Releases.** <u>Item 3.</u>
Certifications.

/0

By signing this Opt Out Form, the undersigned certifies:

(a) that, as of the Voting Record Date, either: (i) the Entity is the Holder of the Claim or Interests set forth in Item 1; or (ii) the Entity is an authorized signatory for an Entity that is a Holder of the Claim or Interests set forth in Item 1;

(b) that the Holder has received a copy of the *Notice of Non-Voting Status to Holders of (I) Unimpaired Claims Conclusively Presumed to Accept the Plan and (II) Impaired Claim Conclusively Presumed to Reject the Plan* and that this Opt Out Form is made pursuant to the terms and conditions set forth therein;

(a) that the Entity has submitted the same respective election concerning the releases with respect to all Claims or Interests in a single Class set forth in Item 1; and

(b) that no other Opt Out Form with respect to the amount(s) of Claims or Interests identified in Item 1 have been submitted or, if any other Opt Out Forms have been submitted with respect to such Claims or Interests, then any such earlier Opt Out Forms are hereby revoked.

| | |
|---|---|
| Name of Holder: | *Michael D. Van Deelen* |
| | (Print or Type) |
| Signature: | *Michael D. Van Deelen* |
| Name of Signatory: | |
| | (If other than holder) |
| Title: | *N/A* |
| Address: | *16215 Friar Circle* |
| | *Spring, TX 77379* |
| Telephone Number: | *832-562-0723* |
| Email: | *michaelvandeelen@gmail.com* |
| Date Completed: | *2/13/20* |

**PLEASE SUBMIT YOUR OPT OUT FORM BY ONE OF THE FOLLOWING TWO METHODS:**

**Via Paper Form. Complete, sign, and date this Opt Out Form and return it (with an original signature) promptly via first class mail (or in the enclosed reply envelope provided), overnight courier, or hand delivery to:**

<div align="center">

**McDermott Opt Out Form Processing**
**c/o Prime Clerk LLC**
**One Grand Central Place**
**60 East 42nd Street, Suite 1440**
**New York, NY 10165**

</div>

Michael Van Deelen
16215 Faith Circle
Spring, TX 77379

ME Dermott Opt Out form Processing
C/O Prime Clerk LLC
One Grand Central Place
60 East 42nd Street, Suite 1440
New York, NY 10165

12



FedEx Office℠

```
Address:          4656 FM 1960 RD W
                  HOUSTON
                  TX 77069
Location:         DWHK
Device ID:        -BTC02
Transaction:      940256549995
```

**FedEx Standard Overnight**
390386463532    0.2 lbs. (S)        38.45
    Declared Value   100
Recipient Address:
    C/O Prime Clerk LLC
    McDermott Opt Out Form Processing
    60 East 42nd Street, Ste 1440
    One Grand Central Place
    New York, NY 10165
    0000000000

Scheduled Delivery Date 2/17/2020

Pricing option:
    ONE RATE

Package Information:
    FedEx Envelope

        Shipment subtotal:      $38.45

            **Total Due:**      **$38.45**

           (S) CreditCard:      $38.45
            ************1248

13

**IMPORTANT!**
We are continuing to respond to the impact of COVID-19 around the world. See our latest updates. For COVID-19-related recipient closures, you can redirect packages, Ask FedEx, or contact the shipper.

390386463532

# Delivered
# Monday 2/17/2020 at 9:13 am

**DELIVERED**

Signed for by: O.OBEE

**GET STATUS UPDATES**

**OBTAIN PROOF OF DELIVERY**

| FROM | TO |
|---|---|
| SPRING, TX US | NEW YORK, NY US |

## Shipment Facts

| TRACKING NUMBER | SERVICE | SPECIAL HANDLING SECTION |
|---|---|---|
| 390386463532 | FedEx Standard Overnight | Deliver Weekday, No Signature Required |

| SHIP DATE | ACTUAL DELIVERY | |
|---|---|---|
| | Mon 2/17/2020 9:13 am | |
| Fri 2/14/2020 | | |

## Travel History

Local Scan Time

Monday , 2/17/2020

| 9:13 am | NEW YORK, NY | Delivered |

*14*

000256

# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

United States Courts
Southern District of Texas
F I L E D

**FEB - 4 2021**

Nathan Ochsner, Clerk of Court

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| MCDERMOTT INTERNATIONAL, INC, *et al* | ) | Case No. 20-30336 |
|  | ) |  |
| Reorganized Debtor(s). | ) | (Jointly Administered) |
|  | ) |  |
|  | ) |  |
| MICHAEL VAN DEELEN | ) |  |
|  | ) |  |
| Plaintiff, | ) | Adv. Proc. No. 20-3309 |
|  | ) |  |
| v. | ) |  |
|  | ) |  |
| DAVID DICKSON, | ) |  |
| and STUART SPENCE, | ) |  |
| and SCOTT LAMB, | ) |  |
| and 10 JOHN/JANE DOES | ) |  |
|  | ) |  |
| Defendants. | ) |  |

## AMENDED NOTICE OF HEARING

Please take notice that the Court will conduct a hearing on the following matters on **March 10, 2021, at 9:00 a.m.**, before the Honorable David Jones, United States Bankruptcy Court, Southern District of Texas, Houston Division, via video and telephone conference only, as follows:

1. Plaintiff's Motion Pursuant to 28 U.S.C. Sections 455(a) and 455(b)(1) and Federal Rules of Bankruptcy Procedure Rule 5004 to Disqualify Bankruptcy Court Judge David Jones From Presiding Over the Above-Captioned Adversary Proceeding (Docket No. 8).

2.  Plaintiff's Motion to Remand His State Law Cause of Action Against the Defendants to Montgomery County, Texas, District Court Because the Federal Bankruptcy Court Does Not Have Jurisdiction Over Plaintiff's Montgomery County Cause of Action, Because Remand Is Required Pursuant to 28 U.S.C. Section 1334(c)(2) and Because Remand Is Permissive Pursuant to U.S.C. Section 1334(c)(1) (Docket No. 4) and Addendum to Plaintiff's Motion to Remand (Docket No. 7).

3.  Plaintiff's Motion for Default Judgment Against Defendants Dickson, Spence and Lamb (Docket Nos. 26, 17, 19, 21, 22).

4.  If necessary after the hearing of the above matters, the Court will conduct a scheduling conference pursuant to Rule 16 as made applicable by Bankruptcy Rule 7016.

This Amended Notice of Hearing replaces the Notice of Hearing (Dkt. 34) previously filed in the above-captioned case.  Parties should consult the Court's protocol regarding video and telephonic appearances.

DATED: February 4, 2021

Respectfully submitted,

/s/ Michael Van Deelen
Michael Van Deelen
Plaintiff (Pro Se)
16215 Friar Circle
Spring, TX 77379
832-562-0723
michaelvandeelen@gmail.com

## CERTIFICATE OF SERVICE

I hereby certify that I have on this 4th day of February, 2021, served a true and correct copy of the foregoing document on the defendants via the court-approved eFiling system, which will forward a copy thereof to all attorneys of record.


/s/ Michael Van Deelen
Michael Van Deelen

### UNITED STATES BANKRUPTCY COURT
### SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| MCDERMOTT INTERNATIONAL, INC., *et al.*,[1] | § | Case No. 20-30336 (DRJ) |
| | § | |
| Reorganized Debtors. | § | (Jointly Administered) |
| | § | |
| | § | |
| MICHAEL VAN DEELEN | § | |
| | § | |
| Plaintiff, | § | Adv. Proc. No. 20-03309 |
| | § | |
| v. | § | |
| | § | |
| DAVID DICKSON, | § | |
| and STUART SPENCE, | § | |
| and SCOTT LAMB, | § | |
| and 10 JOHN/JANE DOES | § | |
| | § | |
| Defendants. | § | |
| | § | |

## DEFENDANTS' EMERGENCY MOTION TO SEAL

<div style="border:1px solid black; padding:1em;">

**Emergency relief has been requested.**

**If you object to the relief requested or you believe that emergency consideration is not warranted, you must either appear at the hearing or file a written response prior to the hearing.  Otherwise, the Court may treat the pleading as unopposed and grant the relief requested.**

**Relief is requested not later than March 10, 2021.**

</div>

The above-captioned defendants (the "Defendants" or "McDermott")[2] state the following

in support of this motion (this "Motion"):

---

[1] A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://cases.primeclerk.com/McDermott. The location of Debtor McDermott International, Inc.'s principal place of business and the Debtors' service address in these chapter 11 cases is 757 North Eldridge Parkway, Houston, Texas 77079.

[2]     A detailed description of the Debtors and their businesses, and the facts and circumstances supporting the Debtors' chapter 11 cases, are set forth in detail in the *Declaration of Michael Lou, Chief Financial Officer of Oasis Petroleum, Inc., in Support of Debtors' Chapter 11 Petitions* (the "First Day Declaration"), which is filed in connection herewith.

1

## Relief Requested

1.      The Defendants seek entry of an order, substantially in the form attached hereto (the "Order"): (a) authorizing the Defendants to file under seal the Van Deelen Communications (as described herein), and (b) directing that the Van Deelen Communications shall remain under seal and confidential and not be made available to anyone, without an order of the Court including in response to any Freedom of Information Act requests.

## Jurisdiction and Venue

2.      The United States Bankruptcy Court for the Southern District of Texas (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  The Defendants confirm their consent, pursuant to rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), to the entry of a final order by the Court.

3.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

4.      The bases for the relief requested herein are sections 105(a) and 107(b) of the Bankruptcy Code, Bankruptcy Rule 9018, and rules 9037-1 and 9013-1 of the Bankruptcy Local Rules for the Southern District of Texas (the "Bankruptcy Local Rules").

## Background and Basis for Relief

5.      In recent months counsel for McDermott has received several communications from Mr. Van Deelen.  These communications have been increasingly antagonistic.  McDermott seeks authority to file these communications and any responses thereto under seal (the "Van Deelen Communications").

6.      The Van Deelen Communications contain defamatory statements and should be sealed pursuant to 11 U.S.C. § 107(b)(2).

2

7.      Section 105(a) of the Bankruptcy Code codifies the inherent equitable powers of the bankruptcy court and empowers the bankruptcy court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]."

8.      Bankruptcy Rule 9018 defines the procedures by which a party may move for relief under section 107(b) of the Bankruptcy Code.  Bankruptcy Rule 9018 provides, in relevant part, that on motion "the court may make any order which justice requires . . . to protect any entity against scandalous or defamatory matter contained in any paper filed in a case under the Code." Additionally, Bankruptcy Local Rule 9037-1 provides, in relevant part, that "[a] motion, reply or other document may initially be filed under seal if the filing party simultaneously files a motion requesting that the document be maintained under seal."

9.      Good cause exists to authorize the Defendants to file the Van Deelen Communications under seal.  Filing the Van Deelen Communications under seal allows the Court to be made aware of the content of the Van Deelen Communications while protecting the parties. Critically, Mr. Van Deelen already has possession of the Van Deelen Communications and will not be prejudiced by the relief requested.

## Emergency Consideration

10.     The Defendants request emergency consideration of this Motion as the sealed documents are being filed contemporaneously herewith and a hearing is presently scheduled in this matter for this Wednesday, March 10, 2021 at 9:00 a.m.

28304334v.1 156008/00001

Houston, Texas
Dated:  March 8, 2020

Respectfully submitted,

*/s/ Matthew D. Cavenaugh*

**JACKSON WALKER LLP**
Matthew D. Cavenaugh (TX Bar No. 24062656)
1401 McKinney Street, Suite 1900
Houston, TX 77010
Facsimile:    (713) 752-4221
Email:        mcavenaugh@jw.com

4

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 8, 2021, I caused a true and correct copy of the foregoing document to be served via the Court's ECF notification system to the parties listed below at the email addresses listed.

Michael Van Deelen,
16215 Friar Circle
Spring, TX 77379
<u>michaelvandeelen@gmail.com</u>

*/s/ Matthew D. Cavenaugh*
Matthew D. Cavenaugh

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| MCDERMOTT INTERNATIONAL, INC., *et al.*,[3] | § | Case No. 20-30336 (DRJ) |
| | § | |
| Reorganized Debtors. | § | (Jointly Administered) |
| | § | |
| | § | |
| MICHAEL VAN DEELEN | § | |
| | § | |
| Plaintiff, | § | Adv. Proc. No. 20-03309 |
| | § | |
| v. | § | |
| | § | |
| DAVID DICKSON, | § | |
| and STUART SPENCE, | § | |
| and SCOTT LAMB, | § | |
| and 10 JOHN/JANE DOES | § | |
| | § | |
| Defendants. | § | |
| | § | |

## <u>ORDER GRANTING DEFENDANTS' EMERGENCY MOTION TO SEAL</u>

Upon the motion (the "<u>Motion</u>")[4] of the above-captioned Defendants (collectively, the

"<u>Defendants</u>" or "<u>McDermott</u>") for entry of an order (this "<u>Order</u>"), authorizing them to file certain

the Van Deelen Communications under seal, all as more fully set forth in the Motion; and this

Court having jurisdiction over this matter pursuant to 28 U.S.C. §1334; and this Court having

found that this is a core proceeding pursuant to 28 U.S.C. §157(b)(2); and this Court having found

that it may enter a final order consistent with Article III of the United States Constitution; and this

---

[3] A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at <u>https://cases.primeclerk.com/McDermott</u>. The location of Debtor McDermott International, Inc.'s principal place of business and the Debtors' service address in these chapter 11 cases is 757 North Eldridge Parkway, Houston, Texas 77079.

[4] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion.

1

Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the Defendants' notice of the Motion and opportunity for a hearing on the Motion were appropriate and no other notice need be provided; and this Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing before this Court (the "Hearing"); and this Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor, it is HEREBY ORDERED THAT:

1.      The Defendants are authorized to file the Van Deelen Communications under seal.

2.      Except upon further order of the Court after notice to the Defendants, the Van Deelen Communications shall remain under seal, and shall not be made available to anyone without order of the Court including in response to any Freedom of Information Act requests.

3.      Notice of the Motion as provided therein shall be deemed good and sufficient notice of such Motion and the requirements of Bankruptcy Rule 6004(a) and the Local Rules are satisfied by such notice.

4.      Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Order are immediately effective and enforceable upon its entry.

5.      The Defendants are authorized to take all actions necessary to effectuate the relief granted in this Order in accordance with the Motion.

6.      This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

Dated: _____, 2020

_____
DAVID R. JONES
UNITED STATES BANKRUPTCY JUDGE

28304334v.1 156008/00001

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

ENTERED
03/09/2021

| | | |
|---|---|---|
| **IN RE:** | § | |
| **MCDERMOTT INTERNATIONAL, INC.,** | § | **CASE NO: 20-30336** |
| *et al*, | § | |
| Debtors. | § | **CHAPTER 11** |
| | § | |
| **MICHAEL VAN DEELEN,** | § | |
| Plaintiff, | § | |
| | § | |
| **VS.** | § | **ADVERSARY NO. 20-3309** |
| | § | |
| **DAVID DICKSON,** *et al*, | § | |
| Defendants. | § | |

**ORDER REASSIGNING MOTION TO RECUSE**

Chief Judge Jones contacted the undersigned judge as the most senior bankruptcy judge in this District and requested that the undersigned determine which judge will conduct the hearing on the motion to recuse filed in this adversary proceeding. The Court Orders:

1. The motion to recuse (ECF No. 8) will be heard by Judge Isgur.

2. The document filed at ECF No. 39 is sealed, pending the Court's determination of whether there is credible, admissible evidence in support of the allegations made in ECF No. 39.

3. The hearing on the motion to recuse that is scheduled for 9:00 a.m. on March 10, 2021 will occur as scheduled. Parties should utilize Judge Jones' dial in and video connection for the hearing.

SIGNED 03/09/2021

_____
Marvin Isgur
United States Bankruptcy Judge

1 / 1

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

ENTERED
03/10/2021

| | | |
|---|---|---|
| **IN RE:** | § | |
| **MCDERMOTT INTERNATIONAL, INC.,** | § | **CASE NO: 20-30336** |
| *et al*, | § | |
| Debtors. | § | **CHAPTER 11** |
| | § | |
| **MICHAEL VAN DEELEN,** | § | |
| Plaintiff, | § | |
| | § | |
| **VS.** | § | **ADVERSARY NO. 20-3309** |
| | § | |
| **DAVID DICKSON,** *et al*, | § | |
| Defendants. | § | |

## ORDER DENYING MOTION TO RECUSE

For the reasons set forth on the record, the motion to recuse Chief Judge Jones is denied.

SIGNED 03/10/2021

_____
Marvin Isgur
United States Bankruptcy Judge

1 / 1

000269

United States Courts
Southern District of Texas
F I L E D

MAR 1 0 2021

Nathan Ochsner, Clerk of Court

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| MCDERMOTT INTERNATIONAL, INC, *et al* | ) | |
| | ) | Case No. 20-30336 |
| Reorganized Debtor(s). | ) | |
| | ) | (Jointly Administered) |
| _____ | ) | |
| | ) | |
| MICHAEL VAN DEELEN | ) | |
| | ) | |
| Plaintiff, | ) | Adv. Proc. No. 20-3309 |
| | ) | |
| v. | ) | |
| | ) | |
| DAVID DICKSON, | ) | |
| and STUART SPENCE, | ) | |
| and SCOTT LAMB, | ) | |
| and 10 JOHN/JANE DOES | ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFF'S RESPONSE TO DEFENDANTS' EMERGENCY MOTION TO SEAL (DOCUMENT 36)

COMES NOW, the Plaintiff, Michael Van Deelen, and for his Plaintiff's Response to Defendants' Emergency Motion to Seal states as follows:

1. The Defendants' Emergency Motion to Seal ("Emergency Motion") is a frivolous motion that asks this Court to somehow seal documents none of which have been filed with it.

2. The Court can only seal documents that have been filed with it. 11 U.S.C. 107(a)(b).

3. None of the documents are related to the instant action.

4. One of the documents is an email (January 28, 2021) to attorneys who have worked on the above-captioned cases asking them to correct, clarify or retract defamatory statements they have made about Plaintiff. One of the documents (January 28, 2021) is a list of defamatory statements the defendants have they themselves made about Plaintiff in previous filings with this Court. One of the documents is a letter (Beck/Redden) from attorney David Beck the defendants retained to contact Plaintiff. The final document is an email (March 6, 2021) Plaintiff sent to Defendant attorney Matthew Cavenaugh asking him some questions about possible inappropriate behavior by his firm.

5. The defendants failed to appear at the March 10, 2021, hearing to discuss their motion. Plaintiff files the instant Response in an abundance of caution.

Dated March 10, 2021

Plaintiff
16215 Friar Circle
Spring, TX 77379
832-562-0723
michaelvandeelen@gmail.com

2

## **CERTIFICATE OF SERVICE**

I hereby certify that I have on this 10th day of March, 2021, served a true and correct copy of the foregoing document on the defendants via the court-approved eFiling system, which will forward a copy thereof to all attorneys of record.

Michael Van Deelen

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| MCDERMOTT INTERNATIONAL, INC, *et al* | ) | Chapter 11 |
| | ) | |
| Reorganized Debtor(s). | ) | Case No. 20-30336 |
| | ) | |
| | ) | (Jointly Administered) |
| ———————————————— | ) | |
| | ) | |
| MICHAEL VAN DEELEN | ) | |
| | ) | |
| Plaintiff, | ) | Adv. Proc. No. 20-3309 |
| | ) | |
| v. | ) | |
| | ) | |
| DAVID DICKSON, | ) | |
| and STUART SPENCE, | ) | |
| and SCOTT LAMB, | ) | |
| and 10 JOHN/JANE DOES | ) | |
| | ) | |
| Defendants. | ) | |

### ORDER DENYING DEFENDANTS' EMERGENCY MOTION TO SEAL

The Court, having considered the Defendants' Emergency Motion to Seal (Document 36), as well as the evidence presented, finds that the Motion should be DENIED. The Court therefore:

ORDERS that the Defendants' Emergency Motion to Seal is denied.

DAVID R. JONES
UNITED STATES BANKRUPTCY COURT



## CERTIFICATE OF SERVICE

I hereby certify that I have on this 10th day of March, 2021, served a true and correct copy of the foregoing document on the defendants via the court-approved eFiling system, which will forward a copy thereof to all attorneys of record.

Michael Van Deelen

2

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

United States Courts
Southern District of Texas
**F I L E D**

MAR 1 0 2021

Nathan Ochsner, Clerk of Court

In re:                                )
                                      )
MCDERMOTT INTERNATIONAL, INC, *et al*  )
                                      )
        Reorganized Debtor(s).        )
                                      )
_____        )
                                      )
MICHAEL VAN DEELEN                    )
                                      )
        Plaintiff,                    )
                                      )
v.                                    )
                                      )
DAVID DICKSON,                        )
and STUART SPENCE,                    )
and SCOTT LAMB,                       )
and 10 JOHN/JANE DOES                 )
                                      )
        Defendants.                   )

Chapter 11

Case No. 20-30336

(Jointly Administered)

Adv. Proc. No. 20-3309

## PLAINTIFF'S  REQUEST FOR HEARING

COMES NOW the plaintiff, Michael Van Deelen, and for his Plaintiff's Request

for Hearing states as follows:

Plaintiff requests a hearing and the earliest possible hearing date for the following

Motions:

A.  Defendants' Emergency Motion to Seal (Document36).

Houston, Texas
March 10, 2021

Respectfully submitted,

Michael Van Deelen
Party In Interest
16215 Friar Circle
Spring, TX 77379
832-562-0723
michaelvandeelen@gmail.com

## CERTIFICATE OF SERVICE

I hereby certify that I have on this 10th day of March, 2021, served a true and correct copy of the foregoing document on the defendants via the court-approved eFiling system, which will forward a copy thereof to all attorneys of record.

Michael Van Deelen

# UNITED STATES BANKRUPTCY COURT

## Southern District of Texas

PDF FILE WITH AUDIO FILE ATTACHMENT

2020-03309

Van Deelen v. Dickson et al

| | |
|---|---|
| Case Type : | ap |
| Case Number : | 2020-03309 |
| Case Title : | Van Deelen v. Dickson et al |
| Audio Date\Time: | 3/10/2021 9:50:34 AM |
| Audio File Name : | 4ap2020-03309_20210310-095034.mp3 |
| Audio File Size : | 13064 KB |
| Audio Run Time : | [00:27:13] (hh:mm:ss) |

**Help using this file:**

An audio file is embedded as an attachment in this PDF document. To listen to the file, click the Attachments tab or the Paper Clip icon. Select the Audio File and click Open.

**MPEG Layer-3 audio coding technology from Fraunhofer IIS and Thomson.**

**This digital recording is a copy of a court proceeding and is provided as a convenience to the public. In accordance with 28 U.S.C. § 753 (b) "[n]o transcripts of the proceedings of the court shall be considered as official except those made from the records certified by the reporter or other individual designated to produce the record."**

**UNITED STATES BANKRUPTCY COURT**

**Southern District of Texas**

PDF FILE WITH AUDIO FILE ATTACHMENT

2020-03309

Van Deelen v. Dickson et al

Motion to Recuse [8], heard before Bankruptcy Judge Marvin Isgur 900 am - 938 am 3-10-21

---

| | |
|---|---|
| Case Type : | ap |
| Case Number : | 2020-03309 |
| Case Title : | Van Deelen v. Dickson et al |
| Audio Date\Time: | 3/10/2021 8:59:54 AM |
| Audio File Name : | 4ap2020-03309_20210310-085954.mp3 |
| Audio File Size : | 18689 KB |
| Audio Run Time : | [00:38:56] (hh:mm:ss) |

---

**Help using this file:**

An audio file is embedded as an attachment in this PDF document. To listen to the file, click the Attachments tab or the Paper Clip icon. Select the Audio File and click Open.

**MPEG Layer-3 audio coding technology from Fraunhofer IIS and Thomson.**

**This digital recording is a copy of a court proceeding and is provided as a convenience to the public.  In accordance with 28 U.S.C. § 753 (b) "[n]o transcripts of the proceedings of the court shall be considered as official except those made from the records certified by the reporter or other individual designated to produce the record."**

000278

United States Courts
Southern District of Texas
F I L E D

APR 08 2021

Nathan Ochsner, Clerk of Court

# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| MCDERMOTT INTERNATIONAL, INC, *et al* | ) | |
| | ) | Case No. 20-30336 |
| Reorganized Debtor(s). | ) | |
| | ) | (Jointly Administered) |
| | ) | |
| | ) | |
| MICHAEL VAN DEELEN | ) | |
| | ) | |
| Plaintiff, | ) | Adv. Proc. No. 20-3309 |
| | ) | |
| v. | ) | |
| | ) | |
| DAVID DICKSON, | ) | |
| and STUART SPENCE, | ) | |
| and SCOTT LAMB, | ) | |
| and 10 JOHN/JANE DOES | ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFF'S FIRST AMENDED PETITION

COMES NOW, the Plaintiff, Michael Van Deelen, and submits his

Plaintiff's First Amended Petition (Exhibit A herein) as follows:

1.  Plaintiff's Original Petition was a state law cause of action that was filed

in state court (Montgomery County, Texas, District Court) but removed to Federal

Court by the defendants.

2.  On March 10, 2021, a hearing was held in the instant action before the

Honorable David R. Jones of the United States Bankruptcy Court for the Southern

District of Texas, Houston Division.

3.  Plaintiff's First Amended Petition (Exhibit A) is also a state law cause of

action which has been filed in response to Judge Jones' instruction during the

March 10, 2021, hearing to file an amended petition containing only state law

claims as preparatory to having this case remanded to state court.


Respectfully submitted,


/s/ Michael Van Deelen
Michael Van Deelen
16215 Friar Circle
Spring, TX 77379
832-562-0723
michaelvandeelen@gmail.com
Plaintiff

# <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have on this 8th day of April, 2021, served a true and correct copy of the foregoing document on the defendants via the court-approved eFiling system, which will forward a copy thereof to all attorneys of record.


<u>/s/ Michael Van Deelen</u>
Michael Van Deelen

# EXHIBIT A

## CAUSE NO. 20-06-07348

| | | |
|---|---|---|
| MICHAEL VAN DEELEN | § | IN THE DISTRICT COURT |
| Plaintiff, | § | |
| | § | |
| | § | |
| v. | § | OF MONTGOMERY COUNTY, |
| | § | TEXAS |
| DAVID DICKSON, | § | |
| and STUART SPENCE, | § | |
| and SCOTT LAMB, | § | 284th JUDICIAL DISTRICT |
| and 10 JOHN/JANE DOES | § | |
| Defendants. | § | |

## <u>PLAINTIFF'S FIRST AMENDED PETITION</u>

COMES NOW Michael Van Deelen, plaintiff in the above-styled state law

cause of action, and for his cause of action shows as follows:

(NOTE: This is a state law cause of action that was filed in state court but removed

to Federal Court by the defendants.  This Plaintiff's First Amended Petition is also

a state law cause of action which has been filed in response to the (Federal

Bankruptcy) Court's instruction on March 10, 2021, to file an amended petition

containing only state law claims as preparatory to having this case remanded to

state court.)

## DISCOVERY CONTROL PLAN

1.  Plaintiff intends to conduct discovery under Level 2 of the Texas Rules of Civil Procedure 190.3.

## PARTIES

2.  Defendant Scott Lamb is an individual residing in Montgomery County, Texas, who can be served at his residence: 29 Watermill Ct, The Woodlands, Tx, 77380.  At all times material herein, defendant Lamb was McDermott International's Vice President of Investor Relations.

3.  Defendant David Dickson is an individual believed to be residing in either Montgomery County, Texas, or Harris County, Texas, who can be served at McDermott International, 757 N. Eldridge Pkwy, Houston, Tx, 77079.  At all times material herein, defendant Dickson was the President and Chief Executive Officer of McDermott International.

4.  Defendant Stuart Spence is an individual residing in Harris County, Texas, who can be served at his residence: 301 Hedwig Street, Houston, Tx, 77024.  At all times material herein, until 11/4/2019, defendant Spence was the Executive Vice President and Chief Financial Officer of McDermott International.

5.  The 10 John/Jane Doe defendants, if any, will be identified through the process of discovery.

## JURISDICTION AND VENUE

6.  This Court has personal jurisdiction over the defendants because they (a) have, at all material times, conducted business in Texas; (b) have committed tortuous actions, in whole or in part, in Texas; and (c) have sufficient minimum contact with Texas such that the assumption of jurisdiction will not offend traditional notions of fair play and substantial justice.

7.  Plaintiff seeks monetary relief of $180,000.00, plus exemplary damages, and the damages sought are therefore within the jurisdictional limit of this Court.

8.  Venue is proper in Montgomery County, Texas, pursuant to Section 15.002(a)(2) of the TEX. CIV. PRAC. & REM. CODE because it was the residence of one or more of the defendants at the time plaintiff's causes of action accrued.

9.  The following is alleged on information and belief.

## FACTUAL ALLEGATIONS

### Defendants Dickson and Spence Have a History of Being Accused of Making Material Misrepresentations and Omissions in Their Communications to the Investing Public.

10.  On November 15, 2018, a complaint was filed in the United States District Court for the Southern District of Texas seeking class action status on behalf of purchasers of McDermott International ("McDermott") common stock

Page 7

and alleging damages on their behalf arising from McDermott's allegedly false and misleading statements during the class period from January 24, 2018, to October 30, 2018.  The case is captioned *Edwards v. McDermott International, Inc., et al,* No. 4:18-cv-04330.  The defendants in the case are McDermott; David Dickson, McDermott's President and CEO; and Stuart Spence, McDermott's Chief Financial Officer (who left McDermott on 11/4/2019).  The plaintiff in that case has alleged that the defendants made material misrepresentations and omissions about the integration of the CB&I (Chicago Bridge and Iron) business, certain CB&I projects and their fair values, and McDermott's business, prospects and operations.

11.  On January 14, 2019, a related action was filed in the United States District Court for the Southern District of Texas seeking class action status on behalf of all shareholders of McDermott common stock as of April 4, 2018, who had the right to vote on the McDermott/CB&I Combination, captioned: *The Public Employees Retirement System of Mississippi v. McDermott International, Inc., et al,* No.4:19-cv-00135.  The plaintiff in that case has alleged the defendants, which include Mr. Dickson and Mr. Spence, made material misrepresentations and omissions in the proxy statement McDermott used in connection with the Combination. The court granted McDermott's motion to consolidate the two actions on February 22, 2019.  The case is ongoing.

12.  On July 26, 2019, the Securities and Exchange Commission ('SEC') sent a letter, accompanied by subpoenas, notifying McDermott International that it was under investigation for failing to properly disclose projected losses on its Cameron LNG (Hackberry) project (which was part of CB&I when McDermott acquired that company).

**Timeline of Events**

13.  On May 10, 2018, McDermott completed its merger with Chicago Bridge and Iron ("CBI").  With this merger, McDermott inherited two CBI projects: the Cameron, Louisiana, LNG (liquefied natural gas) project and the Freeport, Texas, LNG project.  Each of these projects were fixed price projects, which meant that any cost overruns would be borne by McDermott.  Cost overruns, which McDermott internally projected to be in the hundreds of millions of dollars, began almost immediately, particularly at Cameron.  The projected cost overruns, though highly material, were not disclosed to plaintiff or the investing public by the defendants.

14.  Not long thereafter, as seen below, the losses became so great that McDermott was running out of cash.  As seen below, the company, with the knowledge and at the direction of the defendants, decided in September, 2019, that its only alternative was to file for Chapter 11 bankruptcy.

15.  Defendants Dickson and Spencer receive(d) the majority of their annual compensation in McDermott stock.  For example, defendant Dickson's total remuneration in 2018 exceeded $11 million, most of which came from stock awards, and defendant Spence's total 2018 remuneration was $3.6 million, most of which also came from stock awards.

16.  If the very bad outlook for McDermott, including the projected losses from Cameron and Freeport and the company's plan to file bankruptcy, would have become known to the public, McDermott's share price would have fallen precipitously and defendants Dickson's and Spence's annual remuneration from stock grants would have all but evaporated.  To prevent this from happening, the defendants agreed on a scheme ("the scheme") to artificially inflate McDermott's share price by not disclosing the company's true financial condition and outlook, including material current and projected losses from the Cameron and Freeport projects and elsewhere, and the company's impending bankruptcy to plaintiff and the investing public.  (See below.)

17.  Defendants Dickson, Spence and Lamb were equal participants in the scheme and they each approved all actions taken by each other pursuant to the scheme.  Pursuant to the scheme, the defendants intentionally or negligently committed the following acts in order to maintain McDermott's share price at an artificially high, inflated, level it would not have been at had the material

misrepresentations and omissions concerning the company's financial condition and outlook not been made.

18.  On March 22, 2019, the defendants, in concert with one another and in furtherance of the scheme or through negligence, published a letter to the company's website.  The letter, viewed by the plaintiff on or about April 3, 2019, contained material misrepresentations and omissions concerning McDermott's financial condition and outlook.  For example:

"Today, we are a fundamentally different and much larger company, as compared to where we were at the end of 2017, with a formidable new presence in significant onshore markets."

"Thanks to the tremendous amount of hard work and dedication of our Board, executive management and employees during 2018, we are ahead of schedule in becoming a premier, fully integrated, global engineering, procurement, construction and installation ("EPCI") provider, with product solutions spanning onshore and offshore from concept to commissioning."

"Looking forward to 2019, our end markets are growing.  We are continuing to see recovery in the offshore and subsea, LNG and downstream markets, with the highest McDermott revenue opportunity pipeline in our history.  Today, McDermott is well-positioned to offer the technology-led, vertically-integrated solutions that we know our customers are seeking.  We believe that McDermott

has the right strategy in place to play a major role in the next chapter of global energy solutions."

19.  At the time the letter was published, the defendants were aware that McDermott's Cameron LNG project was in trouble and had estimated probable losses of over $1 billion (approximately $3.50 per share).  Although the projected losses were highly material, they were hidden from plaintiff and the investing public so that the defendants could continue to receive vast remuneration through stock grants at inflated stock prices.

20.  On April 29, 2019, McDermott released its first quarter 2019 report, which was posted on the company's website and read by the plaintiff on or about May 6, 2019.  The report, written, reviewed and approved by the defendants in concert with one another and in furtherance of the scheme or through negligence, materially overstated the results the company had achieved as well as its outlook. In part, the report stated:

"More broadly, the company continues to exhibit commercial success in a steadily improving market.  In particular, McDermott reported a book-to-bill ratio of 3.0x, a new award total of $6.7 billion and a 41% sequential-quarter improvement in backlog."

21. The report released McDermott's full-year 2019 earnings guidance, which predicted strong second-half 2019 results. The guidance predicted that McDermott's full year earnings per share would be $.90

22. Nowhere in the first quarter report or the full-year guidance were public investors informed of the significant losses being accrued by the company's Cameron LNG project. In furtherance of the scheme or through negligence, these losses were not included in the first quarter results or in the full-year projections.

23. McDermott held its annual meeting on May 2, 2019. All reports, slides and presentations given at the meeting were reviewed and approved in advance of the meeting by the defendants in concert with one another and in furtherance of the scheme or through negligence. The meeting presentation was included on McDermott's website and was viewed by plaintiff on or about May 15, 2019. The meeting continued the false good-news reporting that had taken place in prior months. For example, the company showed a slide which stated:

"Post-Combination, McDermott is a fundamentally different and much larger company as compared to where we were in 2017, with significant earnings potential."

24. The slide showed dramatic increase in revenues, backlog and order intake from the prior year.

25.  At no time during the meeting were plaintiff or the investing public informed of the significant losses being accrued by the company's Cameron LNG project.  In furtherance of the scheme or through negligence, these losses were not discussed during the meeting by the defendants or in any report, slide or presentation given during the meeting.

26.  In July, 2019, just two months after the company's annual meeting, the Securities and Exchange Commission ('SEC') sent McDermott a letter, accompanied by subpoenas, notifying the company that it was under investigation for failing to properly disclose projected losses on its Cameron LNG project. Although the investigation was highly material, the defendants, in concert with one another and in furtherance of the scheme or through negligence, did not disclose the investigation to plaintiff or the investing public.

27.  In July, 2019, McDermott undertook a study (the "Financing Case") the purpose of which was to consider its options, including declaring bankruptcy, as the result of the massive losses being incurred at the Cameron and Freeport projects which were draining the company's cash and impacting its loan covenants. The defendants, in concert with one another and in furtherance of the scheme or through negligence, did not disclose this highly material study or the mounting Cameron and Freeport losses to the plaintiff or the investing public.

28. The "Financing Case" was undertaken because McDermott was being forced by the SEC investigation to start recognizing and reporting the huge losses that had been accruing on the Cameron LNG project.

29. On July 29, 2019, in order to placate and fend off the SEC, McDermott released its second quarter 2019 results which unexpectedly showed the company lost $146 million during second quarter 2019 versus a net income of $47 million during the prior year period. The second quarter 2019 report was published on McDermott's website and was read by plaintiff on or about July 29, 2019. In addition, the company reduced its full year guidance which now predicted the company would **lose** $1.65 per share instead of making $.90 a share in 2019, a negative swing of $2.55 a share from the first quarter, 2019, guidance. The losses and reduced earnings projections were the result of the recognition of past and present Cameron (and to a lesser extent, Freeport) losses which had been known by the defendants but not previously reported, as noted herein.

30. On July 29, 2019, the defendants, acting in concert with one another and in furtherance of the scheme or through negligence, issued a statement (as part of the second quarter, 2019, report) on McDermott's website, read by the plaintiff on or about July 29, 2019, that operating income was going to achieve a "sharp improvement" during the fourth quarter of 2019. The company's anticipated

improvement was therefore shifted by the defendants from second-half 2019 to fourth quarter 2019.

31.  In the statement, defendant Dickson, acting in concert with the other defendants and in furtherance of the scheme or through negligence, omitted material information that McDermott faced significant difficulty in the months ahead, including impending earnings, cash flow, loan covenant and potential bankruptcy problems.  To the contrary, defendant Dickson stated that:

"Although the company reported mixed results for the second quarter of 2019, we are encouraged by the record-setting level of backlog and new awards. We are also pleased with the visibility we have into expected 2020 revenues, of which $7.4 billion was already in backlog as of the end of the second quarter of 2019. This is well above the $4.2 billion of 2019 revenues we had in backlog this time last year. This strong market posture continues to demonstrate the benefits of our combination with CB&I and the opportunities available in a strong market environment. McDermott has booked more than $19 billion of awards since the May 2018 combination with CB&I, demonstrating continued customer confidence and healthy end markets. Importantly, as of the end of the second quarter of 2019, legacy CB&I projects represented only about 14% of the current backlog. All the awards we've won since the combination were booked under McDermott's stringent risk management protocols, which we believe pave the way for us to deliver consistent margin performance through the application of the One McDermott Way in the execution of this backlog. The company continues to remain on schedule executing the Cameron and Freeport LNG projects. The Cameron settlement agreement we signed earlier this month is a testament to the mutually productive relationship we have built with this customer since the combination – and the associated incentives provided a meaningful contribution to our second quarter results."

"...we expect to see a sharp improvement in the company's operating income by the fourth quarter of this year, as we build momentum heading into 2020."

"Looking ahead, our revenue opportunity pipeline remains near a historic high and, more specifically, we are seeing steady upward momentum in a number of key

areas. For example, in the strategic area of front end engineering design (FEED), our awards through the first half of 2019 are already more than double what we won in all of 2018 – in terms of both man-hours and dollar value – and that's especially important as FEED work positions us for EPC opportunities. This year we have booked $1.5 billion of EPC work as a result of FEED work that's been done since the combination. Further, in our Technology business, we are forecasting the number of license sales to increase by 25% this year versus 2018. One of the recent highlights was our selection as the Master Licensor by S-OIL, an affiliate of Saudi Aramco, in support of its ethylene cracker and downstream petrochemicals complex, being developed as a major expansion of S-OIL's existing refinery in South Korea. Our Technology business gives us unparalleled insight into upcoming EPC opportunities, and we see roughly $40 billion of potential EPC pull-through opportunities in the refining and petrochemical markets over the next five years. We believe the petrochemical market, in particular, is poised for another wave of investment in the next 12 to 24 months, with world ethylene capacity expected to increase by more than 40% between 2019 and 2028."

32.  Nowhere in their statement did the defendants alert plaintiff or the investing public to the fact that McDermott had already begun a material analysis (the "Financing Case") designed to consider a change in the capital structure of the company, including bankruptcy, as discussed herein.  And nowhere in the July 29, 2019, second quarter report did the defendants alert plaintiff or the investing public to the material fact that they were aware that the Cameron LNG project, and other legacy projects as well, were going to continue experiencing substantial losses in the months ahead which would cause the company to incur huge losses, a cash flow drain and loan covenant problems.

33.  On August 2, 2019, after having read the defendants' false representations mentioned herein, and not being aware of the defendants' material omissions, plaintiff became convinced that the share price decline that resulted

from the second quarter loss was a buying opportunity given the defendants'

projections for substantial earnings improvement in the fourth quarter of 2019.

Plaintiff, relying on the defendants' false representations, accordingly purchased

22,000 shares of McDermott International common stock at a combined cost of

$139,322.28.  Had the defendants disclosed the material information that the

company was going to continue experiencing massive losses at its Cameron and

Freeport facilities, that the company was in dire need of working capital, that it had

or was about to violate its loan covenants, that it had undertaken a study (the

Financing Case) to stave off bankruptcy, that bankruptcy was a very real

possibility in the near term and that the company was under SEC investigation for

failing to properly disclose projected losses and had the defendants not

intentionally materially overstated the company's projected results as discussed

herein, plaintiff would not have purchased or held the stock.

34.  The Financing Case analysis was concluded on or about September 16,

2019, and the company immediately made the decision to declare Chapter 11

bankruptcy.  (At the company's Chapter 11 bankruptcy plan confirmation hearing

in the U.S. District Court for the Southern District of Texas, Southern Division, on

March 12, 2020, John R. Castellano, Chief Transformation Officer for McDermott

and a company insider with intimate knowledge of the decision-making process,

testified that the company decided in mid-September, 2019, to declare Chapter 11

bankruptcy.)  The decision to declare bankruptcy was made just seven weeks after

the defendants' July 29, 2019, effusive second quarter comments, including

defendant Dickson's comment that

*"...we expect to see a sharp improvement in the company's operating income by the fourth quarter of this year, as we build momentum heading into 2020."*

It is unbelievable that the defendants were not aware of the massive difficulty the

company was in when they, in concert with one another and in furtherance of the

scheme or through negligence, made their July 29, 2019, statement that the

company was doing great and operating income would see a "sharp  improvement"

by the fourth quarter of 2019.

35.  The defendants, acting in concert and in furtherance of the scheme or

through negligence, failed to inform plaintiff or the investing public in mid-

September, 2019, that the decision had been made to declare bankruptcy.

However, rumors began to fly and the company's share price declined from $6.08

on September 16, 2019, immediately before the rumors, to $2.16 on September 18,

2019, after the rumors came out.

36.  On September 18, 2019, in order to stem the share price decline, the

defendants, acting in concert and in furtherance of the scheme or through

negligence, issued a terse press release (read by plaintiff on or about September 18,

2019) stating that:

"McDermott International, Inc., routinely hires external advisors to evaluate opportunities for the Company.  The Company is taking positive and proactive measures, as we have done in the past, intended to improve its capital structure and the long-term health of its balance sheet."

37.  The defendants, acting in concert and in furtherance of the scheme or through negligence, made no mention in their press release of the highly material fact that the company had already decided to declare bankruptcy.  Instead, they attempted to deceive the plaintiff and the investing public that everything that was happening at the company was "routine".  The defendants, acting in concert and in furtherance of the scheme or through negligence, dismissed the prospect of a bankruptcy filing as "rumor or speculation" in subsequent communications with plaintiff and the investing public even though they were aware that the company had already decided to file for Chapter 11.

38.  On September 20, 2019, the defendants, acting in concert and in furtherance of the scheme or through negligence, issued a press release (read by plaintiff on or about September 20, 2019) stating that the company had hired Evercore to help it sell its Lummus Technology division in order to strengthen the company's balance sheet.  **The press release made no mention of the highly material fact that the company had already decided to declare bankruptcy.** The defendants and their agents have subsequently testified that there was never a plan for the out-of-court sale of Lummus Technology to strengthen McDermott's balance sheet.

39.  The press release sets forth, in part, as follows:

"HOUSTON, Sept. 20, 2019 /PRNewswire/ -- McDermott International, Inc.
(NYSE: MDR) today *announced it recently received unsolicited approaches to
acquire all or part of Lummus Technology, McDermott's industry-leading
technology business, with valuation exceeding $2.5 billion. Based on the receipt of
these approaches, McDermott is exploring strategic alternatives to unlock the
value of Lummus Technology while maintaining the strategic rationale of
engineering, procurement and construction (EPC) pull-through.* [Emphasis
added.]

McDermott's Lummus Technology is a leading licensor of proprietary
petrochemicals, refining, gasification and gas processing technologies, and a
supplier of proprietary catalysts and related engineering. With a heritage spanning
more than 100 years, encompassing approximately 3,100 patents and patent
applications, Lummus Technology provides one of the industry's most diversified
technology portfolios to the hydrocarbon processing sector.

'Lummus is an excellent business, with incredibly impressive employees, that has
earned a reputation for expertise, innovation and reliability in the refining and
petrochemical industries,' said David Dickson, President and Chief Executive
Officer of McDermott. *"The process of exploring strategic alternatives is part of
our ongoing efforts intended to improve McDermott's capital structure, and we
plan to use the proceeds from any transaction involving Lummus Technology to
strengthen our balance sheet. While Lummus is an important business within
McDermott, we have decided to undertake a process to fully realize its strategic
and financial value."* [Emphasis added.]

Separately, McDermott's previously announced processes to sell the remaining
portion of its pipe fabrication business and its industrial storage tank business are
ongoing."

40.  This disclosure regarding the unsolicited approaches to acquire Lummus

and that McDermott would use the proceeds from any Lummus transaction to

strengthen its balance sheet was well received by the market.  Zephirin Group

Page 21

analyst Lenny Zephirin said the offer is "salivating" and, if accepted, should allow the company to reduce leverage by about $1.2 billion. See A. Sarkar, "McDermott International gets takeover interest for its Lummus Technology unit", Reuters, Sept. 20, 2019, available at https://www.reuters.com/article/us-mcdermott-international-strategic-alt/mcdermott-international-gets-takeover-interest-for-its-lummus-technology-unit-idUSKBN1W51AC.  Credit Suisse analysts, who called Lummus the "crown jewel" of McDermott, said the valuation is reasonable given historic transactions in the space, and that the deal could happen in early 2020. Id. Following the disclosure, the price for McDermott common stock spiked 50% in premarket trading on September 20 and closed at $2.01 per share, up 27.22%.

41. The September 20 press release and Defendant Dickson's statements therein, however, were materially misleading. There was not any near-term plan for a Lummus transaction to strengthen the company's balance sheet. The statements were merely part of the defendants' scheme to artificially inflate the price of McDermott common stock while providing the company time to develop and execute on a prepackaged Chapter 11 restructuring plan **which it was already working on**.

42. John R. Castellano, AlixPartners Managing Director and Chief Transformation Officer for McDermott, in testimony before the bankruptcy court during the March 12, 2020, bankruptcy hearing *stated that when he began working*

000300

*with defendants, McDermott, and their advisors **in September 2019**, the objective*

*was to negotiate a consensual Chapter 11 reorganization as this was the only*

*viable option McDermott had.*  [Emphasis added.]

43.  Mr. Castellano also testified during the March 12, 2020, bankruptcy

hearing that [at least] one of the "unsolicited" approaches to purchase Lummas

actually came from a company controlled by a McDermott International insider.

This raises the possibility that the company's claim that it got miracle, last-minute,

'unsolicited' offers to buy Lummus "out of the blue" was a sham.

44. In his Declaration in Support of Chapter 11 Petitions, Defendant Dickson

confirmed his contemporary September, 2019, knowledge of the acute liquidity

crisis:

"In late September 2019, we were running out of cash. It became clear that despite
McDermott's improvements and success winning projects, the company remained
over-leveraged and could not continue running its business and servicing its debt."
(Dickson Decl.)

45.Thus, the defendants knew that the statements in the September 20 press

release were materially false and/or misleading when made, but nonetheless

approved them for public distribution. These statements had the principal purpose

to calm plaintiff and the investing public as well as McDermott's agitated vendor

base.

46.  On October 21, 2019, McDermott, with the prior knowledge and at the

direction of the defendants in concert and in furtherance of the scheme or through

negligence, issued a press release (read by plaintiff on or about October 21, 2019) that it had secured financing of $1.7 billion, subject to certain terms, that the company would use to finance working capital and support the issuance of required performance guarantees on new projects.  The tone and tenor of the press release was that the company's liquidity problems had been solved.  Nowhere in the press release was the possibility of bankruptcy even raised, even though the company had decided in mid-September to declare bankruptcy.  The press release included a statement from defendant Dickson, McDermott President and CEO, that:

> "This new credit agreement is a continued signal from our lenders that they support McDermott, our underlying business growth strategy and ability to achieve a long-term balance sheet solution.  The Agreement provides near-term liquidity for the Company to manage working capital and provide performance guarantees on expected new awards.  We remain focused on serving our customers' needs, supporting our dedicated employees and maintaining our valued relationships with our subcontractors, suppliers and other business counterparties, all as part of our efforts to enhance our position as a premier, fully integrated provider to technology, engineering and construction solutions to the energy industry."

47.  The press release reiterated McDermott's plan to sell Lummus Technology: "McDermott continues to pursue the previously announced strategic alternatives process for Lummus Technology".

48.  The press release also announced that McDermott had withdrawn its previously stated guidance for full-year 2019.  The defendants, acting in concert and in furtherance of the scheme or through negligence, gave no new guidance for

full-year 2019 earnings. Nowhere in the press release, written by the defendants, acting in concert and in furtherance of the scheme or through negligence, were the highly material facts that McDermott had already decided to declare bankruptcy or that it was going to report massive losses for the remainder of the year and for full-year 2019.

49. On October 22, 2019, just one day after the October 21, 2019, press release, McDermott and AP Services, an affiliate of AlixPartners, entered into an agreement (the "October 22 Agreement") that replaced a September 17, 2019, agreement between McDermott and AlixPartners, wherein AP Services agreed "to provide temporary personnel to McDermott to assist in a contemplated financial restructuring." Bankr. Proc. ECF No. 916 at 1 (¶1). Among other things, **the October 22 Agreement provided for the payment of a $5 million success fee that would be earned upon the completion of a restructuring through confirmation of a Chapter 11 plan of reorganization**. Bankr. Proc. ECF 434-1.

50. Even though the October 22 Agreement was highly material, the defendants, in concert and in furtherance of the scheme or through negligence, did not report it to plaintiff or the investing public in order to keep McDermott's share price at an artificially high level.

51. **Just two weeks after the October 21, 2019, press release, November 4, 2019, McDermott released its third quarter results in which it reported a net loss of $1.887 billion, or $10.37 per share**.

52. Prior to the third quarter report, the defendants, acting in concert and in furtherance of the scheme or through negligence, had not made any announcement to plaintiff or the investing public that the third quarter results were going to substantially deviate from what had been projected.  As noted herein, on October 21, 2019, defendants, acting in concert and in furtherance of the scheme or through negligence, issued a press release (read by plaintiff on or about October 21, 2019) which, among other things, withdrew the company's full-year, 2019, guidance without updating said guidance even though the defendants, acting in concert and in furtherance of the scheme or through negligence, had forecast a "sharp improvement" for the fourth quarter just weeks earlier.

53. On the same day, November 4, 2019, McDermott filed its Form 10-Q (for the third quarter, 2019) in which it disclosed for the first time that it was being investigated by the SEC.  Plaintiff read the 10-Q on or about November 5, 2019. Significantly, McDermott was notified by the SEC in July 2019 (by a letter dated July 26, 2019 together with an accompanying subpoena) that it was conducting an investigation related to disclosures made by the company concerning the reporting of projected losses associated with the Cameron LNG project.

54. At no prior time did the defendants or the company disclose to the plaintiff or the investing public the existence of the SEC's investigation. The defendants, acting in concert an in furtherance of the scheme or through negligence, kept the plaintiff and the investing public in the dark about the material SEC investigation for over three months, from July 26, 2019, to November 4, 2019.

55. The November 4, 2019, 10-Q for the first time described a Chapter 11 filing as a risk McDermott *might* face. This statement was materially false and misleading when made because, as described above, the defendants, McDermott, and their advisors had already begun preparing a Chapter 11 bankruptcy plan starting in late September, 2019. In other words, there was no *might* at all. There was a *will*. A McDermott Chapter 11 filing was certain, not just possible.

56. On November 4, 2019, the day of the third quarter earnings announcement, McDermott reported that defendant Stuart Spence, the company's Chief Financial Officer whose compensation was $3.6 million in 2018 (largely the result of stock grants) had resigned "to pursue other opportunities". Mr. Spence's resignation date was actually November 4, 2019, the date of the disastrous third quarter earnings announcement. As discussed above, defendant Spence was already the defendant in litigation against him, defendant Dickson and McDermott

which, among other things, accused him of making false and misleading statements relating to McDermott's finances.

57.   Defendant Spence also received a severance payment of $866,000.00 and other benefits from McDermott in return for his release of all claims against McDermott and its employees and agents, **including any such matter arising from the negligence, gross negligence or reckless, willful or wanton misconduct of any of the Releasees**.

58.   The release does not include any claims for indemnification for suits filed against Defendant Spence by outside parties during his tenure at McDermott.

59.   The release has a non-disparagement agreement:

"Employee shall refrain from making, directly or indirectly, in any public or private communication (whether oral, written or electronic), any criticisms or negative or disparaging comments or other statements about the Company or any of the other Releasees, or about any aspect of the respective businesses, operations, financial results or prospects of any of the Company Entities, including comments relating to Employee's termination of employment. Notwithstanding the foregoing, it is understood and agreed that nothing in this Section 4(b) or in Section 5 hereof is intended to: (i) prevent Employee from testifying truthfully in any legal proceeding brought by any governmental authority or other third party or interfere with any obligation Employee may have to cooperate with or provide information to any government agency or commission, subject to compliance with the provisions of Section 5(c) hereof, if applicable; (ii) prevent Employee from advising Employee's spouse of the terms and conditions of this Agreement; or (iii) prevent Employee from consulting with Employee's own legal counsel, as contemplated by Section 7 of this Agreement."

60. Most importantly, the release has a non-disclosure agreement

prohibiting defendant Spence from disclosing any information to McDermott

analysts or shareholders:

" *Employee will not disclose any of the Confidential Information to any securities analysts, shareholders, prospective investors*, customers, competitors or any other third party, including any third party who has or may express an interest in acquiring any of the Company Entities or all or any significant portion of their respective outstanding equity securities or assets. If Employee is legally required to disclose any Confidential Information, Employee shall, to the extent not prohibited by applicable law or legal process, promptly notify the Company in writing of such requirement so that the Company or any of the other Company Entities may seek an appropriate protective order or other relief or waive compliance with the nondisclosure provisions of this Section 5 with respect to such Confidential Information. To the extent not prohibited by applicable law, Employee agrees to cooperate with and not to oppose any effort by the Company or any other Company Entity to resist or narrow such request or to seek a protective order or other appropriate remedy. In any such case, Employee will: (i) disclose only that portion of the Confidential Information that, according to written advice of Employee's counsel, is required to be disclosed; (ii) use reasonable best efforts to obtain assurances that such Confidential Information will be treated confidentially; and (iii) to the extent not prohibited by applicable law, promptly notify the Company in writing of the items of Confidential Information so disclosed."

61. Defendant Spence may have to pay back McDermott for any payments

made to him if he breaches the agreement or even if a court or arbitrator finds it

invalid or unenforceable:

"Employee agrees that in the event that (i) Employee breaches any term of Sections 3 or 4 hereof or this Section 5, or (ii) Employee challenges the validity of all or any part of this Section 5, and all or any part of this Section 5 is found invalid or unenforceable for any reason whatsoever by a court of competent jurisdiction or an arbitrator in a proceeding between Employee and a Company Entity, in addition to any other remedies at law or in equity the Company may have available to it, the Company shall not be obligated to make any of the payments and may cease to make such payments or to provide for any of the benefits specified in Section 2

hereof, and shall be entitled to recoup from Employee any and all of the value of the payments and benefits provided pursuant to Section 2 hereof that have vested or been paid pursuant to that Section."

62.  It can be inferred from the above that McDermott did not want the details of its financial operations and outlook to become public and that defendant Spence may have known something that McDermott was paying him not to discuss.

63.  On December 2, 2019, the defendants, acting in concert and in furtherance of the scheme or through negligence, wrote and issued a press release titled *McDermott to Access $350 Million Tranche B Financing Under Superpriority Senior Secured Credit Facility*.  The press release stated that McDermott was granted access to the second tranche of funding (Tranche B) under the superpriority senior secured credit agreement (SSSCA), whereby the company received a $250 million Term Loan Facility and a $100 million Letter of Credit Facility.  The press release, read by plaintiff on or about December 2, 2019, stated that McDermott would use the proceeds "to continue financing working capital and support the issuance of required performance guarantees on new projects."  In the press release, the defendants also reiterated the company's continued pursuit of "the previously announced strategic alternatives process for Lummus ...." Id.

64.  The December 2, 2019, press release, however, was materially false and misleading when made because, as the following declaration of John Castellano to

the bankruptcy court shows, it failed to disclose the material fact that the

company's secured lenders would not provide any further liquidity under the

SSSCA to fund business operations, and that the sale of Lummus would be

consummated only as part of a Chapter 11 process:

"On December 1, 2019, after significant deliberation and discussion with the
secured lenders on whether to fund the second tranche under a debtor-in-
possession financing facility rather than on an out-of-court basis, McDermott
gained access to the second tranche of funding under the Superpriority Facility
providing an incremental $250 million term loan facility ($229 million after fees)
and a $100 million letter of credit facility. ***In connection with this funding, the
secured lenders stated that they did not expect to fund any additional amounts on
an out-of-court basis. As such, McDermott's liquidity would drive the timing of
any potential chapter 11 filing.***

***McDermott told prospective purchasers of [Lummus] that the purchase was to be
consummated as part of a chapter 11 process, and provided clear milestones for
the marketing process with the aim of achieving a signed "stalking horse"
purchaser by the time McDermott would need to seek chapter 11 relief."***
Castellano Decl.

Mr. Castellano subsequently stated to the bankruptcy court:

"McDermott enters chapter 11 with a massively consensual prepackaged
restructuring." "Getting here has been an all-out sprint for the company and its
many stakeholders around the globe." ***"Since September 2019, McDermott has....
marketed and achieved a signed stalking-horse purchaser for the sale of
[Lummus]"***. Castellano Decl.

65.   Between November 8, 2019, and December 26, 2019, plaintiff

purchased an additional 8,000 shares of McDermott International shares at a total

cost of $7219.  Had the defendants disclosed the material information that the

company was going to continue experiencing massive losses at its Cameron and

Freeport facilities, that the company was in dire need of working capital, that it had

or was about to violate its loan covenants, that the company was actively pursuing

and finalizing a bankruptcy filing and had the defendants not intentionally

materially overstated the company's projected results (see above), plaintiff would

not have purchased or held the stock.

66. McDermott did not release fourth quarter 2019 results.  However,

McDermott advisors Evercore, Kirkland & Ellis and AlixPartners estimated that

McDermott experienced a fourth quarter operating loss of $141 million, or

approximately $.77 per share, even though the defendants had been saying as late

as July 29, 2019, (second quarter 2019 earnings release) that operating income was

going to achieve a "**sharp improvement**" during the fourth quarter of 2019.

67. On January 21, 2020, McDermott formerly announced that it was filing

a Prepackaged Chapter 11 proceeding in the United States Bankruptcy Court for

the Southern District of Texas (Case number 20-30336).  As part of the filing, the

company announced that it was proposing that all of the existing outstanding

shares of McDermott would be cancelled (declared worthless).

68. Prior to the January 21, 2020, announcement, the defendants, acting in

concert and in furtherance of the scheme or through negligence, had made no

announcements to plaintiff or the investing public that the company was even

considering bankruptcy or that it had decided to declare bankruptcy in mid-

September, 2019. Throughout the entirety of 2019 and up until the January 21,

2020, bankruptcy announcement, the defendants, acting in concert and in

furtherance of the scheme or through negligence, produced and published a

continuous stream of positive press releases, read by plaintiff, touting the

continued and unparalleled success of the company and its operations. **Not one**

**press release informed plaintiff or the investing public of the present or future**

**difficulties the company was experiencing or of the company's decision to**

**declare bankruptcy in mid-September, 2019. Indeed, to the contrary, at all**

**times relevant, McDermott continually inundated plaintiff and the investing**

**public with nothing but feel-good, good news press releases falsely touting the**

**company's results, financial condition and outlook.** These press releases can be

found here:

https://www.mcdermott-investors.com/news/default.aspx

69. Just prior to the January 21, 2020, bankruptcy announcement,

McDermott shares were trading at $.70 per share. After the January 21, 2020,

announcement, McDermott's share price fell to a low of $.01 per share. The shares

have since been cancelled and are now worthless.

70. Part of McDermott's bankruptcy Plan filed with the court called for the

issuance of new common stock. The Management Incentive Plan included in the

company's bankruptcy Plan calls for the reservation of 7.5% of the new stock to be

used in grants to McDermott management and the company's Board of Directors. Assuming the number of pre-bankruptcy shares outstanding (193 million), a conservative post-bankruptcy share price of $25 and 10% of the post-bankruptcy 7.5% insider share allotment goes to defendant Dickson, defendant Dixon stands to gain over $36,000,000 from a McDermott bankruptcy (193,000,000 x $25 x .10 x .075 = $36,187,000), not including his annual salary.

## DEFENDANTS' DUTY TO DISCLOSE

71.  Plaintiff alleges that he was directly harmed by the actions of the defendants as described herein.  (Plaintiff also alleges that the actions of the defendants as described herein did not deplete the assets of the bankruptcy estate.) The defendants had a duty to disclose material facts and omissions to the plaintiff because:

A.  The defendants, especially defendants Dickson and Spencer, had a special fiduciary relationship with the plaintiff.  (See esp. paragraph 83 below.)

B.  The defendants voluntarily disclosed partial information to the plaintiff, but knowingly failed to disclose the whole truth, as seen herein.

C.  The defendants made representations to plaintiff but knowingly failed to disclose new information that made the earlier representations misleading or untrue, as seen herein.

D. The defendants made partial disclosures to plaintiff which conveyed a false impression, as seen herein.

## SCIENTER ALLEGATIONS

(NOTE: As noted above, this is a state law cause of action that was filed in state court but removed to Federal Court by the defendants. This Plaintiff's First Amended Petition is also a state law cause of action which has been filed in response to the (Federal Bankruptcy) Court's instruction on March 10, 2021, to file an amended petition containing only state law claims as preparatory to having this case remanded to state court. Although a plaintiff is not required to plead Scienter in a state law cause of action, plaintiff has done so herein in an abundance of caution.)

72. As alleged herein, defendants acted with scienter because they knew that the public documents and statements they issued and/or disseminated in the name of McDermott were materially false and/or misleading or failed to disclose (omitted) material facts to make them not misleading and they knew that such documents or statements would be issued or disseminated to the plaintiff and the investing public. The defendants participated in the scheme to fool plaintiff and the investing public into continuing to purchase and hold McDermott International shares by making material misrepresentations and omissions so that the defendants

would benefit by having their own holdings of McDermott International shares remain at inflated levels they would not have been at had the material misrepresentations and omissions not been made.

73. Defendants, as the individuals that created, signed, were quoted in, or orally made the allegedly false and misleading statements described herein were obligated to familiarize themselves with the subject matter of those public statements and to speak truthfully. The defendants violated such obligations.

74. Defendants, as the individuals that certified filings made to the SEC filing pursuant to Exchange Act Rules 13a-14(a)/15d-14(a) and Section 906 of the Sarbanes-Oxley Act of 2002, were obligated to inquire and investigate, familiarize themselves with the subject matter underlying their certifications, and reassure themselves that the matters they were certifying were accurate and that McDermott was speaking truthfully when it made such disclosures.  The defendants violated such obligations.

75. The statements of defendants and their agents evidencing that there was never a plan for the out-of-court sale of Lummus to strengthen McDermott's balance sheet demonstrate strong evidence of conscious misbehavior or recklessness.  Motive and opportunity are also evident.

76. As detailed above, defendants had significant personal financial motivations, unique to them, to engage in the misconduct alleged herein.

77. Defendants were motivated by their compensation packages, retention bonuses, and continued employment and took affirmative actions to protect their financial interests including when they denied that a bankruptcy was forthcoming even after the company had already decided to pursue Chapter 11.

78. Defendants' scienter was further demonstrated when they, in concert and in furtherance of the scheme or through negligence, gave clear guidance that the proposed Lummus sale process was proceeding when, in fact, defendants and their advisers had previously concluded that there was no way of avoiding bankruptcy and Lummus would be sold only as part of a bankruptcy.

79. In addition, as seen herein, the Management Incentive Plan in the Plan of Reorganization leaves management with a significant equity stake even as common stockholders' interests are eliminated.

80. The company's public filings with the SEC that attempt to conceal or otherwise obfuscate defendants' fraudulent conduct are also highly probative of scienter. For example, defendants' repeated assertions that the (out-of-court) sale process for Lummus was ongoing is highly probative of scienter; as are defendants' dismissals of the prospect of a Chapter 11 filing as rumor or speculation.

81. Even further, the fraud alleged herein implicates the core operations of McDermott, since its acute liquidity crisis threatened the company's very existence

as an ongoing concern. In light of these facts and their day-to-day involvement in the development of a prepackaged Chapter 11 Plan of Reorganization, it is inconceivable that defendants did not have actual access to information contradicting the statements made in the company's name regarding the sale process for Lummus and the prospect of bankruptcy. Such knowledge is imputable to defendants given the implication of core operations and the defendants' roles and status within the company.

82. Defendants' flagrant violation of express corporate policy further buttresses the inference of defendants' scienter, whether based on their knowledge or their recklessness.

83. McDermott's Code of Ethics for Chief Executive Officer and Senior Financial Officers (the "Code"), applies to both defendants Dickson and Spencer. The Code is available at

http://s22.q4cdn.com/787409078/files/doc_downloads/governance_documents/CG -Code-of-Ethics-for-CEO-SFOs.pdf

Pursuant to the Code:

**"Full and fair disclosure.** It is the Company's policy that the information in its public communications, including filings with the Securities and Exchange Commission, be timely and understandable and fair, complete and accurate in all material respects. Covered Employees should exercise diligence and care to do their part in acting in furtherance of this policy. ***Covered Employees are prohibited from knowingly misrepresenting, omitting, or causing others to misrepresent or omit, material facts about the Company to anyone having a role in the Company's financial reporting and disclosure processes.*** Covered Employees must not directly or indirectly take any action to coerce, manipulate, mislead or

fraudulently influence the Company's or its subsidiaries' independent auditors or any internal accounting or auditing personnel for the purpose or with the effect of rendering the Company's financial statements misleading, or direct anyone else to do so.

It is the responsibility of each Covered Employee promptly to bring to the attention of the Company's Disclosure Committee any material information of which the executive may become aware that affects the disclosures made by the Company in its public filings or otherwise, and otherwise to assist the Disclosure Committee in fulfilling its responsibilities. In addition, ***each Covered Employee shall promptly bring to the attention of the Disclosure Committee any information the employee may have concerning*** (a) significant deficiencies or material weaknesses in the design or operation of internal controls which could adversely affect the Company's ability to record, process, summarize and report financial information or (b) ***any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's financial reporting, disclosures or internal controls***.

...

**Reporting of violations of this code.** ***Each Covered Employee is responsible for reporting any violation of this Code of Ethics, or circumstances which the Covered Employee considers to involve a probable violation, to the Compliance Officer identified below***. Employees may choose to remain anonymous in reporting violations or circumstances that may involve a violation.

**Accountability.** ***Each Covered Employee will be held accountable for his or her adherence to this Code of Ethics***. The failure to observe the terms of this Code of Ethics may result in disciplinary action, up to and including termination of employment. ***Violations of this Code of Ethics may also constitute violations of law that may result in civil and criminal penalties***."

84.   As seen herein, defendant Spencer's non-disclosure agreement, made by him upon his separation from the company in exchange for a payment of $866,000.00, included a promise not to disclose any information "to any securities analysts, shareholders, prospective investors, .......".  This, as well as the other promises he made in his termination agreement, is highly indicative of scienter.

# COUNT 1
# COMMON LAW FRAUD

85. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

86. The defendants made or caused to be made material representations to the plaintiff about McDermott International, its performance and its financial condition which were false, inaccurate or misleading.

87. When the defendants made the representations to the plaintiff, they knew the representations were false or they made the representations recklessly, as positive assertions, and without knowledge of their truth.

88. The defendants made the representations with the intent that the plaintiff would act on them.

89. The plaintiff acted on the representations.

90. The defendants agreed upon and operated a scheme ("the scheme") to artificially inflate McDermott's share price by not disclosing the company's financial condition and outlook, including, but not limited to, material current and projected losses from the Cameron and Freeport projects and elsewhere and the company's impending bankruptcy, to plaintiff. The defendants participated in the scheme to fool plaintiff into continuing to purchase and hold McDermott International shares by making material misrepresentations and omissions so that the defendants would benefit by having their own holdings of McDermott

International shares remain at inflated levels they would not have been at had the material misrepresentations and omissions not been made.

91. The defendants failed to disclose the material facts necessary to make the statements they and their representatives made, in light of the circumstances under which they were made, not misleading.

92. The defendants did not have a reasonable basis for their alleged false statements and omissions and engaged in practices and a course of business that operated as a fraud and deceit upon plaintiff.

93. The defendants and their representatives, with prior knowledge and approval of the defendants, individually and in concert, directly and indirectly, engaged and participated in a continuous course of conduct (the scheme) to conceal adverse material information about McDermott International, including, but not limited to, its actual (poor) present financial condition, its projected large earnings losses and its impending bankruptcy filing.

94. The defendants and their representatives, with prior knowledge and approval of the defendants, individually and in concert, directly and indirectly, engaged and participated in a continuous course of conduct to conceal the fact that the company, including its Cameron LNG and Freeport LNG operations, were experiencing and were projected to experience large losses.

95. The defendants and their representatives, with prior knowledge and approval of the defendants, individually and in concert, directly and indirectly, engaged and participated in a continuous course of conduct to conceal the fact that the company was contemplating bankruptcy, that a bankruptcy filing was imminent and that the company had made the decision to file for bankruptcy.

96. Such material misrepresentations and omissions were done knowingly or with recklessness, and without a reasonable basis, for the purpose and effect of concealing the true status of McDermott's financial condition and outlook in order to maintain McDermott's share price at an artificially high, inflated, level it would not have been at had the material misrepresentations and omissions not been made.

97. The defendants and their representatives, with prior knowledge and approval of the defendants, made the misrepresentations and omissions of material facts set forth herein with the intent to induce the plaintiff to rely on such misrepresentations and omissions of material fact.

98. Plaintiff reasonably relied on the defendants' misrepresentations and omissions of material facts in connection with his purchases and retention of McDermott International common stock. Plaintiff relied on these statements both directly to the extent they were personally made to plaintiff and indirectly to the extent they artificially inflated the market price. But for the defendants'

representations (wrongful conduct), plaintiff would not have purchased and retained (held) his McDermott International stock.

99.  Plaintiff alleges that he was directly harmed by the actions of the defendants as described herein.  Plaintiff further alleges that the actions of the defendants as described herein did not deplete the assets of the bankruptcy estate.

100.  As a direct and proximate result of defendants' representations (wrongful conduct), plaintiff suffered damages in connection with his purchases and his retention (holding) of McDermott International common stock in excess of the jurisdictional limits of this Court.

101.  Pursuant to Section 41.003 of the Texas Civil Practice and Remedies Code, plaintiff is entitled to recover exemplary damages in an amount to be determined by the trier of fact.


## COUNT 2
## NEGLIGENT MISREPRESENTATION

102.  Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

103.  The defendants made representations to plaintiff in the course of their business or in transactions in which they had pecuniary interests.

104.  The defendants supplied false information for the guidance of plaintiff in their business.

105.  The defendants did not exercise reasonable care or competence in obtaining or communicating the information.

106.  The Plaintiff justifiably relied on the defendants' representations.

107.  The defendants negligently made false and misleading representations to the plaintiff and failed to disclose material facts to the plaintiff.

108.  The defendants made these negligent misrepresentations and omissions of material fact to plaintiff for the purpose of inducing plaintiff to rely on such misrepresentations and omissions of material fact to purchase and/or to retain (hold) McDermott International common stock.

109.  Plaintiff justifiably relied on the defendants' misrepresentations and omissions of material fact in purchasing and retaining his McDermott International common stock.

110.  Plaintiff would not have purchased or retained McDermott International stock if plaintiff had been provided accurate and not misleading information by the defendants about the company, its outlook, its financial condition and the defendants' plan to take the company into bankruptcy.

111.  Plaintiff alleges that he was directly harmed by the actions of the defendants as described herein.  Plaintiff further alleges that the actions of the defendants as described herein did not deplete the assets of the bankruptcy estate.

112. The defendants' negligent misrepresentations proximately caused the plaintiff's injuries. Plaintiff suffered material pecuniary loss by justifiably relying on the representations of the defendants.

113. As a direct and proximate result of the defendants' misrepresentations and omissions of material fact, plaintiff suffered damages in connection with his purchase and/or retention (holding) of McDermott International common stock in excess of the jurisdictional limits of this Court.

## DISCOVERY RULE AND FRAUDULENT CONCEALMENT

114. Plaintiff asserts all applicable state statutory, common law and contractual rights and theories related to the tolling and/or extension of any applicable statute of limitations, including equitable tolling, delayed discovery, discovery rule, and/or fraudulent concealment.

## JURY DEMAND

115. Plaintiff demands a trial by jury on all issues so triable.

## PRAYER

WHEREFORE, Plaintiff prays that defendants be cited to appear herein and, after a trial on the merits, that the Court enter judgment awarding plaintiff the following:

1. actual damages;

2. exemplary damages;

3. costs;

4. pre-judgment and post-judgment interest as allowed by law; and

5. all such other and further relief, both general and special, at equity and at law, to which plaintiff may be justly entitled.


Respectfully submitted,


/s/ Michael Van Deelen
Michael Van Deelen
16215 Friar Circle
Spring, TX 77379
832-562-0723
michaelvandeelen@gmail.com
Plaintiff

This page intentionally left blank.

# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

|  |  |  |
|---|---|---|
| In re: | § | Chapter 11 |
|  | § |  |
| MCDERMOTT INTERNATIONAL, INC., *et al.*,[1] | § | Case No. 20-30336 (DRJ) |
|  | § |  |
| Reorganized Debtors. | § | (Jointly Administered) |
|  | § |  |
| ———————————————— | § |  |
|  | § |  |
| MICHAEL VAN DEELEN | § |  |
|  | § |  |
| Plaintiff, | § | Adv. Proc. No. 20-03309 |
|  | § |  |
| v. | § |  |
|  | § |  |
| DAVID DICKSON, | § |  |
| and STUART SPENCE, | § |  |
| and SCOTT LAMB, | § |  |
| and 10 JOHN/JANE DOES | § |  |
|  | § |  |
| Defendants. | § |  |
| ———————————————— | § |  |

## DEFENDANTS' MOTION TO DISMISS
## PLAINTIFF'S FIRST AMENDED PETITION

---

**This motion seeks an order that may adversely affect you. If you oppose the motion, you should immediately contact the moving party to resolve the dispute. If you and the moving party cannot agree, you must file a response and send a copy to the moving party. You must file and serve your response within 21 days of the date this was served on you. Your response must state why the motion should not be granted. If you do not file a timely response, the relief may be granted without further notice to you. If you oppose the motion and have not reached an agreement, you must attend the hearing. Unless the parties agree otherwise, the court may consider evidence at the hearing and may decide the motion at the hearing.**

**Represented parties should act through their attorneys.**

---

[1] A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://cases.primeclerk.com/McDermott. The location of Debtor McDermott International, Inc.'s principal place of business and the Debtors' service address in these chapter 11 cases is 757 North Eldridge Parkway, Houston, Texas 77079.

## <u>TABLE OF CONTENTS</u>

<div align="right">

**Page**
</div>

I.      **PRELIMINARY STATEMENT** ................................................................. 1

II.     **FACTUAL BACKGROUND** ................................................................. 2

     A.     McDermott's only viable option was to file for relief under chapter 11. ............... 2

     B.     The Court confirmed McDermott's value-maximizing Plan, which included exculpation and injunction provisions. .................................................. 4

          i.     The Exculpation broadly released claims related to the bankruptcy proceedings and related prepetition transactions. ...................................... 4

          ii.    The Injunction Provision prohibits any parties from commencing or continuing any action based on Released Claims. ...................................... 6

     C.     The Court confirmed McDermott's Plan over Van Deelen's objection and Van Deelen then filed suit in state court asserting Released Claims explicitly subject to the Exculpation and Injunction Provision. ............................................... 7

III.    **STANDARD OF REVIEW** ................................................................. 8

IV.    **ARGUMENT** .................................................................................... 9

     A.     Because the Confirmation Order expressly bars Van Deelen's claim for negligent misrepresentation, the Court should dismiss that claim. ........................ 9

          i.     The Exculpation bars Van Deelen's negligent misrepresentation claim. ................................................................................................. 9

          ii.    Van Deelen violated the Injunction Provision in bringing his claims. ................................................................................................. 12

     B.     The Court also should dismiss Van Deelen's claims because they fail to satisfy the heightened pleading requirements of Federal Rule 9(b). .................... 13

          iii.   Van Deelen's common law fraud claim fails to satisfy Federal Rule 9(b) because it does not state with particularity the circumstances giving rise to fraud. ................................................................... 13

          iv.   Van Deelen's claim for negligent misrepresentation also fails to satisfy Federal Rule 9(b) because it does not set forth Defendants' representations or duty to Van Deelen with sufficient particularity. ........ 18

V.     **CONCLUSION** ................................................................................ 19

<div align="center">

i
</div>

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Realty Tr., Inc. v. Travelers Cas. & Sur. Co. of Am.*,
  362 F. Supp. 2d 744 (N.D. Tex. 2005) ................................................................12

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)...............................................................................................8

*Bell Atlantic Corp. v. Twombly*,
  550 U.S. 544 (2007)..........................................................................................8, 17

*Bradford v. Vento*,
  48 S.W.3d 749 (Tex. 2001)...................................................................................16

*Coates v. Heartland Wireless Comms., Inc.*,
  26 F. Supp. 2d 910 (N.D. Tex. 1998) ...................................................................15

*Glaser v. Enzo Biochem, Inc.*,
  303 F. Supp. 2d 724 (E.D. Va. 2003) ...................................................................15

*Hernandez v. Metropolitan Life Ins. Co.*,
  No. 5:19-CV-37-DAE, 2019 WL 11555188 (W.D. Tex. June 25, 2019)................9

*Ingalls v. Edgewater Private Equity Fund III, L.P.*,
  No. H-05-1392, 2005 WL 2647962 (S.D. Tex. Oct. 17, 2005) .............................15

*Ins. of N. Am. v. Morris*,
  981 S.W.2d 667 (Tex. 1998)............................................................................17, 18

*Kougl v. Xspedius Mgmt. Co. of Dallas/Fort Worth, L.L.C.*,
  No. Civ.A.3:04CV2518-D, 2005 WL 1421446 (N.D. Tex. June 1, 2005)........18, 19

*Lormand v. U.S. Unwired, Inc.*,
  565 F.3d 228 (5th Cir. 2009) .................................................................................9

*Luppino v. York*,
  No. SA-16-CV-00409-RCL, 2017 WL 8161008 (W.D. Tex. Nov. 27, 2017) ........15

*Mercedes-Benz USA, LLC v. Carduco, Inc.*,
  583 S.W.3d 553 (Tex. 2019)..................................................................................18

*Mesdag v. Nancy Sue Davis Trust (In re Davis Offshore, L.P.)*,
  644 F.3d 259 (5th Cir. 2011) ................................................................................10

*Meyer v. Cathey*,
    167 S.W.3d 327 (Tex. 2005)................................................................................18

*Ritchie v. Rupe*,
    443 S.W.3d 856 (Tex. 2014)................................................................................17

*Soto v. Lloyds*,
    No. 5:15-CV-86, 2016 WL 6883174 (S.D. Tex. Aug. 19, 2016) ...........................12

*Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.*,
    365 F.3d 353 (5th Cir. 2004) ..........................................................................14, 15

*Trevino v. HSBC Mortgs. Servs., Inc. (In re Trevino)*,
    535 B.R. 110 (Bankr. S.D. Tex. 2015) ..................................................................8

*United States ex rel. Barrett v. Johnson Controls, Inc.*,
    No. 3:01-CV-1641-M, 2003 U.S. Dist. LEXIS 5973, at *32 (N.D. Tex. Apr. 9,
    2003) ....................................................................................................................13

*United States ex rel. Russell v. Epic Healthcare Mgmt. Group*,
    193 F.3d 304 (5th Cir. 1999) ...............................................................................13

*Williams v. WMX Techs.*,
    112 F.3d 175 (5th Cir. 1997) ...........................................................13, 14, 18, 19

**Statutes**

11 U.S.C. § 5 .................................................................................................................5

**Rules**

Fed. R. Bank. P. 7012 ...................................................................................................1

Fed. R. Civ. P. 9(b) ..............................................................................................*passim*

Fed. R. Civ. P. 12 .........................................................................................................1

Fed. R. Civ. P. 12(b)(6).................................................................................................1

**Other Authorities**

Mark J. Loewenstein & William K.S. Wang, *The Corporation as Insider Trader*,
    Del. J. Corp. L. 45 (2005) ...................................................................................17

Defendants David Dickson, Stuart Spence, and Scott Lamb (collectively, "<u>Defendants</u>") hereby file this motion to dismiss (the "<u>Motion</u>") Plaintiff Michael Van Deelen's ("<u>Van Deelen</u>") First Amended Petition (the "<u>Amended Petition</u>") pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure (the "<u>Federal Rules</u>") and Rule 7012 of the Federal Rules of Bankruptcy Procedure (which incorporates by reference Federal Rule 12).   In support of the Motion, Defendants respectfully state as follows:

## I.        PRELIMINARY STATEMENT

1.      In his original petition, Van Deelen brought claims against Defendants for conversion, breach of fiduciary duty, conspiracy, negligent misrepresentation, and statutory and common law fraud based on actions Defendants allegedly took in connection with McDermott's bankruptcy.  *See* Dkt. 1, Ex. 1.  Defendants removed the case to this Court and then moved to dismiss these claims because they were subject to certain exculpation, release, and injunction provisions of the Court's Confirmation Order and the claims did not satisfy federal pleading standards.  Dkt. 5 ¶¶ 18-44.  After receiving instruction from the Court at the March 10, 2021 hearing, Van Deelen filed the instant Amended Petition. Dkt. 50.

2.      The Amended Petition suffers from the same shortcomings as Van Deelen's original petition, however.  Though Van Deelen appropriately chose to abandon most of his original claims that were barred by the Confirmation Order, the Amended Petition's remaining claims—negligent misrepresentation and common law fraud—are still subject to dismissal for the same reasons set forth in Defendants' original motion to dismiss.  These claims are foreclosed explicitly by the Confirmation Order and suffer from pleading defects that Van Deelen has demonstrated cannot be corrected.

3.      Van Deelen actively participated in McDermott's bankruptcy proceedings and objected to confirmation of McDermott's chapter 11 plan of reorganization on the unsupported

1

theory that McDermott never should have filed for chapter 11 and that its filing and the transactions leading up to and included as part of the plan were somehow fraudulent or otherwise wrongful. Despite having the opportunity, he presented no evidence in support of his theory and McDermott's plan was confirmed over his objection.  Van Deelen was made fully aware that the confirmed plan would include the exculpation and injunction provision and would thus prohibit parties from bringing a wide range of claims.   But in complete disregard of the Court's Confirmation Order, Van Deelen then brought this lawsuit against McDermott officers based on alleged conduct related to the chapter 11 proceedings and related transactions, conduct explicitly exculpated in the Confirmation Order.

4.      Because Van Deelen has (again) made no effort to articulate how his claims could proceed in the face of Confirmation Order's exculpation and injunction provisions, and because Van Deelen has demonstrated that he cannot provide even basic information necessary to plead fraud allegations, Van Deelen's claims should be dismissed with prejudice.

## II.      FACTUAL BACKGROUND

**A.      McDermott's only viable option was to file for relief under chapter 11.**

5.      McDermott was founded nearly a century ago in east Texas. Since that time, and through strategic acquisitions and business combinations, McDermott has become a premier upstream and downstream engineering procurement, construction, and installation company. In this capacity, McDermott has focused on delivering fixed and floating production facilities, pipelines, installations, and subsea systems that allow for the safe production and transportation of hydrocarbons. McDermott currently operates in 54 countries, has over 42,000 employees and independent contractors, and maintains a diverse fleet of specialty marine construction vessels and fabrication facilities.

6.      Notwithstanding this growth and success, McDermott was facing a severe liquidity problem in September 2019. Much of McDermott's cash was trapped within its joint venture operations and McDermott had inherited from a previous combination certain legacy onshore projects that resulted in large, unanticipated losses. The confluence of these and other factors created an acute liquidity crisis that McDermott could no longer manage. McDermott had to restructure.

7.      In an effort to facilitate this restructuring and avoid liquidation, McDermott obtained on an emergency basis a liquidity infusion through a superpriority financing facility. McDermott received the first tranche of this superpriority financing in October 2019, and used the additional runway to reassess its operations and financial condition. Over the next several months, McDermott engaged financial and legal advisors, shared a significant amount of information with its prepetition lenders, negotiated extensively with stakeholders, and considered all possible alternatives. Ultimately, McDermott determined that a pre-packaged balance sheet restructuring was the best way to maximize value for its stakeholders.

8.      To that end, on January 22, 2020, McDermott filed a voluntary petition for relief (Bankr. Dkt. 5) (the "Petition") under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "Court"). McDermott amended or supplemented the Petition and the plan of reorganization several times during the course of the bankruptcy proceedings (Bankr. Dkt. 121, 520, 620, 622, 647, 651) (collectively, the "Plan"). The Plan reflected substantial levels of support among McDermott's lenders--a difficult feat given the scale and complexity of McDermott's operations, the number of stakeholder constituencies and their divergent interests, and the urgent nature of McDermott's capital needs.

**B.    The Court confirmed McDermott's value-maximizing Plan, which included exculpation and injunction provisions.**

9.      On March 14, 2020, the Court entered its *Amended Order Approving the Debtors' Disclosure Statement and Confirming the Second Amended Joint Prepackaged Chapter 11 Plan of Reorganization (Technical Modifications) of McDermott International, Inc. and Its Debtor Affiliates* (Bankr. Dkt. 684) (the "Confirmation Order").

10.     The Confirmation Order approving the Plan contains two provisions relevant to this dispute: an exculpation provision ("Exculpation") and an injunction provision ("Injunction Provision").

**i.    The Exculpation broadly released claims related to the bankruptcy proceedings and related prepetition transactions.**

11.     The Exculpation released and exculpated the "Exculpated Part[ies]"[2] from claims related to, among other things, McDermott's chapter 11 proceedings and administration and implementation of the Plan:

> 52. Except as otherwise specifically provided in the Plan or this Confirmation Order, no Exculpated Party shall have or incur liability for, and each Exculpated Party shall be released and exculpated from any Claims and Cause of Action for any claim related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, filing, or termination of the Restructuring Support Agreement and related prepetition transactions (including the Superpriority Credit Agreement, the

---

[2]      The Plan defines "Exculpated Parties" to mean:

> collectively, and in each case in its capacity as such: (a) the Debtors; (b) any official committees appointed in the Chapter 11 Cases and each of their respective members; (c) the Consenting Stakeholders and any affiliated Hedge Banks; (d) each Agent and the Senior Notes Trustee, and (e) with respect to each of the foregoing, such Entity and its current and former Affiliates, and such Entity's and its current and former Affiliates' current and former equity holders, subsidiaries, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals.

*See* Plan, Art. I, § A.

4

Credit Agreement, the Senior Notes Indenture or Senior Notes, the 2021 LC Agreement, and the Lloyds Letter of Credit Agreement), the Disclosure Statement, the Plan, the DIP Credit Facility, the Exit Facility Documents, the New Warrants Agreements, the Plan Supplement, the Rights Offering, or any Restructuring Transaction, contract, instrument, release or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or this Confirmation Order in lieu of such legal opinion), including any Definitive Document, created or entered into before or during the Chapter 11 Cases, any preference, fraudulent transfer, or other avoidance claim arising pursuant to chapter 5 of the Bankruptcy Code or other applicable law, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, except for claims related to any act or omission that is determined in a Final Order by a court of competent jurisdiction to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.

53. The Exculpated Parties and other parties set forth above have, and upon confirmation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

(Bankr. Dkt. 684, Confirmation Order ¶¶ 52-53 (emphases added)).

ii.     **The Injunction Provision prohibits any parties from commencing or continuing any action based on Released Claims.**

12.     The Injunction Provision, for its part, permanently enjoined holders of "Released Claims"[3] from commencing or continuing any action against the "Exculpated[] or []Released Parties" in connection with such claims:

> 54. Except as otherwise expressly provided in the Plan or this Confirmation Order or for obligations or distributions issued or required to be paid pursuant to the Plan or this Confirmation Order, ***all Entities who have held, hold, or may hold the Released Claims are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties: (1) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any Released Claims***; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any Released Claims; (3) creating, perfecting, or enforcing any lien or encumbrance of any kind against such Entities or the property of such Entities on account of or in connection with or with respect to any Released Claims; (4) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property or the Estates of such Entities on account of or in connection with or with respect to any Released Claims unless such holder has filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a Claim or Interest or otherwise that such holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any Released Claims released or settled pursuant to the Plan.

> 55. Upon entry of this Confirmation Order, all holders of Claims and Interests and their respective current and former employees, agents, officers, directors, principals, and direct and indirect

---

[3]     The Plan defines "Released Claims" to mean "any Claims or Interests that have been released, discharged, or are subject to exculpation pursuant to this Plan." *See* Plan, Art. I, § A.

6

> Affiliates shall be enjoined from taking any actions to interfere with the implementation or Consummation of the Plan. Unless otherwise set forth in this Confirmation Order, each holder of an Allowed Claim or Allowed Interest, as applicable, by accepting, or being eligible to accept, distributions under or Reinstatement of such Claim or Interest, as applicable, pursuant to the Plan, shall be deemed to have consented to the injunction provisions set forth in Article VIII.F of the Plan.

(Bankr. Dkt. 684, Confirmation Order ¶¶ 54-55 (emphasis added).)

## C.   The Court confirmed McDermott's Plan over Van Deelen's objection and Van Deelen then filed suit in state court asserting Released Claims explicitly subject to the Exculpation and Injunction Provision.

13.     On February 27, 2020, Van Deelen filed a motion (Bankr. Dkt. 510) with this Court alleging that McDermott had improperly sought chapter 11 relief.  Specifically, Van Deelen alleged that McDermott had proposed the Plan in bad faith because the Plan called for the cancellation of existing shares and the re-equitization of the company "for the sole purpose of enriching McDermott's management and Board." (Bankr. Dkt. 510 at 6-15.) Based on these allegations, Van Deelen requested that the Court deny McDermott's Plan.

14.     The Court overruled and denied Van Deelen's Motion on March 14, 2020. (*See* Bankr. Dkt. 684, Confirmation Order ¶ 11.)

15.     Just three months after the Court confirmed McDermott's Plan, on June 23, 2020, Van Deelen filed suit against Defendants in Texas state court asserting claims for (1) conversion; (2) common law fraud; (3) statutory fraud; (4) negligent misrepresentation; (5) breach of fiduciary duty; and (6) conspiracy. *See* Dkt. 1, Ex. 1 ¶¶ 65-112. Defendants removed the case to this Court and moved to dismiss these claims on the grounds that the claims were subject to certain exculpation, release, and injunction provisions of the Court's Confirmation Order and did not satisfy federal pleading standards.  *See* Dkt. 5 ¶¶ 18-44. Van Deelen moved to remand the case to

state court.  Dkt. 4.  Following the Court's instructions at a hearing on the motion to remand, Van Deelen filed the instant Amended Petition on April 8, 2021.

16.     While Van Deelen dropped some of his claims barred by the Exculpation and Injunction Provisions and added some additional allegations in an effort to demonstrate that his claims are direct rather than indirect, the gravamen of Van Deelen's Amended Petition is the same as his original petition—and his original objection to McDermott's Plan:  he alleges that Defendants, as officers of McDermott, caused McDermott to undergo an unnecessary chapter 11 restructuring for their own benefit and to the detriment of Van Deelen and other shareholders. Dkt. 50 ¶¶ 10-83.

## III.     <u>STANDARD OF REVIEW</u>

17.     To survive a motion to dismiss, a complaint "must contain sufficient factual matter, accepted as true, to state a claim that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted). "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id*. (internal quotation marks omitted). Though the court must accept the plaintiff's allegations as true, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id*. at 678; *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 545 (2007) (plaintiff required to provide more than "labels and conclusions, and a formulaic recitation of the elements of a cause of action"). Instead, the complaint "must provide the plaintiff's grounds for entitlement to relief -- including factual allegations that when assumed to be true raise a right to relief beyond the speculative level." *Trevino v. HSBC Mortgs. Servs., Inc. (In re Trevino)*, 535

B.R. 110, 126 (Bankr. S.D. Tex. 2015) (quoting *Lormand v. U.S. Unwired, Inc.*, 565 F.3d 228, 232 (5th Cir. 2009) (internal quotation marks omitted)).

18.     Finally, where a plaintiff has failed through amendment to cure deficiencies in his complaint, the court may dismiss such complaint without allowing leave to amend.  *See, e.g.*, *Hernandez v. Metropolitan Life Ins. Co.*, No. 5:19-CV-37-DAE, 2019 WL 11555188, at *4 (W.D. Tex. June 25, 2019) (dismissing deficient claim with prejudice because plaintiff "ha[d] already been given a chance to amend her complaint to address these deficiencies").

## IV.     <u>ARGUMENT</u>

**A.     Because the Confirmation Order expressly bars Van Deelen's claim for negligent misrepresentation, the Court should dismiss that claim.**

19.     Just as the claims Van Deelen dropped were barred by the Confirmation Order's Exculpation and Injunction Provision, so too is his claim for negligent misrepresentation.  Van Deelen is using this claim to re-litigate his contention that McDermott never should have filed for chapter 11 or engaged in the transactions at the heart of the chapter 11 Plan for reorganization. But the Exculpation expressly releases any such claims against the Defendants and the Injunction Provision bars Van Deelen from bringing such Released Claims.  There is no carve-out that would allow this claim to proceed against the Defendants.

**i.     The Exculpation bars Van Deelen's negligent misrepresentation claim.**

20.     The Exculpation "released and exculpated [the Exculpated Parties] from any [non-fraud] Claims and Cause[s] of Action . . . related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 cases, . . . the filing of the Chapter 11 Cases, the pursuit of Confirmation, [and] the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the plan[.]" (Bankr. Dkt. 684, Confirmation Order ¶ 52.)

21.     Van Deelen's negligent misrepresentation claim falls squarely within the ambit of this provision and should be dismissed. *See Mesdag v. Nancy Sue Davis Trust (In re Davis Offshore, L.P.)*, 644 F.3d 259, 263 (5th Cir. 2011) (holding that reorganization plan's release and exculpation clauses barred equity holder's claims). As a threshold matter, Defendants are "Exculpated Parties" for purposes of the Confirmation Order because they are current or former officers of McDermott. (*See* Bankr. Dkt. 620, Plan, Art. I, § A.) Moreover, Van Deelen's negligent misrepresentation claim is based on or related to McDermott's restructuring and administration of the Plan. Van Deelen specifically alleges in Count II of his Amended Petition that he "was directly harmed by the actions of the defendants" because he "would not have purchased  or retained McDermott International stock if [he] had been provided accurate and not misleading information by the defendants about . . . the defendants' plan to take the company into bankruptcy." *See* Dkt. 50 ¶¶ 108-09.

22.     If this were not clear enough (it is), the "Factual Allegations" section of the Amended Petition leaves no room for mistake that Van Deelen's claims are based on or related to McDermott's restructuring and administration of the Plan:

- To prevent [McDermott's share price from falling], the defendants agreed on a scheme ("the scheme") to artificially inflate McDermott's share price by not disclosing . . . the company's impending bankruptcy to plaintiff and the investing public. *Id*. ¶ 16.

- The defendants . . . did not disclose [a study that McDermott undertook to determine whether it should declare bankruptcy] . . . to the plaintiff or the investing public. *Id*. ¶ 27.

- [D]efendant Dickson, acting in concert with the other defendants . . . omitted material information that McDermott faced . . . potential bankruptcy problems. *Id*. ¶ 31.

- Nowhere in their statement did the defendants alert plaintiff or the investing public to the fact that McDermott had already begun a material analysis (the "Financing Case") designed to consider a change in a change in the capital structure of the company, including bankruptcy, as discussed herein. *Id*. ¶ 32.

- Had the defendants disclosed the material information that . . . [the company] had undertaken a study (the Financing Case) to stave off bankruptcy [and] that bankruptcy was a very real possibility in the near term . . . plaintiff would not have purchased or held the stock. *Id*. ¶ 33.

- The defendants . . . failed to inform plaintiff or the investing public in mid-September, 2019, that the decision had been made to declare bankruptcy. *Id*. ¶ 34.

- The defendants . . . made no mention in their press release of the highly material fact that the company had already decided to declare bankruptcy. . . . The defendants . . . dismissed the prospect of a bankruptcy filing as "rumor or speculation" in subsequent communications with plaintiff and the investing public even though they were aware that the company had already decided to file for Chapter 11. *Id*. ¶ 36.

- [Defendants'] press release made no mention of the highly material fact that the company had already decided to declare bankruptcy. *Id*. ¶ 37.

- The statements were merely part of the defendants' scheme to artificially inflate the price of McDermott common stock while providing the company time to develop and execute on a prepackaged Chapter 11 restructuring plan which it was already working on. *Id*. ¶ 40.

- Nowhere in [McDermott's] press release was the possibility of bankruptcy even raised, even though the company had decided in mid-September to declare bankniptcy [sic]. *Id*. ¶ 45.

- Nowhere in the press release, written by the defendants . . . w[as] the highly material fact[] that McDermott had already decided to declare bankruptcy . . . *Id*. ¶ 47.

- The November 4, 2019, 10-Q for the first time described a Chapter 11 filing as a risk McDermott *might* face. . . [A]s described above, the defendants, McDermott, and their advisors had already begun preparing a Chapter 11 bankruptcy plan starting in late September, 2019. *Id*. ¶ 54 (emphasis in original).

- The December 2, 2019, press release, however, was materially false and misleading when made because . . . the sale of Lummus would be consummated only as part of a Chapter 11 process. *Id.* ¶ 63.

- Had the defendants disclosed the material information that . . . the company was actively pursuing and finalizing a bankruptcy filing . . . plaintiff would not have purchased or held the stock. *Id*. ¶ 64.

- Prior to the January 21, 2020, announcement, defendants . . . had made no announcements to plaintiff or the investing public that the company was even considering bankruptcy or that it had decided to declare bankruptcy in mid-September, 2019. *Id*. ¶ 67.

23.     The transactions leading up to and the filing for chapter 11 do not merely supply background that might add color to Van Deelen's claims but rather constitute the meat of his allegations on which his claims depend.  As such, and because Van Deelen's claim for negligent misrepresentation directly "relate[s] to" McDermott's restructuring and the "administration and implementation of the Plan," it is therefore subject to the Exculpation of the Confirmation Order.

24.     The Exculpation does include a carve-out, however, such that it does not apply to "claims related to any act or omission that is determined in a Final Order by a court of competent jurisdiction to have constituted actual fraud." Bankr. Dkt. 684, Confirmation Order ¶ 52.  But Van Deelen's negligent misrepresentation claim does not fall within this exemption.  Indeed, fraud and negligent misrepresentation are distinct claims, and fraud is not an element of a negligent misrepresentation claim. *See, e.g.*, *Soto v. Lloyds*, No. 5:15-CV-86, 2016 WL 6883174, at *2 (S.D. Tex. Aug. 19, 2016); *Am. Realty Tr., Inc. v. Travelers Cas. & Sur. Co. of Am.*, 362 F. Supp. 2d 744, 751 (N.D. Tex. 2005).

25.     Because Van Deelen's negligent misrepresentation claim is subject to the Exculpation and Injunction Provisions and not exempted by the carve-out for actual fraud, the Court should dismiss this claim.

### ii.     Van Deelen violated the Injunction Provision in bringing his claims.

26.     The Injunction Provision—no less than the Exculpation—provides a basis to dismiss Van Deelen's negligent misrepresentation claim. For its part, the Injunction Provision provides that the holders of any "Released Claims are permanently enjoined . . . from commencing or continuing in any manner any action or other proceeding of any kind [against the Exculpated or Released Parties] on account of or in connection with  . . .[such] Released Claims." (Bankr. Dkt. 684, Confirmation Order ¶ 54.)

27.     Because Van Deelen's negligent misrepresentation claim falls within the scope of the Confirmation's Exculpation, as set forth in more detail above, this claim is a "Released Claim" that the Injunction Provision bars Van Deelen from bringing.  The negligent misrepresentation claim should be dismissed.

**B.     The Court also should dismiss Van Deelen's claims because they fail to satisfy the heightened pleading requirements of Federal Rule 9(b).**

> **iii.     Van Deelen's common law fraud claim fails to satisfy Federal Rule 9(b) because it does not state with particularity the circumstances giving rise to alleged fraud.**

28.     Federal Rule 9(b) requires that the Amended Petition state "the who, what, when, and where" of the alleged fraud.  *Williams v. WMX Techs.*, 112 F.3d 175, 178 (5th Cir. 1997).  In other words, "to plead fraud with particularity a plaintiff must include the 'time, place and contents of the false representations, as well as the identity of the person making the misrepresentations and what [the defendant] obtained thereby.'" *United States ex rel. Barrett v. Johnson Controls, Inc.*, No. 3:01-CV-1641-M, 2003 U.S. Dist. LEXIS 5973, at *32 (N.D. Tex. Apr. 9, 2003) (citing *United States ex rel. Russell v. Epic Healthcare Mgmt. Group*, 193 F.3d 304, 308 (5th Cir. 1999)).  Further, courts are required to "apply the rule with force, without apology." *Williams*, 112 F.3d at 178.

29.     Despite having the opportunity to amend his allegations to address his pleading defects, Van Deelen again has failed to satisfy his burden of pleading common law fraud for at least two reasons.

30.     *First*, Van Deelen does not identify with sufficient particularity the "false representations" that Defendants individually made to him or show why such statements were false. Instead, Van Deelen *repeatedly* excerpts various letters, press releases, or reports, and then alleges, in conclusory fashion, that "Defendants"—as an undifferentiated whole—made or

13

reviewed or approved statements in the excerpted material. *See* Dkt. No. 50 ¶¶ 18 (Defendants published a letter), 20 (Defendants reviewed and approved first quarter report), 23 (Defendants reviewed and approved reports, slides, and presentations), 30 (Defendants issued a statement), 33 (Defendants made their July 29, 2019 statement), 35 (Defendants issued a press release), 37 (Defendants issued a press release), 62 (Defendants wrote and issued a press release), 67 (Defendants produced and published press releases).

31.     This does not satisfy Van Deelen's burden under Federal Rule 9(b). As a threshold matter, it is not enough for Van Deelen to excerpt third-party statements, allege that Defendants collectively reviewed or approved such statements, and then sue Defendants for fraud. *See Williams*, 112 F.3d at 179 ("These vague pleadings illustrate the practical basis for the requirement that a plaintiff point to specific statements made by the defendants. Many of the newspaper excerpts attached to [plaintiffs'] complaint . . . [do not] specify[] who gave information to the paper. These excerpts, standing alone, cannot satisfy the "who, what, when, where, and how" required by Rule 9(b).").

32.     Van Deelen must, at the very least, show either that Defendants adopted the statements or that Defendants represented the statements "were true or at least in accordance with [their] view[s]," or that Defendants "used the [third party] as a conduit, making false and misleading statements to the [third party] with the intent that the [third party] communicate those statements to the market." *Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353, 373-74 (5th Cir. 2004) (also holding that the pleading should "point to specific interactions between the [defendant] and the [third party] which allegedly gave rise to the entanglement [between the defendant's and third party's statements]," and state the dates on which these interactions occurred).  Van Deelen has failed to allege any such facts.

33.     Van Deelen has also failed to plead, with respect to the statements that "Defendants" allegedly authored themselves, *which* Defendant(s) individually made the statements. Instead, Van Deelen repeatedly refers to Defendants as a collective whole and fails to distinguish among them—exactly the kind of "group pleading" that courts in the Fifth Circuit have found not to satisfy the heightened pleading requirements of Federal Rule 9(b). *See, e.g.*, *Southland*, 365 F.3d at 365  ("Consistent with our rejection of the 'group pleading' doctrine, we do not construe allegations contained in the Complaint against the 'defendants' as a group as properly imputable to any particular individual defendant unless the connection between the individual defendant and the allegedly fraudulent statement is specifically pleaded."); *Luppino v. York*, No. SA-16-CV-00409-RCL, 2017 WL 8161008, at *3 (W.D. Tex. Nov. 27, 2017) ("[H]is failure to state with particularity in what fraudulent conduct each particular defendant engaged (i.e. what representations each made in his individual capacity, what knowledge each had of the falsity of any representations, etc.) was fatal to his claim for fraud."); *Ingalls v. Edgewater Private Equity Fund III, L.P.*, No. H-05-1392, 2005 WL 2647962, at *5 (S.D. Tex. Oct. 17, 2005) ("Group pleading fails to satisfy the requirement of the who, what, where, why, and when of the fraud to be specified.") (quoting *Glaser v. Enzo Biochem, Inc.*, 303 F. Supp. 2d 724, 734 (E.D. Va. 2003) (internal citation omitted)); *Coates v. Heartland Wireless Comms., Inc.*, 26 F. Supp. 2d 910, 915 (N.D. Tex. 1998) ("[A] plaintiff must 'plead with sufficient particularity attribution of the alleged misrepresentations and omissions to each defendant; the plaintiff is obligated to 'distinguish among those they sue and enlighten each defendant as to his or her part in the alleged fraud.'").

34.     In his voluminous complaint, Van Deelen only points to a couple of specific statements by a particular Defendant.  But Van Deelen does not even identify what was allegedly fraudulent about these particular statements, which are general in nature, and Van Deelen does not

allege that these statements reasonably induced reliance, nor could he plausibly allege as much. *See* Dkt. 50 ¶ 45 (citing statement allegedly made by David Dickson that "This new credit agreement is a continued signal from our lenders that they support McDermott, our underlying business growth strategy and ability to achieve a long-term balance sheet solution. The Agreement provides near-term liquidity for the Company to manage working capital and provide performance guarantees on expected new awards. We remain focused on serving our customers' needs, supporting our dedicated employees and maintaining our valued relationships with our subcontractors, suppliers and other business counterparties, all as part of our efforts to enhance our position as a premier, fully integrated provided to technology, engineering and construction solutions to the energy industry.").

35.    ***Second***, and as it concerns Defendants' alleged omissions, Van Deelen fails to plead facts showing that any Defendant had a duty to disclose the allegedly omitted information to Van Deelen. *See Bradford v. Vento*, 48 S.W.3d 749, 755 (Tex. 2001) ("As a general rule, a failure to disclose information does not constitute fraud unless there is a duty to disclose the information."); *id*. ("Whether such a duty exists is a question of law.").

36.    Rather than plead such facts, Van Deelen alleges a number of purportedly material omissions[4] and conclusorily argues that Defendants owed him a duty because they (1) "had a special fiduciary relationship with [Van Deelen]"; (2) voluntarily disclosed partial information to Van Deelen but knowingly failed to disclose the whole truth; (3) made representations to Van Deelen but knowingly failed to disclose new information that made the earlier representations

---

[4]    Dkt. No. 50 ¶¶ 26 (Defendants did not disclose investigation), 27 (Defendants did not disclose "Financing Case"), 32 (same), 34 (Defendants failed to inform public that McDermott had decided to declare bankruptcy), 36 (same), 47 (Defendants failed to give new guidance), 49 (Defendants did not report October 22, 2019 agreement to investors), 51 (Defendants did not announce that third quarter results were going to deviate from projections), 53 (Defendants did not disclose SEC investigation), 67 (Defendants did not announce that McDermott was considering bankruptcy).

misleading or untrue; and (4) made partial disclosures to Van Deelen which conveyed a false impression. *Id*. ¶ 70.  None of these arguments has any merit and as a matter of law such allegations cannot give rise to a duty to disclose additional information.

37.   As a threshold matter, Van Deelen does not and cannot plead facts to show that Defendants had a formal fiduciary relationship with him. *See Ins. of N. Am. v. Morris*, 981 S.W.2d 667, 674 (Tex. 1998) (a fiduciary duty can arise "as a matter of law in certain formal relationships, including attorney-client, partnership, and trustee relationships") (citations omitted).  Indeed, the Texas Supreme Court has expressly declined to "impos[e] on directors and officers a [formal] fiduciary duty to individual shareholders".  *Ritchie v. Rupe*, 443 S.W.3d 856, 890 & n.62 (Tex. 2014).  Moreover, and in reaching this decision, the court cited Mark J. Loewenstein & William K.S. Wang, *The Corporation as Insider Trader*, 30 Del. J. Corp. L. 45, 42 (2005) for the proposition that:

> The very idea that a corporation has a fiduciary duty to individual shareholders is troubling. The corporation can act only through its board of directors, officers, employees, and other agents. These actors are obligated to act in the best interests of the corporation, which may not coincide with the best interests of an individual shareholder transacting business with the corporation. ***There is no reason to impose a fiduciary obligation on these actors to act in the best interest of an individual shareholder when that shareholder proposes a course of conduct not in the best interests of the corporation***.

*Id*. (emphasis added).   The same reasoning applies with equal force here: Defendants were obligated to act in the best interests of McDermott, and owed only McDermott—not individual shareholders like Van Deleen—a formal fiduciary duty.  Van Deelen's conclusory argument to the contrary must therefore fail. *Twombly*, 550 U.S. at 545 (plaintiff required to provide more than "labels and conclusions, and a formulaic recitation of the elements of a cause of action").

38.   As must any argument concerning informal fiduciary duties. Informal fiduciary duties arise where the "parties have dealt with each other in such a manner for a long period of

17

time that one party is justified in expecting the other to act in its best interest." *Morris*, 981 S.W.2d at 674; *see also Meyer v. Cathey*, 167 S.W.3d 327, 331 (Tex. 2005) (an informal relationship giving rise to a duty may also be formed from "a moral, social, domestic or purely personal relationship of trust and confidence"). Van Deelen has pleaded no facts to show that he had any such relationship of trust with Defendants.

39.     Nor has Van Deelen pleaded facts to show that Defendants individually made specific "representations" or "partial disclosures" to him, as set forth in more detail above. In the absence of any such facts, Van Deelen cannot show that Defendants owed him a duty of disclosure. *See Mercedes-Benz USA, LLC v. Carduco, Inc.*, 583 S.W.3d 553, 562-63 (Tex. 2019) (defendants made no affirmative disclosure or representation that could have triggered a legal duty to disclose more).

40.     For these reasons, Van Deelen has failed to plead his common law fraud claim with sufficient particularity, and his claim should be dismissed accordingly.

> **iv.     Van Deelen's claim for negligent misrepresentation also fails to satisfy Federal Rule 9(b) because it does not set forth Defendants' representations or duty to Van Deelen with sufficient particularity.**

41.     Van Deelen's negligent misrepresentation claim also fails to satisfy the heightened pleading standard of Federal Rule 9(b). This claim is subject to the more stringent pleading standards of Federal Rule 9(b) because the "fraud averment[s] are so intertwined with the negligent misrepresentation claim that it is not possible to describe a simple redaction that removes the inadequate fraud averment while leaving behind a viable negligent misrepresentation claim." *Kougl v. Xspedius Mgmt. Co. of Dallas/Fort Worth, L.L.C.*, No. Civ.A.3:04CV2518-D, 2005 WL 1421446, *21-22 (N.D. Tex. June 1, 2005) ("If plaintiffs fail to distinguish their negligent misrepresentation claims from those based on fraud, the court will not separate the two when applying its Rule 9(b) analysis."); *see also Williams*, 112 F.3d at 177 ("[Defendant] contends that

18

9(b) also applies to the state law claims of common law fraud and negligent misrepresentation. Because [plaintiffs] do not attempt to distinguish these claims in their brief, and because the state law claims rely upon the same misrepresentations as the federal claims, we do not distinguish between them here.").

42.     Here, as in *Kougl* and *Williams*, Van Deelen's negligent misrepresentation claim is based on the same factual allegations as his fraud claim.  As such, and because Van Deelen must, in pleading negligent misrepresentation, identify the false representations each Defendant made, and the source of any duty to disclose (to the extent his claim is based on material omissions), Van Deelen's negligent misrepresentation claim must fail for the same reasons set forth above.  Van Deelen's Amended Petition does not attempt to attribute allegedly false statements to Defendants individually, and fails to plead facts showing that the Defendants had any duty of disclosure to Van Deelen.  Accordingly, and because these allegations do not satisfy the requirements of Federal Rule 9(b), this Court should dismiss Van Deelen's negligent misrepresentation claim.

## V.     <u>CONCLUSION</u>

While Van Deelen appropriately dropped several claims explicitly foreclosed by the Confirmation Order's Exculpation and Injunction Provisions, he likewise should have dropped his negligent misrepresentation claim, which must be dismissed for the same reason.  In addition, his fraud and negligent misrepresentation claims, which rely on the same factual allegations, do not come anywhere close to meeting the heightened pleading standard mandated by Rule 9(b).  For these reasons, the Court should dismiss Van Deelen's Amended Petition with prejudice.

19

Houston, Texas
Dated:  May 3, 2021

Respectfully submitted,

/s/ *Matthew D. Cavenaugh*
**JACKSON WALKER L.L.P.**
Matthew D. Cavenaugh (TX Bar No. 24062656)
Jennifer F. Wertz (TX Bar No. 24072822)
Kristhy M. Peguero (TX Bar No. 24102776)
Veronica A. Polnick (TX Bar No. 24079148)
1401 McKinney Street, Suite 1900
Houston, TX 77010
Facsimile:       (713) 752-4221
Email:            mcavenaugh@jw.com
                      jwertz@jw.com
                      kpeguero@jw.com
                      vpolnick@jw.com

Anna G. Rotman, P.C. (TX Bar No. 24046761)
Jamie Alan Aycock (TX Bar No. 24050241)
John Christian (TX Bar No. 24109727)
609 Main Street
Houston, TX 77002
Telephone:       (713) 836-3600
Facsimile:       (713) 836-3601
Email:            anna.rotman@kirkland.com
                      jamie.aycock@kirkland.com
                      john.christian@kirkland.com

*Counsel to the Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on May 3, 2021, I caused a true and correct copy of the foregoing Motion to Dismiss to be served via the Court's ECF notification system to the parties listed below at the email addresses listed.

Michael Van Deelen, 16215 Friar Circle, Spring, TX 77379, michaelvandeelen@gmail.com

/s/ *Matthew D. Cavenaugh*
Matthew D. Cavenaugh

United States Courts
Southern District of Texas
FILED

MAY 20 2021

Nathan Ochsner, Clerk of Court

# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| MCDERMOTT INTERNATIONAL, INC, *et al* | ) | |
| | ) | Case No. 20-30336 |
| Reorganized Debtor(s). | ) | |
| | ) | (Jointly Administered) |
| | ) | |
| _____ | ) | |
| | ) | |
| MICHAEL VAN DEELEN | ) | |
| | ) | |
| Plaintiff, | ) | Adv. Proc. No. 20-3309 |
| | ) | |
| v. | ) | |
| | ) | |
| DAVID DICKSON, | ) | |
| and STUART SPENCE, | ) | |
| and SCOTT LAMB, | ) | |
| and 10 JOHN/JANE DOES | ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED PETITION (DOCUMENT 51); PROPOSED ORDER; NOTICE OF HEARING

This motion seeks an order that may adversely affect you. If you oppose the motion, you should immediately contact the moving party to resolve the dispute. If you and the moving party cannot agree, you must file a response and send a copy to the moving party. You must file and serve your response within 21 days of the date this was served on you. Your response must state why the motion should not be granted. If you do not file a timely response, the relief may be granted without further notice to you. If you oppose the motion and have not reached an agreement, you must attend the hearing. Unless the parties agree otherwise, the court may consider evidence at the hearing and may decide the motion at the hearing.

000350

**Represented parties should act through their attorney.**

COMES NOW the Plaintiff, Michael Van Deelen, and for his Plaintiff's Response to Defendants' Motion to Dismiss Plaintiff's First Amended Petition (Document 51) states as follows:

Plaintiff's Original Petition is a state law cause of action that was filed in state court but removed to Federal Court by the defendants. The Plaintiff's First Amended Petition (Document 50) is also a state law cause of action which has been filed in response to the (Federal Bankruptcy) Court's instruction on March 10, 2021, to file an amended petition containing only state law claims as preparatory to having this case remanded to state court.

**It Is Premature To Hear The Defendants' Motion To Dismiss Plaintiff's First Amended Petition (Document 51) Before Plaintiff's Motion To Remand (Document 4) Is Heard And Decided**

Plaintiff incorporates herein his Plaintiff's Motion to Remand (Document 4) and his Plaintiff's Response to Defendants' Motion to Dismiss Plaintiff's Original Petition (Document 10).

The defendants filed their Notice of Removal in the instant action (Document 1) on July 17, 2020. Plaintiff was not served with said Notice until July 19, 2020.

Plaintiff filed his Motion to Remand the adversary proceeding back to Montgomery County, Texas, District Court on July 23, 2020. (Document 4).

On July 25, 2020, the defendants filed and served their Motion to Dismiss Plaintiff's Original Petition (Document 5).

On April 8, 2021, plaintiff filed and served his Plaintiff's First Amended Petition (Document 50).

On May 3, 2021, the defendants filed and served their Motion to Dismiss Plaintiff's First Amended Petition (Document 51).

Plaintiff's Motion to Remand must be heard before the Defendants' Motion to Dismiss Plaintiff's First Amended Petition ("Defendants' Motion to Dismiss") because:

1)   Plaintiff's Motion to Remand challenges this Court's jurisdiction to hear this adversary proceeding.   This challenge must be addressed before the Court hears the Defendants' Motion to Dismiss.   The Court cannot lawfully hear the Defendants' Motion to Dismiss if it does not have jurisdiction over this adversary  proceeding.   The Supreme Court has stated that jurisdiction must be  considered at the outset of a case.  *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 118 S.Ct. 1003, 1012, 140 L.Ed.2d 210 (1998) (majority opinion) (quoting *United States v. Troescher*, 99 F.3d 933, 934 n. 1 (9th Cir.1996)).

In *Steel, Supra*, the U.S. Supreme Court stated:

"this Court has held that, without proper jurisdiction, a court cannot proceed at all, but can only note the jurisdictional defect and dismiss the suit. See, *e. g., Capron* v. *Van Noorden*, 2 Cranch 126; *Arizonans for Official English* v. *Arizona*, 520 U. S. 43, 73. *Bell* v. *Hood, supra; National Railroad Passenger Corp.* v. *National Assn. of Railroad Passengers*, 414 U. S. 453, 465, n. 13; *Norton* v. *Mathews*, 427 U. S. 524, 531; *Secretary of Navy* v. *Avrech*, 418 U. S. 676, 678 *(per curiam); United States* v. *Augenblick*, 393 U. S. 348; *Philbrook* v. *Glodgett*, 421 U. S. 707, 721; and *Chandler* v. *Judicial Council of Tenth Circuit*, 398 U. S. 74, 86-88, distinguished. For a court to pronounce upon a law's meaning or constitutionality when it has no jurisdiction to do so is, by very definition, an ultra vires act. Pp. 93-102."

2)   The Defendants' Motion to Dismiss relies on a federal law argument (including Rule 12(b)(6) and the Rule9(b) enhanced pleading requirement for fraud) even before this Court has determined if it must, or will, remand this adversary case to state court to decide state law-only causes of action.

## This Court Does Not Have Jurisdiction To Hear The Defendants' Motion To Dismiss

Under 28 U.S.C. §1478(a) "any claim or cause of action in a civil action, other than a proceeding before the United States Tax Court or a civil action by a Government unit to enforce [a] . . . regulatory or police power" may be removed "if the bankruptcy courts have jurisdiction over such claim or cause of action."

28 U.S.C. Section 1478(a) does not permit removal of this action due to lack of Jurisdiction. Because removal is not permitted, this Court does not have jurisdiction to hear the Defendants' Motion to Dismiss.

McDermott International's Plan had been confirmed and the Effective Date of the Plan occurred on June 30, 2020. Plaintiff received notice of these events. On July 17, 2020, defendants Dickson, Spence and Lamb (hereinafter, 'defendants') filed their Notice of Removal in this Court.

The Fifth Circuit, in *Wood v. Wood (In re Wood)*, 825 F.2d 90, 93 (5th Cir. 1987), adopted the "related to" jurisdictional test articulated by the Third Circuit, which enjoys broad support, that looks at "whether the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy." 825 F.2d at at 93, n.15 (citing to *Pacor, Inc. v. Higgins*, 743 F.2d 984, 994 (3d Cir. 1984)). In applying the test, the Fifth Circuit looked to see whether the proceeding was "sufficiently related to the pending bankruptcy to allow the district court to exercise jurisdiction under section 1334," which is to say that "plaintiff's claims must affect the estate, **not just the debtor** (emphasis added)." *Id.* at 93-94.

4

The Fifth Circuit further fleshed out what it means to "affect the estate" in

*Meridian Capital CIS Fund v. Burton (In re Buccaneer Res., L.L.C.)*, 912 F.3d 291 (5th

Cir. 2019).  In that case, the Fifth Circuit classified injuries as "direct" or "derivative".

In *Meridian*, the Fifth Circuit stated:

"Whether the bankruptcy estate or a creditor can pursue a claim against third parties is a recurring issue in bankruptcy law. *In re Seven Seas Petroleum, Inc.*, 522 F.3d 575 (5th Cir. 2008), instructs us to focus on whether the creditor has suffered a direct injury or one that is derivative of an injury to the debtor. Id. at 584. If the harm to the creditor comes about only because of harm to the debtor, then its injury is derivative, and the claim is property of the estate. Id.; see also 11 U.S.C. § 541(a)(1). In that situation, only the bankruptcy trustee has standing to pursue the claim for the estate so that all creditors will share in any recovery. *Seven Seas*, 522 F.3d at 584.

As for direct-injury claims that belong to a particular creditor or group of creditors, the simple case is when the claim does not involve any harm to the debtor. These cannot be part of the estate. Id. at 584 (quoting *In re Educators Grp. Health Trust*, 25 F.3d 1281, 1284 (5th Cir. 1994)). But even when the conduct harms the debtor, the creditor may also have a claim if its asserted injury does not flow from injury to the debtor. This means that the estate and a creditor may have separate claims against a third party arising out of the same events. *Seven Seas*, 522 F.3d at 585, 590; Educators Trust, 25 F.3d at 1284–85."

Plaintiff's First Amended Petition has pleaded that his injuries from the

defendants' fraud and negligent misrepresentation were direct injuries and the defendants

in their Motion to Dismiss have not challenged this assertion.  And nowhere in Plaintiff's

First Amended Petition does the plaintiff plead that any of his injuries were derivative.

Established Fifth Circuit case law classifies both fraud and negligent

misrepresentation as direct injuries that are beyond the jurisdiction of the Court.  See, for

example, *In re Seven Seas Petroleum*, 522 F.3d 575, 584-85 (5th Cir. 2008); *In re*

*Educators Group Health Trust*, 25 F.3d at 1284 (citing *S.I. Acquisition, Inc. v. Eastway*

*Delivery Serv., Inc. (In re S.I. Acquisition)*, 817 F.2d 1142 (5th Cir. 1987)); *Matter of*

*Educators Group Health Trust*, 25 F.3d 1281 (5th Cir. 1994).

5

During the March 10, 2021, hearing in this action, the Court (Judge Jones) stated on the record that fraud is a direct injury.

The mere fact that there may be common issues of fact between a civil proceeding and a controversy involving the bankruptcy estate does not bring the matter within the scope of section 1471(b). Judicial economy itself does not justify federal jurisdiction. See, for example, *Aldinger v. Howard,* 427 U.S. 1, 15, 96 S.Ct. 2413, 2420, 49 L.Ed.2d 276 (1976). "[J]urisdiction over nonbankruptcy controversies with third parties who are otherwise strangers to the civil proceeding and to the parent bankruptcy does not exist." *In re Haug,* 19 B.R. 223, 224-25 (Bankr.D.Ore.1982); See also *In re McConaghy,* 15 B.R. 480, 481 (Bankr.E.D.Va.1981). "Bankruptcy court lacks jurisdiction to decide disputes between third parties in which the estate of the debtor has no interest."

## The Plaintiff Opted Out of the Release Provisions

Never letting the facts and the law get in the way of their argument, the defendants' Motion to Dismiss continuously erroneously argues that the Plan's exculpation, release and injunction provisions preclude plaintiff's claims. This is essentially the defendants' entire argument in their Motion to Dismiss (and the argument rejected by the Court during the 3/10/21 hearing).

As the defendants know (and knew), the exculpation, release and injunction provisions of McDermott's Confirmation Plan do not apply to the plaintiff. During the course of the bankruptcy proceedings, the debtors sought affirmative releases from shareholders. **Plaintiff did not release the debtors from wrongdoing and is therefore not a "releasing party" with respect to the Plan.**

Exhibit 1 herein contains the opt out form **'with respect to the releases, exculpation, injunction and third-party releases provided in the Plan'** (Exhibit 1, page 6) that plaintiff submitted to the debtors that excluded him from the Third-Party Release set forth in Article VIII.D of the Plan.  There is nothing for the Court to decide here.  Plaintiff is not a releasing party and he did not release the debtors from wrongdoing.

None of the releases, including the exculpation and injunction, apply to the plaintiff because plaintiff opted out of all of them.  See Article VIII of the Second Amended Joint Prepackaged Chapter 11 Plan of Reorganization (Technical Modifications) of McDermott International, Inc. and Its Debtor Affiliates (Case No. 20-30336, Document 651):

> **'"*Released Claims*" means any Claims or Interests that have been released, discharged, or are subject to exculpation pursuant to this Plan.'**  (Emphasis added.)

During the March 10, 2021, hearing, the defendants admitted that plaintiff had opted out of the releases, including the exculpation and injunction.  However, not once in their Defendants' Motion to Dismiss do the defendants admit that plaintiff had opted out of the releases and was accordingly not subject to the Plan's exculpation and injunction provisions.  Instead they drag on and on trying to convince this Court that Plaintiff's First Amended Petition should be dismissed because plaintiff had violated the inapplicable exculpation and injunction provisions of the plan.

7

**Mandatory Abstention Pursuant To 28 U.S.C. Section 1334(c)(2) Applies To This Action**

Even if this Court had jurisdiction to hear this removed case, remand would be mandatory under 28 U.S.C. Section 1334(c)(2).

The key distinction between mandatory abstention and equitable or discretionary remand is that mandatory abstention applies "only to non-core proceedings--that is, proceedings 'related to a case under title 11,' but not 'arising under title 11, or arising in a case under title 11.'" *In re Gober*, 100 F.3d at 1206 (comparing 28 U.S.C. §§ 157(b)(1) & 1334(c)(2)); *see also J.T. Thorpe Co.*, 2003 U.S. Dist. LEXIS 26016, at *10; *Ramirez*, 413 B.R. at 626-27. *Cf. Stern*, 131 S. Ct. at 2618.

Section 1334(c)(2) provides for mandatory abstention when:

"[u]pon timely motion of a party in a proceeding based upon a State law claim or State law cause of action, related to a case under title 11 but not arising under title 11 or arising in a case under title 11, with respect to which an action could not have been commenced in a court of the United States absent jurisdiction under this section, the district court shall abstain from hearing such proceeding if an action is commenced, and can be timely adjudicated, in a State forum of appropriate jurisdiction." 28 U.S.C. § 1334(c)(2).

A court must abstain from hearing the state law claim at issue when all of the following factors are met:

(1) a motion has been timely filed requesting abstention;
(2) the cause of action is essentially one that is premised on state law;
(3) the claim is a non-core proceeding, i.e., it is "related to" a case under title 11 but does not arise under or in a case under title 11;
(4) the proceeding could not otherwise have been commenced in federal court absent federal jurisdiction under § 1334(b);
(5) an action has been commenced in state court; and
(6) the action could be adjudicated timely in state court.

*J.T. Thorpe Co.*, 2003 U.S. Dist. LEXIS 26016, at *10 (citing to *Schuster v. Mims (In re Rupp & Bowman Co.)*, 109 F.3d 237, 239 (5th Cir. 1997); *In re Gober*, 100 F.3d at 1206;

8

*Broyles v. U.S.Gypsum Co.*, 266 B.R. 778, 782-83 (E.D. Tex. 2001); *Lee v. Miller*, 263 B.R. 757, 763 (S.D. Miss. 2001); *Chickaway v. Bank One Dayton, N. A.*, 261 B.R. 646, 649 (S.D. Miss. 2001); *WRTCreditors Liquidation Trust v. C.I.B.C. Oppenheimer Corp.*, 75 F. Supp. 2d 596, 605 (S.D. Tex. 1999)). The determination of the status of a cause of action is rooted in the list of core proceedings in 28 U.S.C. § 157(b)(2). Although Section 157(b)(2) is non-exhaustive, that does not mean that every cause of action that can be categorized as a "core proceeding" under § 157(b)(2) should be included, given decisions such as *Marathon* and *Stern. Ramirez*, 413 B.R. at 627; *see also Stern*, 131 S. Ct. at 2618; *Northern Pipeline Const. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50 (1982).

Plaintiff has satisfied the first factor given above in that he filed this pleading on July 23, 2020, four days after he was served the Defendants' Notice of Removal.

Plaintiff has satisfied the second, third and fifth factors given above in that the Montgomery County, Texas, District Court suit against the defendants is entirely premised on Texas state law and involves only claims of Common Law Fraud and Negligent Misrepresentation and does not involve federal law.

Plaintiff has satisfied the fourth factor given above because there is no federal subject matter jurisdiction over plaintiff's state law claims absent jurisdiction pursuant to Section 1334(b) and diversity of citizenship is lacking.

The sixth and final factor looks to whether "the action could be adjudicated timely in state court." *J.T. Thorpe Co.*, 2003 U.S. Dist. LEXIS 26016, at *10. The standard for timely adjudication in state court does not place a burden upon the movant to show a "*more timely* adjudicat[ion] in state court, but only that the matter can be timely

000358

adjudicated..." *J.T. Thorpe Co.*, 2003 U.S. Dist. LEXIS 26016, at *12-13.  However, plaintiff addresses this 'burden'.

On information and belief, Montgomery County is 'open' and not subject to a shelter-in-place order.  The Montgomery County District Court Clerk's office is currently fully staffed and open to the public during the COVID-19 pandemic.  The Clerk's office dockets cases and events on a normal basis.  Court 284 (Judge Bays), where the defendants' case was removed from, is open and holding jury trials.  (Exhibit 2 herein.) There is no indication that the Montgomery County Court or its staff is unable to efficiently and normally handle its case load during the pandemic.  Plaintiff is approved and is and has been able to electronically file documents in Montgomery County District Court.  The Montgomery County Court, including Court 284, hears cases on a full-time basis in Montgomery County.

On the other hand, on information and belief, Harris County is on lock-down status.  Federal in-court appearances have been greatly reduced or deferred.  The federal Clerk's office is operating with a skeleton staff.  The docketing of federal cases is being done remotely.  Most court employees are working from home.  Plaintiff has been prohibited from electronically filing documents in the McDermott bankruptcy case or this adversary proceeding by bankruptcy court Judge David Jones.  Furthermore, the Southern District of Texas Bankruptcy Court is SWAMPED with cases as Houston and Texas companies operating in the oil patch and other industries continue to file for bankruptcy at an alarming rate.  The bankruptcy court judge overseeing this action, Judge Jones, is only hearing Houston cases (including the instant action) on a part-time basis as he divides his time between hearing separate cases in Houston, Corpus Christi and Laredo.

"[The] Covid-19 [pandemic] ....does not weigh in favor of retaining federal jurisdiction".  Southern District of Texas Chief Judge Lee H. Rosenthal in *American General Life Insurance Company v. Schahin II Finance Company (SPV) Limited*, Civil Action No. H-19-4025, U.S. District Court, S.D. Texas, Houston Division (June 16, 2020).

The above illustrates that there is an exceedingly high likelihood that plaintiff's state-law case against the defendants will be adjudicated much more quickly in Montgomery County District Court than it would be in the Southern District of Texas Bankruptcy Court.  This is amplified by the fact that state law causes of action against the individual defendants were not raised during the pendency of the bankruptcy proceedings.  If the bankruptcy court were to hear plaintiff's state law claims against the defendants, it would have to "start fresh" with a new case and would not have an advantage because it had previously heard the debtor's bankruptcy case.

Furthermore, since the defendants have rendered no evidence to indicate that the state court could *not* adjudicate the matter in a timely fashion, the Court must presume that the state court will timely adjudicate the matter, given the immense policy interest in comity.  *In re Doctors Hosp.*, 351 B.R. at 846 n.29.  "While an affirmative showing of the possibility of timely adjudication in state court may be necessary where a movant seeks abstention from a proceeding originating in federal court, such a showing is not necessary where the movant is contesting the removal of his own state action." *In Re Treyson Dev., Inc.*, No. 14-70256, 2016 WL 1604347 (Bankr. S.D. Tex. Apr. 19, 2016) (citing *Abadie v. Poppin*, 154 B.R. 86, 90 (N.D. Cal. 1993)).

11

Given the above, plaintiff has satisfied the sixth factor that the action could be adjudicated timely (and more timely) in state court.


## Plaintiff's Montgomery County (State-Law) Claims Stand

As noted above, on 3/10/21, the Court (Judge Jones) directed plaintiff to amend his complaint to only include state-law claims.  Plaintiff has done that.  Plaintiff's fraud and negligent misrepresentation claims are valid state law claims which are beyond the jurisdiction of the Bankruptcy Court because they are direct claims, as seen above.

Texas Rules Civ. Proc. Rule 45(b) states that pleadings shall

**"consist of a statement in plain and concise language of the plaintiff's cause of action** or the defendant's grounds of defense. **That an allegation be evidentiary or be of legal conclusion shall not be grounds for objection when fair notice to the opponent is given by the allegations as a whole."** (Emphasis added.)

Rule 45 also states that "All pleadings shall be construed so as to do substantial justice."

Texas follows a "fair notice" standard for pleading, which looks to whether the opposing party can ascertain from the pleading the nature and basic issues of the controversy and what testimony will be relevant. *Horizon/CMS Healthcare Corp. v. Auld*, 34 S.W.3d 887, 896 (Tex. 2000).  Rule 47 of the Texas  Rule of Civil Procedure provides a pleading "shall contain . . . a short statement of the cause of action sufficient to give fair notice of the claim involved . . . ." Tex. R. Civ. P. 47. "The purpose of this rule is to give the opposing party information sufficient to enable him to prepare a defense." *Roark v. Allen*, 633 S.W.2d 804, 810 (Tex. 1982). The test of fair notice is whether an opposing

attorney of reasonable competence, on review of the pleadings, can ascertain the nature and the basic issues of the controversy and the testimony probably relevant. *Bowen v. Robinson*, 227 S.W.3d 86, 91 (Tex. App.--Houston [1st Dist.] 2006, pet. denied). **The "fair notice" requirement of Texas pleading relieves the pleader of the burden of pleading evidentiary matters with meticulous particularity. Id.** (Emphasis added.)

As seen in Plaintiff's First Amended Petition, the defendants made numerous false statements of fact to plaintiff in furtherance of their scheme. Some of the defendants' statements may be construed as actionable opinion. Plaintiff's First Amended Petition alleges that the defendants made representations to plaintiff that they knew were false. An opinion may support a fraud claim if the defendant knows the statement of opinion is false. *Trenholm v. Ratcliff*, 646 S.W.2d 927, 930 (Tex. 1983); *Allen v. Devon Entergy Holdings, L.L.C.*, 367 S.W.3d 355, 370 (Tex.App. - Houston [1st Dist.] 2012).

Plaintiff's First Amended Petition alleges that the defendants made representations to plaintiff based on false statements of fact. An opinion may support a fraud claim if the opinion is based on or supported with false statements of fact. *Transport Ins. Co. v. Faircloth*, 898 S.W.2d 269, 277 (Tex. 1995); *Trenholm*, supra; *Allen*, supra. If an opinion is intertwined with misstatements of fact, the opinion amounts to a false representation of fact. *Trenholm*, supra; *Allen*, supra.

An opinion about the happening of a future event may be actionable if the defendant (1) purports to have special knowledge of facts that will occur in the future, (2) has present knowledge that the statement is false, or (3) offers an opinion based on facts known to be false. *Trenholm*, supra, (element 1); *Nancarrow v. Whitmer*, 463 S.W.3d 243, 252 (Tex.App. - Waco 2015) (element 2); *Guevara v. Lackner*, 447 S.W.3d 566, 577

(Tex.App. - Corpus Christi 2014) (elements 2, 3). Plaintiff's First Amended Petition is actionable against the defendants on all three elements.

A false promise of future performance is actionable as a false representation when the defendant had no intention of performing it. *Aquaplex, Inc. v. Rancho La Valencia, Inc*. 297 S.W.3d 768, 774 (Tex.2009).

Even though the defendants communicated with plaintiff through press releases, quarterly and annual reports and other documents, they are still liable to plaintiff for their fraudulent scheme. A plaintiff can be a member of a class of people who relied on the defendants' misrepresentations. Even if a defendant does not know the specific identity of a plaintiff, the defendant can be held liable for fraud if the defendant had information that would have led a reasonable person to believe that the misrepresentation would reach the class of people (i.e. - the investing public) the plaintiff belongs to, and that the class would rely on the misrepresentation. *Ernst & Young, L.L.P. v. Pacific Mut. Life Ins*., 51 S.W.3d 573 (Tex.2001).

Plaintiff's First Amended Petition alleges the elements of joint enterprise in its allegation that the defendants participated in a "scheme". Vicarious liability can be imposed on a defendant under the theory of joint enterprise (e.g. - the defendants' "scheme"). *Blackburn v. Columbia Med. Ctr*. 58 S.W.3d 263, 272-73 (Tex.App. - Fort Worth 2001, pet. denied).

The concept of piercing the corporate veil does not apply to this action as it applies in holding an individual liable for a cause of action that otherwise could have been brought against only the corporation. *Dodd V. Savino*, 426 S.W.3d 275, 291 (Tex.App. - Houston [14th Dist.] 2014, no pet.). In an action to hold a corporate officer

liable for her own tortious conduct, the corporate veil is not required to be pierced.

*Alexander v. Kent*, 480 S.W.3d 676, 698 (Tex,App. - Fort Worth 2015, no pet.).

Texas Common Law Fraud elements are:

1. The defendant made a representation to the plaintiff.

2. The representation was material.

3. The representation was false.

4. When the defendant made the representation, the defendant

   (1) knew the representation was false, or

   (2) made the representation recklessly, as a positive assertion, and without

   knowledge of the truth.

5. The defendant made the representation with the intent that the plaintiff act on it.

6. The plaintiff relied on the representation.

7. The representation caused the plaintiff injury.

See, for example, *JPMorgan Chase Bank v. Orca Assets G.P., L.L.C.*, 546 S.W.3d 648,

653 (Tex.2018).

Texas Negligent Misrepresentation elements are:

1. The defendant made a representation to the plaintiff in the course of the defendant's

business or in a transaction in which the defendant had a pecuniary interest.

2. The defendant supplied false information for the guidance of others.

3. The defendant did not use reasonable care in obtaining or communicating the

information.

4. The plaintiff justifiably relied on the representation.

5. The defendant's negligent misrepresentation proximately caused the plaintiff's injury.

See, for example, *JPMorgan Chase Bank v. Orca Assets G.P., L.L.C.*, 546 S.W.3d 648, 653-54 (Tex.2018).

Plaintiff's First Amended Petition contains plain and concise statements stating the elements of common law fraud and negligent misrepresentation that allow the defendants to ascertain the nature and the basic issues of the controversy and the testimony probably relevant. **Nowhere in the Defendants' Motion to Dismiss Plaintiff's First Amended Petition do the defendants claim that plaintiff's state-law claims for common law fraud and negligent misrepresentation are insufficiently pleaded.** Since the defendants have not challenged plaintiff's state-law claims, the state-law claims must stand.


## Federal Rules Of Civil Procedure Rules 12(b)(6) and 9(b)

As noted herein, plaintiff filed and served his Plaintiff's First Amended Petition (Document 50) in response to the (Federal Bankruptcy) Court's instruction on March 10, 2021, to file an amended petition containing only state law claims as preparatory to having this case remanded to state court. The Court did not instruct plaintiff to include or plead federal claims (e.g. - complying with Fed. Rules Civ. Proc. Rules 12(b)(6) and 9(b)) in his Plaintiff's First Amended Petition.

Disregarding the Court's instruction, the defendants argue in their Defendants' Motion to Dismiss that Plaintiff's First Amended Petition should be dismissed because it fails to satisfy the heightened **federal** pleading standard of Rule 9(b) which is not required in Texas state-law claims.

As discussed herein, this Court does not have jurisdiction over this case and this case must be remanded to Montgomery County, Texas, District Court where it originated and where the Federal Rules of Civil Procedure do not apply.

Should the Court decide that plaintiff's claims are federal claims, plaintiff respectfully requests leave to file and serve a Second Amended Petition which pleads the particularity required by Fed. Rules Civ. Proc. Rules 12(b)(6) and 9(b).

WHEREFORE, Plaintiff respectfully moves this Court to deny in its entirety the Defendants' Motion to Dismiss Plaintiff's First Amended Petition and to remand this action to Montgomery County, Texas, District Court.

/s/ Michael Van Deelen
Michael Van Deelen
Plaintiff
16215 Friar Circle
Spring, TX 77379
832-562-0723
michaelvandeelen@gmail.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have on this 20th day of May, 2021, served a true and correct copy of the foregoing document on the defendants via the court-approved eFiling system, which will forward a copy thereof to all attorneys of record.


/s/ Michael Van Deelen
Michael Van Deelen

# EXHIBIT 1

# PLAINTIFF'S OPT-OUT

000368

SRF 39341

# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| MCDERMOTT INTERNATIONAL, INC., *et al.*,[1] | ) Case No. 20-30336 (DRJ) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |

## NOTICE OF (A) NON-VOTING STATUS
## TO HOLDERS OR POTENTIAL HOLDERS
## OF (I) UNIMPAIRED CLAIMS CONCLUSIVELY PRESUMED
## TO ACCEPT THE PLAN AND (II) IMPAIRED CLAIMS CONCLUSIVELY
## PRESUMED TO REJECT THE PLAN AND (B) OPPORTUNITY FOR HOLDERS
## OF CLAIMS AND INTERESTS TO OPT OUT OF THE THIRD-PARTY RELEASES

**PLEASE TAKE NOTICE THAT** McDermott International, Inc. and certain of its affiliates ("McDermott") commenced Chapter 11 Cases in the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court") on January 21, 2020 (the "Petition Date") and seek to consummate the Restructuring Transactions contemplated by the *Joint Chapter 11 Plan of Reorganization of McDermott International, Inc. and Its Debtor Affiliates* (the "Plan")[2] through the chapter 11 bankruptcy process and the Plan. The Company filed the Plan and the related *Disclosure Statement for the Joint Chapter 11 Plan of Reorganization of McDermott International, Inc. and Its Debtor Affiliates* (as may be amended, modified, or supplemented from time to time including all exhibits or supplements thereto, the "Disclosure Statement") with the Bankruptcy Court on January 22, 2020 [Docket Nos. 4, 121].

**PLEASE TAKE FURTHER NOTICE THAT** you are a holder or potential holder of a Claim against or Interest in McDermott that, due to the nature and treatment of such Claim or Interest under the Plan, *is **not** entitled to vote on the Plan*. Specifically, under the terms of the Plan, (i) a holder of a Claim in a Class that is not Impaired under the Plan and, therefore, conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, and (ii) a holder of a Claim or Interest in a Class that is Impaired under the Plan and, therefore, deemed to reject the Plan pursuant to section 1126(g), is *not* entitled to vote on the Plan.

**PLEASE TAKE FURTHER NOTICE THAT** if you would like to **obtain a copy of the Disclosure Statement, the Plan, or related documents at no additional cost**, you should contact

---

[1]   A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://cases.primeclerk.com/McDermott. The location of Debtor McDermott International, Inc.'s principal place of business and the Debtors' service address in these chapter 11 cases is 757 North Eldridge Parkway, Houston, Texas 77079.

[2]   Capitalized terms used but not defined herein have the meaning ascribed to such terms in the Plan.

*l*

Prime Clerk LLC, the Debtors' proposed solicitation agent in the chapter 11 cases (the "Solicitation Agent") by:   (a) visiting the Debtors' restructuring website at: https://cases.primeclerk.com/McDermott; (b) writing to Prime Clerk LLC, Re: McDermott, One Grand Central Place, 60 East 42nd Street, Suite 1440, New York, NY 10165; (c) emailing McDermottInfo@primeclerk.com; and/or (d) calling the Debtors' restructuring hotline at the following number:

<div align="center">

**US/CANADA TOLL FREE: +1 (877) 426-7705**

**or**

**INTERNATIONAL: +1 (917) 994-8380**

</div>

All pleadings filed in the cases (i) may be inspected at the office of the Clerk of the Bankruptcy Court for the Southern District of Texas, P.O. Box 61010, Houston, Texas 77208 (the "Clerk's Office") and (ii) will also be available through the Court's electronic case filing system at https://www.txs.uscourts.gov/page/bankruptcy-court using a PACER password (to obtain a PACER password, go to the PACER website at http://pacer.psc.uscourts.gov), or on the website maintained by the Solicitation Agent at https://cases.primeclerk.com/McDermott.

<div align="center">

**PLEASE TAKE FURTHER NOTICE** of the following provisions in the Plan:

</div>

---

<div align="center">

**ARTICLE VIII OF THE PLAN CONTAINS RELEASE, EXCULPATION, AND INJUNCTION PROVISIONS, AND ARTICLE VIII.D CONTAINS THE FOLLOWING THIRD-PARTY RELEASE:**

</div>

**EXCEPT AS OTHERWISE EXPRESSLY SET FORTH IN THIS PLAN OR THE CONFIRMATION ORDER, ON AND AFTER THE EFFECTIVE DATE, IN EXCHANGE FOR GOOD AND VALUABLE CONSIDERATION, THE ADEQUACY OF WHICH IS HEREBY CONFIRMED, EACH RELEASED PARTY IS, AND IS DEEMED HEREBY TO BE, FULLY, CONCLUSIVELY, ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY AND FOREVER, RELEASED AND DISCHARGED BY EACH RELEASING PARTY, IN EACH CASE ON BEHALF OF THEMSELVES AND THEIR RESPECTIVE SUCCESSORS, ASSIGNS, AND REPRESENTATIVES, AND ANY AND ALL OTHER ENTITIES WHO MAY PURPORT TO ASSERT ANY CAUSE OF ACTION, DIRECTLY OR DERIVATIVELY, BY, THROUGH, FOR, OR BECAUSE OF THE FOREGOING ENTITIES, FROM ANY AND ALL CLAIMS AND CAUSES OF ACTION, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, MATURED OR UNMATURED, EXISTING OR HEREAFTER ARISING, CONTINGENT OR NON-CONTINGENT, IN LAW, EQUITY, CONTRACT, TORT, OR OTHERWISE, INCLUDING ANY DERIVATIVE CLAIMS ASSERTED ON BEHALF OF THE DEBTORS, THAT SUCH ENTITY WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT IN THEIR OWN RIGHT (WHETHER INDIVIDUALLY OR COLLECTIVELY) OR ON BEHALF OF THE HOLDER OF ANY CLAIM AGAINST, OR INTEREST IN, A DEBTOR OR OTHER ENTITY, OR THAT ANY HOLDER OF ANY CLAIM AGAINST, OR INTEREST IN, A DEBTOR OR OTHER ENTITY COULD HAVE ASSERTED ON BEHALF OF THE DEBTORS, BASED ON OR RELATING TO, OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART:**

---

<div align="center">

2

</div>

1. THE DEBTORS (INCLUDING THE CAPITAL STRUCTURE, MANAGEMENT, OWNERSHIP, OR OPERATION THEREOF), THE BUSINESS OR CONTRACTUAL ARRANGEMENT BETWEEN THE DEBTORS AND ANY RELEASING PARTY, ANY SECURITIES ISSUED BY THE DEBTORS AND THE OWNERSHIP THEREOF, THE ASSERTION OR ENFORCEMENT OF RIGHTS AND REMEDIES AGAINST THE DEBTORS, THE DEBTORS' IN- OR OUT-OF-COURT RESTRUCTURING EFFORTS, ANY AVOIDANCE ACTIONS (BUT EXCLUDING AVOIDANCE ACTIONS BROUGHT AS COUNTERCLAIMS OR DEFENSES TO CLAIMS ASSERTED AGAINST THE DEBTORS), INTERCOMPANY TRANSACTIONS BETWEEN OR AMONG A COMPANY PARTY AND ANOTHER COMPANY PARTY, THE SUPERPRIORITY CREDIT AGREEMENT, THE CREDIT AGREEMENT, THE 2021 LC AGREEMENT, THE LLOYDS LETTER OF CREDIT AGREEMENT, SENIOR NOTES INDENTURE, THE SENIOR NOTES, THE CHAPTER 11 CASES, THE FORMULATION, PREPARATION, DISSEMINATION, NEGOTIATION, OR FILING OF THE RESTRUCTURING SUPPORT AGREEMENT, THE DISCLOSURE STATEMENT, THE DIP CREDIT AGREEMENT, THE EXIT FACILITY DOCUMENTS, OR THE PLAN (INCLUDING, FOR THE AVOIDANCE OF DOUBT, THE PLAN SUPPLEMENT);

2. ANY RESTRUCTURING TRANSACTION, CONTRACT, INSTRUMENT, RELEASE, OR OTHER AGREEMENT OR DOCUMENT (INCLUDING ANY LEGAL OPINION REQUESTED BY ANY ENTITY REGARDING ANY TRANSACTION, CONTRACT, INSTRUMENT, DOCUMENT OR OTHER AGREEMENT CONTEMPLATED BY THE PLAN OR THE RELIANCE BY ANY RELEASED PARTY ON THE PLAN OR THE CONFIRMATION ORDER IN LIEU OF SUCH LEGAL OPINION) CREATED OR ENTERED INTO IN CONNECTION WITH THE RESTRUCTURING SUPPORT AGREEMENT, THE RIGHTS OFFERING, THE DISCLOSURE STATEMENT, THE DIP CREDIT AGREEMENT, THE NEW WARRANTS AGREEMENTS, THE EXIT FACILITY DOCUMENTS, THE PLAN, OR THE PLAN SUPPLEMENT, BEFORE OR DURING THE CHAPTER 11 CASES,

3. THE CHAPTER 11 CASES, THE FILING OF THE CHAPTER 11 CASES, THE DISCLOSURE STATEMENT, OR THE PLAN, THE SOLICITATION OF VOTES WITH RESPECT TO THE PLAN, THE PURSUIT OF CONFIRMATION, THE PURSUIT OF CONSUMMATION, THE ADMINISTRATION AND IMPLEMENTATION OF THE PLAN, INCLUDING THE ISSUANCE OR DISTRIBUTION OF SECURITIES PURSUANT TO THE PLAN, THE RIGHTS OFFERING, OR THE DISTRIBUTION OF PROPERTY UNDER THE PLAN OR ANY OTHER RELATED AGREEMENT; OR

4. ANY RELATED ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE RELATED OR RELATING TO ANY OF THE FOREGOING TAKING PLACE ON OR BEFORE THE EFFECTIVE

DATE, INCLUDING ALL AVOIDANCE ACTIONS OR OTHER RELIEF OBTAINED BY THE DEBTORS IN THE CHAPTER 11 CASES.

NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE FOREGOING, THE RELEASES SET FORTH ABOVE DO NOT RELEASE (I) ANY PARTY OF ANY OBLIGATIONS RELATED TO CUSTOMARY BANKING PRODUCTS, BANKING SERVICES OR OTHER FINANCIAL ACCOMMODATIONS (EXCEPT AS MAY BE EXPRESSLY AMENDED OR MODIFIED BY THE PLAN AND THE EXIT FACILITY DOCUMENTS, OR ANY OTHER FINANCING DOCUMENT UNDER AND AS DEFINED THEREIN), (II) ANY POST-EFFECTIVE DATE OBLIGATIONS OF ANY PARTY OR ENTITY UNDER THE PLAN, THE CONFIRMATION ORDER, ANY RESTRUCTURING TRANSACTION, OR ANY DOCUMENT, INSTRUMENT, ANY DEFINITIVE DOCUMENT, OR ANY AGREEMENT (INCLUDING THOSE SET FORTH IN THE PLAN SUPPLEMENT) EXECUTED TO IMPLEMENT THE PLAN, INCLUDING THE EXIT FACILITY DOCUMENTS, THE NEW WARRANTS AGREEMENTS, OR ANY CLAIM OR OBLIGATION ARISING UNDER THE PLAN, OR (III) THE RIGHTS OF HOLDERS OF ALLOWED CLAIMS TO RECEIVE DISTRIBUTIONS UNDER THE PLAN.

ENTRY OF THE CONFIRMATION ORDER SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO BANKRUPTCY RULE 9019, OF THE FOREGOING THIRD-PARTY RELEASE, WHICH INCLUDES BY REFERENCE EACH OF THE RELATED PROVISIONS AND DEFINITIONS CONTAINED HEREIN, AND, FURTHER, SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THE FOREGOING THIRD-PARTY RELEASE IS: (A) CONSENSUAL; (B) ESSENTIAL TO THE CONFIRMATION OF THE PLAN; (C) GIVEN IN EXCHANGE FOR A SUBSTANTIAL CONTRIBUTION AND FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY THE RELEASED PARTIES THAT IS IMPORTANT TO THE SUCCESS OF THE PLAN; (D) A GOOD FAITH SETTLEMENT AND COMPROMISE OF THE CLAIMS RELEASED BY THE FOREGOING THIRD-PARTY RELEASE; (E) IN THE BEST INTERESTS OF THE DEBTORS AND THEIR ESTATES; (F) FAIR, EQUITABLE, AND REASONABLE; (G) GIVEN AND MADE AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING; AND (H) A BAR TO ANY OF THE RELEASING PARTIES ASSERTING ANY CLAIM OR CAUSE OF ACTION RELEASED PURSUANT TO THE FOREGOING THIRD-PARTY RELEASE.

DEFINITIONS RELATED TO THE THIRD-PARTY RELEASE:

UNDER THE PLAN, "RELEASED PARTIES" MEANS, COLLECTIVELY, AND IN EACH CASE IN ITS CAPACITY AS SUCH: (A) EACH DEBTOR; (B) EACH REORGANIZED DEBTOR; (C) EACH COMPANY PARTY; (D) EACH DIP LENDER AND EACH DIP LETTER OF CREDIT ISSUER; (E) EACH AGENT; (F) THE SENIOR NOTES TRUSTEE; (G) EACH CONSENTING STAKEHOLDER; (H) EACH HEDGE BANK; (I) EACH CASH MANAGEMENT BANK; (J) EACH LENDER UNDER THE SUPERPRIORITY CREDIT AGREEMENT, CREDIT AGREEMENT, THE 2021 LC AGREEMENT, AND THE LLOYDS LETTER OF CREDIT AGREEMENT; (K) EACH HOLDER OF AN OBLIGATION (AS

DEFINED IN THE SUPERPRIORITY CREDIT AGREEMENT) UNDER THE SUPERPRIORITY CREDIT AGREEMENT; (L) EACH HOLDER OF AN OBLIGATION (AS DEFINED IN THE CREDIT AGREEMENT) UNDER THE CREDIT AGREEMENT; (M) EACH ISSUER (AS DEFINED IN THE SUPERPRIORITY CREDIT AGREEMENT) UNDER THE SUPERPRIORITY CREDIT AGREEMENT; (N) EACH ISSUER (AS DEFINED IN THE CREDIT AGREEMENT) UNDER THE CREDIT AGREEMENT; (O) THE TERM LOAN AD HOC GROUP, THE LIQUIDITY LENDER STEERING COMMITTEE, AND THE SENIOR NOTES AD HOC GROUP; (P) EACH CURRENT AND FORMER AFFILIATE OF EACH ENTITY IN CLAUSE (A) THROUGH (O); AND (Q) EACH RELATED PARTY OF EACH ENTITY IN CLAUSE (A) THROUGH (O); PROVIDED THAT ANY HOLDER OF A CLAIM OR INTEREST THAT OPTS OUT OF THE RELEASES SHALL NOT BE A "RELEASED PARTY."

UNDER THE PLAN, "RELEASING PARTIES" MEANS, COLLECTIVELY, AND IN EACH CASE IN ITS CAPACITY AS SUCH: (A) EACH DEBTOR; (B) EACH REORGANIZED DEBTOR; (C) EACH COMPANY PARTY; (D) EACH DIP LENDER AND EACH DIP LETTER OF CREDIT ISSUER; (E) EACH AGENT; (F) THE SENIOR NOTES TRUSTEE; (G) EACH CONSENTING STAKEHOLDER; (H) EACH HEDGE BANK; (I) EACH CASH MANAGEMENT BANK; (J) EACH LENDER UNDER THE SUPERPRIORITY CREDIT AGREEMENT, CREDIT AGREEMENT, THE 2021 LC AGREEMENT, AND THE LLOYDS LETTER OF CREDIT AGREEMENT; (K) EACH HOLDER OF AN OBLIGATION (AS DEFINED IN THE SUPERPRIORITY CREDIT AGREEMENT) UNDER THE SUPERPRIORITY CREDIT AGREEMENT; (L) EACH HOLDER OF AN OBLIGATION (AS DEFINED IN THE CREDIT AGREEMENT) UNDER THE CREDIT AGREEMENT; (M) EACH ISSUER (AS DEFINED IN THE SUPERPRIORITY CREDIT AGREEMENT) UNDER THE SUPERPRIORITY CREDIT AGREEMENT; (N) EACH ISSUER (AS DEFINED IN THE CREDIT AGREEMENT) UNDER THE CREDIT AGREEMENT; (O) THE TERM LOAN AD HOC GROUP, THE LIQUIDITY LENDER STEERING COMMITTEE, AND THE SENIOR NOTES AD HOC GROUP; (P) ALL HOLDERS OF CLAIMS OR INTERESTS THAT VOTE TO ACCEPT OR ARE DEEMED TO ACCEPT THE PLAN; (Q) ALL HOLDERS OF CLAIMS OR INTERESTS THAT ABSTAIN FROM VOTING ON THE PLAN AND WHO DO NOT AFFIRMATIVELY OPT OUT OF THE RELEASES PROVIDED BY THE PLAN BY CHECKING THE BOX ON THE APPLICABLE BALLOT INDICATING THAT THEY OPT NOT TO GRANT THE RELEASES PROVIDED IN THE PLAN; (R) ALL HOLDERS OF CLAIMS OR INTERESTS THAT VOTE TO REJECT THE PLAN OR ARE DEEMED TO REJECT THE PLAN AND WHO DO NOT AFFIRMATIVELY OPT OUT OF THE RELEASES PROVIDED BY THE PLAN BY CHECKING THE BOX ON THE APPLICABLE BALLOT INDICATING THAT THEY OPT NOT TO GRANT THE RELEASES PROVIDED IN THE PLAN; (S) EACH CURRENT AND FORMER AFFILIATE OF EACH ENTITY IN CLAUSE (A) THROUGH (R); AND (T) EACH RELATED PARTY OF EACH ENTITY IN CLAUSE (A) THROUGH (R).

**NOTWITHSTANDING THE FOREGOING, AN ENTITY SHALL BE NEITHER A RELEASING PARTY NOR A RELEASED PARTY IF IT: (X) VALIDLY OPTS OUT OF THE RELEASES CONTAINED IN ARTICLE VIII.D OF THE PLAN; OR (Y) TIMELY FILES WITH THE BANKRUPTCY COURT ON THE DOCKET OF THE CHAPTER 11 CASES AN OBJECTION TO THE RELEASES CONTAINED IN**

ARTICLE VIII.D OF THE PLAN THAT IS NOT RESOLVED BEFORE CONFIRMATION.

*       *       *

THIS NOTICE IS BEING SENT TO YOU FOR INFORMATIONAL PURPOSES ONLY AND TO PROVIDE YOU WITH THE ATTACHED OPT-OUT FORM WITH RESPECT TO THE RELEASES, EXCULPATION, INJUNCTION, AND THIRD-PARTY RELEASES PROVIDED IN THE PLAN. IF YOU HAVE QUESTIONS WITH RESPECT TO YOUR RIGHTS UNDER THE PLAN OR ABOUT ANYTHING STATED HEREIN OR IF YOU WOULD LIKE TO OBTAIN ADDITIONAL INFORMATION, CONTACT THE SOLICITATION AGENT.

## EXHIBIT A
## OPTIONAL: RELEASE OPT OUT FORM

You are receiving this opt out form (the "Opt Out Form") because you are or may be a holder of a Claim or Interest that is not entitled to vote on the *Joint Chapter 11 Plan of Reorganization of McDermott International, Inc. and Its Debtor Affiliates* (as may be amended from time to time, the "Plan"). Holders of Claims and Interests are deemed to grant the Third-Party Release set forth in the Notice unless a holder affirmatively opts out or files an objection to the Third-Party Release with the Bankruptcy Court on or before the Plan Voting Deadline.

**If you believe you are a holder of a Claim or Interest with respect to McDermott International, Inc. or its affiliates and choose to opt out of the Third-Party Release set forth in Article VIII.D of the Plan, please complete, sign, and date this Opt Out Form and return it promptly** via first class mail (or in the enclosed reply envelope provided), overnight courier, via the Solicitation Agent's online E-Ballot Portal, or hand delivery to Prime Clerk LLC (the "Solicitation Agent") at the address set forth below. Holders are strongly encouraged to submit their Opt Out Form through the Solicitation Agent's online E-Ballot Portal. For the avoidance of doubt, if you hold Existing Interests through a broker nominee, you cannot submit your Opt-Out via E-Ballot; rather, you must complete and return the paper Opt-Out Form. Parties that submit their Opt Out Form using the E-Ballot Portal should NOT also submit a paper Opt Out Form.

> **Use of Hard Copy Opt Out Form.** To ensure that your hard copy Opt Out Form is counted clearly sign and return your Opt Out Form in the enclosed pre-addressed, pre-paid envelope or via first class mail, overnight courier, or hand delivery to: McDermott Opt Out Form Processing, c/o Prime Clerk, One Grand Central Place, 60 East 42nd Street, Suite 1440, New York, NY 10165.

**THIS OPT OUT FORM MUST BE ACTUALLY RECEIVED BY THE SOLICITATION AGENT BY WEDNESDAY, FEBRUARY 19, 2020, AT 4:00 P.M. PREVAILING CENTRAL TIME (THE "RESPONSE DEADLINE"). IF THE OPT OUT FORM IS RECEIVED AFTER THE RESPONSE DEADLINE, IT WILL NOT BE COUNTED.**

<u>Item 1.</u>  **Amount of Claim or Interests.**

The undersigned hereby certifies that, as of Friday, January 17, 2020 (the "Voting Record Date"), the undersigned was the holder of either (a) Class 1 Other Secured Claims, (b) Class 2 Other Priority Claims, (c) Class 3 Other Prepetition Financing Claims, (d) Class 4 Bilateral Facility Claims, (e) Class 10 General Unsecured Claims, (d) Class 13 Existing Preferred Equity Interests in McDermott, or (e) Class 14 Existing Common Equity Interests in McDermott in the following aggregate amount (insert amount in box below)[1]:

---

Class 1 Other Secured Claims Amount $ _____

OR

Class 2 Other Priority Claims Amount $ _____

OR

Class 3 Other Prepetition Financing Claims Amount $ _____

OR

---

[1]  To the extent there are any discrepancies between the applicable registers or records of holders and the amounts claimed on this opt-out form, the applicable registers or records shall govern.

> Class 4 Bilateral Facility Claims Amount $ _____
>
> OR
>
> Class 10 General Unsecured Claims Amount $ _____
>
> OR
>
> Class 13 Existing Preferred Equity Interests in McDermott Amount $ _____
>
> OR
>
> Class 14 Existing Common Equity Interests in McDermott Amount $ _30,000 Shares_

**Item 2.**  **Important information regarding the Third-Party Release.**

Article VIII.D of the Plan contains the following **Third-Party Release:**

Except as otherwise expressly set forth in this Plan or the Confirmation Order, on and after the Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is, and is deemed hereby to be, fully, conclusively, absolutely, unconditionally, irrevocably and forever, released and discharged by each Releasing Party, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all Claims and Causes of Action, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, contingent or non-contingent, in law, equity, contract, tort, or otherwise, including any derivative claims asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim against, or Interest in, a Debtor or other Entity, or that any holder of any Claim against, or Interest in, a Debtor or other Entity could have asserted on behalf of the Debtors, based on or relating to, or in any manner arising from, in whole or in part:

1.   the Debtors (including the capital structure, management, ownership, or operation thereof), the business or contractual arrangement between the Debtors and any Releasing Party, any Securities issued by the Debtors and the ownership thereof, the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in- or out-of-court restructuring efforts, any Avoidance Actions (but excluding Avoidance Actions brought as counterclaims or defenses to Claims asserted against the Debtors), intercompany transactions between or among a Company Party and another Company Party, the Superpriority Credit Agreement, the Credit Agreement, the 2021 LC Agreement, the Lloyds Letter of Credit Agreement, Senior Notes Indenture, the Senior Notes, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Restructuring Support Agreement, the Disclosure Statement, the DIP Credit Agreement, the Exit Facility Documents, or the Plan (including, for the avoidance of doubt, the Plan Supplement);

2.   any Restructuring Transaction, contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Restructuring Support Agreement, the Rights

8

Offering, the Disclosure Statement, the DIP Credit Agreement, the New Warrants Agreements, the Exit Facility Documents, the Plan, or the Plan Supplement, before or during the Chapter 11 Cases,

3. the Chapter 11 Cases, the filing of the Chapter 11 Cases, the Disclosure Statement, or the Plan, the solicitation of votes with respect to the Plan, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, the Rights Offering, or the distribution of property under the Plan or any other related agreement; or

4. any related act or omission, transaction, agreement, event, or other occurrence related or relating to any of the foregoing taking place on or before the Effective Date, including all Avoidance Actions or other relief obtained by the Debtors in the Chapter 11 Cases.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (i) any party of any obligations related to customary banking products, banking services or other financial accommodations (except as may be expressly amended or modified by the Plan and the Exit Facility Documents, or any other financing document under and as defined therein), (ii) any post-Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Restructuring Transaction, or any document, instrument, any Definitive Document, or any agreement (including those set forth in the Plan Supplement) executed to implement the Plan, including the Exit Facility Documents, the New Warrants Agreements, or any Claim or obligation arising under the Plan, or (iii) the rights of holders of Allowed Claims to receive distributions under the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the foregoing third-party release, which includes by reference each of the related provisions and definitions contained herein, and, further, shall constitute the Bankruptcy Court's finding that the foregoing third-party release is: (a) consensual; (b) essential to the Confirmation of the Plan; (c) given in exchange for a substantial contribution and for the good and valuable consideration provided by the Released Parties that is important to the success of the Plan; (d) a good faith settlement and compromise of the Claims released by the foregoing third-party release; (e) in the best interests of the Debtors and their Estates; (f) fair, equitable, and reasonable; (g) given and made after due notice and opportunity for hearing; and (h) a bar to any of the Releasing Parties asserting any claim or Cause of Action released pursuant to the foregoing third-party release.

Definitions Related to the Third-Party Release:

UNDER THE PLAN, "*RELEASED PARTY*" MEANS EACH OF THE FOLLOWING, SOLELY IN ITS CAPACITY AS SUCH: (A) EACH DEBTOR; (B) EACH REORGANIZED DEBTOR; (C) EACH COMPANY PARTY; (D) EACH DIP LENDER AND EACH DIP LETTER OF CREDIT ISSUER; (E) EACH AGENT; (F) THE SENIOR NOTES TRUSTEE; (G) EACH CONSENTING STAKEHOLDER; (H) EACH HEDGE BANK; (I) EACH CASH MANAGEMENT BANK; (J) EACH LENDER UNDER THE SUPERPRIORITY CREDIT AGREEMENT, CREDIT AGREEMENT, THE 2021 LC AGREEMENT, AND THE LLOYDS LETTER OF CREDIT AGREEMENT; (K) EACH HOLDER OF AN OBLIGATION (AS DEFINED IN THE SUPERPRIORITY CREDIT AGREEMENT) UNDER THE SUPERPRIORITY CREDIT AGREEMENT; (L) EACH HOLDER OF AN OBLIGATION (AS DEFINED IN THE CREDIT AGREEMENT) UNDER THE CREDIT AGREEMENT; (M) EACH ISSUER (AS DEFINED IN THE SUPERPRIORITY CREDIT AGREEMENT) UNDER THE SUPERPRIORITY CREDIT AGREEMENT; (N) EACH ISSUER (AS DEFINED IN THE CREDIT AGREEMENT) UNDER THE CREDIT AGREEMENT; (O) THE TERM LOAN AD HOC GROUP, THE LIQUIDITY LENDER

9

STEERING COMMITTEE, AND THE SENIOR NOTES AD HOC GROUP; (P) EACH CURRENT AND FORMER AFFILIATE OF EACH ENTITY IN CLAUSE (A) THROUGH (O); AND (Q) EACH RELATED PARTY OF EACH ENTITY IN CLAUSE (A) THROUGH (O); PROVIDED THAT ANY HOLDER OF A CLAIM OR INTEREST THAT OPTS OUT OF THE RELEASES SHALL NOT BE A "RELEASED PARTY."

UNDER THE PLAN, "*RELEASING PARTIES*" MEANS EACH OF THE FOLLOWING, SOLELY IN ITS CAPACITY AS SUCH: (A) EACH DEBTOR; (B) EACH REORGANIZED DEBTOR; (C) EACH COMPANY PARTY; (D) EACH DIP LENDER AND EACH DIP LETTER OF CREDIT ISSUER; (E) EACH AGENT; (F) THE SENIOR NOTES TRUSTEE; (G) EACH CONSENTING STAKEHOLDER; (H) EACH HEDGE BANK; (I) EACH CASH MANAGEMENT BANK; (J) EACH LENDER UNDER THE SUPERPRIORITY CREDIT AGREEMENT, CREDIT AGREEMENT, THE 2021 LC AGREEMENT, AND THE LLOYDS LETTER OF CREDIT AGREEMENT; (K) EACH HOLDER OF AN OBLIGATION (AS DEFINED IN THE SUPERPRIORITY CREDIT AGREEMENT) UNDER THE SUPERPRIORITY CREDIT AGREEMENT; (L) EACH HOLDER OF AN OBLIGATION (AS DEFINED IN THE CREDIT AGREEMENT) UNDER THE CREDIT AGREEMENT; (M) EACH ISSUER (AS DEFINED IN THE SUPERPRIORITY CREDIT AGREEMENT) UNDER THE SUPERPRIORITY CREDIT AGREEMENT; (N) EACH ISSUER (AS DEFINED IN THE CREDIT AGREEMENT) UNDER THE CREDIT AGREEMENT; (O) THE TERM LOAN AD HOC GROUP, THE LIQUIDITY LENDER STEERING COMMITTEE, AND THE SENIOR NOTES AD HOC GROUP; (P) ALL HOLDERS OF CLAIMS OR INTERESTS THAT VOTE TO ACCEPT OR ARE DEEMED TO ACCEPT THE PLAN; (Q) ALL HOLDERS OF CLAIMS OR INTERESTS THAT ABSTAIN FROM VOTING ON THE PLAN AND WHO DO NOT AFFIRMATIVELY OPT OUT OF THE RELEASES PROVIDED BY THE PLAN BY CHECKING THE BOX ON THE APPLICABLE BALLOT INDICATING THAT THEY OPT NOT TO GRANT THE RELEASES PROVIDED IN THE PLAN; (R) ALL HOLDERS OF CLAIMS OR INTERESTS THAT VOTE TO REJECT THE PLAN OR ARE DEEMED TO REJECT THE PLAN AND WHO DO NOT AFFIRMATIVELY OPT OUT OF THE RELEASES PROVIDED BY THE PLAN BY CHECKING THE BOX ON THE APPLICABLE BALLOT INDICATING THAT THEY OPT NOT TO GRANT THE RELEASES PROVIDED IN THE PLAN; (S) EACH CURRENT AND FORMER AFFILIATE OF EACH ENTITY IN CLAUSE (A) THROUGH (R); AND (T) EACH RELATED PARTY OF EACH ENTITY IN CLAUSE (A) THROUGH (R).

**IMPORTANT INFORMATION REGARDING THE RELEASES:**

AS A HOLDER OF A CLAIM OR INTEREST, YOU ARE A "RELEASING PARTY" UNDER THE PLAN AND ARE DEEMED TO PROVIDE THE THIRD-PARTY RELEASE CONTAINED IN ARTICLE VIII.D OF THE PLAN, AS SET FORTH ABOVE. YOU MAY CHECK THE BOX BELOW TO ELECT NOT TO GRANT THE RELEASE CONTAINED IN ARTICLE VIII.D OF THE PLAN. YOU WILL NOT BE CONSIDERED A "RELEASING PARTY" UNDER THE PLAN ONLY IF (I) THE BANKRUPTCY COURT DETERMINES THAT YOU HAVE THE RIGHT TO OPT OUT OF THE RELEASES AND (II) YOU (A) CHECK THE BOX BELOW AND SUBMIT THE BALLOT BY THE VOTING DEADLINE, (B) FILE AN OBJECTION TO THE RELEASES CONTAINED IN THE PLAN WITH THE BANKRUPTCY COURT PRIOR TO THE PLAN OBJECTION DEADLINE, OR (C) VOTE TO REJECT THE PLAN AND SUBMIT THE BALLOT BY THE VOTING DEADLINE. THE ELECTION TO WITHHOLD CONSENT TO GRANT THE THIRD-PARTY RELEASE IS AT YOUR OPTION.

☑ **By checking this box, you elect to opt out of the Third-Party Releases.Item 3.**

Certifications.

10

By signing this Opt Out Form, the undersigned certifies:

(a) that, as of the Voting Record Date, either:  (i) the Entity is the Holder of the Claim or Interests set forth in Item 1; or (ii) the Entity is an authorized signatory for an Entity that is a Holder of the Claim or Interests set forth in Item 1;

(b) that the Holder has received a copy of the *Notice of Non-Voting Status to Holders of (I) Unimpaired Claims Conclusively Presumed to Accept the Plan and (II) Impaired Claim Conclusively Presumed to Reject the Plan* and that this Opt Out Form is made pursuant to the terms and conditions set forth therein;

(a) that the Entity has submitted the same respective election concerning the releases with respect to all Claims or Interests in a single Class set forth in Item 1; and

(b) that no other Opt Out Form with respect to the amount(s) of Claims or Interests identified in Item 1 have been submitted or, if any other Opt Out Forms have been submitted with respect to such Claims or Interests, then any such earlier Opt Out Forms are hereby revoked.

| | |
|---|---|
| Name of Holder: | *Michael D. Van Deelen* |
| | (Print or Type) |
| Signature: | *Michael D. Van Deelen* |
| Name of Signatory: | |
| | (If other than holder) |
| Title: | *N/A* |
| Address: | *16215 Friar Circle* |
| | *Spring, TX 77379* |
| Telephone Number: | *832-562-0723* |
| Email: | *michaelvandeelen @ gmail.com* |
| Date Completed: | *2/13/20* |

## PLEASE SUBMIT YOUR OPT OUT FORM BY ONE OF THE FOLLOWING TWO METHODS:

**Via Paper Form.** Complete, sign, and date this Opt Out Form and return it (with an original signature) promptly via first class mail (or in the enclosed reply envelope provided), overnight courier, or hand delivery to:

<div align="center">

**McDermott Opt Out Form Processing**
**c/o Prime Clerk LLC**
**One Grand Central Place**
**60 East 42nd Street, Suite 1440**
**New York, NY 10165**

</div>

11

Michael Van Deelen
16215 Friar Circle
Spring, TX 77379

MC Dermott Opt Out form processing
c/o Prime Clerk LLC
One Grand Central Place
60 East 42nd Street, Suite 1440
New York, NY 10165

12



Address:              4656 FM 1960 RD W
                      HOUSTON
                      TX 77069
Location:             DWHK
Device ID:            -BTC02
Transaction:          940256549995

FedEx Standard Overnight
390386463532    0.2 lbs. (S)      38.45
    Declared Value    100
Recipient Address:
    C/O Prime Clerk LLC
    McDermott Opt Out Form Processing
    60 East 42nd Street, Ste 1440
    One Grand Central Place
    New York, NY 10165
    0000000000

Scheduled Delivery Date 2/17/2020

Pricing option:
    ONE RATE

Package Information:
    FedEx Envelope

        Shipment subtotal:      $38.45

            Total Due:      $38.45

        (S) CreditCard:      $38.45
        ************1248

/3

**IMPORTANT!**
We are continuing to respond to the impact of COVID-19 around the world. See our latest updates. For COVID-19-related recipient closures, you can redirect packages, Ask FedEx, or contact the shipper.

390386463532

# Delivered
## Monday 2/17/2020 at 9:13 am

**DELIVERED**

Signed for by: O.OBEE

**GET STATUS UPDATES**

**OBTAIN PROOF OF DELIVERY**

| FROM | TO |
|---|---|
| SPRING, TX US | NEW YORK, NY US |

## Shipment Facts

| TRACKING NUMBER | SERVICE | SPECIAL HANDLING SECTION |
|---|---|---|
| 390386463532 | FedEx Standard Overnight | Deliver Weekday, No Signature Required |

**SHIP DATE**

**ACTUAL DELIVERY**
Mon 2/17/2020 9:13 am

Fri 2/14/2020

## Travel History

Local Scan Time

Monday , 2/17/2020

| 9:13 am | NEW YORK, NY | Delivered |
|---|---|---|

14

**EXHIBIT 2**

**MONTGOMERY COUNTY DISTRICT COURT SCHEDULE**

# 284th District Court

## Judge Kristin Bays

**The Trial Line Up was last updated on 05/03/2021 at 2:41 p.m.**

| | Cause No. | Style | Case Activity | Time Estimate | Status |
|---|---|---|---|---|---|
| | | **Trial Line up for Week of May 3, 2021** | | | |
| | 19-10-14181 | Wilmington Savings Fund Society v. Deleon | Bench Trial | 30 min | Set for Bench Trial on 5/3/2021 at 9:00 am via Zoom Video Conferencing.  Contact the Court for meeting details. |
| | 20-07-08162 | Specialty Associates of West Houston PLLC v. Thompson | | | Settled - Set for Entry 06/25/2021 at 9 am by submission |
| | 20-06-07582 | White v. White | Bench Trial | 1/2 day | Set for Bench Trial on 5/3/2021 at 1:30 pm via Zoom Video Conferencin |

/

| | | | | | g. Contact the Court for meeting details. |
|---|---|---|---|---|---|
| #1 | 19-06-07953 | Mace v. Castleberry, et al | Jury Trial | 2-3 days | Set for Jury Trial on 05/06/2021 at 9:00 AM. Pre-Trial to begin at 8:00 am. |
| #2 | 19-10-13366 | Salazar v. JFM International | | | Settled - Set for Entry on 06/25/2021 at 9 am by submission |
| #3 | 20-07-08999 | Langley v. CHCH Conroe | | | continuance granted |
| | 20-08-09539 | LVNV Funding v. Brown | Bench Trial | 30 min | Set for Bench Trial on 5/07/2021 at 2:00 pm via Zoom Video Conferencing. Contact the Court for meeting details. |
| **Trial Line up for Week of May 10, 2021** | | | | | |
| | 19-02-02658 | Shops at Northpark v. Mian | Bench Trial | 1 day | Set for Bench Trial on 5/12/2021 at 10:00 am via |

2

| | | | | | Zoom Video Conferencing.  Contact the Court for meeting details. |
|---|---|---|---|---|---|
| # 1 | 19-08-10771 | Wakefield v. Sparks | Jury Trial | 2 days | Set for Jury Trial on 5/13/2021 at 9:00 AM. Pre-Trial to begin at 8:00 am. |
| # 2 | 20-05-05746 | Clements v. Almaguer | Jury Trial | 2-3 days | Set for Jury Trial on 5/13/2021 at 9:00 AM (in the event that #1 case does not go forward) Pre-Trial to begin at 8:00 am. |
| # 3 | 20-04-04687 | Walden on Lake Conroe CIA v. McWhorter | Jury Trial | 1/2 day | continuance granted |
| | | | | | |

000386

# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| | ) | Chapter 11 |
| MCDERMOTT INTERNATIONAL, INC, *et al* | ) | |
| | ) | Case No. 20-30336 |
| Reorganized Debtor(s). | ) | |
| | ) | (Jointly Administered) |
| | ) | |
| | ) | |
| MICHAEL VAN DEELEN | ) | |
| | ) | |
| Plaintiff, | ) | Adv. Proc. No. 20-3309 |
| | ) | |
| v. | ) | |
| | ) | |
| DAVID DICKSON, | ) | |
| and STUART SPENCE, | ) | |
| and SCOTT LAMB, | ) | |
| and 10 JOHN/JANE DOES | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER REMANDING THIS CASE TO MONTGOMERY COUNTY, TEXAS, DISTRICT COURT AND DENYING DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED PETITION

The Court, having considered the Defendants' Motion to Dismiss Plaintiff's First Amended Petition and Plaintiff's Motion to Remand this case to Montgomery County, Texas, District Court, as well as the evidence presented, finds that the Defendants' Motion to Dismiss be DENIED and the Plaintiff's Motion to Remand be GRANTED. The Court:

ORDERS that the Defendants' Motion to Dismiss Plaintiff's First Amended Petition is denied.

21

ORDERS that the Plaintiff's Motion to Remand this case to Montgomery County,

Texas, District Court is granted.

_____

JUDGE
UNITED STATES BANKRUPTCY COURT

# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| MCDERMOTT INTERNATIONAL, INC, *et al* | ) | |
| | ) | Case No. 20-30336 |
| Reorganized Debtor(s). | ) | |
| | ) | (Jointly Administered) |
| | ) | |
| | ) | |
| MICHAEL VAN DEELEN | ) | |
| | ) | |
| Plaintiff, | ) | Adv. Proc. No. 20-3309 |
| | ) | |
| v. | ) | |
| | ) | |
| DAVID DICKSON, | ) | |
| and STUART SPENCE, | ) | |
| and SCOTT LAMB, | ) | |
| and 10 JOHN/JANE DOES | ) | |
| | ) | |
| Defendants. | ) | |

## NOTICE OF HEARING

Please take notice that the Court will conduct a hearing on the following matters on **June 7, 2021, at 9:00 a.m.**, via telephone and video conference before the Honorable David Jones, United States Bankruptcy Court, Southern District of Texas, Houston Division, as follows:

1. Plaintiff's Motion to Remand His State Law Cause of Action Against the Defendants to Montgomery County, Texas, District Court Because the Federal Bankruptcy Court Does Not Have Jurisdiction Over Plaintiff's Montgomery County Cause of Action, Because Remand Is Required Pursuant to 28 U.S.C. Section 1334(c)(2) and Because Remand Is Permissive Pursuant to U.S.C. Section 1334(c)(1) (Docket No. 4).

23

2.  The Defendants Motion to Dismiss Plaintiff's First Amended Petition (Docket Nos. 50, 51) and Plaintiff's Response to Defendants' Motion to Dismiss Plaintiff's First Amended Petition.

3.  If necessary after the hearing of the above, all other pending matters.

DATED: May 20, 2021

Respectfully submitted,

/s/ Michael Van Deelen
Michael Van Deelen
Plaintiff
16215 Friar Circle
Spring, TX 77379
832-562-0723
michaelvandeelen@gmail.com

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| MCDERMOTT INTERNATIONAL, INC., *et al.*,[1] | § | Case No. 20-30336 (DRJ) |
| | § | |
| Reorganized Debtors. | § | (Jointly Administered) |
| | § | |
| | § | |
| MICHAEL VAN DEELEN | § | |
| | § | |
| Plaintiff, | § | Adv. Proc. No. 20-03309 |
| | § | |
| v. | § | |
| | § | |
| DAVID DICKSON, | § | |
| and STUART SPENCE, | § | |
| and SCOTT LAMB, | § | |
| and 10 JOHN/JANE DOES | § | |
| | § | |
| Defendants. | § | |
| | § | |

## REPLY IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS
## PLAINTIFF'S FIRST AMENDED PETITION

---

[1] A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://cases.primeclerk.com/McDermott. The location of Debtor McDermott International, Inc.'s principal place of business and the Debtors' service address in these chapter 11 cases is 757 North Eldridge Parkway, Houston, Texas 77079.

Defendants David Dickson, Stuart Spence, and Scott Lamb (collectively, "Defendants") hereby file this Reply in Support of their Motion to Dismiss Plaintiff's First Amended Petition, and in support thereof, would respectfully show the Court as follows:

## I.      PRELIMINARY STATEMENT

After having amended his complaint, Van Deelen continues to base his negligent misrepresentation claim on conduct related to the Debtors' bankruptcy and restructuring that is subject to the Exculpation in the Confirmation Order, and his generalized fraud allegations still do not allege the specifics that would be necessary to survive a motion to dismiss.  In his Response to Defendants' Motion to Dismiss (the "Response"), Van Deelen does not even attempt to grapple with Defendants' argument that the Exculpation encompasses his negligent misrepresentation claim, or that his claims fail to satisfy the heightened pleading standard under Rule 9(b), though. Instead, Van Deelen argues that the Court lacks subject matter jurisdiction because his claims do not "relate to" McDermott's bankruptcy proceedings; that he opted out of the Exculpation; that the Court should abstain from hearing the Defendants' Motion to Dismiss; and that Rule 9(b) does not apply to state law claims.  For the reasons set forth below, these arguments are meritless, and the Court should dismiss Van Deleen's First Amended Complaint with prejudice.

## II.      LEGAL STANDARD

### A.      Subject Matter Jurisdiction

1.      Bankruptcy courts derive their subject matter jurisdiction from 28 U.S.C. §§ 1334 and 157. *See In re U.S. Brass Corp.*, 301 F.3d 296, 303-05 (5th Cir. 2002). Together, and "[b]y way of district-court referral," these sections provide bankruptcy courts with the power to hear (1) cases under title 11; (2) core proceedings "arising under" title 11; (3) core proceedings "arising in"

a case under title 11; and (4) non-core proceedings "related to" a case under title 11. *See* 28 U.S.C. §§ 1334(b), 157(a)-(c)(1).

2.      The fourth category—"related to" proceedings—is the broadest, and encompasses any proceeding for which "the outcome . . . could *conceivably* have an effect . . . on the estate being administered in bankruptcy." *In re U.S. Brass Corp.*, 301 F.3d at 304 (emphasis in original). Moreover, and because "the second, third, and fourth categories . . . operate conjunctively to define the scope of jurisdiction," bankruptcy courts often just need "to determine whether a matter is . . . 'related to' the bankruptcy." *Id*.

3.      Still, the distinction between these categories becomes more important after the bankruptcy court has confirmed the debtor's plan of reorganization. The Fifth Circuit has held that, following confirmation, and as far as non-core, "related to" proceedings are concerned, "bankruptcy jurisdiction[] ceases to exist, other than for matters pertaining to the implementation or execution of the plan[,]" if: (1) the claims primarily arise from post-confirmation relations between the parties; (2) no claims or antagonisms were pending between the parties on the date of plan confirmation; and (3) no facts or law deriving from the bankruptcy are necessary to the claims. *Newby v. Enron Corp. (In re Enron Corp. Securities)*, 535 F.3d 325, 335 (5th Cir. 2008) (quoting *In re Craig's Stores of Texas, Inc.*, 266 F.3d 388, 390 (5th Cir. 2001)). But "the Fifth Circuit has emphasized that  . . . all three factors [need] not weight heavily in the bankruptcy court's favor" for there to be jurisdiction. *In re MSB Energy, Inc.*, 438 B.R. 571, 586 (Bankr. S.D. Tex. 2010); *In re Enron Corp. Securities*, 535 F.3d at 335-36.

4.      The Fifth Circuit has not similarly limited post-confirmation bankruptcy jurisdiction over "core" (i.e., "arising under" or "arising in") proceedings. *See, e.g.*, *In re Talsma*, 509 B.R. 535 (Bankr. N.D. Tex. 2014) ("*Craig's Stores* involved claims that invoked only "related

to" jurisdiction. . . . [C]ourts have treated core proceedings differently post-confirmation than the "related to" proceedings within the scope of *Craig's Stores*."); *Faulkner v. Eagle View Capital Mgt. (In re Heritage Org., L.L.C.)*, 454 B.R. 353, 364-65 (Bankr. N.D. Tex. 2011) (concluding that *Craig's Stores* did not apply to an "arising under" proceeding brought pursuant to 11 U.S.C. 550 post-confirmation).

5.      In this context, "core proceedings" are those that "invoke[] a substantive right provided by title 11" or "could arise only in the context of a bankruptcy case," *In re U.S. Brass Corp.*, 301 F.3d at 304, and include proceedings which would require interpretation of bankruptcy court orders. For example, "bankruptcy courts retain significant jurisdiction after a discharge order is issued and a case is closed over matters concerning the interpretation and enforcement of bankruptcy court orders . . . Such matters fall within the Court's 'arising in' and arising under' jurisdiction." *Cano v. GMAC Mortg. Corp. (In re Cano)*, 410 B.R. 506, 548-49 (Bankr. S.D. Tex. 2009); *see also In re ABC Dentistry, P.A.,* No. H-16-34221-11, 2019 WL 6894775, at *6 (S.D. Tex. Dec. 17, 2019) (because the removed action would require the bankruptcy court to interpret rights associated with its order dividing settlement proceeds, "the Bankruptcy Court did not err in determining that it had 'arising in or under jurisdiction' over the removed action"); *see also Travelers Indemnity Co. v. Bailey*, 129 S. Ct. 2195, 2205 (2009) (a bankruptcy court "plainly ha[s] jurisdiction to interpret and enforce its own prior orders").

**B.      Mandatory Abstention**

6.      The party seeking mandatory abstention must show that: (1) the claim has no independent basis for federal jurisdiction, other than section 1334(b); (2) the claim is a non-core proceeding, *i.e.*, it is related or in a case under title 11; (3) an action has been commenced in state court; and (4) the action could be adjudicated timely in state court. *In re TXNB Internal Case*, 483 F.3d 292, 300 (5th Cir.), *cert. denied*, 552 U.S. 1022, 128 S. Ct. 613 (2007).

7.      Specifically, the party seeking mandatory abstention must prove the existence of each element by a preponderance of the evidence. *In re Lorax Corp.*, 295 B.R. 83, 90 (Bankr. N.D. Tex. 2003). A party is not entitled to mandatory abstention if it fails to prove any one of the statutory requirements. *Id*.; *see also In re Montalvo*, 559 B.R. 825, 842 (Bankr. S.D. Tex. 2016) (the bankruptcy court refused to abstain because the fourth factor was not demonstrated)

## III.      ARGUMENT

**A.      The Court has subject matter jurisdiction because Plaintiff's First Amended Complaint violates the Court's Confirmation Order.**

8.      In his Response, Van Deelen first argues that the Court lacks subject matter jurisdiction to hear Defendants' Motion to Dismiss because he does not plead claims "relating to" McDermott's chapter 11 proceedings. (Dkt. 52 at 5-6.)  This argument fails for at least three reasons.

9.      ***First***, the Court has jurisdiction because this is a core proceeding.  Bankruptcy courts retain jurisdiction over core proceedings, including any proceeding that would require the court to interpret or enforce its orders, even following confirmation. *See, e.g.*, *In re Cano*, 410 B.R. at 548-49; *In re ABC Dentistry, P.A.*, 2019 WL 6894775 at *6; *see also Travelers Indemnity Co.*, 129 S. Ct. at 2205.  In this case, the Court will have to interpret and enforce its Confirmation Order—specifically, the Exculpation. *See, e.g.*, *In Matter of Galaz*, 841 F.3d 316 (5th Cir. 2016) (holding that bankruptcy court had post-confirmation jurisdiction over removed state court action seeking to recover on pre-confirmation claims in violation of debtor's discharge rights).

10.      As set forth in Defendants' Motion to Dismiss, the Confirmation Order contains an Exculpation that "released and exculpated [the Exculpated Parties] from any [non-fraud] Claims and Cause[s] of Action . . . related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 cases, . . . the filing of the Chapter 11 Cases, the pursuit of Confirmation,

4

[and] the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the plan[.]" (Bankr. Dkt. 684, Confirmation Order ¶ 52.)

11.     The Exculpation applies here because, as a threshold matter, Defendants are current or former officers and/or employees of McDermott and therefore "Exculpated Parties" for purposes of the Confirmation Order. (Bankr. Dkt. 620, Plan, Art. I, § A.)  Moreover, Van Deelen's negligent misrepresentation claim is "related to" actions Defendants allegedly took in connection with McDermott's restructuring and administration of the Plan.  Indeed, Van Deelen specifically alleges in Count II of his Amended Petition that he "was directly harmed by the actions of the defendants" because he "would not have purchased  or retained McDermott International stock if [he] had been provided accurate and not misleading information by the defendants about . . . the defendants' plan to take the company into bankruptcy." *See* Dkt. 50 ¶¶ 108-09; *see also id*. ¶¶ 16, 27, 31-34, 36-37, 40, 45, 47, 54, 63-64, 67 (factual allegations relating to McDermott's restructuring).

12.     Because Van Deelen's negligent misrepresentation claim directly "relate[s] to" McDermott's restructuring and the "administration and implementation of the Plan," and will require that the Court interpret and enforce the Exculpation, this is a core proceeding over which the Court has subject matter jurisdiction. *See In Matter of Galaz*, 841 F.3d at 322 ("Galaz's suit in state court is arguably a violation of Katona's discharge rights, directly implicating the bankruptcy court's 'arising under' jurisdiction."); *id*. ("Even though Katona's bankruptcy case was closed, the bankruptcy court retains jurisdiction to consider violations of the discharge order; the order of discharge necessarily implicates the implementation or execution of the plan."); *In re Talsma*, 509 B.R. at 550 ("[D]etermining whether a provision of a Plan or Plan Document has been breached necessarily requires interpreting that provision.").

13.     *Second*, even if this weren't a core proceeding (it is), the Court would still have jurisdiction. In determining whether post-confirmation "related to" jurisdiction exists, courts first examine the *Craig's Stores* factors, which are whether: (1) the claims primarily arise from pre-confirmation or post-confirmation relations between the parties; (2) any claims or antagonisms were pending between the parties on the date of plan confirmation; and (3) any facts or law deriving from the bankruptcy are necessary to the claims. *In re Enron Corp. Securities*, 535 F.3d at 335; *In re MSB Energy, Inc.*, 438 B.R. at 571 (applying factors and finding that post-confirmation "related to" bankruptcy jurisdiction existed).

14.     In this case, Van Deelen's negligent misrepresentation claim arises from pre-confirmation relations between the parties. Indeed, Van Deelen based these claims on actions that Defendants allegedly took and misrepresentations Defendants allegedly made in connection with and in the months leading up to McDermott's petition for relief under chapter 11. *See, e.g.*, Dkt. 50 ¶¶ 16, 27, 31-34, 36-37, 40, 45, 47, 54, 63-64, 67. The first *Craig's Stores* factor therefore weighs in favor of the bankruptcy court's jurisdiction. *See, e.g.*, *In re Blast Energy Servs., Inc.*, 396 B.R. 676, 684 (Bankr. S.D. Tex. 2008) ("[A]lthough the dispute arose post-confirmation, the claims against Hallwood . . . arose pre-confirmation. Thus, the claims at issue primarily deal with pre-confirmation relations between the parties[.]"); *In re MSB Energy, Inc.*, 438 B.R. at 586 (holding that the first factor "weighs heavily in favor of bankruptcy court jurisdiction" because "the subject of the Adversary Proceeding" occurred before the confirmation date).

15.     With regard to the second factor, there were clear "antagonisms" pending between the parties on the date of confirmation. At that time, Van Deelen had already filed a motion objecting to McDermott's plan of reorganization, and had accused the company and Defendants of acting in bad faith "for the sole purpose of enriching McDermott's management and Board."

6

(Bankr. Dkt. 510, Motion at 6-15.). Moreover, during the confirmation hearing itself, Van Deelen made certain threatening and vulgar remarks to counsel for the Debtors, such that the Debtors sought emergency relief from this Court to prohibit Van Deelen from further direct contact with the Debtors, their current or former officers, directors and employees, and their counsel. (Bankr. Dkt. 694 ¶¶ 7, 16.). This is more than enough to satisfy the second factor. *See, e.g.*, *In re MSB Energy, Inc.*, 438 B.R. at 586 (second factors "weighs heavily in favor" of bankruptcy court jurisdiction because the plaintiffs had filed a motion to lift the automatic stay and objected the reorganization plan prior to the confirmation hearing).

16.     Finally, the third factor is also satisfied because the resolution of this action turns, at least in part, on the Confirmation Order's Exculpation. *But see id*. at 586-87 ("At this point, pursuant to the analysis presented in *Enron*, the Court retains its jurisdiction even if the third factor fails."). As previously discussed, Van Deelen's negligent misrepresentation claim falls squarely within the ambit of this provision, and will require that the Court interpret and enforce the provision as the case proceeds. The Confirmation Order is therefore "necessary to the claims," such that the third factor weighs in favor of bankruptcy court jurisdiction. *Id*. at 589 ("The Complaint represents a formal lawsuit reflecting the pre-confirmation conflict between the parties, the resolution of which assuredly hinges on an evaluation of facts and law derived from the underlying Chapter 11 case, as well as the language presented in the Plan and Confirmation Order. Under all of these circumstances, this third factor also weighs heavily in favor of this Court having jurisdiction over the Adversary Proceeding.").

17.     ***Third***, and even if the *Craig's Stores* factors were not satisfied here (though they unequivocally are), the Court would still have jurisdiction. The absence of such factors does not strip bankruptcy courts of all "related to" jurisdiction—it just limits such jurisdiction to actions

that would affect "the implementation or execution of the plan." *In re Enron Corp. Securities*, 535 F.3d at 335. In this case, Van Deelen's action *would* affect the "execution of the [P]lan." Specifically, it would affect the Debtors' ability to enforce the Plan's Exculpation, as incorporated in the Confirmation Order. This is enough to establish the Court's jurisdiction. *In Matter of Galaz*, 841 F.3d at 322 ("[T]he order of discharge necessarily implicates the implementation or execution of the plan.").

**B.     The Exculpation bars certain claims regardless of whether the party bringing those claims opted out of the Release.**

18.     Perhaps realizing that the Exculpation *does* encompass his non-fraud claim, and that the Court has jurisdiction to enforce the Exculpation, Van Deelen next argues that he opted out of the Exculpation.  *See* Dkt. 52 at 6-7.  That is not the case.

19.     Prior to confirmation, McDermott provided Van Deelen and other claimants who were not otherwise entitled to vote on the Plan with an optional "Release Opt Out Form" (the "Form").  Importantly, the Form only permitted Van Deelen to opt out of the Plan's "Third-Party Release," ***not*** the Exculpation.  *See* Dkt. 52-1 at 8-10.  Specifically, the Form advised Van Deelen that:

> Holders of Claims and Interests are deemed to grant the Third-Party Release set forth in the Notice unless a holder affirmatively opts out or files an objection to the Third-Party Release with the Bankruptcy Court on or before the Plan Voting Deadline.

> If you believe you are a holder of a Claim or Interest with respect to McDermott International, Inc. or its affiliates and ***choose to opt out of the Third-Party Release*** set forth in Article VIII.D of the Plan, please complete, sign, and date this Opt Out Form and return it promptly via first class mail (or in the enclosed reply envelope provided), overnight courier, via the Solicitation Agent's online E-Ballot Portal, or hand delivery to Prime Clerk LLC (the "<u>Solicitation Agent</u>") at the address set forth below.

*Id*. at 7 (emphasis removed).

20.     The Form then outlined the Plan's "Third-Party Release" provisions, and provided Van Deelen with the option to opt out of these—and only these—provisions:

> ☑ **By checking this box, you elect to opt <u>out</u> of the Third-Party Releases.** <u>Item 3</u>.
> **Certifications.**

*Id*. at 8-10.

21.     The Form did not encompass or even address the Exculpation which is entirely separate from the Release.  Moreover, it is important that conduct that is not fraudulent that is performed in furtherance of a bankruptcy and restructuring be exculpated.  Otherwise, disgruntled constituents always could second-guess and re-litigate a bankruptcy case.

**C.     Mandatory abstention is inappropriate because this is a core proceeding and Van Deelen has not satisfied his burden of showing that this action could be adjudicated timely in state court.**

22.     Van Deelen did not satisfy his burden to show that his action is non-core or could be adjudicated timely in state court. As discussed above, this action is a "core proceeding" because it requires that the Court interpret and enforce its Confirmation Order and the Exculpation provided therein. *See, e.g.*, *See In Matter of Galaz*, 841 F.3d at 322 ("Galaz's suit in state court is arguably a violation of Katona's discharge rights, directly implicating the bankruptcy court's 'arising under' jurisdiction."); *In re Cano*, 410 B.R. at 548-49 ("[B]ankruptcy courts retain significant jurisdiction after a discharge order is issued and a case is closed over matters concerning the interpretation and enforcement of bankruptcy court orders . . . Such matters fall within the Court's 'arising in' and arising under' jurisdiction."); *In re ABC Dentistry, P.A.*, 2019 WL 6894775 at *6 ("the Bankruptcy Court did not err in determining that it had 'arising in or under jurisdiction' over the removed action" because it would require the court to interpret rights associated with the court's order dividing settlement proceeds).

23.    Nor could this action be adjudicated timely in state court. Factors relevant to this prong include "(a) the extent to which the suit has already been prosecuted in state court, (b) the expectation of when the state court trial will commence, and (c) evidence in contravention that the state court could timely adjudicate the case timely." *In re Hallwood Energy, L.P.*, No. 09-31253-H4-11, 2009 WL 2601294, at *8 (Bankr. S.D. Tex. Aug. 24, 2009).

24.    Here, Van Deelen has presented no evidence of prosecution, nor could he—Van Deelen has not prosecuted this action beyond filing his original petition in state court last year. He has not served or otherwise engaged in any discovery, he has not filed any motions or set such motions for hearing, and he has not sought or obtained any orders from the state court. *See, e.g.*, *In re Doctors Hosp. 1997, L.P.*, 351 B.R. 813, 846 n.29 (S.D. Tex. 2006) ("[T]he record reflects that during the 41 days that the suit was pending in [state] court, virtually nothing occurred. No hearings were held, no motions were filed, no discovery was conducted, and no orders were entered on the docket. Thus, unlike this Court, the Harris County District Court has no background at all about the nature of this lawsuit or the substantive issues to be adjudicated.").

25.    Neither was this case set for trial. *See, e.g.*, *In re Petroleum Prod. & Servs., Inc.*, 561 B.R. 662, 666 (Bankr. S.D. Tex. 2016) (courts in this circuit view a docket-control order setting dates for trial as evidence "sufficient to show that the state court will be familiar with the case and prosecute it efficiently"); *see also In re Mugica*, 362 B.R. 782, 793 (Bankr. S.D. Tex. 2007) (mandatory abstention was required when the plaintiffs demonstrated a history of prosecution in state court, including a trial setting).

26.    In the absence of any evidence that he has prosecuted his action or that trial is to commence on a given date, the fourth prong of the mandatory abstention analysis weighs against abstention, and the Court should deny Van Deelen's request. *See In re Lorax Corp.*, 295 B.R. at

90 (party not entitled to mandatory abstention if it fails to prove any one of the statutory requirements); *In re Montalvo*, 559 B.R. 825, 842 (Bankr. S.D. Tex. 2016) (the bankruptcy court refused to abstain because the fourth factor was not demonstrated).

**D.      Van Deelen's claims fail to satisfy the heightened pleading standards under Rule 9(b).**

27.      Finally, Van Deelen argues that because he did not plead federal claims, he was not required to satisfy the heightened pleading standards under Rule 9(b).  *See* Dkt. 52 at 16.  But whether Rule 9(b) applies to a given claim simply turns on the forum in which such claim is pending and the nature of the allegations supporting the claim.  Where, as here, a party is litigating his claims in federal court, and where the claims "alleg[e] fraud or mistake," the heightened pleading standards of Rule 9(b) apply.  *See* Fed. R. Civ. P. 9(b); *see also, e.g.*, *Shandong Yinguang Chemical Indus. Joint Stock Co., Ltd. v. Potter*, 607 F.3d 1029, 1033 (5th Cir. 2010) (dismissing Texas common law fraud claim under Rule 9(b)).

28.      Van Deelen did not satisfy those standards here.  Indeed, as set forth in Defendants' Motion to Dismiss, Van Deelen fails to identify with sufficient particularity the "false representations" that Defendants individually made to him, and he fails to plead any facts showing, with respect to Defendants' alleged omissions, that Defendants had a duty to disclose the allegedly omitted information.  Van Deelen has accordingly failed to plead his claims with the requisite particularity, and the Court should dismiss his First Amended Complaint with prejudice.

## IV.      <u>CONCLUSION</u>

Given that Van Deelen alleges that actions taken in the bankruptcy proceedings and related transactions give rise to his claims, this Court has subject matter jurisdiction over this action and should not abstain.  Moreover, and because Van Deelen has failed to satisfy the heightened

pleading standards applicable to his fraud and negligent misrepresentation claims under Rule 9(b),

the Court should dismiss Van Deelen's First Amended Complaint.

Houston, Texas
Dated:  June 3, 2021

Respectfully submitted,

*/s/ Matthew D. Cavenaugh*

**JACKSON WALKER LLP**
Matthew D. Cavenaugh (TX Bar No. 24062656)
Jennifer F. Wertz (TX Bar No. 24072822)
Veronica A. Polnick (TX Bar No. 24079148)
1401 McKinney Street, Suite 1900
Houston, TX 77010
Facsimile:   (713) 752-4221
Email:        mcavenaugh@jw.com
                  jwertz@jw.com
                  kpeguero@jw.com
                  vpolnick@jw.com

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Anna G. Rotman, P.C. (TX Bar No. 24046761)
Jamie Alan Aycock (TX Bar No. 24050241)
609 Main Street
Houston, TX 77002
Telephone:   (713) 836-3600
Facsimile:   (713) 836-3601
Email:        anna.rotman@kirkland.com
                  jamie.aycock@kirkland.com

-and-

John Christian (TX Bar No. 24109727)
1601 Elm Street
Dallas, TX 75201
Telephone:   (214) 972-1770
Facsimile:   (214) 972-1771
Email:         john.christian@kirkland.com

*Counsel to the Defendants*

## **CERTIFICATE OF SERVICE**

I hereby certify that on June 3, 2021, I caused a true and correct copy of the foregoing document to be served via the Court's ECF notification system to the parties listed below at the email addresses listed.

Michael Van Deelen
16215 Friar Circle
Spring, TX 77379
michaelvandeelen@gmail.com

*/s/ Matthew D. Cavenaugh*
Matthew D. Cavenaugh

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

United States Courts
Southern District of Texas
F I L E D

JUN 0 4 2021

Nathan Ochsner, Clerk of Court

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| MCDERMOTT INTERNATIONAL, INC, *et al* | ) | |
| | ) | Case No. 20-30336 |
| Reorganized Debtor(s). | ) | |
| | ) | (Jointly Administered) |
| | ) | |
| | ) | |
| MICHAEL VAN DEELEN | ) | |
| | ) | |
| Plaintiff, | ) | Adv. Proc. No. 20-3309 |
| | ) | |
| v. | ) | |
| | ) | |
| DAVID DICKSON, | ) | |
| and STUART SPENCE, | ) | |
| and SCOTT LAMB, | ) | |
| and 10 JOHN/JANE DOES | ) | |
| | ) | |
| Defendants. | ) | |

# PLAINTIFF'S EMERGENCY MOTION TO AMEND

**Emergency relief has been requested. A hearing will be conducted on this matter on June 7, 2021, at 11:00 am in Courtroom 400 , fourth floor, 515 Rusk, Houston, TX 77002.  You may participate in the hearing by audio/video connection.**

**Audio communication will be by use of the Court's dial-in facility. You may access the facility at (832) 917-1510. You will be responsible for your own long-distance charges. Once connected, you will be asked to enter the conference room number. Judge Jones' conference room number is 205691.**

**You may view video via GoToMeeting. To use GoToMeeting, the Court recommends that you download the free GoToMeeting application. To**

connect, you should enter the meeting code "Judge Jones" in the GoToMeeting app or click the link on Judge Jones' home page on the Southern District of Texas website. Once connected, click the settings icon in the upper right corner and enter your name under the personal information setting.

Hearing appearances must be made electronically, if available, in advance of the hearing. To make your electronic appearance, go to the Southern District of Texas website and select "Bankruptcy Court" from the top menu. Select "Judges' Procedures," then "View Home Page" for Judge Jones. Under "Electronic Appearance" select "Click here to submit Electronic Appearance". Select the case name, complete the required fields and click "Submit" to complete your appearance.

If you object to the relief requested or you believe that emergency consideration is not warranted, you must either appear at the hearing or file a written response prior to the hearing. Otherwise, the Court may treat the pleading as unopposed and grant the relief requested.

Relief is requested not later than June 7, 2021.


COMES NOW, the Plaintiff, Michael Van Deelen, and pursuant to Fed.

Rules Civ. Proc. Rule 15(a)(2), moves to amend his Plaintiff's First Amended

Petition (Doc. 50) as follows:

1.  Plaintiff seeks leave to remove Count 2, Negligent Misrepresentation,

from his Plaintiff's First Amended Petition.

2.  On March 10, 2021, the Court instructed Plaintiff to submit his Plaintiff's

First Amended Petition containing only state law causes of action.

3.  Due to perceived ambiguities in Articles VIII and VIII.D of the Confirmation Plan, Count 2 may or may not violate the Exculpation and Injunction provisions of the Plan.  Accordingly, in an abundance of caution, plaintiff seeks to remove Count 2 from his Plaintiff's First Amended Petition in order to fully comply with the Court's March 10, 2021, instruction.

4.  The Court should feely give leave to amend when justice so requires. *Fed. Rules Civ. Proc. Rule 15(a)(2).*

5.  Exhibit A herein contains Plaintiff's Second Amended Petition which is identical to Plaintiff's First Amended Petition except for its deletion of Count 2, Negligent Misrepresentation.

WHEREFORE, Plaintiff moves to amend his Plaintiff's First Amended Petition to remove Count 2, Negligent Misrepresentation, from said Plaintiff's First Amended Petition.

Respectfully submitted,

/s/ Michael Van Deelen
Michael Van Deelen
16215 Friar Circle
Spring, TX 77379
832-562-0723
michaelvandeelen@gmail.com
Plaintiff

## CERTIFICATE OF SERVICE

I hereby certify that I have on this 4th day of June, 2021, served a true and correct copy of the foregoing document on the defendants via the court-approved eFiling system, which will forward a copy thereof to all attorneys of record.


/s/ Michael Van Deelen
Michael Van Deelen

# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | |
| | ) | |
| | ) | Chapter 11 |
| MCDERMOTT INTERNATIONAL, INC, *et al* | ) | |
| | ) | Case No. 20-30336 |
| Reorganized Debtor(s). | ) | |
| | ) | (Jointly Administered) |
| | ) | |
| _____ | ) | |
| | ) | |
| MICHAEL VAN DEELEN | ) | |
| | ) | |
| Plaintiff, | ) | Adv. Proc. No. 20-3309 |
| | ) | |
| v. | ) | |
| | ) | |
| DAVID DICKSON, | ) | |
| and STUART SPENCE, | ) | |
| and SCOTT LAMB, | ) | |
| and 10 JOHN/JANE DOES | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER GRANTING PLAINTIFF'S MOTION TO REMOVE COUNT 2, NEGLIGENT MISREPRESENTATION, FROM PLAINTIFF'S FIRST AMENDED PETITION

The Court, having considered the Plaintiff's Motion to Amend, as well as the evidence

presented, finds that the Plaintiff's Motion to Amend be GRANTED.  The Court:

ORDERS that the Plaintiff's Motion to Amend is granted.

_____
JUDGE
UNITED STATES BANKRUPTCY COURT

# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| MCDERMOTT INTERNATIONAL, INC, *et al* | ) | |
| | ) | Case No. 20-30336 |
| Reorganized Debtor(s). | ) | |
| | ) | (Jointly Administered) |
| | ) | |
| MICHAEL VAN DEELEN | ) | |
| | ) | |
| Plaintiff, | ) | Adv. Proc. No. 20-3309 |
| | ) | |
| v. | ) | |
| | ) | |
| DAVID DICKSON, | ) | |
| and STUART SPENCE, | ) | |
| and SCOTT LAMB, | ) | |
| and 10 JOHN/JANE DOES | ) | |
| | ) | |
| Defendants. | ) | |

## <u>NOTICE OF HEARING</u>

A hearing will be conducted on this matter on June 7, 2021, at 11:00 am in Courtroom 400 , fourth floor, 515 Rusk, Houston, TX 77002. You may participate in the hearing by audio/video connection.

Audio communication will be by use of the Court's dial-in facility. You may access the facility at (832) 917-1510. You will be responsible for your own long-distance charges. Once connected, you will be asked to enter the conference room number. Judge Jones' conference room number is 205691.

You may view video via GoToMeeting. To use GoToMeeting, the Court recommends that you download the free GoToMeeting application. To connect, you should enter the meeting code "Judge Jones" in the

000411

GoToMeeting app or click the link on Judge Jones' home page on the Southern District of Texas website. Once connected, click the settings icon in the upper right corner and enter your name under the personal information setting.

Hearing appearances must be made electronically, if available, in advance of the hearing. To make your electronic appearance, go to the Southern District of Texas website and select "Bankruptcy Court" from the top menu. Select "Judges' Procedures," then "View Home Page" for Judge Jones. Under "Electronic Appearance" select "Click here to submit Electronic Appearance". Select the case name, complete the required fields and click "Submit" to complete your appearance.

If you object to the relief requested or you believe that emergency consideration is not warranted, you must either appear at the hearing or file a written response prior to the hearing. Otherwise, the Court may treat the pleading as unopposed and grant the relief requested.

DATED: June 4, 2021

Respectfully submitted,

/s/ Michael Van Deelen
Michael Van Deelen
Plaintiff
16215 Friar Circle
Spring, TX 77379
832-562-0723
michaelvandeelen@gmail.com

# EXHIBIT A

## CAUSE NO. 20-06-07348

| | | |
|---|---|---|
| MICHAEL VAN DEELEN | § | IN THE DISTRICT COURT |
| Plaintiff, | § | |
| | § | |
| | § | |
| v. | § | OF MONTGOMERY COUNTY, |
| | § | TEXAS |
| DAVID DICKSON, | § | |
| and STUART SPENCE, | § | |
| and SCOTT LAMB, | § | 284th JUDICIAL DISTRICT |
| and 10 JOHN/JANE DOES | § | |
| Defendants. | § | |

## **PLAINTIFF'S SECOND AMENDED PETITION**

COMES NOW Michael Van Deelen, plaintiff in the above-styled state law

cause of action, and for his cause of action shows as follows:

(NOTE: This is a state law cause of action that was filed in state court but removed

to Federal Court by the defendants. This Plaintiff's Second Amended Petition is

also a state law cause of action which has been filed in response to the (Federal

Bankruptcy) Court's instruction on March 10, 2021, to file an amended petition

containing only state law claims as preparatory to having this case remanded to

state court.)

## DISCOVERY CONTROL PLAN

1.  Plaintiff intends to conduct discovery under Level 2 of the Texas Rules of Civil Procedure 190.3.

## PARTIES

2.  Defendant Scott Lamb is an individual residing in Montgomery County, Texas, who can be served at his residence: 29 Watermill Ct, The Woodlands, Tx, 77380.  At all times material herein, defendant Lamb was McDermott International's Vice President of Investor Relations.

3.  Defendant David Dickson is an individual believed to be residing in either Montgomery County, Texas, or Harris County, Texas, who can be served at McDermott International, 757 N. Eldridge Pkwy, Houston, Tx, 77079.  At all times material herein, defendant Dickson was the President and Chief Executive Officer of McDermott International.

4.  Defendant Stuart Spence is an individual residing in Harris County, Texas, who can be served at his residence: 301 Hedwig Street, Houston, Tx, 77024.  At all times material herein, until 11/4/2019, defendant Spence was the Executive Vice President and Chief Financial Officer of McDermott International.

5.  The 10 John/Jane Doe defendants, if any, will be identified through the process of discovery.

## JURISDICTION AND VENUE

6.  This Court has personal jurisdiction over the defendants because they (a) have, at all material times, conducted business in Texas; (b) have committed tortuous actions, in whole or in part, in Texas; and (c) have sufficient minimum contact with Texas such that the assumption of jurisdiction will not offend traditional notions of fair play and substantial justice.

7.  Plaintiff seeks monetary relief of $180,000.00, plus exemplary damages, and the damages sought are therefore within the jurisdictional limit of this Court.

8.  Venue is proper in Montgomery County, Texas, pursuant to Section 15.002(a)(2) of the TEX. CIV. PRAC. & REM. CODE because it was the residence of one or more of the defendants at the time plaintiff's causes of action accrued.

9.  The following is alleged on information and belief.

## FACTUAL ALLEGATIONS

**Defendants Dickson and Spence Have a History of Being Accused of Making Material Misrepresentations and Omissions in Their Communications to the Investing Public.**

10.  On November 15, 2018, a complaint was filed in the United States District Court for the Southern District of Texas seeking class action status on behalf of purchasers of McDermott International ("McDermott") common stock

and alleging damages on their behalf arising from McDermott's allegedly false and misleading statements during the class period from January 24, 2018, to October 30, 2018.  The case is captioned *Edwards v. McDermott International, Inc., et al,* No. 4:18-cv-04330.  The defendants in the case are McDermott; David Dickson, McDermott's President and CEO; and Stuart Spence, McDermott's Chief Financial Officer (who left McDermott on 11/4/2019).  The plaintiff in that case has alleged that the defendants made material misrepresentations and omissions about the integration of the CB&I (Chicago Bridge and Iron) business, certain CB&I projects and their fair values, and McDermott's business, prospects and operations.

11.  On January 14, 2019, a related action was filed in the United States District Court for the Southern District of Texas seeking class action status on behalf of all shareholders of McDermott common stock as of April 4, 2018, who had the right to vote on the McDermott/CB&I Combination, captioned: *The Public Employees Retirement System of Mississippi v. McDermott International, Inc., et al,* No.4:19-cv-00135.  The plaintiff in that case has alleged the defendants, which include Mr. Dickson and Mr. Spence, made material misrepresentations and omissions in the proxy statement McDermott used in connection with the Combination. The court granted McDermott's motion to consolidate the two actions on February 22, 2019.  The case is ongoing.

12.  On July 26, 2019, the Securities and Exchange Commission ('SEC') sent a letter, accompanied by subpoenas, notifying McDermott International that it was under investigation for failing to properly disclose projected losses on its Cameron LNG (Hackberry) project (which was part of CB&I when McDermott acquired that company).

**Timeline of Events**

13.  On May 10, 2018, McDermott completed its merger with Chicago Bridge and Iron ("CBI").  With this merger, McDermott inherited two CBI projects: the Cameron, Louisiana, LNG (liquefied natural gas) project and the Freeport, Texas, LNG project.  Each of these projects were fixed price projects, which meant that any cost overruns would be borne by McDermott.  Cost overruns, which McDermott internally projected to be in the hundreds of millions of dollars, began almost immediately, particularly at Cameron.  The projected cost overruns, though highly material, were not disclosed to plaintiff or the investing public by the defendants.

14.  Not long thereafter, as seen below, the losses became so great that McDermott was running out of cash.  As seen below, the company, with the knowledge and at the direction of the defendants, decided in September, 2019, that its only alternative was to file for Chapter 11 bankruptcy.

15.  Defendants Dickson and Spencer receive(d) the majority of their annual compensation in McDermott stock.  For example, defendant Dickson's total remuneration in 2018 exceeded $11 million, most of which came from stock awards, and defendant Spence's total 2018 remuneration was $3.6 million, most of which also came from stock awards.

16.  If the very bad outlook for McDermott, including the projected losses from Cameron and Freeport and the company's plan to file bankruptcy, would have become known to the public, McDermott's share price would have fallen precipitously and defendants Dickson's and Spence's annual remuneration from stock grants would have all but evaporated.  To prevent this from happening, the defendants agreed on a scheme ("the scheme") to artificially inflate McDermott's share price by not disclosing the company's true financial condition and outlook, including material current and projected losses from the Cameron and Freeport projects and elsewhere, and the company's impending bankruptcy to plaintiff and the investing public.  (See below.)

17.  Defendants Dickson, Spence and Lamb were equal participants in the scheme and they each approved all actions taken by each other pursuant to the scheme.  Pursuant to the scheme, the defendants intentionally or negligently committed the following acts in order to maintain McDermott's share price at an artificially high, inflated, level it would not have been at had the material

misrepresentations and omissions concerning the company's financial condition
and outlook not been made.

18.  On March 22, 2019, the defendants, in concert with one another and in
furtherance of the scheme or through negligence, published a letter to the
company's website.  The letter, viewed by the plaintiff on or about April 3, 2019,
contained material misrepresentations and omissions concerning McDermott's
financial condition and outlook.  For example:

"Today, we are a fundamentally different and much larger company, as
compared to where we were at the end of 2017, with a formidable new presence in
significant onshore markets."

"Thanks to the tremendous amount of hard work and dedication of our
Board, executive management and employees during 2018, we are ahead of
schedule in becoming a premier, fully integrated, global engineering, procurement,
construction and installation ("EPCI") provider, with product solutions spanning
onshore and offshore from concept to commissioning."

"Looking forward to 2019, our end markets are growing.  We are continuing
to see recovery in the offshore and subsea, LNG and downstream markets, with the
highest McDermott revenue opportunity pipeline in our history.  Today,
McDermott is well-positioned to offer the technology-led, vertically-integrated
solutions that we know our customers are seeking.  We believe that McDermott

has the right strategy in place to play a major role in the next chapter of global energy solutions."

19.  At the time the letter was published, the defendants were aware that McDermott's Cameron LNG project was in trouble and had estimated probable losses of over $1 billion (approximately $3.50 per share).  Although the projected losses were highly material, they were hidden from plaintiff and the investing public so that the defendants could continue to receive vast remuneration through stock grants at inflated stock prices.

20.  On April 29, 2019, McDermott released its first quarter 2019 report, which was posted on the company's website and read by the plaintiff on or about May 6, 2019.  The report, written, reviewed and approved by the defendants in concert with one another and in furtherance of the scheme or through negligence, materially overstated the results the company had achieved as well as its outlook. In part, the report stated:

"More broadly, the company continues to exhibit commercial success in a steadily improving market.  In particular, McDermott reported a book-to-bill ratio of 3.0x, a new award total of $6.7 billion and a 41% sequential-quarter improvement in backlog."

21.  The report released McDermott's full-year 2019 earnings guidance, which predicted strong second-half 2019 results.  The guidance predicted that McDermott's full year earnings per share would be $.90

22.  Nowhere in the first quarter report or the full-year guidance were public investors informed of the significant losses being accrued by the company's Cameron LNG project.  In furtherance of the scheme or through negligence, these losses were not included in the first quarter results or in the full-year projections.

23.  McDermott held its annual meeting on May 2, 2019.  All reports, slides and presentations given at the meeting were reviewed and approved in advance of the meeting by the defendants in concert with one another and in furtherance of the scheme or through negligence.  The meeting presentation was included on McDermott's website and was viewed by plaintiff on or about May 15, 2019.  The meeting continued the false good-news reporting that had taken place in prior months.  For example, the company showed a slide which stated:

"Post-Combination, McDermott is a fundamentally different and much larger company as compared to where we were in 2017, with significant earnings potential."

24.  The slide showed dramatic increase in revenues, backlog and order intake from the prior year.

25.  At no time during the meeting were plaintiff or the investing public informed of the significant losses being accrued by the company's Cameron LNG project.  In furtherance of the scheme or through negligence, these losses were not discussed during the meeting by the defendants or in any report, slide or presentation given during the meeting.

26.  In July, 2019, just two months after the company's annual meeting, the Securities and Exchange Commission ('SEC') sent McDermott a letter, accompanied by subpoenas, notifying the company that it was under investigation for failing to properly disclose projected losses on its Cameron LNG project. Although the investigation was highly material, the defendants, in concert with one another and in furtherance of the scheme or through negligence, did not disclose the investigation to plaintiff or the investing public.

27.  In July, 2019, McDermott undertook a study (the "Financing Case") the purpose of which was to consider its options, including declaring bankruptcy, as the result of the massive losses being incurred at the Cameron and Freeport projects which were draining the company's cash and impacting its loan covenants. The defendants, in concert with one another and in furtherance of the scheme or through negligence, did not disclose this highly material study or the mounting Cameron and Freeport losses to the plaintiff or the investing public.

28.  The "Financing Case" was undertaken because McDermott was being forced by the SEC investigation to start recognizing and reporting the huge losses that had been accruing on the Cameron LNG project.

29.  On July 29, 2019, in order to placate and fend off the SEC, McDermott released its second quarter 2019 results which unexpectedly showed the company lost $146 million during second quarter 2019 versus a net income of $47 million during the prior year period.  The second quarter 2019 report was published on McDermott's website and was read by plaintiff on or about July 29, 2019.  In addition, the company reduced its full year guidance which now predicted the company would **lose** $1.65 per share instead of making $.90 a share in 2019, a negative swing of $2.55 a share from the first quarter, 2019, guidance.  The losses and reduced earnings projections were the result of the recognition of past and present Cameron (and to a lesser extent, Freeport) losses which had been known by the defendants but not previously reported, as noted herein.

30.  On July 29, 2019, the defendants, acting in concert with one another and in furtherance of the scheme or through negligence, issued a statement (as part of the second quarter, 2019, report) on McDermott's website, read by the plaintiff on or about July 29, 2019, that operating income was going to achieve a "sharp improvement" during the fourth quarter of 2019.  The company's anticipated

improvement was therefore shifted by the defendants from second-half 2019 to fourth quarter 2019.

31.  In the statement, defendant Dickson, acting in concert with the other defendants and in furtherance of the scheme or through negligence, omitted material information that McDermott faced significant difficulty in the months ahead, including impending earnings, cash flow, loan covenant and potential bankruptcy problems.  To the contrary, defendant Dickson stated that:

"Although the company reported mixed results for the second quarter of 2019, we are encouraged by the record-setting level of backlog and new awards. We are also pleased with the visibility we have into expected 2020 revenues, of which $7.4 billion was already in backlog as of the end of the second quarter of 2019. This is well above the $4.2 billion of 2019 revenues we had in backlog this time last year. This strong market posture continues to demonstrate the benefits of our combination with CB&I and the opportunities available in a strong market environment. McDermott has booked more than $19 billion of awards since the May 2018 combination with CB&I, demonstrating continued customer confidence and healthy end markets. Importantly, as of the end of the second quarter of 2019, legacy CB&I projects represented only about 14% of the current backlog. All the awards we've won since the combination were booked under McDermott's stringent risk management protocols, which we believe pave the way for us to deliver consistent margin performance through the application of the One McDermott Way in the execution of this backlog. The company continues to remain on schedule executing the Cameron and Freeport LNG projects. The Cameron settlement agreement we signed earlier this month is a testament to the mutually productive relationship we have built with this customer since the combination – and the associated incentives provided a meaningful contribution to our second quarter results."

"...we expect to see a sharp improvement in the company's operating income by the fourth quarter of this year, as we build momentum heading into 2020."

"Looking ahead, our revenue opportunity pipeline remains near a historic high and, more specifically, we are seeing steady upward momentum in a number of key

areas. For example, in the strategic area of front end engineering design (FEED), our awards through the first half of 2019 are already more than double what we won in all of 2018 – in terms of both man-hours and dollar value – and that's especially important as FEED work positions us for EPC opportunities. This year we have booked $1.5 billion of EPC work as a result of FEED work that's been done since the combination. Further, in our Technology business, we are forecasting the number of license sales to increase by 25% this year versus 2018. One of the recent highlights was our selection as the Master Licensor by S-OIL, an affiliate of Saudi Aramco, in support of its ethylene cracker and downstream petrochemicals complex, being developed as a major expansion of S-OIL's existing refinery in South Korea. Our Technology business gives us unparalleled insight into upcoming EPC opportunities, and we see roughly $40 billion of potential EPC pull-through opportunities in the refining and petrochemical markets over the next five years. We believe the petrochemical market, in particular, is poised for another wave of investment in the next 12 to 24 months, with world ethylene capacity expected to increase by more than 40% between 2019 and 2028."

32. Nowhere in their statement did the defendants alert plaintiff or the investing public to the fact that McDermott had already begun a material analysis (the "Financing Case") designed to consider a change in the capital structure of the company, including bankruptcy, as discussed herein. And nowhere in the July 29, 2019, second quarter report did the defendants alert plaintiff or the investing public to the material fact that they were aware that the Cameron LNG project, and other legacy projects as well, were going to continue experiencing substantial losses in the months ahead which would cause the company to incur huge losses, a cash flow drain and loan covenant problems.

33. On August 2, 2019, after having read the defendants' false representations mentioned herein, and not being aware of the defendants' material omissions, plaintiff became convinced that the share price decline that resulted

from the second quarter loss was a buying opportunity given the defendants'

projections for substantial earnings improvement in the fourth quarter of 2019.

Plaintiff, relying on the defendants' false representations, accordingly purchased

22,000 shares of McDermott International common stock at a combined cost of

$139,322.28.  Had the defendants disclosed the material information that the

company was going to continue experiencing massive losses at its Cameron and

Freeport facilities, that the company was in dire need of working capital, that it had

or was about to violate its loan covenants, that it had undertaken a study (the

Financing Case) to stave off bankruptcy, that bankruptcy was a very real

possibility in the near term and that the company was under SEC investigation for

failing to properly disclose projected losses and had the defendants not

intentionally materially overstated the company's projected results as discussed

herein, plaintiff would not have purchased or held the stock.

     34.  The Financing Case analysis was concluded on or about September 16,

2019, and the company immediately made the decision to declare Chapter 11

bankruptcy.  (At the company's Chapter 11 bankruptcy plan confirmation hearing

in the U.S. District Court for the Southern District of Texas, Southern Division, on

March 12, 2020, John R. Castellano, Chief Transformation Officer for McDermott

and a company insider with intimate knowledge of the decision-making process,

testified that the company decided in mid-September, 2019, to declare Chapter 11

bankruptcy.)  The decision to declare bankruptcy was made just seven weeks after

the defendants' July 29, 2019, effusive second quarter comments, including

defendant Dickson's comment that

*"...we expect to see a sharp improvement in the company's operating income by the fourth quarter of this year, as we build momentum heading into 2020."*

It is unbelievable that the defendants were not aware of the massive difficulty the

company was in when they, in concert with one another and in furtherance of the

scheme or through negligence, made their July 29, 2019, statement that the

company was doing great and operating income would see a "sharp  improvement"

by the fourth quarter of 2019.

35.  The defendants, acting in concert and in furtherance of the scheme or

through negligence, failed to inform plaintiff or the investing public in mid-

September, 2019, that the decision had been made to declare bankruptcy.

However, rumors began to fly and the company's share price declined from $6.08

on September 16, 2019, immediately before the rumors, to $2.16 on September 18,

2019, after the rumors came out.

36.  On September 18, 2019, in order to stem the share price decline, the

defendants, acting in concert and in furtherance of the scheme or through

negligence, issued a terse press release (read by plaintiff on or about September 18,

2019) stating that:

"McDermott International, Inc., routinely hires external advisors to evaluate opportunities for the Company.  The Company is taking positive and proactive measures, as we have done in the past, intended to improve its capital structure and the long-term health of its balance sheet."

37.  The defendants, acting in concert and in furtherance of the scheme or through negligence, made no mention in their press release of the highly material fact that the company had already decided to declare bankruptcy.  Instead, they attempted to deceive the plaintiff and the investing public that everything that was happening at the company was "routine".  The defendants, acting in concert and in furtherance of the scheme or through negligence, dismissed the prospect of a bankruptcy filing as "rumor or speculation" in subsequent communications with plaintiff and the investing public even though they were aware that the company had already decided to file for Chapter 11.

38.  On September 20, 2019, the defendants, acting in concert and in furtherance of the scheme or through negligence, issued a press release (read by plaintiff on or about September 20, 2019) stating that the company had hired Evercore to help it sell its Lummus Technology division in order to strengthen the company's balance sheet.  **The press release made no mention of the highly material fact that the company had already decided to declare bankruptcy.** The defendants and their agents have subsequently testified that there was never a plan for the out-of-court sale of Lummus Technology to strengthen McDermott's balance sheet.

39.   The press release sets forth, in part, as follows:

"HOUSTON, Sept. 20, 2019 /PRNewswire/ -- McDermott International, Inc.
(NYSE: MDR) today *announced it recently received unsolicited approaches to
acquire all or part of Lummus Technology, McDermott's industry-leading
technology business, with valuation exceeding $2.5 billion. Based on the receipt of
these approaches, McDermott is exploring strategic alternatives to unlock the
value of Lummus Technology while maintaining the strategic rationale of
engineering, procurement and construction (EPC) pull-through.* [Emphasis
added.]

McDermott's Lummus Technology is a leading licensor of proprietary
petrochemicals, refining, gasification and gas processing technologies, and a
supplier of proprietary catalysts and related engineering. With a heritage spanning
more than 100 years, encompassing approximately 3,100 patents and patent
applications, Lummus Technology provides one of the industry's most diversified
technology portfolios to the hydrocarbon processing sector.

'Lummus is an excellent business, with incredibly impressive employees, that has
earned a reputation for expertise, innovation and reliability in the refining and
petrochemical industries,' said David Dickson, President and Chief Executive
Officer of McDermott. *"The process of exploring strategic alternatives is part of
our ongoing efforts intended to improve McDermott's capital structure, and we
plan to use the proceeds from any transaction involving Lummus Technology to
strengthen our balance sheet. While Lummus is an important business within
McDermott, we have decided to undertake a process to fully realize its strategic
and financial value."* [Emphasis added.]

Separately, McDermott's previously announced processes to sell the remaining
portion of its pipe fabrication business and its industrial storage tank business are
ongoing."

40.   This disclosure regarding the unsolicited approaches to acquire Lummus

and that McDermott would use the proceeds from any Lummus transaction to

strengthen its balance sheet was well received by the market.   Zephirin Group

analyst Lenny Zephirin said the offer is "salivating" and, if accepted, should allow the company to reduce leverage by about $1.2 billion. See A. Sarkar, "McDermott International gets takeover interest for its Lummus Technology unit", Reuters, Sept. 20, 2019, available at https://www.reuters.com/article/us-mcdermott-international-strategic-alt/mcdermott-international-gets-takeover-interest-for-its-lummus-technology-unit-idUSKBN1W51AC.  Credit Suisse analysts, who called Lummus the "crown jewel" of McDermott, said the valuation is reasonable given historic transactions in the space, and that the deal could happen in early 2020. Id. Following the disclosure, the price for McDermott common stock spiked 50% in premarket trading on September 20 and closed at $2.01 per share, up 27.22%.

41. The September 20 press release and Defendant Dickson's statements therein, however, were materially misleading. There was not any near-term plan for a Lummus transaction to strengthen the company's balance sheet. The statements were merely part of the defendants' scheme to artificially inflate the price of McDermott common stock while providing the company time to develop and execute on a prepackaged Chapter 11 restructuring plan **which it was already working on**.

42. John R. Castellano, AlixPartners Managing Director and Chief Transformation Officer for McDermott, in testimony before the bankruptcy court during the March 12, 2020, bankruptcy hearing *stated that when he began working*

*with defendants, McDermott, and their advisors **in September 2019**, the objective was to negotiate a consensual Chapter 11 reorganization as this was the only viable option McDermott had.*  [Emphasis added.]

43.  Mr. Castellano also testified during the March 12, 2020, bankruptcy hearing that [at least] one of the "unsolicited" approaches to purchase Lummas actually came from a company controlled by a McDermott International insider. This raises the possibility that the company's claim that it got miracle, last-minute, 'unsolicited' offers to buy Lummus "out of the blue" was a sham.

44. In his Declaration in Support of Chapter 11 Petitions, Defendant Dickson confirmed his contemporary September, 2019, knowledge of the acute liquidity crisis:

"In late September 2019, we were running out of cash. It became clear that despite McDermott's improvements and success winning projects, the company remained over-leveraged and could not continue running its business and servicing its debt." (Dickson Decl.)

45.Thus, the defendants knew that the statements in the September 20 press release were materially false and/or misleading when made, but nonetheless approved them for public distribution. These statements had the principal purpose to calm plaintiff and the investing public as well as McDermott's agitated vendor base.

46.  On October 21, 2019, McDermott, with the prior knowledge and at the direction of the defendants in concert and in furtherance of the scheme or through

negligence, issued a press release (read by plaintiff on or about October 21, 2019) that it had secured financing of $1.7 billion, subject to certain terms, that the company would use to finance working capital and support the issuance of required performance guarantees on new projects. The tone and tenor of the press release was that the company's liquidity problems had been solved. Nowhere in the press release was the possibility of bankruptcy even raised, even though the company had decided in mid-September to declare bankruptcy. The press release included a statement from defendant Dickson, McDermott President and CEO, that:

> "This new credit agreement is a continued signal from our lenders that they support McDermott, our underlying business growth strategy and ability to achieve a long-term balance sheet solution. The Agreement provides near-term liquidity for the Company to manage working capital and provide performance guarantees on expected new awards. We remain focused on serving our customers' needs, supporting our dedicated employees and maintaining our valued relationships with our subcontractors, suppliers and other business counterparties, all as part of our efforts to enhance our position as a premier, fully integrated provider to technology, engineering and construction solutions to the energy industry."

47. The press release reiterated McDermott's plan to sell Lummus Technology: "McDermott continues to pursue the previously announced strategic alternatives process for Lummus Technology".

48. The press release also announced that McDermott had withdrawn its previously stated guidance for full-year 2019. The defendants, acting in concert and in furtherance of the scheme or through negligence, gave no new guidance for

full-year 2019 earnings.  Nowhere in the press release, written by the defendants,
acting in concert and in furtherance of the scheme or through negligence, were the
highly material facts that McDermott had already decided to declare bankruptcy or
that it was going to report massive losses for the remainder of the year and for full-
year 2019.

49.  On October 22, 2019, just one day after the October 21, 2019, press
release, McDermott and AP Services, an affiliate of AlixPartners, entered into
an agreement (the "October 22 Agreement") that replaced a September 17,
2019, agreement between McDermott and AlixPartners, wherein AP Services
agreed "to provide temporary personnel to McDermott to assist in a
contemplated financial restructuring." Bankr. Proc. ECF No. 916 at 1 (¶1).
Among other things, **the October 22 Agreement provided for the payment
of a $5 million success fee that would be earned upon the completion of a
restructuring through confirmation of a Chapter 11 plan of
reorganization**.  Bankr. Proc. ECF 434-1.

50.  Even though the October 22 Agreement was highly material, the
defendants, in concert and in furtherance of the scheme or through
negligence, did not report it to plaintiff or the investing public in order to
keep McDermott's share price at an artificially high level.

51. **Just two weeks after the October 21, 2019, press release, November 4, 2019, McDermott released its third quarter results in which it reported a net loss of $1.887 billion, or $10.37 per share.**

52. Prior to the third quarter report, the defendants, acting in concert and in furtherance of the scheme or through negligence, had not made any announcement to plaintiff or the investing public that the third quarter results were going to substantially deviate from what had been projected. As noted herein, on October 21, 2019, defendants, acting in concert and in furtherance of the scheme or through negligence, issued a press release (read by plaintiff on or about October 21, 2019) which, among other things, withdrew the company's full-year, 2019, guidance without updating said guidance even though the defendants, acting in concert and in furtherance of the scheme or through negligence, had forecast a "sharp improvement" for the fourth quarter just weeks earlier.

53. On the same day, November 4, 2019, McDermott filed its Form 10-Q (for the third quarter, 2019) in which it disclosed for the first time that it was being investigated by the SEC. Plaintiff read the 10-Q on or about November 5, 2019. Significantly, McDermott was notified by the SEC in July 2019 (by a letter dated July 26, 2019 together with an accompanying subpoena) that it was conducting an investigation related to disclosures made by the company concerning the reporting of projected losses associated with the Cameron LNG project.

54. At no prior time did the defendants or the company disclose to the plaintiff or the investing public the existence of the SEC's investigation. The defendants, acting in concert an in furtherance of the scheme or through negligence, kept the plaintiff and the investing public in the dark about the material SEC investigation for over three months, from July 26, 2019, to November 4, 2019.

55. The November 4, 2019, 10-Q for the first time described a Chapter 11 filing as a risk McDermott *might* face. This statement was materially false and misleading when made because, as described above, the defendants, McDermott, and their advisors had already begun preparing a Chapter 11 bankruptcy plan starting in late September, 2019. In other words, there was no *might* at all. There was a *will*. A McDermott Chapter 11 filing was certain, not just possible.

56. On November 4, 2019, the day of the third quarter earnings announcement, McDermott reported that defendant Stuart Spence, the company's Chief Financial Officer whose compensation was $3.6 million in 2018 (largely the result of stock grants) had resigned "to pursue other opportunities". Mr. Spence's resignation date was actually November 4, 2019, the date of the disastrous third quarter earnings announcement. As discussed above, defendant Spence was already the defendant in litigation against him, defendant Dickson and McDermott

which, among other things, accused him of making false and misleading statements relating to McDermott's finances.

57.   Defendant Spence also received a severance payment of $866,000.00 and other benefits from McDermott in return for his release of all claims against McDermott and its employees and agents, **including any such matter arising from the negligence, gross negligence or reckless, willful or wanton misconduct of any of the Releasees**.

58.   The release does not include any claims for indemnification for suits filed against Defendant Spence by outside parties during his tenure at McDermott.

59.   The release has a non-disparagement agreement:

"Employee shall refrain from making, directly or indirectly, in any public or private communication (whether oral, written or electronic), any criticisms or negative or disparaging comments or other statements about the Company or any of the other Releasees, or about any aspect of the respective businesses, operations, financial results or prospects of any of the Company Entities, including comments relating to Employee's termination of employment. Notwithstanding the foregoing, it is understood and agreed that nothing in this Section 4(b) or in Section 5 hereof is intended to: (i) prevent Employee from testifying truthfully in any legal proceeding brought by any governmental authority or other third party or interfere with any obligation Employee may have to cooperate with or provide information to any government agency or commission, subject to compliance with the provisions of Section 5(c) hereof, if applicable; (ii) prevent Employee from advising Employee's spouse of the terms and conditions of this Agreement; or (iii) prevent Employee from consulting with Employee's own legal counsel, as contemplated by Section 7 of this Agreement."

60. Most importantly, the release has a non-disclosure agreement

prohibiting defendant Spence from disclosing any information to McDermott

analysts or shareholders:

" *Employee will not disclose any of the Confidential Information to any securities analysts, shareholders, prospective investors*, customers, competitors or any other third party, including any third party who has or may express an interest in acquiring any of the Company Entities or all or any significant portion of their respective outstanding equity securities or assets. If Employee is legally required to disclose any Confidential Information, Employee shall, to the extent not prohibited by applicable law or legal process, promptly notify the Company in writing of such requirement so that the Company or any of the other Company Entities may seek an appropriate protective order or other relief or waive compliance with the nondisclosure provisions of this Section 5 with respect to such Confidential Information. To the extent not prohibited by applicable law, Employee agrees to cooperate with and not to oppose any effort by the Company or any other Company Entity to resist or narrow such request or to seek a protective order or other appropriate remedy. In any such case, Employee will: (i) disclose only that portion of the Confidential Information that, according to written advice of Employee's counsel, is required to be disclosed; (ii) use reasonable best efforts to obtain assurances that such Confidential Information will be treated confidentially; and (iii) to the extent not prohibited by applicable law, promptly notify the Company in writing of the items of Confidential Information so disclosed."

61. Defendant Spence may have to pay back McDermott for any payments

made to him if he breaches the agreement or even if a court or arbitrator finds it

invalid or unenforceable:

"Employee agrees that in the event that (i) Employee breaches any term of Sections 3 or 4 hereof or this Section 5, or (ii) Employee challenges the validity of all or any part of this Section 5, and all or any part of this Section 5 is found invalid or unenforceable for any reason whatsoever by a court of competent jurisdiction or an arbitrator in a proceeding between Employee and a Company Entity, in addition to any other remedies at law or in equity the Company may have available to it, the Company shall not be obligated to make any of the payments and may cease to make such payments or to provide for any of the benefits specified in Section 2

hereof, and shall be entitled to recoup from Employee any and all of the value of the payments and benefits provided pursuant to Section 2 hereof that have vested or been paid pursuant to that Section."

62.  It can be inferred from the above that McDermott did not want the details of its financial operations and outlook to become public and that defendant Spence may have known something that McDermott was paying him not to discuss.

63.  On December 2, 2019, the defendants, acting in concert and in furtherance of the scheme or through negligence, wrote and issued a press release titled *McDermott to Access $350 Million Tranche B Financing Under Superpriority Senior Secured Credit Facility.*  The press release stated that McDermott was granted access to the second tranche of funding (Tranche B) under the superpriority senior secured credit agreement (SSSCA), whereby the company received a $250 million Term Loan Facility and a $100 million Letter of Credit Facility.  The press release, read by plaintiff on or about December 2, 2019, stated that McDermott would use the proceeds "to continue financing working capital and support the issuance of required performance guarantees on new projects."  In the press release, the defendants also reiterated the company's continued pursuit of "the previously announced strategic alternatives process for Lummus ...." Id.

64.  The December 2, 2019, press release, however, was materially false and misleading when made because, as the following declaration of John Castellano to

the bankruptcy court shows, it failed to disclose the material fact that the

company's secured lenders would not provide any further liquidity under the

SSSCA to fund business operations, and that the sale of Lummus would be

consummated only as part of a Chapter 11 process:

"On December 1, 2019, after significant deliberation and discussion with the
secured lenders on whether to fund the second tranche under a debtor-in-
possession financing facility rather than on an out-of-court basis, McDermott
gained access to the second tranche of funding under the Superpriority Facility
providing an incremental $250 million term loan facility ($229 million after fees)
and a $100 million letter of credit facility. ***In connection with this funding, the
secured lenders stated that they did not expect to fund any additional amounts on
an out-of-court basis. As such, McDermott's liquidity would drive the timing of
any potential chapter 11 filing.***

***McDermott told prospective purchasers of [Lummus] that the purchase was to be
consummated as part of a chapter 11 process, and provided clear milestones for
the marketing process with the aim of achieving a signed "stalking horse"
purchaser by the time McDermott would need to seek chapter 11 relief."***
Castellano Decl.

     Mr. Castellano subsequently stated to the bankruptcy court:

"McDermott enters chapter 11 with a massively consensual prepackaged
restructuring." "Getting here has been an all-out sprint for the company and its
many stakeholders around the globe." ***"Since September 2019, McDermott has....
marketed and achieved a signed stalking-horse purchaser for the sale of
[Lummus]"***. Castellano Decl.

     65.  Between November 8, 2019, and December 26, 2019, plaintiff

purchased an additional 8,000 shares of McDermott International shares at a total

cost of $7219.  Had the defendants disclosed the material information that the

company was going to continue experiencing massive losses at its Cameron and

Freeport facilities, that the company was in dire need of working capital, that it had or was about to violate its loan covenants, that the company was actively pursuing and finalizing a bankruptcy filing and had the defendants not intentionally materially overstated the company's projected results (see above), plaintiff would not have purchased or held the stock.

66.  McDermott did not release fourth quarter 2019 results.  However, McDermott advisors Evercore, Kirkland & Ellis and AlixPartners estimated that McDermott experienced a fourth quarter operating loss of $141 million, or approximately $.77 per share, even though the defendants had been saying as late as July 29, 2019, (second quarter 2019 earnings release) that operating income was going to achieve a "**sharp improvement**" during the fourth quarter of 2019.

67.  On January 21, 2020, McDermott formerly announced that it was filing a Prepackaged Chapter 11 proceeding in the United States Bankruptcy Court for the Southern District of Texas (Case number 20-30336).  As part of the filing, the company announced that it was proposing that all of the existing outstanding shares of McDermott would be cancelled (declared worthless).

68.  Prior to the January 21, 2020, announcement, the defendants, acting in concert and in furtherance of the scheme or through negligence, had made no announcements to plaintiff or the investing public that the company was even considering bankruptcy or that it had decided to declare bankruptcy in mid-

September, 2019.  Throughout the entirety of 2019 and up until the January 21,

2020, bankruptcy announcement, the defendants, acting in concert and in

furtherance of the scheme or through negligence, produced and published a

continuous stream of positive press releases, read by plaintiff, touting the

continued and unparalleled success of the company and its operations.  **Not one**

**press release informed plaintiff or the investing public of the present or future**

**difficulties the company was experiencing or of the company's decision to**

**declare bankruptcy in mid-September, 2019.  Indeed, to the contrary, at all**

**times relevant, McDermott continually inundated plaintiff and the investing**

**public with nothing but feel-good, good news press releases falsely touting the**

**company's results, financial condition and outlook.**  These press releases can be

found here:

https://www.mcdermott-investors.com/news/default.aspx

69.  Just prior to the January 21, 2020, bankruptcy announcement,

McDermott shares were trading at $.70 per share.  After the January 21, 2020,

announcement, McDermott's share price fell to a low of $.01 per share.  The shares

have since been cancelled and are now worthless.

70.  Part of McDermott's bankruptcy Plan filed with the court called for the

issuance of new common stock.  The Management Incentive Plan included in the

company's bankruptcy Plan calls for the reservation of 7.5% of the new stock to be

used in grants to McDermott management and the company's Board of Directors.

Assuming the number of pre-bankruptcy shares outstanding (193 million), a

conservative post-bankruptcy share price of $25 and 10% of the post-bankruptcy

7.5% insider share allotment goes to defendant Dickson, defendant Dixon stands to

gain over $36,000,000 from a McDermott bankruptcy (193,000,000 x $25 x .10 x

.075 = $36,187,000), not including his annual salary.

## DEFENDANTS' DUTY TO DISCLOSE

71.  Plaintiff alleges that he was directly harmed by the actions of the

defendants as described herein.  (Plaintiff also alleges that the actions of the

defendants as described herein did not deplete the assets of the bankruptcy estate.)

The defendants had a duty to disclose material facts and omissions to the plaintiff

because:

A.  The defendants, especially defendants Dickson and Spencer, had a

special fiduciary relationship with the plaintiff.  (See esp. paragraph 83 below.)

B.  The defendants voluntarily disclosed partial information to the plaintiff,

but knowingly failed to disclose the whole truth, as seen herein.

C.  The defendants made representations to plaintiff but knowingly failed to

disclose new information that made the earlier representations misleading or

untrue, as seen herein.

D. The defendants made partial disclosures to plaintiff which conveyed a false impression, as seen herein.

## SCIENTER ALLEGATIONS

(NOTE: As noted above, this is a state law cause of action that was filed in state court but removed to Federal Court by the defendants. This Plaintiff's Second Amended Petition is also a state law cause of action which has been filed in response to the (Federal Bankruptcy) Court's instruction on March 10, 2021, to file an amended petition containing only state law claims as preparatory to having this case remanded to state court. Although a plaintiff is not required to plead Scienter in a state law cause of action, plaintiff has done so herein in an abundance of caution.)

72. As alleged herein, defendants acted with scienter because they knew that the public documents and statements they issued and/or disseminated in the name of McDermott were materially false and/or misleading or failed to disclose (omitted) material facts to make them not misleading and they knew that such documents or statements would be issued or disseminated to the plaintiff and the investing public. The defendants participated in the scheme to fool plaintiff and the investing public into continuing to purchase and hold McDermott International shares by making material misrepresentations and omissions so that the defendants

would benefit by having their own holdings of McDermott International shares

remain at inflated levels they would not have been at had the material

misrepresentations and omissions not been made.

73. Defendants, as the individuals that created, signed, were quoted in, or

orally made the allegedly false and misleading statements described herein were

obligated to familiarize themselves with the subject matter of those public

statements and to speak truthfully. The defendants violated such obligations.

74. Defendants, as the individuals that certified filings made to the SEC

filing pursuant to Exchange Act Rules 13a-14(a)/15d-14(a) and Section 906 of the

Sarbanes-Oxley Act of 2002, were obligated to inquire and investigate, familiarize

themselves with the subject matter underlying their certifications, and reassure

themselves that the matters they were certifying were accurate and that McDermott

was speaking truthfully when it made such disclosures.  The defendants violated

such obligations.

75. The statements of defendants and their agents evidencing that there was

never a plan for the out-of-court sale of Lummus to strengthen McDermott's

balance sheet demonstrate strong evidence of conscious misbehavior or

recklessness.  Motive and opportunity are also evident.

76. As detailed above, defendants had significant personal financial

motivations, unique to them, to engage in the misconduct alleged herein.

77. Defendants were motivated by their compensation packages, retention bonuses, and continued employment and took affirmative actions to protect their financial interests including when they denied that a bankruptcy was forthcoming even after the company had already decided to pursue Chapter 11.

78. Defendants' scienter was further demonstrated when they, in concert and in furtherance of the scheme or through negligence, gave clear guidance that the proposed Lummus sale process was proceeding when, in fact, defendants and their advisers had previously concluded that there was no way of avoiding bankruptcy and Lummus would be sold only as part of a bankruptcy.

79. In addition, as seen herein, the Management Incentive Plan in the Plan of Reorganization leaves management with a significant equity stake even as common stockholders' interests are eliminated.

80. The company's public filings with the SEC that attempt to conceal or otherwise obfuscate defendants' fraudulent conduct are also highly probative of scienter. For example, defendants' repeated assertions that the (out-of-court) sale process for Lummus was ongoing is highly probative of scienter; as are defendants' dismissals of the prospect of a Chapter 11 filing as rumor or speculation.

81. Even further, the fraud alleged herein implicates the core operations of McDermott, since its acute liquidity crisis threatened the company's very existence

as an ongoing concern. In light of these facts and their day-to-day involvement in the development of a prepackaged Chapter 11 Plan of Reorganization, it is inconceivable that defendants did not have actual access to information contradicting the statements made in the company's name regarding the sale process for Lummus and the prospect of bankruptcy. Such knowledge is imputable to defendants given the implication of core operations and the defendants' roles and status within the company.

82. Defendants' flagrant violation of express corporate policy further buttresses the inference of defendants' scienter, whether based on their knowledge or their recklessness.

83. McDermott's Code of Ethics for Chief Executive Officer and Senior Financial Officers (the "Code"), applies to both defendants Dickson and Spencer. The Code is available at

http://s22.q4cdn.com/787409078/files/doc_downloads/governance_documents/CG-Code-of-Ethics-for-CEO-SFOs.pdf

Pursuant to the Code:

**"Full and fair disclosure.** It is the Company's policy that the information in its public communications, including filings with the Securities and Exchange Commission, be timely and understandable and fair, complete and accurate in all material respects. Covered Employees should exercise diligence and care to do their part in acting in furtherance of this policy. ***Covered Employees are prohibited from knowingly misrepresenting, omitting, or causing others to misrepresent or omit, material facts about the Company to anyone having a role in the Company's financial reporting and disclosure processes.*** Covered Employees must not directly or indirectly take any action to coerce, manipulate, mislead or

fraudulently influence the Company's or its subsidiaries' independent auditors or any internal accounting or auditing personnel for the purpose or with the effect of rendering the Company's financial statements misleading, or direct anyone else to do so.

It is the responsibility of each Covered Employee promptly to bring to the attention of the Company's Disclosure Committee any material information of which the executive may become aware that affects the disclosures made by the Company in its public filings or otherwise, and otherwise to assist the Disclosure Committee in fulfilling its responsibilities. In addition, ***each Covered Employee shall promptly bring to the attention of the Disclosure Committee any information the employee may have concerning*** (a) significant deficiencies or material weaknesses in the design or operation of internal controls which could adversely affect the Company's ability to record, process, summarize and report financial information or (b) ***any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's financial reporting, disclosures or internal controls***.

...

**Reporting of violations of this code. *Each Covered Employee is responsible for reporting any violation of this Code of Ethics, or circumstances which the Covered Employee considers to involve a probable violation, to the Compliance Officer identified below***. Employees may choose to remain anonymous in reporting violations or circumstances that may involve a violation.

**Accountability. *Each Covered Employee will be held accountable for his or her adherence to this Code of Ethics***. The failure to observe the terms of this Code of Ethics may result in disciplinary action, up to and including termination of employment. ***Violations of this Code of Ethics may also constitute violations of law that may result in civil and criminal penalties***."

84.   As seen herein, defendant Spencer's non-disclosure agreement, made by him upon his separation from the company in exchange for a payment of $866,000.00, included a promise not to disclose any information "to any securities analysts, shareholders, prospective investors, .......".  This, as well as the other promises he made in his termination agreement, is highly indicative of scienter.

# COUNT 1
## COMMON LAW FRAUD

85. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

86. The defendants made or caused to be made material representations to the plaintiff about McDermott International, its performance and its financial condition which were false, inaccurate or misleading.

87. When the defendants made the representations to the plaintiff, they knew the representations were false or they made the representations recklessly, as positive assertions, and without knowledge of their truth.

88. The defendants made the representations with the intent that the plaintiff would act on them.

89. The plaintiff acted on the representations.

90. The defendants agreed upon and operated a scheme ("the scheme") to artificially inflate McDermott's share price by not disclosing the company's financial condition and outlook, including, but not limited to, material current and projected losses from the Cameron and Freeport projects and elsewhere and the company's impending bankruptcy, to plaintiff. The defendants participated in the scheme to fool plaintiff into continuing to purchase and hold McDermott International shares by making material misrepresentations and omissions so that the defendants would benefit by having their own holdings of McDermott

International shares remain at inflated levels they would not have been at had the material misrepresentations and omissions not been made.

91.  The defendants failed to disclose the material facts necessary to make the statements they and their representatives made, in light of the circumstances under which they were made, not misleading.

92.  The defendants did not have a reasonable basis for their alleged false statements and omissions and engaged in practices and a course of business that operated as a fraud and deceit upon plaintiff.

93.  The defendants and their representatives, with prior knowledge and approval of the defendants, individually and in concert, directly and indirectly, engaged and participated in a continuous course of conduct (the scheme) to conceal adverse material information about McDermott International, including, but not limited to, its actual (poor) present financial condition, its projected large earnings losses and its impending bankruptcy filing.

94.  The defendants and their representatives, with prior knowledge and approval of the defendants, individually and in concert, directly and indirectly, engaged and participated in a continuous course of conduct to conceal the fact that the company, including its Cameron LNG and Freeport LNG operations, were experiencing and were projected to experience large losses.

95. The defendants and their representatives, with prior knowledge and approval of the defendants, individually and in concert, directly and indirectly, engaged and participated in a continuous course of conduct to conceal the fact that the company was contemplating bankruptcy, that a bankruptcy filing was imminent and that the company had made the decision to file for bankruptcy.

96. Such material misrepresentations and omissions were done knowingly or with recklessness, and without a reasonable basis, for the purpose and effect of concealing the true status of McDermott's financial condition and outlook in order to maintain McDermott's share price at an artificially high, inflated, level it would not have been at had the material misrepresentations and omissions not been made.

97. The defendants and their representatives, with prior knowledge and approval of the defendants, made the misrepresentations and omissions of material facts set forth herein with the intent to induce the plaintiff to rely on such misrepresentations and omissions of material fact.

98. Plaintiff reasonably relied on the defendants' misrepresentations and omissions of material facts in connection with his purchases and retention of McDermott International common stock. Plaintiff relied on these statements both directly to the extent they were personally made to plaintiff and indirectly to the extent they artificially inflated the market price. But for the defendants'

representations (wrongful conduct), plaintiff would not have purchased and retained (held) his McDermott International stock.

99.  Plaintiff alleges that he was directly harmed by the actions of the defendants as described herein.  Plaintiff further alleges that the actions of the defendants as described herein did not deplete the assets of the bankruptcy estate.

100.  As a direct and proximate result of defendants' representations (wrongful conduct), plaintiff suffered damages in connection with his purchases and his retention (holding) of McDermott International common stock in excess of the jurisdictional limits of this Court.

101.  Pursuant to Section 41.003 of the Texas Civil Practice and Remedies Code, plaintiff is entitled to recover exemplary damages in an amount to be determined by the trier of fact.

## DISCOVERY RULE AND FRAUDULENT CONCEALMENT

102.  Plaintiff asserts all applicable state statutory, common law and contractual rights and theories related to the tolling and/or extension of any applicable statute of limitations, including equitable tolling, delayed discovery, discovery rule, and/or fraudulent concealment.

## JURY DEMAND

103.  Plaintiff demands a trial by jury on all issues so triable.


## PRAYER

WHEREFORE, Plaintiff prays that defendants be cited to appear herein and, after a trial on the merits, that the Court enter judgment awarding plaintiff the following:

1.  actual damages;

2.  exemplary damages;

3.  costs;

4.  pre-judgment and post-judgment interest as allowed by law; and

5.  all such other and further relief, both general and special, at equity and at law, to which plaintiff may be justly entitled.


Respectfully submitted,


/s/ Michael Van Deelen
Michael Van Deelen
16215 Friar Circle
Spring, TX 77379
832-562-0723
michaelvandeelen@gmail.com
Plaintiff

This page intentionally left blank.

**UNITED STATES BANKRUPTCY COURT**

**Southern District of Texas**

PDF FILE WITH AUDIO FILE ATTACHMENT

2020-03309

Van Deelen v. Dickson et al

In ref to doc no. 1. Hearing held June 7, 2021.

| | |
|---|---|
| Case Type : | ap |
| Case Number : | 2020-03309 |
| Case Title : | Van Deelen v. Dickson et al |
| Audio Date\Time: | 6/7/2021 11:00:05 AM |
| Audio File Name : | 4ap2020-03309_20210607-110005.mp3 |
| Audio File Size : | 5896 KB |
| Audio Run Time : | [00:12:17] (hh:mm:ss) |

**Help using this file:**

An audio file is embedded as an attachment in this PDF document. To listen to the file, click the Attachments tab or the Paper Clip icon.  Select the Audio File and click Open.

**MPEG Layer-3 audio coding technology from Fraunhofer IIS and Thomson.**

**This digital recording is a copy of a court proceeding and is provided as a convenience to the public.  In accordance with 28 U.S.C. § 753 (b) "[n]o transcripts of the proceedings of the court shall be considered as official except those made from the records certified by the reporter or other individual designated to produce the record."**

United States Courts
Southern District of Texas
**FILED**

JUN 18 2021

Nathan Ochsner, Clerk of Court

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| In re: | ) |
| | ) |
| MCDERMOTT INTERNATIONAL, INC, *et al* | ) Chapter 11 |
| | ) Case No. 20-30336 |
| Reorganized Debtor(s). | ) |
| | ) (Jointly Administered) |
| ‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾ | ) |
| | ) |
| MICHAEL VAN DEELEN | ) |
| | ) |
| Plaintiff, | ) Adv. Proc. No. 20-3309 |
| | ) |
| v. | ) |
| | ) |
| DAVID DICKSON, | ) |
| and STUART SPENCE, | ) |
| and SCOTT LAMB, | ) |
| and 10 JOHN/JANE DOES | ) |
| | ) |
| Defendants. | ) |

## PLAINTIFF'S THIRD AMENDED PETITION

COMES NOW, the Plaintiff, Michael Van Deelen, and submits his

Plaintiff's Third Amended Petition (Exhibit A herein).


Respectfully submitted,

/s/ Michael Van Deelen
Michael Van Deelen
16215 Friar Circle
Spring, TX 77379
832-562-0723
michaelvandeelen@gmail.com
Plaintiff

1

## CERTIFICATE OF SERVICE

I hereby certify that I have on this 18th day of June, 2021, served a true and correct copy of the foregoing document on the defendants via the court-approved eFiling system, which will forward a copy thereof to all attorneys of record.


/s/ Michael Van Deelen
Michael Van Deelen

# EXHIBIT A

## CAUSE NO. 20-06-07348

| | | |
|---|---|---|
| MICHAEL VAN DEELEN | § | IN THE DISTRICT COURT |
|     Plaintiff, | § | |
| | § | |
| | § | |
| v. | § | OF MONTGOMERY COUNTY, |
| | § | TEXAS |
| DAVID DICKSON, | § | |
| and STUART SPENCE, | § | |
| and SCOTT LAMB | § | 284th JUDICIAL DISTRICT |
| and JOSHUA SUSSBERG | § | |
|     Defendants. | § | |
| | § | |
| and 10 JOHN/JANE DOES | § | |

## <u>PLAINTIFF'S THIRD AMENDED PETITION</u>

COMES NOW Michael Van Deelen, plaintiff in the above-styled state law cause of action, and for his cause of action shows as follows:

### DISCOVERY CONTROL PLAN

1.  Plaintiff intends to conduct discovery under Level 2 of the Texas Rules of Civil Procedure 190.3.

### PARTIES

2.  Defendant Scott Lamb is an individual residing in Montgomery County, Texas, who can be served at his residence: 29 Watermill Ct, The Woodlands, Tx, 77380.  At all times material herein, defendant Lamb was McDermott

International's Vice President of Investor Relations.  Defendant Lamb is a citizen of Texas.

3.  Defendant David Dickson is an individual believed to be residing in either Montgomery County, Texas, or Harris County, Texas, who can be served at McDermott International, 757 N. Eldridge Pkwy, Houston, Tx, 77079.  At all times material herein, defendant Dickson was the President and Chief Executive Officer of McDermott International.  Defendant Dickson is a citizen of Texas.

4.  Defendant Stuart Spence is an individual residing in Harris County, Texas, who can be served at his residence: 301 Hedwig Street, Houston, Texas, 77024.  At all times material herein, until 11/4/2019, defendant Spence was the Executive Vice President and Chief Financial Officer of McDermott International. Defendant Spence is a citizen of Texas.

5.  Defendant Joshua Sussberg is an individual who is an attorney who can be served at 601 Lexington Avenue, New York, NY 10022.  Defendant Sussberg also maintains an office in Houston, Texas.  Defendant Sussberg regularly travels to Texas to represent clients in the U.S. Bankruptcy Court for the Southern District of Texas, Houston Division.  Defendant has regularly travelled Texas to represent McDermott International in its bankruptcy case in the U.S. Bankruptcy Court for the Southern District of Texas, Houston Division (case number 20-30336).  As alleged herein, defendant Sussberg assaulted plaintiff while in Houston

representing McDermott International in its bankruptcy case.  Defendant Sussberg is a citizen of New York.

6.  The 10 John/Jane Does will be determined through the process of discovery.

## JURISDICTION AND VENUE

7.  Montgomery County, Texas, District Court has personal jurisdiction over the defendants because they (a) have, at all times material, conducted business in Texas; (b) have committed tortuous actions, in whole or in part, in Texas; and (c) have sufficient minimum contact with Texas such that the assumption of jurisdiction will not offend traditional notions of fair play and substantial justice.

8.  The damages sought by plaintiff are within the jurisdictional limit of the Montgomery County, Texas, District Court.

9.  Venue is proper in Montgomery County, Texas, pursuant to Section 15.002(a)(2) of the TEX. CIV. PRAC. & REM. CODE because it was the residence of one or more of the defendants at the time plaintiff's causes of action accrued.

10.  Complete diversity of citizenship does not exist in this case.

11.  The following is alleged on information and belief.

## FACTUAL ALLEGATIONS

**Defendants Dickson and Spence Have a History of Being Accused of Making
Material Misrepresentations in Their Communications to the Investing
Public.**

12.  On November 15, 2018, a complaint was filed in the United
States District Court for the Southern District of Texas seeking class action status
on behalf of purchasers of McDermott International ("McDermott") common stock
and alleging damages on their behalf arising from McDermott's allegedly false and
misleading statements during the class period from January 24, 2018, to October
30, 2018.  The case is captioned *Edwards v. McDermott International, Inc., et al,*
No. 4:18-cv-04330.  The defendants in the case are McDermott; David Dickson,
McDermott's President and CEO; and Stuart Spence, McDermott's Chief Financial
Officer (who left McDermott on 11/4/2019).  The plaintiff in that case has alleged
that the defendants made material misrepresentations and omissions about the
integration of the CBI (Chicago Bridge and Iron) business, certain CBI projects
and their fair values, and McDermott's business, prospects and operations.

13.  In an April 14, 2021, Memorandum in the United States District Court
for the Southern District of Texas, Houston Division, U.S. District Court Judge
George Hanks, Jr., ruled in *Edwards v. McDermott International, Inc., et al,* No.
4:18-cv-04330, that the defendants had omitted material facts about the costs of
CBI's Cameron and Freeport (and other) projects and those omissions were

actionable.  Some of the material facts omitted and concealed from plaintiff and

the investing public by the defendants were that the defendants were aware prior to

the May 10, 2018, merger completion between McDermott International and CBI

that internal CBI forecasts seen by the defendants indicated that CBI's financial

statements were underreporting costs for the projects by $1 billion and that, after

the merger was completed, the company had not adjusted the carrying values of the

Cameron and Freeport (and other) projects to reflect the losses that had not been

recognized by CBI.  In other words, the defendants had falsely and intentionally

concealed and materially overstated the true values and prospects of the Cameron

and Freeport (and other) projects from plaintiff and the investing public prior and

subsequent to the completion of the company's merger with CBI.

14.  On January 14, 2019, a related action was filed in the United States

District Court for the Southern District of Texas seeking class action status on

behalf of all shareholders of McDermott common stock as of April 4, 2018, who

had the right to vote on the McDermott/CBI Combination, captioned: *The Public*

*Employees Retirement System of Mississippi v. McDermott International, Inc., et*

*al,* No.4:19-cv-00135.  The plaintiff in that case has alleged that the defendants,

which include Mr. Dickson and Mr. Spence, made material misrepresentations and

omissions in the proxy statement McDermott used in connection with the

combination. The court granted McDermott's motion to consolidate this action with *Edwards, supra*, on February 22, 2019.  The case is ongoing.

15.  On July 26, 2019, the Securities and Exchange Commission ('SEC') sent a letter, accompanied by subpoenas, notifying McDermott International that it was under investigation for failing to properly disclose projected losses on its Cameron LNG project (which was part of CBI when McDermott acquired that company). On information and belief, this case is ongoing.

16.  By letter dated February 25, 2020, together with an accompanying subpoena, the office of the United States Attorney for the Southern District of Texas within the U.S. Department of Justice notified McDermott International that a Federal Grand Jury is conducting a criminal investigation and requested various documents, including cost forecasts and other financial-related information, related to the Cameron LNG project.  On information and belief, this case is ongoing.

**Timeline of Events**

17.  On May 10, 2018, McDermott completed its merger with Chicago Bridge and Iron ("CBI").  With this merger, McDermott inherited several CBI projects, including the Cameron, Louisiana, LNG (liquefied natural gas) project and the Freeport, Texas, LNG project.  Each of these projects were fixed price projects, which meant that any cost overruns would be borne by McDermott. Future cost overruns, the likelihood of which McDermott was aware of prior to

consummation of the merger through due diligence and CBI internal reports and projections (see above), and which were internally projected to be in the hundreds of millions of dollars, began immediately post merger, particularly at Cameron. The projected cost overruns, though highly material (at a minimum, in excess of $1 billion dollars, or over $5 per share), were concealed by the defendants and not disclosed to plaintiff or the investing public by the defendants.

18.  Not long thereafter, as seen below, the losses became so great that McDermott was running out of cash.  As seen below, the company, with the knowledge and at the direction of the defendants, decided in September, 2019, that its only alternative was to file for Chapter 11 bankruptcy.

19.  To prevent plaintiff and the investing public from finding out about the company's dire earnings outlook, the defendants agreed on a scheme ("the scheme") on or about January 1, 2019, to conceal and misrepresent the company's true financial results, condition and outlook, including material current and projected losses from the Cameron and Freeport projects and elsewhere, and, eventually, the company's impending bankruptcy.  The defendants intentionally reported to plaintiff and the investing public higher than achieved, artificial, made-up and fraudulent earnings results and projections that would deceive plaintiff and the investing public into believing that all was well at McDermott.

20.  Neither the creation of the scheme nor the defendants' acts under the scheme, including those acts mentioned, discussed or detailed herein, were done while the defendants were acting under the scope of their employment.  Nothing herein alleges, assumes or implies that the defendants were acting under the scope of their employment when they acted under the scheme or when their actions harmed the plaintiff.

21.  The defendants were able to concoct the scheme because they, through their positions or affiliations with McDermott, possessed the power and authority to control the contents of McDermott's SEC filings, press releases and presentations to plaintiff, the investing public, securities analysts, money and portfolio managers and institutional investors. The defendants were provided with copies of McDermott's filings and press releases alleged herein to have been false or misleading prior to their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, the defendants knew that the adverse facts specified herein had not been disclosed to, and were being misrepresented to and concealed from, the plaintiff and the investing public, and that the positive misrepresentations that were being made were materially false and/or misleading. The defendants are liable for the false and misleading and concealed statements alleged herein.

22.  The defendants were equal participants in the scheme and they each approved all actions taken by each other pursuant to the scheme.  Pursuant to the scheme, the defendants intentionally committed the following acts, one result of which maintained McDermott's share price at an artificially high, inflated, level it would not have been at had the defendants' material misrepresentations concerning the company's financial results, condition and outlook not been made and had the defendants' not concealed the company's true financial condition and outlook from plaintiff and the investing public.

23.  The defendants, participating in the scheme, unless otherwise noted herein, were Scott Lamb, David Dickson and Stuart Spence prior to September 20, 2019; Scott Lamb, David Dickson, Stuart Spence and Joshua Sussberg between September 20, 2019, and November 4, 2019; Scott Lamb, David Dickson and Joshua Sussberg between November 4, 2019, and 5/6/2020; and David Dickson and Joshua  Sussberg after 5/6/2020.  Joshua Sussberg joined the scheme on or about September 20, 2019; defendant Spence left the scheme on November 4, 2019, when he resigned from McDermott; and Scott Lamb left the scheme on or about 5/6/2020, when he resigned from McDermott..

24.  On March 22, 2019, the defendants, in concert with one another and in furtherance of the scheme, wrote, reviewed, approved and published a letter to the company's website.  The letter, viewed by the plaintiff on or about April 3, 2019,

contained material misrepresentations concerning McDermott's financial condition and outlook.  For example:

*"Today, we are a fundamentally different and much larger company, as compared to where we were at the end of 2017, with a formidable new presence in significant onshore markets.*"

*"Thanks to the tremendous amount of hard work and dedication of our Board, executive management and employees during 2018, we are ahead of schedule in becoming a premier, fully integrated, global engineering, procurement, construction and installation ("EPCI") provider, with product solutions spanning onshore and offshore from concept to commissioning."*

*"Looking forward to 2019, our end markets are growing.  We are continuing to see recovery in the offshore and subsea, LNG and downstream markets, with the highest McDermott revenue opportunity pipeline in our history.  Today, McDermott is well-positioned to offer the technology-led, vertically-integrated solutions that we know our customers are seeking.  We believe that McDermott has the right strategy in place to play a major role in the next chapter of global energy solutions.*"

25.  At the time the letter was published, the defendants were aware that McDermott's projects, most notably the Cameron and Freeport LNG projects, were in trouble and had estimated probable losses of over $1 billion (approximately

$5.00 per share), as seen above.  Although the projected losses were highly material, they were concealed from plaintiff and the investing public by the defendants.  The defendants' letter accordingly materially misrepresented the company's financial condition, results and outlook.

26.  On April 29, 2019, McDermott released its first quarter 2019 report, which was posted on the company's website and read by the plaintiff on or about May 6, 2019.  The report, written, reviewed and approved by the defendants in concert with one another and in furtherance of the scheme,  materially overstated the results the company had achieved as well as its outlook.  In part, the report stated:

*"More broadly, the company continues to exhibit commercial success in a steadily improving market.  In particular, McDermott reported a book-to-bill ratio of 3.0x, a new award total of $6.7 billion and a 41% sequential-quarter improvement in backlog."*

27.  The report released McDermott's full-year 2019 earnings guidance, which predicted strong second-half 2019 results.  The guidance predicted that McDermott's full year earnings per share would be $.90

28.  Nowhere in the first quarter report or the full-year guidance were plaintiff or the investing public informed of the first quarter, 2019, unrecognized losses and projected losses for the company's Cameron and Freeport projects.  In

furtherance of the scheme, these actual and projected losses were concealed from the plaintiff and the investing public by the defendants and not included in the first quarter results or in the full-year projections. The defendants' first quarter, 2019, report misrepresented the company's financial condition, results and outlook because the defendants were aware at the time of the report's publication that the company's financial condition, results and outlook were worse than reported.

29. Significantly, at the time of the first quarter report, the defendants were aware that the Cameron and Freeport carrying values were overstated and did not reflect the losses that those projects had experienced. (See above). This resulted in a material overstatement of McDermott profits and the concealment of material losses from plaintiff and the investing public.

30. McDermott held its annual meeting on May 2, 2019. All reports, slides and presentations given at the meeting were ordered, reviewed and approved in advance of the meeting by the defendants in concert with one another and in furtherance of the scheme. The meeting presentation was included on McDermott's website and was viewed by plaintiff on or about May 15, 2019. The meeting continued the false good-news reporting that had taken place in prior months. For example, the company showed a slide which stated:

*"Post-Combination, McDermott is a fundamentally different and much larger company as compared to where we were in 2017, with significant earnings potential."*

31. The slide showed dramatic increase in revenues, backlog and order intake from the prior year.

32. At no time during the meeting were plaintiff or the investing public informed of the significant losses being experienced (but not recognized) or projected for the Cameron and Freeport projects. In furtherance of the scheme, these losses and projected losses were not discussed during the meeting by the defendants or in any report, slide or presentation given during the meeting. The defendants' annual meeting presentation misrepresented and concealed the company's true financial condition, results and outlook because the defendants were aware at the time of the annual meeting presentation that the company's financial condition, results and outlook were worse than reported.

33. Significantly, at the time of the annual meeting, the defendants were aware that the Cameron and Freeport carrying values were overstated and did not reflect the losses that those projects had experienced. (See above). This resulted in a material overstatement of McDermott profits and the concealment of material losses from plaintiff and the investing public.

34. On July 26, 2019, just two months after the company's annual meeting, the Securities and Exchange Commission ('SEC') sent McDermott a letter, accompanied by subpoenas, notifying the company that it was under investigation for failing to properly disclose projected losses on its Cameron LNG project. Although the investigation was highly material, the defendants, in concert with one another and in furtherance of the scheme, concealed the existence of the investigation by not disclosing the investigation to plaintiff or the investing public.

35. In July, 2019, McDermott undertook a study (the "Financing Case") the purpose of which was to consider the company's options, including declaring bankruptcy, as the result of the massive losses being incurred at the Cameron and Freeport projects which were draining the company's cash and impacting its loan covenants. The defendants, in concert with one another and in furtherance of the scheme, concealed the existence of this study and did not disclose this highly material study which included the option of declaring bankruptcy to the plaintiff or the investing public.

36. On July 29, 2019, McDermott released its second quarter 2019 results which unexpectedly showed the company lost $146 million during second quarter 2019 versus a net income of $47 million during the prior year period. The second quarter 2019 report was published on McDermott's website and was read by plaintiff on or about July 29, 2019. In addition, the company reduced its full year

guidance which now predicted the company would **lose** $1.65 per share instead of making $.90 a share in 2019, a negative swing of $2.55 a share from the first quarter, 2019, guidance.  The losses and reduced earnings projections were largely the result of the partial recognition of  Cameron (and to a lesser extent, Freeport) losses.

37.  On July 29, 2019, the defendants, acting in concert with one another and in furtherance of the scheme, created, approved and issued a statement (as part of the second quarter, 2019, report) on McDermott's website, read by the plaintiff on or about July 29, 2019, that operating income was going to achieve a "sharp improvement" during the fourth quarter of 2019.  The company's anticipated improvement was therefore shifted by the defendants from second-half 2019 to fourth quarter 2019.

38.  In the statement, defendant Dickson, acting in concert with the other defendants and in furtherance of the scheme, concealed and misrepresented the true financial condition and prospects of the company when he stated that the fourth quarter was going to see a "sharp improvement" when he was already aware that the Cameron and Freeport projects were bleeding the company dry and that McDermott faced significant difficulty in the months ahead, including impending earnings, cash flow, loan covenant and potential bankruptcy problems.  To the contrary, defendant Dickson stated that:

*"Although the company reported mixed results for the second quarter of 2019, we are encouraged by the record-setting level of backlog and new awards. We are also pleased with the visibility we have into expected 2020 revenues, of which $7.4 billion was already in backlog as of the end of the second quarter of 2019. This is well above the $4.2 billion of 2019 revenues we had in backlog this time last year. This strong market posture continues to demonstrate the benefits of our combination with CB&I and the opportunities available in a strong market environment. McDermott has booked more than $19 billion of awards since the May 2018 combination with CB&I, demonstrating continued customer confidence and healthy end markets. Importantly, as of the end of the second quarter of 2019, legacy CB&I projects represented only about 14% of the current backlog. All the awards we've won since the combination were booked under McDermott's stringent risk management protocols, which we believe pave the way for us to deliver consistent margin performance through the application of the One McDermott Way in the execution of this backlog. The company continues to remain on schedule executing the Cameron and Freeport LNG projects. The Cameron settlement agreement we signed earlier this month is a testament to the mutually productive relationship we have built with this customer since the combination – and the associated incentives provided a meaningful contribution to our second quarter results.*"

*"...we expect to see a sharp improvement in the company's operating income by the fourth quarter of this year, as we build momentum heading into 2020."*

*"Looking ahead, our revenue opportunity pipeline remains near a historic high and, more specifically, we are seeing steady upward momentum in a number of key areas. For example, in the strategic area of front end engineering design (FEED), our awards through the first half of 2019 are already more than double what we won in all of 2018 – in terms of both man-hours and dollar value – and that's especially important as FEED work positions us for EPC opportunities. This year we have booked $1.5 billion of EPC work as a result of FEED work that's been done since the combination. Further, in our Technology business, we are forecasting the number of license sales to increase by 25% this year versus 2018. One of the recent highlights was our selection as the Master Licensor by S-OIL, an affiliate of Saudi Aramco, in support of its ethylene cracker and downstream petrochemicals complex, being developed as a major expansion of S-OIL's existing refinery in South Korea. Our Technology business gives us unparalleled insight into upcoming EPC opportunities, and we see roughly $40 billion of potential EPC pull-through opportunities in the refining and petrochemical markets over the next five years. We believe the petrochemical market, in particular, is poised for*

Page 16

*another wave of investment in the next 12 to 24 months, with world ethylene capacity expected to increase by more than 40% between 2019 and 2028."*

39.  Nowhere in their statement did the defendants alert plaintiff or the investing public to the fact that McDermott had already begun a material analysis (the "Financing Case") designed to consider a change in the capital structure of the company, including bankruptcy, as discussed herein.  And nowhere in the July 29, 2019, second quarter report or statement did the defendants alert plaintiff or the investing public to the material fact that they were aware that the Cameron LNG project, and other legacy projects as well, were going to continue experiencing substantial losses in the months ahead which would cause the company to incur huge losses, a cash flow drain and loan covenant problems.  The defendants' statement materially concealed and misrepresented the company's true financial condition, results and outlook because the defendants were aware at the time of the letter's publication that the company's financial condition, results and outlook were worse than reported (even though the second quarter results were worse than expected), particularly with respect to the inflated carrying values and poor prospects of the Cameron and Freeport projects; because the defendants were aware that the company was under investigation by the SEC and because the defendants were aware that a near-term bankruptcy declaration was a real possibility.

40. On August 2, 2019, after having read the defendants' misrepresentations mentioned herein, plaintiff became convinced that the share price decline that resulted from the second quarter loss was a buying opportunity. Plaintiff, relying on the defendants' false representations, accordingly purchased 22,000 shares of McDermott International common stock at a combined cost of $139,322.28. Had the defendants not concealed and misrepresented the current condition and future outlook for McDermott, had the defendants not concealed the material information that the company was going to continue experiencing massive losses at its Cameron and Freeport facilities, that the company was in dire need of working capital, that it had or was about to violate its loan covenants, that it had undertaken a study (the Financing Case) which included the company's bankruptcy options, that bankruptcy was a very real possibility in the near term and that the company was under SEC investigation for failing to properly disclose projected losses at the Cameron project and had the defendants not intentionally materially overstated the company's current earnings, projected results and financial condition as discussed herein, plaintiff would not have purchased or held the stock.

41. The Financing Case analysis was concluded on or about September 16, 2019, and the company immediately made the decision to declare Chapter 11 bankruptcy. (At the company's Chapter 11 bankruptcy plan confirmation hearing in the U.S. District Court for the Southern District of Texas, Houston Division, on

March 12, 2020, John R. Castellano, Chief Transformation Officer for McDermott and a company insider with intimate knowledge of the decision-making process, testified that the company decided in mid-September, 2019, to declare Chapter 11 bankruptcy.)  The decision to declare bankruptcy was made just seven weeks after the defendants' July 29, 2019, effusive second quarter comments, including defendant Dickson's comment that

*"...we expect to see a sharp improvement in the company's operating income by the fourth quarter of this year, as we build momentum heading into 2020."*

42.  It is unbelievable that the defendants were not aware of the massive difficulty the company was in when they, in concert with one another and in furtherance of the scheme, concealed and materially misrepresented the true financial condition of the company in their July 29, 2019, statement that the company was doing well and operating income would see a "sharp  improvement" by the fourth quarter of 2019.

43.  The defendants, acting in concert and in furtherance of the scheme, concealed and misrepresented the true financial condition and outlook of the company by failing to inform plaintiff or the investing public in mid-September, 2019, that the highly material decision had been made to declare bankruptcy and that it had hired AlixPartners to help prepare the bankruptcy filing.  However, rumors began to fly and the company's share price declined from $6.08 on

September 16, 2019, immediately before the rumors, to $2.16 on September 18, 2019, after the rumors (including the hiring of AlixPartners) came out.

44.  On September 18, 2019, in order to stem the share price decline, the defendants, acting in concert and in furtherance of the scheme, created, approved and issued a terse press release (read by plaintiff on or about September 18, 2019) stating that:

> "McDermott International, Inc., **routinely** (emphasis added) hires external advisors to evaluate opportunities for the Company.  The Company is taking positive and proactive measures, **as we have done in the past** (emphasis added), intended to improve its capital structure and the long-term health of its balance sheet."

45.  The defendants, acting in concert and in furtherance of the scheme, made no mention in their press release of the highly material fact that the company had already decided to declare bankruptcy.  Instead, they attempted to deceive the plaintiff and the investing public into believing that everything that was happening at the company was "routine" and a common occurrence ("as we have done in the past") .  The defendants, acting in concert and in furtherance of the scheme, misrepresented the reason for hiring external advisors as "routine" when the true reason for the advisors was to help them prepare a bankruptcy filing (see below).

46.  Furthermore, the defendants concealed and misrepresented the true financial condition of the company by stating that the prospect of a bankruptcy filing was "rumor or speculation" in subsequent communications with plaintiff and

the investing public (between September 18, 2019, and January 21, 2020) even though they were aware that the company had already decided to file for Chapter 11.

47.  Defendant Sussberg joined the scheme and became an equal member of the scheme with equal authority under the scheme as of September 20, 2019.  As a member of the scheme, defendant Sussberg advised the other members of the scheme as to how to carry out and advance the scheme.

48.  On September 20, 2019, the defendants, acting in concert and in furtherance of the scheme, created, approved and issued a press release (read by plaintiff on or about September 20, 2019) stating that the company had hired Evercore to help it sell its Lummus Technology division in order to strengthen the company's balance sheet.  **The press release concealed and made no mention of the highly material fact that the company had already decided to declare bankruptcy and that the Lummus sale would only be completed as part of a McDermott bankruptcy filing.**  The defendants and their agents have subsequently testified that there was never a plan for the out-of-court (i.e. - non-bankruptcy) sale of Lummus Technology to strengthen McDermott's balance sheet. (See below.)

49.  The press release sets forth, in part, as follows:

"HOUSTON, Sept. 20, 2019 /PRNewswire/ -- *McDermott International, Inc. (NYSE: MDR) today announced it recently received unsolicited approaches to*

*acquire all or part of Lummus Technology, McDermott's industry-leading technology business, with valuation exceeding $2.5 billion. Based on the receipt of these approaches, McDermott is exploring strategic alternatives to unlock the value of Lummus Technology while maintaining the strategic rationale of engineering, procurement and construction (EPC) pull-through.* [Emphasis added.]

*McDermott's Lummus Technology is a leading licensor of proprietary petrochemicals, refining, gasification and gas processing technologies, and a supplier of proprietary catalysts and related engineering. With a heritage spanning more than 100 years, encompassing approximately 3,100 patents and patent applications, Lummus Technology provides one of the industry's most diversified technology portfolios to the hydrocarbon processing sector.*

*'Lummus is an excellent business, with incredibly impressive employees, that has earned a reputation for expertise, innovation and reliability in the refining and petrochemical industries,' said David Dickson, President and Chief Executive Officer of McDermott. "The process of exploring strategic alternatives is part of our ongoing efforts intended to improve McDermott's capital structure, and we plan to use the proceeds from any transaction involving Lummus Technology to strengthen our balance sheet. While Lummus is an important business within McDermott, we have decided to undertake a process to fully realize its strategic and financial value."* [Emphasis added.]

*Separately, McDermott's previously announced processes to sell the remaining portion of its pipe fabrication business and its industrial storage tank business are ongoing."*

50.  This disclosure regarding the unsolicited approaches to acquire Lummus and that McDermott would use the proceeds from any Lummus transaction to strengthen its balance sheet was well received by the market.  Zephirin Group analyst Lenny Zephirin said the offer is "salivating" and, if accepted, should allow the company to reduce leverage by about $1.2 billion. See A. Sarkar, "McDermott

International gets takeover interest for its Lummus Technology unit", Reuters,

Sept. 20, 2019, available at https://www.reuters.com/article/us-mcdermott-

international-strategic-alt/mcdermott-international-gets-takeover-interest-for-its-

lummus-technology-unit-idUSKBN1W51AC.  Credit Suisse analysts, who called

Lummus the "crown jewel" of McDermott, said the valuation is reasonable given

historic transactions in the space, and that the deal could happen in early 2020. Id.

Following the disclosure, the price for McDermott common stock spiked 50% in

premarket trading on September 20 and closed at $2.01 per share, up 27.22%.

51. The September 20 press release and defendant Dickson's statements

therein, however, were materially misleading. There was not any near-term plan

for a Lummus transaction to strengthen the company's balance sheet outside of a

bankruptcy proceeding, as seen below. The statements were merely part of the

defendants' scheme to conceal the true status of the company, including its true

financial condition and outlook and impending bankruptcy.

52.  John R. Castellano, AlixPartners Managing Director and Chief

Transformation Officer for McDermott, in testimony before the bankruptcy court

during the March 12, 2020, bankruptcy hearing, *stated that when he began working

with Defendants, McDermott, and their advisors **in September 2019**, the objective

was to negotiate a consensual Chapter 11 reorganization as this was the only

viable option McDermott had.*  [Emphasis added.]

53. Mr. Castellano also testified during the March 12, 2020, bankruptcy hearing that [at least] one of the "unsolicited" approaches to purchase Lummus actually came from a company controlled by a McDermott International insider. This raises the possibility that the company's claim that it got miracle, last-minute, 'unsolicited' offers to buy Lummus "out of the blue" was a sham.

54. In his Declaration in Support of Chapter 11 Petitions, defendant Dickson confirmed his contemporary September, 2019, knowledge of the acute liquidity crisis:

*"In late September 2019, we were running out of cash. It became clear that despite McDermott's improvements and success winning projects, the company remained over-leveraged and could not continue running its business and servicing its debt."* *(Dickson Decl.)*

55. Thus, the defendants knew that the statements in the September 20, 2019, press release were materially false and/or misleading when made, but nonetheless, acting in concert and in furtherance of their scheme, approved them for public distribution. These materially false and misleading statements had the principal purpose to conceal the true status of the company in order to calm plaintiff and the investing public. The defendants' statements concealed and materially misrepresented the company's true financial condition, results and outlook because the defendants were aware at the time of the statements' publication that the company's financial condition, results and outlook were worse than reported; because the defendants were aware that the company was under

investigation by the SEC for underreporting Cameron losses; because the

defendants were aware that a near-term bankruptcy declaration was a certainty; and

because the defendants were aware that a Lummus sale would only be made as part

of a bankruptcy filing (see below).

56.   On October 21, 2019, the defendants, acting in concert and in

furtherance of the scheme, created, approved and issued a press release (read by

plaintiff on or about October 21, 2019) that the company had secured financing of

$1.7 billion, subject to certain terms, that the company would use to finance

working capital and support the issuance of required performance guarantees on

new projects.   The tone and tenor of the press release was that the company's

liquidity problems had been solved.   Nowhere in the press release was the

possibility of bankruptcy even raised, even though the company had decided in

mid-September to declare bankruptcy.   The press release included a statement from

defendant Dickson, McDermott President and CEO, that:

> *"This new credit agreement is a continued signal from our lenders that they
> support McDermott, our underlying business growth strategy and ability to
> achieve a long-term balance sheet solution.   The Agreement provides near-term
> liquidity for the Company to manage working capital and provide performance
> guarantees on expected new awards.   We remain focused on serving our
> customers' needs, supporting our dedicated employees and maintaining our valued
> relationships with our subcontractors, suppliers and other business counterparties,
> all as part of our efforts to enhance our position as a premier, fully integrated
> provider to technology, engineering and construction solutions to the energy
> industry."*

57. The press release reiterated McDermott's plan to sell Lummus Technology: "McDermott continues to pursue the previously announced strategic alternatives process for Lummus Technology".

58. The press release also announced that McDermott had withdrawn its previously stated guidance for full-year 2019. The defendants, acting in concert and in furtherance of the scheme, did not update or give new guidance for full-year 2019 earnings even though they knew that full-year 2019 earnings were going to be non-existent. Nowhere in the press release, created, approved and issued by the defendants, acting in concert and in furtherance of the scheme, were the highly material facts that McDermott had already decided to declare bankruptcy or that it was going to report massive losses for the third quarter and for full-year 2019. The defendants' press release concealed and materially misrepresented the company's true financial condition, results and outlook because the defendants were aware at the time of the press release that the $1.7 billion in financing was only to tide the company over until its bankruptcy filing had been finalized; because the defendants were aware that they were reporting better-than-achieved results and prospects; because the defendants were aware that the company was under investigation by the SEC for underreporting Cameron losses; because the defendants were aware that a near-term bankruptcy declaration was being planned as a certainty; because the defendants were aware that a Lummus sale would only

be made as part of a bankruptcy filing (see below); and because the defendants were aware on the date of the press release, October 21, 2019, that the earnings for the third quarter (already ended in September) were going to be disastrous.

59.  On October 22, 2019, just one day after the October 21, 2019, press release, McDermott and AP Services, an affiliate of AlixPartners, entered into an agreement (the "October 22 Agreement") that replaced a September 17, 2019, agreement between McDermott and AlixPartners, wherein AP Services agreed "to provide temporary personnel to McDermott to assist in a contemplated financial restructuring." Bankr. Proc. ECF No. 916 at 1 (¶1). Among other things, **the October 22 Agreement provided for the payment of a $5 million success fee that would be earned upon the completion of a restructuring through confirmation of a Chapter 11 plan of reorganization**.  Bankr. Proc. ECF 434-1.

60.  Even though the October 22 Agreement was highly material, the defendants, acting in concert and in furtherance of the scheme, concealed and did not report its existence to plaintiff or the investing public.

61.  **Just two weeks after the October 21, 2019, press release, November 4, 2019, McDermott released its third quarter results in which it reported a net loss of $1.887 billion, or a massive $10.37 per share**.

62. Prior to the third quarter report, the defendants, acting in concert and in furtherance of the scheme, had not made any announcement to plaintiff or the investing public that the third quarter results were going to substantially deviate from what had been projected. There is no way that the defendants were not aware on October 21, 2019, the day of the press release withdrawing guidance, that there was going to be a historic, massive loss of $10.37 a share reported two weeks hence. The defendants, acting in concert and in furtherance of the scheme, concealed and failed to report this highly material fact to plaintiff and the investing public or to amend their previous guidance.

63. On the same day, November 4, 2019, prepared by, under the direction of and with the approval of the defendants, McDermott filed its Form 10-Q (for the third quarter, 2019) in which it disclosed for the first time that it was being investigated by the SEC. Plaintiff read the 10-Q on or about November 5, 2019. The 10-Q reported that the SEC had informed McDermott International by letter dated July 26, 2019, together with accompanying subpoenas, that it was under investigation for failing to properly disclose projected losses on its Cameron LNG project.

64. At no prior time did the defendants disclose to the plaintiff or the investing public the highly material fact concerning the existence of the SEC's investigation. The defendants, acting in concert and in furtherance of the scheme,

concealed the existence of the highly material SEC study from plaintiff and the

investing public for over three months, from July 26, 2019, to November 4, 2019.

Furthermore, the company's 10-Q materially misrepresented the facts concerning

the SEC investigation because the defendants were aware when they published the

10-Q that the company had, in fact, underreported Cameron losses.

65.  In an April 14, 2021, Memorandum in the United States District Court

for the Southern District of Texas, Houston Division, U.S. District Court Judge

George Hanks, Jr., ruled in *Edwards v. McDermott International, Inc., et al*, No.

4:18-cv-04330, that the defendants had omitted material facts about the costs of

CBI's Cameron and Freeport (and other) projects and those omissions were

actionable.  Some of the material facts omitted and concealed from plaintiff and

the investing public by the defendants were that the defendants were aware prior to

the May 10, 2018, merger completion between McDermott International and CBI

that internal CBI forecasts seen by the defendants indicated that CBI's financial

statements were underreporting costs for the projects by $1 billion and that, after

the merger was completed, the company had not adjusted the carrying values of the

Cameron and Freeport (and other) projects to reflect the losses that had not been

recognized by CBI. In other words, the defendants had falsely and intentionally

concealed and materially overstated the true values and prospects of the Cameron

and Freeport (and other) projects from plaintiff and the investing public prior and subsequent to the completion of the company's merger with CBI.

66. The November 4, 2019, 10-Q for the first time described a Chapter 11 filing as a risk McDermott *might* face. This statement by the defendants was materially false and misleading when made because, as described above, the defendants, McDermott, and its advisors had already begun preparing a Chapter 11 bankruptcy plan starting in late September, 2019. In other words, there was no *might* at all. There was a *will*. A McDermott Chapter 11 filing was certain, not just possible.

67. On November 4, 2019, the day of the third quarter earnings announcement, McDermott reported that defendant Stuart Spence, the company's Chief Financial Officer, had resigned "to pursue other opportunities". Mr. Spence's resignation date was actually November 4, 2019, the date of the disastrous third quarter earnings announcement. As discussed above, defendant Spence was already the defendant in litigation against him, defendant Dickson and McDermott which, among other things, accused him of making false and misleading statements relating to McDermott's finances.

On present information and belief, defendant Spence was no longer a member of or participated in the scheme after November 4, 2019.

68.   On December 2, 2019, defendants Dickson, Lamb and Sussberg, acting in concert and in furtherance of the scheme, wrote, approved and issued a press release titled *McDermott to Access $350 Million Tranche B Financing Under Superpriority Senior Secured Credit Facility.*  The press release stated that McDermott was granted access to the second tranche of funding (Tranche B) under the superpriority senior secured credit agreement (SSSCA), whereby the company received a $250 million Term Loan Facility and a $100 million Letter of Credit Facility.  The press release, read by plaintiff on or about December 2, 2019, stated that McDermott would use the proceeds "to continue financing working capital and support the issuance of required performance guarantees on new projects."  In the press release, the defendants also reiterated the company's continued pursuit of "the previously announced strategic alternatives process for Lummus ...." Id.

69.   The December 2, 2019, press release, however, was materially false and misleading and concealed material facts when made because, as the following declaration of John Castellano to the bankruptcy court shows, it failed to disclose the material fact that the company's secured lenders would not provide any further liquidity under the SSSCA to fund business operations, and that the sale of Lummus would be consummated only as part of a Chapter 11 process:

*"On December 1, 2019, after significant deliberation and discussion with the secured lenders on whether to fund the second tranche under a debtor-in-possession financing facility rather than on an out-of-court basis, McDermott gained access to the second tranche of funding under the Superpriority Facility*

*providing an incremental $250 million term loan facility ($229 million after fees) and a $100 million letter of credit facility. **In connection with this funding, the secured lenders stated that they did not expect to fund any additional amounts on an out-of-court basis. As such, McDermott's liquidity would drive the timing of any potential chapter 11 filing.***

***McDermott told prospective purchasers of [Lummus] that the purchase was to be consummated as part of a chapter 11 process, and provided clear milestones for the marketing process with the aim of achieving a signed "stalking horse" purchaser by the time McDermott would need to seek chapter 11 relief."*** Castellano Decl.

70.  In another admission that a Chapter 11 filing had been in the works

since September, 2019, Mr. Castellano subsequently stated to the bankruptcy court:

*"McDermott enters chapter 11 with a massively consensual prepackaged restructuring."  "Getting here has been an all-out sprint for the company and its many stakeholders around the globe."  **"Since September 2019, McDermott has.... marketed and achieved a signed stalking-horse purchaser for the sale of [Lummus]"***.  Castellano Decl.

71.  Between November 8, 2019, and December 26, 2019, plaintiff

purchased an additional 8,000 shares of McDermott International shares at a total

cost of $7219.  Had the defendants not concealed the material information that the

company was going to continue experiencing massive losses at its Cameron and

Freeport facilities, that the company was in dire need of working capital, that it had

or was about to violate its loan covenants, that the company was actively pursuing

and finalizing a bankruptcy filing, and that a bankruptcy filing was a certainty and

had the defendants not intentionally materially overstated the company's outlook,

projected results and financial condition, plaintiff would not have purchased or held the stock.

72. McDermott did not release fourth quarter 2019 results. However, McDermott advisors Evercore, Kirkland & Ellis and AlixPartners estimated that McDermott experienced a fourth quarter operating loss of $141 million, or approximately $.77 per share, even though the defendants, acting in concert and in furtherance of the scheme, had been saying as late as July 29, 2019, (second quarter 2019 earnings release) that operating income was going to achieve a **"sharp improvement"** during the fourth quarter of 2019.

73. On January 21, 2020, McDermott formerly announced that it was filing a Prepackaged Chapter 11 proceeding in the United States Bankruptcy Court for the Southern District of Texas (Case number 20-30336). As part of the filing, the company announced that it was proposing that all of the existing outstanding shares of McDermott would be cancelled (declared worthless).

74. Prior to the January 21, 2020, announcement, the defendants, acting in concert and in furtherance of the scheme, had made no announcements to plaintiff or the investing public that the company was even considering bankruptcy or that it had decided to declare bankruptcy in mid-September, 2019. Throughout the entirety of 2019 and up until the January 21, 2020, bankruptcy announcement, the defendants, acting in concert and in furtherance of the scheme, produced and

published a continuous stream of positive press releases, read by plaintiff within two or three days of their release, touting the continued and unparalleled success of the company and its operations, that materially concealed and misrepresented the company's true outlook, projected results and financial condition. **Not one press release informed plaintiff or the investing public of the present or future difficulties the company was experiencing or of the company's decision to declare bankruptcy in mid-September, 2019. Indeed, to the contrary, at all times relevant, McDermott continually inundated plaintiff and the investing public with nothing but feel-good, good news press releases falsely touting the company's results, financial condition and outlook while concealing the true status of the company's financial condition and outlook.** These press releases can be found here:

https://www.mcdermott-investors.com/news/default.aspx

75. Just prior to the January 21, 2020, bankruptcy announcement, McDermott shares were trading at $.70 per share. After the January 21, 2020, announcement, McDermott's share price fell to a low of $.01 per share. The shares have since been cancelled and are now worthless.

76. By letter dated February 25, 2020, together with an accompanying subpoena, the office of the United States Attorney for the Southern District of Texas within the U.S. Department of Justice notified McDermott that a Federal

Grand Jury was conducting a criminal investigation and requested various documents, including cost forecasts and other financial-related information, related to the Cameron LNG project.

77. Defendant Lamb left McDermott on or about 5/6/2020. No comment or explanation was given by the company for defendant Lamb's departure.

78. In a terse nine word, one sentence, announcement on June 7, 2021, McDermott announced that defendant Dickson had resigned. No further comment or explanation was given.

### Defendant Sussberg's Assault of Plaintiff

79. The following is based on information and belief.

80. Plaintiff repeats each and every allegation contained above as if fully set forth herein.

81. On February 27, 2020, plaintiff filed and served his Opposition and Objection to Confirmation of Debtor's Plan ('Plaintiff's motion') in the McDermott bankruptcy case (case number 20-30336). Plaintiff's motion, among other things, asked the bankruptcy court to deny McDermott's Plan and to refer the actions of McDermott employees and advisors, including the defendants herein, for investigation to the U.S. Attorney and the F.B.I. for the allegedly fraudulent statements they had made pursuant to McDermott's bankruptcy case (18 U.S.C. 158(d) and 18 U.S.C. Section 3057).

82. Plaintiff's motion simultaneously enraged the defendants and frightened the defendants that plaintiff had asked for an investigation into their alleged illegal and fraudulent acts and testimony concerning McDermott's bankruptcy filing. The defendants (Lamb, Dickson, Sussberg), pursuant to their scheme, instituted several actions to cancel the plaintiff and scare the plaintiff from continuing his course of action alleging improper, illegal, fraudulent behavior by of the defendants. Accordingly, pursuant to the scheme, the defendants (Lamb, Dickson, Sussberg) hatched a plan to harass, frighten and intimidate the plaintiff should he attend the March 12, 2020, Plan Confirmation hearing.

83. On March 12, 2020, plaintiff did attend McDermott International's Chapter 11 bankruptcy Plan Confirmation Hearing in the U.S. District Court for the Southern District of Texas, Houston Division. Plaintiff represented himself as an interested party (shareholder). Defendant Sussberg was one of the attorneys representing McDermott International at the hearing. Plaintiff was one of the first ones in the courtroom and he chose a seat near the front. Defendant Sussberg came in and sat directly across from plaintiff, within arm's distance of the plaintiff. Plaintiff thought this was odd because when defendant Sussberg came into the courtroom, there were still quite a few seats available. Nevertheless, defendant Sussberg chose a seat right next to plaintiff.

84.  Plaintiff was literally the only McDermott shareholder who attended the hearing to argue against the Plan confirmation, save for one attorney representing a few shareholders who barely spoke during the hearing.  The rest of the attendees, including defendant Sussberg, appeared to be in favor of the plan's confirmation.  Accordingly, the expectation from the large, standing room only, crowd who favored confirmation was that there would be no objections to the plan and the hearing would begin and conclude quickly.

85.  Unfortunately for these people, plaintiff insisted that McDermott provide testimony from a host of witnesses verifying the company's bankruptcy plan.  This caused the hearing to take much longer than usual as the witnesses were forced by plaintiff to provide live testimony one at a time.  The longer the hearing took, the more agitated defendant Sussberg became.  He began to glare at plaintiff and then started to make uncalled for, unprofessional remarks to plaintiff such as "*You are disgusting!*"

86.  Plaintiff was unnerved by defendant Sussberg's behavior.  Plaintiff did not know defendant Sussberg and had never seen or spoken to him prior to the hearing.  After the hearing, plaintiff politely asked defendant Sussberg his name.  Defendant Sussberg angrily replied, "*I don't have to give you my name!*" Defendant Susberg told plaintiff that, "*You are disgusting!*" and "*You are a fool!*" Defendant Sussberg is a young, muscular, man who appears to be in his 30's.  Plaintiff is a

senior citizen who is in his 70's.  Defendant Sussberg's angry demeanor and comments frightened the plaintiff.

87.  After the hearing had ended and the Plan had been approved by the court, plaintiff was heading down a narrow hallway in the courthouse that led to the elevators.  (The hearing had been held in a fifth floor courtroom.)  Defendant Sussberg was approximately 30 feet in front of the plaintiff and appeared to also be going to the elevators.  There was nobody between plaintiff and defendant Sussberg in the hallway.  Defendant Sussberg looked behind him and saw plaintiff. At that point, without cause, warning or explanation, defendant Sussberg turned around and intentionally and willfully charged directly at plaintiff at a high rate of speed.  Plaintiff was apprehensive and terrified and feared for his safety and his life as the muscular defendant Sussberg came barreling towards him.

88.  Defendant Sussberg's charge happened so fast that plaintiff had nowhere to go to get out of defendant Sussberg's way.  Defendant Sussberg ran right up to plaintiff and stopped just and inch or two from plaintiff.  Defendant Sussberg then again angrily told plaintiff, *"You are disgusting!"*  Defendant Sussberg then intentionally and willfully physically "chest-bumped" the plaintiff, causing pain to the plaintiff and injuring the plaintiff.

89.  Plaintiff was shocked and terrified.  Plaintiff began having chest pains and thought he might be having a heart attack.  Plaintiff tried moving to the right to

get around defendant Sussberg, but defendant Sussberg moved his body in front of

plaintiff to prevent plaintiff from getting past him.  Plaintiff then tried moving to

the left to get around defendant Sussberg, but defendant Sussberg again cut off

plaintiff's exit by moving his body in from of plaintiff.

90.  Defendant Sussberg's actions falsely imprisoned the plaintiff.

91.  Plaintiff then retreated back down the hallway where he had come from

and defendant Sussberg continued on in the other direction toward the elevators.

Plaintiff waited until he thought defendant Sussberg had left via the elevators.

Plaintiff then exited the courthouse.

92.  Plaintiff was very upset, frightened and scared and injured when he left

the courthouse.  Plaintiff's chest hurt as the result of defendant Sussberg chest-

bumping him.  Plaintiff's heart was racing.  Plaintiff was terrified that he would

encounter the muscular defendant Sussberg outside of the courthouse and be

assaulted again by defendant Sussberg.  Plaintiff was so upset that he could not

even locate his car in the parking garage near the courthouse where he had parked.

Plaintiff suffered personal indignity as the result of defendant Sussberg's actions

against him as described herein.

93.  After plaintiff arrived home, he was so upset that he could not sleep

well.  Plaintiff had headaches when he recalled defendant Sussberg's actions

toward him.  Plaintiff's chest was bruised and hurt for almost a week as the result

of being chest-bumped by defendant Sussberg. Plaintiff's appetite declined. Plaintiff was, and still is, terrified and has a racing heart when he has to go back to the courthouse to file documents in his fraud case against the defendants discussed herein. (The federal court does not allow pro se filers to file electronically.) Plaintiff's headaches, insomnia, mental anguish, loss of appetite and emotional distress over defendant Sussberg's assault continue unabated to this day.

94. Defendant Sussberg's actions towards the plaintiff as described herein were done intentionally, knowingly and willfully and done with the prior knowledge that they would injure, harm, threaten, cause personal indignity and cause mental anguish and severe emotional distress to the plaintiff.

95. Defendant Sussberg's actions towards the plaintiff as described herein were done pursuant to the scheme.

96. Plaintiff does not allege that the actions of defendant Sussberg as alleged herein were done under the scope of his employment while representing McDermott International in its bankruptcy case (case number 20-30336). Plaintiff asserts no claim against McDermott International or against defendant Sussberg's employer (Kirkland & Ellis, LLP) for the tortuous actions against him by defendant Sussberg.

## COUNT 1
## COMMON LAW FRAUD
### (State Claim against all defendants)

97.  Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.  As seen herein:

98.  The defendants made or caused to be made material representations to the plaintiff about McDermott International, its performance, its financial condition and its outlook which were false.

99.  The defendants concealed adverse material facts from plaintiff to prevent plaintiff from knowing McDermott International's true financial condition and outlook.

100.  When the defendants made the representations to the plaintiff, they knew the representations were false or they made the representations recklessly, as positive assertions, and without knowledge of their truth.

101.  The defendants made the representations with the intent that the plaintiff would act on them.

102.  The plaintiff relied on the representations.

103.  The plaintiff acted on the representations.

104.  The representations caused the plaintiff injury.

105.  The defendants agreed upon and operated a scheme ("the scheme") to conceal and misrepresent McDermott's true financial condition and outlook from and to plaintiff and the investing public.

106.  The defendants did not have a reasonable basis for their scheme and engaged in practices and a course of business that operated as a fraud and deceit upon plaintiff.

107.  Neither the creation of the scheme nor the defendants' acts under the scheme, including those acts mentioned, discussed or detailed herein, were done while the defendants were acting under the scope of their employment.  Nothing herein alleges, assumes or implies that the defendants were acting under the scope of their employment when they acted under the scheme or when their actions harmed the plaintiff.

108.  The defendants and their representatives, with prior knowledge and approval of the defendants, individually and in concert, directly and indirectly, engaged and participated in a continuous course of conduct (the scheme) to conceal and misrepresent adverse material information about McDermott International, including, but not limited to, its actual (poor) present financial condition, its current earnings losses, its projected large earnings losses, its deteriorating financial condition and its impending bankruptcy filing from and to plaintiff and the investing public.

109.  The defendants and their representatives, with prior knowledge and approval of the defendants, individually and in concert, directly and indirectly, engaged and participated in a continuous course of conduct (the scheme) to conceal and misrepresent the fact that McDermott International's Cameron LNG and Freeport LNG operations were experiencing large losses and were projected to continue experiencing large losses from and to plaintiff and the investing public.

110.  The defendants and their representatives, with prior knowledge and approval of the defendants, individually and in concert, directly and indirectly, engaged and participated in a continuous course of conduct (the scheme) to conceal and misrepresent the fact that the company had already made the decision to file for bankruptcy and that a bankruptcy filing was imminent from and to plaintiff and the investing public.

111.  The defendants and their representatives, with prior knowledge and approval of the defendants, individually and in concert, directly and indirectly, engaged and participated in a continuous course of conduct (the scheme) to conceal and misrepresent the fact that the company only planned to sell its Lummus Technology business as part of a negotiated, pre-packaged bankruptcy plan from and to plaintiff and the investing public.

112.  The defendants and their representatives, with prior knowledge and approval of the defendants, individually and in concert, directly and indirectly,