000953

**COMPLX, DUPFILER, LEAD, COMPLX**

# U.S. Bankruptcy Court
## Southern District of Texas (Houston)
### Bankruptcy Petition #: 20-30336

*Date filed:* 01/21/2020

*Assigned to:* David R Jones
Chapter 11
Voluntary
Asset

**Debtor**
**McDermott International, Inc.**
757 North Eldridge Parkway
Houston, TX 77079
HARRIS-TX
Tax ID / EIN: 72-0593134

represented by **Matthew D Cavenaugh**
Jackson Walker LLP
1401 McKinney Street
Ste 1900
Houston, TX 77010
713-752-4200
Email: mcavenaugh@jw.com

**Jeffrey L Diamond**
J Diamon Assoc PLLC
730 North Loop
Houston, TX 77009
713-227-6800
Email: Jeffrey@jdiamondandassociates.com

**Ciara Foster**
Kirkland & Ellis LLP
601 Lexington Ave.
New York, NY 10022
212-446-4800
Email: ciara.foster@kirkland.com

**Christopher T Greco**
Kirkland & Ellis LLP
601 Lexington Ave
New York, NY 10022
212-446-4800
Email: christopher.greco@kirkland.com

**Anthony R. Grossi**
Kirkland & Ellis LLP
1301 Pennsylvania Avenue, N.W.
Washington, DC 20004
(202) 389-5000

**John R. Luze**
Kirkland & Ellis LLP
300 North LaSalle
Chicago, IL 60654

000954

312-862-2000
Email: john.luze@kirkland.com

**Kristhy M Peguero**
Jackson Walker LLP
1401 McKinney St
Ste 1900
Houston, TX 77010
713-752-4440
Email: kpeguero@jw.com

**Veronica Ann Polnick**
Jackson Walker, LLP
1401 McKinney St.
Suite 1900
Houston, TX 77010
713-752-4200
Fax : 713-754-6716
Email: vpolnick@jw.com

**Joshua A Sussberg**
Kirkland & Ellis LLP
601 Lexington Avenue
New York, NY 10022
212-446-4800
Email: joshua.sussberg@kirkland.com

*Debtor*
**850 Pine Street LLC**
757 North Eldridge Parkway
Houston, TX 77079
HARRIS-TX
Tax ID / EIN: 20-4730297

represented by **850 Pine Street LLC**
PRO SE

*Debtor*
**A & B Builders, Ltd.**
5324 Gorman Rd.
Beaumont, TX 77705
JEFFERSON-TX
Tax ID / EIN: 76-0151187

represented by **A & B Builders, Ltd.**
PRO SE

*Debtor*
**Aiton & Co Limited**
40 Eastbourne Terrace
London W2 6LG
OUTSIDE U. S.
England
Tax ID / EIN: 00-0000000

represented by **Aiton & Co Limited**
PRO SE

*Debtor*
**Arabian CBI Co Ltd.**
3rd Floor Sadat Tower-Dammam-Khobar Hwy
Al Khobar

represented by **Arabian CBI Co Ltd.**
PRO SE

OUTSIDE U. S.
Saudi Arabia 31952
Tax ID / EIN: 00-0000000

*Debtor*
**Arabian CBI Tank Manufacturing Company, Ltd.**
3rd Floor Sadat Tower-Dammam-Khobar Hwy
Al Khobar
OUTSIDE U. S.
Saudi Arabia
Tax ID / EIN: 00-0000000

represented by **Arabian CBI Tank Manufacturing Company, Ltd.**
PRO SE

*Debtor*
**Asia Pacific Supply Co.**
71501 North Division Street
Plainfield, IL 60544
WILL-IL
Tax ID / EIN: 36-3368217

represented by **Asia Pacific Supply Co.**
PRO SE

*Debtor*
**Atlantic Contingency Constructors II, LLC**
757 North Eldridge Parkway
Houston, TX 77079
HARRIS-TX
Tax ID / EIN: 46-0753631

represented by **Atlantic Contingency Constructors II, LLC**
PRO SE

*Debtor*
**Atlantis Contractors Inc.**
1501 North Division Street
Plainfield, IL 60544
WILL-IL
Tax ID / EIN: 36-2761226

represented by **Atlantis Contractors Inc.**
PRO SE

*Debtor*
**Catalytic Distillation Technologies**
10100 Bay Area Blvd.
Pasadena, TX 77507
HARRIS-TX
Tax ID / EIN: 76-0275342

represented by **Catalytic Distillation Technologies**
PRO SE

*Debtor*
**CB&I (US) Holdings, Limited**
40 Eastbourne Terrace
London W2 6LG
OUTSIDE U. S.
England
Tax ID / EIN: 00-0000000

represented by **CB&I (US) Holdings, Limited**
PRO SE

*Debtor*
**CB&I Brazil Holdings,Inc.**
2370 Towne Center Blvd.
Baton Rouge, LA 70806

represented by **CB&I Brazil Holdings,Inc.**
PRO SE

000956

EAST BATON ROUGE-LA
Tax ID / EIN: 26-2615636

**Debtor**
**CB&I Canada Ltd.**
2900-550 Burrard Street
Vancouver V6C0A3
OUTSIDE U. S.
Canada
Tax ID / EIN: 00-0000000

represented by **CB&I Canada Ltd.**
PRO SE

**Debtor**
**CB&I Clearfield, Inc.**
757 North Eldridge Parkway
Houston, TX 77079
HARRIS-TX
Tax ID / EIN: 87-0492102

represented by **CB&I Clearfield, Inc.**
PRO SE

**Debtor**
**CB&I Cojafex B.V.**
Prinses Beatrixlaan 35
The Hague 2595 AK
OUTSIDE U. S.
Netherlands
Tax ID / EIN: 00-0000000

represented by **CB&I Cojafex B.V.**
PRO SE

**Debtor**
**CB&I Connecticut, Inc.**
2103 Research Forest Drive
The Woodlands, TX 77380
MONTGOMERY-TX
Tax ID / EIN: 82-3018558

represented by **CB&I Connecticut, Inc.**
PRO SE

**Debtor**
**CB&I Constructors Limited**
40 Eastbourne Terrace
London W2 6LG
OUTSIDE U. S.
United Kingdom
Tax ID / EIN: 00-0000000

represented by **CB&I Constructors Limited**
PRO SE

**Debtor**
**CB&I El Dorado, Inc.**
757 North Eldridge Parkway
Houston, TX 77079
HARRIS-TX
Tax ID / EIN: 71-0561174

represented by **CB&I El Dorado, Inc.**
PRO SE

**Debtor**
**CB&I Energy Services, LLC**
10404 Twin Port Road
Delcambre, LA 70528
IBERIA-LA

represented by **CB&I Energy Services, LLC**
PRO SE

000957

Tax ID / EIN: 72-0962273

**Debtor**                                                    represented by **CB&I Europe B.V.**
**CB&I Europe B.V.**                                                                          PRO SE
Prinses Beatrixlaan 35
The Hague 2595 AK
OUTSIDE U. S.
Netherlands
Tax ID / EIN: 00-0000000

**Debtor**                                                    represented by **CB&I Fabrication, LLC**
**CB&I Fabrication, LLC**                                                                     PRO SE
2370 Towne Center Blvd.
Baton Rouge, LA 70806
EAST BATON ROUGE-LA
Tax ID / EIN: 30-0652230

**Debtor**                                                    represented by **CB&I Finance Company Limited**
**CB&I Finance Company Limited**                                                              PRO SE
10 Earlsfort Terrace
Dublin 2, Ireland
Dublin D02T380
OUTSIDE U. S.
Ireland
Tax ID / EIN: 00-0000000

**Debtor**                                                    represented by **CB&I Financial Resources LLC**
**CB&I Financial Resources LLC**                                                             PRO SE
757 North Eldridge Parkway
Houston, TX 77079
HARRIS-TX
Tax ID / EIN: 10-0905154

**Debtor**                                                    represented by **CB&I Global Operations International,**
**CB&I Global Operations International, Pte.**                                **Pte. Ltd.**
**Ltd.**                                                                                      PRO SE
757 North Eldridge Parkway
Houston, TX 77079
HARRIS-TX
Tax ID / EIN: 00-0000000

**Debtor**                                                    represented by **CB&I Global Operations US Pte. Ltd.**
**CB&I Global Operations US Pte. Ltd.**                                                       PRO SE
757 North Eldridge Parkway
Houston, TX 77079
HARRIS-TX
Tax ID / EIN: 00-0000000

**Debtor**                                                    represented by **CB&I Global, L.L.C.**
**CB&I Global, L.L.C.**                                                                       PRO SE
757 North Eldridge Parkway
Houston, TX 77079
HARRIS-TX

Tax ID / EIN: 20-0769528                                                                    000958

*Debtor*                                        represented by **CB&I Group Inc.**
**CB&I Group Inc.**                                             PRO SE
757 North Eldridge Parkway
Houston, TX 77079
HARRIS-TX
Tax ID / EIN: 72-1106167

*Debtor*                                        represented by **CB&I Group UK Holdings**
**CB&I Group UK Holdings**                                      PRO SE
40 Eastbourne Terrace
London, England
OUTSIDE U. S.
United Kingdom
Tax ID / EIN: 00-0000000

*Debtor*                                        represented by **CB&I Holdco International, LLC**
**CB&I Holdco International, LLC**                              PRO SE
757 North Eldridge Parkway
Houston, TX 77079
HARRIS-TX
Tax ID / EIN: 00-0000000

*Debtor*                                        represented by **CB&I Holdco, LLC**
**CB&I Holdco, LLC**                                           PRO SE
757 North Eldridge Parkway
Houston, TX 77079
HARRIS-TX
Tax ID / EIN: 81-0737109

*Debtor*                                        represented by **CB&I Holdings (UK) Limited**
**CB&I Holdings (UK) Limited**                                 PRO SE
40 Eastbourne Terrace
London W2 6LG
OUTSIDE U. S.
England
Tax ID / EIN: 00-0000000

*Debtor*                                        represented by **CB&I Holdings B.V.**
**CB&I Holdings B.V.**                                         PRO SE
Prinses Beatrixlaan 35
The Hague 2595 AK
OUTSIDE U. S.
Netherlands
Tax ID / EIN: 00-0000000

*Debtor*                                        represented by **CB&I Houston 06 LLC**
**CB&I Houston 06 LLC**                                        PRO SE
757 North Eldridge Parkway
Houston, TX 77079
HARRIS-TX

Tax ID / EIN: 20-3197110

000959

*Debtor*
**CB&I Houston 07 LLC**
757 North Eldridge Parkway
Houston, TX 77079
HARRIS-TX
Tax ID / EIN: 20-3197179

represented by **CB&I Houston 07 LLC**
PRO SE

*Debtor*
**CB&I Houston 08 LLC**
757 North Eldridge Parkway
Houston, TX 77079
HARRIS-TX
Tax ID / EIN: 20-3197221

represented by **CB&I Houston 08 LLC**
PRO SE

*Debtor*
**CB&I Houston 09 LLC**
757 North Eldridge PArkway
Houston, TX 77079
HARRIS-TX
Tax ID / EIN: 20-3197315

represented by **CB&I Houston 09 LLC**
PRO SE

*Debtor*
**CB&I Houston 10 LLC**
757 North Eldridge Parkway
Houston, TX 77079
HARRIS-TX
Tax ID / EIN: 20-3197370

represented by **CB&I Houston 10 LLC**
PRO SE

*Debtor*
**CB&I Houston 11 LLC**
757 North Elridge Parkway
Houston, TX 77079
HARRIS-TX
Tax ID / EIN: 20-3197415

represented by **CB&I Houston 11 LLC**
PRO SE

*Debtor*
**CB&I Houston 12 LLC**
757 North Eldridge Parkway
Houston, TX 77079
HARRIS-TX
Tax ID / EIN: 20-3197452

represented by **CB&I Houston 12 LLC**
PRO SE

*Debtor*
**CB&I Houston 13 LLC**
757 North Elridge Parkway
Houston, TX 77079
HARRIS-TX
Tax ID / EIN: 20-3197532

represented by **CB&I Houston 13 LLC**
PRO SE

*Debtor*
**CB&I Houston LLC**

represented by **CB&I Houston LLC**
PRO SE

000960

757 North Elridge Parkway
Houston, TX 77079
HARRIS-TX
Tax ID / EIN: 20-3197016

**Debtor**                                              represented by  **CB&I International One, LLC**
**CB&I International One, LLC**                                          PRO SE
757 North Eldridge Parkway
Houston, TX 77079
HARRIS-TX
Tax ID / EIN: 61-1686142

**Debtor**                                              represented by  **CB&I International, Inc.**
**CB&I International, Inc.**                                             PRO SE
2370 Towne Centre Blvd.
Baton Rouge, LA 70806
EAST BATON ROUGE-LA
Tax ID / EIN: 72-1237437

**Debtor**                                              represented by  **CB&I International, LLC**
**CB&I International, LLC**                                              PRO SE
2370 Towne Centre Blvd.
Baton Rouge, LA 70806
EAST BATON ROUGE-LA
Tax ID / EIN: 72-1481348

**Debtor**                                              represented by  **CB&I Lake Charles, L.L.C.**
**CB&I Lake Charles, L.L.C.**                                           PRO SE
2370 Towne Centre Blvd.
Baton Rouge, LA 70806
EAST BATON ROUGE-LA
Tax ID / EIN: 26-1193463

**Debtor**                                              represented by  **CB&I Laurens, Inc.**
**CB&I Laurens, Inc.**                                                  PRO SE
366 Old Aiport Road
Laurens, SC 29360
LAURENS-SC
Tax ID / EIN: 72-1106168

**Debtor**                                              represented by  **CB&I LLC**
**CB&I LLC**                                                            PRO SE
757 North Eldridge Parkway
Houston, TX 77079
HARRIS-TX
Tax ID / EIN: 36-3046868

**Debtor**                                              represented by  **CB&I London**
**CB&I London**                                                         PRO SE
40 Eastbourne Terrace
London W2 6LG
OUTSIDE U. S.
England

Tax ID / EIN: 00-0000000

000961

*Debtor*
**CB&I Matamoros, S. de R.L. de C.V.**
Calle Guillermo Gonzalez Camarena 560
Parque Industrial La Ventana. Carr.
Matamoros-Reynosa KM 9.6, Matamoros
Tamaulipas 87360
OUTSIDE U. S.
Mexico
Tax ID / EIN: 00-0000000

represented by **CB&I Matamoros, S. de R.L. de C.V.**
PRO SE

*Debtor*
**CB&I Middle East Holding, Inc.**
757 North Eldridge Parkway
Houston, TX 77079
HARRIS-TX
Tax ID / EIN: 00-0000000

represented by **CB&I Middle East Holding, Inc.**
PRO SE

*Debtor*
**CB&I Nederland B.V.**
Prinses Beatrixlaan 35
The Hague 2595 AK
OUTSIDE U. S.
Netherlands
Tax ID / EIN: 00-0000000

represented by **CB&I Nederland B.V.**
PRO SE

*Debtor*
**CB&I North Carolina, Inc.**
500 East Morehead
Suite 400
Charlotte, NC 28202
MECKLENBURG-NC
Tax ID / EIN: 56-0751431

represented by **CB&I North Carolina, Inc.**
PRO SE

*Debtor*
**CB&I Offshore Services, Inc.**
2370 Towne Centre Blvd.
Baton Rouge, LA 70806
EAST BATON ROUGE-LA
Tax ID / EIN: 26-0838055

represented by **CB&I Offshore Services, Inc.**
PRO SE

*Debtor*
**CB&I Oil & Gas Europe B.V.**
Prinses Beatrixlaan 35
The Hague 2595 AK
OUTSIDE U. S.
Netherlands
Tax ID / EIN: 00-0000000

represented by **CB&I Oil & Gas Europe B.V.**
PRO SE

*Debtor*
**CB&I Paddington Limited**
40 Eastbourne Terrace

represented by **CB&I Paddington Limited**
PRO SE

000962

London W2 6LG
OUTSIDE U. S.
England
Tax ID / EIN: 00-0000000

***Debtor***
**CB&I Power Company B.V.**
Prinses Beatrixlaan 35
The Hague 2595 AK
OUTSIDE U. S.
Netherlands
Tax ID / EIN: 00-0000000

represented by **CB&I Power Company B.V.**
PRO SE

***Debtor***
**CB&I Power International, Inc.**
2370 Towne Centre Blvd.
Baton Rouge, LA 70806
EAST BATON ROUGE-LA
Tax ID / EIN: 26-2615746

represented by **CB&I Power International, Inc.**
PRO SE

***Debtor***
**CB&I Power Limited**
500 Elder Gate, Milton Keynes
Buckinghamshire MD9 1BA
OUTSIDE U. S.
England
Tax ID / EIN: 00-0000000

represented by **CB&I Power Limited**
PRO SE

***Debtor***
**CB&I Power, LLC**
2370 Towne Centre Blvd.
Baton Rouge, LA 70806
EAST BATON ROUGE-LA
Tax ID / EIN: 26-1193582

represented by **CB&I Power, LLC**
PRO SE

***Debtor***
**CB&I Project Services Group, LLC**
757 North Elridge Parkway
Houston, TX 77079
HARRIS-TX
Tax ID / EIN: 51-0364523

represented by **CB&I Project Services Group, LLC**
PRO SE

***Debtor***
**CB&I Rio Grande Holdings, L.L.C.**
2370 Towne Centre Blvd.
Baton Rouge, LA 70806
EAST BATON ROUGE-LA
Tax ID / EIN: 26-0283322

represented by **CB&I Rio Grande Holdings, L.L.C.**
PRO SE

***Debtor***
**CB&I Rio Grande Valley Fabrication & Manufacturing, L.L.C.**
2370 Towne Centre Blvd.

represented by **CB&I Rio Grande Valley Fabrication & Manufacturing, L.L.C.**
PRO SE

000963

Baton Rouge, LA 70806
EAST BATON ROUGE-LA
Tax ID / EIN: 27-0580865

***Debtor***
**CB&I Rusland B.V.**
Prinses Beatrixlaan 35
The Hague 2595 AK
OUTSIDE U. S.
Netherlands
Tax ID / EIN: 00-0000000

represented by **CB&I Rusland B.V.**
PRO SE

***Debtor***
**CB&I Singapore Pte. Ltd.**
2103 Research Forest Drive
The Woodlands, TX 77380
HARRIS-TX
Tax ID / EIN: 00-0000000

represented by **CB&I Singapore Pte. Ltd.**
PRO SE

***Debtor***
**CB&I Storage Tank Solutions LLC**
2103 Research Forest Drive
The Woodlands, TX 77380
MONTGOMERY-TX
Tax ID / EIN: 83-3674907

represented by **CB&I Storage Tank Solutions LLC**
PRO SE

***Debtor***
**CB&I STS Delaware LLC**
2103 Research Forest Drive
The Woodlands, TX 77380
MONTGOMERY-TX
Tax ID / EIN: 84-2219297

represented by **CB&I STS Delaware LLC**
PRO SE

***Debtor***
**CB&I STS Holdings LLC**
2103 Research Forest Drive
The Woodlands, TX 77380
MONTGOMERY-TX
Tax ID / EIN: 84-2291077

represented by **CB&I STS Holdings LLC**
PRO SE

***Debtor***
**CB&I Tyler LLC**
1501 North Division Street
Plainfield, IL 60544
WILL-IL
Tax ID / EIN: 75-2905637

represented by **CB&I Tyler LLC**
PRO SE

***Debtor***
**CB&I UK Limited**
40 Eastbourne Terrace
London W2 6LG
OUTSIDE U. S.
United Kingdom

represented by **CB&I UK Limited**
PRO SE

Tax ID / EIN: 00-0000000

000964

**Debtor**
**CB&I Walker LA, L.L.C.**
30103 Sunland Drive
Walker, LA 70785
LIVINGSTON-LA
Tax ID / EIN: 72-1239935

represented by **CB&I Walker LA, L.L.C.**
PRO SE

**Debtor**
**CBI Americas Ltd.**
757 North Elridge Parkway
Houston, TX 77079
HARRIS-TX
Tax ID / EIN: 20-1973526

represented by **CBI Americas Ltd.**
PRO SE

**Debtor**
**CBI Company B.V.**
Prinses Beatrixlaan 35
The Hague 2595 AK
OUTSIDE U. S.
Netherlands
Tax ID / EIN: 00-0000000

represented by **CBI Company B.V.**
PRO SE

**Debtor**
**CBI Company Ltd.**
2103 Research Forest Drive
The Woodlands, TX 77380
HARRIS-TX
Tax ID / EIN: 36-2196189

represented by **CBI Company Ltd.**
PRO SE

**Debtor**
**CBI Company Two B.V.**
Prinses Beatrixlaan 35
The Hague 2595 AK
OUTSIDE U. S.
Netherlands
Tax ID / EIN: 00-0000000

represented by **CBI Company Two B.V.**
PRO SE

**Debtor**
**CBI Constructors Pty. Ltd.**
58 Thomas Road
Kwinana Beach WA
W. Australia 6167
OUTSIDE U. S.
Australia
Tax ID / EIN: 00-0000000

represented by **CBI Constructors Pty. Ltd.**
PRO SE

**Debtor**
**CBI Eastern Anstalt**
2103 Research Forest Drive
The Woodlands, TX 77380
MONTGOMERY-TX

represented by **CBI Eastern Anstalt**
PRO SE

11/18/21, 11:12 AM Case 4:21-cv-03369 Document 10-2 Filed on 11/19/21 in TXSD Page 13 of 550
BK10.2-ECF LIVE - US Bankruptcy Court:TexasSouthern

000965

Tax ID / EIN: 00-0000000

*Debtor*
**CBI HoldCo Two Inc.**
757 North Elridge Parkway
Houston, TX 77079
HARRIS-TX
Tax ID / EIN: 81-2727585

represented by **CBI HoldCo Two Inc.**
PRO SE

*Debtor*
**CBI Overseas (Far East) Inc.**
757 North Elridge Parkway
Houston, TX 77079
HARRIS-TX
Tax ID / EIN: 82-3018370

represented by **CBI Overseas (Far East) Inc.**
PRO SE

*Debtor*
**CBI Overseas, LLC**
757 North Elridge Parkway
Houston, TX 77079
HARRIS-TX
Tax ID / EIN: 36-2667468

represented by **CBI Overseas, LLC**
PRO SE

*Debtor*
**CBI Panama, S.A.**
Calle 50, Apt. 0816-01098
Edificio Plaza 2000
Panama City
OUTSIDE U. S.
Panama
Tax ID / EIN: 00-0000000

represented by **CBI Panama, S.A.**
PRO SE

*Debtor*
**CBI Services, LLC**
2103 Research Forest Drive
The Woodlands, TX 77380
MONTGOMERY-TX
Tax ID / EIN: 36-3369071

represented by **CBI Services, LLC**
PRO SE

*Debtor*
**CBI UK Cayman Acquisition Limited**
40 Eastbourne Terrace
London W2 6LG
OUTSIDE U. S.
United Kingdom
Tax ID / EIN: 00-0000000

represented by **CBI UK Cayman Acquisition Limited**
PRO SE

*Debtor*
**CBI US Holding Company Inc.**
757 North Eldridge Parkway
Houston, TX 77079
HARRIS-TX

represented by **CBI US Holding Company Inc.**
PRO SE

11/18/21, 11:12 AM Case 4:21-cv-03369 Document 10-2 BK ECF Live US Bankruptcy Court-Texas Southern Filed on 11/19/21 in TXSD Page 14 of 550

000966

Tax ID / EIN: 81-2731551

**Debtor**
**Central Trading Company Ltd.**
1501 North Division Street
Plainfield, IL 60544
WILL-IL
Tax ID / EIN: 36-3621439

represented by **Central Trading Company Ltd.**
PRO SE

**Debtor**
**Chartering Company (Singapore) Pte. Ltd.**
Level 24, Menara Hap Seng 2, No. 1
Jalan P. Ramlee
Kuala Lumpur 500250
OUTSIDE U. S.
Malaysia
Tax ID / EIN: 00-0000000

represented by **Chartering Company (Singapore) Pte. Ltd.**
PRO SE

**Debtor**
**Chemical Research and Licensing, LLC**
10100 Bay Area Blvd.
Houston, TX 77507
OUTSIDE U. S.
Tax ID / EIN: 00-0000000

represented by **Chemical Research and Licensing, LLC**
PRO SE

**Debtor**
**Chicago Bridge & Iron (Antilles) N.V.**
Schottegatweg Oost 44
P.O. Box 812
Curacao
OUTSIDE U. S.
Netherlands Antilles
Tax ID / EIN: 00-0000000

represented by **Chicago Bridge & Iron (Antilles) N.V.**
PRO SE

**Debtor**
**Chicago Bridge & Iron Company**
757 North Eldridge Parkway
Houston, TX 77079
HARRIS-TX
Tax ID / EIN: 06-1477022

represented by **Matthew D Cavenaugh**
(See above for address)

**Debtor**
**Chicago Bridge & Iron Company**
14105 S Rt 59
Plainfield, IL 60544
WILL-IL
Tax ID / EIN: 36-0897120

represented by **Chicago Bridge & Iron Company**
PRO SE

**Debtor**
**Chicago Bridge & Iron Company (Delaware)**
757 North Eldridge Parkway
Houston, TX 77079
HARRIS-TX

represented by **Chicago Bridge & Iron Company (Delaware)**
PRO SE

000967

Tax ID / EIN: 36-3026565

**Debtor**
**Chicago Bridge & Iron Company B.V.**
Prinses Beatrixlaan 35
The Hague 2595 AK
OUTSIDE U. S.
Netherlands
Tax ID / EIN: 00-0000000

represented by **Chicago Bridge & Iron Company B.V.**
    PRO SE

**Debtor**
**Chicago Bridge de Mexico, S.A. de C.V.**
San Uriel No. 685
Colonia Chapalita Oriente
Zapopan
Jalisco 45040
OUTSIDE U. S.
Mexico
Tax ID / EIN: 00-0000000

represented by **Chicago Bridge de Mexico, S.A. de C.V.**
    PRO SE

**Debtor**
**Comet II B.V.**
Prinses Beatrixlaan 35
The Hague 2595 AK
OUTSIDE U. S.
Netherlands
Tax ID / EIN: 00-0000000

represented by **Comet II B.V.**
    PRO SE

**Debtor**
**Constructors International, L.L.C.**
3102 East Fifth Street
P.O. Box 956
Tyler, TX 75710
SMITH-TX
Tax ID / EIN: 75-2905207

represented by **Constructors International, L.L.C.**
    PRO SE

**Debtor**
**CSA Trading Company Ltd.**
2103 Research Forest Drive
The Woodlands, TX 77380
MONTGOMERY-TX
Tax ID / EIN: 20-1973663

represented by **CSA Trading Company Ltd.**
    PRO SE

**Debtor**
**Eastern Marine Services, Inc.**
P.O. Box 16961
Jebel Ali Free Trade Zone
Dubai
OUTSIDE U. S.
United Arab Emirates
Tax ID / EIN: 00-0000000

represented by **Eastern Marine Services, Inc.**
    PRO SE

**Debtor**

represented by **EDS Equipment Company, LLC**

**EDS Equipment Company, LLC**                                    PRO SE
500 East Morehead
Suite 400
Charlotte, NC 28202
MECKLENBURG-NC
Tax ID / EIN: 56-2216244

*Debtor*
**Environmental Solutions (Cayman) Ltd.**          represented by **Environmental Solutions (Cayman) Ltd.**
757 Eldridge Parkway                                                PRO SE
Houston, TX 77079
HARRIS-TX
Tax ID / EIN: 00-0000000

*Debtor*
**Environmental Solutions Holding Ltd.**          represented by **Environmental Solutions Holding Ltd.**
757 North Eldridge Parkway                                          PRO SE
Houston, TX 77079
HARRIS-TX
Tax ID / EIN: 00-0000000

*Debtor*
**Environmental Solutions Ltd.**                   represented by **Environmental Solutions Ltd.**
757 North Eldridge Parkway                                          PRO SE
Houston, TX 77079
HARRIS-TX
Tax ID / EIN: 00-0000000

*Debtor*
**HBI Holdings, LLC**                              represented by **HBI Holdings, LLC**
3102 East Fifth Street                                              PRO SE
Tyler, TX 75710
SMITH-TX
Tax ID / EIN: 75-2838623

*Debtor*
**Highland Trading Company, Ltd.**                 represented by **Highland Trading Company, Ltd.**
757 North Eldridge Parkway                                          PRO SE
Houston, TX 77079
HARRIS-TX
Tax ID / EIN: 00-0000000

*Debtor*
**Horton CBI, Limited**                            represented by **Horton CBI, Limited**
55116 Hwy 825                                                       PRO SE
Sturgeon Industrial Park
Alberta T8L5C1
OUTSIDE U. S.
Canada
Tax ID / EIN: 10-2398591

*Debtor*
**Howe-Baker Engineers, Ltd.**                     represented by **Howe-Baker Engineers, Ltd.**
                                                                    PRO SE

757 North Eldridge Parkway
Houston, TX 77079
HARRIS-TX
Tax ID / EIN: 75-2912742

***Debtor***                                          represented by **Howe-Baker Holdings, L.L.C.**
**Howe-Baker Holdings, L.L.C.**                                       PRO SE
3102 East FifthStreet
Tyler, TX 75710
SMITH-TX
Tax ID / EIN: 75-2905206

***Debtor***                                          represented by **Howe-Baker International Management,**
**Howe-Baker International Management,**                               **LLC**
**LLC**                                                               PRO SE
757 North Elridge Parkway
Houston, TX 77079
HARRIS-TX
Tax ID / EIN: 75-2838620

***Debtor***                                          represented by **Howe-Baker International, LLC**
**Howe-Baker International, LLC**                                      PRO SE
3102 East Fifth Street
Tyler, TX 75701
SMITH-TX
Tax ID / EIN: 75-2905191

***Debtor***                                          represented by **Howe-Baker Management, L.L.C.**
**Howe-Baker Management, L.L.C.**                                     PRO SE
3102 East Fifth Street
Tyler, TX 75710
SMITH-TX
Tax ID / EIN: 75-2905212

***Debtor***                                          represented by **Hydro Marine Services, Inc.**
**Hydro Marine Services, Inc.**                                       PRO SE
P.O. Box 16961
Jebel Ali Free Trade Zone
Dubai
OUTSIDE U. S.
United Arab Emirates
Tax ID / EIN: 00-0000000

***Debtor***                                          represented by **International Consultants, L.L.C.**
**International Consultants, L.L.C.**                                  PRO SE
757 North Eldridge Parkway
Houston, TX 77079
HARRIS-TX
Tax ID / EIN: 74-1479284

***Debtor***                                          represented by **J. Ray Holdings, Inc.**
**J. Ray Holdings, Inc.**                                             PRO SE
757 North Elridge Parkway

11/18/21, 11:12 AM   Case 4:21-cv-03369   Document 10-2  CM/ECF LIVE - US Bankruptcy Court-Texas Southern  Filed on 11/19/21 in TXSD   Page 18 of 550

000970

Houston, TX 77079
HARRIS-TX
Tax ID / EIN: 27-2703947

**Debtor**
**J. Ray McDermott (Aust.) Holding Pty.**
**Limited**
5-17 William Street
Level 8, Australia Place
Perth
OUTSIDE U. S.
Western Australia 600, Australia
Tax ID / EIN: 00-0000000

represented by **J. Ray McDermott (Aust.) Holding Pty.**
**Limited**
PRO SE

**Debtor**
**J. Ray McDermott (Norway), AS**
757 North Elridge Parkway
Houston, TX 77079
HARRIS-TX
Tax ID / EIN: 00-0000000

represented by **J. Ray McDermott (Norway), AS**
PRO SE

**Debtor**
**J. Ray McDermott (Qingdao) Pte. Ltd.**
Level 24, Menara Hap Seng 2, No. 1
Jalan P. Ramlee
Kuala Lumpur 500250
OUTSIDE U. S.
Malaysia
Tax ID / EIN: 00-0000000

represented by **J. Ray McDermott (Qingdao) Pte. Ltd.**
PRO SE

**Debtor**
**J. Ray McDermott de Mexico, S.A. De C.V.**
757 North Eldridge Parkway
Houston, TX 77079
HARRIS-TX
Tax ID / EIN: 00-0000000

represented by **J. Ray McDermott de Mexico, S.A. De**
**C.V.**
PRO SE

**Debtor**
**J. Ray McDermott Far East, Inc.**
Level 24, Menara Hap Seng 2
Jalan P. Ramlee
Kuala Lumpur
OUTSIDE U. S.
Malaysia 50250
Tax ID / EIN: 00-0000000

represented by **J. Ray McDermott Far East, Inc.**
PRO SE

**Debtor**
**J. Ray McDermott Holdings, LLC**
757 North Elridge Parkway
Houston, TX 77079
HARRIS-TX
Tax ID / EIN: 72-1280625

represented by **J. Ray McDermott Holdings, LLC**
PRO SE

*Debtor*
**J. Ray McDermott International Vessels, Ltd.**
757 North Eldridge Parkway
Houston, TX 77079
HARRIS-TX
Tax ID / EIN: 00-0000000

represented by **J. Ray McDermott International Vessels, Ltd.**
PRO SE

*Debtor*
**J. Ray McDermott International, Inc.**
757 North Eldridge Parkway
Houston, TX 77079
HARRIS-TX
Tax ID / EIN: 00-0000000

represented by **J. Ray McDermott International, Inc.**
PRO SE

*Debtor*
**J. Ray McDermott Solutions, Inc.**
757 North Eldridge Parkway
Houston, TX 77079
HARRIS-TX
Tax ID / EIN: 76-0651440

represented by **Matthew D Cavenaugh**
(See above for address)

*Debtor*
**J. Ray McDermott Technology, Inc.**
757 North Eldridge Parkway
Houston, TX 77079
HARRIS-TX
Tax ID / EIN: 76-0386016

represented by **Matthew D Cavenaugh**
(See above for address)

*Debtor*
**J. Ray McDermott Underwater Services, Inc.**
757 North Eldridge Parkway
Houston, TX 77079
HARRIS-TX
Tax ID / EIN: 72-1324300

represented by **Matthew D Cavenaugh**
(See above for address)

*Debtor*
**J. Ray McDermott, S.A.**
757 North Eldridge Parkway
Houston, TX 77079
HARRIS-TX
Tax ID / EIN: 72-1278896

represented by **Matthew D Cavenaugh**
(See above for address)

*Debtor*
**Lealand Finance Company B.V.**
Prinses Beatrixlaan 35
The Hague 2595 AK
OUTSIDE U. S.
Netherlands
Tax ID / EIN: 00-0000000

represented by **Matthew D Cavenaugh**
(See above for address)

*Debtor*
**Lummus Arabia Ltd. Co.**
3rd Floor Sadat Tower-Dammam-Khobar Hwy

represented by **Matthew D Cavenaugh**
(See above for address)

000972

P.O. Box 31682
Al Khobar 31952
OUTSIDE U. S.
Saudi Arabia
Tax ID / EIN: 00-0000000

*Debtor*                                    represented by **Matthew D Cavenaugh**
**Lummus Consultants International Limited**            (See above for address)
2103 Research Forest Drive
The Woodlands, TX 77380
OUTSIDE U. S.
Tax ID / EIN: 00-0000000

*Debtor*                                    represented by **Lummus Consultants International LLC**
**Lummus Consultants International LLC**                PRO SE
2103 Research Forest Drive
The Woodlands, TX 77380
MONTGOMERY-TX
Tax ID / EIN: 72-1483442

*Debtor*                                    represented by **Matthew D Cavenaugh**
**Lummus Gasification Technology Licensing**            (See above for address)
**LLC**
2103 Research Forest Drive
The Woodlands, TX 77380
MONTGOMERY-TX
Tax ID / EIN: 90-0739091

*Debtor*                                    represented by **Lummus Technology B.V.**
**Lummus Technology B.V.**                              PRO SE
Prinses Beatrixlaan 35
The Hague 2595 AK
OUTSIDE U. S.
Netherlands
Tax ID / EIN: 00-0000000

*Debtor*                                    represented by **Matthew D Cavenaugh**
**Lummus Technology Heat Transfer B.V.**               (See above for address)
Prinses Beatrixlaan 35
The Netherlands 2595 AK
OUTSIDE U. S.
Netherlands
Tax ID / EIN: 00-0000000

*Debtor*                                    represented by **Matthew D Cavenaugh**
**Lummus Technology International, LLC**               (See above for address)
2103 Research Forest Drive
The Woodlands, TX 77380
MONTGOMERY-TX
Tax ID / EIN: 06-1334973

*Debtor*                                    represented by **Matthew D Cavenaugh**
**Lummus Technology LLC**                              (See above for address)

000973

1515 Broad Street
Bloomfield, NJ 07003
ESSEX-NJ
Tax ID / EIN: 13-0989425

**Debtor**                                        represented by **Matthew D Cavenaugh**
**Lummus Technology Overseas LLC**                    (See above for address)
2103 Research Forest Drive
The Woodlands, TX 77380
MONTGOMERY-TX
Tax ID / EIN: 13-2623361

**Debtor**                                        represented by **Matthew D Cavenaugh**
**Lummus Technology Services LLC**                    (See above for address)
2103 Research Forest Drive
The Woodlands, TX 77380
MONTGOMERY-TX
Tax ID / EIN: 45-4294702

**Debtor**                                        represented by **Matthew D Cavenaugh**
**Lummus Technology Ventures LLC**                    (See above for address)
2103 Research Forest Drive
The Woodlands, TX 77380
MONTGOMERY-TX
Tax ID / EIN: 06-1334969

**Debtor**                                        represented by **Matthew D Cavenaugh**
**Lutech Project Solutions B.V.**                     (See above for address)
Prinses Beatrixlaan 35
The Hague 2595 AK
OUTSIDE U. S.
Netherlands
Tax ID / EIN: 00-0000000

**Debtor**                                        represented by **Matthew D Cavenaugh**
**Lutech Projects B.V.**                              (See above for address)
Prinses Beatrixlaan 35
The Hague 2595 AK
OUTSIDE U. S.
Netherlands
Tax ID / EIN: 00-0000000

**Debtor**                                        represented by **Matthew D Cavenaugh**
**Lutech Resources B.V.**                             (See above for address)
Prinses Beatrixlaan 35
The Hague 2595 AK
OUTSIDE U. S.
Netherlands
Tax ID / EIN: 00-0000000

**Debtor**                                        represented by **Matthew D Cavenaugh**
**Lutech Resources Canada Ltd.**                      (See above for address)
261 Seneca Road

000974

Sherwood Park
Alberta T8A4G6
OUTSIDE U. S.
Canada
Tax ID / EIN: 80-3208859

**Debtor**
**Lutech Resources Inc.**
757 North Eldridge Parkway
Houston, TX 77079
HARRIS-TX
Tax ID / EIN: 75-2903851

represented by **Matthew D Cavenaugh**
(See above for address)

**Debtor**
**Lutech Resources Limited**
40 Eastbourne Terrace
London W2 6LG
OUTSIDE U. S.
England
Tax ID / EIN: 00-0000000

represented by **Matthew D Cavenaugh**
(See above for address)

**Debtor**
**Matrix Engineering, Ltd.**
5324 Gorman Rd.
Beaumont, TX 77705
JEFFERSON-TX
Tax ID / EIN: 74-1974536

represented by **Matthew D Cavenaugh**
(See above for address)

**Debtor**
**Matrix Management Services, L.L.C.**
5324 Gorman Road
Beaumont, TX 77705
JEFFERSON-TX
Tax ID / EIN: 75-2838621

represented by **Matrix Management Services, L.L.C.**
PRO SE

**Debtor**
**McDermott (Amazon Chartering), Inc.**
757 North Eldridge Parkway
Houston, TX 77079
HARRIS-TX
Tax ID / EIN: 00-0000000

represented by **Matthew D Cavenaugh**
(See above for address)

**Debtor**
**McDermott Arabia Company Limited**
Sumou Tower, 5th Floor
Prince Salman & Prince Turkey
Bin Abdulaziz, Corniche, PO Box 20582
Al Khobar
OUTSIDE U. S.
Saudi Arabia 31952
Tax ID / EIN: 00-0000000

represented by **McDermott Arabia Company Limited**
PRO SE

**Debtor**

represented by **McDermott Asia Pacific Pte. Ltd.**

**McDermott Asia Pacific Pte. Ltd.**
Level 24, Menara Hap Seng 2, No. 1
Jalan P. Ramlee
Kuala Lumpur 500250
OUTSIDE U. S.
Malaysia
Tax ID / EIN: 00-0000000

PRO SE

000975

*Debtor*
**McDermott Asia Pacific Sdn. Bhd.**
757 North Eldridge Parkway
Houston, TX 77079
HARRIS-TX
Tax ID / EIN: 00-0000000

represented by **McDermott Asia Pacific Sdn. Bhd.**
PRO SE

*Debtor*
**McDermott Australia Pty. Ltd.**
15-17 William Street
Level 8, Australia Place
Perth 6000
OUTSIDE U. S.
Australia
Tax ID / EIN: 00-0000000

represented by **McDermott Australia Pty. Ltd.**
PRO SE

*Debtor*
**McDermott Blackbird Holdings, LLC**
757 North Eldridge Parkway
Houston, TX 77079
HARRIS-TX
Tax ID / EIN: 47-4857206

represented by **McDermott Blackbird Holdings, LLC**
PRO SE

*Debtor*
**McDermott Caspian Contractors, Inc.**
Jebel Ali Free Trade Zone
P.O. Box 16961
Dubai
OUTSIDE U. S.
United Arab Emirates
Tax ID / EIN: 00-0000000

represented by **McDermott Caspian Contractors, Inc.**
PRO SE

*Debtor*
**McDermott Cayman Ltd.**
757 North Eldridge Parkway
Houston, TX 77079
HARRIS-TX
Tax ID / EIN: 00-0000000

represented by **McDermott Cayman Ltd.**
PRO SE

*Debtor*
**McDermott Eastern Hemisphere, Ltd.**
757 North Eldridge Parkway
Houston, TX 77079
HARRIS-TX

represented by **McDermott Eastern Hemisphere, Ltd.**
PRO SE

Tax ID / EIN: 00-0000000

000976

*Debtor*
**McDermott Engineering, LLC**
757 North Eldridge Parkway
Houston, TX 77079
HARRIS-TX
Tax ID / EIN: 76-0502420

represented by **McDermott Engineering, LLC**
PRO SE

*Debtor*
**McDermott Finance L.L.C.**
757 North Eldridge Parkway
Houston, TX 77079
HARRIS-TX
Tax ID / EIN: 46-5357514

represented by **McDermott Finance L.L.C.**
PRO SE

*Debtor*
**McDermott Gulf Operating Company, Inc.**
757 North Eldridge Parkway
Houston, TX 77079
HARRIS-TX
Tax ID / EIN: 00-0000000

represented by **McDermott Gulf Operating Company, Inc.**
PRO SE

*Debtor*
**McDermott Holdings (U.K.) Limited**
Global House
1 Ashley Avenue
Epsom, Surrey KT17 1JG
OUTSIDE U. S.
England
Tax ID / EIN: 00-0000000

represented by **McDermott Holdings (U.K.) Limited**
PRO SE

*Debtor*
**McDermott International Investments Co., Inc.**
Cedar House, 41 Cedar Ave
Hamilton
OUTSIDE U. S.
Bermuda HM 12
Tax ID / EIN: 00-0000000

represented by **McDermott International Investments Co., Inc.**
PRO SE

*Debtor*
**McDermott International Management, S. de RL.**
757 North Eldridge Parkway
Houston, TX 77079
HARRIS-TX
Tax ID / EIN: 00-0000000

represented by **McDermott International Management, S. de RL.**
PRO SE

*Debtor*
**McDermott International Marine Investments N.V.**
757 North Eldridge Parkway

represented by **McDermott International Marine Investments N.V.**
PRO SE

000977

Houston, TX 77079
HARRIS-TX
Tax ID / EIN: 00-0000000

**Debtor**
**McDermott International Trading Co., Inc.**
757 North Eldridge Parkway
Houston, TX 77079
HARRIS-TX
Tax ID / EIN: 00-0000000

represented by **McDermott International Trading Co., Inc.**
PRO SE

**Debtor**
**McDermott International Vessels, Inc.**
757 North Eldridge Parkway
Houston, TX 77079
HARRIS-TX
Tax ID / EIN: 00-0000000

represented by **McDermott International Vessels, Inc.**
PRO SE

**Debtor**
**McDermott Investments, LLC**
757 North Eldridge Parkway
Houston, TX 77079
HARRIS-TX
Tax ID / EIN: 74-1032246

represented by **McDermott Investments, LLC**
PRO SE

**Debtor**
**McDermott Marine Construction Limited**
Global House
1 Ashley Avenue
Epsom, Surrey KT17 1JG
OUTSIDE U. S.
England
Tax ID / EIN: 00-0000000

represented by **McDermott Marine Construction Limited**
PRO SE

**Debtor**
**McDermott Marine Mexico, S.A. de C.V.**
Paseo de la Reforma 505, Piso 49
Col. Cuauhtemoc
Piso 06500 C.P.
OUTSIDE U. S.
Mexico
Tax ID / EIN: 00-0000000

represented by **McDermott Marine Mexico, S.A. de C.V.**
PRO SE

**Debtor**
**McDermott Middle East, Inc.**
Plot 56, Jebel Ali Free Trade Zone
P.O. Box 16961
Dubai
OUTSIDE U. S.
United Arab Emirates
Tax ID / EIN: 00-0000000

represented by **McDermott Middle East, Inc.**
PRO SE

**Debtor**

represented by **McDermott Offshore Services Company,**

**McDermott Offshore Services Company, Inc.**                          Inc.
757 North Eldridge Parkway                                            PRO SE
Houston, TX 77079                                                     000978
HARRIS-TX
Tax ID / EIN: 00-0000000

*Debtor*                                                 represented by **McDermott Old JV Office, Inc.**
**McDermott Old JV Office, Inc.**                                     PRO SE
757 North Eldridge Parkway
Houston, TX 77079
HARRIS-TX
Tax ID / EIN: 00-0000000

*Debtor*                                                 represented by **McDermott Overseas Investment Co.**
**McDermott Overseas Investment Co. N.V.**                            **N.V.**
757 North Eldridge Parkway                                            PRO SE
Houston, TX 77079
HARRIS-TX
Tax ID / EIN: 00-0000000

*Debtor*                                                 represented by **McDermott Overseas, Inc.**
**McDermott Overseas, Inc.**                                          PRO SE
757 North Eldridge Parkway
Houston, TX 77079
HARRIS-TX
Tax ID / EIN: 00-0000000

*Debtor*                                                 represented by **McDermott Servicos Offshore do Brasil**
**McDermott Servicos Offshore do Brasil Ltda.**                       **Ltda.**
Avenida Republica do Chile                                            PRO SE
No 230, sala 1301, Centro
Rio de Janeiro
OUTSIDE U. S.
Brazil
Tax ID / EIN: 00-0000000

*Debtor*                                                 represented by **McDermott Subsea Engineering, Inc.**
**McDermott Subsea Engineering, Inc.**                                PRO SE
757 North Eldridge Parkway
Houston, TX 77079
HARRIS-TX
Tax ID / EIN: 72-1283228

*Debtor*                                                 represented by **McDermott Subsea, Inc.**
**McDermott Subsea, Inc.**                                            PRO SE
Prinses Beatrixlaan 35
The Hague 2595 AK
OUTSIDE U. S.
The Netherlands
Tax ID / EIN: 00-0000000

*Debtor*                                                 represented by **McDermott Technology (2), B.V.**
**McDermott Technology (2), B.V.**                                    PRO SE

000979

757 North Eldridge Parkway
Houston, TX 77079
HARRIS-TX
Tax ID / EIN: 00-0000000

***Debtor***                                                    represented by **McDermott Technology (3), B.V.**
**McDermott Technology (3), B.V.**                                                 PRO SE
757 North Eldridge Parkway
Houston, TX 77079
HARRIS-TX
Tax ID / EIN: 00-0000000

***Debtor***                                                    represented by **McDermott Technology (Americas) Inc.**
**McDermott Technology (Americas) Inc.**                                           PRO SE
757 North Eldridge Parkway
Houston, TX 77079
HARRIS-TX
Tax ID / EIN: 82-4639930

***Debtor***                                                    represented by **McDermott Technology (US), Inc.**
**McDermott Technology (US), Inc.**                                                PRO SE
757 North Eldridge Parkway
Houston, TX 77079
HARRIS-TX
Tax ID / EIN: 82-4625271

***Debtor***                                                    represented by **McDermott Technology, B.V.**
**McDermott Technology, B.V.**                                                     PRO SE
Prinses Beatrixlaan 35
The Hague 2595 AK
OUTSIDE U. S.
Netherlands
Tax ID / EIN: 98-1412195

***Debtor***                                                    represented by **McDermott Technology, LLC**
**McDermott Technology, LLC**                                                      PRO SE
757 North Eldridge Parkway
Houston, TX 77079
HARRIS-TX
Tax ID / EIN: 00-0000000

***Debtor***                                                    represented by **McDermott Trinidad Ltd**
**McDermott Trinidad Ltd**                                                         PRO SE
757 North Eldridge Parkway
Houston, TX 77079
HARRIS-TX
Tax ID / EIN: 00-0000000

***Debtor***                                                    represented by **McDermott Inc.**
**McDermott Inc.**                                                                 PRO SE
757 North Eldridge Parkway
Houston, TX 77079
HARRIS-TX

Tax ID / EIN: 76-0151356

***Debtor***
**Netherlands Operating Company B.V.**
Prinses Beatrixlaan 35
The Hague 2595 AK
OUTSIDE U. S.
Netherlands
Tax ID / EIN: 00-0000000

represented by **Netherlands Operating Company B.V.**
PRO SE

***Debtor***
**North Atlantic Vessel, Inc.**
Level 24, Menara Hap Seng 2
Jalan P. Ramlee
Kuala Lumpur
OUTSIDE U. S.
Malaysia 50250
Tax ID / EIN: 00-0000000

represented by **North Atlantic Vessel, Inc.**
PRO SE

***Debtor***
**North Ocean 105 AS**
757 North Eldridge Parkway
Houston, TX 77079
HARRIS-TX
Tax ID / EIN: 00-0000000

represented by **North Ocean 105 AS**
PRO SE

***Debtor***
**Novolen Technology Holdings C.V.**
Prinses Beatrixlaan 35
The Hague 2595 AK
OUTSIDE U. S.
Netherlands
Tax ID / EIN: 00-0000000

represented by **Novolen Technology Holdings C.V.**
PRO SE

***Debtor***
**Nuclear Energy Holdings, L.L.C.**
2370 Town Center Blvd.
Baton Rouge, LA 70806
EAST BATON ROUGE-LA
Tax ID / EIN: 20-5578243

represented by **Nuclear Energy Holdings, L.L.C.**
PRO SE

***Debtor***
**Oasis Supply Company, Ltd.**
757 North Eldridge Parkway
Houston, TX 77079
HARRIS-TX
Tax ID / EIN: 00-0000000

represented by **Oasis Supply Company, Ltd.**
PRO SE

***Debtor***
**Oceanic Contractors, Inc.**
1501 North Division Street
Plainfield, IL 60544
WILL-IL

represented by **Oceanic Contractors, Inc.**
PRO SE

Tax ID / EIN: 36-2536765

*Debtor*
**Offshore Pipelines International, Ltd.**
757 North Eldridge Parkway
Houston, TX 77079
HARRIS-TX
Tax ID / EIN: 98-0133074

represented by **Offshore Pipelines International, Ltd.**
PRO SE

*Debtor*
**OPI Vessels, Inc.**
757 North Eldridge Parkway
Houston, TX 77079
HARRIS-TX
Tax ID / EIN: 72-1210907

represented by **OPI Vessels, Inc.**
PRO SE

*Debtor*
**Oxford Metal Supply Limited**
40 Eastbourne Terrace
London W2 6LG
OUTSIDE U. S.
England
Tax ID / EIN: 00-0000000

represented by **Oxford Metal Supply Limited**
PRO SE

*Debtor*
**Pike Properties II, Inc.**
757 North Eldridge Parkway
Houston, TX 77079
HARRIS-TX
Tax ID / EIN: 72-1212032

represented by **Pike Properties II, Inc.**
PRO SE

*Debtor*
**Pipework Engineering and Developments Limited**
40 Eastbourne Terrace
London W2 6LG
OUTSIDE U. S.
England
Tax ID / EIN: 00-0000000

represented by **Pipework Engineering and Developments Limited**
PRO SE

*Debtor*
**Prospect Industries (Holdings) Inc.**
2370 Towne Center Blvd.
Baton Rouge, LA 70806
EAST BATON ROUGE-LA
Tax ID / EIN: 36-2860679

represented by **Prospect Industries (Holdings) Inc.**
PRO SE

*Debtor*
**S C Woods, L.L.C.**
2370 Towne Centre Boulevard
Baton Rouge, LA 70806
EAST BATON ROUGE-LA

represented by **S C Woods, L.L.C.**
PRO SE

Tax ID / EIN: 72-1507985

000982

**Debtor**
**Servicios de Fabricacion de Altamira, S.A. de C. V.**
757 North Eldridge Parkway
Houston, TX 77079
HARRIS-TX
Tax ID / EIN: 00-0000000

represented by **Servicios de Fabricacion de Altamira, S.A. de C. V.**
PRO SE

**Debtor**
**Servicios Profesionales de Altamira, S.A. de C.V.**
757 North Eldridge Parkway
Houston, TX 77079
HARRIS-TX
Tax ID / EIN: 00-0000000

represented by **Servicios Profesionales de Altamira, S.A. de C.V.**
PRO SE

**Debtor**
**Shaw Beneco, Inc.**
2370 Towne Centre Boulevard
Baton Rouge, LA 70806
EAST BATON ROUGE-LA
Tax ID / EIN: 68-0501371

represented by **Shaw Beneco, Inc.**
PRO SE

**Debtor**
**Shaw Connex, Inc.**
81 Connex Way
Troutville, VA 24175
BOTETOURT-VA
Tax ID / EIN: 31-1333038

represented by **Shaw Connex, Inc.**
PRO SE

**Debtor**
**Shaw Dunn Limited**
40 Eastbourne Terrace
London
OUTSIDE U. S.
England W2 6LG
Tax ID / EIN: 00-0000000

represented by **Shaw Dunn Limited**
PRO SE

**Debtor**
**Shaw E & I International Ltd.**
757 North Eldridge Parkway
Houston, TX 77079
HARRIS-TX
Tax ID / EIN: 00-0000000

represented by **Shaw E & I International Ltd.**
PRO SE

**Debtor**
**Shaw Energy Services, Inc.**
2370 Towne Centre Boulevard
Baton Rouge, LA 70806
EAST BATON ROUGE-LA

represented by **Shaw Energy Services, Inc.**
PRO SE

Tax ID / EIN: 20-5103311

000983

***Debtor***
**Shaw Fabricators, Inc.**
757 North Eldridge Parkway
Houston, TX 77079
HARRIS-TX
Tax ID / EIN: 62-1718401

represented by **Shaw Fabricators, Inc.**
PRO SE

***Debtor***
**Shaw Far East Services, LLC**
757 North Eldridge Parkway
Houston, TX 77079
HARRIS-TX
Tax ID / EIN: 35-2410426

represented by **Shaw Far East Services, LLC**
PRO SE

***Debtor***
**Shaw Group UK Limited**
40 Eastbourne Terrace
London W2 6LG
OUTSIDE U. S.
England
Tax ID / EIN: 00-0000000

represented by **Shaw Group UK Limited**
PRO SE

***Debtor***
**Shaw Home Louisiana, LLC**
2370 Towne Center Boulevard
Baton Rouge, LA 70806
EAST BATON ROUGE-LA
Tax ID / EIN: 20-3872849

represented by **Shaw Home Louisiana, LLC**
PRO SE

***Debtor***
**Shaw International Inc.**
757 North Eldridge Parkway
Houston, TX 77079
HARRIS-TX
Tax ID / EIN: 82-3033570

represented by **Shaw International Inc.**
PRO SE

***Debtor***
**Shaw International Management Services Two, Inc.**
2370 Towne Center Boulevard
Baton Rouge, LA 70806
EAST BATON ROUGE-LA
Tax ID / EIN: 41-2055305

represented by **Shaw International Management Services Two, Inc.**
PRO SE

***Debtor***
**Shaw JV Holdings, L.L.C.**
2370 Towne Center Boulevard
Baton Rouge, LA 70806
EAST BATON ROUGE-LA
Tax ID / EIN: 72-1483385

represented by **Shaw JV Holdings, L.L.C.**
PRO SE

*Debtor*

**Shaw Managed Services, LLC**
2370 Towne Center Boulevard
Baton Rouge, LA 70806
EAST BATON ROUGE-LA
Tax ID / EIN: 72-1345961

represented by **Shaw Managed Services, LLC**
PRO SE

*Debtor*

**Shaw Management Services One, Inc.**
2370 Towne Center Boulevard
Baton Rouge, LA 70806
EAST BATON ROUGE-LA
Tax ID / EIN: 41-2055300

represented by **Shaw Management Services One, Inc.**
PRO SE

*Debtor*

**Shaw NC Company, Inc.**
500 East Morehad, Suite 400
Charlotte, NC 28202
MECKLENBURG-NC
Tax ID / EIN: 56-0861901

represented by **Matthew D Cavenaugh**
(See above for address)

*Debtor*

**Shaw Nuclear Energy Holdings (UK), Inc.**
2370 Towne center Boulevard
Baton Rouge, LA 70806
EAST BATON ROUGE-LA
Tax ID / EIN: 20-5201328

represented by **Matthew D Cavenaugh**
(See above for address)

*Debtor*

**Shaw Overseas (Middle East) Ltd.**
757 North Eldridge Parkway
Houston, TX 77079
HARRIS-TX
Tax ID / EIN: 00-0000000

represented by **Matthew D Cavenaugh**
(See above for address)

*Debtor*

**Shaw Power Delivery Systems, Inc.**
2370 Towne Center Boulevard
Baton Rouge, LA 70806
EAST BATON ROUGE-LA
Tax ID / EIN: 20-5103113

represented by **Matthew D Cavenaugh**
(See above for address)

*Debtor*

**Shaw Power Services Group, L.L.C.**
2370 Towne Center Boulevard
Baton Rouge, LA 70806
EAST BATON ROUGE-LA
Tax ID / EIN: 72-1515472

represented by **Shaw Power Services Group, L.L.C.**
PRO SE

*Debtor*

**Shaw Power Services, LLC**
2370 Towne Centre Blvd.
Baton Rouge, LA 70806

represented by **Shaw Power Services, LLC**
PRO SE

EAST BATON ROUGE-LA
Tax ID / EIN: 72-1338077

***Debtor***
**Shaw Power Technologies, Inc.**
2370 Towne Centre Blvd.
Baton Rouge, LA 70806
EAST BATON ROUGE-LA
Tax ID / EIN: 72-1496643

represented by **Shaw Power Technologies, Inc.**
PRO SE

***Debtor***
**Shaw Process Fabricators, Inc.**
36445 Perkins Road
Prairieville, LA 70769
ASCENSION-LA
Tax ID / EIN: 72-1080769

represented by **Shaw Process Fabricators, Inc.**
PRO SE

***Debtor***
**Shaw Services, L.L.C.**
2370 Towne Centre Blvd.
East Rouge, LA 70806
EAST BATON ROUGE-LA
Tax ID / EIN: 72-1515466

represented by **Shaw Services, L.L.C.**
PRO SE

***Debtor***
**Shaw SSS Fabricators, Inc.**
757 North Eldridge Parkway
Houston, TX 77079
HARRIS-TX
Tax ID / EIN: 72-1495933

represented by **Shaw SSS Fabricators, Inc.**
PRO SE

***Debtor***
**Shaw Transmission & Distribution Services
International, Inc.**
500 East Morehead
Suite 400
Charlotte, NC 28202
MECKLENBURG-NC
Tax ID / EIN: 56-2140790

represented by **Shaw Transmission & Distribution
Services International, Inc.**
PRO SE

***Debtor***
**Shaw Transmission & Distribution Services,
Inc.**
2730 Towne Centre Boulevard
Baton Rouge, LA 70806
EAST BATON ROUGE-LA
Tax ID / EIN: 41-2055306

represented by **Shaw Transmission & Distribution
Services, Inc.**
PRO SE

***Debtor***
**SparTEC, Inc.**
757 North Eldridge Parkway
Houston, TX 77079
HARRIS-TX

represented by **SparTEC, Inc.**
PRO SE

11/18/21, 11:12 AM   Case 4:21-cv-03369   Document 10-2   Filed on 11/19/21 in TXSD   Page 34 of 550
BK ECF - Live US Bankruptcy Court-Texas Southern

000986

Tax ID / EIN: 76-0629467

| | |
|---|---|
| ***Debtor*** | represented by **TVL Lender II, Inc.** |
| **TVL Lender II, Inc.** | PRO SE |
| 2370 Towne Centre Boulevard | |
| Baton Rouge, LA 70806 | |
| EAST BATON ROUGE-LA | |
| Tax ID / EIN: 27-1556004 | |

| | |
|---|---|
| ***Debtor*** | represented by **Varsy International N.V.** |
| **Varsy International N.V.** | PRO SE |
| 757 North Eldridge Parkway | |
| Houston, TX 70079 | |
| HARRIS-TX | |
| Tax ID / EIN: 00-0000000 | |

| | |
|---|---|
| ***Debtor*** | represented by **Whessoe Piping Systems Limited** |
| **Whessoe Piping Systems Limited** | PRO SE |
| 40 Eastbourne Terrace | |
| London W2 6LG | |
| OUTSIDE U. S. | |
| England | |
| Tax ID / EIN: 00-0000000 | |

| | |
|---|---|
| ***U.S. Trustee*** | represented by **Alicia Lenae Barcomb** |
| **US Trustee** | Office of the US Trustee |
| Office of the US Trustee | 515 Rusk Street |
| 515 Rusk Ave | Ste 3516 |
| Ste 3516 | Houston, TX 77002 |
| Houston, TX 77002 | 713-718-4650 |
| (713) 718-4650 | Email: alicia.barcomb@usdoj.gov |
| | |
| | **Hector Duran, Jr** |
| | U.S. Trustee |
| | 515 Rusk |
| | Ste 3516 |
| | Houston, Tx 77002 |
| | 7137184650 |
| | Email: Hector.Duran.Jr@usdoj.gov |
| | |
| | **Stephen Douglas Statham** |
| | Office of US Trustee |
| | 515 Rusk |
| | Ste 3516 |
| | Houston, TX 77002 |
| | 713-718-4650 Ext 252 |
| | Fax : 713-718-4670 |
| | Email: stephen.statham@usdoj.gov |

| Filing Date | # | Docket Text |
|---|---|---|
| 01/21/2020 | 🔵1<br>(27 pgs) | Chapter 11 Voluntary Petition Non-Individual Fee Amount $1717 Filed by McDermott International, Inc.. (Cavenaugh, Matthew) (Entered: |

000987

| 01/21/2020 | **2** (3 pgs) | Notice of Appearance and Request for Notice Filed by Alfredo R Perez Filed by on behalf of Zachry Industrial, Inc. (Perez, Alfredo) (Entered: 01/21/2020) |
|---|---|---|
| 01/21/2020 | ● | Notice of Appearance and Request for Notice Filed by Stephen Douglas Statham (Statham, Stephen) (Entered: 01/21/2020) |
| 01/21/2020 | **3** (4 pgs) | Notice of Appearance and Request for Notice Filed by Hugh Massey Ray III Filed by on behalf of Illuminate Buyer, LLC (Ray, Hugh) (Entered: 01/21/2020) |
| 01/22/2020 | **4** (304 pgs) | Disclosure Statement Filed by McDermott International, Inc.. (Cavenaugh, Matthew) (Entered: 01/22/2020) |
| 01/22/2020 | **5** (66 pgs) | Chapter 11 Plan of Reorganization Filed by McDermott International, Inc.. (Cavenaugh, Matthew) (Entered: 01/22/2020) |
| 01/22/2020 | **6** (14 pgs; 2 docs) | Emergency Motion *for Entry of an Order (I) Authorizing the Debtors to File a Consolidated List of Creditors and a Consolidated List of the 50 Largest Unsecured Creditors, (II) Waiving the Requirement to File a List of Equity Security Holders, and (III) Authorizing the Debtors to Redact Certain Personal Identification Information* Filed by Debtor McDermott International, Inc. Hearing scheduled for 1/23/2020 at 09:00 AM at Houston, Courtroom 400 (DRJ). (Attachments: # **1** Proposed Order) (Cavenaugh, Matthew) (Entered: 01/22/2020) |
| 01/22/2020 | **7** (42 pgs; 2 docs) | Emergency Motion *Application for Entry of an Order Authorizing the Retention and Appointment of Prime Clerk LLC as Claims, Noticing, and Solicitation Agent* Filed by Debtor McDermott International, Inc. Hearing scheduled for 1/23/2020 at 09:00 AM at Houston, Courtroom 400 (DRJ). (Attachments: # **1** Proposed Order) (Cavenaugh, Matthew) (Entered: 01/22/2020) |
| 01/22/2020 | **8** (31 pgs; 2 docs) | Emergency Motion *for Entry of an Order (I) Approving the Debtors' Proposed Adequate Assurance of Payment for Future Utility Services, (II) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Services, and (III) Approving the Debtors' Proposed Procedures for Resolving Adequate Assurance Requests* Filed by Debtor McDermott International, Inc. Hearing scheduled for 1/23/2020 at 09:00 AM at Houston, Courtroom 400 (DRJ). (Attachments: # **1** Proposed Order) (Cavenaugh, Matthew) (Entered: 01/22/2020) |
| 01/22/2020 | | Receipt of Voluntary Petition (Chapter 11)(20-30336) [misc,volp11] (1717.00) Filing Fee. Receipt number 21813518. Fee amount $1717.00. (U.S. Treasury) (Entered: 01/22/2020) |
| 01/22/2020 | **9** (37 pgs; 2 docs) | Emergency Motion *for Entry of an Order Authorizing the Debtors to (I) Pay Prepetition Wages, Salaries, Other Compensation, and Reimbursable Expenses and (II) Continue Employee Benefits Programs* Filed by Debtor McDermott International, Inc. Hearing scheduled for 1/23/2020 at 09:00 AM at Houston, Courtroom 400 (DRJ). (Attachments: # **1** Proposed Order) (Cavenaugh, Matthew) (Entered: 01/22/2020) |
| 01/22/2020 | **10** | Emergency Motion *for Entry of an Order (I) Restating and Enforcing the* |

000989

| | | |
|---|---|---|
| | (26 pgs; 2 docs) | *Worldwide Automatic Stay, Anti-Discrimination Provisions, and Ipso Facto Protections of the Bankruptcy Code, (II) Permitting the Debtors to Modify the Automatic Stay in Their Sole Discretion to Proceed With Litigation or Contested Matter Commenced Prepetition, and (III) Approving the Form and Manner of Notice* Filed by Debtor McDermott International, Inc. Hearing scheduled for 1/23/2020 at 09:00 AM at Houston, Courtroom 400 (DRJ). (Attachments: # 1 Proposed Order) (Cavenaugh, Matthew) (Entered: 01/22/2020) |
| 01/22/2020 | ◉ 11<br>(38 pgs; 2 docs) | Emergency Motion *for Entry of an Order Authorizing the Debtors to (I) Continue Insurance Coverage Entered Into Prepetition and Satisfy Prepetition Obligations Related Thereto, (II) Renew, Amend, Supplement, Extend, or Purchase Insurance Policies, (III) Honor the Terms of the Premium Financing Agreement and Pay Premiums Thereunder, and (IV) Enter Into New Premium Financing Agreement* Filed by Debtor McDermott International, Inc. Hearing scheduled for 1/23/2020 at 09:00 AM at Houston, Courtroom 400 (DRJ). (Attachments: # 1 Proposed Order) (Cavenaugh, Matthew) (Entered: 01/22/2020) |
| 01/22/2020 | ◉ 12<br>(26 pgs; 2 docs) | Emergency Motion *for Entry of An Order Authorizing the Debtors to (I) Honor and Incur Obligations Under Customer Contracts, (II) Obtain New Customer Contracts, and (III) Utilize the Contract Procedures to Settle Post-Petition Disputes* Filed by Debtor McDermott International, Inc. Hearing scheduled for 1/23/2020 at 09:00 AM at Houston, Courtroom 400 (DRJ). (Attachments: # 1 Proposed Order) (Cavenaugh, Matthew) (Entered: 01/22/2020) |
| 01/22/2020 | ◉ 13<br>(37 pgs; 3 docs) | Emergency Motion *for Entry of Interim and Final Orders (I) Authorizing the Payment of Foreign Claims, Lien Claims, 503(b)(9) Claims, and Other Claims, and (II) Confirming Administrative Expense Priority of Outstanding Purchase Orders* Filed by Debtor McDermott International, Inc. Hearing scheduled for 1/23/2020 at 09:00 AM at Houston, Courtroom 400 (DRJ). (Attachments: # 1 Proposed Order Interim Order # 2 Proposed Order Final Order) (Cavenaugh, Matthew) (Entered: 01/22/2020) |
| 01/22/2020 | ◉ 14<br>(27 pgs; 2 docs) | Emergency Motion *for Entry of an Order Authorizing the Payment of Certain Taxes and Fees* Filed by Debtor McDermott International, Inc. Hearing scheduled for 1/23/2020 at 09:00 AM at Houston, Courtroom 400 (DRJ). (Attachments: # 1 Proposed Order) (Cavenaugh, Matthew) (Entered: 01/22/2020) |
| 01/22/2020 | ◉ 15<br>(62 pgs; 3 docs) | Emergency Motion *for Entry of Interim and Final Orders Authorizing the Debtors to (I) Continue to Operate Their Cash Management System and Maintenance Existing Bank Accounts and (II) Continue to Perform Intercompany Transactions* Filed by Debtor McDermott International, Inc. Hearing scheduled for 1/23/2020 at 09:00 AM at Houston, Courtroom 400 (DRJ). (Attachments: # 1 Proposed Order Interim Order # 2 Proposed Order Final Order) (Cavenaugh, Matthew) (Entered: 01/22/2020) |
| 01/22/2020 | ◉ 16<br>(60 pgs; 2 docs) | Emergency Motion *for Entry of an Order Approving Notification and Hearing Procedures for Certain Transfers of Declarations of Worthlessness with Respect to Common Stock and Preferred Stock* Filed by Debtor McDermott International, Inc. Hearing scheduled for 1/23/2020 at 09:00 AM at Houston, Courtroom 400 (DRJ). (Attachments: # 1 Proposed Order) (Cavenaugh, Matthew) (Entered: 01/22/2020) |

000989

| 01/22/2020 | 🌐 17 (4 pgs; 2 docs) | Designation of Complex Chapter 11 Bankruptcy Case (Filed By McDermott International, Inc. ). (Attachments: # 1 Proposed Order) (Cavenaugh, Matthew) (Entered: 01/22/2020) |
| --- | --- | --- |
| 01/22/2020 | 🌐 18 (29 pgs; 2 docs) | Emergency Motion *for Entry of an Order Approving Continuation of the Surety Bond Program* Filed by Debtor McDermott International, Inc. Hearing scheduled for 1/23/2020 at 09:00 AM at Houston, Courtroom 400 (DRJ). (Attachments: # 1 Proposed Order) (Cavenaugh, Matthew) (Entered: 01/22/2020) |
| 01/22/2020 | 🌐 19 (50 pgs; 2 docs) | Emergency Motion *for Entry of an Order (I) Authorizing the Debtors to (A) Enter Into, and Perform Under, Amended and Restated Hedge Agreements, (B) Enter Into, and Perform Under, New Hedge Agreements, (C) Grant Superpriority Claims, and (D) Modify the Automatic Stay, and (II) Granting Related Relief* Filed by Debtor McDermott International, Inc. Hearing scheduled for 1/23/2020 at 09:00 AM at Houston, 515 Rusk Suite 3401. (Attachments: # 1 Proposed Order) (Cavenaugh, Matthew) (Entered: 01/22/2020) |
| 01/22/2020 | 🌐 20 (1 pg) | Motion to Appear pro hac vice *Ciara Foster*. Filed by Debtor McDermott International, Inc. (Cavenaugh, Matthew) (Entered: 01/22/2020) |
| 01/22/2020 | 🌐 21 (1 pg) | Motion to Appear pro hac vice *Christopher T. Greco, P.C.*. Filed by Debtor McDermott International, Inc. (Cavenaugh, Matthew) (Entered: 01/22/2020) |
| 01/22/2020 | 🌐 22 (1 pg) | Motion to Appear pro hac vice *Anthony R. Grossi*. Filed by Debtor McDermott International, Inc. (Cavenaugh, Matthew) (Entered: 01/22/2020) |
| 01/22/2020 | 🌐 23 (1 pg) | Motion to Appear pro hac vice *John R. Luze*. Filed by Debtor McDermott International, Inc. (Cavenaugh, Matthew) (Entered: 01/22/2020) |
| 01/22/2020 | 🌐 24 (1 pg) | Motion to Appear pro hac vice *Joshua A. Sussberg*. Filed by Debtor McDermott International, Inc. (Cavenaugh, Matthew) (Entered: 01/22/2020) |
| 01/22/2020 | 🌐 25 (47 pgs) | Emergency Motion *for Entry of (A) an Order (I) Approving the Stalking Horse Protections, (II) Approving Bidding Procedures for the Sale of the Lummus Assets and Interests, and (III) Approving Contract Assumption and Assignment Procedures, and (B) Order Authorizing the Debtors to Enter Into a Definitive Purchase Agreement Subject to Entry of the Confirmation Order* Filed by Debtor McDermott International, Inc. Hearing scheduled for 1/23/2020 at 09:00 AM at Houston, Courtroom 400 (DRJ). (Cavenaugh, Matthew) (Entered: 01/22/2020) |
| 01/22/2020 | 🌐 26 (216 pgs) | Proposed Order RE: *Emergency Motion for Entry of (A) an Order (I) Approving the Stalking Horse Protections, (II) Approving Bidding Procedures for the Sale of the Lummus Assets and Interests, and (III) Approving Contract Assumption and Assignment Procedures, and (B) Order Authorizing the Debtors to Enter Into a Definitive Purchase Agreement Subject to Entry of the Confirmation Order* (Filed By McDermott International, Inc. ).(Related document(s):25 Emergency Motion) (Cavenaugh, Matthew) (Entered: 01/22/2020) |
| 01/22/2020 | 🌐 27 (106 pgs; 2 docs) | Emergency Motion *for Entry of an Order (I) Scheduling a Combined Disclosure Statement Approval and Plan Confirmation Hearing, (II)* |

000990

| | | |
|---|---|---|
| | | *Establishing Plan and Disclosure Statement Objection and Reply Deadlines and Related Procedures, (III) Approving the Form and Manner of Notice of Commencement, (IV) Approving the Rights Offering Procedures and Related Materials, (V) Waiving the Requirement that the U.S. Trustee Convene a Meeting of Creditors, (VI) Waiving the Requirement That the Debtors File Schedules and Statements, (VII) Approving the Form and Manner of Notice of Bid Deadlines and an Auction, and (VIII) Granting Related Relief* Filed by Debtor McDermott International, Inc. Hearing scheduled for 1/23/2020 at 09:00 AM at Houston, Courtroom 400 (DRJ). (Attachments: # 1 Proposed Order) (Cavenaugh, Matthew) (Entered: 01/22/2020) |
| 01/22/2020 | 28 (95 pgs) | Declaration re: *Declaration of John R. Castellano, Chief Transformation Officer of McDermott International, Inc., In Support of the Debtors' First Day Motions* (Filed By McDermott International, Inc. ). (Cavenaugh, Matthew) (Entered: 01/22/2020) |
| 01/22/2020 | 29 (11 pgs) | Declaration re: *Declaration of David Dickson, President and Chief Executive Officer of McDermott International, Inc., in Support of the Chapter 11 Petitions* (Filed By McDermott International, Inc. ). (Cavenaugh, Matthew) (Entered: 01/22/2020) |
| 01/22/2020 | 30 (3 pgs) | Notice of Appearance and Request for Notice Filed by T. Josh Judd Filed by on behalf of Bo-Mac Contractors, Ltd. (Judd, T.) (Entered: 01/22/2020) |
| 01/22/2020 | 31 (3 pgs) | Notice of Appearance and Request for Notice Filed by Patrick Andrew Kelly Filed by on behalf of Apache Industrial Services, Inc. (Kelly, Patrick) (Entered: 01/22/2020) |
| 01/22/2020 | 32 (106 pgs; 2 docs) | Emergency Motion *for Entry of an Order (I) Directing Joint Administration of the Chapter 11 Cases and (II) Granting Related Relief* Filed by Debtor McDermott International, Inc. Hearing scheduled for 1/23/2020 at 09:00 AM at Houston, Courtroom 400 (DRJ). (Attachments: # 1 Proposed Order) (Cavenaugh, Matthew) (Entered: 01/22/2020) |
| 01/22/2020 | | Judge David R Jones added to case. Involvement of Judge Marvin Isgur Terminated (emiller) (Entered: 01/22/2020) |
| 01/22/2020 | 33 (4 pgs) | Notice of Appearance and Request for Notice Filed by Paul M Green Filed by on behalf of Cameron LNG, LLC (Green, Paul) (Entered: 01/22/2020) |
| 01/22/2020 | 34 (1 pg) | Motion to Appear pro hac vice *of Daniel J. Merrett*. Filed by Creditor Cameron LNG, LLC (Green, Paul) (Entered: 01/22/2020) |
| 01/22/2020 | 35 (3 pgs) | Notice of Appearance and Request for Notice Filed by William Ross Spence Filed by on behalf of Curtis Kelly, Inc. (Spence, William) (Entered: 01/22/2020) |
| 01/22/2020 | 36 (4 pgs) | Notice of Appearance and Request for Notice Filed by Henry Flores Filed by on behalf of Ad Hoc Noteholder Groups (Flores, Henry) (Entered: 01/22/2020) |
| 01/22/2020 | 37 (4 pgs) | Notice of Appearance and Request for Notice Filed by Charles A Beckham Jr Filed by on behalf of Chiyoda International Corporation |

11/18/21, 11:12 AM Case 4:21-cv-03369 Document 10-2 Filed on 11/19/21 in TXSD Page 39 of 550 BLN-CM ECF Live US Bankruptcy Court-Texas Southern

000991

| | | (Beckham, Charles) (Entered: 01/22/2020) |
|---|---|---|
| 01/22/2020 | 🔵 38 (3 pgs) | Notice of Appearance and Request for Notice Filed by Ashley L. Harper Filed by on behalf of UMB Bank, N.A., as Successor Indenture Trustee for Senior Notes (Harper, Ashley) (Entered: 01/22/2020) |
| 01/22/2020 | 🔵 39 (1 pg) | Motion to Appear pro hac vice *Seth H. Lieberman*. Filed by Creditor UMB Bank, N.A., as Successor Indenture Trustee for Senior Notes (Harper, Ashley) (Entered: 01/22/2020) |
| 01/22/2020 | 🔵 40 (1 pg) | Motion to Appear pro hac vice *Patrick Sibley*. Filed by Creditor UMB Bank, N.A., as Successor Indenture Trustee for Senior Notes (Harper, Ashley) (Entered: 01/22/2020) |
| 01/22/2020 | 🔵 41 (1 pg) | Motion to Appear pro hac vice *Matthew W. Silverman*. Filed by Creditor UMB Bank, N.A., as Successor Indenture Trustee for Senior Notes (Harper, Ashley) (Entered: 01/22/2020) |
| 01/22/2020 | 🔵 42 (3 pgs) | Notice of Appearance and Request for Notice Filed by Robin B Cheatham Filed by on behalf of Harvey Gulf International Marine, LLC (Cheatham, Robin) (Entered: 01/22/2020) |
| 01/22/2020 | 🔵 43 (2 pgs) | Notice of Appearance and Request for Notice Filed by Trent L Rosenthal Filed by on behalf of Marnoy Interest Ltd., d/b/a OP (Rosenthal, Trent) (Entered: 01/22/2020) |
| 01/22/2020 | 🔵 44 (1 pg) | Motion to Appear pro hac vice *Margot B. Schonholtz of Linklaters LLP*. Filed by Creditor Credit Agricole Corporate and Investment Bank Hearing scheduled for 1/23/2020 at 09:00 AM at Houston, Courtroom 400 (DRJ). (Wood, William) (Entered: 01/22/2020) |
| 01/22/2020 | 🔵 45 (1 pg) | Motion to Appear pro hac vice *Penelope J. Jensen of Linklaters LLP*. Filed by Creditor Credit Agricole Corporate and Investment Bank Hearing scheduled for 1/23/2020 at 09:00 AM at Houston, Courtroom 400 (DRJ). (Wood, William) (Entered: 01/22/2020) |
| 01/22/2020 | 🔵 46 (1 pg) | Motion to Appear pro hac vice *Eric Hilmo of Linklaters LLP*. Filed by Creditor Credit Agricole Corporate and Investment Bank Hearing scheduled for 1/23/2020 at 09:00 AM at Houston, Courtroom 400 (DRJ). (Wood, William) (Entered: 01/22/2020) |
| 01/22/2020 | 🔵 47 (1 pg) | Motion to Appear pro hac vice *Amy Edgy of Linklaters LLP*. Filed by Creditor Credit Agricole Corporate and Investment Bank Hearing scheduled for 1/23/2020 at 09:00 AM at Houston, Courtroom 400 (DRJ). (Wood, William) (Entered: 01/22/2020) |
| 01/22/2020 | ⚫ | Notice of Appearance and Request for Notice Filed by Hector Duran Jr (Duran, Hector) (Entered: 01/22/2020) |
| 01/22/2020 | 🔵 48 (1 pg) | Motion to Appear pro hac vice *of Robert J. Stark*. Filed by Creditor Ad Hoc Noteholder Groups (Fuller, Melissa) (Entered: 01/22/2020) |
| 01/22/2020 | 🔵 49 (1 pg) | Notice of Appearance and Request for Notice Filed by Smith County, Dallas County (Weller, H) (Entered: 01/22/2020) |
| 01/22/2020 | 🔵 50 | Motion to Appear pro hac vice *of Bennett S. Silverberg*. Filed by Creditor |

| | 51 (1 pg) | Motion to Appear pro hac vice *of Andrew N. Rosenberg.* Filed by Creditor Ad Hoc Noteholder Groups (Fuller, Melissa) (Entered: 01/22/2020) |
| 01/22/2020 | | |
| 01/22/2020 | 52 (1 pg) | Motion to Appear pro hac vice *of Alice B. Eaton.* Filed by Creditor Ad Hoc Noteholder Groups (Fuller, Melissa) (Entered: 01/22/2020) |
| 01/22/2020 | 53 (1 pg) | Motion to Appear pro hac vice *of Diane Meyers.* Filed by Creditor Ad Hoc Noteholder Groups (Fuller, Melissa) (Entered: 01/22/2020) |
| 01/22/2020 | 54 (1 pg) | Motion to Appear pro hac vice *of Alice Nofzinger.* Filed by Creditor Ad Hoc Noteholder Groups (Fuller, Melissa) (Entered: 01/22/2020) |
| 01/22/2020 | 55 (1 pg) | Motion to Appear pro hac vice *of Omid Rahnama.* Filed by Creditor Ad Hoc Noteholder Groups (Fuller, Melissa) (Entered: 01/22/2020) |
| 01/22/2020 | 56 (353 pgs; 2 docs) | Emergency Motion *for Entry of Interim and Final Orders (A) Authorizing the Debtors to Obtain Postpetition Financing, (B) Authorizing the Debtors to Use Cash Collateral, (C) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (D) Granting Adequate Protection to the Prepetition Secured Parties, (E) Modifying the Automatic Stay, (F) Scheduling a Final Hearing, and (G) Granting Related Relief* Filed by Debtor McDermott International, Inc. (Attachments: # 1 Proposed Order) (Cavenaugh, Matthew) (Entered: 01/22/2020) |
| 01/22/2020 | 57 (51 pgs) | Order for Joint Administration Signed on 1/22/2020 (aaloadi) (Related Doc # 32) (Entered: 01/22/2020) |
| 01/22/2020 | 58 (3 pgs) | Notice of Appearance and Request for Notice Filed by Owen Mark Sonik Filed by on behalf of Spring Branch Independent School District (Sonik, Owen) (Entered: 01/22/2020) |
| 01/22/2020 | 59 (1 pg) | Motion to Appear pro hac vice *Robert Britton.* Filed by Interested Party Illuminate Buyer, LLC (Ray, Hugh) (Entered: 01/22/2020) |
| 01/22/2020 | 60 (1 pg) | Motion to Appear pro hac vice *Neal Donnelly.* Filed by Interested Party Illuminate Buyer, LLC (Ray, Hugh) (Entered: 01/22/2020) |
| 01/22/2020 | 61 (4 pgs) | Notice of Appearance and Request for Notice Filed by Hugh Massey Ray III Filed by on behalf of Illuminate Buyer, LLC (Ray, Hugh) (Entered: 01/22/2020) |
| 01/22/2020 | 62 (95 pgs) | Declaration re: *Declaration of John R. Castellano, Chief Transformation Officer of McDermott International, Inc., In Support of the Debtors' First Day Motions* (Filed By McDermott International, Inc. ). (Cavenaugh, Matthew) (Entered: 01/22/2020) |
| 01/22/2020 | 63 (2 pgs) | Notice of Appearance and Request for Notice Filed by Robert P Franke Filed by on behalf of Flowserve Corporation and Flowserve US Inc. (Franke, Robert) (Entered: 01/22/2020) |
| 01/22/2020 | 64 (6 pgs) | Agenda for Hearing on 1/23/2020 (Filed By McDermott International, Inc. ). (Cavenaugh, Matthew) (Entered: 01/22/2020) |

| | | |
|---|---|---|
| 01/22/2020 | 🌐 65<br>(2 pgs) | Notice of Appearance and Request for Notice Filed by James S Carr Filed by on behalf of Infosys Limited (Carr, James) (Entered: 01/22/2020) |
| 01/22/2020 | 🌐 66<br>(1 pg) | Notice of Appearance and Request for Notice Filed by Tara L Grundemeier Filed by on behalf of Jefferson County, Fort Bend County, Galveston County, Harris County, Montgomery County, Cleveland ISD, Cypress Fairbanks ISD (Grundemeier, Tara) (Entered: 01/22/2020) |
| 01/22/2020 | 🌐 67<br>(6 pgs) | Order Authorizing the Retention and Appointment of Prime Clerk LLC as Claims, Noticing, and Solicitation Agent (Related Doc # 7) Signed on 1/22/2020. (emiller) (Entered: 01/22/2020) |
| 01/22/2020 | 🌐 68<br>(1 pg) | Order Granting Motion To Appear pro hac vice - Ciara Foster (Related Doc # 20) Signed on 1/22/2020. (emiller) (Entered: 01/22/2020) |
| 01/22/2020 | 🌐 69<br>(3 pgs) | Notice of Appearance and Request for Notice Filed by John F Higgins IV Filed by on behalf of Ad Hoc Group of Term Lenders (Higgins, John) (Entered: 01/22/2020) |
| 01/22/2020 | 🌐 70<br>(1 pg) | Order Granting Motion To Appear pro hac vice - Christopher T. Greco (Related Doc # 21) Signed on 1/22/2020. (emiller) (Entered: 01/22/2020) |
| 01/22/2020 | 🌐 71<br>(4 pgs) | Notice of Appearance and Request for Notice Filed by Nathan F Coco Filed by on behalf of Bo-Mac Contractors, Ltd. (Coco, Nathan) (Entered: 01/22/2020) |
| 01/22/2020 | 🌐 72<br>(1 pg) | Order Granting Motion To Appear pro hac vice - Anthony R. Grossi (Related Doc # 22) Signed on 1/22/2020. (emiller) (Entered: 01/22/2020) |
| 01/22/2020 | 🌐 73<br>(1 pg) | Motion to Appear pro hac vice *of Damian S. Schaible*. Filed by Interested Party Ad Hoc Group of Term Lenders (Higgins, John) (Entered: 01/22/2020) |
| 01/22/2020 | 🌐 74<br>(1 pg) | Order Granting Motion To Appear pro hac vice - John R. Luze (Related Doc # 23) Signed on 1/22/2020. (emiller) (Entered: 01/22/2020) |
| 01/22/2020 | 🌐 75<br>(1 pg) | Order Granting Motion To Appear pro hac vice - Joshua A. Sussberg (Related Doc # 24) Signed on 1/22/2020. (emiller) (Entered: 01/22/2020) |
| 01/22/2020 | 🌐 76<br>(1 pg) | Motion to Appear pro hac vice *of Natasha Tsiouris*. Filed by Interested Party Ad Hoc Group of Term Lenders (Higgins, John) (Entered: 01/22/2020) |
| 01/22/2020 | 🌐 77<br>(1 pg) | Motion to Appear pro hac vice *Bradley Thomas Giordano*. Filed by Creditor Bo-Mac Contractors, Ltd. (Coco, Nathan) (Entered: 01/22/2020) |
| 01/22/2020 | 🌐 78<br>(1 pg) | Order Granting Motion To Appear pro hac vice - Daniel J. Merrett (Related Doc # 34) Signed on 1/22/2020. (emiller) (Entered: 01/22/2020) |
| 01/22/2020 | 🌐 79<br>(1 pg) | Order Granting Motion To Appear pro hac vice - Seth H. Lieberman (Related Doc # 39) Signed on 1/22/2020. (emiller) (Entered: 01/22/2020) |
| 01/22/2020 | 🌐 80 | Order Granting Motion To Appear pro hac vice - Patrick Sibley (Related |

| 01/22/2020 | ● 81<br>(1 pg) | Order Granting Motion To Appear pro hac vice - Matthew W. Silverman (Related Doc # 41) Signed on 1/22/2020. (emiller) (Entered: 01/22/2020) |
| 01/22/2020 | ● 82<br>(1 pg) | Order Granting Motion To Appear pro hac vice - Margot B. Schonholtz (Related Doc # 44) Signed on 1/22/2020. (emiller) (Entered: 01/22/2020) |
| 01/22/2020 | ● 83<br>(1 pg) | Order Granting Motion To Appear pro hac vice - Penelope J. Jensen (Related Doc # 45) Signed on 1/22/2020. (emiller) (Entered: 01/22/2020) |
| 01/22/2020 | ● 84<br>(1 pg) | Order Granting Motion To Appear pro hac vice - Eric Hilmo (Related Doc # 46) Signed on 1/22/2020. (emiller) (Entered: 01/22/2020) |
| 01/22/2020 | ● 85<br>(1 pg) | Order Granting Motion To Appear pro hac vice - Amy Edgy (Related Doc # 47) Signed on 1/22/2020. (emiller) (Entered: 01/22/2020) |
| 01/22/2020 | ● 86<br>(1 pg) | Order Granting Motion To Appear pro hac vice - Robert J. Stark (Related Doc # 48) Signed on 1/22/2020. (emiller) (Entered: 01/22/2020) |
| 01/22/2020 | ● 87<br>(1 pg) | Order Granting Motion To Appear pro hac vice - Bennett S. Silverberg (Related Doc # 50) Signed on 1/22/2020. (emiller) (Entered: 01/22/2020) |
| 01/22/2020 | ● 88<br>(1 pg) | Order Granting Motion To Appear pro hac vice - Andrew N. Rosenberg (Related Doc # 51) Signed on 1/22/2020. (emiller) (Entered: 01/22/2020) |
| 01/22/2020 | ● 89<br>(1 pg) | Order Granting Motion To Appear pro hac vice - Alice B. Eaton (Related Doc # 52) Signed on 1/22/2020. (emiller) (Entered: 01/22/2020) |
| 01/22/2020 | ● 90<br>(1 pg) | Order Granting Motion To Appear pro hac vice - Diane Meyers (Related Doc # 53) Signed on 1/22/2020. (emiller) (Entered: 01/22/2020) |
| 01/22/2020 | ● 91<br>(1 pg) | Order Granting Motion To Appear pro hac vice - Alice Nofzinger (Related Doc # 54) Signed on 1/22/2020. (emiller) (Entered: 01/22/2020) |
| 01/22/2020 | ● 92<br>(1 pg) | Order Granting Motion To Appear pro hac vice - Omid Rahnama (Related Doc # 55) Signed on 1/22/2020. (emiller) (Entered: 01/22/2020) |
| 01/22/2020 | ● 93<br>(1 pg) | Order Granting Motion To Appear pro hac vice - Robert Britton (Related Doc # 59) Signed on 1/22/2020. (emiller) (Entered: 01/22/2020) |
| 01/22/2020 | ● 94<br>(1 pg) | Order Granting Motion To Appear pro hac vice - Neal Donnelly (Related Doc # 60) Signed on 1/22/2020. (emiller) (Entered: 01/22/2020) |
| 01/22/2020 | ● 95 | No Creditor Mailing List (RubenCastroadi) (Entered: 01/22/2020) |
| 01/22/2020 | ● 96<br>(3 pgs) | Notice of Appearance and Request for Notice Filed by Lynn Hamilton Butler Filed by on behalf of Sun Industrial Group, LLC (Butler, Lynn) (Entered: 01/22/2020) |
| 01/22/2020 | ● 97<br>(3 pgs) | Notice of Appearance and Request for Notice Filed by Timothy Aaron Million Filed by on behalf of Sun Industrial Group, LLC (Million, Timothy) (Entered: 01/22/2020) |

| 01/22/2020 | ● 98 (1 pg) | Motion to Appear pro hac vice *Craig Solomon Ganz*. Filed by Creditor Insight Direct USA, Inc. (Ganz, Craig) (Entered: 01/22/2020) |
|---|---|---|
| 01/22/2020 | ● 99 (1 pg) | Order Granting Motion To Appear pro hac vice - Damian S. Schaible (Related Doc # 73) Signed on 1/22/2020. (emiller) (Entered: 01/22/2020) |
| 01/22/2020 | ● 100 (3 pgs) | Notice of Appearance and Request for Notice Filed by Michael Edward Collins Filed by on behalf of Fianzas Monterrey, S.A., Federal Insurance Company, Westchester Fire Insurance Company (Collins, Michael) (Entered: 01/22/2020) |
| 01/22/2020 | ● 101 (1 pg) | Order Granting Motion To Appear pro hac vice - Natasha Tsiouris (Related Doc # 76) Signed on 1/22/2020. (emiller) (Entered: 01/22/2020) |
| 01/22/2020 | ● 102 (1 pg) | Order Granting Motion To Appear pro hac vice - Bradley Thomas Giordano (Related Doc # 77) Signed on 1/22/2020. (emiller) (Entered: 01/22/2020) |
| 01/22/2020 | ● 103 (1 pg) | Motion to Appear pro hac vice *Robert W. Miller*. Filed by Creditors Federal Insurance Company, Fianzas Monterrey, S.A., Westchester Fire Insurance Company (Collins, Michael) (Entered: 01/22/2020) |
| 01/22/2020 | ● 104 (1 pg) | Motion to Appear pro hac vice *Michael A. DiGiacomo*. Filed by Creditor Insight Direct USA, Inc. (DiGiacomo, Michael) (Entered: 01/22/2020) |
| 01/22/2020 | ● 105 (3 pgs) | Notice of Appearance and Request for Notice Filed by William Alfred Wood III Filed by on behalf of Credit Agricole Corporate and Investment Bank (Wood, William) (Entered: 01/22/2020) |
| 01/22/2020 | ● 106 (3 pgs) | Statement *of Manier & Herod, P.C. Pursuant to Federal Rule of Bankruptcy Procedure 2019* (Filed By Federal Insurance Company, Fianzas Monterrey, S.A., Westchester Fire Insurance Company ). (Collins, Michael) (Entered: 01/22/2020) |
| 01/22/2020 | ● 107 (1 pg) | Order Granting Motion To Appear pro hac vice - Craig Solomon Ganz (Related Doc # 98) Signed on 1/22/2020. (emiller) (Entered: 01/22/2020) |
| 01/22/2020 | ● 108 (1 pg) | Order Granting Motion To Appear pro hac vice - Robert W. Miller (Related Doc # 103) Signed on 1/22/2020. (emiller) (Entered: 01/22/2020) |
| 01/22/2020 | ● 109 (1 pg) | Order Granting Complex Chapter 11 Bankruptcy Case Treatment Signed on 1/22/2020 (Related document(s):17 Designation of Complex Chapter 11 Bankruptcy Case) (emiller) (Entered: 01/22/2020) |
| 01/22/2020 | ● 110 (262 pgs; 3 docs) | Amended Motion *for Entry of (A) an Order (I) Approving the Stalking Horse Protections, (II) Approving Bidding Procedures for the Sale of the Lummus Assets and Interest, and (III) Approving Contract Assumption and Assignment Procedures, and (B) an Order Authorizing the Debtors to Enter Into a Definitive Purchase Agreement Subject to Entry of the Confirmation Order* Filed by Debtor McDermott International, Inc. (Attachments: # 1 Proposed Order # 2 Proposed Order Proposed Sale Order) (Cavenaugh, Matthew) (Entered: 01/22/2020) |
| 01/22/2020 | ● 111 (3 pgs) | Notice of Appearance and Request for Notice Filed by William James Hotze Filed by on behalf of Larsen & Toubro Hydrocarbon Engineering |

| | | Limited (Hotze, William) (Entered: 01/22/2020) |
|---|---|---|

000996

| 01/22/2020 | 112 (1 pg) | Motion to Appear pro hac vice *Patrick J. Potter*. Filed by Creditor Larsen & Toubro Hydrocarbon Engineering Limited (Hotze, William) (Entered: 01/22/2020) |
|---|---|---|
| 01/22/2020 | 113 (3 pgs) | Notice of Appearance and Request for Notice Filed by Julie Goodrich Harrison Filed by on behalf of ExxonMobil Pipeline Company, Gulf Coast Growth Ventures LLC (Harrison, Julie) (Entered: 01/22/2020) |
| 01/22/2020 | 114 (3 pgs) | Notice of Appearance and Request for Notice Filed by Sean B Davis Filed by on behalf of Powell Electrical Systems, Inc. (Davis, Sean) (Entered: 01/22/2020) |
| 01/22/2020 | 115 (1 pg) | Motion to Appear pro hac vice *for Andrew M. Parlen*. Filed by Interested Party Barclays Bank PLC (Mayer, Simon) (Entered: 01/22/2020) |
| 01/22/2020 | 116 (1 pg) | Motion to Appear pro hac vice *for Anupama Yerramalli*. Filed by Interested Party Barclays Bank PLC (Mayer, Simon) (Entered: 01/22/2020) |
| 01/22/2020 | 117 (1 pg) | Motion to Appear pro hac vice *for Andrew Sorkin*. Filed by Interested Party Barclays Bank PLC (Mayer, Simon) (Entered: 01/22/2020) |
| 01/22/2020 | 118 (3 pgs) | Notice of Appearance and Request for Notice Filed by Thomas A Howley Filed by on behalf of Total Petrochemicals & Refining USA, Inc. (Howley, Thomas) (Entered: 01/22/2020) |
| 01/22/2020 | 119 (1 pg) | Motion to Appear pro hac vice *Lisa M. Schweitzer*. Filed by Interested Party Total Petrochemicals & Refining USA, Inc. (Howley, Thomas) (Entered: 01/22/2020) |
| 01/22/2020 | 120 (1 pg) | Motion to Appear pro hac vice *Jane VanLare*. Filed by Interested Party Total Petrochemicals & Refining USA, Inc. (Howley, Thomas) (Entered: 01/22/2020) |
| 01/22/2020 | 121 (134 pgs; 2 docs) | Amended Chapter 11 Plan Filed by McDermott International, Inc.. (Related document(s):5 Chapter 11 Plan) (Attachments: # 1 Redline) (Cavenaugh, Matthew) (Entered: 01/22/2020) |
| 01/22/2020 | 122 (32 pgs; 2 docs) | Proposed Order RE: *Emergency Motion for Entry of Interim and Final Orders Authorizing the Debtors to (I) Continue to Operate Their Cash Management System and Maintenance Existing Bank Accounts and (II) Continue to Perform Intercompany Transactions* (Filed By McDermott International, Inc. ).(Related document(s):15 Emergency Motion) (Attachments: # 1 Redline) (Cavenaugh, Matthew) (Entered: 01/22/2020) |
| 01/22/2020 | 123 (22 pgs; 2 docs) | Proposed Order RE: *Emergency Motion for Entry of an Order Authorizing the Debtors to (I) Continue Insurance Coverage Entered Into Prepetition and Satisfy Prepetition Obligations Related Thereto, (II) Renew, Amend, Supplement, Extend, or Purchase Insurance Policies, (III) Honor the Terms of the Premium Financing Agreement and Pay Premiums Thereunder, and (IV) Enter Into New Premium Financing Agreement* (Filed By McDermott International, Inc. ).(Related document(s):11 Emergency Motion) (Attachments: # 1 Redline) (Cavenaugh, Matthew) (Entered: 01/22/2020) |

000997

| 01/22/2020 | ● 124<br>(16 pgs; 2 docs) | Proposed Order RE: *Emergency Motion for Entry of an Order (I) Restating and Enforcing the Worldwide Automatic Stay, Anti-Discrimination Provisions, and Ipso Facto Protections of the Bankruptcy Code, (II) Permitting the Debtors to Modify the Automatic Stay in Their Sole Discretion to Proceed With Litigation or Contested Matter Commenced Prepetition, and (III) Approving the Form and Manner of Notice* (Filed By McDermott International, Inc. ).(Related document(s):10 Emergency Motion) (Attachments: # 1 Redline) (Cavenaugh, Matthew) (Entered: 01/22/2020) |
| --- | --- | --- |
| 01/22/2020 | ● 125<br>(122 pgs) | Affidavit Re: *of Christina Pullo Regarding Disclosure Statement Book, DS Prepack Joint Ballot, Class 9 Master Ballot, Class 9 Beneficial Ballot, and Return Envelope.* (related document(s):4 Disclosure Statement, 5 Chapter 11 Plan. Filed by Prime Clerk LLC (Steele, Benjamin) (Entered: 01/22/2020) |
| 01/22/2020 | ● 126<br>(12 pgs; 2 docs) | Proposed Order RE: *Emergency Motion for Entry of an Order Authorizing the Debtors to (I) Pay Prepetition Wages, Salaries, Other Compensation, and Reimbursable Expenses and (II) Continue Employee Benefits Programs* (Filed By McDermott International, Inc. ).(Related document(s):9 Emergency Motion) (Attachments: # 1 Redline) (Cavenaugh, Matthew) (Entered: 01/22/2020) |
| 01/23/2020 | ● 127<br>(27 pgs) | Affidavit Re: *of Nicholas Vass Regarding First Day Emergency Motions, Disclosure Statement for the Joint Prepackaged Chapter 11 Plan of Reorganization of McDermott International, Inc. and Its Debtor Affiliates, Joint Prepackaged Chapter 11 Plan of Reorganization of McDermott International, Inc. and Its Debtor Affiliates, Debtors Emergency Application for Entry of an Order Authorizing the Retention and Appointment of Prime Clerk LLC as Claims, Noticing, and Solicitation Agent, Notice of Designation as Complex Chapter 11 Bankruptcy Case, Declarations of David Dickson and John R. Castellano, Joint Administration Order, First Day Hearing Agenda, Prime Clerk Retention Order, Order Granting Complex Chapter 11 Bankruptcy Case Treatment, and Debtors Amended Motion for Entry of (A) an Order (I) Approving the Stalking Horse Protections, (II) Approving Bidding Procedures for the Sale of the Lummus Assets and Interests, and (III) Approving Contract Assumption and Assignment Procedures, and (B) an Order Authorizing the Debtors to Enter into a Definitive Purchase Agreement Subject to Entry of the Confirmation Order.* (related document(s):4 Disclosure Statement, 5 Chapter 11 Plan, 6 Emergency Motion, 8 Emergency Motion, 9 Emergency Motion, 10 Emergency Motion, 11 Emergency Motion, 12 Emergency Motion, 13 Emergency Motion, 14 Emergency Motion, 15 Emergency Motion, 16 Emergency Motion, 18 Emergency Motion, 19 Emergency Motion, 27 Emergency Motion, 29 Declaration, 56 Emergency Motion, 57 Order for Joint Administration, 62 Declaration, 64 Agenda, 67 Order on Emergency Motion, 109 Generic Order, 110 Generic Motion). Filed by Prime Clerk LLC (Steele, Benjamin) (Entered: 01/23/2020) |
| 01/23/2020 | ● 128<br>(1 pg) | Notice and Order regarding exchanging of exhibits and witness lists in all contested matters and adversary proceedings. (Entered: 01/23/2020) |
| 01/23/2020 | ● 129<br>(1 pg) | Order Granting Motion To Appear pro hac vice - Michael A. DiGiacomo (Related Doc # 104) Signed on 1/23/2020. (emiller) (Entered: 01/23/2020) |
| 01/23/2020 | ● 130 | Order Granting Motion To Appear pro hac vice - Patrick J. Potter |

| | | |
|---|---|---|
| | | (Related Doc # 112) Signed on 1/23/2020. (emiller) (Entered: 01/23/2020) |
| 01/23/2020 | 🔘 131<br>(1 pg) | Order Granting Motion To Appear pro hac vice - Andrew M. Parlen (Related Doc # 115) Signed on 1/23/2020. (emiller) (Entered: 01/23/2020) |
| 01/23/2020 | 🔘 132<br>(1 pg) | Order Granting Motion To Appear pro hac vice - Anupama Yerramalli (Related Doc # 116) Signed on 1/23/2020. (emiller) (Entered: 01/23/2020) |
| 01/23/2020 | 🔘 133<br>(1 pg) | Order Granting Motion To Appear pro hac vice - Andrew Sorkin (Related Doc # 117) Signed on 1/23/2020. (emiller) (Entered: 01/23/2020) |
| 01/23/2020 | 🔘 134<br>(1 pg) | Order Granting Motion To Appear pro hac vice - Lisa M. Schweitzer (Related Doc # 119) Signed on 1/23/2020. (emiller) (Entered: 01/23/2020) |
| 01/23/2020 | 🔘 135<br>(1 pg) | Order Granting Motion To Appear pro hac vice - Jane VanLare (Related Doc # 120) Signed on 1/23/2020. (emiller) (Entered: 01/23/2020) |
| 01/23/2020 | 🔘 136<br>(12 pgs) | Statement *of Davis Polk & Wardwell LLP and Porter Hedges LLP Pursuant to Federal Rule of Bankruptcy Procedure 2019* (Filed By Ad Hoc Group of Term Lenders ). (Higgins, John) (Entered: 01/23/2020) |
| 01/23/2020 | 🔘 137<br>(12 pgs; 2 docs) | Proposed Order RE: *Emergency Motion for Entry of an Order Authorizing the Debtors to (I) Pay Prepetition Wages, Salaries, Other Compensation, and Reimbursable Expenses and (II) Continue Employee Benefits Programs* (Filed By McDermott International, Inc. ).(Related document(s):9 Emergency Motion) (Attachments: # 1 Redline) (Cavenaugh, Matthew) (Entered: 01/23/2020) |
| 01/23/2020 | 🔘 138<br>(145 pgs; 2 docs) | Proposed Order RE: *Emergency Motion for Entry of an Order (I) Scheduling a Combined Disclosure Statement Approval and Plan Confirmation Hearing, (II) Establishing Plan and Disclosure Statement Objection and Reply Deadlines and Related Procedures, (III) Approving the Form and Manner of Notice of Commencement, (IV) Approving the Rights Offering Procedures and Related Materials, (V) Waiving the Requirement that the U.S. Trustee Convene a Meeting of Creditors, (VI) Waiving the Requirement That the Debtors File Schedules and Statements, (VII) Approving the Form and Manner of Notice of Bid Deadlines and an Auction, and (VIII) Granting Related Relief* (Filed By McDermott International, Inc. ).(Related document(s):27 Emergency Motion) (Attachments: # 1 Redline) (Peguero, Kristhy) (Entered: 01/23/2020) |
| 01/23/2020 | 🔘 139<br>(68 pgs; 2 docs) | Proposed Order RE: *Emergency Motion for Entry of an Order (I) Authorizing the Debtors to (A) Enter Into, and Perform Under, Amended and Restated Hedge Agreements, (B) Enter Into, and Perform Under, New Hedge Agreements, (C) Grant Superpriority Claims, and (D) Modify the Automatic Stay, and (II) Granting Related Relief* (Filed By McDermott International, Inc. ).(Related document(s):19 Emergency Motion) (Attachments: # 1 Redline) (Peguero, Kristhy) (Entered: 01/23/2020) |
| 01/23/2020 | 🔘 140 | Proposed Order RE: *Emergency Motion for Entry of Interim and Final* |

| | | |
|---|---|---|
| | (167 pgs; 2 docs) | *Orders (A) Authorizing the Debtors to Obtain Postpetition Financing, (B) Authorizing the Debtors to Use Cash Collateral, (C) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (D) Granting Adequate Protection to the Prepetition Secured Parties, (E) Modifying the Automatic Stay, (F) Scheduling a Final Hearing, and (G) Granting Related Relief* (Filed By McDermott International, Inc. ). (Related document(s):56 Emergency Motion) (Attachments: # 1 Redline) (Cavenaugh, Matthew) (Entered: 01/23/2020) |
| 01/23/2020 | 141 (34 pgs; 2 docs) | Proposed Order RE: *Emergency Motion for Entry of Interim and Final Orders Authorizing the Debtors to (I) Continue to Operate Their Cash Management System and Maintenance Existing Bank Accounts and (II) Continue to Perform Intercompany Transactions* (Filed By McDermott International, Inc. ).(Related document(s):15 Emergency Motion) (Attachments: # 1 Redline) (Cavenaugh, Matthew) (Entered: 01/23/2020) |
| 01/23/2020 | 142 (2 pgs) | Notice of Appearance and Request for Notice Filed by Carl Dore Jr Filed by on behalf of Trinidad Offshore Fabricators Unlimited (Dore, Carl) (Entered: 01/23/2020) |
| 01/23/2020 | 143 (2 pgs) | Notice of Appearance and Request for Notice Filed by Allyson Sasha Johnson Filed by on behalf of Trinidad Offshore Fabricators Unlimited (Johnson, Allyson) (Entered: 01/23/2020) |
| 01/23/2020 | 144 (1 pg) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by Matthew D. Cavenaugh. This is to order a transcript of 1/23/2020 before Judge David R. Jones. Court Reporter/Transcriber: Access Transcripts (Filed By McDermott International, Inc. ). (Cavenaugh, Matthew) Electronically forwarded to Access Transcripts on January 24, 2020. Estimated completion date: January 25, 2020. Modified on 1/24/2020 (ClaudiaGutierrez). (Entered: 01/23/2020) |
| 01/23/2020 | 145 (34 pgs) | Order (I) Authorizing the Debtors to Enter into and Perform Under (A) Amended and Restated Hedge Agreements and (B) New Hedge Agreements, (II) Granting DIP Liens and DIP Superiority Claims, (III) Modifying the Automatic Stay and (IV) Granting Related Relief (Related Doc # 19) Signed on 1/23/2020. (emiller) (Entered: 01/23/2020) |
| 01/23/2020 | 146 (84 pgs) | Interim Order (A) Authorizing the Debtors to Obtain Postpetition Financing, (B) Authorizing the Debtors to Use Cash Collateral, (C) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (D) Granting Adequate Protection to the Prepetition Secured Parties, (E) Modifying the Automatic Stay, (F) Scheduling a Final Hearing, and (G) Granting Related Relief Signed on 1/23/2020 (Related document(s):56 Emergency Motion) **Final Hearing scheduled for 2/24/2020 at 12:00 PM at Houston, Courtroom 400 (DRJ).** (emiller) (Entered: 01/23/2020) |
| 01/23/2020 | 147 (21 pgs) | Interim Order Authorizing the Debtors to (I) Continue to Operate Their Cash Management System and Maintain Existing Bank Accounts and (II) Continue to Perform Intercompany Transactions Signed on 1/23/2020 (Related document(s):15 Emergency Motion) **Final Hearing scheduled for 3/12/2020 at 09:00 AM at Houston, Courtroom 400 (DRJ).** (emiller) (Entered: 01/23/2020) |
| 01/23/2020 | 148 (2 pgs) | Notice of Appearance and Request for Notice Filed by Antonio J Rodriguez Filed by on behalf of Calamity Jane Transport Chartering |

| | | N.V., Allseas Marine Contractors S.A. (Rodriguez, Antonio) (Entered: 01/23/2020) 001000 |
|---|---|---|
| 01/23/2020 | 149 (6 pgs) | Order Authorizing the Debtors to (I) Pay Prepetition Wages, Salaries, Other Compensation, and Reimbursable Expenses and (II) Continue Employee Benefits Programs (Related Doc # 9) Signed on 1/23/2020. (emiller) (Entered: 01/23/2020) |
| 01/23/2020 | 150 (6 pgs) | Order Authorizing the Debtors to (I) Honor and Incur Obligations Under Customer Contracts, (II) Obtain New Customer Contracts, and (III) Utilize the Contract Procedures to Settle Post-Petition Disputes (Related Doc # 12) Signed on 1/23/2020. (emiller) (Entered: 01/23/2020) |
| 01/23/2020 | 151 (3 pgs) | Order (I) Authorizing the Debtors to File a Consolidated List of Creditors and a Consolidated List of the 50 Largest Unsecured Creditors, (II) Waiving the Requirement to File a List of Equity Security Holders, and (III) Authorizing the Debtors to Redact Certain Personal Identification Information (Related Doc # 6) Signed on 1/23/2020. (emiller) (Entered: 01/23/2020) |
| 01/23/2020 | 152 (17 pgs) | Order (I) Approving the Debtors' Proposed Adequate Assurance of Payment for Future Utility Services, (II) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Services, and (III) Approving the Debtors' Proposed Procedures for Resolving Adequate Assurance Requests (Related Doc # 8) Signed on 1/23/2020. (emiller) (Entered: 01/23/2020) |
| 01/23/2020 | 153 (7 pgs) | Interim Order (I) Authorizing the Payment of Foreign Claims, Lien Claims, 503(B)(9) Claims, and Other Claims, and (II) Confirming Administrative Expense Priority of Outstanding Purchase Orders Signed on 1/23/2020 (Related document(s):13 Emergency Motion) **Final Hearing scheduled for 2/24/2020 at 12:00 PM at Houston, Courtroom 400 (DRJ).** (emiller) (Entered: 01/23/2020) |
| 01/23/2020 | 154 (5 pgs) | Order Authorizing the Payment of Certain Prepetition Taxes and Fees (Related Doc # 14) Signed on 1/23/2020. (emiller) (Entered: 01/23/2020) |
| 01/23/2020 | 155 (40 pgs) | Order Approving Notification and Hearing Procedures for Certain Transfers of and Declarations of Worthlessness with Respect to Common Stock and Preferred Stock (Related Doc # 16) Signed on 1/23/2020. (emiller) (Entered: 01/23/2020) |
| 01/23/2020 | 156 (14 pgs) | Order Approving Continuation of the Surety Bond Program (Related Doc # 18) Signed on 1/23/2020. (emiller) (Entered: 01/23/2020) |
| 01/23/2020 | 157 (16 pgs) | Order Authorizing the Debtors to (I) Continue Insurance Coverage Entered into Prepetition and Satisfy Prepetition Obligations Related Thereto, (II) Renew, Amend, Supplement, Extend, or Purchase Insurance Policies, (III) Honor the Terms of the Premium Financing Agreement and Pay Premiums Thereunder, and (IV) enter into New Premium Financing Agreements (Related Doc # 11) Signed on 1/23/2020. (emiller) (Entered: 01/23/2020) |
| 01/23/2020 | 158 (11 pgs) | Order (I) Restating and Enforcing the Worldwide Automatic Stay, Anti-Discrimination Provisions, and Ipso Facto Protections of the Bankruptcy Code, (II) Permitting the Debtors to Modify the Automatic Stay in Their Sole Discretion to Proceed with Litigation or Contested Matters |

| | | |
|---|---|---|
| | | Commenced Prepetition, and (III) Approving the Form and Manner of Notice (Related Doc # 10) Signed on 1/23/2020. (emiller) (Entered: 01/23/2020) |
| 01/23/2020 | 🔵 159 (4 pgs) | Notice of Appearance and Request for Notice Filed by Robert Bernard Bruner Filed by on behalf of The Standard Bank of South Africa, Limited (Bruner, Robert) (Entered: 01/23/2020) |
| 01/23/2020 | 🔵 160 (72 pgs) | Order (I) Scheduling a Combined Disclosure Statement Approval and Plan Confirmation Hearing, (II) Establishing Plan and Disclosure Statement Objection and Reply Deadlines and Related Procedures, (III) Approving the Form and Manner of Notice of Commencement, (IV) Approving the Rights Offering Procedures and Related Materials, (V) Waiving the Requirement that the U.S. Trustee Convene a Meeting of Creditors, (VI) Waiving the Requirement that the Debtors File Schedules and Statements, (IX) Approving the Form and Manner of Notice of Bid Deadlines and an Auction, and (VII) Granting Related Relief Signed on 1/23/2020 (Related document(s):27 Emergency Motion) **A Combined Disclosure Statement Approval and Confirmation hearing to be held on 3/12/2020 at 09:00 AM at Houston, Courtroom 400 (DRJ).** (emiller) (Entered: 01/23/2020) |
| 01/23/2020 | 🔵 161 (2 pgs) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by Patricia B. Tomasco. This is to order a transcript of Hearing on First Day Pleadings held on January 23, 2020, before Judge David R. Jones. Court Reporter/Transcriber: Judicial Transcribers of Texas (Filed By Monterra ). (Tomasco, Patricia) Electronically forwarded to Original requested Transcriber Access Transcripts on January 24, 2020. Estimated completion date: January 24, 2020. Modified on 1/24/2020 (ClaudiaGutierrez). (Entered: 01/23/2020) |
| 01/23/2020 | 🔵 | Courtroom Minutes. Time Hearing Held: 9:00 AM. Appearances: Matthew Cavenaugh, Joshua Sussberg, John Luze, Chris Greco, Anthony Grossi, Anna Rotman, Andrw McGaan; Trey Wood, Margo Schonholtz, and Penelope Jensen; Kenneth Krock, Melissa Fuller, Robert Stark, Andrew Roosenberg, Alice Nofzinger, and Diane Meyers; Philip Eisenburg, Anu Yerramalli, Brett Newman, and Andrew Sorkin; Hugh Ray III, Bob Britton and Nal Donnelly; John Higgins, Kiran Vakamudi, Damian Schaible and Natasha Tsiouris; Tom Howley and Jane VanLare; Cliff Carlson and Alfredo Perez; Paul Green and Daniel Merrett; Ashley Harper and Patrick Sibley; Jason Boland and Julie Harrison; Charles Beckham, Kelli Norfleet, Ken Kattner, Kourtney Lyda; Hector Duran and Stephen Statham and Jason R.; Carl Dore and Allyson Johnson; Bill Greendyke (by phone). Declarations of David Dickson, John R. Castellano, and Shah submitted at docket nos. 62 and 29 admitted. Witnesses: David Dickson, John Castellano. The Court approved the DIP/Cash Collateral motion 56. The revised order submitted at docket no. 140 was signed on the record. **A final hearing on the motion is scheduled for 02/24/2020 at 12:00 PM at Houston, Courtroom 400 (DRJ).** The Court approved the hedging motion 19. The revised proposed order submitted at docket no. 139 was signed on the record. The Court approved the Cash Management Motion 15. The revised proposed order submitted at docket no. 141 was signed on the record. **A Final hearing is scheduled for 03/12/2020 at 9:00 AM at Houston, Courtroom 400 (DRJ).** The Court approved the wages motion 9. The revised order submitted at docket no. 137 was signed on the record. The Court approved the customer motion 12. Order to be entered. The Court approved the vendor motion 13. Order to be entered. **A final hearing on the motion is scheduled for 02/24/2020 at 12:00 PM at Houston,** |

| | | |
|---|---|---|
| | | **Courtroom 400 (DRJ).** The Court approved the surety motion 18. Order to be entered. The Court approved the insurance motion 11. The revised order submitted at docket no. 123 was signed on the record. The Court approved the taxes motion 14. Order to be entered. The Court approved the Motion for Entry of Interim and Final Orders Approving Notification and Hearing Procedures for Certain Transfers of and Declarations of Worthlessness with Respect to Common Stock and Preferred Stock 16. Order to be entered. The Court approved the automatic stay motion 10. The revised proposed order submitted at docket no. 124 was signed on the record. The Court approved the utility motion 8. Order to be entered. The Court approved the creditor matrix motion 6. Order to be entered. The Court approved the scheduling motion 27. The revised proposed order submitted at docket no. 138 was signed on the record. (VrianaPortillo) (Entered: 01/23/2020) |
| 01/23/2020 | ● 162 (1 pg) | Notice of Appearance and Request for Notice Filed by Diane Wade Sanders Filed by on behalf of Nueces County, Live Oak CAD (Sanders, Diane) (Entered: 01/23/2020) |
| 01/23/2020 | ● 163 (3 pgs) | Notice of Appearance and Request for Notice Filed by Thomas Patrick Henican Filed by on behalf of Boh Bros. Construction Co., L.L.C. (Henican, Thomas) (Entered: 01/23/2020) |
| 01/23/2020 | ● 164 (1 pg) | Motion to Appear pro hac vice *Gerardo Mijares-Shafai*. Filed by Interested Party BP America, Inc. (Callagy, Sean) (Entered: 01/23/2020) |
| 01/23/2020 | ● 165 (1 pg) | Motion to Appear pro hac vice *Rosa J. Evergreen*. Filed by Interested Party BP America, Inc. (Callagy, Sean) (Entered: 01/23/2020) |
| 01/23/2020 | ● 166 (4 pgs) | Notice of Appearance and Request for Notice Filed by Sean Michael Callagy Filed by on behalf of BP America, Inc. (Callagy, Sean) (Entered: 01/23/2020) |
| 01/23/2020 | ● 167 (1 pg) | Letter from Shareholder Sai Kumar (JeannieAndresen) (Entered: 01/23/2020) |
| 01/23/2020 | ● | Notice of Appearance and Request for Notice Filed by Alicia Lenae McCullar (McCullar, Alicia) (Entered: 01/23/2020) |
| 01/23/2020 | ● 168 (3 pgs) | Notice of Appearance and Request for Notice Filed by William Ross Spence Filed by on behalf of Morris-Shea Bridge Company, Inc. (Spence, William) (Entered: 01/23/2020) |
| 01/23/2020 | ● 169 (3 pgs) | Notice of Appearance and Request for Notice Filed by William R Greendyke Filed by on behalf of Golden Pass LNG Terminal LLC (Greendyke, William) (Entered: 01/23/2020) |
| 01/23/2020 | ● 170 (1 pg) | 🔊 PDF with attached Audio File. Court Date & Time [ 1/23/2020 9:10:06 AM ]. File Size [ 85580 KB ]. Run Time [ 02:58:18 ]. (First Day Hearings. Hearing held January 23, 2020.). (admin). (Entered: 01/23/2020) |
| 01/23/2020 | ● 171 (4 pgs) | Notice of Appearance and Request for Notice Filed by Elizabeth E Klingensmith Filed by on behalf of MMR Constructors Inc. (Klingensmith, Elizabeth) (Entered: 01/23/2020) |

| | | |
|---|---|---|
| 01/23/2020 | 🔵 172<br>(2 pgs) | Letter from Shareholder Sean Connolly (JeannieAndresen) (Entered: 01/23/2020) |
| 01/23/2020 | 🔵 173<br>(1 pg) | Motion to Appear pro hac vice *by Morgan L. Patterson*. Filed by Creditor MMR Constructors Inc. (Klingensmith, Elizabeth) (Entered: 01/23/2020) |
| 01/23/2020 | 🔵 174<br>(1 pg) | Motion to Appear pro hac vice *by Matthew P. Ward*. Filed by Creditor MMR Constructors Inc. (Klingensmith, Elizabeth) (Entered: 01/23/2020) |
| 01/23/2020 | 🔵 175<br>(4 pgs) | Notice of Appearance and Request for Notice Filed by Jarett Dillard Filed by on behalf of Amec Foster Wheeler USA Corp f/k/a Foster Wheeler USA Corporation (Dillard, Jarett) (Entered: 01/23/2020) |
| 01/23/2020 | 🔵 176<br>(1 pg) | Motion *and Order for Admission Pro Hac Vice* Filed by Interested Party Amec Foster Wheeler USA Corp f/k/a Foster Wheeler USA Corporation (Dillard, Jarett) (Entered: 01/23/2020) |
| 01/23/2020 | 🔵 177<br>(2 pgs) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by Illuminate Buyer, LLC/Hugh M. Ray, III. This is to order a transcript of First Day Hearing, January 23, 2020 before Judge David R. Jones. Court Reporter/Transcriber: Judicial Transcribers of Texas (Filed By Illuminate Buyer, LLC ). (Ray, Hugh) Electronically forwarded to Access Transcripts, LLC on January 27, 2020. Estimated completion date: January 28, 2020. Modified on 1/27/2020 (ClaudiaGutierrez). (Entered: 01/23/2020) |
| 01/24/2020 | 🔵 178<br>(2 pgs) | Notice *of Appearance and Request for Service of Papers*. Filed by Coastal Welding Supply and Coastal Welding Supply of Louisiana (McKinney, Christopher) (Entered: 01/24/2020) |
| 01/24/2020 | 🔵 179<br>(1 pg) | Motion to Appear pro hac vice . Filed by Creditor Oceanwide Houston, Inc. (Mashburn-Myrick, I.) (Entered: 01/24/2020) |
| 01/24/2020 | 🔵 180<br>(6 pgs) | Notice of Appearance and Request for Notice Filed by Scott Robert Cheatham Filed by on behalf of Honeywell International, Inc. (Cheatham, Scott) (Entered: 01/24/2020) |
| 01/24/2020 | 🔵 181<br>(1 pg) | Motion to Appear pro hac vice *D. Tyler Nurnberg*. Filed by Interested Party BP America, Inc. (Callagy, Sean) (Entered: 01/24/2020) |
| 01/24/2020 | 🔵 182<br>(1 pg) | Motion to Appear pro hac vice *of Alexandra J. Kirincic*. Filed by Interested Party Lloyds Bank Corporate Markets Plc (Trausch, David) (Entered: 01/24/2020) |
| 01/24/2020 | 🔵 183<br>(4 pgs) | Notice of Appearance and Request for Notice Filed by David A Trausch Filed by on behalf of Lloyds Bank Corporate Markets Plc (Trausch, David) (Entered: 01/24/2020) |
| 01/24/2020 | 🔵 184<br>(53 pgs) | BNC Certificate of Mailing. (Related document(s):57 Order for Joint Administration) No. of Notices: 7. Notice Date 01/24/2020. (Admin.) (Entered: 01/25/2020) |
| 01/24/2020 | 🔵 185<br>(8 pgs) | BNC Certificate of Mailing. (Related document(s):67 Order on Emergency Motion) No. of Notices: 8. Notice Date 01/24/2020. (Admin.) (Entered: 01/25/2020) |

001004

| | | |
|---|---|---|
| 01/24/2020 | ● 186 (3 pgs) | BNC Certificate of Mailing. (Related document(s):68 Order on Motion to Appear pro hac vice) No. of Notices: 8. Notice Date 01/24/2020. (Admin.) (Entered: 01/25/2020) |
| 01/24/2020 | ● 187 (3 pgs) | BNC Certificate of Mailing. (Related document(s):70 Order on Motion to Appear pro hac vice) No. of Notices: 8. Notice Date 01/24/2020. (Admin.) (Entered: 01/25/2020) |
| 01/24/2020 | ● 188 (3 pgs) | BNC Certificate of Mailing. (Related document(s):72 Order on Motion to Appear pro hac vice) No. of Notices: 8. Notice Date 01/24/2020. (Admin.) (Entered: 01/25/2020) |
| 01/24/2020 | ● 189 (3 pgs) | BNC Certificate of Mailing. (Related document(s):74 Order on Motion to Appear pro hac vice) No. of Notices: 8. Notice Date 01/24/2020. (Admin.) (Entered: 01/25/2020) |
| 01/24/2020 | ● 190 (3 pgs) | BNC Certificate of Mailing. (Related document(s):75 Order on Motion to Appear pro hac vice) No. of Notices: 8. Notice Date 01/24/2020. (Admin.) (Entered: 01/25/2020) |
| 01/24/2020 | ● 191 (3 pgs) | BNC Certificate of Mailing. (Related document(s):78 Order on Motion to Appear pro hac vice) No. of Notices: 11. Notice Date 01/24/2020. (Admin.) (Entered: 01/25/2020) |
| 01/24/2020 | ● 192 (3 pgs) | BNC Certificate of Mailing. (Related document(s):79 Order on Motion to Appear pro hac vice) No. of Notices: 12. Notice Date 01/24/2020. (Admin.) (Entered: 01/25/2020) |
| 01/24/2020 | ● 193 (3 pgs) | BNC Certificate of Mailing. (Related document(s):80 Order on Motion to Appear pro hac vice) No. of Notices: 12. Notice Date 01/24/2020. (Admin.) (Entered: 01/25/2020) |
| 01/24/2020 | ● 194 (3 pgs) | BNC Certificate of Mailing. (Related document(s):81 Order on Motion to Appear pro hac vice) No. of Notices: 12. Notice Date 01/24/2020. (Admin.) (Entered: 01/25/2020) |
| 01/24/2020 | ● 195 (3 pgs) | BNC Certificate of Mailing. (Related document(s):82 Order on Motion to Appear pro hac vice) No. of Notices: 12. Notice Date 01/24/2020. (Admin.) (Entered: 01/25/2020) |
| 01/24/2020 | ● 196 (6 pgs) | BNC Certificate of Mailing. (Related document(s):83 Order on Motion to Appear pro hac vice) No. of Notices: 12. Notice Date 01/24/2020. (Admin.) (Entered: 01/25/2020) |
| 01/24/2020 | ● 197 (3 pgs) | BNC Certificate of Mailing. (Related document(s):84 Order on Motion to Appear pro hac vice) No. of Notices: 12. Notice Date 01/24/2020. (Admin.) (Entered: 01/25/2020) |
| 01/24/2020 | ● 198 (3 pgs) | BNC Certificate of Mailing. (Related document(s):85 Order on Motion to Appear pro hac vice) No. of Notices: 12. Notice Date 01/24/2020. (Admin.) (Entered: 01/25/2020) |
| 01/24/2020 | ● 199 (3 pgs) | BNC Certificate of Mailing. (Related document(s):86 Order on Motion to Appear pro hac vice) No. of Notices: 12. Notice Date 01/24/2020. (Admin.) (Entered: 01/25/2020) |

| | | |
|---|---|---|
| 01/24/2020 | ● 200<br>(3 pgs) | BNC Certificate of Mailing. (Related document(s):87 Order on Motion to Appear pro hac vice) No. of Notices: 12. Notice Date 01/24/2020. (Admin.) (Entered: 01/25/2020) |
| 01/24/2020 | ● 201<br>(3 pgs) | BNC Certificate of Mailing. (Related document(s):88 Order on Motion to Appear pro hac vice) No. of Notices: 12. Notice Date 01/24/2020. (Admin.) (Entered: 01/25/2020) |
| 01/24/2020 | ● 202<br>(3 pgs) | BNC Certificate of Mailing. (Related document(s):89 Order on Motion to Appear pro hac vice) No. of Notices: 12. Notice Date 01/24/2020. (Admin.) (Entered: 01/25/2020) |
| 01/24/2020 | ● 203<br>(3 pgs) | BNC Certificate of Mailing. (Related document(s):90 Order on Motion to Appear pro hac vice) No. of Notices: 12. Notice Date 01/24/2020. (Admin.) (Entered: 01/25/2020) |
| 01/24/2020 | ● 204<br>(3 pgs) | BNC Certificate of Mailing. (Related document(s):91 Order on Motion to Appear pro hac vice) No. of Notices: 12. Notice Date 01/24/2020. (Admin.) (Entered: 01/25/2020) |
| 01/24/2020 | ● 205<br>(3 pgs) | BNC Certificate of Mailing. (Related document(s):92 Order on Motion to Appear pro hac vice) No. of Notices: 12. Notice Date 01/24/2020. (Admin.) (Entered: 01/25/2020) |
| 01/24/2020 | ● 206<br>(3 pgs) | BNC Certificate of Mailing. (Related document(s):93 Order on Motion to Appear pro hac vice) No. of Notices: 12. Notice Date 01/24/2020. (Admin.) (Entered: 01/25/2020) |
| 01/24/2020 | ● 207<br>(3 pgs) | BNC Certificate of Mailing. (Related document(s):94 Order on Motion to Appear pro hac vice) No. of Notices: 12. Notice Date 01/24/2020. (Admin.) (Entered: 01/25/2020) |
| 01/24/2020 | ● 208<br>(3 pgs) | BNC Certificate of Mailing. (Related document(s):99 Order on Motion to Appear pro hac vice) No. of Notices: 13. Notice Date 01/24/2020. (Admin.) (Entered: 01/25/2020) |
| 01/24/2020 | ● 209<br>(3 pgs) | BNC Certificate of Mailing. (Related document(s):101 Order on Motion to Appear pro hac vice) No. of Notices: 13. Notice Date 01/24/2020. (Admin.) (Entered: 01/25/2020) |
| 01/24/2020 | ● 210<br>(3 pgs) | BNC Certificate of Mailing. (Related document(s):102 Order on Motion to Appear pro hac vice) No. of Notices: 13. Notice Date 01/24/2020. (Admin.) (Entered: 01/25/2020) |
| 01/24/2020 | ● 211<br>(3 pgs) | BNC Certificate of Mailing. (Related document(s):107 Order on Motion to Appear pro hac vice) No. of Notices: 13. Notice Date 01/24/2020. (Admin.) (Entered: 01/25/2020) |
| 01/24/2020 | ● 212<br>(3 pgs) | BNC Certificate of Mailing. (Related document(s):108 Order on Motion to Appear pro hac vice) No. of Notices: 13. Notice Date 01/24/2020. (Admin.) (Entered: 01/25/2020) |
| 01/24/2020 | ● 279<br>(1 pg) | Motion to Appear pro hac vice - *Kimberly E. Neureiter*. Filed by Interested Party Pension Benefit Guaranty Corporation (MelissaMorgan) (Entered: 02/03/2020) |

| | | |
|---|---|---|
| 01/24/2020 | 280 (1 pg) | Motion to Appear pro hac vice - *Hannah Leah Uricchio*. Filed by Interested Party Pension Benefit Guaranty Corporation (MelissaMorgan) (Entered: 02/03/2020) |
| 01/25/2020 | 213 (135 pgs) | Transcript RE: First Day Hearing held on 1/23/20 before Judge David R. Jones. Transcript is available for viewing in the Clerk's Office. Filed by Transcript access will be restricted through 04/24/2020. (AccessTranscripts) (Entered: 01/25/2020) |
| 01/25/2020 | 214 (10 pgs) | BNC Certificate of Mailing. (Related document(s):128 Order Regarding the Exchange of Exhibits and Witness lists in all contested matters and adversary proceedings) No. of Notices: 16. Notice Date 01/25/2020. (Admin.) (Entered: 01/25/2020) |
| 01/25/2020 | 215 (3 pgs) | BNC Certificate of Mailing. (Related document(s):109 Generic Order) No. of Notices: 14. Notice Date 01/25/2020. (Admin.) (Entered: 01/25/2020) |
| 01/25/2020 | 216 (3 pgs) | BNC Certificate of Mailing. (Related document(s):129 Order on Motion to Appear pro hac vice) No. of Notices: 16. Notice Date 01/25/2020. (Admin.) (Entered: 01/25/2020) |
| 01/25/2020 | 217 (3 pgs) | BNC Certificate of Mailing. (Related document(s):130 Order on Motion to Appear pro hac vice) No. of Notices: 16. Notice Date 01/25/2020. (Admin.) (Entered: 01/25/2020) |
| 01/25/2020 | 218 (3 pgs) | BNC Certificate of Mailing. (Related document(s):131 Order on Motion to Appear pro hac vice) No. of Notices: 16. Notice Date 01/25/2020. (Admin.) (Entered: 01/25/2020) |
| 01/25/2020 | 219 (3 pgs) | BNC Certificate of Mailing. (Related document(s):132 Order on Motion to Appear pro hac vice) No. of Notices: 16. Notice Date 01/25/2020. (Admin.) (Entered: 01/25/2020) |
| 01/25/2020 | 220 (3 pgs) | BNC Certificate of Mailing. (Related document(s):133 Order on Motion to Appear pro hac vice) No. of Notices: 16. Notice Date 01/25/2020. (Admin.) (Entered: 01/25/2020) |
| 01/25/2020 | 221 (3 pgs) | BNC Certificate of Mailing. (Related document(s):134 Order on Motion to Appear pro hac vice) No. of Notices: 16. Notice Date 01/25/2020. (Admin.) (Entered: 01/25/2020) |
| 01/25/2020 | 222 (3 pgs) | BNC Certificate of Mailing. (Related document(s):135 Order on Motion to Appear pro hac vice) No. of Notices: 16. Notice Date 01/25/2020. (Admin.) (Entered: 01/25/2020) |
| 01/25/2020 | 223 (36 pgs) | BNC Certificate of Mailing. (Related document(s):145 Order on Emergency Motion) No. of Notices: 32. Notice Date 01/25/2020. (Admin.) (Entered: 01/25/2020) |
| 01/25/2020 | 224 (86 pgs) | BNC Certificate of Mailing. (Related document(s):146 Order Setting Hearing) No. of Notices: 32. Notice Date 01/25/2020. (Admin.) (Entered: 01/25/2020) |
| 01/25/2020 | 225 (8 pgs) | BNC Certificate of Mailing. (Related document(s):149 Order on Emergency Motion) No. of Notices: 32. Notice Date 01/25/2020. |

| | | (Admin.) (Entered: 01/25/2020) |
|---|---|---|
| 01/25/2020 | 🔵 226<br>(8 pgs) | BNC Certificate of Mailing. (Related document(s):150 Order on Emergency Motion) No. of Notices: 32. Notice Date 01/25/2020. (Admin.) (Entered: 01/25/2020) |
| 01/25/2020 | 🔵 227<br>(5 pgs) | BNC Certificate of Mailing. (Related document(s):151 Order on Emergency Motion) No. of Notices: 32. Notice Date 01/25/2020. (Admin.) (Entered: 01/25/2020) |
| 01/25/2020 | 🔵 228<br>(19 pgs) | BNC Certificate of Mailing. (Related document(s):152 Order on Emergency Motion) No. of Notices: 32. Notice Date 01/25/2020. (Admin.) (Entered: 01/25/2020) |
| 01/25/2020 | 🔵 229<br>(9 pgs) | BNC Certificate of Mailing. (Related document(s):153 Order Setting Hearing) No. of Notices: 32. Notice Date 01/25/2020. (Admin.) (Entered: 01/25/2020) |
| 01/25/2020 | 🔵 230<br>(7 pgs) | BNC Certificate of Mailing. (Related document(s):154 Order on Emergency Motion) No. of Notices: 32. Notice Date 01/25/2020. (Admin.) (Entered: 01/25/2020) |
| 01/25/2020 | 🔵 231<br>(42 pgs) | BNC Certificate of Mailing. (Related document(s):155 Order on Emergency Motion) No. of Notices: 32. Notice Date 01/25/2020. (Admin.) (Entered: 01/25/2020) |
| 01/25/2020 | 🔵 232<br>(16 pgs) | BNC Certificate of Mailing. (Related document(s):156 Order on Emergency Motion) No. of Notices: 32. Notice Date 01/25/2020. (Admin.) (Entered: 01/25/2020) |
| 01/25/2020 | 🔵 233<br>(18 pgs) | BNC Certificate of Mailing. (Related document(s):157 Order on Emergency Motion) No. of Notices: 32. Notice Date 01/25/2020. (Admin.) (Entered: 01/25/2020) |
| 01/25/2020 | 🔵 234<br>(13 pgs) | BNC Certificate of Mailing. (Related document(s):158 Order on Emergency Motion) No. of Notices: 32. Notice Date 01/25/2020. (Admin.) (Entered: 01/25/2020) |
| 01/25/2020 | 🔵 235<br>(74 pgs) | BNC Certificate of Mailing. (Related document(s):160 Order Setting Hearing) No. of Notices: 32. Notice Date 01/25/2020. (Admin.) (Entered: 01/25/2020) |
| 01/27/2020 | 🔵 236<br>(1 pg) | Notice of Filing of Official Transcript as to 213 Transcript. Parties notified (Related document(s):213 Transcript) (jdav) (Entered: 01/27/2020) |
| 01/27/2020 | 🔵 237<br>(2 pgs) | Letter from shareholder Staffan Bonnier (JeannieAndresen) (Entered: 01/27/2020) |
| 01/27/2020 | 🔵 239<br>(3 pgs) | Notice of Appearance and Request for Notice Filed by T. Josh Judd Filed by on behalf of Gerab National Enterprises LLC (Judd, T.) (Entered: 01/27/2020) |
| 01/27/2020 | 🔵 240<br>(1 pg) | Notice *of Withdrawal of Notice of Appearance*. (Related document(s):30 Notice of Appearance) Filed by Bo-Mac Contractors, Ltd. (Judd, T.) (Entered: 01/27/2020) |

| 01/27/2020 | ● 241<br>(2 pgs) | Notice of Appearance and Request for Notice Filed by Alexander Rafael Perez Filed by on behalf of Foster, LLP (Perez, Alexander) (Entered: 01/27/2020) |
| 01/27/2020 | ● 242<br>(1 pg) | Motion to Appear pro hac vice *for Sam H. Poteet, Jr.*. Filed by Creditors Federal Insurance Company, Fianzas Monterrey, S.A., Westchester Fire Insurance Company (Collins, Michael) (Entered: 01/27/2020) |
| 01/27/2020 | ● 243<br>(3 pgs) | Notice of Appearance and Request for Notice Filed by Lloyd A. Lim Filed by on behalf of Puffer-Sweiven LP (Lim, Lloyd) (Entered: 01/27/2020) |
| 01/28/2020 | ● 244<br>(1 pg) | Letter from Shareholder Jason Morris (JeannieAndresen) (Entered: 01/28/2020) |
| 01/28/2020 | ● 245<br>(1 pg) | Letter from Shareholder Daniel Gad (JeannieAndresen) (Entered: 01/28/2020) |
| 01/28/2020 | ● 246<br>(1 pg) | Order Granting Motion To Appear pro hac vice - Gerardo Mijares-Shafai (Related Doc # 164) Signed on 1/28/2020. (emiller) (Entered: 01/28/2020) |
| 01/28/2020 | ● 247<br>(1 pg) | Order Granting Motion To Appear pro hac vice - Rosa J. Evergreen (Related Doc # 165) Signed on 1/28/2020. (emiller) (Entered: 01/28/2020) |
| 01/28/2020 | ● 248<br>(1 pg) | Order Granting Motion To Appear pro hac vice - Morgan L. Patterson (Related Doc # 173) Signed on 1/28/2020. (emiller) (Entered: 01/28/2020) |
| 01/28/2020 | ● 249<br>(1 pg) | Order Granting Motion To Appear pro hac vice - Matthew P. Ward (Related Doc # 174) Signed on 1/28/2020. (emiller) (Entered: 01/28/2020) |
| 01/28/2020 | ● 250<br>(1 pg) | Order Granting Motion To Appear pro hac vice - Danielle Mashburn-Myrick (Related Doc # 179) Signed on 1/28/2020. (emiller) (Entered: 01/28/2020) |
| 01/28/2020 | ● 251<br>(1 pg) | Order Granting Motion To Appear pro hac vice - D. Tyler Nurnberg (Related Doc # 181) Signed on 1/28/2020. (emiller) (Entered: 01/28/2020) |
| 01/28/2020 | ● 252<br>(1 pg) | Order Granting Motion To Appear pro hac vice - Alexandra J. Kirincic (Related Doc # 182) Signed on 1/28/2020. (emiller) (Entered: 01/28/2020) |
| 01/28/2020 | ● 253<br>(1 pg) | Letter/Motion to Intervene and Access to Filing System. Objections/Request for Hearing Due in 21 days. Filed by Interested Party Michael Van Deelen (BrendaLacy) (Entered: 01/28/2020) |
| 01/28/2020 | ● 254<br>(1 pg) | Order Granting Motion To Appear pro hac vice - Sam H. Poteet, Jr. (Related Doc # 242) Signed on 1/28/2020. (emiller) (Entered: 01/28/2020) |
| 01/28/2020 | ● 255<br>(3 pgs) | Notice of Appearance and Request for Notice Filed by Craig E Power Filed by on behalf of David E. Harvey Builders, Inc. (Power, Craig) (Entered: 01/28/2020) |
| 01/28/2020 | ● 256<br>(2 pgs) | Notice of Appearance and Request for Notice Filed by Katharine Battaia Clark Filed by on behalf of Sundyne, LLC (Clark, Katharine) (Entered: 01/28/2020) |
| | ● | |

| 01/28/2020 | 257<br>(1 pg) | Motion to Appear pro hac vice *of Courtney E. Jackson*. Filed by Creditor Sundyne, LLC (Clark, Katharine) (Entered: 01/28/2020) |
| 01/29/2020 | 258<br>(4 pgs) | Notice of Appearance and Request for Notice Filed by Sharon Marie Beausoleil Filed by on behalf of Glander International Bunkering, Inc., Dan-Bunkering (America), Inc. (Beausoleil, Sharon) (Entered: 01/29/2020) |
| 01/29/2020 | 259<br>(1 pg) | Motion to Appear pro hac vice *Michael J. Small*. Filed by Creditors Dan-Bunkering (America), Inc., Glander International Bunkering, Inc. (Small, Michael) (Entered: 01/29/2020) |
| 01/29/2020 | 260<br>(4 pgs) | BNC Certificate of Mailing. (Related document(s):236 Notice of Filing of Official Transcript (Form)) No. of Notices: 37. Notice Date 01/29/2020. (Admin.) (Entered: 01/29/2020) |
| 01/30/2020 | 261<br>(2 pgs) | Notice of Appearance and Request for Notice Filed by Alan H Katz Filed by on behalf of Entergy Texas, Inc (Katz, Alan) (Entered: 01/30/2020) |
| 01/30/2020 | 262<br>(6 pgs) | Notice *Proof of Interest and Request for Service of Papers*. Filed by Michael D Deelen (hler) (Entered: 01/30/2020) |
| 01/30/2020 | 263<br>(1 pg) | Motion to Appear pro hac vice - *James M. Liston*. Filed by Creditor BAC Canton Holdings LLC (MelissaMorgan) (Entered: 01/30/2020) |
| 01/30/2020 | 264<br>(2 pgs) | Notice of Appearance and Request for Notice Filed by Alan H Katz, Omer F Kuebel III Filed by on behalf of Entergy Texas, Inc (Kuebel, Omer) (Entered: 01/30/2020) |
| 01/30/2020 | 265<br>(12 pgs) | Notice *of Filing of Revised Exhibit to Disclosure Statement for the Joint Prepackaged Chapter 11 Plan of Reorganization of McDermott International, Inc. and Its Debtor Affiliates*. (Related document(s):4 Disclosure Statement) Filed by McDermott International, Inc. (Cavenaugh, Matthew) (Entered: 01/30/2020) |
| 01/30/2020 | 266<br>(8 pgs) | Affidavit Re: *(Publication) of Keenan K. Baldeo Regarding the Notice of Commencement of Prepackaged Chapter 11 Bankruptcy Cases and Hearing on the Disclosure Statement and Confirmation on the Joint Prepackaged Chapter 11 Plan*.. Filed by Prime Clerk LLC (Steele, Benjamin) (Entered: 01/30/2020) |
| 01/30/2020 | 267<br>(4 pgs) | BNC Certificate of Mailing. (Related document(s):246 Order on Motion to Appear pro hac vice) No. of Notices: 38. Notice Date 01/30/2020. (Admin.) (Entered: 01/30/2020) |
| 01/30/2020 | 268<br>(4 pgs) | BNC Certificate of Mailing. (Related document(s):247 Order on Motion to Appear pro hac vice) No. of Notices: 38. Notice Date 01/30/2020. (Admin.) (Entered: 01/30/2020) |
| 01/30/2020 | 269<br>(4 pgs) | BNC Certificate of Mailing. (Related document(s):248 Order on Motion to Appear pro hac vice) No. of Notices: 38. Notice Date 01/30/2020. (Admin.) (Entered: 01/30/2020) |
| 01/30/2020 | 270<br>(4 pgs) | BNC Certificate of Mailing. (Related document(s):249 Order on Motion to Appear pro hac vice) No. of Notices: 38. Notice Date 01/30/2020. (Admin.) (Entered: 01/30/2020) |

001010

| | | |
|---|---|---|
| 01/30/2020 | ● 271 (4 pgs) | BNC Certificate of Mailing. (Related document(s):250 Order on Motion to Appear pro hac vice) No. of Notices: 38. Notice Date 01/30/2020. (Admin.) (Entered: 01/30/2020) |
| 01/30/2020 | ● 272 (4 pgs) | BNC Certificate of Mailing. (Related document(s):251 Order on Motion to Appear pro hac vice) No. of Notices: 38. Notice Date 01/30/2020. (Admin.) (Entered: 01/30/2020) |
| 01/30/2020 | ● 273 (4 pgs) | BNC Certificate of Mailing. (Related document(s):252 Order on Motion to Appear pro hac vice) No. of Notices: 38. Notice Date 01/30/2020. (Admin.) (Entered: 01/30/2020) |
| 01/30/2020 | ● 274 (4 pgs) | BNC Certificate of Mailing. (Related document(s):254 Order on Motion to Appear pro hac vice) No. of Notices: 44. Notice Date 01/30/2020. (Admin.) (Entered: 01/30/2020) |
| 01/31/2020 | ● | Previous case filed in the USBC SD/NY, Case Number 17-10761. (mmap) (Entered: 01/31/2020) |
| 01/31/2020 | ● 275 (7 pgs) | Letter from Shareholder TM Kumar (JeannieAndresen) (Entered: 01/31/2020) |
| 01/31/2020 | ● 276 (9 pgs) | Statement *of Paul, Weiss, Rifkind, Wharton & Garrison LLP, Brown Rudnick LLP and Rapp & Krock, PC, Pursuant to Fed. R. Bankr. P. 2019* (Filed By Ad Hoc Noteholder Groups ). (Flores, Henry) (Entered: 01/31/2020) |
| 01/31/2020 | ● 277 (87 pgs; 3 docs) | Motion *for Entry of an Order (I) Authorizing Assumption of the Existing Insurance Programs, (II) Authorizing the Debtors to Enter Into the New Insurance Programs, and (III) Granting Related Relief* Filed by Debtor McDermott International, Inc. (Attachments: # 1 Exhibit A and B # 2 Proposed Order) (Cavenaugh, Matthew) (Entered: 01/31/2020) |
| 01/31/2020 | ● 278 | Sealed Document *Creditor Matrix* (Filed By McDermott International, Inc. ). (Cavenaugh, Matthew) (Entered: 01/31/2020) |
| 01/31/2020 | ● 281 (1 pg) | Letter from John D. Scott (MelissaMorgan) (Entered: 02/03/2020) |
| 01/31/2020 | ● 282 (1 pg) | Letter from John D. Scott re: Objection (MelissaMorgan) (Entered: 02/03/2020) |
| 02/03/2020 | ● 283 (1 pg) | Order Granting Motion To Appear pro hac vice -- Courtney E. Jackson (Related Doc # 257) Signed on 2/3/2020. (VrianaPortillo) (Entered: 02/03/2020) |
| 02/03/2020 | ● 284 (1 pg) | Order Granting Motion To Appear pro hac vice -- Michael J. Small (Related Doc # 259) Signed on 2/3/2020. (VrianaPortillo) (Entered: 02/03/2020) |
| 02/03/2020 | ● 285 (9 pgs) | Statement *Amended Verified Statement of Paul, Weiss, Rifkind, Wharton & Garrison LLP, Brown Rudnick LLP and Rapp & Krock, PC Pursuant to Fed. R. Bankr. P. 2019* (Filed By Ad Hoc Noteholder Groups ). (Flores, Henry) (Entered: 02/03/2020) |

| 02/03/2020 | 286 (1 pg) | Order Granting Motion To Appear pro hac vice - James M. Prince (Related Doc # 263) Signed on 2/3/2020. (emiller) (Entered: 02/03/2020) |
| 02/03/2020 | 287 (4 pgs) | Letter from Shareholder Vishnu Kumar (JeannieAndresen) (Entered: 02/03/2020) |
| 02/03/2020 | 299 (2 pgs) | Notice of Appearance and Request for Notice Filed by Eboney Delane Cobb Filed by on behalf of Richardson ISD (JessicaVillarreal) (Entered: 02/05/2020) |
| 02/04/2020 | 288 (3 pgs; 2 docs) | Transfer of Claim Transfer Agreement 3001 (e) 2 Transferor: Atlas Copco Compressors LLC To Cowen Special Investments LLC Fee Amount $25 (Rosenblum, Gail) (Entered: 02/04/2020) |
| 02/04/2020 | 289 (3 pgs; 2 docs) | Transfer of Claim Transfer Agreement 3001 (e) 2 Transferor: Atlas Copco Compressors LLC To Cowen Special Investments LLC Fee Amount $25 (Rosenblum, Gail) (Entered: 02/04/2020) |
| 02/04/2020 | 290 (4 pgs) | Notice of Appearance and Request for Notice Filed by Simon Richard Mayer Filed by on behalf of Barclays Bank PLC (Mayer, Simon) (Entered: 02/04/2020) |
| 02/04/2020 | 291 (1 pg) | Motion to Appear pro hac vice *Jon David Kelley*. Filed by Debtor McDermott International, Inc. (Cavenaugh, Matthew) (Entered: 02/04/2020) |
| 02/04/2020 | 292 (1 pg) | Motion to Appear pro hac vice *Andrew R. McGaan*. Filed by Debtor McDermott International, Inc. (Cavenaugh, Matthew) (Entered: 02/04/2020) |
| 02/04/2020 | 293 (4 pgs) | Notice of Appearance and Request for Notice Filed by John E Mitchell Filed by on behalf of W-Industries of Texas LLC (Mitchell, John) (Entered: 02/04/2020) |
| 02/04/2020 | 294 (1 pg) | Motion to Appear pro hac vice *(Amos U. Priester, IV)*. Filed by Creditor Duke Energy Progress, LLC (Cornwell, John) (Entered: 02/04/2020) |
| 02/04/2020 | 295 (3 pgs) | Notice of Appearance and Request for Notice Filed by John David Cornwell Filed by on behalf of Duke Energy Progress, LLC (Cornwell, John) (Entered: 02/04/2020) |
| 02/04/2020 | 296 (2 pgs) | Notice of Appearance and Request for Notice Filed by Shawn M Christianson Filed by on behalf of Oracle America, Inc. (Christianson, Shawn) (Entered: 02/04/2020) |
| 02/04/2020 | 297 (57 pgs) | Notice *Under Section 546(b) of Perfection of Interest in Property*. Filed by Harvey Gulf International Marine, LLC (Cheatham, Robin) (Entered: 02/04/2020) |
| 02/04/2020 | 305 (1 pg) | Declaration for Electronic Filing and Statement of Social Security Number Filed. Does this document change the social security number for one or more debtors? No. Has the Meeting of Creditors been set in this case? No. (JessicaVillarreal) (Entered: 02/05/2020) |
| 02/04/2020 | 306 | Motion to Appear pro hac vice *(Hamid R. Rafatjoo)*. Filed by Creditor |

| | | |
|---|---|---|
| | (1 pg) | Maire Tecnimont SPA and MET Gas Processing Technologies SPA (LupitaCorbett) (Entered: 02/05/2020) |
| 02/04/2020 | 311 (1 pg) | Declaration re: *For Electronic Filing Of Bankruptcy Petition And Master Mailing List (MATRIX)* (Filed By Chicago Bridge & Iron Company ). (bmendoza) (Entered: 02/06/2020) |
| 02/04/2020 | 313 (1 pg) | Declaration re: *DECLARATION FOR ELECTRONIC FILING OF BANKRUPTCY PETITION AND MASTER MAILING LIST (MATRIX)* (Filed By J. Ray McDermott Solutions, Inc. ). (bmendoza) (Entered: 02/06/2020) |
| 02/04/2020 | 316 (1 pg) | Declaration re: *DECLARATION FOR ELECTRONIC FILING OF BANKRUPTCY PETITION AND MASTER MAILING LIST (MATRIX)* (Filed By J. Ray McDermott Technology, Inc. ). (bmendoza) (Entered: 02/06/2020) |
| 02/04/2020 | 317 (1 pg) | Declaration for Electronic Filing and Statement of Social Security Number Filed. Does this document change the social security number for one or more debtors? No. Has the Meeting of Creditors been set in this case? No. (JessicaVillarreal) (Entered: 02/06/2020) |
| 02/04/2020 | 318 (1 pg) | Declaration for Electronic Filing and Statement of Social Security Number Filed. Does this document change the social security number for one or more debtors? No. Has the Meeting of Creditors been set in this case? No. (JessicaVillarreal) (Entered: 02/06/2020) |
| 02/04/2020 | 319 (1 pg) | Declaration for Electronic Filing and Statement of Social Security Number Filed. Does this document change the social security number for one or more debtors? No. Has the Meeting of Creditors been set in this case? No. (JessicaVillarreal) (Entered: 02/06/2020) |
| 02/04/2020 | 320 (1 pg) | Declaration for Electronic Filing and Statement of Social Security Number Filed. Does this document change the social security number for one or more debtors? No. Has the Meeting of Creditors been set in this case? No. (JessicaVillarreal) (Entered: 02/06/2020) |
| 02/04/2020 | 321 (1 pg) | Declaration for Electronic Filing and Statement of Social Security Number Filed. Does this document change the social security number for one or more debtors? No. Has the Meeting of Creditors been set in this case? No. (JessicaVillarreal) (Entered: 02/06/2020) |
| 02/04/2020 | 322 (1 pg) | Declaration for Electronic Filing and Statement of Social Security Number Filed. Does this document change the social security number for one or more debtors? No. Has the Meeting of Creditors been set in this case? No. (JessicaVillarreal) (Entered: 02/06/2020) |
| 02/04/2020 | 323 (1 pg) | Declaration for Electronic Filing and Statement of Social Security Number Filed. Does this document change the social security number for one or more debtors? No. Has the Meeting of Creditors been set in this case? No. (JessicaVillarreal) (Entered: 02/06/2020) |
| 02/04/2020 | 324 (1 pg) | Declaration for Electronic Filing and Statement of Social Security Number Filed. Does this document change the social security number for one or more debtors? No. Has the Meeting of Creditors been set in this case? No. (JessicaVillarreal) (Entered: 02/06/2020) |

| | | |
|---|---|---|
| 02/04/2020 | 🌐 325<br>(1 pg) | Declaration for Electronic Filing and Statement of Social Security Number Filed. Does this document change the social security number for one or more debtors? No. Has the Meeting of Creditors been set in this case? No. (JessicaVillarreal) (Entered: 02/06/2020) |
| 02/04/2020 | 🌐 326<br>(1 pg) | Declaration re: *DECLARATION FOR ELECTRONIC FILING OF BANKRUPTCY PETITION AND MASTER MAILING LIST (MATRIX)* (Filed By J. Ray McDermott Underwater Services, Inc. ). (bmendoza) (Entered: 02/06/2020) |
| 02/04/2020 | 🌐 327<br>(1 pg) | Declaration re: *DECLARATION FOR ELECTRONIC FILING OF BANKRUPTCY PETITION AND MASTER MAILING LIST (MATRIX)* (Filed By J. Ray McDermott, S.A. ). (bmendoza) (Entered: 02/06/2020) |
| 02/04/2020 | 🌐 328<br>(53 pgs; 53 docs) | Declaration re: *Electronic Filing of Bankruptcy Petition and Matrix* (Filed By McDermott International, Inc. ).(Related document(s):1 Voluntary Petition (Chapter 11)) (Attachments: # 1 20-30449 # 2 20-30474 # 3 20-30480 # 4 20-30335 # 5 20-30495 # 6 20-30453 # 7 20-30482 # 8 20-30384 # 9 20-30387 # 10 20-30383 # 11 20-30395 # 12 20-30389 # 13 20-30388 # 14 20-30399 # 15 20-30397 # 16 20-30405 # 17 20-30391 # 18 20-30505 # 19 20-30372 # 20 20-30509 # 21 20-30377 # 22 20-30513 # 23 20-30385 # 24 20-30390 # 25 20-30394 # 26 20-30392 # 27 20-30517 # 28 20-30393 # 29 20-30519 # 30 20-30396 # 31 20-30524 # 32 20-30375 # 33 20-30381 # 34 20-30379 # 35 20-30526 # 36 20-30539 # 37 20-30543 # 38 20-30547 # 39 20-30530 # 40 20-30531 # 41 20-30536 # 42 20-30551 # 43 20-30542 # 44 20-30527 # 45 20-30529 # 46 20-30532 # 47 20-30554 # 48 20-30556 # 49 20-30557 # 50 20-30558 # 51 20-30559 # 52 20-30560) (sgue) Modified on 2/6/2020 (sgue). (Entered: 02/06/2020) |
| 02/04/2020 | 🌐 329<br>(1 pg) | Declaration re: *DECLARATION FOR ELECTRONIC FILING OF BANKRUPTCY PETITION AND MASTER MAILING LIST (MATRIX)* (Filed By Lealand Finance Company B.V. ). (bmendoza) (Entered: 02/06/2020) |
| 02/04/2020 | 🌐 330<br>(1 pg) | Declaration re: *DECLARATION FOR ELECTRONIC FILING OF BANKRUPTCY PETITION AND MASTER MAILING LIST (MATRIX)* (Filed By Lummus Arabia Ltd. Co. ). (bmendoza) (Entered: 02/06/2020) |
| 02/04/2020 | 🌐 331<br>(1 pg) | Declaration re: *DECLARATION FOR ELECTRONIC FILING OF BANKRUPTCY PETITION AND MASTER MAILING LIST (MATRIX)* (Filed By Lummus Consultants International Limited ). (bmendoza) (Entered: 02/06/2020) |
| 02/04/2020 | 🌐 332<br>(1 pg) | Declaration re: *DECLARATION FOR ELECTRONIC FILING OF BANKRUPTCY PETITION AND MASTER MAILING LIST (MATRIX)* (Filed By Lummus Gasification Technology Licensing LLC ). (bmendoza) (Entered: 02/06/2020) |
| 02/04/2020 | 🌐 333<br>(1 pg) | Declaration re: *DECLARATION FOR ELECTRONIC FILING OF BANKRUPTCY PETITION AND MASTER MAILING LIST (MATRIX)* (Filed By Lummus Technology Heat Transfer B.V. ). (bmendoza) (Entered: 02/06/2020) |
| 02/04/2020 | 🌐 334<br>(1 pg) | Declaration re: *DECLARATION FOR ELECTRONIC FILING OF BANKRUPTCY PETITION AND MASTER MAILING LIST (MATRIX)* |

| | | |
|---|---|---|
| | | (Filed By Lummus Technology International, LLC ). (bmendoza) (Entered: 02/06/2020) |
| 02/04/2020 | 🔵 335<br>(1 pg) | Declaration re: *DECLARATION FOR ELECTRONIC FILING OF BANKRUPTCY PETITION AND MASTER MAILING LIST (MATRIX)* (Filed By Lummus Technology LLC ). (bmendoza) (Entered: 02/06/2020) |
| 02/04/2020 | 🔵 336<br>(1 pg) | Declaration re: *DECLARATION FOR ELECTRONIC FILING OF BANKRUPTCY PETITION AND MASTER MAILING LIST (MATRIX)* (Filed By Lummus Technology Overseas LLC ). (bmendoza) (Entered: 02/06/2020) |
| 02/04/2020 | 🔵 337<br>(1 pg) | Declaration re: *DECLARATION FOR ELECTRONIC FILING OF BANKRUPTCY PETITION AND MASTER MAILING LIST (MATRIX)* (Filed By Lummus Technology Services LLC ). (bmendoza) (Entered: 02/06/2020) |
| 02/04/2020 | 🔵 338<br>(1 pg) | Declaration re: *DECLARATION FOR ELECTRONIC FILING OF BANKRUPTCY PETITION AND MASTER MAILING LIST (MATRIX)* (Filed By Lummus Technology Ventures LLC ). (bmendoza) (Entered: 02/06/2020) |
| 02/04/2020 | 🔵 339<br>(1 pg) | Declaration re: *DECLARATION FOR ELECTRONIC FILING OF BANKRUPTCY PETITION AND MASTER MAILING LIST (MATRIX)* (Filed By Lutech Project Solutions B.V. ). (bmendoza) (Entered: 02/06/2020) |
| 02/04/2020 | 🔵 340<br>(1 pg) | Declaration re: *DECLARATION FOR ELECTRONIC FILING OF BANKRUPTCY PETITION AND MASTER MAILING LIST (MATRIX)* (Filed By Lutech Projects B.V. ). (bmendoza) (Entered: 02/06/2020) |
| 02/04/2020 | 🔵 341<br>(1 pg) | Declaration re: *DECLARATION FOR ELECTRONIC FILING OF BANKRUPTCY PETITION AND MASTER MAILING LIST (MATRIX)* (Filed By Lutech Resources B.V. ). (bmendoza) (Entered: 02/06/2020) |
| 02/04/2020 | 🔵 342<br>(1 pg) | Declaration re: *DECLARATION FOR ELECTRONIC FILING OF BANKRUPTCY PETITION AND MASTER MAILING LIST (MATRIX)* (Filed By Lutech Resources Canada Ltd. ). (bmendoza) (Entered: 02/06/2020) |
| 02/04/2020 | 🔵 343<br>(1 pg) | Declaration re: *DECLARATION FOR ELECTRONIC FILING OF BANKRUPTCY PETITION AND MASTER MAILING LIST (MATRIX)* (Filed By Lutech Resources Inc. ). (bmendoza) (Entered: 02/06/2020) |
| 02/04/2020 | 🔵 344<br>(1 pg) | Declaration re: *DECLARATION FOR ELECTRONIC FILING OF BANKRUPTCY PETITION AND MASTER MAILING LIST (MATRIX)* (Filed By Lutech Resources Limited ). (bmendoza) (Entered: 02/06/2020) |
| 02/04/2020 | 🔵 345<br>(1 pg) | Declaration re: *DECLARATION FOR ELECTRONIC FILING OF BANKRUPTCY PETITION AND MASTER MAILING LIST (MATRIX)* (Filed By Matrix Engineering, Ltd. ). (bmendoza) (Entered: 02/06/2020) |
| 02/04/2020 | 🔵 346 | Declaration re: *DECLARATION FOR ELECTRONIC FILING OF* |

| | | |
|---|---|---|
| | (1 pg) | *BANKRUPTCY PETITION AND MASTER MAILING LIST (MATRIX)* (Filed By McDermott (Amazon Chartering), Inc. ). (bmendoza) (Entered: 02/06/2020) |
| 02/04/2020 | 347 (1 pg) | Declaration re: *DECLARATION FOR ELECTRONIC FILING OF BANKRUPTCY PETITION AND MASTER MAILING LIST (MATRIX)* (Filed By Shaw NC Company, Inc. ). (bmendoza) (Entered: 02/06/2020) |
| 02/04/2020 | 348 (1 pg) | Declaration re: *DECLARATION FOR ELECTRONIC FILING OF BANKRUPTCY PETITION AND MASTER MAILING LIST (MATRIX)* (Filed By Shaw Nuclear Energy Holdings (UK), Inc. ). (bmendoza) (Entered: 02/06/2020) |
| 02/04/2020 | 349 (1 pg) | Declaration re: *DECLARATION FOR ELECTRONIC FILING OF BANKRUPTCY PETITION AND MASTER MAILING LIST (MATRIX)* (Filed By Shaw Overseas (Middle East) Ltd. ). (bmendoza) (Entered: 02/06/2020) |
| 02/04/2020 | 350 (1 pg) | Declaration re: *DECLARATION FOR ELECTRONIC FILING OF BANKRUPTCY PETITION AND MASTER MAILING LIST (MATRIX)* (Filed By Shaw Power Delivery Systems, Inc. ). (bmendoza) (Entered: 02/06/2020) |
| 02/04/2020 | doc (1 pg) | Declaration for Electronic Filing Of Bankruptcy Petition and Master Mailing List (Matrix), (LupitaCorbett) Additional attachment(s) added on 2/6/2020 (LupitaCorbett). (Entered: 02/06/2020) |
| 02/04/2020 | | Declaration for Electronic Filing Of Bankruptcy Petition and Master Mailing List (Matrix), (Filed By Shaw Process Fabricators, Inc., 20-30537(DRJ)) (LupitaCorbett) (Entered: 02/06/2020) |
| 02/04/2020 | doc (1 pg) | Declaration for Electronic Filing of Bankruptcy Petition and Master Mailing List (Matrix), (Filed By Shaw Services, L.L.C., 20-30541(DRJ))(LupitaCorbett) Additional attachment(s) added on 2/6/2020 (LupitaCorbett). (Entered: 02/06/2020) |
| 02/04/2020 | | Declaration for Electronic Filing Of Bankruptcy Petition and Master Mailing List (Matrix), (Filed By Shaw SSS Fabricators, Inc., 20-30546(DRJ)) (LupitaCorbett) (Entered: 02/06/2020) |
| 02/05/2020 | 298 (1 pg) | Motion to Appear pro hac vice *Scott A. Zuber*. Filed by Creditor Euler Hermes North America Insurance Company (Laney Hill, Anne) (Entered: 02/05/2020) |
| 02/05/2020 | 300 (1 pg) | Order Granting Motion To Appear pro hac vice -- Kimberly E. Neureiter (Related Doc # 279) Signed on 2/5/2020. (VrianaPortillo) (Entered: 02/05/2020) |
| 02/05/2020 | 301 (1 pg) | Order Granting Motion To Appear pro hac vice -- Hannah Leah Uricchio (Related Doc # 280) Signed on 2/5/2020. (VrianaPortillo) (Entered: 02/05/2020) |
| 02/05/2020 | 302 (1 pg) | Order Granting Motion To Appear pro hac vice -- Jon David Kelley (Related Doc # 291) Signed on 2/5/2020. (VrianaPortillo) (Entered: 02/05/2020) |

| 02/05/2020 | 🔵 303<br>(1 pg) | Order Granting Motion To Appear pro hac vice -- Andrew R. McGaan (Related Doc # 292) Signed on 2/5/2020. (VrianaPortillo) (Entered: 02/05/2020) |
|---|---|---|
| 02/05/2020 | 🔵 304<br>(1 pg) | Order Granting Motion To Appear pro hac vice -- Amos U. Priester, IV (Related Doc # 294) Signed on 2/5/2020. (VrianaPortillo) (Entered: 02/05/2020) |
| 02/05/2020 | 307<br>(338 pgs) | Affidavit Re: *Mailings for the Period from January 25, 2020 through February 3, 2020, including Affidavits of Publication of Notice of Disclosure Procedures Applicable to Certain Holder of Common Stock and Preferred Stock, Disclosure Procedures for Transfers of and Declarations of Worthlessness With Respect to Common Stock and Preferred Stock and Notice of Auction for the Sale of the Lummus Assets and Interests.* (related document(s):4 Disclosure Statement, 13 Emergency Motion, 15 Emergency Motion, 27 Emergency Motion, 29 Declaration, 56 Declaration, 57 Order for Joint Administration, 62 Declaration, 67 Order on Emergency Motion, 109 Generic Order, 110 Generic Motion, 121 Amended Chapter 11 Plan, 123 Proposed Order, 124 Proposed Order, 137 Proposed Order, 138 Proposed Order, 139 Proposed Order, 140 Proposed Order, 141 Proposed Order, 145 Order on Emergency Motion, 146 Order Setting Hearing, 147 Order Setting Hearing, 149 Order on Emergency Motion, 150 Order on Emergency Motion, 151 Order on Emergency Motion, 152 Order on Emergency Motion, 153 Order Setting Hearing, 154 Order on Emergency Motion, 155 Order on Emergency Motion, 156 Order on Emergency Motion, 157 Order on Emergency Motion, 158 Order on Emergency Motion, 160 Order Setting Hearing, 265 Notice, 277 Generic Motion). Filed by Prime Clerk LLC (Steele, Benjamin) (Entered: 02/05/2020) |
| 02/05/2020 | 🔵 308<br>(8 pgs) | BNC Certificate of Mailing. (Related document(s):283 Order on Motion to Appear pro hac vice) No. of Notices: 270. Notice Date 02/05/2020. (Admin.) (Entered: 02/05/2020) |
| 02/05/2020 | 🔵 309<br>(8 pgs) | BNC Certificate of Mailing. (Related document(s):284 Order on Motion to Appear pro hac vice) No. of Notices: 270. Notice Date 02/05/2020. (Admin.) (Entered: 02/05/2020) |
| 02/05/2020 | 🔵 310<br>(8 pgs) | BNC Certificate of Mailing. (Related document(s):286 Order on Motion to Appear pro hac vice) No. of Notices: 270. Notice Date 02/05/2020. (Admin.) (Entered: 02/05/2020) |
| 02/05/2020 | 🔵 351<br>(1 pg) | Motion to Appear pro hac vice . Filed by Creditor Pension Benefit Guaranty Corporation (JessicaVillarreal) (Entered: 02/06/2020) |
| 02/05/2020 | 🔵 352<br>(1 pg) | Motion to Appear pro hac vice . Filed by Creditor Pension Benefit Guaranty Corporation (JessicaVillarreal) (Entered: 02/06/2020) |
| 02/06/2020 | 🔵 312<br>(1 pg) | Motion to Appear pro hac vice *Christopher T. Caplinger*. Filed by Interested Party Travelers Indemity Company (Kadden, Benjamin) (Entered: 02/06/2020) |
| 02/06/2020 | 🔵 314<br>(1 pg) | Motion to Appear pro hac vice *Kristopher T. Wilson*. Filed by Interested Party Travelers Indemity Company (Kadden, Benjamin) (Entered: 02/06/2020) |

| 02/06/2020 | 315 (1 pg) | Motion to Appear pro hac vice *Coleman Torrans*. Filed by Interested Party Travelers Indemnity Company (Kadden, Benjamin) (Entered: 02/06/2020) |
|---|---|---|
| 02/06/2020 | 353 (10 pgs) | BNC Certificate of Mailing. (Related document(s):288 Transfer of Claim) No. of Notices: 1. Notice Date 02/06/2020. (Admin.) (Entered: 02/07/2020) |
| 02/06/2020 | 354 (10 pgs) | BNC Certificate of Mailing. (Related document(s):289 Transfer of Claim) No. of Notices: 1. Notice Date 02/06/2020. (Admin.) (Entered: 02/07/2020) |
| 02/07/2020 | 355 (1 pg) | Notice of Appearance and Request for Notice Filed by Annie E Catmull Filed by on behalf of Oracle America, Inc. (Catmull, Annie) (Entered: 02/07/2020) |
| 02/07/2020 | 356 (24 pgs) | Certificate *of Service* (Filed By Oracle America, Inc. ).(Related document(s):355 Notice of Appearance) (Catmull, Annie) (Entered: 02/07/2020) |
| 02/07/2020 | 357 (3 pgs) | Notice of Appearance and Request for Notice Filed by Charles Stephen Kelley Filed by on behalf of Commercial Bank of Dubai (Kelley, Charles) (Entered: 02/07/2020) |
| 02/07/2020 | 358 (106 pgs) | Notice *of Filing of Revised Rights Offering Procedures*. (Related document(s):160 Order Setting Hearing) Filed by McDermott International, Inc. (Cavenaugh, Matthew) (Entered: 02/07/2020) |
| 02/07/2020 | 359 (5 pgs) | Notice of Appearance and Request for Notice Filed by Michael Seth Etkin Filed by on behalf of Public Employees' Retirement System of Mississippi ("Lead Plaintiff") (Etkin, Michael) (Entered: 02/07/2020) |
| 02/07/2020 | 360 (8 pgs) | BNC Certificate of Mailing. (Related document(s):300 Order on Motion to Appear pro hac vice) No. of Notices: 275. Notice Date 02/07/2020. (Admin.) (Entered: 02/07/2020) |
| 02/07/2020 | 361 (8 pgs) | BNC Certificate of Mailing. (Related document(s):301 Order on Motion to Appear pro hac vice) No. of Notices: 275. Notice Date 02/07/2020. (Admin.) (Entered: 02/07/2020) |
| 02/07/2020 | 362 (8 pgs) | BNC Certificate of Mailing. (Related document(s):302 Order on Motion to Appear pro hac vice) No. of Notices: 275. Notice Date 02/07/2020. (Admin.) (Entered: 02/07/2020) |
| 02/07/2020 | 363 (8 pgs) | BNC Certificate of Mailing. (Related document(s):303 Order on Motion to Appear pro hac vice) No. of Notices: 275. Notice Date 02/07/2020. (Admin.) (Entered: 02/07/2020) |
| 02/07/2020 | 364 (8 pgs) | BNC Certificate of Mailing. (Related document(s):304 Order on Motion to Appear pro hac vice) No. of Notices: 275. Notice Date 02/07/2020. (Admin.) (Entered: 02/07/2020) |
| 02/07/2020 | 369 (1 pg) | Motion to Appear pro hac vice *for Slalom, LLC*. Filed by Creditor Slalom, LLC (ClaudiaGutierrez) (Entered: 02/11/2020) |
| 02/10/2020 | 365 | Notice of Appearance and Request for Notice Filed by Howard Marc |

| 02/10/2020 | | (2 pgs) | Spector Filed by on behalf of 2103 Research Forest Holding Company, LLC (Spector, Howard) (Entered: 02/10/2020) |
| 02/10/2020 | ⬤366 (16 pgs) | Notice *of Withdrawal of Notice Under Section 546(b) of Perfection of Interest in Property*. (Related document(s):297 Notice) Filed by Harvey Gulf International Marine, LLC (Cheatham, Robin) (Entered: 02/10/2020) |
| 02/10/2020 | ⬤367 (64 pgs; 2 docs) | Emergency Motion *for Entry of an Order (I) Authorizing and Approving the Debtors' (A) Key Employee Incentive Plan and (B) Key Employee Retention Plan and (II) Granting Related Relief* Filed by Debtor McDermott International, Inc. (Attachments: # 1 Proposed Order) (Cavenaugh, Matthew) (Entered: 02/10/2020) |
| 02/10/2020 | ⬤368 (110 pgs; 2 docs) | Emergency Motion *for Entry of an Order Authorizing the Debtors to Retain and Employ Ernst & Young LLP as Auditors* Filed by Debtor McDermott International, Inc. (Attachments: # 1 Proposed Order) (Cavenaugh, Matthew) (Entered: 02/10/2020) |
| 02/11/2020 | ⬤370 (3 pgs) | Affidavit Re: *of Andrew Q. Chan Regarding Claim Transfer Notices*. (related document(s):288 Transfer of Claim, 289 Transfer of Claim). Filed by Prime Clerk LLC (Steele, Benjamin) (Entered: 02/11/2020) |
| 02/11/2020 | ⬤371 (1 pg) | Order Granting Motion To Appear pro hac vice -- Scott A. Zuber (Related Doc # 298) Signed on 2/11/2020. (VrianaPortillo) (Entered: 02/11/2020) |
| 02/11/2020 | ⬤372 (1 pg) | Order Granting Motion To Appear pro hac vice -- Hamid R. Rafatjoo (Related Doc # 306) Signed on 2/11/2020. (VrianaPortillo) (Entered: 02/11/2020) |
| 02/11/2020 | ⬤373 (3 pgs) | Notice of Appearance and Request for Notice Filed by J Michael Sutherland Filed by on behalf of CTCI Corp. (Taiwan) (Sutherland, J) (Entered: 02/11/2020) |
| 02/12/2020 | ⬤374 (2 pgs) | Notice of Appearance and Request for Notice Filed by Tricia Macaluso Filed by on behalf of Amiad USA Inc. (Macaluso, Tricia) (Entered: 02/12/2020) |
| 02/12/2020 | ⬤375 (2 pgs) | Notice of Appearance and Request for Notice Filed by George A. Kurisky Jr. Filed by on behalf of Eutex International (Kurisky, George) (Entered: 02/12/2020) |
| 02/12/2020 | ⬤376 (2 pgs) | Notice of Appearance and Request for Notice Filed by Aaron Matthew Guerrero Filed by on behalf of Intergraph Corporation d/b/a Hexagon PPM (Guerrero, Aaron) (Entered: 02/12/2020) |
| 02/12/2020 | ⬤377 (3814 pgs; 2 docs) | Notice *of Filing Creditor Matrix*. (Related document(s):151 Order on Emergency Motion) Filed by McDermott International, Inc. (Attachments: # 1 Creditor Matrix) (Cavenaugh, Matthew) (Entered: 02/12/2020) |
| 02/12/2020 | ⬤378 (1 pg) | Motion to Appear pro hac vice *of Joanne Molinaro*. Filed by Creditor ITT Goulds Pumps (Riordan, Michael) (Entered: 02/12/2020) |
| 02/12/2020 | ⬤379 | Notice of Appearance and Request for Notice Filed by Michael Kevin |

| | | Riordan Filed by on behalf of ITT Goulds Pumps (Riordan, Michael) (Entered: 02/12/2020) |
|---|---|---|
| 02/12/2020 | 🔵 380<br>(3 pgs) | Notice of Appearance and Request for Notice Filed by Michael Kevin Riordan Filed by on behalf of ITT Goulds Pumps (Riordan, Michael) (Entered: 02/12/2020) |
| 02/12/2020 | 🔵 381<br>(1 pg) | Motion to Appear pro hac vice *(Carollynn H.G. Callari)*. Filed by Creditor Maire Tecnimont SPA and MET Gas Processing Technologies SPA (Rafatjoo, Hamid) (Entered: 02/12/2020) |
| 02/12/2020 | 🔵 382<br>(10 pgs) | Objection *Limited Objection to Debtor's Motion for Entry of (A) an Order (I) Approving the Stalking Horse Protections, (II) Approving Bidding Procedures for the Sale of the Lummus Assets and Interest, and (III) Approving Contract Assumption and Assignment Procedures, and (B) an Order Authorizing the Debtors to Enter Into a Definitive Purchase Agreement Subject to Entry of the Confirmation Order* (related document(s):110 Generic Motion). Filed by Maire Tecnimont SPA and MET Gas Processing Technologies SPA (Rafatjoo, Hamid) (Entered: 02/12/2020) |
| 02/12/2020 | 🔵 383<br>(197 pgs; 3 docs) | Declaration re: *Declaration of Hamid R. Rafatjoo In Support of Limited Objection to Debtor's Motion for Entry of (A) an Order (I) Approving the Stalking Horse Protections, (II) Approving Bidding Procedures for the Sale of the Lummus Assets and Interest, and (III) Approving Contract Assumption and Assignment Procedures, and (B) an Order Authorizing the Debtors to Enter Into a Definitive Purchase Agreement Subject to Entry of the Confirmation Order* (Filed By Maire Tecnimont SPA and MET Gas Processing Technologies SPA ).(Related document(s):382 Objection) (Attachments: # 1 Exhibit A # 2 Exhibit B) (Rafatjoo, Hamid) (Entered: 02/12/2020) |
| 02/12/2020 | 🔵 402<br>(1 pg) | Motion to Appear pro hac vice *for Bryan R. Lentz*. Filed by Interested Party Hussein Adel Dahroug (LisaHoward) (Entered: 02/14/2020) |
| 02/12/2020 | 🔵 403<br>(1 pg) | Motion to Appear pro hac vice *for Albert M. Belmont, III*. Filed by Interested Party Hussein Adel Dahroug (LisaHoward) (Entered: 02/14/2020) |
| 02/13/2020 | 🔵 384<br>(7 pgs) | Affidavit Re: *of Alex Orchowski Regarding Rights Offering Procedures, Subscription Form, and Subscription Agreement*. (related document(s):358 Notice. Filed by Prime Clerk LLC (Steele, Benjamin) (Entered: 02/13/2020) |
| 02/13/2020 | 🔵 385<br>(3 pgs) | Notice of Appearance and Request for Notice Filed by Christopher Todd Caplinger Filed by on behalf of Travelers Indemity Company (Caplinger, Christopher) (Entered: 02/13/2020) |
| 02/13/2020 | 🔵 386<br>(1 pg) | Order Granting Motion to Appear Pro Hac Vice - Blaine E. Adams (Related Doc # 176) Signed on 2/13/2020. (emiller) (Entered: 02/13/2020) |
| 02/13/2020 | 🔵 387<br>(1 pg) | Order Granting Motion To Appear pro hac vice - Christopher T. Caplinger (Related Doc # 312) Signed on 2/13/2020. (emiller) (Entered: 02/13/2020) |
| 02/13/2020 | 🔵 388 | Order Granting Motion To Appear pro hac vice - Kristopher T. Wilson |

| | | |
|---|---|---|
| | (1 pg) | (Related Doc # 314) Signed on 2/13/2020. (emiller) (Entered: 02/13/2020) |
| 02/13/2020 | 389 (1 pg) | Order Granting Motion To Appear pro hac vice - Coleman Torrans (Related Doc # 315) Signed on 2/13/2020. (emiller) (Entered: 02/13/2020) |
| 02/13/2020 | 390 (1 pg) | Order Granting Motion To Appear pro hac vice - Kimberly E. Neureiter (Related Doc # 351) Signed on 2/13/2020. (emiller) (Entered: 02/13/2020) |
| 02/13/2020 | 391 (1 pg) | Order Granting Motion To Appear pro hac vice - Hannah Leah Uricchio (Related Doc # 352) Signed on 2/13/2020. (emiller) (Entered: 02/13/2020) |
| 02/13/2020 | 392 (4 pgs; 2 docs) | Transfer of Claim Transfer Agreement 3001 (e) 2 Transferor: Bedford Reinforced Plastics To CRG Financial, LLC Fee Amount $25 (Polanco, Odalisa) (Entered: 02/13/2020) |
| 02/13/2020 | 393 (1 pg) | Order Granting Motion To Appear pro hac vice - Daniel R. Merkle (Related Doc # 369) Signed on 2/13/2020. (emiller) (Entered: 02/13/2020) |
| 02/13/2020 | 394 (1 pg) | Order Granting Motion To Appear pro hac vice - Joanne Molinaro (Related Doc # 378) Signed on 2/13/2020. (emiller) (Entered: 02/13/2020) |
| 02/13/2020 | 395 (1 pg) | Order Granting Motion To Appear pro hac vice - Carollynn H.G. Callari (Related Doc # 381) Signed on 2/13/2020. (emiller) (Entered: 02/13/2020) |
| 02/13/2020 | | Receipt of Transfer of Claim(20-30336) [claims,trclm] ( 25.00) Filing Fee. Receipt number 21884570. Fee amount $ 25.00. (U.S. Treasury) (Entered: 02/13/2020) |
| 02/13/2020 | 396 (96 pgs) | Affidavit Re: *Mailings for the Period from February 1, 2020 through February 7, 2020*. (related document(s):109 Generic Order, 152 Order on Emergency Motion, 358 Notice). Filed by Prime Clerk LLC (Steele, Benjamin) (Entered: 02/13/2020) |
| 02/13/2020 | 397 (3 pgs) | Notice of Appearance and Request for Notice Filed by Anne Marie Laney Hill Filed by on behalf of Euler Hermes North America Insurance Company (Laney Hill, Anne) (Entered: 02/13/2020) |
| 02/13/2020 | 398 (8 pgs) | BNC Certificate of Mailing. (Related document(s):371 Order on Motion to Appear pro hac vice) No. of Notices: 278. Notice Date 02/13/2020. (Admin.) (Entered: 02/13/2020) |
| 02/13/2020 | 399 (8 pgs) | BNC Certificate of Mailing. (Related document(s):372 Order on Motion to Appear pro hac vice) No. of Notices: 278. Notice Date 02/13/2020. (Admin.) (Entered: 02/13/2020) |
| 02/13/2020 | 405 (1 pg) | Motion to Appear pro hac vice *Allan Shuldiner*. Filed by Creditor Pension Plan for the Pension Trust Fund of Operating Engineers (mmap) (Entered: 02/14/2020) |

| 02/14/2020 | 🌐 400 (6 pgs) | Letter from Shareholder Nicola Difonzo (JeannieAndresen) (Entered: 02/14/2020) |
|---|---|---|
| 02/14/2020 | 🌐 401 (4 pgs) | Response *Limited Objection to Key Employee Incentive Plan (submitted by Christopher Komatinsky, pro se)* (related document(s):367 Emergency Motion). Filed by (JeannieAndresen) (Entered: 02/14/2020) |
| 02/14/2020 | 🌐 404 (2 pgs) | Notice of Appearance and Request for Notice Filed by Richard A. Kincheloe Filed by on behalf of United States of America (Kincheloe, Richard) (Entered: 02/14/2020) |
| 02/14/2020 | 🌐 437 (1 pg) | Motion to Appear pro hac vice *for Todd E. Hatcher*. Filed by Creditor Yancey Bros. Co. (LisaHoward) (Entered: 02/20/2020) |
| 02/15/2020 | 🌐 406 (8 pgs) | BNC Certificate of Mailing. (Related document(s):386 Generic Order) No. of Notices: 276. Notice Date 02/15/2020. (Admin.) (Entered: 02/15/2020) |
| 02/15/2020 | 🌐 407 (8 pgs) | BNC Certificate of Mailing. (Related document(s):387 Order on Motion to Appear pro hac vice) No. of Notices: 276. Notice Date 02/15/2020. (Admin.) (Entered: 02/15/2020) |
| 02/15/2020 | 🌐 408 (8 pgs) | BNC Certificate of Mailing. (Related document(s):388 Order on Motion to Appear pro hac vice) No. of Notices: 276. Notice Date 02/15/2020. (Admin.) (Entered: 02/15/2020) |
| 02/15/2020 | 🌐 409 (8 pgs) | BNC Certificate of Mailing. (Related document(s):389 Order on Motion to Appear pro hac vice) No. of Notices: 276. Notice Date 02/15/2020. (Admin.) (Entered: 02/15/2020) |
| 02/15/2020 | 🌐 410 (8 pgs) | BNC Certificate of Mailing. (Related document(s):390 Order on Motion to Appear pro hac vice) No. of Notices: 276. Notice Date 02/15/2020. (Admin.) (Entered: 02/15/2020) |
| 02/15/2020 | 🌐 411 (8 pgs) | BNC Certificate of Mailing. (Related document(s):391 Order on Motion to Appear pro hac vice) No. of Notices: 276. Notice Date 02/15/2020. (Admin.) (Entered: 02/15/2020) |
| 02/15/2020 | 🌐 412 (8 pgs) | BNC Certificate of Mailing. (Related document(s):393 Order on Motion to Appear pro hac vice) No. of Notices: 277. Notice Date 02/15/2020. (Admin.) (Entered: 02/15/2020) |
| 02/15/2020 | 🌐 413 (8 pgs) | BNC Certificate of Mailing. (Related document(s):394 Order on Motion to Appear pro hac vice) No. of Notices: 277. Notice Date 02/15/2020. (Admin.) (Entered: 02/15/2020) |
| 02/15/2020 | 🌐 414 (8 pgs) | BNC Certificate of Mailing. (Related document(s):395 Order on Motion to Appear pro hac vice) No. of Notices: 277. Notice Date 02/15/2020. (Admin.) (Entered: 02/15/2020) |
| 02/15/2020 | 🌐 415 (11 pgs) | BNC Certificate of Mailing. (Related document(s):392 Transfer of Claim) No. of Notices: 1. Notice Date 02/15/2020. (Admin.) (Entered: 02/15/2020) |
| 02/17/2020 | 🌐 416 | Motion to Appear pro hac vice *Stephen L. Iacovo*. Filed by Debtor |

| | | |
|---|---|---|
| | | McDermott International, Inc. (Cavenaugh, Matthew) (Entered: 02/17/2020) |
| 02/18/2020 | 🔵 417<br>(2 pgs) | Notice of Appearance and Request for Notice Filed by Kevin S. Wiley Filed by on behalf of Lehigh Hanson Inc. (Wiley, Kevin) (Entered: 02/18/2020) |
| 02/18/2020 | 🔵 418<br>(3 pgs) | Affidavit Re: *of Andrew Q. Chan Regarding Claim Transfer Notices*. (related document(s):392 Transfer of Claim). Filed by Prime Clerk LLC (Steele, Benjamin) (Entered: 02/18/2020) |
| 02/18/2020 | 🔵 451<br>(1 pg) | Motion to Appear pro hac vice *Matthew W. McDade*. Filed by Interested Party Mississippi State Port Authority at Gulfport (ShoshanaArnow) (Entered: 02/21/2020) |
| 02/18/2020 | 🔵 492<br>(2 pgs) | Letter of Objection by Shareholder David Wilde (JesusGuajardo) (Entered: 02/26/2020) |
| 02/18/2020 | 🔵 493<br>(6 pgs) | Letter of Objection by David Wild (JesusGuajardo) (Entered: 02/26/2020) |
| 02/19/2020 | 🔵 419<br>(3 pgs) | Letter from Shareholder Libor Kralicek (JeannieAndresen) (Entered: 02/19/2020) |
| 02/19/2020 | 🔵 420<br>(3 pgs) | Notice of Appearance and Request for Notice Filed by Matthew Brian Probus Filed by on behalf of Aker Solutions, Inc. (Probus, Matthew) (Entered: 02/19/2020) |
| 02/19/2020 | 🔵 421<br>(2 pgs) | Letter from Shareholder Asad Khan (JeannieAndresen) (Entered: 02/19/2020) |
| 02/19/2020 | 🔵 422<br>(2 pgs) | Letter from Shareholder Daniel O'Donnell (JeannieAndresen) (Entered: 02/19/2020) |
| 02/19/2020 | 🔵 423<br>(36 pgs) | Affidavit Re: *Mailings for the Period from February 8, 2020 through February 15, 2020*. (related document(s):152 Order on Emergency Motion, 367 Emergency Motion, 368 Emergency Motion, 377 Notice). Filed by Prime Clerk LLC (Steele, Benjamin) (Entered: 02/19/2020) |
| 02/19/2020 | 🔵 424<br>(48 pgs; 4 docs) | Application to Employ Jackson Walker LLP as Co-Counsel and Conflicts Counsel to the Debtors and the Debtors-In-Possession. Objections/Request for Hearing Due in 21 days. Filed by Debtor McDermott International, Inc. (Attachments: # 1 Exhibit A # 2 Exhibit B # 3 Proposed Order) (Cavenaugh, Matthew) (Entered: 02/19/2020) |
| 02/19/2020 | 🔵 425<br>(113 pgs; 4 docs) | Application to Employ Baker Botts, L.L.P. as Special Counsel to the Debtors and the Debtors-In-Possession. Objections/Request for Hearing Due in 21 days. Filed by Debtor McDermott International, Inc. (Attachments: # 1 Exhibit A # 2 Exhibit B # 3 Proposed Order) (Cavenaugh, Matthew) (Entered: 02/19/2020) |
| 02/19/2020 | 🔵 426<br>(256 pgs; 4 docs) | Application to Employ KPMG, LLP as Tax Compliance, Tax Consultant, Financial Accountant and Advisor. Objections/Request for Hearing Due in 21 days. Filed by Debtor McDermott International, Inc. (Attachments: # 1 Exhibit A # 2 Exhibit B # 3 Proposed Order) (Cavenaugh, Matthew) (Entered: 02/19/2020) |

001023

| | | |
|---|---|---|
| 02/19/2020 | ⬤[427](https://) (138 pgs; 3 docs) | Application to Employ Evercore Group, L.L.C. and Evercore Partners International, LLP as Investment Banker to the Debtors and the Debtors-In-Possession. Objections/Request for Hearing Due in 21 days. Filed by Debtor McDermott International, Inc. (Attachments: # [1](https://) Exhibit A # [2](https://) Proposed Order) (Cavenaugh, Matthew) (Entered: 02/19/2020) |
| 02/19/2020 | ⬤[428](https://) (146 pgs; 3 docs) | Application to Employ Kirkland & Ellis LLP and Kirkland & Ellis International LLP as Attorneys for the Debtors and Debtors-In-Possession. Objections/Request for Hearing Due in 21 days. Filed by Debtor McDermott International, Inc. (Attachments: # [1](https://) Exhibit A # [2](https://) Proposed Order) (Cavenaugh, Matthew) (Entered: 02/19/2020) |
| 02/19/2020 | ⬤[429](https://) (172 pgs; 4 docs) | Application to Employ Holland & Knight LLP as Special Litigation and Colombia Counsel to the Debtors and the Debtors-In-Possession. Objections/Request for Hearing Due in 21 days. Filed by Debtor McDermott International, Inc. (Attachments: # [1](https://) Exhibit A # [2](https://) Exhibit B # [3](https://) Proposed Order) (Cavenaugh, Matthew) (Entered: 02/19/2020) |
| 02/19/2020 | ⬤[430](https://) (96 pgs; 4 docs) | Application to Employ PricewaterhouseCoopers LLP as to Provide Certain Accounting, Transaction, and Valuation Services to the Debtors. Objections/Request for Hearing Due in 21 days. Filed by Debtor McDermott International, Inc. (Attachments: # [1](https://) Exhibit A # [2](https://) Exhibit B # [3](https://) Proposed Order) (Cavenaugh, Matthew) (Entered: 02/19/2020) |
| 02/19/2020 | ⬤[431](https://) (226 pgs; 4 docs) | Application to Employ K&L Gates, LLP as Special Counsel to the Debtors. Objections/Request for Hearing Due in 21 days. Filed by Debtor McDermott International, Inc. (Attachments: # [1](https://) Exhibit A # [2](https://) Exhibit B # [3](https://) Proposed Order) (Cavenaugh, Matthew) (Entered: 02/19/2020) |
| 02/19/2020 | ⬤[432](https://) (8 pgs) | Declaration re: *Declaration of John R. Castellano in Support of the Debtors' Applications for Entry of Orders Authorizing the Retention of Various Professionals* (Filed By McDermott International, Inc. ).(Related document(s):[368](https://) Emergency Motion, [424](https://) Application to Employ, [425](https://) Application to Employ, [426](https://) Application to Employ, [427](https://) Application to Employ, [428](https://) Application to Employ, [429](https://) Application to Employ, [430](https://) Application to Employ, [431](https://) Application to Employ) (Cavenaugh, Matthew) (Entered: 02/19/2020) |
| 02/19/2020 | ⬤433 | Sealed Document *related to the Debtors' Application for Entry of an Order Authorizing the Retention and Employment of Kirkland & Ellis LLP and Kirkland & Ellis International LLP as Attorneys for the Debtors and Debtors in Possession, ECF No. 428* (Filed By McDermott International, Inc. ). (Cavenaugh, Matthew) (Entered: 02/19/2020) |
| 02/19/2020 | ⬤[434](https://) (134 pgs; 3 docs) | Application to Employ AP Services, LLC as Restructuring Advisor and Designate John R. Castellano as Chief Transformation Officer. Objections/Request for Hearing Due in 21 days. Filed by Debtor McDermott International, Inc. (Attachments: # [1](https://) Exhibit A # [2](https://) Proposed Order) (Cavenaugh, Matthew) (Entered: 02/19/2020) |
| 02/19/2020 | ⬤[435](https://) (38 pgs; 2 docs) | Motion *for Entry of an Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* Filed by Debtor McDermott International, Inc. (Attachments: # [1](https://) Proposed Order) (Cavenaugh, Matthew) (Entered: 02/19/2020) |
| 02/19/2020 | ⬤[436](https://) | Motion *for Appointment of Trustee or Examiner and the earliest possible* |

| | | |
|---|---|---|
| | | *hearing date* Filed by Interested Party Michael Van Deelen (jaar) (Entered: 02/20/2020) |
| 02/20/2020 | 438 (4 pgs) | Exhibit List, Witness List (Filed By Ad Hoc Noteholder Groups ). (Flores, Henry) (Entered: 02/20/2020) |
| 02/20/2020 | 439 (5 pgs) | Witness List, Exhibit List (Filed By McDermott International, Inc. ). (Cavenaugh, Matthew) (Entered: 02/20/2020) |
| 02/20/2020 | 440 (2 pgs) | Witness List, Exhibit List (Filed By Ad Hoc Group of Term Lenders ). (Higgins, John) (Entered: 02/20/2020) |
| 02/20/2020 | 441 (6 pgs; 2 docs) | Motion to Appoint Trustee. Objections/Request for Hearing Due in 21 days. Filed by Interested Party Michael Van Deelen (Attachments: # 1 Proposed Order) (mmap) (Entered: 02/20/2020) |
| 02/20/2020 | 442 (1 pg) | Order Granting Motion To Appear pro hac vice - Bryan R. Lentz (Related Doc # 402) Signed on 2/20/2020. (emiller) (Entered: 02/20/2020) |
| 02/20/2020 | 443 (1 pg) | Order Granting Motion To Appear pro hac vice - Albert M. Belmont, III (Related Doc # 403) Signed on 2/20/2020. (emiller) (Entered: 02/20/2020) |
| 02/20/2020 | 444 (1 pg) | Order Granting Motion To Appear pro hac vice - Allan Shuldiner (Related Doc # 405) Signed on 2/20/2020. (emiller) (Entered: 02/20/2020) |
| 02/20/2020 | 445 (1 pg) | Order Granting Motion To Appear pro hac vice - Stephen L. Iacovo (Related Doc # 416) Signed on 2/20/2020. (emiller) (Entered: 02/20/2020) |
| 02/21/2020 | 446 (1 pg) | Motion to Appear pro hac vice *Catherine B. Heitzenrater*. Filed by Creditor Chubb Companies (Weideman, Corey) (Entered: 02/21/2020) |
| 02/21/2020 | 447 (6 pgs) | Objection (related document(s):56 Emergency Motion). Filed by Jefferson County, Cleveland ISD, Cypress Fairbanks ISD, Dallas County, Fort Bend County, Galveston County, Harris County, Live Oak CAD, Montgomery County, Nueces County, Smith County (Grundemeier, Tara) (Entered: 02/21/2020) |
| 02/21/2020 | 448 (3 pgs) | Notice of Appearance and Request for Notice Filed by Todd Brice Headden Filed by on behalf of Texas Commission on Environmental Quality (Headden, Todd) (Entered: 02/21/2020) |
| 02/21/2020 | 449 (6 pgs) | Response *Joinder to Objection Filed by Texas Taxing Authorities at Docket 447* (related document(s):56 Emergency Motion). Filed by Certain Texas Taxing Entities (Valdez, Melissa) (Entered: 02/21/2020) |
| 02/21/2020 | 450 (2 pgs) | Exhibit List, Witness List (Filed By US Trustee ).(Related document(s):367 Emergency Motion) (Duran, Hector) (Entered: 02/21/2020) |
| 02/21/2020 | 452 (4 pgs) | Notice of Appearance and Request for Notice Filed by Bradley Roland Foxman Filed by on behalf of Standard Chartered Bank (Foxman, Bradley) (Entered: 02/21/2020) |

| | | |
|---|---|---|
| 02/21/2020 | 🌐 453<br>(171 pgs; 2 docs) | Proposed Order RE: *Final Order (A) Authorizing the Debtors to Obtain Postpetition Financing, (B) Authorizing the Debtors to Use Cash Collateral, (C) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (D) Granting Adequate Protection to the Prepetition Secured Parties, (E) Modifying the Automatic Stay, and (F) Granting Related Relief* (Filed By McDermott International, Inc. ). (Related document(s):56 Emergency Motion, 146 Order Setting Hearing) (Attachments: # 1 Redline) (Cavenaugh, Matthew) (Entered: 02/21/2020) |
| 02/21/2020 | 🌐 454<br>(1 pg) | Notice of Appearance and Request for Notice Filed by Reese W Baker Filed by on behalf of Reese Coligado Shareholder Group (Baker, Reese) (Entered: 02/21/2020) |
| 02/21/2020 | 🌐 455<br>(12 pgs; 2 docs) | Response (related document(s):367 Emergency Motion). Filed by US Trustee (Attachments: # 1 Proposed Order) (Duran, Hector) (Entered: 02/21/2020) |
| 02/21/2020 | 🌐 456<br>(354 pgs; 2 docs) | Proposed Order RE: *Order (I) Approving the Stalking Horse Protections, (II) Approving Bidding Procedures for the Sale of the Lummus Assets and Interest, and (III) Approving Contract Assumption and Assignment Procedures* (Filed By McDermott International, Inc. ).(Related document(s):110 Generic Motion) (Attachments: # 1 Redline) (Cavenaugh, Matthew) (Entered: 02/21/2020) |
| 02/21/2020 | 🌐 457<br>(18 pgs; 2 docs) | Proposed Order RE: *Order (I) Authorizing Assumption for the Existing Insurance Programs, (II) Authorizing the Debtors to Enter Into the New Insurance Programs, and (III) Granting Related Relief* (Filed By McDermott International, Inc. ).(Related document(s):277 Generic Motion) (Attachments: # 1 Redline) (Cavenaugh, Matthew) (Entered: 02/21/2020) |
| 02/21/2020 | 🌐 481<br>(1 pg) | Notice of Appearance and Request for Notice Filed by Office of Unemployment Compensation Tax Services (ClaudiaGutierrez) (Entered: 02/25/2020) |
| 02/22/2020 | 🌐 458<br>(8 pgs) | BNC Certificate of Mailing. (Related document(s):442 Order on Motion to Appear pro hac vice) No. of Notices: 286. Notice Date 02/22/2020. (Admin.) (Entered: 02/22/2020) |
| 02/22/2020 | 🌐 459<br>(8 pgs) | BNC Certificate of Mailing. (Related document(s):443 Order on Motion to Appear pro hac vice) No. of Notices: 286. Notice Date 02/22/2020. (Admin.) (Entered: 02/22/2020) |
| 02/22/2020 | 🌐 460<br>(8 pgs) | BNC Certificate of Mailing. (Related document(s):444 Order on Motion to Appear pro hac vice) No. of Notices: 286. Notice Date 02/22/2020. (Admin.) (Entered: 02/22/2020) |
| 02/22/2020 | 🌐 461<br>(8 pgs) | BNC Certificate of Mailing. (Related document(s):445 Order on Motion to Appear pro hac vice) No. of Notices: 286. Notice Date 02/22/2020. (Admin.) (Entered: 02/22/2020) |
| 02/23/2020 | 🌐 462<br>(15 pgs; 2 docs) | Proposed Order RE: *Final Order (I) Authorizing the Payment of Foreign Claims, Lien Claims, 503(b)(9) Claims, and Other Claims, and (II) Confirming Administrative Expense Priority of Outstanding Purchase Orders* (Filed By McDermott International, Inc. ).(Related |

| | | |
|---|---|---|
| | | document(s):13 Emergency Motion, 153 Order Setting Hearing) (Attachments: # 1 Redline) (Cavenaugh, Matthew) (Entered: 02/23/2020) |
| 02/23/2020 | 463 (531 pgs; 3 docs) | Proposed Order RE: *Final Order (I) Approving the Stalking Horse Protections, (II) Approving Bidding Procedures for the Sale of the Lummus Assets and Interest, and (III) Approving Contract Assumption and Assignment Procedures* (Filed By McDermott International, Inc. ). (Related document(s):110 Generic Motion) (Attachments: # 1 Redline to ECF No. 110 # 2 Redline to ECF No. 456) (Cavenaugh, Matthew) (Entered: 02/23/2020) |
| 02/23/2020 | 464 (258 pgs; 3 docs) | Proposed Order RE: *Final Order (A) Authorizing the Debtors to Obtain Postpetition Financing, (B) Authorizing the Debtors to Use Cash Collateral, (C) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (D) Granting Adequate Protection to the Prepetition Secured Parties, (E) Modifying the Automatic Stay, (F) Granting Related Relief* (Filed By McDermott International, Inc. ). (Related document(s):56 Emergency Motion, 146 Order Setting Hearing) (Attachments: # 1 Redline to ECF No. 146 # 2 Redline to ECF No. 453) (Cavenaugh, Matthew) (Entered: 02/23/2020) |
| 02/24/2020 | 465 (13 pgs; 2 docs) | Proposed Order RE: *Authorizing the Debtors to Retain and Employ Ernst&Young, LLP as Auditors* (Filed By McDermott International, Inc. ).(Related document(s):368 Emergency Motion) (Attachments: # 1 Redline) (Cavenaugh, Matthew) (Entered: 02/24/2020) |
| 02/24/2020 | 466 (6 pgs) | Agenda for Hearing on 2/24/2020 (Filed By McDermott International, Inc. ). (Cavenaugh, Matthew) (Entered: 02/24/2020) |
| 02/24/2020 | 467 (2 pgs) | Letter from Shareholder Kirk Rispone (JeannieAndresen) (Entered: 02/24/2020) |
| 02/24/2020 | 468 (1 pg) | Order Granting Motion To Appear pro hac vice - Todd E. Hatcher (Related Doc # 437) Signed on 2/24/2020. (emiller) (Entered: 02/24/2020) |
| 02/24/2020 | 469 (1 pg) | Order Granting Motion To Appear pro hac vice - Catherine B. Heitzenrater (Related Doc # 446) Signed on 2/24/2020. (emiller) (Entered: 02/24/2020) |
| 02/24/2020 | 470 (1 pg) | Order Granting Motion To Appear pro hac vice - Matthew W. McDade(Related Doc # 451) Signed on 2/24/2020. (emiller) (Entered: 02/24/2020) |
| 02/24/2020 | 471 (1 pg) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by Matthew Cavenaugh. This is to order a transcript of 2/24/2020 before Judge David R. Jones. Court Reporter/Transcriber: Access Transcripts (Filed By McDermott International, Inc. ). (Cavenaugh, Matthew) Electronically forwarded to Access Transcripts on 2/25/2020. Estimated completion date: 2/26/2020. Modified on 2/25/2020 (MelissaMorgan). (Entered: 02/24/2020) |
| 02/24/2020 | | Courtroom Minutes. Time Hearing Held: 12:01 PM. Appearances: Matthew Cavenaugh, Veronica Polnick, Chris Greco, Anna Rotman, Alexandra Caritis, Ciera Foster, and Anthony Grossi for the Debtors; Carollyn Ellis, Penelope Jensen and Margo Schonholtz; John Higgins and Nathsha Tsiouris; Philip Eisenburg, Simon Mayer, Anu Yerramalli; |

| | | |
|---|---|---|
| | | Hugh Ray and Robert Britton; Josh Judd and Carollynn Callari; Hector Duran; Tom Howley Jae VanLare (by phone); Henry Flores and Bennett Silverberg (Related document(s):13 Emergency Motion, 56 Emergency Motion, 110 Generic Motion, 277 Generic Motion, 367 Emergency Motion, 368 Emergency Motion) Witnesses: John Castellano and Zachary Georgeson. Trustees exhibits 1-4 admitted without objection. The Court approved the post-petition financing motion 56 on a final basis. The revised proposed order submitted at docket no. 464 was signed on the record. The Court approved the key incentive plan motion 367. Order to be entered. The Court approved the bidding procedures motion 110. The revised proposed order submitted at docket no. 463 was signed on the record. The Court approved the Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Payment of Foreign Claims, Lien Claims, 503(b)(9) Claims, and Other Claims, and (II) Confirming Administrative Expense Priority of Outstanding Purchase Orders 13 on a final basis. The revised proposed order submitted at docket no. 462 was signed on the record. The Court approved the insurance programs motion 277. The revised proposed order submitted at docket no. 457 was signed on the record. Finally, the Court approved the Emergency Motion for Entry of an Order Authorizing the Debtors to Retain and Employ Ernst & Young LLP as Auditors 368. The revised proposed order submitted at docket no. 465 was signed on the record. (VrianaPortillo) (Entered: 02/24/2020) |
| 02/24/2020 | 472 (1 pg) | PDF with attached Audio File. Court Date & Time [ 2/24/2020 12:01:41 PM ]. File Size [ 43094 KB ]. Run Time [ 01:29:47 ]. (In ref to Second Day Hearings. Hearing held February 24, 2020.). (admin). (Entered: 02/24/2020) |
| 02/24/2020 | 473 (3 pgs) | Order Authorizing and Approving the Debtors' Motion for Entry of an Order (I) Authorizing and Approving the Debtors' (A) Key Employee Incentive Plan and (B) Key Employee Retention Plan and (II) Granting Related Relief (Related Doc # 367) Signed on 2/24/2020. (VrianaPortillo) (Entered: 02/24/2020) |
| 02/24/2020 | 474 (9 pgs) | Order (I) Authorizing Assumption of the Existing Insurance Programs, (II) Authorizing the Debtors to Enter Into the New Insurance Programs, and (III) Granting Related Relief (Related Doc # 277) Signed on 2/24/2020. (VrianaPortillo) (Entered: 02/24/2020) |
| 02/24/2020 | 475 (7 pgs) | Final Order (I) Authorizing the Payment of Foreign Claims, Lien Claims, 503(B)(9) Claims, and Other Claims, and (II) Confirming Administrative Expense Priority of Outstanding Purchase Orders (Related Doc # 13) Signed on 2/24/2020. (VrianaPortillo) (Entered: 02/24/2020) |
| 02/24/2020 | 476 (177 pgs) | Order (I) Approving the Stalking Horse Protections, (II) Approving Bidding Procedures for the Sale of the Lummus Assets and Interests, and (III) Approving Contract Assumption and Assignment Procedures (Related Doc # 110) Signed on 2/24/2020. (VrianaPortillo) (Entered: 02/24/2020) |
| 02/24/2020 | 477 (84 pgs) | Final Order (A) Authorizing the Debtors to Obtain Postpetition Financing, (B) Authorizing the Debtors to Use Cash Collateral, (C) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (D) Granting Adequate Protection to the Prepetition Secured Parties, (E) Modifying the Automatic Stay, and (F) Granting Related Relief (Related Doc # 56) Signed on 2/24/2020. (VrianaPortillo) (Entered: 02/24/2020) |

| 02/24/2020 | 🔵478<br>(6 pgs) | Order Authorizing the Debtors to Retain and Employ Ernst & Young LLP as Auditors (Related Doc # 368) Signed on 2/24/2020. (VrianaPortillo). (Entered: 02/24/2020) |
| 02/24/2020 | 🔵479<br>(1 pg) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by Marty L. Brimmage, Jr.. This is to order a transcript of February 24, 2020 before Judge David R. Jones. Court Reporter/Transcriber: Judicial Transcribers of Texas (Filed By Akin Gump Strauss Hauer & Feld LLP ). (Brimmage, Marty) Electronically forwarded to the original transcriber: Access Transcripts, LLC on 2/25/2020. Estimated completion date: 2/26/2020. Modified on 2/25/2020 (MelissaMorgan). (Entered: 02/24/2020) |
| 02/24/2020 | 🔵482<br>(6 pgs) | Limited Objection by Christopher Komatinsky (Related document(s):4 Disclosure Statement for the Joint Prepackaged Chapter 11 Plan of Reorganization) (ClaudiaGutierrez) (Entered: 02/25/2020) |
| 02/24/2020 | 🔵488<br>(2 pgs) | Copy of Letter provided to McDermott Claims Center (JesusGuajardo) (Entered: 02/26/2020) |
| 02/24/2020 | 🔵489<br>(2 pgs) | Letter of Objection against McDermott International Inc. By David Wild (JesusGuajardo) (Entered: 02/26/2020) |
| 02/24/2020 | 🔵490<br>(2 pgs) | Letter from Shareholder Fredrick D. Braid (JesusGuajardo) (Entered: 02/26/2020) |
| 02/24/2020 | 🔵491<br>(1 pg) | Letter from Shareholder Mary Ellen Holub (JesusGuajardo) (Entered: 02/26/2020) |
| 02/25/2020 | 🔵480<br>(45 pgs; 2 docs) | Notice *of Lien Perfection*. Filed by Olsen & Guerra Lumber Company (Attachments: # 1 Exhibit) (Aderholt, Ben) (Entered: 02/25/2020) |
| 02/25/2020 | 🔵483<br>(1 pg) | Motion to Appear pro hac vice , *Lindsey Henrikson*. (rcas) (Entered: 02/25/2020) |
| 02/25/2020 | 🔵484<br>(1 pg) | Motion to Appear pro hac vice , *Matthew L. Warren*. (rcas) (Entered: 02/25/2020) |
| 02/25/2020 | 🔵485<br>(10 pgs) | Declaration re: *Declaration of Status as a Substantial Shareholder* (Filed By Apicorp Managed Account Investment Vehicle, L.P., West Street Capital Partners VII - Parallel B, L.P., West Street Capital Partners VII Investments B, L.P., West Street Capital Partners VII Offshore Investments, L.P. ).(Related document(s):155 Order on Emergency Motion) (Grissel, Katherine) (Entered: 02/25/2020) |
| 02/25/2020 | 🔵486<br>(10 pgs) | Declaration re: *Declaration of Status as a 50-Percent Shareholder* (Filed By Apicorp Managed Account Investment Vehicle, L.P., West Street Capital Partners VII - Parallel B, L.P., West Street Capital Partners VII Investments B, L.P., West Street Capital Partners VII Offshore Investments, L.P. ).(Related document(s):155 Order on Emergency Motion) (Grissel, Katherine) (Entered: 02/25/2020) |
| 02/26/2020 | 🔵487<br>(1 pg) | Motion to Appear pro hac vice . Filed by Creditor Sonia Chae U.S. Securities & Exchange Commission (Chae, Sonia) (Entered: 02/26/2020) |
| 02/26/2020 | 🔵494 | Order Granting Motion To Appear pro hac vice -- Matthew L. Warren |

| | | |
|---|---|---|
| | (1 pg) | (Related Doc # 484) Signed on 2/26/2020. (VrianaPortillo) (Entered: 02/26/2020) |
| 02/26/2020 | 495 (1 pg) | Order Granting Motion To Appear pro hac vice -- Lindsey Henrikson (Related Doc # 483) Signed on 2/26/2020. (VrianaPortillo) (Entered: 02/26/2020) |
| 02/26/2020 | 496 (22 pgs) | Affidavit Re: *Mailings for the Period from February 15, 2020 through February 21, 2020.* (related document(s):152 Order on Emergency Motion, 453 Proposed Order, 456 Proposed Order, 457 Proposed Order). Filed by Prime Clerk LLC (Steele, Benjamin) (Entered: 02/26/2020) |
| 02/26/2020 | 497 (8 pgs) | BNC Certificate of Mailing. (Related document(s):468 Order on Motion to Appear pro hac vice) No. of Notices: 290. Notice Date 02/26/2020. (Admin.) (Entered: 02/26/2020) |
| 02/26/2020 | 498 (8 pgs) | BNC Certificate of Mailing. (Related document(s):469 Order on Motion to Appear pro hac vice) No. of Notices: 290. Notice Date 02/26/2020. (Admin.) (Entered: 02/26/2020) |
| 02/26/2020 | 499 (8 pgs) | BNC Certificate of Mailing. (Related document(s):470 Order on Motion to Appear pro hac vice) No. of Notices: 290. Notice Date 02/26/2020. (Admin.) (Entered: 02/26/2020) |
| 02/26/2020 | 500 (10 pgs) | BNC Certificate of Mailing. (Related document(s):473 Order on Emergency Motion) No. of Notices: 291. Notice Date 02/26/2020. (Admin.) (Entered: 02/26/2020) |
| 02/26/2020 | 501 (16 pgs) | BNC Certificate of Mailing. (Related document(s):474 Generic Order) No. of Notices: 291. Notice Date 02/26/2020. (Admin.) (Entered: 02/26/2020) |
| 02/26/2020 | 502 (14 pgs) | BNC Certificate of Mailing. (Related document(s):475 Order on Emergency Motion) No. of Notices: 291. Notice Date 02/26/2020. (Admin.) (Entered: 02/26/2020) |
| 02/26/2020 | 503 (184 pgs) | BNC Certificate of Mailing. (Related document(s):476 Generic Order) No. of Notices: 291. Notice Date 02/26/2020. (Admin.) (Entered: 02/26/2020) |
| 02/26/2020 | 504 (91 pgs) | BNC Certificate of Mailing. (Related document(s):477 Order on Emergency Motion) No. of Notices: 291. Notice Date 02/26/2020. (Admin.) (Entered: 02/26/2020) |
| 02/26/2020 | 505 (13 pgs) | BNC Certificate of Mailing. (Related document(s):478 Order on Emergency Motion) No. of Notices: 291. Notice Date 02/26/2020. (Admin.) (Entered: 02/26/2020) |
| 02/27/2020 | 506 (1 pg) | Order Granting Motion To Appear pro hac vice (Related Doc # 487) Signed on 2/27/2020. (VrianaPortillo) (Entered: 02/27/2020) |
| 02/27/2020 | 507 (74 pgs) | Transcript RE: Hearing held on 02/24/20 before Judge David R. Jones. Transcript is available for viewing in the Clerk's Office. Filed by Transcript access will be restricted through 05/27/2020. (AccessTranscripts) (Entered: 02/27/2020) |
| 02/27/2020 | 509 (156 pgs) | Motion for Entry of Order Filed by Interested Party Michael Van Deelen (hler) Modified on 2/28/2020 (hler). (Entered: 02/28/2020) |

11/18/21, 11:12 AM Case 4:21-cv-03369 Document 10-2 BK CM/ECF Filed - U.S. on Bankruptcy 11/19/21 Court-Texas in TXSD Southern Page 78 of 550

001030

| 02/27/2020 | ○ 510<br>(156 pgs) | Objection to Confirmation of Plan Filed by Michael Van Deelen. (hler) (Entered: 02/28/2020) |
| 02/27/2020 | ○ 511<br>(3 pgs) | Exhibit and Witness List ref: hrg set 3/12/2020 (Filed By Michael Van Deelen ). (hler) Modified on 2/28/2020 (hler). Additional attachment(s) added on 2/28/2020 (hler). (Entered: 02/28/2020) |
| 02/28/2020 | ○ 508<br>(1 pg) | Notice of Filing of Official Transcript as to 507 Transcript. Parties notified (Related document(s):507 Transcript) (jdav) (Entered: 02/28/2020) |
| 02/28/2020 | ○ 512<br>(67 pgs; 3 docs) | Emergency Motion *to Shorten Deadline for Debtors to Respond to Discovery* Filed by Creditor Maire Tecnimont SPA and MET Gas Processing Technologies SPA (Attachments: # 1 Callari Declaration # 2 Proposed Order) (Judd, T.) (Entered: 02/28/2020) |
| 02/28/2020 | ○ 513<br>(4 pgs) | Notice of Appearance and Request for Notice Filed by Timothy Q Karcher Filed by on behalf of Bollore Transport & Logistics (Karcher, Timothy) (Entered: 02/28/2020) |
| 02/28/2020 | ○ 514<br>(5 pgs) | Notice of Appearance and Request for Notice Filed by Albert M Belmont III Filed by on behalf of Hussein Adel Dahroug (Belmont, Albert) (Entered: 02/28/2020) |
| 02/28/2020 | ○ 515<br>(2 pgs) | Notice of Appearance and Request for Notice Filed by Michael P Ridulfo Filed by on behalf of Sparrows Offshore LLC (Ridulfo, Michael) (Entered: 02/28/2020) |
| 02/28/2020 | ○ 516<br>(3 pgs) | Notice of Appearance and Request for Notice Filed by Sonia Anne Chae Filed by on behalf of Sonia Chae U.S. Securities & Exchange Commission (Chae, Sonia) (Entered: 02/28/2020) |
| 02/28/2020 | ○ 517<br>(12 pgs) | Objection to Confirmation of Plan Filed by Sonia Chae U.S. Securities & Exchange Commission. (Related document(s):121 Amended Chapter 11 Plan) (Chae, Sonia) (Entered: 02/28/2020) |
| 02/28/2020 | ○ 518<br>(8 pgs) | BNC Certificate of Mailing. (Related document(s):494 Order on Motion to Appear pro hac vice) No. of Notices: 296. Notice Date 02/28/2020. (Admin.) (Entered: 02/28/2020) |
| 02/28/2020 | ○ 519<br>(8 pgs) | BNC Certificate of Mailing. (Related document(s):495 Order on Motion to Appear pro hac vice) No. of Notices: 296. Notice Date 02/28/2020. (Admin.) (Entered: 02/28/2020) |
| 02/29/2020 | ○ 520<br>(172 pgs) | Notice *of Filing of Plan Supplement*. (Related document(s):121 Amended Chapter 11 Plan) Filed by McDermott International, Inc. (Cavenaugh, Matthew) (Entered: 02/29/2020) |
| 02/29/2020 | ○ 521<br>(8 pgs) | BNC Certificate of Mailing. (Related document(s):506 Order on Motion to Appear pro hac vice) No. of Notices: 296. Notice Date 02/29/2020. (Admin.) (Entered: 02/29/2020) |
| 03/01/2020 | ○ 522<br>(2 pgs) | Notice of Appearance and Request for Notice Filed by William G. Harris Filed by on behalf of Veronica Porter (Harris, William) (Entered: 03/01/2020) |

001031

| 03/01/2020 | ⬤ 523 (8 pgs) | BNC Certificate of Mailing. (Related document(s):508 Notice of Filing of Official Transcript (Form)) No. of Notices: 296. Notice Date 03/01/2020. (Admin.) (Entered: 03/01/2020) |
|---|---|---|
| 03/02/2020 | ⬤ 524 (4 pgs) | Notice of Appearance and Request for Notice Filed by Charles A Beckham Jr Filed by on behalf of John R Castellano, AP Services, LLC, AlixPartners LLP (Beckham, Charles) (Entered: 03/02/2020) |
| 03/02/2020 | ⬤ 525 (3 pgs) | Notice *Regarding the Debtors' Application for Entry of an Order Authorizing the (I) Retention of AP Services and (II) Designation of John R. Castellano as Chief Transformation Officer of the Debtors*. (Related document(s):434 Application to Employ) Filed by AP Services, LLC, AlixPartners LLP, John R Castellano (Beckham, Charles) (Entered: 03/02/2020) |
| 03/02/2020 | ⬤ 526 (1 pg) | Motion to Appear pro hac vice *Valerie Bantner Peo*. Filed by Creditor Oracle America, Inc. (Catmull, Annie) (Entered: 03/02/2020) |
| 03/02/2020 | ⬤ 527 (4 pgs) | Notice *Expert Report*. Filed by Michael Van Deelen (hler) (Entered: 03/02/2020) |
| 03/02/2020 | ⬤ 528 (22 pgs; 2 docs) | Objection to Confirmation of Plan, Response/Objection Filed by Reese Coligado Shareholder Group. (Related document(s):4 Disclosure Statement, 5 Chapter 11 Plan, 121 Amended Chapter 11 Plan, 160 Order Setting Hearing) (Attachments: # 1 Exhibit List of Members of Coligado Shareholders Group)(Baker, Reese) (Entered: 03/02/2020) |
| 03/02/2020 | ⬤ 529 (10 pgs; 2 docs) | Objection *Limited Objection to Confirmation of the Amended Joint Prepackaged Chapter 11 Plan of Reorganization of McDermott International, Inc. and its Debtor Affiliates*. Filed by B.F.E. S.r.l. (Attachments: # 1 Proposed Order) (Durrschmidt, Michael) (Entered: 03/02/2020) |
| 03/02/2020 | ⬤ 530 (31 pgs) | Response/Objection Filed by Wholesale Electric Supply Co., of Houston, Inc., Gas Innovations, VPF Fire Systems, Inc., MLN Service Company, Wilson Fire Equipment & Service Co., Inc., Network Cabling Services, Inc., Inventure Design, LLC, Kelkar LLC d/b/a Troop Industrial, Nooter/Eriksen, Inc., Remedial Construction Services, L.P., Trio Electric, LLC, CFI Mechanical, Inc., DGI-Menard, Inc., W.T. Byler Co., Inc., Apache Industrial Painting, Inc., Apache Industrial Services, Inc., Gerab National Enterprises LLC. (Related document(s):121 Amended Chapter 11 Plan) (Judd, T.) (Entered: 03/02/2020) |
| 03/02/2020 | ⬤ 531 (30 pgs) | Certificate *of Serice for Objection to Disclosure Statement and Chapter 11 Plan* (Filed By Reese Coligado Shareholder Group ).(Related document(s):528 Objection to Confirmation of the Plan, Response/Objection) (Baker, Reese) (Entered: 03/02/2020) |
| 03/02/2020 | ⬤ 532 (5 pgs) | Objection *Limited Objection of The Travelers Indemnity Company to the Disclosure Statement and Plan Supplement for the Amended Joint Prepackaged Chapter 11 Plan of Reorganization of McDermott International, Inc. and its Debtor Affiliates*. Filed by Travelers Indemity Company (Caplinger, Christopher) (Entered: 03/02/2020) |
| 03/02/2020 | ⬤ 533 (11 pgs) | Objection *to Confirmation of the Joint Prepackaged Chapter 11 Plan of McDermott International, Inc. and Its Debtor Affiliates*. Filed by Yancey Bros. Co. (Hatcher, Todd) (Entered: 03/02/2020) |

11/18/21, 11:12 AM Case 4:21-cv-03369 Document 10-2 BK-CM/ECF LIVE US Bankruptcy Court-Texas Southern Filed on 11/18/21 in TXSD Page 80 of 550

001032

| | | |
|---|---|---|
| 03/02/2020 | 534<br>(5 pgs) | Notice of Appearance and Request for Notice Filed by Bryan Roy Lentz Filed by on behalf of Hussein Adel Dahroug (Lentz, Bryan) (Entered: 03/02/2020) |
| 03/02/2020 | 535<br>(30 pgs) | Objection to Confirmation of Plan Filed by Oracle America, Inc.. (Related document(s):121 Amended Chapter 11 Plan) (Catmull, Annie) (Entered: 03/02/2020) |
| 03/02/2020 | 536<br>(1 pg) | Motion to Appear pro hac vice *Peter S. Bryant*. Filed by Creditor Hussein Adel Dahroug (dnor) (Entered: 03/02/2020) |
| 03/02/2020 | 537<br>(3 pgs) | Response (Filed By Air Products and Chemicals, Inc ).(Related document(s):121 Amended Chapter 11 Plan) (Grogan, James) (Entered: 03/02/2020) |
| 03/02/2020 | 538<br>(4 pgs) | Objection to Confirmation of Plan Filed by Veronica Porter. (Related document(s):121 Amended Chapter 11 Plan) (Harris, William) (Entered: 03/02/2020) |
| 03/02/2020 | 539<br>(5 pgs) | Response (Filed By Public Employees' Retirement System of Mississippi ("Lead Plaintiff") ).(Related document(s):4 Disclosure Statement, 121 Amended Chapter 11 Plan) (Etkin, Michael) (Entered: 03/02/2020) |
| 03/02/2020 | 540<br>(4 pgs) | Objection to Confirmation of Plan Filed by Sparrows Offshore LLC. (Ridulfo, Michael) (Entered: 03/02/2020) |
| 03/02/2020 | 541<br>(3 pgs) | Notice *of Reservation of Rights*. (Related document(s):121 Amended Chapter 11 Plan) Filed by MMR Constructors Inc. (Klingensmith, Elizabeth) (Entered: 03/02/2020) |
| 03/02/2020 | 542<br>(3 pgs; 2 docs) | Notice of Appearance and Request for Notice Filed by Iron Mountain Information Management, LLC (Attachments: # 1 Certificate of Service) (Corrigan, Joseph) (Entered: 03/02/2020) |
| 03/03/2020 | 543<br>(3 pgs) | Notice *of Cancellation of Auction for the Sale of Lummus Assets and Interests*. (Related document(s):160 Order Setting Hearing) Filed by McDermott International, Inc. (Cavenaugh, Matthew) (Entered: 03/03/2020) |
| 03/03/2020 | 544<br>(41 pgs) | Response/Objection Filed by Maire Tecnimont SPA and MET Gas Processing Technologies SPA. (Related document(s):4 Disclosure Statement, 121 Amended Chapter 11 Plan) (Judd, T.) (Entered: 03/03/2020) |
| 03/03/2020 | 545<br>(2 pgs) | Certificate *of Service* (Filed By Public Employees' Retirement System of Mississippi ("Lead Plaintiff") ).(Related document(s):539 Response) (Etkin, Michael) (Entered: 03/03/2020) |
| 03/03/2020 | 546<br>(18 pgs) | Amended Objection to Confirmation of Plan Filed by Veronica Porter. (Related document(s):121 Amended Chapter 11 Plan, 538 Objection to Confirmation of the Plan) (Harris, William) (Entered: 03/03/2020) |
| 03/03/2020 | 547<br>(1 pg) | Order Granting Motion To Appear pro hac vice -- Valerie Bantner Peo (Related Doc # 526) Signed on 3/3/2020. (VrianaPortillo) (Entered: 03/03/2020) |

| | | |
|---|---|---|
| 03/03/2020 | 548 (1 pg) | Order Granting Motion To Appear pro hac vice -- Peter R. Bryant Esquire (Related Doc # 536) Signed on 3/3/2020. (VrianaPortillo) (Entered: 03/03/2020) |
| 03/03/2020 | 549 (24 pgs; 2 docs) | Emergency Motion *for Entry of an Order (I) Authorizing and Approving the Settlements By and Among the Debtors and the Insurers, and (II) Granting Related Relief* Filed by Debtor McDermott International, Inc. (Attachments: # 1 Proposed Order) (Cavenaugh, Matthew) (Entered: 03/03/2020) |
| 03/03/2020 | 550 (11 pgs; 2 docs) | Emergency Motion *for Entry of an Order Authorizing the Debtors to File the Settlement Agreements Under Seal* Filed by Debtor McDermott International, Inc. (Attachments: # 1 Proposed Order) (Cavenaugh, Matthew) (Entered: 03/03/2020) |
| 03/03/2020 | 551 | Sealed Document *Exhibit A to ECF No. 549* (Filed By McDermott International, Inc. ). (Cavenaugh, Matthew) (Entered: 03/03/2020) |
| 03/03/2020 | 552 | Sealed Document *Exhibit B to ECF No. 549* (Filed By McDermott International, Inc. ). (Cavenaugh, Matthew) (Entered: 03/03/2020) |
| 03/03/2020 | 553 | Sealed Document *Exhibit C to ECF No. 549* (Filed By McDermott International, Inc. ). (Cavenaugh, Matthew) (Entered: 03/03/2020) |
| 03/03/2020 | 554 (23 pgs) | Stipulation By McDermott International, Inc. and FIRST Insurance Funding, a Division of Lake Forest Bank & Trust Company, N.A.. Does this document include an agreed order or otherwise request that the judge sign a document? Yes. (Filed By McDermott International, Inc. ). (Cavenaugh, Matthew) (Entered: 03/03/2020) |
| 03/03/2020 | 555 (10 pgs; 2 docs) | Proposed Order RE: *Authorizing the Retention and Employment of Baker Botts, L.L.P. as Special Counsel to the Debtors and the Debtors In Possession* (Filed By McDermott International, Inc. ).(Related document(s):425 Application to Employ) (Attachments: # 1 Redline) (Cavenaugh, Matthew) (Entered: 03/03/2020) |
| 03/04/2020 | 556 (126 pgs) | Affidavit Re: *Mailings for the Period from February 22, 2020 through February 28, 2020.* (related document(s):424 Application to Employ, 425 Application to Employ, 426 Application to Employ, 427 Application to Employ, 428 Application to Employ, 429 Application to Employ, 430 Application to Employ, 431 Application to Employ, 432 Declaration, 434 Application to Employ, 435 Generic Motion, 462 Proposed Order, 463 Proposed Order, 464 Proposed Order, 465 Proposed Order, 466 Agenda, 473 Order on Emergency Motion, 474 Generic Order, 475 Order on Emergency Motion, 476 Generic Order, 477 Order on Emergency Motion, 478 Order on Emergency Motion). Filed by Prime Clerk LLC (Steele, Benjamin) (Entered: 03/04/2020) |
| 03/04/2020 | 557 (6 pgs; 2 docs) | EXPEDITED Motion *for an Order Continuing the March 12, 2020 Plan Hearing* Filed by Interested Party Michael Van Deelen (Attachments: # 1 Proposed Order) (mmap) (Entered: 03/04/2020) |
| 03/04/2020 | 563 (1 pg) | Motion to Appear pro hac vice *David H. Conaway*. Filed by Creditor Toshiba America Energy Systems Corporation (dnor) (Entered: 03/05/2020) |

| 03/05/2020 | 🔵 558<br>(2 pgs) | Letter from Shareholder Chamath Kodituwakku (JeannieAndresen) (Entered: 03/05/2020) |
| 03/05/2020 | 🔵 559<br>(2 pgs) | Notice of REQUEST FOR A HEARING. Filed by Michael D Deelen (Olin) (Entered: 03/05/2020) |
| 03/05/2020 | 🔵 560<br>(2 pgs) | Notice of Appearance and Request for Notice Filed by James M Liston Filed by on behalf of BAC CANTON HOLDINGS LLC (Liston, James) (Entered: 03/05/2020) |
| 03/05/2020 | 🔵 | Hearing Set On Michael D. Van Deelen's Motion for an Order Continuing the March 12, 2020 Plan Hearing (Related document(s):557 Motion to Extend Time) **Hearing scheduled for 3/9/2020 at 09:00 AM at Houston, Courtroom 400 (DRJ).** Movant to serve notice and file a certificate of service with the Court. (JeannieAndresen) (Entered: 03/05/2020) |
| 03/05/2020 | 🔵 561<br>(14 pgs; 2 docs) | Proposed Order RE: Authorizing the Retention and Employment of Evercore Group L.L.C. and Evercore Partners International LLP as Investment Banker to the Debtors and Debtors In Possession (Filed By McDermott International, Inc. ).(Related document(s):427 Application to Employ) (Attachments: # 1 Redline) (Cavenaugh, Matthew) (Entered: 03/05/2020) |
| 03/05/2020 | 🔵 562<br>(2 pgs) | Notice of Appearance and Request for Notice Filed by James M Liston Filed by on behalf of BAC CANTON HOLDINGS LLC (Liston, James) (Entered: 03/05/2020) |
| 03/05/2020 | 🔵 564<br>(14 pgs; 2 docs) | Proposed Order RE: Authorizing the Debtors and Debtors In Possession to (I) Retain and Employ KPMG LLP as Tax Compliance, Tax Consultant, Financial Accountant and Advisor, and (II) Waiving Certain Information Requirements Imposed by Local Rule 2016-2 (Filed By McDermott International, Inc. ).(Related document(s):426 Application to Employ) (Attachments: # 1 Redline) (Cavenaugh, Matthew) (Entered: 03/05/2020) |
| 03/05/2020 | 🔵 565<br>(3 pgs; 2 docs) | Transfer of Claim Transfer Agreement 3001 (e) 2 Transferor: Madesta To Cowen Special Investments LLC Fee Amount $25 Filed by Cowen Special Investments LLC (Rosenblum, Gail) (Entered: 03/05/2020) |
| 03/05/2020 | 🔵 566<br>(9 pgs; 2 docs) | Proposed Order RE: Granting the Application of Debtors and Debtors-In-Possession to Retain Jackson Walker LLP as Co-Counsel and Conflicts Counsel for Debtors and Debtors-In-Possession (Filed By McDermott International, Inc. ).(Related document(s):424 Application to Employ) (Attachments: # 1 Redline) (Cavenaugh, Matthew) (Entered: 03/05/2020) |
| 03/05/2020 | 🔵 567<br>(1 pg) | Motion to Appear pro hac vice for Jeffrey Michalik. Filed by Debtor McDermott International, Inc. (Cavenaugh, Matthew) (Entered: 03/05/2020) |
| 03/05/2020 | 🔵 568<br>(9 pgs) | BNC Certificate of Mailing. (Related document(s):547 Order on Motion to Appear pro hac vice) No. of Notices: 297. Notice Date 03/05/2020. (Admin.) (Entered: 03/05/2020) |
| 03/05/2020 | 🔵 569<br>(9 pgs) | BNC Certificate of Mailing. (Related document(s):548 Order on Motion to Appear pro hac vice) No. of Notices: 297. Notice Date 03/05/2020. (Admin.) (Entered: 03/05/2020) |

| 03/06/2020 | 570<br>(10 pgs; 2 docs) | Proposed Order RE: *Authorizing the Retention and Employment of Holland & Knight LLP as Special Litigation and Colombia Counsel to the Debtors and Debtors in Possession* (Filed By McDermott International, Inc. ).(Related document(s):429 Application to Employ) (Attachments: # 1 Redline) (Cavenaugh, Matthew) (Entered: 03/06/2020) |
| --- | --- | --- |
| 03/06/2020 | 571<br>(11 pgs; 2 docs) | Proposed Order RE: *Authorizing the Employment and Retention of PricewaterhouseCoopers LLP to Provide Certain Accounting, Transaction, and Valuation Services to the Debtors* (Filed By McDermott International, Inc. ).(Related document(s):430 Application to Employ) (Attachments: # 1 Redline) (Cavenaugh, Matthew) (Entered: 03/06/2020) |
| 03/06/2020 | 572<br>(4 pgs; 2 docs) | Transfer of Claim Transfer Agreement 3001 (e) 2 Transferor: WoodRiver Energy, LLC To Fair Harbor Capital, LLC Fee Amount $25 (Grand, Joseph) (Entered: 03/06/2020) |
| 03/06/2020 | 573<br>(4 pgs; 2 docs) | Transfer of Claim Transfer Agreement 3001 (e) 2 Transferor: WoodRiver Energy, LLC To Fair Harbor Capital, LLC Fee Amount $25 (Grand, Joseph) (Entered: 03/06/2020) |
| 03/06/2020 | | Receipt of Transfer of Claim(20-30336) [claims,trclm] ( 25.00) Filing Fee. Receipt number 21945858. Fee amount $ 25.00. (U.S. Treasury) (Entered: 03/06/2020) |
| 03/06/2020 | | Receipt of Transfer of Claim(20-30336) [claims,trclm] ( 25.00) Filing Fee. Receipt number 21945858. Fee amount $ 25.00. (U.S. Treasury) (Entered: 03/06/2020) |
| 03/06/2020 | 574<br>(8 pgs; 2 docs) | Proposed Order RE: *Authorizing the Employment and Retention of K&L Gates LLP as Special Counsel to the Debtors* (Filed By McDermott International, Inc. ).(Related document(s):431 Application to Employ) (Attachments: # 1 Redline) (Cavenaugh, Matthew) (Entered: 03/06/2020) |
| 03/06/2020 | 575<br>(16 pgs; 2 docs) | Proposed Order RE: *Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* (Filed By McDermott International, Inc. ).(Related document(s):435 Generic Motion) (Attachments: # 1 Redline) (Cavenaugh, Matthew) (Entered: 03/06/2020) |
| 03/06/2020 | 576<br>(4 pgs; 2 docs) | Transfer of Claim Transfer Agreement 3001 (e) 2 Transferor: Mpw Industrial Water Services, Inc. To CRG Financial, LLC Fee Amount $25 (Polanco, Odalisa) (Entered: 03/06/2020) |
| 03/06/2020 | | Receipt of Transfer of Claim(20-30336) [claims,trclm] ( 25.00) Filing Fee. Receipt number 21947128. Fee amount $ 25.00. (U.S. Treasury) (Entered: 03/06/2020) |
| 03/06/2020 | 577<br>(1 pg) | Motion to Appear pro hac vice *Eric Handler*. Filed by Creditor Autodesk, Inc.; PlanGrid, Inc. (dnor) (Entered: 03/06/2020) |
| 03/06/2020 | 578<br>(5 pgs) | *Response to Maire Tecnimont S.P.A. and MET Gas Processing Technologies S.P.A.'s Emergency Motion to Shorten Deadline for Debtors to Respond to Discovery* (related document(s):512 Emergency Motion). Filed by McDermott International, Inc. (Cavenaugh, Matthew) (Entered: 03/06/2020) |

| 03/07/2020 | 🔵 579<br>(23 pgs) | Stipulation and Agreed Order Signed on 3/7/2020 (Related    001036<br>document(s):554 Stipulation) (aalo) (Entered: 03/08/2020) |
|---|---|---|
| 03/07/2020 | 🔵 581<br>(12 pgs) | BNC Certificate of Mailing. (Related document(s):565 Transfer of Claim) No. of Notices: 1. Notice Date 03/07/2020. (Admin.) (Entered: 03/08/2020) |
| 03/08/2020 | 🔵 580<br>(2 pgs) | Order Granting Emergency Motion to File Settlement Agreements Under Seal (Related Doc # 550) Signed on 3/8/2020. (aalo) (Entered: 03/08/2020) |
| 03/08/2020 | 🔵 582<br>(4 pgs) | *Response to Expedited Motion for an Order Continuing the March 12, 2020 Plan Confirmation Hearing Until Such Time as The Lummus Stalking Horse Purchaser Has Shown It Has Obtained, Or Can Obtain, Funds to Consummate The Lummus Purchase and Request for Earliest Possible Hearing Date On This Motion* (related document(s):557 Motion to Extend Time). Filed by McDermott International, Inc. (Cavenaugh, Matthew) (Entered: 03/08/2020) |
| 03/08/2020 | 🔵 583<br>(12 pgs) | BNC Certificate of Mailing. (Related document(s):572 Transfer of Claim) No. of Notices: 1. Notice Date 03/08/2020. (Admin.) (Entered: 03/09/2020) |
| 03/08/2020 | 🔵 584<br>(12 pgs) | BNC Certificate of Mailing. (Related document(s):573 Transfer of Claim) No. of Notices: 1. Notice Date 03/08/2020. (Admin.) (Entered: 03/09/2020) |
| 03/09/2020 | 🔵 | Courtroom Minutes. Time Hearing Held: 9:01 AM. Appearances: Anna Rotman, Matthew Cavenaugh, Ciara Foster for the Debtors; Michael Van Deelen, Interested Party; Shane Johnson; Hugh Ray III (By phone) (Related document(s):557 Motion to Extend Time) For the reasons stated on the record, the Court denied the Motion for an Order Continuing the March 12, 2020 Plan Hearing 557. Order to be entered (VrianaPortillo) (Entered: 03/09/2020) |
| 03/09/2020 | 🔵 585<br>(1 pg) | 🔊 PDF with attached Audio File. Court Date & Time [ 3/9/2020 9:01:51 AM ]. File Size [ 18064 KB ]. Run Time [ 00:37:38 ]. (In ref to doc no. 557. Hearing held March 9, 2020.). (admin). (Entered: 03/09/2020) |
| 03/09/2020 | 🔵 586<br>(1 pg) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by Matthew Cavenaugh. This is to order a transcript of 3/9/2020 before Judge David R. Jones. Court Reporter/Transcriber: Access Transcripts (Filed By McDermott International, Inc. ). (Cavenaugh, Matthew) Electronically forwarded to Access Transcripts on 3-10-2020. Estimated completion date: 3-11-2020. Modified on 3/10/2020 (MelissaMorgan). (Entered: 03/09/2020) |
| 03/09/2020 | 🔵 587<br>(1 pg) | Order (Related Doc # 557) Signed on 3/9/2020. (VrianaPortillo) (Entered: 03/09/2020) |
| 03/09/2020 | 🔵 588<br>(14 pgs) | Declaration re: *Declaration of Christina Pullo of Prime Clerk LLC Regarding Solicitation of Votes and Tabulation of Ballots Cast on the Joint Pre-Packaged Chapter 11 Plan of Reorganization of McDermott International, Inc. and Its Debtor Affiliates* (Filed By McDermott International, Inc. ). (Cavenaugh, Matthew) (Entered: 03/09/2020) |

| 03/09/2020 | 🔵 589<br>(122 pgs) | Brief (Filed By McDermott International, Inc. ).(Related document(s):4 Disclosure Statement, 121 Amended Chapter 11 Plan) (Cavenaugh, Matthew) (Entered: 03/09/2020) |
|---|---|---|
| 03/09/2020 | 🔵 590<br>(7 pgs) | Order Authorizing the Debtors and Debtors in Possession to (I) Retain and Employ KPMG LLP as Tax Compliance, Tax Consultant, Financial Accountant and Advisor, and (II) Waiving Certain Information Requirements Imposed by Local Rule 2016-2 (Related Doc # 426) Signed on 3/9/2020. (VrianaPortillo) (Entered: 03/09/2020) |
| 03/09/2020 | 🔵 591<br>(3 pgs) | Order Granting the Application of Debtors and Debtors-In-Possession to Retain Jackson Walker LLP as Co-Counsel and Conflicts Counsel for Debtors and Debtors-In-Possession (Related Doc # 424) Signed on 3/9/2020. (VrianaPortillo) (Entered: 03/09/2020) |
| 03/09/2020 | 🔵 592<br>(175 pgs; 4 docs) | Adversary case 20-03056. Nature of Suit: (21 (Validity, priority or extent of lien or other interest in property)),(91 (Declaratory judgment)) Complaint *for Declaratory Relief* by Lummus Technology LLC against Maire Tecnimont S.p.A. an Italian Company, MET Gas Processing Technologies S.p.A.. Fee Amount $350 (Attachments: # 1 Exhibit A # 2 Exhibit B # 3 Adversary Cover Sheet) (Cavenaugh, Matthew) (Entered: 03/09/2020) |
| 03/09/2020 | 🔵 593<br>(12 pgs; 2 docs) | Proposed Order RE: *Authorizing the Retention and Employment of Kirkland & Ellis LLP and Kirkland & Ellis International LLP as Attorneys for the Debtors and Debtors in Possession* (Filed By McDermott International, Inc. ).(Related document(s):428 Application to Employ) (Attachments: # 1 Redline) (Cavenaugh, Matthew) (Entered: 03/09/2020) |
| 03/09/2020 | 🔵 606<br>(5 pgs) | Order Authorizing the Retention and Employment of Baker Botts L.L.P. as Special Counsel to the Debtors and Debtors in Possession (Related Doc # 425) Signed on 3/9/2020. (VrianaPortillo) (Entered: 03/10/2020) |
| 03/09/2020 | 🔵 608<br>(7 pgs) | Order Authorizing the Retention and Employment of Evercore Group L.L.C. and Evercore Partners International LLP as Investment Banker to the Debtors in Possession (Related Doc # 427) Signed on 3/9/2020. (VrianaPortillo) (Entered: 03/10/2020) |
| 03/09/2020 | 🔵 609<br>(5 pgs) | Order Authorizing the Retention and Employment of Holland & Knight LLP as Special Litigation and Colombia Counsel to the Debtors and Debtors in Possession (Related Doc # 429) Signed on 3/9/2020. (VrianaPortillo) (Entered: 03/10/2020) |
| 03/09/2020 | 🔵 611<br>(4 pgs) | Order Authorizing the Employment and Retention of K&L Gates LLP as Special Counsel to the Debtors (Related Doc # 431) Signed on 3/9/2020. (VrianaPortillo) (Entered: 03/10/2020) |
| 03/09/2020 | 🔵 612<br>(27 pgs) | Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business (Related Doc # 435) Signed on 3/9/2020. (VrianaPortillo) (Entered: 03/10/2020) |
| 03/09/2020 | 🔵 624<br>(1 pg) | Notice *of Unliquidated Claim for CB & I LLC filed by Jean Hoffman*. (ClaudiaGutierrez) (Entered: 03/11/2020) |
| 03/09/2020 | 🔵 625 | Notice *of Unliquidated Claim for Shaw Services LLC filed by Jean* |

001038

| | (1 pg) | *Hoffman*. (ClaudiaGutierrez) (Entered: 03/11/2020) |
|---|---|---|
| 03/09/2020 | 🔵 626 (1 pg) | Notice *for Unliquidated Claim for Lutech Resources Inc filed by Jean Hoffman*. (ClaudiaGutierrez) (Entered: 03/11/2020) |
| 03/10/2020 | 🔵 594 (23 pgs; 2 docs) | Witness List (Filed By Reese Coligado Shareholder Group ). (Attachments: # 1 Exhibit List) (Baker, Reese) (Entered: 03/10/2020) |
| 03/10/2020 | 🔵 595 (9 pgs) | Notice *of response and reservation of rights regarding proposed sale*. (Related document(s):476 Generic Order) Filed by Oracle America, Inc. (Catmull, Annie) (Entered: 03/10/2020) |
| 03/10/2020 | 🔵 596 (28 pgs) | Certificate *of service* (Filed By Oracle America, Inc. ).(Related document(s):595 Notice) (Catmull, Annie) (Entered: 03/10/2020) |
| 03/10/2020 | 🔵 597 (34 pgs) | Notice *Shawna Green, Individually, and as Personal Representative of the Estate of Aaron Green Deceased's Notice of Joinder to the Limited Objection to the Amended Joint Prepackaged Chapter 11 Plan of Reorganization of McDermott International, Inc. and Its Debtor Affiliates*. (Related document(s):530 Response/Objection) Filed by Shawna Green, Individually, and as Personal Representative of the Estate of Aaron Green Deceased (Judd, T.) (Entered: 03/10/2020) |
| 03/10/2020 | 🔵 598 (28 pgs) | Exhibit List, Witness List (Filed By Oracle America, Inc. ).(Related document(s):535 Objection to Confirmation of the Plan, 595 Notice) (Catmull, Annie) (Entered: 03/10/2020) |
| 03/10/2020 | 🔵 599 (2 pgs) | Exhibit List, Witness List (Filed By Apache Industrial Painting, Inc., Apache Industrial Services, Inc., CFI Mechanical, Inc., DGI-Menard, Inc., Gas Innovations, Gerab National Enterprises LLC, Inventure Design, LLC, Kelkar LLC d/b/a Troop Industrial, MLN Service Company, Network Cabling Services, Inc., Nooter/Eriksen, Inc., Remedial Construction Services, L.P., Shawna Green, Individually, and as Personal Representative of the Estate of Aaron Green Deceased, Trio Electric, LLC, VPF Fire Systems, Inc., W.T. Byler Co., Inc., Wholesale Electric Supply Co., of Houston, Inc., Wilson Fire Equipment & Service Co., Inc. ).(Related document(s):530 Response/Objection) (Judd, T.) (Entered: 03/10/2020) |
| 03/10/2020 | 🔵 600 (3 pgs) | Witness List, Exhibit List (Filed By Sonia Chae U.S. Securities & Exchange Commission ). (Chae, Sonia) (Entered: 03/10/2020) |
| 03/10/2020 | 🔵 601 (3 pgs) | Exhibit List, Witness List (Filed By Maire Tecnimont SPA and MET Gas Processing Technologies SPA ).(Related document(s):544 Response/Objection) (Judd, T.) (Entered: 03/10/2020) |
| 03/10/2020 | 🔵 602 (3 pgs) | Exhibit List (Filed By Credit Agricole Corporate and Investment Bank ). (Wood, William) (Entered: 03/10/2020) |
| 03/10/2020 | 🔵 603 (5 pgs) | Witness List, Exhibit List (Filed By McDermott International, Inc. ). (Cavenaugh, Matthew) (Entered: 03/10/2020) |
| 03/10/2020 | 🔵 604 (1 pg) | Motion to Appear pro hac vice *by Nacif Taousse*. Filed by Creditor Chevron Corporation (Zottnick, Kelsey) (Entered: 03/10/2020) |
| 03/10/2020 | 🔵 605 | Notice of Appearance and Request for Notice Filed by Kelsey Zottnick |

11/18/21, 11:12 AM Case 4:21-cv-03369 Document 2-2 CM/ECF LIVE - US Bankruptcy Court: Texas Southern Filed on 11/18/21 in TXSD Page 87 of 550

001989

| | | Filed by on behalf of Chevron Corporation (Zottnick, Kelsey) (Entered: 03/10/2020) |
|---|---|---|
| 03/10/2020 | 607 (3 pgs) | Letter from Shareholder Vishvanath Yellore (JeannieAndresen) (Entered: 03/10/2020) |
| 03/10/2020 | 610 (5 pgs) | Order Authorizing the Employment and Retention of PricewaterhouseCoopers LLP to Provide Certain Services to the Debtors (Related Doc # 430) Signed on 3/10/2020. (VrianaPortillo) (Entered: 03/10/2020) |
| 03/10/2020 | 613 (2 pgs) | Response/Objection Filed by Christopher Komatinsky. (Related document(s):589 Brief) (JeannieAndresen) (Entered: 03/10/2020) |
| 03/10/2020 | 614 (52 pgs; 2 docs) | Supplemental Objection *TO DEBTORS AMENDED MOTION FOR ENTRY OF (A) AN ORDER (I) APPROVING THE STALKING HORSE PROTECTIONS, (II) APPROVING BIDDING PROCEDURES FOR THE SALE OF THE LUMMUS ASSETS AND INTERESTS, AND (III) APPROVING CONTRACT ASSUMPTION AND ASSIGNMENT PROCEDURES, AND (B) AN ORDER AUTHORIZING THE DEBTORS TO ENTER INTO A DEFINITIVE PURCHASE AGREEMENT SUBJECT TO ENTRY OF THE CONFIRMATION ORDER.* Filed by Maire Tecnimont SPA and MET Gas Processing Technologies SPA (Attachments: # 1 Declaration) (Judd, T.) (Entered: 03/10/2020) |
| 03/10/2020 | 615 (22 pgs; 2 docs) | Proposed Order RE: *Final Order Authorizing the Debtors to (I) Continue to Operate Their Cash Management System and Maintain Existing Bank Accounts and (II) Continue to Perform Intercompany Transactions* (Filed By McDermott International, Inc. ).(Related document(s):15 Emergency Motion, 147 Order Setting Hearing) (Attachments: # 1 Redline) (Cavenaugh, Matthew) (Entered: 03/10/2020) |
| 03/10/2020 | 616 (10 pgs) | Notice *of Revised Exhibit B to Motion for Entry of Interim and Final Orders Authorizing the Debtors to (I) Continue to Operate Their Cash Management System and Maintain Existing Bank Accounts and (II) Continue to Perform Intercompany Transactions.* (Related document(s):15 Emergency Motion) Filed by McDermott International, Inc. (Cavenaugh, Matthew) (Entered: 03/10/2020) |
| 03/10/2020 | 617 (117 pgs; 2 docs) | Amended Objection *AMENDED SUPPLEMENTAL OBJECTION TO DEBTORS AMENDED MOTION FOR ENTRY OF (A) AN ORDER (I) APPROVING THE STALKING HORSE PROTECTIONS, (II) APPROVING BIDDING PROCEDURES FOR THE SALE OF THE LUMMUS ASSETS AND INTERESTS, AND (III) APPROVING CONTRACT ASSUMPTION AND ASSIGNMENT PROCEDURES, AND (B) AN ORDER AUTHORIZING THE DEBTORS TO ENTER INTO A DEFINITIVE PURCHASE AGREEMENT SUBJECT TO ENTRY OF THE CONFIRMATION ORDER.* Filed by Maire Tecnimont SPA and MET Gas Processing Technologies SPA (Attachments: # 1 Declaration) (Judd, T.) (Entered: 03/10/2020) |
| 03/10/2020 | 618 (4 pgs) | Response *to the Amended Motion for Order Appointing a Trustee or Examiner Pursuant to U.S.C. Section 1104* (related document(s):441 Motion to Appoint Trustee). Filed by McDermott International, Inc. (Cavenaugh, Matthew) (Entered: 03/11/2020) |
| 03/11/2020 | 619 | Letter from Shareholder T.M. Kumar (JeannieAndresen) (Entered: |

11/18/21, 11:12 AM Case 4:21-cv-03369 Document 10-2 Filed on 11/18/21 in TXSD Page 88 of 550
BK LIVE - ECF LIVE - US Bankruptcy Court-Texas Southern

001040

| | | (9 pgs) | 03/11/2020 |
|---|---|---|---|
| 03/11/2020 | 🌐 620<br>(143 pgs; 2 docs) | Second Amended Chapter 11 Plan Filed by McDermott International, Inc.. (Attachments: # 1 Redline)(Cavenaugh, Matthew) (Entered: 03/11/2020) |
| 03/11/2020 | 🌐 621<br>(2 pgs) | Withdraw Document (Filed By Air Products and Chemicals, Inc ). (Related document(s):537 Response) (Grogan, James) (Entered: 03/11/2020) |
| 03/11/2020 | 🌐 622<br>(309 pgs) | Notice *of Filing of Amended Plan Supplement*. (Related document(s):520 Notice, 620 Amended Chapter 11 Plan) Filed by McDermott International, Inc. (Cavenaugh, Matthew) (Entered: 03/11/2020) |
| 03/11/2020 | 🌐 623<br>(283 pgs) | Affidavit Re: *Mailings for the Period from February 29, 2020 through March 6, 2020.* (related document(s):520 Notice, 543 Notice, 549 Emergency Motion, 554 Stipulation, 555 Proposed Order, 561 Proposed Order, 564 Proposed Order, 566 Proposed Order). Filed by Prime Clerk LLC (Steele, Benjamin) (Entered: 03/11/2020) |
| 03/11/2020 | 🌐 627<br>(257 pgs; 2 docs) | Proposed Order RE: *Approving the Debtors' Disclosure Statement and Confirming the Second Amended Joint Prepackaged Chapter 11 Plan of Reorganization of McDermott International, Inc. and its Debtor Affiliates* (Filed By McDermott International, Inc ).(Related document(s):620 Amended Chapter 11 Plan) (Attachments: # 1 Redline - Sale Order) (Cavenaugh, Matthew) (Entered: 03/11/2020) |
| 03/11/2020 | 🌐 628<br>(5 pgs) | Objection *Limited Objection and Reservation of Rights*. Filed by Toshiba America Energy Systems Corporation (Conaway, David) (Entered: 03/11/2020) |
| 03/11/2020 | 🌐 629<br>(6 pgs) | Objection *Reservation of Rights*. Filed by Certain Contract Counterparties (Henrikson, Lindsey) (Entered: 03/11/2020) |
| 03/11/2020 | 🌐 630<br>(1 pg) | Order Granting Motion To Appear pro hac vice - David H. Conaway (Related Doc # 563) Signed on 3/11/2020. (emiller) (Entered: 03/11/2020) |
| 03/11/2020 | 🌐 631<br>(1 pg) | Order Granting Motion To Appear pro hac vice - Jeffrey Michalik (Related Doc # 567) Signed on 3/11/2020. (emiller) (Entered: 03/11/2020) |
| 03/11/2020 | 🌐 632<br>(1 pg) | Order Granting Motion To Appear pro hac vice - Eric Handler (Related Doc # 577) Signed on 3/11/2020. (emiller) (Entered: 03/11/2020) |
| 03/11/2020 | 🌐 633<br>(1 pg) | Order Granting Motion To Appear pro hac vice - Nacif Taousse (Related Doc # 604) Signed on 3/11/2020. (emiller) (Entered: 03/11/2020) |
| 03/11/2020 | 🌐 634<br>(2 pgs) | Withdraw Document (Filed By Sparrows Offshore LLC ).(Related document(s):540 Objection to Confirmation of the Plan) (Ridulfo, Michael) (Entered: 03/11/2020) |
| 03/11/2020 | 🌐 635<br>(57 pgs; 3 docs) | Notice *Under Section 546(b) of Perfection of Interest in Property*. Filed by Innova Global Inc. (Attachments: # 1 Exhibit A # 2 Exhibit B) (Peirce, Steve) (Entered: 03/11/2020) |

| | | |
|---|---|---|
| 03/11/2020 | 🌐 636<br>(156 pgs; 2 docs) | Application to Employ AlixPartners LLP as Financial Advisor. Objections/Request for Hearing Due in 21 days. Filed by Debtor McDermott International, Inc. (Attachments: # 1 Proposed Order) (Cavenaugh, Matthew) (Entered: 03/11/2020) |
| 03/11/2020 | 🌐 637<br>(153 pgs; 2 docs) | Application to Employ AP Services and John R. Castellano as Chief Transformation Officer (relates to ECF No. 434). Objections/Request for Hearing Due in 21 days. Filed by Debtor McDermott International, Inc. (Attachments: # 1 Proposed Order) (Cavenaugh, Matthew) (Entered: 03/11/2020) |
| 03/11/2020 | 🌐 638<br>(4 pgs) | Response *Reservation of Rights by the Chevron Corporation and Certain of its Affiliates*. Filed by Chevron Corporation (Zottnick, Kelsey) (Entered: 03/11/2020) |
| 03/11/2020 | 🌐 639<br>(17 pgs; 2 docs) | Emergency Motion *for Entry of an Order Authorizing the Debtors to (I) File Under Seal the Names of Certain Parties in Interest Related to Kirkland & Ellis LLP and Kirkland & Ellis International LLP's Retention Application and (II) Maintain the Confidentiality of a Certain Confidential Client Previously Filed Under Seal Related to Kirkland & Ellis LLP and Kirkland & Ellis International LLP's Retention Application* Filed by Debtor McDermott International, Inc. (Attachments: # 1 Proposed Order) (Cavenaugh, Matthew) (Entered: 03/11/2020) |
| 03/11/2020 | 🌑 640 | Sealed Document *Schedule 1 to Motion for Entry of an Order Authorizing the Debtors to (I) File Under Seal the Names of Certain Confidential Parties in Interest Related to Kirkland & Ellis LLP and Kirkland & Ellis International LLP's Retention Application and (II) Maintain the Confidentiality of a Certain Confidential Client Previously Filed Under Seal Related to Kirkland & Ellis LLP and Kirkland & Ellis International LLP's Retention Application (related to ECF No. 639)* (Filed By McDermott International, Inc. ). (Cavenaugh, Matthew) (Entered: 03/11/2020) |
| 03/11/2020 | 🌑 | Hearing Set On Debtors' Emergency Motion to File Under Seal (Related document(s):639 Emergency Motion) **Hearing scheduled for 3/12/2020 at 09:00 AM at Houston, Courtroom 400 (DRJ).** (JeannieAndresen) (Entered: 03/11/2020) |
| 03/11/2020 | 🌐 641<br>(31 pgs) | BNC Certificate of Mailing. (Related document(s):579 Generic Order) No. of Notices: 300. Notice Date 03/11/2020. (Admin.) (Entered: 03/11/2020) |
| 03/11/2020 | 🌐 642<br>(10 pgs) | BNC Certificate of Mailing. (Related document(s):580 Order on Emergency Motion) No. of Notices: 300. Notice Date 03/11/2020. (Admin.) (Entered: 03/11/2020) |
| 03/11/2020 | 🌐 643<br>(9 pgs) | BNC Certificate of Mailing. (Related document(s):587 Order on Motion to Extend Time) No. of Notices: 300. Notice Date 03/11/2020. (Admin.) (Entered: 03/11/2020) |
| 03/11/2020 | 🌐 644<br>(15 pgs) | BNC Certificate of Mailing. (Related document(s):590 Order on Application to Employ) No. of Notices: 300. Notice Date 03/11/2020. (Admin.) (Entered: 03/11/2020) |
| 03/11/2020 | 🌐 645<br>(11 pgs) | BNC Certificate of Mailing. (Related document(s):591 Order on Application to Employ) No. of Notices: 300. Notice Date 03/11/2020. |

| 03/11/2020 | 🌀 646 (12 pgs) | BNC Certificate of Mailing. (Related document(s):576 Transfer of Claim) No. of Notices: 1. Notice Date 03/11/2020. (Admin.) (Entered: 03/11/2020) |
| --- | --- | --- |
| 03/11/2020 | 🌀 674 (1 pg) | Motion to Appear pro hac vice *Andrew J. Herink*. Filed by Interested Party Central States, Southeast and Southwest Areas Pension Fund (ShoshanaArnow) (Entered: 03/13/2020) |
| 03/12/2020 | 🌀 647 (115 pgs) | *Notice of Filing of Second Amended Plan Supplement*. (Related document(s):520 Notice, 622 Notice) Filed by McDermott International, Inc. (Cavenaugh, Matthew) (Entered: 03/12/2020) |
| 03/12/2020 | 🌀 648 (1 pg) | Motion to Appear pro hac vice *by Daniel Guyder*. Filed by Creditor IHC Services B.V. (Lippman, Kevin) (Entered: 03/12/2020) |
| 03/12/2020 | 🌀 649 (10 pgs; 2 docs) | Response (Filed By US Trustee ).(Related document(s):639 Emergency Motion) (Attachments: # 1 Proposed Order) (Statham, Stephen) (Entered: 03/12/2020) |
| 03/12/2020 | 🌀 650 (9 pgs) | Agenda for Hearing on 3/12/2020 (Filed By McDermott International, Inc. ). (Cavenaugh, Matthew) (Entered: 03/12/2020) |
| 03/12/2020 | 🌀 651 (215 pgs; 3 docs) | Amended Chapter 11 Plan Filed by McDermott International, Inc.. (Attachments: # 1 Redline to January 22 version # 2 Redline to March 11 version)(Cavenaugh, Matthew) (Entered: 03/12/2020) |
| 03/12/2020 | 🌀 652 (3 pgs) | Notice of Appearance and Request for Notice Filed by Kevin M Lippman Filed by on behalf of IHC Services B.V. (Lippman, Kevin) (Entered: 03/12/2020) |
| 03/12/2020 | 🌀 653 (3 pgs) | Withdraw Document (Filed By Yancey Bros. Co. ).(Related document(s):533 Objection) (Hatcher, Todd) (Entered: 03/12/2020) |
| 03/12/2020 | 🌀 654 (14 pgs) | Statement *Amended Verified Statement of Davis Polk & Wardwell LLP and Porter Hedges LLP Pursuant to Federal Rule of Bankruptcy Procedure 2019* (Filed By Ad Hoc Group of Term Lenders ). (Higgins, John) (Entered: 03/12/2020) |
| 03/12/2020 | 🌀 655 (26 pgs) | Withdraw Document (Filed By Apache Industrial Painting, Inc., Apache Industrial Services, Inc., CFI Mechanical, Inc., DGI-Menard, Inc., Gas Innovations, Gerab National Enterprises LLC, Inventure Design, LLC, Kelkar LLC d/b/a Troop Industrial, MLN Service Company, Network Cabling Services, Inc., Nooter/Eriksen, Inc., Remedial Construction Services, L.P., Shawna Green, Individually, and as Personal Representative of the Estate of Aaron Green Deceased, Trio Electric, LLC, VPF Fire Systems, Inc., W.T. Byler Co., Inc., Wholesale Electric Supply Co., of Houston, Inc., Wilson Fire Equipment & Service Co., Inc. ).(Related document(s):530 Response/Objection) (Judd, T.) (Entered: 03/12/2020) |
| 03/12/2020 | 🌀 656 (2 pgs) | Notice of Inability to Appoint Creditors' Committee by the United States Trustee (Duran, Hector) (Entered: 03/12/2020) |
| 03/12/2020 | 🌀 657 | Proposed Order RE: *Order Approving the Debtors' Disclosure Statement* |

| | | |
|---|---|---|
| | (288 pgs; 2 docs) | *and Confirming the Second Amended Joint Prepackaged Chapter 11 Plan of Reorganization (Technical Modifications) of McDermott International, Inc. and its Debtor Affiliates* (Filed By McDermott International, Inc. ).(Related document(s):651 Amended Chapter 11 Plan) (Attachments: # 1 Redline) (Cavenaugh, Matthew) (Entered: 03/12/2020) |
| 03/12/2020 | 🔵658 (1 pg) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by Matthew Cavenaugh. This is to order a transcript of 3/12/2020 before Judge David R. Jones. Court Reporter/Transcriber: Access Transcripts (Filed By McDermott International, Inc. ). (Cavenaugh, Matthew) Electronically forwarded to Access Transcripts on 3-13-2020. Estimated completion date: 3-14-2020. Modified on 3/13/2020 (MelissaMorgan). (Entered: 03/12/2020) |
| 03/12/2020 | 🔵659 (1 pg) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by Matthew Whitaker. This is to order a transcript of Plan Hearing on March 9 2020 before Judge David R. Jones. Court Reporter/Transcriber: Access Transcripts. (JenniferOlson) Electronically forwarded to the original transcriber: Access Transcripts on 3-13-2020. Estimated completion date: 3-14-2020. Modified on 3/13/2020 (MelissaMorgan). (Entered: 03/12/2020) |
| 03/12/2020 | 🔵660 (316 pgs; 2 docs) | Proposed Order RE: *Approving the Debtors' Disclosure Statement and Confirming the Second Amended Joint Prepackaged Chapter 11 Plan of Reorganization (Technical Modifications) of McDermott International, Inc. and Its Debtor Affiliates* (Filed By McDermott International, Inc. ). (Related document(s):651 Amended Chapter 11 Plan) (Attachments: # 1 Redline) (Cavenaugh, Matthew) (Entered: 03/12/2020) |
| 03/12/2020 | 🔵 | Courtroom Minutes. Time Hearing Held: 9:00 AM. Appearances: Matthew Cavenaugh, Veronica Polnick, Joshua Sussberg, Anthony Grossi, Anna Rotman, Ciara Foster, Chris Greco for the Debtors; Penelope Jensen, Margo Schonholtz; Simon Mayer and Anu Yerramalli; Michael Van Deelen; Hugh Ray, Robert Britton, and Neal Donnelly; Kenneth Krock; John Higgins, Damien Schaible, and Natasha Tsiouris; Carollynn Callari and Josh Judd (by phone); Ashley Harper; Tom Howley nd Jane VanLare; Cliff Carlson; Reese Baker; and Ken Kattner, Charlie Beckham and Courtney Lyda; Michael Etkin; Michael Collins; Michael Durrschmidt; Daniel Myrick; Zach Clement; Annie Catmull; Christopher Komatinshy (by phone); Christopher Caplinger (by phone); Catherine Heitzenrater (by phone); Sonia Chae (by phone) (Related document(s):15 Emergency Motion, 428 Application to Employ, 512 Emergency Motion, 549 Emergency Motion, 639 Emergency Motion) Witnesses: Dimitrios Georgiou, Todd Kramer, Mark Brown, Roopesh Shah, and John Castellano. Docket no. 588 admitted. Debtors exhibit B, D and F admitted without objection. For the reasons stated on the record, the Court approved the debtors disclosure statement and confirmed the second amended joint prepackaged chapter 11 plan. The parties to submit a revised confirmation order. The Court approved the Amended Motion for Entry of (A) an Order (I) Approving the Stalking Horse Protections, (II) Approving Bidding Procedures for the Sale of the Lummus Assets and Interest, and (III) Approving Contract Assumption and Assignment Procedures, and (B) an Order Authorizing the Debtors to Enter Into a Definitive Purchase Agreement Subject to Entry of the Confirmation Order 110. The Motion to Appoint Trustee 441 is now moot. The Emergency Motion to Shorten Deadline for Debtors to Respond to Discovery 512 was withdrawn on the record. The Court approved the Cash Management Motion 15 on a final basis. The revised proposed final |

| | | |
|---|---|---|
| | | order submitted at docket no. 615 was signed on the record. The Court approved the Insurance Motion 549. Order to be entered. The retention application submitted at docket no. 428 was approved. Order to be entered. (VrianaPortillo) (Entered: 03/12/2020) |
| 03/12/2020 | 661 (3 pgs) | Order Authorizing the Debtors to (I) File Under Seal the Names of Certain Confidential Parties in Interest Related to Kirkland & Ellis LLP and Kirkland & Ellis LLP International LLP's Retention Application and (II) Maintain the Confidentiality of Certain Confidential Client Previously Filed Under Seal Related to Kirkland & Ellis LLP nd Kirkland & Ellis International LLP's Retention Application (Related Doc # 639) Signed on 3/12/2020. (VrianaPortillo) (Entered: 03/12/2020) |
| 03/12/2020 | 662 (11 pgs) | Final Order Authorizing the Debtors to (I) Continue to Operate their Cash Management System and Maintain Existing Bank Accounts and (II) Continue to Perform Intercompany Transactions Signed on 3/12/2020 (Related document(s):15 Emergency Motion, 147 Order Setting Hearing) (VrianaPortillo) (Entered: 03/12/2020) |
| 03/12/2020 | 663 (7 pgs) | Order (I) Authorizing and Approving the Settlement by nd Among the Debtors and the Insurers, and (II) Granting Related Relief (Related Doc # 549) Signed on 3/12/2020. (VrianaPortillo) (Entered: 03/12/2020) |
| 03/12/2020 | 664 (32 pgs) | Transcript RE: Hearing held on 03/09/20 before Judge David R. Jones. Transcript is available for viewing in the Clerk's Office. Filed by Transcript access will be restricted through 06/10/2020. (AccessTranscripts) (Entered: 03/12/2020) |
| 03/12/2020 | 665 (213 pgs) | Order Approving the Debtors' Disclosure Statement and Confirming the Second Amended Joint Prepackaged Chapter 11 Plan of Reorganization (Technical Modifications) of McDermott International, Inc. and Its Debtor Affiliates Signed on 3/12/2020 (Related document(s):651 Amended Chapter 11 Plan) (emiller) (Entered: 03/12/2020) |
| 03/12/2020 | 666 (1 pg) | PDF with attached Audio File. Court Date & Time [ 3/12/2020 9:02:25 AM ]. File Size [ 105979 KB ]. Run Time [ 03:40:47 ]. (In ref to Confirmation and doc nos. 15, 110, 512, 428, 639, 549, and 441. Hearing held March 12, 2020.). (admin). (Entered: 03/12/2020) |
| 03/12/2020 | 667 (13 pgs) | BNC Certificate of Mailing. (Related document(s):606 Order on Application to Employ) No. of Notices: 300. Notice Date 03/12/2020. (Admin.) (Entered: 03/13/2020) |
| 03/12/2020 | 668 (15 pgs) | BNC Certificate of Mailing. (Related document(s):608 Order on Application to Employ) No. of Notices: 300. Notice Date 03/12/2020. (Admin.) (Entered: 03/13/2020) |
| 03/12/2020 | 669 (13 pgs) | BNC Certificate of Mailing. (Related document(s):609 Order on Application to Employ) No. of Notices: 300. Notice Date 03/12/2020. (Admin.) (Entered: 03/13/2020) |
| 03/12/2020 | 670 (13 pgs) | BNC Certificate of Mailing. (Related document(s):610 Order on Application to Employ) No. of Notices: 300. Notice Date 03/12/2020. (Admin.) (Entered: 03/13/2020) |
| 03/12/2020 | 671 | BNC Certificate of Mailing. (Related document(s):611 Order on |

| | | Application to Employ) No. of Notices: 300. Notice Date 03/12/2020. (Admin.) (Entered: 03/13/2020) |
|---|---|---|
| 03/12/2020 | 672 (35 pgs) | BNC Certificate of Mailing. (Related document(s):612 Generic Order) No. of Notices: 300. Notice Date 03/12/2020. (Admin.) (Entered: 03/13/2020) |
| 03/13/2020 | 673 (1 pg) | Notice of Filing of Official Transcript as to 664 Transcript. Parties notified (Related document(s):664 Transcript) (jdav) (Entered: 03/13/2020) |
| 03/13/2020 | 675 (4 pgs) | Declaration re: *Disinterstedness of Armstrong Teasdale LLP* (Filed By Armstrong Teasdale LLP ). (Engel, Richard) (Entered: 03/13/2020) |
| 03/13/2020 | 676 (2 pgs) | Declaration re: *Declaration of Disinterestedness of Ughi E Nunziante Studio Legale Pursuant to the Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* (Filed By McDermott International, Inc. ). (Cavenaugh, Matthew) (Entered: 03/13/2020) |
| 03/13/2020 | 677 (5 pgs) | Declaration re: *Declaration of Disinterestedness of Fieldfisher, LLP Pursuant to the Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* (Filed By McDermott International, Inc. ). (Cavenaugh, Matthew) (Entered: 03/13/2020) |
| 03/13/2020 | 678 (2 pgs) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by Matthew Whitaker. This is to order a transcript of Motion Hearing, 2/24/2020 before Judge David R. Jones. Court Reporter/Transcriber: Access Transcripts. (mmap) Electronically forwarded to the original transcriber: Access Transcripts on 3-13-2020. Estimated completion date: 3-14-2020. Modified on 3/13/2020 (MelissaMorgan). (Entered: 03/13/2020) |
| 03/13/2020 | 679 (8 pgs) | Notice *of Declaration of Disinterestedness of Foster LLP*. Filed by Foster, LLP (Perez, Alexander) (Entered: 03/13/2020) |
| 03/13/2020 | 680 (9 pgs) | BNC Certificate of Mailing. (Related document(s):630 Order on Motion to Appear pro hac vice) No. of Notices: 300. Notice Date 03/13/2020. (Admin.) (Entered: 03/13/2020) |
| 03/13/2020 | 681 (9 pgs) | BNC Certificate of Mailing. (Related document(s):631 Order on Motion to Appear pro hac vice) No. of Notices: 300. Notice Date 03/13/2020. (Admin.) (Entered: 03/13/2020) |
| 03/13/2020 | 682 (9 pgs) | BNC Certificate of Mailing. (Related document(s):632 Order on Motion to Appear pro hac vice) No. of Notices: 300. Notice Date 03/13/2020. (Admin.) (Entered: 03/13/2020) |
| 03/13/2020 | 683 (9 pgs) | BNC Certificate of Mailing. (Related document(s):633 Order on Motion to Appear pro hac vice) No. of Notices: 300. Notice Date 03/13/2020. (Admin.) (Entered: 03/13/2020) |
| 03/14/2020 | 684 (213 pgs) | Amended Order Approving the Debtors' Disclosure Statement and Confirming the Second Amended Joint Prepackaged Chapter 11 Plan of Reorganization (Technical Modifications) of McDermott International, |

| | | Inc. and Its Debtor Affiliates Signed on 3/14/2020 (Related document(s):660 Proposed Order) (aalo) (Entered: 03/14/2020) 001046 |
|---|---|---|
| 03/14/2020 | 🔵685 (11 pgs) | BNC Certificate of Mailing. (Related document(s):661 Order on Emergency Motion) No. of Notices: 301. Notice Date 03/14/2020. (Admin.) (Entered: 03/14/2020) |
| 03/14/2020 | 🔵686 (19 pgs) | BNC Certificate of Mailing. (Related document(s):662 Generic Order) No. of Notices: 301. Notice Date 03/14/2020. (Admin.) (Entered: 03/14/2020) |
| 03/14/2020 | 🔵687 (15 pgs) | BNC Certificate of Mailing. (Related document(s):663 Order on Emergency Motion) No. of Notices: 301. Notice Date 03/14/2020. (Admin.) (Entered: 03/14/2020) |
| 03/14/2020 | 🔵688 (221 pgs) | BNC Certificate of Mailing. (Related document(s):665 Generic Order) No. of Notices: 301. Notice Date 03/14/2020. (Admin.) (Entered: 03/14/2020) |
| 03/15/2020 | 🔵689 (9 pgs) | BNC Certificate of Mailing. (Related document(s):673 Notice of Filing of Official Transcript (Form)) No. of Notices: 301. Notice Date 03/15/2020. (Admin.) (Entered: 03/15/2020) |
| 03/16/2020 | 🔵690 (188 pgs) | Transcript RE: Hearing held on 03/12/20 before Judge David R. Jones. Transcript is available for viewing in the Clerk's Office. Filed by Transcript access will be restricted through 06/15/2020. (AccessTranscripts) (Entered: 03/16/2020) |
| 03/16/2020 | 🔵691 (3 pgs; 2 docs) | Transfer of Claim Transfer Agreement 3001 (e) 2 Transferor: RR Donnelly & Sons Co. To Cedar Glade LP Fee Amount $25 (Tanabe, Kesha) (Entered: 03/16/2020) |
| 03/16/2020 | | Receipt of Transfer of Claim(20-30336) [claims,trclm] ( 25.00) Filing Fee. Receipt number 21971506. Fee amount $ 25.00. (U.S. Treasury) (Entered: 03/16/2020) |
| 03/17/2020 | 🔵692 (6 pgs) | Order Authorizing the Retention and Employment of Kirkland & Ellis LLP (Related Doc # 428) Signed on 3/17/2020. (aalo) (Entered: 03/17/2020) |
| 03/17/2020 | 🔵693 (1 pg) | Notice of Filing of Official Transcript as to 690 Transcript. Parties notified (Related document(s):690 Transcript) (dhan) (Entered: 03/17/2020) |
| 03/17/2020 | 🔵694 (21 pgs; 4 docs) | Emergency Motion *for Michael Van Deelen to Appear and Show Cause Why He Should Not be Held in Contempt of Court and Prohibited from Further Contact with the Debtors, Their Officers, or Their Counsel* Filed by Debtor McDermott International, Inc. (Attachments: # 1 Complaint A-Sussberg Affidavit # 2 Exhibit B-Spence Affidavit # 3 Proposed Order) (Cavenaugh, Matthew) (Entered: 03/17/2020) |
| 03/17/2020 | 🔵695 (2 pgs) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by Matthew Whitaker. This is to order a transcript of Motion hearing, 3/12/2020, before Judge David R. Jones. Court Reporter/Transcriber: Access Transcripts. (mmap) Electronically forwarded to the original transcriber: Access Transcripts on 3-18-2020. Estimated completion date 3-19-2020. Modified on 3/18/2020 (MelissaMorgan). (Entered: 03/17/2020) |
| 03/17/2020 | 🔵696 | Notice *of Filing of Third Amended Plan Supplement.* (Related |

| | | |
|---|---|---|
| | (257 pgs) | document(s):684 Generic Order) Filed by McDermott International, Inc. (Cavenaugh, Matthew) (Entered: 03/17/2020) |
| 03/17/2020 | 697 (4 pgs) | Declaration re: *Declaration of Disinterestedness of Cohen International Consulting Pursuant to the Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* (Filed By McDermott International, Inc. ). (Cavenaugh, Matthew) (Entered: 03/17/2020) |
| 03/18/2020 | 698 (1 pg) | Order Granting Motion To Appear pro hac vice - Daniel Guyder (Related Doc # 648) Signed on 3/18/2020. (emiller) (Entered: 03/18/2020) |
| 03/18/2020 | 699 (1 pg) | Order Granting Motion To Appear pro hac vice - Andrew J. Herink (Related Doc # 674) Signed on 3/18/2020. (emiller) (Entered: 03/18/2020) |
| 03/18/2020 | 700 (3 pgs) | Notice of Appearance and Request for Notice Filed by Eric A Handler Filed by on behalf of Autodesk, Inc.; PlanGrid, Inc. (Handler, Eric) (Entered: 03/18/2020) |
| 03/18/2020 | 701 (22 pgs; 2 docs) | Response (related document(s):694 Emergency Motion). Filed by Michael Van Deelen (Attachments: # 1 Proposed Order) (sgue) (Entered: 03/18/2020) |
| 03/18/2020 | 702 (4 pgs) | Witness and Exhibit List (Filed By Michael Van Deelen ). (sgue) (Entered: 03/18/2020) |
| 03/18/2020 | 703 (3 pgs) | Affidavit Re: *of Andrew Q. Chan Regarding Claim Transfer Notices*. (related document(s):565 Transfer of Claim, 572 Transfer of Claim, 573 Transfer of Claim, 576 Transfer of Claim). Filed by Prime Clerk LLC (Steele, Benjamin) (Entered: 03/18/2020) |
| 03/18/2020 | 704 (222 pgs) | Affidavit Re: *Mailings for the Period from March 7, 2020 through March 13, 2020*. (related document(s):57 Order for Joint Administration, 152 Order on Emergency Motion, 570 Proposed Order, 571 Proposed Order, 574 Proposed Order, 575 Proposed Order, 578 Response, 579 Generic Order, 580 Order on Emergency Motion, 582 Response, 588 Generic Order, 589 Brief, 590 Order on Application to Employ, 591 Order on Application to Employ, 593 Proposed Order, 606 Order on Application to Employ, 608 Order on Application to Employ, 609 Order on Application to Employ, 610 Order on Application to Employ, 611 Order on Application to Employ, 612 Generic Order, 615 Proposed Order, 616 Notice, 618 Response, 620 Amended Chapter 11 Plan, 622 Notice, 627 Proposed Order, 636 Application to Employ, 637 Application to Employ, 647 Notice, 650 Agenda, 651 Amended Chapter 11 Plan, 661 Order on Emergency Motion, 662 Generic Order, 663 Order on Emergency Motion, 665 Generic Order, 676 Declaration, 677 Declaration). Filed by Prime Clerk LLC (Steele, Benjamin) (Entered: 03/18/2020) |
| 03/18/2020 | 705 (1 pg) | Letter from Shareholder -- Fazal Hosein (VrianaPortillo) (Entered: 03/18/2020) |
| 03/18/2020 | 706 (3 pgs) | Affidavit Re: *Affidavit of Christopher T. Greco In Support of the Debtors' Emergency Motion for Michael Van Deelen to Appear and Show Cause Why He Should Not be Held in Contempt of Court and Prohibited from Further Contact with the Debtors, Their Officers, or Their Counsel* (Filed By McDermott International, Inc. ).(Related document(s):694 Emergency Motion) (Cavenaugh, Matthew) (Entered: 03/18/2020) |

001048

| 03/18/2020 | ⬤ 707<br>(221 pgs) | BNC Certificate of Mailing. (Related document(s):684 Generic Order) No. of Notices: 302. Notice Date 03/18/2020. (Admin.) (Entered: 03/18/2020) |
|---|---|---|
| 03/19/2020 | ⬤ 708<br>(2 pgs) | *Notice of Change of Firm Affiliation and Related Change of Address of Counsel*. Filed by Sundyne, LLC (Clark, Katharine) (Entered: 03/19/2020) |
| 03/19/2020 | ⬤ 709<br>(1 pg) | Order Signed on 3/19/2020 (Related document(s):427 Application to Employ) **Hearing scheduled for 4/14/2020 at 02:30 PM at Houston, Courtroom 400 (DRJ).** (aalo) (Entered: 03/19/2020) |
| 03/19/2020 | ⬤ 710<br>(9 pgs) | BNC Certificate of Mailing. (Related document(s):693 Notice of Filing of Official Transcript (Form)) No. of Notices: 303. Notice Date 03/19/2020. (Admin.) (Entered: 03/19/2020) |
| 03/19/2020 | ⬤ 711<br>(14 pgs) | BNC Certificate of Mailing. (Related document(s):692 Order on Application to Employ) No. of Notices: 303. Notice Date 03/19/2020. (Admin.) (Entered: 03/19/2020) |
| 03/19/2020 | ⬤ 712<br>(12 pgs) | BNC Certificate of Mailing. (Related document(s):691 Transfer of Claim) No. of Notices: 1. Notice Date 03/19/2020. (Admin.) (Entered: 03/19/2020) |
| 03/20/2020 | ⬤ 713<br>(3 pgs) | Declaration re: *Disinterestedness of Stibbs & Co., P.C.* (Filed By Stibbs & Co., P.C.) (Lapp, Stuart) (Entered: 03/20/2020) |
| 03/20/2020 | ⬤ 714<br>(5 pgs) | Response from Jee Hyun Kim (Related document(s):651 Amended Chapter 11 Plan) (ShoshanaArnow) (Entered: 03/20/2020) |
| 03/20/2020 | ⬤ 715<br>(9 pgs) | BNC Certificate of Mailing. (Related document(s):698 Order on Motion to Appear pro hac vice) No. of Notices: 302. Notice Date 03/20/2020. (Admin.) (Entered: 03/20/2020) |
| 03/20/2020 | ⬤ 716<br>(9 pgs) | BNC Certificate of Mailing. (Related document(s):699 Order on Motion to Appear pro hac vice) No. of Notices: 302. Notice Date 03/20/2020. (Admin.) (Entered: 03/20/2020) |
| 03/22/2020 | ⬤ 717<br>(9 pgs) | BNC Certificate of Mailing. (Related document(s):709 Order Setting Hearing) No. of Notices: 302. Notice Date 03/22/2020. (Admin.) (Entered: 03/22/2020) |
| 03/23/2020 | ⬤ 718<br>(4 pgs) | Declaration re: *Disinterestedness of Sulzer & Williams LLC.* (gclair) (Entered: 03/23/2020) |
| 03/23/2020 | ⬤ 719<br>(2 pgs) | Order Signed on 3/23/2020 (Related document(s):694 Emergency Motion) (aalo) (Entered: 03/23/2020) |
| 03/23/2020 | ⬤ 720<br>(10 pgs) | Declaration of Disinterestedness of Elig Gurkaynak Attorney at Law Pursuant to The Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business. (JesusGuajardo) (Entered: 03/23/2020) |
| 03/24/2020 | ⬤ 721<br>(2 pgs) | Notice of Appearance and Request for Notice Filed by Tammy Jayk Dunn Filed by on behalf of Osha Liang LLP (Dunn, Tammy) (Entered: 03/24/2020) |

| 03/24/2020 | ⬤ 722 (4 pgs) | Declaration re: *Declaration of Disinterestedness of Osha Liang LLP Pursuant to the Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* (Filed By Osha Liang LLP ).(Related document(s):612 Generic Order) (Dunn, Tammy) (Entered: 03/24/2020) |
|---|---|---|
| 03/24/2020 | ⬤ 723 (5 pgs; 2 docs) | Request for Hearing (Filed By Michael Van Deelen ).(Related document(s):719 Generic Order) (Attachments: # 1 Proposed Order) (mmap) (Entered: 03/24/2020) |
| 03/25/2020 | ⬤ 724 (4 pgs) | Declaration re: *of Disinterestedness of Assessment Technologies, Ltd. Pursuant to the Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* (Filed By McDermott International, Inc. ).(Related document(s):612 Generic Order) (Cavenaugh, Matthew) (Entered: 03/25/2020) |
| 03/25/2020 | ⬤ 725 (3 pgs) | Declaration re: *Disinterestedness of Patterson + Sheridan, LLP Pursuant to the Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* (Filed By Patterson + Sheridan, LLP ). (Segura, Misty) (Entered: 03/25/2020) |
| 03/25/2020 | ⬤ 726 (3 pgs) | Declaration re: *Decleration of Disinterestedness* (Filed By McDermott International, Inc. ). (Diamond, Jeffrey) (Entered: 03/25/2020) |
| 03/25/2020 | ⬤ 727 (2 pgs) | Notice of Appearance and Request for Notice Filed by Bryan Patrick Vezey Filed by on behalf of Sinclair Wyoming Refining Company (Vezey, Bryan) (Entered: 03/25/2020) |
| 03/25/2020 | ⬤ 728 (1 pg) | Motion to Appear pro hac vice *(Frederick E. Schmidt)*. Filed by Creditor Sinclair Wyoming Refining Company (Vezey, Bryan) (Entered: 03/25/2020) |
| 03/25/2020 | ⬤ 729 (262 pgs) | Affidavit Re: *Mailings for the Period from March 14, 2020 through March 20, 2020.* (related document(s):684 Generic Order, 692 Order on Application to Employ, 696 Notice, 697 Declaration, 709 Order Setting Hearing). Filed by Prime Clerk LLC (Steele, Benjamin) (Entered: 03/25/2020) |
| 03/25/2020 | ⬤ 730 (10 pgs) | BNC Certificate of Mailing. (Related document(s):719 Generic Order) No. of Notices: 304. Notice Date 03/25/2020. (Admin.) (Entered: 03/25/2020) |
| 03/26/2020 | ⬤ 731 (4 pgs) | Declaration re: *Declaration of Disinterestedness of Arnold & Porter Kaye Scholer LLP Pursuant to the Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* (Filed By McDermott International, Inc. ). (Cavenaugh, Matthew) (Entered: 03/26/2020) |
| 03/26/2020 | ⬤ 732 (6 pgs) | Declaration re: *Declaration of Disinterestedness of ELIG Gurkaynak, Attorney At Law, Pursuant to the Order Authorizing The Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* (Filed By McDermott International, Inc. ). (Cavenaugh, Matthew) (Entered: 03/26/2020) |
| 03/26/2020 | ⬤ 733 (3 pgs) | Declaration re: *Declaration of Disinterestedness of Trahan Kornegay Partners LLP Purusant to the Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of* |

| | | *Business* (Filed By McDermott International, Inc. ).(Related 001050 document(s):612 Generic Order) (Cavenaugh, Matthew) (Entered: 03/26/2020) |
|---|---|---|
| 03/27/2020 | 🔵 734 (3 pgs) | Declaration re: *Declaration of Disinterestedness of Holman Fenwick Willian LLP, Pursuant to the Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* (Filed By McDermott International, Inc. ). (Cavenaugh, Matthew) (Entered: 03/27/2020) |
| 03/27/2020 | 🔵 735 (1 pg) | Order Granting Motion To Appear pro hac vice - Frederick E. Schmidt (Related Doc # 728) Signed on 3/27/2020. (emiller) (Entered: 03/27/2020) |
| 03/27/2020 | 🔵 736 (4 pgs) | Declaration re: *Declaration of Disinterestedness of Galloway, Johnson, Tompkins, Burr & Smith Pursuant to the Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* (Filed By McDermott International, Inc. ). (Cavenaugh, Matthew) (Entered: 03/27/2020) |
| 03/27/2020 | 🔵 737 (3 pgs) | Declaration re: *Declaration of Disinterestedness of Ferguson Braswell Fraser Kubasta PC Pursuant to the Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* (Filed By McDermott International, Inc. ). (Cavenaugh, Matthew) (Entered: 03/27/2020) |
| 03/29/2020 | 🔵 738 (9 pgs) | BNC Certificate of Mailing. (Related document(s):735 Order on Motion to Appear pro hac vice) No. of Notices: 305. Notice Date 03/29/2020. (Admin.) (Entered: 03/29/2020) |
| 03/30/2020 | 🔵 739 (4 pgs) | Declaration re: *Declaration Of Disinterestedness Of Jones Day Pursuant To The Order Authorizing The Retention And Compensation Of Certain Professionals Utilized In The Ordinary Course Of Business* (Filed By Jones Day ). (Zeltner, Oliver) (Entered: 03/30/2020) |
| 03/30/2020 | 🔵 740 (4 pgs) | Declaration re: *Declaration of Disinterestedness of Essak & Associados Advogados, Sociedade Unipessoal Limitada, Pursuant to the Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* (Filed By McDermott International, Inc. ). (Cavenaugh, Matthew) (Entered: 03/30/2020) |
| 03/30/2020 | 🔵 741 (3 pgs) | Declaration re: *Declaration of Disinterestedness of King & Jurgens, LLC Pursuant to the Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* (Filed By McDermott International, Inc. ). (Cavenaugh, Matthew) (Entered: 03/30/2020) |
| 03/30/2020 | 🔵 742 (4 pgs) | Declaration re: *Declaration of Disinterestedness of ARIAS, FABREGA & FABREGA Pursuant to the Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* (Filed By McDermott International, Inc. ). (Cavenaugh, Matthew) (Entered: 03/30/2020) |
| 03/30/2020 | 🔵 743 (3 pgs) | Declaration re: *Declaration of Disinterestedness of Pinto Coates Kyre & Bowers, PLLC Pursuant to the Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* (Filed By McDermott International, Inc. ). (Cavenaugh, Matthew) (Entered: 03/30/2020) |

11/18/21, 11:12 AM Case 4:21-cv-03369 Document 40-2 Filed on 11/19/21 in TXSD Page 99 of 550
BKS-CM/ECF LIVE - US Bankruptcy Court-Texas Southern

001051

| 03/30/2020 | 🔵 744 (4 pgs) | Declaration re: *Declaration of Disinterestedness of BarentsKrans Cooperatief U.A. Pursuant to the Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* (Filed By McDermott International, Inc. ). (Cavenaugh, Matthew) (Entered: 03/30/2020) |
|---|---|---|
| 03/30/2020 | 🔵 745 (29 pgs) | Notice *of Filing of Amended Exhibits Attached to the Debtors' Motion for Entry of an Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business*. (Related document(s):612 Generic Order) Filed by McDermott International, Inc. (Cavenaugh, Matthew) (Entered: 03/30/2020) |
| 03/30/2020 | 🔵 746 (16 pgs) | Notice *of Additional Supplemental Agreement to the Debtors Emergency Motion for Entry of an Order Authorizing the Debtors to Retain and Employ Ernst & Young LLP as Auditors*. (Related document(s):478 Order on Emergency Motion) Filed by McDermott International, Inc. (Cavenaugh, Matthew) (Entered: 03/30/2020) |
| 03/30/2020 | 🔵 747 (13 pgs; 3 docs) | Motion for Relief from Stay *Motion of Sinclair Wyoming Refining Company for Relief from the Automatic Stay to Permit Continuation of Litigation Pending Against Certain of the Debtors in the United States Court of Appeals for the Tenth Circuit*. Fee Amount $181. Filed by Creditor Sinclair Wyoming Refining Company Hearing scheduled for 4/27/2020 at 01:30 PM at Houston, Courtroom 400 (DRJ). (Attachments: # 1 Certificate Pursuant to BLR 4001-1 # 2 Proposed Order) (Vezey, Bryan) (Entered: 03/30/2020) |
| 03/30/2020 | | Receipt of Motion for Relief From Stay(20-30336) [motion,mrlfsty] ( 181.00) Filing Fee. Receipt number 22007155. Fee amount $ 181.00. (U.S. Treasury) (Entered: 03/30/2020) |
| 03/30/2020 | 🔵 748 (3 pgs) | Declaration re: *Declaration of Disinterestedness of Redgrave LLP Pursuant to the Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* (Filed By McDermott International, Inc. ). (Cavenaugh, Matthew) (Entered: 03/30/2020) |
| 03/30/2020 | 🔵 749 (4 pgs) | Declaration re: *Declaration of Disinterestedness of Dinsmore & Shohl LLP Pursuant to the Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* (Filed By McDermott International, Inc. ). (Cavenaugh, Matthew) (Entered: 03/30/2020) |
| 03/30/2020 | 🔵 750 (4 pgs) | Declaration re: *Declaration of Disinterestedness of Calfee, Halter & Griswold LLP Pursuant to the Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* (Filed By McDermott International, Inc. ). (Cavenaugh, Matthew) (Entered: 03/30/2020) |
| 03/31/2020 | 🔵 751 (4 pgs) | Declaration re: *Declaration of Disinterestedness of Cornejo, Mendez, Gonzalez y Duarte, S.C., Pursuant to the Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* (Filed By McDermott International, Inc. ). (Cavenaugh, Matthew) (Entered: 03/31/2020) |
| 03/31/2020 | 🔵 752 (4 pgs) | Declaration re: *Declaration of Disinterestedness of NautaDutilh New York P.C. Pursuant to the Order Authorizing the Retention and Compensation* |

11/18/21, 11:12 AM  Case 4:21-cv-03369  Document 1-2 ECF Filed on 11/19/21 Bankruptcy Court-Texas Southern  Page 100 of 550

801052

| | | |
|---|---|---|
| | | *of Certain Professionals Utilized in the Ordinary Course of Business* (Filed By McDermott International, Inc. ). (Cavenaugh, Matthew) (Entered: 03/31/2020) |
| 03/31/2020 | 753 (4 pgs) | Declaration re: *Declaration of Disinterestedness of Schonherr Pursuant to the Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* (Filed By McDermott International, Inc. ). (Cavenaugh, Matthew) (Entered: 03/31/2020) |
| 03/31/2020 | 754 (4 pgs) | Declaration re: *Declaration of Disinterestedness of Arthur Cox Pursuant to the Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* (Filed By McDermott International, Inc. ). (Cavenaugh, Matthew) (Entered: 03/31/2020) |
| 03/31/2020 | 755 (4 pgs) | Declaration re: *Declaration of Disinterestedness of Kelley Drye & Warren LLP Pursuant to the Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* (Filed By McDermott International, Inc. ). (Cavenaugh, Matthew) (Entered: 03/31/2020) |
| 03/31/2020 | 756 (12 pgs) | Certificate *of Service Regarding Motion of Sinclair Wyoming Refining Company for Relief from the Automatic Stay to Permit Continuation of Litigation Pending Against Certain of the Debtors in the United States Court of Appeals for the Tenth Circuit* (Filed By Sinclair Wyoming Refining Company ).(Related document(s):747 Motion for Relief From Stay) (Vezey, Bryan) (Entered: 03/31/2020) |
| 03/31/2020 | 757 (4 pgs) | Declaration re: *Declaration of Disinterestedness of Bennett Jones LLP, Pursuant to the Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* (Filed By McDermott International, Inc. ). (Cavenaugh, Matthew) (Entered: 03/31/2020) |
| 03/31/2020 | 758 (4 pgs) | Declaration re: *Declaration of Disinterestedness of DLA Piper Pursuant to the Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* (Filed By McDermott International, Inc. ). (Cavenaugh, Matthew) (Entered: 03/31/2020) |
| 03/31/2020 | 759 (4 pgs) | Declaration re: *Declaration of Disinterestedness of Clarke Gittens Farmer, Attorneys-At-Law, Pursuant to the Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* (Filed By McDermott International, Inc. ). (Cavenaugh, Matthew) (Entered: 03/31/2020) |
| 04/01/2020 | 760 (65 pgs; 3 docs) | Withdrawal of Claim: (Attachments: # 1 Exhibit A - Proposed Order # 2 Callari Declaration)(Judd, T.) (Entered: 04/01/2020) |
| 04/01/2020 | 761 (76 pgs) | Affidavit Re: *Mailings for the Period from March 21, 2020 through March 27, 2020.* (related document(s):713 Declaration, 718 Declaration, 719 Generic Order, 720 Document, 722 Declaration, 724 Declaration, 725 Declaration, 726 Declaration, 731 Declaration, 732 Declaration, 733 Declaration, 734 Declaration, 736 Declaration, 737 Declaration). Filed by Prime Clerk LLC (Steele, Benjamin) (Entered: 04/01/2020) |

| 04/01/2020 | ●762<br>(4 pgs) | Declaration re: *Declaration of Disinterestedness of Baker &* 001053<br>*McKenzie.Wong & Leow Pursuant to the Order Authorizing the Retention*<br>*and Compensation of Certain Professionals Utilized in the Ordinary*<br>*Course of Business* (Filed By McDermott International, Inc. ).<br>(Cavenaugh, Matthew) (Entered: 04/01/2020) |
| 04/01/2020 | ●763<br>(4 pgs) | Declaration re: *Declaration of Disinterestedness of Gorodissky &*<br>*Partners, Ltd. Pursuant to the Order Authorizing the Retention and*<br>*Compensation of Certain Professionals Utilized in the Ordinary Course of*<br>*Business* (Filed By McDermott International, Inc. ). (Cavenaugh,<br>Matthew) (Entered: 04/01/2020) |
| 04/01/2020 | ●764<br>(4 pgs) | Declaration re: *Declaration of Disinterestedness of Hodge & Hodge*<br>*Pursuant to the Order Authorizing the Retention and Compensation of*<br>*Certain Professionals Utilized in the Ordinary Course of Business* (Filed<br>By McDermott International, Inc. ). (Cavenaugh, Matthew) (Entered:<br>04/01/2020) |
| 04/01/2020 | ●765<br>(4 pgs) | Declaration re: *Declaration of Disinterestedness of Spilman Thomas &*<br>*Battle, PLLC Pursuant to the Order Authorizing the Retention and*<br>*Compensation of Certain Professionals Utilized in the Ordinary Course of*<br>*Business* (Filed By McDermott International, Inc. ). (Cavenaugh,<br>Matthew) (Entered: 04/01/2020) |
| 04/01/2020 | ●766<br>(4 pgs) | Declaration re: *Declaration of Disinterestedness of Milligan Herns, PC*<br>*Pursuant to the Order Authorizing the Retention and Compensation of*<br>*Certain Professionals Utilized in the Ordinary Course of Business* (Filed<br>By McDermott International, Inc. ). (Cavenaugh, Matthew) (Entered:<br>04/01/2020) |
| 04/01/2020 | ●767<br>(4 pgs) | Declaration re: *Declaration of Disinterestedness of Michael B. Burris CPA*<br>*Pursuant to the Order Authorizing the Retention and Compensation of*<br>*Certain Professionals Utilized in the Ordinary Course of Business* (Filed<br>By McDermott International, Inc. ). (Cavenaugh, Matthew) (Entered:<br>04/01/2020) |
| 04/01/2020 | ●768<br>(10 pgs) | Declaration re: *Supplemental Declaration of Roopesh Shah in Support of*<br>*the Debtors' Application for Entry of an Order Authorizing the Retention*<br>*and Employment of Evercore Group L.L.C. and Evercore Partners*<br>*International LLP as Investment Banker to the Debtors and the Debtors-*<br>*In-Possession* (Filed By McDermott International, Inc. ).(Related<br>document(s):427 Application to Employ) (Cavenaugh, Matthew) (Entered:<br>04/01/2020) |
| 04/01/2020 | ●769<br>(13 pgs; 2 docs) | Emergency Motion *for Entry of an Order Authorizing the Debtors to File*<br>*Under Seal The Names of Certain Confidential Parties In Interest Related*<br>*to the Evercore Group L.L.C and Evercore Partners International LLP's*<br>*Retention Application* Filed by Debtor McDermott International, Inc.<br>(Attachments: # 1 Proposed Order) (Cavenaugh, Matthew) (Entered:<br>04/01/2020) |
| 04/01/2020 | ●770 | Sealed Document *Related to ECF No. 769* (Filed By McDermott<br>International, Inc. ). (Cavenaugh, Matthew) (Entered: 04/01/2020) |
| 04/02/2020 | ●771<br>(3 pgs) | Declaration re: *Declaration of Disinterestedness of Stephenson Harwood*<br>*LLP Pursuant to the Order Authorizing the Retention and Compensation*<br>*of Certain Professionals Utilized in the Ordinary Course of Business* |

| | | |
|---|---|---|
| | | (Filed By McDermott International, Inc. ). (Cavenaugh, Matthew) (Entered: 04/02/2020) |
| 04/02/2020 | 🔵 772 (4 pgs) | Declaration re: *Declaration of Disinterestedness of Appleby, Mauritius Office, Pursuant to the Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* (Filed By McDermott International, Inc. ). (Cavenaugh, Matthew) (Entered: 04/02/2020) |
| 04/02/2020 | 🔵 773 (4 pgs) | Declaration re: *Declaration of Disinterestedness of Rose Law Firm, a Professional Association, Pursuant to the Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* (Filed By McDermott International, Inc. ). (Cavenaugh, Matthew) (Entered: 04/02/2020) |
| 04/02/2020 | 🔵 774 (3 pgs) | Declaration re: *Declaration of Disinterestedness of The Moore Law Firm Pursuant to the Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* (Filed By McDermott International, Inc. ). (Cavenaugh, Matthew) (Entered: 04/02/2020) |
| 04/02/2020 | 🔵 775 (4 pgs) | Declaration re: *Declaration of Disinterestedness of Eason Law Firm Pursuant to the Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* (Filed By McDermott International, Inc. ). (Cavenaugh, Matthew) (Entered: 04/02/2020) |
| 04/02/2020 | 🔵 776 (4 pgs) | Declaration re: *Declaration of Disinterestedness of NeunerPate Law Firm Pursuant to the Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* (Filed By McDermott International, Inc. ). (Cavenaugh, Matthew) (Entered: 04/02/2020) |
| 04/02/2020 | 🔵 777 (3 pgs) | Declaration re: *Declaration of Disinterestedness of Ogletree, Deakins, Nash, Smoak & Stewart P.C. Pursuant to the Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* (Filed By McDermott International, Inc. ). (Cavenaugh, Matthew) (Entered: 04/02/2020) |
| 04/02/2020 | 🔵 778 (2 pgs) | Declaration re: *Declaration of Disinterestedness of Ernest Richardson Pursuant to the Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* (Filed By McDermott International, Inc. ). (Cavenaugh, Matthew) (Entered: 04/02/2020) |
| 04/02/2020 | 🔵 779 (3 pgs) | Declaration re: *Declaration of Disinterestedness of Ricci Tyrrell Johnson & Grey PLLC Pursuant to the Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* (Filed By McDermott International, Inc. ). (Cavenaugh, Matthew) (Entered: 04/02/2020) |
| 04/03/2020 | 🔵 780 (4 pgs) | Declaration re: *Declaration of Disinterestedness of Lewis Silkin LLP Pursuant to the Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* (Filed By McDermott International, Inc. ). (Cavenaugh, Matthew) (Entered: 04/03/2020) |
| 04/03/2020 | 🔵 781 | Declaration re: *Declaration of Disinterestedness of Lewis Brisbois Bisgaard and* |

001055

| | | |
|---|---|---|
| | (4 pgs) | Smith LLP Pursuant to the Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business (Filed By McDermott International, Inc. ). (Cavenaugh, Matthew) (Entered: 04/03/2020) |
| 04/03/2020 | 782 (4 pgs) | Declaration re: Declaration of Disinterestedness of Pinsent Masons LLP Pursuant to the Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business (Filed By McDermott International, Inc. ). (Cavenaugh, Matthew) (Entered: 04/03/2020) |
| 04/03/2020 | 783 (4 pgs) | Declaration re: Declaration of Disinterestedness of Seed Intellectual Property Law Group LLP, Pursuant to the Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business (Filed By McDermott International, Inc. ). (Cavenaugh, Matthew) (Entered: 04/03/2020) |
| 04/03/2020 | 784 (4 pgs) | Declaration re: Declaration of Disinterestedness of Fangda Partners Pursuant to the Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business (Filed By McDermott International, Inc. ). (Cavenaugh, Matthew) (Entered: 04/03/2020) |
| 04/03/2020 | 785 (4 pgs) | Declaration re: Declaration of Disinterestedness of Blue Williams, LLP Pursuant to the Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business (Filed By McDermott International, Inc. ). (Cavenaugh, Matthew) (Entered: 04/03/2020) |
| 04/03/2020 | 786 (4 pgs) | Declaration re: Declaration of Disinterestedness of Tauil E Chequer Advogados Pursuant to the Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business (Filed By McDermott International, Inc. ). (Cavenaugh, Matthew) (Entered: 04/03/2020) |
| 04/03/2020 | 787 (4 pgs) | Declaration re: Declaration of Disinterestedness of Haynsworth Sinkler Boyd, P.A. Pursuant to the Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business (Filed By McDermott International, Inc. ). (Cavenaugh, Matthew) (Entered: 04/03/2020) |
| 04/03/2020 | 788 (3 pgs) | Declaration re: Declaration of Disinterestedness of Hillier International Ltd. Pursuant to the Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business (Filed By McDermott International, Inc. ). (Cavenaugh, Matthew) (Entered: 04/03/2020) |
| 04/03/2020 | 789 (3 pgs) | Declaration re: Declaration of Disinterestedness of Mark Hackett Associates LLP Pursuant to the Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business (Filed By McDermott International, Inc. ). (Cavenaugh, Matthew) (Entered: 04/03/2020) |
| 04/03/2020 | 790 (2 pgs) | Declaration re: Declaration of Disinterestedness of Philip Joseph Chapman Pursuant to the Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business (Filed By McDermott International, Inc. ). (Cavenaugh, Matthew) (Entered: 04/03/2020) |
| 04/03/2020 | 791 (3 pgs) | Declaration re: Declaration of Disinterestedness of Prias Cadavid Abogados Pursuant to the Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business (Filed By McDermott International, Inc. ). (Cavenaugh, Matthew) (Entered: 04/03/2020) |
| 04/03/2020 | 792 (2 pgs) | Declaration re: Declaration of Disinterestedness of Robert J. Bridges Pursuant to the Order Authorizing the Retention and Compensation of Certain |

| | | |
|---|---|---|
| | | *Professionals Utilized in the Ordinary Course of Business* (Filed By McDermott International, Inc. ). (Cavenaugh, Matthew) (Entered: 04/03/2020) |
| 04/03/2020 | 🔵793 (6 pgs) | Declaration re: *Declaration of Disinterestedness of Terry Anderson Baker Pursuant to the Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* (Filed By McDermott International, Inc. ). (Cavenaugh, Matthew) (Entered: 04/03/2020) |
| 04/03/2020 | 🔵794 (3 pgs) | Declaration re: *Declaration of Disinterestedness of VT Servicios Legales S.A.S. Pursuant to the Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* (Filed By McDermott International, Inc. ). (Cavenaugh, Matthew) (Entered: 04/03/2020) |
| 04/03/2020 | 🔵795 (3 pgs) | Declaration re: *Declaration of Disinterestedness of Watson Millican & Company Pursuant to the Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* (Filed By McDermott International, Inc. ). (Cavenaugh, Matthew) (Entered: 04/03/2020) |
| 04/03/2020 | 🔵796 (3 pgs) | Declaration re: *Declaration of Disinterestedness of Z-Axis LLC Pursuant to the Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* (Filed By McDermott International, Inc. ). (Cavenaugh, Matthew) (Entered: 04/03/2020) |
| 04/03/2020 | 🔵797 (2 pgs) | Declaration re: *Declaration of Disinterestedness of Danny Reeves Pursuant to the Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* (Filed By McDermott International, Inc. ). (Cavenaugh, Matthew) (Entered: 04/03/2020) |
| 04/03/2020 | 🔵798 (4 pgs) | Declaration re: *Declaration of Disinterestedness of TLS Associazione Professionale di Avvocati e Commercialisti, (PwC TLS) Pursuant to the Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* (Filed By McDermott International, Inc. ). (Cavenaugh, Matthew) (Entered: 04/03/2020) |
| 04/03/2020 | 🔵804 (3 pgs) | Order Authorizing the Debtors to File Under Seal the Names of Certain Confidential Parties in Interest Related to Evercore Group, L.L.C. and Evercore Partners International LLP's Retention Application (Related Doc # 769) Signed on 4/3/2020. (emiller) (Entered: 04/04/2020) |
| 04/04/2020 | 🔵799 (4 pgs) | Declaration re: *Declaration of Disinterestedness of Wikborg Rein Advokatfirma AS, Pursuant to the Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* (Filed By McDermott International, Inc. ). (Cavenaugh, Matthew) (Entered: 04/04/2020) |
| 04/04/2020 | 🔵800 (4 pgs) | Declaration re: *Declaration of Disinterestedness of Grata Azerbaijan LLC, Pursuant to the Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* (Filed By McDermott International, Inc. ). (Cavenaugh, Matthew) (Entered: 04/04/2020) |
| 04/04/2020 | 🔵801 (3 pgs) | Declaration re: *Declaration of Disinterestedness of Epiq Systems Pursuant to the Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* (Filed By McDermott International, Inc. ). (Cavenaugh, Matthew) (Entered: 04/04/2020) |
| 04/04/2020 | 🔵802 (3 pgs) | Declaration re: *Declaration of Disinterestedness of Jimeno Acevedo Pursuant to the Order Authorizing the Retention and Compensation of Certain Professionals* |

| | | |
|---|---|---|
| | | *Utilized in the Ordinary Course of Business* (Filed By McDermott International, Inc. ). (Cavenaugh, Matthew) (Entered: 04/04/2020) |
| 04/04/2020 | 🔵 803 (3 pgs) | Declaration re: *Declaration of Disinterestedness of Custom Information LLC Pursuant to the Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* (Filed By McDermott International, Inc. ). (Cavenaugh, Matthew) (Entered: 04/04/2020) |
| 04/06/2020 | 🔵 805 (3 pgs) | Declaration re: *Declaration of Disinterestedness of Secretariat International Inc. Pursuant to the Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* (Filed By McDermott International, Inc. ). (Cavenaugh, Matthew) (Entered: 04/06/2020) |
| 04/06/2020 | 🔵 806 (2 pgs) | Declaration re: *Declaration of Disinterestedness of Michelle L. Tipton Pursuant to the Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* (Filed By McDermott International, Inc. ). (Cavenaugh, Matthew) (Entered: 04/06/2020) |
| 04/06/2020 | 🔵 807 (4 pgs) | Declaration re: *Declaration of Disinterestedness of Clayton Utz Pursuant to the Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* (Filed By McDermott International, Inc. ). (Cavenaugh, Matthew) (Entered: 04/06/2020) |
| 04/06/2020 | 🔵 808 (4 pgs) | Declaration re: *Declaration of Disinterestedness of GRATA Law Firm, LLP, Pursuant to the Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* (Filed By McDermott International, Inc. ). (Cavenaugh, Matthew) (Entered: 04/06/2020) |
| 04/06/2020 | 🔵 809 (4 pgs) | Declaration re: *Declaration of Disinterestedness of SEDLAKOVA LEGAL S.R.O. Pursuant to the Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* (Filed By McDermott International, Inc. ). (Cavenaugh, Matthew) (Entered: 04/06/2020) |
| 04/06/2020 | 🔵 810 (4 pgs) | Declaration re: *Declaration of Disinterestedness of Wong & Partners Pursuant to the Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* (Filed By McDermott International, Inc. ). (Cavenaugh, Matthew) (Entered: 04/06/2020) |
| 04/06/2020 | 🔵 811 (3 pgs) | Declaration re: *Declaration of Disinterestedness of Jones Walker, LLP Pursuant to the Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* (Filed By McDermott International, Inc. ). (Cavenaugh, Matthew) (Entered: 04/06/2020) |
| 04/06/2020 | 🔵 812 (3 pgs) | Declaration re: *Declaration of Disinterestedness of Tucker Ellis LLP Pursuant to the Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* (Filed By McDermott International, Inc. ). (Cavenaugh, Matthew) (Entered: 04/06/2020) |
| 04/06/2020 | 🔵 813 (4 pgs) | Declaration re: *Declaration of Disinterestedness of Luz Marina Esponiza Pursuant to the Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* (Filed By McDermott International, Inc. ). (Cavenaugh, Matthew) (Entered: 04/06/2020) |
| 04/06/2020 | 🔵 814 (4 pgs) | Declaration re: *Declaration of Disinterestedness of BPMAW Pursuant to the Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* (Filed By McDermott International, Inc. ). (Cavenaugh, Matthew) (Entered: 04/06/2020) |

001058

| | | |
|---|---|---|
| 04/06/2020 | 🔵 815<br>(4 pgs) | Declaration re: *Declaration of Disinterestedness of Locke Lord LLP, Pursuant to the Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* (Filed By McDermott International, Inc. ). (Cavenaugh, Matthew) (Entered: 04/06/2020) |
| 04/06/2020 | 🔵 816<br>(5 pgs) | Declaration re: *Declaration of Disinterestedness of Ankura Consulting Group, LLC Pursuant to the Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* (Filed By McDermott International, Inc. ). (Cavenaugh, Matthew) (Entered: 04/06/2020) |
| 04/06/2020 | 🔵 817<br>(3 pgs) | Declaration re: *Declaration of Disinterestedness of Foley Hoag LLP Pursuant to the Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* (Filed By McDermott International, Inc. ). (Cavenaugh, Matthew) (Entered: 04/06/2020) |
| 04/06/2020 | 🔵 818<br>(4 pgs) | Declaration re: *Declaration of Disinterestedness of McCarter English, LLP Pursuant to the Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* (Filed By McDermott International, Inc. ). (Cavenaugh, Matthew) (Entered: 04/06/2020) |
| 04/06/2020 | 🔵 819<br>(3 pgs) | Declaration re: *Declaration of Disinterestedness of Fish & Richardson P.C. Pursuant to the Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* (Filed By McDermott International, Inc. ). (Cavenaugh, Matthew) (Entered: 04/06/2020) |
| 04/06/2020 | 🔵 820<br>(4 pgs) | Declaration re: *Declaration of Disinterestedness of Barry McTiernan & Moore LLC Pursuant to the Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* (Filed By McDermott International, Inc. ). (Cavenaugh, Matthew) (Entered: 04/06/2020) |
| 04/06/2020 | 🔵 821<br>(3 pgs) | Declaration re: *Declaration of Disinterestedness of Basch & Rameh Advogados Associados Pursuant to the Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* (Filed By McDermott International, Inc. ). (Cavenaugh, Matthew) (Entered: 04/06/2020) |
| 04/06/2020 | 🔵 822<br>(5 pgs) | Declaration re: *Declaration of Disinterestedness of FTI Consulting Technology LLC Pursuant to the Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* (Filed By McDermott International, Inc. ). (Cavenaugh, Matthew) (Entered: 04/06/2020) |
| 04/06/2020 | 🔵 823<br>(5 pgs) | Declaration re: *Declaration of Disinterestedness of BDO USA LLP Pursuant to the Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* (Filed By McDermott International, Inc. ). (Cavenaugh, Matthew) (Entered: 04/06/2020) |
| 04/06/2020 | 🔵 824<br>(4 pgs) | Declaration re: *Declaration of Disinterestedness of Compass Lexecon Pursuant to the Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* (Filed By McDermott International, Inc. ). (Cavenaugh, Matthew) (Entered: 04/06/2020) |
| 04/06/2020 | 🔵 825<br>(9 pgs) | Declaration re: *Declaration of Disinterestedness of Arrubla Devis Asociados S.A.S. Pursuant to the Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* (Filed By McDermott International, Inc. ). (Cavenaugh, Matthew) (Entered: 04/06/2020) |
| | 🔵 | |

| 04/06/2020 | 826 (7 pgs) | Declaration re: *Declaration of Disinterestedness of Carlos Ernesto Urrutia Monsalve Pursuant to the Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* (Filed By McDermott International, Inc. ). (Cavenaugh, Matthew) (Entered: 04/06/2020) |
|---|---|---|
| 04/06/2020 | 827 (5 pgs) | Declaration re: *Declaration of Disinterestedness of Todd E. Minnich Pursuant to the Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* (Filed By McDermott International, Inc. ). (Cavenaugh, Matthew) (Entered: 04/06/2020) |
| 04/07/2020 | 828 (4 pgs) | Declaration re: *Declaration of Disinterestedness of Alvarado y Asociados Pursuant to the Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* (Filed By McDermott International, Inc. ). (Cavenaugh, Matthew) (Entered: 04/07/2020) |
| 04/07/2020 | 829 (3 pgs) | Declaration re: Declaration of Disinterestedness of Juge, Napolitano, Guilbeau, Ruli & Frieman Pursuant to the Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business (Filed By Denis Paul Juge ). (ltre) (Entered: 04/07/2020) |
| 04/07/2020 | 830 (4 pgs) | Declaration re: *Declaration of Disinterestedness of Gilbert LLP Pursuant to the Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* (Filed By McDermott International, Inc. ). (Cavenaugh, Matthew) (Entered: 04/07/2020) |
| 04/08/2020 | 831 (2 pgs) | Notice of Appearance and Request for Notice Filed by Frederick Zarate Filed by on behalf of Steamfitters & Plumbers Local Union No 464 Pension Fund (gclair) (Entered: 04/08/2020) |
| 04/08/2020 | 832 (3 pgs) | Declaration re: *Declaration of Disinterestedness of Brons & Salas Law Firm Pursuant to the Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* (Filed By McDermott International, Inc. ). (Cavenaugh, Matthew) (Entered: 04/08/2020) |
| 04/08/2020 | 833 (4 pgs) | Declaration re: *Amended Declaration of Disinterestedness of ARIAS, FABREGA & FABREGA Pursuant to the Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* (Filed By McDermott International, Inc. ). (Cavenaugh, Matthew) (Entered: 04/08/2020) |
| 04/08/2020 | 834 (1 pg) | Motion to Appear pro hac vice *filed by Frederick Zarate*. (rcas) (Entered: 04/08/2020) |
| 04/08/2020 | 835 (14 pgs) | Statement *STATEMENT OF THE ACTING UNITED STATES TRUSTEE REGARDING DEBTORS APPLICATION FOR ENTRY OF AN ORDER AUTHORIZING THE EMPLOYMENT AND RETENTION OF ALIXPARTNERS, LLP AS FINANCIAL ADVISOR NUNC PRO TUNC TO THE PETITION DATE [DOCKET NO. 636]* (Filed By US Trustee ).(Related document(s):636 Application to Employ) (Statham, Stephen) (Entered: 04/08/2020) |
| 04/08/2020 | 836 (85 pgs) | Affidavit Re: *Mailings for the Period from March 28, 2020 through April 3, 2020*. (related document(s):675 Declaration, 739 Declaration, 740 Declaration, 741 Declaration, 742 Declaration, 743 Declaration, 744 Declaration, 745 Notice, 746 Notice, 748 Declaration, 749 Declaration, 750 Declaration, 751 Declaration, 752 Declaration, 753 Declaration, 754 Declaration, 755 Declaration, 757 Declaration, 758 Declaration, 759 Declaration, 762 Declaration, 763 Declaration, 764 Declaration, 765 Declaration, 766 Declaration, 767 Declaration, 768 |

| | | |
|---|---|---|
| | | Declaration, [771] Declaration, [772] Declaration, [773] Declaration, [774] Declaration, [775] Declaration, [776] Declaration, [777] Declaration, [778] Declaration, [779] Declaration, [780] Declaration, [781] Declaration, [782] Declaration, [783] Declaration, [784] Declaration, [785] Declaration, [786] Declaration, [787] Declaration, [788] Declaration, [789] Declaration, [790] Declaration, [791] Declaration, [792] Declaration, [793] Declaration, [794] Declaration, [795] Declaration, [796] Declaration, [797] Declaration, [798] Declaration). Filed by Prime Clerk LLC (Steele, Benjamin) (Entered: 04/08/2020) |
| 04/08/2020 | 🔵 [837] (11 pgs) | BNC Certificate of Mailing. (Related document(s):[804] Order on Emergency Motion) No. of Notices: 304. Notice Date 04/08/2020. (Admin.) (Entered: 04/09/2020) |
| 04/10/2020 | 🔵 [838] (1 pg) | Order Granting Motion To Appear pro hac vice - Frederick Zarate (Related Doc # [834]) Signed on 4/10/2020. (emiller) (Entered: 04/10/2020) |
| 04/12/2020 | 🔵 [839] (9 pgs) | BNC Certificate of Mailing. (Related document(s):[838] Order on Motion to Appear pro hac vice) No. of Notices: 301. Notice Date 04/12/2020. (Admin.) (Entered: 04/12/2020) |
| 04/13/2020 | 🔵 [840] (28 pgs) | Notice *of Additional Supplemental Agreements*. (Related document(s):[610] Order on Application to Employ) Filed by McDermott International, Inc. (Cavenaugh, Matthew) (Entered: 04/13/2020) |
| 04/13/2020 | 🔵 | Certificate of Email Notice. The parties have contacted the Court and indicated that an agreement has been met with respect to the retention application filed at [427]. The parties will be uploading a revised proposed order with 14 days and will contact the Court once that has been done. **The hearing set for 4/14/2020 at 2:30 is cancelled.** (Related document(s):[427] Application to Employ) (aalo) (Entered: 04/13/2020) |
| 04/14/2020 | 🔵 [841] (3 pgs) | Declaration re: *Amended Declaration of Disinterestedness of Holman Fenwick Willan LLP Pursuant to the Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* (Filed By McDermott International, Inc. ). (Cavenaugh, Matthew) (Entered: 04/14/2020) |
| 04/14/2020 | 🔵 [842] (2 pgs) | Notice *OF WITHDRAWAL OF APPEARANCE BY JAMES T. GROGAN*. Filed by Air Products and Chemicals, Inc (Grogan, James) (Entered: 04/14/2020) |
| 04/15/2020 | 🔵 [843] (4 pgs) | Declaration re: *Declaration of Disinterestedness of Erstad & Riemer, P.A. Pursuant to the Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* (Filed By McDermott International, Inc. ). (Cavenaugh, Matthew) (Entered: 04/15/2020) |
| 04/15/2020 | 🔵 [844] (51 pgs) | Affidavit Re: *Mailings for the Period from April 4, 2020 through April 10, 2020*. (related document(s):[799] Declaration, [800] Declaration, [801] Declaration, [802] Declaration, [803] Declaration, [804] Order on Emergency Motion, [805] Declaration, [806] Declaration, [807] Declaration, [808] Declaration, [809] Declaration, [810] Declaration, [811] Declaration, [812] Declaration, [813] Declaration, [814] Declaration, [815] Declaration, [816] Declaration, [817] Declaration, [818] Declaration, [819] Declaration, [820] Declaration, [821] Declaration, [822] Declaration, [823] Declaration, [824] Declaration, [825] Declaration, [826] Declaration, [827] Declaration, [828] Declaration, [829] Declaration, [830] Declaration, [832] Declaration, [833] Declaration). Filed by Prime Clerk LLC (Steele, Benjamin) (Entered: 04/15/2020) |
| 04/15/2020 | 🔵 [845] | Notice *to Contract Parties to Potentially Assumed or Assumed and Assigned* |

| | | |
|---|---|---|
| | | *Executory Contracts and Unexpired Leases in Connection with the Sale of the Debtors' Technology Business*. (Related document(s):476 Generic Order, 684 Generic Order) Filed by McDermott International, Inc. (Cavenaugh, Matthew) (Entered: 04/15/2020) |
| 04/16/2020 | 846 (146 pgs) | Notice *to Contract Parties to Potentially Assumed or Assumed and Assigned Executory Contracts and Unexpired Leases in Connection with the Sale of the Debtors' Technology Business*. (Related document(s):476 Generic Order, 684 Generic Order) Filed by McDermott International, Inc. (Cavenaugh, Matthew) (Entered: 04/16/2020) |
| 04/17/2020 | 847 (3 pgs) | Notice of Appearance and Request for Notice Filed by Christopher S Murphy Filed by on behalf of Texas Comptroller of Public Accounts (Murphy, Christopher) (Entered: 04/17/2020) |
| 04/18/2020 | 848 (14 pgs) | Statement *Statement of AlixPartners, LLP And AP Services, LLC in Support of the Debtors Retention Applications and Request for Hearing* (Filed By AP Services, LLC, AlixPartners LLP ).(Related document(s):434 Application to Employ, 636 Application to Employ, 637 Application to Employ, 835 Statement) (Beckham, Charles) (Entered: 04/18/2020) |
| 04/20/2020 | 849 (1 pg) | Order Signed on 4/20/2020 (Related document(s):723 Request for Hearing) (VrianaPortillo) (Entered: 04/20/2020) |
| 04/20/2020 | 850 (1 pg) | Motion to Appear pro hac vice *Howard Teplinsky*. Filed by Creditor Meridian Leasing Corporation (JenniferOlson) (Entered: 04/20/2020) |
| 04/20/2020 | 851 (2 pgs) | Notice of Appearance and Request for Notice Filed by Howard L. Teplinsky Filed by on behalf of Meridian Leasing Corporation (JenniferOlson) (Entered: 04/20/2020) |
| 04/21/2020 | 852 (18 pgs) | Debtor-In-Possession Monthly Operating Report for Filing Period *Chapter 11 Post-Confirmation Report for the Quarter Ending 3/31/2020* (Filed By McDermott International, Inc. ). (Cavenaugh, Matthew) (Entered: 04/21/2020) |
| 04/21/2020 | 853 (1 pg) | Order Granting Motion To Appear pro hac vice - Howard L. Teplinsky (Related Doc # 850) Signed on 4/21/2020. (emiller) (Entered: 04/21/2020) |
| 04/21/2020 | 854 (7 pgs) | Declaration re: *Declaration of Disinterestedness of Special Counsel, Inc. Pursuant to the Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* (Filed By McDermott International, Inc. ). (Cavenaugh, Matthew) (Entered: 04/21/2020) |
| 04/21/2020 | 855 (3 pgs) | Declaration re: *Declaration of Disinterestedness of Sack Rosendin, LLP Pursuant to the Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* (Filed By McDermott International, Inc. ). (Cavenaugh, Matthew) (Entered: 04/21/2020) |
| 04/22/2020 | 856 (3 pgs) | Notice *of Hearing on the Retention Applications for AlixPartners, LLP and AP Services, LLC*. (Related document(s):434 Application to Employ, 636 Application to Employ, 637 Application to Employ, 835 Statement, 848 Statement) Filed by AP Services, LLC, AlixPartners LLP (Beckham, Charles) (Entered: 04/22/2020) |
| 04/22/2020 | 857 (79 pgs) | Affidavit Re: *Mailings for the Period from April 11, 2020 through April 17, 2020*. (related document(s):840 Notice, 841 Declaration, 843 Declaration, 846 |

| | | |
|---|---|---|
| | | Notice). Filed by Prime Clerk LLC (Steele, Benjamin) (Entered: 04/22/2020) |
| 04/22/2020 | 858 (3 pgs) | Declaration re: *Declaration of Disinterestedness of Konig Rebholz Zechberger Pursuant to the Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* (Filed By McDermott International, Inc. ). (Cavenaugh, Matthew) (Entered: 04/22/2020) |
| 04/22/2020 | 859 (7 pgs) | Response *to Maire Tecnimont S.P.A. and MET Gas Processing Technologies S.P.A.'s Motion to Withdraw Proofs of Claim*. Filed by McDermott International, Inc. (Cavenaugh, Matthew) (Entered: 04/22/2020) |
| 04/22/2020 | 860 (19 pgs) | Stipulation By McDermott International, Inc. and Argonaut Insurance Company. Does this document include an agreed order or otherwise request that the judge sign a document? Yes. (Filed By McDermott International, Inc. ).(Related document(s):156 Order on Emergency Motion) (Cavenaugh, Matthew) (Entered: 04/22/2020) |
| 04/22/2020 | 861 (9 pgs) | BNC Certificate of Mailing. (Related document(s):849 Generic Order) No. of Notices: 296. Notice Date 04/22/2020. (Admin.) (Entered: 04/22/2020) |
| 04/23/2020 | 862 (9 pgs) | BNC Certificate of Mailing. (Related document(s):853 Order on Motion to Appear pro hac vice) No. of Notices: 297. Notice Date 04/23/2020. (Admin.) (Entered: 04/23/2020) |
| 04/24/2020 | 863 (3 pgs) | Exhibit List, Witness List (Filed By AP Services, LLC, AlixPartners LLP ). (Beckham, Charles) (Entered: 04/24/2020) |
| 04/24/2020 | 864 (2 pgs) | Witness List, Exhibit List (Filed By US Trustee ). (Statham, Stephen) (Entered: 04/24/2020) |
| 04/24/2020 | ⬤ | Certificate of Email Notice. Contacted Martha Wyrick. Movant to notice all interested parties and file a certificate of service with the court (Related document(s):434 Application to Employ, 636 Application to Employ, 637 Application to Employ) **Hearing scheduled for 4/28/2020 at 02:00 PM at Houston, Courtroom 400 (DRJ).** (aalo) (Entered: 04/24/2020) |
| 04/27/2020 | ⬤ | Certificate of Email Notice. By agreement of the interested parties, the hearing on the motion for relief from stay has been continued. Movant to notice all interested parties and file a certificate of service with the court (Related document(s):747 Motion for Relief From Stay) **Hearing rescheduled for 5/6/2020 at 01:30 PM** (aalo) (Entered: 04/27/2020) |
| 04/27/2020 | 865 (2 pgs) | Notice *of Continued Hearing*. (Related document(s):747 Motion for Relief From Stay) Filed by Sinclair Wyoming Refining Company (Warner, Michael) (Entered: 04/27/2020) |
| 04/27/2020 | 869 (19 pgs) | Stipulation and Agreed Order Authorizing Performance Pursuant to Surety Bond Terms Argonaut Insurance Company Signed on 4/27/2020 (VrianaPortillo) (Entered: 04/28/2020) |
| 04/28/2020 | 866 (1 pg) | Motion to Appear pro hac vice *of Marc Abrams*. Filed by Interested Parties AP Services, LLC, AlixPartners LLP (Beckham, Charles) (Entered: 04/28/2020) |
| 04/28/2020 | 867 (3 pgs) | Notice of Appearance and Request for Notice Filed by Michael D Warner Filed by on behalf of Sinclair Wyoming Refining Company (Warner, Michael) (Entered: 04/28/2020) |

| 04/28/2020 | ● 868 (1 pg) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by Matthew D. Cavenaugh. This is to order a transcript of 04/28/2020 before Judge David R. Jones. Court Reporter/Transcriber: Access Transcripts (Filed By McDermott International, Inc. ). (Cavenaugh, Matthew) Electronically forwarded to Access Transcripts on April 28, 2020. Estimated completion date: April 29, 2020. Modified on 4/28/2020 (ClaudiaGutierrez). (Entered: 04/28/2020) |
|---|---|---|
| 04/28/2020 | ● | Courtroom Minutes. Time Hearing Held: 2:00-2:55. Appearances: Charles Beckham, Martha Wyrick, Matt Cavenaugh, Veronica Polnick, John Castellano, Penelope Jensen, Steve Statham, Esben Christensen. (Related document(s):636 Application to Employ, 637 Application to Employ) As stated on the record, the Court will approve the retention of AP Services 637 and Alix Partners636. The Court to issue a written opinion. Note: The application at 434 has been withdrawn. (aalo) (Entered: 04/28/2020) |
| 04/29/2020 | ● 870 (33 pgs) | Transcript RE: Application to Employ AlixPartners LLP as financial advisor; Application to Employ AP Services and John Castellano as Chief Transformation Officer held on 04/28/2020 before Judge David R. Jones. Transcript is available for viewing in the Clerk's Office. Filed by Transcript access will be restricted through 07/28/2020. (AccessTranscripts) (Entered: 04/29/2020) |
| 04/29/2020 | ● 871 (2 pgs) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by William A. (Trey) Wood. This is to order a transcript of April 28, 2020 before Judge David R. Jones. Court Reporter/Transcriber: Access Transcripts (Filed By Credit Agricole Corporate and Investment Bank ). (Wood, William) Electronically forwarded to the original transcriber: Access Transcripts on 4-29-2020. Estimated completion date: 4-30-2020. Modified on 4/29/2020 (MelissaMorgan). (Entered: 04/29/2020) |
| 04/29/2020 | ● 872 (35 pgs) | Reply IN SUPPORT OF MOTION TO WITHDRAW PROOFS OF CLAIMS. Filed by Maire Tecnimont SPA and MET Gas Processing Technologies SPA (Judd, T.) (Entered: 04/29/2020) |
| 04/29/2020 | ● 873 (4 pgs) | Declaration re: Declaration of Disinterestedness of Maples and Calder Pursuant to the Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business (Filed By McDermott International, Inc. ). (Cavenaugh, Matthew) (Entered: 04/29/2020) |
| 04/29/2020 | ● 874 (1 pg) | Order Granting Motion To Appear pro hac vice - Marc Abrams (Related Doc # 866) Signed on 4/29/2020. (emiller) (Entered: 04/29/2020) |
| 04/29/2020 | ● 875 (42 pgs) | Affidavit Re: Mailings for the Period from April 18, 2020 through April 24, 2020. (related document(s):846 Notice, 854 Declaration, 855 Declaration, 858 Declaration, 859 Response, 860 Stipulation). Filed by Prime Clerk LLC (Steele, Benjamin) (Entered: 04/29/2020) |
| 04/30/2020 | ● 876 (29 pgs) | Notice of Filing of Further Amended Exhibits Attached to the Debtors' Motion for Entry of an Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business. (Related document(s):612 Generic Order, 745 Notice) Filed by McDermott International, Inc. (Polnick, Veronica) (Entered: 04/30/2020) |
| 04/30/2020 | ● 877 (3 pgs) | Declaration re: Declaration of Disinterestedness of Norman Wohlgemuth Chandler Jeter Barnett & Ray, PC Pursuant to the Order Authorizing the |

| | | |
|---|---|---|
| | | *Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* (Filed By McDermott International, Inc. ). (Polnick, Veronica) (Entered: 04/30/2020) |
| 04/30/2020 | 🔵878 (1 pg) | Notice of Filing of Official Transcript as to 870 Transcript. Parties notified (Related document(s):870 Transcript) (gclair) (Entered: 04/30/2020) |
| 04/30/2020 | 🔵879 (1 pg) | Notice of Appearance and Request for Notice Filed by Kelsey Zottnick Filed by on behalf of Chevron Lummus Global LLC (Zottnick, Kelsey) (Entered: 04/30/2020) |
| 04/30/2020 | 🔵880 (5 pgs) | Objection . Filed by Chevron Lummus Global LLC (Zottnick, Kelsey) (Entered: 04/30/2020) |
| 04/30/2020 | 🔵881 (1 pg) | Motion to Appear pro hac vice - *Motion and Order for Admission Pro Hac Vice of Michael L. Armstrong*. Filed by Creditor Chevron Lummus Global LLC (Zottnick, Kelsey) (Entered: 04/30/2020) |
| 04/30/2020 | 🔵882 (27 pgs) | BNC Certificate of Mailing. (Related document(s):869 Generic Order) No. of Notices: 296. Notice Date 04/30/2020. (Admin.) (Entered: 04/30/2020) |
| 05/01/2020 | 🔵883 (1 pg) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by Charles A. Beckham, Jr.. This is to order a transcript of Hearing Held on 4-28-20 before Judge David R. Jones. Court Reporter/Transcriber: Access Transcripts (Filed By AP Services, LLC, AlixPartners LLP ). (Beckham, Charles) Copy request forwarded to Access Transcripts on May 1, 2020. Estimated completion date: May 2, 2020. Modified on 5/1/2020 (ClaudiaGutierrez). (Entered: 05/01/2020) |
| 05/01/2020 | 🔵884 (9 pgs) | BNC Certificate of Mailing. (Related document(s):874 Order on Motion to Appear pro hac vice) No. of Notices: 295. Notice Date 05/01/2020. (Admin.) (Entered: 05/01/2020) |
| 05/02/2020 | 🔵885 (9 pgs) | BNC Certificate of Mailing. (Related document(s):878 Notice of Filing of Official Transcript (Form)) No. of Notices: 295. Notice Date 05/02/2020. (Admin.) (Entered: 05/02/2020) |
| 05/04/2020 | 🔵886 (12 pgs) | Declaration re: *Supplemental Declaration of Thomas F. Holt, Jr. in Support of Debtors' Application for Entry of an Order Authorizing the Employment and Retention of K&L Gates LLP as Special Counsel to the Debtors* (Filed By McDermott International, Inc. ). (Cavenaugh, Matthew) (Entered: 05/04/2020) |
| 05/04/2020 | 🔵887 (14 pgs; 2 docs) | Emergency Motion *for Entry of an Order Authorizing the Debtors to File Under Seal the Names of Certain Confidential Parties In Interest Related to K&L Gates LLP's Retention Application* Filed by Debtor McDermott International, Inc. (Attachments: # 1 Proposed Order) (Cavenaugh, Matthew) (Entered: 05/04/2020) |
| 05/04/2020 | 🔵888 | Sealed Document *Related to ECF No. 886* (Filed By McDermott International, Inc. ). (Cavenaugh, Matthew) (Entered: 05/04/2020) |
| 05/04/2020 | 🔵889 (4 pgs) | Declaration re: *Declaration of Disinterestedness of ENSafrica Pursuant to the Order Authorizing the Retention and Compensation of Certain* |

| | | |
|---|---|---|
| | | *Professionals Utilized in the Ordinary Course of Business* (191085 By McDermott International, Inc. ). (Cavenaugh, Matthew) (Entered: 05/04/2020) |
| 05/04/2020 | | Certificate of Email Notice. Contacted Mike Warner. Movant to notice all interested parties and file a certificate of service with the court (Related document(s):747 Motion for Relief From Stay) **Hearing rescheduled for 5/19/2020 at 10:30 AM at Houston, Courtroom 400 (DRJ).** (aalo) (Entered: 05/04/2020) |
| 05/04/2020 | 890 (2 pgs) | Notice *of Continued Hearing*. (Related document(s):747 Motion for Relief From Stay, 865 Notice) Filed by Sinclair Wyoming Refining Company (Warner, Michael) (Entered: 05/04/2020) |
| 05/05/2020 | 891 (1 pg) | Order Granting Motion To Appear pro hac vice - Michael L. Armstrong (Related Doc # 881) Signed on 5/5/2020. (emiller) (Entered: 05/05/2020) |
| 05/05/2020 | 892 (1 pg) | PDF with attached Audio File. Court Date & Time [ 4/28/2020 2:00:07 PM ]. File Size [ 23426 KB ]. Run Time [ 00:48:48 ]. (Hearing held April 28, 2020. In ref to doc nos. 636 and 637.). (admin). (Entered: 05/05/2020) |
| 05/05/2020 | 893 (8 pgs; 2 docs) | Objection *Limited Objection to Motion to Seal* (related document(s):887 Emergency Motion). Filed by US Trustee (Attachments: # 1 Proposed Order) (Statham, Stephen) (Entered: 05/05/2020) |
| 05/06/2020 | 894 (178 pgs) | Affidavit Re: *Mailings for the Period from April 25, 2020 through May 1, 2020.* (related document(s):520 Notice, 869 Generic Order, 873 Declaration, 876 Notice, 877 Declaration). Filed by Prime Clerk LLC (Steele, Benjamin) (Entered: 05/06/2020) |
| 05/07/2020 | 895 (2 pgs) | Creditor Request for Notices (Filed By Colorado Department of Revenue ). (dnor) (Entered: 05/07/2020) |
| 05/07/2020 | 896 (2 pgs) | Witness List, Exhibit List (Filed By US Trustee ).(Related document(s):887 Emergency Motion) (Statham, Stephen) (Entered: 05/07/2020) |
| 05/07/2020 | 897 (9 pgs) | BNC Certificate of Mailing. (Related document(s):891 Order on Motion to Appear pro hac vice) No. of Notices: 295. Notice Date 05/07/2020. (Admin.) (Entered: 05/07/2020) |
| 05/08/2020 | 898 (4 pgs) | Witness List, Exhibit List (Filed By McDermott International, Inc. ). (Related document(s):886 Declaration, 887 Emergency Motion, 888 Sealed Document) (Cavenaugh, Matthew) (Entered: 05/08/2020) |
| 05/08/2020 | 899 (15 pgs; 2 docs) | Adversary case 20-03123. Nature of Suit: (21 (Validity, priority or extent of lien or other interest in property)) Complaint *Seeking Relief Under 11 U.S.C. §§ 505 and 506* by McDermott International, Inc. against Harris County Appraisal District, Calcasieu Parish Assessor, Cameron Parish Assessor, Harrison County Assessor. Fee Amount $350 (Attachments: # 1 Adversary Cover Sheet) (Cavenaugh, Matthew) (Entered: 05/08/2020) |
| 05/08/2020 | 900 (3 pgs) | Order Authorizing the Debtors to File Under Seal the Names of Certain Confidential Parties in Interest Related to K&L Gates LLP's Retention |

| | | |
|---|---|---|
| | | Application (Related Doc # 887) Signed on 5/8/2020. (emihel) (Entered: 05/08/2020) |
| 05/08/2020 | 901 | Courtroom Minutes. Time Hearing Held: 9:00 AM- 9:05 AM. Appearances: To be attached. For the reasons stated on the record, the Court approved the Motion for Entry of an Order Authorizing the Debtors to File Under Seal 884. Order to be entered. (VrianaPortillo) (Entered: 05/08/2020) |
| 05/10/2020 | 902 (11 pgs) | BNC Certificate of Mailing. (Related document(s):900 Order on Emergency Motion) No. of Notices: 296. Notice Date 05/10/2020. (Admin.) (Entered: 05/10/2020) |
| 05/12/2020 | 903 (22 pgs; 3 docs) | Motion for Relief from Stay *Case No. 3:19-cv-1305 pending in the Middle District of Pennsylvania*. Receipt Number o, Fee Amount $181. Filed by Creditor Hesham Ismail (Attachments: # 1 Exhibit # 2 Proposed Order) (than) (Entered: 05/12/2020) |
| 05/12/2020 | 904 (4 pgs) | Declaration re: *Declaration of Disinterestedness of ENSafrica Pursuant to the Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* (Filed By McDermott International, Inc. ). (Cavenaugh, Matthew) (Entered: 05/12/2020) |
| 05/12/2020 | | Receipt Number 190077, Fee Amount $181.00. (Related document(s):903 Motion for Relief From Stay) (than) (Entered: 05/12/2020) |
| 05/13/2020 | 905 (54 pgs) | Affidavit Re: *Mailings for the Period from May 2, 2020 through May 8, 2020*. (related document(s):846 Notice, 886 Declaration, 889 Declaration, 900 Order on Emergency Motion). Filed by Prime Clerk LLC (Steele, Benjamin) (Entered: 05/13/2020) |
| 05/15/2020 | 906 (29 pgs) | Notice *of Hearing*. (Related document(s):760 Withdrawal of Claim, 859 Response, 872 Reply) Filed by Maire Tecnimont SPA and MET Gas Processing Technologies SPA (Judd, T.) (Entered: 05/15/2020) |
| 05/15/2020 | 907 (1 pg) | PDF with attached Audio File. Court Date & Time [ 5/8/2020 9:00:00 AM ]. File Size [ 2863 KB ]. Run Time [ 00:05:58 ]. (In ref to doc no. 884. Hearing held May 8, 2020). (admin). (Entered: 05/15/2020) |
| 05/15/2020 | | Certificate of Email Notice. Contacted Josh Judd. Movant to notice all interested parties and file a certificate of service with the court (Related document(s):760 Withdrawal of Claim) **Hearing scheduled for 5/21/2020 at 10:00 AM (DRJ).** (aalo) (Entered: 05/15/2020) |
| 05/18/2020 | | Certificate of Email Notice. Contacted Mike Warner. Movant to notice all interested parties and file a certificate of service with the court (Related document(s):747 Motion for Relief From Stay) **Hearing scheduled for 5/27/2020 at 10:00 AM (DRJ).** (aalo) (Entered: 05/18/2020) |
| 05/18/2020 | 908 (2 pgs) | Notice *of Continued Hearing (May 27, 2020 at 10:00 a.m.)*. (Related document(s):747 Motion for Relief From Stay, 865 Notice, 890 Notice) Filed by Sinclair Wyoming Refining Company (Warner, Michael) (Entered: 05/18/2020) |

| 05/18/2020 | ● 909 (11 pgs) | Declaration re: *Declaration of Disinterestedness of Ganado Advocates Pursuant to the Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* (Filed By McDermott International, Inc. ). (Cavenaugh, Matthew) (Entered: 05/18/2020) |
| 05/19/2020 | ● 910 (243 pgs; 5 docs) | Exhibit List, Witness List (Filed By Maire Tecnimont SPA and MET Gas Processing Technologies SPA ).(Related document(s):906 Notice) (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4) (Judd, T.) (Entered: 05/19/2020) |
| 05/19/2020 | ● 911 (4 pgs) | Witness List, Exhibit List (Filed By McDermott International, Inc. ). (Related document(s): Certificate of Notice) (Cavenaugh, Matthew) (Entered: 05/19/2020) |
| 05/19/2020 | ● 912 (2 pgs) | AO 435 TRANSCRIPT ORDER FORM (Hourly) by Matthew Whitaker. This is to order a transcript of Order Authorizing 5/8/2020 before Judge David R. Jones. Court Reporter/Transcriber: Exceptional Reporting Services. (MelissaMorgan) Modified on 5/19/2020 (MelissaMorgan). Electronically forwarded to Exceptional Reporting Services on 5-19-2020. Estimated completion date: 5-20-2020. Modified on 5/19/2020 (MelissaMorgan). (Entered: 05/19/2020) |
| 05/19/2020 | ● 913 (7 pgs) | Transcript RE: HEARING held on 5/8/20 before Judge DAVID R. JONES. Transcript is available for viewing in the Clerk's Office. Filed by Transcript access will be restricted through 08/17/2020. (thud) (Entered: 05/19/2020) |
| 05/20/2020 | ● 914 (4 pgs) | Affidavit Re: *of Kelsey L. Gordon Regarding Declaration of Disinterestedness of ENSafrica Pursuant to the Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business*. (related document(s):904 Declaration). Filed by Prime Clerk LLC (Steele, Benjamin) (Entered: 05/20/2020) |
| 05/20/2020 | ● 915 (1 pg) | Notice of Filing of Official Transcript as to 913 Transcript. Parties notified (Related document(s):913 Transcript) (gclair) (Entered: 05/20/2020) |
| 05/20/2020 | ● 916 (10 pgs) | Memorandum Opinion Signed on 5/20/2020 (Related document(s):434 Application to Employ, 636 Application to Employ, 637 Application to Employ) (aalo) (Entered: 05/20/2020) |
| 05/20/2020 | ● 917 (1 pg) | Order Signed on 5/20/2020 (Related document(s):434 Application to Employ, 636 Application to Employ, 637 Application to Employ) (aalo) (Entered: 05/20/2020) |
| 05/21/2020 | ● 918 (1 pg) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by Matthew D. Cavenaugh. This is to order a transcript of 05/21/2020 before Judge David R. Jones. Court Reporter/Transcriber: Access Transcripts (Filed By McDermott International, Inc. ). (Cavenaugh, Matthew) Electronically forwarded to Access Transcripts on 5-21-2020. Estimated completion date: 5-22-2020. Modified on 5/21/2020 (MelissaMorgan). (Entered: 05/21/2020) |
| 05/21/2020 | ● | Per the Courts instruction at the hearing on 5/21/2020, the Motion to Withdraw Proofs of Claims filed at 760 has been transferred to Adv 20-3056. (aalo) (Entered: 05/21/2020) |

001068

| | | |
|---|---|---|
| 05/21/2020 | ⚫ | Courtroom Minutes. Time Hearing Held: 10:00 AM. Appearances: Josh Judd, Carollyn Callari, Howard Alperin, Matthew Cavenaugh, Jaime Aycock. (Related document(s):6 Motion to Dismiss Adversary Proceeding, 16 Document). The motion to withdraw filed at 760 has been transferred to Adversary 20-3056. The Court will Status Conference in the Adversary case on 6/15/2020 at 01:30 PM at Houston, Courtroom 400 (DRJ). (aalo) (aalo) (Entered: 05/21/2020) |
| 05/21/2020 | ⚫919<br>(5 pgs) | Statement *Quarterly Statement of Amounts Paid by the Debtors to Ordinary Course Professionals from January 22, 2020 to April 21, 2020* (Filed By McDermott International, Inc. ).(Related document(s):612 Generic Order) (Cavenaugh, Matthew) (Entered: 05/21/2020) |
| 05/22/2020 | ⚫920<br>(3 pgs) | Declaration re: *Declaration of Disinterestedness of Baker Donelson Bearman Caldwell & Berkowitz, P.C. Pursuant to the Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* (Filed By McDermott International, Inc. ). (Cavenaugh, Matthew) (Entered: 05/22/2020) |
| 05/22/2020 | ⚫921<br>(48 pgs) | Transcript RE: Telephonic Motions Hearing held on 05/21/20 before Judge David R. Jones. Transcript is available for viewing in the Clerk's Office. Filed by Transcript access will be restricted through 08/20/2020. (AccessTranscripts) (Entered: 05/22/2020) |
| 05/22/2020 | ⚫922<br>(9 pgs) | BNC Certificate of Mailing. (Related document(s):915 Notice of Filing of Official Transcript (Form)) No. of Notices: 297. Notice Date 05/22/2020. (Admin.) (Entered: 05/22/2020) |
| 05/23/2020 | ⚫923<br>(18 pgs) | BNC Certificate of Mailing. (Related document(s):916 Opinion) No. of Notices: 297. Notice Date 05/23/2020. (Admin.) (Entered: 05/23/2020) |
| 05/23/2020 | ⚫924<br>(9 pgs) | BNC Certificate of Mailing. (Related document(s):917 Generic Order) No. of Notices: 297. Notice Date 05/23/2020. (Admin.) (Entered: 05/23/2020) |
| 05/26/2020 | ⚫925<br>(1 pg) | Notice of Filing of Official Transcript as to 921 Transcript. Parties notified (Related document(s):921 Transcript) (jdav) (Entered: 05/26/2020) |
| 05/26/2020 | ⚫926<br>(227 pgs; 7 docs) | Final Application to Employ Baker Botts, L.L.P. as Special Counsel to the Debtors. Objections/Request for Hearing Due in 21 days. Filed by Debtor McDermott International, Inc. (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Proposed Order) (Cavenaugh, Matthew) (Entered: 05/26/2020) |
| 05/26/2020 | ⚫927<br>(5 pgs) | Declaration re: *Declaration of Disinterestedness of Ernst & Young Middle East (Dubai Branch) Pursuant to the Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* (Filed By McDermott International, Inc. ). (Cavenaugh, Matthew) (Entered: 05/26/2020) |
| 05/26/2020 | ⚫928<br>(6 pgs) | Declaration re: *Declaration of Disinterestedness of Ernst & Young & Co. (Certified Public Accountants) Pursuant to the Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* (Filed By McDermott International, Inc. ). (Cavenaugh, Matthew) (Entered: 05/26/2020) |

001069

| 05/26/2020 | 929 (3 pgs) | Motion to Extend Time . Filed by PJSC Nizhnekamskneftekhim. (ShoshanaArnow) (Entered: 05/26/2020) |
|---|---|---|
| 05/26/2020 | 930 (2 pgs) | Notice of Continued Hearing (June 3, 2020 at 11:45 a.m.). (Related document(s):747 Motion for Relief From Stay, 865 Notice, 890 Notice, 908 Notice) Filed by Sinclair Wyoming Refining Company (Warner, Michael) (Entered: 05/26/2020) |
| 05/27/2020 | ● | Certificate of Email Notice. Contacted Michael Warner. Movant to notice all interested parties and file a certificate of service with the court (Related document(s):747 Motion for Relief From Stay) **Hearing rescheduled for 6/3/2020 at 11:45 AM DRJ).** (aalo) (Entered: 05/27/2020) |
| 05/27/2020 | 931 (2 pgs) | Motion to Extend Time (scas) (Entered: 05/28/2020) |
| 05/28/2020 | 932 (6 pgs) | Declaration re: Declaration of Disinterestedness of Ernst & Young (Australia) Pursuant to the Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business (Filed By McDermott International, Inc. ). (Cavenaugh, Matthew) (Entered: 05/28/2020) |
| 05/28/2020 | 933 (10 pgs) | Affidavit Re: Mailings for the Period from May 16, 2020 through May 22, 2020. (related document(s):846 Notice, 909 Declaration, 920 Declaration). Filed by Prime Clerk LLC (Steele, Benjamin) (Entered: 05/28/2020) |
| 05/28/2020 | 934 (9 pgs) | BNC Certificate of Mailing. (Related document(s):925 Notice of Filing of Official Transcript (Form)) No. of Notices: 297. Notice Date 05/28/2020. (Admin.) (Entered: 05/28/2020) |
| 06/01/2020 | 935 (3 pgs) | Declaration re: Declaration of Disinterestedness of Burr Forman, L.L.P. Pursuant to the Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business (Filed By McDermott International, Inc. ). (Cavenaugh, Matthew) (Entered: 06/01/2020) |
| 06/02/2020 | 936 (10 pgs; 2 docs) | Stipulation By Sinclair Wyoming Refining Company and Stipulation and Order Granting Relief From the Automatic Stay. Does this document include an agreed order or otherwise request that the judge sign a document? Yes. (Filed By Sinclair Wyoming Refining Company ). (Related document(s):747 Motion for Relief From Stay) (Attachments: # 1 Proposed Order) (Warner, Michael) (Entered: 06/02/2020) |
| 06/03/2020 | 937 (5 pgs) | Stipulation and Agreed Order Granting Relief From the Automatic Stay (Related Doc # 747) Signed on 6/3/2020. (emiller) (Entered: 06/03/2020) |
| 06/03/2020 | 938 (30 pgs) | Affidavit Re: Mailings for the Period from May 23, 2020 through May 29, 2020. (related document(s):926 Application to Employ, 927 Declaration, 928 Declaration, 932 Declaration). Filed by Prime Clerk LLC (Steele, Benjamin) (Entered: 06/03/2020) |
| 06/03/2020 | 939 (87 pgs) | Notice of Filing. Filed by Michael Van Deelen (jtab) (Entered: 06/04/2020) |

| 06/04/2020 | ⬤940<br>(2 pgs) | Declaration re: *Declaration of Disinterestedness of Alrud Law Firm ("Alrud" JSC) Pursuant to the Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* (Filed By McDermott International, Inc. ). (Cavenaugh, Matthew) (Entered: 06/04/2020) |
|---|---|---|
| 06/05/2020 | ⬤941<br>(14 pgs; 2 docs) | Motion to Seal *Certain Confidential Commercial Information Related to Evercore Group, L.L.C. and Evercore Partners International LLP's Retention Application* Filed by Debtor McDermott International, Inc. (Attachments: # 1 Proposed Order) (Cavenaugh, Matthew) (Entered: 06/05/2020) |
| 06/05/2020 | ⬤942<br>(8 pgs) | Proposed Order RE: *Order Authorizing the Retention and Employment of Evercore Group L.L.P. and Evercore Partners International LLP as Investment Bankers to the Debtors and Debtors in Possession* (Filed By McDermott International, Inc. ).(Related document(s):427 Application to Employ) (Cavenaugh, Matthew) (Entered: 06/05/2020) |
| 06/05/2020 | ⬤943 | Sealed Document *Order Authorizing the Retention and Employment of Evercore Group L.L.P. and Evercore Partners International LLP as Investment Bankers to the Debtors and Debtors in Possession* (Filed By McDermott International, Inc. ). (Cavenaugh, Matthew) (Entered: 06/05/2020) |
| 06/05/2020 | ⬤944<br>(13 pgs) | BNC Certificate of Mailing. (Related document(s):937 Order on Motion For Relief From Stay) No. of Notices: 297. Notice Date 06/05/2020. (Admin.) (Entered: 06/05/2020) |
| 06/08/2020 | ⬤945<br>(18 pgs) | Notice *of Excess Fees of Arnold & Porter Kaye Scholer LLP for the Period from March 1, 2020 - March 31, 2020.* Filed by McDermott International, Inc. (Cavenaugh, Matthew) (Entered: 06/08/2020) |
| 06/10/2020 | ⬤946<br>(3 pgs) | Order Authorizing the Debtors to File Under Seal Certain Confidential Commercial Information Related to Evercore Group, L.L.C. and Evercore Partners International LLP's Retention Application (Related Doc # 941) Signed on 6/10/2020. (emiller) (Entered: 06/10/2020) |
| 06/10/2020 | ⬤947<br>(4 pgs) | Declaration re: *Declaration of Disinterestedness of Law Office of Alan R. Hinaman, PLLC Pursuant to the Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* (Filed By McDermott International, Inc. ). (Cavenaugh, Matthew) (Entered: 06/10/2020) |
| 06/11/2020 | ⬤948<br>(1 pg) | Order (Related Doc # 903) Signed on 6/11/2020. (VrianaPortillo) (Entered: 06/11/2020) |
| 06/11/2020 | ⬤949<br>(69 pgs) | Affidavit Re: *Mailings for the Period from May 30, 2020 through June 5, 2020.* (related document(s):935 Declaration, 940 Declaration, 942 Proposed Order). Filed by Prime Clerk LLC (Steele, Benjamin) (Entered: 06/11/2020) |
| 06/12/2020 | ⬤950<br>(12 pgs; 2 docs) | Certificate *of Counsel* (Filed By McDermott International, Inc. ).(Related document(s):942 Proposed Order) (Attachments: # 1 Proposed Order) (Cavenaugh, Matthew) (Entered: 06/12/2020) |
| 06/12/2020 | ⬤951<br>(8 pgs) | BNC Certificate of Mailing. (Related document(s):946 Order on Motion to Seal) No. of Notices: 217. Notice Date 06/12/2020. (Admin.) (Entered: |

| 06/15/2020 | 🔵 952 (1 pg) | AO 435 TRANSCRIPT ORDER FORM (Expedited (7 days)) by T. Josh Judd. This is to order a transcript of May 21, 2020 Hearing before Judge David R. Jones. Court Reporter/Transcriber: Access Transcripts (Filed By Maire Tecnimont SPA and MET Gas Processing Technologies SPA ). (Judd, T.) Copy request forwarded to Access Transcripts, LLC on June 15, 2020. Estimated completion date: June 22, 2020. Modified on 6/15/2020 (ClaudiaGutierrez). (Entered: 06/15/2020) |
|---|---|---|
| 06/15/2020 | 🔵 953 (1 pg) | Notice *of Withdrawal of Objection and Reservation of Rights of Chevron Lummus Global LLC to Debtors Notice to Contract Parties to Potentially Assumed or Assumed and Assigned Executory Contracts and Unexpired Leases in Connection With the Sale of the Debtors Technology Business*. (Related document(s):880 Objection) Filed by Chevron Lummus Global LLC (Zottnick, Kelsey) (Entered: 06/15/2020) |
| 06/15/2020 | 🔵 954 (1 pg) | Withdrawal of Claim: 65 *(State of Minnesota)* (sgue) (Entered: 06/15/2020) |
| 06/16/2020 | 🔵 955 (8 pgs) | Order Granting Application to Employ the Retention and Employment of Evercore Group LLC (Related Doc # 427) Signed on 6/16/2020. (aalo) (Entered: 06/16/2020) |
| 06/16/2020 | 🔵 956 (6 pgs) | Response *Debtors' Response to PJSC Nizhnekamskneftekhim's Motion to Extend Time* (related document(s):929 Motion to Extend Time). Filed by McDermott International, Inc. (Cavenaugh, Matthew) (Entered: 06/16/2020) |
| 06/17/2020 | 🔵 957 (52 pgs) | Affidavit Re: *Mailings for the Period from June 6, 2020 through June 12, 2020*. (related document(s):945 Notice, 946 Order on Motion to Seal, 947 Declaration, 950 Certificate). Filed by Prime Clerk LLC (Steele, Benjamin) (Entered: 06/17/2020) |
| 06/17/2020 | 🔵 958 (5 pgs; 2 docs) | Certificate of No Objection *to the Final Application to Employ Baker Botts, L.L.P. as Special Counsel to the Debtors* (Filed By McDermott International, Inc. ).(Related document(s):926 Application to Employ) (Attachments: # 1 Proposed Order) (Cavenaugh, Matthew) (Entered: 06/17/2020) |
| 06/17/2020 | 🔵 959 (20 pgs) | BNC Certificate of Mailing. (Related document(s):948 Order on Motion For Relief From Stay) No. of Notices: 297. Notice Date 06/17/2020. (Admin.) (Entered: 06/17/2020) |
| 06/18/2020 | 🔵 960 (16 pgs) | BNC Certificate of Mailing. (Related document(s):955 Order on Application to Employ) No. of Notices: 297. Notice Date 06/18/2020. (Admin.) (Entered: 06/19/2020) |
| 06/23/2020 | 🔵 961 (1 pg) | Order Signed on 6/23/2020 (Related document(s):929 Motion to Extend Time, 931 Motion to Extend Time) (emiller) (Entered: 06/23/2020) |
| 06/23/2020 | 🔵 962 (17 pgs) | Notice *of Modified Schedules of Potentially Assumed or Assumed and Assigned Executory Contracts and Unexpired Leases in Connection with the Sale of the Debtors Technology Business*. (Related document(s):476 Generic Order, 684 Generic Order, 846 Notice) Filed by McDermott International, Inc. (Cavenaugh, Matthew) (Entered: 06/23/2020) |

11/18/21, 11:12 AM Case 4:21-cv-03369 Document 10-2 ECF Filed on 11/18/21 in TXSD Bankruptcy Court-Texas Southern Page 120 of 550

001072

| 06/24/2020 | ⦿963<br>(691 pgs; 2 docs) | Application for Compensation *First and Final Fee Application of Ernst & Young LLP for Compensation and Reimbursement of Expenses for the Period From January 21, 2020 Through March 12, 2020.* Objections/Request for Hearing Due in 21 days. Filed by Attorney Matthew D Cavenaugh (Attachments: # 1 Proposed Order) (Cavenaugh, Matthew) (Entered: 06/24/2020) |
| 06/25/2020 | ⦿964<br>(2 pgs) | Notice *of Anticipated Effective Date*. (Related document(s):684 Generic Order) Filed by McDermott International, Inc. (Cavenaugh, Matthew) (Entered: 06/25/2020) |
| 06/25/2020 | ⦿965<br>(7 pgs) | Stipulation By McDermott International, Inc. and Entergy Louisiana, LLC and Entergy Texas, Inc.. Does this document include an agreed order or otherwise request that the judge sign a document? Yes. (Filed By McDermott International, Inc. ). (Cavenaugh, Matthew) (Entered: 06/25/2020) |
| 06/25/2020 | ⦿966<br>(9 pgs) | BNC Certificate of Mailing. (Related document(s):961 Generic Order) No. of Notices: 297. Notice Date 06/25/2020. (Admin.) (Entered: 06/25/2020) |
| 06/29/2020 | ⦿967<br>(7 pgs) | Stipulation and Agreed Order Authorizing Immediate Assumption of Certain Contracts with Entergy Signed on 6/29/2020 (Related document(s):965 Stipulation) (emiller) (Entered: 06/29/2020) |
| 06/29/2020 | ⦿968<br>(49 pgs) | Affidavit Re: *Mailings for the Period from June 13, 2020 through June 19, 2020.* (related document(s):955 Order on Application to Employ, 956 Response, 958 Certificate of No Objection). Filed by Prime Clerk LLC (Steele, Benjamin) (Entered: 06/29/2020) |
| 06/30/2020 | ⦿969<br>(853 pgs) | Notice *of Fourth Amended Plan Supplement*. (Related document(s):622 Notice, 647 Notice, 696 Notice) Filed by McDermott International, Inc. (Cavenaugh, Matthew) (Entered: 06/30/2020) |
| 06/30/2020 | ⦿970<br>(2 pgs) | Notice *of (I) Entry of an Order Approving the Debtors' Disclosure Statement and Confirming the Second Amended Joint Prepackaged Chapter 11 Plan of Reorganization (Technical Modifications) of McDermott International, Inc. and its Debtor Affiliates and (II) Anticipated Occurrence of Effective Date*. Filed by McDermott International, Inc. (Cavenaugh, Matthew) (Entered: 06/30/2020) |
| 07/01/2020 | ⦿971<br>(2 pgs) | Order Granting Final Application to Employ Baker Botts, L.L.P. as Special Counsel to the Debtors Signed on 7/1/2020 (Related document(s):958 Certificate of No Objection) (aalo) (Entered: 07/01/2020) |
| 07/01/2020 | ⦿972<br>(2 pgs) | Notice *of Revised Exhibit D to Fourth Amended Plan Supplement*. (Related document(s):969 Notice) Filed by McDermott International, Inc. (Cavenaugh, Matthew) (Entered: 07/01/2020) |
| 07/02/2020 | ⦿973<br>(6 pgs) | Stipulation By McDermott International, Inc. and Columbia Texas Westchase II Office Properties, LLC. Does this document include an agreed order or otherwise request that the judge sign a document? Yes. (Filed By McDermott International, Inc. ). (Cavenaugh, Matthew) (Entered: 07/02/2020) |

| 07/02/2020 | ◯ 974 (335 pgs) | Affidavit Re: *Mailings for the Period from June 21, 2020 through June 27, 2020*. (related document(s):846 Notice, 961 Generic Order, 962 Notice, 963 Application for Compensation, 964 Notice). Filed by Prime Clerk LLC (Steele, Benjamin) (Entered: 07/02/2020) |
|---|---|---|
| 07/02/2020 | ◯ 975 (15 pgs) | BNC Certificate of Mailing. (Related document(s):967 Generic Order) No. of Notices: 297. Notice Date 07/02/2020. (Admin.) (Entered: 07/02/2020) |
| 07/03/2020 | ◯ 976 (10 pgs) | BNC Certificate of Mailing. (Related document(s):971 Generic Order) No. of Notices: 297. Notice Date 07/03/2020. (Admin.) (Entered: 07/03/2020) |
| 07/06/2020 | ◯ 977 (2 pgs) | Notice *of Withdrawal of Attorney*. Filed by W-Industries of Texas LLC (Mitchell, John) (Entered: 07/06/2020) |
| 07/07/2020 | ◯ 978 (6 pgs) | Stipulation and Agreed Order Authorizing Immediate Assumption of Certain Lease Agreement with Columbia Texas Westchase Signed on 7/7/2020 (Related document(s):973 Stipulation) (VrianaPortillo) (Entered: 07/07/2020) |
| 07/09/2020 | ◯ 979 (14 pgs) | BNC Certificate of Mailing. (Related document(s):978 Generic Order) No. of Notices: 299. Notice Date 07/09/2020. (Admin.) (Entered: 07/09/2020) |
| 07/13/2020 | ◯ 980 (4205 pgs) | Affidavit Re: *Mailings for the Period from June 27, 2020 through July 3, 2020*. (related document(s):969 Notice, 970 Notice, 971 Generic Order, 972 Notice, 973 Stipulation). Filed by Prime Clerk LLC (Steele, Benjamin) (Entered: 07/13/2020) |
| 07/14/2020 | ◯ 981 (2 pgs) | Notice of Change of Address Filed by Maricopa County Attorney's Office (gkel) (Entered: 07/14/2020) |
| 07/15/2020 | ◯ 982 (1 pg) | Notice of Video Platform Upgrade. Effective August 1, 2020, the Court will utilize GoToMeeting for all video hearings. See attached. (emiller) (Entered: 07/15/2020) |
| 07/17/2020 | ◯ 983 (55 pgs; 2 docs) | Adversary case 20-03309. Nature of Suit: (01 (Determination of removed claim or cause)),(02 (Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy))) Notice of Removal Michael Van Deelen. Fee Amount $350 (Attachments: # 1 Adversary Cover Sheet) (Cavenaugh, Matthew) (Entered: 07/17/2020) |
| 07/24/2020 | ◯ 984 (17 pgs) | Chapter 11 Post-Confirmation Report for Quarter Ended 6/30/2020 (Filed By McDermott International, Inc. ). (Cavenaugh, Matthew) (Entered: 07/24/2020) |
| 07/31/2020 | ◯ 985 (3 pgs) | Notice *of Withdrawal of Attorney - Amy Edgy*. Filed by Credit Agricole Corporate and Investment Bank (Wood, William) (Entered: 07/31/2020) |
| 08/06/2020 | ◯ 986 (119 pgs; 2 docs) | Application for Compensation *First and Final Fee Application of PricewaterCoopers LLP for Services Rendered and Reimbursement of Expenses to Provide Certain Accounting, Transaction, and Valuation Services for the Debtors for the Period January 21, 2020 Through March 12, 2020*. Objections/Request for Hearing Due in 21 days. Filed by |

| | | Attorney Matthew D Cavenaugh (Attachments: # 1 Proposed Order) (Cavenaugh, Matthew) (Entered: 08/06/2020) |
|---|---|---|
| 08/10/2020 | 987<br>(2 pgs) | Withdrawal of Claim: 57 (Streusand, Sabrina) (Entered: 08/10/2020) |
| 08/10/2020 | 988<br>(2 pgs) | Withdrawal of Claim: 1 (Streusand, Sabrina) (Entered: 08/10/2020) |
| 08/12/2020 | 989<br>(2 pgs) | Notice of Appearance and Request for Notice Filed by Paul M. Lopez Filed by on behalf of COLLIN COUNTY TAX ASSESSOR/COLLECTOR (Lopez, Paul) (Entered: 08/12/2020) |
| 08/14/2020 | 990<br>(600 pgs; 2 docs) | Application for Compensation *First and Final Fee Application of Kirkland & Ellis LLP and Kirkland & Ellis International LLP Attorneys for the Debtors and Debtors in Possession for the Period From January 21, 2020 Through and Including March 12, 2020*. Objections/Request for Hearing Due in 21 days. Filed by Attorney Matthew D Cavenaugh (Attachments: # 1 Proposed Order) (Cavenaugh, Matthew) (Entered: 08/14/2020) |
| 08/14/2020 | 991<br>(79 pgs; 2 docs) | Application for Compensation *Jackson Walker LLP's First and Final Fee Application for Allowance and Payment of Fees and Expenses as Co-Counsel and Conflicts Counsel to the Debtors for the Period from January 21, 2020 Through March 12, 2020*. Objections/Request for Hearing Due in 21 days. Filed by Attorney Matthew D Cavenaugh (Attachments: # 1 Proposed Order) (Cavenaugh, Matthew) (Entered: 08/14/2020) |
| 08/14/2020 | 992<br>(490 pgs; 2 docs) | Application for Compensation *Final Application of AP Services, LLC and AlixPartners, LLP for Allowance and Payment of (I) Compensation for Services Rendered and for Reimbursement of Expenses Incurred as Chief Transformation Officer and Financial Advisor to the Chapter 11 Reorganized Debtors for the Period January 21, 2020 Through March 12, 2020 and (II) Success Fee*. Objections/Request for Hearing Due in 21 days. Filed by Attorney Matthew D Cavenaugh (Attachments: # 1 Proposed Order) (Cavenaugh, Matthew) (Entered: 08/14/2020) |
| 08/14/2020 | 993<br>(145 pgs; 2 docs) | Application for Compensation *Final Fee Application of Holland & Knight LLP, Special Litigation and Colombia Counsel to the Debtors and Debtors in Possession, for the Period From January 21, 2020 Through and Including March 12, 2020*. Objections/Request for Hearing Due in 21 days. Filed by Attorney Matthew D Cavenaugh (Attachments: # 1 Proposed Order) (Cavenaugh, Matthew) (Entered: 08/14/2020) |
| 08/14/2020 | 994<br>(291 pgs; 2 docs) | Application for Compensation *First and Final Fee Application of K&L Gates LLP, as Special Counsel to the Debtors, for Allowance and Payment of Compensation for Professional Services Rendered and Reimbursement of Actual and Necessary Expenses Incurred, for the Period from January 21, 2020 Through March 12, 2020*. Objections/Request for Hearing Due in 21 days. Filed by Attorney Matthew D Cavenaugh (Attachments: # 1 Proposed Order) (Cavenaugh, Matthew) (Entered: 08/14/2020) |
| 08/14/2020 | 995<br>(263 pgs; 2 docs) | Application for Compensation *Final Fee Application of KPMG LLP for Entry of an Order Granting Final Allowance of Compensation for Services Rendered and Reimbursement of Expenses Incurred as Tax* |

001075

| | | |
|---|---|---|
| | | *Compliance, Tax Consultant, Financial Accountant and Advisor to the Debtors for the Final Period from January 21, 2020 Through March 12, 2020; and Authorizing and Directing the Debtors to Pay any and all Unpaid Fees*. Objections/Request for Hearing Due in 21 days. Filed by Attorney Matthew D Cavenaugh (Attachments: # 1 Proposed Order) (Cavenaugh, Matthew) (Entered: 08/14/2020) |
| 08/14/2020 | 996 (97 pgs; 2 docs) | Application for Compensation *First and Final Fee Application of Evercore Group L.L.C. and Evercore Partners International LLP, Investment Banker to the Debtors and Debtors in Possession, for Allowance and Payment of an Administrative Expense Claim for Compensation for the Period from January 21, 2020 Through and Including June 30, 2020 and Related Expense Reimbursement*. Objections/Request for Hearing Due in 21 days. Filed by Attorney Matthew D Cavenaugh (Attachments: # 1 Proposed Order) (Cavenaugh, Matthew) (Entered: 08/14/2020) |
| 08/17/2020 | 997 (37 pgs) | Declaration re: *Declaration of Disinterestedness of Ernst & Young Belastingadviseurs LLP - The Netherlands* (Filed By McDermott International, Inc. ).(Related document(s):478 Order on Emergency Motion) (Cavenaugh, Matthew) (Entered: 08/17/2020) |
| 08/17/2020 | 998 (36 pgs) | Declaration re: *Declaration of Disinterestedness of Ernst & Young Chartered Accountants - Ireland* (Filed By McDermott International, Inc. ).(Related document(s):478 Order on Emergency Motion) (Cavenaugh, Matthew) (Entered: 08/17/2020) |
| 08/17/2020 | 999 (38 pgs) | Declaration re: *Declaration of Disinterestedness of Ernst & Young LLP - United Kingdom* (Filed By McDermott International, Inc. ).(Related document(s):478 Order on Emergency Motion) (Cavenaugh, Matthew) (Entered: 08/17/2020) |
| 08/17/2020 | 1000 (12 pgs; 2 docs) | Emergency Motion *Debtors' Emergency Omnibus Motion for Entry of an Order Authorizing the Debtors to File Under Seal Certain Confidential Commercial Information Related to Ernst & Young Member Firms' Declarations of Disinterestedness* Filed by Debtor McDermott International, Inc. (Attachments: # 1 Proposed Order) (Cavenaugh, Matthew) (Entered: 08/17/2020) |
| 08/17/2020 | 1001 | Sealed Document (Filed By McDermott International, Inc. ). (Cavenaugh, Matthew) (Entered: 08/17/2020) |
| 08/17/2020 | 1002 | Sealed Document (Filed By McDermott International, Inc. ). (Cavenaugh, Matthew) (Entered: 08/17/2020) |
| 08/17/2020 | 1003 | Sealed Document (Filed By McDermott International, Inc. ). (Cavenaugh, Matthew) (Entered: 08/17/2020) |
| 08/17/2020 | 1004 (1 pg) | Withdrawal of Claim: 68 *by Minnesota Department of Revenue* (sgue) (Entered: 08/19/2020) |
| 08/20/2020 | 1005 (3 pgs) | Order (Related Doc # 1000) Signed on 8/20/2020. (aalo) (Entered: 08/20/2020) |
| 08/20/2020 | 1006 (302 pgs; 5 docs) | Affidavit Re: *Mailings for the Period from July 29, 2020 through August 14, 2020*. (related document(s):684 Generic Order, 865 Notice, 986 Application for Compensation, 990 Application for Compensation, 992 |

| | | |
|---|---|---|
| | | Application for Compensation, 993 Application for Compensation, 994 Application for Compensation, 995 Application for Compensation, 996 Application for Compensation). Filed by Prime Clerk LLC (Attachments: # 1 Affidavit of 7/29/2020 Supplemental Service of Amended Order Approving the Debtors' Disclosure Statement and Confirming the Second Amended Joint Prepackaged Chapter 11 Plan of Reorganization (Technical Modifications) of McDermott International, Inc. and it # 2 Affidavit of 8/6/2020 Service of First and Final Fee Application of PricewaterCoopers LLP for Services Rendered and Reimbursement of Expenses to Provide Certain Accounting, Transaction, and Valuation Services for the Debtors for the Period January 21, 2020 # 3 Affidavit of 8/11/2020 Supplemental Service of Notice of (A) Executory Contracts and Unexpired Leases to be Assumed by the Debtors Pursuant to the Plan, and (B) Related Procedures in Connection Therewith and Notice to Contract Parties to Potentially Assume # 4 Affidavit of 8/14/2020 Service of Various First and Final Fee Applications)(Steele, Benjamin) (Entered: 08/20/2020) |
| 08/22/2020 | ● 1007 (11 pgs) | BNC Certificate of Mailing. (Related document(s):1005 Order on Emergency Motion) No. of Notices: 304. Notice Date 08/22/2020. (Admin.) (Entered: 08/22/2020) |
| 08/24/2020 | ● 1008 (4 pgs) | Notice of Appearance and Request for Notice Filed by Union Pacific Railroad Company (than) (Entered: 08/25/2020) |
| 08/26/2020 | ● 1009 (5 pgs; 2 docs) | Certificate of No Objection (Filed By McDermott International, Inc. ). (Related document(s):963 Application for Compensation) (Attachments: # 1 Proposed Order) (Cavenaugh, Matthew) (Entered: 08/26/2020) |
| 08/27/2020 | ● 1010 (24 pgs; 2 docs) | Affidavit Re: *Mailings for the Period from August 15, 2020 through August 21, 2020.* (related document(s):997 Declaration, 998 Declaration, 999 Declaration). Filed by Prime Clerk LLC (Attachments: # 1 Affidavit of 8/17/2020 Service of Declarations of Disinterestedness (DN 997, 998, 999) and Debtors' Emergency Omnibus Motion for Entry of an Order Authorizing the Debtors to File Under Seal Certain Confidential Commercial Information Related to Ernst)(Steele, Benjamin) (Entered: 08/27/2020) |
| 08/28/2020 | ● 1011 (2 pgs) | Order Approving First and Final Application of Ernst & Young LLP for Compensation and Reimbursement of Expenses for the Period from January 21, 2020 through and Including March 12, 2020 (Related Doc # 963). Signed on 8/28/2020. (emiller) (Entered: 08/28/2020) |
| 08/30/2020 | ● 1012 (10 pgs) | BNC Certificate of Mailing. (Related document(s):1011 Order on Application for Compensation) No. of Notices: 306. Notice Date 08/30/2020. (Admin.) (Entered: 08/30/2020) |
| 08/31/2020 | ● 1013 (16 pgs; 2 docs) | Motion for Final Decree Filed by Debtor McDermott International, Inc. (Attachments: # 1 Proposed Order) (Cavenaugh, Matthew) (Entered: 08/31/2020) |
| 09/01/2020 | ● 1014 (5 pgs; 2 docs) | Certificate of No Objection (Filed By McDermott International, Inc. ). (Related document(s):986 Application for Compensation) (Attachments: # 1 Proposed Order) (Cavenaugh, Matthew) (Entered: 09/01/2020) |
| 09/02/2020 | ● 1015 (2 pgs) | Notice of Appearance and Request for Notice Filed by Aldine ISD (Morales, Yolanda) (Entered: 09/02/2020) |

001077

| 09/02/2020 | ●1016<br>(17 pgs; 2 docs) | Amended Motion for Final Decree Filed by Debtor McDermott International, Inc. (Attachments: # 1 Proposed Order) (Cavenaugh, Matthew) (Entered: 09/02/2020) |
|---|---|---|
| 09/04/2020 | ●1017<br>(29 pgs; 2 docs) | Affidavit Re: *Mailings for the Period from August 22, 2020 through August 28, 2020.* (related document(s):970 Notice). Filed by Prime Clerk LLC (Attachments: # 1 Affidavit of 8/25/2020 Supplemental Service of Notice of (I) Entry of an Order Approving the Debtors' Disclosure Statement and Confirming the Second Amended Joint Prepackaged Chapter 11 Plan of Reorganization (Technical Modifications) of McDermott)(Steele, Benjamin) (Entered: 09/04/2020) |
| 09/08/2020 | ●1018<br>(18 pgs; 8 docs) | Certificate of No Objection *Omnibus Certificate of No Objection* (Filed By McDermott International, Inc. ).(Related document(s):990 Application for Compensation, 991 Application for Compensation, 992 Application for Compensation, 993 Application for Compensation, 994 Application for Compensation, 995 Application for Compensation, 996 Application for Compensation) (Attachments: # 1 Proposed Order Kirkland & Ellis LLP # 2 Proposed Order Jackson Walker LLP # 3 Proposed Order AlixPartners # 4 Proposed Order Holland & Knight # 5 Proposed Order K&L Gates LLP # 6 Proposed Order KPMG LLP # 7 Proposed Order Evercore Group L.L.C.) (Cavenaugh, Matthew) (Entered: 09/08/2020) |
| 09/08/2020 | ●1020<br>(2 pgs) | Order Granting First and Final Fee Application of Kirkland & Ellis LLP and Kirkland & Ellis International LLP, Attorneys for the Debtors and Debtors in Possession, for the Period from January 21, 2020 Through and Including March 12, 2020 (Related Doc # 990) Signed on 9/8/2020. (emiller) (Entered: 09/10/2020) |
| 09/08/2020 | ●1021<br>(2 pgs) | Order Granting Jackson Walker LLP's First and Final Fee Application For Allowance and Payment of Fees and Expenses as Co-Counsel to the Debtors for the Period from January 21, 2020 Through and Including March 12, 2020 (Related Doc # 991) Signed on 9/8/2020. (emiller) (Entered: 09/10/2020) |
| 09/08/2020 | ●1022<br>(2 pgs) | Order Approving the Final Application of AP Services, LLC and AlixPartners, LLP for Allowance and Payment of (I) Compensation for Services Rendered and for Reimbursement of Expenses Incurred as Chief Transformation Officer of and Financial Advisor to the Chapter 11 Reorganized Debtors for the Period January 21, 2020 Through March 12, 2020 and (II) a Success Fee (Related Doc # 992) Signed on 9/8/2020. (emiller) (Entered: 09/10/2020) |
| 09/08/2020 | ●1023<br>(2 pgs) | Order Granting the Final Fee Application of Holland & Knight LLP, Special Litigation and Colombia Counsel to the Debtors and Debtors in Possession for the Period From January 21, 2020 Through and Including March 12, 2020 (Related Doc # 993) Signed on 9/8/2020. (emiller) (Entered: 09/10/2020) |
| 09/08/2020 | ●1024<br>(2 pgs) | Order Granting First and Final Application of K&L Gates LLP, as Special Counsel to the Debtors, for Allowance and Payment of Compensation for Professional Services Rendered and Reimbursement of Actual and Necessary Expenses Incurred, for the Period from January 21, 2020 Through March 12, 2020 (Related Doc # 994) Signed on 9/8/2020. (emiller) (Entered: 09/10/2020) |

| 09/08/2020 | ● 1025<br>(2 pgs) | Order Granting Final Fee Application of KPMG LLP, as Tax Compliance, Tax Consultant, Financial Accountant and Advisor to the Debtors and Debtors in Possession for the Final Period From January 21, 2020 Through March 12, 2020 (Related Doc # 995) Signed on 9/8/2020. (emiller) (Entered: 09/10/2020) |
| 09/08/2020 | ● 1026<br>(2 pgs) | Order Approving First and Final Fee Application of Evercore Group L.L.C. nd Evercore Partners International LLP, Investment Banker to the Debtors and Debtors in Possession, for Allowance and Payment of an Administrative Expense Claim for Compensation for the Period from January 21, 2020 Through and Including June 30, 2020 (Related Doc # 996) Signed on 9/8/2020. (emiller) (Entered: 09/10/2020) |
| 09/10/2020 | ● 1019<br>(2 pgs) | Order Granting First and Final Fee Application of PricewaterhouseCoopers LLP for Services Rendered and Reimbursement of Expenses to Provide Certain Accounting Transaction, and Valuation Services for the Debtors for the Period January 21, 2020 through March 12, 2020 (Related Doc # 986) Signed on 9/10/2020. (emiller) (Entered: 09/10/2020) |
| 09/12/2020 | ● 1027<br>(10 pgs) | BNC Certificate of Mailing. (Related document(s):1019 Order on Application for Compensation) No. of Notices: 306. Notice Date 09/12/2020. (Admin.) (Entered: 09/12/2020) |
| 09/12/2020 | ● 1028<br>(10 pgs) | BNC Certificate of Mailing. (Related document(s):1020 Order on Application for Compensation) No. of Notices: 306. Notice Date 09/12/2020. (Admin.) (Entered: 09/12/2020) |
| 09/12/2020 | ● 1029<br>(10 pgs) | BNC Certificate of Mailing. (Related document(s):1021 Order on Application for Compensation) No. of Notices: 306. Notice Date 09/12/2020. (Admin.) (Entered: 09/12/2020) |
| 09/12/2020 | ● 1030<br>(10 pgs) | BNC Certificate of Mailing. (Related document(s):1022 Order on Application for Compensation) No. of Notices: 306. Notice Date 09/12/2020. (Admin.) (Entered: 09/12/2020) |
| 09/12/2020 | ● 1031<br>(10 pgs) | BNC Certificate of Mailing. (Related document(s):1023 Order on Application for Compensation) No. of Notices: 306. Notice Date 09/12/2020. (Admin.) (Entered: 09/12/2020) |
| 09/12/2020 | ● 1032<br>(10 pgs) | BNC Certificate of Mailing. (Related document(s):1024 Order on Application for Compensation) No. of Notices: 306. Notice Date 09/12/2020. (Admin.) (Entered: 09/12/2020) |
| 09/12/2020 | ● 1033<br>(10 pgs) | BNC Certificate of Mailing. (Related document(s):1025 Order on Application for Compensation) No. of Notices: 306. Notice Date 09/12/2020. (Admin.) (Entered: 09/12/2020) |
| 09/12/2020 | ● 1034<br>(10 pgs) | BNC Certificate of Mailing. (Related document(s):1026 Order on Application for Compensation) No. of Notices: 306. Notice Date 09/12/2020. (Admin.) (Entered: 09/12/2020) |
| 09/15/2020 | ● 1035<br>(45 pgs; 4 docs) | Affidavit Re: *Mailings for the Period from August 29, 2020 through September 4, 2020.* (related document(s):970 Notice, 1013 Final Decree, 1016 Final Decree). Filed by Prime Clerk LLC (Attachments: # 1 Affidavit of 9/1/2020 Service of Reorganized Debtors Motion for Entry of a Final Decree Closing Certain of the Chapter 11 Cases [DN 1013] # 2 |

| | | |
|---|---|---|
| | | Affidavit of 9/2/2020 Service of Reorganized Debtors Amended Motion for Entry of a Final Decree Closing Certain of the Chapter 11 Cases [DN 1016] # 3 Affidavit of 9/4/2020 Service of Notice of (I) Entry of an Order Approving the Debtors' Disclosure Statement and Confirming the Second Amended Joint Prepackaged Chapter 11 Plan of Reorganization (Technical Modifications) of McDermott International, Inc.)(Steele, Benjamin) (Entered: 09/15/2020) |
| 09/17/2020 | 1036 (32 pgs; 2 docs) | ***Per conversation with attys office, this document was filed in error.*** Affidavit Re: *Mailings for the Period from September 6, 2020 through September 12, 2020.* (related document(s):844 Affidavit, 845 Notice, 846 Notice. Filed by Prime Clerk LLC (Attachments: # 1 Affidavit of 9/9/2020 Service of Eleventh Omnibus Objection [DN 844], Twelfth Omnibus Objection [DN 845], and Thirteenth Omnibus Objection)(Steele, Benjamin) Modified on 9/18/2020 (ckrus). (Entered: 09/17/2020) |
| 09/17/2020 | 1037 (5 pgs) | Final Decree Granting Reorganized Debtors' Motion to Close Certain of the Chapter 11 Cases (Related Doc # 1016) Signed on 9/17/2020. (emiller) (Entered: 09/17/2020) |
| 09/20/2020 | 1038 (15 pgs) | BNC Certificate of Mailing. (Related document(s):1037 Order on Motion for Final Decree) No. of Notices: 368. Notice Date 09/20/2020. (Admin.) (Entered: 09/20/2020) |
| 09/21/2020 | 1039 (2 pgs) | Letter from Shareholder (JeannieAndresen) (Entered: 09/21/2020) |
| 09/22/2020 | 1040 (276 pgs; 4 docs) | Affidavit Re: *Mailings for the Period from September 5, 2020 through September 11, 2020.* (related document(s):846 Notice, 962 Notice, 970 Notice, 1019 Order on Application for Compensation, 1020 Order on Application for Compensation, 1021 Order on Application for Compensation, 1022 Order on Application for Compensation, 1023 Order on Application for Compensation, 1024 Order on Application for Compensation, 1025 Order on Application for Compensation). Filed by Prime Clerk LLC (Attachments: # 1 Affidavit of September 9, 2020 Service of Notice of (A) Executory Contracts and Unexpired Leases to be Assumed by the Debtors Pursuant to the Plan, and (B) Related Procedures in Connection Therewith; Notice to Contract Parties to Potentially Assumed or # 2 Supplemental Affidavit of September 11, 2020 of Service of Notice of (I) Entry of an Order Approving the Debtors' Disclosure Statement and Confirming the Second Amended Joint Prepackaged Chapter 11 Plan of Reorganization (Technical Modifications) of # 3 Affidavit of September 11, 2020 of Service of Order Granting First and Final Fee Application of PricewaterhouseCoopers LLP for Services Rendered and Reimbursement of Expenses to Provide Certain Accounting, Transaction, and Valuation Services for the Debtor)(Steele, Benjamin) (Entered: 09/22/2020) |
| 09/23/2020 | 1041 (23 pgs) | Affidavit Re: *Mailings for the Period from September 12, 2020 through September 18, 2020.* (related document(s):1037 Order on Motion for Final Decree). Filed by Prime Clerk LLC (Steele, Benjamin) (Entered: 09/23/2020) |
| 09/24/2020 | 1042 (1 pg) | Motion to Appear pro hac vice *Ana Sophia Garcia.* Filed by Creditor Victor Martinez (mmap) (Entered: 09/24/2020) |
| 09/24/2020 | 1043 | COPY OF: Request for Clerk's Entry of Default Against Defendant |

| | | |
|---|---|---|
| | (13 pgs; 3 docs) | David Dickson by Michael D Deelen FILED IN: 20-AP-3309 (Attachments: # 1 Plaintiff's Affidavit in Support of his Request for Clerk's Entry of Default Against Defendant David Dickson # 2 Clerk's Entry of Default Against Defendant David Dickson) (JesusGuajardo) (Entered: 09/28/2020) |
| 09/25/2020 | 1044 (14 pgs; 3 docs) | COPY OF: Corrected Request for Clerk's Entry of Default Against Defendant David Dickson by Michael V. Deelen FILE IN: 20-AP-3309 (Attachments: # 1 Plaintiff's Corrected Affidavit in Support of his Request for Clerk's Entry of Default Against Defendant David Dickson # 2 Clerk's Entry of Default Against Defendant David Dickson) (JesusGuajardo) (Entered: 09/28/2020) |
| 09/28/2020 | 1045 (1 pg) | Order Granting Motion To Appear pro hac vice - Ana Sophia Garcia (Related Doc # 1042) Signed on 9/28/2020. (emiller) (Entered: 09/29/2020) |
| 09/30/2020 | 1046 (5 pgs) | Affidavit Re: *Mailings for the Period from September 19, 2020 through September 25, 2020*. (related document(s):846 Notice. Filed by Prime Clerk LLC (Steele, Benjamin) (Entered: 09/30/2020) |
| 10/01/2020 | 1047 (10 pgs) | BNC Certificate of Mailing. (Related document(s):1045 Order on Motion to Appear pro hac vice) No. of Notices: 307. Notice Date 10/01/2020. (Admin.) (Entered: 10/02/2020) |
| 10/08/2020 | 1048 (3 pgs) | Notice of Change of Address Filed by Osha Liang LLP (Dunn, Tammy) (Entered: 10/08/2020) |
| 10/15/2020 | 1049 (3 pgs) | Affidavit Re: *of Andrew Chan Regarding Claim Transfer Notices*. (related document(s):691 Transfer of Claim). Filed by Prime Clerk LLC (Steele, Benjamin) (Entered: 10/15/2020) |
| 10/21/2020 | 1050 (5 pgs; 2 docs) | Affidavit Re: *Mailings for the Period from October 10, 2020 through October 16, 2020*. (related document(s):970 Notice. Filed by Prime Clerk LLC (Attachments: # 1 Affidavit)(Steele, Benjamin) (Entered: 10/21/2020) |
| 10/28/2020 | 1051 (122 pgs; 2 docs) | Affidavit Re: *Mailings for the Period from October 17, 2020 through October 23, 2020*. (related document(s):846 Notice. Filed by Prime Clerk LLC (Attachments: # 1 Affidavit of October 21)(Steele, Benjamin) (Entered: 10/28/2020) |
| 10/29/2020 | 1052 (17 pgs) | Chapter 11 Post-Confirmation Report for Quarter Ended 9/17/2020 (Filed By McDermott International, Inc. ). (Polnick, Veronica) (Entered: 10/29/2020) |
| 10/29/2020 | 1053 (4 pgs) | Chapter 11 Post-Confirmation Report for Quarter Ended 9/30/2020 (Filed By McDermott International, Inc. ). (Polnick, Veronica) (Entered: 10/29/2020) |
| 11/04/2020 | 1054 (4 pgs) | Affidavit Re: *of Arnold A. Jaglal Regarding Notice of (I) Entry of an Order Approving the Debtors' Disclosure Statement and Confirming the Second Amended Joint Prepackaged Chapter 11 Plan of Reorganization (Technical Modifications) of McDermott International, Inc. and its Debtor Affiliates and (II) Anticipated Occurrence of Effective Date*. (related document(s):970 Notice). Filed by Prime Clerk LLC (Steele, Benjamin) (Entered: 11/04/2020) |

| | | |
|---|---|---|
| 11/05/2020 | ○ 1055<br>(52 pgs) | Non-Opposition Motion for Relief from Stay *under 11 USC Section 362*. Fee Amount $181. Filed by Interested Party Victor Arturo Martinez (Garcia, Ana) (Entered: 11/05/2020) |
| 11/05/2020 | | Receipt of Motion for Relief From Stay(20-30336) [motion,mrlfsty] ( 181.00) Filing Fee. Receipt number 22574008. Fee amount $ 181.00. (U.S. Treasury) (Entered: 11/05/2020) |
| 11/11/2020 | ○ 1056<br>(4 pgs) | Affidavit Re: *(Supplemental) of Arnold A. Jaglal Regarding Notice of (I) Entry of an Order Approving the Debtors' Disclosure Statement and Confirming the Second Amended Joint Prepackaged Chapter 11 Plan of Reorganization (Technical Modifications) of McDermott International, Inc. and its Debtor Affiliates and (II) Anticipated Occurrence of Effective Date*. (related document(s):970 Notice). Filed by Prime Clerk LLC (Steele, Benjamin) (Entered: 11/11/2020) |
| 12/16/2020 | ○ 1057<br>(4 pgs) | Affidavit Re: *(Supplemental) of Arnold A. Jaglal Regarding Notice of (I) Entry of an Order Approving the Debtors' Disclosure Statement and Confirming the Second Amended Joint Prepackaged Chapter 11 Plan of Reorganization (Technical Modifications) of McDermott International, Inc. and its Debtor Affiliates and (II) Anticipated Occurrence of Effective Date*. (related document(s):970 Notice). Filed by Prime Clerk LLC (Steele, Benjamin) (Entered: 12/16/2020) |
| 12/23/2020 | ○ 1058<br>(1 pg) | Notice of Appearance and Request for Notice Filed by Stephen R. Butler Filed by on behalf of TN Dept of Revenue (Butler, Stephen) (Entered: 12/23/2020) |
| 01/06/2021 | ○ 1059<br>(447 pgs; 8 docs) | Emergency Motion *to Enforce the Confirmation Order* Filed by Debtor McDermott International, Inc. Hearing scheduled for 1/7/2021 at 03:00 PM at Houston, Courtroom 400 (DRJ). (Attachments: # 1 Exhibit A # 2 Exhibit B # 3 Exhibit C # 4 Exhibit D # 5 Exhibit E # 6 Exhibit F # 7 Proposed Order) (Cavenaugh, Matthew) (Entered: 01/06/2021) |
| 01/07/2021 | ○ 1060<br>(1 pg) | 🔊 PDF with attached Audio File. Court Date & Time [ 1/7/2021 2:58:28 PM ]. File Size [ 14627 KB ]. Run Time [ 00:30:28 ]. (admin). (Entered: 01/07/2021) |
| 01/07/2021 | ○ 1061<br>(1 pg) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by Matthew D. Cavenaugh. This is to order a transcript of 01/07/2021 before Judge David R. Jones. Court Reporter/Transcriber: Judicial Transcribers of Texas (Filed By McDermott International, Inc. ). (Cavenaugh, Matthew) Electronically forwarded to Judicial Transcribers of Texas on 1-8-2021. Estimated completion date: 1-9-2021. Modified on 1/8/2021 (MelissaMorgan). (Entered: 01/07/2021) |
| 01/07/2021 | ○ 1062<br>(1 pg) | Proposed Order RE: (Filed By Chicago Bridge & Iron Company ). (Related document(s):1059 Emergency Motion (with hearing date)) (Cavenaugh, Matthew) (Entered: 01/07/2021) |
| 01/08/2021 | ○ 1063<br>(1 pg) | Order (Related Doc # 1059) Signed on 1/8/2021. (emiller) (Entered: 01/08/2021) |
| 01/10/2021 | ○ 1064<br>(22 pgs) | Transcript RE: Emergency Motion Hearing (Via Zoom) held on January 7, 2021 before Judge David R. Jones. Transcript is available for viewing |

| | | in the Clerk's Office. Filed by Transcript access will be restricted through 04/12/2021. (mhen) (Entered: 01/10/2021) |
|---|---|---|
| 01/10/2021 | ● [1065](#) <br> (10 pgs) | BNC Certificate of Mailing. (Related document(s):[1063](#) Order on Emergency Motion) No. of Notices: 307. Notice Date 01/10/2021. (Admin.) (Entered: 01/10/2021) |
| 01/11/2021 | ● [1066](#) <br> (1 pg) | Notice of Filing of Official Transcript as to [1064](#) Transcript. Parties notified (Related document(s):[1064](#) Transcript) (dhan) (Entered: 01/11/2021) |
| 01/11/2021 | ● [1067](#) <br> (18 pgs; 3 docs) | Response (Filed By Zephyr Oil & Gas Funding Co. LLC ). (Attachments: # [1](#) Proposed Order # [2](#) Proposed Order (Alternative)) (Davidson, Timothy) (Entered: 01/11/2021) |
| 01/13/2021 | ● [1068](#) <br> (41 pgs; 4 docs) | Affidavit Re: *Mailings for the Period from January 2, 2021 through January 8, 2021.* (related document(s):[970](#) Notice, [1059](#) Emergency Motion (with hearing date), [1063](#) Order on Emergency Motion). Filed by Prime Clerk LLC (Attachments: # [1](#) Affidavit of January 8 # [2](#) Affidavit of January 6 # [3](#) Supplemental Affidavit of January 6)(Steele, Benjamin) (Entered: 01/13/2021) |
| 01/13/2021 | ● [1069](#) <br> (2 pgs) | Notice of Appearance and Request for Notice Filed by Victoria Duncan Vonder Haar Filed by on behalf of Aldine ISD (Vonder Haar, Victoria) (Entered: 01/13/2021) |
| 01/13/2021 | ● [1070](#) <br> (10 pgs) | BNC Certificate of Mailing. (Related document(s):[1066](#) Notice of Filing of Official Transcript (Form)) No. of Notices: 304. Notice Date 01/13/2021. (Admin.) (Entered: 01/14/2021) |
| 01/14/2021 | ● [1071](#) <br> (3 pgs) | Proposed Order RE: *Order Resolving Reorganized Debtors' Emergency Motion to Enforce the Confirmation Order* (Filed By McDermott International, Inc. ).(Related document(s):[1059](#) Emergency Motion (with hearing date)) (Cavenaugh, Matthew) (Entered: 01/14/2021) |
| 01/18/2021 | ● [1072](#) <br> (3 pgs) | Order Resolving Reorganized Debtor's Emergency Motion to Enforce the Confirmation Order Signed on 1/18/2021 (Related document(s):[1059](#) Emergency Motion, [1071](#) Proposed Order) (emiller) (Entered: 01/18/2021) |
| 01/21/2021 | ● [1073](#) <br> (12 pgs) | BNC Certificate of Mailing. (Related document(s):[1072](#) Generic Order) No. of Notices: 304. Notice Date 01/21/2021. (Admin.) (Entered: 01/21/2021) |
| 01/24/2021 | ● [1074](#) <br> (4 pgs) | Chapter 11 Post-Confirmation Report for Quarter Ended 12/31/2020 (Filed By McDermott International, Inc. ). (Cavenaugh, Matthew) (Entered: 01/24/2021) |
| 01/27/2021 | ● [1075](#) <br> (20 pgs) | Affidavit Re: *Of Nicholas Vass Regarding Order Resolving Reorganized Debtor's Emergency Motion to Enforce the Confirmation Order.* (related document(s):[1072](#) Generic Order). Filed by Prime Clerk LLC (Steele, Benjamin) (Entered: 01/27/2021) |
| 01/27/2021 | ● [1076](#) <br> (1 pg) | Notice *of Withdrawal from Case and Termination of Electronic Case Filings.* Filed by W-Industries of Texas LLC (Mitchell, John) (Entered: 01/27/2021) |

001083

| | | |
|---|---|---|
| 01/27/2021 | ⬤ [1077](#)<br>(1 pg) | Notice of *Withdrawal from Case and Termination of Electronic Case Filings*. Filed by W-Industries of Texas LLC (Archiyan, Yelena) (Entered: 01/27/2021) |
| 01/28/2021 | ⬤ [1078](#)<br>(2 pgs) | Notice of Change of Address Filed by Intergraph Corporation d/b/a Hexagon PPM (Guerrero, Aaron) (Entered: 01/28/2021) |
| 02/03/2021 | ⬤ [1079](#)<br>(4 pgs) | Affidavit Re: *Of Arnold A. Jaglal Regarding Notice of (I) Entry of an Order Approving the Debtors Disclosure Statement and Confirming the Second Amended Joint Prepackaged Chapter 11 Plan of Reorganization (Technical Modifications) of McDermott International, Inc. and its Debtor Affiliates and (II) Anticipated Occurrence of Effective Date*. (related document(s):[970](#) Notice. Filed by Prime Clerk LLC (Steele, Benjamin) (Entered: 02/03/2021) |
| 02/12/2021 | ⬤ [1080](#)<br>(3 pgs) | Notice of *Stephen L. Iacovo Withdrawal as Counsel*. Filed by McDermott International, Inc. (Cavenaugh, Matthew) (Entered: 02/12/2021) |
| 02/19/2021 | ⬤ [1081](#)<br>(443 pgs; 2 docs) | Motion *Reorganized Debtors' Motion to Enforce the Confirmation Order with Respect to the SDNY Securities Litigation* Filed by Debtor McDermott International, Inc. (Attachments: # [1](#) Proposed Order) (Cavenaugh, Matthew) (Entered: 02/19/2021) |
| 02/24/2021 | ⬤ [1082](#)<br>(19 pgs) | Affidavit Re: *of Asir U. Ashraf Regarding Reorganized Debtors' Motion to Enforce the Confirmation Order with Respect to the SDNY Securities Litigation*. (related document(s):[1081](#) Generic Motion). Filed by Prime Clerk LLC (Steele, Benjamin) (Entered: 02/24/2021) |
| 03/05/2021 | ⬤ [1083](#)<br>(1 pg) | Motion to Appear pro hac vice *Richar A. Bodnar*. Filed by Creditor Opt Out Plaintffs (mmap) (Entered: 03/05/2021) |
| 03/05/2021 | ⬤ [1084](#)<br>(1 pg) | Motion to Appear pro hac vice *Brandon Fierro*. Filed by Creditor Opt Out Plaintffs (mmap) (Entered: 03/05/2021) |
| 03/05/2021 | ⬤ [1085](#)<br>(1 pg) | Motion to Appear pro hac vice *Jennifer A Randolph*. Filed by Creditor Opt Out Plaintffs (mmap) (Entered: 03/05/2021) |
| 03/08/2021 | ⬤ [1086](#)<br>(1 pg) | Order Granting Motion To Appear pro hac vice - Richard A. Bodnar (Related Doc # [1083](#)) Signed on 3/8/2021. (emiller) (Entered: 03/09/2021) |
| 03/08/2021 | ⬤ [1087](#)<br>(1 pg) | Order Granting Motion To Appear pro hac vice - Brandon Fierro (Related Doc # [1084](#)) Signed on 3/8/2021. (emiller) (Entered: 03/09/2021) |
| 03/08/2021 | ⬤ [1088](#)<br>(1 pg) | Order Granting Motion To Appear pro hac vice - Jennifer A. Randolph (Related Doc # [1085](#)) Signed on 3/8/2021. (emiller) (Entered: 03/09/2021) |
| 03/10/2021 | ⬤ [1089](#)<br>(4 pgs; 2 docs) | Certificate of *No Objection* (Filed By Victor Martinez ).(Related document(s):[1055](#) Motion for Relief From Stay) (Attachments: # [1](#) Proposed Order) (Garcia, Ana) (Entered: 03/10/2021) |
| 03/12/2021 | ⬤ [1090](#)<br>(10 pgs) | BNC Certificate of Mailing. (Related document(s):[1086](#) Order on Motion to Appear pro hac vice) No. of Notices: 310. Notice Date 03/12/2021. |

| | | (Admin.) (Entered: 03/12/2021) |
|---|---|---|
| 03/12/2021 | 🔘 1091<br>(10 pgs) | BNC Certificate of Mailing. (Related document(s):1087 Order on Motion to Appear pro hac vice) No. of Notices: 310. Notice Date 03/12/2021. (Admin.) (Entered: 03/12/2021) |
| 03/12/2021 | 🔘 1092<br>(27 pgs) | BNC Certificate of Mailing. (Related document(s):1088 Order on Motion to Appear pro hac vice) No. of Notices: 310. Notice Date 03/12/2021. (Admin.) (Entered: 03/12/2021) |
| 03/24/2021 | 🔘 1093<br>(2 pgs) | Order Signed on 3/24/2021 (Related document(s):1055 Motion for Relief From Stay) (VrianaPortillo) (Entered: 03/24/2021) |
| 03/27/2021 | 🔘 1094<br>(11 pgs) | BNC Certificate of Mailing. (Related document(s):1093 Generic Order) No. of Notices: 307. Notice Date 03/27/2021. (Admin.) (Entered: 03/27/2021) |
| 04/27/2021 | 🔘 1095<br>(4 pgs) | Chapter 11 Post-Confirmation Report for Quarter Ended 3/31/2021 (Filed By McDermott International, Inc. ). (Cavenaugh, Matthew) (Entered: 04/27/2021) |
| 04/28/2021 | 🔘 1096<br>(2 pgs) | Affidavit Re: *(Supplemental) of Arnold A. Jaglal Regarding Notice of (I) Entry of an Order Approving the Debtors Disclosure Statement and Confirming the Second Amended Joint Prepackaged Chapter 11 Plan of Reorganization (Technical Modifications) of McDermott International, Inc. and its Debtor Affiliates and (II) Anticipated Occurrence of Effective Date.* (related document(s):970 Notice). Filed by Prime Clerk LLC (Steele, Benjamin) (Entered: 04/28/2021) |
| 05/12/2021 | 🔘 1097<br>(2 pgs) | Affidavit Re: *of Arnold A. Jaglal Regarding Notice of (I) Entry of an Order Approving the Debtors Disclosure Statement and Confirming the Second Amended Joint Prepackaged Chapter 11 Plan of Reorganization (Technical Modifications) of McDermott International, Inc. and its Debtor Affiliates and (II) Anticipated Occurrence of Effective Date.* (related document(s):970 Notice). Filed by Prime Clerk LLC (Steele, Benjamin) (Entered: 05/12/2021) |
| 06/10/2021 | 🔘 1098<br>(5 pgs) | Stipulation and Agreed Order Dismissing Adversary Proceeding Signed on 6/10/2021 (emiller) (Entered: 06/11/2021) |
| 06/18/2021 | 🔘 1099<br>(7 pgs; 2 docs) | Agreed Order and Certificate of Counsel (Filed By McDermott International, Inc. ).(Related document(s):1081 Generic Motion) (Attachments: # 1 Proposed Order) (Cavenaugh, Matthew) (Entered: 06/18/2021) |
| 06/23/2021 | 🔘 1100<br>(4 pgs) | Order Resolving Reorganized Debtor's Motion to Enforce the Confirmation Order with Respect to the SDNY Securities Litigation (Related Doc # 1081) Signed on 6/23/2021. (emiller) (Entered: 06/23/2021) |
| 06/23/2021 | 🔘 1101<br>(2 pgs) | Affidavit Re: *(Supplemental) of Xavi Flores regarding Notice of (I) Entry of an Order Approving the Debtors' Disclosure Statement and Confirming the Second Amended Joint Prepackaged Chapter 11 Plan of Reorganization (Technical Modifications) of McDermott International, Inc. and its Debtor Affiliates and (II) Anticipated Occurrence of Effective Date.* (related document(s):970 Notice). Filed by Prime Clerk LLC (Steele, Benjamin) (Entered: 06/23/2021) |

| | | |
|---|---|---|
| 06/25/2021 | 🌐 1102<br>(13 pgs) | BNC Certificate of Mailing. (Related document(s):1100 Generic Order) No. of Notices: 306. Notice Date 06/25/2021. (Admin.) (Entered: 06/25/2021) |
| 07/02/2021 | 🌐 1103<br>(7 pgs; 2 docs) | Agreed Order and Certificate of Counsel (Filed By McDermott International, Inc. ).(Related document(s):1081 Generic Motion) (Attachments: # 1 Proposed Order) (Cavenaugh, Matthew) (Entered: 07/02/2021) |
| 07/26/2021 | 🌐 1104<br>(4 pgs) | Chapter 11 Post-Confirmation Report for Quarter Ended 6/30/2021 (Filed By McDermott International, Inc. ). (Cavenaugh, Matthew) (Entered: 07/26/2021) |
| 07/28/2021 | 🌐 1105<br>(1 pg) | Affidavit Re: *(Supplemental) of Nuno Cardoso Regarding Notice to Contract Parties to Potentially Assumed or Assumed and Assigned Executory Contracts and Unexpired Leases in Connection with the Sale of the Debtors' Technology Business.* (related document(s):846 Notice). Filed by Prime Clerk LLC (Steele, Benjamin) (Entered: 07/28/2021) |
| 08/27/2021 | 🌐 1106<br>(4 pgs) | Order Resolving Reorganized Debtor's Motion to Enforce the Confirmation Order with Respect to the SDNY Securities Litigation Signed on 8/27/2021 (Related document(s):1081 Generic Motion, 1103 Agreed Order and Certificate of Counsel) (emiller) (Entered: 08/27/2021) |
| 09/01/2021 | 🌐 1107<br>(13 pgs) | BNC Certificate of Mailing. (Related document(s):1106 Generic Order) No. of Notices: 304. Notice Date 09/01/2021. (Admin.) (Entered: 09/01/2021) |
| 10/12/2021 | 🌐 1108<br>(13 pgs) | Order Signed on 10/12/2021 (aalo) (Entered: 10/12/2021) |
| 10/21/2021 | 🌐 1109<br>(3 pgs) | Chapter 11 Post-Confirmation Report for Quarter Ended 9/30/2021 (Filed By McDermott International, Inc. ). (Cavenaugh, Matthew) (Entered: 10/21/2021) |

**IN THE UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| MCDERMOTT INTERNATIONAL, INC., *et al.*,[1] | ) | Case No. 20-30336 (DRJ) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

**AMENDED JOINT PREPACKAGED CHAPTER 11 PLAN OF REORGANIZATION**
**OF MCDERMOTT INTERNATIONAL, INC. AND ITS DEBTOR AFFILIATES**

**JACKSON WALKER L.L.P.**
Matthew D. Cavenaugh (TX Bar No. 24062656)
Jennifer F. Wertz (TX Bar No. 24072822)
Kristhy M. Peguero (TX Bar No. 24102776)
Veronica A. Polnick (TX Bar No. 24079148)
1401 McKinney Street, Suite 1900
Houston, Texas 77010
Telephone:    (713) 752-4200
Facsimile:    (713) 752-4221
Email:    mcavenaugh@jw.com
    jwertz@jw.com
    kpeguero@jw.com
    vpolnick@jw.com

*Proposed Co-Counsel to the Debtors*
*and Debtors in Possession*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (*pro hac vice* pending)
Christopher T. Greco, P.C. (*pro hac vice* pending)
Anthony R. Grossi (*pro hac vice* pending)
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900
Email:    joshua.sussberg@kirkland.com
    christopher.greco@kirkland.com
    anthony.grossi@kirkland.com

-and-

James H.M. Sprayregen, P.C.
John R. Luze (*pro hac vice* pending)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200
Email:    james.sprayregen@kirkland.com
    john.luze@kirkland.com

*Proposed Co-Counsel to the Debtors*
*and Debtors in Possession*

Dated: January 22, 2020

---

[1]    A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://cases.primeclerk.com/McDermott.   The location of Debtor McDermott International, Inc.'s principal place of business and the Debtors' service address in these chapter 11 cases is 757 North Eldridge Parkway, Houston, Texas 77079.

## TABLE OF CONTENTS

ARTICLE I. DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, AND
          GOVERNING LAW ............................................................................................................1
    A.    Defined Terms. .....................................................................................................................1
    B.    Rules of Interpretation. ......................................................................................................18
    C.    Computation of Time. .........................................................................................................19
    D.    Governing Law. ..................................................................................................................19
    E.    Reference to Monetary Figures. .........................................................................................19
    F.    Reference to the Debtors or the Reorganized Debtors. ......................................................19
    G.    Controlling Document. .......................................................................................................19
    H.    Consultation, Information, Notice, and Consent Rights......................................................19

ARTICLE II. ADMINISTRATIVE CLAIMS, DIP CLAIMS,  PRIORITY CLAIMS, AND
          RESTRUCTURING EXPENSES ......................................................................................20
    A.    Administrative Claims. ......................................................................................................20
    B.    DIP Claims. ........................................................................................................................20
    C.    Professional Claims............................................................................................................21
    D.    Priority Tax Claims.............................................................................................................22
    E.    Payment of Restructuring Expenses, Consent Fee. ...........................................................22

ARTICLE III. CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS ...................................22
    A.    Classification of Claims and Interests. ..............................................................................22
    B.    Treatment of Claims and Interests. ....................................................................................23
    C.    Special Provision Governing Unimpaired Claims. ............................................................29
    D.    Elimination of Vacant Classes. ..........................................................................................29
    E.    Voting Classes, Presumed Acceptance by Non-Voting Classes. .......................................29
    F.    Intercompany Interests. ......................................................................................................29
    G.    Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code. .................29
    H.    Controversy Concerning Impairment..................................................................................29
    I.    Subordinated Claims. .........................................................................................................29

ARTICLE IV. MEANS FOR IMPLEMENTATION OF THE PLAN ...........................................................30
    A.    General Settlement of Claims and Interests. ......................................................................30
    B.    Restructuring Transactions. ................................................................................................30
    C.    Reorganized Debtors..........................................................................................................30
    D.    Technology Business Sale...................................................................................................31
    E.    Sources of Consideration for Plan Distributions. ..............................................................32
    F.    Corporate Existence. ..........................................................................................................34
    G.    Vesting of Assets in the Reorganized Debtors. ..................................................................35
    H.    Cancellation of Existing Securities and Agreements. ........................................................35
    I.    Corporate Action. ...............................................................................................................36
    J.    New Organizational Documents. ........................................................................................36
    K.    Indemnification Obligations...............................................................................................36
    L.    Directors and Officers of the Reorganized Debtors. ..........................................................37
    M.    Effectuating Documents; Further Transactions...................................................................37
    N.    Section 1146 Exemption. ...................................................................................................37
    O.    Director and Officer Liability Insurance. ...........................................................................37
    P.    Management Incentive Plan. ...............................................................................................38
    Q.    Employee and Retiree Benefits...........................................................................................38
    R.    Preservation of Causes of Action. ......................................................................................38

ARTICLE V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ...........................39
    A.    Assumption and Rejection of Executory Contracts and Unexpired Leases. .....................39

| B. | Claims Based on Rejection of Executory Contracts or Unexpired Leases. | 40 |
| C. | Cure of Defaults for Assumed Executory Contracts and Unexpired Leases. | 40 |
| D. | Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases. | 41 |
| E. | Insurance Policies. | 41 |
| F. | Reservation of Rights. | 41 |
| G. | Nonoccurrence of Effective Date. | 42 |
| H. | Employee Compensation and Benefits. | 42 |
| I. | Contracts and Leases Entered Into After the Petition Date. | 42 |
| J. | Assumption of Cameron LNG Project Obligations | 43 |

ARTICLE VI. PROVISIONS GOVERNING DISTRIBUTIONS ..... 43
| A. | Distributions on Account of Claims Allowed as of the Effective Date. | 43 |
| B. | Disbursing Agent. | 43 |
| C. | Rights and Powers of Disbursing Agent. | 43 |
| D. | Delivery of Distributions and Undeliverable or Unclaimed Distributions. | 44 |
| E. | Manner of Payment. | 45 |
| F. | Section 1145 Exemption. | 45 |
| G. | Compliance with Tax Requirements. | 45 |
| H. | Allocations. | 45 |
| I. | No Postpetition Interest on Claims | 45 |
| J. | Foreign Currency Exchange Rate. | 45 |
| K. | Setoffs and Recoupment. | 46 |
| L. | Claims Paid or Payable by Third Parties. | 46 |

ARTICLE VII. PROCEDURES FOR RESOLVING CONTINGENT,  UNLIQUIDATED, AND
| | DISPUTED CLAIMS | 47 |
| A. | Disputed Claims Process. | 47 |
| B. | Allowance of Claims. | 47 |
| C. | Claims Administration Responsibilities. | 47 |
| D. | Estimation of Claims and Interests. | 47 |
| E. | Adjustment to Claims or Interests without Objection. | 48 |
| F. | Disallowance of Claims or Interests. | 48 |
| G. | No Distributions Pending Allowance. | 48 |
| H. | Distributions After Allowance. | 48 |
| I. | No Interest. | 48 |

ARTICLE VIII. SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS ..... 48
| A. | Discharge of Claims and Termination of Interests. | 48 |
| **B.** | **Release of Liens.** | 49 |
| **C.** | **Releases by the Debtors.** | 49 |
| **D.** | **Releases by the Releasing Parties.** | 51 |
| **E.** | **Exculpation.** | 52 |
| **F.** | **Injunction.** | 52 |
| G. | Protections Against Discriminatory Treatment. | 53 |
| H. | Document Retention. | 53 |
| I. | Reimbursement or Contribution. | 53 |

ARTICLE IX. CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN ..... 53
| A. | Conditions Precedent to the Effective Date. | 53 |
| B. | Waiver of Conditions. | 55 |
| C. | Effect of Failure of Conditions. | 55 |
| D. | Substantial Consummation | 55 |

ARTICLE X. MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN ..... 55
| A. | Modification and Amendments. | 55 |
| B. | Effect of Confirmation on Modifications. | 56 |

C.        Revocation or Withdrawal of Plan. ................................................................................56

ARTICLE XI. RETENTION OF JURISDICTION ...........................................................................56

ARTICLE XII. MISCELLANEOUS PROVISIONS ..........................................................................58
        A.        Immediate Binding Effect. ........................................................................................58
        B.        Additional Documents. ..............................................................................................58
        C.        Payment of Statutory Fees. ........................................................................................58
        D.        Statutory Committee and Cessation of Fee and Expense Payment. ...........................58
        E.        Reservation of Rights. ...............................................................................................58
        F.        Successors and Assigns. .............................................................................................59
        G.        Notices. .......................................................................................................................59
        H.        Term of Injunctions or Stays. ....................................................................................60
        I.        Entire Agreement. .......................................................................................................60
        J.        Plan Supplement. ........................................................................................................61
        K.        Nonseverability of Plan Provisions. ..........................................................................61
        L.        Votes Solicited in Good Faith. ...................................................................................61
        M.        Closing of Chapter 11 Cases. .....................................................................................61
        N.        Waiver or Estoppel. ....................................................................................................61
        O.        Creditor Default ..........................................................................................................61

**INTRODUCTION**

McDermott International, Inc. and the above-captioned debtors and debtors in possession (collectively, the "Debtors"), propose this joint prepackaged chapter 11 plan of reorganization (the "Plan") for the resolution of the outstanding claims against, and equity interests in, the Debtors.  Although proposed jointly for administrative purposes, the Plan constitutes a separate Plan for each Debtor.  Holders of Claims or Interests may refer to the Disclosure Statement for a discussion of the Debtors' history, businesses, assets, results of operations, historical financial information, risk factors, a summary and analysis of this Plan, the Restructuring Transactions, and certain related matters.  The Debtors are the proponents of the Plan within the meaning of section 1129 of the Bankruptcy Code.

ALL HOLDERS OF CLAIMS, TO THE EXTENT APPLICABLE, ARE ENCOURAGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

**ARTICLE I.**
**DEFINED TERMS, RULES OF INTERPRETATION,**
**COMPUTATION OF TIME, AND GOVERNING LAW**

A.      *Defined Terms.*

As used in this Plan, capitalized terms have the meanings set forth below.

"*2018 Collateral Agent*" means Crédit Agricole Corporate and Investment Bank, in its capacity as Collateral Agent in respect of the Credit Agreement, the 2021 LC Facility, and the Lloyds LC Facility.

"*2021 LC Agreement*" means that certain letter of credit agreement dated as of October 30, 2018 by and among certain of the Debtors as applicants and guarantors thereto, and the 2021 LC Administrative Agent, as may be amended, supplemented, or otherwise modified from time to time.

"*2021 LC Administrative Agent*" means Barclays Bank PLC, as administrative agent for the 2021 LC Agreement.

"*2021 LC Facility*" means the $230,000,000.00 senior secured letter of credit facility under the 2021 LC Agreement.

"*2021 Letter of Credit Claims*" means any Claim for obligations arising under, or relating to, the 2021 LC Facility, including Claims for all principal amounts outstanding, interest, fees, expenses, costs and other charges arising thereunder or related thereto.

"*2021 Letters of Credit*" means the letters of credit issued under the 2021 LC Facility.

"*2023 LC Facility*" means the $1,440,000,000.00 senior secured letter of credit facility under the Credit Agreement.

"*2023 Letter of Credit Claims*" means any Claim for obligations arising under, or relating to, the 2023 LC Facility, including Claims for all principal amounts outstanding, interest, fees, expenses, costs and other charges arising thereunder or related thereto.

"*2023 Letters of Credit*" means the letters of credit issued under the 2023 LC Facility.

"*Achievement Target*" means the (i) final, binding signed documentation reflecting (x) positive value adjustment of $235 million in projected gross profit and (y) $285 million in letter of credit relief and (ii) project cost savings of $560 million through the employment of risk mitigation strategies, in each case subject to the satisfaction of the Required Consenting Term Lenders and the Required Consenting Revolving Lenders in their sole discretion.

1

"*Additional Obligations*" shall have the meaning specified in the DIP Credit Facility Term Sheet.

"*Administrative Claim*" means a Claim for costs and expenses of administration of the Chapter 11 Cases pursuant to sections 327, 328, 330, 365, 503(b), 507(a), 507(b), or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses of preserving the Estates and operating the businesses of the Debtors incurred on or after the Petition Date and through the Effective Date; (b) Allowed Professional Claims; and (c) all fees and charges assessed against the Estates under chapter 123 of the Judicial Code.

"*Affiliate*" has the meaning set forth in section 101(2) of the Bankruptcy Code.

"*Agents*" means, collectively, the DIP Agents, the Revolving and LC Administrative Agent, the Term Loan Administrative Agent, the 2021 LC Administrative Agent, the 2018 Collateral Agent, the Superpriority Revolving Administrative Agent, the Superpriority Term Loan Agent, the Superpriority Collateral Agent, and each administrative agent, collateral agent, trustee or other similar agent in respect of the Exit Facilities solely in its capacity as such.

"*Allowed*" means, as to a Claim or Interest, a Claim or Interest allowed under the Plan, under the Bankruptcy Code, or by a final order as applicable.

"*Assumed Executory Contracts and Unexpired Leases Schedule*" means the schedule of Executory Contracts and Unexpired Leases to be assumed by the Debtors pursuant to the Plan, which shall be included in the Plan Supplement, as the same may be amended, modified, or supplemented from time to time; *provided* that such schedule shall be in form and substance acceptable to the Required Consenting Lenders.

"*Avoidance Actions*" means any and all actual or potential avoidance, recovery, subordination, or other Claims, Causes of Action, or remedies that may be brought by or on behalf of the Debtors or their Estates or other authorized parties in interest under the Bankruptcy Code or applicable non-bankruptcy law, including Claims, Causes of Action, or remedies under sections 502, 510, 542, 544, 545, 547 through 553, and 724(a) of the Bankruptcy Code or under similar local, state, federal, or foreign statutes and common law, including fraudulent transfer laws.

"*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as amended from time to time.

"*Bankruptcy Court*" means the United States Bankruptcy Court for the Southern District of Texas.

"*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure promulgated under section 2075 of the Judicial Code and the general, local, and chambers rules of the Bankruptcy Court, each, as amended from time to time.

"*Barclays Advisors*" means Latham & Watkins LLP and any other local or foreign advisors.

"*Bidding Procedures*" means the procedures governing the auction and the Technology Business Sale, as approved by the Bankruptcy Court and as may be amended from time to time in accordance with their terms.

"*Bilateral Facilities*" means those certain bilateral facilities entered into by various Debtors and their affiliates and the individual lenders party thereto, including:

(a) that certain facility agreement (as amended), dated April 13, 2016, between McDermott International, Inc., as borrower, McDermott Middle East, Inc., McDermott Eastern Hemisphere, Ltd., McDermott Arabia Company Limited, as guarantors, and Abu Dhabi Commercial Bank PJSC, as lending bank;

(b) that certain credit facility agreement (as amended), dated April 30, 2018, between CBI Eastern Anstalt, as borrower, and Mashreqbank PSC, as lending bank;

2

(c)    that certain credit agreement (as amended) dated as of July 19, 2018 between Arabian CBI Company Limited, as customer, McDermott International Inc., as guarantor, and Samba Financial Group, as lending bank;

(d)    that certain facility letter (as amended), dated as of January 29, 2018 between McDermott Middle East, Inc., and McDermott Eastern Hemisphere, Ltd., as applicants, McDermott International, Inc., as guarantor, and International Bank of Qatar, as lending bank;

(e)    that certain reimbursement agreement for letters of credit or guarantees, dated July 30, 2015 between McDermott International, Inc., as applicant and Riyad Bank, as lending bank;

(f)    that certain facility agreement between McDermott Middle East Inc., as borrower, McDermott International, Inc., as guarantor, and First Gulf Bank, as lending bank;

(g)    that certain letter of credit reimbursement agreement (as novated), dated August 1, 2007 between J. Ray McDermott S.A., as applicant and Standard Chartered Bank, as lending bank;

(h)    that certain master reimbursement agreement between J. Ray McDermott S.A., as applicant, McDermott International, Inc., as guarantor, and ICICI Bank Limited, as lending bank;

(i)    that certain reimbursement agreement between Chicago Bridge and Iron Company, N.V., as customer, and Europe Arab Bank PLC, as lending bank;

(j)    that certain credit facilities agreement, dated April 4, 2019 between McDermott Middle East, Inc. and McDermott Middle East, Inc. Panama, as borrowers, McDermott International, Inc., as guarantor, and Commercial Bank of Dubai PSC, as lending bank; and

(k)    that certain (a) indemnity and undertaking, dated as of June 28, 2019 between Comet II, B.V. as borrower and The Standard Bank of South African Limited as lending bank and (b) parent company guarantee, dated as of June 28, 2019 between McDermott International, Inc. as guarantor and The Standard Bank of South Africa Limited as lending bank.

"*Business Day*" means any day other than a Saturday, Sunday, or other day on which commercial banks are authorized to close under the laws of, or are in fact closed in, the State of New York.

"*Business Plan*" means the business plan for the Reorganized Debtors.

"*Cameron LNG Contractor*" means CCJV, an unincorporated joint venture the members of which are CB&I LLC (as successor in interest) and Chiyoda International Corporation.

"*Cameron LNG EPC Agreement*" means that certain Engineering, Procurement and Construction Contract, dated as of March 17, 2014, between Cameron LNG, LLC and the Cameron LNG Contractor (as amended).

"*Cameron LNG Project Obligations*" means, collectively, the obligations of any Debtor under:  (a) that certain EPC Joint Venture Agreement, dated March 17, 2014 between CB&I LLC (as successor in interest) and Chiyoda International Corporation (as amended); and (b) the Cameron LNG EPC Agreement.

"*Cameron LNG Replacement Guarantee*" means a guarantee, which Reorganized McDermott shall execute and deliver to Cameron LNG, LLC, guaranteeing on a joint and several basis on behalf of CB&I LLC the payment and performance of the obligations of the Cameron LNG Contractor under the Cameron LNG EPC Agreement, whether arising prior to or after the execution of such guarantee.

"*Cash*" means cash in legal tender of the United States of America and cash equivalents, including bank deposits, checks, and other similar items.

3

"*Cash Management Bank*" means any financial institution through which the Debtors have entered into "Cash Management Arrangements" (as defined in the Credit Agreement).

"*Cash Secured LC Exit Facility*" means a 4-year, cash secured letter of credit exit facility in an amount up to $371 million, and otherwise on terms satisfactory to the Required Consenting Lenders, and set forth in the Definitive Documents to be included in the Plan Supplement.

"*Cash Secured Letter of Credit Claims*" means any Claim for obligations arising under, or relating to, the Cash Secured Letters of Credit, including Claims for all principal amounts outstanding, interest, fees, expenses, costs and other charges arising thereunder or related thereto.

"*Cash Secured Letters of Credit*" means the "Cash Secured Letters of Credit" issued under and on the terms set forth under the Credit Agreement.

"*Cause of Action*" or "*Causes of Action*" means any claims, interests, damages, remedies, causes of action, demands, rights, actions, controversies, proceedings, agreements, suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, Liens, indemnities, guaranties, and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, secured or unsecured, assertable, directly or derivatively, matured or unmatured, suspected or unsuspected, in contract, tort, law, equity, or otherwise.  Causes of Action also include: (a) all rights of setoff, counterclaim, or recoupment and claims under contracts or for breaches of duties imposed by law or in equity; (b) the right to object to or otherwise contest Claims or Interests; (c) claims pursuant to section 362 or chapter 5 of the Bankruptcy Code; (d) such claims and defenses as fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) any Avoidance Action.

"*Chapter 11 Cases*" means (a) when used with reference to a particular Debtor, the case pending for that Debtor under chapter 11 of the Bankruptcy Code in the Bankruptcy Court and (b) when used with reference to all the Debtors, the procedurally consolidated chapter 11 cases pending for the Debtors in the Bankruptcy Court.

"*Chiyoda Replacement Guarantee*" means a guarantee which Reorganized McDermott shall execute and deliver to Chiyoda International Corporation in accordance with Section 15.3 of the EPC Joint Venture Agreement, dated March 17, 2014 between CB&I LLC (as successor in interest) and Chiyoda International Corporation (as amended) as required by the Guaranty and Indemnity Agreement entered into by and between CB&I LLC, McDermott International and Chiyoda International Corporation.

"*Claim*" means any claim, as defined in section 101(5) of the Bankruptcy Code, against any of the Debtors.

"*Claims and Balloting Agent*" means Prime Clerk LLC, the notice, claims, and solicitation agent proposed to be retained by the Debtors in the Chapter 11 Cases.

"*Claims Register*" means the official register of Claims maintained by the Claims and Balloting Agent.

"*Class*" means a class of Claims or Interests as set forth in Article III of the Plan pursuant to section 1122(a) of the Bankruptcy Code.

"*CM/ECF*" means the Bankruptcy Court's Case Management and Electronic Case Filing system.

"*Company Party*" has the meaning set forth in the Restructuring Support Agreement.

"*Compensation and Benefits Programs*" means all employment and severance agreements and policies, and all employment, compensation, and benefit plans, policies, workers' compensation programs, savings plans, retirement plans, deferred compensation plans, supplemental executive retirement plans, healthcare plans, disability plans, severance benefit plans, incentive plans, life and accidental death and dismemberment insurance plans, and programs of the Debtors, and all amendments and modifications thereto, applicable to the Debtors' employees, former employees, retirees, and non-employee directors and the employees, former employees and retirees of their

4

subsidiaries, including all savings plans, retirement plans, health care plans, disability plans, severance benefit agreements, and plans, incentive plans, deferred compensation plans and life, accidental death, and dismemberment insurance plans.

"*Confirmation*" means the Bankruptcy Court's entry of the Confirmation Order on the docket of the Chapter 11 Cases.

"*Confirmation Date*" means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases, within the meaning of Bankruptcy Rules 5003 and 9021.

"*Confirmation Hearing*" means the hearing to be held by the Bankruptcy Court on confirmation of the Plan, pursuant to Bankruptcy Rule 3020(b)(2) and sections 1128 and 1129 of the Bankruptcy Code, as such hearing may be continued from time to time.

"*Confirmation Order*" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code and approving the consummation of the Technology Business Sale.

"*Consenting 2021 LC Lenders*" has the meaning set forth in the Restructuring Support Agreement.

"*Consenting 2023 LC Lenders*" has the meaning set forth in the Restructuring Support Agreement.

"*Consenting Cash Secured LC Issuers*" has the meaning set forth in the Restructuring Support Agreement.

"*Consenting LC Lenders*" has the meaning set forth in the Restructuring Support Agreement.

"*Consenting Lenders*" has the meaning set forth in the Restructuring Support Agreement.

"*Consenting Noteholders*" has the meaning set forth in the Restructuring Support Agreement.

"*Consenting Revolving Lenders*" has the meaning set forth in the Restructuring Support Agreement.

"*Consenting Stakeholders*" has the meaning set forth in the Restructuring Support Agreement.

"*Consenting Superpriority LC Lenders*" has the meaning set forth in the Restructuring Support Agreement.

"*Consenting Superpriority Term Lenders*" has the meaning set forth in the Restructuring Support Agreement.

"*Consenting Term Lenders*" has the meaning set forth in the Restructuring Support Agreement.

"*Consummation*" means the occurrence of the Effective Date.

"*Credit Agreement*" means that certain credit agreement dated as of May 10, 2018, by and among certain of the Debtors as borrowers and guarantors thereto, the Revolving and LC Administrative Agent, the Term Loan Administrative Agent, the Issuers (as defined in the Credit Agreement), and the lenders from time to time party thereto, as may be amended, supplemented, or otherwise modified from time to time.

"*Credit Agreement Hedging Claims*" means Claims in respect of Credit Agreement Hedging Obligations, which, for the avoidance of doubt, shall not include DIP Hedging Obligations.

"*Credit Agreement Hedging Obligations*" means mark-to-market obligations arising out of the termination of any "Hedging Obligations" (as defined under the Credit Agreement) prior to the Effective Date.

"*Cure*" means all amounts, including an amount of $0.00, required to cure any monetary defaults under any Executory Contract or Unexpired Lease (or such lesser amount as may be agreed upon by the parties under an

Executory Contract or Unexpired Lease) that is to be assumed by the Debtors pursuant to sections 365 or 1123 of the Bankruptcy Code.

"*D&O Liability Insurance Policies*" means all insurance policies of any of the Debtors for directors', managers', and officers' liability existing as of the Petition Date (including any "tail policy") and all agreements, documents, or instruments relating thereto.

"*Definitive Documents*" means the documents listed in Section 3 of the Restructuring Support Agreement.

"*DIP Agents*" means the DIP LC Agent, the DIP Collateral Agent, and the DIP Term Loan Agent.

"*DIP Cash Secured Letter of Credit Claim*" means any Claim for obligations arising under, or relating to, the DIP Cash Secured LC Facility, including Claims for all principal amounts outstanding, interest, fees, expenses, costs and other charges arising thereunder or related thereto.

"*DIP Cash Secured Letters of Credit*" means the letters of credit issued pursuant to the DIP Cash Secured LC Facility.

"*DIP Cash Secured LC Facility*" means the cash secured letter of credit facility pursuant to which up to $100 million of the DIP Letter of Credit Facility may be allocated.

"*DIP Claims*" means all Claims (including adequate protection Claims) derived from, arising under, based upon, or secured pursuant to the DIP Credit Agreement, including all prepetition Claims rolled into the DIP Credit Facility and all other Claims in respect of principal amounts outstanding, interest, fees, expenses, costs, hedging obligations, and other charges arising thereunder or related thereto, in each case, with respect to the DIP Credit Facility.

"*DIP Collateral Agent*" means Crédit Agricole Corporate and Investment Bank in its capacity as collateral agent under the DIP Credit Agreement.

"*DIP Credit Agreement*" means that certain superpriority secured debtor-in-possession credit agreement that governs the DIP Credit Facility (as may be amended, supplemented, or otherwise modified from time to time), among McDermott International, Inc., as parent, certain of the Debtors as borrowers, the lenders party thereto, the DIP Lenders, the DIP Letter of Credit Issuers, and the DIP Agents.

"*DIP Credit Facility*" means the superpriority committed credit facilities provided by the DIP Lenders, which includes the DIP Letter of Credit Facility, the DIP Term Loan Facility, the DIP Hedging Obligations, and any other obligations specified in the DIP Financing Orders.

"*DIP Credit Facility Term Sheet*" means the DIP Credit Facility Term Sheet attached as Exhibit 2 to the Restructuring Term Sheet.

"*DIP Financing Orders*" means the interim order approving the DIP Credit Facility and the final order approving the DIP Credit Facility, to be filed and approved by the Bankruptcy Court in the Chapter 11 Cases.

"*DIP Hedging Obligations*" means all hedging obligations subject to or deemed incurred under the DIP Credit Facility (including for the avoidance of doubt all obligations in respect of the Debtors' prepetition foreign currency hedging transactions and $500 million notional amount of interest rate hedging transactions rolled into the DIP credit facility pursuant to the DIP Financing Orders and the Hedging Orders).

"*DIP LC Agent*" means Crédit Agricole Corporate and Investment Bank in its capacity as letter of credit administrative agent under the DIP Credit Agreement.

"*DIP LC Claim*" means any Claim of a DIP Lender, a DIP Letter of Credit Issuer, or the DIP Agents arising under or relating to the DIP Letter of Credit Facility pursuant to the DIP Credit Agreement.

"*DIP Lenders*" means the lenders party to the DIP Credit Agreement with respect to the DIP Credit Facility.

"*DIP Letter of Credit Facility*" means the senior secured superpriority letter of credit facility plus interest, fees, and other amounts due in respect of the Superpriority Letters of Credit (including the DIP Cash Secured LC Facility), provided under the DIP Credit Agreement and approved by the Bankruptcy Court pursuant to the DIP Financing Orders.

"*DIP Letter of Credit Issuers*" means the "Issuing Banks" under the DIP Credit Agreement.

"*DIP Letters of Credit*" means (i) the $543 million of new and incremental letters of credit to be provided under the DIP Letter of Credit Facility (including the DIP Cash Secured Letters of Credit) plus (ii) the DIP Roll-Up Letters of Credit.

"*DIP Roll-Up Letters of Credit*" means (i) those Superpriority Letters of Credit, including Claims for all reimbursement obligations outstanding, interest, fees, expenses, costs, and other charges arising thereunder or relating thereto, that are "rolled-up" and deemed issued under the DIP Letter of Credit Facility pursuant to the final DIP Financing Order and (ii) any obligations to be deemed outstanding under the DIP Letter of Credit Facility.

"*DIP Roll-Up Term Loans*" means the term loans outstanding under the Superpriority Term Loan Facility that upon entry of the final DIP Financing Order, shall be deemed to be issued under the DIP Term Loan Facility, including all of the Claims arising under, derived from, based upon, or related to the Superpriority Term Loan Facility, including all of the Claims arising under, derived from, based upon, or related to the Superpriority Term Loan Facility, including Claims for all principal amounts outstanding, interest, fees, expenses, costs, the Make Whole Amount, and other charges arising thereunder or related thereto, in each case, with respect to the Superpriority Term Loan Facility.

"*DIP Term Loan Agent*" means Barclays Bank PLC, in its capacity as term loan administrative agent under the DIP Credit Agreement.

"*DIP Term Loan Claim*" means any Claim of a DIP Lender or the DIP Agents arising under or relating to the DIP Term Loan Facility pursuant to the DIP Credit Agreement or the DIP Financing Orders.

"*DIP Term Loan Facility*" means a superpriority term loan facility, comprised of up to $1.2 billion principal amount of New DIP Term Loans plus $800 million principal amount of the Superpriority Term Loans rolled into the DIP Term Loan Facility plus the Make Whole Amount plus the Additional Obligations and approved by the Bankruptcy Court pursuant to the DIP Financing Orders.

"*DIP Term Loans*" means the New DIP Term Loans and the DIP Roll-Up Term Loans.

"*Disbursing Agent*" means the Reorganized Debtors or the Entity or Entities selected by the Debtors or the Reorganized Debtors, as applicable, to make or facilitate distributions pursuant to the Plan.

"*Disclosure Statement*" means the disclosure statement for the Plan, including all exhibits and schedules thereto, to be approved by the Confirmation Order.

"*Disputed*" means, as to a Claim or an Interest, any Claim or Interest:  (a) that is not Allowed; (b) that is not disallowed by the Plan, the Bankruptcy Code, or a Final Order, as applicable; (c) as to which a dispute is being adjudicated by a court of competent jurisdiction in accordance with non-bankruptcy law; (d) that is Filed in the Bankruptcy Court and not withdrawn, as to which a timely objection or request for estimation has been Filed; and (e) with respect to which a party in interest has Filed a Proof of Claim or otherwise made a written request to a Debtor for payment, without any further notice to or action, order, or approval of the Bankruptcy Court.

"*Distribution Date*" means, except as otherwise set forth herein, the date or dates determined by the Debtors or the Reorganized Debtors, on or after the Effective Date, with the first such date occurring on or as soon as is reasonably practicable after the Effective Date, upon which the Distribution Agent shall make distributions to holders of Allowed Claims entitled to receive distributions under the Plan.

"*Distribution Record Date*" means, other than with respect to publicly held Securities, the record date for purposes of making distributions under the Plan on account of Allowed Claims, which date shall be on or as soon as is reasonably practicable after the Effective Date.  For the avoidance of doubt, no distribution record date shall apply to holders of public securities.

"*Effective Date*" means the date that is the first Business Day on which (a) no stay of the Confirmation Order is in effect and (b) all conditions precedent to the occurrence of the Effective Date set forth in Article IX.A of the Plan have been satisfied or waived in accordance with Article IX.B of the Plan.  Any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable thereafter.

"*Entity*" has the meaning set forth in section 101(15) of the Bankruptcy Code.

"*Estate*" means as to each Debtor, the estate created for such Debtor in its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code upon the commencement of such Debtor's Chapter 11 Case.

"*Exchange Act*" means the Securities Exchange Act of 1934, 15 U.S.C. § 78a, *et seq.*, as amended from time to time.

"*Exculpated Parties*" means collectively, and in each case in its capacity as such: (a) the Debtors; (b) any official committees appointed in the Chapter 11 Cases and each of their respective members; (c) the Consenting Stakeholders and any affiliated Hedge Banks; (d) each Agent and the Senior Notes Trustee, and (e) with respect to each of the foregoing, such Entity and its current and former Affiliates, and such Entity's and its current and former Affiliates' current and former equity holders, subsidiaries, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals.

"*Executory Contract*" means a contract to which one or more of the Debtors is a party and that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

"*Existing Common Equity Interests*" means the common stock of McDermott, which is traded and quoted on the New York Stock Exchange under the symbol "MDR," any and all outstanding and unexercised or unvested warrants, options, or rights to acquire such common stock existing prior to the Petition Date, and any Section 510(b) Claims.

"*Existing Preferred Equity Interests*" means all outstanding 12% Redeemable Preferred Stock in McDermott, issued on November 29, 2018, and the Series A Preferred Stock of McDermott, issued on December 2, 2019, and any Section 510(b) Claims.

"*Exit Facilities*" means, collectively, the Term Loan Exit Facility, the Cash Secured LC Exit Facility, and the Exit LC Facilities, as applicable.

"*Exit Facility Agents*" means each of the administrative agents, trustees, or other similar agents under the Exit Facility Agreement, solely in its capacity as such.

"*Exit Facility Agreement*" means that certain agreement to provide the Exit Facilities, if any, dated as of the Effective Date, by and among the Reorganized Debtors party thereto as borrowers, Reorganized McDermott, the Exit Facility Agents, the issuing banks party thereto, and the lender parties thereto, which shall be included in the Plan Supplement.

"*Exit Facility Documents*" means, collectively, the Exit Facility Agreement, and any and all other agreements, documents, and instruments delivered or to be entered into in connection therewith, including any guarantee agreements, pledge and collateral agreements, intercreditor agreements, and other security documents, in each case if any, the terms of which documents shall be acceptable to the Debtors or the Reorganized Debtors, as applicable, and the Required Consenting Lenders.

"*Exit LC Facilities*" means the Super Senior Exit Facility, the Senior Exit LC Facility, and the Roll-Off LC Exit Facility.

"*Federal Judgment Rate*" means the federal judgment rate in effect as of the Petition Date.

"*File*," "*Filed*," or "*Filing*" means file, filed, or filing with the Bankruptcy Court or its authorized designee in the Chapter 11 Cases.

"*Final Order*" means an order or judgment of the Bankruptcy Court, or court of competent jurisdiction with respect to the subject matter that has not been reversed, stayed, modified, or amended, as entered on the docket in any Chapter 11 Case or the docket of any court of competent jurisdiction, and as to which the time to appeal, or seek certiorari or move for a new trial, reargument, or rehearing has expired and no appeal or petition for certiorari or other proceedings for a new trial, reargument, or rehearing has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be timely filed has been withdrawn or resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought or the new trial, reargument, or rehearing will have been denied, resulted in no stay pending appeal of such order, or has otherwise been dismissed with prejudice; *provided* that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed with respect to such order will not preclude such order from being a Final Order.

"*Funded DIP Indebtedness*" means indebtedness under the DIP Credit Facility in respect of the DIP Term Loans (which for the avoidance of doubt includes the Superpriority Term Loans rolled up into the DIP Credit Facility, but excludes any DIP Hedging Obligations) and the Additional Obligations.

"*General Unsecured Claim*" means any Unsecured Claim against a Debtor other than the Bilateral Facility Claims and the Senior Notes Claims.

"*Governmental Unit*" has the meaning set forth in section 101(27) of the Bankruptcy Code.

"*Hedge Bank*" means, with respect to any Consenting Lender, either such Consenting Lender or an affiliate of such Consenting Lender that has entered into "Hedging Obligations" (as defined in the Credit Agreement) with the Debtors.

"*Impaired*" means with respect to a Class of Claims or Interests, a Class of Claims or Interests that is impaired within the meaning of section 1124 of the Bankruptcy Code.

"*Insider*" has the meaning set forth in section 101(31) of the Bankruptcy Code.

"*Intercompany Claim*" means any Claim held by a Debtor or an Affiliate against a Debtor or an Affiliate of a Debtor.

"*Intercompany Interest*" means an Interest in a Debtor held by a Debtor or an Affiliate of a Debtor.

"*Interest*" means any equity security (as defined in section 101(16) of the Bankruptcy Code) in any Debtor and any other rights, options, warrants, stock appreciation rights, phantom stock rights, restricted stock units, performance shares, performance units, redemption rights, repurchase rights, convertible, exercisable or exchangeable Securities or other agreements, arrangements or commitments of any character relating to, or whose value is related to, any such interest or other ownership interest in any Debtor.

"*Judicial Code*" means title 28 of the United States Code, 28 U.S.C. §§ 1–4001, as amended from time to time.

"*Lloyds LC Bank*" means Lloyds Bank PLC, as the Bank under the Lloyds Letter of Credit Agreement.

"*Lloyds LC Facility*" means the $127,000,000.00 senior secured letter of credit facility under the Lloyds Letter of Credit Agreement.

"*Lloyds Letter of Credit Agreement*" means that certain master agreement for stand-by letters of credit originally dated as of June 10, 2013 by and among Lloyds Bank plc (formerly known as Lloyds TSB Bank plc) and Comet II B.V., CB&I, LLC, Chicago Bridge and Iron Company B.V., CBI Services, LLC, CB&I UK Limited, CBI Constructors PTY LTD, CB&I Group Inc., and Woodlands International Insurance Ltd, as amended and restated May 10, 2018 in connection with the Business Combination (as defined therein) with McDermott and certain of its subsidiaries, as may be amended, supplemented, or otherwise modified from time to time.

"*Lloyds Letter of Credit Claims*" means any Claim for obligations arising under, or relating to, the Lloyds LC Facility, including Claims for all principal amounts outstanding, interest, fees, expenses, costs and other charges arising thereunder or related thereto.

"*Lloyds Letters of Credit*" means the letters of credit issued under the Lloyds LC Facility.

"*Lien*" has the meaning set forth in section 101(37) of the Bankruptcy Code.

"*Liquidity Lender Steering Committee*" means those certain institutions comprising the steering committee of lenders under the Superpriority Revolving Facility, the Revolving Credit Facility, and the 2023 LC Facility.

"*Lummus Assets and Interests*" means the Debtors' rights, titles, and interests in the Lummus Entities and related assets, as described in the Purchase Agreement.

"*Lummus Entities*" means Lummus Technology LLC; McDermott Technology (2), B.V.; McDermott Technology (3), B.V.; OOO Lummus Technology; CB&I Lummus Engineering & Technology China Co. Ltd.; Lummus Technology Heat Transfer B.V. (Netherlands); Lummus Technology Heat Transfer B.V. (India); Lummus Novolen Technology GmbH; Novolen Technology Holdings C.V.; Lummus Technology B.V.; Lummus Gasification Technology Licensing LLC; Lummus Engineered Products, LLC; Lummus Technology International LLC; Lummus Technology Services LLC; Chemical Research and Licensing, LLC; Lummus Technology Ventures LLC; Catalytic Distillation Technologies; Lummus Technology Overseas LLC, Chevron Lummus Global LLC, and CLG Technical Services, LLC.

"*Make Whole Amount*" means the make whole amount payable under Section 2.11(b) of the Superpriority Credit Agreement solely with respect to the tranches of the Superpriority Term Loan Facility that were funded prior to the Petition Date.

"*Make Whole Tranche*" means that certain tranche under the Super Senior Exit Facility in an amount equal to the portion of the Make Whole Amount remaining (if any) after applying the Technology Business Sale Proceeds and proceeds from the Rights Offering, subject to the terms of the Exit Facilities Term Sheet.

"*Management Incentive Plan*" has the meaning set forth in Article IV.P of the Plan.

"*Management Incentive Plan Pool*" has the meaning set forth in Article IV.P of the Plan.

"*McDermott*" means McDermott International, Inc. or any successor or assign, by merger, consolidation, or otherwise, prior to the Effective Date.

"*New Board*" means the board of directors of Reorganized McDermott.  The identities of directors on the New Board shall be set forth in the Plan Supplement.

"*New Common Stock*" means, depending on the transaction structure and as detailed in the Restructuring Transactions Memorandum, common equity in one or more Reorganized Debtors.

"*New DIP Term Loans*" means the new money term loans to be provided under the DIP Term Loan Facility.

"*New Organizational Documents*" means the documents providing for corporate governance of the Reorganized Debtors, including charters, bylaws, operating agreements, or other organizational documents or shareholders' agreements, as applicable, which shall be consistent with the Restructuring Support Agreement (including Section 3.02 of the Restructuring Support Agreement), this Plan, and section 1123(a)(6) of the Bankruptcy Code (as applicable), and shall be included in the Plan Supplement.

"*New Tranche A Warrants*" means the 7-year warrants to purchase 10% of the New Common Stock at a strike price equal to (a) the Prepetition Funded Secured Claims (including, without limitation, principal and any accrued prepetition or postpetition interest at the default rate as applicable) less (i) the proceeds of the Rights Offering, (ii) the aggregate amount of the loans evidenced by the Term Loan Exit Facility, and (iii) the Residual Prepetition Funded Secured Claims Pay Down, divided by (b) the initial allocation of 94% of the New Common Stock to the holders of Prepetition Funded Secured Claims minus an amount equal to (x) the aggregate proceeds of the Rights Offering divided by Plan Equity Value plus (y) the Prepetition Funded Secured Claims Excess Cash Adjustment.

"*New Tranche B Warrants*" means the 7-year warrants to purchase 10% of the New Common Stock at a strike price equal to (a) the Prepetition Funded Secured Claims (including, without limitation, principal and any accrued prepetition or postpetition interest at the default rate as applicable) multiplied by 125%, less (i) the proceeds of the Rights Offering, (ii) the aggregate amount of the loans evidenced by the Term Loan Exit Facility, and (iii) the Residual Prepetition Funded Secured Claims Pay Down, divided by (b) the initial allocation of 94% of the New Common Stock to holders of Prepetition Funded Secured Claims minus an amount equal to (x) the aggregate proceeds of the Rights Offering divided by Plan Equity Value and (y) the Prepetition Funded Secured Claims Excess Cash Adjustment.

"*New Warrants*" means, collectively, the New Tranche A Warrants and the New Tranche B Warrants.

"*New Warrants Agreements*" means those certain agreements providing for, among other things, the issuance and terms of the New Warrants, which shall be included in the Plan Supplement and in form and substance acceptable to the Required Consenting Lenders and the Required Consenting Noteholders. The New Warrants Agreements shall provide for full anti-dilution and Black-Scholes protection.

"*Other Prepetition Financing Claim*" means any Secured Claim arising under:

(a) that certain facility agreement dated September 30, 2010 among McDermott, as guarantor, and its subsidiary NO 105 AS, as borrower, the BNP Paribas, in its capacity as facility agent and security agent, and the lenders party thereto, as may be amended, supplemented, or otherwise modified from time to time, to pay a portion of the construction costs of the *NO 105*;

(b) that certain receivables factoring agreement dated November 25, 2016 among J. Ray McDermott de Mexico S.A. de C.V. and the financing intermediaries thereto, as may be amended, supplemented, or otherwise modified from time to time; or

(c) that certain re-invoicing service agreement dated May 2019 among Bramid Outsource Limited, as service provider, McDermott, as parent, and CB&I LLC, as customer.

"*Other Priority Claim*" means any Claim, other than an Administrative Claim or a Priority Tax Claim, entitled to priority in right of payment under section 507(a) of the Bankruptcy Code.

"*Other Secured Claim*" means any Secured Claim other than a Revolving Credit Claim, a Term Loan Claim, a 2021 Letter of Credit Claim, a 2023 Letter of Credit Claim, a Lloyds Letter of Credit Claim, a Cash Secured Letter of Credit Claim, a Credit Agreement Hedging Claim, a Superpriority Term Loan Claim, a Superpriority Revolving Facility Claim, an Other Prepetition Financing Claim, a Bilateral Facility Claim, or a DIP Claim.

"*Person*" has the meaning set forth in section 101(41) of the Bankruptcy Code.

"*Petition Date*" means the date on which the Debtors commenced the Chapter 11 Cases.

"*Plan Distribution*" means a payment or distribution to holders of Allowed Claims, Allowed Interests, or other eligible Entities under this Plan.

"*Plan Equity Value*" means $2,352,000,000.

"*Plan Objection Deadline*" means the date the Bankruptcy Court establishes as the deadline to File an objection to Confirmation of the Plan.

"*Plan Supplement*" means the compilation of documents and forms of documents, agreements, schedules, and exhibits to the Plan (in each case, as may be altered, amended, modified, or supplemented from time to time in accordance with the terms hereof and in accordance with the Bankruptcy Code and Bankruptcy Rules) to be Filed prior to the Confirmation Hearing, and any additional documents Filed prior to the Effective Date as amendments to the Plan Supplement, including the following, as applicable: (a) the New Organizational Documents; (b) to the extent known, the identities of the members of the New Board; (c) the Assumed Executory Contracts and Unexpired Leases Schedule; (d) the Rejected Executory Contracts and Unexpired Leases Schedule; (e) the Schedule of Retained Causes of Action; (f) the Exit Facility Documents; (g) the definitive documentation related to the Management Incentive Plan; (h) the Restructuring Transactions Memorandum; (i) the New Warrants Agreements; and (j) to the extent available, the form of any Technology Business Sale Documents distributed by the Debtors to potentially interested parties, if any.  The Debtors shall have the right to alter, amend, modify, or supplement the documents contained in the Plan Supplement up to the Effective Date as set forth in this Plan and in accordance with the Restructuring Support Agreement (and subject to the applicable consent rights thereunder).

"*Prepetition Funded Secured Claims*" means Claims in respect of (i) the Term Loans and the Revolving Loans, (ii) any funded Prepetition Secured Letters of Credit, and (iii) the Credit Agreement Hedging Claims, but excluding any amounts being rolled into the DIP Credit Facility.

"*Prepetition Funded Secured Claims Excess Cash Adjustment*" has the meaning set forth in Article IV.D.4 of the Plan.

"*Prepetition Secured Letters of Credit*" means the 2021 Letters of Credit, the 2023 Letters of Credit, the Revolving LCs, the Lloyds Letters of Credit, and the Cash Secured Letters of Credit.

"*Priority Tax Claim*" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

"*Pro Rata*" means the proportion that an Allowed Claim or an Allowed Interest in a particular Class bears to the aggregate amount of Allowed Claims or Allowed Interests in that Class, unless otherwise indicated.

"*Professional*" means an Entity:  (a) employed pursuant to a Bankruptcy Court order in accordance with sections 327, 363, or 1103 of the Bankruptcy Code and to be compensated for services rendered prior to or on the Confirmation Date, pursuant to sections 327, 328, 329, 330, 331, and 363 of the Bankruptcy Code; or (b) awarded compensation and reimbursement by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

"*Professional Amount*" means the aggregate amount of Professional Claims and other unpaid fees and expenses that the Professionals estimate they have incurred or will incur in rendering services to the Debtors as set forth in Article II.C of the Plan.

"*Professional Claim*" means a Claim by a professional seeking an award by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Confirmation Date under sections 330, 331, 503(b)(2), 503(b)(3), 503(b)(4), or 503(b)(5) of the Bankruptcy Code.

"*Professional Escrow Account*" means an interest-bearing account funded by the Debtors with Cash on the Effective Date in an amount equal to the Professional Amount.

"*Proof of Claim*" means a proof of Claim Filed against any of the Debtors in the Chapter 11 Cases.

"*Purchase Agreement*" means, solely with respect to the Technology Business Sale, the share and asset purchase agreement between the Debtors and the Purchaser.

"*Purchaser*" means one or more Entities that are the purchasers with respect to the Technology Business Sale.

"*Reinstate*," "*Reinstated*," or "*Reinstatement*" means with respect to Claims and Interests, that the Claim or Interest shall not be discharged hereunder and the holder's legal, equitable, and contractual rights on account of such Claim or Interest shall remain unaltered by Consummation in accordance with section 1124(1) of the Bankruptcy Code.

"*Rejected Executory Contracts and Unexpired Leases Schedule*" means the schedule of Executory Contracts and Unexpired Leases to be rejected by the Debtors pursuant to the Plan, which schedule shall be included in the Plan Supplement, as the same may be amended, modified, or supplemented from time to time; *provided* that such schedule shall be in form and substance acceptable to the Required Consenting Lenders.

"*Related Party*" means, collectively, current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, predecessors, participants, successors, assigns, subsidiaries, affiliates, managed accounts or funds, partners, limited partners, general partners, principals, members, management companies, fund advisors or managers, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, heirs, executors, and assigns, and other professionals, in each case solely in their capacities as such, together with their respective past and present directors, officers, shareholders, partners, members, employees, agents, attorneys, representatives, heirs, executors and assigns, in each case solely in their capacities as such.

"*Released Claims*" means any Claims or Interests that have been released, discharged, or are subject to exculpation pursuant to this Plan.

"*Released Parties*" means, collectively, and in each case in its capacity as such:  (a) each Debtor; (b) each Reorganized Debtor; (c) each Company Party; (d) each DIP Lender and each DIP Letter of Credit Issuer; (e) each Agent; (f) the Senior Notes Trustee; (g) each Consenting Stakeholder; (h) each Hedge Bank; (i) each Cash Management Bank; (j) each lender under the Superpriority Credit Agreement, Credit Agreement, the 2021 LC Agreement, and the Lloyds Letter of Credit Agreement; (k) each holder of an Obligation (as defined in the Superpriority Credit Agreement) under the Superpriority Credit Agreement; (l) each holder of an Obligation (as defined in the Credit Agreement) under the Credit Agreement; (m) each Issuer (as defined in the Superpriority Credit Agreement) under the Superpriority Credit Agreement; (n) each Issuer (as defined in the Credit Agreement) under the Credit Agreement; (o) the Term Loan Ad Hoc Group, the Liquidity Lender Steering Committee, and the Senior Notes Ad Hoc Group; (p) each current and former Affiliate of each Entity in clause (a) through (o); and (q) each Related Party of each Entity in clause (a) through (o); *provided* that any holder of a Claim or Interest that opts out of the releases shall not be a "Released Party."

"*Releasing Parties*" means, collectively, and in each case in its capacity as such:  (a) each Debtor; (b) each Reorganized Debtor; (c) each Company Party; (d) each DIP Lender and each DIP Letter of Credit Issuer; (e) each Agent; (f) the Senior Notes Trustee; (g) each Consenting Stakeholder; (h) each Hedge Bank; (i) each Cash Management Bank; (j) each lender under the Superpriority Credit Agreement, Credit Agreement, the 2021 LC Agreement, and the Lloyds Letter of Credit Agreement; (k) each holder of an Obligation (as defined in the Superpriority Credit Agreement) under the Superpriority Credit Agreement; (l) each holder of an Obligation (as defined in the Credit Agreement) under the Credit Agreement; (m) each Issuer (as defined in the Superpriority Credit Agreement) under the Superpriority Credit Agreement; (n) each Issuer (as defined in the Credit Agreement) under the Credit Agreement; (o) the Term Loan Ad Hoc Group, the Liquidity Lender Steering Committee, and the Senior Notes Ad Hoc Group; (p) all holders of Claims or Interests that vote to accept or are deemed to accept the Plan; (q) all holders of Claims or Interests that abstain from voting on the Plan and who do not affirmatively opt out of the releases provided by the Plan by checking the box on the applicable ballot indicating that they opt not to grant the releases provided in the Plan; (r) all holders of Claims or Interests that vote to reject the Plan or are deemed to reject the Plan and who do not affirmatively opt out of the releases provided by the Plan by checking the box on the applicable ballot

indicating that they opt not to grant the releases provided in the Plan; (s) each current and former Affiliate of each Entity in clause (a) through (r); and (t) each Related Party of each Entity in clause (a) through (r).

"*Reorganized Debtors*" means collectively, a Debtor, or any successor or assign thereto, by merger, consolidation, or otherwise, on and after the Effective Date, including any new entity established in connection with the implementation of the Restructuring Transactions.

"*Reorganized McDermott*" means McDermott, or any successor or assign, by merger, consolidation, or otherwise, on or after the Effective Date.

"*Required Consenting LC Lenders*" has the meaning set forth in the Restructuring Support Agreement.

"*Required Consenting Lender*" has the meaning set forth in the Restructuring Support Agreement.

"*Required Consenting Noteholders*" has the meaning set forth in the Restructuring Support Agreement.

"*Required Consenting Revolving Lenders*" has the meaning set forth in the Restructuring Support Agreement.

"*Required Consenting Stakeholders*" has the meaning set forth in the Restructuring Support Agreement.

"*Required Consenting Term Lenders*" has the meaning set forth in the Restructuring Support Agreement.

"*Residual Prepetition Funded Secured Claims Pay Down*" has the meaning set forth in Article IV.D.4 of the Plan.

"*Restructuring Expenses*" means the prepetition and postpetition reasonable and documented fees and expenses of the Revolving and LC Administrative Agent Advisors, the Term Loan Ad Hoc Group Advisors, the Senior Notes Ad Hoc Group Advisors, the Barclays Advisors, and the Senior Notes Trustee and its advisors, including local and foreign counsel (in each case, in accordance with the terms of their respective engagement letters with their respective clients, if any).

"*Restructuring Term Sheet*" means the Restructuring Term Sheet attached as <u>Exhibit A</u> to the Restructuring Support Agreement.

"*Restructuring Transactions*" means any transaction and any actions as may be necessary or appropriate to effect a corporate restructuring of the Debtors' and the Reorganized Debtors' respective businesses or a corporate restructuring of the overall corporate structure of the Debtors on the terms set forth in the Plan, Restructuring Support Agreement, and Restructuring Transactions Memorandum, including the issuance of all Securities, notes, instruments, certificates, and other documents required to be issued pursuant to the Plan, one or more inter-company mergers, consolidations, amalgamations, arrangements, continuances, restructurings, conversions, dissolutions, transfers, liquidations, or other corporate transactions, as described in Article IV.B of the Plan.

"*Restructuring Transactions Memorandum*" means a document, in form and substance acceptable to the Required Consenting Lenders, to be included in the Plan Supplement that will set forth the material components of the Restructuring Transactions, including the identity of the issuer or issuers of the New Common Stock and any elections that must be made with respect to the receipt of the New Common Stock.

"*Restructuring Support Agreement*" means that certain Restructuring Support Agreement, dated as of January 20, 2020, by and among the Debtors and the Consenting Stakeholders, as may be further amended, modified, or supplemented from time to time, in accordance with its terms.

"*Revolving and LC Administrative Agent*" means Crédit Agricole Corporate and Investment Bank, in its capacity as administrative agent for the Revolving Credit Facility and the 2023 LC Facility.

"*Revolving and LC Administrative Agent Advisors*" means Linklaters LLP, Bracewell LLP and FTI Consulting, Inc., as advisors to the DIP LC Agent, the DIP Collateral Agent, the Revolving and LC Administrative Agent, 2018 Collateral Agent, the Superpriority Revolving Administrative Agent and the Superpriority Collateral Agent, and any other local or foreign advisors.

"*Revolving Credit*" means the Revolving LCs and the Revolving Loans.

"*Revolving Credit Facility*" means the senior secured revolving credit facility under the Credit Agreement.

"*Revolving LC Claims*" means any Claim for obligations arising under, or relating to, the Revolving LCs issued under the Revolving Credit Facility, including Claims for all principal amounts outstanding, interest, fees, expenses, costs and other charges arising thereunder or related thereto.

"*Revolving LCs*" means the letters of credit issued under and on the terms set forth under the Revolving Credit Facility.

"*Revolving Lenders*" means the lenders under the Revolving Credit Facility.

"*Revolving Loans*" means the revolving loans issued under and on the terms set forth under the Revolving Credit Facility.

"*Rights Offering*" means a rights offering providing for the Consenting Noteholders with the right to purchase up to $150 million of the New Common Stock otherwise earmarked for the holders of Prepetition Funded Secured Claims valued at the Plan Equity Value in connection with the Restructuring Transactions and in accordance with the Rights Offering Procedures and Section 12 of the Restructuring Support Agreement.

"*Rights Offering Procedures*" means the procedures governing the Rights Offering, as approved by the Bankruptcy Court.

"*Rights Offering Shares*" means the shares of New Common Stock issued in accordance with the Rights Offering and subject to the terms of the Rights Offering Procedures and the Restructuring Support Agreement.

"*Roll-Off LC Exit Facility*" means a senior secured letter of credit exit facility pursuant to which each outstanding Prepetition Secured Letter of Credit will be deemed issued on the Effective Date, ranked junior to the Senior Exit LC Facility, and otherwise on terms satisfactory to the Required Consenting Lenders, and set forth in the Definitive Documents to be included in the Plan Supplement.

"*Schedule of Retained Causes of Action*" means the schedule of certain Causes of Action of the Debtors that are not released, waived, or transferred pursuant to the Plan, as the same may be amended, modified, or supplemented from time to time.

"*Section 510(b) Claim*" means any Claim or Interest against a Debtor subject to subordination under section 510(b) of the Bankruptcy Code, whether by operation of law or contract.

"*Secured Claim*" means a Claim:  (a) secured by a valid, perfected, and enforceable Lien on collateral to the extent of the value of such collateral, as determined in accordance with section 506(a) of the Bankruptcy Code or (b) subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code.

"*Secured Creditor Equity Distribution*" means 94% of the New Common Stock less the percentage of New Common Stock to be turned over on account of (i) the Prepetition Funded Secured Claims Excess Cash Adjustment and (ii) the Rights Offering, and subject to dilution on account of the Management Incentive Plan and the New Warrants.

"*Secured Creditor Funded Debt Distribution*" means (a) Cash in an amount equal to the Residual Technology Business Sale Proceeds; (b) Cash in an amount equal to any proceeds of the Rights Offering; (c) the Secured Creditor Equity Distribution; and (d) the new term loans evidenced by the Term Loan Exit Facility.

"*Secured Creditor Pro Rata Share*" means with respect to any recipient of any distribution from the Secured Creditor Funded Debt Distribution under the Plan, such recipient's pro rata share thereof measured by reference to the aggregate amount of: (a) all Allowed Term Loan Claims, (b) all Allowed Revolving Credit Claims consisting of (x) all Revolving Loans and (y) funded Revolving LCs, (c) all Allowed 2021 Letter of Credit Claims consisting of funded 2021 Letters of Credit, (d) all Allowed 2023 Letter of Credit Claims consisting of funded 2023 Letters of Credit, (e) all Allowed Lloyds Letter of Credit Claims consisting of funded Lloyds Letters of Credit, and (f) all Credit Agreement Hedging Claims consisting of Credit Agreement Hedging Obligations, that are not being rolled into the DIP Credit Facility, in each case as of the date of such distribution.

"*Secured Letter of Credit Cap*" has the meaning ascribed to it in the Exit Facilities Term Sheet.

"*Securities Act*" means the Securities Act of 1933, as amended, 15 U.S.C. §§ 77a–77aa, or any similar federal, state, or local law, as now in effect or hereafter amended, and the rules and regulations promulgated thereunder.

"*Security*" means any security, as defined in section 2(a)(1) of the Securities Act.

"*Senior Exit LC Facility*" means a 4-year, senior secured letter of credit exit facility in an amount up to $1.326 billion, ranked junior to the Super Senior Exit Facility, on terms satisfactory to the Debtors or the Reorganized Debtors, as applicable, and otherwise on terms satisfactory to the Required Consenting Lenders; and set forth in the Definitive Documents to be included in the Plan Supplement; *provided* that the amount of the Senior Exit LC Facility shall be reduced dollar-for-dollar for each Prepetition Secured Letter of Credit that is drawn and not reimbursed in full in Cash during or after the Chapter 11 Cases.

"*Senior Notes*" means the 10.625% senior notes due 2024 issued by certain of the Debtors pursuant to the Senior Notes Indenture.

"*Senior Notes Ad Hoc Group*" means, collectively, those certain institutions comprising the ad hoc groups of holders of the Senior Notes represented by Paul, Weiss, Rifkind, Wharton & Garrison LLP and Brown Rudnick LLP.

"*Senior Notes Ad Hoc Group Advisors*" means Paul, Weiss, Rifkind, Wharton & Garrison LLP, Brown Rudnick LLP, Houlihan Lokey Capital, Inc., counsel to the Senior Notes Trustee, and any local or foreign advisors.

"*Senior Notes Claims*" means all principal and interest outstanding as of the Petition Date under the Senior Notes.

"*Senior Notes Indenture*" means that certain indenture dated as of April 18, 2018, by and among certain of the Debtors and the Senior Notes Trustee, as may be amended, supplemented, or otherwise modified from time to time.

"*Senior Notes Trustee*" means UMB Bank, N.A., in its capacity as trustee for the Senior Notes Indenture.

"*Superpriority Agreement Agents*" means the Superpriority Revolving Administrative Agent, the Superpriority Collateral Agent and the Superpriority Term Loan Agent.

"*Superpriority Collateral Agent*" means Crédit Agricole Corporate and Investment Bank, in its capacity as Collateral Agent under the Superpriority Credit Agreement.

"*Superpriority Credit Agreement*" means that certain superpriority senior secured credit agreement, dated October 21, 2019, between certain of the Debtors as borrowers and guarantors, a syndicate of lenders and letter of

credit issuers, the Superpriority Term Loan Agent, and the Superpriority Revolving Administrative Agent, as amended from time to time.

"*Superpriority Facility*" means, collectively, the Superpriority Term Loan Facility and the Superpriority Revolving Facility.

"*Superpriority Letters of Credit*" means the superpriority letters of credit issued under the Superpriority Revolving Facility.

"*Superpriority Revolving Administrative Agent*" means Crédit Agricole Corporate and Investment Bank, in its capacity as administrative agent for the Superpriority Revolving Facility.

"*Superpriority Revolving Facility*" means the superpriority secured letter of credit facility under the Superpriority Credit Agreement.

"*Superpriority Term Loan Agent*" means Barclays Bank PLC in its capacity as administrative agent for the Superpriority Term Loan Facility.

"*Superpriority Term Loan Facility*" means the superpriority secured term loan credit facility under the Superpriority Credit Agreement.

"*Superpriority Term Loans*" means the superpriority term loans issued under and on the terms set forth under the Superpriority Term Loan Facility.

"*Super Senior Exit Facility*" means a 4-year, super senior secured exit facility consisting of a letter of credit facility in an amount of $743 million and the Make Whole Tranche (which Make Whole Tranche will be subordinate in right of payment to the obligations with respect to the letters of credit under the Super Senior Exit Facility on the terms provided therein), on terms satisfactory to the Required Consenting Lenders and set forth in the Definitive Documents to be included in the Plan Supplement.

"*Technology Business Sale*" means a sale of the Lummus Assets and Interests under this Plan, pursuant to the Purchase Agreement, and to be agreed to or consummated by the Debtors on the Effective Date.

"*Technology Business Sale Proceeds*" means Cash proceeds received from the Technology Business Sale, net of (a) the reasonable transaction costs in connection with the Technology Business Sale, (b) taxes paid or reasonably estimated to be payable by the Debtors or Reorganized Debtors as a result of the Technology Business Sale, (c) any debt service payments due under the DIP Credit Agreement which are required to be repaid or otherwise becomes due in connection with the Technology Business Sale, and (d) payment of $210 million of prepetition accounts payable.

"*Technology Business Sale Proceeds Waterfall*" means the distribution waterfall for the Technology Business Sale Proceeds, as described in Article IV.D.3 of this Plan.

"*Term Lenders*" means the lenders under the Term Loan Facility.

"*Term Loan Ad Hoc Group*" means certain institutions comprising the ad hoc group of lenders in respect of the Superpriority Term Loans and the lenders in respect of the Term Loan Facility.

"*Term Loan Ad Hoc Group Advisors*" means Davis Polk & Wardwell LLP, Porter Hedges LLP, Centerview Partners, Inc., Ankura Consulting Group, LLC, and any other local or foreign advisors.

"*Term Loan Administrative Agent*" means Barclays Bank PLC, in its capacity as administrative agent for the Term Loan Facility.

"*Term Loan Claims*" means any Claim for obligations arising under, or relating to, the Term Loan Facility.

"*Term Loan Exit Facility*" means a 5-year senior secured term loan facility in an amount equal to $500 million of take-back debt, ranked *pari passu* with the Roll-Off LC Exit Facility, and otherwise on terms satisfactory to the Required Consenting Lenders, and set forth in Definitive Documents to be included in the Plan Supplement.

"*Term Loan Exit Facility Lenders*" means those lenders party to the Exit Facility Agreement.

"*Term Loans*" means the term loans issued and on the terms set forth under the Term Loan Facility.

"*Term Loan Facility*" means the senior secured term loan facility under the Credit Agreement.

"*Unexpired Lease*" means a lease to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

"*Unimpaired*" means with respect to a Class of Claims or Interests, a Class of Claims or Interests that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

"*Unsecured Claim*" means any Claim that is not a Secured Claim.

"*Voting Deadline*" means, subject to the approval of the Bankruptcy Court, February 18, 2020, or such other date as ordered by the Bankruptcy Court.

B.      *Rules of Interpretation.*

For purposes of this Plan:  (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; *provided* that nothing in this clause (2) shall affect any parties' consent rights over any of the Definitive Documents or any amendments thereto, as provided for in the Restructuring Support Agreement; (3) unless otherwise specified, any reference herein to an existing document, schedule, or exhibit, whether or not Filed, having been Filed or to be Filed shall mean that document, schedule, or exhibit, as it may thereafter be amended, modified, or supplemented in accordance with the Plan or Confirmation Order, as applicable; (4) any reference to an Entity as a holder of a Claim or Interest includes that Entity's successors and assigns; (5) unless otherwise specified, all references herein to "Articles" are references to Articles hereof or hereto; (6) unless otherwise specified, all references herein to exhibits are references to exhibits in the Plan Supplement; (7) unless otherwise specified, the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (8) subject to the provisions of any contract, certificate of incorporation, by-law, instrument, release, or other agreement or document entered into in connection with the Plan, the rights and obligations arising pursuant to the Plan shall be governed by, and construed and enforced in accordance with the applicable federal law, including the Bankruptcy Code and Bankruptcy Rules; (9) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (10) unless otherwise specified herein, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (11) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; (12) all references to docket numbers of documents Filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (13) all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time, and as applicable to the Chapter 11 Cases, unless otherwise stated; (14) the words "include" and "including," and variations thereof, shall not be deemed to be terms of limitation, and shall be deemed to be followed by the words "without limitation"; (15) references to "Proofs of Claim," "holders of Claims," "Disputed Claims," and the like shall include "Proofs of Interest," "holders of Interests," "Disputed Interests," and the like, as applicable; (16) any immaterial effectuating provisions may be interpreted by the Reorganized Debtors in such a manner that is consistent with the overall purpose and intent of the Plan all without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity; and (17) all references

herein to consent, acceptance, or approval may be conveyed by counsel for the respective parties that have such consent, acceptance, or approval rights, including by electronic mail.

C.      *Computation of Time.*

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein. If the date on which a transaction may occur pursuant to the Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day. Any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable after the Effective Date.

D.      *Governing Law.*

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of New York, without giving effect to the principles of conflict of laws (other than section 5-1401 and section 5-1402 of the New York General Obligations Law), shall govern the rights, obligations, construction, and implementation of the Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control), and corporate governance matters; *provided* that corporate governance matters relating to the Debtors or the Reorganized Debtors, as applicable, not incorporated in New York shall be governed by the laws of the state of incorporation or formation of the relevant Debtor or the Reorganized Debtors, as applicable.

E.      *Reference to Monetary Figures.*

All references in the Plan to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided herein.

F.      *Reference to the Debtors or the Reorganized Debtors.*

Except as otherwise specifically provided in the Plan to the contrary, references in the Plan to the Debtors or the Reorganized Debtors shall mean the Debtors and the Reorganized Debtors, as applicable, to the extent the context requires.

G.      *Controlling Document.*

In the event of an inconsistency between the Plan and the Disclosure Statement, the terms of the Plan shall control in all respects. In the event of an inconsistency between the Plan and the Plan Supplement, the terms of the relevant provision in the Plan Supplement shall control (unless stated otherwise in such Plan Supplement document or in the Confirmation Order). In the event of an inconsistency between the Confirmation Order and the Plan, the Confirmation Order shall control.

H.      *Consultation, Information, Notice, and Consent Rights.*

Notwithstanding anything herein to the contrary, any and all consultation, information, notice, and consent rights of the parties to the Restructuring Support Agreement set forth in the Restructuring Support Agreement (including the exhibits thereto) with respect to the form and substance of this Plan, all exhibits to the Plan, and the Plan Supplement, and all other Definitive Documents (as defined in the Restructuring Support Agreement), including any amendments, restatements, supplements, or other modifications to such agreements and documents, and any consents, waivers, or other deviations under or from any such documents, shall be incorporated herein by this reference (including to the applicable definitions in Article I.A hereof) and fully enforceable as if stated in full herein.

Failure to reference the rights referred to in the immediately preceding paragraph as such rights relate to any document referenced in the Restructuring Support Agreement shall not impair such rights and obligations.

# ARTICLE II.
## ADMINISTRATIVE CLAIMS, DIP CLAIMS, PRIORITY CLAIMS, AND RESTRUCTURING EXPENSES

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, DIP Claims, Professional Claims, and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III hereof.

A.      *Administrative Claims.*

Unless otherwise agreed to by the holder of an Allowed Administrative Claim and the Debtors or the Reorganized Debtors, as applicable, or otherwise provided for under the Plan or the Restructuring Support Agreement, each holder of an Allowed Administrative Claim (other than holders of Professional Claims and Claims for fees and expenses pursuant to section 1930 of chapter 123 of title 28 of the United States Code) will receive in full and final satisfaction of its Administrative Claim an amount of Cash equal to the amount of such Allowed Administrative Claim in accordance with the following:  (1) if an Administrative Claim is Allowed on or prior to the Effective Date, on the Effective Date or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (2) if such Administrative Claim is not Allowed as of the Effective Date, no later than thirty (30) days after the date on which an order allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; (3) if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claim without any further action by the holders of such Allowed Administrative Claim; (4) at such time and upon such terms as may be agreed upon by such holder and the Debtors or the Reorganized Debtors, as applicable; or (5) at such time and upon such terms as set forth in an order of the Bankruptcy Court.

B.      *DIP Claims.*

As set forth in Article IV.D of this Plan, certain of the Technology Business Sale Proceeds shall be used to pay Allowed DIP Claims (including Allowed DIP Claims with respect to the Make Whole Amount pursuant to the Technology Business Sale Proceeds Waterfall) outstanding on the Effective Date.  Except to the extent that a holder of an Allowed DIP Claim agrees to less favorable treatment, on the Effective Date, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each holder of an Allowed DIP Claim shall receive the following treatment:

(a)      to the extent not paid in full in accordance with the Technology Business Sale Proceeds Waterfall, each holder of an Allowed DIP Term Loan Claim (other than the Make Whole Amount, but including all principal, accrued and unpaid interest, fees and expenses and non-contingent indemnity claims) shall receive payment in full in Cash;

(b)      to the extent not paid in full in accordance with the Technology Business Sale Proceeds Waterfall or the proceeds of the Rights Offering, each holder of an Allowed DIP Term Loan Claim constituting the Make Whole Amount shall receive its Pro Rata share of the term loans arising under the Make Whole Tranche;

(c)      to the extent not paid in full in accordance with the Technology Business Sale Proceeds Waterfall, each holder of an Allowed DIP LC Claim with respect to drawn DIP Letters of Credit that have not been reimbursed in full in Cash as of the Effective Date shall receive payment in full in Cash;

(d)      each holder of an Allowed DIP LC Claim (other than in respect of DIP Cash Secured Letters of Credit) shall receive participation in the Super Senior Exit Facility in an amount equal to each such holder's DIP Letter of Credit Facility commitments;

(e)      each holder of a DIP Cash Secured Letter of Credit Claim shall receive participation in the Cash Secured Exit LC Facility in an amount equal to such holder's DIP Cash Secured Letter of Credit Claim; *provided* that any cash collateral in the DIP Cash Secured LC Account (as defined in the DIP Credit Facility Term Sheet) shall collateralize the Cash Secured LC Exit Facility; and

(f)      all DIP Hedging Obligations shall be rolled into and deemed incurred under the Super Senior Exit Facility.

To the extent the Funded DIP Indebtedness is repaid in full prior to the Effective Date, the Debtors shall not make any payments to trade vendors for penalty interest payments (excluding, for the avoidance of doubt, customary liquidated damages to customers) unless such payments had otherwise been specified in the Approved Budget (as defined in the DIP Credit Agreement) or authorized pursuant to the DIP Financing Orders.

*C.*      *Professional Claims.*

1.      Final Fee Applications and Payment of Professional Claims.

All requests for payment of Professional Claims for services rendered and reimbursement of expenses incurred prior to the Confirmation Date must be Filed no later than 45 days after the Effective Date.  The Bankruptcy Court shall determine the Allowed amounts of such Professional Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Court.  The Reorganized Debtors shall pay Professional Claims in Cash in the amount the Bankruptcy Court allows, including from the Professional Escrow Account, which the Reorganized Debtors will establish in trust for the Professionals and fund with Cash equal to the Professional Amount on the Effective Date.

2.      Professional Escrow Account.

On the Effective Date, the Reorganized Debtors shall, in consultation with the Required Consenting Lenders, establish and fund the Professional Escrow Account with Cash equal to the Professional Amount, which shall be funded by the Reorganized Debtors.  The Professional Escrow Account shall be maintained in trust solely for the Professionals.  Such funds shall not be considered property of the Estates of the Debtors or the Reorganized Debtors.  The amount of Allowed Professional Claims shall be paid in Cash to the Professionals by the Reorganized Debtors from the Professional Escrow Account as soon as reasonably practicable after such Professional Claims are Allowed.  When such Allowed Professional Claims have been paid in full, any remaining amount in the Professional Escrow Account shall promptly be paid to the Reorganized Debtors without any further action or order of the Bankruptcy Court.

3.      Professional Amount.

Professionals shall reasonably estimate their unpaid Professional Claims and other unpaid fees and expenses incurred in rendering services to the Debtors before and as of the Effective Date, and shall deliver such estimate to the Debtors no later than five days before the Effective Date; *provided* that such estimate shall not be deemed to limit the amount of the fees and expenses that are the subject of each Professional's final request for payment in the Chapter 11 Cases.  If a Professional does not provide an estimate, the Debtors or Reorganized Debtors may estimate the unpaid and unbilled fees and expenses of such Professional.

4.      Post-Confirmation Fees and Expenses.

Except as otherwise specifically provided in the Plan, from and after the Confirmation Date, the Debtors shall, in the ordinary course of business and without any further notice to or action, order, or approval of the

Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses related to implementation of the Plan and Consummation incurred by the Debtors.  Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Debtors may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

D.      *Priority Tax Claims.*

        Except to the extent that a holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.

E.      *Payment of Restructuring Expenses, Consent Fee.*

        The Restructuring Expenses incurred, or estimated to be incurred, up to and including the Effective Date, and noteholder consent fees payable under Section 12 of the Restructuring Support Agreement payable in Cash, which, for the avoidance of doubt, shall include the Noteholder Consent Fee (as defined in the Restructuring Support Agreement), shall be paid in full in Cash on the Effective Date or as reasonably practicable thereafter (to the extent not previously paid during the course of the Chapter 11 Cases) in accordance with, and subject to, the terms of the Restructuring Support Agreement, without any requirement to file a fee application with the Bankruptcy Court, without the need for itemized time detail, or without any requirement for Bankruptcy Court review or approval.  All Restructuring Expenses and Cash consent fees to be paid on the Effective Date shall be estimated prior to and as of the Effective Date and such estimates shall be delivered to the Debtors at least two (2) Business Days before the anticipated Effective Date; *provided* that such estimates shall not be considered an admission or limitation with respect to such Restructuring Expenses.  On or as soon as practicable after the Effective Date, final invoices for all Restructuring Expenses incurred prior to and as of the Effective Date shall be submitted to the Debtors.  In addition, the Debtors and the Reorganized Debtors (as applicable) shall continue to pay pre- and post-Effective Date, when due Restructuring Expenses related to implementation, consummation, and defense of the Plan, whether incurred before, on, or after the Effective Date.

## ARTICLE III.
## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

A.      *Classification of Claims and Interests.*

        This Plan constitutes a separate Plan proposed by each Debtor.  Except for the Claims addressed in Article II hereof, all Claims and Interests are classified in the Classes set forth below in accordance with sections 1122 and 1123(a)(1) of the Bankruptcy Code.  A Claim or an Interest, or any portion thereof, is classified in a particular Class only to the extent that any portion of such Claim or Interest fits within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest fits within the description of such other Classes.  A Claim or an Interest also is classified in a particular Class for the purpose of receiving distributions under the Plan only to the extent that such Claim or Interest is an Allowed Claim or Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

        The classification of Claims and Interests against the Debtors pursuant to the Plan is as follows:

| Class | Claims and Interests | Status | Voting Rights |
|-------|---------------------|--------|---------------|
| Class 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 3 | Other Prepetition Financing Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |

| Class | Claims and Interests | Status | Voting Rights |
|-------|---------------------|--------|---------------|
| Class 4 | Bilateral Facility Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 5 | 2021 Letter of Credit Claims | Impaired | Entitled to Vote |
| Class 6A | 2023 Letter of Credit Claims | Impaired | Entitled to Vote |
| Class 6B | Revolving Credit Claims | Impaired | Entitled to Vote |
| Class 6C | Term Loan Claims | Impaired | Entitled to Vote |
| Class 6D | Credit Agreement Hedging Claims | Impaired | Entitled to Vote |
| Class 7 | Cash Secured Letter of Credit Claims | Impaired | Entitled to Vote |
| Class 8 | Lloyds Letter of Credit Claims | Impaired | Entitled to Vote |
| Class 9 | Senior Notes Claims | Impaired | Entitled to Vote |
| Class 10 | General Unsecured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 11 | Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept or Deemed to Reject) |
| Class 12 | Existing Equity Interests Other Than in McDermott | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept or Deemed to Reject) |
| Class 13 | Existing Preferred Equity Interests in McDermott | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 14 | Existing Common Equity Interests in McDermott | Impaired | Not Entitled to Vote (Deemed to Reject) |

B.      *Treatment of Claims and Interests.*

Each holder of an Allowed Claim or Allowed Interest, as applicable, shall receive under the Plan the treatment described below in full and final satisfaction, settlement, release, and discharge of and in exchange for such holder's Allowed Claim or Allowed Interest, except to the extent different treatment is agreed to by the Reorganized Debtors and the holder of such Allowed Claim or Allowed Interest, as applicable.  Unless otherwise indicated, the holder of an Allowed Claim or Allowed Interest, as applicable, shall receive such treatment on the Effective Date or as soon as reasonably practicable thereafter.

1.   Class 1 – Other Secured Claims

(a)      *Classification*:  Class 1 consists of all Other Secured Claims.

(b)      *Treatment*: Each holder of an Allowed Other Secured Claim shall receive, at the option of the applicable Debtor:

(i)      payment in full in Cash of its Allowed Other Secured Claim;

(ii)     the collateral securing its Allowed Other Secured Claim;

(iii)    Reinstatement of its Allowed Other Secured Claim; or

(iv)      such other treatment that renders its Allowed Other Secured Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code.

(c)      *Voting*:  Class 1 is Unimpaired under the Plan.  Holders of Other Secured Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, such holders are not entitled to vote to accept or reject the Plan.

2.    <u>Class 2 – Other Priority Claims</u>

(a)      *Classification*:  Class 2 consists of all Other Priority Claims.

(b)      *Treatment*:  Each holder of an Allowed Other Priority Claim shall receive payment in full in Cash.

(c)      *Voting*:  Class 2 is Unimpaired under the Plan.  Holders of Other Priority Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, such holders are not entitled to vote to accept or reject the Plan.

3.    <u>Class 3 – Other Prepetition Financing Claims</u>

(a)      *Classification*:  Class 3 consists of all Other Prepetition Financing Claims.

(b)      *Treatment*:  Each Allowed Other Prepetition Financing Claim shall be Reinstated.

(c)      *Voting:* Class 3 is Unimpaired under the Plan.  Holders of Other Prepetition Financing Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, such holders are not entitled to vote to accept or reject the Plan.

4.    <u>Class 4 – Bilateral Facility Claims</u>

(a)      *Classification*:  Class 4 consists of all Bilateral Facility Claims.

(b)      *Treatment*:  Each Allowed Bilateral Facility Claim shall be Reinstated.

(c)      *Voting*:  Class 4 is Unimpaired under the Plan.  Holders of Bilateral Facility Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, such holders are not entitled to vote to accept or reject the Plan.

5.    <u>Class 5 – 2021 Letter of Credit Claims</u>

(a)      *Classification:*  Class 5 consists of all 2021 Letter of Credit Claims.

(b)      *Treatment*:  Each holder of an Allowed 2021 Letter of Credit Claim shall receive:

(i)      with respect to any 2021 Letter of Credit Claims on account of unfunded 2021 Letters of Credit, participation in the Roll-Off LC Exit Facility in an amount equal to each such holder's Allowed 2021 Letter of Credit Claim,

(ii)      with respect to any 2021 Letter of Credit Claims on account of funded 2021 Letters of Credit, its Secured Creditor Pro Rata Share of the Secured Creditor

24

Funded Debt Distribution, and

    (iii)    payment in full in Cash of any amounts accrued and unpaid as of the Petition Date due to such holder of an Allowed 2021 Letter of Credit Claim pursuant to Section 2.15 of the 2021 LC Agreement.

    (c)    *Voting:* Class 5 is Impaired under the Plan. Holders of 2021 Letter of Credit Claims are entitled to vote to accept or reject the Plan.

6.    <u>Class 6A – 2023 Letter of Credit Claims</u>

    (a)    *Classification:* Class 6A consists of all 2023 Letter of Credit Claims.

    (b)    *Treatment*: Each holder of an Allowed 2023 Letter of Credit Claim shall receive:

    (i)    with respect to any 2023 Letter of Credit Claims on account of unfunded 2023 Letters of Credit, participation in the Roll-Off LC Exit Facility in an amount equal to each such holder's Allowed 2023 Letter of Credit Claim,

    (ii)    with respect to any 2023 Letter of Credit Claims on account of funded 2023 Letters of Credit, its Secured Creditor Pro Rata Share of the Secured Creditor Funded Debt Distribution, and

    (iii)    payment in full in Cash of any amounts accrued and unpaid as of the Petition Date due to such holder of an Allowed 2023 Letter of Credit Claim pursuant to Section 2.15 of the Credit Agreement.

    (c)    *Voting:* Class 6A is Impaired under the Plan. Holders of 2023 Letter of Credit Claims are entitled to vote to accept or reject the Plan.

7.    <u>Class 6B – Revolving Credit Claims</u>

    (a)    *Classification:* Class 6B consists of all Revolving Credit Claims.

    (b)    *Allowed Amount:* As of the Effective Date, the Revolving Credit Claims shall be Allowed and deemed to be Allowed Claims in the full amount outstanding under the Revolving Credit Facility, including all principal, accrued and unpaid interest at the applicable default rate, and all accrued and unpaid fees, expenses, and noncontingent indemnity payable under the Revolving Credit Facility and the DIP Financing Order.

    (c)    *Treatment*: Each holder of an Allowed Revolving Credit Claim shall receive:

    (i)    with respect to any Revolving Credit Claims on account of unfunded Revolving LCs, participation in the Roll-Off LC Exit Facility in an amount equal to each such holder's Allowed Revolving Credit Claim,

    (ii)    with respect to any Revolving Credit Claims on account of (x) Revolving Loans or (y) funded Revolving LCs, its Secured Creditor Pro Rata Share of the Secured Creditor Funded Debt Distribution, and

    (iii)    payment in full in Cash of any amounts accrued and unpaid as of the Petition Date due to such holder of an Allowed Revolving Credit Claim pursuant to Section

2.15 of the Credit Agreement.

    (d)    *Voting:*  Class 6B is Impaired under the Plan.  Holders of Revolving Credit Claims are entitled to vote to accept or reject the Plan.

8.    <u>Class 6C – Term Loan Claims</u>

    (a)    *Classification*:  Class 6C consists of all Term Loan Claims.

    (b)    *Allowed Amount*: As of the Effective Date, the Term Loan Claims shall be Allowed and deemed to be Allowed Claims in the full amount outstanding under the Term Loan Facility, including all principal, accrued and unpaid interest at the applicable default rate, and all accrued and unpaid fees, expenses, and noncontingent indemnity payable under the Term Loan Facility and the DIP Financing Order.

    (c)    *Treatment*:  Each holder of an Allowed Term Loan Claim shall receive its Secured Creditor Pro Rata Share of the Secured Creditor Funded Debt Distribution.

    (d)    *Voting*:  Class 6C is Impaired under the Plan.  Holders of Term Loan Claims are entitled to vote to accept or reject the Plan.

9.    <u>Class 6D – Credit Agreement Hedging Claims</u>

    (a)    *Classification*:  Class 6D consists of all Credit Agreement Hedging Claims.

    (b)    *Treatment*:  Each holder of an Allowed Credit Agreement Hedging Claim that remains unpaid as of the Effective Date shall receive for any Allowed Credit Agreement Hedging Claims such holder's Secured Creditor Pro Rata Share of the Secured Creditor Funded Debt Distribution.

    (c)    *Voting*:  Class 6D is Impaired under the Plan.  Holders of Credit Agreement Hedging Claims are entitled to vote to accept or reject the Plan.

10.    <u>Class 7 – Cash Secured Letter of Credit Claims</u>

    (a)    *Classification:*  Class 7 consists of all Cash Secured Letter of Credit Claims.

    (b)    *Treatment*:  Each holder of an Allowed Cash Secured Letter of Credit Claim outstanding as of such date shall:

        (i)    be deemed to reissue its Cash Secured Letters of Credit under the Cash Secured LC Exit Facility which shall be secured by the same cash collateral which secured the Cash Secured Letters of Credit prior to the Petition Date, and

        (ii)    payment in full in Cash of any amounts accrued and unpaid as of the Petition Date due to such holder of an Allowed Cash Secured Letter of Credit Claim pursuant to Section 2.15 of the Credit Agreement.

    (c)    *Voting:*  Class 7 is Impaired under the Plan.  Holders of Cash Secured Letter of Credit Claims are entitled to vote to accept or reject the Plan.

11.  <u>Class 8 – Lloyds Letter of Credit Claims</u>

    (a)    *Classification:*  Class 8 consists of all Lloyds Letter of Credit Claims.

    (b)    *Treatment*:  Each holder of an Allowed Lloyds Letter of Credit Claim shall receive:

        (i)    with respect to any Lloyds Letter of Credit Claims on account of unfunded Lloyds Letters of Credit, participation in the Roll-Off LC Exit Facility in amount equal to such Allowed Lloyds Letter of Credit Claim,

        (ii)    with respect to any Lloyds Letter of Credit Claims on account of funded Lloyds Letters of Credit, its Secured Creditor Pro Rata Share of the Secured Creditor Funded Debt Distribution, and

        (iii)    payment in full in Cash of any amounts accrued and unpaid as of the Petition Date due to such holder of an Allowed Lloyds Letter of Credit Claim pursuant to Section 2(b) of the Lloyds Letter of Credit Agreement.

    (c)    *Voting:*  Class 8 is Impaired under the Plan.  Holders of Lloyds Letter of Credit Claims are entitled to vote to accept or reject the Plan.

12.  <u>Class 9 – Senior Notes Claims</u>

    (a)    *Classification*:  Class 9 consists of all Senior Notes Claims.

    (b)    *Allowed Amount*: $[●].

    (c)    *Treatment*:  Each holder of an Allowed Senior Notes Claim shall receive its pro rata share of:

        (i)    6% of the New Common Stock, plus additional shares of New Common Stock as a result of the Prepetition Funded Secured Claims Excess Cash Adjustment, subject to dilution on account of the New Warrants and the Management Incentive Plan; and

        (ii)    the New Warrants.

    (d)    *Voting:*  Class 9 is Impaired under the Plan.  Holders of Senior Notes Claims are entitled to vote to accept or reject the Plan.

13.  <u>Class 10 – General Unsecured Claims</u>

    (a)    *Classification:*  Class 10 consists of all General Unsecured Claims.

    (b)    *Treatment:*  Each holder of an Allowed General Unsecured Claim shall receive, at the option of the applicable Debtor:

        (i)    payment in full in Cash; or

        (ii)    Reinstatement.

    (c)    *Voting:* Class 10 is Unimpaired under the Plan.  Holders of General Unsecured Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, such holders are not entitled to vote to accept or reject the Plan.

14. Class 11 – Intercompany Claims

    (a)    *Classification*:  Class 11 consists of all Intercompany Claims.

    (b)    *Treatment*:  Each Allowed Intercompany Claim shall be, at the option of the applicable Debtor (with the consent of the Required Consenting Lenders), either:

        (i)    Reinstated;

        (ii)    canceled, released, and extinguished, and will be of no further force or effect; or

        (iii)    otherwise addressed at the option of each applicable Debtor such that holders of Intercompany Claims will not receive any distribution on account of such Intercompany Claims.

    (c)    *Voting*:   Class 11 is conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code or rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Class 11 is not entitled to vote to accept or reject the Plan.

15. Class 12 – Existing Equity Interests Other Than in McDermott

    (a)    *Classification*:  Class 12 consists of all Existing Equity Interests Other Than in McDermott.

    (b)    *Treatment:*  Each Existing Equity Interests Other Than in McDermott shall be, at the option of the applicable Debtor, either:

        (i)    Reinstated;

        (ii)    canceled, released, and extinguished, and will be of no further force or effect; or

        (iii)    otherwise addressed at the option of each applicable Debtor such that holders of Existing Equity Interests Other Than in McDermott will not receive any distribution on account of such Existing Equity Interests Other Than in McDermott.

    (c)    *Voting*:   Class 12 is conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code or rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Class 12 is not entitled to vote to accept or reject the Plan.

16. Class 13 – Existing Preferred Equity Interests

    (a)    *Classification*:  Class 13 consists of all Existing Preferred Equity Interests.

    (b)    *Treatment:*  Holders of Existing Preferred Equity Interests will not receive any distribution on account of such Interests, which will be canceled, released, and extinguished as of the Effective Date, and will be of no further force or effect.

    (c)    *Voting*:   Class 13 is conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Class 13 is not entitled to vote to accept or reject the Plan.

17. Class 14 – Existing Common Equity Interests

    (a)    *Classification*:  Class 14 consists of all Existing Common Equity Interests.

(b)    *Treatment*:  Holders of Existing Common Equity Interests will not receive any distribution on account of such Interests, which will be canceled, released, and extinguished as of the Effective Date, and will be of no further force or effect.

(c)    *Voting*:   Class 14 is conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Class 14 is not entitled to vote to accept or reject the Plan.

C.    *Special Provision Governing Unimpaired Claims.*

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtors' or the Reorganized Debtors' rights regarding any Unimpaired Claim, including, all rights regarding legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claim.

D.    *Elimination of Vacant Classes.*

Any Class of Claims or Interests that does not have a holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

E.    *Voting Classes, Presumed Acceptance by Non-Voting Classes.*

If a Class contains Claims or Interests eligible to vote and no holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the holders of such Claims or Interests in such Class shall be deemed to have accepted the Plan.

F.    *Intercompany Interests.*

To the extent Reinstated under the Plan, distributions on account of Intercompany Interests are not being received by holders of such Intercompany Interests on account of their Intercompany Interests but for the purposes of administrative convenience and due to the importance of maintaining the prepetition corporate structure for the ultimate benefit of the holders of New Common Stock, and in exchange for the Debtors' and Reorganized Debtors' agreement under the Plan to make certain distributions to the holders of Allowed Claims.

G.    *Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code.*

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by one or more of the Classes entitled to vote pursuant to Article III.B of the Plan. The Debtors reserve the right, subject to the prior consent of the Required Consenting Lenders, which shall not be unreasonably withheld,  to modify the Plan in accordance with Article X hereof and the Restructuring Support Agreement to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules.

H.    *Controversy Concerning Impairment.*

If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

I.    *Subordinated Claims.*

The allowance, classification, and treatment of all Allowed Claims and Allowed Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the

Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise. Any such contractual, legal, or equitable subordination rights shall be settled, compromised, and released pursuant to the Plan.

## ARTICLE IV.
## MEANS FOR IMPLEMENTATION OF THE PLAN

A.      *General Settlement of Claims and Interests.*

As discussed in detail in the Disclosure Statement and as otherwise provided herein, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims and Interests and controversies resolved pursuant to the Plan, including (1) any challenge to the amount, validity, perfection, enforceability, priority or extent of the DIP Claims, Superpriority Term Loan Claims, 2021 Letter of Credit Claims, 2023 Letter of Credit Claims, Revolving LC Claims, Revolving Loan Claims, Term Loan Claims, Cash Secured Letter of Credit Claims, Credit Agreement Hedging Claims, and Senior Notes Claims and (2) any claim to avoid, subordinate, or disallow any 2021 Letter of Credit Claims, 2023 Letter of Credit Claims, Revolving LC Claims, Revolving Loan Claims, Term Loan Claims, Cash Secured Letter of Credit Claims, Credit Agreement Hedging Claims, and Senior Notes Claims, whether under any provision of chapter 5 of the Bankruptcy Code, on any equitable theory (including equitable subordination, equitable disallowance, or unjust enrichment) or otherwise. The Plan shall be deemed a motion to approve the good faith compromise and settlement of all such Claims, Interests, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable and in the best interests of the Debtors and their Estates. Subject to Article VI hereof, all distributions made to holders of Allowed Claims and Allowed Interests (as applicable) in any Class are intended to be and shall be final.

B.      *Restructuring Transactions.*

On or before the Effective Date, the applicable Debtors or the Reorganized Debtors shall enter into and shall take any actions as may be necessary or appropriate to effect the Restructuring Transactions, including as set forth in the Restructuring Transactions Memorandum. The actions to implement the Restructuring Transactions may include: (1) the execution and delivery of appropriate agreements or other documents of merger, amalgamation, consolidation, restructuring, conversion, disposition, transfer, arrangement, continuance, dissolution, sale, purchase, or liquidation containing terms that are consistent with the terms of the Plan and that satisfy the applicable requirements of applicable law and any other terms to which the applicable Entities may agree; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable parties agree; (3) the filing of appropriate certificates or articles of incorporation, formation, reincorporation, merger, consolidation, conversion, amalgamation, arrangement, continuance, or dissolution pursuant to applicable state or provincial law; and (4) all other actions that the applicable Entities determine to be necessary, including making filings or recordings that may be required by applicable law in connection with the Plan. The Confirmation Order shall, and shall be deemed to, pursuant to sections 363 and 1123 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, contemplated by, or necessary to effectuate the Plan. On the Effective Date or as soon as reasonably practicable thereafter, the Reorganized Debtors, as applicable, shall issue all securities, notes, instruments, certificates, and other documents required to be issued pursuant to the Restructuring Transactions.

C.      *Reorganized Debtors.*

On the Effective Date, the New Board shall be established, and the Reorganized Debtors shall adopt their New Organizational Documents. The Reorganized Debtors shall be authorized to adopt any other agreements, documents, and instruments and to take any other actions contemplated under the Plan as necessary to consummate

the Plan. Cash payments to be made pursuant to the Plan will be made by the Debtors or Reorganized Debtors. The Debtors and Reorganized Debtors will be entitled to transfer funds between and among themselves as they determine to be necessary or appropriate to enable the Debtors or Reorganized Debtors, as applicable, to satisfy their obligations under the Plan. Except as set forth herein, any changes in intercompany account balances resulting from such transfers will be accounted for and settled in accordance with the Debtors' historical intercompany account settlement practices and will not violate the terms of the Plan.

From and after the Effective Date, the Reorganized Debtors, subject to any applicable limitations set forth in any post-Effective Date agreement, shall have the right and authority without further order of the Bankruptcy Court to raise additional capital and obtain additional financing, subject to the New Organizational Documents and the Exit Facility Documents, as the boards of directors of the applicable Reorganized Debtors deem appropriate.

D.    *Technology Business Sale.*

1.    Technology Business Sale Process.

Following the Petition Date, in consultation with the Consultation Parties (as defined in the Bidding Procedures), the Debtors shall continue their sale and marketing process and solicit bids for the sale or other disposition of all or substantially all of the Technology Business Sale, in accordance with the terms and conditions of the Restructuring Support Agreement (including the Milestones (as defined in the Restructuring Support Agreement)) and in a manner acceptable to the Required Consenting Lenders. For the avoidance of doubt, the Debtors may only execute an agreement for the sale or other disposition of any part of the Technology Business with the consent of the Required Consenting Lenders.

The Consultation Parties shall have the right to review all information, diligence, documents and other materials provided by the Debtors or their advisors to any bidder or prospective bidder in connection with the Technology Business Sale and to consult with the Debtors and their advisors with respect to the Technology Business Sale. The Debtors shall provide to the Consultation Parties all term sheets, letters, proposals, offers, bids and other materials, whether non-binding or not, that are received by the Debtors or their advisors in connection with the Technology Business Sale within one (1) day of receipt by the Debtors or their advisors, as applicable.

2.    Closing of the Technology Business Sale.

On or before the Effective Date, the Debtors shall be authorized to consummate the Technology Business Sale and, among other things, the Lummus Assets and Interests (including Executory Contracts and Unexpired Leases assumed and assigned pursuant to Article V hereof) shall be transferred to and vest in the Purchaser free and clear of all Liens, Claims, charges, or other encumbrances pursuant to the terms of the Purchase Agreement and, as applicable, the Confirmation Order or an order approving the Technology Business Sale; *provided* that, to the extent the Technology Business Sale is to be consummated pursuant to the Confirmation Order, the Debtors may request entry of any order supplementing the Confirmation Order that the Debtors believe is necessary or appropriate to implement the terms and conditions of the Technology Business Sale. On and after the Effective Date, except as otherwise provided in the Plan, the Debtors or the Purchaser, as applicable, may operate the Debtors' businesses and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

3.   Technology Business Sale Proceeds Waterfall.

Any Technology Business Sale Proceeds that have not otherwise been applied in accordance with the DIP Credit Agreement shall be applied as follows:

(a)   first, to fund the minimum Cash balance of $820 million, as required by the Business Plan;

(b)   second, to repay Funded DIP Indebtedness (other than the Make Whole Amount);

(c)   third, payment of the Make Whole Amount; and

(d)   fourth, to fund cash to support new or additional letters of credit sufficient to meet the $2.44 billion letter of credit capacity contemplated by the Exit Facilities Term Sheet; and

(e)   fifth, the repayment of Prepetition Funded Secured Claims on a Pro Rata basis.

4.   Residual Prepetition Funded Secured Claims Pay Down.

On the Effective Date, the Prepetition Funded Secured Claims will be repaid on a pro rata basis from (i) the Residual Technology Business Sale Proceeds and (ii) any available Cash (such available Cash shall exclude Cash held in variable interest entities associated with joint venture and consortium arrangements, Cash trapped in foreign jurisdictions, and insurance captive Cash) in excess of $820 million available cash at emergence after payment of all fees and transaction expenses ((i) and (ii) together the "Residual Prepetition Funded Secured Claims Pay Down").

If the Residual Prepetition Funded Secured Claims Pay Down amount is greater than $0, the initial allocation of 94% of the New Common Stock to the holders of Prepetition Funded Secured Claims shall be reduced, and the initial allocation of 6% of the New Common Stock to holders of Senior Notes Claim shall be increased, by the percentage calculated by dividing:

(a)   the Residual Prepetition Funded Secured Claims Pay Down amount by

(b)   an amount equal to:

(i)   the aggregate amount of Prepetition Funded Secured Claims (including, without limitation, principal and any accrued prepetition or postpetition interest at the default rate as applicable) minus an amount equal to the sum of (y) the aggregate amount of the loans to be issued under the Term Loan Exit Facility and (z) any proceeds of the Rights Offering up to $150 million; divided by

(ii)   94% minus an amount equal to (y) the aggregate proceeds of the Rights Offering up to $150 million divided by (z) Plan Equity Value

(such adjustment of initial allocations, the "Prepetition Funded Secured Claims Excess Cash Adjustment").

For the avoidance of doubt, if the Technology Business Sale Proceeds paid pursuant to the Technology Business Sale Proceeds Waterfall have not paid the Make Whole Amount in full, all proceeds of the Rights Offering will (a) first go to the pay down of the Make Whole Amount and (b) once the Make Whole Amount is paid in full, the Prepetition Funded Secured Claims will be repaid on a pro rata basis from such remaining proceeds of the Rights Offering.

E.   Sources of Consideration for Plan Distributions.

The Debtors and the Reorganized Debtors, as applicable, shall fund distributions under the Plan with: (1) Cash on hand, including Cash from operations, the Rights Offering, or the Technology Business Sale in accordance

with the Technology Business Sale Proceeds Waterfall, as applicable; (2) the New Common Stock; (3) the proceeds from the Rights Offering; (4) the New Warrants; and (5) the proceeds from the Exit Facilities, as applicable.

    1.   Exit Facilities.

    On the Effective Date, the Reorganized Debtors shall enter into the Exit Facilities, the terms of which will be set forth in the Exit Facility Documents.

    To the extent applicable, Confirmation of the Plan shall be deemed (a) approval of the Exit Facilities (including the transactions and related agreements contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred and fees and expenses to be paid by the Debtors or the Reorganized Debtors, as applicable, in connection therewith), to the extent not approved by the Bankruptcy Court previously, and (b) authorization for the Debtors or the Reorganized Debtors, as applicable, to, without further notice to or order of the Bankruptcy Court, (i) execute and deliver those documents and agreements necessary or appropriate to pursue or obtain the Exit Facilities, including the Exit Facility Documents, and incur and pay any fees and expenses in connection therewith, and (ii) act or take action under applicable law, regulation, order, or rule or vote, consent, authorization, or approval of any Person, subject to such modifications as the Debtors or the Reorganized Debtors, as applicable, may deem to be necessary to consummate the Exit Facilities.

    As of the Effective Date, upon the granting or continuation of Liens in accordance with the Exit Facility Documents, such Liens shall constitute valid, binding, enforceable, and automatically perfected Liens in the collateral specified in the Exit Facility Documents.  To the extent provided in the Exit Facility Documents, the Exit Facility Agents or holder(s) of Liens under the Exit Facility Documents are authorized to file with the appropriate authorities mortgages, financing statements and other documents, and to take any other action in order to evidence, validate, and perfect such Liens or security interests.  The guarantees, mortgages, pledges, Liens, and other security interests granted to secure the obligations arising under the Exit Facility Documents have been granted in good faith, for legitimate business purposes, and for reasonably equivalent value as an inducement to the lenders thereunder to extent credit thereunder shall be deemed not to constitute a fraudulent conveyance or fraudulent transfer and shall not otherwise be subject to avoidance, recharacterization, or subordination for any purposes whatsoever and shall not constitute preferential transfers or fraudulent conveyances under the Bankruptcy Code or any applicable nonbankruptcy law, and the priorities of such Liens and security interests shall be as set forth in the Exit Facility Documents.  The Reorganized Debtors and the persons and entities granted such Liens and security interests shall be authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, federal, or other law that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order and any such filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

    In no event shall the sum of (v) the face amount of letters of credit issued and outstanding at any time under the Senior Exit LC Facility, plus (w) the face amount of letters of credit issued and outstanding at any time under the Super Senior Exit Facility, plus (x) the face amount of letters of credit issued or deemed issued and outstanding at any time under the Roll-Off LC Exit Facility, plus (y) the face amount of letters of credit issued and outstanding at any time under the Cash Secured LC Exit Facility, exceed the Secured Letter of Credit Cap plus permitted incremental capacity set forth in the Exit Facilities Term Sheet.

    2.   Issuance of New Common Stock.

    The issuance of the New Common Stock, including the Rights Offering Shares and any options or other equity awards, if any, reserved for the Management Incentive Plan and the New Warrants, by the Reorganized Debtors (as set forth in the Restructuring Transactions Memorandum) shall be authorized without the need for any further corporate action or without any further action by the holders of Claims or Interests.  The Reorganized Debtors shall be authorized to issue a certain number of shares, units or equity interests (as the case may be based on how the New Common Stock is denominated and the identity of the Reorganized Debtor issuing such shares, units, or equity interests) of New Common Stock required to be issued under the Plan and pursuant to their New Organizational Documents.  On the Effective Date, the Debtors or Reorganized Debtors, as applicable, shall issue all Securities, notes, instruments, certificates, and other documents required to be issued pursuant to the Plan.

All of the shares, units, or equity interests (as the case may be based on how the New Common Stock is denominated) of New Common Stock issued or authorized to be issued pursuant to the Plan shall be duly authorized, validly issued, fully paid, and non-assessable.  Each distribution and issuance referred to in Article VI hereof shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.

On the Effective Date or as soon as reasonably practicable thereafter, the New Common Stock will be distributed in accordance with the Plan.

3.   Rights Offering.

In accordance with the Restructuring Support Agreement, the applicable Reorganized Debtor shall consummate the Rights Offering, through which each Consenting Noteholder shall have the opportunity, subject to the terms and conditions set forth in the Plan and the Rights Offering Procedures, to purchase the Rights Offering Shares.

The Rights Offering Procedures shall be approved within 5 days of Petition Date and shall provide for a subscription deadline of no later than the Voting Deadline.  Subscription rights to participate in the Rights Offering shall be distributed to the Consenting Noteholders in accordance with the Restructuring Support Agreement, the Restructuring Term Sheet, and the Plan and the issuance of such subscription rights will be exempt from SEC registration under applicable law.  Proceeds of the Rights Offering to be used (a) first, for Cash pay down of any portion Make Whole Amount that is not paid in full in Cash from Technology Business Sale Proceeds in accordance with the Technology Business Sale Proceeds Waterfall and (b) second, for Cash pay down of Prepetition Funded Secured Claims.

4.   Issuance of New Warrants.

On the Effective Date, the applicable Reorganized Debtor (as set forth in the Restructuring Transactions Memorandum) will issue the New Warrants only to the extent required to provide for distributions to holders of the Senior Notes Claims, as contemplated by this Plan.  All of the New Warrants issued pursuant to the Plan shall be duly authorized without the need for any further corporate action and without any further action by the Debtors or Reorganized Debtors, as applicable, validly issued, fully paid, and non-assessable.  Each distribution and issuance referred to in Article VI hereof shall be governed by the terms and conditions set forth in the Restructuring Support Agreement, the Plan, and the New Warrant Agreements applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance without the need for execution by any party thereto other than the applicable Reorganized Debtor(s).

The New Warrants shall be distributed to holders of Senior Notes Claims in accordance with the Restructuring Support Agreement and the Plan.  The New Warrants shall have full customary anti-dilution and Black-Scholes protection.

F.   *Corporate Existence.*

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, each Debtor shall continue to exist after the Effective Date as a separate corporate entity, limited liability company, partnership, or other form, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other formation documents) in effect prior to the Effective Date, except to the extent such certificate of incorporation and bylaws (or other formation documents) are amended under the Plan or otherwise, in each case, consistent with the Plan and the Restructuring Support Agreement, and to the extent such documents are amended in accordance therewith, such documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite filings required under applicable state, provincial, or federal law).

After the Effective Date, the respective certificate of incorporation and bylaws (or other formation documents) of one or more of the Reorganized Debtors may be amended or modified on the terms therein without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.  After the Effective Date, one or more of the Reorganized Debtors may be disposed of, dissolved, wound down, or liquidated without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

G.       *Vesting of Assets in the Reorganized Debtors.*

Except as otherwise provided in the Confirmation Order, the Plan (including, for the avoidance of doubt, the Restructuring Transactions Memorandum), or any agreement, instrument, or other document incorporated in, or entered into in connection with or pursuant to, the Plan or Plan Supplement, on the Effective Date, all property in each Estate, all Causes of Action, and any property acquired by any of the Debtors pursuant to the Plan shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances.  On and after the Effective Date, except as otherwise provided in the Plan, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

H.       *Cancellation of Existing Securities and Agreements.*

On the Effective Date, except to the extent otherwise provided in the Plan or the Confirmation Order, all notes, instruments, certificates, credit agreements, indentures, and other documents evidencing Claims or Interests shall be cancelled and the obligations of the Debtors thereunder or in any way related thereto shall be deemed satisfied in full, cancelled, discharged, and of no force or effect.  Holders of or parties to such cancelled instruments, Securities, and other documentation will have no rights arising from or relating to such instruments, Securities, and other documentation, or the cancellation thereof, except the rights provided for pursuant to this Plan.  Notwithstanding anything to the contrary herein, but subject to any applicable provisions of Article VI hereof, to the extent cancelled pursuant to this paragraph, the DIP Credit Agreement, 2021 LC Agreement, the Credit Agreement, and the Senior Notes Indenture shall continue in effect solely to the extent necessary to:  (1) permit holders of Claims under the DIP Credit Agreement, the 2021 LC Agreement, the Credit Agreement, and the Senior Notes Indenture to receive their respective Plan Distributions, if any; (2) permit the Reorganized Debtors and the Disbursing Agent, as applicable, to make Plan Distributions on account of the Allowed Claims under the DIP Credit Agreement, the 2021 LC Agreement, the Credit Agreement, and the Senior Notes Indenture, as applicable; (3) permit each of the DIP Agents, the Revolving and LC Administrative Agent, the Term Loan Administrative Agent, the 2021 LC Administrative Agent, the Superpriority Term Loan Agent, and the Senior Notes Trustee to seek compensation and/or reimbursement of fees and expenses in accordance with the terms of this Plan; and (4) permit each of the DIP Agent, the Revolving and LC Administrative Agent, the Term Loan Administrative Agent, the 2021 LC Administrative Agent, Superpriority Term Loan Agent, and the Senior Notes Trustee to appear and be heard in the Chapter 11 Cases or in any proceeding in the Bankruptcy Court, including to enforce any obligation owed to the DIP Agent, the Revolving and LC Administrative Agent, the Term Loan Administrative Agent, the 2021 LC Administrative Agent, the Superpriority Term Loan Agent, and the Senior Notes Trustee, or holders of Claims under the DIP Credit Agreement, the 2021 LC Agreement, the Credit Agreement, and the Senior Notes Indenture.  Except as provided in this Plan (including Article VI hereof), on the Effective Date, the DIP Agents, the Revolving and LC Administrative Agent, the Term Loan Administrative Agent, the 2021 LC Administrative Agent, the Superpriority Term Loan Agent, and the Senior Notes Trustee, and their respective agents, successors, and assigns, shall be automatically and fully discharged of all of their duties and obligations associated with the DIP Credit Agreement, the 2021 LC Agreement, the Credit Agreement, and the Senior Notes Indenture, as applicable.  To the extent cancelled in accordance with this paragraph, the commitments and obligations (if any) of the holders of the Senior Notes and the lenders under the DIP Credit Agreement, the Credit Agreement, and the 2021 LC Agreement to extend any further or future credit or financial accommodations to any of the Debtors, any of their respective subsidiaries or any of their respective successors or assigns under the 2021 LC Agreement, the Credit Agreement, and the Senior Notes Indenture, as applicable, shall fully terminate and be of no further force or effect on the Effective Date.

I.      *Corporate Action.*

Upon the Effective Date, all actions contemplated under the Plan shall be deemed authorized and approved in all respects, including: (1) adoption or assumption, as applicable, of the Compensation and Benefit Programs; (2) selection of the directors and officers for the Reorganized Debtors; (3) the issuance and distribution of the New Common Stock; (4) implementation of the Restructuring Transactions, including the Rights Offering; (5) issuance and distribution of the New Warrants; (6) entry into the New Warrants Agreements and the Exit Facility Documents, as applicable; (7) all other actions contemplated under the Plan (whether to occur before, on, or after the Effective Date); (8) adoption of the New Organizational Documents; (9) the rejection, assumption, or assumption and assignment, as applicable, of Executory Contracts and Unexpired Leases; and (10) all other acts or actions contemplated or reasonably necessary or appropriate to promptly consummate the Restructuring Transactions contemplated by the Plan (whether to occur before, on, or after the Effective Date).  All matters provided for in the Plan involving the corporate structure of the Debtors or the Reorganized Debtors, and any corporate, partnership, limited liability company, or other governance action required by the Debtors or the Reorganized Debtor, as applicable, in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the Security holders, members, directors, or officers of the Debtors or the Reorganized Debtors, as applicable.  On or (as applicable) prior to the Effective Date, the appropriate officers of the Debtors or the Reorganized Debtors, as applicable, shall be authorized and (as applicable) directed to issue, execute, and deliver the agreements, documents, Securities, and instruments contemplated under the Plan (or necessary or desirable to effect the transactions contemplated under the Plan) in the name of and on behalf of the Reorganized Debtors, including the New Common Stock, the New Organizational Documents, the Exit Facility Documents, the New Warrants, the New Warrants Agreements (as applicable), and any and all other agreements, documents, Securities, and instruments relating to the foregoing.  The authorizations and approvals contemplated by this Article IV.I shall be effective notwithstanding any requirements under non-bankruptcy law.

J.      *New Organizational Documents.*

On or immediately prior to the Effective Date, the New Organizational Documents shall be automatically adopted by the applicable Reorganized Debtors.  To the extent required under the Plan or applicable non-bankruptcy law, each of the Reorganized Debtors will file its New Organizational Documents with the applicable Secretaries of State and/or other applicable authorities in its respective state or country of organization if and to the extent required in accordance with the applicable laws of the respective state or country of organization.  The New Organizational Documents will (a) prohibit the issuance of non-voting equity Securities, to the extent required under section 1123(a)(6) of the Bankruptcy Code and (b) provide for customary minority shareholder protections and information and reporting requirements subject to the consent rights set forth in Section 3.02 of the Restructuring Support Agreement.

After the Effective Date, the Reorganized Debtors may amend and restate their respective New Organizational Documents in accordance with the terms thereof, and the Reorganized Debtors may file such amended certificates or articles of incorporation, bylaws, or such other applicable formation documents, and other constituent documents as permitted by the laws of the respective states, provinces, or countries of incorporation and the New Organizational Documents.

K.      *Indemnification Obligations.*

Consistent with applicable law, all indemnification provisions in place as of the Effective Date (whether in the by-laws, certificates of incorporation or formation, limited liability company agreements, other organizational documents, board resolutions, indemnification agreements, employment contracts, or otherwise) for current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of the Debtors, as applicable, shall be reinstated and remain intact, irrevocable, and shall survive the effectiveness of the Plan on terms no less favorable to such current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of the Debtors than the indemnification provisions in place prior to the Effective Date[; *provided* that the Reorganized Debtors shall not indemnify officers, directors, managers, employees, attorneys, accountants, investment bankers, or other professionals of the Debtors for any claims or Causes

36

of Action arising out of or relating to any act or omission that is a criminal act or constitutes intentional fraud, gross negligence, or willful misconduct.]

L.      *Directors and Officers of the Reorganized Debtors.*

The New Board will consist of [●] directors: (i) the Chief Executive Officer of Reorganized McDermott, (ii) [●] directors selected by the Required Consenting Term Lenders, and (iii) [●] directors selected by the Required Consenting Revolving Lenders and the Required Consenting LC Lenders. The identities of directors on the New Board shall be set forth in the Plan Supplement to the extent known at the time of filing. Corporate governance for Reorganized McDermott, including charters, bylaws, operating agreements, or other organization documents, as applicable, shall: (a) be consistent with the Restructuring Term Sheet, Section 3 of the Restructuring Support Agreement, and section 1123(a)(6) of the Bankruptcy Code; and (b) provide for customary minority shareholder protections and information and reporting requirements reasonably acceptable to the Debtors and the Required Consenting Stakeholders.

M.      *Effectuating Documents; Further Transactions.*

On and after the Effective Date, the Reorganized Debtors, and their respective officers, directors, members, or managers (as applicable), are authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, Exit Facilities entered into, and the Securities issued pursuant to the Plan in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorization, or consents except for those expressly required pursuant to the Plan.

N.      *Section 1146 Exemption.*

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfers (whether from a Debtor to a Reorganized Debtor or to any other Person) of property under the Plan or pursuant to: (1) the issuance, distribution, transfer, or exchange of any debt, equity Security, or other interest in the Debtors or the Reorganized Debtors, including the New Common Stock and the New Warrants; (2) the Restructuring Transactions; (3) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (4) the making, assignment, or recording of any lease or sublease; (5) the grant of collateral as security for the Reorganized Debtors' obligations under and in connection with the Exit Facilities; or (6) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, personal property transfer tax, sales or use tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment. All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146(a) of the Bankruptcy Code, shall forego the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

O.      *Director and Officer Liability Insurance.*

Notwithstanding anything in the Plan to the contrary, the Reorganized Debtors shall be deemed to have assumed all of the Debtors' D&O Liability Insurance Policies pursuant to section 365(a) of the Bankruptcy Code effective as of the Effective Date. Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Reorganized Debtors' foregoing assumption of each of the unexpired D&O Liability Insurance Policies. Notwithstanding anything to the contrary contained in the Plan, Confirmation of the Plan shall not discharge, impair,

or otherwise modify any indemnity obligations assumed by the foregoing assumption of the D&O Liability Insurance Policies, and each such indemnity obligation will be deemed and treated as an Executory Contract that has been assumed by the Debtors under the Plan as to which no Proof of Claim need be filed.

In addition, after the Effective Date, none of the Reorganized Debtors shall terminate or otherwise reduce the coverage under any D&O Liability Insurance Policies (including any "tail policy") in effect on or after the Petition Date, with respect to conduct occurring prior thereto, and all directors and officers of the Debtors who served in such capacity at any time prior to the Effective Date shall be entitled to the full benefits of any such policy for the full term of such policy, to the extent set forth therein, regardless of whether such directors and officers remain in such positions after the Effective Date.

P.    *Management Incentive Plan.*

Effective on the Effective Date, the Reorganized Debtors will reserve 7.5% of New Common Stock (on a fully diluted and fully distributed basis) which may be granted in the form of options, restricted stock, restricted stock units, warrants, stock appreciations rights or any combination thereof (each an "**Award**" and such reserve, the "**MIP Pool**") for grant to management employees and members of the New Board and enter into severance and change in control arrangements ("**Severance Arrangements**") with senior executives of the Debtors that are insiders pursuant to Section 16 of the Exchange Act ("**Senior Executives**") in amounts and on terms and conditions to be agreed with and approved by the Required Consenting Lenders.  The New Board shall grant no less than 53.33% of the MIP Pool to the employees of the Debtors no later than 60 days following the Effective Date (the "**Emergence Awards**") with the terms of the Emergence Awards to be determined as set forth below and the remainder of the MIP Pool will be available for future grants to management employees and members of the New Board with allocations, terms and conditions to be determined by the New Board.  From the Petition Date through entry of the Confirmation Order, the Debtors, the Required Consenting Lenders and any consultants or advisors engaged by the Required Consenting Lenders will use commercially reasonable efforts to agree on an allocation schedule and the terms, conditions, vesting and composition (including, for the avoidance of doubt, which may be in any form of Award) of the Emergence Awards (together, the "**MIP Proposal**"), and during this period the Debtors will use commercially reasonable efforts to facilitate meetings between the Required Consenting Lenders and the Debtors' key management personnel.  As soon as reasonably practicable following the Effective Date but no later than 60 days following the Effective Date, the New Board shall consider the MIP Proposal for approval and New Board shall determine the final terms and conditions of the actual grants.  A Senior Executive will be permitted to voluntarily terminate for "Good Reason" and receive the severance benefits under the Severance Arrangements if the Senior Executive does not receive an Emergence Award.

Q.    *Employee and Retiree Benefits.*

Unless otherwise provided herein, and subject to Article V hereof, all employee wages, compensation, and benefit programs in place as of the Effective Date with the Debtors shall be assumed by the Reorganized Debtors and shall remain in place as of the Effective Date, and the Reorganized Debtors will continue to honor such agreements, arrangements, programs, and plans.  For the avoidance of doubt, pursuant to section 1129(a)(13) of the Bankruptcy Code, from and after the Effective Date, all retiree benefits (as such term is defined in section 1114 of the Bankruptcy Code), if any, shall continue to be paid in accordance with applicable law.  On the Effective Date, the Debtors shall enter into severance and change in control arrangements with Senior Executives in amounts and on terms and conditions to be agreed with and approved by the Required Consenting Lenders.

R.    *Preservation of Causes of Action.*

In accordance with section 1123(b) of the Bankruptcy Code, but subject to Article VIII hereof, each Reorganized Debtor, as applicable, shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action of the Debtors, whether arising before or after the Petition Date, including any actions specifically enumerated in the Schedule of Retained Causes of Action, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date, other than the Causes of Action released by the Debtors pursuant to the releases and exculpations

contained in the Plan, including in Article VIII hereof, which shall be deemed released and waived by the Debtors and the Reorganized Debtors as of the Effective Date.

The Reorganized Debtors may pursue such retained Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors. **No Entity (other than the Released Parties) may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors or the Reorganized Debtors, as applicable, will not pursue any and all available Causes of Action of the Debtors against it. The Debtors and the Reorganized Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan, including Article VIII hereof. Unless otherwise agreed upon in writing by the parties to the applicable Cause of Action, all objections to the Schedule of Retained Causes of Action must be Filed with the Bankruptcy Court on or before thirty (30) days after the Effective Date. Any such objection that is not timely filed shall be disallowed and forever barred, estopped, and enjoined from assertion against any Reorganized Debtor, without the need for any objection or responsive pleading by the Reorganized Debtors or any other party in interest or any further notice to or action, order, or approval of the Bankruptcy Court.** The Reorganized Debtors may settle any such objection without any further notice to or action, order, or approval of the Bankruptcy Court. If there is any dispute regarding the inclusion of any Cause of Action on the Schedule of Retained Causes of Action that remains unresolved by the Debtors or Reorganized Debtors, as applicable, and the objection party for thirty (30) days, such objection shall be resolved by the Bankruptcy Court. Unless any Causes of Action of the Debtors against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Final Order, the Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

The Reorganized Debtors reserve and shall retain such Causes of Action of the Debtors notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan. In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that a Debtor may hold against any Entity shall vest in the Reorganized Debtors, except as otherwise expressly provided in the Plan, including Article VIII hereof. The applicable Reorganized Debtors, through their authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action. The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

## ARTICLE V.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A.    *Assumption and Rejection of Executory Contracts and Unexpired Leases.*

On the Effective Date, except as otherwise provided in Article V.H.1 and elsewhere herein, all Executory Contracts or Unexpired Leases not otherwise assumed or rejected will be deemed assumed by the applicable Reorganized Debtor (and assigned to the party(ies) set forth in the Technology Business Sale Documents, as applicable) in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, other than those that are: (1) identified on the Rejected Executory Contracts and Unexpired Leases Schedule; (2) previously expired or terminated pursuant to their own terms; (3) have been previously assumed or rejected by the Debtors pursuant to a Final Order; (4) are the subject of a motion to reject that is pending on the Effective Date; or (5) have an ordered or requested effective date of rejection that is after the Effective Date.

Entry of the Confirmation Order shall constitute an order of the Bankruptcy Court approving the assumptions, assumptions and assignments, or rejections of the Executory Contracts or Unexpired Leases as set forth in the Plan, the Assumed Executory Contract and Unexpired Leases Schedule, or the Rejected Executory Contracts and Unexpired Leases Schedule, pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Except as otherwise specifically set forth herein, assumptions or rejections of Executory Contracts and Unexpired Leases pursuant to the Plan are effective

as of the Effective Date. Each Executory Contract or Unexpired Lease assumed pursuant to the Plan or by Bankruptcy Court order but not assigned to a third party before the Effective Date shall re-vest in and be fully enforceable by the applicable contracting Reorganized Debtor in accordance with its terms, except as such terms may have been modified by the provisions of the Plan or any order of the Bankruptcy Court authorizing and providing for its assumption. Any motions to assume Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by a Final Order on or after the Effective Date but may be withdrawn, settled, or otherwise prosecuted by the Reorganized Debtors.

To the maximum extent permitted by law, to the extent any provision in any Executory Contract or Unexpired Lease assumed or assumed and assigned pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption or assumption and assignment of such Executory Contract or Unexpired Lease (including any "change of control" provision), then such provision shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto. Notwithstanding anything to the contrary in the Plan, the Debtors or the Reorganized Debtors, as applicable, reserve the right to alter, amend, modify, or supplement the Assumed Executory Contracts and Unexpired Leases Schedule and the Rejected Executory Contracts and Unexpired Leases Schedule at any time up to forty-five (45) days after the Effective Date, so long as such allocation, amendment, modification, or supplement is consistent with the Restructuring Support Agreement; *provided* that the Cameron LNG Project Obligations shall be assumed as of the Effective Date in accordance with Article V.J.

B.      *Claims Based on Rejection of Executory Contracts or Unexpired Leases.*

Unless otherwise provided by a Final Order of the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, pursuant to the Plan or the Confirmation Order, if any, must be Filed with the Bankruptcy Court within thirty (30) days after the later of (1) the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection, (2) the effective date of such rejection, or (3) the Effective Date. **Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed with the Bankruptcy Court within such time will be automatically disallowed, forever barred from assertion, and shall not be enforceable against the Debtors or the Reorganized Debtors, the Estates, or their property without the need for any objection by the Reorganized Debtors or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in the Proof of Claim to the contrary.** All Allowed Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases shall be classified as General Unsecured Claims and shall be treated in accordance with Article III.B.13 of this Plan.

C.      *Cure of Defaults for Assumed Executory Contracts and Unexpired Leases.*

No later than seven (7) calendar days before the Confirmation Hearing, the Debtors shall provide notices of proposed Cure amounts to the counterparties to the agreements listed on the Assumed Executory Contracts and Unexpired Leases Schedule, which shall include a description of the procedures for objecting to the proposed Cure amounts or the Reorganized Debtors' ability to provide "adequate assurance of future performance thereunder" (within the meaning of section 365 of the Bankruptcy Code). Unless otherwise agreed in writing by the parties in the applicable Executory Contract or Unexpired Lease, any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption or related Cure amount must be Filed, served, and actually received by the counsel to the Debtor no later than the date and time specified in the notice. Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption or Cure amount will be deemed to have assented to such assumption or Cure amount. Notwithstanding anything herein to the contrary, in the event that any Executory Contract or Unexpired Lease is added to the Assumed Executory Contracts and Unexpired Leases Schedule after such seven-day deadline, a notice of proposed Cure amounts with respect to such Executory Contract or Unexpired Lease will be sent promptly to the counterparty thereof.

Unless otherwise agreed upon in writing by the parties to the applicable Executory Contract or Unexpired Lease, all requests for payment of Cure that differ from the amounts paid or proposed to be paid by the Debtors or the

Reorganized Debtors to a counterparty must be Filed with the Bankruptcy Court on or before thirty (30) days after the Effective Date. Any such request that is not timely filed shall be disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Reorganized Debtor, without the need for any objection by the Reorganized Debtors or any other party in interest or any further notice to or action, order, or approval of the Bankruptcy Court. Any Cure shall be deemed fully satisfied, released, and discharged upon payment by the Debtors or the Reorganized Debtors of the Cure; *provided* that nothing herein shall prevent the Reorganized Debtors from paying any Cure despite the failure of the relevant counterparty to file such request for payment of such Cure amount. The Reorganized Debtors also may settle any Cure without any further notice to or action, order, or approval of the Bankruptcy Court.

The Debtors or the Reorganized Debtors, as applicable, shall pay the Cure amounts, if any, on the Effective Date or as soon as reasonably practicable thereafter, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may agree. If there is any dispute regarding any Cure, the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" within the meaning of section 365 of the Bankruptcy Code, or any other matter pertaining to assumption, then payment of the applicable Cure amount shall occur as soon as reasonably practicable after entry of a Final Order resolving such dispute, approving such assumption (and, if applicable, assignment), or as may be agreed upon by the Debtors or the Reorganized Debtors, as applicable, and the counterparty to the Executory Contract or Unexpired Lease.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Cures, Claims, or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or any bankruptcy-related defaults, arising at any time prior to the effective date of assumption. **Any and all Proofs of Claim based upon Executory Contracts or Unexpired Leases that have been assumed in the Chapter 11 Cases, including pursuant to the Confirmation Order, shall be deemed disallowed and expunged as of the later of (1) the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such assumption, (2) the effective date of such assumption or (3) the Effective Date without the need for any objection thereto or any further notice to or action, order, or approval of the Bankruptcy Court**.

D.      *Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases.*

Rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of preexisting obligations owed to the Debtors or the Reorganized Debtors, as applicable, under such Executory Contracts or Unexpired Leases. In particular, notwithstanding any non-bankruptcy law to the contrary, the Reorganized Debtors expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations with respect to goods previously purchased by the Debtors pursuant to rejected Executory Contracts or Unexpired Leases.

E.      *Insurance Policies.*

Each of the Debtors' insurance policies and any agreements, documents, or instruments relating thereto, are treated as Executory Contracts under the Plan. Unless otherwise provided in the Plan, on the Effective Date, (1) the Debtors shall be deemed to have assumed all insurance policies and any agreements, documents, and instruments relating to coverage of all insured Claims and (2) such insurance policies and any agreements, documents, or instruments relating thereto shall revest in the Reorganized Debtors.

F.      *Reservation of Rights.*

Nothing contained in the Plan or the Plan Supplement shall constitute an admission by the Debtors or any other party that any contract or lease is in fact an Executory Contract or Unexpired Lease or that any Reorganized Debtor has any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or the Reorganized Debtors, as applicable, shall have forty-five (45) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

G.      *Nonoccurrence of Effective Date.*

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

H.      *Employee Compensation and Benefits.*

1.      Compensation and Benefit Programs.

Subject to the provisions of the Plan, all Compensation and Benefits Programs shall be treated as Executory Contracts under the Plan and deemed assumed on the Effective Date pursuant to the provisions of sections 365 and 1123 of the Bankruptcy Code, except for:

a.      all employee equity or equity-based incentive plans, and any provisions set forth in the Compensation and Benefits Program that provide for rights to acquire Existing Equity Interests in any of the Debtors;

b.      the change in control agreements entered into with current employees, unless otherwise determined by the Required Consenting Lenders prior to the Effective Date;

c.      Compensation and Benefits Programs that have been rejected pursuant to an order of a Bankruptcy Court; and

d.      Compensation and Benefits Programs that, as of the entry of the Confirmation Order, have been specifically waived by the beneficiaries of any employee benefit plan or contract.

Any assumption of Compensation and Benefits Programs pursuant to the terms herein shall be deemed not to trigger (i) any applicable change of control, immediate vesting, termination (similar provisions therein) and (ii) an event of "Good Reason" (or a term of like import), in each case as a result of the consummation of the Restructuring Transactions.  No counterparty shall have rights under a Compensation and Benefits Program assumed pursuant to the Plan other than those applicable immediately prior to such assumption.

On the Effective Date, the Debtors shall enter into severance and change in control arrangements with Senior Executives in amounts and on terms and conditions to be agreed with and approved by the Required Consenting Lenders.

2.      Workers' Compensation Programs.

As of the Effective Date, except as set forth in the Plan Supplement, the Debtors and the Reorganized Debtors shall continue to honor their obligations under: (a) all applicable workers' compensation laws in states in which the Reorganized Debtors operate; and (b) the Debtors' written contracts, agreements, agreements of indemnity, self-insured workers' compensation bonds, policies, programs, and plans for workers' compensation and workers' compensation insurance.  All Proofs of Claims on account of workers' compensation shall be deemed withdrawn automatically and without any further notice to or action, order, or approval of the Bankruptcy Court; *provided* that nothing in the Plan shall limit, diminish, or otherwise alter the Debtors' or Reorganized Debtors' defenses, Causes of Action, or other rights under applicable non-bankruptcy law with respect to any such contracts, agreements, policies, programs, and plans; *provided further* that nothing herein shall be deemed to impose any obligations on the Debtors in addition to what is provided for under applicable state law.

I.      *Contracts and Leases Entered Into After the Petition Date.*

Contracts and leases entered into after the Petition Date by any Debtor, including any Executory Contracts and Unexpired Leases assumed by such Debtor, will be performed by the applicable Debtor or the Reorganized

Debtors in the ordinary course of their business.  Accordingly, such contracts and leases (including any assumed Executory Contracts and Unexpired Leases) will survive and remain unaffected by entry of the Confirmation Order.

J.       *Assumption of Cameron LNG Project Obligations*

The Cameron LNG Project Obligations shall be assumed by the applicable Reorganized Debtor effective as of the Effective Date, and the Cameron LNG Project Obligations shall not be subject to the provision of Section V.A. hereof authorizing the Debtors or Reorganized Debtors, as applicable, to alter, amend, modify, or supplement the Assumed Executory Contracts and Unexpired Leases Schedule and the Rejected Executory Contracts and Unexpired Leases Schedule at any time up to forty-five (45) days after the Effective Date.  Within three Business Days after the Effective Date, Reorganized McDermott shall issue the Cameron LNG Replacement Guarantee and the Chiyoda Replacement Guarantee.

## ARTICLE VI.
## PROVISIONS GOVERNING DISTRIBUTIONS

A.       *Distributions on Account of Claims Allowed as of the Effective Date.*

Except as otherwise provided herein, in a Final Order, or as otherwise agreed to by the Debtors or the Reorganized Debtors, as the case may be, and the holder of the applicable Allowed Claim on the first Distribution Date, the Reorganized Debtors shall make initial distributions under the Plan on account of Claims Allowed on or before the Effective Date, subject to the Reorganized Debtors' right to object to Claims; *provided* that (1) Allowed Administrative Claims with respect to liabilities incurred by the Debtors in the ordinary course of business during the Chapter 11 Cases or assumed by the Debtors prior to the Effective Date shall be paid or performed in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, course of dealing, course of business, or industry practice, (2) Allowed Priority Tax Claims shall be paid in accordance with Article II.D of the Plan, and (3) Allowed General Unsecured Claims shall be paid in accordance with Article III.B.13 of the Plan. To the extent any Allowed Priority Tax Claim is not due and owing on the Effective Date, such Claim shall be paid in full in Cash in accordance with the terms of any agreement between the Debtors and the holder of such Claim or as may be due and payable under applicable non-bankruptcy law or in the ordinary course of business.  Thereafter, a Distribution Date shall occur no less frequently than once in every ninety (90) day period, as necessary, in the Reorganized Debtors' sole discretion.

B.       *Disbursing Agent.*

All distributions under the Plan shall be made by the Reorganized Debtors.  The Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.  Additionally, in the event that the Disbursing Agent is so otherwise ordered, all costs and expenses of procuring any such bond or surety shall be borne by the Reorganized Debtors.

C.       *Rights and Powers of Disbursing Agent.*

1.   Powers of the Disbursing Agent.

The Disbursing Agent shall be empowered to:  (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

2.   Expenses Incurred On or After the Effective Date.

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and expenses incurred by the Disbursing Agent on or after the Effective Date (including taxes), and any reasonable compensation

and expense reimbursement claims (including reasonable attorney fees and expenses), made by the Disbursing Agent shall be paid in Cash by the Reorganized Debtors.

D.      *Delivery of Distributions and Undeliverable or Unclaimed Distributions.*

    1.   Record Date for Distribution.

On the Distribution Record Date, the Claims Register shall be closed and any party responsible for making distributions shall instead be authorized and entitled to recognize only those record holders listed on the Claims Register as of the close of business on the Distribution Record Date.  If a Claim, other than one based on a publicly traded Security, is transferred twenty (20) or fewer days before the Distribution Record Date, the Distribution Agent shall make distributions to the transferee only to the extent practical and, in any event, only if the relevant transfer form contains an unconditional and explicit certification and waiver of any objection to the transfer by the transferor.

    2.   Delivery of Distributions in General.

Except as otherwise provided herein, the Disbursing Agent shall make distributions to holders of Allowed Claims and Allowed Interests (as applicable) as of the Distribution Record Date at the address for each such holder as indicated on the Debtors' records as of the date of any such distribution; *provided* that the manner of such distributions shall be determined at the discretion of the Reorganized Debtors.

    3.   Minimum Distributions.

No fractional shares of New Common Stock or New Warrants shall be distributed and no Cash shall be distributed in lieu of such fractional amounts.  When any distribution pursuant to the Plan on account of an Allowed Claim or Allowed Interest (as applicable) would otherwise result in the issuance of a number of shares of New Common Stock or New Warrants that is not a whole number, the actual distribution of shares of New Common Stock or New Warrants shall be rounded to the next lower whole number with no further payment therefor.  The total number of authorized shares of New Common Stock or New Warrants to be distributed to holders of Allowed Claims hereunder shall be adjusted as necessary to account for the foregoing rounding.

    4.   Undeliverable Distributions and Unclaimed Property.

In the event that any distribution to any holder of Allowed Claims or Allowed Interests (as applicable) is returned as undeliverable, no distribution to such holder shall be made unless and until the Disbursing Agent has determined the then-current address of such holder, at which time such distribution shall be made to such holder without interest; *provided* that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of one year from the Effective Date.  After such date, all unclaimed property or interests in property shall revert to the Reorganized Debtors automatically and without need for a further order by the Bankruptcy Court (notwithstanding any applicable federal, provincial or state escheat, abandoned, or unclaimed property laws to the contrary), and the Claim of any holder of Claims and Interests to such property or Interest in property shall be discharged and forever barred.

    5.   Surrender of Canceled Instruments or Securities.

On the Effective Date or as soon as reasonably practicable thereafter, each holder of a certificate or instrument evidencing a Claim or an Interest that has been cancelled in accordance with Article IV.H hereof shall be deemed to have surrendered such certificate or instrument to the Distribution Agent.  Such surrendered certificate or instrument shall be cancelled solely with respect to the Debtors, and such cancellation shall not alter the obligations or rights of any non-Debtor third parties vis-à-vis one another with respect to such certificate or instrument, including with respect to any indenture or agreement that governs the rights of the holder of a Claim or Interest, which shall continue in effect for purposes of allowing holders to receive distributions under the Plan, charging liens, priority of payment, and indemnification rights.  Notwithstanding anything to the contrary herein, this paragraph shall not apply to certificates or instruments evidencing Claims that are Unimpaired under the Plan.

E.      *Manner of Payment.*

1.      All distributions of the New Common Stock and the New Warrants to the holders of the applicable Allowed Claims under the Plan shall be made by the Disbursing Agent on behalf of the Debtors or Reorganized Debtors, as applicable.

2.      All distributions of Cash to the holders of the applicable Allowed Claims under the Plan shall be made by the Disbursing Agent on behalf of the applicable Debtor or Reorganized Debtor.

3.      At the option of the Disbursing Agent, any Cash payment to be made hereunder may be made by check or wire transfer or as otherwise required or provided in applicable agreements.

F.      *Section 1145 Exemption.*

Pursuant to section 1145 of the Bankruptcy Code or any other applicable exemption, the offering, issuance, and distribution of the New Common Stock (including the Rights Offering Shares) and the New Warrants, as contemplated by Article III.B hereof, shall be exempt from, among other things, the registration requirements of section 5 of the Securities Act and any other applicable law requiring registration prior to the offering, issuance, distribution, or sale of Securities.  In addition, under section 1145 of the Bankruptcy Code, the New Common Stock and the New Warrants will be freely tradable in the U.S. by the recipients thereof, subject to the provisions of (i) section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act, (ii) compliance with applicable securities laws and any rules and regulations of the Securities and Exchange Commission, if any, applicable at the time of any future transfer of such Securities or instruments, and (iii) any restrictions in the Reorganized Debtors' New Organizational Documents.

G.      *Compliance with Tax Requirements.*

In connection with the Plan, to the extent applicable, the Debtors, Reorganized Debtors, Disbursing Agent, and any applicable withholding agent shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions made pursuant to the Plan shall be subject to such withholding and reporting requirements.  Notwithstanding any provision in the Plan to the contrary, such parties shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate.  The Debtors and Reorganized Debtors reserve the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and similar spousal awards, Liens, and encumbrances.

H.      *Allocations.*

Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest.

I.      *No Postpetition Interest on Claims.*

Unless otherwise specifically provided for in the DIP Financing Orders, the Plan, or the Confirmation Order, or required by applicable bankruptcy and non-bankruptcy law, postpetition interest shall not accrue or be paid on any prepetition Claims, and no holder of a Claim shall be entitled to interest accruing on or after the Petition Date on such Claim.

J.      *Foreign Currency Exchange Rate.*

Except as otherwise provided in a Bankruptcy Court order, as of the Effective Date, any Claim asserted in currency other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using the

exchange rate for the applicable currency as published in The Wall Street Journal, National Edition, on the Effective Date.

K.      *Setoffs and Recoupment.*

Except as expressly provided in this Plan, each Reorganized Debtor may, pursuant to section 553 of the Bankruptcy Code, set off and/or recoup against any Plan Distributions to be made on account of any Allowed Claim, any and all claims, rights, and Causes of Action that such Reorganized Debtor may hold against the holder of such Allowed Claim to the extent such setoff or recoupment is either (1) agreed in amount among the relevant Reorganized Debtor(s) and the holder of the Allowed Claim or (2) otherwise adjudicated by the Bankruptcy Court or another court of competent jurisdiction; *provided* that neither the failure to effectuate a setoff or recoupment nor the allowance of any Claim hereunder shall constitute a waiver or release by a Reorganized Debtor or its successor of any and all claims, rights, and Causes of Action that such Reorganized Debtor or its successor may possess against the applicable holder.  In no event shall any holder of a Claim be entitled to recoup such Claim against any claim, right, or Cause of Action of the Debtors or the Reorganized Debtors, as applicable, unless such holder actually has performed such recoupment and provided notice thereof in writing to the Debtors in accordance with Article XII.G hereof on or before the Effective Date, notwithstanding any indication in any Proof of Claim or otherwise that such holder asserts, has, or intends to preserve any right of recoupment.

L.      *Claims Paid or Payable by Third Parties.*

1.   <u>Claims Paid by Third Parties.</u>

The Debtors or the Reorganized Debtors, as applicable, shall reduce in full a Claim, and such Claim shall be disallowed without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor or a Reorganized Debtor.  Subject to the last sentence of this paragraph, to the extent a holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor or a Reorganized Debtor on account of such Claim, such holder shall, within fourteen (14) days of receipt thereof, repay or return the distribution to the applicable Reorganized Debtor, to the extent the holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan.  The failure of such holder to timely repay or return such distribution shall result in the holder owing the applicable Reorganized Debtor annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the fourteen (14) day grace period specified above until the amount is repaid.

2.   <u>Claims Payable by Third Parties.</u>

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy.  To the extent that one or more of the Debtors' insurers agrees to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, the applicable portion of such Claim may be expunged without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

3.   <u>Applicability of Insurance Policies.</u>

Except as otherwise provided in the Plan, distributions to holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy.  Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

## ARTICLE VII.
## PROCEDURES FOR RESOLVING CONTINGENT,
## UNLIQUIDATED, AND DISPUTED CLAIMS

A. *Disputed Claims Process.*

There is no requirement to file a Proof of Claim (or move the Bankruptcy Court for allowance) to have a Claim Allowed for the purposes of the Plan, except as provided in Article V.B of the Plan.  On and after the Effective Date, except as otherwise provided in this Plan, all Allowed Claims shall be satisfied in the ordinary court of business of the Reorganized Debtors.  The Debtors and the Reorganized Debtors, as applicable, shall have the exclusive authority to (i) determine, without the need for notice to or action, order, or approval of the Bankruptcy Court, that a claim subject to any Proof of Claim that is Filed is Allowed and (ii) file, settle, compromise, withdraw, or litigate to judgment any objections to Claims as permitted under this Plan.  If the Debtors or Reorganized Debtors dispute any Claim, such dispute shall be determined, resolved, or adjudicated, as the case may be, in the manner as if the Chapter 11 Cases had not been commenced and shall survive the Effective Date as if the Chapter 11 Cases had not been commenced; *provided* that the Debtors or Reorganized Debtors may elect, at their sole option, to object to any Claim (other than Claims expressly Allowed by this Plan) and to have the validity or amount of any Claim adjudicated by the Bankruptcy Court; *provided further* that holders of Claims may elect to resolve the validity or amount of any Claim in the Bankruptcy Court.  If a holder makes such an election, the Bankruptcy Court shall apply the law that would have governed the dispute if the Chapter 11 Cases had not been filed.  All Proofs of Claim Filed in the Chapter 11 Cases shall be considered objected to and Disputed without further action by the Debtors.  **Except as otherwise provided herein, all Proofs of Claim Filed after the Effective Date shall be disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Reorganized Debtor, without the need for any objection by the Reorganized Debtors or any further notice to or action, order, or approval of the Bankruptcy Court.**

B. *Allowance of Claims.*

After the Effective Date, except as otherwise expressly set forth herein, each of the Reorganized Debtors shall have and retain any and all rights and defenses such Debtor had with respect to any Claim or Interest immediately prior to the Effective Date.  The Debtors may affirmatively determine to deem Unimpaired Claims Allowed to the same extent such Claims would be allowed under applicable non-bankruptcy law.

C. *Claims Administration Responsibilities.*

Except as otherwise specifically provided in the Plan, after the Effective Date, the Reorganized Debtors shall have the sole authority:  (1) to File, withdraw, or litigate to judgment, objections to Claims or Interests; (2) to settle or compromise any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court; and (3) to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court.  For the avoidance of doubt, except as otherwise provided herein, from and after the Effective Date, each Reorganized Debtor shall have and retain any and all rights and defenses such Debtor had immediately prior to the Effective Date with respect to any Disputed Claim or Interest, including the Causes of Action retained pursuant to Article IV.R of the Plan.

D. *Estimation of Claims and Interests..*

Before or after the Effective Date, the Debtors or the Reorganized Debtors, as applicable, may (but are not required to) at any time request that the Bankruptcy Court estimate any Disputed Claim or Interest that is contingent or unliquidated pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party in interest previously has objected to such Claim or Interest or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim or Interest, including during the litigation of any objection to any Claim or Interest or during the appeal relating to such objection.  Notwithstanding any provision otherwise in the Plan, a Claim that has been expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court. In the event that the Bankruptcy Court estimates any contingent or unliquidated

47

Claim or Interest, that estimated amount shall constitute a maximum limitation on such Claim or Interest for all purposes under the Plan (including for purposes of distributions), and the relevant Reorganized Debtor may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim or Interest.

E.      *Adjustment to Claims or Interests without Objection.*

Any duplicate Claim or Interest or any Claim or Interest that has been paid, satisfied, amended, or superseded may be adjusted or expunged on the Claims Register by the Reorganized Debtors without the Reorganized Debtors having to File an application, motion, complaint, objection, or any other legal proceeding seeking to object to such Claim or Interest and without any further notice to or action, order, or approval of the Bankruptcy Court.

F.      *Disallowance of Claims or Interests.*

Except as otherwise expressly set forth herein, all Claims and Interests of any Entity from which property is sought by the Debtors under sections 542, 543, 550, or 553 of the Bankruptcy Code or that the Debtors or the Reorganized Debtors allege is a transferee of a transfer that is avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code shall be disallowed if: (a) the Entity, on the one hand, and the Debtors or the Reorganized Debtors, as applicable, on the other hand, agree or the Bankruptcy Court has determined by Final Order that such Entity or transferee is liable to turn over any property or monies under any of the aforementioned sections of the Bankruptcy Code; and (b) such Entity or transferee has failed to turn over such property by the date set forth in such agreement or Final Order.

G.      *No Distributions Pending Allowance.*

Notwithstanding any other provision of the Plan, if any portion of a Claim or Interest is a Disputed Claim or Interest, as applicable, no payment or distribution provided hereunder shall be made on account of such Claim or Interest unless and until such Disputed Claim or Interest becomes an Allowed Claim or Interest; *provided* that if only the Allowed amount of an otherwise valid Claim or Interest is Disputed, such Claim or Interest shall be deemed Allowed in the amount not Disputed and payment or distribution shall be made on account of such undisputed amount.

H.      *Distributions After Allowance.*

To the extent that a Disputed Claim or Interest ultimately becomes an Allowed Claim or Interest, distributions (if any) shall be made to the holder of such Allowed Claim or Interest in accordance with the provisions of the Plan. As soon as reasonably practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim or Interest becomes a Final Order, the Disbursing Agent shall provide to the holder of such Claim or Interest the distribution (if any) to which such holder is entitled under the Plan as of the Effective Date, without any interest to be paid on account of such Claim or Interest.

I.      *No Interest.*

Unless otherwise specifically provided for herein or by order of the Bankruptcy Court, postpetition interest shall not accrue or be paid on Claims, and no holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim or right.  Additionally, and without limiting the foregoing, interest shall not accrue or be paid on any Disputed Claim with respect to the period from the Effective Date to the date a final distribution is made on account of such Disputed Claim, if and when such Disputed Claim becomes an Allowed Claim.

**ARTICLE VIII.**
**SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS**

A.      *Discharge of Claims and Termination of Interests.*

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Definitive Documents, the Plan, or in any contract, instrument, or other agreement or document created or entered into pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete

48

satisfaction, discharge, and release, effective as of the Effective Date, of Claims (including any Intercompany Claims resolved or compromised after the Effective Date by the Reorganized Debtors), Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by employees of the Debtors prior to the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not:  (1) a Proof of Claim based upon such debt or right is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such debt, right, or interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the holder of such a Claim or Interest has accepted the Plan.  The Confirmation Order shall be a judicial determination of the discharge of all Claims (other than the Reinstated Claims) and Interests (other than the Intercompany Interests that are Reinstated) subject to the occurrence of the Effective Date.

B.      *Release of Liens.*

Except as otherwise provided in the Exit Facility Documents, the Plan, the Confirmation Order, or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, except for Other Secured Claims that the Debtors elect to Reinstate in accordance with this Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors and their successors and assigns.  Any holder of such Secured Claim (and the applicable agents for such holder) shall be authorized and directed, at the sole cost and expense of the Reorganized Debtors, to release any collateral or other property of any Debtor (including any cash collateral and possessory collateral) held by such holder (and the applicable agents for such holder), and to take such actions as may be reasonably requested by the Reorganized Debtors to evidence the release of such Liens and/or security interests, including the execution, delivery, and filing or recording of such releases.  The presentation or filing of the Confirmation Order to or with any federal, state, provincial, or local agency, records office, or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.

To the extent that any holder of a Secured Claim that has been satisfied or discharged in full pursuant to the Plan, or any agent for such holder, has filed or recorded publicly any Liens and/or security interests to secure such holder's Secured Claim, then as soon as practicable on or after the Effective Date, such holder (or the agent for such holder) shall take any and all steps requested by the Debtors, the Reorganized Debtors, or Exit Facility Agents that are necessary or desirable to record or effectuate the cancellation and/or extinguishment of such Liens and/or security interests, including the making of any applicable filings or recordings, and the Reorganized Debtors shall be entitled to make any such filings or recordings on such holder's behalf.

C.      *Releases by the Debtors.*

Notwithstanding anything contained in the Plan to the contrary, pursuant to section 1123(b) of the Bankruptcy Code, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, on and after the Effective Date, each Released Party is, and is deemed hereby to be, fully, conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by the Debtors, the Reorganized Debtors, their Estates, and any person seeking to exercise the rights of the Debtors or their Estates, including any successors to the Debtors or any Estates representatives appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all Claims and Causes of

49

Action, including any derivative claims asserted or assertable on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, contingent or non-contingent, in law, equity, contract, tort or otherwise, that the Debtors, the Reorganized Debtors, or their Estates, including any successors to the Debtors or any Estates representative appointed or selected pursuant to section 1123(b) of the Bankruptcy Code, would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor or other Entity, or that any Holder of any Claim against, or Interest in, a Debtor or other Entity could have asserted on behalf of the Debtors, based on or relating to, or in any manner arising from, in whole or in part:

1. the Debtors (including the capital structure, management, ownership, or operation thereof), the business or contractual arrangement between the Debtors and any Released Party, any Securities issued by the Debtors and the ownership thereof, the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in- or out-of-court restructuring efforts, any Avoidance Actions (but excluding Avoidance Actions brought as counterclaims or defenses to Claims asserted against the Debtors), intercompany transactions between or among a Company Party and another Company Party, the Superpriority Credit Agreement, the Credit Agreement, the 2021 LC Agreement, the Lloyds Letter of Credit Agreement, the Senior Notes Indenture, the Senior Notes, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Restructuring Support Agreement, the Disclosure Statement, the DIP Credit Agreement, the Exit Facility Documents, or the Plan (including, for the avoidance of doubt, the Plan Supplement);

2. any Restructuring Transaction, contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Restructuring Support Agreement, the Rights Offering, the Disclosure Statement, the DIP Credit Agreement, the New Warrants Agreements, the Exit Facility Documents, the Plan, or the Plan Supplement, before or during the Chapter 11 Cases;

3. the Chapter 11 Cases, the filing of the Chapter 11 Cases, the Disclosure Statement or the Plan, the solicitation of votes with respect to the Plan, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, the Rights Offering, or the distribution of property under the Plan or any other related agreement; or

4. any related act or omission, transaction, agreement, event, or other occurrence related or relating to any of the foregoing taking place on or before the Effective Date, including all Avoidance Actions or other relief obtained by the Debtors in the Chapter 11 Cases.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (i) post Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Restructuring Transaction, any Definitive Document, or any other document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, including the Exit Facility Documents, the New Warrants Agreements, or any Claim or obligation arising under the Plan, or (ii) the rights of any holder of Allowed Claims to receive distributions under the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the foregoing Debtor release, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that the foregoing Debtor release is: (a) in exchange for the good and valuable consideration provided by the Released Parties, including, without limitation, the Released Parties' contributions to facilitating the Restructuring Transactions and implementing the Plan; (b) a good faith settlement and compromise of the Claims released by the foregoing Debtor release; (c) in the best interests of the Debtors and their Estates and all holders of Claims and Interests; (d) fair, equitable, and reasonable; (e) given and made after due notice and

opportunity for hearing; and (f) a bar to any of the Debtors, the Reorganized Debtors, or the Debtors' Estates asserting any Claim or Cause of Action released pursuant to the foregoing Debtor release.

**D.**      *Releases by the Releasing Parties.*

Except as otherwise expressly set forth in this Plan or the Confirmation Order, on and after the Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is, and is deemed hereby to be, fully, conclusively, absolutely, unconditionally, irrevocably and forever, released and discharged by each Releasing Party, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all Claims and Causes of Action, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, contingent or non-contingent, in law, equity, contract, tort, or otherwise, including any derivative claims asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim against, or Interest in, a Debtor or other Entity, or that any holder of any Claim against, or Interest in, a Debtor or other Entity could have asserted on behalf of the Debtors, based on or relating to, or in any manner arising from, in whole or in part:

1.   the Debtors (including the capital structure, management, ownership, or operation thereof), the business or contractual arrangement between the Debtors and any Releasing Party, any Securities issued by the Debtors and the ownership thereof, the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in- or out-of-court restructuring efforts, any Avoidance Actions (but excluding Avoidance Actions brought as counterclaims or defenses to Claims asserted against the Debtors), intercompany transactions between or among a Company Party and another Company Party, the Superpriority Credit Agreement, the Credit Agreement, the 2021 LC Agreement, the Lloyds Letter of Credit Agreement, Senior Notes Indenture, the Senior Notes, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Restructuring Support Agreement, the Disclosure Statement, the DIP Credit Agreement, the Exit Facility Documents, or the Plan (including, for the avoidance of doubt, the Plan Supplement);

2.   any Restructuring Transaction, contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Restructuring Support Agreement, the Rights Offering, the Disclosure Statement, the DIP Credit Agreement, the New Warrants Agreements, the Exit Facility Documents, the Plan, or the Plan Supplement, before or during the Chapter 11 Cases,

3.   the Chapter 11 Cases, the filing of the Chapter 11 Cases, the Disclosure Statement, or the Plan, the solicitation of votes with respect to the Plan, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, the Rights Offering, or the distribution of property under the Plan or any other related agreement; or

4.   any related act or omission, transaction, agreement, event, or other occurrence related or relating to any of the foregoing taking place on or before the Effective Date, including all Avoidance Actions or other relief obtained by the Debtors in the Chapter 11 Cases.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (i) any party of any obligations related to customary banking products, banking services or other financial accommodations (except as may be expressly amended or modified by the Plan and the Exit Facility Documents, or any other financing document under and as defined therein), (ii) any post-Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Restructuring Transaction, or any document, instrument, any Definitive Document, or any agreement (including those set forth in the Plan

51

Supplement) executed to implement the Plan, including the Exit Facility Documents, the New Warrants Agreements, or any Claim or obligation arising under the Plan, or (iii) the rights of holders of Allowed Claims to receive distributions under the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the foregoing third-party release, which includes by reference each of the related provisions and definitions contained herein, and, further, shall constitute the Bankruptcy Court's finding that the foregoing third-party release is: (a) consensual; (b) essential to the Confirmation of the Plan; (c) given in exchange for a substantial contribution and for the good and valuable consideration provided by the Released Parties that is important to the success of the Plan; (d) a good faith settlement and compromise of the Claims released by the foregoing third-party release; (e) in the best interests of the Debtors and their Estates; (f) fair, equitable, and reasonable; (g) given and made after due notice and opportunity for hearing; and (h) a bar to any of the Releasing Parties asserting any claim or Cause of Action released pursuant to the foregoing third-party release.

E.     *Exculpation.*

Except as otherwise specifically provided in the Plan or the Confirmation Order, no Exculpated Party shall have or incur liability for, and each Exculpated Party shall be released and exculpated from any Claims and Cause of Action for any claim related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, filing, or termination of the Restructuring Support Agreement and related prepetition transactions (including the Superpriority Credit Agreement, the Credit Agreement, the Senior Notes Indenture or Senior Notes, the 2021 LC Agreement, and the Lloyds Letter of Credit Agreement), the Disclosure Statement, the Plan, the DIP Credit Facility, the Exit Facility Documents, the New Warrants Agreements, the Plan Supplement, the Rights Offering, or any Restructuring Transaction, contract, instrument, release or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion), including any Definitive Document, created or entered into before or during the Chapter 11 Cases, any preference, fraudulent transfer, or other avoidance claim arising pursuant to chapter 5 of the Bankruptcy Code or other applicable law, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, except for claims related to any act or omission that is determined in a Final Order by a court of competent jurisdiction to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.

The Exculpated Parties and other parties set forth above have, and upon confirmation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

F.     *Injunction.*

Except as otherwise expressly provided in the Plan or the Confirmation Order or for obligations or distributions issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities who have held, hold, or may hold the Released Claims are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties:  (1) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any Released Claims; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or

order against such Entities on account of or in connection with or with respect to any Released Claims; (3) creating, perfecting, or enforcing any lien or encumbrance of any kind against such Entities or the property of such Entities on account of or in connection with or with respect to any Released Claims; (4) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property or the Estates of such Entities on account of or in connection with or with respect to any Released Claims unless such holder has filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a Claim or Interest or otherwise that such holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any Released Claims released or settled pursuant to the Plan.

Upon entry of the Confirmation Order, all holders of Claims and Interests and their respective current and former employees, agents, officers, directors, principals, and direct and indirect Affiliates shall be enjoined from taking any actions to interfere with the implementation or Consummation of the Plan.  Each holder of an Allowed Claim or Allowed Interest, as applicable, by accepting, or being eligible to accept, distributions under or Reinstatement of such Claim or Interest, as applicable, pursuant to the Plan, shall be deemed to have consented to the injunction provisions set forth in this Article VIII.F hereof.

G.    *Protections Against Discriminatory Treatment.*

Consistent with section 525 of the Bankruptcy Code and the Supremacy Clause of the U.S. Constitution, all Entities, including Governmental Units, shall not discriminate against the Reorganized Debtors or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Reorganized Debtors, or another Entity with whom the Reorganized Debtors have been associated, solely because each Debtor has been a debtor under chapter 11 of the Bankruptcy Code, has been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before the Debtors are granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

H.    *Document Retention.*

On and after the Effective Date, the Reorganized Debtors may maintain documents in accordance with their standard document retention policy, as may be altered, amended, modified, or supplemented by the Reorganized Debtors.

I.    *Reimbursement or Contribution.*

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the time of allowance or disallowance, such Claim shall be forever disallowed and expunged notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Confirmation Date:  (1) such Claim has been adjudicated as non-contingent or (2) the relevant holder of a Claim has Filed a non-contingent Proof of Claim on account of such Claim and a Final Order has been entered prior to the Confirmation Date determining such Claim as no longer contingent.

# ARTICLE IX.
## CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN

A.    *Conditions Precedent to the Effective Date.*

It shall be a condition to the Effective Date that the following conditions shall have been satisfied or waived pursuant to the provisions of Article IX.B hereof:

a.    the Debtors shall have achieved the Achievement Target; and

b.   the Bankruptcy Court shall have entered the Confirmation Order, which shall be a Final Order, in form and substance consistent in all respects with the Restructuring Support Agreement (including any consent rights thereunder) and otherwise in form and substance acceptable to the Debtors and the Required Consenting Stakeholders, and which shall:

   i.   authorize the Debtors to take all actions necessary to enter into, implement, and consummate the contracts, instruments, releases, leases, indentures, and other agreements or documents created in connection with the Plan;

   ii.   decree that the provisions in the Confirmation Order and the Plan are nonseverable and mutually dependent;

   iii.   authorize the Debtors, as applicable/necessary, to:  (a) implement the Restructuring Transactions, including the Rights Offering; (b) distribute the New Common Stock and the New Warrants pursuant to the exemption from registration under the Securities Act provided by section 1145 of the Bankruptcy Code or such other applicable exemption from such registration or pursuant to one or more registration statements; (c) make all distributions and issuances as required under the Plan, including Cash and the New Common Stock; and (d) enter into any agreements, transactions, and sales of property as set forth in the Plan Supplement, including the Management Incentive Plan, in each case, in a manner consistent with the terms of the Restructuring Support Agreement and subject to the consent rights set forth therein;

   iv.   authorize the implementation of the Plan in accordance with its terms; and

   v.   provide that, pursuant to section 1146 of the Bankruptcy Code, the assignment or surrender of any lease or sublease, and the delivery of any deed or other instrument or transfer order, in furtherance of, or in connection with the Plan, including any deeds, bills of sale, or assignments executed in connection with any disposition or transfer of assets contemplated under the Plan, shall not be subject to any stamp, real estate transfer, mortgage recording, or other similar tax; and

c.   the Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan;

d.   the final version of each of the Plan, the Definitive Documents, and all documents contained in any supplement to the Plan, including Plan Supplement and any exhibits, schedules, amendments, modifications, or supplements thereto or other documents contained therein shall have been executed or filed, as applicable in form and substance consistent in all respects with the Restructuring Support Agreement, the Restructuring Term Sheet, and the Plan, and comply with the applicable consent rights set forth in the Restructuring Support Agreement and/or the Plan for such documents and shall not have been modified in a manner inconsistent with the Restructuring Support Agreement;

e.   the Exit Facility Documents shall have been duly executed and delivered by all of the Entities that are parties thereto and all conditions precedent (other than any conditions related to the occurrence of the Effective Date) to the effectiveness of the Exit Facilities shall have been satisfied or duly waived in writing in accordance with the terms of each of the Exit Facilities and the closing of each of the Exit Facilities shall have occurred;

f.   the Final Order approving the DIP Credit Facility shall have been entered and shall remain in full force and effect and no event of default shall have occurred and be continuing thereunder;

g.   no more than $50 million principal amount of Prepetition Secured Letters of Credit or DIP Letters of Credit (other than cash collateralized letters of credit) shall have been drawn and unreimbursed in full in Cash as of the Effective Date; *provided* that this condition may be waived solely with the written consent of the Required Consenting LC Lenders;

h. Reorganized McDermott shall have a minimum of $820 million of Cash on its balance sheet (which amount shall not include Cash held by the Debtors' joint-venture affiliates or cash collateral securing the Cash Secured Letters of Credit, the Lloyds Letters of Credit, and the DIP Cash Secured Letters of Credit) assuming normal working capital; *provided* that this condition may be waived solely with the written consent of the [Required Consenting Lenders];

i. all professional fees and expenses of retained professionals that require the Bankruptcy Court's approval shall have been paid in full or amounts sufficient to pay such fees and expenses after the Effective Date shall have been placed in a professional fee escrow account pending the Bankruptcy Court's approval of such fees and expenses;

j. the Technology Business Sale shall have been consummated;

k. to the extent invoiced in accordance with the terms of the Plan, the payment in Cash in full of the Restructuring Expenses; and

l. the Debtors shall have implemented the Restructuring Transactions and all transactions contemplated in the Restructuring Term Sheet in a manner consistent with the Restructuring Support Agreement (and subject to, and in accordance with, the consent rights set forth therein), the Restructuring Term Sheet, and the Plan.

B.   *Waiver of Conditions.*

Except as otherwise specified in the Plan or the Restructuring Support Agreement, any one or more of the conditions to Consummation set forth in this Article IX may be waived by the Debtors with the prior written consent of the Required Consenting Stakeholders (not to be withheld unreasonably), without notice, leave, or order of the Bankruptcy Court or any formal action other than proceedings to confirm or consummate the Plan.

C.   *Effect of Failure of Conditions.*

If Consummation does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan, the Disclosure Statement, or Restructuring Support Agreement shall:  (1) constitute a waiver or release of any Claims by the Debtors, Claims, or Interests; (2) prejudice in any manner the rights of the Debtors, any holders of Claims or Interests, or any other Entity; or (3) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any holders of Claims or Interests, or any other Entity.

D.   *Substantial Consummation*

"Substantial Consummation" of the Plan, as defined in 11 U.S.C. § 1101(2), shall be deemed to occur on the Effective Date.

## ARTICLE X.
## MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

A.   *Modification and Amendments.*

Except as otherwise specifically provided in this Plan and subject to the consent rights set forth in the Restructuring Support Agreement, the Debtors reserve the right to modify the Plan, whether such modification is material or immaterial, and seek Confirmation consistent with the Bankruptcy Code and, as appropriate, not resolicit votes on such modified Plan.  Subject to those restrictions on modifications set forth in the Plan and the requirements of section 1127 of the Bankruptcy Code, Rule 3019 of the Federal Rules of Bankruptcy Procedure, and, to the extent applicable, sections 1122, 1123, and 1125 of the Bankruptcy Code, each of the Debtors expressly reserves its respective rights to revoke or withdraw, or to alter, amend, or modify the Plan with respect to such Debtor, one or more times, after Confirmation, and, to the extent necessary may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the

Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan.

B.      *Effect of Confirmation on Modifications.*

Entry of the Confirmation Order shall mean that all modifications or amendments to the Plan since the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

C.      *Revocation or Withdrawal of Plan.*

To the extent permitted by the Restructuring Support Agreement, the Debtors reserve the right to revoke or withdraw the Plan prior to the Confirmation Date and to File subsequent plans of reorganization.  If the Debtors revoke or withdraw the Plan, or if Confirmation or Consummation does not occur, then:  (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected under the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (3) nothing contained in the Plan shall:  (a) constitute a waiver or release of any Claims or Interests; (b) prejudice in any manner the rights of such Debtor or any other Entity; or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by such Debtor or any other Entity.

## ARTICLE XI.
## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or relating to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

a.   allow, disallow, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the secured or unsecured status, priority, amount, or allowance of Claims or Interests;

a.   decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

b.   resolve any matters related to:  (a) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Cures pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; (c) the Reorganized Debtors amending, modifying, or supplementing, after the Effective Date, pursuant to Article V hereof, any Executory Contracts or Unexpired Leases to the list of Executory Contracts and Unexpired Leases to be assumed or rejected or otherwise; and (d) any dispute regarding whether a contract or lease is or was executory or expired;

c.   ensure that distributions to holders of Allowed Claims and Allowed Interests (as applicable) are accomplished pursuant to the provisions of the Plan, including with respect to the New Warrants;

d.   adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

e.   adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code;

f.   enter and implement such orders as may be necessary to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created or entered into in connection with the Plan or the Disclosure Statement, including the Restructuring Support Agreement;

g.   enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

h.   resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the Consummation, interpretation, or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

i.   issue injunctions, enter and implement other orders, or take such other actions as may be necessary to restrain interference by any Entity with Consummation or enforcement of the Plan;

j.   resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the releases, injunctions, exculpations, and other provisions contained in Article VIII hereof and enter such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions;

k.   resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the holder of a Claim or Interest for amounts not timely repaid pursuant to Article VI.L hereof;

l.   enter and implement such orders as are necessary if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

m.   determine any other matters that may arise in connection with or relate to the Plan, the Plan Supplement, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection with the Plan or the Disclosure Statement, including the Restructuring Support Agreement;

n.   enter an order concluding or closing the Chapter 11 Cases;

o.   adjudicate any and all disputes arising from or relating to distributions under the Plan;

p.   consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

q.   determine requests for the payment of Claims and Interests entitled to priority pursuant to section 507 of the Bankruptcy Code;

r.   hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan or the Confirmation Order, including disputes arising under agreements, documents, or instruments executed in connection with the Plan;

s.   hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

t.   hear and determine all disputes involving the existence, nature, scope, or enforcement of any exculpations, discharges, injunctions, and releases granted in the Plan, including under Article VIII hereof, regardless of whether such termination occurred prior to or after the Effective Date;

u.   enforce all orders previously entered by the Bankruptcy Court; and

v.    hear any other matter not inconsistent with the Bankruptcy Code.

As of the Effective Date, notwithstanding anything in this Article XI to the contrary, the New Organizational Documents and the Exit Facilities and any documents related thereto shall be governed by the jurisdictional provisions therein and the Bankruptcy Court shall not retain jurisdiction with respect thereto.

# ARTICLE XII.
## MISCELLANEOUS PROVISIONS

A.    *Immediate Binding Effect.*

Subject to Article IX.A hereof and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan (including, for the avoidance of doubt, the documents and instruments contained in the Plan Supplement) shall be immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized Debtors, any and all holders of Claims or Interests (irrespective of whether such holders of Claims or Interests have, or are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in the Plan, each Entity acquiring property under the Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.

B.    *Additional Documents.*

On or before the Effective Date, and consistent in all respects with the terms of the Restructuring Support Agreement, the Debtors may file with the Bankruptcy Court such agreements and other documents as may be necessary to effectuate and further evidence the terms and conditions of the Plan and the Restructuring Support Agreement.  The Debtors or the Reorganized Debtors, as applicable, and all holders of Claims or Interests receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

C.    *Payment of Statutory Fees.*

All fees payable pursuant to section 1930(a) of the Judicial Code, as determined by the Bankruptcy Court at a hearing pursuant to section 1128 of the Bankruptcy Code, shall be paid by each of the Reorganized Debtors (or the Disbursing Agent on behalf of each of the Reorganized Debtors) for each quarter (including any fraction thereof) until the earlier of entry of a final decree closing such Chapter 11 Cases or an order of dismissal or conversion, whichever comes first.

D.    *Statutory Committee and Cessation of Fee and Expense Payment.*

On the Confirmation Date, any statutory committee appointed in the Chapter 11 Cases shall dissolve and members thereof shall be released and discharged from all rights and duties from or related to the Chapter 11 Cases. The Reorganized Debtors shall no longer be responsible for paying any fees or expenses incurred by the members of or advisors to any statutory committees after the Confirmation Date.

E.    *Reservation of Rights.*

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order, and the Confirmation Order shall have no force or effect if the Effective Date does not occur.  None of the Filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by any Debtor with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the holders of Claims or Interests prior to the Effective Date.

F.      *Successors and Assigns.*

     The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, Affiliate, officer, manager, director, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

G.      *Notices.*

     All notices, requests, and demands to or upon the Debtors to be effective shall be in writing (including by facsimile transmission) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

| Debtors | Counsel to the Debtors |
|---|---|
| McDermott International, Inc.<br>757 North Eldridge Parkway<br>Houston, Texas 77079<br>Attention:  John Freeman | Kirkland & Ellis LLP<br>601 Lexington Avenue<br>New York, New York 10022<br>Attention: Joshua A. Sussberg, P.C., Christopher T. Greco, P.C., and Anthony R. Grossi<br><br>and<br><br>Kirkland & Ellis LLP<br>300 North LaSalle Street<br>Chicago, Illinois 60654<br>Attention:  John R. Luze<br><br>and<br><br>Jackson Walker L.L.P.<br>1401 McKinney Street, Suite 1900<br>Houston, Texas 77010<br>Attention: Elizabeth C. Freeman and Matthew D. Cavenaugh |
| **United States Trustee** | **Counsel to the Consenting Superpriority Term Lenders and the Consenting Term Lenders** |
| Office of The United States Trustee<br>515 Rusk Street, Suite 3516<br>Houston, TX 77002 | Davis Polk & Wardwell LLP<br>450 Lexington Avenue<br>New York, NY 10017<br>Attention:  Damian S. Schaible and Natasha Tsiouris |

| Counsel to the proposed DIP LC Agent, the proposed DIP Collateral Agent, the Revolving and LC Administrative Agent, the 2018 Collateral Agent, the Superpriority Revolving Administrative Agent and the Superpriority Collateral Agent | Counsel to the proposed DIP Term Loan Agent, the 2021 LC Administrative Agent, the Superpriority Term Loan Agent, and the Term Loan Administrative Agent |
|---|---|
| Linklaters LLP<br>1345 Avenue of the Americas<br>New York, New York 10105<br>Attention:  Margot Schonholtz and Penelope Jensen<br><br>and<br><br>Bracewell LLP<br>711 Louisiana Street<br>Houston, Texas 77002<br>Attention: William A. (Trey) Wood III | Latham & Watkins LLP<br>885 Third Avenue<br>New York, NY 10022<br>Attention: Andrew Parlen and Anupama Yerramalli |
| **Counsel to the Consenting Noteholders** | |
| Paul, Weiss, Rifkind, Wharton & Garrison LLP<br>1285 Avenue of the Americas<br>New York, NY 10019<br>Attention: Andrew N. Rosenberg and Alice B. Eaton<br><br>-and-<br><br>Brown Rudnick LLP<br>7 Times Square<br>New York, NY 10036<br>Attention: Robert J. Stark and Bennett S. Silverberg | |

After the Effective Date, the Reorganized Debtors have the authority to send a notice to Entities that to continue to receive documents pursuant to Bankruptcy Rule 2002, such Entity must file a renewed request to receive documents pursuant to Bankruptcy Rule 2002.  After the Effective Date, the Reorganized Debtors are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have Filed such renewed requests.

H.      *Term of Injunctions or Stays.*

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date.  All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

I.      *Entire Agreement.*

Except as otherwise indicated, and without limiting the effectiveness of the Restructuring Support Agreement, the Plan (including, for the avoidance of doubt, the documents and instruments in the Plan Supplement) supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

J.     *Plan Supplement.*

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan.  After the exhibits and documents are Filed, copies of such exhibits and documents shall be available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from the Debtors' restructuring website at https://cases.primeclerk.com/McDermott or the Bankruptcy Court's website at www.txs.uscourts.gov/bankruptcy.  To the extent any exhibit or document is inconsistent with the terms of the Plan, unless otherwise ordered by the Bankruptcy Court, the non-exhibit or non-document portion of the Plan shall control.

K.     *Nonseverability of Plan Provisions.*

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the Debtors' or Reorganized Debtors' consent, as applicable; and (3) nonseverable and mutually dependent.

L.     *Votes Solicited in Good Faith.*

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with section 1125(g) of the Bankruptcy Code, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtors and each of their respective Affiliates, agents, representatives, members, principals, shareholders, officers, directors, employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of securities offered and sold under the Plan and any previous plan, and, therefore, neither any of such parties or individuals or the Reorganized Debtors will have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under the Plan and any previous plan.

M.     *Closing of Chapter 11 Cases.*

The Reorganized Debtors shall, promptly after the full administration of the Chapter 11 Cases, File with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Cases.

N.     *Waiver or Estoppel.*

Each holder of a Claim or an Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, secured or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement, or papers Filed with the Bankruptcy Court prior to the Confirmation Date.

O.     *Creditor Default*

An act or omission by a holder of a Claim or an Interest in contravention of the provisions of this Plan shall be deemed an event of default under this Plan. Upon an event of default, the Reorganized Debtors may seek to hold the defaulting party in contempt of the Confirmation Order and shall be entitled to reasonable attorneys' fees and costs of the Reorganized Debtors in remedying such default.  Upon the finding of such a default by a creditor, the

Bankruptcy Court may:  (a) designate a party to appear, sign and/or accept the documents required under the Plan on behalf of the defaulting party, in accordance with Bankruptcy Rule 7070; (b) enforce the Plan by order of specific performance; (c) award judgment against such defaulting creditor in favor of the Reorganized debtor in an amount, including interest, to compensate the Reorganized Debtors for the damages caused by such default; and (d) make such other order as may be equitable that does not materially alter the terms of the Plan.

Dated: January 22, 2020                    MCDERMOTT INTERNATIONAL, INC.

on behalf of itself and all other Debtors

_/s/ John Castellano_

John Castellano
Chief Restructuring Officer

001153

*SOLICITATION VERSION*

**IN THE UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| MCDERMOTT INTERNATIONAL, INC., *et al.*,[1] | ) Case No. 20-[____] (____) 30336 (DRJ) |
| | ) |
| Debtors. | ) (Joint Administration Requested) |
| | ) |

**AMENDED JOINT PREPACKAGED CHAPTER 11 PLAN OF REORGANIZATION**
**OF MCDERMOTT INTERNATIONAL, INC. AND ITS DEBTOR AFFILIATES**

---

**THIS CHAPTER 11 PLAN IS BEING SOLICITED FOR ACCEPTANCE OR REJECTION IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND WITHIN THE MEANING OF SECTION 1126 OF THE BANKRUPTCY CODE. THIS CHAPTER 11 PLAN WILL BE SUBMITTED TO THE BANKRUPTCY COURT FOR APPROVAL FOLLOWING SOLICITATION AND THE DEBTORS' FILING FOR CHAPTER 11 BANKRUPTCY.**

---

**JACKSON WALKER L.L.P.**
Matthew D. Cavenaugh (TX Bar No. 24062656)
Jennifer F. Wertz (TX Bar No. 24072822)
Kristhy M. Peguero (TX Bar No. 24102776)
Veronica A. Polnick (TX Bar No. 24079148)
1401 McKinney Street, Suite 1900
Houston, Texas 77010
Telephone:     (713) 752-4200
Facsimile:     (713) 752-4221
Email:     mcavenaugh@jw.com
               jwertz@jw.com
               kpeguero@jw.com
               vpolnick@jw.com

*Proposed Co-Counsel to the Debtors*
*and Debtors in Possession*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (*pro hac vice* pending)
Christopher T. Greco, P.C. (*pro hac vice* pending)
Anthony R. Grossi (*pro hac vice* pending)
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900
Email:     joshua.sussberg@kirkland.com
               christopher.greco@kirkland.com
               anthony.grossi@kirkland.com

-and-

James H.M. Sprayregen, P.C.
John R. Luze (*pro hac* vice pending)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:     (312) 862-2200
Email:     james.sprayregen@kirkland.com
               john.luze@kirkland.com

*Proposed Co-Counsel to the Debtors*
*and Debtors in Possession*

Dated: January 21 22, 2020

---

[1]     A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://cases.primeclerk.com/McDermott. The location of Debtor McDermott International, Inc.'s principal place of business and the Debtors' service address in these chapter 11 cases is 757 North Eldridge Parkway, Houston, Texas 77079.

## **TABLE OF CONTENTS**

ARTICLE I. DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, AND
      GOVERNING LAW ............................................................................................................... 1
    A.    Defined Terms. ............................................................................................................ 1
    B.    Rules of Interpretation. ............................................................................................. 18
    C.    Computation of Time. ............................................................................................... 19
    D.    Governing Law. ........................................................................................................ 19
    E.    Reference to Monetary Figures. ............................................................................... 19
    F.    Reference to the Debtors or the Reorganized Debtors. ............................................ 19
    G.    Controlling Document. ............................................................................................. 19
    H.    Consultation, Information, Notice, and Consent Rights............................................ 19

ARTICLE II. ADMINISTRATIVE CLAIMS, DIP CLAIMS,  PRIORITY CLAIMS, AND
      RESTRUCTURING EXPENSES ........................................................................................ 20
    A.    Administrative Claims. ............................................................................................. 20
    B.    DIP Claims. ............................................................................................................... 20
    C.    Professional Claims................................................................................................... 21
    D.    Priority Tax Claims................................................................................................... 22
    E.    Payment of Restructuring Expenses, Consent Fee. .................................................. 22

ARTICLE III. CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS ................................. 22
    A.    Classification of Claims and Interests. .................................................................... 22
    B.    Treatment of Claims and Interests. .......................................................................... 23
    C.    Special Provision Governing Unimpaired Claims. .................................................. 29
    D.    Elimination of Vacant Classes. ................................................................................ 29
    E.    Voting Classes, Presumed Acceptance by Non-Voting Classes. ............................. 29
    F.    Intercompany Interests. ............................................................................................ 29
    G.    Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code. ................. 29
    H.    Controversy Concerning Impairment. ...................................................................... 29
    I.    Subordinated Claims. ............................................................................................... 29

ARTICLE IV. MEANS FOR IMPLEMENTATION OF THE PLAN ............................................................. 30
    A.    General Settlement of Claims and Interests. ............................................................ 30
    B.    Restructuring Transactions. ...................................................................................... 30
    C.    Reorganized Debtors................................................................................................. 30
    D.    Technology Business Sale......................................................................................... 31
    E.    Sources of Consideration for Plan Distributions. ..................................................... 32
    F.    Corporate Existence. ................................................................................................ 34
    G.    Vesting of Assets in the Reorganized Debtors. ........................................................ 35
    H.    Cancellation of Existing Securities and Agreements. .............................................. 35
    I.    Corporate Action. ..................................................................................................... 36
    J.    New Organizational Documents. .............................................................................. 36
    K.    Indemnification Obligations...................................................................................... 36
    L.    Directors and Officers of the Reorganized Debtors. ................................................ 37
    M.    Effectuating Documents; Further Transactions........................................................ 37
    N.    Section 1146 Exemption. .......................................................................................... 37
    O.    Director and Officer Liability Insurance. ................................................................. 37
    P.    Management Incentive Plan. ..................................................................................... 38
    Q.    Employee and Retiree Benefits. ............................................................................... 38
    R.    Preservation of Causes of Action. ............................................................................ 38

ARTICLE V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ............................. 39
    A.    Assumption and Rejection of Executory Contracts and Unexpired Leases. ................... 39

B.      Claims Based on Rejection of Executory Contracts or Unexpired Leases. ................................... 40
C.      Cure of Defaults for Assumed Executory Contracts and Unexpired Leases. ................................... 40
D.      Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases. .......... 41
E.      Insurance Policies. ............................................................................................................. 41
F.      Reservation of Rights. ......................................................................................................... 41
G.      Nonoccurrence of Effective Date. ........................................................................................ 42
H.      Employee Compensation and Benefits. .................................................................................. 42
I.      Contracts and Leases Entered Into After the Petition Date. ....................................................... 42
J.      Assumption of Cameron LNG Project Obligations ................................................................... 43

ARTICLE VI. PROVISIONS GOVERNING DISTRIBUTIONS ............................................................ 43
A.      Distributions on Account of Claims Allowed as of the Effective Date. ....................................... 43
B.      Disbursing Agent. .............................................................................................................. 43
C.      Rights and Powers of Disbursing Agent. ................................................................................ 43
D.      Delivery of Distributions and Undeliverable or Unclaimed Distributions. ................................... 44
E.      Manner of Payment. ........................................................................................................... 45
F.      Section 1145 Exemption. ..................................................................................................... 45
G.      Compliance with Tax Requirements. ..................................................................................... 45
H.      Allocations. ...................................................................................................................... 45
I.      No Postpetition Interest on Claims ........................................................................................ 45
J.      Foreign Currency Exchange Rate. ......................................................................................... 45
K.      Setoffs and Recoupment. .................................................................................................... 46
L.      Claims Paid or Payable by Third Parties ................................................................................ 46

ARTICLE VII. PROCEDURES FOR RESOLVING CONTINGENT,  UNLIQUIDATED, AND
              DISPUTED CLAIMS ........................................................................................... 47
A.      Disputed Claims Process. .................................................................................................... 47
B.      Allowance of Claims. ......................................................................................................... 47
C.      Claims Administration Responsibilities. ................................................................................. 47
D.D.    Estimation of Claims and Interests. ....................................................................................... 47
.E.     Adjustment to Claims or Interests without Objection. ............................................................... 48
E.F.    Disallowance of Claims or Interests. ...................................................................................... 48
F.G.    No Distributions Pending Allowance. .................................................................................... 48
G.H.    Distributions After Allowance. ............................................................................................. 48
H.I.    No Interest. ...................................................................................................................... 48

ARTICLE VIII. SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS ...................... 48
A.      Discharge of Claims and Termination of Interests. ................................................................... 48
B.      Release of Liens. ............................................................................................................... 49
C.      Releases by the Debtors. ..................................................................................................... 49
D.      Releases by the Releasing Parties. ........................................................................................ 51
E.      Exculpation. ..................................................................................................................... 52
F.      Injunction. ....................................................................................................................... 52
G.      Protections Against Discriminatory Treatment. ....................................................................... 53
H.      Document Retention. .......................................................................................................... 53
I.      Reimbursement or Contribution. ........................................................................................... 53

ARTICLE IX. CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN ................................. 53
A.      Conditions Precedent to the Effective Date. ............................................................................ 53
B.      Waiver of Conditions. ........................................................................................................ 55
C.      Effect of Failure of Conditions. ........................................................................................... 55
D.      Substantial Consummation .................................................................................................. 55

ARTICLE X. MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN ............................. 55
A.      Modification and Amendments. ............................................................................................ 55
B.      Effect of Confirmation on Modifications. ............................................................................... 56

C.      Revocation or Withdrawal of Plan. ................................................................56

ARTICLE XI. RETENTION OF JURISDICTION ......................................................................56

ARTICLE XII. MISCELLANEOUS PROVISIONS ....................................................................58
    A.      Immediate Binding Effect. ...............................................................................58
    B.      Additional Documents. .....................................................................................58
    C.      Payment of Statutory Fees. ...............................................................................58
    D.      Statutory Committee and Cessation of Fee and Expense Payment. ..................58
    E.      Reservation of Rights. .......................................................................................58
    F.      Successors and Assigns. .....................................................................................59
    G.      Notices. ..............................................................................................................59
    H.      Term of Injunctions or Stays. ...........................................................................60
    I.      Entire Agreement. ..............................................................................................60
    J.      Plan Supplement. ...............................................................................................60
    K.      Nonseverability of Plan Provisions. .................................................................61
    L.      Votes Solicited in Good Faith. ..........................................................................61
    M.      Closing of Chapter 11 Cases. ............................................................................61
    N.      Waiver or Estoppel. ...........................................................................................61
    O.      Creditor Default .................................................................................................61

## INTRODUCTION

McDermott International, Inc. and the above-captioned debtors and debtors in possession (collectively, the "Debtors"), propose this joint prepackaged chapter 11 plan of reorganization (the "Plan") for the resolution of the outstanding claims against, and equity interests in, the Debtors.  Although proposed jointly for administrative purposes, the Plan constitutes a separate Plan for each Debtor.  Holders of Claims or Interests may refer to the Disclosure Statement for a discussion of the Debtors' history, businesses, assets, results of operations, historical financial information, risk factors, a summary and analysis of this Plan, the Restructuring Transactions, and certain related matters.  The Debtors are the proponents of the Plan within the meaning of section 1129 of the Bankruptcy Code.

ALL HOLDERS OF CLAIMS, TO THE EXTENT APPLICABLE, ARE ENCOURAGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

## ARTICLE I.
## DEFINED TERMS, RULES OF INTERPRETATION,
## COMPUTATION OF TIME, AND GOVERNING LAW

A.     *Defined Terms.*

As used in this Plan, capitalized terms have the meanings set forth below.

"*2018 Collateral Agent*" means Crédit Agricole Corporate and Investment Bank, in its capacity as Collateral Agent in respect of the Credit Agreement, the 2021 LC Facility, and the Lloyds LC Facility.

"*2021 LC Agreement*" means that certain letter of credit agreement dated as of October 30, 2018 by and among certain of the Debtors as applicants and guarantors thereto, and the 2021 LC Administrative Agent, as may be amended, supplemented, or otherwise modified from time to time.

"*2021 LC Administrative Agent*" means Barclays Bank PLC, as administrative agent for the 2021 LC Agreement.

"*2021 LC Facility*" means the $230,000,000.00 senior secured letter of credit facility under the 2021 LC Agreement.

"*2021 Letter of Credit Claims*" means any Claim for obligations arising under, or relating to, the 2021 LC Facility, including Claims for all principal amounts outstanding, interest, fees, expenses, costs and other charges arising thereunder or related thereto.

"*2021 Letters of Credit*" means the letters of credit issued under the 2021 LC Facility.

"*2023 LC Facility*" means the $1,440,000,000.00 senior secured letter of credit facility under the Credit Agreement.

"*2023 Letter of Credit Claims*" means any Claim for obligations arising under, or relating to, the 2023 LC Facility, including Claims for all principal amounts outstanding, interest, fees, expenses, costs and other charges arising thereunder or related thereto.

"*2023 Letters of Credit*" means the letters of credit issued under the 2023 LC Facility.

"*Achievement Target*" means the (i) final, binding signed documentation reflecting (x) positive value adjustment of $235 million in projected gross profit and (y) $285 million in letter of credit relief and (ii) project cost savings of $560 million through the employment of risk mitigation strategies, in each case subject to the satisfaction of the Required Consenting Term Lenders and the Required Consenting Revolving Lenders in their sole discretion.

"*Additional Obligations*" shall have the meaning specified in the DIP Credit Facility Term Sheet.

"*Administrative Claim*" means a Claim for costs and expenses of administration of the Chapter 11 Cases pursuant to sections 327, 328, 330, 365, 503(b), 507(a), 507(b), or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses of preserving the Estates and operating the businesses of the Debtors incurred on or after the Petition Date and through the Effective Date; (b) Allowed Professional Claims; and (c) all fees and charges assessed against the Estates under chapter 123 of the Judicial Code.

"*Affiliate*" has the meaning set forth in section 101(2) of the Bankruptcy Code.

"*Agents*" means, collectively, the DIP Agents, the Revolving and LC Administrative Agent, the Term Loan Administrative Agent, the 2021 LC Administrative Agent, the 2018 Collateral Agent, the Superpriority Revolving Administrative Agent, the Superpriority Term Loan Agent, the Superpriority Collateral Agent, and each administrative agent, collateral agent, trustee or other similar agent in respect of the Exit Facilities solely in its capacity as such.

"*Allowed*" means, as to a Claim or Interest, a Claim or Interest allowed under the Plan, under the Bankruptcy Code, or by a final order as applicable.

"*Assumed Executory Contracts and Unexpired Leases Schedule*" means the schedule of Executory Contracts and Unexpired Leases to be assumed by the Debtors pursuant to the Plan, which shall be included in the Plan Supplement, as the same may be amended, modified, or supplemented from time to time; *provided* that such schedule shall be in form and substance acceptable to the Required Consenting Lenders.

"*Avoidance Actions*" means any and all actual or potential avoidance, recovery, subordination, or other Claims, Causes of Action, or remedies that may be brought by or on behalf of the Debtors or their Estates or other authorized parties in interest under the Bankruptcy Code or applicable non-bankruptcy law, including Claims, Causes of Action, or remedies under sections 502, 510, 542, 544, 545, 547 through 553, and 724(a) of the Bankruptcy Code or under similar local, state, federal, or foreign statutes and common law, including fraudulent transfer laws.

"*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as amended from time to time.

"*Bankruptcy Court*" means the United States Bankruptcy Court for the Southern District of Texas.

"*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure promulgated under section 2075 of the Judicial Code and the general, local, and chambers rules of the Bankruptcy Court, each, as amended from time to time.

"*Barclays Advisors*" means Latham & Watkins LLP and any other local or foreign advisors.

"*Bidding Procedures*" means the procedures governing the auction and the Technology Business Sale, as approved by the Bankruptcy Court and as may be amended from time to time in accordance with their terms.

"*Bilateral Facilities*" means those certain bilateral facilities entered into by various Debtors and their affiliates and the individual lenders party thereto, including:

    (a) that certain facility agreement (as amended), dated April 13, 2016, between McDermott International, Inc., as borrower, McDermott Middle East, Inc., McDermott Eastern Hemisphere, Ltd., McDermott Arabia Company Limited, as guarantors, and Abu Dhabi Commercial Bank PJSC, as lending bank;

    (b) that certain credit facility agreement (as amended), dated April 30, 2018, between CBI Eastern Anstalt, as borrower, and Mashreqbank PSC, as lending bank;

(c)    that certain credit agreement (as amended) dated as of July 19, 2018 between Arabian CBI Company Limited, as customer, McDermott International Inc., as guarantor, and Samba Financial Group, as lending bank;

(d)    that certain facility letter (as amended), dated as of January 29, 2018 between McDermott Middle East, Inc., and McDermott Eastern Hemisphere, Ltd., as applicants, McDermott International, Inc., as guarantor, and International Bank of Qatar, as lending bank;

(e)    that certain reimbursement agreement for letters of credit or guarantees, dated July 30, 2015 between McDermott International, Inc., as applicant and Riyad Bank, as lending bank;

(f)    that certain facility agreement between McDermott Middle East Inc., as borrower, McDermott International, Inc., as guarantor, and First Gulf Bank, as lending bank;

(g)    that certain letter of credit reimbursement agreement (as novated), dated August 1, 2007 between J. Ray McDermott S.A., as applicant and Standard Chartered Bank, as lending bank;

(h)    that certain master reimbursement agreement between J. Ray McDermott S.A., as applicant, McDermott International, Inc., as guarantor, and ICICI Bank Limited, as lending bank;

(i)    that certain reimbursement agreement between Chicago Bridge and Iron Company, N.V., as customer, and Europe Arab Bank PLC, as lending bank;

(j)    that certain credit facilities agreement, dated April 4, 2019 between McDermott Middle East, Inc. and McDermott Middle East, Inc. Panama, as borrowers, McDermott International, Inc., as guarantor, and Commercial Bank of Dubai PSC, as lending bank; and

(k)    that certain (a) indemnity and undertaking, dated as of June 28, 2019 between Comet II, B.V., as borrower and tThe Standard Bank of South African Limited, as lending bank and (b) parent company guarantee, dated as of June 28, 2019 between McDermott International, Inc. as guarantor and The Standard Bank of South Africa Limited as lending bank.

"*Business Day*" means any day other than a Saturday, Sunday, or other day on which commercial banks are authorized to close under the laws of, or are in fact closed in, the State of New York.

"*Business Plan*" means the business plan for the Reorganized Debtors.

"*Cameron LNG Contractor*" means CCJV, an unincorporated joint venture the members of which are CB&I LLC (as successor in interest) and Chiyoda International Corporation.

"*Cameron LNG EPC Agreement*" means that certain Engineering, Procurement and Construction Contract, dated as of March 17, 2014, between Cameron LNG, LLC and the Cameron LNG Contractor (as amended).

"*Cameron LNG Project Obligations*" means, collectively, the obligations of any Debtor under: (a) that certain EPC Joint Venture Agreement, dated March 17, 2014 between CB&I LLC (as successor in interest) and Chiyoda International Corporation (as amended); and (b) the Cameron LNG EPC Agreement.

"*Cameron LNG Replacement Guarantee*" means a guarantee, which Reorganized McDermott shall execute and deliver to Cameron LNG, LLC, guaranteeing on a joint and several basis on behalf of CB&I LLC the payment and performance of the obligations of the Cameron LNG Contractor under the Cameron LNG EPC Agreement, whether arising prior to or after the execution of such guarantee.

"*Cash*" means cash in legal tender of the United States of America and cash equivalents, including bank deposits, checks, and other similar items.

3

"*Cash Management Bank*" means any financial institution through which the Debtors have entered into "Cash Management Arrangements" (as defined in the Credit Agreement).

"*Cash Secured LC Exit Facility*" means a 4-year, cash secured letter of credit exit facility in an amount up to $371 million, and otherwise on terms satisfactory to the Required Consenting Lenders, and set forth in the Definitive Documents to be included in the Plan Supplement.

"*Cash Secured Letter of Credit Claims*" means any Claim for obligations arising under, or relating to, the Cash Secured Letters of Credit, including Claims for all principal amounts outstanding, interest, fees, expenses, costs and other charges arising thereunder or related thereto.

"*Cash Secured Letters of Credit*" means the "Cash Secured Letters of Credit" issued under and on the terms set forth under the Credit Agreement.

"*Cause of Action*" or "*Causes of Action*" means any claims, interests, damages, remedies, causes of action, demands, rights, actions, controversies, proceedings, agreements, suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, Liens, indemnities, guaranties, and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, secured or unsecured, assertable, directly or derivatively, matured or unmatured, suspected or unsuspected, in contract, tort, law, equity, or otherwise.  Causes of Action also include: (a) all rights of setoff, counterclaim, or recoupment and claims under contracts or for breaches of duties imposed by law or in equity; (b) the right to object to or otherwise contest Claims or Interests; (c) claims pursuant to section 362 or chapter 5 of the Bankruptcy Code; (d) such claims and defenses as fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) any Avoidance Action.

"*Chapter 11 Cases*" means (a) when used with reference to a particular Debtor, the case pending for that Debtor under chapter 11 of the Bankruptcy Code in the Bankruptcy Court and (b) when used with reference to all the Debtors, the procedurally consolidated chapter 11 cases pending for the Debtors in the Bankruptcy Court.

"*Chiyoda Replacement Guarantee*" means a guarantee which Reorganized McDermott shall execute and deliver to Chiyoda International Corporation in accordance with Section 15.3 of the EPC Joint Venture Agreement, dated March 17, 2014 between CB&I LLC (as successor in interest) and Chiyoda International Corporation (as amended) as required by the Guaranty and Indemnity Agreement entered into by and between CB&I LLC, McDermott International and Chiyoda International Corporation.

"*Claim*" means any claim, as defined in section 101(5) of the Bankruptcy Code, against any of the Debtors.

"*Claims and Balloting Agent*" means Prime Clerk LLC, the notice, claims, and solicitation agent proposed to be retained by the Debtors in the Chapter 11 Cases.

"*Claims Register*" means the official register of Claims maintained by the Claims and Balloting Agent.

"*Class*" means a class of Claims or Interests as set forth in Article III of the Plan pursuant to section 1122(a) of the Bankruptcy Code.

"*CM/ECF*" means the Bankruptcy Court's Case Management and Electronic Case Filing system.

"*Company Party*" has the meaning set forth in the Restructuring Support Agreement.

"*Compensation and Benefits Programs*" means all employment and severance agreements and policies, and all employment, compensation, and benefit plans, policies, workers' compensation programs, savings plans, retirement plans, deferred compensation plans, supplemental executive retirement plans, healthcare plans, disability plans, severance benefit plans, incentive plans, life and accidental death and dismemberment insurance plans, and programs of the Debtors, and all amendments and modifications thereto, applicable to the Debtors' employees, former employees, retirees, and non-employee directors and the employees, former employees and retirees of their

4

subsidiaries, including all savings plans, retirement plans, health care plans, disability plans, severance benefit agreements, and plans, incentive plans, deferred compensation plans and life, accidental death, and dismemberment insurance plans.

"*Confirmation*" means the Bankruptcy Court's entry of the Confirmation Order on the docket of the Chapter 11 Cases.

"*Confirmation Date*" means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases, within the meaning of Bankruptcy Rules 5003 and 9021.

"*Confirmation Hearing*" means the hearing to be held by the Bankruptcy Court on confirmation of the Plan, pursuant to Bankruptcy Rule 3020(b)(2) and sections 1128 and 1129 of the Bankruptcy Code, as such hearing may be continued from time to time.

"*Confirmation Order*" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code and approving the consummation of the Technology Business Sale.

"*Consenting 2021 LC Lenders*" has the meaning set forth in the Restructuring Support Agreement.

"*Consenting 2023 LC Lenders*" has the meaning set forth in the Restructuring Support Agreement.

"*Consenting Cash Secured LC Issuers*" has the meaning set forth in the Restructuring Support Agreement.

"*Consenting LC Lenders*" has the meaning set forth in the Restructuring Support Agreement.

"*Consenting Lenders*" has the meaning set forth in the Restructuring Support Agreement.

"*Consenting Noteholders*" has the meaning set forth in the Restructuring Support Agreement.

"*Consenting Revolving Lenders*" has the meaning set forth in the Restructuring Support Agreement.

"*Consenting Stakeholders*" has the meaning set forth in the Restructuring Support Agreement.

"*Consenting Superpriority LC Lenders*" has the meaning set forth in the Restructuring Support Agreement.

"*Consenting Superpriority Term Lenders*" has the meaning set forth in the Restructuring Support Agreement.

"*Consenting Term Lenders*" has the meaning set forth in the Restructuring Support Agreement.

"*Consummation*" means the occurrence of the Effective Date.

"*Credit Agreement*" means that certain credit agreement dated as of May 10, 2018, by and among certain of the Debtors as borrowers and guarantors thereto, the Revolving and LC Administrative Agent, the Term Loan Administrative Agent, the Issuers (as defined in the Credit Agreement), and the lenders from time to time party thereto, as may be amended, supplemented, or otherwise modified from time to time.

"*Credit Agreement Hedging Claims*" means Claims in respect of Credit Agreement Hedging Obligations, which, for the avoidance of doubt, shall not include DIP Hedging Obligations.

"*Credit Agreement Hedging Obligations*" means mark-to-market obligations arising out of the termination of any "Hedging Obligations" (as defined under the Credit Agreement) prior to the Effective Date.

"*Cure*" means all amounts, including an amount of $0.00, required to cure any monetary defaults under any Executory Contract or Unexpired Lease (or such lesser amount as may be agreed upon by the parties under an

Executory Contract or Unexpired Lease) that is to be assumed by the Debtors pursuant to sections 365 or 1123 of the Bankruptcy Code.

"*D&O Liability Insurance Policies*" means all insurance policies of any of the Debtors for directors', managers', and officers' liability existing as of the Petition Date (including any "tail policy") and all agreements, documents, or instruments relating thereto.

"*Definitive Documents*" means the documents listed in Section 3 of the Restructuring Support Agreement.

"*DIP Agents*" means the DIP LC Agent, the DIP Collateral Agent, and the DIP Term Loan Agent.

"*DIP Cash Secured Letter of Credit Claim*" means any Claim for obligations arising under, or relating to, the DIP Cash Secured LC Facility, including Claims for all principal amounts outstanding, interest, fees, expenses, costs and other charges arising thereunder or related thereto.

"*DIP Cash Secured Letters of Credit*" means the letters of credit issued pursuant to the DIP Cash Secured LC Facility.

"*DIP Cash Secured LC Facility*" means the cash secured letter of credit facility pursuant to which up to $100 million of the DIP Letter of Credit Facility may be allocated.

"*DIP Claims*" means all Claims (including adequate protection Claims) derived from, arising under, based upon, or secured pursuant to the DIP Credit Agreement, including all prepetition Claims rolled into the DIP Credit Facility and all other Claims in respect of principal amounts outstanding, interest, fees, expenses, costs, hedging obligations, and other charges arising thereunder or related thereto, in each case, with respect to the DIP Credit Facility.

"*DIP Collateral Agent*" means Crédit Agricole Corporate and Investment Bank in its capacity as collateral agent under the DIP Credit Agreement.

"*DIP Credit Agreement*" means that certain superpriority secured debtor-in-possession credit agreement that governs the DIP Credit Facility (as may be amended, supplemented, or otherwise modified from time to time), among McDermott International, Inc., as parent, certain of the Debtors as borrowers, the lenders party thereto, the DIP Lenders, the DIP Letter of Credit Issuers, and the DIP Agents.

"*DIP Credit Facility*" means the superpriority committed credit facilities provided by the DIP Lenders, which includes the DIP Letter of Credit Facility, the DIP Term Loan Facility, the DIP Hedging Obligations, and any other obligations specified in the DIP Financing Orders.

"*DIP Credit Facility Term Sheet*" means the DIP Credit Facility Term Sheet attached as Exhibit 2 to the Restructuring Term Sheet.

"*DIP Financing Orders*" means the interim order approving the DIP Credit Facility and the final order approving the DIP Credit Facility, to be filed and approved by the Bankruptcy Court in the Chapter 11 Cases.

"*DIP Hedging Obligations*" means all hedging obligations subject to or deemed incurred under the DIP Credit Facility (including, for the avoidance of doubt all obligations in respect of the Debtors' prepetition foreign currency hedging transactions and $500 million notional amount of interest rate hedging transactions rolled into the DIP credit facility pursuant to the DIP Financing Orders and the Hedging Orders).

"*DIP LC Agent*" means Crédit Agricole Corporate and Investment Bank in its capacity as letter of credit administrative agent under the DIP Credit Agreement.

"*DIP LC Claim*" means any Claim of a DIP Lender, a DIP Letter of Credit Issuer, or the DIP Agents arising under or relating to the DIP Letter of Credit Facility pursuant to the DIP Credit Agreement.

"*DIP Lenders*" means the lenders party to the DIP Credit Agreement with respect to the DIP Credit Facility.

"*DIP Letter of Credit Facility*" means the senior secured superpriority letter of credit facility plus interest, fees, and other amounts due in respect of the Superpriority Letters of Credit (including the DIP Cash Secured LC Facility), provided under the DIP Credit Agreement and approved by the Bankruptcy Court pursuant to the DIP Financing Orders.

"*DIP Letter of Credit Issuers*" means the "Issuing Banks" under the DIP Credit Agreement.

"*DIP Letters of Credit*" means (i) the $543 million of new and incremental letters of credit to be provided under the DIP Letter of Credit Facility (including the DIP Cash Secured Letters of Credit) plus (ii) the DIP Roll-Up Letters of Credit.

"*DIP Roll-Up Letters of Credit*" means (i) those Superpriority Letters of Credit, including Claims for all reimbursement obligations outstanding, interest, fees, expenses, costs, and other charges arising thereunder or relating thereto, that are "rolled-up" and deemed issued under the DIP Letter of Credit Facility pursuant to the final DIP Financing Order and (ii) any obligations to be deemed outstanding under the DIP Letter of Credit Facility.

"*DIP Roll-Up Term Loans*" means the term loans outstanding under the Superpriority Term Loan Facility that upon entry of the final DIP Financing Order, shall be deemed to be issued under the DIP Term Loan Facility, including all of the Claims arising under, derived from, based upon, or secured pursuant to the Superpriority Term Loan Facility plus the Claims for all principal amounts outstanding, interest, fees, expenses, costs, the Make Whole Amount, and other charges arising thereunder or related thereto, in each case, with respect to the Superpriority Term Loan Facility.

"*DIP Term Loan Agent*" means Barclays Bank PLC, in its capacity as term loan administrative agent under the DIP Credit Agreement.

"*DIP Term Loan Claim*" means any Claim of a DIP Lender or the DIP Agents arising under or relating to the DIP Term Loan Facility pursuant to the DIP Credit Agreement or the DIP Financing Orders.

"*DIP Term Loan Facility*" means a superpriority term loan facility, comprised of up to $1.2 billion principal amount of New DIP Term Loans plus $800 million principal amount of the Superpriority Term Loans rolled into the DIP Term Loan Facility plus the Make Whole Amount plus the Additional Obligations and approved by the Bankruptcy Court pursuant to the DIP Financing Orders.

"*DIP Term Loans*" means the New DIP Term Loans and the DIP Roll-Up Term Loans.

"*Disbursing Agent*" means the Reorganized Debtors or the Entity or Entities selected by the Debtors or the Reorganized Debtors, as applicable, to make or facilitate distributions pursuant to the Plan.

"*Disclosure Statement*" means the disclosure statement for the Plan, including all exhibits and schedules thereto, to be approved by the Confirmation Order.

"*Disputed*" means, as to a Claim or an Interest, any Claim or Interest: (a) that is not Allowed; (b) that is not disallowed by the Plan, the Bankruptcy Code, or a Final Order, as applicable; (c) as to which a dispute is being adjudicated by a court of competent jurisdiction in accordance with non-bankruptcy law; (d) that is Filed in the Bankruptcy Court and not withdrawn, as to which a timely objection or request for estimation has been Filed; and (e) with respect to which a party in interest has Filed a Proof of Claim or otherwise made a written request to a Debtor for payment, without any further notice to or action, order, or approval of the Bankruptcy Court.

"*Distribution Date*" means, except as otherwise set forth herein, the date or dates determined by the Debtors or the Reorganized Debtors, on or after the Effective Date, with the first such date occurring on or as soon as is reasonably practicable after the Effective Date, upon which the Distribution Agent shall make distributions to holders of Allowed Claims entitled to receive distributions under the Plan.

"*Distribution Record Date*" means, other than with respect to publicly held Securities, the record date for purposes of making distributions under the Plan on account of Allowed Claims, which date shall be on or as soon as is reasonably practicable after the Effective Date.  For the avoidance of doubt, no distribution record date shall apply to holders of public securities.

"*Effective Date*" means the date that is the first Business Day on which (a) no stay of the Confirmation Order is in effect and (b) all conditions precedent to the occurrence of the Effective Date set forth in Article IX.A of the Plan have been satisfied or waived in accordance with Article IX.B of the Plan.  Any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable thereafter.

"*Entity*" has the meaning set forth in section 101(15) of the Bankruptcy Code.

"*Estate*" means as to each Debtor, the estate created for such Debtor in its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code upon the commencement of such Debtor's Chapter 11 Case.

"*Exchange Act*" means the Securities Exchange Act of 1934, 15 U.S.C. § 78a, *et seq.*, as amended from time to time.

"*Exculpated Parties*" means collectively, and in each case in its capacity as such: (a) the Debtors; (b) any official committees appointed in the Chapter 11 Cases and each of their respective members; (c) the Consenting Stakeholders and any affiliated Hedge Banks; (d) each Agent and the Senior Notes Trustee, and (e) with respect to each of the foregoing, such Entity and its current and former Affiliates, and such Entity's and its current and former Affiliates' current and former equity holders, subsidiaries, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals.

"*Executory Contract*" means a contract to which one or more of the Debtors is a party and that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

"*Existing Common Equity Interests*" means the common stock of McDermott, which is traded and quoted on the New York Stock Exchange under the symbol "MDR," any and all outstanding and unexercised or unvested warrants, options, or rights to acquire such common stock existing prior to the Petition Date, and any Section 510(b) Claims.

"*Existing Preferred Equity Interests*" means all outstanding 12% Redeemable Preferred Stock in McDermott, issued on November 29, 2018, and the Series A Preferred Stock of McDermott, issued on December 2, 2019, and any Section 510(b) Claims.

"*Exit Facilities*" means, collectively, the Term Loan Exit Facility, the Cash Secured LC Exit Facility, and the Exit LC Facilities, as applicable.

"*Exit Facility Agents*" means each of the administrative agents, trustees, or other similar agents under the Exit Facility Agreement, solely in its capacity as such.

"*Exit Facility Agreement*" means that certain agreement to provide the Exit Facilities, if any, dated as of the Effective Date, by and among the Reorganized Debtors party thereto as borrowers, Reorganized McDermott, the Exit Facility Agents, the issuing banks party thereto, and the lender parties thereto, which shall be included in the Plan Supplement.

"*Exit Facility Documents*" means, collectively, the Exit Facility Agreement, and any and all other agreements, documents, and instruments delivered or to be entered into in connection therewith, including any guarantee agreements, pledge and collateral agreements, intercreditor agreements, and other security documents, in each case if any, the terms of which documents shall be acceptable to the Debtors or the Reorganized Debtors, as applicable, and the Required Consenting Lenders.

"*Exit LC Facilities*" means the Super Senior Exit Facility, the Senior Exit LC Facility, and the Roll-Off LC Exit Facility.

"*Federal Judgment Rate*" means the federal judgment rate in effect as of the Petition Date.

"*File*," "*Filed*," or "*Filing*" means file, filed, or filing with the Bankruptcy Court or its authorized designee in the Chapter 11 Cases.

"*Final Order*" means an order or judgment of the Bankruptcy Court, or court of competent jurisdiction with respect to the subject matter that has not been reversed, stayed, modified, or amended, as entered on the docket in any Chapter 11 Case or the docket of any court of competent jurisdiction, and as to which the time to appeal, or seek certiorari or move for a new trial, reargument, or rehearing has expired and no appeal or petition for certiorari or other proceedings for a new trial, reargument, or rehearing has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be timely filed has been withdrawn or resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought or the new trial, reargument, or rehearing will have been denied, resulted in no stay pending appeal of such order, or has otherwise been dismissed with prejudice; *provided* that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed with respect to such order will not preclude such order from being a Final Order.

"*Funded DIP Indebtedness*" means indebtedness under the DIP Credit Facility in respect of the DIP Term Loans (which for the avoidance of doubt includes the Superpriority Term Loans rolled up into the DIP Credit Facility, but excludes any DIP Hedging Obligations) and the Additional Obligations.

"*General Unsecured Claim*" means any Unsecured Claim against a Debtor other than the Bilateral Facility Claims and the Senior Notes Claims.

"*Governmental Unit*" has the meaning set forth in section 101(27) of the Bankruptcy Code.

"*Hedge Bank*" means, with respect to any Consenting Lender, either such Consenting Lender or an affiliate of such Consenting Lender that has entered into "Hedging Obligations" (as defined in the Credit Agreement) with the Debtors.

"*Impaired*" means with respect to a Class of Claims or Interests, a Class of Claims or Interests that is impaired within the meaning of section 1124 of the Bankruptcy Code.

"*Insider*" has the meaning set forth in section 101(31) of the Bankruptcy Code.

"*Intercompany Claim*" means any Claim held by a Debtor or an Affiliate against a Debtor or an Affiliate of a Debtor.

"*Intercompany Interest*" means an Interest in a Debtor held by a Debtor or an Affiliate of a Debtor.

"*Interest*" means any equity security (as defined in section 101(16) of the Bankruptcy Code) in any Debtor and any other rights, options, warrants, stock appreciation rights, phantom stock rights, restricted stock units, performance shares, performance units, redemption rights, repurchase rights, convertible, exercisable or exchangeable Securities or other agreements, arrangements or commitments of any character relating to, or whose value is related to, any such interest or other ownership interest in any Debtor.

"*Judicial Code*" means title 28 of the United States Code, 28 U.S.C. §§ 1–4001, as amended from time to time.

"*Lloyds LC Bank*" means Lloyds Bank PLC, as the Bank under the Lloyds Letter of Credit Agreement.

9

"*Lloyds LC Facility*" means the $127,000,000.00 senior secured letter of credit facility under the Lloyds Letter of Credit Agreement.

"*Lloyds Letter of Credit Agreement*" means that certain master agreement for stand-by letters of credit originally dated as of June 10, 2013 by and among Lloyds Bank plc (formerly known as Lloyds TSB Bank plc) and Comet II B.V., CB&I, LLC, Chicago Bridge and Iron Company B.V., CBI Services, LLC, CB&I UK Limited, CBI Constructors PTY LTD, CB&I Group Inc., and Woodlands International Insurance Ltd, as amended and restated May 10, 2018 in connection with the Business Combination (as defined therein) with McDermott and certain of its subsidiaries, as may be amended, supplemented, or otherwise modified from time to time.

"*Lloyds Letter of Credit Claims*" means any Claim for obligations arising under, or relating to, the Lloyds LC Facility, including Claims for all principal amounts outstanding, interest, fees, expenses, costs and other charges arising thereunder or related thereto.

"*Lloyds Letters of Credit*" means the letters of credit issued under the Lloyds LC Facility.

"*Lien*" has the meaning set forth in section 101(37) of the Bankruptcy Code.

"*Liquidity Lender Steering Committee*" means those certain institutions comprising the steering committee of lenders under the Superpriority Revolving Facility, the Revolving Credit Facility, and the 2023 LC Facility.

"*Lummus Assets and Interests*" means the Debtors' rights, titles, and interests in the Lummus ~~Debtors~~Entities and related assets, as described in the Purchase Agreement.

"*Lummus ~~Debtors~~Entities*" means Lummus Technology LLC; McDermott Technology (2), B.V.; McDermott Technology (3), B.V.; OOO Lummus Technology; CB&I Lummus Engineering & Technology China Co. Ltd.; Lummus Technology Heat Transfer B.V. (Netherlands); Lummus Technology Heat Transfer B.V. (India); Lummus Novolen Technology GmbH; Novolen Technology Holdings C.V.; Lummus Technology B.V.; Lummus Gasification Technology Licensing LLC; Lummus Engineered Products, LLC; Lummus Technology International LLC; Lummus Technology Services LLC; Chemical Research and Licensing, LLC; Lummus Technology Ventures LLC; Catalytic Distillation Technologies; Lummus Technology Overseas LLC, Chevron Lummus Global LLC, and CLG Technical Services, LLC.

"*Make Whole Amount*" means the make whole amount payable under Section 2.11(b) of the Superpriority Credit Agreement solely with respect to the tranches of the Superpriority Term Loan Facility that were funded prior to the Petition Date.

"*Make Whole Tranche*" means that certain tranche under the Super Senior Exit Facility in an amount equal to the portion of the Make Whole Amount remaining (if any) after applying the Technology Business Sale Proceeds and proceeds from the Rights Offering, subject to the terms of the Exit Facilities Term Sheet.

"*Management Incentive Plan*" has the meaning set forth in Article IV.P of the Plan.

"*Management Incentive Plan Pool*" has the meaning set forth in Article IV.P of the Plan.

"*McDermott*" means McDermott International, Inc. or any successor or assign, by merger, consolidation, or otherwise, prior to the Effective Date.

"*New Board*" means the board of directors of Reorganized McDermott.  The identities of directors on the New Board shall be set forth in the Plan Supplement.

"*New Common Stock*" means, depending on the transaction structure and as detailed in the Restructuring Transactions Memorandum, common equity in one or more Reorganized Debtors.

"*New DIP Term Loans*" means the new money term loans to be provided under the DIP Term Loan Facility.

"*New Organizational Documents*" means the documents providing for corporate governance of the Reorganized Debtors, including charters, bylaws, operating agreements, or other organizational documents or shareholders' agreements, as applicable, which shall be consistent with the Restructuring Support Agreement (including Section 3.02 of the Restructuring Support Agreement), this Plan, and section 1123(a)(6) of the Bankruptcy Code (as applicable), and shall be included in the Plan Supplement.

"*New Tranche A Warrants*" means the 7-year warrants to purchase 10% of the New Common Stock at a strike price equal to (a) the Prepetition Funded Secured Claims (including, without limitation, principal and any accrued prepetition or postpetition interest at the default rate as applicable) less (i) the proceeds of the Rights Offering, (ii) the aggregate amount of the loans evidenced by the Term Loan Exit Facility, and (iii) the Residual Prepetition Funded Secured Claims Pay Down, divided by (b) the initial allocation of 94% of the New Common Stock to the holders of Prepetition Funded Secured Claims minus an amount equal to (x) the aggregate proceeds of the Rights Offering divided by Plan Equity Value plus (y) the Prepetition Funded Secured Claims Excess Cash Adjustment.

"*New Tranche B Warrants*" means the 7-year warrants to purchase 10% of the New Common Stock at a strike price equal to (a) the Prepetition Funded Secured Claims (including, without limitation, principal and any accrued prepetition or postpetition interest at the default rate as applicable) multiplied by 125%, less (i) the proceeds of the Rights Offering, (ii) the aggregate amount of the loans evidenced by the Term Loan Exit Facility, and (iii) the Residual Prepetition Funded Secured Claims Pay Down, divided by (b) the initial allocation of 94% of the New Common Stock to the holders of Prepetition Funded Secured Claims minus an amount equal to (x) the aggregate proceeds of the Rights Offering divided by Plan Equity Value and (y) the Prepetition Funded Secured Claims Excess Cash Adjustment.

"*New Warrants*" means, collectively, the New Tranche A Warrants and the New Tranche B Warrants.

"*New Warrants Agreements*" means those certain agreements providing for, among other things, the issuance and terms of the New Warrants, which shall be included in the Plan Supplement and in form and substance acceptable to the Required Consenting Lenders and the Required Consenting Noteholders.  The New Warrants Agreements shall provide for full anti-dilution and Black-Scholes protection.

"*Other Prepetition Financing Claim*" means any Secured Claim arising under:

(a) that certain facility agreement dated September 30, 2010 among McDermott, as guarantor, and its subsidiary NO 105 AS, as borrower, the BNP Paribas, in its capacity as facility agent and security agent, and the lenders party thereto, as may be amended, supplemented, or otherwise modified from time to time, to pay a portion of the construction costs of the *NO 105*;

(b) that certain receivables factoring agreement dated November 25, 2016 among J. Ray McDermott de Mexico S.A. de C.V. and the financing intermediaries thereto, as may be amended, supplemented, or otherwise modified from time to time; or

(c) that certain re-invoicing service agreement dated May 2019 among Bramid Outsource Limited, as service provider, McDermott, as parent, and CB&I LLC, as customer.

"*Other Priority Claim*" means any Claim, other than an Administrative Claim or a Priority Tax Claim, entitled to priority in right of payment under section 507(a) of the Bankruptcy Code.

"*Other Secured Claim*" means any Secured Claim other than a Revolving Credit Claim, a Term Loan Claim, a 2021 Letter of Credit Claim, a 2023 Letter of Credit Claim, a Lloyds Letter of Credit Claim, a Cash Secured Letter of Credit Claim, a Credit Agreement Hedging Claim, a Superpriority Term Loan Claim, a Superpriority Revolving Facility Claim, an Other Prepetition Financing Claim, a Bilateral Facility Claim, or a DIP Claim.

"*Person*" has the meaning set forth in section 101(41) of the Bankruptcy Code.

"*Petition Date*" means the date on which the Debtors commenced the Chapter 11 Cases.

"*Plan Distribution*" means a payment or distribution to holders of Allowed Claims, Allowed Interests, or other eligible Entities under this Plan.

"*Plan Equity Value*" means $2,352,000,000.

"*Plan Objection Deadline*" means the date the Bankruptcy Court establishes as the deadline to File an objection to Confirmation of the Plan.

"*Plan Supplement*" means the compilation of documents and forms of documents, agreements, schedules, and exhibits to the Plan (in each case, as may be altered, amended, modified, or supplemented from time to time in accordance with the terms hereof and in accordance with the Bankruptcy Code and Bankruptcy Rules) to be Filed prior to the Confirmation Hearing, and any additional documents Filed prior to the Effective Date as amendments to the Plan Supplement, including the following, as applicable: (a) the New Organizational Documents; (b) to the extent known, the identities of the members of the New Board; (c) the Assumed Executory Contracts and Unexpired Leases Schedule; (d) the Rejected Executory Contracts and Unexpired Leases Schedule; (e) the Schedule of Retained Causes of Action; (f) the Exit Facility Documents; (g) the definitive documentation related to the Management Incentive Plan; (h) the Restructuring Transactions Memorandum; (i) the New Warrants Agreements; and (j) to the extent available, the form of any Technology Business Sale Documents distributed by the Debtors to potentially interested parties, if any.  The Debtors shall have the right to alter, amend, modify, or supplement the documents contained in the Plan Supplement up to the Effective Date as set forth in this Plan and in accordance with the Restructuring Support Agreement (and subject to the applicable consent rights thereunder).

"*Prepetition Funded Secured Claims*" means Claims in respect of (i) the Term Loans and the Revolving Loans, (ii) any funded Prepetition Secured Letters of Credit, and (iii) the Credit Agreement Hedging Claims, but excluding any amounts being rolled into the DIP Credit Facility.

"*Prepetition Funded Secured Claims Excess Cash Adjustment*" has the meaning set forth in Article IV.D.4 of the Plan.

"*Prepetition Secured Letters of Credit*" means the 2021 Letters of Credit, the 2023 Letters of Credit, the Revolving LCs, the Lloyds Letters of Credit, and the Cash Secured Letters of Credit.

"*Priority Tax Claim*" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

"*Pro Rata*" means the proportion that an Allowed Claim or an Allowed Interest in a particular Class bears to the aggregate amount of Allowed Claims or Allowed Interests in that Class, unless otherwise indicated.

"*Professional*" means an Entity:  (a) employed pursuant to a Bankruptcy Court order in accordance with sections 327, 363, or 1103 of the Bankruptcy Code and to be compensated for services rendered prior to or on the Confirmation Date, pursuant to sections 327, 328, 329, 330, 331, and 363 of the Bankruptcy Code; or (b) awarded compensation and reimbursement by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

"*Professional Amount*" means the aggregate amount of Professional Claims and other unpaid fees and expenses that the Professionals estimate they have incurred or will incur in rendering services to the Debtors as set forth in Article II.C of the Plan.

"*Professional Claim*" means a Claim by a professional seeking an award by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Confirmation Date under sections 330, 331, 503(b)(2), 503(b)(3), 503(b)(4), or 503(b)(5) of the Bankruptcy Code.

"*Professional Escrow Account*" means an interest-bearing account funded by the Debtors with Cash on the Effective Date in an amount equal to the Professional Amount.

"*Proof of Claim*" means a proof of Claim Filed against any of the Debtors in the Chapter 11 Cases.

"*Purchase Agreement*" means, solely with respect to the Technology Business Sale, the share and asset purchase agreement between the Debtors and the Purchaser.

"*Purchaser*" means one or more Entities that are the purchasers with respect to the Technology Business Sale.

"*Reinstate*," "*Reinstated*," or "*Reinstatement*" means with respect to Claims and Interests, that the Claim or Interest shall not be discharged hereunder and the holder's legal, equitable, and contractual rights on account of such Claim or Interest shall remain unaltered by Consummation in accordance with section 1124(1) of the Bankruptcy Code.

"*Rejected Executory Contracts and Unexpired Leases Schedule*" means the schedule of Executory Contracts and Unexpired Leases to be rejected by the Debtors pursuant to the Plan, which schedule shall be included in the Plan Supplement, as the same may be amended, modified, or supplemented from time to time; *provided* that such schedule shall be in form and substance acceptable to the Required Consenting Lenders.

"*Related Party*" means, collectively, current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, predecessors, participants, successors, assigns, subsidiaries, affiliates, managed accounts or funds, partners, limited partners, general partners, principals, members, management companies, fund advisors or managers, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, heirs, executors, and assigns, and other professionals, in each case solely in their capacities as such, together with their respective past and present directors, officers, shareholders, partners, members, employees, agents, attorneys, representatives, heirs, executors and assigns, in each case solely in their capacities as such.

"*Released Claims*" means any Claims or Interests that have been released, discharged, or are subject to exculpation pursuant to this Plan.

"*Released Parties*" means, collectively, and in each case in its capacity as such:  (a) each Debtor; (b) each Reorganized Debtor; (c) each Company Party; (d) each DIP Lender and each DIP Letter of Credit Issuer; (e) each Agent; (f) the Senior Notes Trustee; (g) each Consenting Stakeholder; (h) each Hedge Bank; (i) each Cash Management Bank; (j) each lender under the Superpriority Credit Agreement, Credit Agreement, the 2021 LC Agreement, and the Lloyds Letter of Credit Agreement; (k) each holder of an Obligation (as defined in the Superpriority Credit Agreement) under the Superpriority Credit Agreement; (l) each holder of an Obligation (as defined in the Credit Agreement) under the Credit Agreement; (m) each Issuer (as defined in the Superpriority Credit Agreement) under the Superpriority Credit Agreement; (n) each Issuer (as defined in the Credit Agreement) under the Credit Agreement; (o) the Term Loan Ad Hoc Group, the Liquidity Lender Steering Committee, and the Senior Notes Ad Hoc Group; (p) each current and former Affiliate of each Entity in clause (a) through (o); and (q) each Related Party of each Entity in clause (a) through (o); *provided* that any holder of a Claim or Interest that opts out of the releases shall not be a "Released Party."

"*Releasing Parties*" means, collectively, and in each case in its capacity as such:  (a) each Debtor; (b) each Reorganized Debtor; (c) each Company Party; (d) each DIP Lender and each DIP Letter of Credit Issuer; (e) each Agent; (f) the Senior Notes Trustee; (g) each Consenting Stakeholder; (h) each Hedge Bank; (i) each Cash Management Bank; (j) each lender under the Superpriority Credit Agreement, Credit Agreement, the 2021 LC Agreement, and the Lloyds Letter of Credit Agreement; (k) each holder of an Obligation (as defined in the Superpriority Credit Agreement) under the Superpriority Credit Agreement; (l) each holder of an Obligation (as defined in the Credit Agreement) under the Credit Agreement; (m) each Issuer (as defined in the Superpriority Credit Agreement) under the Superpriority Credit Agreement; (n) each Issuer (as defined in the Credit Agreement) under the Credit Agreement; (o) the Term Loan Ad Hoc Group, the Liquidity Lender Steering Committee, and the Senior Notes Ad Hoc Group; (p) all holders of Claims or Interests that vote to accept or are deemed to accept the Plan; (q) all holders of Claims or Interests that abstain from voting on the Plan and who do not affirmatively opt out of the releases provided by the Plan by checking the box on the applicable ballot indicating that they opt not to grant the releases provided in the Plan; (r) all holders of Claims or Interests that vote to reject the Plan or are deemed to reject the Plan and who do not affirmatively opt out of the releases provided by the Plan by checking the box on the applicable ballot

13

indicating that they opt not to grant the releases provided in the Plan; (s) each current and former Affiliate of each Entity in clause (a) through (r); and (t) each Related Party of each Entity in clause (a) through (r).

"*Reorganized Debtors*" means collectively, a Debtor, or any successor or assign thereto, by merger, consolidation, or otherwise, on and after the Effective Date, including any new entity established in connection with the implementation of the Restructuring Transactions.

"*Reorganized McDermott*" means McDermott, or any successor or assign, by merger, consolidation, or otherwise, on or after the Effective Date.

"*Required Consenting LC Lenders*" has the meaning set forth in the Restructuring Support Agreement.

"*Required Consenting Lender*" has the meaning set forth in the Restructuring Support Agreement.

"*Required Consenting Noteholders*" has the meaning set forth in the Restructuring Support Agreement.

"*Required Consenting Revolving Lenders*" has the meaning set forth in the Restructuring Support Agreement.

"*Required Consenting Stakeholders*" has the meaning set forth in the Restructuring Support Agreement.

"*Required Consenting Term Lenders*" has the meaning set forth in the Restructuring Support Agreement.

"*Residual Prepetition Funded Secured Claims Pay Down*" has the meaning set forth in Article IV.D.4 of the Plan.

"*Restructuring Expenses*" means the prepetition and postpetition reasonable and documented fees and expenses of the Revolving and LC Administrative Agent Advisors, the Term Loan Ad Hoc Group Advisors, the Senior Notes Ad Hoc Group Advisors, the Barclays Advisors, and the ~~advisors of the~~ Senior Notes Trustee and its advisors, including local and foreign counsel (in each case, in accordance with the terms of their respective engagement letters with their respective clients, if any).

"*Restructuring Term Sheet*" means the Restructuring Term Sheet attached as <u>Exhibit A</u> to the Restructuring Support Agreement.

"*Restructuring Transactions*" means any transaction and any actions as may be necessary or appropriate to effect a corporate restructuring of the Debtors' and the Reorganized Debtors' respective businesses or a corporate restructuring of the overall corporate structure of the Debtors on the terms set forth in the Plan, Restructuring Support Agreement, and Restructuring Transactions Memorandum, including the issuance of all Securities, notes, instruments, certificates, and other documents required to be issued pursuant to the Plan, one or more inter-company mergers, consolidations, amalgamations, arrangements, continuances, restructurings, conversions, dissolutions, transfers, liquidations, or other corporate transactions, as described in Article IV.B of the Plan.

"*Restructuring Transactions Memorandum*" means a document, in form and substance acceptable to the Required Consenting Lenders, to be included in the Plan Supplement that will set forth the material components of the Restructuring Transactions, including the identity of the issuer or issuers of the New Common Stock and any elections that must be made with respect to the receipt of the New Common Stock.

"*Restructuring Support Agreement*" means that certain Restructuring Support Agreement, dated as of January 20, 2020, by and among the Debtors and the Consenting Stakeholders, as may be further amended, modified, or supplemented from time to time, in accordance with its terms.

"*Revolving and LC Administrative Agent*" means Crédit Agricole Corporate and Investment Bank, in its capacity as administrative agent for the Revolving Credit Facility and the 2023 LC Facility.

14

"*Revolving and LC Administrative Agent Advisors*" means Linklaters LLP, Bracewell LLP and FTI Consulting, Inc., as advisors to the DIP LC Agent, the DIP Collateral Agent, the Revolving and LC Administrative Agent, 2018 Collateral Agent, the Superpriority Revolving Administrative Agent and the Superpriority Collateral Agent, and any other local or foreign advisors.

"*Revolving Credit*" means the Revolving LCs and the Revolving Loans.

"*Revolving Credit Facility*" means the senior secured revolving credit facility under the Credit Agreement.

"*Revolving LC Claims*" means any Claim for obligations arising under, or relating to, the Revolving LCs issued under the Revolving Credit Facility, including Claims for all principal amounts outstanding, interest, fees, expenses, costs and other charges arising thereunder or related thereto.

"*Revolving LCs*" means the letters of credit issued under and on the terms set forth under the Revolving Credit Facility.

"*Revolving Lenders*" means the lenders under the Revolving Credit Facility.

"*Revolving Loans*" means the revolving loans issued under and on the terms set forth under the Revolving Credit Facility.

"*Rights Offering*" means a rights offering providing for the Consenting Noteholders with the right to purchase up to $150 million of the New Common Stock otherwise earmarked for the holders of Prepetition Funded Secured Claims valued at the Plan Equity Value in connection with the Restructuring Transactions and in accordance with the Rights Offering Procedures and Section 12 of the Restructuring Support Agreement.

"*Rights Offering Procedures*" means the procedures governing the Rights Offering, as approved by the Bankruptcy Court.

"*Rights Offering Shares*" means the shares of New Common Stock issued in accordance with the Rights Offering and subject to the terms of the Rights Offering Procedures and the Restructuring Support Agreement.

"*Roll-Off LC Exit Facility*" means a senior secured letter of credit exit facility pursuant to which each outstanding Prepetition Secured Letter of Credit will be deemed issued on the Effective Date, ranked junior to the Senior Exit LC Facility, and otherwise on terms satisfactory to the Required Consenting Lenders, and set forth in the Definitive Documents to be included in the Plan Supplement.

"*Schedule of Retained Causes of Action*" means the schedule of certain Causes of Action of the Debtors that are not released, waived, or transferred pursuant to the Plan, as the same may be amended, modified, or supplemented from time to time.

"*Section 510(b) Claim*" means any Claim or Interest against a Debtor subject to subordination under section 510(b) of the Bankruptcy Code, whether by operation of law or contract.

"*Secured Claim*" means a Claim: (a) secured by a valid, perfected, and enforceable Lien on collateral to the extent of the value of such collateral, as determined in accordance with section 506(a) of the Bankruptcy Code or (b) subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code.

"*Secured Creditor Equity Distribution*" means 94% of the New Common Stock less the percentage of New Common Stock to be turned over on account of (i) the Prepetition Funded Secured Claims Excess Cash Adjustment and (ii) the Rights Offering, and subject to dilution on account of the Management Incentive Plan and the New Warrants.

"*Secured Creditor Funded Debt Distribution*" means (a) Cash in an amount equal to the Residual Technology Business Sale Proceeds; (b) Cash in an amount equal to any proceeds of the Rights Offering; (c) the Secured Creditor Equity Distribution; and (d) the new term loans evidenced by the Term Loan Exit Facility.

"*Secured Creditor Pro Rata Share*" means with respect to any recipient of any distribution from the Secured Creditor Funded Debt Distribution under the Plan, such recipient's pro rata share thereof measured by reference to the aggregate amount of: (a) all Allowed Term Loan Claims, (b) all Allowed Revolving Credit Claims consisting of (x) all Revolving Loans and (y) funded Revolving LCs, (c) all Allowed 2021 Letter of Credit Claims consisting of funded 2021 Letters of Credit, (d) all Allowed 2023 Letter of Credit Claims consisting of funded 2023 Letters of Credit, (e) all Allowed Lloyds Letter of Credit Claims consisting of funded Lloyds Letters of Credit, and (f) all Credit Agreement Hedging Claims consisting of Credit Agreement Hedging Obligations, that are not being rolled into the DIP Credit Facility, in each case as of the date of such distribution.

"*Secured Letter of Credit Cap*" has the meaning ascribed to it in the Exit Facilities Term Sheet.

"*Securities Act*" means the Securities Act of 1933, as amended, 15 U.S.C. §§ 77a–77aa, or any similar federal, state, or local law, as now in effect or hereafter amended, and the rules and regulations promulgated thereunder.

"*Security*" means any security, as defined in section 2(a)(1) of the Securities Act.

"*Senior Exit LC Facility*" means a 4-year, senior secured letter of credit exit facility in an amount up to $1.326 billion, ranked junior to the Super Senior Exit Facility, on terms satisfactory to the Debtors or the Reorganized Debtors, as applicable, and otherwise on terms satisfactory to the Required Consenting Lenders; and set forth in the Definitive Documents to be included in the Plan Supplement; *provided* that the amount of the Senior Exit LC Facility shall be reduced dollar-for-dollar for each Prepetition Secured Letter of Credit that is drawn and not reimbursed in full in Cash during or after the Chapter 11 Cases.

"*Senior Notes*" means the 10.625% senior notes due 2024 issued by certain of the Debtors pursuant to the Senior Notes Indenture.

"*Senior Notes Ad Hoc Group*" means, collectively, those certain institutions comprising the ad hoc groups of holders of the Senior Notes represented by Paul, Weiss, Rifkind, Wharton & Garrison LLP and Brown Rudnick LLP.

"*Senior Notes Ad Hoc Group Advisors*" means Paul, Weiss, Rifkind, Wharton & Garrison LLP, Brown Rudnick LLP, Houlihan Lokey Capital, Inc., counsel to the Senior Notes Trustee, and any local or foreign advisors.

"*Senior Notes Claims*" means all principal and interest outstanding as of the Petition Date under the Senior Notes.

"*Senior Notes Indenture*" means that certain indenture dated as of April 18, 2018, by and among certain of the Debtors and the Senior Notes Trustee, as may be amended, supplemented, or otherwise modified from time to time.

"*Senior Notes Trustee*" means UMB Bank, N.A., in its capacity as trustee for the Senior Notes Indenture.

"*Superpriority Agreement Agents*" means the Superpriority Revolving Administrative Agent, the Superpriority Collateral Agent and the Superpriority Term Loan Agent.

"*Superpriority Collateral Agent*" means Crédit Agricole Corporate and Investment Bank, in its capacity as Collateral Agent under the Superpriority Credit Agreement.

"*Superpriority Credit Agreement*" means that certain superpriority senior secured credit agreement, dated October 21, 2019, between certain of the Debtors as borrowers and guarantors, a syndicate of lenders and letter of

credit issuers, the Superpriority Term Loan Agent, and the Superpriority Revolving Administrative Agent, as amended from time to time.

"*Superpriority Facility*" means, collectively, the Superpriority Term Loan Facility and the Superpriority Revolving Facility.

"*Superpriority Letters of Credit*" means the superpriority letters of credit issued under the Superpriority Revolving Facility.

"*Superpriority Revolving Administrative Agent*" means Crédit Agricole Corporate and Investment Bank, in its capacity as administrative agent for the Superpriority Revolving Facility.

"*Superpriority Revolving Facility*" means the superpriority secured letter of credit facility under the Superpriority Credit Agreement.

"*Superpriority Term Loan Agent*" means Barclays Bank PLC in its capacity as administrative agent for the Superpriority Term Loan Facility.

"*Superpriority Term Loan Facility*" means the superpriority secured term loan credit facility under the Superpriority Credit Agreement.

"*Superpriority Term Loans*" means the superpriority term loans issued under and on the terms set forth under the Superpriority Term Loan Facility.

"*Super Senior Exit Facility*" means a 4-year, super senior secured exit facility consisting of a letter of credit facility in an amount of $743 million and the Make Whole Tranche (which Make Whole Tranche will be subordinate in right of payment to the obligations with respect to the letters of credit under the Super Senior Exit Facility on the terms provided therein), on terms satisfactory to the Required Consenting Lenders and set forth in the Definitive Documents to be included in the Plan Supplement.

"*Technology Business Sale*" means a sale of the Lummus Assets and Interests under this Plan, pursuant to the Purchase Agreement, and to be agreed to or consummated by the Debtors on the Effective Date.

"*Technology Business Sale Proceeds*" means Cash proceeds received from the Technology Business Sale, net of (a) the reasonable transaction costs in connection with the Technology Business Sale, (b) taxes paid or reasonably estimated to be payable by the Debtors or Reorganized Debtors as a result of the Technology Business Sale, (c) any debt service payments due under the DIP Credit Agreement which are required to be repaid or otherwise becomes due in connection with the Technology Business Sale, and (d) payment of $210 million of prepetition accounts payable.

"*Technology Business Sale Proceeds Waterfall*" means the distribution waterfall for the Technology Business Sale Proceeds, as described in Article IV.D.3 of this Plan.

"*Term Lenders*" means the lenders under the Term Loan Facility.

"*Term Loan Ad Hoc Group*" means certain institutions comprising the ad hoc group of lenders in respect of the Superpriority Term Loans and the lenders in respect of the Term Loan Facility.

"*Term Loan Ad Hoc Group Advisors*" means Davis Polk & Wardwell LLP, Porter Hedges LLP, Centerview Partners, Inc., Ankura Consulting Group, LLC, and any other local or foreign advisors.

"*Term Loan Administrative Agent*" means Barclays Bank PLC, in its capacity as administrative agent for the Term Loan Facility.

"*Term Loan Claims*" means any Claim for obligations arising under, or relating to, the Term Loan Facility.

"*Term Loan Exit Facility*" means a 5-year senior secured term loan facility in an amount equal to $500 million of take-back debt, ranked *pari passu* with the Roll-Off LC Exit Facility, and otherwise on terms satisfactory to the Required Consenting Lenders, and set forth in Definitive Documents to be included in the Plan Supplement.

"*Term Loan Exit Facility Lenders*" means those lenders party to the Exit Facility Agreement.

"*Term Loans*" means the term loans issued and on the terms set forth under the Term Loan Facility.

"*Term Loan Facility*" means the senior secured term loan facility under the Credit Agreement.

"*Unexpired Lease*" means a lease to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

"*Unimpaired*" means with respect to a Class of Claims or Interests, a Class of Claims or Interests that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

"*Unsecured Claim*" means any Claim that is not a Secured Claim.

"*Voting Deadline*" means, subject to the approval of the Bankruptcy Court, February 18, 2020, or such other date as ordered by the Bankruptcy Court.

B.      *Rules of Interpretation.*

For purposes of this Plan:  (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; *provided* that nothing in this clause (2) shall affect any parties' consent rights over any of the Definitive Documents or any amendments thereto, as provided for in the Restructuring Support Agreement; (3) unless otherwise specified, any reference herein to an existing document, schedule, or exhibit, whether or not Filed, having been Filed or to be Filed shall mean that document, schedule, or exhibit, as it may thereafter be amended, modified, or supplemented in accordance with the Plan or Confirmation Order, as applicable; (4) any reference to an Entity as a holder of a Claim or Interest includes that Entity's successors and assigns; (5) unless otherwise specified, all references herein to "Articles" are references to Articles hereof or hereto; (6) unless otherwise specified, all references herein to exhibits are references to exhibits in the Plan Supplement; (7) unless otherwise specified, the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (8) subject to the provisions of any contract, certificate of incorporation, by-law, instrument, release, or other agreement or document entered into in connection with the Plan, the rights and obligations arising pursuant to the Plan shall be governed by, and construed and enforced in accordance with the applicable federal law, including the Bankruptcy Code and Bankruptcy Rules; (9) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (10) unless otherwise specified herein, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (11) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; (12) all references to docket numbers of documents Filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (13) all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time, and as applicable to the Chapter 11 Cases, unless otherwise stated; (14) the words "include" and "including," and variations thereof, shall not be deemed to be terms of limitation, and shall be deemed to be followed by the words "without limitation"; (15) references to "Proofs of Claim," "holders of Claims," "Disputed Claims," and the like shall include "Proofs of Interest," "holders of Interests," "Disputed Interests," and the like, as applicable; (16) any immaterial effectuating provisions may be interpreted by the Reorganized Debtors in such a manner that is consistent with the overall purpose and intent of the Plan all without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity; and (17) all references

herein to consent, acceptance, or approval may be conveyed by counsel for the respective parties that have such consent, acceptance, or approval rights, including by electronic mail.

C.      *Computation of Time.*

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.  If the date on which a transaction may occur pursuant to the Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day.  Any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable after the Effective Date.

D.      *Governing Law.*

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of New York, without giving effect to the principles of conflict of laws (other than section 5-1401 and section 5-1402 of the New York General Obligations Law), shall govern the rights, obligations, construction, and implementation of the Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control), and corporate governance matters; *provided* that corporate governance matters relating to the Debtors or the Reorganized Debtors, as applicable, not incorporated in New York shall be governed by the laws of the state of incorporation or formation of the relevant Debtor or the Reorganized Debtors, as applicable.

E.      *Reference to Monetary Figures.*

All references in the Plan to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided herein.

F.      *Reference to the Debtors or the Reorganized Debtors.*

Except as otherwise specifically provided in the Plan to the contrary, references in the Plan to the Debtors or the Reorganized Debtors shall mean the Debtors and the Reorganized Debtors, as applicable, to the extent the context requires.

G.      *Controlling Document.*

In the event of an inconsistency between the Plan and the Disclosure Statement, the terms of the Plan shall control in all respects.  In the event of an inconsistency between the Plan and the Plan Supplement, the terms of the relevant provision in the Plan Supplement shall control (unless stated otherwise in such Plan Supplement document or in the Confirmation Order).  In the event of an inconsistency between the Confirmation Order and the Plan, the Confirmation Order shall control.

H.      *Consultation, Information, Notice, and Consent Rights.*

Notwithstanding anything herein to the contrary, any and all consultation, information, notice, and consent rights of the parties to the Restructuring Support Agreement set forth in the Restructuring Support Agreement (including the exhibits thereto) with respect to the form and substance of this Plan, all exhibits to the Plan, and the Plan Supplement, and all other Definitive Documents (as defined in the Restructuring Support Agreement), including any amendments, restatements, supplements, or other modifications to such agreements and documents, and any consents, waivers, or other deviations under or from any such documents, shall be incorporated herein by this reference (including to the applicable definitions in Article I.A hereof) and fully enforceable as if stated in full herein.

Failure to reference the rights referred to in the immediately preceding paragraph as such rights relate to any document referenced in the Restructuring Support Agreement shall not impair such rights and obligations.

19

**ARTICLE II.**
**ADMINISTRATIVE CLAIMS, DIP CLAIMS,**
**PRIORITY CLAIMS, AND RESTRUCTURING EXPENSES**

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, DIP Claims, Professional Claims, and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III hereof.

A.      *Administrative Claims.*

Unless otherwise agreed to by the holder of an Allowed Administrative Claim and the Debtors or the Reorganized Debtors, as applicable, or otherwise provided for under the Plan or the Restructuring Support Agreement, each holder of an Allowed Administrative Claim (other than holders of Professional Claims and Claims for fees and expenses pursuant to section 1930 of chapter 123 of title 28 of the United States Code) will receive in full and final satisfaction of its Administrative Claim an amount of Cash equal to the amount of such Allowed Administrative Claim in accordance with the following:  (1) if an Administrative Claim is Allowed on or prior to the Effective Date, on the Effective Date or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (2) if such Administrative Claim is not Allowed as of the Effective Date, no later than thirty (30) days after the date on which an order allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; (3) if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claim without any further action by the holders of such Allowed Administrative Claim; (4) at such time and upon such terms as may be agreed upon by such holder and the Debtors or the Reorganized Debtors, as applicable; or (5) at such time and upon such terms as set forth in an order of the Bankruptcy Court.

B.      *DIP Claims.*

As set forth in Article IV.D of this Plan, certain of the Technology Business Sale Proceeds shall be used to pay Allowed DIP Claims (including Allowed DIP Claims with respect to the Make Whole Amount pursuant to the Technology Business Sale Proceeds Waterfall) outstanding on the Effective Date.  Except to the extent that a holder of an Allowed DIP Claim agrees to less favorable treatment, on the Effective Date, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each holder of an Allowed DIP Claim shall receive the following treatment:

(a)      to the extent not paid in full in accordance with the Technology Business Sale Proceeds Waterfall, each holder of an Allowed DIP Term Loan Claim (other than the Make Whole Amount, but including all principal, accrued and unpaid interest, fees and expenses and non-contingent indemnity claims) shall receive payment in full in Cash;

(b)      to the extent not paid in full in accordance with the Technology Business Sale Proceeds Waterfall or the proceeds of the Rights Offering, each holder of an Allowed DIP Term Loan Claim constituting the Make Whole Amount shall receive its Pro Rata share of the term loans arising under the Make Whole Tranche;

(c)      to the extent not paid in full in accordance with the Technology Business Sale Proceeds Waterfall, each holder of an Allowed DIP LC Claim with respect to drawn DIP Letters of Credit that have not been reimbursed in full in Cash as of the Effective Date shall receive payment in full in Cash;

(d)       each holder of an Allowed DIP LC Claim (other than in respect of DIP Cash Secured Letters of Credit) shall receive participation in the Super Senior Exit Facility in an amount equal to each such holder's DIP Letter of Credit Facility commitments;

(e)       each holder of a DIP Cash Secured Letter of Credit Claim shall receive participation in the Cash Secured Exit LC Facility in an amount equal to such holder's DIP Cash Secured Letter of Credit Claim; *provided* that any cash collateral in the DIP Cash Secured LC Account (as defined in the DIP Credit Facility Term Sheet) shall collateralize the Cash Secured LC Exit Facility; and

(f)       all DIP Hedging Obligations shall be rolled into and deemed incurred under the Super Senior Exit Facility.

To the extent the Funded DIP Indebtedness is repaid in full prior to the Effective Date, the Debtors shall not make any payments to trade vendors for penalty interest payments (excluding, for the avoidance of doubt, customary liquidated damages to customers) unless such payments had otherwise been specified in the Approved Budget (as defined in the DIP Credit Agreement) or authorized pursuant to the DIP Financing Orders.

C.      *Professional Claims.*

1.     <u>Final Fee Applications and Payment of Professional Claims</u>.

All requests for payment of Professional Claims for services rendered and reimbursement of expenses incurred prior to the Confirmation Date must be Filed no later than 45 days after the Effective Date. The Bankruptcy Court shall determine the Allowed amounts of such Professional Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Court. The Reorganized Debtors shall pay Professional Claims in Cash in the amount the Bankruptcy Court allows, including from the Professional Escrow Account, which the Reorganized Debtors will establish in trust for the Professionals and fund with Cash equal to the Professional Amount on the Effective Date.

2.     <u>Professional Escrow Account</u>.

On the Effective Date, the Reorganized Debtors shall, in consultation with the Required Consenting Lenders, establish and fund the Professional Escrow Account with Cash equal to the Professional Amount, which shall be funded by the Reorganized Debtors. The Professional Escrow Account shall be maintained in trust solely for the Professionals. Such funds shall not be considered property of the Estates of the Debtors or the Reorganized Debtors. The amount of Allowed Professional Claims shall be paid in Cash to the Professionals by the Reorganized Debtors from the Professional Escrow Account as soon as reasonably practicable after such Professional Claims are Allowed. When such Allowed Professional Claims have been paid in full, any remaining amount in the Professional Escrow Account shall promptly be paid to the Reorganized Debtors without any further action or order of the Bankruptcy Court.

3.     <u>Professional Amount</u>.

Professionals shall reasonably estimate their unpaid Professional Claims and other unpaid fees and expenses incurred in rendering services to the Debtors before and as of the Effective Date, and shall deliver such estimate to the Debtors no later than five days before the Effective Date; *provided* that such estimate shall not be deemed to limit the amount of the fees and expenses that are the subject of each Professional's final request for payment in the Chapter 11 Cases. If a Professional does not provide an estimate, the Debtors or Reorganized Debtors may estimate the unpaid and unbilled fees and expenses of such Professional.

4.     <u>Post-Confirmation Fees and Expenses</u>.

Except as otherwise specifically provided in the Plan, from and after the Confirmation Date, the Debtors shall, in the ordinary course of business and without any further notice to or action, order, or approval of the

Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses related to implementation of the Plan and Consummation incurred by the Debtors.  Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Debtors may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

D.      *Priority Tax Claims.*

Except to the extent that a holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.

E.      *Payment of Restructuring Expenses, Consent Fee.*

The Restructuring Expenses incurred, or estimated to be incurred, up to and including the Effective Date, and noteholder consent fees payable under Section 12 of the Restructuring Support Agreement payable in Cash, which, for the avoidance of doubt, shall include the Noteholder Consent Fee (as defined in the Restructuring Support Agreement), shall be paid in full in Cash on the Effective Date or as reasonably practicable thereafter (to the extent not previously paid during the course of the Chapter 11 Cases) in accordance with, and subject to, the terms of the Restructuring Support Agreement, without any requirement to file a fee application with the Bankruptcy Court, without the need for itemized time detail, or without any requirement for Bankruptcy Court review or approval.  All Restructuring Expenses and Cash consent fees to be paid on the Effective Date shall be estimated prior to and as of the Effective Date and such estimates shall be delivered to the Debtors at least two (2) Business Days before the anticipated Effective Date; *provided* that such estimates shall not be considered an admission or limitation with respect to such Restructuring Expenses.  On or as soon as practicable after the Effective Date, final invoices for all Restructuring Expenses incurred prior to and as of the Effective Date shall be submitted to the Debtors.  In addition, the Debtors and the Reorganized Debtors (as applicable) shall continue to pay pre- and post-Effective Date, when due Restructuring Expenses related to implementation, consummation, and defense of the Plan, whether incurred before, on, or after the Effective Date.

## ARTICLE III.
## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

A.      *Classification of Claims and Interests.*

This Plan constitutes a separate Plan proposed by each Debtor.  Except for the Claims addressed in Article II hereof, all Claims and Interests are classified in the Classes set forth below in accordance with sections 1122 and 1123(a)(1) of the Bankruptcy Code.  A Claim or an Interest, or any portion thereof, is classified in a particular Class only to the extent that any portion of the Claim or Interest fits within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest fits within the description of such other Classes.  A Claim or an Interest also is classified in a particular Class for the purpose of receiving distributions under the Plan only to the extent that such Claim or Interest is an Allowed Claim or Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

The classification of Claims and Interests against the Debtors pursuant to the Plan is as follows:

| Class | Claims and Interests | Status | Voting Rights |
|-------|---------------------|--------|---------------|
| Class 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 3 | Other Prepetition Financing Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |

| Class | Claims and Interests | Status | Voting Rights |
|-------|---------------------|--------|---------------|
| Class 4 | Bilateral Facility Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 5 | 2021 Letter of Credit Claims | Impaired | Entitled to Vote |
| Class 6A | 2023 Letter of Credit Claims | Impaired | Entitled to Vote |
| Class 6B | Revolving Credit Claims | Impaired | Entitled to Vote |
| Class 6C | Term Loan Claims | Impaired | Entitled to Vote |
| Class 6D | Credit Agreement Hedging Claims | Impaired | Entitled to Vote |
| Class 7 | Cash Secured Letter of Credit Claims | Impaired | Entitled to Vote |
| Class 8 | Lloyds Letter of Credit Claims | Impaired | Entitled to Vote |
| Class 9 | Senior Notes Claims | Impaired | Entitled to Vote |
| Class 10 | General Unsecured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 11 | Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept or Deemed to Reject) |
| Class 12 | Existing Equity Interests Other Than in McDermott | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept or Deemed to Reject) |
| Class 13 | Existing Preferred Equity Interests in McDermott | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 14 | Existing Common Equity Interests in McDermott | Impaired | Not Entitled to Vote (Deemed to Reject) |

B.      *Treatment of Claims and Interests.*

Each holder of an Allowed Claim or Allowed Interest, as applicable, shall receive under the Plan the treatment described below in full and final satisfaction, settlement, release, and discharge of and in exchange for such holder's Allowed Claim or Allowed Interest, except to the extent different treatment is agreed to by the Reorganized Debtors and the holder of such Allowed Claim or Allowed Interest, as applicable.  Unless otherwise indicated, the holder of an Allowed Claim or Allowed Interest, as applicable, shall receive such treatment on the Effective Date or as soon as reasonably practicable thereafter.

    1.   <u>Class 1 – Other Secured Claims</u>

        (a)      *Classification*:  Class 1 consists of all Other Secured Claims.

        (b)      *Treatment*: Each holder of an Allowed Other Secured Claim shall receive, at the option of the applicable Debtor:

            (i)       payment in full in Cash of its Allowed Other Secured Claim;

            (ii)      the collateral securing its Allowed Other Secured Claim;

            (iii)     Reinstatement of its Allowed Other Secured Claim; or

(iv)      such other treatment that renders its Allowed Other Secured Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code.

(c)     *Voting*:  Class 1 is Unimpaired under the Plan.  Holders of Other Secured Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, such holders are not entitled to vote to accept or reject the Plan.

2.    <u>Class 2 – Other Priority Claims</u>

(a)     *Classification*:  Class 2 consists of all Other Priority Claims.

(b)     *Treatment*:  Each holder of an Allowed Other Priority Claim shall receive payment in full in Cash.

(c)     *Voting*:  Class 2 is Unimpaired under the Plan.  Holders of Other Priority Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, such holders are not entitled to vote to accept or reject the Plan.

3.    <u>Class 3 – Other Prepetition Financing Claims</u>

(a)     *Classification*:  Class 3 consists of all Other Prepetition Financing Claims.

(b)     *Treatment*:  Each Allowed Other Prepetition Financing Claim shall be Reinstated.

(c)     *Voting:* Class 3 is Unimpaired under the Plan.  Holders of Other Prepetition Financing Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, such holders are not entitled to vote to accept or reject the Plan.

4.    <u>Class 4 – Bilateral Facility Claims</u>

(a)     *Classification*:  Class 4 consists of all Bilateral Facility Claims.

(b)     *Treatment*:  Each Allowed Bilateral Facility Claim shall be Reinstated.

(c)     *Voting*:  Class 4 is Unimpaired under the Plan.  Holders of Bilateral Facility Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, such holders are not entitled to vote to accept or reject the Plan.

5.    <u>Class 5 – 2021 Letter of Credit Claims</u>

(a)     *Classification:*  Class 5 consists of all 2021 Letter of Credit Claims.

(b)     *Treatment*:  Each holder of an Allowed 2021 Letter of Credit Claim shall receive:

(i)      with respect to any 2021 Letter of Credit Claims on account of unfunded 2021 Letters of Credit, participation in the Roll-Off LC Exit Facility in an amount equal to each such holder's Allowed 2021 Letter of Credit Claim,

(ii)     with respect to any 2021 Letter of Credit Claims on account of funded 2021 Letters of Credit, its Secured Creditor Pro Rata Share of the Secured Creditor

Funded Debt Distribution, and

(iii)     payment in full in Cash of any amounts accrued and unpaid as of the Petition Date due to such holder of an Allowed 2021 Letter of Credit Claim pursuant to Section 2.15 of the 2021 LC Agreement.

(c)     *Voting:* Class 5 is Impaired under the Plan. Holders of 2021 Letter of Credit Claims are entitled to vote to accept or reject the Plan.

6.     <u>Class 6A – 2023 Letter of Credit Claims</u>

(a)     *Classification:* Class 6A consists of all 2023 Letter of Credit Claims.

(b)     *Treatment*: Each holder of an Allowed 2023 Letter of Credit Claim shall receive:

(i)     with respect to any 2023 Letter of Credit Claims on account of unfunded 2023 Letters of Credit, participation in the Roll-Off LC Exit Facility in an amount equal to each such holder's Allowed 2023 Letter of Credit Claim,

(ii)     with respect to any 2023 Letter of Credit Claims on account of funded 2023 Letters of Credit, its Secured Creditor Pro Rata Share of the Secured Creditor Funded Debt Distribution, and

(iii)     payment in full in Cash of any amounts accrued and unpaid as of the Petition Date due to such holder of an Allowed 2023 Letter of Credit Claim pursuant to Section 2.15 of the Credit Agreement.

(c)     *Voting:* Class 6A is Impaired under the Plan. Holders of 2023 Letter of Credit Claims are entitled to vote to accept or reject the Plan.

7.     <u>Class 6B – Revolving Credit Claims</u>

(a)     *Classification:* Class 6B consists of all Revolving Credit Claims.

(b)     *Allowed Amount:* As of the Effective Date, the Revolving Credit Claims shall be Allowed and deemed to be Allowed Claims in the full amount outstanding under the Revolving Credit Facility, including all principal, accrued and unpaid interest at the applicable default rate, and all accrued and unpaid fees, expenses, and noncontingent indemnity payable under the Revolving Credit Facility and the DIP Financing Order.

(c)     *Treatment*: Each holder of an Allowed Revolving Credit Claim shall receive:

(i)     with respect to any Revolving Credit Claims on account of unfunded Revolving LCs, participation in the Roll-Off LC Exit Facility in an amount equal to each such holder's Allowed Revolving Credit Claim,

(ii)     with respect to any Revolving Credit Claims on account of (x) Revolving Loans or (y) funded Revolving LCs, its Secured Creditor Pro Rata Share of the Secured Creditor Funded Debt Distribution, and

(iii)     payment in full in Cash of any amounts accrued and unpaid as of the Petition Date due to such holder of an Allowed Revolving Credit Claim pursuant to Section

2.15 of the Credit Agreement.

    (d)    *Voting:*  Class 6B is Impaired under the Plan.  Holders of Revolving Credit Claims are entitled to vote to accept or reject the Plan.

8.    <u>Class 6C – Term Loan Claims</u>

    (a)    *Classification*:  Class 6C consists of all Term Loan Claims.

    (b)    *Allowed Amount*: As of the Effective Date, the Term Loan Claims shall be Allowed and deemed to be Allowed Claims in the full amount outstanding under the Term Loan Facility, including all principal, accrued and unpaid interest at the applicable default rate, and all accrued and unpaid fees, expenses, and noncontingent indemnity payable under the Term Loan Facility and the DIP Financing Order.

    (c)    *Treatment*:  Each holder of an Allowed Term Loan Claim shall receive its Secured Creditor Pro Rata Share of the Secured Creditor Funded Debt Distribution.

    (d)    *Voting*:  Class 6C is Impaired under the Plan.  Holders of Term Loan Claims are entitled to vote to accept or reject the Plan.

9.    <u>Class 6D – Credit Agreement Hedging Claims</u>

    (a)    *Classification*:  Class 6D consists of all Credit Agreement Hedging Claims.

    (b)    *Treatment*:  Each holder of an Allowed Credit Agreement Hedging Claim that remains unpaid as of the Effective Date shall receive for any Allowed Credit Agreement Hedging Claims such holder's Secured Creditor Pro Rata Share of the Secured Creditor Funded Debt Distribution.

    (c)    *Voting*:  Class 6D is Impaired under the Plan.  Holders of Credit Agreement Hedging Claims are entitled to vote to accept or reject the Plan.

10.    <u>Class 7 – Cash Secured Letter of Credit Claims</u>

    (a)    *Classification:*  Class 7 consists of all Cash Secured Letter of Credit Claims.

    (b)    *Treatment*:  Each holder of an Allowed Cash Secured Letter of Credit Claim outstanding as of such date shall:

        (i)    be deemed to reissue its Cash Secured Letters of Credit under the Cash Secured LC Exit Facility which shall be secured by the same cash collateral which secured the Cash Secured Letters of Credit prior to the Petition Date, and

        (ii)    payment in full in Cash of any amounts accrued and unpaid as of the Petition Date due to such holder of an Allowed Cash Secured Letter of Credit Claim pursuant to Section 2.15 of the Credit Agreement.

    (c)    *Voting:*  Class 7 is Impaired under the Plan.  Holders of Cash Secured Letter of Credit Claims are entitled to vote to accept or reject the Plan.

11. <u>Class 8 – Lloyds Letter of Credit Claims</u>

    (a)    *Classification:*  Class 8 consists of all Lloyds Letter of Credit Claims.

    (b)    *Treatment*:  Each holder of an Allowed Lloyds Letter of Credit Claim shall receive:

        (i)    with respect to any Lloyds Letter of Credit Claims on account of unfunded Lloyds Letters of Credit, participation in the Roll-Off LC Exit Facility in amount equal to such Allowed Lloyds Letter of Credit Claim,

        (ii)    with respect to any Lloyds Letter of Credit Claims on account of funded Lloyds Letters of Credit, its Secured Creditor Pro Rata Share of the Secured Creditor Funded Debt Distribution, and

        (iii)    payment in full in Cash of any amounts accrued and unpaid as of the Petition Date due to such holder of an Allowed Lloyds Letter of Credit Claim pursuant to Section 2(b) of the Lloyds Letter of Credit Agreement.

    (c)    *Voting:*  Class 8 is Impaired under the Plan.  Holders of Lloyds Letter of Credit Claims are entitled to vote to accept or reject the Plan.

12. <u>Class 9 – Senior Notes Claims</u>

    (a)    *Classification*:  Class 9 consists of all Senior Notes Claims.

    (b)    *Allowed Amount*: $[●].

    (c)    *Treatment*:  Each holder of an Allowed Senior Notes Claim shall receive its pro rata share of:

        (i)    6% of the New Common Stock, plus additional shares of New Common Stock as a result of the Prepetition Funded Secured Claims Excess Cash Adjustment, subject to dilution on account of the New Warrants and the Management Incentive Plan; and

        (ii)    the New Warrants.

    (d)    *Voting:*  Class 9 is Impaired under the Plan.  Holders of Senior Notes Claims are entitled to vote to accept or reject the Plan.

13. <u>Class 10 – General Unsecured Claims</u>

    (a)    *Classification:*  Class 10 consists of all General Unsecured Claims.

    (b)    *Treatment:*  Each holder of an Allowed General Unsecured Claim shall receive, at the option of the applicable Debtor:

        (i)    payment in full in Cash; or

        (ii)    Reinstatement.

    (c)    *Voting:*  Class 10 is Unimpaired under the Plan.  Holders of General Unsecured Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, such holders are not entitled to vote to accept or reject the Plan.

14. Class 11 – Intercompany Claims

 (a) *Classification*:  Class 11 consists of all Intercompany Claims.

 (b) *Treatment*:  Each Allowed Intercompany Claim shall be, at the option of the applicable Debtor (with the consent of the Required Consenting Lenders), either:

  (i) Reinstated;

  (ii) canceled, released, and extinguished, and will be of no further force or effect; or

  (iii) otherwise addressed at the option of each applicable Debtor such that holders of Intercompany Claims will not receive any distribution on account of such Intercompany Claims.

 (c) *Voting*:  Class 11 is conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code or rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Class 11 is not entitled to vote to accept or reject the Plan.

15. Class 12 – Existing Equity Interests Other Than in McDermott

 (a) *Classification*:  Class 12 consists of all Existing Equity Interests Other Than in McDermott.

 (b) *Treatment:*  Each Existing Equity Interests Other Than in McDermott shall be, at the option of the applicable Debtor, either:

  (i) Reinstated;

  (ii) canceled, released, and extinguished, and will be of no further force or effect; or

  (iii) otherwise addressed at the option of each applicable Debtor such that holders of Existing Equity Interests Other Than in McDermott will not receive any distribution on account of such Existing Equity Interests Other Than in McDermott.

 (c) *Voting*:  Class 12 is conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code or rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Class 12 is not entitled to vote to accept or reject the Plan.

16. Class 13 – Existing Preferred Equity Interests

 (a) *Classification*:  Class 13 consists of all Existing Preferred Equity Interests.

 (b) *Treatment:*  Holders of Existing Preferred Equity Interests will not receive any distribution on account of such Interests, which will be canceled, released, and extinguished as of the Effective Date, and will be of no further force or effect.

 (c) *Voting*:  Class 13 is conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Class 13 is not entitled to vote to accept or reject the Plan.

17. Class 14 – Existing Common Equity Interests

 (a) *Classification*:  Class 14 consists of all Existing Common Equity Interests.

(b)    *Treatment*:  Holders of Existing Common Equity Interests will not receive any distribution on account of such Interests, which will be canceled, released, and extinguished as of the Effective Date, and will be of no further force or effect.

(c)    *Voting*:  Class 14 is conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Class 14 is not entitled to vote to accept or reject the Plan.

## C.    *Special Provision Governing Unimpaired Claims.*

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtors' or the Reorganized Debtors' rights regarding any Unimpaired Claim, including, all rights regarding legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claim.

## D.    *Elimination of Vacant Classes.*

Any Class of Claims or Interests that does not have a holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

## E.    *Voting Classes, Presumed Acceptance by Non-Voting Classes.*

If a Class contains Claims or Interests eligible to vote and no holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the holders of such Claims or Interests in such Class shall be deemed to have accepted the Plan.

## F.    *Intercompany Interests.*

To the extent Reinstated under the Plan, distributions on account of Intercompany Interests are not being received by holders of such Intercompany Interests on account of their Intercompany Interests but for the purposes of administrative convenience and due to the importance of maintaining the prepetition corporate structure for the ultimate benefit of the holders of New Common Stock, and in exchange for the Debtors' and Reorganized Debtors' agreement under the Plan to make certain distributions to the holders of Allowed Claims.

## G.    *Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code.*

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by one or more of the Classes entitled to vote pursuant to Article III.B of the Plan. The Debtors reserve the right, subject to the prior consent of the Required Consenting Lenders, which shall not be unreasonably withheld,  to modify the Plan in accordance with Article X hereof and the Restructuring Support Agreement to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules.

## H.    *Controversy Concerning Impairment.*

If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

## I.    *Subordinated Claims.*

The allowance, classification, and treatment of all Allowed Claims and Allowed Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the

Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise. Any such contractual, legal, or equitable subordination rights shall be settled, compromised, and released pursuant to the Plan.

## ARTICLE IV.
## MEANS FOR IMPLEMENTATION OF THE PLAN

A.      *General Settlement of Claims and Interests.*

As discussed in detail in the Disclosure Statement and as otherwise provided herein, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims and Interests and controversies resolved pursuant to the Plan, including (1) any challenge to the amount, validity, perfection, enforceability, priority or extent of the DIP Claims, Superpriority Term Loan Claims, 2021 Letter of Credit Claims, 2023 Letter of Credit Claims, Revolving LC Claims, Revolving Loan Claims, Term Loan Claims, Cash Secured Letter of Credit Claims, Credit Agreement Hedging Claims, and Senior Notes Claims and (2) any claim to avoid, subordinate, or disallow any 2021 Letter of Credit Claims, 2023 Letter of Credit Claims, Revolving LC Claims, Revolving Loan Claims, Term Loan Claims, Cash Secured Letter of Credit Claims, Credit Agreement Hedging Claims, and Senior Notes Claims, whether under any provision of chapter 5 of the Bankruptcy Code, on any equitable theory (including equitable subordination, equitable disallowance, or unjust enrichment) or otherwise. The Plan shall be deemed a motion to approve the good faith compromise and settlement of all such Claims, Interests, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable and in the best interests of the Debtors and their Estates. Subject to Article VI hereof, all distributions made to holders of Allowed Claims and Allowed Interests (as applicable) in any Class are intended to be and shall be final.

B.      *Restructuring Transactions.*

On or before the Effective Date, the applicable Debtors or the Reorganized Debtors shall enter into and shall take any actions as may be necessary or appropriate to effect the Restructuring Transactions, including as set forth in the Restructuring Transactions Memorandum. The actions to implement the Restructuring Transactions may include: (1) the execution and delivery of appropriate agreements or other documents of merger, amalgamation, consolidation, restructuring, conversion, disposition, transfer, arrangement, continuance, dissolution, sale, purchase, or liquidation containing terms that are consistent with the terms of the Plan and that satisfy the applicable requirements of applicable law and any other terms to which the applicable Entities may agree; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable parties agree; (3) the filing of appropriate certificates or articles of incorporation, formation, reincorporation, merger, consolidation, conversion, amalgamation, arrangement, continuance, or dissolution pursuant to applicable state or provincial law; and (4) all other actions that the applicable Entities determine to be necessary, including making filings or recordings that may be required by applicable law in connection with the Plan. The Confirmation Order shall, and shall be deemed to, pursuant to sections 363 and 1123 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, contemplated by, or necessary to effectuate the Plan. On the Effective Date or as soon as reasonably practicable thereafter, the Reorganized Debtors, as applicable, shall issue all securities, notes, instruments, certificates, and other documents required to be issued pursuant to the Restructuring Transactions.

C.      *Reorganized Debtors.*

On the Effective Date, the New Board shall be established, and the Reorganized Debtors shall adopt their New Organizational Documents. The Reorganized Debtors shall be authorized to adopt any other agreements, documents, and instruments and to take any other actions contemplated under the Plan as necessary to consummate

the Plan.  Cash payments to be made pursuant to the Plan will be made by the Debtors or Reorganized Debtors.  The Debtors and Reorganized Debtors will be entitled to transfer funds between and among themselves as they determine to be necessary or appropriate to enable the Debtors or Reorganized Debtors, as applicable, to satisfy their obligations under the Plan.  Except as set forth herein, any changes in intercompany account balances resulting from such transfers will be accounted for and settled in accordance with the Debtors' historical intercompany account settlement practices and will not violate the terms of the Plan.

From and after the Effective Date, the Reorganized Debtors, subject to any applicable limitations set forth in any post-Effective Date agreement, shall have the right and authority without further order of the Bankruptcy Court to raise additional capital and obtain additional financing, subject to the New Organizational Documents and the Exit Facility Documents, as the boards of directors of the applicable Reorganized Debtors deem appropriate.

D.      *Technology Business Sale.*

    1.   Technology Business Sale Process.

Following the Petition Date, in consultation with the Consultation Parties (as defined in the Bidding Procedures), the Debtors shall continue their sale and marketing process and solicit bids for the sale or other disposition of all or substantially all of the Technology Business Sale, in accordance with the terms and conditions of the Restructuring Support Agreement (including the Milestones (as defined in the Restructuring Support Agreement)) and in a manner acceptable to the Required Consenting Lenders. For the avoidance of doubt, the Debtors may only execute an agreement for the sale or other disposition of any part of the Technology Business with the consent of the Required Consenting Lenders.

The Consultation Parties shall have the right to review all information, diligence, documents and other materials provided by the Debtors or their advisors to any bidder or prospective bidder in connection with the Technology Business Sale and to consult with the Debtors and their advisors with respect to the Technology Business Sale.  The Debtors shall provide to the Consultation Parties all term sheets, letters, proposals, offers, bids and other materials, whether non-binding or not, that are received by the Debtors or their advisors in connection with the Technology Business Sale within one (1) day of receipt by the Debtors or their advisors, as applicable.

    2.   Closing of the Technology Business Sale.

On or before the Effective Date, the Debtors shall be authorized to consummate the Technology Business Sale and, among other things, the Lummus Assets and Interests (including Executory Contracts and Unexpired Leases assumed and assigned pursuant to Article V hereof) shall be transferred to and vest in the Purchaser free and clear of all Liens, Claims, charges, or other encumbrances pursuant to the terms of the Purchase Agreement and, as applicable, the Confirmation Order or an order approving the Technology Business Sale; *provided* that, to the extent the Technology Business Sale is to be consummated pursuant to the Confirmation Order, the Debtors may request entry of any order supplementing the Confirmation Order that the Debtors believe is necessary or appropriate to implement the terms and conditions of the Technology Business Sale.  On and after the Effective Date, except as otherwise provided in the Plan, the Debtors or the Purchaser, as applicable, may operate the Debtors' businesses and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

3.    Technology Business Sale Proceeds Waterfall.

Any Technology Business Sale Proceeds that have not otherwise been applied in accordance with the DIP Credit Agreement shall be applied as follows:

(a)    first, to fund the minimum Cash balance of $820 million, as required by the Business Plan;

(b)    second, to repay Funded DIP Indebtedness (other than the Make Whole Amount);

(c)    third, payment of the Make Whole Amount; and

(d)    fourth, to fund cash to support new or additional letters of credit sufficient to meet the $2.44 billion letter of credit capacity contemplated by the Exit Facilities Term Sheet; and

(e)    fifth, the repayment of Prepetition Funded Secured Claims on a Pro Rata basis.

4.    Residual Prepetition Funded Secured Claims Pay Down.

On the Effective Date, the Prepetition Funded Secured Claims will be repaid on a pro rata basis from (i) the Residual Technology Business Sale Proceeds and (ii) any available Cash (such available Cash shall exclude Cash held in variable interest entities associated with joint venture and consortium arrangements, Cash trapped in foreign jurisdictions, and insurance captive Cash) in excess of $820 million available cash at emergence after payment of all fees and transaction expenses ((i) and (ii) together the "Residual Prepetition Funded Secured Claims Pay Down").

If the Residual Prepetition Funded Secured Claims Pay Down amount is greater than $0, the initial allocation of 94% of the New Common Stock to the holders of Prepetition Funded Secured Claims shall be reduced, and the initial allocation of 6% of the New Common Stock to holders of Senior Notes Claim shall be increased, by the percentage calculated by dividing:

(a)    the Residual Prepetition Funded Secured Claims Pay Down amount by

(b)    an amount equal to:

(i)    the aggregate amount of Prepetition Funded Secured Claims (including, without limitation, principal and any accrued prepetition or postpetition interest at the default rate as applicable) minus an amount equal to the sum of (y) the aggregate amount of the loans to be issued under the Term Loan Exit Facility and (z) any proceeds of the Rights Offering up to $150 million; divided by

(ii)    94% minus an amount equal to (y) the aggregate proceeds of the Rights Offering up to $150 million divided by (z) Plan Equity Value

(such adjustment of initial allocations, the "Prepetition Funded Secured Claims Excess Cash Adjustment").

For the avoidance of doubt, if the Technology Business Sale Proceeds paid pursuant to the Technology Business Sale Proceeds Waterfall have not paid the Make Whole Amount in full, all proceeds of the Rights Offering will (a) first go to the pay down of the Make Whole Amount and (b) once the Make Whole Amount is paid in full, the Prepetition Funded Secured Claims will be repaid on a pro rata basis from such remaining proceeds of the Rights Offering.

E.    Sources of Consideration for Plan Distributions.

The Debtors and the Reorganized Debtors, as applicable, shall fund distributions under the Plan with: (1) Cash on hand, including Cash from operations, the Rights Offering, or the Technology Business Sale in accordance

32

with the Technology Business Sale Proceeds Waterfall, as applicable; (2) the New Common Stock; (3) the proceeds from the Rights Offering; (4) the New Warrants; and (5) the proceeds from the Exit Facilities, as applicable.

    1.   Exit Facilities.

    On the Effective Date, the Reorganized Debtors shall enter into the Exit Facilities, the terms of which will be set forth in the Exit Facility Documents.

    To the extent applicable, Confirmation of the Plan shall be deemed (a) approval of the Exit Facilities (including the transactions and related agreements contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred and fees and expenses to be paid by the Debtors or the Reorganized Debtors, as applicable, in connection therewith), to the extent not approved by the Bankruptcy Court previously, and (b) authorization for the Debtors or the Reorganized Debtors, as applicable, to, without further notice to or order of the Bankruptcy Court, (i) execute and deliver those documents and agreements necessary or appropriate to pursue or obtain the Exit Facilities, including the Exit Facility Documents, and incur and pay any fees and expenses in connection therewith, and (ii) act or take action under applicable law, regulation, order, or rule or vote, consent, authorization, or approval of any Person, subject to such modifications as the Debtors or the Reorganized Debtors, as applicable, may deem to be necessary to consummate the Exit Facilities.

    As of the Effective Date, upon the granting or continuation of Liens in accordance with the Exit Facility Documents, such Liens shall constitute valid, binding, enforceable, and automatically perfected Liens in the collateral specified in the Exit Facility Documents. To the extent provided in the Exit Facility Documents, the Exit Facility Agents or holder(s) of Liens under the Exit Facility Documents are authorized to file with the appropriate authorities mortgages, financing statements and other documents, and to take any other action in order to evidence, validate, and perfect such Liens or security interests. The guarantees, mortgages, pledges, Liens, and other security interests granted to secure the obligations arising under the Exit Facility Documents have been granted in good faith, for legitimate business purposes, and for reasonably equivalent value as an inducement to the lenders thereunder to extent credit thereunder shall be deemed not to constitute a fraudulent conveyance or fraudulent transfer and shall not otherwise be subject to avoidance, recharacterization, or subordination for any purposes whatsoever and shall not constitute preferential transfers or fraudulent conveyances under the Bankruptcy Code or any applicable nonbankruptcy law, and the priorities of such Liens and security interests shall be as set forth in the Exit Facility Documents. The Reorganized Debtors and the persons and entities granted such Liens and security interests shall be authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, federal, or other law that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order and any such filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

    In no event shall the sum of (v) the face amount of letters of credit issued and outstanding at any time under the Senior Exit LC Facility, plus (w) the face amount of letters of credit issued and outstanding at any time under the Super Senior Exit Facility, plus (x) the face amount of letters of credit issued or deemed issued and outstanding at any time under the Roll-Off LC Exit Facility, plus (y) the face amount of letters of credit issued and outstanding at any time under the Cash Secured LC Exit Facility, exceed the Secured Letter of Credit Cap plus permitted incremental capacity set forth in the Exit Facilities Term Sheet.

    2.   Issuance of New Common Stock.

    The issuance of the New Common Stock, including the Rights Offering Shares and any options or other equity awards, if any, reserved for the Management Incentive Plan and the New Warrants, by the Reorganized Debtors (as set forth in the Restructuring Transactions Memorandum) shall be authorized without the need for any further corporate action or without any further action by the holders of Claims or Interests. The Reorganized Debtors shall be authorized to issue a certain number of shares, units or equity interests (as the case may be based on how the New Common Stock is denominated and the identity of the Reorganized Debtor issuing such shares, units, or equity interests) of New Common Stock required to be issued under the Plan and pursuant to their New Organizational Documents. On the Effective Date, the Debtors or Reorganized Debtors, as applicable, shall issue all Securities, notes, instruments, certificates, and other documents required to be issued pursuant to the Plan.

All of the shares, units, or equity interests (as the case may be based on how the New Common Stock is denominated) of New Common Stock issued or authorized to be issued pursuant to the Plan shall be duly authorized, validly issued, fully paid, and non-assessable.  Each distribution and issuance referred to in Article VI hereof shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.

On the Effective Date or as soon as reasonably practicable thereafter, the New Common Stock will be distributed in accordance with the Plan.

3.   Rights Offering.

On or about the Effective DateIn accordance with the Restructuring Support Agreement, the applicable Reorganized Debtor shall consummate the Rights Offering, through which each Consenting Noteholder shall have the opportunity, subject to the terms and conditions set forth in the Plan and the Rights Offering Procedures, to purchase the Rights Offering Shares.

The Rights Offering Procedures shall be approved within 5 days of Petition Date and shall provide for a subscription deadline of no later than the Voting Deadline.  Subscription rights to participate in the Rights Offering shall be distributed to the Consenting Noteholders in accordance with the Restructuring Support Agreement, the Restructuring Term Sheet, and the Plan and the issuance of such subscription rights will be exempt from SEC registration under applicable law.  Proceeds of the Rights Offering to be used (a) first, for Cash pay down of any portion Make Whole Amount that is not paid in full in Cash from Technology Business Sale Proceeds in accordance with the Technology Business Sale Proceeds Waterfall and (b) second, for Cash pay down of Prepetition Funded Secured Claims.

4.   Issuance of New Warrants.

On the Effective Date, the applicable Reorganized Debtor (as set forth in the Restructuring Transactions Memorandum) will issue the New Warrants only to the extent required to provide for distributions to holders of the Senior Notes Claims, as contemplated by this Plan.  All of the New Warrants issued pursuant to the Plan shall be duly authorized without the need for any further corporate action and without any further action by the Debtors or Reorganized Debtors, as applicable, validly issued, fully paid, and non-assessable.  Each distribution and issuance referred to in Article VI hereof shall be governed by the terms and conditions set forth in the Restructuring Support Agreement, the Plan, and the New Warrant Agreements applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance without the need for execution by any party thereto other than the applicable Reorganized Debtor(s).

The New Warrants shall be distributed to holders of Senior Notes Claims in accordance with the Restructuring Support Agreement and the Plan.  The New Warrants shall have full customary anti-dilution and Black-Scholes protection.

F.   *Corporate Existence.*

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, each Debtor shall continue to exist after the Effective Date as a separate corporate entity, limited liability company, partnership, or other form, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other formation documents) in effect prior to the Effective Date, except to the extent such certificate of incorporation and bylaws (or other formation documents) are amended under the Plan or otherwise, in each case, consistent with the Plan and the Restructuring Support Agreement, and to the extent such documents are amended in accordance therewith, such documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite filings required under applicable state, provincial, or federal law).

After the Effective Date, the respective certificate of incorporation and bylaws (or other formation documents) of one or more of the Reorganized Debtors may be amended or modified on the terms therein without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules. After the Effective Date, one or more of the Reorganized Debtors may be disposed of, dissolved, wound down, or liquidated without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

G.      *Vesting of Assets in the Reorganized Debtors.*

Except as otherwise provided in the Confirmation Order, the Plan (including, for the avoidance of doubt, the Restructuring Transactions Memorandum), or any agreement, instrument, or other document incorporated in, or entered into in connection with or pursuant to, the Plan or Plan Supplement, on the Effective Date, all property in each Estate, all Causes of Action, and any property acquired by any of the Debtors pursuant to the Plan shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances. On and after the Effective Date, except as otherwise provided in the Plan, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

H.      *Cancellation of Existing Securities and Agreements.*

On the Effective Date, except to the extent otherwise provided in the Plan or the Confirmation Order, all notes, instruments, certificates, credit agreements, indentures, and other documents evidencing Claims or Interests shall be cancelled and the obligations of the Debtors thereunder or in any way related thereto shall be deemed satisfied in full, cancelled, discharged, and of no force or effect. Holders of or parties to such cancelled instruments, Securities, and other documentation will have no rights arising from or relating to such instruments, Securities, and other documentation, or the cancellation thereof, except the rights provided for pursuant to this Plan. Notwithstanding anything to the contrary herein, but subject to any applicable provisions of Article VI hereof, to the extent cancelled pursuant to this paragraph, the DIP Credit Agreement, 2021 LC Agreement, the Credit Agreement, and the Senior Notes Indenture shall continue in effect solely to the extent necessary to: (1) permit holders of Claims under the DIP Credit Agreement, the 2021 LC Agreement, the Credit Agreement, and the Senior Notes Indenture to receive their respective Plan Distributions, if any; (2) permit the Reorganized Debtors and the Disbursing Agent, as applicable, to make Plan Distributions on account of the Allowed Claims under the DIP Credit Agreement, the 2021 LC Agreement, the Credit Agreement, and the Senior Notes Indenture, as applicable; (3) permit each of the DIP Agents, the Revolving and LC Administrative Agent, the Term Loan Administrative Agent, the 2021 LC Administrative Agent, the Superpriority Term Loan Agent, and the Senior Notes Trustee to seek compensation and/or reimbursement of fees and expenses in accordance with the terms of this Plan; and (4) permit each of the DIP Agent, the Revolving and LC Administrative Agent, the Term Loan Administrative Agent, the 2021 LC Administrative Agent, Superpriority Term Loan Agent, and the Senior Notes Trustee to appear and be heard in the Chapter 11 Cases or in any proceeding in the Bankruptcy Court, including to enforce any obligation owed to the DIP Agent, the Revolving and LC Administrative Agent, the Term Loan Administrative Agent, the 2021 LC Administrative Agent, the Superpriority Term Loan Agent, and the Senior Notes Trustee, or holders of Claims under the DIP Credit Agreement, the 2021 LC Agreement, the Credit Agreement, and the Senior Notes Indenture. Except as provided in this Plan (including Article VI hereof), on the Effective Date, the DIP Agents, the Revolving and LC Administrative Agent, the Term Loan Administrative Agent, the 2021 LC Administrative Agent, the Superpriority Term Loan Agent, and the Senior Notes Trustee, and their respective agents, successors, and assigns, shall be automatically and fully discharged of all of their duties and obligations associated with the DIP Credit Agreement, the 2021 LC Agreement, the Credit Agreement, and the Senior Notes Indenture, as applicable. To the extent cancelled in accordance with this paragraph, the commitments and obligations (if any) of the holders of the Senior Notes and the lenders under the DIP Credit Agreement, the Credit Agreement, and the 2021 LC Agreement to extend any further or future credit or financial accommodations to any of the Debtors, any of their respective subsidiaries or any of their respective successors or assigns under the 2021 LC Agreement, the Credit Agreement, and the Senior Notes Indenture, as applicable, shall fully terminate and be of no further force or effect on the Effective Date.

I.      *Corporate Action.*

Upon the Effective Date, all actions contemplated under the Plan shall be deemed authorized and approved in all respects, including: (1) adoption or assumption, as applicable, of the Compensation and Benefit Programs; (2) selection of the directors and officers for the Reorganized Debtors; (3) the issuance and distribution of the New Common Stock; (4) implementation of the Restructuring Transactions, including the Rights Offering; (5) issuance and distribution of the New Warrants; (6) entry into the New Warrants Agreements and the Exit Facility Documents, as applicable; (7) all other actions contemplated under the Plan (whether to occur before, on, or after the Effective Date); (8) adoption of the New Organizational Documents; (9) the rejection, assumption, or assumption and assignment, as applicable, of Executory Contracts and Unexpired Leases; and (10) all other acts or actions contemplated or reasonably necessary or appropriate to promptly consummate the Restructuring Transactions contemplated by the Plan (whether to occur before, on, or after the Effective Date).  All matters provided for in the Plan involving the corporate structure of the Debtors or the Reorganized Debtors, and any corporate, partnership, limited liability company, or other governance action required by the Debtors or the Reorganized Debtor, as applicable, in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the Security holders, members, directors, or officers of the Debtors or the Reorganized Debtors, as applicable.  On or (as applicable) prior to the Effective Date, the appropriate officers of the Debtors or the Reorganized Debtors, as applicable, shall be authorized and (as applicable) directed to issue, execute, and deliver the agreements, documents, Securities, and instruments contemplated under the Plan (or necessary or desirable to effect the transactions contemplated under the Plan) in the name of and on behalf of the Reorganized Debtors, including the New Common Stock, the New Organizational Documents, the Exit Facility Documents, the New Warrants, the New Warrants Agreements (as applicable), and any and all other agreements, documents, Securities, and instruments relating to the foregoing.  The authorizations and approvals contemplated by this Article IV.I shall be effective notwithstanding any requirements under non-bankruptcy law.

J.      *New Organizational Documents.*

On or immediately prior to the Effective Date, the New Organizational Documents shall be automatically adopted by the applicable Reorganized Debtors.  To the extent required under the Plan or applicable non-bankruptcy law, each of the Reorganized Debtors will file its New Organizational Documents with the applicable Secretaries of State and/or other applicable authorities in its respective state or country of organization if and to the extent required in accordance with the applicable laws of the respective state or country of organization.  The New Organizational Documents will (a) prohibit the issuance of non-voting equity Securities, to the extent required under section 1123(a)(6) of the Bankruptcy Code and (b) provide for customary minority shareholder protections and information and reporting requirements subject to the consent rights set forth in Section 3.02 of the Restructuring Support Agreement.

After the Effective Date, the Reorganized Debtors may amend and restate their respective New Organizational Documents in accordance with the terms thereof, and the Reorganized Debtors may file such amended certificates or articles of incorporation, bylaws, or such other applicable formation documents, and other constituent documents as permitted by the laws of the respective states, provinces, or countries of incorporation and the New Organizational Documents.

K.      *Indemnification Obligations.*

Consistent with applicable law, all indemnification provisions in place as of the Effective Date (whether in the by-laws, certificates of incorporation or formation, limited liability company agreements, other organizational documents, board resolutions, indemnification agreements, employment contracts, or otherwise) for current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of the Debtors, as applicable, shall be reinstated and remain intact, irrevocable, and shall survive the effectiveness of the Plan on terms no less favorable to such current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of the Debtors than the indemnification provisions in place prior to the Effective Date[; *provided* that the Reorganized Debtors shall not indemnify officers, directors, managers, employees, attorneys, accountants, investment bankers, or other professionals of the Debtors for any claims or Causes

of Action arising out of or relating to any act or omission that is a criminal act or constitutes intentional fraud, gross negligence, or willful misconduct.]

L.       *Directors and Officers of the Reorganized Debtors.*

      The New Board will consist of [●] directors: (i) the Chief Executive Officer of Reorganized McDermott, (ii) [●] directors selected by the Required Consenting Term Lenders, and (iii) [●] directors selected by the Required Consenting Revolving Lenders and the Required Consenting LC Lenders.  The identities of directors on the New Board shall be set forth in the Plan Supplement to the extent known at the time of filing. Corporate governance for Reorganized McDermott, including charters, bylaws, operating agreements, or other organization documents, as applicable, shall: (a) be consistent with the Restructuring Term Sheet, Section 3 of the Restructuring Support Agreement, and section 1123(a)(6) of the Bankruptcy Code; and (b) provide for customary minority shareholder protections and information and reporting requirements reasonably acceptable to the Debtors and the Required Consenting Stakeholders.

M.       *Effectuating Documents; Further Transactions.*

      On and after the Effective Date, the Reorganized Debtors, and their respective officers, directors, members, or managers (as applicable), are authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, Exit Facilities entered into, and the Securities issued pursuant to the Plan in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorization, or consents except for those expressly required pursuant to the Plan.

N.       *Section 1146 Exemption.*

      To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfers (whether from a Debtor to a Reorganized Debtor or to any other Person) of property under the Plan or pursuant to:  (1) the issuance, distribution, transfer, or exchange of any debt, equity Security, or other interest in the Debtors or the Reorganized Debtors, including the New Common Stock and the New Warrants; (2) the Restructuring Transactions; (3) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (4) the making, assignment, or recording of any lease or sublease; (5) the grant of collateral as security for the Reorganized Debtors' obligations under and in connection with the Exit Facilities; or (6) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, personal property transfer tax, sales or use tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment.  All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146(a) of the Bankruptcy Code, shall forego the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

O.       *Director and Officer Liability Insurance.*

      Notwithstanding anything in the Plan to the contrary, the Reorganized Debtors shall be deemed to have assumed all of the Debtors' D&O Liability Insurance Policies pursuant to section 365(a) of the Bankruptcy Code effective as of the Effective Date.  Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Reorganized Debtors' foregoing assumption of each of the unexpired D&O Liability Insurance Policies. Notwithstanding anything to the contrary contained in the Plan, Confirmation of the Plan shall not discharge, impair,

or otherwise modify any indemnity obligations assumed by the foregoing assumption of the D&O Liability Insurance Policies, and each such indemnity obligation will be deemed and treated as an Executory Contract that has been assumed by the Debtors under the Plan as to which no Proof of Claim need be filed.

In addition, after the Effective Date, none of the Reorganized Debtors shall terminate or otherwise reduce the coverage under any D&O Liability Insurance Policies (including any "tail policy") in effect on or after the Petition Date, with respect to conduct occurring prior thereto, and all directors and officers of the Debtors who served in such capacity at any time prior to the Effective Date shall be entitled to the full benefits of any such policy for the full term of such policy, to the extent set forth therein, regardless of whether such directors and officers remain in such positions after the Effective Date.

P.      *Management Incentive Plan.*

Effective on the Effective Date, the Reorganized Debtors will reserve 7.5% of New Common Stock (on a fully diluted and fully distributed basis) which may be granted in the form of options, restricted stock, restricted stock units, warrants, stock appreciations rights or any combination thereof (each an "**Award**" and such reserve, the "**MIP Pool**") for grant to management employees and members of the New Board and enter into severance and change in control arrangements ("**Severance Arrangements**") with senior executives of the Debtors that are insiders pursuant to Section 16 of the Exchange Act ("**Senior Executives**") in amounts and on terms and conditions to be agreed with and approved by the Required Consenting Lenders.  The New Board shall grant no less than 53.33% of the MIP Pool to the employees of the Debtors no later than 60 days following the Effective Date (the "**Emergence Awards**") with the terms of the Emergence Awards to be determined as set forth below and the remainder of the MIP Pool will be available for future grants to management employees and members of the New Board with allocations, terms and conditions to be determined by the New Board.  From the Petition Date through entry of the Confirmation Order, the Debtors, the Required Consenting Lenders and any consultants or advisors engaged by the Required Consenting Lenders will use commercially reasonable efforts to agree on an allocation schedule and the terms, conditions, vesting and composition (including, for the avoidance of doubt, which may be in any form of Award) of the Emergence Awards (together, the "**MIP Proposal**"), and during this period the Debtors will use commercially reasonable efforts to facilitate meetings between the Required Consenting Lenders and the Debtors' key management personnel.  As soon as reasonably practicable following the Effective Date but no later than 60 days following the Effective Date, the New Board shall consider the MIP Proposal for approval and New Board shall determine the final terms and conditions of the actual grants.  A Senior Executive will be permitted to voluntarily terminate for "Good Reason" and receive the severance benefits under the Severance Arrangements if the Senior Executive does not receive an Emergence Award.

Q.      *Employee and Retiree Benefits.*

Unless otherwise provided herein, and subject to Article V hereof, all employee wages, compensation, and benefit programs in place as of the Effective Date with the Debtors shall be assumed by the Reorganized Debtors and shall remain in place as of the Effective Date, and the Reorganized Debtors will continue to honor such agreements, arrangements, programs, and plans.  For the avoidance of doubt, pursuant to section 1129(a)(13) of the Bankruptcy Code, from and after the Effective Date, all retiree benefits (as such term is defined in section 1114 of the Bankruptcy Code), if any, shall continue to be paid in accordance with applicable law.  On the Effective Date, the Debtors shall enter into severance and change in control arrangements with Senior Executives in amounts and on terms and conditions to be agreed with and approved by the Required Consenting Lenders.

R.      *Preservation of Causes of Action.*

In accordance with section 1123(b) of the Bankruptcy Code, but subject to Article VIII hereof, each Reorganized Debtor, as applicable, shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action of the Debtors, whether arising before or after the Petition Date, including any actions specifically enumerated in the Schedule of Retained Causes of Action, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date, other than the Causes of Action released by the Debtors pursuant to the releases and exculpations

contained in the Plan, including in Article VIII hereof, which shall be deemed released and waived by the Debtors and the Reorganized Debtors as of the Effective Date.

The Reorganized Debtors may pursue such retained Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors.  **No Entity (other than the Released Parties) may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors or the Reorganized Debtors, as applicable, will not pursue any and all available Causes of Action of the Debtors against it.  The Debtors and the Reorganized Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan, including Article VIII hereof.  Unless otherwise agreed upon in writing by the parties to the applicable Cause of Action, all objections to the Schedule of Retained Causes of Action must be Filed with the Bankruptcy Court on or before thirty (30) days after the Effective Date.  Any such objection that is not timely filed shall be disallowed and forever barred, estopped, and enjoined from assertion against any Reorganized Debtor, without the need for any objection or responsive pleading by the Reorganized Debtors or any other party in interest or any further notice to or action, order, or approval of the Bankruptcy Court.**  The Reorganized Debtors may settle any such objection without any further notice to or action, order, or approval of the Bankruptcy Court.  If there is any dispute regarding the inclusion of any Cause of Action on the Schedule of Retained Causes of Action that remains unresolved by the Debtors or Reorganized Debtors, as applicable, and the objection party for thirty (30) days, such objection shall be resolved by the Bankruptcy Court.  Unless any Causes of Action of the Debtors against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Final Order, the Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

The Reorganized Debtors reserve and shall retain such Causes of Action of the Debtors notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan.  In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that a Debtor may hold against any Entity shall vest in the Reorganized Debtors, except as otherwise expressly provided in the Plan, including Article VIII hereof.  The applicable Reorganized Debtors, through their authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action.  The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

## ARTICLE V.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A.      *Assumption and Rejection of Executory Contracts and Unexpired Leases.*

On the Effective Date, except as otherwise provided in Article V.H.1 and elsewhere herein, all Executory Contracts or Unexpired Leases not otherwise assumed or rejected will be deemed assumed by the applicable Reorganized Debtor (and assigned to the party(ies) set forth in the Technology Business Sale Documents, as applicable) in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, other than those that are: (1) identified on the Rejected Executory Contracts and Unexpired Leases Schedule; (2) previously expired or terminated pursuant to their own terms; (3) have been previously assumed or rejected by the Debtors pursuant to a Final Order; (4) are the subject of a motion to reject that is pending on the Effective Date; or (5) have an ordered or requested effective date of rejection that is after the Effective Date.

Entry of the Confirmation Order shall constitute an order of the Bankruptcy Court approving the assumptions, assumptions and assignments, or rejections of the Executory Contracts or Unexpired Leases as set forth in the Plan, the Assumed Executory Contract and Unexpired Leases Schedule, or the Rejected Executory Contracts and Unexpired Leases Schedule, pursuant to sections 365(a) and 1123 of the Bankruptcy Code.  Except as otherwise specifically set forth herein, assumptions or rejections of Executory Contracts and Unexpired Leases pursuant to the Plan are effective

as of the Effective Date.  Each Executory Contract or Unexpired Lease assumed pursuant to the Plan or by Bankruptcy Court order but not assigned to a third party before the Effective Date shall re-vest in and be fully enforceable by the applicable contracting Reorganized Debtor in accordance with its terms, except as such terms may have been modified by the provisions of the Plan or any order of the Bankruptcy Court authorizing and providing for its assumption.  Any motions to assume Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by a Final Order on or after the Effective Date but may be withdrawn, settled, or otherwise prosecuted by the Reorganized Debtors.

To the maximum extent permitted by law, to the extent any provision in any Executory Contract or Unexpired Lease assumed or assumed and assigned pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption or assumption and assignment of such Executory Contract or Unexpired Lease (including any "change of control" provision), then such provision shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto. Notwithstanding anything to the contrary in the Plan, the Debtors or the Reorganized Debtors, as applicable, reserve the right to alter, amend, modify, or supplement the Assumed Executory Contracts and Unexpired Leases Schedule and the Rejected Executory Contracts and Unexpired Leases Schedule at any time up to forty-five (45) days after the Effective Date, so long as such allocation, amendment, modification, or supplement is consistent with the Restructuring Support Agreement.; *provided* that the Cameron LNG Project Obligations shall be assumed as of the Effective Date in accordance with Article V.J.

B.      *Claims Based on Rejection of Executory Contracts or Unexpired Leases.*

Unless otherwise provided by a Final Order of the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, pursuant to the Plan or the Confirmation Order, if any, must be Filed with the Bankruptcy Court within thirty (30) days after the later of (1) the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection, (2) the effective date of such rejection, or (3) the Effective Date.  **Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed with the Bankruptcy Court within such time will be automatically disallowed, forever barred from assertion, and shall not be enforceable against the Debtors or the Reorganized Debtors, the Estates, or their property without the need for any objection by the Reorganized Debtors or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in the Proof of Claim to the contrary.**  All Allowed Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases shall be classified as General Unsecured Claims and shall be treated in accordance with Article III.B.13 of this Plan.

C.      *Cure of Defaults for Assumed Executory Contracts and Unexpired Leases.*

No later than seven (7) calendar days before the Confirmation Hearing, the Debtors shall provide notices of proposed Cure amounts to the counterparties to the agreements listed on the Assumed Executory Contracts and Unexpired Leases Schedule, which shall include a description of the procedures for objecting to the proposed Cure amounts or the Reorganized Debtors' ability to provide "adequate assurance of future performance thereunder" (within the meaning of section 365 of the Bankruptcy Code).  Unless otherwise agreed in writing by the parties in the applicable Executory Contract or Unexpired Lease, any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption or related Cure amount must be Filed, served, and actually received by the counsel to the Debtor no later than the date and time specified in the notice.  Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption or Cure amount will be deemed to have assented to such assumption or Cure amount.  Notwithstanding anything herein to the contrary, in the event that any Executory Contract or Unexpired Lease is added to the Assumed Executory Contracts and Unexpired Leases Schedule after such seven-day deadline, a notice of proposed Cure amounts with respect to such Executory Contract or Unexpired Lease will be sent promptly to the counterparty thereof.

Unless otherwise agreed upon in writing by the parties to the applicable Executory Contract or Unexpired Lease, all requests for payment of Cure that differ from the amounts paid or proposed to be paid by the Debtors or the

Reorganized Debtors to a counterparty must be Filed with the Bankruptcy Court on or before thirty (30) days after the Effective Date.  Any such request that is not timely filed shall be disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Reorganized Debtor, without the need for any objection by the Reorganized Debtors or any other party in interest or any further notice to or action, order, or approval of the Bankruptcy Court.  Any Cure shall be deemed fully satisfied, released, and discharged upon payment by the Debtors or the Reorganized Debtors of the Cure; *provided* that nothing herein shall prevent the Reorganized Debtors from paying any Cure despite the failure of the relevant counterparty to file such request for payment of such Cure amount.  The Reorganized Debtors also may settle any Cure without any further notice to or action, order, or approval of the Bankruptcy Court.

The Debtors or the Reorganized Debtors, as applicable, shall pay the Cure amounts, if any, on the Effective Date or as soon as reasonably practicable thereafter, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may agree.  If there is any dispute regarding any Cure, the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" within the meaning of section 365 of the Bankruptcy Code, or any other matter pertaining to assumption, then payment of the applicable Cure amount shall occur as soon as reasonably practicable after entry of a Final Order resolving such dispute, approving such assumption (and, if applicable, assignment), or as may be agreed upon by the Debtors or the Reorganized Debtors, as applicable, and the counterparty to the Executory Contract or Unexpired Lease.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Cures, Claims, or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or any bankruptcy-related defaults, arising at any time prior to the effective date of assumption.  **Any and all Proofs of Claim based upon Executory Contracts or Unexpired Leases that have been assumed in the Chapter 11 Cases, including pursuant to the Confirmation Order, shall be deemed disallowed and expunged as of the later of (1) the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such assumption, (2) the effective date of such assumption or (3) the Effective Date without the need for any objection thereto or any further notice to or action, order, or approval of the Bankruptcy Court**.

D.    *Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases.*

Rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of preexisting obligations owed to the Debtors or the Reorganized Debtors, as applicable, under such Executory Contracts or Unexpired Leases.  In particular, notwithstanding any non-bankruptcy law to the contrary, the Reorganized Debtors expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations with respect to goods previously purchased by the Debtors pursuant to rejected Executory Contracts or Unexpired Leases.

E.    *Insurance Policies.*

Each of the Debtors' insurance policies and any agreements, documents, or instruments relating thereto, are treated as Executory Contracts under the Plan.  Unless otherwise provided in the Plan, on the Effective Date, (1) the Debtors shall be deemed to have assumed all insurance policies and any agreements, documents, and instruments relating to coverage of all insured Claims and (2) such insurance policies and any agreements, documents, or instruments relating thereto shall revest in the Reorganized Debtors.

F.    *Reservation of Rights.*

Nothing contained in the Plan or the Plan Supplement shall constitute an admission by the Debtors or any other party that any contract or lease is in fact an Executory Contract or Unexpired Lease or that any Reorganized Debtor has any liability thereunder.  If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or the Reorganized Debtors, as applicable, shall have forty-five (45) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

G.      *Nonoccurrence of Effective Date.*

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

H.      *Employee Compensation and Benefits.*

1.      Compensation and Benefit Programs.

Subject to the provisions of the Plan, all Compensation and Benefits Programs shall be treated as Executory Contracts under the Plan and deemed assumed on the Effective Date pursuant to the provisions of sections 365 and 1123 of the Bankruptcy Code, except for:

a.      all employee equity or equity-based incentive plans, and any provisions set forth in the Compensation and Benefits Program that provide for rights to acquire Existing Equity Interests in any of the Debtors;

b.      the change in control agreements entered into with current employees, unless otherwise determined by the Required Consenting Lenders prior to the Effective Date;

c.      Compensation and Benefits Programs that have been rejected pursuant to an order of a Bankruptcy Court; and

d.      Compensation and Benefits Programs that, as of the entry of the Confirmation Order, have been specifically waived by the beneficiaries of any employee benefit plan or contract.

Any assumption of Compensation and Benefits Programs pursuant to the terms herein shall be deemed not to trigger (i) any applicable change of control, immediate vesting, termination (similar provisions therein) and (ii) an event of "Good Reason" (or a term of like import), in each case as a result of the consummation of the Restructuring Transactions. No counterparty shall have rights under a Compensation and Benefits Program assumed pursuant to the Plan other than those applicable immediately prior to such assumption.

On the Effective Date, the Debtors shall enter into severance and change in control arrangements with Senior Executives in amounts and on terms and conditions to be agreed with and approved by the Required Consenting Lenders.

2.      Workers' Compensation Programs.

As of the Effective Date, except as set forth in the Plan Supplement, the Debtors and the Reorganized Debtors shall continue to honor their obligations under: (a) all applicable workers' compensation laws in states in which the Reorganized Debtors operate; and (b) the Debtors' written contracts, agreements, agreements of indemnity, self-insured workers' compensation bonds, policies, programs, and plans for workers' compensation and workers' compensation insurance. All Proofs of Claims on account of workers' compensation shall be deemed withdrawn automatically and without any further notice to or action, order, or approval of the Bankruptcy Court; *provided* that nothing in the Plan shall limit, diminish, or otherwise alter the Debtors' or Reorganized Debtors' defenses, Causes of Action, or other rights under applicable non-bankruptcy law with respect to any such contracts, agreements, policies, programs, and plans; *provided further* that nothing herein shall be deemed to impose any obligations on the Debtors in addition to what is provided for under applicable state law.

I.      *Contracts and Leases Entered Into After the Petition Date.*

Contracts and leases entered into after the Petition Date by any Debtor, including any Executory Contracts and Unexpired Leases assumed by such Debtor, will be performed by the applicable Debtor or the Reorganized

Debtors in the ordinary course of their business.  Accordingly, such contracts and leases (including any assumed Executory Contracts and Unexpired Leases) will survive and remain unaffected by entry of the Confirmation Order.

*J.        Assumption of Cameron LNG Project Obligations*

The Cameron LNG Project Obligations shall be assumed by the applicable Reorganized Debtor effective as of the Effective Date, and the Cameron LNG Project Obligations shall not be subject to the provision of Section V.A. hereof authorizing the Debtors or Reorganized Debtors, as applicable, to alter, amend, modify, or supplement the Assumed Executory Contracts and Unexpired Leases Schedule and the Rejected Executory Contracts and Unexpired Leases Schedule at any time up to forty-five (45) days after the Effective Date.  Within three Business Days after the Effective Date, Reorganized McDermott shall issue the Cameron LNG Replacement Guarantee and the Chiyoda Replacement Guarantee.

# ARTICLE VI.
## PROVISIONS GOVERNING DISTRIBUTIONS

A.    *Distributions on Account of Claims Allowed as of the Effective Date.*

Except as otherwise provided herein, in a Final Order, or as otherwise agreed to by the Debtors or the Reorganized Debtors, as the case may be, and the holder of the applicable Allowed Claim on the first Distribution Date, the Reorganized Debtors shall make initial distributions under the Plan on account of Claims Allowed on or before the Effective Date, subject to the Reorganized Debtors' right to object to Claims; *provided* that (1) Allowed Administrative Claims with respect to liabilities incurred by the Debtors in the ordinary course of business during the Chapter 11 Cases or assumed by the Debtors prior to the Effective Date shall be paid or performed in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, course of dealing, course of business, or industry practice, (2) Allowed Priority Tax Claims shall be paid in accordance with Article II.D of the Plan, and (3) Allowed General Unsecured Claims shall be paid in accordance with Article III.B.13 of the Plan. To the extent any Allowed Priority Tax Claim is not due and owing on the Effective Date, such Claim shall be paid in full in Cash in accordance with the terms of any agreement between the Debtors and the holder of such Claim or as may be due and payable under applicable non-bankruptcy law or in the ordinary course of business.  Thereafter, a Distribution Date shall occur no less frequently than once in every ninety (90) day period, as necessary, in the Reorganized Debtors' sole discretion.

B.    *Disbursing Agent.*

All distributions under the Plan shall be made by the Reorganized Debtors.  The Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.  Additionally, in the event that the Disbursing Agent is so otherwise ordered, all costs and expenses of procuring any such bond or surety shall be borne by the Reorganized Debtors.

C.    *Rights and Powers of Disbursing Agent.*

1.    <u>Powers of the Disbursing Agent</u>.

The Disbursing Agent shall be empowered to:  (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

2.    <u>Expenses Incurred On or After the Effective Date</u>.

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and expenses incurred by the Disbursing Agent on or after the Effective Date (including taxes), and any reasonable compensation

and expense reimbursement claims (including reasonable attorney fees and expenses), made by the Disbursing Agent shall be paid in Cash by the Reorganized Debtors.

D.    *Delivery of Distributions and Undeliverable or Unclaimed Distributions.*

    1.    Record Date for Distribution.

On the Distribution Record Date, the Claims Register shall be closed and any party responsible for making distributions shall instead be authorized and entitled to recognize only those record holders listed on the Claims Register as of the close of business on the Distribution Record Date.  If a Claim, other than one based on a publicly traded Security, is transferred twenty (20) or fewer days before the Distribution Record Date, the Distribution Agent shall make distributions to the transferee only to the extent practical and, in any event, only if the relevant transfer form contains an unconditional and explicit certification and waiver of any objection to the transfer by the transferor.

    2.    Delivery of Distributions in General.

Except as otherwise provided herein, the Disbursing Agent shall make distributions to holders of Allowed Claims and Allowed Interests (as applicable) as of the Distribution Record Date at the address for each such holder as indicated on the Debtors' records as of the date of any such distribution; *provided* that the manner of such distributions shall be determined at the discretion of the Reorganized Debtors.

    3.    Minimum Distributions.

No fractional shares of New Common Stock or New Warrants shall be distributed and no Cash shall be distributed in lieu of such fractional amounts.  When any distribution pursuant to the Plan on account of an Allowed Claim or Allowed Interest (as applicable) would otherwise result in the issuance of a number of shares of New Common Stock or New Warrants that is not a whole number, the actual distribution of shares of New Common Stock or New Warrants shall be rounded to the next lower whole number with no further payment therefor.  The total number of authorized shares of New Common Stock or New Warrants to be distributed to holders of Allowed Claims hereunder shall be adjusted as necessary to account for the foregoing rounding.

    4.    Undeliverable Distributions and Unclaimed Property.

In the event that any distribution to any holder of Allowed Claims or Allowed Interests (as applicable) is returned as undeliverable, no distribution to such holder shall be made unless and until the Disbursing Agent has determined the then-current address of such holder, at which time such distribution shall be made to such holder without interest; *provided* that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of one year from the Effective Date.  After such date, all unclaimed property or interests in property shall revert to the Reorganized Debtors automatically and without need for a further order by the Bankruptcy Court (notwithstanding any applicable federal, provincial or state escheat, abandoned, or unclaimed property laws to the contrary), and the Claim of any holder of Claims and Interests to such property or Interest in property shall be discharged and forever barred.

    5.    Surrender of Canceled Instruments or Securities.

On the Effective Date or as soon as reasonably practicable thereafter, each holder of a certificate or instrument evidencing a Claim or an Interest that has been cancelled in accordance with Article IV.H hereof shall be deemed to have surrendered such certificate or instrument to the Distribution Agent.  Such surrendered certificate or instrument shall be cancelled solely with respect to the Debtors, and such cancellation shall not alter the obligations or rights of any non-Debtor third parties vis-à-vis one another with respect to such certificate or instrument, including with respect to any indenture or agreement that governs the rights of the holder of a Claim or Interest, which shall continue in effect for purposes of allowing holders to receive distributions under the Plan, charging liens, priority of payment, and indemnification rights.  Notwithstanding anything to the contrary herein, this paragraph shall not apply to certificates or instruments evidencing Claims that are Unimpaired under the Plan.

E.        *Manner of Payment.*

1.    All distributions of the New Common Stock and the New Warrants to the holders of the applicable Allowed Claims under the Plan shall be made by the Disbursing Agent on behalf of the Debtors or Reorganized Debtors, as applicable.

2.    All distributions of Cash to the holders of the applicable Allowed Claims under the Plan shall be made by the Disbursing Agent on behalf of the applicable Debtor or Reorganized Debtor.

3.    At the option of the Disbursing Agent, any Cash payment to be made hereunder may be made by check or wire transfer or as otherwise required or provided in applicable agreements.

F.        *Section 1145 Exemption.*

Pursuant to section 1145 of the Bankruptcy Code or any other applicable exemption, the offering, issuance, and distribution of the New Common Stock (including the Rights Offering Shares) and the New Warrants, as contemplated by Article III.B hereof, shall be exempt from, among other things, the registration requirements of section 5 of the Securities Act and any other applicable law requiring registration prior to the offering, issuance, distribution, or sale of Securities.  In addition, under section 1145 of the Bankruptcy Code, ~~such~~the New Common Stock and the New Warrants will be freely tradable in the U.S. by the recipients thereof, subject to the provisions of (i) section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act, (ii) compliance with applicable securities laws and any rules and regulations of the Securities and Exchange Commission, if any, applicable at the time of any future transfer of such Securities or instruments, and (iii) any restrictions in the Reorganized Debtors' New Organizational Documents.

G.        *Compliance with Tax Requirements.*

In connection with the Plan, to the extent applicable, the Debtors, Reorganized Debtors, Disbursing Agent, and any applicable withholding agent shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions made pursuant to the Plan shall be subject to such withholding and reporting requirements.  Notwithstanding any provision in the Plan to the contrary, such parties shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate.  The Debtors and Reorganized Debtors reserve the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and similar spousal awards, Liens, and encumbrances.

H.        *Allocations.*

Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest.

I.        *No Postpetition Interest on Claims.*

Unless otherwise specifically provided for in the DIP Financing Orders, the Plan, or the Confirmation Order, or required by applicable bankruptcy and non-bankruptcy law, postpetition interest shall not accrue or be paid on any prepetition Claims, and no holder of a Claim shall be entitled to interest accruing on or after the Petition Date on such Claim.

J.        *Foreign Currency Exchange Rate.*

Except as otherwise provided in a Bankruptcy Court order, as of the Effective Date, any Claim asserted in currency other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using the

exchange rate for the applicable currency as published in The Wall Street Journal, National Edition, on the Effective Date.

K.     Setoffs and Recoupment.

Except as expressly provided in this Plan, each Reorganized Debtor may, pursuant to section 553 of the Bankruptcy Code, set off and/or recoup against any Plan Distributions to be made on account of any Allowed Claim, any and all claims, rights, and Causes of Action that such Reorganized Debtor may hold against the holder of such Allowed Claim to the extent such setoff or recoupment is either (1) agreed in amount among the relevant Reorganized Debtor(s) and the holder of the Allowed Claim or (2) otherwise adjudicated by the Bankruptcy Court or another court of competent jurisdiction; *provided* that neither the failure to effectuate a setoff or recoupment nor the allowance of any Claim hereunder shall constitute a waiver or release by a Reorganized Debtor or its successor of any and all claims, rights, and Causes of Action that such Reorganized Debtor or its successor may possess against the applicable holder.  In no event shall any holder of a Claim be entitled to recoup such Claim against any claim, right, or Cause of Action of the Debtors or the Reorganized Debtors, as applicable, unless such holder actually has performed such recoupment and provided notice thereof in writing to the Debtors in accordance with Article XII.G hereof on or before the Effective Date, notwithstanding any indication in any Proof of Claim or otherwise that such holder asserts, has, or intends to preserve any right of recoupment.

L.     Claims Paid or Payable by Third Parties.

1.     Claims Paid by Third Parties.

The Debtors or the Reorganized Debtors, as applicable, shall reduce in full a Claim, and such Claim shall be disallowed without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor or a Reorganized Debtor.  Subject to the last sentence of this paragraph, to the extent a holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor or a Reorganized Debtor on account of such Claim, such holder shall, within fourteen (14) days of receipt thereof, repay or return the distribution to the applicable Reorganized Debtor, to the extent the holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan.  The failure of such holder to timely repay or return such distribution shall result in the holder owing the applicable Reorganized Debtor annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the fourteen (14) day grace period specified above until the amount is repaid.

2.     Claims Payable by Third Parties.

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy.  To the extent that one or more of the Debtors' insurers agrees to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, the applicable portion of such Claim may be expunged without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

3.     Applicability of Insurance Policies.

Except as otherwise provided in the Plan, distributions to holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy.  Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

# ARTICLE VII.
## PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND DISPUTED CLAIMS

A.      *Disputed Claims Process.*

There is no requirement to file a Proof of Claim (or move the Bankruptcy Court for allowance) to have a Claim Allowed for the purposes of the Plan, except as provided in Article V.B of the Plan.  On and after the Effective Date, except as otherwise provided in this Plan, all Allowed Claims shall be satisfied in the ordinary court of business of the Reorganized Debtors.  The Debtors and the Reorganized Debtors, as applicable, shall have the exclusive authority to (i) determine, without the need for notice to or action, order, or approval of the Bankruptcy Court, that a claim subject to any Proof of Claim that is Filed is Allowed and (ii) file, settle, compromise, withdraw, or litigate to judgment any objections to Claims as permitted under this Plan.  If the Debtors or Reorganized Debtors dispute any Claim, such dispute shall be determined, resolved, or adjudicated, as the case may be, in the manner as if the Chapter 11 Cases had not been commenced and shall survive the Effective Date as if the Chapter 11 Cases had not been commenced; *provided* that the Debtors or Reorganized Debtors may elect, at their sole option, to object to any Claim (other than Claims expressly Allowed by this Plan) and to have the validity or amount of any Claim adjudicated by the Bankruptcy Court; *provided further* that holders of Claims may elect to resolve the validity or amount of any Claim in the Bankruptcy Court.  If a holder makes such an election, the Bankruptcy Court shall apply the law that would have governed the dispute if the Chapter 11 Cases had not been filed.  All Proofs of Claim Filed in the Chapter 11 Cases shall be considered objected to and Disputed without further action by the Debtors.  **Except as otherwise provided herein, all Proofs of Claim Filed after the Effective Date shall be disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Reorganized Debtor, without the need for any objection by the Reorganized Debtors or any further notice to or action, order, or approval of the Bankruptcy Court.**

B.      *Allowance of Claims.*

After the Effective Date, except as otherwise expressly set forth herein, each of the Reorganized Debtors shall have and retain any and all rights and defenses such Debtor had with respect to any Claim or Interest immediately prior to the Effective Date.  The Debtors may affirmatively determine to deem Unimpaired Claims Allowed to the same extent such Claims would be allowed under applicable non-bankruptcy law.

C.      *Claims Administration Responsibilities.*

Except as otherwise specifically provided in the Plan, after the Effective Date, the Reorganized Debtors shall have the sole authority:  (1) to File, withdraw, or litigate to judgment, objections to Claims or Interests; (2) to settle or compromise any Disputed Claim without any further notice to or action, order, or approval of the Bankruptcy Court; and (3) to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court.  For the avoidance of doubt, except as otherwise provided herein, from and after the Effective Date, each Reorganized Debtor shall have and retain any and all rights and defenses such Debtor had immediately prior to the Effective Date with respect to any Disputed Claim or Interest, including the Causes of Action retained pursuant to Article IV.R of the Plan.

D.      *Estimation of Claims and Interests..*

Before or after the Effective Date, the Debtors or the Reorganized Debtors, as applicable, may (but are not required to) at any time request that the Bankruptcy Court estimate any Disputed Claim or Interest that is contingent or unliquidated pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party in interest previously has objected to such Claim or Interest or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim or Interest, including during the litigation of any objection to any Claim or Interest or during the appeal relating to such objection. Notwithstanding any provision otherwise in the Plan, a Claim that has been expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court. In the event that the Bankruptcy Court estimates any contingent or unliquidated

47

Claim or Interest, that estimated amount shall constitute a maximum limitation on such Claim or Interest for all purposes under the Plan (including for purposes of distributions), and the relevant Reorganized Debtor may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim or Interest.

E.      *Adjustment to Claims or Interests without Objection.*

Any duplicate Claim or Interest or any Claim or Interest that has been paid, satisfied, amended, or superseded may be adjusted or expunged on the Claims Register by the Reorganized Debtors without the Reorganized Debtors having to File an application, motion, complaint, objection, or any other legal proceeding seeking to object to such Claim or Interest and without any further notice to or action, order, or approval of the Bankruptcy Court.

F.      *Disallowance of Claims or Interests.*

Except as otherwise expressly set forth herein, all Claims and Interests of any Entity from which property is sought by the Debtors under sections 542, 543, 550, or 553 of the Bankruptcy Code or that the Debtors or the Reorganized Debtors allege is a transferee of a transfer that is avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code shall be disallowed if: (a) the Entity, on the one hand, and the Debtors or the Reorganized Debtors, as applicable, on the other hand, agree or the Bankruptcy Court has determined by Final Order that such Entity or transferee is liable to turn over any property or monies under any of the aforementioned sections of the Bankruptcy Code; and (b) such Entity or transferee has failed to turn over such property by the date set forth in such agreement or Final Order.

G.      *No Distributions Pending Allowance.*

Notwithstanding any other provision of the Plan, if any portion of a Claim or Interest is a Disputed Claim or Interest, as applicable, no payment or distribution provided hereunder shall be made on account of such Claim or Interest unless and until such Disputed Claim or Interest becomes an Allowed Claim or Interest; *provided* that if only the Allowed amount of an otherwise valid Claim or Interest is Disputed, such Claim or Interest shall be deemed Allowed in the amount not Disputed and payment or distribution shall be made on account of such undisputed amount.

H.      *Distributions After Allowance.*

To the extent that a Disputed Claim or Interest ultimately becomes an Allowed Claim or Interest, distributions (if any) shall be made to the holder of such Allowed Claim or Interest in accordance with the provisions of the Plan. As soon as reasonably practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim or Interest becomes a Final Order, the Disbursing Agent shall provide to the holder of such Claim or Interest the distribution (if any) to which such holder is entitled under the Plan as of the Effective Date, without any interest to be paid on account of such Claim or Interest.

I.      *No Interest.*

Unless otherwise specifically provided for herein or by order of the Bankruptcy Court, postpetition interest shall not accrue or be paid on Claims, and no holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim or right.  Additionally, and without limiting the foregoing, interest shall not accrue or be paid on any Disputed Claim with respect to the period from the Effective Date to the date a final distribution is made on account of such Disputed Claim, if and when such Disputed Claim becomes an Allowed Claim.

## ARTICLE VIII.
## SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS

A.      *Discharge of Claims and Termination of Interests.*

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Definitive Documents, the Plan, or in any contract, instrument, or other agreement or document created or entered into pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete

satisfaction, discharge, and release, effective as of the Effective Date, of Claims (including any Intercompany Claims resolved or compromised after the Effective Date by the Reorganized Debtors), Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by employees of the Debtors prior to the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not:  (1) a Proof of Claim based upon such debt or right is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such debt, right, or interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the holder of such a Claim or Interest has accepted the Plan.  The Confirmation Order shall be a judicial determination of the discharge of all Claims (other than the Reinstated Claims) and Interests (other than the Intercompany Interests that are Reinstated) subject to the occurrence of the Effective Date.

B.    *Release of Liens.*

Except as otherwise provided in the Exit Facility Documents, the Plan, the Confirmation Order, or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, except for Other Secured Claims that the Debtors elect to Reinstate in accordance with this Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors and their successors and assigns.  Any holder of such Secured Claim (and the applicable agents for such holder) shall be authorized and directed, at the sole cost and expense of the Reorganized Debtors, to release any collateral or other property of any Debtor (including any cash collateral and possessory collateral) held by such holder (and the applicable agents for such holder), and to take such actions as may be reasonably requested by the Reorganized Debtors to evidence the release of such Liens and/or security interests, including the execution, delivery, and filing or recording of such releases.  The presentation or filing of the Confirmation Order to or with any federal, state, provincial, or local agency, records office, or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.

To the extent that any holder of a Secured Claim that has been satisfied or discharged in full pursuant to the Plan, or any agent for such holder, has filed or recorded publicly any Liens and/or security interests to secure such holder's Secured Claim, then as soon as practicable on or after the Effective Date, such holder (or the agent for such holder) shall take any and all steps requested by the Debtors, the Reorganized Debtors, or Exit Facility Agents that are necessary or desirable to record or effectuate the cancellation and/or extinguishment of such Liens and/or security interests, including the making of any applicable filings or recordings, and the Reorganized Debtors shall be entitled to make any such filings or recordings on such holder's behalf.

C.    *Releases by the Debtors.*

Notwithstanding anything contained in the Plan to the contrary, pursuant to section 1123(b) of the Bankruptcy Code, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, on and after the Effective Date, each Released Party is, and is deemed hereby to be, fully, conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by the Debtors, the Reorganized Debtors, their Estates, and any person seeking to exercise the rights of the Debtors or their Estates, including any successors to the Debtors or any Estates representatives appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all Claims and Causes of

Action, including any derivative claims asserted or assertable on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, contingent or non-contingent, in law, equity, contract, tort or otherwise, that the Debtors, the Reorganized Debtors, or their Estates, including any successors to the Debtors or any Estates representative appointed or selected pursuant to section 1123(b) of the Bankruptcy Code, would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor or other Entity, or that any Holder of any Claim against, or Interest in, a Debtor or other Entity could have asserted on behalf of the Debtors, based on or relating to, or in any manner arising from, in whole or in part:

1. the Debtors (including the capital structure, management, ownership, or operation thereof), the business or contractual arrangement between the Debtors and any Released Party, any Securities issued by the Debtors and the ownership thereof, the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in- or out-of-court restructuring efforts, any Avoidance Actions (but excluding Avoidance Actions brought as counterclaims or defenses to Claims asserted against the Debtors), intercompany transactions between or among a Company Party and another Company Party, the Superpriority Credit Agreement, the Credit Agreement, the 2021 LC Agreement, the Lloyds Letter of Credit Agreement, the Senior Notes Indenture, the Senior Notes, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Restructuring Support Agreement, the Disclosure Statement, the DIP Credit Agreement, the Exit Facility Documents, or the Plan (including, for the avoidance of doubt, the Plan Supplement);

2. any Restructuring Transaction, contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Restructuring Support Agreement, the Rights Offering, the Disclosure Statement, the DIP Credit Agreement, the New Warrants Agreements, the Exit Facility Documents, the Plan, or the Plan Supplement, before or during the Chapter 11 Cases;

3. the Chapter 11 Cases, the filing of the Chapter 11 Cases, the Disclosure Statement or the Plan, the solicitation of votes with respect to the Plan, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, the Rights Offering, or the distribution of property under the Plan or any other related agreement; or

4. any related act or omission, transaction, agreement, event, or other occurrence related or relating to any of the foregoing taking place on or before the Effective Date, including all Avoidance Actions or other relief obtained by the Debtors in the Chapter 11 Cases.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (i) post Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Restructuring Transaction, any Definitive Document, or any other document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, including the Exit Facility Documents, the New Warrants Agreements, or any Claim or obligation arising under the Plan, or (ii) the rights of any holder of Allowed Claims to receive distributions under the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the foregoing Debtor release, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that the foregoing Debtor release is: (a) in exchange for the good and valuable consideration provided by the Released Parties, including, without limitation, the Released Parties' contributions to facilitating the Restructuring Transactions and implementing the Plan; (b) a good faith settlement and compromise of the Claims released by the foregoing Debtor release; (c) in the best interests of the Debtors and their Estates and all holders of Claims and Interests; (d) fair, equitable, and reasonable; (e) given and made after due notice and

opportunity for hearing; and (f) a bar to any of the Debtors, the Reorganized Debtors, or the Debtors' Estates asserting any Claim or Cause of Action released pursuant to the foregoing Debtor release.

D.      *Releases by the Releasing Parties.*

Except as otherwise expressly set forth in this Plan or the Confirmation Order, on and after the Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is, and is deemed hereby to be, fully, conclusively, absolutely, unconditionally, irrevocably and forever, released and discharged by each Releasing Party, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all Claims and Causes of Action, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, contingent or non-contingent, in law, equity, contract, tort, or otherwise, including any derivative claims asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim against, or Interest in, a Debtor or other Entity, or that any holder of any Claim against, or Interest in, a Debtor or other Entity could have asserted on behalf of the Debtors, based on or relating to, or in any manner arising from, in whole or in part:

1.  the Debtors (including the capital structure, management, ownership, or operation thereof), the business or contractual arrangement between the Debtors and any Releasing Party, any Securities issued by the Debtors and the ownership thereof, the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in- or out-of-court restructuring efforts, any Avoidance Actions (but excluding Avoidance Actions brought as counterclaims or defenses to Claims asserted against the Debtors), intercompany transactions between or among a Company Party and another Company Party, the Superpriority Credit Agreement, the Credit Agreement, the 2021 LC Agreement, the Lloyds Letter of Credit Agreement, Senior Notes Indenture, the Senior Notes, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Restructuring Support Agreement, the Disclosure Statement, the DIP Credit Agreement, the Exit Facility Documents, or the Plan (including, for the avoidance of doubt, the Plan Supplement);

2.  any Restructuring Transaction, contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Restructuring Support Agreement, the Rights Offering, the Disclosure Statement, the DIP Credit Agreement, the New Warrants Agreements, the Exit Facility Documents, the Plan, or the Plan Supplement, before or during the Chapter 11 Cases,

3.  the Chapter 11 Cases, the filing of the Chapter 11 Cases, the Disclosure Statement, or the Plan, the solicitation of votes with respect to the Plan, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, the Rights Offering, or the distribution of property under the Plan or any other related agreement; or

4.  any related act or omission, transaction, agreement, event, or other occurrence related or relating to any of the foregoing taking place on or before the Effective Date, including all Avoidance Actions or other relief obtained by the Debtors in the Chapter 11 Cases.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (i) any party of any obligations related to customary banking products, banking services or other financial accommodations (except as may be expressly amended or modified by the Plan and the Exit Facility Documents, or any other financing document under and as defined therein), (ii) any post-Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Restructuring Transaction, or any document, instrument, any Definitive Document, or any agreement (including those set forth in the Plan

Supplement) executed to implement the Plan, including the Exit Facility Documents, the New Warrants Agreements, or any Claim or obligation arising under the Plan, or (iii) the rights of holders of Allowed Claims to receive distributions under the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the foregoing third-party release, which includes by reference each of the related provisions and definitions contained herein, and, further, shall constitute the Bankruptcy Court's finding that the foregoing third-party release is: (a) consensual; (b) essential to the Confirmation of the Plan; (c) given in exchange for a substantial contribution and for the good and valuable consideration provided by the Released Parties that is important to the success of the Plan; (d) a good faith settlement and compromise of the Claims released by the foregoing third-party release; (e) in the best interests of the Debtors and their Estates; (f) fair, equitable, and reasonable; (g) given and made after due notice and opportunity for hearing; and (h) a bar to any of the Releasing Parties asserting any claim or Cause of Action released pursuant to the foregoing third-party release.

E.      *Exculpation.*

Except as otherwise specifically provided in the Plan or the Confirmation Order, no Exculpated Party shall have or incur liability for, and each Exculpated Party shall be released and exculpated from any Claims and Cause of Action for any claim related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, filing, or termination of the Restructuring Support Agreement and related prepetition transactions (including the Superpriority Credit Agreement, the Credit Agreement, the Senior Notes Indenture or Senior Notes, the 2021 LC Agreement, and the Lloyds Letter of Credit Agreement), the Disclosure Statement, the Plan, the DIP Credit Facility, the Exit Facility Documents, the New Warrants Agreements, the Plan Supplement, the Rights Offering, or any Restructuring Transaction, contract, instrument, release or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion), including any Definitive Document, created or entered into before or during the Chapter 11 Cases, any preference, fraudulent transfer, or other avoidance claim arising pursuant to chapter 5 of the Bankruptcy Code or other applicable law, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, except for claims related to any act or omission that is determined in a Final Order by a court of competent jurisdiction to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.

The Exculpated Parties and other parties set forth above have, and upon confirmation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

F.      *Injunction.*

Except as otherwise expressly provided in the Plan or the Confirmation Order or for obligations or distributions issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities who have held, hold, or may hold the Released Claims are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties: (1) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any Released Claims; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or

order against such Entities on account of or in connection with or with respect to any Released Claims; (3) creating, perfecting, or enforcing any lien or encumbrance of any kind against such Entities or the property of such Entities on account of or in connection with or with respect to any Released Claims; (4) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property or the Estates of such Entities on account of or in connection with or with respect to any Released Claims unless such holder has filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a Claim or Interest or otherwise that such holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any Released Claims released or settled pursuant to the Plan.

Upon entry of the Confirmation Order, all holders of Claims and Interests and their respective current and former employees, agents, officers, directors, principals, and direct and indirect Affiliates shall be enjoined from taking any actions to interfere with the implementation or Consummation of the Plan.  Each holder of an Allowed Claim or Allowed Interest, as applicable, by accepting, or being eligible to accept, distributions under or Reinstatement of such Claim or Interest, as applicable, pursuant to the Plan, shall be deemed to have consented to the injunction provisions set forth in this Article VIII.F hereof.

G.     *Protections Against Discriminatory Treatment.*

Consistent with section 525 of the Bankruptcy Code and the Supremacy Clause of the U.S. Constitution, all Entities, including Governmental Units, shall not discriminate against the Reorganized Debtors or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Reorganized Debtors, or another Entity with whom the Reorganized Debtors have been associated, solely because each Debtor has been a debtor under chapter 11 of the Bankruptcy Code, has been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before the Debtors are granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

H.     *Document Retention.*

On and after the Effective Date, the Reorganized Debtors may maintain documents in accordance with their standard document retention policy, as may be altered, amended, modified, or supplemented by the Reorganized Debtors.

I.     *Reimbursement or Contribution.*

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the time of allowance or disallowance, such Claim shall be forever disallowed and expunged notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Confirmation Date:  (1) such Claim has been adjudicated as non-contingent or (2) the relevant holder of a Claim has Filed a non-contingent Proof of Claim on account of such Claim and a Final Order has been entered prior to the Confirmation Date determining such Claim as no longer contingent.

## ARTICLE IX.
## CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN

A.     *Conditions Precedent to the Effective Date.*

It shall be a condition to the Effective Date that the following conditions shall have been satisfied or waived pursuant to the provisions of Article IX.B hereof:

a.     the Debtors shall have achieved the Achievement Target; and

b.   the Bankruptcy Court shall have entered the Confirmation Order, which shall be a Final Order, in form and substance consistent in all respects with the Restructuring Support Agreement (including any consent rights thereunder) and otherwise in form and substance acceptable to the Debtors and the Required Consenting Stakeholders, and which shall:

    i.   authorize the Debtors to take all actions necessary to enter into, implement, and consummate the contracts, instruments, releases, leases, indentures, and other agreements or documents created in connection with the Plan;

    ii.   decree that the provisions in the Confirmation Order and the Plan are nonseverable and mutually dependent;

    iii.   authorize the Debtors, as applicable/necessary, to:  (a) implement the Restructuring Transactions, including the Rights Offering; (b) distribute the New Common Stock and the New Warrants pursuant to the exemption from registration under the Securities Act provided by section 1145 of the Bankruptcy Code or such other applicable exemption from such registration or pursuant to one or more registration statements; (c) make all distributions and issuances as required under the Plan, including Cash and the New Common Stock; and (d) enter into any agreements, transactions, and sales of property as set forth in the Plan Supplement, including the Management Incentive Plan, in each case, in a manner consistent with the terms of the Restructuring Support Agreement and subject to the consent rights set forth therein;

    iv.   authorize the implementation of the Plan in accordance with its terms; and

    v.   provide that, pursuant to section 1146 of the Bankruptcy Code, the assignment or surrender of any lease or sublease, and the delivery of any deed or other instrument or transfer order, in furtherance of, or in connection with the Plan, including any deeds, bills of sale, or assignments executed in connection with any disposition or transfer of assets contemplated under the Plan, shall not be subject to any stamp, real estate transfer, mortgage recording, or other similar tax; and

c.   the Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan;

d.   the final version of each of the Plan, the Definitive Documents, and all documents contained in any supplement to the Plan, including Plan Supplement and any exhibits, schedules, amendments, modifications, or supplements thereto or other documents contained therein shall have been executed or filed, as applicable in form and substance consistent in all respects with the Restructuring Support Agreement, the Restructuring Term Sheet, and the Plan, and comply with the applicable consent rights set forth in the Restructuring Support Agreement and/or the Plan for such documents and shall not have been modified in a manner inconsistent with the Restructuring Support Agreement;

e.   the Exit Facility Documents shall have been duly executed and delivered by all of the Entities that are parties thereto and all conditions precedent (other than any conditions related to the occurrence of the Effective Date) to the effectiveness of the Exit Facilities shall have been satisfied or duly waived in writing in accordance with the terms of each of the Exit Facilities and the closing of each of the Exit Facilities shall have occurred;

f.   the Final Order approving the DIP Credit Facility shall have been entered and shall remain in full force and effect and no event of default shall have occurred and be continuing thereunder;

g.   no more than $50 million principal amount of Prepetition Secured Letters of Credit or DIP Letters of Credit (other than cash collateralized letters of credit) shall have been drawn and unreimbursed in full in Cash as of the Effective Date; *provided* that this condition may be waived solely with the written consent of the Required Consenting LC Lenders;

54

h.  Reorganized McDermott shall have a minimum of $820 million of Cash on its balance sheet (which amount shall not include Cash held by the Debtors' joint-venture affiliates or cash collateral securing the Cash Secured Letters of Credit, the Lloyds Letters of Credit, and the DIP Cash Secured Letters of Credit) assuming normal working capital; *provided* that this condition may be waived solely with the written consent of the [Required Consenting Lenders];

i.  all professional fees and expenses of retained professionals that require the Bankruptcy Court's approval shall have been paid in full or amounts sufficient to pay such fees and expenses after the Effective Date shall have been placed in a professional fee escrow account pending the Bankruptcy Court's approval of such fees and expenses;

j.  the Technology Business Sale shall have been consummated;

k.  to the extent invoiced in accordance with the terms of the Plan, the payment in Cash in full of the Restructuring Expenses; and

l.  the Debtors shall have implemented the Restructuring Transactions and all transactions contemplated in the Restructuring Term Sheet in a manner consistent with the Restructuring Support Agreement (and subject to, and in accordance with, the consent rights set forth therein), the Restructuring Term Sheet, and the Plan.

B.  *Waiver of Conditions.*

Except as otherwise specified in the Plan or the Restructuring Support Agreement, any one or more of the conditions to Consummation set forth in this Article IX may be waived by the Debtors with the prior written consent of the Required Consenting ~~Lenders~~Stakeholders (not to be withheld unreasonably), without notice, leave, or order of the Bankruptcy Court or any formal action other than proceedings to confirm or consummate the Plan.

C.  *Effect of Failure of Conditions.*

If Consummation does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan, the Disclosure Statement, or Restructuring Support Agreement shall:  (1) constitute a waiver or release of any Claims by the Debtors, Claims, or Interests; (2) prejudice in any manner the rights of the Debtors, any holders of Claims or Interests, or any other Entity; or (3) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any holders of Claims or Interests, or any other Entity.

D.  *Substantial Consummation*

"Substantial Consummation" of the Plan, as defined in 11 U.S.C. § 1101(2), shall be deemed to occur on the Effective Date.

## ARTICLE X.
## MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

A.  *Modification and Amendments.*

Except as otherwise specifically provided in this Plan and subject to the consent rights set forth in the Restructuring Support Agreement, the Debtors reserve the right to modify the Plan, whether such modification is material or immaterial, and seek Confirmation consistent with the Bankruptcy Code and, as appropriate, not resolicit votes on such modified Plan.  Subject to those restrictions on modifications set forth in the Plan and the requirements of section 1127 of the Bankruptcy Code, Rule 3019 of the Federal Rules of Bankruptcy Procedure, and, to the extent applicable, sections 1122, 1123, and 1125 of the Bankruptcy Code, each of the Debtors expressly reserves its respective rights to revoke or withdraw, or to alter, amend, or modify the Plan with respect to such Debtor, one or more times, after Confirmation, and, to the extent necessary may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the

Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan.

B.      *Effect of Confirmation on Modifications.*

Entry of the Confirmation Order shall mean that all modifications or amendments to the Plan since the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

C.      *Revocation or Withdrawal of Plan.*

To the extent permitted by the Restructuring Support Agreement, the Debtors reserve the right to revoke or withdraw the Plan prior to the Confirmation Date and to File subsequent plans of reorganization.  If the Debtors revoke or withdraw the Plan, or if Confirmation or Consummation does not occur, then:  (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected under the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (3) nothing contained in the Plan shall:  (a) constitute a waiver or release of any Claims or Interests; (b) prejudice in any manner the rights of such Debtor or any other Entity; or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by such Debtor or any other Entity.

## ARTICLE XI.
## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or relating to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

a.   allow, disallow, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the secured or unsecured status, priority, amount, or allowance of Claims or Interests;

a.   decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

b.   resolve any matters related to:  (a) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Cures pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; (c) the Reorganized Debtors amending, modifying, or supplementing, after the Effective Date, pursuant to Article V hereof, any Executory Contracts or Unexpired Leases to the list of Executory Contracts and Unexpired Leases to be assumed or rejected or otherwise; and (d) any dispute regarding whether a contract or lease is or was executory or expired;

c.   ensure that distributions to holders of Allowed Claims and Allowed Interests (as applicable) are accomplished pursuant to the provisions of the Plan, including with respect to the New Warrants;

d.   adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

e.   adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code;

f.   enter and implement such orders as may be necessary to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created or entered into in connection with the Plan or the Disclosure Statement, including the Restructuring Support Agreement;

g.   enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

h.   resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the Consummation, interpretation, or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

i.   issue injunctions, enter and implement other orders, or take such other actions as may be necessary to restrain interference by any Entity with Consummation or enforcement of the Plan;

j.   resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the releases, injunctions, exculpations, and other provisions contained in Article VIII hereof and enter such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions;

k.   resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the holder of a Claim or Interest for amounts not timely repaid pursuant to Article VI.L hereof;

l.   enter and implement such orders as are necessary if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

m.   determine any other matters that may arise in connection with or relate to the Plan, the Plan Supplement, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection with the Plan or the Disclosure Statement, including the Restructuring Support Agreement;

n.   enter an order concluding or closing the Chapter 11 Cases;

o.   adjudicate any and all disputes arising from or relating to distributions under the Plan;

p.   consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

q.   determine requests for the payment of Claims and Interests entitled to priority pursuant to section 507 of the Bankruptcy Code;

r.   hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan or the Confirmation Order, including disputes arising under agreements, documents, or instruments executed in connection with the Plan;

s.   hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

t.   hear and determine all disputes involving the existence, nature, scope, or enforcement of any exculpations, discharges, injunctions, and releases granted in the Plan, including under Article VIII hereof, regardless of whether such termination occurred prior to or after the Effective Date;

u.   enforce all orders previously entered by the Bankruptcy Court; and

57

v.    hear any other matter not inconsistent with the Bankruptcy Code.

As of the Effective Date, notwithstanding anything in this Article XI to the contrary, the New Organizational Documents and the Exit Facilities and any documents related thereto shall be governed by the jurisdictional provisions therein and the Bankruptcy Court shall not retain jurisdiction with respect thereto.

# ARTICLE XII.
## MISCELLANEOUS PROVISIONS

A.    *Immediate Binding Effect.*

Subject to Article IX.A hereof and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan (including, for the avoidance of doubt, the documents and instruments contained in the Plan Supplement) shall be immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized Debtors, any and all holders of Claims or Interests (irrespective of whether such holders of Claims or Interests have, or are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in the Plan, each Entity acquiring property under the Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.

B.    *Additional Documents.*

On or before the Effective Date, and consistent in all respects with the terms of the Restructuring Support Agreement, the Debtors may file with the Bankruptcy Court such agreements and other documents as may be necessary to effectuate and further evidence the terms and conditions of the Plan and the Restructuring Support Agreement.  The Debtors or the Reorganized Debtors, as applicable, and all holders of Claims or Interests receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

C.    *Payment of Statutory Fees.*

All fees payable pursuant to section 1930(a) of the Judicial Code, as determined by the Bankruptcy Court at a hearing pursuant to section 1128 of the Bankruptcy Code, shall be paid by each of the Reorganized Debtors (or the Disbursing Agent on behalf of each of the Reorganized Debtors) for each quarter (including any fraction thereof) until the earlier of entry of a final decree closing such Chapter 11 Cases or an order of dismissal or conversion, whichever comes first.

D.    *Statutory Committee and Cessation of Fee and Expense Payment.*

On the Confirmation Date, any statutory committee appointed in the Chapter 11 Cases shall dissolve and members thereof shall be released and discharged from all rights and duties from or related to the Chapter 11 Cases. The Reorganized Debtors shall no longer be responsible for paying any fees or expenses incurred by the members of or advisors to any statutory committees after the Confirmation Date.

E.    *Reservation of Rights.*

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order, and the Confirmation Order shall have no force or effect if the Effective Date does not occur.  None of the Filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by any Debtor with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the holders of Claims or Interests prior to the Effective Date.

F.     *Successors and Assigns.*

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, Affiliate, officer, manager, director, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

G.     *Notices.*

All notices, requests, and demands to or upon the Debtors to be effective shall be in writing (including by facsimile transmission) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

| Debtors | Counsel to the Debtors |
|---|---|
| McDermott International, Inc.<br>757 North Eldridge Parkway<br>Houston, Texas 77079<br>Attention:  John Freeman | Kirkland & Ellis LLP<br>601 Lexington Avenue<br>New York, New York 10022<br>Attention: Joshua A. Sussberg, P.C., Christopher T. Greco, P.C., and Anthony R. Grossi<br><br>and<br><br>Kirkland & Ellis LLP<br>300 North LaSalle Street<br>Chicago, Illinois 60654<br>Attention:  John R. Luze<br><br>and<br><br>Jackson Walker L.L.P.<br>1401 McKinney Street, Suite 1900<br>Houston, Texas 77010<br>Attention: Elizabeth C. Freeman and Matthew D. Cavenaugh |
| **United States Trustee** | **Counsel to the Consenting Superpriority Term Lenders and the Consenting Term Lenders** |
| Office of The United States Trustee<br>515 Rusk Street, Suite 3516<br>Houston, TX 77002 | Davis Polk & Wardwell LLP<br>450 Lexington Avenue<br>New York, NY 10017<br>Attention:  Damian S. Schaible and Natasha Tsiouris |
| **Counsel to the proposed DIP LC Agent, the proposed DIP Collateral Agent, the Revolving and LC Administrative Agent, the 2018 Collateral Agent, the Superpriority Revolving Administrative Agent and the Superpriority Collateral Agent** | **Counsel to the proposed DIP Term Loan Agent, the 2021 LC Administrative Agent, the Superpriority Term Loan Agent, and the Term Loan Administrative Agent** |

| Linklaters LLP<br>1345 Avenue of the Americas<br>New York, New York 10105<br>Attention:  Margot Schonholtz and Penelope Jensen<br><br>and<br><br>Bracewell LLP<br>711 Louisiana Street<br>Houston, Texas 77002<br>Attention: William A. (Trey) Wood III | Latham & Watkins LLP<br>885 Third Avenue<br>New York, NY 10022<br>Attention: Andrew Parlen and Anupama Yerramalli |
|---|---|
| **Counsel to the Consenting Noteholders** | |
| Paul, Weiss, Rifkind, Wharton & Garrison LLP<br>1285 Avenue of the Americas<br>New York, NY 10019<br>Attention: Andrew N. Rosenberg and Alice B. Eaton<br><br>-and-<br><br>Brown Rudnick LLP<br>7 Times Square<br>New York, NY 10036<br>Attention: Robert J. Stark and Bennett S. Silverberg | |

After the Effective Date, the Reorganized Debtors have the authority to send a notice to Entities that to continue to receive documents pursuant to Bankruptcy Rule 2002, such Entity must file a renewed request to receive documents pursuant to Bankruptcy Rule 2002.  After the Effective Date, the Reorganized Debtors are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have Filed such renewed requests.

H.      *Term of Injunctions or Stays.*

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date.  All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

I.      *Entire Agreement.*

Except as otherwise indicated, and without limiting the effectiveness of the Restructuring Support Agreement, the Plan (including, for the avoidance of doubt, the documents and instruments in the Plan Supplement) supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

J.      *Plan Supplement.*

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan.  After the exhibits and documents are Filed, copies of such exhibits and documents shall be available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from the Debtors' restructuring website at https://cases.primeclerk.com/McDermott or the Bankruptcy

Court's website at www.txs.uscourts.gov/bankruptcy. To the extent any exhibit or document is inconsistent with the terms of the Plan, unless otherwise ordered by the Bankruptcy Court, the non-exhibit or non-document portion of the Plan shall control.

K.    *Nonseverability of Plan Provisions.*

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the Debtors' or Reorganized Debtors' consent, as applicable; and (3) nonseverable and mutually dependent.

L.    *Votes Solicited in Good Faith.*

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with section 1125(g) of the Bankruptcy Code, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtors and each of their respective Affiliates, agents, representatives, members, principals, shareholders, officers, directors, employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of securities offered and sold under the Plan and any previous plan, and, therefore, neither any of such parties or individuals or the Reorganized Debtors will have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under the Plan and any previous plan.

M.    *Closing of Chapter 11 Cases.*

The Reorganized Debtors shall, promptly after the full administration of the Chapter 11 Cases, File with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Cases.

N.    *Waiver or Estoppel.*

Each holder of a Claim or an Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, secured or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement, or papers Filed with the Bankruptcy Court prior to the Confirmation Date.

O.    *Creditor Default*

An act or omission by a holder of a Claim or an Interest in contravention of the provisions of this Plan shall be deemed an event of default under this Plan. Upon an event of default, the Reorganized Debtors may seek to hold the defaulting party in contempt of the Confirmation Order and shall be entitled to reasonable attorneys' fees and costs of the Reorganized Debtors in remedying such default. Upon the finding of such a default by a creditor, the Bankruptcy Court may: (a) designate a party to appear, sign and/or accept the documents required under the Plan on behalf of the defaulting party, in accordance with Bankruptcy Rule 7070; (b) enforce the Plan by order of specific performance; (c) award judgment against such defaulting creditor in favor of the Reorganized debtor in an amount, including interest, to compensate the Reorganized Debtors for the damages caused by such default; and (d) make such other order as may be equitable that does not materially alter the terms of the Plan.

001218

62

Dated: January ~~21~~22, 2020                    MᴄDᴇʀᴍᴏᴛᴛ Iɴᴛᴇʀɴᴀᴛɪᴏɴᴀʟ, Iɴᴄ.

                                                on behalf of itself and all other Debtors


                                                _/s/ John Castellano_
                                                John Castellano
                                                Chief Restructuring Officer

63

001220

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

United States Courts
Southern District of Texas
F I L E D

MAR 04 2020

David J. Bradley, Clerk of Court

|  |  |
|---|---|
| In re: ) | |
| ) | Case No. 20-30336 |
| MCDERMOTT INTERNATIONAL, INC, *et al* ) | |
| ) | Chapter 11 |
| Debtor(s). ) | |
| ) | |

**EXPEDITED MOTION FOR AN ORDER CONTINUING THE MARCH 12, 2020, PLAN CONFIRMATION HEARING UNTIL SUCH TIME AS THE LUMMUS STALKING HORSE PURCHASER HAS SHOWN IT HAS OBTAINED, OR CAN OBTAIN, FUNDS TO CONSUMMATE THE LUMMUS PURCHASE AND REQUEST FOR EARLIEST POSSIBLE HEARNING DATE ON THIS MOTION; PROPOSED ORDER ATTACHED**

**This motion seeks an order that may adversely affect you. If you oppose the motion, you should immediately contact the moving party to resolve the dispute. If you and the moving party cannot agree, you must file a response and send a copy to the moving party. You must file and serve your response within 21 days of the date this was served on you. Your response must state why the motion should not be granted. If you do not file a timely response, the relief may be granted without further notice to you. If you oppose the motion and have not reached an agreement, you must attend the hearing. Unless the parties agree otherwise, the court may consider evidence at the hearing and may decide the motion at the hearing.**

**Represented parties should act through their attorney.**

**The hearing in this matter should be held before the March 12, 2020, Plan Confirmation hearing.  Van Deelen has requested permission to use the Court's CM/ECF system but said permission has not yet been granted.**

COMES NOW, Michael D. Van Deelen, a party in interest in the instant action and respectfully requests that the Court grant his Expedited Motion for an Order Continuing the March 12, 2020, Plan Confirmation Hearing Until Such Time as the Lummus Stalking Horse Purchaser Has Shown It Has Obtained, or Can Obtain, Funds to Consummate the Lummus Purchase and Request for Earliest Possible Hearing Date on this Motion.  In support of his Motion Van Deelen states as follows:

1.  Van Deelen seeks this Order because Debtor's Plan will be in limbo if Debtor cannot sell Lummus prior to the March 12, 2020, Plan Confirmation Hearing or if Debtor's plan to sell Lummus falls through by that date.

2.  After specifically focusing on the sale of Lummus as the primary part of their Plan, the debtors announced on March 3, 2020, that they have not received even one qualified bid for Lummus (Docket 543).  It now falls on the Stalking Horse bidder to purchase Lummus.

3.  The Stalking Horse bidder for Lummus is Illuminate Buyer, LLC, which is a combination of Chatterjee Group and Rhone Capital. The Chatterjee Group is headed by Mr. Purnendu Chatterjee, who is a McDermott International insider.

4.  It is believed that Illuminate Buyer has not yet obtained the necessary funds to purchase Lummus.  It is unclear whether Illuminate Buyer can obtain the necessary funds to consummate the $2.725 billion purchase of Lummus.

5.  Illuminate Buyer has several options under which it can cancel its purchase agreement for Lummus.  One such option is by mutual agreement with Debtor.  It is

2

unclear at the present time if Illuminate Buyer plans on consummating the Lummus purchase as they made no announcement that they plan to do so subsequent to Debtor's announcement that no qualified bids for Lummus were received.

6. If the Lummus sale is not consummated, then the bulk of the Debtor's Plan will be invalid. The only part of the Plan remaining will be the re-equitization of the company, which Van Deelen has argued is not necessary and an attempt by management to further enrich themselves by receiving 7.5% of the re-equitized shares. See Van Deelen's Objection to Confirmation of Plan (Docket 510).

7. It may be inferred from the filings in this case that the fact Debtor received no bids for Lummus after Debtor ballyhooed the sale and claimed the Lummus sale was an integral part of their Plan, as well as Debtor's past behavior, that Debtor may be attempting to perpetrate a fraud on the Court. Specifically: Get plan approved on the basis of proposed Lummus sale; employ a Stalking Horse bidder with insider connections to create a false bid that cannot or will not be funded; cancel the Lummus sale when it is not funded; re-equitize the company after cancelling all outstanding shareholder debt; keep Lummus (which has been a cash cow for McDermott) and pay back the Debtor-In-Possession financing through the issuance of new debt.

8. If the Debtor's plan is to mirror the above scenario, then the Parties In Interest should have an opportunity to object to that plan. But they cannot do so until the Debtor fails to sell Lummus. Approving the Debtor's Plan before it is certain that Lummus can, and will, be sold denies the Parties In Interest the ability to object to a version of the Debtor's Plan (no Lummus sale) that did not exist until after the March 2, 2020, deadline

to file Plan objections.  It is very instructive that Debtor waited until the deadline for Plan objections had passed to announce that it had not received any bids for Lummus.

9.  McDermott has an inglorious history of promising something and then not delivering.  The Court, for all of the above reasons, should wait to consider the Debtor's Plan until it is known whether the Stalking Horse bidder intends to finance, and can finance, the purchase of Lummus.

10.  This motion for continuance has not been agreed to by the other parties.

WHEREFORE, Van Deelen respectfully requests that this Court grant his Motion for an Order Continuing the March 12, 2020, Plan Confirmation Hearing Until Such Time as the Lummus Stalking Horse Purchaser Has Shown It Has Obtained, or Can Obtain, Funds to Consummate the Lummus Purchase and Request for Earliest Possible Hearing Date on this Motion.  Van Deelen further moves that the Court grant such other and further relief as is appropriate under the circumstances.

Houston, Texas

March 4, 2020

Respectfully submitted,

Michael Van Deelen
Party In Interest
16215 Friar Circle
Spring, TX 77379
832-562-0723
michaelvandeelen@gmail.com

4

## CERTIFICATE OF SERVICE

I, Michael Van Deelen, do hereby certify that I caused a copy of the foregoing document, including Proposed Order, to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas on this 4th day of March, 2020.

Michael Van Deelen
16215 Friar Circle
Spring, TX 77379
832-562-0723
michaelvandeelen@gmail.com

# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

|  |  |
|---|---|
| In re: | ) |
|  | ) |
|  | )   Case No. 20-30336 |
| MCDERMOTT INTERNATIONAL, INC, *et al* | ) |
|  | )   Chapter 11 |
| Debtor(s). | ) |
|  | ) |
|  | ) |

# ORDER

On _____, 2020, a hearing was held concerning Party In Interest Michael Van

Deelen's Motion for an Order Continuing the March 12, 2020, Plan Confirmation Hearing Until

Such Time as the Lummus Stalking Horse Purchaser Has Shown It Has Obtained, or Can Obtain,

Funds to Consummate the Lummus Purchase. The Court considered the argument of the parties

and relevant authority.  It is

ORDERED that the March 12, 2020, Plan Confirmation Hearing is continued until such

time as the Lummus Stalking Horse purchaser has shown it has obtained, or can obtain, funds to

consummate the Lummus purchase.

Houston, Texas

Dated: _____, 2020


_____
DAVID R. JONES
UNITED STATES BANKRUPTCY JUDGE

**IN THE UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| MCDERMOTT INTERNATIONAL, INC., *et al.*,[1] | ) | Case No. 20-30336 (DRJ) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |
|  | ) | **Re: Docket No. 557** |

**DEBTORS' RESPONSE TO EXPEDITED MOTION**
**FOR AN ORDER CONTINUING THE MARCH 12, 2020 PLAN**
**CONFIRMATION HEARING UNTIL SUCH TIME AS THE LUMMUS**
**STALKING HORSE PURCHASER HAS SHOWN IT HAS OBTAINED, OR**
**CAN OBTAIN, FUNDS TO CONSUMMATE THE LUMMUS PURCHASE AND**
**REQUEST FOR EARLIEST POSSIBLE HEARING DATE ON THIS MOTION**

The above-captioned debtors and debtors in possession (collectively, the "Debtors")

respectfully state as follows in support of this response (this "Response") to the *Expedited Motion*

*for an Order Continuing the March 12, 2020 Plan Confirmation Hearing Until Such Time as the*

*Lummus Stalking Horse Purchaser Has Shown It Has Obtained, or Can Obtain, Funds to*

*Consummate the Lummus Purchase and Request for Earliest Possible Hearing Date on this*

*Motion* [Docket No. 557] filed by Michael D. Van Deelen.

**Response**

1.       The Debtors take very seriously the due process rights of all their stakeholders,

especially existing equity holders like Mr. Van Deelen.  To that end, the Debtors ensured that all

parties in interest received substantial notice of the pending March 12, 2020 hearing on the

*Debtors' Amended Joint Prepackaged Chapter 11 Plan of Reorganization of McDermott*

---

[1]     A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors'
claims and noticing agent at https://cases.primeclerk.com/McDermott.  The location of Debtor McDermott
International, Inc.'s principal place of business and the Debtors' service address in these chapter 11 cases is 757
North Eldridge Parkway, Houston, Texas 77079.

*International, Inc. and Its Debtor Affiliates* [Docket No. 121] (as may be modified, amended, or supplemented from time to time, the "Plan").   The dates and timeline provided for in the Scheduling Order [Docket No. 160] are an integral component of the Debtors' restructuring efforts; facilitate the value-maximizing restructuring transaction embodied in the Plan; are broadly supported by the Debtors' stakeholders; and, are tailored to mitigate the expenses of operating the Debtors' businesses in chapter 11.   Adhering to the deadlines approved and established by this Court is critical to preserving and maintaining the value of the Debtors' estates and the extraordinary consensus of the Debtors' stakeholders.   To the extent Mr. Van Deelen wishes to pursue any objections to confirmation of the Plan, he may do so at the confirmation hearing. The Debtors reserve all rights and defenses with respect to all other relief sought now or in the future by Mr. Van Deelen.


[*Remainder of page intentionally left blank.*]

WHEREFORE, the Debtors respectfully request that the Court deny the Emergency

Motion and grant such other and further relief as is appropriate under the circumstances.

Houston, Texas
March 8, 2020

/s/ *Matthew D. Cavenaugh*

**JACKSON WALKER L.L.P.**
Matthew D. Cavenaugh (TX Bar No. 24062656)
Jennifer F. Wertz (TX Bar No. 24072822)
Kristhy M. Peguero (TX Bar No. 24102776)
Veronica A. Polnick (TX Bar No. 24079148)
1401 McKinney Street, Suite 1900
Houston, Texas 77010
Telephone:      (713) 752-4200
Facsimile:      (713) 752-4221
Email:          mcavenaugh@jw.com
                jwertz@jw.com
                kpeguero@jw.com
                vpolnick@jw.com

*Proposed Co-Counsel to the Debtors*
*and Debtors in Possession*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Christopher T. Greco, P.C. (admitted *pro hac vice*)
Anthony R. Grossi (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900
Email:          joshua.sussberg@kirkland.com
                christopher.greco@kirkland.com
                anthony.grossi@kirkland.com

-and-

James H.M. Sprayregen, P.C.
John R. Luze (admitted *pro hac vice*)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200
Email:          james.sprayregen@kirkland.com
                john.luze@kirkland.com

*Proposed Co-Counsel to the Debtors*
*and Debtors in Possession*

001229

## Certificate of Service

I certify that on March 8, 2020, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ Matthew D. Cavenaugh*
Matthew D. Cavenaugh

## UNITED STATES BANKRUPTCY COURT

## Southern District of Texas

PDF FILE WITH AUDIO FILE ATTACHMENT

2020-30336

McDermott International, Inc. and Whessoe Piping Systems Limited

In ref to doc no. 557.  Hearing held March 9, 2020.

| | |
|---|---|
| Case Type : | bk |
| Case Number : | 2020-30336 |
| Case Title : | McDermott International, Inc. and Whessoe Piping Systems Limited |
| Audio Date\Time: | 3/9/2020 9:01:51 AM |
| Audio File Name : | 4bk2020-30336_20200309-090151.mp3 |
| Audio File Size : | 18064 KB |
| Audio Run Time : | [00:37:38] (hh:mm:ss) |

**Help using this file:**

An audio file is embedded as an attachment in this PDF document. To listen to the file, click the Attachments tab or the Paper Clip icon.  Select the Audio File and click Open.

**MPEG Layer-3 audio coding technology from Fraunhofer IIS and Thomson.**

**This digital recording is a copy of a court proceeding and is provided as a convenience to the public.  In accordance with 28 U.S.C. § 753 (b) "[n]o transcripts of the proceedings of the court shall be considered as official except those made from the records certified by the reporter or other individual designated to produce the record."**

**IN THE UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| MCDERMOTT INTERNATIONAL, INC., *et al.*,[1] | ) | Case No. 20-30336 (DRJ) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

**SECOND AMENDED JOINT PREPACKAGED**
**CHAPTER 11 PLAN OF REORGANIZATION OF**
**MCDERMOTT INTERNATIONAL, INC. AND ITS DEBTOR AFFILIATES**

**JACKSON WALKER L.L.P.**
Matthew D. Cavenaugh (TX Bar No. 24062656)
Jennifer F. Wertz (TX Bar No. 24072822)
Kristhy M. Peguero (TX Bar No. 24102776)
Veronica A. Polnick (TX Bar No. 24079148)
1401 McKinney Street, Suite 1900
Houston, Texas 77010
Telephone:    (713) 752-4200
Facsimile:    (713) 752-4221
Email:    mcavenaugh@jw.com
          jwertz@jw.com
          kpeguero@jw.com
          vpolnick@jw.com

*Co-Counsel to the Debtors*
*and Debtors in Possession*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Christopher T. Greco, P.C. (admitted *pro hac vice*)
Anthony R. Grossi (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900
Email:    joshua.sussberg@kirkland.com
          christopher.greco@kirkland.com
          anthony.grossi@kirkland.com

-and-

James H.M. Sprayregen, P.C.
John R. Luze (admitted *pro hac vice*)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200
Email:    james.sprayregen@kirkland.com
          john.luze@kirkland.com

*Proposed Co-Counsel to the Debtors*
*and Debtors in Possession*

Dated: March 11, 2020

---

[1]    A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://cases.primeclerk.com/McDermott.   The location of Debtor McDermott International, Inc.'s principal place of business and the Debtors' service address in these chapter 11 cases is 757 North Eldridge Parkway, Houston, Texas 77079.

## <u>TABLE OF CONTENTS</u>

ARTICLE I. DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, AND
    GOVERNING LAW .................................................................................................1
    A.    Defined Terms. .....................................................................................................1
    B.    Rules of Interpretation. ........................................................................................19
    C.    Computation of Time. ..........................................................................................20
    D.    Governing Law. ...................................................................................................20
    E.    Reference to Monetary Figures. ...........................................................................20
    F.    Reference to the Debtors or the Reorganized Debtors. .........................................20
    G.    Controlling Document. ........................................................................................20
    H.    Consultation, Information, Notice, and Consent Rights.........................................20

ARTICLE II. ADMINISTRATIVE CLAIMS, DIP CLAIMS,  PRIORITY CLAIMS, AND
    RESTRUCTURING EXPENSES ..........................................................................21
    A.    Administrative Claims. ........................................................................................21
    B.    DIP Claims..........................................................................................................21
    C.    Professional Claims.............................................................................................22
    D.    Priority Tax Claims.............................................................................................23
    E.    Payment of Restructuring Expenses, Consent Fee. ...............................................23

ARTICLE III. CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS ....................23
    A.    Classification of Claims and Interests. .................................................................23
    B.    Treatment of Claims and Interests. ......................................................................24
    C.    Special Provision Governing Unimpaired Claims. ................................................30
    D.    Elimination of Vacant Classes. ............................................................................30
    E.    Voting Classes, Presumed Acceptance by Non-Voting Classes. ............................30
    F.    Intercompany Interests. .......................................................................................30
    G.    Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code. .................30
    H.    Controversy Concerning Impairment....................................................................31
    I.    Subordinated Claims. ..........................................................................................31

ARTICLE IV. MEANS FOR IMPLEMENTATION OF THE PLAN ..........................................31
    A.    General Settlement of Claims and Interests. .........................................................31
    B.    Restructuring Transactions. ..................................................................................31
    C.    Reorganized Debtors............................................................................................32
    D.    Technology Business Sale. ...................................................................................32
    E.    Pipes Business Sale. ............................................................................................33
    F.    Sources of Consideration for Plan Distributions. ..................................................34
    G.    Corporate Existence. ...........................................................................................37
    H.    Vesting of Assets in the Reorganized Debtors.......................................................37
    I.    Cancellation of Existing Securities and Agreements. ............................................37
    J.    Corporate Action..................................................................................................38
    K.    New Organizational Documents. ..........................................................................39
    L.    Indemnification Obligations.................................................................................39
    M.    Directors and Officers of the Reorganized Debtors. .............................................39
    N.    Effectuating Documents; Further Transactions......................................................39
    O.    Section 1146 Exemption......................................................................................40
    P.    Director and Officer Liability Insurance. ..............................................................40
    Q.    Management Incentive Plan..................................................................................40
    R.    Employee and Retiree Benefits.............................................................................41
    S.    Preservation of Causes of Action. ........................................................................41

i

ARTICLE V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ............................42
    A.     Assumption and Rejection of Executory Contracts and Unexpired Leases. ...................42
    B.     Claims Based on Rejection of Executory Contracts or Unexpired Leases.....................42
    C.     Cure of Defaults for Assumed Executory Contracts and Unexpired Leases and Lummus
           Executory Contracts or Unexpired Leases. ..................................................................43
    D.     Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases...........44
    E.     Insurance Policies. ......................................................................................................44
    F.     Reservation of Rights. .................................................................................................44
    G.     Nonoccurrence of Effective Date.................................................................................45
    H.     Employee Compensation and Benefits. ........................................................................45
    I.     Contracts and Leases Entered Into After the Petition Date. ..........................................46
    J.     Assumption of Cameron LNG Project Obligations ......................................................46

ARTICLE VI. PROVISIONS GOVERNING DISTRIBUTIONS ............................................................46
    A.     Distributions on Account of Claims Allowed as of the Effective Date. ..........................46
    B.     Disbursing Agent. ......................................................................................................46
    C.     Rights and Powers of Disbursing Agent. .....................................................................46
    D.     Delivery of Distributions and Undeliverable or Unclaimed Distributions......................47
    E.     Manner of Payment. ...................................................................................................48
    F.     Section 1145 Exemption. ............................................................................................48
    G.     Compliance with Tax Requirements. ...........................................................................49
    H.     Allocations. ...............................................................................................................49
    I.     No Postpetition Interest on Claims. .............................................................................49
    J.     Foreign Currency Exchange Rate. ...............................................................................49
    K.     Setoffs and Recoupment. ............................................................................................49
    L.     Claims Paid or Payable by Third Parties......................................................................49

ARTICLE VII. PROCEDURES FOR RESOLVING CONTINGENT,  UNLIQUIDATED, AND
           DISPUTED CLAIMS ...................................................................................................50
    A.     Disputed Claims Process..............................................................................................50
    B.     Allowance of Claims....................................................................................................51
    C.     Claims Administration Responsibilities........................................................................51
    D.     Estimation of Claims and Interests..............................................................................51
    E.     Adjustment to Claims or Interests without Objection. ...................................................51
    F.     Disallowance of Claims or Interests.............................................................................51
    G.     No Distributions Pending Allowance ...........................................................................51
    H.     Distributions After Allowance. ....................................................................................52
    I.     No Interest. ................................................................................................................52

ARTICLE VIII. SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS .....................52
    A.     Discharge of Claims and Termination of Interests.........................................................52
    **B.**     **Release of Liens.** ......................................................................................................52
    **C.**     **Releases by the Debtors.** .........................................................................................53
    **D.**     **Releases by the Releasing Parties.** .........................................................................54
    **E.**     **Exculpation.** ...........................................................................................................55
    **F.**     **Injunction.** .............................................................................................................56
    G.     Protections Against Discriminatory Treatment..............................................................56
    H.     Document Retention. ..................................................................................................57
    I.     Reimbursement or Contribution. .................................................................................57

ARTICLE IX. CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN...............................57
    A.     Conditions Precedent to the Effective Date. .................................................................57
    B.     Waiver of Conditions. .................................................................................................59
    C.     Effect of Failure of Conditions. ..................................................................................59
    D.     Substantial Consummation ..........................................................................................59

ARTICLE X. MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN ....................................59
    A.    Modification and Amendments.........................................................................................59
    B.    Effect of Confirmation on Modifications.........................................................................59
    C.    Revocation or Withdrawal of Plan..................................................................................60

ARTICLE XI. RETENTION OF JURISDICTION ..................................................................................60

ARTICLE XII. MISCELLANEOUS PROVISIONS ................................................................................62
    A.    Immediate Binding Effect.................................................................................................62
    B.    Additional Documents. .....................................................................................................62
    C.    Payment of Statutory Fees. ...............................................................................................62
    D.    Statutory Committee and Cessation of Fee and Expense Payment...................................62
    E.    Reservation of Rights........................................................................................................62
    F.    Successors and Assigns......................................................................................................62
    G.    Notices. .............................................................................................................................63
    H.    Term of Injunctions or Stays. ...........................................................................................64
    I.    Entire Agreement. .............................................................................................................64
    J.    Plan Supplement. ..............................................................................................................64
    K.    Nonseverability of Plan Provisions...................................................................................64
    L.    Votes Solicited in Good Faith. .........................................................................................65
    M.    Closing of Chapter 11 Cases. ...........................................................................................65
    N.    Waiver or Estoppel. ..........................................................................................................65
    O.    Creditor Default ...............................................................................................................65

## INTRODUCTION

McDermott International, Inc. and the above-captioned debtors and debtors in possession (collectively, the "Debtors"), propose this joint prepackaged chapter 11 plan of reorganization (as modified, amended, or supplemented from time to time, the "Plan") for the resolution of the outstanding claims against, and equity interests in, the Debtors.  Although proposed jointly for administrative purposes, the Plan constitutes a separate Plan for each Debtor.  Holders of Claims or Interests may refer to the Disclosure Statement for a discussion of the Debtors' history, businesses, assets, results of operations, historical financial information, risk factors, a summary and analysis of this Plan, the Restructuring Transactions, and certain related matters.  The Debtors are the proponents of the Plan within the meaning of section 1129 of the Bankruptcy Code.

ALL HOLDERS OF CLAIMS, TO THE EXTENT APPLICABLE, ARE ENCOURAGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

## ARTICLE I.
## DEFINED TERMS, RULES OF INTERPRETATION,
## COMPUTATION OF TIME, AND GOVERNING LAW

A.      *Defined Terms.*

As used in this Plan, capitalized terms have the meanings set forth below.

"*2018 Collateral Agent*" means Crédit Agricole Corporate and Investment Bank, in its capacity as Collateral Agent in respect of the Credit Agreement, the 2021 LC Facility, and the Lloyds LC Facility.

"*2021 LC Agreement*" means that certain letter of credit agreement dated as of October 30, 2018 by and among certain of the Debtors as applicants and guarantors thereto, and the 2021 LC Administrative Agent, as may be amended, supplemented, or otherwise modified from time to time.

"*2021 LC Administrative Agent*" means Barclays Bank PLC, as administrative agent for the 2021 LC Agreement.

"*2021 LC Facility*" means the $230,000,000.00 senior secured letter of credit facility under the 2021 LC Agreement.

"*2021 Letter of Credit Claims*" means any Claim for obligations arising under, or relating to, the 2021 LC Facility, including Claims for all principal amounts outstanding, interest, fees, expenses, costs and other charges arising thereunder or related thereto.

"*2021 Letters of Credit*" means the letters of credit issued under the 2021 LC Facility.

"*2023 LC Facility*" means the $1,440,000,000.00 senior secured letter of credit facility under the Credit Agreement.

"*2023 Letter of Credit Claims*" means any Claim for obligations arising under, or relating to, the 2023 LC Facility, including Claims for all principal amounts outstanding, interest, fees, expenses, costs and other charges arising thereunder or related thereto.

"*2023 Letters of Credit*" means the letters of credit issued under the 2023 LC Facility.

"*Achievement Target*" means the (i) final, binding signed documentation reflecting (x) positive value adjustment of $235 million in projected gross profit and (y) $285 million in letter of credit relief and (ii) project cost savings of $560 million through the employment of risk mitigation strategies, in each case subject to the satisfaction of the Required Consenting Term Lenders and the Required Consenting Revolving Lenders in their sole discretion.

1

"*Additional Obligations*" shall have the meaning specified in the DIP Credit Facility Term Sheet.

"*Administrative Claim*" means a Claim for costs and expenses of administration of the Chapter 11 Cases pursuant to sections 327, 328, 330, 365, 503(b), 507(a), 507(b), or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses of preserving the Estates and operating the businesses of the Debtors incurred on or after the Petition Date and through the Effective Date; (b) Allowed Professional Claims; and (c) all fees and charges assessed against the Estates under chapter 123 of the Judicial Code.

"*Affiliate*" has the meaning set forth in section 101(2) of the Bankruptcy Code.

"*Agents*" means, collectively, the DIP Agents, the Revolving and LC Administrative Agent, the Term Loan Administrative Agent, the 2021 LC Administrative Agent, the 2018 Collateral Agent, the Superpriority Revolving Administrative Agent, the Superpriority Term Loan Agent, the Superpriority Collateral Agent, and each administrative agent, collateral agent, trustee or other similar agent in respect of the Exit Facilities solely in its capacity as such.

"*Allowed*" means, as to a Claim or Interest, a Claim or Interest allowed under the Plan, under the Bankruptcy Code, or by a final order (including the DIP Financing Orders) as applicable.

"*Assumed Executory Contracts and Unexpired Leases Schedule*" means the schedule of Executory Contracts and Unexpired Leases to be assumed by the Debtors pursuant to the Plan, which shall be included in the Plan Supplement, as the same may be amended, modified, or supplemented from time to time; *provided* that such schedule shall be in form and substance acceptable to the Required Consenting Lenders.

"*Avoidance Actions*" means any and all actual or potential avoidance, recovery, subordination, or other Claims, Causes of Action, or remedies that may be brought by or on behalf of the Debtors or their Estates or other authorized parties in interest under the Bankruptcy Code or applicable non-bankruptcy law, including Claims, Causes of Action, or remedies under sections 502, 510, 542, 544, 545, 547 through 553, and 724(a) of the Bankruptcy Code or under similar local, state, federal, or foreign statutes and common law, including fraudulent transfer laws.

"*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as amended from time to time.

"*Bankruptcy Court*" means the United States Bankruptcy Court for the Southern District of Texas.

"*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure promulgated under section 2075 of the Judicial Code and the general, local, and chambers rules of the Bankruptcy Court, each, as amended from time to time.

"*Barclays Advisors*" means Latham & Watkins LLP and any other local or foreign advisors.

"*Bidding Procedures*" means the procedures governing the auction and the Technology Business Sale, as approved by the Bankruptcy Court and as may be amended from time to time in accordance with their terms.

"*Bilateral Facilities*" means those certain bilateral facilities entered into by various Debtors and their affiliates and the individual lenders party thereto, including:

(a) that certain facility agreement (as amended), dated April 13, 2016, between McDermott International, Inc., as borrower, McDermott Middle East, Inc., McDermott Eastern Hemisphere, Ltd., McDermott Arabia Company Limited, as guarantors, and Abu Dhabi Commercial Bank PJSC, as lending bank;

(b) that certain credit facility agreement (as amended), dated April 30, 2018, between CBI Eastern Anstalt, as borrower, and Mashreqbank PSC, as lending bank;

2

(c) that certain credit agreement (as amended) dated as of July 19, 2018 between Arabian CBI Company Limited, as customer, McDermott International Inc., as guarantor, and Samba Financial Group, as lending bank;

(d) that certain facility letter (as amended), dated as of January 29, 2018 between McDermott Middle East, Inc., and McDermott Eastern Hemisphere, Ltd., as applicants, McDermott International, Inc., as guarantor, and International Bank of Qatar, as lending bank;

(e) that certain reimbursement agreement for letters of credit or guarantees, dated July 30, 2015 between McDermott International, Inc., as applicant and Riyad Bank, as lending bank;

(f) that certain facility agreement between McDermott Middle East Inc., as borrower, McDermott International, Inc., as guarantor, and First Gulf Bank, as lending bank;

(g) that certain letter of credit reimbursement agreement (as novated), dated August 1, 2007 between J. Ray McDermott S.A., as applicant and Standard Chartered Bank, as lending bank;

(h) that certain master reimbursement agreement between J. Ray McDermott S.A., as applicant, McDermott International, Inc., as guarantor, and ICICI Bank Limited, as lending bank;

(i) that certain reimbursement agreement between Chicago Bridge and Iron Company, N.V., as customer, and Europe Arab Bank PLC, as lending bank;

(j) that certain credit facilities agreement, dated April 4, 2019 between McDermott Middle East, Inc. and McDermott Middle East, Inc. Panama, as borrowers, McDermott International, Inc., as guarantor, and Commercial Bank of Dubai PSC, as lending bank; and

(k) that certain (a) indemnity and undertaking, dated as of June 28, 2019 between Comet II, B.V. as borrower and The Standard Bank of South African Limited as lending bank and (b) parent company guarantee, dated as of June 28, 2019 between McDermott International, Inc. as guarantor and The Standard Bank of South Africa Limited as lending bank.

"*Business Day*" means any day other than a Saturday, Sunday, or other day on which commercial banks are authorized to close under the laws of, or are in fact closed in, the State of New York.

"*Business Plan*" means the business plan for the Reorganized Debtors.

"*Cameron LNG Contractor*" means CCJV, an unincorporated joint venture the members of which are CB&I LLC (as successor in interest) and Chiyoda International Corporation.

"*Cameron LNG EPC Agreement*" means that certain Engineering, Procurement and Construction Contract, dated as of March 17, 2014, between Cameron LNG, LLC and the Cameron LNG Contractor (as amended).

"*Cameron LNG Project Obligations*" means, collectively, the obligations of any Debtor under: (a) that certain EPC Joint Venture Agreement, dated March 17, 2014 between CB&I LLC (as successor in interest) and Chiyoda International Corporation (as amended); and (b) the Cameron LNG EPC Agreement.

"*Cameron LNG Replacement Guarantee*" means a guarantee, which Reorganized McDermott shall execute and deliver to Cameron LNG, LLC, guaranteeing on a joint and several basis on behalf of CB&I LLC the payment and performance of the obligations of the Cameron LNG Contractor under the Cameron LNG EPC Agreement, whether arising prior to or after the execution of such guarantee.

"*Cash*" means cash in legal tender of the United States of America and cash equivalents, including bank deposits, checks, and other similar items.

"*Cash Management Bank*" means any financial institution through which the Debtors have entered into "Cash Management Arrangements" (as defined in the Credit Agreement).

"*Cash Secured LC Exit Facility*" means a 4-year, cash secured letter of credit exit facility in an amount up to $371 million, and otherwise on terms satisfactory to the Required Consenting Lenders, and set forth in the Definitive Documents to be included in the Plan Supplement.

"*Cash Secured Letter of Credit Claims*" means any Claim for obligations arising under, or relating to, the Cash Secured Letters of Credit, including Claims for all principal amounts outstanding, interest, fees, expenses, costs and other charges arising thereunder or related thereto.

"*Cash Secured Letters of Credit*" means the "Cash Secured Letters of Credit" issued under and on the terms set forth under the Credit Agreement.

"*Cause of Action*" or "*Causes of Action*" means any claims, interests, damages, remedies, causes of action, demands, rights, actions, controversies, proceedings, agreements, suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, Liens, indemnities, guaranties, and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, secured or unsecured, assertable, directly or derivatively, matured or unmatured, suspected or unsuspected, in contract, tort, law, equity, or otherwise.  Causes of Action also include: (a) all rights of setoff, counterclaim, or recoupment and claims under contracts or for breaches of duties imposed by law or in equity; (b) the right to object to or otherwise contest Claims or Interests; (c) claims pursuant to section 362 or chapter 5 of the Bankruptcy Code; (d) such claims and defenses as fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) any Avoidance Action.

"*Chapter 11 Cases*" means (a) when used with reference to a particular Debtor, the case pending for that Debtor under chapter 11 of the Bankruptcy Code in the Bankruptcy Court and (b) when used with reference to all the Debtors, the procedurally consolidated chapter 11 cases pending for the Debtors in the Bankruptcy Court.

"*Chiyoda Replacement Guarantee*" means a guarantee which Reorganized McDermott shall execute and deliver to Chiyoda International Corporation in accordance with Section 15.3 of the EPC Joint Venture Agreement, dated March 17, 2014 between CB&I LLC (as successor in interest) and Chiyoda International Corporation (as amended) as required by the Guaranty and Indemnity Agreement entered into by and between CB&I LLC, McDermott International and Chiyoda International Corporation.

"*Claim*" means any claim, as defined in section 101(5) of the Bankruptcy Code, against any of the Debtors.

"*Claims and Balloting Agent*" means Prime Clerk LLC, the notice, claims, and solicitation agent retained by the Debtors in the Chapter 11 Cases.

"*Claims Register*" means the official register of Claims maintained by the Claims and Balloting Agent.

"*Class*" means a class of Claims or Interests as set forth in Article III of the Plan pursuant to section 1122(a) of the Bankruptcy Code.

"*CM/ECF*" means the Bankruptcy Court's Case Management and Electronic Case Filing system.

"*Company Party*" has the meaning set forth in the Restructuring Support Agreement.

"*Compensation and Benefits Programs*" means all employment and severance agreements and policies, and all employment, compensation, and benefit plans, policies, workers' compensation programs, savings plans, retirement plans, deferred compensation plans, supplemental executive retirement plans, healthcare plans, disability plans, severance benefit plans, incentive plans, life and accidental death and dismemberment insurance plans, and programs of the Debtors, and all amendments and modifications thereto, applicable to the Debtors' employees, former employees, retirees, and non-employee directors and the employees, former employees and retirees of their

4

subsidiaries, including all savings plans, retirement plans, health care plans, disability plans, severance benefit agreements, and plans, incentive plans, deferred compensation plans and life, accidental death, and dismemberment insurance plans.

"*Confirmation*" means the Bankruptcy Court's entry of the Confirmation Order on the docket of the Chapter 11 Cases.

"*Confirmation Date*" means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases, within the meaning of Bankruptcy Rules 5003 and 9021.

"*Confirmation Hearing*" means the hearing to be held by the Bankruptcy Court on confirmation of the Plan, pursuant to Bankruptcy Rule 3020(b)(2) and sections 1128 and 1129 of the Bankruptcy Code, as such hearing may be continued from time to time.

"*Confirmation Order*" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code and approving the consummation of the Technology Business Sale and the Pipes Business Sale.

"*Consenting 2021 LC Lenders*" has the meaning set forth in the Restructuring Support Agreement.

"*Consenting 2023 LC Lenders*" has the meaning set forth in the Restructuring Support Agreement.

"*Consenting Cash Secured LC Issuers*" has the meaning set forth in the Restructuring Support Agreement.

"*Consenting LC Lenders*" has the meaning set forth in the Restructuring Support Agreement.

"*Consenting Lenders*" has the meaning set forth in the Restructuring Support Agreement.

"*Consenting Noteholders*" has the meaning set forth in the Restructuring Support Agreement.

"*Consenting Revolving Lenders*" has the meaning set forth in the Restructuring Support Agreement.

"*Consenting Stakeholders*" has the meaning set forth in the Restructuring Support Agreement.

"*Consenting Superpriority LC Lenders*" has the meaning set forth in the Restructuring Support Agreement.

"*Consenting Superpriority Term Lenders*" has the meaning set forth in the Restructuring Support Agreement.

"*Consenting Term Lenders*" has the meaning set forth in the Restructuring Support Agreement.

"*Consummation*" means the occurrence of the Effective Date as to the applicable Debtor.

"*Credit Agreement*" means that certain credit agreement dated as of May 10, 2018, by and among certain of the Debtors as borrowers and guarantors thereto, the Revolving and LC Administrative Agent, the Term Loan Administrative Agent, the Issuers (as defined in the Credit Agreement), and the lenders from time to time party thereto, as may be amended, supplemented, or otherwise modified from time to time.

"*Credit Agreement Hedging Claims*" means Claims in respect of Credit Agreement Hedging Obligations, which, for the avoidance of doubt, shall not include DIP Hedging Obligations.

"*Credit Agreement Hedging Obligations*" means mark-to-market obligations arising out of the termination of any "Hedging Obligations" (as defined under the Credit Agreement) prior to the Effective Date.

"*Cure*" means all amounts, including an amount of $0.00, required to cure any monetary defaults under any Executory Contract or Unexpired Lease (or such lesser amount as may be agreed upon by the parties under an

Executory Contract or Unexpired Lease) that is to be assumed by the Debtors pursuant to sections 365 or 1123 of the Bankruptcy Code.

"*D&O Liability Insurance Policies*" means all insurance policies of any of the Debtors for directors', managers', and officers' liability existing as of the Petition Date (including any "tail policy") and all agreements, documents, or instruments relating thereto.

"*Definitive Documents*" means the documents listed in Section 3 of the Restructuring Support Agreement.

"*DIP Agents*" means the DIP LC Agent, the DIP Collateral Agent, and the DIP Term Loan Agent.

"*DIP Cash Secured Letter of Credit Claim*" means any Claim for obligations arising under, or relating to, the DIP Cash Secured LC Facility, including Claims for all principal amounts outstanding, interest, fees, expenses, costs and other charges arising thereunder or related thereto.

"*DIP Cash Secured Letters of Credit*" means the letters of credit issued pursuant to the DIP Cash Secured LC Facility.

"*DIP Cash Secured LC Facility*" means the cash secured letter of credit facility pursuant to which up to $100 million of the DIP Letter of Credit Facility may be allocated.

"*DIP Claims*" means all Claims (including adequate protection Claims) derived from, arising under, based upon, or secured pursuant to the DIP Credit Agreement, including all prepetition Claims rolled into the DIP Credit Facility and all other Claims in respect of principal amounts outstanding, interest, fees, expenses, costs, hedging obligations, and other charges arising thereunder or related thereto, in each case, with respect to the DIP Credit Facility.

"*DIP Collateral Agent*" means Crédit Agricole Corporate and Investment Bank in its capacity as collateral agent under the DIP Credit Agreement.

"*DIP Credit Agreement*" means that certain superpriority secured debtor-in-possession credit agreement that governs the DIP Credit Facility (as may be amended, supplemented, or otherwise modified from time to time), among McDermott International, Inc., as parent, certain of the Debtors as borrowers, the lenders party thereto, the DIP Lenders, the DIP Letter of Credit Issuers, and the DIP Agents.

"*DIP Credit Facility*" means the superpriority committed credit facilities provided by the DIP Lenders, which includes the DIP Letter of Credit Facility, the DIP Term Loan Facility, the DIP Hedging Obligations, and any other obligations specified in the DIP Financing Orders.

"*DIP Credit Facility Term Sheet*" means the DIP Credit Facility Term Sheet attached as Exhibit 2 to the Restructuring Term Sheet.

"*DIP Financing Orders*" means the interim order approving the DIP Credit Facility and the final order approving the DIP Credit Facility, approved by the Bankruptcy Court in the Chapter 11 Cases.

"*DIP Hedging Obligations*" means all hedging obligations subject to or deemed incurred under the DIP Credit Facility (including for the avoidance of doubt all obligations in respect of the Debtors' prepetition foreign currency hedging transactions and $500 million notional amount of interest rate hedging transactions rolled into the DIP Credit Facility pursuant to the DIP Financing Orders and the Hedging Order).

"*DIP LC Agent*" means Crédit Agricole Corporate and Investment Bank in its capacity as letter of credit administrative agent under the DIP Credit Agreement.

"*DIP LC Claim*" means any Claim of a DIP Lender, a DIP Letter of Credit Issuer, or the DIP Agents arising under or relating to the DIP Letter of Credit Facility pursuant to the DIP Credit Agreement.

"*DIP Lenders*" means the lenders party to the DIP Credit Agreement with respect to the DIP Credit Facility.

"*DIP Letter of Credit Facility*" means the senior secured superpriority letter of credit facility plus interest, fees, and other amounts due in respect of the DIP Letters of Credit (including the DIP Cash Secured LC Facility), provided under the DIP Credit Agreement and approved by the Bankruptcy Court pursuant to the DIP Financing Orders.

"*DIP Letter of Credit Issuers*" means the "Issuing Banks" under the DIP Credit Agreement.

"*DIP Letters of Credit*" means (i) the $543 million of new and incremental letters of credit to be provided under the DIP Letter of Credit Facility (including the DIP Cash Secured Letters of Credit) plus (ii) the DIP Roll-Up Letters of Credit.

"*DIP Roll-Up Letters of Credit*" means (i) those Superpriority Letters of Credit, including Claims for all reimbursement obligations outstanding, interest, fees, expenses, costs, and other charges arising thereunder or relating thereto, that are "rolled-up" and deemed issued under the DIP Letter of Credit Facility pursuant to the final DIP Financing Order and (ii) any obligations to be deemed outstanding under the DIP Letter of Credit Facility.

"*DIP Roll-Up Term Loans*" means the term loans outstanding under the Superpriority Term Loan Facility that upon entry of the final DIP Financing Order, shall be deemed to be issued under the DIP Term Loan Facility, including all of the Claims arising under, derived from, based upon, or secured pursuant to the Superpriority Term Loan Agreement, including Claims for all principal amounts outstanding, interest, fees, expenses, costs, the Make Whole Amount, and other charges arising thereunder or related thereto, in each case, with respect to the Superpriority Term Loan Facility.

"*DIP Term Loan Agent*" means Barclays Bank PLC, in its capacity as term loan administrative agent under the DIP Credit Agreement.

"*DIP Term Loan Claim*" means any Claim of a DIP Lender or the DIP Agents arising under or relating to the DIP Term Loan Facility pursuant to the DIP Credit Agreement or the DIP Financing Orders.

"*DIP Term Loan Facility*" means a superpriority term loan facility, comprised of up to $1.2 billion principal amount of New DIP Term Loans plus $800 million principal amount of the Superpriority Term Loans rolled into the DIP Term Loan Facility plus the Make Whole Amount plus the Additional Obligations and approved by the Bankruptcy Court pursuant to the DIP Financing Orders.

"*DIP Term Loans*" means the New DIP Term Loans and the DIP Roll-Up Term Loans.

"*Disbursing Agent*" means the Reorganized Debtors or the Entity or Entities selected by the Debtors or the Reorganized Debtors, as applicable, to make or facilitate distributions pursuant to the Plan.

"*Disclosure Statement*" means the disclosure statement for the Plan, including all exhibits and schedules thereto, to be approved by the Confirmation Order.

"*Disputed*" means, as to a Claim or an Interest, any Claim or Interest:  (a) that is not Allowed; (b) that is not disallowed by the Plan, the Bankruptcy Code, or a Final Order, as applicable; (c) as to which a dispute is being adjudicated by a court of competent jurisdiction in accordance with non-bankruptcy law; (d) that is Filed in the Bankruptcy Court and not withdrawn, as to which a timely objection or request for estimation has been Filed; and (e) with respect to which a party in interest has Filed a Proof of Claim or otherwise made a written request to a Debtor for payment, without any further notice to or action, order, or approval of the Bankruptcy Court.

"*Distribution Date*" means, except as otherwise set forth herein, the date or dates determined by the Debtors or the Reorganized Debtors, on or after the Effective Date, with the first such date occurring on or as soon as is reasonably practicable after the Effective Date, upon which the Distribution Agent shall make distributions to holders of Allowed Claims entitled to receive distributions under the Plan.

"*Distribution Record Date*" means, other than with respect to publicly held Securities, the record date for purposes of making distributions under the Plan on account of Allowed Claims, which date shall be on or as soon as is reasonably practicable after the Effective Date.  For the avoidance of doubt, no distribution record date shall apply to holders of public securities.

"*DTC*" means the Depository Trust Company.

"*Effective Date*" means, as to the applicable Debtor, the date that is the first Business Day on which (a) no stay of the Confirmation Order is in effect and (b) all conditions precedent to the occurrence of the Effective Date set forth in Article IX.A of the Plan have been satisfied or waived in accordance with Article IX.B of the Plan.  Any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable thereafter.

"*Emergence Awards*" has the meaning set forth in Article IV.Q of the Plan.

"*Entity*" has the meaning set forth in section 101(15) of the Bankruptcy Code.

"*Estate*" means as to each Debtor, the estate created for such Debtor in its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code upon the commencement of such Debtor's Chapter 11 Case.

"*Exchange Act*" means the Securities Exchange Act of 1934, 15 U.S.C. § 78a, *et seq.*, as amended from time to time.

"*Exculpated Parties*" means collectively, and in each case in its capacity as such: (a) the Debtors; (b) any official committees appointed in the Chapter 11 Cases and each of their respective members; (c) the Consenting Stakeholders and any affiliated Hedge Banks; (d) each Agent and the Senior Notes Trustee, and (e) with respect to each of the foregoing, such Entity and its current and former Affiliates, and such Entity's and its current and former Affiliates' current and former equity holders, subsidiaries, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals.

"*Executory Contract*" means a contract to which one or more of the Debtors is a party and that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

"*Existing Common Equity Interests*" means the common stock of McDermott, which is traded and quoted on the New York Stock Exchange under the symbol "MDR," any and all outstanding and unexercised or unvested warrants, options, or rights to acquire such common stock existing prior to the Petition Date, and any Section 510(b) Claims.

"*Existing Preferred Equity Interests*" means all outstanding 12% Redeemable Preferred Stock in McDermott, issued on November 29, 2018, and the Series A Preferred Stock of McDermott, issued on December 2, 2019, and any Section 510(b) Claims.

"*Exit Facilities*" means, collectively, the Term Loan Exit Facility and the Exit LC Facilities, as applicable.

"*Exit Facility Agents*" means each of the administrative agents, trustees, or other similar agents under the Exit Facility Agreement, solely in its capacity as such.

"*Exit Facility Agreement*" means that certain agreement to provide the Exit Facilities, if any, dated as of the Effective Date, by and among the Reorganized Debtors party thereto as borrowers, Reorganized McDermott, the Exit Facility Agents, the issuing banks party thereto, and the lender parties thereto, which shall be included in the Plan Supplement.

"*Exit Facility Documents*" means, collectively, the Exit Facility Agreement, and any and all other agreements, documents, and instruments delivered or to be entered into in connection therewith, including any amendments to existing loan or other finance documentation, any guarantee agreements, pledge and collateral

agreements, intercreditor agreements, and other security documents, in each case if any, the terms of which documents shall be acceptable to the Debtors or the Reorganized Debtors, as applicable, and the Required Consenting Lenders.

"*Exit LC Facilities*" means the Super Senior Exit Facility, the Senior Exit LC Facility, the Cash Secured LC Exit Facility, and the Roll-Off LC Exit Facility.

"*Federal Judgment Rate*" means the federal judgment rate in effect as of the Petition Date.

"*File*," "*Filed*," or "*Filing*" means file, filed, or filing with the Bankruptcy Court or its authorized designee in the Chapter 11 Cases.

"*Final Order*" means an order or judgment of the Bankruptcy Court, or court of competent jurisdiction with respect to the subject matter that has not been reversed, stayed, modified, or amended, as entered on the docket in any Chapter 11 Case or the docket of any court of competent jurisdiction, and as to which the time to appeal, or seek certiorari or move for a new trial, reargument, or rehearing has expired and no appeal or petition for certiorari or other proceedings for a new trial, reargument, or rehearing has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be timely filed has been withdrawn or resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought or the new trial, reargument, or rehearing will have been denied, resulted in no stay pending appeal of such order, or has otherwise been dismissed with prejudice; *provided* that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed with respect to such order will not preclude such order from being a Final Order.

"*Funded DIP Indebtedness*" means indebtedness under the DIP Credit Facility in respect of the DIP Term Loans (which for the avoidance of doubt includes the Superpriority Term Loans rolled up into the DIP Credit Facility, but excludes any DIP Hedging Obligations) and the Additional Obligations.

"*General Unsecured Claim*" means any Unsecured Claim against a Debtor other than the Bilateral Facility Claims and the Senior Notes Claims.

"*Governmental Unit*" has the meaning set forth in section 101(27) of the Bankruptcy Code.

"*Hedge Bank*" means, with respect to any Consenting Lender, either such Consenting Lender or an affiliate of such Consenting Lender that has entered into "Hedging Obligations" (as defined in the Credit Agreement) with the Debtors.

"*Hedging Order*" means the *Order (I) Authorizing the Debtors to Enter into and Perform Under (A) Amended and Restated Hedge Agreements and (B) New Hedge Agreements, (II) Granting DIP Liens and DIP Superpriority Claims, (III) Modifying the Automatic Stay and (IV) Granting Related Relief* entered by the Bankruptcy Court on January 23, 2020 at Docket No. 145 in the Chapter 11 Cases.

"*Impaired*" means with respect to a Class of Claims or Interests, a Class of Claims or Interests that is impaired within the meaning of section 1124 of the Bankruptcy Code.

"*Insider*" has the meaning set forth in section 101(31) of the Bankruptcy Code.

"*Intercompany Claim*" means any Claim held by a Debtor or an Affiliate against a Debtor or an Affiliate of a Debtor.

"*Intercompany Interest*" means an Interest in a Debtor held by a Debtor or an Affiliate of a Debtor.

"*Interest*" means any equity security (as defined in section 101(16) of the Bankruptcy Code) in any Debtor and any other rights, options, warrants, stock appreciation rights, phantom stock rights, restricted stock units, performance shares, performance units, redemption rights, repurchase rights, convertible, exercisable or exchangeable

Securities or other agreements, arrangements or commitments of any character relating to, or whose value is related to, any such interest or other ownership interest in any Debtor.

"*Judicial Code*" means title 28 of the United States Code, 28 U.S.C. §§ 1–4001, as amended from time to time.

"*Lloyds LC Exit Facility*" means a senior secured letter of credit exit facility with Lloyds LC Bank pursuant to which each Lloyds Letter of Credit that is outstanding on the Effective Date under the Lloyds Letter of Credit Agreement will be deemed issued on the Effective Date and which will be secured by only the cash collateral that exclusively secured the Lloyds Letters of Credit as of the Effective Date and any standby letters of credit supporting the Lloyds Letters of Credit as of the Effective Date; *provided* that the cash collateral and/or standby letters of credit, as applicable, securing the Lloyds LC Exit Facility shall be reduced and/or released, as applicable, dollar-for-dollar upon the reduction, expiration, or termination of any Lloyds Letter of Credit in accordance with its terms from and after the Effective Date and upon any such release the applicable cash collateral shall become collateral securing obligations of the Reorganized Debtors under the Exit Facilities. The definitive documentation for the Lloyds LC Exit Facility shall be substantially in the form of the Lloyds Letter of Credit Agreement, and otherwise on terms satisfactory to the Debtors and the Required Consenting Lenders, and set forth in the Definitive Documents to be included in the Plan Supplement.

"*Lloyds LC Bank*" means Lloyds Bank Corporate Markets plc (as successor to Lloyds Bank plc, formerly known as Lloyds TSB Bank plc), as the Bank under the Lloyds Letter of Credit Agreement.

"*Lloyds LC Facility*" means the $127,000,000.00 senior secured letter of credit facility under the Lloyds Letter of Credit Agreement.

"*Lloyds Letter of Credit Agreement*" means that certain master agreement for stand-by letters of credit originally dated as of June 10, 2013 by and among Lloyds LC Bank and Comet II B.V., CB&I, LLC, Chicago Bridge and Iron Company B.V., CBI Services, LLC, CB&I UK Limited, CBI Constructors PTY LTD, CB&I Group Inc., and Woodlands International Insurance Ltd, as amended and restated May 10, 2018 in connection with the Business Combination (as defined therein) with McDermott and certain of its subsidiaries, as may be amended, supplemented, or otherwise modified from time to time.

"*Lloyds Letter of Credit Claims*" means any Claim for obligations arising under, or relating to, the Lloyds LC Facility, including Claims for all principal amounts outstanding, interest, fees, expenses, costs and other charges arising thereunder or related thereto.

"*Lloyds Letters of Credit*" means the letters of credit issued under the Lloyds LC Facility.

"*Lien*" has the meaning set forth in section 101(37) of the Bankruptcy Code.

"*Liquidity Lender Steering Committee*" means those certain institutions comprising the steering committee of lenders under the Superpriority Revolving Facility, the Revolving Credit Facility, and the 2023 LC Facility.

"*Lummus Assets and Interests*" means the Debtors' rights, titles, and interests in the Lummus Entities and related assets, as described in the Purchase Agreement.

"*Lummus Entities*" means Lummus Technology LLC; McDermott Technology (2), B.V.; McDermott Technology (3), B.V.; OOO Lummus Technology; CB&I Lummus Engineering & Technology China Co. Ltd.; Lummus Technology Heat Transfer B.V. (Netherlands); Lummus Technology Heat Transfer B.V. (India); Lummus Novolen Technology GmbH; Novolen Technology Holdings C.V.; Lummus Technology B.V.; Lummus Gasification Technology Licensing LLC; Lummus Engineered Products, LLC; Lummus Technology International LLC; Lummus Technology Services LLC; Chemical Research and Licensing, LLC; Lummus Technology Ventures LLC; Catalytic Distillation Technologies; Lummus Technology Overseas LLC, Chevron Lummus Global LLC, and CLG Technical Services, LLC.

"*Lummus Executory Contracts and Unexpired Leases*" means any Executory Contracts and Unexpired Leases of the Debtors proposed to be assumed or assumed and assigned in connection with the Technology Business Sale.

"*Make Whole Amount*" means the make whole amount payable under Section 2.11(b) of the Superpriority Credit Agreement solely with respect to the tranches of the Superpriority Term Loan Facility that were funded prior to the Petition Date.

"*Make Whole Tranche*" means that certain tranche under the Super Senior Exit Facility in an amount equal to the portion of the Make Whole Amount remaining (if any) after applying the Technology Business Sale Proceeds and proceeds from the Rights Offering, subject to the terms of the Exit Facilities Term Sheet.

"*Management Incentive Plan*" has the meaning set forth in Article IV.Q of the Plan.

"*McDermott*" means McDermott International, Inc. or any successor or assign, by merger, consolidation, or otherwise, prior to the Effective Date.

"*MIP Pool*" has the meaning set forth in Article IV.Q of the Plan.

"*New Board*" means the board of directors of Reorganized McDermott.  The identities of directors on the New Board shall be set forth in the Plan Supplement.

"*New Common Stock*" means, depending on the transaction structure and as detailed in the Restructuring Transactions Memorandum, common equity in one or more Reorganized Debtors.

"*New DIP Term Loans*" means the new money term loans to be provided under the DIP Term Loan Facility.

"*New Organizational Documents*" means the documents providing for corporate governance of the Reorganized Debtors, including charters, bylaws, operating agreements, or other organizational documents or shareholders' agreements, as applicable, which shall be consistent with the Restructuring Support Agreement (including Section 3.02 of the Restructuring Support Agreement), this Plan, and section 1123(a)(6) of the Bankruptcy Code (as applicable), and shall be included in the Plan Supplement.

"*New Tranche A Warrants*" means the 7-year warrants to purchase 10% of the New Common Stock at a strike price equal to (a) the Prepetition Funded Secured Claims (including, without limitation, principal and any accrued prepetition or postpetition interest at the default rate as applicable) less (i) the proceeds of the Rights Offering, (ii) the aggregate amount of the loans evidenced by the Term Loan Exit Facility, and (iii) the Residual Prepetition Funded Secured Claims Pay Down, divided by (b) the initial allocation of 94% of the New Common Stock to the holders of Prepetition Funded Secured Claims minus an amount equal to (x) the aggregate proceeds of the Rights Offering divided by Plan Equity Value plus (y) the Prepetition Funded Secured Claims Excess Cash Adjustment.  For the avoidance of doubt, the New Tranche A Warrants shall not be subject to dilution on account of the Management Incentive Plan.

"*New Tranche B Warrants*" means the 7-year warrants to purchase 10% of the New Common Stock at a strike price equal to (a) the Prepetition Funded Secured Claims (including, without limitation, principal and any accrued prepetition or postpetition interest at the default rate as applicable) multiplied by 125%, less (i) the proceeds of the Rights Offering, (ii) the aggregate amount of the loans evidenced by the Term Loan Exit Facility, and (iii) the Residual Prepetition Funded Secured Claims Pay Down, divided by (b) the initial allocation of 94% of the New Common Stock to the holders of Prepetition Funded Secured Claims minus an amount equal to (x) the aggregate proceeds of the Rights Offering divided by Plan Equity Value and (y) the Prepetition Funded Secured Claims Excess Cash Adjustment.  For the avoidance of doubt, the New Tranche B Warrants shall not be subject to dilution on account of the Management Incentive Plan.

"*New Warrants*" means, collectively, the New Tranche A Warrants and the New Tranche B Warrants.

11

"*New Warrants Agreements*" means those certain agreements providing for, among other things, the issuance and terms of the New Warrants, which shall be included in the Plan Supplement and in form and substance acceptable to the Required Consenting Lenders and the Required Consenting Noteholders. The New Warrants Agreements shall provide for full anti-dilution and Black-Scholes protection.

"*Non-Pipes Debtors*" means any of the Debtors or Reorganized Debtors other than the Pipes Entities.

"*Other Prepetition Financing Claim*" means any Secured Claim arising under:

(a) that certain facility agreement dated September 30, 2010 among McDermott, as guarantor, and its subsidiary NO 105 AS, as borrower, the BNP Paribas, in its capacity as facility agent and security agent, and the lenders party thereto, as may be amended, supplemented, or otherwise modified from time to time, to pay a portion of the construction costs of the *NO 105*;

(b) that certain receivables factoring agreement dated November 25, 2016 among J. Ray McDermott de Mexico S.A. de C.V. and the financing intermediaries thereto, as may be amended, supplemented, or otherwise modified from time to time; or

(c) that certain re-invoicing service agreement dated May 2019 among Bramid Outsource Limited, as service provider, McDermott, as parent, and CB&I LLC, as customer.

"*Other Priority Claim*" means any Claim, other than an Administrative Claim or a Priority Tax Claim, entitled to priority in right of payment under section 507(a) of the Bankruptcy Code.

"*Other Secured Claim*" means any Secured Claim other than a Revolving Credit Claim, a Term Loan Claim, a 2021 Letter of Credit Claim, a 2023 Letter of Credit Claim, a Lloyds Letter of Credit Claim, a Cash Secured Letter of Credit Claim, a Credit Agreement Hedging Claim, a Superpriority Term Loan Claim, a Superpriority Revolving Facility Claim, an Other Prepetition Financing Claim, a Bilateral Facility Claim, or a DIP Claim.

"*Person*" has the meaning set forth in section 101(41) of the Bankruptcy Code.

"*Petition Date*" means the date on which the Debtors commenced the Chapter 11 Cases.

"*Pipes Business Sale*" means a sale of any or all of the Pipes Interests pursuant to the Pipes Business Sale Documents, and to be agreed to or consummated by one or more of the Debtors after the Confirmation Date.

"*Pipes Business Sale Documents*" means any executed purchase agreement for the sale of the Pipes Interests between certain of the Debtors and the Pipes Buyers for the sale of all or part of the Pipes Interests, and any transition services agreements, license agreements, supply agreements, and any other written ancillary agreements, documents, instruments and certificates executed under or in connection therewith. The Pipes Business Sale Documents shall be in form and substance satisfactory to the Required Consenting Lenders.

"*Pipes Buyers*" means those Entities that purchase the Pipes Interests pursuant to the Pipes Business Sale Documents.

"*Pipes Entities*" means CB&I Walker LA, LLC; CB&I Lake Charles LLC; CB&I Clearfield, Inc.; CB&I El Dorado, Inc.; CB&I Middle East Holding, Inc.; Shaw Overseas (Middle East) Ltd.; CB&I Nass Pipe Fabrication WLL; CB&I SKE&C Middle East Ltd.; Shaw Pipe Fabrication Holdings, LLC; and Shaw Emirates Pipes Manufacturing LLC, and any other Debtors or their non-Debtor Affiliates that may be identified in the Pipes Business Sale Documents.

"*Pipes Interests*" means all of the Debtors' rights, titles, and interests (whether direct or indirect) in the Pipes Entities and certain related assets, as described in the Pipes Business Sale Documents.

12

"*Plan Distribution*" means a payment or distribution to holders of Allowed Claims, Allowed Interests, or other eligible Entities under this Plan.

"*Plan Equity Value*" means $2,352,000,000.

"*Plan Objection Deadline*" means the date the Bankruptcy Court establishes as the deadline to File an objection to Confirmation of the Plan.

"*Plan Supplement*" means the compilation of documents and forms of documents, term sheets, agreements, schedules, and exhibits to the Plan (in each case, as may be altered, amended, modified, or supplemented from time to time in accordance with the terms hereof and in accordance with the Bankruptcy Code and Bankruptcy Rules) to be Filed prior to the Confirmation Hearing to the extent available, and any additional documents Filed prior to the Effective Date as amendments to the Plan Supplement, including the following, as applicable: (a) the New Organizational Documents; (b) to the extent known, the identities of the members of the New Board; (c) the Assumed Executory Contracts and Unexpired Leases Schedule; (d) the Rejected Executory Contracts and Unexpired Leases Schedule; (e) the Schedule of Retained Causes of Action; (f) the Exit Facility Documents; (g) the definitive documentation related to the Management Incentive Plan; (h) the Restructuring Transactions Memorandum; (i) the New Warrants Agreements; and (j) to the extent applicable, the form of any Technology Business Sale Documents distributed by the Debtors to potentially interested parties, if any.  The Debtors shall have the right to alter, amend, modify, or supplement the documents contained in the Plan Supplement up to the Effective Date as set forth in this Plan and in accordance with the Restructuring Support Agreement (and subject to the applicable consent rights thereunder).

"*Prepetition Funded Secured Claims*" means Claims in respect of (i) the Term Loans and the Revolving Loans, (ii) any funded Prepetition Secured Letters of Credit, and (iii) the Credit Agreement Hedging Claims, but excluding any amounts being rolled into the DIP Credit Facility.

"*Prepetition Funded Secured Claims Excess Cash Adjustment*" has the meaning set forth in Article IV.D.4 of the Plan.

"*Prepetition Secured Letters of Credit*" means the 2021 Letters of Credit, the 2023 Letters of Credit, the Revolving LCs, and the Cash Secured Letters of Credit.

"*Priority Tax Claim*" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

"*Pro Rata*" means the proportion that an Allowed Claim or an Allowed Interest in a particular Class bears to the aggregate amount of Allowed Claims or Allowed Interests in that Class, unless otherwise indicated.

"*Professional*" means an Entity:  (a) employed pursuant to a Bankruptcy Court order in accordance with sections 327, 363, or 1103 of the Bankruptcy Code and to be compensated for services rendered prior to or on the Confirmation Date, pursuant to sections 327, 328, 329, 330, 331, and 363 of the Bankruptcy Code; or (b) awarded compensation and reimbursement by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

"*Professional Amount*" means the aggregate amount of Professional Claims and other unpaid fees and expenses that the Professionals estimate they have incurred or will incur in rendering services to the Debtors as set forth in Article II.C of the Plan.

"*Professional Claim*" means a Claim by a professional seeking an award by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Confirmation Date under sections 330, 331, 503(b)(2), 503(b)(3), 503(b)(4), or 503(b)(5) of the Bankruptcy Code.

"*Professional Escrow Account*" means an interest-bearing account funded by the Debtors with Cash on the Effective Date in an amount equal to the Professional Amount.

"*Proof of Claim*" means a proof of Claim Filed against any of the Debtors in the Chapter 11 Cases.

"*Purchase Agreement*" means, solely with respect to the Technology Business Sale, the share and asset purchase agreement between the Debtors and the Purchaser.

"*Purchaser*" means one or more Entities that are the purchasers with respect to the Technology Business Sale.

"*Reinstate*," "*Reinstated*," or "*Reinstatement*" means with respect to Claims and Interests, that the Claim or Interest shall not be discharged hereunder and the holder's legal, equitable, and contractual rights on account of such Claim or Interest shall remain unaltered by Consummation in accordance with section 1124(1) of the Bankruptcy Code.

"*Rejected Executory Contracts and Unexpired Leases Schedule*" means the schedule of Executory Contracts and Unexpired Leases to be rejected by the Debtors pursuant to the Plan, which schedule shall be included in the Plan Supplement, as the same may be amended, modified, or supplemented from time to time; *provided* that such schedule shall be in form and substance acceptable to the Required Consenting Lenders.

"*Related Party*" means, collectively, current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, predecessors, participants, successors, assigns, subsidiaries, affiliates, managed accounts or funds, partners, limited partners, general partners, principals, members, management companies, fund advisors or managers, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, heirs, executors and assigns, and other professionals, in each case solely in their capacities as such, together with their respective past and present directors, officers, shareholders, partners, members, employees, agents, attorneys, representatives, heirs, executors and assigns, in each case solely in their capacities as such.

"*Released Claims*" means any Claims or Interests that have been released, discharged, or are subject to exculpation pursuant to this Plan.

"*Released Parties*" means, collectively, and in each case in its capacity as such:  (a) each Debtor; (b) each Reorganized Debtor; (c) each Company Party; (d) each DIP Lender and each DIP Letter of Credit Issuer; (e) each Agent; (f) the Senior Notes Trustee; (g) each Consenting Stakeholder; (h) each Hedge Bank; (i) each Cash Management Bank; (j) each lender under the Superpriority Credit Agreement, Credit Agreement, the 2021 LC Agreement, and the Lloyds Letter of Credit Agreement; (k) each holder of an Obligation (as defined in the Superpriority Credit Agreement) under the Superpriority Credit Agreement; (l) each holder of an Obligation (as defined in the Credit Agreement) under the Credit Agreement; (m) each Issuer (as defined in the Superpriority Credit Agreement) under the Superpriority Credit Agreement; (n) each Issuer (as defined in the Credit Agreement) under the Credit Agreement; (o) the Term Loan Ad Hoc Group, the Liquidity Lender Steering Committee, and the Senior Notes Ad Hoc Group; (p) Illuminate Buyer LLC; (q) each current and former Affiliate of each Entity in clause (a) through (p); and (r) each Related Party of each Entity in clause (a) through (p); *provided* that any holder of a Claim or Interest that opts out of the releases shall not be a "Released Party."

"*Releasing Parties*" means, collectively, and in each case in its capacity as such:  (a) each Debtor; (b) each Reorganized Debtor; (c) each Company Party; (d) each DIP Lender and each DIP Letter of Credit Issuer; (e) each Agent; (f) the Senior Notes Trustee; (g) each Consenting Stakeholder; (h) each Hedge Bank; (i) each Cash Management Bank; (j) each lender under the Superpriority Credit Agreement, Credit Agreement, the 2021 LC Agreement, and the Lloyds Letter of Credit Agreement; (k) each holder of an Obligation (as defined in the Superpriority Credit Agreement) under the Superpriority Credit Agreement; (l) each holder of an Obligation (as defined in the Credit Agreement) under the Credit Agreement; (m) each Issuer (as defined in the Superpriority Credit Agreement) under the Superpriority Credit Agreement; (n) each Issuer (as defined in the Credit Agreement) under the Credit Agreement; (o) the Term Loan Ad Hoc Group, the Liquidity Lender Steering Committee, and the Senior Notes Ad Hoc Group; (p) Illuminate Buyer LLC; (q) all holders of Claims or Interests that vote to accept the Plan; (r) all holders of Claims or Interests that are deemed to accept the Plan who do not affirmatively opt out of the releases provided by the Plan by checking the box on the applicable Notice of Non-Voting Status indicating that they opt not to grant the releases provided in the Plan; (s) all holders of Claims or Interests that abstain from voting on the Plan

and who do not affirmatively opt out of the releases provided by the Plan by checking the box on the applicable ballot indicating that they opt not to grant the releases provided in the Plan; (t) all holders of Claims or Interests that vote to reject the Plan or are deemed to reject the Plan and who do not affirmatively opt out of the releases provided by the Plan by checking the box on the applicable ballot or Notice of Non-Voting Status indicating that they opt not to grant the releases provided in the Plan; (u) each current and former Affiliate of each Entity in clause (a) through (t); and (v) each Related Party of each Entity in clause (a) through (t).

"*Reorganized Debtors*" means collectively, a Debtor, or any successor or assign thereto, by merger, consolidation, or otherwise, on and after the Effective Date, including any new entity established in connection with the implementation of the Restructuring Transactions.

"*Reorganized McDermott*" means McDermott, or any successor or assign, by merger, consolidation, or otherwise, on or after the Effective Date.

"*Required Consenting LC Lenders*" has the meaning set forth in the Restructuring Support Agreement.

"*Required Consenting Lender*" has the meaning set forth in the Restructuring Support Agreement.

"*Required Consenting Noteholders*" has the meaning set forth in the Restructuring Support Agreement.

"*Required Consenting Revolving Lenders*" has the meaning set forth in the Restructuring Support Agreement.

"*Required Consenting Stakeholders*" has the meaning set forth in the Restructuring Support Agreement.

"*Required Consenting Term Lenders*" has the meaning set forth in the Restructuring Support Agreement.

"*Residual Prepetition Funded Secured Claims Pay Down*" has the meaning set forth in Article IV.D.4 of the Plan.

"*Residual Technology Business Sale Proceeds*" means any Technology Business Sale Proceeds remaining after payment of items (a) through (d) of the Technology Business Sale Proceeds Waterfall for application in accordance with item (e) of the Technology Business Sale Proceeds Waterfall in accordance with the Plan.

"*Restructuring Expenses*" means the prepetition and postpetition reasonable and documented fees and expenses of the Revolving and LC Administrative Agent Advisors, the Term Loan Ad Hoc Group Advisors, the Senior Notes Ad Hoc Group Advisors, the Barclays Advisors, and the Senior Notes Trustee and its advisors, including local and foreign counsel (in each case, in accordance with the terms of their respective engagement letters with their respective clients, if any).

"*Restructuring Term Sheet*" means the Restructuring Term Sheet attached as <u>Exhibit A</u> to the Restructuring Support Agreement.

"*Restructuring Transactions*" means any transaction and any actions as may be necessary or appropriate to effect a corporate restructuring of the Debtors' and the Reorganized Debtors' respective businesses or a corporate restructuring of the overall corporate structure of the Debtors on the terms set forth in the Plan, Restructuring Support Agreement, and Restructuring Transactions Memorandum, including the issuance of all Securities, notes, instruments, certificates, and other documents required to be issued or executed pursuant to the Plan, one or more inter-company mergers, consolidations, amalgamations, arrangements, continuances, restructurings, conversions, dissolutions, transfers, liquidations, or other corporate transactions, as described in Article IV.B of the Plan.

"*Restructuring Transactions Memorandum*" means a document, in form and substance acceptable to the Required Consenting Lenders, to be included in the Plan Supplement that will set forth the material components of the Restructuring Transactions, including the identity of the issuer or issuers of the New Common Stock and any elections that must be made with respect to the receipt of the New Common Stock.

"*Restructuring Support Agreement*" means that certain Restructuring Support Agreement, dated as of January 21, 2020, by and among the Debtors and the Consenting Stakeholders, as may be further amended, modified, or supplemented from time to time, in accordance with its terms.

"*Revolving and LC Administrative Agent*" means Crédit Agricole Corporate and Investment Bank, in its capacity as administrative agent for the Revolving Credit Facility and the 2023 LC Facility.

"*Revolving and LC Administrative Agent Advisors*" means Linklaters LLP, Bracewell LLP and FTI Consulting, Inc., as advisors to the DIP LC Agent, the DIP Collateral Agent, the Revolving and LC Administrative Agent, 2018 Collateral Agent, the Superpriority Revolving Administrative Agent and the Superpriority Collateral Agent, and any other local or foreign advisors.

"*Revolving Credit*" means the Revolving LCs and the Revolving Loans.

"*Revolving Credit Claims*" means any Claim for obligations arising under, or relating to, the Revolving LCs or the Revolving Loans issued under the Revolving Credit Facility, including Claims for all principal amounts outstanding, interest, fees, expenses, costs and other charges arising thereunder or related thereto.

"*Revolving Credit Facility*" means the senior secured revolving credit facility under the Credit Agreement.

"*Revolving LCs*" means the letters of credit issued under and on the terms set forth under the Revolving Credit Facility.

"*Revolving Lenders*" means the lenders under the Revolving Credit Facility.

"*Revolving Loans*" means the revolving loans issued under and on the terms set forth under the Revolving Credit Facility.

"*Rights Offering*" means a rights offering providing for the Consenting Noteholders with the right to purchase up to $150 million of the New Common Stock otherwise earmarked for the holders of Prepetition Funded Secured Claims valued at the Plan Equity Value in connection with the Restructuring Transactions and in accordance with the Rights Offering Procedures and Section 12 of the Restructuring Support Agreement.

"*Rights Offering Procedures*" means the procedures governing the Rights Offering, as approved by the Bankruptcy Court.

"*Rights Offering Shares*" means the shares of New Common Stock issued in accordance with the Rights Offering and subject to the terms of the Rights Offering Procedures and the Restructuring Support Agreement.

"*Roll-Off LC Exit Facility*" means each senior secured letter of credit facility (other than in respect of the Cash Secured Letters of Credit) under the Credit Agreement and the 2021 LC Agreement, each as amended by the Exit Facility Agreement, each of which will be ranked junior to the Senior Exit LC Facility, and otherwise contain terms consistent with the Exit Facilities Term Sheet and satisfactory to the Required Consenting Lenders, which shall be set forth in the Definitive Documents to be included in the Plan Supplement.

"*Schedule of Retained Causes of Action*" means the schedule of certain Causes of Action of the Debtors that are not released, waived, or transferred pursuant to the Plan, as the same may be amended, modified, or supplemented from time to time.

"*Section 510(b) Claim*" means any Claim or Interest against a Debtor subject to subordination under section 510(b) of the Bankruptcy Code, whether by operation of law or contract.

"*Secured Claim*" means a Claim: (a) secured by a valid, perfected, and enforceable Lien on collateral to the extent of the value of such collateral, as determined in accordance with section 506(a) of the Bankruptcy Code or (b) subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code.

"*Secured Creditor Equity Distribution*" means 94% of the New Common Stock less the percentage of New Common Stock to be turned over on account of (i) the Prepetition Funded Secured Claims Excess Cash Adjustment and (ii) the Rights Offering, and subject to dilution on account of the Management Incentive Plan and the New Warrants.

"*Secured Creditor Funded Debt Distribution*" means (a) Cash in an amount equal to the Residual Technology Business Sale Proceeds; (b) Cash in an amount equal to any proceeds of the Rights Offering; (c) the Secured Creditor Equity Distribution; and (d) the new term loans evidenced by the Term Loan Exit Facility.

"*Secured Creditor Pro Rata Share*" means with respect to any recipient of any distribution from the Secured Creditor Funded Debt Distribution under the Plan, such recipient's pro rata share thereof measured by reference to the aggregate amount of: (a) all Allowed Term Loan Claims, (b) all Allowed Revolving Credit Claims consisting of (x) all Revolving Loans and (y) funded Revolving LCs, (c) all Allowed 2021 Letter of Credit Claims consisting of funded 2021 Letters of Credit, (d) all Allowed 2023 Letter of Credit Claims consisting of funded 2023 Letters of Credit, (e) all Allowed Lloyds Letter of Credit Claims consisting of funded Lloyds Letters of Credit, and (f) all Credit Agreement Hedging Claims consisting of Credit Agreement Hedging Obligations, that are not being rolled into the DIP Credit Facility, in each case as of the date of such distribution.

"*Secured Letter of Credit Cap*" has the meaning ascribed to it in the Exit Facilities Term Sheet.

"*Securities Act*" means the Securities Act of 1933, as amended, 15 U.S.C. §§ 77a–77aa, or any similar federal, state, or local law, as now in effect or hereafter amended, and the rules and regulations promulgated thereunder.

"*Security*" means any security, as defined in section 2(a)(1) of the Securities Act.

"*Senior Exit LC Facility*" means a 4-year, senior secured letter of credit exit facility in an amount up to $1.326 billion, ranked junior to the Super Senior Exit Facility, on terms satisfactory to the Debtors or the Reorganized Debtors, as applicable, and otherwise on terms satisfactory to the Required Consenting Lenders; and set forth in the Definitive Documents to be included in the Plan Supplement; *provided* that the amount of the Senior Exit LC Facility shall be reduced dollar-for-dollar for each Prepetition Secured Letter of Credit or Lloyds Letter of Credit that is drawn and not reimbursed in full in Cash during or after the Chapter 11 Cases.

"*Senior Notes*" means the 10.625% senior notes due 2024 issued by certain of the Debtors pursuant to the Senior Notes Indenture.

"*Senior Notes Ad Hoc Group*" means, collectively, those certain institutions comprising the ad hoc groups of holders of the Senior Notes represented by Paul, Weiss, Rifkind, Wharton & Garrison LLP and Brown Rudnick LLP.

"*Senior Notes Ad Hoc Group Advisors*" means Paul, Weiss, Rifkind, Wharton & Garrison LLP, Brown Rudnick LLP, Houlihan Lokey Capital, Inc., counsel to the Senior Notes Trustee, and any local or foreign advisors.

"*Senior Notes Claims*" means all principal and interest outstanding as of the Petition Date under the Senior Notes.

"*Senior Notes Indenture*" means that certain indenture dated as of April 18, 2018, by and among certain of the Debtors and the Senior Notes Trustee, as may be amended, supplemented, or otherwise modified from time to time.

"*Senior Notes Trustee*" means UMB Bank, N.A., in its capacity as trustee for the Senior Notes Indenture.

"*Severance Arrangements*" has the meaning set forth in Article IV.Q of the Plan.

"*Superpriority Agreement Agents*" means the Superpriority Revolving Administrative Agent, the Superpriority Collateral Agent and the Superpriority Term Loan Agent.

17

"*Superpriority Collateral Agent*" means Crédit Agricole Corporate and Investment Bank, in its capacity as Collateral Agent under the Superpriority Credit Agreement.

"*Superpriority Credit Agreement*" means that certain superpriority senior secured credit agreement, dated October 21, 2019, between certain of the Debtors as borrowers and guarantors, a syndicate of lenders and letter of credit issuers, the Superpriority Term Loan Agent, and the Superpriority Revolving Administrative Agent, as amended from time to time.

"*Superpriority Facility*" means, collectively, the Superpriority Term Loan Facility and the Superpriority Revolving Facility.

"*Superpriority Letters of Credit*" means the superpriority letters of credit issued under the Superpriority Revolving Facility.

"*Superpriority Revolving Administrative Agent*" means Crédit Agricole Corporate and Investment Bank, in its capacity as administrative agent for the Superpriority Revolving Facility.

"*Superpriority Revolving Facility*" means the superpriority secured letter of credit facility under the Superpriority Credit Agreement.

"*Superpriority Term Loan Agent*" means Barclays Bank PLC in its capacity as administrative agent for the Superpriority Term Loan Facility.

"*Superpriority Term Loan Facility*" means the superpriority secured term loan credit facility under the Superpriority Credit Agreement.

"*Superpriority Term Loans*" means the superpriority term loans issued under and on the terms set forth under the Superpriority Term Loan Facility.

"*Super Senior Exit Facility*" means a 4-year, super senior secured exit facility consisting of a letter of credit facility in an amount of $743 million and the Make Whole Tranche (which Make Whole Tranche will be subordinate in right of payment to the obligations with respect to the letters of credit under the Super Senior Exit Facility on the terms provided therein), on terms satisfactory to the Required Consenting Lenders and set forth in the Definitive Documents to be included in the Plan Supplement.

"*Technology Business Sale*" means a sale of the Lummus Assets and Interests under this Plan, pursuant to the Purchase Agreement, and to be agreed to or consummated by the Debtors on the Effective Date.

"*Technology Business Sale Proceeds*" means Cash proceeds received from the Technology Business Sale, net of (a) the reasonable transaction costs in connection with the Technology Business Sale, (b) taxes paid or reasonably estimated to be payable by the Debtors or Reorganized Debtors as a result of the Technology Business Sale, (c) any debt service payments due under the DIP Credit Agreement which are required to be repaid or otherwise becomes due in connection with the Technology Business Sale, and (d) payment of $210 million of prepetition accounts payable.

"*Technology Business Sale Proceeds Waterfall*" means the distribution waterfall for the Technology Business Sale Proceeds, as described in Article IV.D.3 of this Plan.

"*Term Lenders*" means the lenders under the Term Loan Facility.

"*Term Loan Ad Hoc Group*" means certain institutions comprising the ad hoc group of lenders in respect of the Superpriority Term Loans and the lenders in respect of the Term Loan Facility.

"*Term Loan Ad Hoc Group Advisors*" means Davis Polk & Wardwell LLP, Porter Hedges LLP, Centerview Partners, Inc., Ankura Consulting Group, LLC, and any other local or foreign advisors.

"*Term Loan Administrative Agent*" means Barclays Bank PLC, in its capacity as administrative agent for the Term Loan Facility.

"*Term Loan Claims*" means any Claim for obligations arising under, or relating to, the Term Loan Facility.

"*Term Loan Exit Facility*" means a 5-year senior secured term loan facility in an amount equal to $500 million of take-back debt, ranked *pari passu* with the Roll-Off LC Exit Facility, and otherwise on terms satisfactory to the Required Consenting Lenders, and set forth in Definitive Documents to be included in the Plan Supplement.

"*Term Loan Exit Facility Lenders*" means those lenders party to the Exit Facility Agreement.

"*Term Loans*" means the term loans issued and on the terms set forth under the Term Loan Facility.

"*Term Loan Facility*" means the senior secured term loan facility under the Credit Agreement.

"*Unexpired Lease*" means a lease to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

"*Unimpaired*" means with respect to a Class of Claims or Interests, a Class of Claims or Interests that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

"*Unsecured Claim*" means any Claim that is not a Secured Claim.

"*Voting Deadline*" means, subject to the approval of the Bankruptcy Court, February 19, 2020, or such other date as ordered by the Bankruptcy Court.

B.      *Rules of Interpretation.*

For purposes of this Plan:  (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; *provided* that nothing in this clause (2) shall affect any parties' consent rights over any of the Definitive Documents or any amendments thereto, as provided for in the Restructuring Support Agreement; (3) unless otherwise specified, any reference herein to an existing document, schedule, or exhibit, whether or not Filed, having been Filed or to be Filed shall mean that document, schedule, or exhibit, as it may thereafter be amended, modified, or supplemented in accordance with the Plan or Confirmation Order, as applicable; (4) any reference to an Entity as a holder of a Claim or Interest includes that Entity's successors and assigns; (5) unless otherwise specified, all references herein to "Articles" are references to Articles hereof or hereto; (6) unless otherwise specified, all references herein to exhibits are references to exhibits in the Plan Supplement; (7) unless otherwise specified, the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (8) subject to the provisions of any contract, certificate of incorporation, by-law, instrument, release, or other agreement or document entered into in connection with the Plan, the rights and obligations arising pursuant to the Plan shall be governed by, and construed and enforced in accordance with the applicable federal law, including the Bankruptcy Code and Bankruptcy Rules; (9) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (10) unless otherwise specified herein, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (11) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; (12) all references to docket numbers of documents Filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (13) all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time, and as applicable to the Chapter 11 Cases, unless otherwise stated; (14) the words "include" and "including," and variations thereof, shall not be deemed to be terms of limitation, and shall be deemed to be followed by the words "without limitation"; (15) references to "Proofs of

Claim," "holders of Claims," "Disputed Claims," and the like shall include "Proofs of Interest," "holders of Interests," "Disputed Interests," and the like, as applicable; (16) any immaterial effectuating provisions may be interpreted by the Reorganized Debtors in such a manner that is consistent with the overall purpose and intent of the Plan all without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity; and (17) all references herein to consent, acceptance, or approval may be conveyed by counsel for the respective parties that have such consent, acceptance, or approval rights, including by electronic mail.

C.      *Computation of Time.*

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.  If the date on which a transaction may occur pursuant to the Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day.  Any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable after the Effective Date.

D.      *Governing Law.*

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of New York, without giving effect to the principles of conflict of laws (other than section 5-1401 and section 5-1402 of the New York General Obligations Law), shall govern the rights, obligations, construction, and implementation of the Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control), and corporate governance matters; *provided* that corporate governance matters relating to the Debtors or the Reorganized Debtors, as applicable, not incorporated in New York shall be governed by the laws of the state of incorporation or formation of the relevant Debtor or the Reorganized Debtors, as applicable.

E.      *Reference to Monetary Figures.*

All references in the Plan to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided herein.

F.      *Reference to the Debtors or the Reorganized Debtors.*

Except as otherwise specifically provided in the Plan to the contrary, references in the Plan to the Debtors or the Reorganized Debtors shall mean the Debtors and the Reorganized Debtors, as applicable, to the extent the context requires.

G.      *Controlling Document.*

In the event of an inconsistency between the Plan and the Disclosure Statement, the terms of the Plan shall control in all respects.  In the event of an inconsistency between the Plan and the Plan Supplement, the terms of the relevant provision in the Plan Supplement shall control (unless stated otherwise in such Plan Supplement document or in the Confirmation Order).  In the event of an inconsistency between the Confirmation Order and the Plan, the Confirmation Order shall control.

H.      *Consultation, Information, Notice, and Consent Rights.*

Notwithstanding anything herein to the contrary, any and all consultation, information, notice, and consent rights of the parties to the Restructuring Support Agreement set forth in the Restructuring Support Agreement (including the exhibits thereto) with respect to the form and substance of this Plan, all exhibits to the Plan, and the Plan Supplement, and all other Definitive Documents (as defined in the Restructuring Support Agreement), including any amendments, restatements, supplements, or other modifications to such agreements and documents, and any consents, waivers, or other deviations under or from any such documents, shall be incorporated herein by this reference (including to the applicable definitions in Article I.A hereof) and fully enforceable as if stated in full herein.

Failure to reference the rights referred to in the immediately preceding paragraph as such rights relate to any document referenced in the Restructuring Support Agreement shall not impair such rights and obligations.

## ARTICLE II.
## ADMINISTRATIVE CLAIMS, DIP CLAIMS,
## PRIORITY CLAIMS, AND RESTRUCTURING EXPENSES

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, DIP Claims, Professional Claims, and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III hereof.

A.       *Administrative Claims.*

Unless otherwise agreed to by the holder of an Allowed Administrative Claim and the Debtors or the Reorganized Debtors, as applicable, or otherwise provided for under the Plan or the Restructuring Support Agreement, each holder of an Allowed Administrative Claim (other than holders of Professional Claims and Claims for fees and expenses pursuant to section 1930 of chapter 123 of title 28 of the United States Code) will receive in full and final satisfaction of its Administrative Claim an amount of Cash equal to the amount of such Allowed Administrative Claim in accordance with the following:  (1) if an Administrative Claim is Allowed on or prior to the Effective Date, on the Effective Date or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (2) if such Administrative Claim is not Allowed as of the Effective Date, no later than thirty (30) days after the date on which an order allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; (3) if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claim without any further action by the holders of such Allowed Administrative Claim; (4) at such time and upon such terms as may be agreed upon by such holder and the Debtors or the Reorganized Debtors, as applicable; or (5) at such time and upon such terms as set forth in an order of the Bankruptcy Court.

B.       *DIP Claims.*

As set forth in Article IV.D of this Plan, certain of the Technology Business Sale Proceeds shall be used to pay Allowed DIP Claims (including Allowed DIP Claims with respect to the Make Whole Amount pursuant to the Technology Business Sale Proceeds Waterfall) outstanding on the Effective Date.  Except to the extent that a holder of an Allowed DIP Claim agrees to less favorable treatment, on the Effective Date, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each holder of an Allowed DIP Claim shall receive the following treatment:

(a)       to the extent not paid in full in accordance with the Technology Business Sale Proceeds Waterfall, each holder of an Allowed DIP Term Loan Claim (other than the Make Whole Amount, but including all principal, accrued and unpaid interest, fees and expenses and non-contingent indemnity claims) shall receive payment in full in Cash;

(b)       to the extent not paid in full in accordance with the Technology Business Sale Proceeds Waterfall or the proceeds of the Rights Offering, each holder of an Allowed DIP Term Loan Claim constituting the Make Whole Amount shall receive its Pro Rata share of the term loans arising under the Make Whole Tranche;

(c)       to the extent not paid in full in accordance with the Technology Business Sale Proceeds Waterfall, each holder of an Allowed DIP LC Claim with respect to drawn DIP Letters of Credit that have not been reimbursed in full in Cash as of the Effective Date shall receive payment in full in Cash;

21

(d)     each holder of an Allowed DIP LC Claim (other than in respect of DIP Cash Secured Letters of Credit) shall receive participation in the Super Senior Exit Facility in an amount equal to each such holder's DIP Letter of Credit Facility commitments;

(e)     each holder of a DIP Cash Secured Letter of Credit Claim shall receive participation in the Cash Secured Exit LC Facility in an amount equal to such holder's DIP Cash Secured Letter of Credit Claim; *provided* that any cash collateral in the DIP Cash Secured LC Account (as defined in the DIP Credit Facility Term Sheet) shall collateralize the Cash Secured LC Exit Facility; and

(f)     all DIP Hedging Obligations shall be rolled into and deemed incurred under the Super Senior Exit Facility.

To the extent the Funded DIP Indebtedness is repaid in full prior to the Effective Date, the Debtors shall not make any payments to trade vendors for penalty interest payments (excluding, for the avoidance of doubt, customary liquidated damages to customers) unless such payments had otherwise been specified in the Approved Budget (as defined in the DIP Credit Agreement) or authorized pursuant to the DIP Financing Orders.

*C.     Professional Claims.*

1.     Final Fee Applications and Payment of Professional Claims.

All requests for payment of Professional Claims for services rendered and reimbursement of expenses incurred prior to the Confirmation Date must be Filed no later than 45 days after the Effective Date. The Bankruptcy Court shall determine the Allowed amounts of such Professional Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Court. The Reorganized Debtors shall pay Professional Claims in Cash in the amount the Bankruptcy Court allows, including from the Professional Escrow Account, which the Reorganized Debtors will establish in trust for the Professionals and fund with Cash equal to the Professional Amount on the Effective Date.

2.     Professional Escrow Account.

On the Effective Date, the Reorganized Debtors shall, in consultation with the Required Consenting Lenders, establish and fund the Professional Escrow Account with Cash equal to the Professional Amount, which shall be funded by the Reorganized Debtors. The Professional Escrow Account shall be maintained in trust solely for the Professionals. Such funds shall not be considered property of the Estates of the Debtors or the Reorganized Debtors. The amount of Allowed Professional Claims shall be paid in Cash to the Professionals by the Reorganized Debtors from the Professional Escrow Account as soon as reasonably practicable after such Professional Claims are Allowed. When such Allowed Professional Claims have been paid in full, any remaining amount in the Professional Escrow Account shall promptly be paid to the Reorganized Debtors without any further action or order of the Bankruptcy Court.

3.     Professional Amount.

Professionals shall reasonably estimate their unpaid Professional Claims and other unpaid fees and expenses incurred in rendering services to the Debtors before and as of the Effective Date, and shall deliver such estimate to the Debtors no later than five days before the Effective Date; *provided* that such estimate shall not be deemed to limit the amount of the fees and expenses that are the subject of each Professional's final request for payment in the Chapter 11 Cases. If a Professional does not provide an estimate, the Debtors or Reorganized Debtors may estimate the unpaid and unbilled fees and expenses of such Professional.

4.     Post-Confirmation Fees and Expenses.

Except as otherwise specifically provided in the Plan, from and after the Confirmation Date, the Debtors shall, in the ordinary course of business and without any further notice to or action, order, or approval of the

Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses related to implementation of the Plan and Consummation incurred by the Debtors. Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Debtors may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

D.      *Priority Tax Claims.*

Except to the extent that a holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.

E.      *Payment of Restructuring Expenses, Consent Fee.*

The Restructuring Expenses incurred, or estimated to be incurred, up to and including the Effective Date, and noteholder consent fees payable under Section 12 of the Restructuring Support Agreement payable in Cash, which, for the avoidance of doubt, shall include the Noteholder Consent Fee (as defined in the Restructuring Support Agreement), shall be paid in full in Cash on the Effective Date or as reasonably practicable thereafter (to the extent not previously paid during the course of the Chapter 11 Cases) in accordance with, and subject to, the terms of the Restructuring Support Agreement, without any requirement to file a fee application with the Bankruptcy Court, without the need for itemized time detail, or without any requirement for Bankruptcy Court review or approval. All Restructuring Expenses and Cash consent fees to be paid on the Effective Date shall be estimated prior to and as of the Effective Date and such estimates shall be delivered to the Debtors at least two (2) Business Days before the anticipated Effective Date; *provided* that such estimates shall not be considered an admission or limitation with respect to such Restructuring Expenses. On or as soon as practicable after the Effective Date, final invoices for all Restructuring Expenses incurred prior to and as of the Effective Date shall be submitted to the Debtors. In addition, the Debtors and the Reorganized Debtors (as applicable) shall continue to pay pre- and post-Effective Date, when due Restructuring Expenses related to implementation, consummation, and defense of the Plan, whether incurred before, on, or after the Effective Date.

## ARTICLE III.
## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

A.      *Classification of Claims and Interests.*

This Plan constitutes a separate Plan proposed by each Debtor. Except for the Claims addressed in Article II hereof, all Claims and Interests are classified in the Classes set forth below in accordance with sections 1122 and 1123(a)(1) of the Bankruptcy Code. A Claim or an Interest, or any portion thereof, is classified in a particular Class only to the extent that any portion of such Claim or Interest fits within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest fits within the description of such other Classes. A Claim or an Interest also is classified in a particular Class for the purpose of receiving distributions under the Plan only to the extent that such Claim or Interest is an Allowed Claim or Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

The classification of Claims and Interests against the Debtors pursuant to the Plan is as follows:

| Class | Claims and Interests | Status | Voting Rights |
|-------|---------------------|--------|---------------|
| Class 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 3 | Other Prepetition Financing Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |

| Class | Claims and Interests | Status | Voting Rights |
|-------|---------------------|--------|---------------|
| Class 4 | Bilateral Facility Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 5 | 2021 Letter of Credit Claims | Impaired | Entitled to Vote |
| Class 6A | 2023 Letter of Credit Claims | Impaired | Entitled to Vote |
| Class 6B | Revolving Credit Claims | Impaired | Entitled to Vote |
| Class 6C | Term Loan Claims | Impaired | Entitled to Vote |
| Class 6D | Credit Agreement Hedging Claims | Impaired | Entitled to Vote |
| Class 7 | Cash Secured Letter of Credit Claims | Impaired | Entitled to Vote |
| Class 8 | Lloyds Letter of Credit Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 9 | Senior Notes Claims | Impaired | Entitled to Vote |
| Class 10 | General Unsecured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 11 | Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept or Deemed to Reject) |
| Class 12 | Existing Equity Interests Other Than in McDermott | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept or Deemed to Reject) |
| Class 13 | Existing Preferred Equity Interests in McDermott | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 14 | Existing Common Equity Interests in McDermott | Impaired | Not Entitled to Vote (Deemed to Reject) |

B.      *Treatment of Claims and Interests.*

Each holder of an Allowed Claim or Allowed Interest, as applicable, shall receive under the Plan the treatment described below in full and final satisfaction, settlement, release, and discharge of and in exchange for such holder's Allowed Claim or Allowed Interest, except to the extent different treatment is agreed to by the Reorganized Debtors and the holder of such Allowed Claim or Allowed Interest, as applicable. Unless otherwise indicated, the holder of an Allowed Claim or Allowed Interest, as applicable, shall receive such treatment on the Effective Date or as soon as reasonably practicable thereafter. The Claims in Classes 5, 6A, 6B, 6C, 6D, and 7 shall be Allowed to the extent provided in the DIP Financing Orders.

1.    <u>Class 1 – Other Secured Claims</u>

(a)      *Classification*: Class 1 consists of all Other Secured Claims.

(b)      *Treatment*: Each holder of an Allowed Other Secured Claim shall receive, at the option of the applicable Debtor:

(i)      payment in full in Cash of its Allowed Other Secured Claim;

(ii)      the collateral securing its Allowed Other Secured Claim;

(iii)      Reinstatement of its Allowed Other Secured Claim; or

(iv)     such other treatment that renders its Allowed Other Secured Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code.

(c)     *Voting*:  Class 1 is Unimpaired under the Plan.  Holders of Other Secured Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, such holders are not entitled to vote to accept or reject the Plan.

2.    <u>Class 2 – Other Priority Claims</u>

(a)     *Classification*:  Class 2 consists of all Other Priority Claims.

(b)     *Treatment*:  Each holder of an Allowed Other Priority Claim shall receive payment in full in Cash.

(c)     *Voting*:  Class 2 is Unimpaired under the Plan.  Holders of Other Priority Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, such holders are not entitled to vote to accept or reject the Plan.

3.    <u>Class 3 – Other Prepetition Financing Claims</u>

(a)     *Classification*:  Class 3 consists of all Other Prepetition Financing Claims.

(b)     *Treatment*:  Each Allowed Other Prepetition Financing Claim shall be Reinstated.

(c)     *Voting:* Class 3 is Unimpaired under the Plan.  Holders of Other Prepetition Financing Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, such holders are not entitled to vote to accept or reject the Plan.

4.    <u>Class 4 – Bilateral Facility Claims</u>

(a)     *Classification*:  Class 4 consists of all Bilateral Facility Claims.

(b)     *Treatment*:  Each Allowed Bilateral Facility Claim shall be Reinstated.

(c)     *Voting*:  Class 4 is Unimpaired under the Plan.  Holders of Bilateral Facility Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, such holders are not entitled to vote to accept or reject the Plan.

5.    <u>Class 5 – 2021 Letter of Credit Claims</u>

(a)     *Classification:*  Class 5 consists of all 2021 Letter of Credit Claims.

(b)     *Treatment*:  Each holder of an Allowed 2021 Letter of Credit Claim shall receive:

(i)     with respect to any 2021 Letter of Credit Claims on account of unfunded 2021 Letters of Credit, participation in the Roll-Off LC Exit Facility in an amount equal to each such holder's participation in any such unfunded 2021 Letters of Credit,

(ii)     with respect to any 2021 Letter of Credit Claims on account of funded 2021 Letters of Credit, its Secured Creditor Pro Rata Share of the Secured Creditor Funded Debt Distribution, and

(iii) payment in full in Cash of any amounts accrued and unpaid as of the Petition Date due to such holder of an Allowed 2021 Letter of Credit Claim pursuant to Section 2.15 of the 2021 LC Agreement.

(c) *Voting:* Class 5 is Impaired under the Plan.  Holders of 2021 Letter of Credit Claims are entitled to vote to accept or reject the Plan.

6. Class 6A – 2023 Letter of Credit Claims

 (a) *Classification:* Class 6A consists of all 2023 Letter of Credit Claims.

 (b) *Treatment*: Each holder of an Allowed 2023 Letter of Credit Claim shall receive:

  (i) with respect to any 2023 Letter of Credit Claims on account of unfunded 2023 Letters of Credit, participation in the Roll-Off LC Exit Facility in an amount equal to each such holder's participation in any such unfunded 2023 Letters of Credit,

  (ii) with respect to any 2023 Letter of Credit Claims on account of funded 2023 Letters of Credit, its Secured Creditor Pro Rata Share of the Secured Creditor Funded Debt Distribution, and

  (iii) payment in full in Cash of any amounts accrued and unpaid as of the Petition Date due to such holder of an Allowed 2023 Letter of Credit Claim pursuant to Section 2.15 of the Credit Agreement.

 (c) *Voting:* Class 6A is Impaired under the Plan.  Holders of 2023 Letter of Credit Claims are entitled to vote to accept or reject the Plan.

7. Class 6B – Revolving Credit Claims

 (a) *Classification:* Class 6B consists of all Revolving Credit Claims.

 (b) *Allowed Amount:* As of the Effective Date, the Revolving Credit Claims shall be Allowed and deemed to be Allowed Claims in the full amount outstanding under the Revolving Credit Facility, including all principal, accrued and unpaid interest at the applicable default rate, and all accrued and unpaid fees, expenses, and noncontingent indemnity payable under the Revolving Credit Facility and the DIP Financing Orders.

 (c) *Treatment*: Each holder of an Allowed Revolving Credit Claim shall receive:

  (i) with respect to any Revolving Credit Claims on account of unfunded Revolving LCs, participation in the Roll-Off LC Exit Facility in an amount equal to each such holder's participation in any such unfunded Revolving LCs,

  (ii) with respect to any Revolving Credit Claims on account of (x) Revolving Loans or (y) funded Revolving LCs, its Secured Creditor Pro Rata Share of the Secured Creditor Funded Debt Distribution, and

  (iii) payment in full in Cash of any amounts accrued and unpaid as of the Petition Date due to such holder of an Allowed Revolving Credit Claim pursuant to Section 2.15 of the Credit Agreement.

 (d) *Voting:* Class 6B is Impaired under the Plan.  Holders of Revolving Credit Claims are entitled to vote to accept or reject the Plan.

8.   <u>Class 6C – Term Loan Claims</u>

    (a)     *Classification*:  Class 6C consists of all Term Loan Claims.

    (b)     *Allowed Amount*: As of the Effective Date, the Term Loan Claims shall be Allowed and deemed to be Allowed Claims in the full amount outstanding under the Term Loan Facility, including all principal, accrued and unpaid interest at the applicable default rate, and all accrued and unpaid fees, expenses, and noncontingent indemnity payable under the Term Loan Facility and the DIP Financing Orders.

    (c)     *Treatment*:  Each holder of an Allowed Term Loan Claim shall receive its Secured Creditor Pro Rata Share of the Secured Creditor Funded Debt Distribution.

    (d)     *Voting*:  Class 6C is Impaired under the Plan.  Holders of Term Loan Claims are entitled to vote to accept or reject the Plan.

9.   <u>Class 6D – Credit Agreement Hedging Claims</u>

    (a)     *Classification*:  Class 6D consists of all Credit Agreement Hedging Claims.

    (b)     *Treatment*:  Each holder of an Allowed Credit Agreement Hedging Claim that remains unpaid as of the Effective Date shall receive for any Allowed Credit Agreement Hedging Claims such holder's Secured Creditor Pro Rata Share of the Secured Creditor Funded Debt Distribution.

    (c)     *Voting*:  Class 6D is Impaired under the Plan.  Holders of Credit Agreement Hedging Claims are entitled to vote to accept or reject the Plan.

10.   <u>Class 7 – Cash Secured Letter of Credit Claims</u>

    (a)     *Classification:*  Class 7 consists of all Cash Secured Letter of Credit Claims.

    (b)     *Treatment*:  Each holder of an Allowed Cash Secured Letter of Credit Claim outstanding as of such date shall:

        (i)     be deemed to reissue its Cash Secured Letters of Credit under the Cash Secured LC Exit Facility which shall be secured by the same cash collateral which secured the Cash Secured Letters of Credit prior to the Petition Date, and

        (ii)     receive payment in full in Cash of any amounts accrued and unpaid as of the Petition Date due to such holder of an Allowed Cash Secured Letter of Credit Claim pursuant to Section 2.15 of the Credit Agreement.

    (c)     *Voting:*  Class 7 is Impaired under the Plan.  Holders of Cash Secured Letter of Credit Claims are entitled to vote to accept or reject the Plan.

11.   <u>Class 8 – Lloyds Letter of Credit Claims</u>

    (a)     *Classification:*  Class 8 consists of all Lloyds Letter of Credit Claims.

    (b)     *Treatment*:  Each holder of an Allowed Lloyds Letter of Credit Claim shall:

        (i)     be deemed to issue on the Effective Date its Lloyds Letters of Credit under the Lloyds LC Exit Facility, which from and after the Effective Date shall be secured on a senior and exclusive basis by the cash collateral held by Lloyds LC Bank

and/or its affiliates that secured the Lloyds Letters of Credit as of the Effective Date and any standby letters of credit supporting the Lloyds Letters of Credit as of the Effective Date; *provided* that the cash collateral and/or standby letters of credit, as applicable, securing the Lloyds LC Exit Facility shall be reduced and/or released, as applicable, dollar-for-dollar upon the reduction, expiration, or termination of any Lloyds Letter of Credit in accordance with its terms from and after the Effective Date and upon any such release the applicable cash collateral shall become collateral securing the obligations of the Reorganized Debtors under the Exit Facilities;

(ii)     with respect to any Lloyds Letter of Credit Claims on account of funded Lloyds Letters of Credit, receive payment in full in Cash of such amounts from cash collateral and/or standby letters of credit which secure the Lloyds Letters of Credit, and

(iii)    receive payment in full in Cash of any amounts accrued and unpaid as of the Effective Date due to such holder of an Allowed Lloyds Letter of Credit Claim pursuant to Section 1, Section 2(b), and Section 6 of the Lloyds Letter of Credit Agreement.

(c)    *Voting:* Class 8 is Unimpaired under the Plan.  Holders of Lloyds Letter of Credit Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, such holders are not entitled to vote to accept or reject the Plan.

12.   Class 9 – Senior Notes Claims

(a)    *Classification*:  Class 9 consists of all Senior Notes Claims.

(b)    *Allowed Amount*: As of the Effective Date, the Senior Notes Claims shall be Allowed and deemed to be Allowed Claims in the principal amount outstanding under the Senior Notes, together with all accrued but unpaid interest as of the Petition Date.

(c)    *Treatment*:  Each holder of an Allowed Senior Notes Claim shall receive its pro rata share of:

(i)     6% of the New Common Stock, plus additional shares of New Common Stock as a result of the Prepetition Funded Secured Claims Excess Cash Adjustment, subject to dilution on account of the New Warrants and the Management Incentive Plan; and

(ii)    the New Warrants.

(d)    *Voting:* Class 9 is Impaired under the Plan.  Holders of Senior Notes Claims are entitled to vote to accept or reject the Plan.

13.   Class 10 – General Unsecured Claims

(a)    *Classification:* Class 10 consists of all General Unsecured Claims.

(b)    *Treatment:* Each holder of an Allowed General Unsecured Claim shall receive, at the option of the applicable Debtor:

(i)     payment in full in Cash; or

        (ii)      Reinstatement.

(c)    *Voting:* Class 10 is Unimpaired under the Plan.  Holders of General Unsecured Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, such holders are not entitled to vote to accept or reject the Plan.

14.  <u>Class 11 – Intercompany Claims</u>

(a)    *Classification*:  Class 11 consists of all Intercompany Claims.

(b)    *Treatment*:  Each Allowed Intercompany Claim shall be, at the option of the applicable Debtor (with the consent of the Required Consenting Lenders), either:

        (i)      Reinstated;

        (ii)      canceled, released, and extinguished, and will be of no further force or effect; or

        (iii)      otherwise addressed at the option of each applicable Debtor such that holders of Intercompany Claims will not receive any distribution on account of such Intercompany Claims.

(c)    *Voting*:  Class 11 is conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code or rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Class 11 is not entitled to vote to accept or reject the Plan.

15.  <u>Class 12 – Existing Equity Interests Other Than in McDermott</u>

(a)    *Classification*:  Class 12 consists of all Existing Equity Interests Other Than in McDermott.

(b)    *Treatment:*  Each Existing Equity Interests Other Than in McDermott shall be, at the option of the applicable Debtor, either:

        (i)      Reinstated;

        (ii)      canceled, released, and extinguished, and will be of no further force or effect; or

        (iii)      otherwise addressed at the option of each applicable Debtor such that holders of Existing Equity Interests Other Than in McDermott will not receive any distribution on account of such Existing Equity Interests Other Than in McDermott.

(c)    *Voting*:  Class 12 is conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code or rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Class 12 is not entitled to vote to accept or reject the Plan.

16.  <u>Class 13 – Existing Preferred Equity Interests</u>

(a)    *Classification*:  Class 13 consists of all Existing Preferred Equity Interests.

(b)    *Treatment:*  Holders of Existing Preferred Equity Interests will not receive any distribution on account of such Interests, which will be canceled, released, and extinguished as of the Effective Date, and will be of no further force or effect.

(c)    *Voting*:  Class 13 is conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Class 13 is not entitled to vote to accept or reject the Plan.

17.   <u>Class 14 – Existing Common Equity Interests</u>

(a)    *Classification*:  Class 14 consists of all Existing Common Equity Interests.

(b)    *Treatment*:  Holders of Existing Common Equity Interests will not receive any distribution on account of such Interests, which will be canceled, released, and extinguished as of the Effective Date, and will be of no further force or effect.

(c)    *Voting*:  Class 14 is conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Class 14 is not entitled to vote to accept or reject the Plan.

C.    *Special Provision Governing Unimpaired Claims.*

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtors' or the Reorganized Debtors' rights regarding any Unimpaired Claim, including, all rights regarding legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claim.

D.    *Elimination of Vacant Classes.*

Any Class of Claims or Interests that does not have a holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

E.    *Voting Classes, Presumed Acceptance by Non-Voting Classes.*

If a Class contains Claims or Interests eligible to vote and no holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the holders of such Claims or Interests in such Class shall be deemed to have accepted the Plan.

F.    *Intercompany Interests.*

To the extent Reinstated under the Plan, distributions on account of Intercompany Interests are not being received by holders of such Intercompany Interests on account of their Intercompany Interests but for the purposes of administrative convenience and due to the importance of maintaining the prepetition corporate structure for the ultimate benefit of the holders of New Common Stock, and in exchange for the Debtors' and Reorganized Debtors' agreement under the Plan to make certain distributions to the holders of Allowed Claims.

G.    *Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code.*

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by one or more of the Classes entitled to vote pursuant to Article III.B of the Plan. The Debtors reserve the right, subject to the prior consent of the Required Consenting Lenders, which shall not be unreasonably withheld,  to modify the Plan in accordance with Article X hereof and the Restructuring Support Agreement to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules.

H.      *Controversy Concerning Impairment.*

If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

I.      *Subordinated Claims.*

The allowance, classification, and treatment of all Allowed Claims and Allowed Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.  Any such contractual, legal, or equitable subordination rights shall be settled, compromised, and released pursuant to the Plan.

## ARTICLE IV.
## MEANS FOR IMPLEMENTATION OF THE PLAN

A.      *General Settlement of Claims and Interests.*

As discussed in detail in the Disclosure Statement and as otherwise provided herein, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims and Interests and controversies resolved pursuant to the Plan, including (1) any challenge to the amount, validity, perfection, enforceability, priority or extent of the DIP Claims, Superpriority Term Loan Claims, Superpriority Revolving Facility Claims, 2021 Letter of Credit Claims, 2023 Letter of Credit Claims, Revolving Credit Claims, Term Loan Claims, Cash Secured Letter of Credit Claims, Credit Agreement Hedging Claims, and Senior Notes Claims and (2) any claim to avoid, subordinate, or disallow any DIP Claims, Superpriority Term Loan Claims, Superpriority Revolving Facility Claims, 2021 Letter of Credit Claims, 2023 Letter of Credit Claims, Revolving Credit Claims, Term Loan Claims, Cash Secured Letter of Credit Claims, Credit Agreement Hedging Claims, and Senior Notes Claims, whether under any provision of chapter 5 of the Bankruptcy Code, on any equitable theory (including equitable subordination, equitable disallowance, or unjust enrichment) or otherwise.  The Plan shall be deemed a motion to approve the good faith compromise and settlement of all such Claims, Interests, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable and in the best interests of the Debtors and their Estates.  Subject to Article VI hereof, all distributions made to holders of Allowed Claims and Allowed Interests (as applicable) in any Class are intended to be and shall be final.

B.      *Restructuring Transactions.*

On or before the Effective Date, the applicable Debtors or the Reorganized Debtors shall enter into and shall take any actions as may be necessary or appropriate to effect the Restructuring Transactions, including as set forth in the Restructuring Transactions Memorandum.  The actions to implement the Restructuring Transactions may include: (1) the execution and delivery of appropriate agreements or other documents of merger, amalgamation, consolidation, restructuring, conversion, disposition, transfer, arrangement, continuance, dissolution, sale, purchase, or liquidation containing terms that are consistent with the terms of the Plan and that satisfy the applicable requirements of applicable law and any other terms to which the applicable Entities may agree; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable parties agree; (3) the filing of appropriate certificates or articles of incorporation, formation, reincorporation, merger, consolidation, conversion, amalgamation, arrangement, continuance, or dissolution pursuant to applicable state or provincial law; and (4) all other actions that the applicable Entities determine to be necessary, including making filings or recordings that may be required by applicable law in connection with the Plan.  The Confirmation Order shall, and shall be deemed to, pursuant to sections 363 and 1123 of the Bankruptcy Code, authorize, among other things, all actions as

may be necessary or appropriate to effect any transaction described in, contemplated by, or necessary to effectuate the Plan. On the Effective Date or as soon as reasonably practicable thereafter, the Reorganized Debtors, as applicable, shall issue all securities, notes, instruments, certificates, and other documents required to be issued pursuant to the Restructuring Transactions.

C.      *Reorganized Debtors.*

On the Effective Date, the New Board shall be established, and the Reorganized Debtors shall adopt their New Organizational Documents. The Reorganized Debtors shall be authorized to adopt any other agreements, documents, and instruments and to take any other actions contemplated under the Plan as necessary to consummate the Plan. Cash payments to be made pursuant to the Plan will be made by the Debtors or Reorganized Debtors. The Debtors and Reorganized Debtors will be entitled to transfer funds between and among themselves as they determine to be necessary or appropriate to enable the Debtors or Reorganized Debtors, as applicable, to satisfy their obligations under the Plan. Except as set forth herein, any changes in intercompany account balances resulting from such transfers will be accounted for and settled in accordance with the Debtors' historical intercompany account settlement practices and will not violate the terms of the Plan.

From and after the Effective Date, the Reorganized Debtors, subject to any applicable limitations set forth in any post-Effective Date agreement, shall have the right and authority without further order of the Bankruptcy Court to raise additional capital and obtain additional financing, subject to the New Organizational Documents and the Exit Facility Documents, as the boards of directors of the applicable Reorganized Debtors deem appropriate.

D.      *Technology Business Sale.*

    1.      Technology Business Sale Process.

Following the Petition Date, in consultation with the Consultation Parties (as defined in the Bidding Procedures), the Debtors shall continue their sale and marketing process and solicit bids for the sale or other disposition of all or substantially all of the Technology Business Sale, in accordance with the terms and conditions of the Restructuring Support Agreement (including the Milestones (as defined in the Restructuring Support Agreement)) and in a manner acceptable to the Required Consenting Lenders. For the avoidance of doubt, the Debtors may only execute an agreement for the sale or other disposition of any part of the Technology Business with the consent of the Required Consenting Lenders.

The Consultation Parties shall have the right to review all information, diligence, documents and other materials provided by the Debtors or their advisors to any bidder or prospective bidder in connection with the Technology Business Sale and to consult with the Debtors and their advisors with respect to the Technology Business Sale. The Debtors shall provide to the Consultation Parties all term sheets, letters, proposals, offers, bids and other materials, whether non-binding or not, that are received by the Debtors or their advisors in connection with the Technology Business Sale within one (1) day of receipt by the Debtors or their advisors, as applicable.

    2.      Closing of the Technology Business Sale.

On or before the Effective Date, the Debtors shall be authorized to consummate the Technology Business Sale and, among other things, the Lummus Assets and Interests (including Executory Contracts and Unexpired Leases assumed and assigned pursuant to Article V hereof) shall be transferred to and vest in the Purchaser free and clear of all Liens, Claims, charges, or other encumbrances pursuant to the terms of the Purchase Agreement and, as applicable, in accordance with the DIP Credit Agreement, the Confirmation Order or an order approving the Technology Business Sale; *provided* that, to the extent the Technology Business Sale is to be consummated pursuant to the Confirmation Order, the Debtors may request entry of any order supplementing the Confirmation Order that the Debtors believe is necessary or appropriate to implement the terms and conditions of the Technology Business Sale. On and after the Effective Date, except as otherwise provided in the Plan, the Debtors or the Purchaser, as applicable, may operate the Debtors' businesses and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action, in each case relating to the Lummus Assets and Interests, without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

3. <u>Technology Business Sale Proceeds Waterfall.</u>

On the Effective Date, any Technology Business Sale Proceeds that have not otherwise been applied in accordance with the DIP Credit Agreement shall be applied as follows:

(a) first, to fund the minimum Cash balance of $820 million, as required by the Business Plan;

(b) second, to repay Funded DIP Indebtedness (other than the Make Whole Amount);

(c) third, payment of the Make Whole Amount; and

(d) fourth, to fund cash to support new or additional letters of credit sufficient to meet the $2.44 billion letter of credit capacity contemplated by the Exit Facilities Term Sheet; and

(e) fifth, the repayment of Prepetition Funded Secured Claims on a Pro Rata basis.

4. <u>Residual Prepetition Funded Secured Claims Pay Down.</u>

On the Effective Date, the Prepetition Funded Secured Claims will be repaid on a pro rata basis from (i) the Residual Technology Business Sale Proceeds and (ii) any available Cash (such available Cash shall exclude Cash held in variable interest entities associated with joint venture and consortium arrangements, Cash trapped in foreign jurisdictions, and insurance captive Cash) in excess of $820 million available cash at emergence after payment of all fees and transaction expenses ((i) and (ii) together the "<u>Residual Prepetition Funded Secured Claims Pay Down</u>").

If the Residual Prepetition Funded Secured Claims Pay Down amount is greater than $0, the initial allocation of 94% of the New Common Stock to the holders of Prepetition Funded Secured Claims shall be reduced, and the initial allocation of 6% of the New Common Stock to holders of Senior Notes Claim shall be increased, by the percentage calculated by dividing:

(a) the Residual Prepetition Funded Secured Claims Pay Down amount by

(b) an amount equal to:

(i) the aggregate amount of Prepetition Funded Secured Claims (including, without limitation, principal and any accrued prepetition or postpetition interest at the default rate as applicable) minus an amount equal to the sum of (y) the aggregate amount of the loans to be issued under the Term Loan Exit Facility and (z) any proceeds of the Rights Offering up to $150 million; divided by

(ii) 94% minus an amount equal to (y) the aggregate proceeds of the Rights Offering up to $150 million divided by (z) Plan Equity Value

(such adjustment of initial allocations, the "<u>Prepetition Funded Secured Claims Excess Cash Adjustment</u>").

For the avoidance of doubt, if the Technology Business Sale Proceeds paid pursuant to the Technology Business Sale Proceeds Waterfall have not paid the Make Whole Amount in full, all proceeds of the Rights Offering will (a) first go to the pay down of the Make Whole Amount and (b) once the Make Whole Amount is paid in full, the Prepetition Funded Secured Claims will be repaid on a pro rata basis from such remaining proceeds of the Rights Offering.

E. *Pipes Business Sale.*

Following the Confirmation Date, the Debtors shall be authorized to consummate the Pipes Business Sale with the consent of the Required Consenting Lenders pursuant to the terms of the Pipes Business Sale Documents, the DIP Credit Agreement, the Plan, and the Confirmation Order. Pursuant to the consummation of the Pipes Business

Sale, the Debtors shall, among other things, transfer all or part of the Pipes Interests to the Pipes Buyers free and clear of all Liens, Claims, Interests, charges, and other encumbrances (other than any assumed liabilities) pursuant to sections 363, 365, and/or 1123 of the Bankruptcy Code, this Plan, and the Confirmation Order; *provided* that all Liens, Claims, Interests, charges and other encumbrances on Pipes Interests securing any obligations of the Debtors prior to the closing of the Pipes Business Sale shall attach to the proceeds of the Pipes Business Sale, in the order of their priority, with the same validity, force, and effect, if any, which they had against such Pipes Interests prior to the closing of the Pipes Business Sale.  The proceeds of the Pipes Business Sale shall be applied (i) prior to the Effective Date, in accordance with the DIP Credit Agreement; and (ii) on the Effective Date, including to the extent any Pipes Business Sale proceeds were applied as cash collateral securing the DIP Letters of Credit in accordance with the DIP Credit Agreement, to fund Cash to the Debtors' balance sheet to satisfy the conditions precedent for emergence under Article IX.A of the Plan.

Pursuant to Article IX hereof, if the conditions precedent to the closing of the Pipes Business Sale shall have been satisfied in accordance with the Pipes Business Sale Documents (as approved by the Required Consenting Lenders), then the conditions set forth in Article IX (other than in Article IX.A.b) shall be deemed automatically waived with respect to the Pipes Entities without notice, leave, or order of the Bankruptcy Court, or any further action by the Debtors, the Reorganized Debtors, or any Consenting Stakeholder.  Notwithstanding anything to the contrary herein, upon the closing of the Pipes Business Sale, (x) the Pipes Entities shall not retain any liability arising out of or in connection with (i) Professional Claims incurred by the Pipes Entities prior to the closing of the Pipes Business Sale or the funding of the Professional Fee Escrow, (ii) Restructuring Expenses and any consent fees, (iii) the Restructuring Support Agreement and any fees or obligations thereunder, (iv) the Exit Facilities or the Lloyds LC Exit Facility, (v) the DIP Cash Secured Letter of Credit Claims or the DIP Claims, and (iv) any adequate protection claims under the DIP Financing Orders, Bankruptcy Code § 507(b), or otherwise; (y) any consent or consultation rights in the Restructuring Support Agreement, the Plan, or the Confirmation Order of any Person or Entity other than the Pipes Entities as Reorganized Debtors shall not be enforceable against or apply to the Pipes Entities; and (z) the Pipes Interests shall be Reinstated pursuant to Article III of the Plan.

F.      *Sources of Consideration for Plan Distributions.*

The Debtors and the Reorganized Debtors, as applicable, shall fund distributions under the Plan with: (1) Cash on hand, including Cash from operations, and the proceeds of the Rights Offering, the Technology Business Sale (in accordance with the Technology Business Sale Proceeds Waterfall) and the Pipes Business Sale, as applicable; (2) the New Common Stock; (3) the New Warrants; and (4) the distributions under the Exit Facilities, as applicable.

1.      Exit Facilities.

On the Effective Date, the Reorganized Debtors shall enter into the Exit Facilities (the terms of which will be set forth in the Exit Facility Documents).

To the extent applicable, Confirmation of the Plan shall be deemed (a) approval of the Exit Facilities (including the transactions and related agreements contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred and fees and expenses to be paid by the Debtors or the Reorganized Debtors, as applicable, in connection therewith), to the extent not approved by the Bankruptcy Court previously, and (b) authorization for the Debtors or the Reorganized Debtors, as applicable, to, without further notice to or order of the Bankruptcy Court, (i) execute and deliver those documents and agreements necessary or appropriate to pursue or obtain the Exit Facilities, including the Exit Facility Documents, and incur and pay any fees and expenses in connection therewith, and (ii) act or take action under applicable law, regulation, order, or rule or vote, consent, authorization, or approval of any Person, subject to such modifications as the Debtors or the Reorganized Debtors, as applicable, may deem to be necessary to consummate the Exit Facilities.

Notwithstanding anything in the Plan or the Confirmation Order to the contrary: (x) on the Effective Date, the cash collateral securing the Cash Secured Letters of Credit outstanding under the Credit Agreement and the cash collateral securing the DIP Credit Facility shall be transferred to the collateral agent in respect of the Exit Facilities for the benefit of the secured parties in respect of the Cash Secured LC Exit Facility on a first-priority basis and the secured parties in respect of the other Exit Facilities as set forth in the Exit Facility Documents; and (y) all Liens securing the Debtors' obligations under the DIP Credit Agreement, the Superpriority Credit Agreement, the Credit Agreement, and the 2021 LC Agreement: (i) shall be unaltered by the Plan, (ii) except as otherwise provided in the

Confirmation Order regarding the release of Liens over Lummus Assets and Interest and the Pipes Interests upon consummation of the Technology Business Sale and the Pipes Business Sale, shall continue and remain attached to the property of the Reorganized Debtors and their Affiliates after the Effective Date to the same extent such Liens were attached to the property of the Debtors prior to the Effective Date, and (iii) shall be deemed assigned on the Effective Date to the collateral agent in respect of the Exit Facilities for the benefit of the secured parties in respect of the Exit Facilities (other than the Cash Secured LC Exit Facility) to secure the joint and several obligations of the Reorganized Debtors under the Exit Facilities as set forth in the Exit Facility Documents; *provided* that (a) such Liens shall not secure the Lloyds LC Exit Facility as of the Effective Date and (b) on and after the Effective Date, the granting, attachment, perfection, priority, and continuation of such Liens shall be governed by the terms of the Exit Facilities.

As of the Effective Date, upon the granting or continuation of Liens in accordance with the Plan and the Exit Facility Documents, such Liens shall constitute valid, binding, enforceable, and automatically perfected Liens in the collateral specified in the Exit Facility Documents. The Exit Facility Agents or holder(s) of Liens under the Exit Facility Documents are authorized to file with the appropriate authorities mortgages, financing statements, and other documents, and to take any other action in order to evidence, validate, and perfect such Liens or security interests. The guarantees, mortgages, pledges, Liens, and other security interests granted to secure the obligations arising under the Exit Facility Documents have been granted in good faith, for legitimate business purposes, and for reasonably equivalent value as an inducement to the lenders thereunder to extend credit thereunder and shall be deemed not to constitute a fraudulent conveyance or fraudulent transfer and shall not otherwise be subject to avoidance, recharacterization, or subordination for any purposes whatsoever and shall not constitute preferential transfers or fraudulent conveyances under the Bankruptcy Code or any applicable nonbankruptcy law, and the priorities of such Liens and security interests shall be as set forth in the Exit Facility Documents. The Reorganized Debtors and the persons and entities granted such Liens and security interests shall be authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, federal, or other law that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

In no event shall the sum of (v) the face amount of letters of credit issued and outstanding at any time under the Senior Exit LC Facility, plus (w) the face amount of letters of credit issued and outstanding at any time under the Super Senior Exit Facility, plus (x) the face amount of letters of credit issued or deemed issued and outstanding at any time under the Roll-Off LC Exit Facility, plus (y) the face amount of letters of credit issued and outstanding at any time under the Cash Secured LC Exit Facility, plus (z) the face amount of letters of credit issued or deemed issued and outstanding at any time under the Lloyds LC Exit Facility, exceed the Secured Letter of Credit Cap plus permitted incremental capacity set forth in the Exit Facilities Term Sheet.

2.    Issuance of New Common Stock.

The issuance of the New Common Stock, including the Rights Offering Shares and any options or other equity awards, if any, reserved for the Management Incentive Plan and the New Warrants (including the New Common Stock that may be issuable upon exercise of the New Warrants), by the Reorganized Debtors (as set forth in the Restructuring Transactions Memorandum) shall be authorized without the need for any further corporate action or without any further action by the holders of Claims or Interests. The Reorganized Debtors shall be authorized to issue a certain number of shares, units or equity interests (as the case may be based on how the New Common Stock is denominated and the identity of the Reorganized Debtor issuing such shares, units, or equity interests) of New Common Stock required to be issued under the Plan and pursuant to their New Organizational Documents. On the Effective Date, the Debtors or Reorganized Debtors, as applicable, shall issue all Securities, notes, instruments, certificates, and other documents required to be issued pursuant to the Plan.

All of the shares, units, or equity interests (as the case may be based on how the New Common Stock is denominated) of New Common Stock issued or authorized to be issued pursuant to the Plan shall be duly authorized, validly issued, fully paid, and non-assessable. Each distribution and issuance referred to in Article VI hereof shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.

On the Effective Date or as soon as reasonably practicable thereafter, the New Common Stock will be distributed in accordance with the Plan.

3. <u>Rights Offering</u>.

In accordance with the Restructuring Support Agreement, the applicable Reorganized Debtor shall consummate the Rights Offering, through which each Consenting Noteholder shall have the opportunity, subject to the terms and conditions set forth in the Plan and the Rights Offering Procedures, to purchase the Rights Offering Shares.

The Rights Offering Procedures shall be approved within 5 days of Petition Date and shall provide for a subscription deadline of no later than the Voting Deadline. Subscription rights to participate in the Rights Offering shall be distributed to the Consenting Noteholders in accordance with the Restructuring Support Agreement, the Restructuring Term Sheet, and the Plan and the issuance of such subscription rights will be exempt from SEC registration under applicable law. Proceeds of the Rights Offering to be used (a) first, for Cash pay down of any portion of the Make Whole Amount that is not paid in full in Cash from Technology Business Sale Proceeds in accordance with the Technology Business Sale Proceeds Waterfall and (b) second, for Cash pay down of Prepetition Funded Secured Claims.

4. <u>Issuance of New Warrants</u>.

On the Effective Date, the applicable Reorganized Debtor (as set forth in the Restructuring Transactions Memorandum) will issue the New Warrants only to the extent required to provide for distributions to holders of the Senior Notes Claims, as contemplated by this Plan. All of the New Warrants issued pursuant to the Plan and the shares of New Common Stock that may be issued upon exercise of the New Warrants shall be duly authorized without the need for any further corporate action and without any further action by the Debtors or Reorganized Debtors, as applicable, validly issued, fully paid, and non-assessable. Each distribution and issuance referred to in Article VI hereof shall be governed by the terms and conditions set forth in the Restructuring Support Agreement, the Plan, and the New Warrant Agreements applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance without the need for execution by any party thereto other than the applicable Reorganized Debtor(s).

The New Warrants shall be distributed to holders of Senior Notes Claims in accordance with the Restructuring Support Agreement and the Plan. The New Warrants shall have full customary anti-dilution and Black-Scholes protection.

5. <u>Lloyds LC Exit Facility</u>.

On the Effective Date, the Reorganized Debtors and Lloyds LC Bank shall enter into the Lloyds LC Exit Facility. To the extent applicable, entry of the Confirmation Order shall be deemed (a) approval of the Lloyds LC Exit Facility and (b) authorization for the Debtors or the Reorganized Debtors, as applicable, to, without further notice to or order of the Bankruptcy Court, (i) execute and deliver those documents and agreements necessary or appropriate to pursue or obtain the Lloyds LC Exit Facility, and (ii) act or take action under applicable law, regulation, order, or rule or vote, consent, authorization, or approval of any Person as may be necessary to consummate the Lloyds LC Exit Facility. Liens on the cash collateral held by Lloyds LC Bank and/or its affiliates that exclusively secures the Debtors' obligations under the Lloyds Letter of Credit Agreement: (i) shall be unaltered by the Plan, (ii) shall continue and remain (to the extent continued under the Lloyds LC Exit Facility) attached to the property of the Reorganized Debtors after the Effective Date to the same extent such Liens were attached to the property of the Debtors prior to the Effective Date, and (iii) shall continue to secure the joint and several obligations of the Reorganized Debtors under the Lloyds LC Exit Facility.

G.      *Corporate Existence.*

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, each Debtor shall continue to exist after the Effective Date as a separate corporate entity, limited liability company, partnership, or other form, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other formation documents) in effect prior to the Effective Date, except to the extent such certificate of incorporation and bylaws (or other formation documents) are amended under the Plan or otherwise, in each case, consistent with the Plan and the Restructuring Support Agreement, and to the extent such documents are amended in accordance therewith, such documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite filings required under applicable state, provincial, or federal law). After the Effective Date, the respective certificate of incorporation and bylaws (or other formation documents) of one or more of the Reorganized Debtors may be amended or modified on the terms therein without supervision or approval by the Bankruptcy Court or Bankruptcy Rules.  After the Effective Date, one or more of the Reorganized Debtors may be disposed of, dissolved, wound down, or liquidated without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

H.      *Vesting of Assets in the Reorganized Debtors.*

Except as otherwise provided in the Confirmation Order, the Plan (including, for the avoidance of doubt, the Restructuring Transactions Memorandum), or any agreement, instrument, or other document incorporated in, or entered into in connection with or pursuant to, the Plan or Plan Supplement, on the Effective Date, all property in each Estate, all Causes of Action, and any property acquired by any of the Debtors pursuant to the Plan shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances.  On and after the Effective Date, except as otherwise provided in the Plan, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

I.      *Cancellation of Existing Securities and Agreements.*

On the Effective Date, except to the extent otherwise provided in the Exit Facility Documents, the Plan (including, without limitation, under Article IV.F.1 of the Plan) and the Confirmation Order, all notes, instruments, certificates, credit agreements, indentures, and other documents evidencing Claims or Interests shall be cancelled and the obligations of the Debtors thereunder or in any way related thereto shall be deemed satisfied in full, cancelled, discharged, and of no force or effect.  Holders of or parties to such cancelled instruments, Securities, and other documentation will have no rights arising from or relating to such instruments, Securities, and other documentation, or the cancellation thereof, except the rights provided for pursuant to this Plan or the Confirmation Order.  Notwithstanding anything to the contrary herein, but subject to any applicable provisions of Article VI hereof, to the extent cancelled pursuant to this paragraph, the Senior Notes Indenture shall continue in effect solely to the extent necessary to:  (1) permit holders of Claims under the Senior Notes Indenture to receive their respective Plan Distributions, if any; (2) permit the Reorganized Debtors and the Disbursing Agent, as applicable, to make Plan Distributions on account of the Allowed Claims under the Senior Notes Indenture; (3) permit the Senior Notes Trustee to seek compensation and/or reimbursement of fees and expenses in accordance with the terms of this Plan; (4) allow the Senior Notes Trustee to enforce its rights, claims, and interests against any party other than the Debtors; (5) preserve any rights of the Senior Notes Trustee to payment of fees, expenses, and indemnification obligations as against any money or property distributable to holders of Claims under the Senior Notes Indenture, including any rights to priority of payment and/or to exercise charging liens; and (6) permit the Senior Notes Trustee to appear and be heard in the Chapter 11 Cases or in any proceeding in the Bankruptcy Court, including to enforce any obligation owed to the Senior Notes Trustee or other holders of Claims under Senior Notes Indenture.  Notwithstanding anything to the contrary herein, but subject to any applicable provisions of Article VI hereof and the Confirmation Order, the DIP Credit Agreement, the Superpriority Credit Agreement, 2021 LC Agreement, and the Credit Agreement shall continue in effect to:  (1) permit holders of Claims under the DIP Credit Agreement, the 2021 LC Agreement, and the Credit Agreement to receive their respective Plan Distributions, if any; (2) permit the Reorganized Debtors and the

Disbursing Agent, as applicable, to make Plan Distributions on account of the Allowed Claims under the DIP Credit Agreement, the 2021 LC Agreement, and the Credit Agreement, as applicable; (3) permit each of the DIP Agents, the Revolving and LC Administrative Agent, the Term Loan Administrative Agent, the 2021 LC Administrative Agent, the Superpriority Term Loan Agent, and the Superpriority Revolving Administrative Agent to seek compensation and/or reimbursement of fees and expenses in accordance with the terms of this Plan and the Confirmation Order; (4) allow each of (x) the Revolving and LC Administrative Agent and any issuer of a letter of credit under the Credit Agreement to enforce its rights, claims, and interests against any Defaulting Lender (as defined in the Credit Agreement); and (y) the 2021 LC Administrative Agent and any issuer of 2021 Letters of Credit to enforce its rights, claims and interests against any Defaulting Participant (as defined in the 2021 LC Agreement); (5) permit each of the DIP Agent, the Revolving and LC Administrative Agent, the Term Loan Administrative Agent, the 2021 LC Administrative Agent, Superpriority Term Loan Agent, and the Superpriority Revolving Administrative Agent, to appear and be heard in the Chapter 11 Cases or in any proceeding in the Bankruptcy Court, including to enforce any obligation owed to the DIP Agent, the Revolving and LC Administrative Agent, the Term Loan Administrative Agent, the 2021 LC Administrative Agent and the Superpriority Term Loan Agent or other holders of Claims under the DIP Credit Agreement, the Superpriority Credit Agreement, the 2021 LC Agreement, and the Credit Agreement and (6) preserve the rights and obligations of the parties under the Exit Facility Documents.  Except as provided in this Plan (including Article VI hereof), the Confirmation Order and the Exit Facilities, on the Effective Date, the DIP Agents, the Revolving and LC Administrative Agent, the Term Loan Administrative Agent, the 2021 LC Administrative Agent, the Superpriority Term Loan Agent, the Superpriority Revolving Administrative Agent and the Senior Notes Trustee, and their respective agents, successors, and assigns, shall be automatically and fully discharged of all of their duties and obligations associated with the DIP Credit Agreement, the Superpriority Credit Agreement, the 2021 LC Agreement, the Credit Agreement, and the Senior Notes Indenture, as applicable.  To the extent cancelled in accordance with this paragraph, the commitments and obligations (if any) of the holders of the Senior Notes and the lenders under the DIP Credit Agreement, the Superpriority Credit Agreement, the Credit Agreement, and the 2021 LC Agreement to extend any further or future credit or financial accommodations to any of the Debtors, any of their respective subsidiaries or any of their respective successors or assigns under the DIP Credit Agreement, the 2021 LC Agreement, the Superpriority Credit Agreement the Credit Agreement, and the Senior Notes Indenture, as applicable, shall fully terminate and be of no further force or effect on the Effective Date.

*J.      Corporate Action.*

Upon the Effective Date, all actions contemplated under the Plan shall be deemed authorized and approved in all respects, including: (1) adoption or assumption, as applicable, of the Compensation and Benefit Programs; (2) selection of the directors and officers for the Reorganized Debtors; (3) the issuance and distribution of the New Common Stock; (4) implementation of the Restructuring Transactions, including the Rights Offering, the Pipes Business Sale, and the Technology Business Sale; (5) issuance and distribution of the New Warrants; (6) entry into the New Warrants Agreements and the Exit Facility Documents, as applicable; (7) all other actions contemplated under the Plan (whether to occur before, on, or after the Effective Date); (8) adoption of the New Organizational Documents; (9) the rejection, assumption, or assumption and assignment, as applicable, of Executory Contracts and Unexpired Leases; and (10) all other acts or actions contemplated or reasonably necessary or appropriate to promptly consummate the Restructuring Transactions contemplated by the Plan (whether to occur before, on, or after the Effective Date).  All matters provided for in the Plan involving the corporate structure of the Debtors or the Reorganized Debtors, and any corporate, partnership, limited liability company, or other governance action required by the Debtors or the Reorganized Debtor, as applicable, in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the Security holders, members, directors, or officers of the Debtors or the Reorganized Debtors, as applicable.  On or (as applicable) prior to the Effective Date, the appropriate officers of the Debtors or the Reorganized Debtors, as applicable, shall be authorized and (as applicable) directed to issue, execute, and deliver the agreements, documents, Securities, and instruments contemplated under the Plan (or necessary or desirable to effect the transactions contemplated under the Plan) in the name of and on behalf of the Reorganized Debtors, including the New Common Stock, the New Organizational Documents, the Exit Facility Documents, the New Warrants, the New Warrants Agreements (as applicable), the Pipes Business Sale Documents, the Purchase Agreement, and any and all other agreements, documents, Securities, and instruments relating to the foregoing.  The authorizations and approvals contemplated by this Article IV.J shall be effective notwithstanding any requirements under non-bankruptcy law.

38

K.      *New Organizational Documents.*

On or immediately prior to the Effective Date, the New Organizational Documents shall be automatically adopted by the applicable Reorganized Debtors. To the extent required under the Plan or applicable non-bankruptcy law, each of the Reorganized Debtors will file its New Organizational Documents with the applicable Secretaries of State and/or other applicable authorities in its respective state or country of organization if and to the extent required in accordance with the applicable laws of the respective state or country of organization. The New Organizational Documents will (a) prohibit the issuance of non-voting equity Securities, to the extent required under section 1123(a)(6) of the Bankruptcy Code and (b) provide for customary minority shareholder protections and information and reporting requirements subject to the consent rights set forth in Section 3.02 of the Restructuring Support Agreement.

After the Effective Date, the Reorganized Debtors may amend and restate their respective New Organizational Documents in accordance with the terms thereof, and the Reorganized Debtors may file such amended certificates or articles of incorporation, bylaws, or such other applicable formation documents, and other constituent documents as permitted by the laws of the respective states, provinces, or countries of incorporation and the New Organizational Documents.

L.      *Indemnification Obligations.*

Consistent with applicable law, all indemnification provisions in place as of the Effective Date (whether in the by-laws, certificates of incorporation or formation, limited liability company agreements, other organizational documents, board resolutions, indemnification agreements, employment contracts, or otherwise) for current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of the Debtors, as applicable, shall be reinstated and remain intact, irrevocable, and shall survive the effectiveness of the Plan on terms no less favorable to such current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of the Debtors than the indemnification provisions in place prior to the Effective Date; *provided* that the Reorganized Debtors shall not indemnify current or former officers, directors, managers, employees, attorneys, accountants, investment bankers, or other professionals of the Debtors for any claims or Causes of Action arising out of or relating to any act or omission that is a criminal act or constitutes intentional fraud, gross negligence, or willful misconduct. Notwithstanding the foregoing, in the event of the closing of the Pipes Business Sale, the Pipes Entities shall maintain such indemnification obligations only to the extent required under the Pipes Business Sale Documents.

M.      *Directors and Officers of the Reorganized Debtors.*

As of the Effective Date, the terms of the current members of the board of directors of McDermott shall expire and the new directors and officers of the Reorganized McDermott shall be appointed. The New Board will consist of seven (7) directors: (i) the Chief Executive Officer of Reorganized McDermott, (ii) six (6) directors selected by certain Required Consenting Term Lenders and the Required Consenting Revolving Lenders. The identities of directors on the New Board shall be set forth in the Plan Supplement to the extent known at the time of filing. Corporate governance for Reorganized McDermott, including charters, bylaws, operating agreements, or other organization documents, as applicable, shall: (a) be consistent with the Restructuring Term Sheet, Section 3 of the Restructuring Support Agreement, and section 1123(a)(6) of the Bankruptcy Code; and (b) provide for customary minority shareholder protections and information and reporting requirements reasonably acceptable to the Debtors and the Required Consenting Stakeholders.

N.      *Effectuating Documents; Further Transactions.*

On and after the Effective Date, the Reorganized Debtors, and their respective officers, directors, members, or managers (as applicable), are authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, Exit Facilities entered into, and the Securities issued pursuant to the Plan in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorization, or consents except for those expressly required pursuant to the Plan.

O.       *Section 1146 Exemption.*

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfers (whether from a Debtor to a Reorganized Debtor or to any other Person) of property under the Plan or pursuant to: (1) the issuance, distribution, transfer, or exchange of any debt, equity Security, or other interest in the Debtors or the Reorganized Debtors, including the New Common Stock and the New Warrants (including the New Common Stock that may be issuable upon exercise of the New Warrants); (2) the Restructuring Transactions; (3) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (4) the making, assignment, or recording of any lease or sublease; (5) the grant of collateral as security for the Reorganized Debtors' obligations under and in connection with the Exit Facilities; or (6) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, personal property transfer tax, sales or use tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment. All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146(a) of the Bankruptcy Code, shall forego the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

P.       *Director and Officer Liability Insurance.*

Notwithstanding anything in the Plan to the contrary, the Reorganized Debtors shall be deemed to have assumed all of the Debtors' D&O Liability Insurance Policies pursuant to section 365(a) of the Bankruptcy Code effective as of the Effective Date. Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Reorganized Debtors' foregoing assumption of each of the unexpired D&O Liability Insurance Policies. Notwithstanding anything to the contrary contained in the Plan, Confirmation of the Plan shall not discharge, impair, or otherwise modify any indemnity obligations assumed by the foregoing assumption of the D&O Liability Insurance Policies, and each such indemnity obligation will be deemed and treated as an Executory Contract that has been assumed by the Debtors under the Plan as to which no Proof of Claim need be filed.

In addition, after the Effective Date, none of the Reorganized Debtors shall terminate or otherwise reduce the coverage under any D&O Liability Insurance Policies (including any "tail policy") in effect on or after the Petition Date, with respect to conduct occurring prior thereto, and all directors and officers of the Debtors who served in such capacity at any time prior to the Effective Date shall be entitled to the full benefits of any such policy for the full term of such policy, to the extent set forth therein, regardless of whether such directors and officers remain in such positions after the Effective Date. Notwithstanding the foregoing, in the event of the closing of the Pipes Business Sale, the Pipes Entities shall maintain such D&O Liability Insurance Policies (including any "tail policy") only to the extent required under the Pipes Business Sale Documents.

Q.       *Management Incentive Plan.*

Effective on the Effective Date, the Reorganized Debtors will (i) reserve 7.5% of New Common Stock (on a fully diluted and fully distributed basis, but subject to dilution on account of the New Warrants) which may be granted in the form of options, restricted stock, restricted stock units, warrants, stock appreciations rights or any combination thereof (each an "**Award**" and such reserve, the "**MIP Pool**") for grant to management employees and members of the New Board in accordance with the terms of this Article IV.Q and as set forth in the Plan Supplement and (ii) enter into severance and change in control arrangements ("**Severance Arrangements**") with senior executives of the Debtors that are insiders pursuant to Section 16 of the Exchange Act ("**Senior Executives**") in amounts and on terms and conditions to be agreed with and approved by the Required Consenting Lenders. The New Board shall grant no less than 53.33% of the MIP Pool to the employees of the Debtors no later than 60 days following the Effective Date (the "**Emergence Awards**") with the terms of the Emergence Awards to be determined as set forth in the Plan

40

Supplement and the remainder of the MIP Pool will be available for future grants to management, employees, and members of the New Board with allocations, terms, and conditions to be determined by the New Board. A Senior Executive will be permitted to voluntarily terminate for "Good Reason" and receive the severance benefits under the Severance Arrangements if the Senior Executive does not receive an Emergence Award.

R.     *Employee and Retiree Benefits.*

Unless otherwise provided herein, and subject to Article V hereof, all employee wages, compensation, and benefit programs in place as of the Effective Date with the Debtors shall be assumed by the Reorganized Debtors and shall remain in place as of the Effective Date, and the Reorganized Debtors will continue to honor such agreements, arrangements, programs, and plans. For the avoidance of doubt, pursuant to section 1129(a)(13) of the Bankruptcy Code, from and after the Effective Date, all retiree benefits (as such term is defined in section 1114 of the Bankruptcy Code), if any, shall continue to be paid in accordance with applicable law. Notwithstanding the foregoing, on the Effective Date, the Debtors shall enter into severance and change in control arrangements with Senior Executives in amounts and on terms and conditions to be agreed with and approved by the Required Consenting Lenders which, to the extent provided therein, shall supersede and replace any severance or change of control agreements with such Senior Executives existing prior to the Effective Date and the long-term components of any key employee retention plan or key employee incentive plan existing on the Effective Date shall be subject to modification or termination, as applicable, by the New Board upon adoption of the Management Incentive Plan.

S.     *Preservation of Causes of Action.*

In accordance with section 1123(b) of the Bankruptcy Code, but subject to Article VIII hereof, each Reorganized Debtor, as applicable, shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action of the Debtors, whether arising before or after the Petition Date, including any actions specifically enumerated in the Schedule of Retained Causes of Action, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date, other than the Causes of Action released by the Debtors pursuant to the releases and exculpations contained in the Plan, including Article VIII hereof, which shall be deemed released and waived by the Debtors and the Reorganized Debtors as of the Effective Date.

The Reorganized Debtors may pursue such retained Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors. **No Entity (other than the Released Parties) may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors or the Reorganized Debtors, as applicable, will not pursue any and all available Causes of Action of the Debtors against it. The Debtors and the Reorganized Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan, including Article VIII hereof. Unless otherwise agreed upon in writing by the parties to the applicable Cause of Action, all objections to the Schedule of Retained Causes of Action must be Filed with the Bankruptcy Court on or before thirty (30) days after the Effective Date. Any such objection that is not timely filed shall be disallowed and forever barred, estopped, and enjoined from assertion against any Reorganized Debtor, without the need for any objection or responsive pleading by the Reorganized Debtors or any other party in interest or any further notice to or action, order, or approval of the Bankruptcy Court.** The Reorganized Debtors may settle any such objection without any further notice to or action, order, or approval of the Bankruptcy Court. If there is any dispute regarding the inclusion of any Cause of Action on the Schedule of Retained Causes of Action that remains unresolved by the Debtors or Reorganized Debtors, as applicable, and the objection party for thirty (30) days, such objection shall be resolved by the Bankruptcy Court. Unless any Causes of Action of the Debtors against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Final Order, the Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

The Reorganized Debtors reserve and shall retain such Causes of Action of the Debtors notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan. In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that a Debtor may hold

against any Entity shall vest in the Reorganized Debtors, except as otherwise expressly provided in the Plan, including Article VIII hereof.  The applicable Reorganized Debtors, through their authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action.  The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

## ARTICLE V.
### TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A.      *Assumption and Rejection of Executory Contracts and Unexpired Leases.*

On the Effective Date, except as otherwise provided in Article V.H.1 and elsewhere herein, all Executory Contracts or Unexpired Leases not otherwise assumed or rejected will be deemed assumed by the applicable Reorganized Debtor (and assigned to the party(ies) set forth in the Technology Business Sale Documents, as applicable) in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, other than those that are: (1) identified on the Rejected Executory Contracts and Unexpired Leases Schedule; (2) previously expired or terminated pursuant to their own terms; (3) have been previously assumed or rejected by the Debtors pursuant to a Final Order; (4) are the subject of a motion to reject that is pending on the Effective Date; or (5) have an ordered or requested effective date of rejection that is after the Effective Date.

Entry of the Confirmation Order shall constitute an order of the Bankruptcy Court approving the assumptions, assumptions and assignments, or rejections of the Executory Contracts or Unexpired Leases as set forth in the Plan, the Assumed Executory Contract and Unexpired Leases Schedule, or the Rejected Executory Contracts and Unexpired Leases Schedule, pursuant to sections 365(a) and 1123 of the Bankruptcy Code.  Except as otherwise specifically set forth herein, assumptions or rejections of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Effective Date.  Each Executory Contract or Unexpired Lease assumed pursuant to the Plan or by Bankruptcy Court order but not assigned to a third party before the Effective Date shall re-vest in and be fully enforceable by the applicable contracting Reorganized Debtor in accordance with its terms, except as such terms may have been modified by the provisions of the Plan or any order of the Bankruptcy Court authorizing and providing for its assumption.  Any motions to assume Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by a Final Order on or after the Effective Date but may be withdrawn, settled, or otherwise prosecuted by the Reorganized Debtors.

To the maximum extent permitted by law, to the extent any provision in any Executory Contract or Unexpired Lease assumed or assumed and assigned pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption or assumption and assignment of such Executory Contract or Unexpired Lease (including any "change of control" provision), then such provision shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto. Notwithstanding anything to the contrary in the Plan, the Debtors or the Reorganized Debtors, as applicable, reserve the right to alter, amend, modify, or supplement the Assumed Executory Contracts and Unexpired Leases Schedule and the Rejected Executory Contracts and Unexpired Leases Schedule at any time up to forty-five (45) days after the Effective Date, so long as such allocation, amendment, modification, or supplement is consistent with the Restructuring Support Agreement; *provided* that the Cameron LNG Project Obligations shall be assumed as of the Effective Date in accordance with Article V.J.

B.      *Claims Based on Rejection of Executory Contracts or Unexpired Leases.*

Unless otherwise provided by a Final Order of the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, pursuant to the Plan or the Confirmation Order, if any, must be Filed with the Bankruptcy Court within thirty (30) days after the later of (1) the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection, (2) the effective date of such rejection, or (3) the Effective Date.  **Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed with the Bankruptcy Court within such time will be automatically**

**disallowed, forever barred from assertion, and shall not be enforceable against the Debtors or the Reorganized Debtors, the Estates, or their property without the need for any objection by the Reorganized Debtors or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in the Proof of Claim to the contrary.** All Allowed Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases shall be classified as General Unsecured Claims and shall be treated in accordance with Article III.B.13 of this Plan.

C.      *Cure of Defaults for Assumed Executory Contracts and Unexpired Leases and Lummus Executory Contracts or Unexpired Leases.*

No later than seven (7) calendar days before the Confirmation Hearing, the Debtors shall provide notices of proposed assumptions to the counterparties to the agreements listed on the Assumed Executory Contracts and Unexpired Leases Schedule, which shall include a description of the procedures for resolving disputes related to the proposed assumption of applicable Executory Contracts and Unexpired Leases. Absent any pending dispute, the monetary and nonmonetary defaults existing as of the assumption of the Executory Contract(s) and Unexpired Lease(s) assumed pursuant to this Article V will be satisfied by the Debtors in compliance with section 365(b)(1) of the Bankruptcy Code. To the extent there is a dispute related to any cures of defaults arising under such Executory Contract(s) and Unexpired Lease(s) (other than Lummus Executory Contracts or Unexpired Leases), payment of any such disputed Cure amounts and the cure of any nonmonetary defaults shall be reconciled in the ordinary course of the Debtors' business and all parties' rights shall be reserved with respect thereto, including all rights to receive payment in full of any such Cures whether arising before or after the Effective Date and the right to object prior to or after the Effective Date to any assumption or cures relating thereto. The reconciliation, settlement, and payment of any monetary defaults over $7.5 million in respect of any single Executory Contract or Unexpired Lease or group of related Executory Contracts or Unexpired Leases prior to or on the Effective Date shall be subject to the approval of the Required Consenting Lenders.

Except with regard to Lummus Executory Contracts or Unexpired Leases, there shall be no need to file an objection to reserve rights with respect to disputes relating to monetary and nonmonetary cures and such cures will be reconciled in the ordinary course of the Debtors' business. Notwithstanding anything herein to the contrary, except with regard to Lummus Executory Contracts or Unexpired Leases, in the event that any Executory Contract or Unexpired Lease is added to the Assumed Executory Contracts and Unexpired Leases Schedule after the provision of notices of proposed assumptions described above, a notice of proposed assumption with respect to such Executory Contract or Unexpired Lease will be sent promptly to the counterparty thereof.

With regard to any Lummus Executory Contracts or Unexpired Leases, no later than thirty (30) days before the Effective Date of the Plan, the Debtors shall provide notices of proposed assumptions to the counterparties to any assumed Lummus Executory Contracts or Unexpired Leases, which shall include, with respect to each such Lummus Executory Contract or Unexpired Lease, the Debtors' good faith estimate of the amount of any cure. Each notice of proposed assumption shall state whether the applicable Lummus Executory Contract or Unexpired Lease is being assumed by the Debtors or assumed and assigned to the Lummus Buyer. To the extent there is a dispute related to either a monetary Cure amount or nonmonetary default, the Debtors, with consent of the Lummus Buyer and in accordance with the Stalking Horse SAPA, may elect to: (i) not assume or assume and assign to the Buyer the relevant Lummus Executory Contract or Unexpired Lease; (ii) postpone the assumption of such Lummus Executory Contract or Unexpired Lease until the resolution of such objection; or (iii) reserve the disputed portion of the Cure of the monetary default and, subject to cure of any nonmonetary defaults, assume such Lummus Executory Contract or Unexpired Lease on the Effective Date. The assumption or assumption and assignment of the assumed Lummus Executory Contracts or Unexpired Leases is subject to the cure of all nonmonetary defaults (other than defaults triggered by the filing of the Chapter 11 Cases by the Debtors) prior to the Effective Date of the Plan.

Unless otherwise agreed in writing by the parties in the applicable Lummus Executory Contract or Unexpired Lease, any objection by a counterparty to a Lummus Executory Contract or Unexpired Lease to a proposed assumption must be Filed, served, and actually received by the counsel to the Debtor no later than the date and time specified in the notice. Any counterparty to a Lummus Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption will be deemed to have assented to such assumption.

The Debtors or the Reorganized Debtors, as applicable, shall pay the Cure amounts, if any, and satisfy all nonmonetary defaults on the Effective Date or as soon as reasonably practicable thereafter, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may agree; *provided* that the Debtors shall pay or satisfy, as applicable, any cures, or establish a reserve for any disputed portion of a Cure for any Lummus Executory Contract or Unexpired Lease on or prior the Effective Date.

Any Cure shall be deemed fully satisfied, released, and discharged upon payment or satisfaction by the Debtors or the Reorganized Debtors of the Cure.  If there is any dispute regarding any Cure, the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" within the meaning of section 365 of the Bankruptcy Code, or any other matter pertaining to assumption, then payment of the applicable Cure amount shall occur as soon as reasonably practicable after entry of a Final Order resolving such dispute, approving such assumption (and, if applicable, assignment), or as may be agreed upon by the Debtors or the Reorganized Debtors, as applicable, and the counterparty to the Executory Contract or Unexpired Lease. The Reorganized Debtors also may settle any Cure without any further notice to or action, order, or approval of the Bankruptcy Court.

The Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any nonmonetary defaults arising from or triggered by the filing of these chapter 11 cases, including defaults of provisions restricting the change in control or ownership interest composition or any bankruptcy-related defaults, arising at any time prior to the effective date of assumption.  **Any and all Proofs of Claim based upon Executory Contracts or Unexpired Leases that have been assumed in the Chapter 11 Cases, including pursuant to the Confirmation Order, shall be deemed disallowed and expunged as of the later of (1) the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such assumption, (2) the effective date of such assumption or (3) the Effective Date without the need for any objection thereto or any further notice to or action, order, or approval of the Bankruptcy Court**.

D.     *Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases.*

Rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of preexisting obligations owed to the Debtors or the Reorganized Debtors, as applicable, under such Executory Contracts or Unexpired Leases.  In particular, notwithstanding any non-bankruptcy law to the contrary, the Reorganized Debtors expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations with respect to goods previously purchased by the Debtors pursuant to rejected Executory Contracts or Unexpired Leases.

E.     *Insurance Policies.*

Each of the Debtors' insurance policies and any agreements, documents, or instruments relating thereto, are treated as Executory Contracts under the Plan.  Unless otherwise provided in the Plan, on the Effective Date, (1) the Debtors shall be deemed to have assumed all insurance policies and any agreements, documents, and instruments relating to coverage of all insured Claims and (2) such insurance policies and any agreements, documents, or instruments relating thereto shall revest in the Reorganized Debtors.

F.     *Reservation of Rights.*

Nothing contained in the Plan or the Plan Supplement shall constitute an admission by the Debtors or any other party that any contract or lease is in fact an Executory Contract or Unexpired Lease or that any Reorganized Debtor has any liability thereunder.  If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or the Reorganized Debtors, as applicable, shall have forty-five (45) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

G.      *Nonoccurrence of Effective Date.*

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

H.      *Employee Compensation and Benefits.*

1.      Compensation and Benefit Programs.

Subject to the provisions of the Plan, all Compensation and Benefits Programs shall be treated as Executory Contracts under the Plan and deemed assumed on the Effective Date pursuant to the provisions of sections 365 and 1123 of the Bankruptcy Code, except for:

a.      all employee equity or equity-based incentive plans, and any provisions set forth in the Compensation and Benefits Program that provide for rights to acquire Existing Equity Interests in any of the Debtors;

b.      the change in control agreements entered into with current employees, unless otherwise determined by the Required Consenting Lenders prior to the Effective Date;

c.      Compensation and Benefits Programs that have been rejected pursuant to an order of a Bankruptcy Court; and

d.      Compensation and Benefits Programs that, as of the entry of the Confirmation Order, have been specifically waived by the beneficiaries of any employee benefit plan or contract.

Any assumption of Compensation and Benefits Programs pursuant to the terms herein and the Restructuring Transactions and related matters contemplated by the Plan shall be deemed not to trigger (i) any applicable change of control, immediate vesting, termination (similar provisions therein) and (ii) an event of "Good Reason" (or a term of like import), in each case as a result of the consummation of the Restructuring Transactions.  No counterparty shall have rights under a Compensation and Benefits Program assumed pursuant to the Plan other than those applicable immediately prior to such assumption.

Notwithstanding the foregoing, on the Effective Date, the Debtors shall enter into severance and change in control arrangements with Senior Executives in amounts and on terms and conditions to be agreed with and approved by the Required Consenting Lenders which, to the extent provided therein, shall supersede and replace any severance or change of control agreements with such Senior Executives existing prior to the Effective Date and the long-term components of any key employee retention plan or key employee incentive plan existing on the Effective Date shall be subject to modification or termination, as applicable, by the New Board upon adoption of the Management Incentive Plan.

2.      Workers' Compensation Programs.

As of the Effective Date, except as set forth in the Plan Supplement, the Debtors and the Reorganized Debtors shall continue to honor their obligations under:  (a) all applicable workers' compensation laws in states in which the Reorganized Debtors operate; and (b) the Debtors' written contracts, agreements, agreements of indemnity, self-insured workers' compensation bonds, policies, programs, and plans for workers' compensation and workers' compensation insurance.  All Proofs of Claims on account of workers' compensation shall be deemed withdrawn automatically and without any further notice to or action, order, or approval of the Bankruptcy Court; *provided* that nothing in the Plan shall limit, diminish, or otherwise alter the Debtors' or Reorganized Debtors' defenses, Causes of Action, or other rights under applicable non-bankruptcy law with respect to any such contracts, agreements, policies, programs, and plans; *provided further* that nothing herein shall be deemed to impose any obligations on the Debtors in addition to what is provided for under applicable state law.

I.      *Contracts and Leases Entered Into After the Petition Date.*

Contracts and leases entered into after the Petition Date by any Debtor, including any Executory Contracts and Unexpired Leases assumed by such Debtor, will be performed by the applicable Debtor or the Reorganized Debtors in the ordinary course of their business.  Accordingly, such contracts and leases (including any assumed Executory Contracts and Unexpired Leases) will survive and remain unaffected by entry of the Confirmation Order.

J.      *Assumption of Cameron LNG Project Obligations*

The Cameron LNG Project Obligations shall be assumed by the applicable Reorganized Debtor effective as of the Effective Date, and the Cameron LNG Project Obligations shall not be subject to the provision of Section V.A. hereof authorizing the Debtors or Reorganized Debtors, as applicable, to alter, amend, modify, or supplement the Assumed Executory Contracts and Unexpired Leases Schedule and the Rejected Executory Contracts and Unexpired Leases Schedule at any time up to forty-five (45) days after the Effective Date.  Within three Business Days after the Effective Date, Reorganized McDermott shall issue the Cameron LNG Replacement Guarantee and the Chiyoda Replacement Guarantee.

## ARTICLE VI.
## PROVISIONS GOVERNING DISTRIBUTIONS

A.      *Distributions on Account of Claims Allowed as of the Effective Date.*

Except as otherwise provided herein, in a Final Order, or as otherwise agreed to by the Debtors or the Reorganized Debtors, as the case may be, and the holder of the applicable Allowed Claim on the first Distribution Date, the Reorganized Debtors shall make initial distributions under the Plan on account of Claims Allowed on or before the Effective Date, subject to the Reorganized Debtors' right to object to Claims; *provided* that (1) Allowed Administrative Claims with respect to liabilities incurred by the Debtors in the ordinary course of business during the Chapter 11 Cases or assumed by the Debtors prior to the Effective Date shall be paid or performed in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, course of dealing, course of business, or industry practice, (2) Allowed Priority Tax Claims shall be paid in accordance with Article II.D of the Plan, and (3) Allowed General Unsecured Claims shall be paid in accordance with Article III.B.13 of the Plan. To the extent any Allowed Priority Tax Claim is not due and owing on the Effective Date, such Claim shall be paid in full in Cash in accordance with the terms of any agreement between the Debtors and the holder of such Claim or as may be due and payable under applicable non-bankruptcy law or in the ordinary course of business.  Thereafter, a Distribution Date shall occur no less frequently than once in every ninety (90) day period, as necessary, in the Reorganized Debtors' sole discretion.

B.      *Disbursing Agent.*

All distributions under the Plan shall be made by the Reorganized Debtors.  The Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.  Additionally, in the event that the Disbursing Agent is so otherwise ordered, all costs and expenses of procuring any such bond or surety shall be borne by the Reorganized Debtors.

Distributions in respect of all Claims under Classes 6A, 6B, 6D, and 7 shall be made based upon a distribution schedule provided to the Debtors by Revolving and LC Administrative Agent after consultation with the holders of such Claims.

C.      *Rights and Powers of Disbursing Agent.*

1.      Powers of the Disbursing Agent.

The Disbursing Agent shall be empowered to:  (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may

be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

2.    Expenses Incurred On or After the Effective Date.

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and expenses incurred by the Disbursing Agent on or after the Effective Date (including taxes), and any reasonable compensation and expense reimbursement claims (including reasonable attorney fees and expenses), made by the Disbursing Agent shall be paid in Cash by the Reorganized Debtors.

D.    *Delivery of Distributions and Undeliverable or Unclaimed Distributions.*

1.    Record Date for Distribution.

On the Distribution Record Date, the Claims Register shall be closed and any party responsible for making distributions shall instead be authorized and entitled to recognize only those record holders listed on the Claims Register as of the close of business on the Distribution Record Date.  If a Claim, other than one based on a publicly traded Security, is transferred twenty (20) or fewer days before the Distribution Record Date, the Distribution Agent shall make distributions to the transferee only to the extent practical and, in any event, only if the relevant transfer form contains an unconditional and explicit certification and waiver of any objection to the transfer by the transferor.

2.    Delivery of Distributions in General.

Except as otherwise provided herein, the Disbursing Agent shall make distributions to holders of Allowed Claims and Allowed Interests (as applicable) as of the Distribution Record Date at the address for each such holder as indicated on the Debtors' records as of the date of any such distribution; *provided* that the manner of such distributions shall be determined at the discretion of the Reorganized Debtors.

3.    Minimum Distributions.

No fractional shares of New Common Stock or New Warrants shall be distributed and no Cash shall be distributed in lieu of such fractional amounts.  When any distribution pursuant to the Plan on account of an Allowed Claim or Allowed Interest (as applicable) would otherwise result in the issuance of a number of shares of New Common Stock or New Warrants that is not a whole number, the actual distribution of shares of New Common Stock or New Warrants shall be rounded to the next lower whole number with no further payment therefor.  The total number of authorized shares of New Common Stock or New Warrants to be distributed to holders of Allowed Claims hereunder shall be adjusted as necessary to account for the foregoing rounding.

4.    Undeliverable Distributions and Unclaimed Property.

In the event that any distribution to any holder of Allowed Claims or Allowed Interests (as applicable) is returned as undeliverable, no distribution to such holder shall be made unless and until the Disbursing Agent has determined the then-current address of such holder, at which time such distribution shall be made to such holder without interest; *provided* that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of one year from the Effective Date.  After such date, all unclaimed property or interests in property shall revert to the Reorganized Debtors automatically and without need for a further order by the Bankruptcy Court (notwithstanding any applicable federal, provincial or state escheat, abandoned, or unclaimed property laws to the contrary), and the Claim of any holder of Claims and Interests to such property or Interest in property shall be discharged and forever barred.

5.    Surrender of Canceled Instruments or Securities.

On the Effective Date or as soon as reasonably practicable thereafter, each holder of a certificate or instrument evidencing a Claim or an Interest that has been cancelled in accordance with Article IV.I hereof shall be deemed to have surrendered such certificate or instrument to the Distribution Agent.  Such surrendered certificate or instrument

shall be cancelled solely with respect to the Debtors, and such cancellation shall not alter the obligations or rights of any non-Debtor third parties vis-à-vis one another with respect to such certificate or instrument, including with respect to any indenture or agreement that governs the rights of the holder of a Claim or Interest, which shall continue in effect for purposes of allowing holders to receive distributions under the Plan, charging liens, priority of payment, and indemnification rights. Notwithstanding anything to the contrary herein, this paragraph shall not apply to certificates or instruments evidencing Claims that are Unimpaired under the Plan or Claims in respect of Classes 5, 6A, 6B (in respect of Revolving LCs), 7 or 8 to the extent such certificates or instruments are reinstated or amended on the Effective Date under the terms of the Plan.

6.    Delivery of Distributions on Senior Notes Claims.

Except as otherwise reasonably requested by the Senior Notes Trustee, all distributions to holders of Allowed Senior Notes Claims shall be deemed completed when made to the Senior Notes Trustee. The Senior Notes Trustee shall hold or direct such distributions for the benefit of the holders of Allowed Senior Notes Claims. As soon as practicable in accordance with the requirements set forth in this Article VI, the Senior Notes Trustee shall arrange to deliver such distributions to or on behalf of its holders, subject to the Senior Notes Trustee's charging lien. If the Senior Notes Trustee is unable to make, or consents to the Debtors or the Reorganized Debtors, as applicable, making such distributions, the Debtors or the Reorganized Debtors, as applicable, with the Senior Notes Trustee's cooperation, shall make such distributions to the extent practicable to do so; *provided* that until such distributions are made, the Senior Notes Trustee's charging lien shall attach to the property to be distributed in the same manner as if such distributions were made through the Senior Notes Trustee. The Senior Notes Trustee shall have no duties or responsibility relating to any form of distribution that is not DTC eligible and the Debtors or the Reorganized Debtors, as applicable, shall seek the cooperation of DTC so that any distribution on account of an Allowed Senior Notes Claim that is held in the name of, or by a nominee of, DTC shall be made through the facilities of DTC on the Effective Date or as soon as practicable thereafter.

E.    *Manner of Payment.*

1.    All distributions of the New Common Stock, the New Warrants, participations in the Roll-Off LC Exit Facilities, and the debt in respect of the Term Loan Exit Facility and the Make Whole Tranche (to the extent applicable) to the holders of the applicable Allowed Claims under the Plan shall be made by the Disbursing Agent on behalf of the Debtors or Reorganized Debtors, as applicable.

2.    All distributions of Cash to the holders of the applicable Allowed Claims under the Plan shall be made by the Disbursing Agent on behalf of the applicable Debtor or Reorganized Debtor.

3.    At the option of the Disbursing Agent, any Cash payment to be made hereunder may be made by check or wire transfer or as otherwise required or provided in applicable agreements.

F.    *Section 1145 Exemption.*

Pursuant to section 1145 of the Bankruptcy Code or any other applicable exemption, the offering, issuance, and distribution of the New Common Stock (including the Rights Offering Shares) and the New Warrants, as contemplated by Article III.B hereof, and the issuance of the New Common Stock upon exercise of the New Warrants, shall be exempt from, among other things, the registration requirements of section 5 of the Securities Act and any other applicable law requiring registration prior to the offering, issuance, distribution, or sale of Securities. In addition, under section 1145 of the Bankruptcy Code, the New Common Stock, the New Warrants, and the New Common Stock to be issued upon exercise of the New Warrants will be freely tradable in the U.S. by the recipients thereof, subject to the provisions of (i) section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act, (ii) compliance with applicable securities laws and any rules and regulations of the Securities and Exchange Commission, if any, applicable at the time of any future transfer of such Securities or instruments, and (iii) any restrictions in the Reorganized Debtors' New Organizational Documents.

G.      *Compliance with Tax Requirements.*

In connection with the Plan, to the extent applicable, the Debtors, Reorganized Debtors, Disbursing Agent, and any applicable withholding agent shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions made pursuant to the Plan shall be subject to such withholding and reporting requirements.  Notwithstanding any provision in the Plan to the contrary, such parties shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate.  The Debtors and Reorganized Debtors reserve the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and similar spousal awards, Liens, and encumbrances.

H.      *Allocations.*

Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest.

I.      *No Postpetition Interest on Claims.*

Unless otherwise specifically provided for in the DIP Financing Orders, the Plan, or the Confirmation Order, or required by applicable bankruptcy and non-bankruptcy law, postpetition interest shall not accrue or be paid on any prepetition Claims, and no holder of a Claim shall be entitled to interest accruing on or after the Petition Date on such Claim.

J.      *Foreign Currency Exchange Rate.*

Except as otherwise provided in a Bankruptcy Court order, as of the Effective Date, any Claim asserted in currency other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using the exchange rate for the applicable currency as published in The Wall Street Journal, National Edition, on the Effective Date.

K.      *Setoffs and Recoupment.*

Except as expressly provided in this Plan, and the DIP Financing Orders, each Reorganized Debtor may, pursuant to section 553 of the Bankruptcy Code, set off and/or recoup against any Plan Distributions to be made on account of any Allowed Claim, any and all claims, rights, and Causes of Action that such Reorganized Debtor may hold against the holder of such Allowed Claim to the extent such setoff or recoupment is either (1) agreed in amount among the relevant Reorganized Debtor(s) and the holder of the Allowed Claim or (2) otherwise adjudicated by the Bankruptcy Court or another court of competent jurisdiction; *provided* that neither the failure to effectuate a setoff or recoupment nor the allowance of any Claim hereunder shall constitute a waiver or release by a Reorganized Debtor or its successor of any and all claims, rights, and Causes of Action that such Reorganized Debtor or its successor may possess against the applicable holder.  In no event shall any holder of a Claim be entitled to recoup such Claim against any claim, right, or Cause of Action of the Debtors or the Reorganized Debtors, as applicable, unless such holder actually has performed such recoupment and provided notice thereof in writing to the Debtors in accordance with Article XII.G hereof on or before the Effective Date, notwithstanding any indication in any Proof of Claim or otherwise that such holder asserts, has, or intends to preserve any right of recoupment.

L.      *Claims Paid or Payable by Third Parties.*

1.   <u>Claims Paid by Third Parties</u>.

The Debtors or the Reorganized Debtors, as applicable, shall reduce in full a Claim, and such Claim shall be disallowed without a Claims objection having to be Filed and without any further notice to or action, order, or approval

of the Bankruptcy Court, to the extent that the holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor or a Reorganized Debtor.  Subject to the last sentence of this paragraph, to the extent a holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor or a Reorganized Debtor on account of such Claim, such holder shall, within fourteen (14) days of receipt thereof, repay or return the distribution to the applicable Reorganized Debtor, to the extent the holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan.  The failure of such holder to timely repay or return such distribution shall result in the holder owing the applicable Reorganized Debtor annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the fourteen (14) day grace period specified above until the amount is repaid.

2.  Claims Payable by Third Parties.

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy.  To the extent that one or more of the Debtors' insurers agrees to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, the applicable portion of such Claim may be expunged without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

3.  Applicability of Insurance Policies.

Except as otherwise provided in the Plan, distributions to holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy.  Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

**ARTICLE VII.
PROCEDURES FOR RESOLVING CONTINGENT,
UNLIQUIDATED, AND DISPUTED CLAIMS**

A.   *Disputed Claims Process.*

There is no requirement to file a Proof of Claim (or move the Bankruptcy Court for allowance) to have a Claim Allowed for the purposes of the Plan, except as provided in Article V.B of the Plan.  On and after the Effective Date, except as otherwise provided in this Plan, all Allowed Claims shall be satisfied in the ordinary course of business by the Reorganized Debtors.  The Debtors and the Reorganized Debtors, as applicable, shall have the exclusive authority to (i) determine, without the need for notice to or action, order, or approval of the Bankruptcy Court, that a claim subject to any Proof of Claim that is Filed is Allowed and (ii) file, settle, compromise, withdraw, or litigate to judgment any objections to Claims as permitted under this Plan.  If the Debtors or Reorganized Debtors dispute any Claim, such dispute shall be determined, resolved, or adjudicated, as the case may be, in the manner as if the Chapter 11 Cases had not been commenced and shall survive the Effective Date as if the Chapter 11 Cases had not been commenced; *provided* that the Debtors or Reorganized Debtors may elect, at their sole option, to object to any Claim (other than Claims expressly Allowed by this Plan) and to have the validity or amount of any Claim adjudicated by the Bankruptcy Court; *provided further* that holders of Claims may elect to resolve the validity or amount of any Claim in the Bankruptcy Court.  If a holder makes such an election, the Bankruptcy Court shall apply the law that would have governed the dispute if the Chapter 11 Cases had not been filed.  All Proofs of Claim Filed in the Chapter 11 Cases shall be considered objected to and Disputed without further action by the Debtors.  **Except as otherwise provided herein, all Proofs of Claim Filed after the Effective Date shall be disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Reorganized Debtor, without the need for any objection by the Reorganized Debtors or any further notice to or action, order, or approval of the Bankruptcy Court.**

B.      *Allowance of Claims.*

After the Effective Date, except as otherwise expressly set forth herein, each of the Reorganized Debtors shall have and retain any and all rights and defenses such Debtor had with respect to any Claim or Interest immediately prior to the Effective Date.  The Debtors may affirmatively determine to deem Unimpaired Claims Allowed to the same extent such Claims would be allowed under applicable non-bankruptcy law.

C.      *Claims Administration Responsibilities.*

Except as otherwise specifically provided in the Plan, after the Effective Date, the Reorganized Debtors shall have the sole authority:  (1) to File, withdraw, or litigate to judgment, objections to Claims or Interests; (2) to settle or compromise any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court; and (3) to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court.  For the avoidance of doubt, except as otherwise provided herein, from and after the Effective Date, each Reorganized Debtor shall have and retain any and all rights and defenses such Debtor had immediately prior to the Effective Date with respect to any Disputed Claim or Interest, including the Causes of Action retained pursuant to Article IV.S of the Plan.

D.      *Estimation of Claims and Interests.*

Before or after the Effective Date, the Debtors or the Reorganized Debtors, as applicable, may (but are not required to) at any time request that the Bankruptcy Court estimate any Disputed Claim or Interest that is contingent or unliquidated pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party in interest previously has objected to such Claim or Interest or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim or Interest, including during the litigation of any objection to any Claim or Interest or during the appeal relating to such objection. Notwithstanding any provision otherwise in the Plan, a Claim that has been expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court. In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim or Interest, that estimated amount shall constitute a maximum limitation on such Claim or Interest for all purposes under the Plan (including for purposes of distributions), and the relevant Reorganized Debtor may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim or Interest.

E.      *Adjustment to Claims or Interests without Objection.*

Any duplicate Claim or Interest or any Claim or Interest that has been paid, satisfied, amended, or superseded may be adjusted or expunged on the Claims Register by the Reorganized Debtors without the Reorganized Debtors having to File an application, motion, complaint, objection, or any other legal proceeding seeking to object to such Claim or Interest and without any further notice to or action, order, or approval of the Bankruptcy Court.

F.      *Disallowance of Claims or Interests.*

Except as otherwise expressly set forth herein, all Claims and Interests of any Entity from which property is sought by the Debtors under sections 542, 543, 550, or 553 of the Bankruptcy Code or that the Debtors or the Reorganized Debtors allege is a transferee of a transfer that is avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code shall be disallowed if:  (a) the Entity, on the one hand, and the Debtors or the Reorganized Debtors, as applicable, on the other hand, agree or the Bankruptcy Court has determined by Final Order that such Entity or transferee is liable to turn over any property or monies under any of the aforementioned sections of the Bankruptcy Code; and (b) such Entity or transferee has failed to turn over such property by the date set forth in such agreement or Final Order.

G.      *No Distributions Pending Allowance.*

Notwithstanding any other provision of the Plan, if any portion of a Claim or Interest is a Disputed Claim or Interest, as applicable, no payment or distribution provided hereunder shall be made on account of such Claim or

Interest unless and until such Disputed Claim or Interest becomes an Allowed Claim or Interest; *provided* that if only the Allowed amount of an otherwise valid Claim or Interest is Disputed, such Claim or Interest shall be deemed Allowed in the amount not Disputed and payment or distribution shall be made on account of such undisputed amount.

H.     *Distributions After Allowance.*

To the extent that a Disputed Claim or Interest ultimately becomes an Allowed Claim or Interest, distributions (if any) shall be made to the holder of such Allowed Claim or Interest in accordance with the provisions of the Plan. As soon as reasonably practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim or Interest becomes a Final Order, the Disbursing Agent shall provide to the holder of such Claim or Interest the distribution (if any) to which such holder is entitled under the Plan as of the Effective Date, without any interest to be paid on account of such Claim or Interest.

I.     *No Interest.*

Unless otherwise specifically provided for herein or by order of the Bankruptcy Court, postpetition interest shall not accrue or be paid on Claims, and no holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim or right. Additionally, and without limiting the foregoing, interest shall not accrue or be paid on any Disputed Claim with respect to the period from the Effective Date to the date a final distribution is made on account of such Disputed Claim, if and when such Disputed Claim becomes an Allowed Claim.

## ARTICLE VIII.
## SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS

A.     *Discharge of Claims and Termination of Interests.*

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Definitive Documents, the Plan, or in any contract, instrument, or other agreement or document created or entered into pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims (including any Intercompany Claims resolved or compromised after the Effective Date by the Reorganized Debtors), Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by employees of the Debtors prior to the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not:  (1) a Proof of Claim based upon such debt or right is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such debt, right, or interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the holder of such a Claim or Interest has accepted the Plan.  The Confirmation Order shall be a judicial determination of the discharge of all Claims (other than the Reinstated Claims) and Interests (other than the Intercompany Interests that are Reinstated) subject to the occurrence of the Effective Date.

B.     **Release of Liens.**

**Except as otherwise provided in the Exit Facility Documents, the Plan, the Confirmation Order, or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, except for Other Secured Claims that the Debtors elect to Reinstate in accordance with this Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors and their successors and**

assigns.  Any holder of such Secured Claim (and the applicable agents for such holder) shall be authorized and directed, at the sole cost and expense of the Reorganized Debtors, to release any collateral or other property of any Debtor (including any cash collateral and possessory collateral) held by such holder (and the applicable agents for such holder), and to take such actions as may be reasonably requested by the Reorganized Debtors to evidence the release of such Liens and/or security interests, including the execution, delivery, and filing or recording of such releases.  The presentation or filing of the Confirmation Order to or with any federal, state, provincial, or local agency, records office, or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.

To the extent that any holder of a Secured Claim that has been satisfied or discharged in full pursuant to the Plan, or any agent for such holder, has filed or recorded publicly any Liens and/or security interests to secure such holder's Secured Claim, then as soon as practicable on or after the Effective Date, such holder (or the agent for such holder) shall take any and all steps requested by the Debtors, the Reorganized Debtors, or Exit Facility Agents that are necessary or desirable to record or effectuate the cancellation and/or extinguishment of such Liens and/or security interests, including the making of any applicable filings or recordings, and the Reorganized Debtors shall be entitled to make any such filings or recordings on such holder's behalf.

C.     *Releases by the Debtors.*

Notwithstanding anything contained in the Plan to the contrary, pursuant to section 1123(b) of the Bankruptcy Code, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, on and after the Effective Date, each Released Party is, and is deemed hereby to be, fully, conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by the Debtors, the Reorganized Debtors, their Estates, and any person seeking to exercise the rights of the Debtors or their Estates, including any successors to the Debtors or any Estates representatives appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all Claims and Causes of Action, including any derivative claims asserted or assertable on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, contingent or non-contingent, in law, equity, contract, tort or otherwise, that the Debtors, the Reorganized Debtors, or their Estates, including any successors to the Debtors or any Estates representative appointed or selected pursuant to section 1123(b) of the Bankruptcy Code, would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor or other Entity, or that any Holder of any Claim against, or Interest in, a Debtor or other Entity could have asserted on behalf of the Debtors, based on or relating to, or in any manner arising from, in whole or in part:

1.     the Debtors (including the capital structure, management, ownership, or operation thereof), the business or contractual arrangement between the Debtors and any Released Party, any Securities issued by the Debtors and the ownership thereof, the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in- or out-of-court restructuring efforts, any Avoidance Actions (but excluding Avoidance Actions brought as counterclaims or defenses to Claims asserted against the Debtors), intercompany transactions between or among a Company Party and another Company Party, the Superpriority Credit Agreement, the Credit Agreement, the Hedge Agreements (as defined in the Hedging Order), the 2021 LC Agreement, the Lloyds Letter of Credit Agreement, the Senior Notes Indenture, the Senior Notes, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Restructuring Support Agreement, the Disclosure Statement, the DIP Credit Agreement, the Exit Facility Documents, or the Plan (including, for the avoidance of doubt, the Plan Supplement);

2.     any Restructuring Transaction, contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection

53

with the Restructuring Support Agreement, the Rights Offering, the Disclosure Statement, the DIP Credit Agreement, the New Warrants Agreements, the Exit Facility Documents, the Plan, or the Plan Supplement, before or during the Chapter 11 Cases;

3. the Chapter 11 Cases, the filing of the Chapter 11 Cases, the Disclosure Statement or the Plan, the solicitation of votes with respect to the Plan, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, the Rights Offering, or the distribution of property under the Plan or any other related agreement; or

4. any related act or omission, transaction, agreement, event, or other occurrence related or relating to any of the foregoing taking place on or before the Effective Date, including all Avoidance Actions or other relief obtained by the Debtors in the Chapter 11 Cases.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (i) post Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Restructuring Transaction, any Definitive Document, or any other document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, including the Exit Facility Documents, the New Warrants Agreements, or any Claim or obligation arising under the Plan, or (ii) the rights of any holder of Allowed Claims to receive distributions under the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the foregoing Debtor release, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that the foregoing Debtor release is:  (a) in exchange for the good and valuable consideration provided by the Released Parties, including, without limitation, the Released Parties' contributions to facilitating the Restructuring Transactions and implementing the Plan; (b) a good faith settlement and compromise of the Claims released by the foregoing Debtor release; (c) in the best interests of the Debtors and their Estates and all holders of Claims and Interests; (d) fair, equitable, and reasonable; (e) given and made after due notice and opportunity for hearing; and (f) a bar to any of the Debtors, the Reorganized Debtors, or the Debtors' Estates asserting any Claim or Cause of Action released pursuant to the foregoing Debtor release.

D.      *Releases by the Releasing Parties.*

Except as otherwise expressly set forth in this Plan or the Confirmation Order, on and after the Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is, and is deemed hereby to be, fully, conclusively, absolutely, unconditionally, irrevocably and forever, released and discharged by each Releasing Party, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all Claims and Causes of Action, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, contingent or non-contingent, in law, equity, contract, tort, or otherwise, including any derivative claims asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim against, or Interest in, a Debtor or other Entity, or that any holder of any Claim against, or Interest in, a Debtor or other Entity could have asserted on behalf of the Debtors, based on or relating to, or in any manner arising from, in whole or in part:

1. the Debtors (including the capital structure, management, ownership, or operation thereof), the business or contractual arrangement between the Debtors and any Releasing Party, any Securities issued by the Debtors and the ownership thereof, the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in- or out-of-court restructuring efforts, any Avoidance Actions (but excluding Avoidance Actions brought as counterclaims or defenses to Claims asserted against the Debtors), intercompany transactions between or among a Company Party and another Company Party, the Superpriority Credit Agreement, the Credit Agreement, the Hedge Agreements (as defined in the Hedging Order), the 2021 LC Agreement, the Lloyds Letter of Credit Agreement, Senior Notes

Indenture, the Senior Notes, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Restructuring Support Agreement, the Disclosure Statement, the DIP Credit Agreement, the Exit Facility Documents, or the Plan (including, for the avoidance of doubt, the Plan Supplement);

2.  any Restructuring Transaction, contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Restructuring Support Agreement, the Rights Offering, the Disclosure Statement, the DIP Credit Agreement, the New Warrants Agreements, the Exit Facility Documents, the Plan, or the Plan Supplement, before or during the Chapter 11 Cases;

3.  the Chapter 11 Cases, the filing of the Chapter 11 Cases, the Disclosure Statement, or the Plan, the solicitation of votes with respect to the Plan, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, the Rights Offering, or the distribution of property under the Plan or any other related agreement; or

4.  any related act or omission, transaction, agreement, event, or other occurrence related or relating to any of the foregoing taking place on or before the Effective Date, including all Avoidance Actions or other relief obtained by the Debtors in the Chapter 11 Cases.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (i) any party of any obligations related to customary banking products, banking services or other financial accommodations (except as may be expressly amended or modified by the Plan and the Exit Facility Documents, or any other financing document under and as defined therein), (ii) any post-Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Restructuring Transaction, or any document, instrument, any Definitive Document, or any agreement (including those set forth in the Plan Supplement) executed to implement the Plan, including the Exit Facility Documents, the New Warrants Agreements, or any Claim or obligation arising under the Plan, (iii) the rights of holders of Allowed Claims to receive distributions under the Plan, or (iv) current and former directors, officers, managers, or employees of the Debtors from any Claim or Cause of Action related to an act or omission that is determined in a Final Order by a court of competent jurisdiction to have constituted actual fraud.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the foregoing third-party release, which includes by reference each of the related provisions and definitions contained herein, and, further, shall constitute the Bankruptcy Court's finding that the foregoing third-party release is:  (a) consensual; (b) essential to the Confirmation of the Plan; (c) given in exchange for a substantial contribution and for the good and valuable consideration provided by the Released Parties that is important to the success of the Plan; (d) a good faith settlement and compromise of the Claims released by the foregoing third-party release; (e) in the best interests of the Debtors and their Estates; (f) fair, equitable, and reasonable; (g) given and made after due notice and opportunity for hearing; and (h) a bar to any of the Releasing Parties asserting any claim or Cause of Action released pursuant to the foregoing third-party release.

E.    *Exculpation.*

Except as otherwise specifically provided in the Plan or the Confirmation Order, no Exculpated Party shall have or incur liability for, and each Exculpated Party shall be released and exculpated from any Claims and Cause of Action for any claim related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, filing, or termination of the Restructuring Support Agreement and related prepetition transactions (including the Superpriority Credit Agreement, the Credit Agreement, the Senior Notes Indenture or Senior Notes, the 2021 LC Agreement, and the Lloyds Letter of Credit Agreement), the Disclosure Statement, the Plan, the DIP Credit Facility, the Exit Facility Documents, the New Warrants Agreements, the Plan Supplement, the Rights Offering, or any

Restructuring Transaction, contract, instrument, release or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion), including any Definitive Document, created or entered into before or during the Chapter 11 Cases, any preference, fraudulent transfer, or other avoidance claim arising pursuant to chapter 5 of the Bankruptcy Code or other applicable law, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, except for claims related to any act or omission that is determined in a Final Order by a court of competent jurisdiction to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.

The Exculpated Parties and other parties set forth above have, and upon confirmation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

F.      *Injunction.*

Except as otherwise expressly provided in the Plan or the Confirmation Order or for obligations or distributions issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities who have held, hold, or may hold the Released Claims are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties:  (1) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any Released Claims; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any Released Claims; (3) creating, perfecting, or enforcing any lien or encumbrance of any kind against such Entities or the property of such Entities on account of or in connection with or with respect to any Released Claims; (4) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property or the Estates of such Entities on account of or in connection with or with respect to any Released Claims unless such holder has filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a Claim or Interest or otherwise that such holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any Released Claims released or settled pursuant to the Plan.

Upon entry of the Confirmation Order, all holders of Claims and Interests and their respective current and former employees, agents, officers, directors, principals, and direct and indirect Affiliates shall be enjoined from taking any actions to interfere with the implementation or Consummation of the Plan.  Except as otherwise set forth in the Confirmation Order, each holder of an Allowed Claim or Allowed Interest, as applicable, by accepting, or being eligible to accept, distributions under or Reinstatement of such Claim or Interest, as applicable, pursuant to the Plan, shall be deemed to have consented to the injunction provisions set forth in this Article VIII.F hereof.

G.      *Protections Against Discriminatory Treatment.*

Consistent with section 525 of the Bankruptcy Code and the Supremacy Clause of the U.S. Constitution, all Entities, including Governmental Units, shall not discriminate against the Reorganized Debtors or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Reorganized Debtors, or another Entity with whom the Reorganized Debtors have been associated, solely because each Debtor has been a debtor under chapter 11 of the

Bankruptcy Code, has been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before the Debtors are granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

H.      *Document Retention.*

On and after the Effective Date, the Reorganized Debtors may maintain documents in accordance with their standard document retention policy, as may be altered, amended, modified, or supplemented by the Reorganized Debtors.

I.      *Reimbursement or Contribution.*

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the time of allowance or disallowance, such Claim shall be forever disallowed and expunged notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Confirmation Date:  (1) such Claim has been adjudicated as non-contingent or (2) the relevant holder of a Claim has Filed a non-contingent Proof of Claim on account of such Claim and a Final Order has been entered prior to the Confirmation Date determining such Claim as no longer contingent.

## ARTICLE IX.
## CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN

A.      *Conditions Precedent to the Effective Date.*

It shall be a condition to the Effective Date that the following conditions shall have been satisfied or waived pursuant to the provisions of Article IX.B hereof:

a.      the Debtors shall have achieved the Achievement Target; and

b.      the Bankruptcy Court shall have entered the Confirmation Order, which shall be a Final Order, in form and substance consistent in all respects with the Restructuring Support Agreement (including any consent rights thereunder) and otherwise in form and substance acceptable to the Debtors and the Required Consenting Stakeholders, and which shall:

   i.      authorize the Debtors to take all actions necessary to enter into, implement, and consummate the contracts, instruments, releases, leases, indentures, and other agreements or documents created in connection with the Plan;

   ii.     decree that the provisions in the Confirmation Order and the Plan are nonseverable and mutually dependent;

   iii.    authorize the Debtors, as applicable/necessary, to:  (a) implement the Restructuring Transactions, including the Rights Offering; (b) distribute the New Common Stock and the New Warrants, and to issue the New Common Stock upon exercise of the New Warrants, pursuant to the exemption from registration under the Securities Act provided by section 1145 of the Bankruptcy Code or such other applicable exemption from such registration or pursuant to one or more registration statements; (c) make all distributions and issuances as required under the Plan, including Cash and the New Common Stock; and (d) enter into any agreements, transactions, and sales of property as set forth in the Plan Supplement, including the Management Incentive Plan, in each case, in a manner consistent with the terms of the Restructuring Support Agreement and subject to the consent rights set forth therein;

   iv.     authorize the implementation of the Plan in accordance with its terms; and

v.      provide that, pursuant to section 1146 of the Bankruptcy Code, the assignment or surrender of any lease or sublease, and the delivery of any deed or other instrument or transfer order, in furtherance of, or in connection with the Plan, including any deeds, bills of sale, or assignments executed in connection with any disposition or transfer of assets contemplated under the Plan, shall not be subject to any stamp, real estate transfer, mortgage recording, or other similar tax; and

c.      the Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan;

d.      the final version of each of the Plan, the Definitive Documents, and all documents contained in any supplement to the Plan, including Plan Supplement and any exhibits, schedules, amendments, modifications, or supplements thereto or other documents contained therein shall have been executed or filed, as applicable in form and substance consistent in all respects with the Restructuring Support Agreement, the Restructuring Term Sheet, and the Plan, and comply with the applicable consent rights set forth in the Restructuring Support Agreement and/or the Plan for such documents and shall not have been modified in a manner inconsistent with the Restructuring Support Agreement;

e.      the definitive documents in respect of the Lloyds LC Exit Facility and the Exit Facility Documents shall have been duly executed and delivered by all of the Entities that are parties thereto and all conditions precedent (other than any conditions related to the occurrence of the Effective Date) to the effectiveness of the Exit Facilities shall have been satisfied or duly waived in writing in accordance with the terms of each of the Exit Facilities and the closing of each of the Exit Facilities and the Lloyds LC Exit Facility shall have occurred;

f.      the Final Order approving the DIP Credit Facility shall have been entered and shall remain in full force and effect and no event of default shall have occurred and be continuing thereunder;

g.      no more than $50 million principal amount of Prepetition Secured Letters of Credit, the Lloyds Letters of Credit, or the DIP Letters of Credit (other than cash collateralized letters of credit) shall have been drawn and unreimbursed in full in Cash as of the Effective Date; *provided* that this condition may be waived solely with the written consent of the Required Consenting LC Lenders;

h.      Reorganized McDermott shall have a minimum of $820 million of Cash on its balance sheet (which amount shall not include Cash held by the Debtors' joint-venture affiliates or cash collateral securing the Cash Secured Letters of Credit, the Lloyds Letters of Credit, and the DIP Cash Secured Letters of Credit) assuming normal working capital; *provided* that this condition may be waived solely with the written consent of the Required Consenting Lenders;

i.      all professional fees and expenses of retained professionals that require the Bankruptcy Court's approval shall have been paid in full or amounts sufficient to pay such fees and expenses after the Effective Date shall have been placed in a professional fee escrow account pending the Bankruptcy Court's approval of such fees and expenses;

j.      the Technology Business Sale shall have been consummated;

k.      the Debtors' shall have Filed a *Notice of Anticipated Effective Date* at least five (5) days in advance of such Effective Date;

l.      to the extent invoiced in accordance with the terms of the Plan, the payment in Cash in full of the Restructuring Expenses; and

m.   the Debtors shall have implemented the Restructuring Transactions and all transactions contemplated in the Restructuring Term Sheet in a manner consistent with the Restructuring Support Agreement (and subject to, and in accordance with, the consent rights set forth therein), the Restructuring Term Sheet, and the Plan.

B.      *Waiver of Conditions.*

Except as otherwise specified in the Plan or the Restructuring Support Agreement, any one or more of the conditions to Consummation (or component thereof) set forth in this Article IX may be waived by the Debtors with the prior written consent of the Required Consenting Stakeholders (not to be withheld unreasonably), without notice, leave, or order of the Bankruptcy Court or any formal action other than proceedings to confirm or consummate the Plan.  Notwithstanding the foregoing, if the conditions precedent to the closing of the Pipes Business Sale shall have been satisfied in accordance with the Pipes Business Sale Documents (as approved by the Required Consenting Lenders), then the conditions set forth in this Article IX (other than in Article IX.A.b) shall be deemed automatically waived solely with respect to the Pipes Entities, as applicable, without notice, leave, or order of the Bankruptcy Court, or any further action by the Debtors, the Reorganized Debtors, or the Required Consenting Stakeholders.

C.      *Effect of Failure of Conditions.*

If Consummation does not occur as to any Debtor, the Plan shall be null and void in all respects as to such Debtor and nothing contained in the Plan, the Disclosure Statement, or Restructuring Support Agreement as to such Debtor shall:  (1) constitute a waiver or release of any Claims by the Debtors, Claims, or Interests; (2) prejudice in any manner the rights of the Debtors, any holders of Claims or Interests, or any other Entity; or (3) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any holders of Claims or Interests, or any other Entity.

D.      *Substantial Consummation*

"Substantial Consummation" of the Plan, as defined in 11 U.S.C. § 1101(2), shall be deemed to occur on the Effective Date.

## ARTICLE X.
## MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

A.      *Modification and Amendments.*

Except as otherwise specifically provided in this Plan and subject to the consent rights set forth in the Restructuring Support Agreement, the Debtors reserve the right to modify the Plan, whether such modification is material or immaterial, and seek Confirmation consistent with the Bankruptcy Code and, as appropriate, not resolicit votes on such modified Plan.  Subject to those restrictions on modifications set forth in the Plan and the requirements of section 1127 of the Bankruptcy Code, Rule 3019 of the Federal Rules of Bankruptcy Procedure, and, to the extent applicable, sections 1122, 1123, and 1125 of the Bankruptcy Code, each of the Debtors expressly reserves its respective rights to revoke or withdraw, or to alter, amend, or modify the Plan with respect to such Debtor, one or more times, after Confirmation, and, to the extent necessary may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan.

B.      *Effect of Confirmation on Modifications.*

Entry of the Confirmation Order shall mean that all modifications or amendments to the Plan since the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

*C.*     *Revocation or Withdrawal of Plan.*

To the extent permitted by the Restructuring Support Agreement, the Debtors reserve the right to revoke or withdraw the Plan prior to the Confirmation Date and to File subsequent plans of reorganization.  If the Debtors revoke or withdraw the Plan, or if Confirmation or Consummation does not occur, then:  (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected under the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (3) nothing contained in the Plan shall:  (a) constitute a waiver or release of any Claims or Interests; (b) prejudice in any manner the rights of such Debtor or any other Entity; or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by such Debtor or any other Entity.

## ARTICLE XI.
## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or relating to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

a.   allow, disallow, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the secured or unsecured status, priority, amount, or allowance of Claims or Interests;

a.   decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

b.   resolve any matters related to:  (a) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Cures pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; (c) the Reorganized Debtors amending, modifying, or supplementing, after the Effective Date, pursuant to Article V hereof, any Executory Contracts or Unexpired Leases to the list of Executory Contracts and Unexpired Leases to be assumed or rejected or otherwise; and (d) any dispute regarding whether a contract or lease is or was executory or expired;

c.   ensure that distributions to holders of Allowed Claims and Allowed Interests (as applicable) are accomplished pursuant to the provisions of the Plan, including with respect to the New Warrants;

d.   adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

e.   adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code;

f.   enter and implement such orders as may be necessary to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created or entered into in connection with the Plan or the Disclosure Statement, including the Restructuring Support Agreement;

g.   enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

h.  resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the Consummation, interpretation, or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

i.  issue injunctions, enter and implement other orders, or take such other actions as may be necessary to restrain interference by any Entity with Consummation or enforcement of the Plan;

j.  resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the releases, injunctions, exculpations, and other provisions contained in Article VIII hereof and enter such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions;

k.  resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the holder of a Claim or Interest for amounts not timely repaid pursuant to Article VI.L hereof;

l.  enter and implement such orders as are necessary if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

m.  determine any other matters that may arise in connection with or relate to the Plan, the Plan Supplement, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection with the Plan or the Disclosure Statement, including the Restructuring Support Agreement;

n.  enter an order concluding or closing the Chapter 11 Cases;

o.  adjudicate any and all disputes arising from or relating to distributions under the Plan;

p.  consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

q.  determine requests for the payment of Claims and Interests entitled to priority pursuant to section 507 of the Bankruptcy Code;

r.  hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan or the Confirmation Order, including disputes arising under agreements, documents, or instruments executed in connection with the Plan;

s.  hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

t.  hear and determine all disputes involving the existence, nature, scope, or enforcement of any exculpations, discharges, injunctions, and releases granted in the Plan, including under Article VIII hereof;

u.  enforce all orders previously entered by the Bankruptcy Court; and

v.  hear any other matter not inconsistent with the Bankruptcy Code.

As of the Effective Date, notwithstanding anything in this Article XI to the contrary, the New Organizational Documents and the Exit Facilities and any documents related thereto shall be governed by the jurisdictional provisions therein and the Bankruptcy Court shall not retain jurisdiction with respect thereto.

## ARTICLE XII.
## MISCELLANEOUS PROVISIONS

A.      *Immediate Binding Effect.*

Subject to Article IX.A hereof and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan (including, for the avoidance of doubt, the documents and instruments contained in the Plan Supplement) shall be immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized Debtors, any and all holders of Claims or Interests (irrespective of whether such holders of Claims or Interests have, or are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in the Plan, each Entity acquiring property under the Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.

B.      *Additional Documents.*

On or before the Effective Date, and consistent in all respects with the terms of the Restructuring Support Agreement, the Debtors may file with the Bankruptcy Court such agreements and other documents as may be necessary to effectuate and further evidence the terms and conditions of the Plan and the Restructuring Support Agreement.  The Debtors or the Reorganized Debtors, as applicable, and all holders of Claims or Interests receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

C.      *Payment of Statutory Fees.*

All fees payable pursuant to section 1930(a) of the Judicial Code, as determined by the Bankruptcy Court at a hearing pursuant to section 1128 of the Bankruptcy Code, shall be paid by each of the Reorganized Debtors (or the Disbursing Agent on behalf of each of the Reorganized Debtors) for each quarter (including any fraction thereof) until the earlier of entry of a final decree closing such Chapter 11 Cases or an order of dismissal or conversion, whichever comes first.

D.      *Statutory Committee and Cessation of Fee and Expense Payment.*

On the Confirmation Date, any statutory committee appointed in the Chapter 11 Cases shall dissolve and members thereof shall be released and discharged from all rights and duties from or related to the Chapter 11 Cases. The Reorganized Debtors shall no longer be responsible for paying any fees or expenses incurred by the members of or advisors to any statutory committees after the Confirmation Date.

E.      *Reservation of Rights.*

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order, and the Confirmation Order shall have no force or effect if the Effective Date does not occur.  None of the Filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by any Debtor with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the holders of Claims or Interests prior to the Effective Date.

F.      *Successors and Assigns.*

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, Affiliate, officer, manager, director, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

G.      *Notices.*

All notices, requests, and demands to or upon the Debtors to be effective shall be in writing (including by facsimile transmission) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

| Debtors | Counsel to the Debtors |
|---|---|
| McDermott International, Inc.<br>757 North Eldridge Parkway<br>Houston, Texas 77079<br>Attention:  John Freeman | Kirkland & Ellis LLP<br>601 Lexington Avenue<br>New York, New York 10022<br>Attention: Joshua A. Sussberg, P.C., Christopher T. Greco, P.C., and Anthony R. Grossi<br><br>and<br><br>Kirkland & Ellis LLP<br>300 North LaSalle Street<br>Chicago, Illinois 60654<br>Attention:  John R. Luze<br><br>and<br><br>Jackson Walker L.L.P.<br>1401 McKinney Street, Suite 1900<br>Houston, Texas 77010<br>Attention: Elizabeth C. Freeman and Matthew D. Cavenaugh |
| **United States Trustee** | **Counsel to the Consenting Superpriority Term Lenders and the Consenting Term Lenders** |
| Office of The United States Trustee<br>515 Rusk Street, Suite 3516<br>Houston, TX 77002 | Davis Polk & Wardwell LLP<br>450 Lexington Avenue<br>New York, NY 10017<br>Attention:  Damian S. Schaible and Natasha Tsiouris |
| **Counsel to the DIP LC Agent, the DIP Collateral Agent, the Revolving and LC Administrative Agent, the 2018 Collateral Agent, the Superpriority Revolving Administrative Agent and the Superpriority Collateral Agent** | **Counsel to the DIP Term Loan Agent, the 2021 LC Administrative Agent, the Superpriority Term Loan Agent, and the Term Loan Administrative Agent** |
| Linklaters LLP<br>1345 Avenue of the Americas<br>New York, New York 10105<br>Attention:  Margot Schonholtz and Penelope Jensen<br><br>and<br><br>Bracewell LLP<br>711 Louisiana Street<br>Houston, Texas 77002<br>Attention: William A. (Trey) Wood III | Latham & Watkins LLP<br>885 Third Avenue<br>New York, NY 10022<br>Attention: Andrew Parlen and Anupama Yerramalli |

| **Counsel to the Consenting Noteholders** |
|---|
| Paul, Weiss, Rifkind, Wharton & Garrison LLP<br>1285 Avenue of the Americas<br>New York, NY 10019<br>Attention: Andrew N. Rosenberg and Alice B. Eaton<br><br>-and-<br><br>Brown Rudnick LLP<br>7 Times Square<br>New York, NY 10036<br>Attention: Robert J. Stark and Bennett S. Silverberg |

After the Effective Date, the Reorganized Debtors have the authority to send a notice to Entities that to continue to receive documents pursuant to Bankruptcy Rule 2002, such Entity must file a renewed request to receive documents pursuant to Bankruptcy Rule 2002. After the Effective Date, the Reorganized Debtors are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have Filed such renewed requests.

H.      *Term of Injunctions or Stays.*

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date. All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

I.      *Entire Agreement.*

Except as otherwise indicated, and without limiting the effectiveness of the Restructuring Support Agreement, the Plan (including, for the avoidance of doubt, the documents and instruments in the Plan Supplement) supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

J.      *Plan Supplement.*

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan. After the exhibits and documents are Filed, copies of such exhibits and documents shall be available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from the Debtors' restructuring website at https://cases.primeclerk.com/McDermott or the Bankruptcy Court's website at www.txs.uscourts.gov/bankruptcy. To the extent any exhibit or document is inconsistent with the terms of the Plan, unless otherwise ordered by the Bankruptcy Court, the non-exhibit or non-document portion of the Plan shall control.

K.      *Nonseverability of Plan Provisions.*

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding,

alteration, or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the Debtors' or Reorganized Debtors' consent, as applicable; and (3) nonseverable and mutually dependent.

L.        *Votes Solicited in Good Faith.*

          Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with section 1125(g) of the Bankruptcy Code, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtors and each of their respective Affiliates, agents, representatives, members, principals, shareholders, officers, directors, employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of securities offered and sold under the Plan and any previous plan, and, therefore, neither any of such parties or individuals or the Reorganized Debtors will have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under the Plan and any previous plan.

M.        *Closing of Chapter 11 Cases.*

          The Reorganized Debtors shall, promptly after the full administration of the Chapter 11 Cases, File with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Cases.

N.        *Waiver or Estoppel.*

          Each holder of a Claim or an Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, secured or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement, or papers Filed with the Bankruptcy Court prior to the Confirmation Date.

O.        *Creditor Default*

          An act or omission by a holder of a Claim or an Interest in contravention of the provisions of this Plan shall be deemed an event of default under this Plan. Upon an event of default, the Reorganized Debtors may seek to hold the defaulting party in contempt of the Confirmation Order and shall be entitled to reasonable attorneys' fees and costs of the Reorganized Debtors in remedying such default.  Upon the finding of such a default by a creditor, the Bankruptcy Court may:  (a) designate a party to appear, sign and/or accept the documents required under the Plan on behalf of the defaulting party, in accordance with Bankruptcy Rule 7070; (b) enforce the Plan by order of specific performance; (c) award judgment against such defaulting creditor in favor of the Reorganized debtor in an amount, including interest, to compensate the Reorganized Debtors for the damages caused by such default; and (d) make such other order as may be equitable that does not materially alter the terms of the Plan.

Dated: March 11, 2020

MCDERMOTT INTERNATIONAL, INC.

on behalf of itself and all other Debtors


*/s/ John Castellano*
John Castellano
Chief Restructuring Officer

## IN THE UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| In re: | ) |
| | ) Chapter 11 |
| | ) |
| MCDERMOTT INTERNATIONAL, INC., *et al.*,[1] | ) Case No. 20-30336 (DRJ) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |

### SECOND AMENDED JOINT PREPACKAGED
### CHAPTER 11 PLAN OF REORGANIZATION OF
### ~~OF~~ MCDERMOTT INTERNATIONAL, INC. AND ITS DEBTOR AFFILIATES

**JACKSON WALKER L.L.P.**
Matthew D. Cavenaugh (TX Bar No. 24062656)
Jennifer F. Wertz (TX Bar No. 24072822)
Kristhy M. Peguero (TX Bar No. 24102776)
Veronica A. Polnick (TX Bar No. 24079148)
1401 McKinney Street, Suite 1900
Houston, Texas 77010
Telephone:     (713) 752-4200
Facsimile:     (713) 752-4221
Email:     mcavenaugh@jw.com
                jwertz@jw.com
                kpeguero@jw.com
                vpolnick@jw.com

~~Proposed~~ Co-Counsel to the Debtors
*and Debtors in Possession*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Christopher T. Greco, P.C. (admitted *pro hac vice*)
Anthony R. Grossi (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900
Email:     joshua.sussberg@kirkland.com
                christopher.greco@kirkland.com
                anthony.grossi@kirkland.com

-and-

James H.M. Sprayregen, P.C.
John R. Luze (admitted *pro hac vice*)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:     (312) 862-2200
Email:     james.sprayregen@kirkland.com
                john.luze@kirkland.com

*Proposed Co-Counsel to the Debtors
and Debtors in Possession*

Dated: ~~January 22~~March 11, 2020

---

[1] A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://cases.primeclerk.com/McDermott.  The location of Debtor McDermott International, Inc.'s principal place of business and the Debtors' service address in these chapter 11 cases is 757 North Eldridge Parkway, Houston, Texas 77079.

KE 65052765

44458.00001

**TABLE OF CONTENTS**

ARTICLE I. DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, AND
    GOVERNING LAW ........................................................................................................1
    A.    Defined Terms. ..........................................................................................................1
    B.    Rules of Interpretation. ...........................................................................................18~~18~~9
    C.    Computation of Time. ............................................................................................~~19~~20
    D.    Governing Law. ......................................................................................................~~19~~20
    E.    Reference to Monetary Figures. ............................................................................~~19~~20
    F.    Reference to the Debtors or the Reorganized Debtors. .........................................~~19~~20
    G.    Controlling Document. ..........................................................................................~~19~~20
    H.    Consultation, Information, Notice, and Consent Rights. ......................................~~19~~20

ARTICLE II. ADMINISTRATIVE CLAIMS, DIP CLAIMS,  PRIORITY CLAIMS, AND
    RESTRUCTURING EXPENSES .................................................................................20~~1~~
    A.    Administrative Claims. ..........................................................................................20~~1~~
    B.    DIP Claims. ............................................................................................................20~~1~~
    C.    Professional Claims. ..............................................................................................21~~1~~2
    D.    Priority Tax Claims. ...............................................................................................22~~2~~3
    E.    Payment of Restructuring Expenses, Consent Fee. ..............................................22~~2~~3

ARTICLE III. CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS ......................22~~2~~3
    A.    Classification of Claims and Interests. ..................................................................22~~2~~3
    B.    Treatment of Claims and Interests. .......................................................................23~~3~~4
    C.    Special Provision Governing Unimpaired Claims. ...............................................29~~29~~30
    D.    Elimination of Vacant Classes. .............................................................................29~~29~~30
    E.    Voting Classes, Presumed Acceptance by Non-Voting Classes. ..........................29~~29~~30
    F.    Intercompany Interests. .........................................................................................29~~29~~30
    G.    Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code. ..........29~~29~~30
    H.    Controversy Concerning Impairment. ...................................................................29~~29~~31
    I.    Subordinated Claims. ............................................................................................29~~29~~31

ARTICLE IV. MEANS FOR IMPLEMENTATION OF THE PLAN .....................................................30~~1~~
    A.    General Settlement of Claims and Interests. .........................................................30~~1~~
    B.    Restructuring Transactions. ...................................................................................30~~1~~
    C.    Reorganized Debtors. ............................................................................................30~~2~~
    D.    Technology Business Sale. ....................................................................................31~~1~~2
    E.    Pipes Business Sale. ................................................................................................34
    ~~E~~F.    Sources of Consideration for Plan Distributions. ..................................................32~~2~~4
    ~~F~~G.    Corporate Existence. .............................................................................................34~~4~~7
    ~~G~~H.    Vesting of Assets in the Reorganized Debtors. .....................................................35~~5~~7
    ~~H~~I.    Cancellation of Existing Securities and Agreements. ...........................................35~~5~~7
    ~~I~~J.    Corporate Action. ..................................................................................................36~~6~~8
    ~~J~~K.    New Organizational Documents. ..........................................................................36~~6~~9
    ~~K~~L.    Indemnification Obligations. .................................................................................36~~6~~9
    ~~L~~M.    Directors and Officers of the Reorganized Debtors. .............................................37~~7~~9
    ~~M~~N.    Effectuating Documents; Further Transactions. ....................................................37~~37~~40
    ~~N~~O.    Section 1146 Exemption. ......................................................................................37~~37~~40
    ~~O~~P.    Director and Officer Liability Insurance. ..............................................................37~~37~~40
    ~~P~~Q.    Management Incentive Plan. ..................................................................................38~~38~~41
    ~~Q~~R.    Employee and Retiree Benefits. ...........................................................................38~~38~~41
    ~~R~~S.    Preservation of Causes of Action. .........................................................................38~~38~~41

ARTICLE V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ...............39~~39~~42
    A.    Assumption and Rejection of Executory Contracts and Unexpired Leases. ..........39~~39~~42

| | | |
|---|---|---|
| B. | Claims Based on Rejection of Executory Contracts or Unexpired Leases. | 4~~0~~3 |
| C. | Cure of Defaults for Assumed Executory Contracts and Unexpired Leases _and Lummus Executory Contracts or Unexpired Leases_. | 4~~0~~3 |
| D. | Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases. | 41~~1~~4 |
| E. | Insurance Policies. | 41~~1~~4 |
| F. | Reservation of Rights. | 41~~1~~5 |
| G. | Nonoccurrence of Effective Date. | 42~~2~~5 |
| H. | Employee Compensation and Benefits. | 42~~2~~5 |
| I. | Contracts and Leases Entered Into After the Petition Date. | 42~~2~~6 |
| J. | Assumption of Cameron LNG Project Obligations | 43~~3~~6 |
| | **ARTICLE VI. PROVISIONS GOVERNING DISTRIBUTIONS** | 43~~3~~6 |
| A. | Distributions on Account of Claims Allowed as of the Effective Date. | 43~~3~~6 |
| B. | Disbursing Agent. | 43~~3~~6 |
| C. | Rights and Powers of Disbursing Agent. | 43~~3~~7 |
| D. | Delivery of Distributions and Undeliverable or Unclaimed Distributions. | 44~~4~~7 |
| E. | Manner of Payment. | 45~~5~~8 |
| F. | Section 1145 Exemption. | 45~~5~~9 |
| G. | Compliance with Tax Requirements. | 45~~5~~9 |
| H. | Allocations. | 45~~5~~9 |
| I. | No Postpetition Interest on Claims. | 45~~5~~9 |
| J. | Foreign Currency Exchange Rate. | 45~~5~~9 |
| K. | Setoffs and Recoupment. | 46~~6~~9 |
| L. | Claims Paid or Payable by Third Parties. | 46~~46~~50 |
| | **ARTICLE VII. PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND DISPUTED CLAIMS** | 47~~47~~50 |
| A. | Disputed Claims Process. | 47~~47~~50 |
| B. | Allowance of Claims. | 47~~47~~51 |
| C. | Claims Administration Responsibilities. | 47~~47~~51 |
| D. | Estimation of Claims and Interests. ~~.~~ | 47~~47~~51 |
| E. | Adjustment to Claims or Interests without Objection. | 48~~48~~51 |
| F. | Disallowance of Claims or Interests. | 48~~48~~52 |
| G. | No Distributions Pending Allowance. | 48~~48~~52 |
| H. | Distributions After Allowance. | 48~~48~~52 |
| I. | No Interest. | 48~~48~~52 |
| | **ARTICLE VIII. SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS** | 48~~48~~52 |
| A. | Discharge of Claims and Termination of Interests. | 48~~48~~52 |
| **B.** | **Release of Liens.** | 49~~49~~53 |
| **C.** | **Releases by the Debtors.** | 49~~49~~53 |
| **D.** | **Releases by the Releasing Parties.** | 51~~1~~4 |
| **E.** | **Exculpation.** | 52~~2~~6 |
| **F.** | **Injunction.** | 52~~2~~6 |
| G. | Protections Against Discriminatory Treatment. | 53~~3~~7 |
| H. | Document Retention. | 53~~3~~7 |
| I. | Reimbursement or Contribution. | 53~~3~~7 |
| | **ARTICLE IX. CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN** | 53~~3~~7 |
| A. | Conditions Precedent to the Effective Date. | 53~~3~~7 |
| B. | Waiver of Conditions. | 55~~5~~9 |
| C. | Effect of Failure of Conditions. | 55~~5~~9 |
| D. | Substantial Consummation | 55~~5~~9 |
| | **ARTICLE X. MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN** | 55~~5~~9 |
| A. | Modification and Amendments. | 55~~5~~9 |

| | | |
|---|---|---|
| B. | Effect of Confirmation on Modifications. | 560 |
| C. | Revocation or Withdrawal of Plan. | 560 |

ARTICLE XI. RETENTION OF JURISDICTION ................................................................. 560

ARTICLE XII. MISCELLANEOUS PROVISIONS ............................................................ 5862

| | | |
|---|---|---|
| A. | Immediate Binding Effect. | 5862 |
| B. | Additional Documents. | 5862 |
| C. | Payment of Statutory Fees. | 5862 |
| D. | Statutory Committee and Cessation of Fee and Expense Payment. | 5862 |
| E. | Reservation of Rights. | 5863 |
| F. | Successors and Assigns. | 5963 |
| G. | Notices. | 5963 |
| H. | Term of Injunctions or Stays. | 604 |
| I. | Entire Agreement. | 604 |
| J. | Plan Supplement. | 605 |
| K. | Nonseverability of Plan Provisions. | 615 |
| L. | Votes Solicited in Good Faith. | 615 |
| M. | Closing of Chapter 11 Cases. | 615 |
| N. | Waiver or Estoppel. | 615 |
| O. | Creditor Default | 615 |

**INTRODUCTION**

McDermott International, Inc. and the above-captioned debtors and debtors in possession (collectively, the "Debtors"), propose this joint prepackaged chapter 11 plan of reorganization (as modified, amended, or supplemented from time to time, the "Plan") for the resolution of the outstanding claims against, and equity interests in, the Debtors.  Although proposed jointly for administrative purposes, the Plan constitutes a separate Plan for each Debtor.  Holders of Claims or Interests may refer to the Disclosure Statement for a discussion of the Debtors' history, businesses, assets, results of operations, historical financial information, risk factors, a summary and analysis of this Plan, the Restructuring Transactions, and certain related matters.  The Debtors are the proponents of the Plan within the meaning of section 1129 of the Bankruptcy Code.

ALL HOLDERS OF CLAIMS, TO THE EXTENT APPLICABLE, ARE ENCOURAGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

**ARTICLE I.**
**DEFINED TERMS, RULES OF INTERPRETATION,**
**COMPUTATION OF TIME, AND GOVERNING LAW**

A.    *Defined Terms.*

As used in this Plan, capitalized terms have the meanings set forth below.

"*2018 Collateral Agent*" means Crédit Agricole Corporate and Investment Bank, in its capacity as Collateral Agent in respect of the Credit Agreement, the 2021 LC Facility, and the Lloyds LC Facility.

"*2021 LC Agreement*" means that certain letter of credit agreement dated as of October 30, 2018 by and among certain of the Debtors as applicants and guarantors thereto, and the 2021 LC Administrative Agent, as may be amended, supplemented, or otherwise modified from time to time.

"*2021 LC Administrative Agent*" means Barclays Bank PLC, as administrative agent for the 2021 LC Agreement.

"*2021 LC Facility*" means the $230,000,000.00 senior secured letter of credit facility under the 2021 LC Agreement.

"*2021 Letter of Credit Claims*" means any Claim for obligations arising under, or relating to, the 2021 LC Facility, including Claims for all principal amounts outstanding, interest, fees, expenses, costs and other charges arising thereunder or related thereto.

"*2021 Letters of Credit*" means the letters of credit issued under the 2021 LC Facility.

"*2023 LC Facility*" means the $1,440,000,000.00 senior secured letter of credit facility under the Credit Agreement.

"*2023 Letter of Credit Claims*" means any Claim for obligations arising under, or relating to, the 2023 LC Facility, including Claims for all principal amounts outstanding, interest, fees, expenses, costs and other charges arising thereunder or related thereto.

"*2023 Letters of Credit*" means the letters of credit issued under the 2023 LC Facility.

"*Achievement Target*" means the (i) final, binding signed documentation reflecting (x) positive value adjustment of $235 million in projected gross profit and (y) $285 million in letter of credit relief and (ii) project cost

1

savings of $560 million through the employment of risk mitigation strategies, in each case subject to the satisfaction of the Required Consenting Term Lenders and the Required Consenting Revolving Lenders in their sole discretion.

"*Additional Obligations*" shall have the meaning specified in the DIP Credit Facility Term Sheet.

"*Administrative Claim*" means a Claim for costs and expenses of administration of the Chapter 11 Cases pursuant to sections 327, 328, 330, 365, 503(b), 507(a), 507(b), or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses of preserving the Estates and operating the businesses of the Debtors incurred on or after the Petition Date and through the Effective Date; (b) Allowed Professional Claims; and (c) all fees and charges assessed against the Estates under chapter 123 of the Judicial Code.

"*Affiliate*" has the meaning set forth in section 101(2) of the Bankruptcy Code.

"*Agents*" means, collectively, the DIP Agents, the Revolving and LC Administrative Agent, the Term Loan Administrative Agent, the 2021 LC Administrative Agent, the 2018 Collateral Agent, the Superpriority Revolving Administrative Agent, the Superpriority Term Loan Agent, the Superpriority Collateral Agent, and each administrative agent, collateral agent, trustee or other similar agent in respect of the Exit Facilities solely in its capacity as such.

"*Allowed*" means, as to a Claim or Interest, a Claim or Interest allowed under the Plan, under the Bankruptcy Code, or by a final order (including the DIP Financing Orders) as applicable.

"*Assumed Executory Contracts and Unexpired Leases Schedule*" means the schedule of Executory Contracts and Unexpired Leases to be assumed by the Debtors pursuant to the Plan, which shall be included in the Plan Supplement, as the same may be amended, modified, or supplemented from time to time; *provided* that such schedule shall be in form and substance acceptable to the Required Consenting Lenders.

"*Avoidance Actions*" means any and all actual or potential avoidance, recovery, subordination, or other Claims, Causes of Action, or remedies that may be brought by or on behalf of the Debtors or their Estates or other authorized parties in interest under the Bankruptcy Code or applicable non-bankruptcy law, including Claims, Causes of Action, or remedies under sections 502, 510, 542, 544, 545, 547 through 553, and 724(a) of the Bankruptcy Code or under similar local, state, federal, or foreign statutes and common law, including fraudulent transfer laws.

"*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as amended from time to time.

"*Bankruptcy Court*" means the United States Bankruptcy Court for the Southern District of Texas.

"*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure promulgated under section 2075 of the Judicial Code and the general, local, and chambers rules of the Bankruptcy Court, each, as amended from time to time.

"*Barclays Advisors*" means Latham & Watkins LLP and any other local or foreign advisors.

"*Bidding Procedures*" means the procedures governing the auction and the Technology Business Sale, as approved by the Bankruptcy Court and as may be amended from time to time in accordance with their terms.

"*Bilateral Facilities*" means those certain bilateral facilities entered into by various Debtors and their affiliates and the individual lenders party thereto, including:

      (a)  that certain facility agreement (as amended), dated April 13, 2016, between McDermott International, Inc., as borrower, McDermott Middle East, Inc., McDermott Eastern Hemisphere,

Ltd., McDermott Arabia Company Limited, as guarantors, and Abu Dhabi Commercial Bank PJSC, as lending bank;

(b) that certain credit facility agreement (as amended), dated April 30, 2018, between CBI Eastern Anstalt, as borrower, and Mashreqbank PSC, as lending bank;

(c) that certain credit agreement (as amended) dated as of July 19, 2018 between Arabian CBI Company Limited, as customer, McDermott International Inc., as guarantor, and Samba Financial Group, as lending bank;

(d) that certain facility letter (as amended), dated as of January 29, 2018 between McDermott Middle East, Inc., and McDermott Eastern Hemisphere, Ltd., as applicants, McDermott International, Inc., as guarantor, and International Bank of Qatar, as lending bank;

(e) that certain reimbursement agreement for letters of credit or guarantees, dated July 30, 2015 between McDermott International, Inc., as applicant and Riyad Bank, as lending bank;

(f) that certain facility agreement between McDermott Middle East Inc., as borrower, McDermott International, Inc., as guarantor, and First Gulf Bank, as lending bank;

(g) that certain letter of credit reimbursement agreement (as novated), dated August 1, 2007 between J. Ray McDermott S.A., as applicant and Standard Chartered Bank, as lending bank;

(h) that certain master reimbursement agreement between J. Ray McDermott S.A., as applicant, McDermott International, Inc., as guarantor, and ICICI Bank Limited, as lending bank;

(i) that certain reimbursement agreement between Chicago Bridge and Iron Company, N.V., as customer, and Europe Arab Bank PLC, as lending bank;

(j) that certain credit facilities agreement, dated April 4, 2019 between McDermott Middle East, Inc. and McDermott Middle East, Inc. Panama, as borrowers, McDermott International, Inc., as guarantor, and Commercial Bank of Dubai PSC, as lending bank; and

(k) that certain (a) indemnity and undertaking, dated as of June 28, 2019 between Comet II, B.V. as borrower and The Standard Bank of South African Limited as lending bank and (b) parent company guarantee, dated as of June 28, 2019 between McDermott International, Inc. as guarantor and The Standard Bank of South Africa Limited as lending bank.

"*Business Day*" means any day other than a Saturday, Sunday, or other day on which commercial banks are authorized to close under the laws of, or are in fact closed in, the State of New York.

"*Business Plan*" means the business plan for the Reorganized Debtors.

"*Cameron LNG Contractor*" means CCJV, an unincorporated joint venture the members of which are CB&I LLC (as successor in interest) and Chiyoda International Corporation.

"*Cameron LNG EPC Agreement*" means that certain Engineering, Procurement and Construction Contract, dated as of March 17, 2014, between Cameron LNG, LLC and the Cameron LNG Contractor (as amended).

"*Cameron LNG Project Obligations*" means, collectively, the obligations of any Debtor under: (a) that certain EPC Joint Venture Agreement, dated March 17, 2014 between CB&I LLC (as successor in interest) and Chiyoda International Corporation (as amended); and (b) the Cameron LNG EPC Agreement.

"*Cameron LNG Replacement Guarantee*" means a guarantee, which Reorganized McDermott shall execute and deliver to Cameron LNG, LLC, guaranteeing on a joint and several basis on behalf of CB&I LLC the payment

3

and performance of the obligations of the Cameron LNG Contractor under the Cameron LNG EPC Agreement, whether arising prior to or after the execution of such guarantee.

"*Cash*" means cash in legal tender of the United States of America and cash equivalents, including bank deposits, checks, and other similar items.

"*Cash Management Bank*" means any financial institution through which the Debtors have entered into "Cash Management Arrangements" (as defined in the Credit Agreement).

"*Cash Secured LC Exit Facility*" means a 4-year, cash secured letter of credit exit facility in an amount up to $371 million, and otherwise on terms satisfactory to the Required Consenting Lenders, and set forth in the Definitive Documents to be included in the Plan Supplement.

"*Cash Secured Letter of Credit Claims*" means any Claim for obligations arising under, or relating to, the Cash Secured Letters of Credit, including Claims for all principal amounts outstanding, interest, fees, expenses, costs and other charges arising thereunder or related thereto.

"*Cash Secured Letters of Credit*" means the "Cash Secured Letters of Credit" issued under and on the terms set forth under the Credit Agreement.

"*Cause of Action*" or "*Causes of Action*" means any claims, interests, damages, remedies, causes of action, demands, rights, actions, controversies, proceedings, agreements, suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, Liens, indemnities, guaranties, and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, secured or unsecured, assertable, directly or derivatively, matured or unmatured, suspected or unsuspected, in contract, tort, law, equity, or otherwise.  Causes of Action also include: (a) all rights of setoff, counterclaim, or recoupment and claims under contracts or for breaches of duties imposed by law or in equity; (b) the right to object to or otherwise contest Claims or Interests; (c) claims pursuant to section 362 or chapter 5 of the Bankruptcy Code; (d) such claims and defenses as fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) any Avoidance Action.

"*Chapter 11 Cases*" means (a) when used with reference to a particular Debtor, the case pending for that Debtor under chapter 11 of the Bankruptcy Code in the Bankruptcy Court and (b) when used with reference to all the Debtors, the procedurally consolidated chapter 11 cases pending for the Debtors in the Bankruptcy Court.

"*Chiyoda Replacement Guarantee*" means a guarantee which Reorganized McDermott shall execute and deliver to Chiyoda International Corporation in accordance with Section 15.3 of the EPC Joint Venture Agreement, dated March 17, 2014 between CB&I LLC (as successor in interest) and Chiyoda International Corporation (as amended) as required by the Guaranty and Indemnity Agreement entered into by and between CB&I LLC, McDermott International and Chiyoda International Corporation.

"*Claim*" means any claim, as defined in section 101(5) of the Bankruptcy Code, against any of the Debtors.

"*Claims and Balloting Agent*" means Prime Clerk LLC, the notice, claims, and solicitation agent ~~proposed to be~~ retained by the Debtors in the Chapter 11 Cases.

"*Claims Register*" means the official register of Claims maintained by the Claims and Balloting Agent.

"*Class*" means a class of Claims or Interests as set forth in Article III of the Plan pursuant to section 1122(a) of the Bankruptcy Code.

"*CM/ECF*" means the Bankruptcy Court's Case Management and Electronic Case Filing system.

"*Company Party*" has the meaning set forth in the Restructuring Support Agreement.

"*Compensation and Benefits Programs*" means all employment and severance agreements and policies, and all employment, compensation, and benefit plans, policies, workers' compensation programs, savings plans, retirement plans, deferred compensation plans, supplemental executive retirement plans, healthcare plans, disability plans, severance benefit plans, incentive plans, life and accidental death and dismemberment insurance plans, and programs of the Debtors, and all amendments and modifications thereto, applicable to the Debtors' employees, former employees, retirees, and non-employee directors and the employees, former employees and retirees of their subsidiaries, including all savings plans, retirement plans, health care plans, disability plans, severance benefit agreements, and plans, incentive plans, deferred compensation plans and life, accidental death, and dismemberment insurance plans.

"*Confirmation*" means the Bankruptcy Court's entry of the Confirmation Order on the docket of the Chapter 11 Cases.

"*Confirmation Date*" means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases, within the meaning of Bankruptcy Rules 5003 and 9021.

"*Confirmation Hearing*" means the hearing to be held by the Bankruptcy Court on confirmation of the Plan, pursuant to Bankruptcy Rule 3020(b)(2) and sections 1128 and 1129 of the Bankruptcy Code, as such hearing may be continued from time to time.

"*Confirmation Order*" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code and approving the consummation of the Technology Business Sale and the Pipes Business Sale.

"*Consenting 2021 LC Lenders*" has the meaning set forth in the Restructuring Support Agreement.

"*Consenting 2023 LC Lenders*" has the meaning set forth in the Restructuring Support Agreement.

"*Consenting Cash Secured LC Issuers*" has the meaning set forth in the Restructuring Support Agreement.

"*Consenting LC Lenders*" has the meaning set forth in the Restructuring Support Agreement.

"*Consenting Lenders*" has the meaning set forth in the Restructuring Support Agreement.

"*Consenting Noteholders*" has the meaning set forth in the Restructuring Support Agreement.

"*Consenting Revolving Lenders*" has the meaning set forth in the Restructuring Support Agreement.

"*Consenting Stakeholders*" has the meaning set forth in the Restructuring Support Agreement.

"*Consenting Superpriority LC Lenders*" has the meaning set forth in the Restructuring Support Agreement.

"*Consenting Superpriority Term Lenders*" has the meaning set forth in the Restructuring Support Agreement.

"*Consenting Term Lenders*" has the meaning set forth in the Restructuring Support Agreement.

"*Consummation*" means the occurrence of the Effective Date as to the applicable Debtor.

"*Credit Agreement*" means that certain credit agreement dated as of May 10, 2018, by and among certain of the Debtors as borrowers and guarantors thereto, the Revolving and LC Administrative Agent, the Term Loan Administrative Agent, the Issuers (as defined in the Credit Agreement), and the lenders from time to time party thereto, as may be amended, supplemented, or otherwise modified from time to time.

"*Credit Agreement Hedging Claims*" means Claims in respect of Credit Agreement Hedging Obligations, which, for the avoidance of doubt, shall not include DIP Hedging Obligations.

"*Credit Agreement Hedging Obligations*" means mark-to-market obligations arising out of the termination of any "Hedging Obligations" (as defined under the Credit Agreement) prior to the Effective Date.

"*Cure*" means all amounts, including an amount of $0.00, required to cure any monetary defaults under any Executory Contract or Unexpired Lease (or such lesser amount as may be agreed upon by the parties under an Executory Contract or Unexpired Lease) that is to be assumed by the Debtors pursuant to sections 365 or 1123 of the Bankruptcy Code.

"*D&O Liability Insurance Policies*" means all insurance policies of any of the Debtors for directors', managers', and officers' liability existing as of the Petition Date (including any "tail policy") and all agreements, documents, or instruments relating thereto.

"*Definitive Documents*" means the documents listed in Section 3 of the Restructuring Support Agreement.

"*DIP Agents*" means the DIP LC Agent, the DIP Collateral Agent, and the DIP Term Loan Agent.

"*DIP Cash Secured Letter of Credit Claim*" means any Claim for obligations arising under, or relating to, the DIP Cash Secured LC Facility, including Claims for all principal amounts outstanding, interest, fees, expenses, costs and other charges arising thereunder or related thereto.

"*DIP Cash Secured Letters of Credit*" means the letters of credit issued pursuant to the DIP Cash Secured LC Facility.

"*DIP Cash Secured LC Facility*" means the cash secured letter of credit facility pursuant to which up to $100 million of the DIP Letter of Credit Facility may be allocated.

"*DIP Claims*" means all Claims (including adequate protection Claims) derived from, arising under, based upon, or secured pursuant to the DIP Credit Agreement, including all prepetition Claims rolled into the DIP Credit Facility and all other Claims in respect of principal amounts outstanding, interest, fees, expenses, costs, hedging obligations, and other charges arising thereunder or related thereto, in each case, with respect to the DIP Credit Facility.

"*DIP Collateral Agent*" means Crédit Agricole Corporate and Investment Bank in its capacity as collateral agent under the DIP Credit Agreement.

"*DIP Credit Agreement*" means that certain superpriority secured debtor-in-possession credit agreement that governs the DIP Credit Facility (as may be amended, supplemented, or otherwise modified from time to time), among McDermott International, Inc., as parent, certain of the Debtors as borrowers, the lenders party thereto, the DIP Lenders, the DIP Letter of Credit Issuers, and the DIP Agents.

"*DIP Credit Facility*" means the superpriority committed credit facilities provided by the DIP Lenders, which includes the DIP Letter of Credit Facility, the DIP Term Loan Facility, the DIP Hedging Obligations, and any other obligations specified in the DIP Financing Orders.

"*DIP Credit Facility Term Sheet*" means the DIP Credit Facility Term Sheet attached as Exhibit 2 to the Restructuring Term Sheet.

"*DIP Financing Orders*" means the interim order approving the DIP Credit Facility and the final order approving the DIP Credit Facility, ~~to be filed and~~ approved by the Bankruptcy Court in the Chapter 11 Cases.

"*DIP Hedging Obligations*" means all hedging obligations subject to or deemed incurred under the DIP Credit Facility (including for the avoidance of doubt all obligations in respect of the Debtors' prepetition foreign

currency hedging transactions and $500 million notional amount of interest rate hedging transactions rolled into the DIP cCredit fFacility pursuant to the DIP Financing Orders and the Hedging Orders).

"*DIP LC Agent*" means Crédit Agricole Corporate and Investment Bank in its capacity as letter of credit administrative agent under the DIP Credit Agreement.

"*DIP LC Claim*" means any Claim of a DIP Lender, a DIP Letter of Credit Issuer, or the DIP Agents arising under or relating to the DIP Letter of Credit Facility pursuant to the DIP Credit Agreement.

"*DIP Lenders*" means the lenders party to the DIP Credit Agreement with respect to the DIP Credit Facility.

"*DIP Letter of Credit Facility*" means the senior secured superpriority letter of credit facility plus interest, fees, and other amounts due in respect of the SuperpriorityDIP Letters of Credit (including the DIP Cash Secured LC Facility), provided under the DIP Credit Agreement and approved by the Bankruptcy Court pursuant to the DIP Financing Orders.

"*DIP Letter of Credit Issuers*" means the "Issuing Banks" under the DIP Credit Agreement.

"*DIP Letters of Credit*" means (i) the $543 million of new and incremental letters of credit to be provided under the DIP Letter of Credit Facility (including the DIP Cash Secured Letters of Credit) plus (ii) the DIP Roll-Up Letters of Credit.

"*DIP Roll-Up Letters of Credit*" means (i) those Superpriority Letters of Credit, including Claims for all reimbursement obligations outstanding, interest, fees, expenses, costs, and other charges arising thereunder or relating thereto, that are "rolled-up" and deemed issued under the DIP Letter of Credit Facility pursuant to the final DIP Financing Order and (ii) any obligations to be deemed outstanding under the DIP Letter of Credit Facility.

"*DIP Roll-Up Term Loans*" means the term loans outstanding under the Superpriority Term Loan Facility that upon entry of the final DIP Financing Order, shall be deemed to be issued under the DIP Term Loan Facility, including all of the Claims arising under, derived from, based upon, or secured pursuant to the Superpriority Credit Agreement, including Claims for all principal amounts outstanding, interest, fees, expenses, costs, the Make Whole Amount, and other charges arising thereunder or related thereto, in each case, with respect to the Superpriority Term Loan Facility.

"*DIP Term Loan Agent*" means Barclays Bank PLC, in its capacity as term loan administrative agent under the DIP Credit Agreement.

"*DIP Term Loan Claim*" means any Claim of a DIP Lender or the DIP Agents arising under or relating to the DIP Term Loan Facility pursuant to the DIP Credit Agreement or the DIP Financing Orders.

"*DIP Term Loan Facility*" means a superpriority term loan facility, comprised of up to $1.2 billion principal amount of New DIP Term Loans plus $800 million principal amount of the Superpriority Term Loans rolled into the DIP Term Loan Facility plus the Make Whole Amount plus the Additional Obligations and approved by the Bankruptcy Court pursuant to the DIP Financing Orders.

"*DIP Term Loans*" means the New DIP Term Loans and the DIP Roll-Up Term Loans.

"*Disbursing Agent*" means the Reorganized Debtors or the Entity or Entities selected by the Debtors or the Reorganized Debtors, as applicable, to make or facilitate distributions pursuant to the Plan.

"*Disclosure Statement*" means the disclosure statement for the Plan, including all exhibits and schedules thereto, to be approved by the Confirmation Order.

"*Disputed*" means, as to a Claim or an Interest, any Claim or Interest:  (a) that is not Allowed; (b) that is not disallowed by the Plan, the Bankruptcy Code, or a Final Order, as applicable; (c) as to which a dispute is being adjudicated by a court of competent jurisdiction in accordance with non-bankruptcy law; (d) that is Filed in the Bankruptcy Court and not withdrawn, as to which a timely objection or request for estimation has been Filed; and (e) with respect to which a party in interest has Filed a Proof of Claim or otherwise made a written request to a Debtor for payment, without any further notice to or action, order, or approval of the Bankruptcy Court.

"*Distribution Date*" means, except as otherwise set forth herein, the date or dates determined by the Debtors or the Reorganized Debtors, on or after the Effective Date, with the first such date occurring on or as soon as is reasonably practicable after the Effective Date, upon which the Distribution Agent shall make distributions to holders of Allowed Claims entitled to receive distributions under the Plan.

"*Distribution Record Date*" means, other than with respect to publicly held Securities, the record date for purposes of making distributions under the Plan on account of Allowed Claims, which date shall be on or as soon as is reasonably practicable after the Effective Date.  For the avoidance of doubt, no distribution record date shall apply to holders of public securities.

"*DTC*" means the Depository Trust Company.

"*Effective Date*" means, as to the applicable Debtor, the date that is the first Business Day on which (a) no stay of the Confirmation Order is in effect and (b) all conditions precedent to the occurrence of the Effective Date set forth in Article IX.A of the Plan have been satisfied or waived in accordance with Article IX.B of the Plan.  Any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable thereafter.

"*Emergence Awards*" has the meaning set forth in Article IV.Q of the Plan.

"*Entity*" has the meaning set forth in section 101(15) of the Bankruptcy Code.

"*Estate*" means as to each Debtor, the estate created for such Debtor in its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code upon the commencement of such Debtor's Chapter 11 Case.

"*Exchange Act*" means the Securities Exchange Act of 1934, 15 U.S.C. § 78a, *et seq.*, as amended from time to time.

"*Exculpated Parties*" means collectively, and in each case in its capacity as such: (a) the Debtors; (b) any official committees appointed in the Chapter 11 Cases and each of their respective members; (c) the Consenting Stakeholders and any affiliated Hedge Banks; (d) each Agent and the Senior Notes Trustee, and (e) with respect to each of the foregoing, such Entity and its current and former Affiliates, and such Entity's and its current and former Affiliates' current and former equity holders, subsidiaries, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals.

"*Executory Contract*" means a contract to which one or more of the Debtors is a party and that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

"*Existing Common Equity Interests*" means the common stock of McDermott, which is traded and quoted on the New York Stock Exchange under the symbol "MDR," any and all outstanding and unexercised or unvested warrants, options, or rights to acquire such common stock existing prior to the Petition Date, and any Section 510(b) Claims.

"*Existing Preferred Equity Interests*" means all outstanding 12% Redeemable Preferred Stock in McDermott, issued on November 29, 2018, and the Series A Preferred Stock of McDermott, issued on December 2, 2019, and any Section 510(b) Claims.

"*Exit Facilities*" means, collectively, the Term Loan Exit Facility, ~~the Cash Secured LC Exit Facility,~~ and the Exit LC Facilities, as applicable.

"*Exit Facility Agents*" means each of the administrative agents, trustees, or other similar agents under the Exit Facility Agreement, solely in its capacity as such.

"*Exit Facility Agreement*" means that certain agreement to provide the Exit Facilities, if any, dated as of the Effective Date, by and among the Reorganized Debtors party thereto as borrowers, Reorganized McDermott, the Exit Facility Agents, the issuing banks party thereto, and the lender parties thereto, which shall be included in the Plan Supplement.

"*Exit Facility Documents*" means, collectively, the Exit Facility Agreement, and any and all other agreements, documents, and instruments delivered or to be entered into in connection therewith, including any amendments to existing loan or other finance documentation, any guarantee agreements, pledge and collateral agreements, intercreditor agreements, and other security documents, in each case if any, the terms of which documents shall be acceptable to the Debtors or the Reorganized Debtors, as applicable, and the Required Consenting Lenders.

"*Exit LC Facilities*" means the Super Senior Exit Facility, the Senior Exit LC Facility, the Cash Secured LC Exit Facility, and the Roll-Off LC Exit Facility.

"*Federal Judgment Rate*" means the federal judgment rate in effect as of the Petition Date.

"*File*," "*Filed*," or "*Filing*" means file, filed, or filing with the Bankruptcy Court or its authorized designee in the Chapter 11 Cases.

"*Final Order*" means an order or judgment of the Bankruptcy Court, or court of competent jurisdiction with respect to the subject matter that has not been reversed, stayed, modified, or amended, as entered on the docket in any Chapter 11 Case or the docket of any court of competent jurisdiction, and as to which the time to appeal, or seek certiorari or move for a new trial, reargument, or rehearing has expired and no appeal or petition for certiorari or other proceedings for a new trial, reargument, or rehearing has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be timely filed has been withdrawn or resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought or the new trial, reargument, or rehearing will have been denied, resulted in no stay pending appeal of such order, or has otherwise been dismissed with prejudice; *provided* that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed with respect to such order will not preclude such order from being a Final Order.

"*Funded DIP Indebtedness*" means indebtedness under the DIP Credit Facility in respect of the DIP Term Loans (which for the avoidance of doubt includes the Superpriority Term Loans rolled up into the DIP Credit Facility, but excludes any DIP Hedging Obligations) and the Additional Obligations.

"*General Unsecured Claim*" means any Unsecured Claim against a Debtor other than the Bilateral Facility Claims and the Senior Notes Claims.

"*Governmental Unit*" has the meaning set forth in section 101(27) of the Bankruptcy Code.

"*Hedge Bank*" means, with respect to any Consenting Lender, either such Consenting Lender or an affiliate of such Consenting Lender that has entered into "Hedging Obligations" (as defined in the Credit Agreement) with the Debtors.

"*Hedging Order*" means the *Order (I) Authorizing the Debtors to Enter into and Perform Under (A) Amended and Restated Hedge Agreements and (B) New Hedge Agreements, (II) Granting DIP Liens and DIP*

*Superpriority Claims, (III) Modifying the Automatic Stay and (IV) Granting Related Relief* entered by the Bankruptcy Court on January 23, 2020 at Docket No. 145 in the Chapter 11 Cases.

"*Impaired*" means with respect to a Class of Claims or Interests, a Class of Claims or Interests that is impaired within the meaning of section 1124 of the Bankruptcy Code.

"*Insider*" has the meaning set forth in section 101(31) of the Bankruptcy Code.

"*Intercompany Claim*" means any Claim held by a Debtor or an Affiliate against a Debtor or an Affiliate of a Debtor.

"*Intercompany Interest*" means an Interest in a Debtor held by a Debtor or an Affiliate of a Debtor.

"*Interest*" means any equity security (as defined in section 101(16) of the Bankruptcy Code) in any Debtor and any other rights, options, warrants, stock appreciation rights, phantom stock rights, restricted stock units, performance shares, performance units, redemption rights, repurchase rights, convertible, exercisable or exchangeable Securities or other agreements, arrangements or commitments of any character relating to, or whose value is related to, any such interest or other ownership interest in any Debtor.

"*Judicial Code*" means title 28 of the United States Code, 28 U.S.C. §§ 1–4001, as amended from time to time.

"*Lloyds LC Exit Facility*" means a senior secured letter of credit exit facility with Lloyds LC Bank pursuant to which each Lloyds Letter of Credit that is outstanding on the Effective Date under the Lloyds Letter of Credit Agreement will be deemed issued on the Effective Date and which will be secured by only the cash collateral that exclusively secured the Lloyds Letters of Credit as of the Effective Date and any standby letters of credit supporting the Lloyds Letters of Credit as of the Effective Date; *provided* that the cash collateral and/or standby letters of credit, as applicable, securing the Lloyds LC Exit Facility shall be reduced and/or released, as applicable, dollar-for-dollar upon the reduction, expiration, or termination of any Lloyds Letter of Credit in accordance with its terms from and after the Effective Date and upon any such release the applicable cash collateral shall become collateral securing obligations of the Reorganized Debtors under the Exit Facilities.  The definitive documentation for the Lloyds LC Exit Facility shall be substantially in the form of the Lloyds Letter of Credit Agreement, and otherwise on terms satisfactory to the Debtors and the Required Consenting Lenders, and set forth in the Definitive Documents to be included in the Plan Supplement.

"*Lloyds LC Bank*" means Lloyds Bank PLCCorporate Markets plc (as successor to Lloyds Bank plc, formerly known as Lloyds TSB Bank plc), as the Bank under the Lloyds Letter of Credit Agreement.

"*Lloyds LC Facility*" means the $127,000,000.00 senior secured letter of credit facility under the Lloyds Letter of Credit Agreement.

"*Lloyds Letter of Credit Agreement*" means that certain master agreement for stand-by letters of credit originally dated as of June 10, 2013 by and among Lloyds LC Bank plc (formerly known as Lloyds TSB Bank plc) and Comet II B.V., CB&I, LLC, Chicago Bridge and Iron Company B.V., CBI Services, LLC, CB&I UK Limited, CBI Constructors PTY LTD, CB&I Group Inc., and Woodlands International Insurance Ltd, as amended and restated May 10, 2018 in connection with the Business Combination (as defined therein) with McDermott and certain of its subsidiaries, as may be amended, supplemented, or otherwise modified from time to time.

"*Lloyds Letter of Credit Claims*" means any Claim for obligations arising under, or relating to, the Lloyds LC Facility, including Claims for all principal amounts outstanding, interest, fees, expenses, costs and other charges arising thereunder or related thereto.

"*Lloyds Letters of Credit*" means the letters of credit issued under the Lloyds LC Facility.

"*Lien*" has the meaning set forth in section 101(37) of the Bankruptcy Code.

"*Liquidity Lender Steering Committee*" means those certain institutions comprising the steering committee of lenders under the Superpriority Revolving Facility, the Revolving Credit Facility, and the 2023 LC Facility.

"*Lummus Assets and Interests*" means the Debtors' rights, titles, and interests in the Lummus Entities and related assets, as described in the Purchase Agreement.

"*Lummus Entities*" means Lummus Technology LLC; McDermott Technology (2), B.V.; McDermott Technology (3), B.V.; OOO Lummus Technology; CB&I Lummus Engineering & Technology China Co. Ltd.; Lummus Technology Heat Transfer B.V. (Netherlands); Lummus Technology Heat Transfer B.V. (India); Lummus Novolen Technology GmbH; Novolen Technology Holdings C.V.; Lummus Technology B.V.; Lummus Gasification Technology Licensing LLC; Lummus Engineered Products, LLC; Lummus Technology International LLC; Lummus Technology Services LLC; Chemical Research and Licensing, LLC; Lummus Technology Ventures LLC; Catalytic Distillation Technologies; Lummus Technology Overseas LLC, Chevron Lummus Global LLC, and CLG Technical Services, LLC.

"*Lummus Executory Contracts and Unexpired Leases*" means any Executory Contracts and Unexpired Leases of the Debtors proposed to be assumed or assumed and assigned in connection with the Technology Business Sale.

"*Make Whole Amount*" means the make whole amount payable under Section 2.11(b) of the Superpriority Credit Agreement solely with respect to the tranches of the Superpriority Term Loan Facility that were funded prior to the Petition Date.

"*Make Whole Tranche*" means that certain tranche under the Super Senior Exit Facility in an amount equal to the portion of the Make Whole Amount remaining (if any) after applying the Technology Business Sale Proceeds and proceeds from the Rights Offering, subject to the terms of the Exit Facilities Term Sheet.

"*Management Incentive Plan*" has the meaning set forth in ~~Article IV.P~~ Article IV.Q of the Plan.

"*~~Management Incentive Plan Pool~~*" ~~has the meaning set forth in Article IV.P of the Plan.~~

"*McDermott*" means McDermott International, Inc. or any successor or assign, by merger, consolidation, or otherwise, prior to the Effective Date.

"*MIP Pool*" has the meaning set forth in Article IV.Q of the Plan.

"*New Board*" means the board of directors of Reorganized McDermott.  The identities of directors on the New Board shall be set forth in the Plan Supplement.

"*New Common Stock*" means, depending on the transaction structure and as detailed in the Restructuring Transactions Memorandum, common equity in one or more Reorganized Debtors.

"*New DIP Term Loans*" means the new money term loans to be provided under the DIP Term Loan Facility.

"*New Organizational Documents*" means the documents providing for corporate governance of the Reorganized Debtors, including charters, bylaws, operating agreements, or other organizational documents or shareholders' agreements, as applicable, which shall be consistent with the Restructuring Support Agreement (including Section 3.02 of the Restructuring Support Agreement), this Plan, and section 1123(a)(6) of the Bankruptcy Code (as applicable), and shall be included in the Plan Supplement.

"*New Tranche A Warrants*" means the 7-year warrants to purchase 10% of the New Common Stock at a strike price equal to (a) the Prepetition Funded Secured Claims (including, without limitation, principal and any

accrued prepetition or postpetition interest at the default rate as applicable) less (i) the proceeds of the Rights Offering, (ii) the aggregate amount of the loans evidenced by the Term Loan Exit Facility, and (iii) the Residual Prepetition Funded Secured Claims Pay Down, divided by (b) the initial allocation of 94% of the New Common Stock to the holders of Prepetition Funded Secured Claims minus an amount equal to (x) the aggregate proceeds of the Rights Offering divided by Plan Equity Value plus (y) the Prepetition Funded Secured Claims Excess Cash Adjustment.  For the avoidance of doubt, the New Tranche A Warrants shall not be subject to dilution on account of the Management Incentive Plan.

"*New Tranche B Warrants*" means the 7-year warrants to purchase 10% of the New Common Stock at a strike price equal to (a) the Prepetition Funded Secured Claims (including, without limitation, principal and any accrued prepetition or postpetition interest at the default rate as applicable) multiplied by 125%, less (i) the proceeds of the Rights Offering, (ii) the aggregate amount of the loans evidenced by the Term Loan Exit Facility, and (iii) the Residual Prepetition Funded Secured Claims Pay Down, divided by (b) the initial allocation of 94% of the New Common Stock to the holders of Prepetition Funded Secured Claims minus an amount equal to (x) the aggregate proceeds of the Rights Offering divided by Plan Equity Value and (y) the Prepetition Funded Secured Claims Excess Cash Adjustment.  For the avoidance of doubt, the New Tranche B Warrants shall not be subject to dilution on account of the Management Incentive Plan.

"*New Warrants*" means, collectively, the New Tranche A Warrants and the New Tranche B Warrants.

"*New Warrants Agreements*" means those certain agreements providing for, among other things, the issuance and terms of the New Warrants, which shall be included in the Plan Supplement and in form and substance acceptable to the Required Consenting Lenders and the Required Consenting Noteholders.  The New Warrants Agreements shall provide for full anti-dilution and Black-Scholes protection.

"*Non-Pipes Debtors*" means any of the Debtors or Reorganized Debtors other than the Pipes Entities.

"*Other Prepetition Financing Claim*" means any Secured Claim arising under:

    (a)    that certain facility agreement dated September 30, 2010 among McDermott, as guarantor, and its subsidiary NO 105 AS, as borrower, the BNP Paribas, in its capacity as facility agent and security agent, and the lenders party thereto, as may be amended, supplemented, or otherwise modified from time to time, to pay a portion of the construction costs of the *NO 105*;

    (b)    that certain receivables factoring agreement dated November 25, 2016 among J. Ray McDermott de Mexico S.A. de C.V. and the financing intermediaries thereto, as may be amended, supplemented, or otherwise modified from time to time; or

    (c)    that certain re-invoicing service agreement dated May 2019 among Bramid Outsource Limited, as service provider, McDermott, as parent, and CB&I LLC, as customer.

"*Other Priority Claim*" means any Claim, other than an Administrative Claim or a Priority Tax Claim, entitled to priority in right of payment under section 507(a) of the Bankruptcy Code.

"*Other Secured Claim*" means any Secured Claim other than a Revolving Credit Claim, a Term Loan Claim, a 2021 Letter of Credit Claim, a 2023 Letter of Credit Claim, a Lloyds Letter of Credit Claim, a Cash Secured Letter of Credit Claim, a Credit Agreement Hedging Claim, a Superpriority Term Loan Claim, a Superpriority Revolving Facility Claim, an Other Prepetition Financing Claim, a Bilateral Facility Claim, or a DIP Claim.

"*Person*" has the meaning set forth in section 101(41) of the Bankruptcy Code.

"*Petition Date*" means the date on which the Debtors commenced the Chapter 11 Cases.

"*Pipes Business Sale*" means a sale of any or all of the Pipes Interests pursuant to the Pipes Business Sale Documents, and to be agreed to or consummated by one or more of the Debtors after the Confirmation Date.

"*Pipes Business Sale Documents*" means any executed purchase agreement for the sale of the Pipes Interests between certain of the Debtors and the Pipes Buyers for the sale of all or part of the Pipes Interests, and any transition services agreements, license agreements, supply agreements, and any other written ancillary agreements, documents, instruments and certificates executed under or in connection therewith.   The Pipes Business Sale Documents shall be in form and substance satisfactory to the Required Consenting Lenders.

"*Pipes Buyers*" means those Entities that purchase the Pipes Interests pursuant to the Pipes Business Sale Documents.

"*Pipes Entities*" means CB&I Walker LA, LLC; CB&I Lake Charles LLC; CB&I Clearfield, Inc.; CB&I El Dorado, Inc.; CB&I Middle East Holding, Inc.; Shaw Overseas (Middle East) Ltd.; CB&I Nass Pipe Fabrication WLL; CB&I SKE&C Middle East Ltd.; Shaw Pipe Fabrication Holdings, LLC; and Shaw Emirates Pipes Manufacturing LLC, and any other Debtors or their non-Debtor Affiliates that may be identified in the Pipes Business Sale Documents.

"*Pipes Interests*" means all of the Debtors' rights, titles, and interests (whether direct or indirect) in the Pipes Entities and certain related assets, as described in the Pipes Business Sale Documents.

"*Plan Distribution*" means a payment or distribution to holders of Allowed Claims, Allowed Interests, or other eligible Entities under this Plan.

"*Plan Equity Value*" means $2,352,000,000.

"*Plan Objection Deadline*" means the date the Bankruptcy Court establishes as the deadline to File an objection to Confirmation of the Plan.

"*Plan Supplement*" means the compilation of documents and forms of documents, term sheets, agreements, schedules, and exhibits to the Plan (in each case, as may be altered, amended, modified, or supplemented from time to time in accordance with the terms hereof and in accordance with the Bankruptcy Code and Bankruptcy Rules) to be Filed prior to the Confirmation Hearing, to the extent available, and any additional documents Filed prior to the Effective Date as amendments to the Plan Supplement, including the following, as applicable: (a) the New Organizational Documents; (b) to the extent known, the identities of the members of the New Board; (c) the Assumed Executory Contracts and Unexpired Leases Schedule; (d) the Rejected Executory Contracts and Unexpired Leases Schedule; (e) the Schedule of Retained Causes of Action; (f) the Exit Facility Documents; (g) the definitive documentation related to the Management Incentive Plan; (h) the Restructuring Transactions Memorandum; (i) the New Warrants Agreements; and (j) to the extent availableapplicable, the form of any Technology Business Sale Documents distributed by the Debtors to potentially interested parties, if any.  The Debtors shall have the right to alter, amend, modify, or supplement the documents contained in the Plan Supplement up to the Effective Date as set forth in this Plan and in accordance with the Restructuring Support Agreement (and subject to the applicable consent rights thereunder).

"*Prepetition Funded Secured Claims*" means Claims in respect of (i) the Term Loans and the Revolving Loans, (ii) any funded Prepetition Secured Letters of Credit, and (iii) the Credit Agreement Hedging Claims, but excluding any amounts being rolled into the DIP Credit Facility.

"*Prepetition Funded Secured Claims Excess Cash Adjustment*" has the meaning set forth in Article IV.D.4 of the Plan.

"*Prepetition Secured Letters of Credit*" means the 2021 Letters of Credit, the 2023 Letters of Credit, the Revolving LCs, the Lloyds Letters of Credit, and the Cash Secured Letters of Credit.

"*Priority Tax Claim*" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

"*Pro Rata*" means the proportion that an Allowed Claim or an Allowed Interest in a particular Class bears to the aggregate amount of Allowed Claims or Allowed Interests in that Class, unless otherwise indicated.

"*Professional*" means an Entity:  (a) employed pursuant to a Bankruptcy Court order in accordance with sections 327, 363, or 1103 of the Bankruptcy Code and to be compensated for services rendered prior to or on the Confirmation Date, pursuant to sections 327, 328, 329, 330, 331, and 363 of the Bankruptcy Code; or (b) awarded compensation and reimbursement by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

"*Professional Amount*" means the aggregate amount of Professional Claims and other unpaid fees and expenses that the Professionals estimate they have incurred or will incur in rendering services to the Debtors as set forth in Article II.C of the Plan.

"*Professional Claim*" means a Claim by a professional seeking an award by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Confirmation Date under sections 330, 331, 503(b)(2), 503(b)(3), 503(b)(4), or 503(b)(5) of the Bankruptcy Code.

"*Professional Escrow Account*" means an interest-bearing account funded by the Debtors with Cash on the Effective Date in an amount equal to the Professional Amount.

"*Proof of Claim*" means a proof of Claim Filed against any of the Debtors in the Chapter 11 Cases.

"*Purchase Agreement*" means, solely with respect to the Technology Business Sale, the share and asset purchase agreement between the Debtors and the Purchaser.

"*Purchaser*" means one or more Entities that are the purchasers with respect to the Technology Business Sale.

"*Reinstate*," "*Reinstated*," or "*Reinstatement*" means with respect to Claims and Interests, that the Claim or Interest shall not be discharged hereunder and the holder's legal, equitable, and contractual rights on account of such Claim or Interest shall remain unaltered by Consummation in accordance with section 1124(1) of the Bankruptcy Code.

"*Rejected Executory Contracts and Unexpired Leases Schedule*" means the schedule of Executory Contracts and Unexpired Leases to be rejected by the Debtors pursuant to the Plan, which schedule shall be included in the Plan Supplement, as the same may be amended, modified, or supplemented from time to time; *provided* that such schedule shall be in form and substance acceptable to the Required Consenting Lenders.

"*Related Party*" means, collectively, current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, predecessors, participants, successors, assigns, subsidiaries, affiliates, managed accounts or funds, partners, limited partners, general partners, principals, members, management companies, fund advisors or managers, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, heirs, executors, and assigns, and other professionals, in each case solely in their capacities as such, together with their respective past and present directors, officers, shareholders, partners, members, employees, agents, attorneys, representatives, heirs, executors and assigns, in each case solely in their capacities as such.

"*Released Claims*" means any Claims or Interests that have been released, discharged, or are subject to exculpation pursuant to this Plan.

"*Released Parties*" means, collectively, and in each case in its capacity as such:  (a) each Debtor; (b) each Reorganized Debtor; (c) each Company Party; (d) each DIP Lender and each DIP Letter of Credit Issuer; (e) each

Agent; (f) the Senior Notes Trustee; (g) each Consenting Stakeholder; (h) each Hedge Bank; (i) each Cash Management Bank; (j) each lender under the Superpriority Credit Agreement, Credit Agreement, the 2021 LC Agreement, and the Lloyds Letter of Credit Agreement; (k) each holder of an Obligation (as defined in the Superpriority Credit Agreement) under the Superpriority Credit Agreement; (l) each holder of an Obligation (as defined in the Credit Agreement) under the Credit Agreement; (m) each Issuer (as defined in the Superpriority Credit Agreement) under the Superpriority Credit Agreement; (n) each Issuer (as defined in the Credit Agreement) under the Credit Agreement; (o) the Term Loan Ad Hoc Group, the Liquidity Lender Steering Committee, and the Senior Notes Ad Hoc Group; (p) Illuminate Buyer LLC; (q) each current and former Affiliate of each Entity in clause (a) through (op); and (qr) each Related Party of each Entity in clause (a) through (op); *provided* that any holder of a Claim or Interest that opts out of the releases shall not be a "Released Party."

"*Releasing Parties*" means, collectively, and in each case in its capacity as such:  (a) each Debtor; (b) each Reorganized Debtor; (c) each Company Party; (d) each DIP Lender and each DIP Letter of Credit Issuer; (e) each Agent; (f) the Senior Notes Trustee; (g) each Consenting Stakeholder; (h) each Hedge Bank; (i) each Cash Management Bank; (j) each lender under the Superpriority Credit Agreement, Credit Agreement, the 2021 LC Agreement, and the Lloyds Letter of Credit Agreement; (k) each holder of an Obligation (as defined in the Superpriority Credit Agreement) under the Superpriority Credit Agreement; (l) each holder of an Obligation (as defined in the Credit Agreement) under the Credit Agreement; (m) each Issuer (as defined in the Superpriority Credit Agreement) under the Superpriority Credit Agreement; (n) each Issuer (as defined in the Credit Agreement) under the Credit Agreement; (o) the Term Loan Ad Hoc Group, the Liquidity Lender Steering Committee, and the Senior Notes Ad Hoc Group; (p) ~~all holders of Claims or Interests that vote to accept or are deemed to accept the Plan~~Illuminate Buyer LLC; (q) all holders of Claims or Interests that vote to accept the Plan; (r) all holders of Claims or Interests that are deemed to accept the Plan who do not affirmatively opt out of the releases provided by the Plan by checking the box on the applicable Notice of Non-Voting Status indicating that they opt not to grant the releases provided in the Plan; (s) all holders of Claims or Interests that abstain from voting on the Plan and who do not affirmatively opt out of the releases provided by the Plan by checking the box on the applicable ballot indicating that they opt not to grant the releases provided in the Plan; (rt) all holders of Claims or Interests that vote to reject the Plan or are deemed to reject the Plan and who do not affirmatively opt out of the releases provided by the Plan by checking the box on the applicable ballot or Notice of Non-Voting Status indicating that they opt not to grant the releases provided in the Plan; (su) each current and former Affiliate of each Entity in clause (a) through (rt); and (tv) each Related Party of each Entity in clause (a) through (rt).

"*Reorganized Debtors*" means collectively, a Debtor, or any successor or assign thereto, by merger, consolidation, or otherwise, on and after the Effective Date, including any new entity established in connection with the implementation of the Restructuring Transactions.

"*Reorganized McDermott*" means McDermott, or any successor or assign, by merger, consolidation, or otherwise, on or after the Effective Date.

"*Required Consenting LC Lenders*" has the meaning set forth in the Restructuring Support Agreement.

"*Required Consenting Lender*" has the meaning set forth in the Restructuring Support Agreement.

"*Required Consenting Noteholders*" has the meaning set forth in the Restructuring Support Agreement.

"*Required Consenting Revolving Lenders*" has the meaning set forth in the Restructuring Support Agreement.

"*Required Consenting Stakeholders*" has the meaning set forth in the Restructuring Support Agreement.

"*Required Consenting Term Lenders*" has the meaning set forth in the Restructuring Support Agreement.

"*Residual Prepetition Funded Secured Claims Pay Down*" has the meaning set forth in Article IV.D.4 of the Plan.

"*Residual Technology Business Sale Proceeds*" means any Technology Business Sale Proceeds remaining after payment of items (a) through (d) of the Technology Business Sale Proceeds Waterfall for application in accordance with item (e) of the Technology Business Sale Proceeds Waterfall in accordance with the Plan.

"*Restructuring Expenses*" means the prepetition and postpetition reasonable and documented fees and expenses of the Revolving and LC Administrative Agent Advisors, the Term Loan Ad Hoc Group Advisors, the Senior Notes Ad Hoc Group Advisors, the Barclays Advisors, and the Senior Notes Trustee and its advisors, including local and foreign counsel (in each case, in accordance with the terms of their respective engagement letters with their respective clients, if any).

"*Restructuring Term Sheet*" means the Restructuring Term Sheet attached as Exhibit A to the Restructuring Support Agreement.

"*Restructuring Transactions*" means any transaction and any actions as may be necessary or appropriate to effect a corporate restructuring of the Debtors' and the Reorganized Debtors' respective businesses or a corporate restructuring of the overall corporate structure of the Debtors on the terms set forth in the Plan, Restructuring Support Agreement, and Restructuring Transactions Memorandum, including the issuance of all Securities, notes, instruments, certificates, and other documents required to be issued or executed pursuant to the Plan, one or more inter-company mergers, consolidations, amalgamations, arrangements, continuances, restructurings, conversions, dissolutions, transfers, liquidations, or other corporate transactions, as described in Article IV.B of the Plan.

"*Restructuring Transactions Memorandum*" means a document, in form and substance acceptable to the Required Consenting Lenders, to be included in the Plan Supplement that will set forth the material components of the Restructuring Transactions, including the identity of the issuer or issuers of the New Common Stock and any elections that must be made with respect to the receipt of the New Common Stock.

"*Restructuring Support Agreement*" means that certain Restructuring Support Agreement, dated as of January 2~~0~~1, 2020, by and among the Debtors and the Consenting Stakeholders, as may be further amended, modified, or supplemented from time to time, in accordance with its terms.

"*Revolving and LC Administrative Agent*" means Crédit Agricole Corporate and Investment Bank, in its capacity as administrative agent for the Revolving Credit Facility and the 2023 LC Facility.

"*Revolving and LC Administrative Agent Advisors*" means Linklaters LLP, Bracewell LLP and FTI Consulting, Inc., as advisors to the DIP LC Agent, the DIP Collateral Agent, the Revolving and LC Administrative Agent, 2018 Collateral Agent, the Superpriority Revolving Administrative Agent and the Superpriority Collateral Agent, and any other local or foreign advisors.

"*Revolving Credit*" means the Revolving LCs and the Revolving Loans.

"~~*Revolving Credit Facility*~~" ~~means the senior secured revolving credit facility under the Credit Agreement.~~

"*Revolving ~~LC~~Credit Claims*" means any Claim for obligations arising under, or relating to, the Revolving LCs or the Revolving Loans issued under the Revolving Credit Facility, including Claims for all principal amounts outstanding, interest, fees, expenses, costs and other charges arising thereunder or related thereto.

"*Revolving Credit Facility*" means the senior secured revolving credit facility under the Credit Agreement.

"*Revolving LCs*" means the letters of credit issued under and on the terms set forth under the Revolving Credit Facility.

"*Revolving Lenders*" means the lenders under the Revolving Credit Facility.

"*Revolving Loans*" means the revolving loans issued under and on the terms set forth under the Revolving Credit Facility.

"*Rights Offering*" means a rights offering providing for the Consenting Noteholders with the right to purchase up to $150 million of the New Common Stock otherwise earmarked for the holders of Prepetition Funded Secured Claims valued at the Plan Equity Value in connection with the Restructuring Transactions and in accordance with the Rights Offering Procedures and Section 12 of the Restructuring Support Agreement.

"*Rights Offering Procedures*" means the procedures governing the Rights Offering, as approved by the Bankruptcy Court.

"*Rights Offering Shares*" means the shares of New Common Stock issued in accordance with the Rights Offering and subject to the terms of the Rights Offering Procedures and the Restructuring Support Agreement.

"*Roll-Off LC Exit Facility*" means a~~each~~ senior secured letter of credit ~~exit~~ facility ~~pursuant to which each outstanding Prepetition~~(other than in respect of the Cash Secured Letters of Credit~~ will be deemed issued on the Effective Date,~~) under the Credit Agreement and the 2021 LC Agreement, each as amended by the Exit Facility Agreement, each of which will be ranked junior to the Senior Exit LC Facility, and otherwise ~~on~~contain terms consistent with the Exit Facilities Term Sheet and satisfactory to the Required Consenting Lenders, ~~and~~which shall be set forth in the Definitive Documents to be included in the Plan Supplement.

"*Schedule of Retained Causes of Action*" means the schedule of certain Causes of Action of the Debtors that are not released, waived, or transferred pursuant to the Plan, as the same may be amended, modified, or supplemented from time to time.

"*Section 510(b) Claim*" means any Claim or Interest against a Debtor subject to subordination under section 510(b) of the Bankruptcy Code, whether by operation of law or contract.

"*Secured Claim*" means a Claim:  (a) secured by a valid, perfected, and enforceable Lien on collateral to the extent of the value of such collateral, as determined in accordance with section 506(a) of the Bankruptcy Code or (b) subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code.

"*Secured Creditor Equity Distribution*" means 94% of the New Common Stock less the percentage of New Common Stock to be turned over on account of (i) the Prepetition Funded Secured Claims Excess Cash Adjustment and (ii) the Rights Offering, and subject to dilution on account of the Management Incentive Plan and the New Warrants.

"*Secured Creditor Funded Debt Distribution*" means (a) Cash in an amount equal to the Residual Technology Business Sale Proceeds; (b) Cash in an amount equal to any proceeds of the Rights Offering; (c) the Secured Creditor Equity Distribution; and (d) the new term loans evidenced by the Term Loan Exit Facility.

"*Secured Creditor Pro Rata Share*" means with respect to any recipient of any distribution from the Secured Creditor Funded Debt Distribution under the Plan, such recipient's pro rata share thereof measured by reference to the aggregate amount of: (a) all Allowed Term Loan Claims, (b) all Allowed Revolving Credit Claims consisting of (x) all Revolving Loans and (y) funded Revolving LCs, (c) all Allowed 2021 Letter of Credit Claims consisting of funded 2021 Letters of Credit, (d) all Allowed 2023 Letter of Credit Claims consisting of funded 2023 Letters of Credit, (e) all Allowed Lloyds Letter of Credit Claims consisting of funded Lloyds Letters of Credit, and (f) all Credit Agreement Hedging Claims consisting of Credit Agreement Hedging Obligations, that are not being rolled into the DIP Credit Facility, in each case as of the date of such distribution.

"*Secured Letter of Credit Cap*" has the meaning ascribed to it in the Exit Facilities Term Sheet.

17

"*Securities Act*" means the Securities Act of 1933, as amended, 15 U.S.C. §§ 77a–77aa, or any similar federal, state, or local law, as now in effect or hereafter amended, and the rules and regulations promulgated thereunder.

"*Security*" means any security, as defined in section 2(a)(1) of the Securities Act.

"*Senior Exit LC Facility*" means a 4-year, senior secured letter of credit exit facility in an amount up to $1.326 billion, ranked junior to the Super Senior Exit Facility, on terms satisfactory to the Debtors or the Reorganized Debtors, as applicable, and otherwise on terms satisfactory to the Required Consenting Lenders; and set forth in the Definitive Documents to be included in the Plan Supplement; *provided* that the amount of the Senior Exit LC Facility shall be reduced dollar-for-dollar for each Prepetition Secured Letter of Credit or Lloyds Letter of Credit that is drawn and not reimbursed in full in Cash during or after the Chapter 11 Cases.

"*Senior Notes*" means the 10.625% senior notes due 2024 issued by certain of the Debtors pursuant to the Senior Notes Indenture.

"*Senior Notes Ad Hoc Group*" means, collectively, those certain institutions comprising the ad hoc groups of holders of the Senior Notes represented by Paul, Weiss, Rifkind, Wharton & Garrison LLP and Brown Rudnick LLP.

"*Senior Notes Ad Hoc Group Advisors*" means Paul, Weiss, Rifkind, Wharton & Garrison LLP, Brown Rudnick LLP, Houlihan Lokey Capital, Inc., counsel to the Senior Notes Trustee, and any local or foreign advisors.

"*Senior Notes Claims*" means all principal and interest outstanding as of the Petition Date under the Senior Notes.

"*Senior Notes Indenture*" means that certain indenture dated as of April 18, 2018, by and among certain of the Debtors and the Senior Notes Trustee, as may be amended, supplemented, or otherwise modified from time to time.

"*Senior Notes Trustee*" means UMB Bank, N.A., in its capacity as trustee for the Senior Notes Indenture.

"*Severance Arrangements*" has the meaning set forth in Article IV.Q of the Plan.

"*Superpriority Agreement Agents*" means the Superpriority Revolving Administrative Agent, the Superpriority Collateral Agent and the Superpriority Term Loan Agent.

"*Superpriority Collateral Agent*" means Crédit Agricole Corporate and Investment Bank, in its capacity as Collateral Agent under the Superpriority Credit Agreement.

"*Superpriority Credit Agreement*" means that certain superpriority senior secured credit agreement, dated October 21, 2019, between certain of the Debtors as borrowers and guarantors, a syndicate of lenders and letter of credit issuers, the Superpriority Term Loan Agent, and the Superpriority Revolving Administrative Agent, as amended from time to time.

"*Superpriority Facility*" means, collectively, the Superpriority Term Loan Facility and the Superpriority Revolving Facility.

"*Superpriority Letters of Credit*" means the superpriority letters of credit issued under the Superpriority Revolving Facility.

"*Superpriority Revolving Administrative Agent*" means Crédit Agricole Corporate and Investment Bank, in its capacity as administrative agent for the Superpriority Revolving Facility.

18

"*Superpriority Revolving Facility*" means the superpriority secured letter of credit facility under the Superpriority Credit Agreement.

"*Superpriority Term Loan Agent*" means Barclays Bank PLC in its capacity as administrative agent for the Superpriority Term Loan Facility.

"*Superpriority Term Loan Facility*" means the superpriority secured term loan credit facility under the Superpriority Credit Agreement.

"*Superpriority Term Loans*" means the superpriority term loans issued under and on the terms set forth under the Superpriority Term Loan Facility.

"*Super Senior Exit Facility*" means a 4-year, super senior secured exit facility consisting of a letter of credit facility in an amount of $743 million and the Make Whole Tranche (which Make Whole Tranche will be subordinate in right of payment to the obligations with respect to the letters of credit under the Super Senior Exit Facility on the terms provided therein), on terms satisfactory to the Required Consenting Lenders and set forth in the Definitive Documents to be included in the Plan Supplement.

"*Technology Business Sale*" means a sale of the Lummus Assets and Interests under this Plan, pursuant to the Purchase Agreement, and to be agreed to or consummated by the Debtors on the Effective Date.

"*Technology Business Sale Proceeds*" means Cash proceeds received from the Technology Business Sale, net of (a) the reasonable transaction costs in connection with the Technology Business Sale, (b) taxes paid or reasonably estimated to be payable by the Debtors or Reorganized Debtors as a result of the Technology Business Sale, (c) any debt service payments due under the DIP Credit Agreement which are required to be repaid or otherwise becomes due in connection with the Technology Business Sale, and (d) payment of $210 million of prepetition accounts payable.

"*Technology Business Sale Proceeds Waterfall*" means the distribution waterfall for the Technology Business Sale Proceeds, as described in Article IV.D.3 of this Plan.

"*Term Lenders*" means the lenders under the Term Loan Facility.

"*Term Loan Ad Hoc Group*" means certain institutions comprising the ad hoc group of lenders in respect of the Superpriority Term Loans and the lenders in respect of the Term Loan Facility.

"*Term Loan Ad Hoc Group Advisors*" means Davis Polk & Wardwell LLP, Porter Hedges LLP, Centerview Partners, Inc., Ankura Consulting Group, LLC, and any other local or foreign advisors.

"*Term Loan Administrative Agent*" means Barclays Bank PLC, in its capacity as administrative agent for the Term Loan Facility.

"*Term Loan Claims*" means any Claim for obligations arising under, or relating to, the Term Loan Facility.

"*Term Loan Exit Facility*" means a 5-year senior secured term loan facility in an amount equal to $500 million of take-back debt, ranked *pari passu* with the Roll-Off LC Exit Facility, and otherwise on terms satisfactory to the Required Consenting Lenders, and set forth in Definitive Documents to be included in the Plan Supplement.

"*Term Loan Exit Facility Lenders*" means those lenders party to the Exit Facility Agreement.

"*Term Loans*" means the term loans issued and on the terms set forth under the Term Loan Facility.

"*Term Loan Facility*" means the senior secured term loan facility under the Credit Agreement.

19

"*Unexpired Lease*" means a lease to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

"*Unimpaired*" means with respect to a Class of Claims or Interests, a Class of Claims or Interests that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

"*Unsecured Claim*" means any Claim that is not a Secured Claim.

"*Voting Deadline*" means, subject to the approval of the Bankruptcy Court, February 18, 2020, or such other date as ordered by the Bankruptcy Court.

B.      *Rules of Interpretation.*

For purposes of this Plan:  (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; *provided* that nothing in this clause (2) shall affect any parties' consent rights over any of the Definitive Documents or any amendments thereto, as provided for in the Restructuring Support Agreement; (3) unless otherwise specified, any reference herein to an existing document, schedule, or exhibit, whether or not Filed, having been Filed or to be Filed shall mean that document, schedule, or exhibit, as it may thereafter be amended, modified, or supplemented in accordance with the Plan or Confirmation Order, as applicable; (4) any reference to an Entity as a holder of a Claim or Interest includes that Entity's successors and assigns; (5) unless otherwise specified, all references herein to "Articles" are references to Articles hereof or hereto; (6) unless otherwise specified, all references herein to exhibits are references to exhibits in the Plan Supplement; (7) unless otherwise specified, the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (8) subject to the provisions of any contract, certificate of incorporation, by-law, instrument, release, or other agreement or document entered into in connection with the Plan, the rights and obligations arising pursuant to the Plan shall be governed by, and construed and enforced in accordance with the applicable federal law, including the Bankruptcy Code and Bankruptcy Rules; (9) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (10) unless otherwise specified herein, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (11) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; (12) all references to docket numbers of documents Filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (13) all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time, and as applicable to the Chapter 11 Cases, unless otherwise stated; (14) the words "include" and "including," and variations thereof, shall not be deemed to be terms of limitation, and shall be deemed to be followed by the words "without limitation"; (15) references to "Proofs of Claim," "holders of Claims," "Disputed Claims," and the like shall include "Proofs of Interest," "holders of Interests," "Disputed Interests," and the like, as applicable; (16) any immaterial effectuating provisions may be interpreted by the Reorganized Debtors in such a manner that is consistent with the overall purpose and intent of the Plan all without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity; and (17) all references herein to consent, acceptance, or approval may be conveyed by counsel for the respective parties that have such consent, acceptance, or approval rights, including by electronic mail.

C.      *Computation of Time.*

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.  If the date on which a transaction may occur pursuant to the Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day.  Any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable after the Effective Date.

D.      *Governing Law.*

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of New York, without giving effect to the principles of conflict of laws (other than section 5-1401 and section 5-1402 of the New York General Obligations Law), shall govern the rights, obligations, construction, and implementation of the Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control), and corporate governance matters; *provided* that corporate governance matters relating to the Debtors or the Reorganized Debtors, as applicable, not incorporated in New York shall be governed by the laws of the state of incorporation or formation of the relevant Debtor or the Reorganized Debtors, as applicable.

E.      *Reference to Monetary Figures.*

All references in the Plan to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided herein.

F.      *Reference to the Debtors or the Reorganized Debtors.*

Except as otherwise specifically provided in the Plan to the contrary, references in the Plan to the Debtors or the Reorganized Debtors shall mean the Debtors and the Reorganized Debtors, as applicable, to the extent the context requires.

G.      *Controlling Document.*

In the event of an inconsistency between the Plan and the Disclosure Statement, the terms of the Plan shall control in all respects.  In the event of an inconsistency between the Plan and the Plan Supplement, the terms of the relevant provision in the Plan Supplement shall control (unless stated otherwise in such Plan Supplement document or in the Confirmation Order).  In the event of an inconsistency between the Confirmation Order and the Plan, the Confirmation Order shall control.

H.      *Consultation, Information, Notice, and Consent Rights.*

Notwithstanding anything herein to the contrary, any and all consultation, information, notice, and consent rights of the parties to the Restructuring Support Agreement set forth in the Restructuring Support Agreement (including the exhibits thereto) with respect to the form and substance of this Plan, all exhibits to the Plan, and the Plan Supplement, and all other Definitive Documents (as defined in the Restructuring Support Agreement), including any amendments, restatements, supplements, or other modifications to such agreements and documents, and any consents, waivers, or other deviations under or from any such documents, shall be incorporated herein by this reference (including to the applicable definitions in Article I.A hereof) and fully enforceable as if stated in full herein.

Failure to reference the rights referred to in the immediately preceding paragraph as such rights relate to any document referenced in the Restructuring Support Agreement shall not impair such rights and obligations.

## ARTICLE II.
## ADMINISTRATIVE CLAIMS, DIP CLAIMS,
## PRIORITY CLAIMS, AND RESTRUCTURING EXPENSES

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, DIP Claims, Professional Claims, and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III hereof.

A.      *Administrative Claims.*

Unless otherwise agreed to by the holder of an Allowed Administrative Claim and the Debtors or the Reorganized Debtors, as applicable, or otherwise provided for under the Plan or the Restructuring Support Agreement, each holder of an Allowed Administrative Claim (other than holders of Professional Claims and Claims for fees and expenses pursuant to section 1930 of chapter 123 of title 28 of the United States Code) will receive in full and final satisfaction of its Administrative Claim an amount of Cash equal to the amount of such Allowed Administrative Claim in accordance with the following:  (1) if an Administrative Claim is Allowed on or prior to the Effective Date, on the Effective Date or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (2) if such Administrative Claim is not Allowed as of the Effective Date, no later than thirty (30) days after the date on which an order allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; (3) if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claim without any further action by the holders of such Allowed Administrative Claim; (4) at such time and upon such terms as may be agreed upon by such holder and the Debtors or the Reorganized Debtors, as applicable; or (5) at such time and upon such terms as set forth in an order of the Bankruptcy Court.

B.      *DIP Claims.*

As set forth in Article IV.D of this Plan, certain of the Technology Business Sale Proceeds shall be used to pay Allowed DIP Claims (including Allowed DIP Claims with respect to the Make Whole Amount pursuant to the Technology Business Sale Proceeds Waterfall) outstanding on the Effective Date.  Except to the extent that a holder of an Allowed DIP Claim agrees to less favorable treatment, on the Effective Date, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each holder of an Allowed DIP Claim shall receive the following treatment:

(a)     to the extent not paid in full in accordance with the Technology Business Sale Proceeds Waterfall, each holder of an Allowed DIP Term Loan Claim (other than the Make Whole Amount, but including all principal, accrued and unpaid interest, fees and expenses and non-contingent indemnity claims) shall receive payment in full in Cash;

(b)     to the extent not paid in full in accordance with the Technology Business Sale Proceeds Waterfall or the proceeds of the Rights Offering, each holder of an Allowed DIP Term Loan Claim constituting the Make Whole Amount shall receive its Pro Rata share of the term loans arising under the Make Whole Tranche;

(c)     to the extent not paid in full in accordance with the Technology Business Sale Proceeds Waterfall, each holder of an Allowed DIP LC Claim with respect to drawn DIP Letters of Credit that have not been reimbursed in full in Cash as of the Effective Date shall receive payment in full in Cash;

(d)     each holder of an Allowed DIP LC Claim (other than in respect of DIP Cash Secured Letters of Credit) shall receive participation in the Super Senior Exit Facility in an amount equal to each such holder's DIP Letter of Credit Facility commitments;

(e)     each holder of a DIP Cash Secured Letter of Credit Claim shall receive participation in the Cash Secured Exit LC Facility in an amount equal to such holder's DIP Cash Secured Letter of Credit Claim; *provided* that any cash collateral in the DIP Cash Secured LC Account (as defined in the DIP Credit Facility Term Sheet) shall collateralize the Cash Secured LC Exit Facility; and

(f)     all DIP Hedging Obligations shall be rolled into and deemed incurred under the Super Senior Exit Facility.

To the extent the Funded DIP Indebtedness is repaid in full prior to the Effective Date, the Debtors shall not make any payments to trade vendors for penalty interest payments (excluding, for the avoidance of doubt, customary liquidated damages to customers) unless such payments had otherwise been specified in the Approved Budget (as defined in the DIP Credit Agreement) or authorized pursuant to the DIP Financing Orders.

C.    *Professional Claims.*

1.    Final Fee Applications and Payment of Professional Claims.

All requests for payment of Professional Claims for services rendered and reimbursement of expenses incurred prior to the Confirmation Date must be Filed no later than 45 days after the Effective Date.   The Bankruptcy Court shall determine the Allowed amounts of such Professional Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Court.   The Reorganized Debtors shall pay Professional Claims in Cash in the amount the Bankruptcy Court allows, including from the Professional Escrow Account, which the Reorganized Debtors will establish in trust for the Professionals and fund with Cash equal to the Professional Amount on the Effective Date.

2.    Professional Escrow Account.

On the Effective Date, the Reorganized Debtors shall, in consultation with the Required Consenting Lenders, establish and fund the Professional Escrow Account with Cash equal to the Professional Amount, which shall be funded by the Reorganized Debtors.   The Professional Escrow Account shall be maintained in trust solely for the Professionals.   Such funds shall not be considered property of the Estates of the Debtors or the Reorganized Debtors.   The amount of Allowed Professional Claims shall be paid in Cash to the Professionals by the Reorganized Debtors from the Professional Escrow Account as soon as reasonably practicable after such Professional Claims are Allowed.   When such Allowed Professional Claims have been paid in full, any remaining amount in the Professional Escrow Account shall promptly be paid to the Reorganized Debtors without any further action or order of the Bankruptcy Court.

3.    Professional Amount.

Professionals shall reasonably estimate their unpaid Professional Claims and other unpaid fees and expenses incurred in rendering services to the Debtors before and as of the Effective Date, and shall deliver such estimate to the Debtors no later than five days before the Effective Date; *provided* that such estimate shall not be deemed to limit the amount of the fees and expenses that are the subject of each Professional's final request for payment in the Chapter 11 Cases.   If a Professional does not provide an estimate, the Debtors or Reorganized Debtors may estimate the unpaid and unbilled fees and expenses of such Professional.

4.    Post-Confirmation Fees and Expenses.

Except as otherwise specifically provided in the Plan, from and after the Confirmation Date, the Debtors shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses related to implementation of the Plan and Consummation incurred by the Debtors.   Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Debtors may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

D.    *Priority Tax Claims.*

Except to the extent that a holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax

Claim, each holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.

E.      *Payment of Restructuring Expenses, Consent Fee.*

The Restructuring Expenses incurred, or estimated to be incurred, up to and including the Effective Date, and noteholder consent fees payable under Section 12 of the Restructuring Support Agreement payable in Cash, which, for the avoidance of doubt, shall include the Noteholder Consent Fee (as defined in the Restructuring Support Agreement), shall be paid in full in Cash on the Effective Date or as reasonably practicable thereafter (to the extent not previously paid during the course of the Chapter 11 Cases) in accordance with, and subject to, the terms of the Restructuring Support Agreement, without any requirement to file a fee application with the Bankruptcy Court, without the need for itemized time detail, or without any requirement for Bankruptcy Court review or approval. All Restructuring Expenses and Cash consent fees to be paid on the Effective Date shall be estimated prior to and as of the Effective Date and such estimates shall be delivered to the Debtors at least two (2) Business Days before the anticipated Effective Date; *provided* that such estimates shall not be considered an admission or limitation with respect to such Restructuring Expenses. On or as soon as practicable after the Effective Date, final invoices for all Restructuring Expenses incurred prior to and as of the Effective Date shall be submitted to the Debtors. In addition, the Debtors and the Reorganized Debtors (as applicable) shall continue to pay pre- and post-Effective Date, when due Restructuring Expenses related to implementation, consummation, and defense of the Plan, whether incurred before, on, or after the Effective Date.

## ARTICLE III.
## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

A.      *Classification of Claims and Interests.*

This Plan constitutes a separate Plan proposed by each Debtor. Except for the Claims addressed in Article II hereof, all Claims and Interests are classified in the Classes set forth below in accordance with sections 1122 and 1123(a)(1) of the Bankruptcy Code. A Claim or an Interest, or any portion thereof, is classified in a particular Class only to the extent that any portion of such Claim or Interest fits within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest fits within the description of such other Classes. A Claim or an Interest also is classified in a particular Class for the purpose of receiving distributions under the Plan only to the extent that such Claim or Interest is an Allowed Claim or Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

The classification of Claims and Interests against the Debtors pursuant to the Plan is as follows:

| Class | Claims and Interests | Status | Voting Rights |
|-------|---------------------|--------|---------------|
| Class 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 3 | Other Prepetition Financing Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 4 | Bilateral Facility Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 5 | 2021 Letter of Credit Claims | Impaired | Entitled to Vote |
| Class 6A | 2023 Letter of Credit Claims | Impaired | Entitled to Vote |
| Class 6B | Revolving Credit Claims | Impaired | Entitled to Vote |
| Class 6C | Term Loan Claims | Impaired | Entitled to Vote |
| Class 6D | Credit Agreement Hedging Claims | Impaired | Entitled to Vote |

24

| Class | Claims and Interests | Status | Voting Rights |
|-------|---------------------|--------|---------------|
| Class 7 | Cash Secured Letter of Credit Claims | Impaired | Entitled to Vote |
| Class 8 | Lloyds Letter of Credit Claims | ~~I~~Unimpaired | ~~Not~~ Entitled to Vote (Presumed to Accept) |
| Class 9 | Senior Notes Claims | Impaired | Entitled to Vote |
| Class 10 | General Unsecured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 11 | Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept or Deemed to Reject) |
| Class 12 | Existing Equity Interests Other Than in McDermott | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept or Deemed to Reject) |
| Class 13 | Existing Preferred Equity Interests in McDermott | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 14 | Existing Common Equity Interests in McDermott | Impaired | Not Entitled to Vote (Deemed to Reject) |

B.      *Treatment of Claims and Interests.*

Each holder of an Allowed Claim or Allowed Interest, as applicable, shall receive under the Plan the treatment described below in full and final satisfaction, settlement, release, and discharge of and in exchange for such holder's Allowed Claim or Allowed Interest, except to the extent different treatment is agreed to by the Reorganized Debtors and the holder of such Allowed Claim or Allowed Interest, as applicable.  Unless otherwise indicated, the holder of an Allowed Claim or Allowed Interest, as applicable, shall receive such treatment on the Effective Date or as soon as reasonably practicable thereafter.  The Claims in Classes 5, 6A, 6B, 6C, 6D, and 7 shall be Allowed to the extent provided in the DIP Financing Orders.

1.      Class 1 – Other Secured Claims

   (a)      *Classification*:  Class 1 consists of all Other Secured Claims.

   (b)      *Treatment*: Each holder of an Allowed Other Secured Claim shall receive, at the option of the applicable Debtor:

      (i)      payment in full in Cash of its Allowed Other Secured Claim;

      (ii)      the collateral securing its Allowed Other Secured Claim;

      (iii)      Reinstatement of its Allowed Other Secured Claim; or

      (iv)      such other treatment that renders its Allowed Other Secured Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code.

   (c)      *Voting*:  Class 1 is Unimpaired under the Plan.  Holders of Other Secured Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, such holders are not entitled to vote to accept or reject the Plan.

2.   Class 2 – Other Priority Claims

    (a)    *Classification*:  Class 2 consists of all Other Priority Claims.

    (b)    *Treatment*:  Each holder of an Allowed Other Priority Claim shall receive payment in full in Cash.

    (c)    *Voting*:  Class 2 is Unimpaired under the Plan.  Holders of Other Priority Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, such holders are not entitled to vote to accept or reject the Plan.

3.   Class 3 – Other Prepetition Financing Claims

    (a)    *Classification*:  Class 3 consists of all Other Prepetition Financing Claims.

    (b)    *Treatment*:  Each Allowed Other Prepetition Financing Claim shall be Reinstated.

    (c)    *Voting:* Class 3 is Unimpaired under the Plan.  Holders of Other Prepetition Financing Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, such holders are not entitled to vote to accept or reject the Plan.

4.   Class 4 – Bilateral Facility Claims

    (a)    *Classification*:  Class 4 consists of all Bilateral Facility Claims.

    (b)    *Treatment*:  Each Allowed Bilateral Facility Claim shall be Reinstated.

    (c)    *Voting*:  Class 4 is Unimpaired under the Plan.  Holders of Bilateral Facility Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, such holders are not entitled to vote to accept or reject the Plan.

5.   Class 5 – 2021 Letter of Credit Claims

    (a)    *Classification:*  Class 5 consists of all 2021 Letter of Credit Claims.

    (b)    *Treatment*:  Each holder of an Allowed 2021 Letter of Credit Claim shall receive:

        (i)    with respect to any 2021 Letter of Credit Claims on account of unfunded 2021 Letters of Credit, participation in the Roll-Off LC Exit Facility in an amount equal to each such holder's ~~Allowed~~participation in any such unfunded 2021 Letters of Credit ~~Claim~~,

        (ii)    with respect to any 2021 Letter of Credit Claims on account of funded 2021 Letters of Credit, its Secured Creditor Pro Rata Share of the Secured Creditor Funded Debt Distribution, and

(iii)    payment in full in Cash of any amounts accrued and unpaid as of the Petition Date due to such holder of an Allowed 2021 Letter of Credit Claim pursuant to Section 2.15 of the 2021 LC Agreement.

(c)    *Voting:*  Class 5 is Impaired under the Plan.  Holders of 2021 Letter of Credit Claims are entitled to vote to accept or reject the Plan.

6.    <u>Class 6A – 2023 Letter of Credit Claims</u>

(a)    *Classification:*  Class 6A consists of all 2023 Letter of Credit Claims.

(b)    *Treatment*:  Each holder of an Allowed 2023 Letter of Credit Claim shall receive:

(i)    with respect to any 2023 Letter of Credit Claims on account of unfunded 2023 Letters of Credit, participation in the Roll-Off LC Exit Facility in an amount equal to each such holder's ~~Allowed~~participation in any such unfunded 2023 Letters of Credit ~~Claim~~,

(ii)    with respect to any 2023 Letter of Credit Claims on account of funded 2023 Letters of Credit, its Secured Creditor Pro Rata Share of the Secured Creditor Funded Debt Distribution, and

(iii)    payment in full in Cash of any amounts accrued and unpaid as of the Petition Date due to such holder of an Allowed 2023 Letter of Credit Claim pursuant to Section 2.15 of the Credit Agreement.

(c)    *Voting:*  Class 6A is Impaired under the Plan.  Holders of 2023 Letter of Credit Claims are entitled to vote to accept or reject the Plan.

7.    <u>Class 6B – Revolving Credit Claims</u>

(a)    *Classification:*  Class 6B consists of all Revolving Credit Claims.

(b)    *Allowed Amount:* As of the Effective Date, the Revolving Credit Claims shall be Allowed and deemed to be Allowed Claims in the full amount outstanding under the Revolving Credit Facility, including all principal, accrued and unpaid interest at the applicable default rate, and all accrued and unpaid fees, expenses, and noncontingent indemnity payable under the Revolving Credit Facility and the DIP Financing Orders.

(c)    *Treatment*:  Each holder of an Allowed Revolving Credit Claim shall receive:

(i)      with respect to any Revolving Credit Claims on account of unfunded Revolving LCs, participation in the Roll-Off LC Exit Facility in an amount equal to each such holder's ~~Allowed~~participation in any such unfunded Revolving ~~Credit Claim~~LCs,

(ii)     with respect to any Revolving Credit Claims on account of (x) Revolving Loans or (y) funded Revolving LCs, its Secured Creditor Pro Rata Share of the Secured Creditor Funded Debt Distribution, and

(iii)    payment in full in Cash of any amounts accrued and unpaid as of the Petition Date due to such holder of an Allowed Revolving Credit Claim pursuant to Section 2.15 of the Credit Agreement.

(d)    *Voting:* Class 6B is Impaired under the Plan.  Holders of Revolving Credit Claims are entitled to vote to accept or reject the Plan.

8.   Class 6C – Term Loan Claims

(a)    *Classification*:  Class 6C consists of all Term Loan Claims.

(b)    *Allowed Amount*: As of the Effective Date, the Term Loan Claims shall be Allowed and deemed to be Allowed Claims in the full amount outstanding under the Term Loan Facility, including all principal, accrued and unpaid interest at the applicable default rate, and all accrued and unpaid fees, expenses, and noncontingent indemnity payable under the Term Loan Facility and the DIP Financing Order_s_.

(c)    *Treatment*:  Each holder of an Allowed Term Loan Claim shall receive its Secured Creditor Pro Rata Share of the Secured Creditor Funded Debt Distribution.

(d)    *Voting*:  Class 6C is Impaired under the Plan.  Holders of Term Loan Claims are entitled to vote to accept or reject the Plan.

9.   Class 6D – Credit Agreement Hedging Claims

(a)    *Classification*:  Class 6D consists of all Credit Agreement Hedging Claims.

(b)    *Treatment*:  Each holder of an Allowed Credit Agreement Hedging Claim that remains unpaid as of the Effective Date shall receive for any Allowed Credit Agreement Hedging Claims such holder's Secured Creditor Pro Rata Share of the Secured Creditor Funded Debt Distribution.

(c)    *Voting*:  Class 6D is Impaired under the Plan.  Holders of Credit Agreement Hedging Claims are entitled to vote to accept or reject the Plan.

10.  Class 7 – Cash Secured Letter of Credit Claims

(a)    *Classification:*  Class 7 consists of all Cash Secured Letter of Credit Claims.

(b)    *Treatment*:  Each holder of an Allowed Cash Secured Letter of Credit Claim outstanding as of such date shall:

        (i)      be deemed to reissue its Cash Secured Letters of Credit under the Cash Secured LC Exit Facility which shall be secured by the same cash collateral which secured the Cash Secured Letters of Credit prior to the Petition Date, and

        (ii)     <u>receive</u> payment in full in Cash of any amounts accrued and unpaid as of the Petition Date due to such holder of an Allowed Cash Secured Letter of Credit Claim pursuant to Section 2.15 of the Credit Agreement.

  (c)    *Voting:* Class 7 is Impaired under the Plan.  Holders of Cash Secured Letter of Credit Claims are entitled to vote to accept or reject the Plan.

11.  <u>Class 8 – Lloyds Letter of Credit Claims</u>

  (a)    *Classification:* Class 8 consists of all Lloyds Letter of Credit Claims.

  (b)    *Treatment*: Each holder of an Allowed Lloyds Letter of Credit Claim shall ~~receive~~:

        ~~(i) with respect to any Lloyds Letter of Credit Claims on account of unfunded Lloyds Letters of Credit, participation in the Roll-Off LC Exit Facility in amount equal to such Allowed Lloyds Letter of Credit Claim,~~

        <u>(i)</u>     <u>be deemed to issue on the Effective Date its Lloyds Letters of Credit under the Lloyds LC Exit Facility, which from and after the Effective Date shall be secured on a senior and exclusive basis by the cash collateral held by Lloyds LC Bank and/or its affiliates that secured the Lloyds Letters of Credit as of the Effective Date and any standby letters of credit supporting the Lloyds Letters of Credit as of the Effective Date; *provided* that the cash collateral and/or standby letters of credit, as applicable, securing the Lloyds LC Exit Facility shall be reduced and/or released, as applicable, dollar-for-dollar upon the reduction, expiration, or termination of any Lloyds Letter of Credit in accordance with its terms from and after the Effective Date and upon any such release the applicable cash collateral shall become collateral securing the obligations of the Reorganized Debtors under the Exit Facilities;</u>

        (ii)     with respect to any Lloyds Letter of Credit Claims on account of funded Lloyds Letters of Credit, ~~its Secured Creditor Pro Rata Share of the Secured Creditor Funded Debt Distribution~~<u>receive payment in full in Cash of such amounts from cash collateral and/or standby letters of credit which secure the Lloyds Letters of Credit</u>, and

        (iii)    <u>receive</u> payment in full in Cash of any amounts accrued and unpaid as of the ~~Petition~~<u>Effective</u> Date due to such holder of an Allowed Lloyds Letter of Credit Claim pursuant to Section <u>1, Section</u> 2(b)<u>, and Section 6</u> of the Lloyds Letter of Credit Agreement.

  (c)    *Voting:* Class 8 is ~~I~~<u>Uni</u>mpaired under the Plan. Holders of Lloyds Letter of Credit Claims are <u>conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, such holders are not</u> entitled to vote to accept or reject the Plan.

12. Class 9 – Senior Notes Claims

    (a)     *Classification*:  Class 9 consists of all Senior Notes Claims.

    (b)     *Allowed Amount*: $[   ]As of the Effective Date, the Senior Notes Claims shall be Allowed and deemed to be Allowed Claims in the principal amount outstanding under the Senior Notes, together with all accrued but unpaid interest as of the Petition Date.

    (c)     *Treatment*:  Each holder of an Allowed Senior Notes Claim shall receive its pro rata share of:

        (i)     6% of the New Common Stock, plus additional shares of New Common Stock as a result of the Prepetition Funded Secured Claims Excess Cash Adjustment, subject to dilution on account of the New Warrants and the Management Incentive Plan; and

        (ii)     the New Warrants.

    (d)     *Voting:*  Class 9 is Impaired under the Plan.  Holders of Senior Notes Claims are entitled to vote to accept or reject the Plan.

13. Class 10 – General Unsecured Claims

    (a)     *Classification:*  Class 10 consists of all General Unsecured Claims.

    (b)     *Treatment:*  Each holder of an Allowed General Unsecured Claim shall receive, at the option of the applicable Debtor:

        (i)     payment in full in Cash; or

        (ii)     Reinstatement.

    (c)     *Voting:*  Class 10 is Unimpaired under the Plan.  Holders of General Unsecured Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, such holders are not entitled to vote to accept or reject the Plan.

14. Class 11 – Intercompany Claims

    (a)     *Classification*:  Class 11 consists of all Intercompany Claims.

    (b)     *Treatment*:  Each Allowed Intercompany Claim shall be, at the option of the applicable Debtor (with the consent of the Required Consenting Lenders), either:

        (i)     Reinstated;

        (ii)     canceled, released, and extinguished, and will be of no further force or effect; or

        (iii)     otherwise addressed at the option of each applicable Debtor such that holders of Intercompany Claims will not receive any distribution on account of such Intercompany Claims.

(c)     *Voting*: Class 11 is conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code or rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Class 11 is not entitled to vote to accept or reject the Plan.

15.   Class 12 – Existing Equity Interests Other Than in McDermott

(a)     *Classification*: Class 12 consists of all Existing Equity Interests Other Than in McDermott.

(b)     *Treatment:* Each Existing Equity Interests Other Than in McDermott shall be, at the option of the applicable Debtor, either:

(i)     Reinstated;

(ii)     canceled, released, and extinguished, and will be of no further force or effect; or

(iii)     otherwise addressed at the option of each applicable Debtor such that holders of Existing Equity Interests Other Than in McDermott will not receive any distribution on account of such Existing Equity Interests Other Than in McDermott.

(c)     *Voting*: Class 12 is conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code or rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Class 12 is not entitled to vote to accept or reject the Plan.

16.   Class 13 – Existing Preferred Equity Interests

(a)     *Classification*: Class 13 consists of all Existing Preferred Equity Interests.

(b)     *Treatment:* Holders of Existing Preferred Equity Interests will not receive any distribution on account of such Interests, which will be canceled, released, and extinguished as of the Effective Date, and will be of no further force or effect.

(c)     *Voting*: Class 13 is conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Class 13 is not entitled to vote to accept or reject the Plan.

17.   Class 14 – Existing Common Equity Interests

(a)     *Classification*: Class 14 consists of all Existing Common Equity Interests.

(b)     *Treatment*: Holders of Existing Common Equity Interests will not receive any distribution on account of such Interests, which will be canceled, released, and extinguished as of the Effective Date, and will be of no further force or effect.

(c)     *Voting*: Class 14 is conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Class 14 is not entitled to vote to accept or reject the Plan.

C.     *Special Provision Governing Unimpaired Claims.*

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtors' or the Reorganized Debtors' rights regarding any Unimpaired Claim, including, all rights regarding legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claim.

31

D.      *Elimination of Vacant Classes.*

Any Class of Claims or Interests that does not have a holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

E.      *Voting Classes, Presumed Acceptance by Non-Voting Classes.*

If a Class contains Claims or Interests eligible to vote and no holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the holders of such Claims or Interests in such Class shall be deemed to have accepted the Plan.

F.      *Intercompany Interests.*

To the extent Reinstated under the Plan, distributions on account of Intercompany Interests are not being received by holders of such Intercompany Interests on account of their Intercompany Interests but for the purposes of administrative convenience and due to the importance of maintaining the prepetition corporate structure for the ultimate benefit of the holders of New Common Stock, and in exchange for the Debtors' and Reorganized Debtors' agreement under the Plan to make certain distributions to the holders of Allowed Claims.

G.      *Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code.*

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by one or more of the Classes entitled to vote pursuant to Article III.B of the Plan. The Debtors reserve the right, subject to the prior consent of the Required Consenting Lenders, which shall not be unreasonably withheld, to modify the Plan in accordance with Article X hereof and the Restructuring Support Agreement to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules.

H.      *Controversy Concerning Impairment.*

If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

I.      *Subordinated Claims.*

The allowance, classification, and treatment of all Allowed Claims and Allowed Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.  Any such contractual, legal, or equitable subordination rights shall be settled, compromised, and released pursuant to the Plan.

## ARTICLE IV.
## MEANS FOR IMPLEMENTATION OF THE PLAN

A.      *General Settlement of Claims and Interests.*

As discussed in detail in the Disclosure Statement and as otherwise provided herein, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims and Interests and controversies resolved

pursuant to the Plan, including (1) any challenge to the amount, validity, perfection, enforceability, priority or extent of the DIP Claims, Superpriority Term Loan Claims, Superpriority Revolving Facility Claims, 2021 Letter of Credit Claims, 2023 Letter of Credit Claims, Revolving LCCredit Claims, Revolving Loan Claims, Term Loan Claims, Cash Secured Letter of Credit Claims, Credit Agreement Hedging Claims, and Senior Notes Claims and (2) any claim to avoid, subordinate, or disallow any DIP Claims, Superpriority Term Loan Claims, Superpriority Revolving Facility Claims, 2021 Letter of Credit Claims, 2023 Letter of Credit Claims, Revolving LCCredit Claims, Revolving Loan Claims, Term Loan Claims, Cash Secured Letter of Credit Claims, Credit Agreement Hedging Claims, and Senior Notes Claims, whether under any provision of chapter 5 of the Bankruptcy Code, on any equitable theory (including equitable subordination, equitable disallowance, or unjust enrichment) or otherwise.  The Plan shall be deemed a motion to approve the good faith compromise and settlement of all such Claims, Interests, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable and in the best interests of the Debtors and their Estates.  Subject to Article VI hereof, all distributions made to holders of Allowed Claims and Allowed Interests (as applicable) in any Class are intended to be and shall be final.

B.      *Restructuring Transactions.*

        On or before the Effective Date, the applicable Debtors or the Reorganized Debtors shall enter into and shall take any actions as may be necessary or appropriate to effect the Restructuring Transactions, including as set forth in the Restructuring Transactions Memorandum.  The actions to implement the Restructuring Transactions may include:  (1) the execution and delivery of appropriate agreements or other documents of merger, amalgamation, consolidation, restructuring, conversion, disposition, transfer, arrangement, continuance, dissolution, sale, purchase, or liquidation containing terms that are consistent with the terms of the Plan and that satisfy the applicable requirements of applicable law and any other terms to which the applicable Entities may agree; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable parties agree; (3) the filing of appropriate certificates or articles of incorporation, formation, reincorporation, merger, consolidation, conversion, amalgamation, arrangement, continuance, or dissolution pursuant to applicable state or provincial law; and (4) all other actions that the applicable Entities determine to be necessary, including making filings or recordings that may be required by applicable law in connection with the Plan.  The Confirmation Order shall, and shall be deemed to, pursuant to sections 363 and 1123 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, contemplated by, or necessary to effectuate the Plan.  On the Effective Date or as soon as reasonably practicable thereafter, the Reorganized Debtors, as applicable, shall issue all securities, notes, instruments, certificates, and other documents required to be issued pursuant to the Restructuring Transactions.

C.      *Reorganized Debtors.*

        On the Effective Date, the New Board shall be established, and the Reorganized Debtors shall adopt their New Organizational Documents.  The Reorganized Debtors shall be authorized to adopt any other agreements, documents, and instruments and to take any other actions contemplated under the Plan as necessary to consummate the Plan.  Cash payments to be made pursuant to the Plan will be made by the Debtors or Reorganized Debtors.  The Debtors and Reorganized Debtors will be entitled to transfer funds between and among themselves as they determine to be necessary or appropriate to enable the Debtors or Reorganized Debtors, as applicable, to satisfy their obligations under the Plan.  Except as set forth herein, any changes in intercompany account balances resulting from such transfers will be accounted for and settled in accordance with the Debtors' historical intercompany account settlement practices and will not violate the terms of the Plan.

        From and after the Effective Date, the Reorganized Debtors, subject to any applicable limitations set forth in any post-Effective Date agreement, shall have the right and authority without further order of the Bankruptcy Court to raise additional capital and obtain additional financing, subject to the New Organizational Documents and the Exit Facility Documents, as the boards of directors of the applicable Reorganized Debtors deem appropriate.

D.      *Technology Business Sale.*

     1.      <u>Technology Business Sale Process</u>.

Following the Petition Date, in consultation with the Consultation Parties (as defined in the Bidding Procedures), the Debtors shall continue their sale and marketing process and solicit bids for the sale or other disposition of all or substantially all of the Technology Business Sale, in accordance with the terms and conditions of the Restructuring Support Agreement (including the Milestones (as defined in the Restructuring Support Agreement)) and in a manner acceptable to the Required Consenting Lenders. For the avoidance of doubt, the Debtors may only execute an agreement for the sale or other disposition of any part of the Technology Business with the consent of the Required Consenting Lenders.

The Consultation Parties shall have the right to review all information, diligence, documents and other materials provided by the Debtors or their advisors to any bidder or prospective bidder in connection with the Technology Business Sale and to consult with the Debtors and their advisors with respect to the Technology Business Sale. The Debtors shall provide to the Consultation Parties all term sheets, letters, proposals, offers, bids and other materials, whether non-binding or not, that are received by the Debtors or their advisors in connection with the Technology Business Sale within one (1) day of receipt by the Debtors or their advisors, as applicable.

     2.      <u>Closing of the Technology Business Sale</u>.

On or before the Effective Date, the Debtors shall be authorized to consummate the Technology Business Sale and, among other things, the Lummus Assets and Interests (including Executory Contracts and Unexpired Leases assumed and assigned pursuant to Article V hereof) shall be transferred to and vest in the Purchaser free and clear of all Liens, Claims, charges, or other encumbrances pursuant to the terms of the Purchase Agreement and, as applicable, <u>in accordance with the DIP Credit Agreement,</u> the Confirmation Order or an order approving the Technology Business Sale; *provided* that, to the extent the Technology Business Sale is to be consummated pursuant to the Confirmation Order, the Debtors may request entry of any order supplementing the Confirmation Order that the Debtors believe is necessary or appropriate to implement the terms and conditions of the Technology Business Sale. On and after the Effective Date, except as otherwise provided in the Plan, the Debtors or the Purchaser, as applicable, may operate the Debtors' businesses and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action<u>, in each case relating to the Lummus Assets and Interests,</u> without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

     3.      <u>Technology Business Sale Proceeds Waterfall</u>.

~~Any~~<u>On the Effective Date, any</u> Technology Business Sale Proceeds that have not otherwise been applied in accordance with the DIP Credit Agreement shall be applied as follows:

          (a)      first, to fund the minimum Cash balance of $820 million, as required by the Business Plan,

          (b)      second, to repay Funded DIP Indebtedness (other than the Make Whole Amount);

          (c)      third, payment of the Make Whole Amount; and

          (d)      fourth, to fund cash to support new or additional letters of credit sufficient to meet the $2.44 billion letter of credit capacity contemplated by the Exit Facilities Term Sheet; and

          (e)      fifth, the repayment of Prepetition Funded Secured Claims on a Pro Rata basis.

4.   Residual Prepetition Funded Secured Claims Pay Down.

On the Effective Date, the Prepetition Funded Secured Claims will be repaid on a pro rata basis from (i) the Residual Technology Business Sale Proceeds and (ii) any available Cash (such available Cash shall exclude Cash held in variable interest entities associated with joint venture and consortium arrangements, Cash trapped in foreign jurisdictions, and insurance captive Cash) in excess of $820 million available cash at emergence after payment of all fees and transaction expenses ((i) and (ii) together the "Residual Prepetition Funded Secured Claims Pay Down").

If the Residual Prepetition Funded Secured Claims Pay Down amount is greater than $0, the initial allocation of 94% of the New Common Stock to the holders of Prepetition Funded Secured Claims shall be reduced, and the initial allocation of 6% of the New Common Stock to holders of Senior Notes Claim shall be increased, by the percentage calculated by dividing:

> (a)   the Residual Prepetition Funded Secured Claims Pay Down amount by

> (b)   an amount equal to:

> > (i)   the aggregate amount of Prepetition Funded Secured Claims (including, without limitation, principal and any accrued prepetition or postpetition interest at the default rate as applicable) minus an amount equal to the sum of (y) the aggregate amount of the loans to be issued under the Term Loan Exit Facility and (z) any proceeds of the Rights Offering up to $150 million; divided by

> > (ii)   94% minus an amount equal to (y) the aggregate proceeds of the Rights Offering up to $150 million divided by (z) Plan Equity Value

(such adjustment of initial allocations, the "Prepetition Funded Secured Claims Excess Cash Adjustment").

For the avoidance of doubt, if the Technology Business Sale Proceeds paid pursuant to the Technology Business Sale Proceeds Waterfall have not paid the Make Whole Amount in full, all proceeds of the Rights Offering will (a) first go to the pay down of the Make Whole Amount and (b) once the Make Whole Amount is paid in full, the Prepetition Funded Secured Claims will be repaid on a pro rata basis from such remaining proceeds of the Rights Offering.

E.   *Pipes Business Sale.*

Following the Confirmation Date, the Debtors shall be authorized to consummate the Pipes Business Sale with the consent of the Required Consenting Lenders pursuant to the terms of the Pipes Business Sale Documents, the DIP Credit Agreement, the Plan, and the Confirmation Order.  Pursuant to the consummation of the Pipes Business Sale, the Debtors shall, among other things, transfer all or part of the Pipes Interests to the Pipes Buyers free and clear of all Liens, Claims, Interests, charges, and other encumbrances (other than any assumed liabilities) pursuant to sections 363, 365, and/or 1123 of the Bankruptcy Code, this Plan, and the Confirmation Order; *provided* that all Liens, Claims, Interests, charges and other encumbrances on Pipes Interests securing any obligations of the Debtors prior to the closing of the Pipes Business Sale shall attach to the proceeds of the Pipes Business Sale, in the order of their priority, with the same validity, force, and effect, if any, which they had against such Pipes Interests prior to the closing of the Pipes Business Sale.  The proceeds of the Pipes Business Sale shall be applied (i) prior to the Effective Date, in accordance with the DIP Credit Agreement; and (ii) on the Effective Date, including to the extent any Pipes Business Sale proceeds were applied as cash collateral securing the DIP Letters of Credit in accordance with the DIP Credit Agreement, to fund Cash to the Debtors' balance sheet to satisfy the conditions precedent for emergence under Article IX.A of the Plan.

Pursuant to Article IX hereof, if the conditions precedent to the closing of the Pipes Business Sale shall have been satisfied in accordance with the Pipes Business Sale Documents (as approved by the Required Consenting Lenders), then the conditions set forth in Article IX (other than in Article IX.A.b) shall be deemed automatically waived with respect to the Pipes Entities without notice, leave, or order of the Bankruptcy Court, or any further

action by the Debtors, the Reorganized Debtors, or any Consenting Stakeholder. Notwithstanding anything to the contrary herein, upon the closing of the Pipes Business Sale, (x) the Pipes Entities shall not retain any liability arising out of or in connection with (i) Professional Claims incurred by the Pipes Entities prior to the closing of the Pipes Business Sale or the funding of the Professional Fee Escrow, (ii) Restructuring Expenses and any consent fees, (iii) the Restructuring Support Agreement and any fees or obligations thereunder, (iv) the Exit Facilities or the Lloyds LC Exit Facility, (v) the DIP Cash Secured Letter of Credit Claims or the DIP Claims, and (iv) any adequate protection claims under the DIP Financing Orders, Bankruptcy Code § 507(b), or otherwise; (y) any consent or consultation rights in the Restructuring Support Agreement, the Plan, or the Confirmation Order of any Person or Entity other than the Pipes Entities as Reorganized Debtors shall not be enforceable against or apply to the Pipes Entities; and (z) the Pipes Interests shall be Reinstated pursuant to Article III of the Plan.

*F.* ~~E.~~ *Sources of Consideration for Plan Distributions.*

The Debtors and the Reorganized Debtors, as applicable, shall fund distributions under the Plan with: (1) Cash on hand, including Cash from operations, and the proceeds of the Rights Offering, ~~or~~ the Technology Business Sale (in accordance with the Technology Business Sale Proceeds Waterfall) and the Pipes Business Sale, as applicable; (2) the New Common Stock; (3) the ~~proceeds from the Rights Offering; (4) the~~ New Warrants; and (5~~4~~) the ~~proceeds from~~distributions under the Exit Facilities, as applicable.

1. Exit Facilities.

On the Effective Date, the Reorganized Debtors shall enter into the Exit Facilities, ~~(~~the terms of which will be set forth in the Exit Facility Documents).

To the extent applicable, Confirmation of the Plan shall be deemed (a) approval of the Exit Facilities (including the transactions and related agreements contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred and fees and expenses to be paid by the Debtors or the Reorganized Debtors, as applicable, in connection therewith), to the extent not approved by the Bankruptcy Court previously, and (b) authorization for the Debtors or the Reorganized Debtors, as applicable, to, without further notice to or order of the Bankruptcy Court, (i) execute and deliver those documents and agreements necessary or appropriate to pursue or obtain the Exit Facilities, including the Exit Facility Documents, and incur and pay any fees and expenses in connection therewith, and (ii) act or take action under applicable law, regulation, order, or rule or vote, consent, authorization, or approval of any Person, subject to such modifications as the Debtors or the Reorganized Debtors, as applicable, may deem to be necessary to consummate the Exit Facilities.

Notwithstanding anything in the Plan or the Confirmation Order to the contrary: (x) on the Effective Date, the cash collateral securing the Cash Secured Letters of Credit outstanding under the Credit Agreement and the cash collateral securing the DIP Credit Facility shall be transferred to the collateral agent in respect of the Exit Facilities for the benefit of the secured parties in respect of the Cash Secured LC Exit Facility on a first-priority basis and the secured parties in respect of the other Exit Facilities as set forth in the Exit Facility Documents; and (y) all Liens securing the Debtors' obligations under the DIP Credit Agreement, the Superpriority Credit Agreement, the Credit Agreement, and the 2021 LC Agreement: (i) shall be unaltered by the Plan, (ii) except as otherwise provided in the Confirmation Order regarding the release of Liens over Lummus Assets and Interest and the Pipes Interests upon consummation of the Technology Business Sale and the Pipes Business Sale, shall continue and remain attached to the property of the Reorganized Debtors and their Affiliates after the Effective Date to the same extent such Liens were attached to the property of the Debtors prior to the Effective Date, and (iii) shall be deemed assigned on the Effective Date to the collateral agent in respect of the Exit Facilities for the benefit of the secured parties in respect of the Exit Facilities (other than the Cash Secured LC Exit Facility) to secure the joint and several obligations of the Reorganized Debtors under the Exit Facilities as set forth in the Exit Facility Documents; *provided* that (a) such Liens shall not secure the Lloyds LC Exit Facility as of the Effective Date and (b) on and after the Effective Date, the granting, attachment, perfection, priority, and continuation of such Liens shall be governed by the terms of the Exit Facilities.

As of the Effective Date, upon the granting or continuation of Liens in accordance with the Plan and the Exit Facility Documents, such Liens shall constitute valid, binding, enforceable, and automatically perfected Liens in the collateral specified in the Exit Facility Documents. ~~To the extent provided in the~~ The Exit Facility ~~Documents, the Exit Facility~~ Agents or holder(s) of Liens under the Exit Facility Documents are authorized to file with the

appropriate authorities mortgages, financing statements, and other documents, and to take any other action in order to evidence, validate, and perfect such Liens or security interests.  The guarantees, mortgages, pledges, Liens, and other security interests granted to secure the obligations arising under the Exit Facility Documents have been granted in good faith, for legitimate business purposes, and for reasonably equivalent value as an inducement to the lenders thereunder to extend~~td~~ credit thereunder and shall be deemed not to constitute a fraudulent conveyance or fraudulent transfer and shall not otherwise be subject to avoidance, recharacterization, or subordination for any purposes whatsoever and shall not constitute preferential transfers or fraudulent conveyances under the Bankruptcy Code or any applicable nonbankruptcy law, and the priorities of such Liens and security interests shall be as set forth in the Exit Facility Documents.  The Reorganized Debtors and the persons and entities granted such Liens and security interests shall be authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, federal, or other law that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order ~~and any such filings, recordings, approvals, and consents shall not be required~~), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

In no event shall the sum of (v) the face amount of letters of credit issued and outstanding at any time under the Senior Exit LC Facility, plus (w) the face amount of letters of credit issued and outstanding at any time under the Super Senior Exit Facility, plus (x) the face amount of letters of credit issued or deemed issued and outstanding at any time under the Roll-Off LC Exit Facility, plus (y) the face amount of letters of credit issued and outstanding at any time under the Cash Secured LC Exit Facility, plus (z) the face amount of letters of credit issued or deemed issued and outstanding at any time under the Lloyds LC Exit Facility, exceed the Secured Letter of Credit Cap plus permitted incremental capacity set forth in the Exit Facilities Term Sheet.

2.  Issuance of New Common Stock.

The issuance of the New Common Stock, including the Rights Offering Shares and any options or other equity awards, if any, reserved for the Management Incentive Plan and the New Warrants (including the New Common Stock that may be issuable upon exercise of the New Warrants), by the Reorganized Debtors (as set forth in the Restructuring Transactions Memorandum) shall be authorized without the need for any further corporate action or without any further action by the holders of Claims or Interests.  The Reorganized Debtors shall be authorized to issue a certain number of shares, units or equity interests (as the case may be based on how the New Common Stock is denominated and the identity of the Reorganized Debtor issuing such shares, units, or equity interests) of New Common Stock required to be issued under the Plan and pursuant to their New Organizational Documents.  On the Effective Date, the Debtors or Reorganized Debtors, as applicable, shall issue all Securities, notes, instruments, certificates, and other documents required to be issued pursuant to the Plan.

All of the shares, units, or equity interests (as the case may be based on how the New Common Stock is denominated) of New Common Stock issued or authorized to be issued pursuant to the Plan shall be duly authorized, validly issued, fully paid, and non-assessable.  Each distribution and issuance referred to in Article VI hereof shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.

On the Effective Date or as soon as reasonably practicable thereafter, the New Common Stock will be distributed in accordance with the Plan.

3.  Rights Offering.

In accordance with the Restructuring Support Agreement, the applicable Reorganized Debtor shall consummate the Rights Offering, through which each Consenting Noteholder shall have the opportunity, subject to the terms and conditions set forth in the Plan and the Rights Offering Procedures, to purchase the Rights Offering Shares.

The Rights Offering Procedures shall be approved within 5 days of Petition Date and shall provide for a subscription deadline of no later than the Voting Deadline.  Subscription rights to participate in the Rights Offering shall be distributed to the Consenting Noteholders in accordance with the Restructuring Support Agreement, the Restructuring Term Sheet, and the Plan and the issuance of such subscription rights will be exempt from SEC registration under applicable law.  Proceeds of the Rights Offering to be used (a) first, for Cash pay down of any portion of the Make Whole Amount that is not paid in full in Cash from Technology Business Sale Proceeds in accordance with the Technology Business Sale Proceeds Waterfall and (b) second, for Cash pay down of Prepetition Funded Secured Claims.

### 4.  Issuance of New Warrants.

On the Effective Date, the applicable Reorganized Debtor (as set forth in the Restructuring Transactions Memorandum) will issue the New Warrants only to the extent required to provide for distributions to holders of the Senior Notes Claims, as contemplated by this Plan.  All of the New Warrants issued pursuant to the Plan and the shares of New Common Stock that may be issued upon exercise of the New Warrants shall be duly authorized without the need for any further corporate action and without any further action by the Debtors or Reorganized Debtors, as applicable, validly issued, fully paid, and non-assessable.  Each distribution and issuance referred to in Article VI hereof shall be governed by the terms and conditions set forth in the Restructuring Support Agreement, the Plan, and the New Warrant Agreements applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance without the need for execution by any party thereto other than the applicable Reorganized Debtor(s).

The New Warrants shall be distributed to holders of Senior Notes Claims in accordance with the Restructuring Support Agreement and the Plan.  The New Warrants shall have full customary anti-dilution and Black-Scholes protection.

### 5.  Lloyds LC Exit Facility.

On the Effective Date, the Reorganized Debtors and Lloyds LC Bank shall enter into the Lloyds LC Exit Facility.  To the extent applicable, entry of the Confirmation Order shall be deemed (a) approval of the Lloyds LC Exit Facility and (b) authorization for the Debtors or the Reorganized Debtors, as applicable, to, without further notice to or order of the Bankruptcy Court, (i) execute and deliver those documents and agreements necessary or appropriate to pursue or obtain the Lloyds LC Exit Facility, and (ii) act or take action under applicable law, regulation, order, or rule or vote, consent, authorization, or approval of any Person as may be necessary to consummate the Lloyds LC Exit Facility.  Liens on the cash collateral held by Lloyds LC Bank and/or its affiliates that exclusively secures the Debtors' obligations under the Lloyds Letter of Credit Agreement: (i) shall be unaltered by the Plan, (ii) shall continue and remain  (to the extent continued under the Lloyds LC Exit Facility) attached to the property of the Reorganized Debtors after the Effective Date to the same extent such Liens were attached to the property of the Debtors prior to the Effective Date, and (iii) shall continue to secure the joint and several obligations of the Reorganized Debtors under the Lloyds LC Exit Facility.

### G.  F. Corporate Existence.

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, each Debtor shall continue to exist after the Effective Date as a separate corporate entity, limited liability company, partnership, or other form, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other formation documents) in effect prior to the Effective Date, except to the extent such certificate of incorporation and bylaws (or other formation documents) are amended under the Plan or otherwise, in each case, consistent with the Plan and the Restructuring Support Agreement, and to the extent such documents are amended in accordance therewith, such documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite filings required under applicable state, provincial, or federal law).  After the Effective Date, the respective certificate of incorporation and bylaws (or other formation

documents) of one or more of the Reorganized Debtors may be amended or modified on the terms therein without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules. After the Effective Date, one or more of the Reorganized Debtors may be disposed of, dissolved, wound down, or liquidated without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

*H.* ~~G.~~ *Vesting of Assets in the Reorganized Debtors.*

Except as otherwise provided in the Confirmation Order, the Plan (including, for the avoidance of doubt, the Restructuring Transactions Memorandum), or any agreement, instrument, or other document incorporated in, or entered into in connection with or pursuant to, the Plan or Plan Supplement, on the Effective Date, all property in each Estate, all Causes of Action, and any property acquired by any of the Debtors pursuant to the Plan shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances. On and after the Effective Date, except as otherwise provided in the Plan, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

*I.* ~~H.~~ *Cancellation of Existing Securities and Agreements.*

On the Effective Date, except to the extent otherwise provided in the ~~Plan or the~~Exit Facility Documents, the Plan (including, without limitation, under Article IV.F.1 of the Plan) and the Confirmation Order, all notes, instruments, certificates, credit agreements, indentures, and other documents evidencing Claims or Interests shall be cancelled and the obligations of the Debtors thereunder or in any way related thereto shall be deemed satisfied in full, cancelled, discharged, and of no force or effect. Holders of or parties to such cancelled instruments, Securities, and other documentation will have no rights arising from or relating to such instruments, Securities, and other documentation, or the cancellation thereof, except the rights provided for pursuant to this Plan or the Confirmation Order. Notwithstanding anything to the contrary herein, but subject to any applicable provisions of Article VI hereof, to the extent cancelled pursuant to this paragraph, the ~~DIP Credit Agreement, 2021 LC Agreement, the Credit Agreement, and the~~ Senior Notes Indenture shall continue in effect solely to the extent necessary to: (1) permit holders of Claims under the Senior Notes Indenture to receive their respective Plan Distributions, if any; (2) permit the Reorganized Debtors and the Disbursing Agent, as applicable, to make Distributions on account of the Allowed Claims under the Senior Notes Indenture; (3) permit the Senior Notes Trustee to seek compensation and/or reimbursement of fees and expenses in accordance with the terms of this Plan; (4) allow the Senior Notes Trustee to enforce its rights, claims, and interests against any party other than the Debtors; (5) preserve any rights of the Senior Notes Trustee to payment of fees, expenses, and indemnification obligations as against any money or property distributable to holders of Claims under the Senior Notes Indenture, including any rights to priority of payment and/or to exercise charging liens; and (6) permit the Senior Notes Trustee to appear and be heard in the Chapter 11 Cases or in any proceeding in the Bankruptcy Court, including to enforce any obligation owed to the Senior Notes Trustee or other holders of Claims under Senior Notes Indenture. Notwithstanding anything to the contrary herein, but subject to any applicable provisions of Article VI hereof and the Confirmation Order, the DIP Credit Agreement, the Superpriority Credit Agreement, 2021 LC Agreement, and the Credit Agreement shall continue in effect to: (1) permit holders of Claims under the DIP Credit Agreement, the 2021 LC Agreement, and the Credit Agreement~~, and the Senior Notes Indenture~~ to receive their respective Plan Distributions, if any; (2) permit the Reorganized Debtors and the Disbursing Agent, as applicable, to make Plan Distributions on account of the Allowed Claims under the DIP Credit Agreement, the 2021 LC Agreement, and the Credit Agreement, ~~and the Senior Notes Indenture,~~ as applicable; (3) permit each of the DIP Agents, the Revolving and LC Administrative Agent, the Term Loan Administrative Agent, the 2021 LC Administrative Agent, the Superpriority Term Loan Agent, and the ~~Senior Notes Trustee~~Superpriority Revolving Administrative Agent to seek compensation and/or reimbursement of fees and expenses in accordance with the terms of this Plan~~; and (4~~ and the Confirmation Order; (4) allow each of (x) the Revolving and LC Administrative Agent and any issuer of a letter of credit under the Credit Agreement to enforce its rights, claims, and interests against any Defaulting Lender (as defined in the Credit Agreement); and (y) the 2021 LC Administrative Agent and any issuer of 2021 Letters of Credit to enforce its rights, claims and interests against any Defaulting Participant (as defined in the 2021 LC Agreement); (5) permit each of the DIP Agent, the Revolving and LC Administrative Agent, the Term Loan Administrative Agent, the 2021 LC Administrative Agent, Superpriority Term Loan Agent, and the ~~Senior Notes Trustee~~Superpriority Revolving

Administrative Agent, to appear and be heard in the Chapter 11 Cases or in any proceeding in the Bankruptcy Court, including to enforce any obligation owed to the DIP Agent, the Revolving and LC Administrative Agent, the Term Loan Administrative Agent, the 2021 LC Administrative Agent, and the Superpriority Term Loan Agent, and the Senior Notes Trustee, or or other holders of Claims under the DIP Credit Agreement, the Superpriority Credit Agreement, the 2021 LC Agreement, and the Credit Agreement, and the Senior Notes Indenture(6) preserve the rights and obligations of the parties under the Exit Facility Documents.  Except as provided in this Plan (including Article VI hereof), the Confirmation Order and the Exit Facilities, on the Effective Date, the DIP Agents, the Revolving and LC Administrative Agent, the Term Loan Administrative Agent, the 2021 LC Administrative Agent, the Superpriority Term Loan Agent, the Superpriority Revolving Administrative Agent and the Senior Notes Trustee, and their respective agents, successors, and assigns, shall be automatically and fully discharged of all of their duties and obligations associated with the DIP Credit Agreement, the Superpriority Credit Agreement, the 2021 LC Agreement, the Credit Agreement, and the Senior Notes Indenture, as applicable.  To the extent cancelled in accordance with this paragraph, the commitments and obligations (if any) of the holders of the Senior Notes and the lenders under the DIP Credit Agreement, the Superpriority Credit Agreement, the Credit Agreement, and the 2021 LC Agreement to extend any further or future credit or financial accommodations to any of the Debtors, any of their respective subsidiaries or any of their respective successors or assigns under the DIP Credit Agreement, the 2021 LC Agreement, the Superpriority Credit Agreement the Credit Agreement, and the Senior Notes Indenture, as applicable, shall fully terminate and be of no further force or effect on the Effective Date.

J.    I. Corporate Action.

Upon the Effective Date, all actions contemplated under the Plan shall be deemed authorized and approved in all respects, including: (1) adoption or assumption, as applicable, of the Compensation and Benefit Programs; (2) selection of the directors and officers for the Reorganized Debtors; (3) the issuance and distribution of the New Common Stock; (4) implementation of the Restructuring Transactions, including the Rights Offering, the Pipes Business Sale, and the Technology Business Sale; (5) issuance and distribution of the New Warrants; (6) entry into the New Warrants Agreements and the Exit Facility Documents, as applicable; (7) all other actions contemplated under the Plan (whether to occur before, on, or after the Effective Date); (8) adoption of the New Organizational Documents; (9) the rejection, assumption, or assumption and assignment, as applicable, of Executory Contracts and Unexpired Leases; and (10) all other acts or actions contemplated or reasonably necessary or appropriate to promptly consummate the Restructuring Transactions contemplated by the Plan (whether to occur before, on, or after the Effective Date).  All matters provided for in the Plan involving the corporate structure of the Debtors or the Reorganized Debtors, and any corporate, partnership, limited liability company, or other governance action required by the Debtors or the Reorganized Debtor, as applicable, in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the Security holders, members, directors, or officers of the Debtors or the Reorganized Debtors, as applicable.  On or (as applicable) prior to the Effective Date, the appropriate officers of the Debtors or the Reorganized Debtors, as applicable, shall be authorized and (as applicable) directed to issue, execute, and deliver the agreements, documents, Securities, and instruments contemplated under the Plan (or necessary or desirable to effect the transactions contemplated under the Plan) in the name of and on behalf of the Reorganized Debtors, including the New Common Stock, the New Organizational Documents, the Exit Facility Documents, the New Warrants, the New Warrants Agreements (as applicable), the Pipes Business Sale Documents, the Purchase Agreement, and any and all other agreements, documents, Securities, and instruments relating to the foregoing.  The authorizations and approvals contemplated by this Article IV.I Article IV.J shall be effective notwithstanding any requirements under non-bankruptcy law.

K.    J. New Organizational Documents.

On or immediately prior to the Effective Date, the New Organizational Documents shall be automatically adopted by the applicable Reorganized Debtors.  To the extent required under the Plan or applicable non-bankruptcy law, each of the Reorganized Debtors will file its New Organizational Documents with the applicable Secretaries of State and/or other applicable authorities in its respective state or country of organization if and to the extent required in accordance with the applicable laws of the respective state or country of organization.  The New Organizational Documents will (a) prohibit the issuance of non-voting equity Securities, to the extent required under section 1123(a)(6) of the Bankruptcy Code and (b) provide for customary minority shareholder protections and

information and reporting requirements subject to the consent rights set forth in Section 3.02 of the Restructuring Support Agreement.

After the Effective Date, the Reorganized Debtors may amend and restate their respective New Organizational Documents in accordance with the terms thereof, and the Reorganized Debtors may file such amended certificates or articles of incorporation, bylaws, or such other applicable formation documents, and other constituent documents as permitted by the laws of the respective states, provinces, or countries of incorporation and the New Organizational Documents.

*L.    K. Indemnification Obligations.*

Consistent with applicable law, all indemnification provisions in place as of the Effective Date (whether in the by-laws, certificates of incorporation or formation, limited liability company agreements, other organizational documents, board resolutions, indemnification agreements, employment contracts, or otherwise) for current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of the Debtors, as applicable, shall be reinstated and remain intact, irrevocable, and shall survive the effectiveness of the Plan on terms no less favorable to such current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of the Debtors than the indemnification provisions in place prior to the Effective Date[; *provided* that the Reorganized Debtors shall not indemnify current or former officers, directors, managers, employees, attorneys, accountants, investment bankers, or other professionals of the Debtors for any claims or Causes of Action arising out of or relating to any act or omission that is a criminal act or constitutes intentional fraud, gross negligence, or willful misconduct.] Notwithstanding the foregoing, in the event of the closing of the Pipes Business Sale, the Pipes Entities shall maintain such indemnification obligations only to the extent required under the Pipes Business Sale Documents.

*M.    L. Directors and Officers of the Reorganized Debtors.*

As of the Effective Date, the terms of the current members of the board of directors of McDermott shall expire and the new directors and officers of the Reorganized McDermott shall be appointed.  The New Board will consist of [    ]seven (7) directors: (i) the Chief Executive Officer of Reorganized McDermott, (ii) [    ]six (6) directors selected by thecertain Required Consenting Term Lenders, and (iii) [   ] directors selected by the Required Consenting Revolving Lenders and the Required Consenting LCRevolving Lenders.  The identities of directors on the New Board shall be set forth in the Plan Supplement to the extent known at the time of filing. Corporate governance for Reorganized McDermott, including charters, bylaws, operating agreements, or other organization documents, as applicable, shall: (a) be consistent with the Restructuring Term Sheet, Section 3 of the Restructuring Support Agreement, and section 1123(a)(6) of the Bankruptcy Code; and (b) provide for customary minority shareholder protections and information and reporting requirements reasonably acceptable to the Debtors and the Required Consenting Stakeholders.

*N.    M. Effectuating Documents; Further Transactions.*

On and after the Effective Date, the Reorganized Debtors, and their respective officers, directors, members, or managers (as applicable), are authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, Exit Facilities entered into, and the Securities issued pursuant to the Plan in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorization, or consents except for those expressly required pursuant to the Plan.

*O.    N. Section 1146 Exemption.*

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfers (whether from a Debtor to a Reorganized Debtor or to any other Person) of property under the Plan or pursuant to: (1) the issuance, distribution, transfer, or exchange of any debt, equity Security, or other interest in the Debtors or the Reorganized Debtors, including the New Common Stock and the New Warrants (including the New Common Stock that may be

issuable upon exercise of the New Warrants); (2) the Restructuring Transactions; (3) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (4) the making, assignment, or recording of any lease or sublease; (5) the grant of collateral as security for the Reorganized Debtors' obligations under and in connection with the Exit Facilities; or (6) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, personal property transfer tax, sales or use tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment. All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146(a) of the Bankruptcy Code, shall forego the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

P.     O. Director and Officer Liability Insurance.

        Notwithstanding anything in the Plan to the contrary, the Reorganized Debtors shall be deemed to have assumed all of the Debtors' D&O Liability Insurance Policies pursuant to section 365(a) of the Bankruptcy Code effective as of the Effective Date. Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Reorganized Debtors' foregoing assumption of each of the unexpired D&O Liability Insurance Policies. Notwithstanding anything to the contrary contained in the Plan, Confirmation of the Plan shall not discharge, impair, or otherwise modify any indemnity obligations assumed by the foregoing assumption of the D&O Liability Insurance Policies, and each such indemnity obligation will be deemed and treated as an Executory Contract that has been assumed by the Debtors under the Plan as to which no Proof of Claim need be filed.

        In addition, after the Effective Date, none of the Reorganized Debtors shall terminate or otherwise reduce the coverage under any D&O Liability Insurance Policies (including any "tail policy") in effect on or after the Petition Date, with respect to conduct occurring prior thereto, and all directors and officers of the Debtors who served in such capacity at any time prior to the Effective Date shall be entitled to the full benefits of any such policy for the full term of such policy, to the extent set forth therein, regardless of whether such directors and officers remain in such positions after the Effective Date. Notwithstanding the foregoing, in the event of the closing of the Pipes Business Sale, the Pipes Entities shall maintain such D&O Liability Insurance Policies (including any "tail policy") only to the extent required under the Pipes Business Sale Documents.

Q.     P. Management Incentive Plan.

        Effective on the Effective Date, the Reorganized Debtors will (i) reserve 7.5% of New Common Stock (on a fully diluted and fully distributed basis, but subject to dilution on account of the New Warrants) which may be granted in the form of options, restricted stock, restricted stock units, warrants, stock appreciations rights or any combination thereof (each an "**Award**" and such reserve, the "**MIP Pool**") for grant to management employees and members of the New Board and in accordance with the terms of this Article IV.Q and as set forth in the Plan Supplement and (ii) enter into severance and change in control arrangements ("**Severance Arrangements**") with senior executives of the Debtors that are insiders pursuant to Section 16 of the Exchange Act ("**Senior Executives**") in amounts and on terms and conditions to be agreed with and approved by the Required Consenting Lenders. The New Board shall grant no less than 53.33% of the MIP Pool to the employees of the Debtors no later than 60 days following the Effective Date (the "**Emergence Awards**") with the terms of the Emergence Awards to be determined as set forth below in the Plan Supplement and the remainder of the MIP Pool will be available for future grants to management, employees, and members of the New Board with allocations, terms, and conditions to be determined by the New Board. From the Petition Date through entry of the Confirmation Order, the Debtors, the Required Consenting Lenders and any consultants or advisors engaged by the Required Consenting Lenders will use

~~commercially reasonable efforts to agree on an allocation schedule and the terms, conditions, vesting and composition (including, for the avoidance of doubt, which may be in any form of Award) of the Emergence Awards (together, the "**MIP Proposal**"), and during this period the Debtors will use commercially reasonable efforts to facilitate meetings between the Required Consenting Lenders and the Debtors' key management personnel. As soon as reasonably practicable following the Effective Date but no later than 60 days following the Effective Date, the New Board shall consider the MIP Proposal for approval and New Board shall determine the final terms and conditions of the actual grants.~~ A Senior Executive will be permitted to voluntarily terminate for "Good Reason" and receive the severance benefits under the Severance Arrangements if the Senior Executive does not receive an Emergence Award.

<u>R.</u>    ~~Q.~~ *Employee and Retiree Benefits.*

Unless otherwise provided herein, and subject to Article V hereof, all employee wages, compensation, and benefit programs in place as of the Effective Date with the Debtors shall be assumed by the Reorganized Debtors and shall remain in place as of the Effective Date, and the Reorganized Debtors will continue to honor such agreements, arrangements, programs, and plans. For the avoidance of doubt, pursuant to section 1129(a)(13) of the Bankruptcy Code, from and after the Effective Date, all retiree benefits (as such term is defined in section 1114 of the Bankruptcy Code), if any, shall continue to be paid in accordance with applicable law. ~~On~~<u>Notwithstanding the foregoing, on</u> the Effective Date, the Debtors shall enter into severance and change in control arrangements with Senior Executives in amounts and on terms and conditions to be agreed with and approved by the Required Consenting Lenders~~,~~ <u>which, to the extent provided therein, shall supersede and replace any severance or change of control agreements with such Senior Executives existing prior to the Effective Date and the long-term components of any key employee retention plan or key employee incentive plan existing on the Effective Date shall be subject to modification or termination, as applicable, by the New Board upon adoption of the Management Incentive Plan.</u>

<u>S.</u>    ~~R.~~ *Preservation of Causes of Action.*

In accordance with section 1123(b) of the Bankruptcy Code, but subject to Article VIII hereof, each Reorganized Debtor, as applicable, shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action of the Debtors, whether arising before or after the Petition Date, including any actions specifically enumerated in the Schedule of Retained Causes of Action, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date, other than the Causes of Action released by the Debtors pursuant to the releases and exculpations contained in the Plan, including in Article VIII hereof, which shall be deemed released and waived by the Debtors and the Reorganized Debtors as of the Effective Date.

The Reorganized Debtors may pursue such retained Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors. **No Entity (other than the Released Parties) may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors or the Reorganized Debtors, as applicable, will not pursue any and all available Causes of Action of the Debtors against it. The Debtors and the Reorganized Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan, including Article VIII hereof. Unless otherwise agreed upon in writing by the parties to the applicable Cause of Action, all objections to the Schedule of Retained Causes of Action must be Filed with the Bankruptcy Court on or before thirty (30) days after the Effective Date. Any such objection that is not timely filed shall be disallowed and forever barred, estopped, and enjoined from assertion against any Reorganized Debtor, without the need for any objection or responsive pleading by the Reorganized Debtors or any other party in interest or any further notice to or action, order, or approval of the Bankruptcy Court.** The Reorganized Debtors may settle any such objection without any further notice to or action, order, or approval of the Bankruptcy Court. If there is any dispute regarding the inclusion of any Cause of Action on the Schedule of Retained Causes of Action that remains unresolved by the Debtors or Reorganized Debtors, as applicable, and the objection party for thirty (30) days, such objection shall be resolved by the Bankruptcy Court. Unless any Causes of Action of the Debtors against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Final Order, the Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata,

collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

The Reorganized Debtors reserve and shall retain such Causes of Action of the Debtors notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan. In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that a Debtor may hold against any Entity shall vest in the Reorganized Debtors, except as otherwise expressly provided in the Plan, including Article VIII hereof. The applicable Reorganized Debtors, through their authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action. The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

## ARTICLE V.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A.      *Assumption and Rejection of Executory Contracts and Unexpired Leases.*

On the Effective Date, except as otherwise provided in Article V.H.1 and elsewhere herein, all Executory Contracts or Unexpired Leases not otherwise assumed or rejected will be deemed assumed by the applicable Reorganized Debtor (and assigned to the party(ies) set forth in the Technology Business Sale Documents, as applicable) in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, other than those that are: (1) identified on the Rejected Executory Contracts and Unexpired Leases Schedule; (2) previously expired or terminated pursuant to their own terms; (3) have been previously assumed or rejected by the Debtors pursuant to a Final Order; (4) are the subject of a motion to reject that is pending on the Effective Date; or (5) have an ordered or requested effective date of rejection that is after the Effective Date.

Entry of the Confirmation Order shall constitute an order of the Bankruptcy Court approving the assumptions, assumptions and assignments, or rejections of the Executory Contracts or Unexpired Leases as set forth in the Plan, the Assumed Executory Contract and Unexpired Leases Schedule, or the Rejected Executory Contracts and Unexpired Leases Schedule, pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Except as otherwise specifically set forth herein, assumptions or rejections of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Effective Date. Each Executory Contract or Unexpired Lease assumed pursuant to the Plan or by Bankruptcy Court order but not assigned to a third party before the Effective Date shall re-vest in and be fully enforceable by the applicable contracting Reorganized Debtor in accordance with its terms, except as such terms may have been modified by the provisions of the Plan or any order of the Bankruptcy Court authorizing and providing for its assumption. Any motions to assume Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by a Final Order on or after the Effective Date but may be withdrawn, settled, or otherwise prosecuted by the Reorganized Debtors.

To the maximum extent permitted by law, to the extent any provision in any Executory Contract or Unexpired Lease assumed or assumed and assigned pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption or assumption and assignment of such Executory Contract or Unexpired Lease (including any "change of control" provision), then such provision shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto. Notwithstanding anything to the contrary in the Plan, the Debtors or the Reorganized Debtors, as applicable, reserve the right to alter, amend, modify, or supplement the Assumed Executory Contracts and Unexpired Leases Schedule and the Rejected Executory Contracts and Unexpired Leases Schedule at any time up to forty-five (45) days after the Effective Date, so long as such allocation, amendment, modification, or supplement is consistent with the Restructuring Support Agreement; *provided* that the Cameron LNG Project Obligations shall be assumed as of the Effective Date in accordance with Article V.J.

B.      *Claims Based on Rejection of Executory Contracts or Unexpired Leases.*

        Unless otherwise provided by a Final Order of the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, pursuant to the Plan or the Confirmation Order, if any, must be Filed with the Bankruptcy Court within thirty (30) days after the later of (1) the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection, (2) the effective date of such rejection, or (3) the Effective Date.  **Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed with the Bankruptcy Court within such time will be automatically disallowed, forever barred from assertion, and shall not be enforceable against the Debtors or the Reorganized Debtors, the Estates, or their property without the need for any objection by the Reorganized Debtors or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in the Proof of Claim to the contrary.**  All Allowed Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases shall be classified as General Unsecured Claims and shall be treated in accordance with Article III.B.13 of this Plan.

C.      *Cure of Defaults for Assumed Executory Contracts and Unexpired Leases and Lummus Executory Contracts or Unexpired Leases.*

        No later than seven (7) calendar days before the Confirmation Hearing, the Debtors shall provide notices of proposed ~~Cure amounts~~assumptions to the counterparties to the agreements listed on the Assumed Executory Contracts and Unexpired Leases Schedule, which shall include a description of the procedures for ~~objecting~~resolving disputes related to the proposed ~~Cure amounts or the Reorganized Debtors' ability to provide "adequate assurance of future performance thereunder" (within the meaning of~~assumption of applicable Executory Contracts and Unexpired Leases.  Absent any pending dispute, the monetary and nonmonetary defaults existing as of the assumption of the Executory Contract(s) and Unexpired Lease(s) assumed pursuant to this Article V will be satisfied by the Debtors in compliance with section 365(b)(1) of the Bankruptcy Code~~)~~.  ~~Unless otherwise agreed in writing by the parties in the applicable~~ To the extent there is a dispute related to any cures of defaults arising under such Executory Contract(s) and Unexpired Lease(s) (other than Lummus Executory Contracts or Unexpired Leases), payment of any such disputed Cure amounts and the cure of any nonmonetary defaults shall be reconciled in the ordinary course of the Debtors' business and all parties' rights shall be reserved with respect thereto, including all rights to receive payment in full of any such Cures whether arising before or after the Effective Date and the right to object prior to or after the Effective Date to any assumption or cures relating thereto.  The reconciliation, settlement, and payment of any monetary defaults over $7.5 million in respect of any single Executory Contract or Unexpired Lease~~,~~ ~~any objection by a counterparty to a~~nor group of related Executory Contracts or Unexpired Leases ~~to a proposed assumption or related Cure amount must be Filed, served, and actually received by the counsel to the Debtor no later than the date and time specified in the notice.  Any counterparty~~ prior to or on the Effective Date shall be subject to the approval of the Required Consenting Lenders.

        ~~to an~~Except with regard to Lummus Executory Contracts or Unexpired Leases~~that fails to object timely to the proposed assumption or Cure amount will be deemed to have assented to such assumption or Cure amount~~, there shall be no need to file an objection to reserve rights with respect to disputes relating to monetary and nonmonetary cures and such cures will be reconciled in the ordinary course of the Debtors' business. Notwithstanding anything herein to the contrary, except with regard to Lummus Executory Contracts or Unexpired Leases, in the event that any Executory Contract or Unexpired Lease is added to the Assumed Executory Contracts and Unexpired Leases Schedule after ~~such seven-day deadline~~the provision of notices of proposed assumptions described above, a notice of proposed ~~Cure amounts~~assumption with respect to such Executory Contract or Unexpired Lease will be sent promptly to the counterparty thereof.

        With regard to any Lummus Executory Contracts or Unexpired Leases, no later than thirty (30) days before the Effective Date of the Plan, the Debtors shall provide notices of proposed assumptions to the counterparties to any assumed Lummus Executory Contracts or Unexpired Leases, which shall include, with respect to each such Lummus Executory Contract or Unexpired Lease, the Debtors' good faith estimate of the amount of any cure.  Each notice of proposed assumption shall state whether the applicable Lummus Executory Contract or Unexpired Lease is being assumed by the Debtors or assumed and assigned to the Lummus Buyer.  To the extent there is a dispute

related to either a monetary Cure amount or nonmonetary default, the Debtors, with consent of the Lummus Buyer and in accordance with the Stalking Horse SAPA, may elect to: (i) not assume or assume and assign to the Buyer the relevant Lummus Executory Contract or Unexpired Lease; (ii) postpone the assumption of such Lummus Executory Contract or Unexpired Lease until the resolution of such objection; or (iii) reserve the disputed portion of the Cure of the monetary default and, and subject to cure of any nonmonetary defaults, assume such Lummus Executory Contract or Unexpired Lease on the Effective Date. The assumption or assumption and assignment of the assumed Lummus Executory Contracts or Unexpired Leases is subject to the cure of all nonmonetary defaults (other than defaults triggered by the filing of the Chapter 11 Cases by the Debtors) prior to the Effective Date of the Plan.

Unless otherwise agreed ~~upon~~ in writing by the parties ~~to~~in the applicable Lummus Executory Contract or Unexpired Lease, ~~all requests for payment of Cure that differ from the amounts paid or proposed to be paid by the Debtors or the Reorganized Debtors to a counterparty must be Filed with the Bankruptcy Court on or before thirty (30) days after the Effective Date.  Any such request that is not timely filed shall be disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Reorganized Debtor, without the need for any objection by the Reorganized Debtors or any other party in interest or any further notice to or action, order, or approval of the Bankruptcy Court.  Any Cure shall be deemed fully satisfied, released, and discharged upon payment by the Debtors or the Reorganized Debtors of the Cure; *provided* that nothing herein shall prevent the Reorganized Debtors from paying any Cure despite the failure of the relevant counterparty to file such request for payment of such Cure amount.  The Reorganized Debtors also may settle any Cure without any further notice to or action, order, or approval of the Bankruptcy Court.~~ any objection by a counterparty to a Lummus Executory Contract or Unexpired Lease to a proposed assumption must be Filed, served, and actually received by the counsel to the Debtor no later than the date and time specified in the notice.  Any counterparty to a Lummus Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption will be deemed to have assented to such assumption.

The Debtors or the Reorganized Debtors, as applicable, shall pay the Cure amounts, if any, and satisfy all nonmonetary defaults on the Effective Date or as soon as reasonably practicable thereafter, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may agree.~~;~~ *provided* that the Debtors shall pay or satisfy, as applicable, any cures, or establish a reserve for any disputed portion of a Cure for any Lummus Executory Contract or Unexpired Lease on or prior the Effective Date.

Any Cure shall be deemed fully satisfied, released, and discharged upon payment or satisfaction by the Debtors or the Reorganized Debtors of the Cure.  If there is any dispute regarding any Cure, the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" within the meaning of section 365 of the Bankruptcy Code, or any other matter pertaining to assumption, then payment of the applicable Cure amount shall occur as soon as reasonably practicable after entry of a Final Order resolving such dispute, approving such assumption (and, if applicable, assignment), or as may be agreed upon by the Debtors or the Reorganized Debtors, as applicable, and the counterparty to the Executory Contract or Unexpired Lease. The Reorganized Debtors also may settle any Cure without any further notice to or action, order, or approval of the Bankruptcy Court.

The Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any ~~Cures, Claims, or defaults, whether monetary or~~ nonmonetary defaults arising from or triggered by the filing of these chapter 11 cases, including defaults of provisions restricting the change in control or ownership interest composition or any bankruptcy-related defaults, arising at any time prior to the effective date of assumption. **Any and all Proofs of Claim based upon Executory Contracts or Unexpired Leases that have been assumed in the Chapter 11 Cases, including pursuant to the Confirmation Order, shall be deemed disallowed and expunged as of the later of (1) the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such assumption, (2) the effective date of such assumption or (3) the Effective Date without the need for any objection thereto or any further notice to or action, order, or approval of the Bankruptcy Court**.

D.    *Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases.*

Rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of preexisting obligations owed to the Debtors or the Reorganized Debtors, as applicable, under such Executory Contracts or Unexpired Leases.  In particular, notwithstanding any non-bankruptcy law to the contrary, the Reorganized Debtors expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations with respect to goods previously purchased by the Debtors pursuant to rejected Executory Contracts or Unexpired Leases.

E.    *Insurance Policies.*

Each of the Debtors' insurance policies and any agreements, documents, or instruments relating thereto, are treated as Executory Contracts under the Plan.  Unless otherwise provided in the Plan, on the Effective Date, (1) the Debtors shall be deemed to have assumed all insurance policies and any agreements, documents, and instruments relating to coverage of all insured Claims and (2) such insurance policies and any agreements, documents, or instruments relating thereto shall revest in the Reorganized Debtors.

F.    *Reservation of Rights.*

Nothing contained in the Plan or the Plan Supplement shall constitute an admission by the Debtors or any other party that any contract or lease is in fact an Executory Contract or Unexpired Lease or that any Reorganized Debtor has any liability thereunder.  If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or the Reorganized Debtors, as applicable, shall have forty-five (45) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

G.    *Nonoccurrence of Effective Date.*

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

H.    *Employee Compensation and Benefits.*

1.    Compensation and Benefit Programs.

Subject to the provisions of the Plan, all Compensation and Benefits Programs shall be treated as Executory Contracts under the Plan and deemed assumed on the Effective Date pursuant to the provisions of sections 365 and 1123 of the Bankruptcy Code, except for:

a.    all employee equity or equity-based incentive plans, and any provisions set forth in the Compensation and Benefits Program that provide for rights to acquire Existing Equity Interests in any of the Debtors;

b.    the change in control agreements entered into with current employees, unless otherwise determined by the Required Consenting Lenders prior to the Effective Date;

c.    Compensation and Benefits Programs that have been rejected pursuant to an order of a Bankruptcy Court; and

d.    Compensation and Benefits Programs that, as of the entry of the Confirmation Order, have been specifically waived by the beneficiaries of any employee benefit plan or contract.

Any assumption of Compensation and Benefits Programs pursuant to the terms herein and the Restructuring Transactions and related matters contemplated by the Plan shall be deemed not to trigger (i) any applicable change

47

of control, immediate vesting, termination (similar provisions therein) and (ii) an event of "Good Reason" (or a term of like import), in each case as a result of the consummation of the Restructuring Transactions.  No counterparty shall have rights under a Compensation and Benefits Program assumed pursuant to the Plan other than those applicable immediately prior to such assumption.

~~On~~Notwithstanding the foregoing, on the Effective Date, the Debtors shall enter into severance and change in control arrangements with Senior Executives in amounts and on terms and conditions to be agreed with and approved by the Required Consenting Lenders~~.~~ which, to the extent provided therein, shall supersede and replace any severance or change of control agreements with such Senior Executives existing prior to the Effective Date and the long-term components of any key employee retention plan or key employee incentive plan existing on the Effective Date shall be subject to modification or termination, as applicable, by the New Board upon adoption of the Management Incentive Plan.

2.      Workers' Compensation Programs.

As of the Effective Date, except as set forth in the Plan Supplement, the Debtors and the Reorganized Debtors shall continue to honor their obligations under:  (a) all applicable workers' compensation laws in states in which the Reorganized Debtors operate; and (b) the Debtors' written contracts, agreements, agreements of indemnity, self-insured workers' compensation bonds, policies, programs, and plans for workers' compensation and workers' compensation insurance.  All Proofs of Claims on account of workers' compensation shall be deemed withdrawn automatically and without any further notice to or action, order, or approval of the Bankruptcy Court; *provided* that nothing in the Plan shall limit, diminish, or otherwise alter the Debtors' or Reorganized Debtors' defenses, Causes of Action, or other rights under applicable non-bankruptcy law with respect to any such contracts, agreements, policies, programs, and plans; *provided further* that nothing herein shall be deemed to impose any obligations on the Debtors in addition to what is provided for under applicable state law.

I.      *Contracts and Leases Entered Into After the Petition Date.*

Contracts and leases entered into after the Petition Date by any Debtor, including any Executory Contracts and Unexpired Leases assumed by such Debtor, will be performed by the applicable Debtor or the Reorganized Debtors in the ordinary course of their business.  Accordingly, such contracts and leases (including any assumed Executory Contracts and Unexpired Leases) will survive and remain unaffected by entry of the Confirmation Order.

J.      *Assumption of Cameron LNG Project Obligations*

The Cameron LNG Project Obligations shall be assumed by the applicable Reorganized Debtor effective as of the Effective Date, and the Cameron LNG Project Obligations shall not be subject to the provision of Section V.A. hereof authorizing the Debtors or Reorganized Debtors, as applicable, to alter, amend, modify, or supplement the Assumed Executory Contracts and Unexpired Leases Schedule and the Rejected Executory Contracts and Unexpired Leases Schedule at any time up to forty-five (45) days after the Effective Date.  Within three Business Days after the Effective Date, Reorganized McDermott shall issue the Cameron LNG Replacement Guarantee and the Chiyoda Replacement Guarantee.

## ARTICLE VI.
## PROVISIONS GOVERNING DISTRIBUTIONS

A.      *Distributions on Account of Claims Allowed as of the Effective Date.*

Except as otherwise provided herein, in a Final Order, or as otherwise agreed to by the Debtors or the Reorganized Debtors, as the case may be, and the holder of the applicable Allowed Claim on the first Distribution Date, the Reorganized Debtors shall make initial distributions under the Plan on account of Claims Allowed on or before the Effective Date, subject to the Reorganized Debtors' right to object to Claims; *provided* that (1) Allowed Administrative Claims with respect to liabilities incurred by the Debtors in the ordinary course of business during the Chapter 11 Cases or assumed by the Debtors prior to the Effective Date shall be paid or performed in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, course of

48

dealing, course of business, or industry practice, (2) Allowed Priority Tax Claims shall be paid in accordance with Article II.D of the Plan, and (3) Allowed General Unsecured Claims shall be paid in accordance with Article III.B.13 of the Plan.  To the extent any Allowed Priority Tax Claim is not due and owing on the Effective Date, such Claim shall be paid in full in Cash in accordance with the terms of any agreement between the Debtors and the holder of such Claim or as may be due and payable under applicable non-bankruptcy law or in the ordinary course of business.  Thereafter, a Distribution Date shall occur no less frequently than once in every ninety (90) day period, as necessary, in the Reorganized Debtors' sole discretion.

B.      *Disbursing Agent.*

        All distributions under the Plan shall be made by the Reorganized Debtors.  The Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.  Additionally, in the event that the Disbursing Agent is so otherwise ordered, all costs and expenses of procuring any such bond or surety shall be borne by the Reorganized Debtors.

        Distributions in respect of all Claims under Classes 6A, 6B, 6D, and 7 shall be made based upon a distribution schedule provided to the Debtors by Revolving and LC Administrative Agent after consultation with the holders of such Claims.

C.      *Rights and Powers of Disbursing Agent.*

        1.      Powers of the Disbursing Agent.

        The Disbursing Agent shall be empowered to:  (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

        2.      Expenses Incurred On or After the Effective Date.

        Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and expenses incurred by the Disbursing Agent on or after the Effective Date (including taxes), and any reasonable compensation and expense reimbursement claims (including reasonable attorney fees and expenses), made by the Disbursing Agent shall be paid in Cash by the Reorganized Debtors.

D.      *Delivery of Distributions and Undeliverable or Unclaimed Distributions.*

        1.      Record Date for Distribution.

        On the Distribution Record Date, the Claims Register shall be closed and any party responsible for making distributions shall instead be authorized and entitled to recognize only those record holders listed on the Claims Register as of the close of business on the Distribution Record Date.  If a Claim, other than one based on a publicly traded Security, is transferred twenty (20) or fewer days before the Distribution Record Date, the Distribution Agent shall make distributions to the transferee only to the extent practical and, in any event, only if the relevant transfer form contains an unconditional and explicit certification and waiver of any objection to the transfer by the transferor.

        2.      Delivery of Distributions in General.

        Except as otherwise provided herein, the Disbursing Agent shall make distributions to holders of Allowed Claims and Allowed Interests (as applicable) as of the Distribution Record Date at the address for each such holder as indicated on the Debtors' records as of the date of any such distribution; *provided* that the manner of such distributions shall be determined at the discretion of the Reorganized Debtors.

3.  <u>Minimum Distributions</u>.

No fractional shares of New Common Stock or New Warrants shall be distributed and no Cash shall be distributed in lieu of such fractional amounts.  When any distribution pursuant to the Plan on account of an Allowed Claim or Allowed Interest (as applicable) would otherwise result in the issuance of a number of shares of New Common Stock or New Warrants that is not a whole number, the actual distribution of shares of New Common Stock or New Warrants shall be rounded to the next lower whole number with no further payment therefor.  The total number of authorized shares of New Common Stock or New Warrants to be distributed to holders of Allowed Claims hereunder shall be adjusted as necessary to account for the foregoing rounding.

4.  <u>Undeliverable Distributions and Unclaimed Property</u>.

In the event that any distribution to any holder of Allowed Claims or Allowed Interests (as applicable) is returned as undeliverable, no distribution to such holder shall be made unless and until the Disbursing Agent has determined the then-current address of such holder, at which time such distribution shall be made to such holder without interest; *provided* that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of one year from the Effective Date.  After such date, all unclaimed property or interests in property shall revert to the Reorganized Debtors automatically and without need for a further order by the Bankruptcy Court (notwithstanding any applicable federal, provincial or state escheat, abandoned, or unclaimed property laws to the contrary), and the Claim of any holder of Claims and Interests to such property or Interest in property shall be discharged and forever barred.

5.  <u>Surrender of Canceled Instruments or Securities</u>.

On the Effective Date or as soon as reasonably practicable thereafter, each holder of a certificate or instrument evidencing a Claim or an Interest that has been cancelled in accordance with ~~Article IV.H~~ Article IV.I hereof shall be deemed to have surrendered such certificate or instrument to the Distribution Agent.  Such surrendered certificate or instrument shall be cancelled solely with respect to the Debtors, and such cancellation shall not alter the obligations or rights of any non-Debtor third parties vis-à-vis one another with respect to such certificate or instrument, including with respect to any indenture or agreement that governs the rights of the holder of a Claim or Interest, which shall continue in effect for purposes of allowing holders to receive distributions under the Plan, charging liens, priority of payment, and indemnification rights.  Notwithstanding anything to the contrary herein, this paragraph shall not apply to certificates or instruments evidencing Claims that are Unimpaired under the Plan or Claims in respect of Classes 5, 6A, 6B (in respect of Revolving LCs), 7 or 8 to the extent such certificates or instruments are reinstated or amended on the Effective Date under the terms of the Plan.

6.  <u>Delivery of Distributions on Senior Notes Claims.</u>

Except as otherwise reasonably requested by the Senior Notes Trustee, all distributions to holders of Allowed Senior Notes Claims shall be deemed completed when made to the Senior Notes Trustee.  The Senior Notes Trustee shall hold or direct such distributions for the benefit of the holders of Allowed Senior Notes Claims.  As soon as practicable in accordance with the requirements set forth in this Article VI, the Senior Notes Trustee shall arrange to deliver such distributions to or on behalf of its holders, subject to the Senior Notes Trustee's charging lien.  If the Senior Notes Trustee is unable to make, or consents to the Debtors or the Reorganized Debtors, as applicable, making such distributions, the Debtors or the Reorganized Debtors, as applicable, with the Senior Notes Trustee's cooperation, shall make such distributions to the extent practicable to do so; *provided* that until such distributions are made, the Senior Notes Trustee's charging lien shall attach to the property to be distributed in the same manner as if such distributions were made through the Senior Notes Trustee.  The Senior Notes Trustee shall have no duties or responsibility relating to any form of distribution that is not DTC eligible and the Debtors or the Reorganized Debtors, as applicable, shall seek the cooperation of DTC so that any distribution on account of an Allowed Senior Notes Claim that is held in the name of, or by a nominee of, DTC shall be made through the facilities of DTC on the Effective Date or as soon as practicable thereafter.

E.      *Manner of Payment.*

1.    All distributions of the New Common Stock ~~and~~, the New Warrants, participations in the Roll-Off LC Exit Facilities, and the debt in respect of the Term Loan Exit Facility and the Make Whole Tranche (to the extent applicable) to the holders of the applicable Allowed Claims under the Plan shall be made by the Disbursing Agent on behalf of the Debtors or Reorganized Debtors, as applicable.

2.    All distributions of Cash to the holders of the applicable Allowed Claims under the Plan shall be made by the Disbursing Agent on behalf of the applicable Debtor or Reorganized Debtor.

3.    At the option of the Disbursing Agent, any Cash payment to be made hereunder may be made by check or wire transfer or as otherwise required or provided in applicable agreements.

F.      *Section 1145 Exemption.*

Pursuant to section 1145 of the Bankruptcy Code or any other applicable exemption, the offering, issuance, and distribution of the New Common Stock (including the Rights Offering Shares) and the New Warrants, as contemplated by Article III.B hereof, and the issuance of the New Common Stock upon exercise of the New Warrants, shall be exempt from, among other things, the registration requirements of section 5 of the Securities Act and any other applicable law requiring registration prior to the offering, issuance, distribution, or sale of Securities. In addition, under section 1145 of the Bankruptcy Code, the New Common Stock, the New Warrants, and the New Common Stock to be issued upon exercise of the New Warrants will be freely tradable in the U.S. by the recipients thereof, subject to the provisions of (i) section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act, (ii) compliance with applicable securities laws and any rules and regulations of the Securities and Exchange Commission, if any, applicable at the time of any future transfer of such Securities or instruments, and (iii) any restrictions in the Reorganized Debtors' New Organizational Documents.

G.      *Compliance with Tax Requirements.*

In connection with the Plan, to the extent applicable, the Debtors, Reorganized Debtors, Disbursing Agent, and any applicable withholding agent shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions made pursuant to the Plan shall be subject to such withholding and reporting requirements.  Notwithstanding any provision in the Plan to the contrary, such parties shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate.  The Debtors and Reorganized Debtors reserve the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and similar spousal awards, Liens, and encumbrances.

H.      *Allocations.*

Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest.

I.      *No Postpetition Interest on Claims.*

Unless otherwise specifically provided for in the DIP Financing Orders, the Plan, or the Confirmation Order, or required by applicable bankruptcy and non-bankruptcy law, postpetition interest shall not accrue or be paid on any prepetition Claims, and no holder of a Claim shall be entitled to interest accruing on or after the Petition Date on such Claim.

J.      *Foreign Currency Exchange Rate.*

Except as otherwise provided in a Bankruptcy Court order, as of the Effective Date, any Claim asserted in currency other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using the exchange rate for the applicable currency as published in The Wall Street Journal, National Edition, on the Effective Date.

K.      *Setoffs and Recoupment.*

Except as expressly provided in this Plan, and the DIP Financing Orders, each Reorganized Debtor may, pursuant to section 553 of the Bankruptcy Code, set off and/or recoup against any Plan Distributions to be made on account of any Allowed Claim, any and all claims, rights, and Causes of Action that such Reorganized Debtor may hold against the holder of such Allowed Claim to the extent such setoff or recoupment is either (1) agreed in amount among the relevant Reorganized Debtor(s) and the holder of the Allowed Claim or (2) otherwise adjudicated by the Bankruptcy Court or another court of competent jurisdiction; *provided* that neither the failure to effectuate a setoff or recoupment nor the allowance of any Claim hereunder shall constitute a waiver or release by a Reorganized Debtor or its successor of any and all claims, rights, and Causes of Action that such Reorganized Debtor or its successor may possess against the applicable holder.  In no event shall any holder of a Claim be entitled to recoup such Claim against any claim, right, or Cause of Action of the Debtors or the Reorganized Debtors, as applicable, unless such holder actually has performed such recoupment and provided notice thereof in writing to the Debtors in accordance with Article XII.G hereof on or before the Effective Date, notwithstanding any indication in any Proof of Claim or otherwise that such holder asserts, has, or intends to preserve any right of recoupment.

L.      *Claims Paid or Payable by Third Parties.*

        1.      Claims Paid by Third Parties.

The Debtors or the Reorganized Debtors, as applicable, shall reduce in full a Claim, and such Claim shall without be disallowed without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor or a Reorganized Debtor.  Subject to the last sentence of this paragraph, to the extent a holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor or a Reorganized Debtor on account of such Claim, such holder shall, within fourteen (14) days of receipt thereof, repay or return the distribution to the applicable Reorganized Debtor, to the extent the holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan.  The failure of such holder to timely repay or return such distribution shall result in the holder owing the applicable Reorganized Debtor annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the fourteen (14) day grace period specified above until the amount is repaid.

        2.      Claims Payable by Third Parties.

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy.  To the extent that one or more of the Debtors' insurers agrees to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, the applicable portion of such Claim may be expunged without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

        3.      Applicability of Insurance Policies.

Except as otherwise provided in the Plan, distributions to holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy.  Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including insurers

under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

## ARTICLE VII.
## PROCEDURES FOR RESOLVING CONTINGENT,
## UNLIQUIDATED, AND DISPUTED CLAIMS

A.      *Disputed Claims Process.*

There is no requirement to file a Proof of Claim (or move the Bankruptcy Court for allowance) to have a Claim Allowed for the purposes of the Plan, except as provided in Article V.B of the Plan.  On and after the Effective Date, except as otherwise provided in this Plan, all Allowed Claims shall be satisfied in the ordinary course of business ~~of~~by the Reorganized Debtors.  The Debtors and the Reorganized Debtors, as applicable, shall have the exclusive authority to (i) determine, without the need for notice to or action, order, or approval of the Bankruptcy Court, that a claim subject to any Proof of Claim that is Filed is Allowed and (ii) file, settle, compromise, withdraw, or litigate to judgment any objections to Claims as permitted under this Plan.  If the Debtors or Reorganized Debtors dispute any Claim, such dispute shall be determined, resolved, or adjudicated, as the case may be, in the manner as if the Chapter 11 Cases had not been commenced and shall survive the Effective Date as if the Chapter 11 Cases had not been commenced; *provided* that the Debtors or Reorganized Debtors may elect, at their sole option, to object to any Claim (other than Claims expressly Allowed by this Plan) and to have the validity or amount of any Claim adjudicated by the Bankruptcy Court; *provided further* that holders of Claims may elect to resolve the validity or amount of any Claim in the Bankruptcy Court.  If a holder makes such an election, the Bankruptcy Court shall apply the law that would have governed the dispute if the Chapter 11 Cases had not been filed.  All Proofs of Claim Filed in the Chapter 11 Cases shall be considered objected to and Disputed without further action by the Debtors.  **Except as otherwise provided herein, all Proofs of Claim Filed after the Effective Date shall be disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Reorganized Debtor, without the need for any objection by the Reorganized Debtors or any further notice to or action, order, or approval of the Bankruptcy Court.**

B.      *Allowance of Claims.*

After the Effective Date, except as otherwise expressly set forth herein, each of the Reorganized Debtors shall have and retain any and all rights and defenses such Debtor had with respect to any Claim or Interest immediately prior to the Effective Date.  The Debtors may affirmatively determine to deem Unimpaired Claims Allowed to the same extent such Claims would be allowed under applicable non-bankruptcy law.

C.      *Claims Administration Responsibilities.*

Except as otherwise specifically provided in the Plan, after the Effective Date, the Reorganized Debtors shall have the sole authority:  (1) to File, withdraw, or litigate to judgment, objections to Claims or Interests; (2) to settle or compromise any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court; and (3) to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court.  For the avoidance of doubt, except as otherwise provided herein, from and after the Effective Date, each Reorganized Debtor shall have and retain any and all rights and defenses such Debtor had immediately prior to the Effective Date with respect to any Disputed Claim or Interest, including the Causes of Action retained pursuant to ~~Article IV.R~~ Article IV.S of the Plan.

D.      *Estimation of Claims and Interests.~~:~~*

Before or after the Effective Date, the Debtors or the Reorganized Debtors, as applicable, may (but are not required to) at any time request that the Bankruptcy Court estimate any Disputed Claim or Interest that is contingent or unliquidated pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party in interest previously has objected to such Claim or Interest or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim or Interest, including during

the litigation of any objection to any Claim or Interest or during the appeal relating to such objection. Notwithstanding any provision otherwise in the Plan, a Claim that has been expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court. In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim or Interest, that estimated amount shall constitute a maximum limitation on such Claim or Interest for all purposes under the Plan (including for purposes of distributions), and the relevant Reorganized Debtor may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim or Interest.

E.       *Adjustment to Claims or Interests without Objection.*

Any duplicate Claim or Interest or any Claim or Interest that has been paid, satisfied, amended, or superseded may be adjusted or expunged on the Claims Register by the Reorganized Debtors without the Reorganized Debtors having to File an application, motion, complaint, objection, or any other legal proceeding seeking to object to such Claim or Interest and without any further notice to or action, order, or approval of the Bankruptcy Court.

F.       *Disallowance of Claims or Interests.*

Except as otherwise expressly set forth herein, all Claims and Interests of any Entity from which property is sought by the Debtors under sections 542, 543, 550, or 553 of the Bankruptcy Code or that the Debtors or the Reorganized Debtors allege is a transferee of a transfer that is avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code shall be disallowed if:  (a) the Entity, on the one hand, and the Debtors or the Reorganized Debtors, as applicable, on the other hand, agree or the Bankruptcy Court has determined by Final Order that such Entity or transferee is liable to turn over any property or monies under any of the aforementioned sections of the Bankruptcy Code; and (b) such Entity or transferee has failed to turn over such property by the date set forth in such agreement or Final Order.

G.       *No Distributions Pending Allowance.*

Notwithstanding any other provision of the Plan, if any portion of a Claim or Interest is a Disputed Claim or Interest, as applicable, no payment or distribution provided hereunder shall be made on account of such Claim or Interest unless and until such Disputed Claim or Interest becomes an Allowed Claim or Interest; *provided* that if only the Allowed amount of an otherwise valid Claim or Interest is Disputed, such Claim or Interest shall be deemed Allowed in the amount not Disputed and payment or distribution shall be made on account of such undisputed amount.

H.       *Distributions After Allowance.*

To the extent that a Disputed Claim or Interest ultimately becomes an Allowed Claim or Interest, distributions (if any) shall be made to the holder of such Allowed Claim or Interest in accordance with the provisions of the Plan.  As soon as reasonably practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim or Interest becomes a Final Order, the Disbursing Agent shall provide to the holder of such Claim or Interest the distribution (if any) to which such holder is entitled under the Plan as of the Effective Date, without any interest to be paid on account of such Claim or Interest.

I.       *No Interest.*

Unless otherwise specifically provided for herein or by order of the Bankruptcy Court, postpetition interest shall not accrue or be paid on Claims, and no holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim or right.  Additionally, and without limiting the foregoing, interest shall not accrue or be paid on any Disputed Claim with respect to the period from the Effective Date to the date a final distribution is made on account of such Disputed Claim, if and when such Disputed Claim becomes an Allowed Claim.

## ARTICLE VIII.
## SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS

A.      *Discharge of Claims and Termination of Interests.*

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Definitive Documents, the Plan, or in any contract, instrument, or other agreement or document created or entered into pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims (including any Intercompany Claims resolved or compromised after the Effective Date by the Reorganized Debtors), Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by employees of the Debtors prior to the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not:  (1) a Proof of Claim based upon such debt or right is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such debt, right, or interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the holder of such a Claim or Interest has accepted the Plan.  The Confirmation Order shall be a judicial determination of the discharge of all Claims (other than the Reinstated Claims) and Interests (other than the Intercompany Interests that are Reinstated) subject to the occurrence of the Effective Date.

B.      **Release of Liens.**

**Except as otherwise provided in the Exit Facility Documents, the Plan, the Confirmation Order, or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, except for Other Secured Claims that the Debtors elect to Reinstate in accordance with this Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors and their successors and assigns.  Any holder of such Secured Claim (and the applicable agents for such holder) shall be authorized and directed, at the sole cost and expense of the Reorganized Debtors, to release any collateral or other property of any Debtor (including any cash collateral and possessory collateral) held by such holder (and the applicable agents for such holder), and to take such actions as may be reasonably requested by the Reorganized Debtors to evidence the release of such Liens and/or security interests, including the execution, delivery, and filing or recording of such releases.  The presentation or filing of the Confirmation Order to or with any federal, state, provincial, or local agency, records office, or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.**

**To the extent that any holder of a Secured Claim that has been satisfied or discharged in full pursuant to the Plan, or any agent for such holder, has filed or recorded publicly any Liens and/or security interests to secure such holder's Secured Claim, then as soon as practicable on or after the Effective Date, such holder (or the agent for such holder) shall take any and all steps requested by the Debtors, the Reorganized Debtors, or Exit Facility Agents that are necessary or desirable to record or effectuate the cancellation and/or extinguishment of such Liens and/or security interests, including the making of any applicable filings or recordings, and the Reorganized Debtors shall be entitled to make any such filings or recordings on such holder's behalf.**

*C.*      *Releases by the Debtors.*

**Notwithstanding anything contained in the Plan to the contrary, pursuant to section 1123(b) of the Bankruptcy Code, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, on and after the Effective Date, each Released Party is, and is deemed hereby to be, fully, conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by the Debtors, the Reorganized Debtors, their Estates, and any person seeking to exercise the rights of the Debtors or their Estates, including any successors to the Debtors or any Estates representatives appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all Claims and Causes of Action, including any derivative claims asserted or assertable on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, contingent or non-contingent, in law, equity, contract, tort or otherwise, that the Debtors, the Reorganized Debtors, or their Estates, including any successors to the Debtors or any Estates representative appointed or selected pursuant to section 1123(b) of the Bankruptcy Code, would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor or other Entity, or that any Holder of any Claim against, or Interest in, a Debtor or other Entity could have asserted on behalf of the Debtors, based on or relating to, or in any manner arising from, in whole or in part:**

1.   **the Debtors (including the capital structure, management, ownership, or operation thereof), the business or contractual arrangement between the Debtors and any Released Party, any Securities issued by the Debtors and the ownership thereof, the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in- or out-of-court restructuring efforts, any Avoidance Actions (but excluding Avoidance Actions brought as counterclaims or defenses to Claims asserted against the Debtors), intercompany transactions between or among a Company Party and another Company Party, the Superpriority Credit Agreement, the Credit Agreement, the <u>Hedge Agreements (as defined in the Hedging Order), the</u> 2021 LC Agreement, the Lloyds Letter of Credit Agreement, the Senior Notes Indenture, the Senior Notes, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Restructuring Support Agreement, the Disclosure Statement, the DIP Credit Agreement, the Exit Facility Documents, or the Plan (including, for the avoidance of doubt, the Plan Supplement);**

2.   **any Restructuring Transaction, contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Restructuring Support Agreement, the Rights Offering, the Disclosure Statement, the DIP Credit Agreement, the New Warrants Agreements, the Exit Facility Documents, the Plan, or the Plan Supplement, before or during the Chapter 11 Cases;**

3.   **the Chapter 11 Cases, the filing of the Chapter 11 Cases, the Disclosure Statement or the Plan, the solicitation of votes with respect to the Plan, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, the Rights Offering, or the distribution of property under the Plan or any other related agreement; or**

4.   **any related act or omission, transaction, agreement, event, or other occurrence related or relating to any of the foregoing taking place on or before the Effective Date, including all Avoidance Actions or other relief obtained by the Debtors in the Chapter 11 Cases.**

**Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (i) post Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Restructuring Transaction, any Definitive Document, or any other document, instrument, or agreement (including those set**

forth in the Plan Supplement) executed to implement the Plan, including the Exit Facility Documents, the New Warrants Agreements, or any Claim or obligation arising under the Plan, or (ii) the rights of any holder of Allowed Claims to receive distributions under the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the foregoing Debtor release, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that the foregoing Debtor release is: (a) in exchange for the good and valuable consideration provided by the Released Parties, including, without limitation, the Released Parties' contributions to facilitating the Restructuring Transactions and implementing the Plan; (b) a good faith settlement and compromise of the Claims released by the foregoing Debtor release; (c) in the best interests of the Debtors and their Estates and all holders of Claims and Interests; (d) fair, equitable, and reasonable; (e) given and made after due notice and opportunity for hearing; and (f) a bar to any of the Debtors, the Reorganized Debtors, or the Debtors' Estates asserting any Claim or Cause of Action released pursuant to the foregoing Debtor release.

### D.   *Releases by the Releasing Parties.*

Except as otherwise expressly set forth in this Plan or the Confirmation Order, on and after the Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is, and is deemed hereby to be, fully, conclusively, absolutely, unconditionally, irrevocably and forever, released and discharged by each Releasing Party, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all Claims and Causes of Action, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, contingent or non-contingent, in law, equity, contract, tort, or otherwise, including any derivative claims asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim against, or Interest in, a Debtor or other Entity, or that any holder of any Claim against, or Interest in, a Debtor or other Entity could have asserted on behalf of the Debtors, based on or relating to, or in any manner arising from, in whole or in part:

1.   the Debtors (including the capital structure, management, ownership, or operation thereof), the business or contractual arrangement between the Debtors and any Releasing Party, any Securities issued by the Debtors and the ownership thereof, the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in- or out-of-court restructuring efforts, any Avoidance Actions (but excluding Avoidance Actions brought as counterclaims or defenses to Claims asserted against the Debtors), intercompany transactions between or among a Company Party and another Company Party, the Superpriority Credit Agreement, the Credit Agreement, the **Hedge Agreements (as defined in the Hedging Order), the** 2021 LC Agreement, the Lloyds Letter of Credit Agreement, Senior Notes Indenture, the Senior Notes, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Restructuring Support Agreement, the Disclosure Statement, the DIP Credit Agreement, the Exit Facility Documents, or the Plan (including, for the avoidance of doubt, the Plan Supplement);

2.   any Restructuring Transaction, contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Restructuring Support Agreement, the Rights Offering, the Disclosure Statement, the DIP Credit Agreement, the New Warrants Agreements, the Exit Facility Documents, the Plan, or the Plan Supplement, before or during the Chapter 11 Cases;**;**

3.   the Chapter 11 Cases, the filing of the Chapter 11 Cases, the Disclosure Statement, or the Plan, the solicitation of votes with respect to the Plan, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or

distribution of Securities pursuant to the Plan, the Rights Offering, or the distribution of property under the Plan or any other related agreement; or

4. any related act or omission, transaction, agreement, event, or other occurrence related or relating to any of the foregoing taking place on or before the Effective Date, including all Avoidance Actions or other relief obtained by the Debtors in the Chapter 11 Cases.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (i) any party of any obligations related to customary banking products, banking services or other financial accommodations (except as may be expressly amended or modified by the Plan and the Exit Facility Documents, or any other financing document under and as defined therein), (ii) any post-Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Restructuring Transaction, or any document, instrument, any Definitive Document, or any agreement (including those set forth in the Plan Supplement) executed to implement the Plan, including the Exit Facility Documents, the New Warrants Agreements, or any Claim or obligation arising under the Plan, ~~or~~ (iii) the rights of holders of Allowed Claims to receive distributions under the Plan~~.~~, or (iv) current and former directors, officers, managers, or employees of the Debtors from any Claim or Cause of Action related to an act or omission that is determined in a Final Order by a court of competent jurisdiction to have constituted actual fraud.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the foregoing third-party release, which includes by reference each of the related provisions and definitions contained herein, and, further, shall constitute the Bankruptcy Court's finding that the foregoing third-party release is: (a) consensual; (b) essential to the Confirmation of the Plan; (c) given in exchange for a substantial contribution and for the good and valuable consideration provided by the Released Parties that is important to the success of the Plan; (d) a good faith settlement and compromise of the Claims released by the foregoing third-party release; (e) in the best interests of the Debtors and their Estates; (f) fair, equitable, and reasonable; (g) given and made after due notice and opportunity for hearing; and (h) a bar to any of the Releasing Parties asserting any claim or Cause of Action released pursuant to the foregoing third-party release.

*E. Exculpation.*

Except as otherwise specifically provided in the Plan or the Confirmation Order, no Exculpated Party shall have or incur liability for, and each Exculpated Party shall be released and exculpated from any Claims and Cause of Action for any claim related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, filing, or termination of the Restructuring Support Agreement and related prepetition transactions (including the Superpriority Credit Agreement, the Credit Agreement, the Senior Notes Indenture or Senior Notes, the 2021 LC Agreement, and the Lloyds Letter of Credit Agreement), the Disclosure Statement, the Plan, the DIP Credit Facility, the Exit Facility Documents, the New Warrants Agreements, the Plan Supplement, the Rights Offering, or any Restructuring Transaction, contract, instrument, release or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion), including any Definitive Document, created or entered into before or during the Chapter 11 Cases, any preference, fraudulent transfer, or other avoidance claim arising pursuant to chapter 5 of the Bankruptcy Code or other applicable law, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, except for claims related to any act or omission that is determined in a Final Order by a court of competent jurisdiction to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.

The Exculpated Parties and other parties set forth above have, and upon confirmation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

*F.*     *Injunction.*

Except as otherwise expressly provided in the Plan or the Confirmation Order or for obligations or distributions issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities who have held, hold, or may hold the Released Claims are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties:  (1) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any Released Claims; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any Released Claims; (3) creating, perfecting, or enforcing any lien or encumbrance of any kind against such Entities or the property of such Entities on account of or in connection with or with respect to any Released Claims; (4) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property or the Estates of such Entities on account of or in connection with or with respect to any Released Claims unless such holder has filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a Claim or Interest or otherwise that such holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any Released Claims released or settled pursuant to the Plan.

Upon entry of the Confirmation Order, all holders of Claims and Interests and their respective current and former employees, agents, officers, directors, principals, and direct and indirect Affiliates shall be enjoined from taking any actions to interfere with the implementation or Consummation of the Plan. **Except as otherwise set forth in the Confirmation Order, E**each holder of an Allowed Claim or Allowed Interest, as applicable, by accepting, or being eligible to accept, distributions under or Reinstatement of such Claim or Interest, as applicable, pursuant to the Plan, shall be deemed to have consented to the injunction provisions set forth in this Article VIII.F hereof.

*G.*     *Protections Against Discriminatory Treatment.*

Consistent with section 525 of the Bankruptcy Code and the Supremacy Clause of the U.S. Constitution, all Entities, including Governmental Units, shall not discriminate against the Reorganized Debtors or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Reorganized Debtors, or another Entity with whom the Reorganized Debtors have been associated, solely because each Debtor has been a debtor under chapter 11 of the Bankruptcy Code, has been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before the Debtors are granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

*H.*     *Document Retention.*

On and after the Effective Date, the Reorganized Debtors may maintain documents in accordance with their standard document retention policy, as may be altered, amended, modified, or supplemented by the Reorganized Debtors.

I.      *Reimbursement or Contribution.*

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the time of allowance or disallowance, such Claim shall be forever disallowed and expunged notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Confirmation Date:  (1) such Claim has been adjudicated as non-contingent or (2) the relevant holder of a Claim has Filed a non-contingent Proof of Claim on account of such Claim and a Final Order has been entered prior to the Confirmation Date determining such Claim as no longer contingent.

## ARTICLE IX.
## CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN

A.      *Conditions Precedent to the Effective Date.*

It shall be a condition to the Effective Date that the following conditions shall have been satisfied or waived pursuant to the provisions of Article IX.B hereof:

a.      the Debtors shall have achieved the Achievement Target; and

b.      the Bankruptcy Court shall have entered the Confirmation Order, which shall be a Final Order, in form and substance consistent in all respects with the Restructuring Support Agreement (including any consent rights thereunder) and otherwise in form and substance acceptable to the Debtors and the Required Consenting Stakeholders, and which shall:

   i.      authorize the Debtors to take all actions necessary to enter into, implement, and consummate the contracts, instruments, releases, leases, indentures, and other agreements or documents created in connection with the Plan;

   ii.     decree that the provisions in the Confirmation Order and the Plan are nonseverable and mutually dependent;

   iii.    authorize the Debtors, as applicable/necessary, to:   (a) implement the Restructuring Transactions, including the Rights Offering; (b) distribute the New Common Stock and the New Warrants, and to issue the New Common Stock upon exercise of the New Warrants, pursuant to the exemption from registration under the Securities Act provided by section 1145 of the Bankruptcy Code or such other applicable exemption from such registration or pursuant to one or more registration statements; (c) make all distributions and issuances as required under the Plan, including Cash and the New Common Stock; and (d) enter into any agreements, transactions, and sales of property as set forth in the Plan Supplement, including the Management Incentive Plan, in each case, in a manner consistent with the terms of the Restructuring Support Agreement and subject to the consent rights set forth therein;

   iv.     authorize the implementation of the Plan in accordance with its terms; and

   v.      provide that, pursuant to section 1146 of the Bankruptcy Code, the assignment or surrender of any lease or sublease, and the delivery of any deed or other instrument or transfer order, in furtherance of, or in connection with the Plan, including any deeds, bills of sale, or assignments executed in connection with any disposition or transfer of assets contemplated under the Plan, shall not be subject to any stamp, real estate transfer, mortgage recording, or other similar tax; and

c.      the Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan;

d. the final version of each of the Plan, the Definitive Documents, and all documents contained in any supplement to the Plan, including Plan Supplement and any exhibits, schedules, amendments, modifications, or supplements thereto or other documents contained therein shall have been executed or filed, as applicable in form and substance consistent in all respects with the Restructuring Support Agreement, the Restructuring Term Sheet, and the Plan, and comply with the applicable consent rights set forth in the Restructuring Support Agreement and/or the Plan for such documents and shall not have been modified in a manner inconsistent with the Restructuring Support Agreement;

e. the ~~Exit~~definitive documents in respect of the Lloyds LC Exit Facility and the Exit Facility Documents shall have been duly executed and delivered by all of the Entities that are parties thereto and all conditions precedent (other than any conditions related to the occurrence of the Effective Date) to the effectiveness of the Exit Facilities shall have been satisfied or duly waived in writing in accordance with the terms of each of the Exit Facilities and the closing of each of the Exit Facilities and the Lloyds LC Exit Facility shall have occurred;

f. the Final Order approving the DIP Credit Facility shall have been entered and shall remain in full force and effect and no event of default shall have occurred and be continuing thereunder;

g. no more than $50 million principal amount of Prepetition Secured Letters of Credit ~~or,~~ the Lloyds Letters of Credit, or the DIP Letters of Credit (other than cash collateralized letters of credit) shall have been drawn and unreimbursed in full in Cash as of the Effective Date; *provided* that this condition may be waived solely with the written consent of the Required Consenting LC Lenders;

h. Reorganized McDermott shall have a minimum of $820 million of Cash on its balance sheet (which amount shall not include Cash held by the Debtors' joint-venture affiliates or cash collateral securing the Cash Secured Letters of Credit, the Lloyds Letters of Credit, and the DIP Cash Secured Letters of Credit) assuming normal working capital; *provided* that this condition may be waived solely with the written consent of the ~~[~~Required Consenting Lenders~~]~~;

i. all professional fees and expenses of retained professionals that require the Bankruptcy Court's approval shall have been paid in full or amounts sufficient to pay such fees and expenses after the Effective Date shall have been placed in a professional fee escrow account pending the Bankruptcy Court's approval of such fees and expenses;

j. the Technology Business Sale shall have been consummated;

k. the Debtors' shall have Filed a *Notice of Anticipated Effective Date* at least five (5) days in advance of such Effective Date;

l. ~~k.~~ to the extent invoiced in accordance with the terms of the Plan, the payment in Cash in full of the Restructuring Expenses; and

m. ~~l.~~ the Debtors shall have implemented the Restructuring Transactions and all transactions contemplated in the Restructuring Term Sheet in a manner consistent with the Restructuring Support Agreement (and subject to, and in accordance with, the consent rights set forth therein), the Restructuring Term Sheet, and the Plan.

B.     *Waiver of Conditions.*

Except as otherwise specified in the Plan or the Restructuring Support Agreement, any one or more of the conditions to Consummation (or component thereof) set forth in this Article IX may be waived by the Debtors with the prior written consent of the Required Consenting Stakeholders (not to be withheld unreasonably), without notice, leave, or order of the Bankruptcy Court or any formal action other than proceedings to confirm or consummate the Plan. Notwithstanding the foregoing, if the conditions precedent to the closing of the Pipes Business Sale shall have been satisfied in accordance with the Pipes Business Sale Documents (as approved by the Required Consenting

Lenders), then the conditions set forth in this Article IX (other than in Article IX.A.b) shall be deemed automatically waived solely with respect to the Pipes Entities, as applicable, without notice, leave, or order of the Bankruptcy Court, or any further action by the Debtors, the Reorganized Debtors, or the Required Consenting Stakeholders.

C.      *Effect of Failure of Conditions.*

If Consummation does not occur as to any Debtor, the Plan shall be null and void in all respects as to such Debtor and nothing contained in the Plan, the Disclosure Statement, or Restructuring Support Agreement as to such Debtor shall:  (1) constitute a waiver or release of any Claims by the Debtors, Claims, or Interests; (2) prejudice in any manner the rights of the Debtors, any holders of Claims or Interests, or any other Entity; or (3) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any holders of Claims or Interests, or any other Entity.

D.      *Substantial Consummation*

"Substantial Consummation" of the Plan, as defined in 11 U.S.C. § 1101(2), shall be deemed to occur on the Effective Date.

**ARTICLE X.**
**MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN**

A.      *Modification and Amendments.*

Except as otherwise specifically provided in this Plan and subject to the consent rights set forth in the Restructuring Support Agreement, the Debtors reserve the right to modify the Plan, whether such modification is material or immaterial, and seek Confirmation consistent with the Bankruptcy Code and, as appropriate, not resolicit votes on such modified Plan.  Subject to those restrictions on modifications set forth in the Plan and the requirements of section 1127 of the Bankruptcy Code, Rule 3019 of the Federal Rules of Bankruptcy Procedure, and, to the extent applicable, sections 1122, 1123, and 1125 of the Bankruptcy Code, each of the Debtors expressly reserves its respective rights to revoke or withdraw, or to alter, amend, or modify the Plan with respect to such Debtor, one or more times, after Confirmation, and, to the extent necessary may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan.

B.      *Effect of Confirmation on Modifications.*

Entry of the Confirmation Order shall mean that all modifications or amendments to the Plan since the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

C.      *Revocation or Withdrawal of Plan.*

To the extent permitted by the Restructuring Support Agreement, the Debtors reserve the right to revoke or withdraw the Plan prior to the Confirmation Date and to File subsequent plans of reorganization.  If the Debtors revoke or withdraw the Plan, or if Confirmation or Consummation does not occur, then:  (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected under the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (3) nothing contained in the Plan shall:  (a) constitute a waiver or release of any Claims or Interests; (b) prejudice in any manner the rights of such Debtor or any other Entity; or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by such Debtor or any other Entity.

## ARTICLE XI.
## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or relating to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

    a.    allow, disallow, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the secured or unsecured status, priority, amount, or allowance of Claims or Interests;

    a.    decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

    b.    resolve any matters related to:  (a) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Cures pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; (c) the Reorganized Debtors amending, modifying, or supplementing, after the Effective Date, pursuant to Article V hereof, any Executory Contracts or Unexpired Leases to the list of Executory Contracts and Unexpired Leases to be assumed or rejected or otherwise; and (d) any dispute regarding whether a contract or lease is or was executory or expired;

    c.    ensure that distributions to holders of Allowed Claims and Allowed Interests (as applicable) are accomplished pursuant to the provisions of the Plan, including with respect to the New Warrants;

    d.    adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

    e.    adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code;

    f.    enter and implement such orders as may be necessary to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created or entered into in connection with the Plan or the Disclosure Statement, including the Restructuring Support Agreement;

    g.    enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

    h.    resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the Consummation, interpretation, or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

    i.    issue injunctions, enter and implement other orders, or take such other actions as may be necessary to restrain interference by any Entity with Consummation or enforcement of the Plan;

    j.    resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the releases, injunctions, exculpations, and other provisions contained in Article VIII hereof and enter such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions;

k.   resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the holder of a Claim or Interest for amounts not timely repaid pursuant to Article VI.L hereof;

l.   enter and implement such orders as are necessary if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

m.   determine any other matters that may arise in connection with or relate to the Plan, the Plan Supplement, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection with the Plan or the Disclosure Statement, including the Restructuring Support Agreement;

n.   enter an order concluding or closing the Chapter 11 Cases;

o.   adjudicate any and all disputes arising from or relating to distributions under the Plan;

p.   consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

q.   determine requests for the payment of Claims and Interests entitled to priority pursuant to section 507 of the Bankruptcy Code;

r.   hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan or the Confirmation Order, including disputes arising under agreements, documents, or instruments executed in connection with the Plan;

s.   hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

t.   hear and determine all disputes involving the existence, nature, scope, or enforcement of any exculpations, discharges, injunctions, and releases granted in the Plan, including under Article VIII hereof, ~~regardless of whether such termination occurred prior to or after the Effective Date~~;

u.   enforce all orders previously entered by the Bankruptcy Court; and

v.   hear any other matter not inconsistent with the Bankruptcy Code.

As of the Effective Date, notwithstanding anything in this Article XI to the contrary, the New Organizational Documents and the Exit Facilities and any documents related thereto shall be governed by the jurisdictional provisions therein and the Bankruptcy Court shall not retain jurisdiction with respect thereto.

## ARTICLE XII.
## MISCELLANEOUS PROVISIONS

A.   *Immediate Binding Effect.*

Subject to Article IX.A hereof and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan (including, for the avoidance of doubt, the documents and instruments contained in the Plan Supplement) shall be immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized Debtors, any and all holders of Claims or Interests (irrespective of whether such holders of Claims or Interests have, or are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in the Plan, each Entity acquiring property under the Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.

B.      *Additional Documents.*

On or before the Effective Date, and consistent in all respects with the terms of the Restructuring Support Agreement, the Debtors may file with the Bankruptcy Court such agreements and other documents as may be necessary to effectuate and further evidence the terms and conditions of the Plan and the Restructuring Support Agreement.  The Debtors or the Reorganized Debtors, as applicable, and all holders of Claims or Interests receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

C.      *Payment of Statutory Fees.*

All fees payable pursuant to section 1930(a) of the Judicial Code, as determined by the Bankruptcy Court at a hearing pursuant to section 1128 of the Bankruptcy Code, shall be paid by each of the Reorganized Debtors (or the Disbursing Agent on behalf of each of the Reorganized Debtors) for each quarter (including any fraction thereof) until the earlier of entry of a final decree closing such Chapter 11 Cases or an order of dismissal or conversion, whichever comes first.

D.      *Statutory Committee and Cessation of Fee and Expense Payment.*

On the Confirmation Date, any statutory committee appointed in the Chapter 11 Cases shall dissolve and members thereof shall be released and discharged from all rights and duties from or related to the Chapter 11 Cases. The Reorganized Debtors shall no longer be responsible for paying any fees or expenses incurred by the members of or advisors to any statutory committees after the Confirmation Date.

E.      *Reservation of Rights.*

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order, and the Confirmation Order shall have no force or effect if the Effective Date does not occur.  None of the Filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by any Debtor with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the holders of Claims or Interests prior to the Effective Date.

F.      *Successors and Assigns.*

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, Affiliate, officer, manager, director, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

G.      *Notices.*

All notices, requests, and demands to or upon the Debtors to be effective shall be in writing (including by facsimile transmission) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

| Debtors | Counsel to the Debtors |
|---|---|
| McDermott International, Inc.<br>757 North Eldridge Parkway<br>Houston, Texas 77079<br>Attention:  John Freeman | Kirkland & Ellis LLP<br>601 Lexington Avenue<br>New York, New York 10022<br>Attention: Joshua A. Sussberg, P.C., Christopher T. Greco, P.C., and Anthony R. Grossi |

| | and |
|---|---|
| | Kirkland & Ellis LLP<br>300 North LaSalle Street<br>Chicago, Illinois 60654<br>Attention: John R. Luze |
| | and |
| | Jackson Walker L.L.P.<br>1401 McKinney Street, Suite 1900<br>Houston, Texas 77010<br>Attention: Elizabeth C. Freeman and Matthew D. Cavenaugh |
| **United States Trustee** | **Counsel to the Consenting Superpriority Term Lenders and the Consenting Term Lenders** |
| Office of The United States Trustee<br>515 Rusk Street, Suite 3516<br>Houston, TX 77002 | Davis Polk & Wardwell LLP<br>450 Lexington Avenue<br>New York, NY 10017<br>Attention: Damian S. Schaible and Natasha Tsiouris |
| **Counsel to the DIP LC Agent, the DIP Collateral Agent, the Revolving and LC Administrative Agent, the 2018 Collateral Agent, the Superpriority Revolving Administrative Agent and the Superpriority Collateral Agent** | **Counsel to the ~~proposed~~ DIP Term Loan Agent, the 2021 LC Administrative Agent, the Superpriority Term Loan Agent, and the Term Loan Administrative Agent** |
| Linklaters LLP<br>1345 Avenue of the Americas<br>New York, New York 10105<br>Attention: Margot Schonholtz and Penelope Jensen<br><br>and<br><br>Bracewell LLP<br>711 Louisiana Street<br>Houston, Texas 77002<br>Attention: William A. (Trey) Wood III | Latham & Watkins LLP<br>885 Third Avenue<br>New York, NY 10022<br>Attention: Andrew Parlen and Anupama Yerramalli |
| **Counsel to the Consenting Noteholders** | |
| Paul, Weiss, Rifkind, Wharton & Garrison LLP<br>1285 Avenue of the Americas<br>New York, NY 10019<br>Attention: Andrew N. Rosenberg and Alice B. Eaton<br><br>-and-<br><br>Brown Rudnick LLP<br>7 Times Square<br>New York, NY 10036<br>Attention: Robert J. Stark and Bennett S. Silverberg | |

After the Effective Date, the Reorganized Debtors have the authority to send a notice to Entities that to continue to receive documents pursuant to Bankruptcy Rule 2002, such Entity must file a renewed request to receive documents pursuant to Bankruptcy Rule 2002.  After the Effective Date, the Reorganized Debtors are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have Filed such renewed requests.

H.       *Term of Injunctions or Stays.*

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date.  All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

I.       *Entire Agreement.*

Except as otherwise indicated, and without limiting the effectiveness of the Restructuring Support Agreement, the Plan (including, for the avoidance of doubt, the documents and instruments in the Plan Supplement) supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

J.       *Plan Supplement.*

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan.  After the exhibits and documents are Filed, copies of such exhibits and documents shall be available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from the Debtors' restructuring website at https://cases.primeclerk.com/McDermott or the Bankruptcy Court's website at www.txs.uscourts.gov/bankruptcy.  To the extent any exhibit or document is inconsistent with the terms of the Plan, unless otherwise ordered by the Bankruptcy Court, the non-exhibit or non-document portion of the Plan shall control.

K.       *Nonseverability of Plan Provisions.*

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is:  (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the Debtors' or Reorganized Debtors' consent, as applicable; and (3) nonseverable and mutually dependent.

L.       *Votes Solicited in Good Faith.*

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with section 1125(g) of the Bankruptcy Code, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtors and each of their respective Affiliates, agents, representatives, members, principals, shareholders, officers, directors, employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of securities offered and sold under the Plan and any previous plan, and, therefore, neither any of such parties or individuals or the Reorganized Debtors will have any liability for the violation of any applicable law, rule, or regulation governing the

solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under the Plan and any previous plan.

M.      *Closing of Chapter 11 Cases.*

The Reorganized Debtors shall, promptly after the full administration of the Chapter 11 Cases, File with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Cases.

N.      *Waiver or Estoppel.*

Each holder of a Claim or an Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, secured or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement, or papers Filed with the Bankruptcy Court prior to the Confirmation Date.

O.      *Creditor Default*

An act or omission by a holder of a Claim or an Interest in contravention of the provisions of this Plan shall be deemed an event of default under this Plan. Upon an event of default, the Reorganized Debtors may seek to hold the defaulting party in contempt of the Confirmation Order and shall be entitled to reasonable attorneys' fees and costs of the Reorganized Debtors in remedying such default. Upon the finding of such a default by a creditor, the Bankruptcy Court may: (a) designate a party to appear, sign and/or accept the documents required under the Plan on behalf of the defaulting party, in accordance with Bankruptcy Rule 7070; (b) enforce the Plan by order of specific performance; (c) award judgment against such defaulting creditor in favor of the Reorganized debtor in an amount, including interest, to compensate the Reorganized Debtors for the damages caused by such default; and (d) make such other order as may be equitable that does not materially alter the terms of the Plan.

Dated: ~~January 22~~March 11, 2020

MCDERMOTT INTERNATIONAL, INC.

on behalf of itself and all other Debtors

*/s/ John Castellano*

John Castellano
Chief Restructuring Officer

## UNITED STATES BANKRUPTCY COURT

## Southern District of Texas

PDF FILE WITH AUDIO FILE ATTACHMENT

2020-30336

McDermott International, Inc. and Whessoe Piping Systems Limited

In ref to Confirmation and doc nos. 15, 110, 512, 428, 639, 549, and 441.
Hearing held March 12, 2020.

| | |
|---|---|
| Case Type : | bk |
| Case Number : | 2020-30336 |
| Case Title : | McDermott International, Inc. and Whessoe Piping Systems Limited |
| Audio Date\Time: | 3/12/2020 9:02:25 AM |
| Audio File Name : | 4bk2020-30336_20200312-090225.mp3 |
| Audio File Size : | 105979 KB |
| Audio Run Time : | [03:40:47] (hh:mm:ss) |

**Help using this file:**

An audio file is embedded as an attachment in this PDF document. To listen to the file,
click the Attachments tab or the Paper Clip icon.  Select the Audio File and click Open.

**MPEG Layer-3 audio coding technology from Fraunhofer IIS and Thomson.**

**This digital recording is a copy of a court proceeding and is provided as
a convenience to the public.  In accordance with 28 U.S.C. § 753 (b)
"[n]o transcripts of the proceedings of the court shall be considered as
official except those made from the records certified by the reporter or
other individual designated to produce the record."**

001375

## Exhibit A

**Sussberg Affidavit**

## IN THE UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| MCDERMOTT INTERNATIONAL, INC., *et al.*,[1] | ) | Case No. 20-30336 (DRJ) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

## AFFIDAVIT OF JOSHUA A. SUSSBERG
## IN SUPPORT OF DEBTORS' EMERGENCY MOTION
## FOR MICHAEL VAN DEELEN TO APPEAR AND SHOW CAUSE WHY HE
## SHOULD NOT BE HELD IN CONTEMPT OF COURT AND PROHIBITED FROM
## FURTHER CONTACT WITH THE DEBTORS, THEIR OFFICERS, OR THEIR COUNSEL

I, Joshua A. Sussberg, hereby declare under penalty of perjury:

1.     I am over the age of 18 and competent to testify.  I am the president of Joshua A. Sussberg, P.C., a partner of the law firm of Kirkland & Ellis LLP, located at 601 Lexington Avenue, New York, New York 10022, and a partner of Kirkland & Ellis International, LLP (together with Kirkland & Ellis LLP, collectively, "Kirkland").  I am one of the lead attorneys from Kirkland working on the above-captioned chapter 11 cases.  I am a member in good standing of the Bar of the State of New York, and I have been admitted to practice in the Southern District of New York.  There are no disciplinary proceedings pending against me.

2.     I submit this Affidavit (the "Affidavit") in support of the Debtors' *Emergency Motion for Michael Van Deelen to Appear and Show Cause Why He Should Not Be Held in Contempt of Court and Prohibited From Further Contact with the Debtors, their Officers, or their*

---

[1]     A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://cases.primeclerk.com/McDermott.  The location of Debtor McDermott International, Inc.'s principal place of business and the Debtors' service address in these chapter 11 cases is 757 North Eldridge Parkway, Houston, Texas 77079.

*Counsel* (the "Motion").[2]  Except as otherwise noted, I have personal knowledge of the matters set forth herein.

3.        I am authorized to submit this Affidavit, and, if I were called upon to testify, I could and would testify competently to the facts set forth herein.

**Interactions with Mr. Van Deelen**

4.        On March 12, 2020, the Court conducted a hearing on confirmation of the Debtors' plan of reorganization (the "March 12th Hearing").  During and after the March 12th Hearing, Michael Van Deelen made certain false, threatening, and vulgar remarks to me.

5.        Mr. Van Deelen made false and misleading statements about me, Kirkland, and the Debtors on the record during the March 12th Hearing.  During his closing argument, Mr. Van Deelen suggested that the Debtors' chapter 11 plan of reorganization could contain a provision allowing either the Debtors or Kirkland to "come out to [his] house and shoot [him]."  Mr. Van Deelen also falsely stated on the record that I threatened him.  Mr. Van Deelen also referred to the Court as a "son of a bitch."  These statements can be heard on the Court's audio recording of the March 12th Hearing.

6.        After the conclusion of the March 12th Hearing, Mr. Van Deelen waited outside of the restroom to confront me.  Mr. Van Deelen first asked for my name.  Mr. Van Deelen did not indicate why he was attempting to personally identify me.  I responded to Mr. Van Deelen that it "didn't matter" what my name was.  Mr. Van Deelen then called me a "pasty white fuck" and said "I'll have my way with your wife."

7.        On March 12, 2020, Mr. Van Deelen also sent me an email asking me to confirm our seating positions during the March 12th Hearing.  A copy of this email is attached to this

---

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Motion.

2

Affidavit as **<u>Exhibit 1</u>**.  I believe this email was a further attempt by Mr. Van Deelen to personally identify me.

8.      In light of the statements on the record at the March 12th Hearing and herein, I believe Mr. Van Deelen's behavior is intended to threaten, harass, and intimidate me, the Debtors' officers, and our families.  Accordingly, I support the relief sought in the Motion.

Pursuant to 28 U.S.C. § 1746, I declare under the penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: March 17, 2020

*/s/ Joshua A. Sussberg*
Joshua A. Sussberg
as President of Joshua A. Sussberg, P.C., as
Partner of Kirkland & Ellis LLP; and as
Partner of Kirkland & Ellis International LLP

001379

## **Exhibit 1**

**Van Deelen Email**

001380

Begin forwarded message:

> **From:** Michael Van Deelen <michaelvandeelen@gmail.com>
> **Date:** March 13, 2020 at 4:36:33 PM EDT
> **To:** "Sussberg, Josh" <jsussberg@kirkland.com>
> **Subject: [EXT] March 12, 2020, Plan Confirmation Hearing for Debtor McDermott International (case number 20-30336)**
>
> Mr. Sussberg:
>
> I was at the above hearing and represented myself as a Party In Interest who opposed the plan confirmation. You sat across the gap between the two conference tables at approximately arms length from me.  If you deny this, please forward said denial to me at your earliest convenience, but no later than 5:00 C.S.T. on Wednesday, March 18, 2020.
>
> I recognize you from your picture on the Kirkland & Ellis website which is where I obtained your email address.
>
> Regards,
>
> Michael Van Deelen

The information contained in this communication is confidential, may be attorney-client privileged, may constitute inside information, and is intended only for the use of the addressee. It is the property of Kirkland & Ellis LLP or Kirkland & Ellis International LLP. Unauthorized use, disclosure or copying of this communication or any part thereof is strictly prohibited and may be unlawful. If you have received this communication in error, please notify us immediately by return email or by email to postmaster@kirkland.com, and destroy this communication and all copies thereof, including all attachments.

001381

## Exhibit B

**Spence Affidavit**

# IN THE UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| MCDERMOTT INTERNATIONAL, INC., *et al.*,[1] | ) | Case No. 20-30336 (DRJ) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

## AFFIDAVIT OF STUART SPENCE
## IN SUPPORT OF DEBTORS' EMERGENCY MOTION
## FOR MICHAEL VAN DEELEN TO APPEAR AND SHOW CAUSE WHY HE
## SHOULD NOT BE HELD IN CONTEMPT OF COURT AND PROHIBITED FROM
## FURTHER CONTACT WITH THE DEBTORS, THEIR OFFICERS, OR THEIR COUNSEL

I, Stuart Spence, hereby declare under penalty of perjury:

1. I am over the age of 18 and competent to testify. I am the former Executive Vice President and Chief Financial Officer of McDermott International, Inc.

2. I submit this Affidavit (the "Affidavit") in support of the Debtors' *Emergency Motion for Michael Van Deelen to Appear and Show Cause Why He Should Not Be Held in Contempt of Court and Prohibited From Further Contact with the Debtors, their Officers, or their Counsel* (the "Motion").[2] Except as otherwise noted, I have personal knowledge of the matters set forth herein.

3. I am authorized to submit this affidavit, and, if I were called upon to testify, I could and would testify competently to the facts set forth herein.

---

[1] A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://cases.primeclerk.com/McDermott. The location of Debtor McDermott International, Inc.'s principal place of business and the Debtors' service address in these chapter 11 cases is 757 North Eldridge Parkway, Houston, Texas 77079.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Motion.

## Interactions with Mr. Van Deelen

4.        At approximately 10:57 a.m. on February 27, 2020, Michael Van Deelen arrived at my private residence and knocked on the front door to my home.  Mr. Van Deelen's appearance was unannounced and I had never spoken to him or contacted him prior to February 27, 2020.  A photograph captured from my doorbell camera is attached hereto as Exhibit 1.

5.        Because I was on a conference call at the time, my wife answered the door.  Mr. Van Deelen spoke with my wife, purporting to do so to confirm he had my correct address for purposes of sending a subpoena.  Upon realizing the nature of Mr. Van Deelen's presence at our home, my wife became visibly shaken.

6.        Despite this interaction, I voluntarily testified at the hearing in the Debtors' chapter 11 cases on March 12, 2020.  In light of the statements on the record at that hearing and herein, I believe Mr. Van Deelen's behavior is intended to threaten, harass, and intimidate me. Accordingly, I support the relief sought in the Motion.

Pursuant to 28 U.S.C. § 1746, I declare under the penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.


Dated: March 17, 2020                          */s/ Stuart Spence*
                                                             Stuart Spence

001384

## <u>Exhibit 1</u>

**Doorbell Camera Photograph**

001385



**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| | ) | |
| **In re:** | ) | **Chapter 11** |
| | ) | |
| **MCDERMOTT INTERNATIONAL, INC.,** *et al.,*[3] | ) | **Case No. 20-30336 (DRJ)** |
| | ) | |
| **Debtors.** | ) | **(Jointly Administered)** |
| | ) | **(Emergency Relief Requested)** |

## ORDER TO SHOW CAUSE
### (Re: Docket No. _____)

   Mr. Michael Van Deelen, Party-in-Interest, shall personally appear on _____ at

_____.m. in Courtroom 400, 4th Floor, 515 Rusk, Houston, TX 77002 and show cause why he

should not be held in contempt of court and prohibited from further contact with the Debtors, their

current and former officers, directors, and employees, and counsel and other professionals in these

Cases and their families.

   Failure to appear at the time and date above will result in the Court issuing a bench warrant

for Mr. Van Deelen's arrest.

**Dated: _____, 2020**
**Houston, Texas**

          **DAVID R. JONES**
          **UNITED STATES BANKRUPTCY JUDGE**

---

[3] A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://cases.primeclerk.com/McDermott. The location of Debtor McDermott International, Inc.'s principal place of business and the Debtors' service address in these chapter 11 cases is 757 North Eldridge Parkway, Houston, Texas 77079.

001387

# UNITED STATES BANKRUPTCY COURT
# SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

United States Courts
Southern District of Texas
FILED

**MAR 18 2020**

David J. Bradley, Clerk of Court

|  |  |  |
|---|---|---|
| In re: | ) | |
| | ) | |
| | ) | Case No. 20-30336 |
| MCDERMOTT INTERNATIONAL, INC, *et al* | ) | |
| | ) | Chapter 11 |
| Debtor(s). | ) | |
| | ) | |
| | ) | |

### PARTY IN INTEREST MICHAEL VAN DEELEN'S RESPONSE TO EMERGENCY MOTION FOR MICHAEL VAN DEELEN TO APPEAR AND SHOW CAUSE WHY HE SHOULD NOT BE HELD IN CONTEMPT OF COURT AND PROHIBITED FROM FURTHER CONTACT WITH THE DEBTORS, THEIR OFFICERS, OR THEIR COUNSEL; PROPOSED ORDER

COMES NOW, Michael D. Van Deelen, a Party In Interest in the instant action and for his Response to Emergency Motion for Michael Van Deelen to Appear and Show Cause Why He Should Not Be Held In Contempt of Court and Prohibited from Further Contact With the Debtors, Their Officers, or Their Counsel states as follows:

1. Van Deelen did not call the Court a 'son of a bitch' as the movants claim in paragraph 7 of their emergency motion and in paragraph 5 of Exhibit A (Sussberg Affidavit). Van Deelen respectfully asks this Court to listen to that section of the audio in which movants claim Van Deelen calls the Court a 'son of a bitch' (3:19:29 - 3:21:20). Van Deelen was sitting just a few feet from the Court during the hearing. If Van Deelen would have called the Court a 'son of a bitch', the Court would certainly have heard him do so.

1

## The Law

2. Except for the falsely alleged profanity mentioned above, the other alleged improprieties claimed of by the movants are alleged to have taken place when Court was not in session, outside the courtroom and in violation of no Court order. The Court had no jurisdiction over Van Deelen under such circumstances.

3. The Court does not have jurisdiction of Van Deelen's private actions unrelated to the judicial proceedings under 11 U.S.C. 105(a). Section 105(a) authorizes the bankruptcy court to issue any order necessary or appropriate to carry out the provisions of the Code:

"The Supreme Court has taught that any grant of authority given to the bankruptcy courts under § 105 must be exercised within the confines of the bankruptcy code." *Gouveia v. Tazbir*, 37 F.3d 295, 301 (7th Cir. 1994) (citing *Norwest Bank Worthington v. Ahlers*, 485 U.S. 197 (1988)). Thus, courts may not use § 105 to create substantive rights unavailable under the Code. *See Taylor v. United States (In re Taylor)*, 263 B.R. 139 (N.D. Ala. 2001) (note: on appeal to 11th Cir.); *MFS Telecom, Inc. v. Motorola, Inc. (In re Conxus Communications, Inc.)*, 262 B.R. 893, 899 (D. Del. 2001); *Waugh v. Eldridge (In re Waugh)*, 165 B.R. 450, 451 (Bankr. E.D. Ark. 1994); *see also In re One Times Square Assocs. Ltd. P'ship*, 159 B.R. 695, 702 (Bankr. S.D.N.Y. 1993), *aff'd*, 165 B.R. 773 (S.D.N.Y.), *aff'd*, 41 F.3d 1502 (2d Cir. 1994) (§ 105 should be used sparingly and then only to supplement, not supplant, the Code).

4. The Court may not issue a contempt of court order for behavior which does not directly defy the Court or **which does not violate a previous court order**. (Note that Appendix A to the Local Rules of the Southern District of Texas deals with Courtroom Etiquette, not with behavior outside of the courtroom.)

5. The movants cite *Chambers v. NASCO*, 501 U.S. 32 (1991), in their argument that the Court can sanction Van Deelen, but do not inform this Court that *Chambers* has been superceded. There currently are no statutes, rules or procedures, either federal or local, which gives the Court the ability to sanction a party's behavior that does not

directly defy the sanctioning court or is beyond the confines of a court order.  In *F.D.I.C. v. Maxxam, Inc.*, the district court in Texas sanctioned an attorney for misconduct that occurred in an administrative proceeding in Washington, D.C., a proceeding that was not overseen by the district court. 532 F.3d 566, 591 (5th Cir. 2008). Upon review, the Fifth Circuit held that the court's inherent power to sanction did not extend to the administrative hearing but rather only extended to situations in which "a party engages in bad-faith conduct [that directly defies] the sanctioning court." *Id.* at 591 (internal quotation marks omitted). Later, in *Positive Software Solutions, Inc. v. New Century Mortgage Corporation*, the Fifth Circuit, relying on its *Maxxam* decision, held that misconduct during arbitration was beyond the reach of the district court's inherent power, stating that the misconduct "was neither before the district court nor in direct defiance of its order." 619 F.3d 458, 461 (5th Cir. 2010).

6.  The movants also cite *In re Cochener*, 360 B.R. 542, 569 (Bankr., S.D. Tex. 2007) (quoting *Chambers v. NASCO*, 501 U.S. 32 (1991)), *Placid Ref. Co. v. Terrebonne Fuel & Lube*, 108 F.3d 609 (5th Cir. 21997 (sic)) and *Mooney v. Green Tree Serv. Inc.* 340 B.R. 351 (Bankr. E.D. Tex. 2006) to support their claim that this Court can sanction Van Deelen.  However, each of these cases involved actions inside the confines of the bankruptcy code or the violation of orders or procedures that the court had jurisdiction over and therefore do not apply to the instant case as seen above.

## The Allegations

### Mrs. Spence

7. Van Deelen subpoenaed Mr. Stuart Spence to testify during the 3/12/20 Plan Confirmation Hearing.  Van Deelen hired Ms. Lisa Moberg, a process server, to serve Mr. Spence.  Mr. Spence accepted service on 2/19/20.  Exhibit 1.

8. In reviewing the Proof of Service, Van Deelen noticed that the description of Mr. Spence given by Ms. Moberg stated that he was 65 years old with white hair.  Van Deelen called Ms. Moberg who confirmed the description of Mr. Spence.

9. Van Deelen believed that Mr. Spence was in his early 50's and bald. Accordingly, Van Deelen thought that maybe the wrong person had been served, especially since the address of service was not the address given in public records as Mr. Spence's recent address.  Van Deelen and Ms. Moberg tried several times to call Mr. Spence to ask if he was the right person be served.  Mr. Spence did not answer his phone or return the calls.

10. To avoid having possibly served the wrong person, Van Deelen went to the Proof of Service address and rang the bell.  A middle-aged lady answered the bell.  Van Deelen politely asked if Mr. Stuart Spence was home.  The lady said 'no'.  Van Deelen then **apologetically and very politely** told the lady that he had had a summons issued to Mr. Spence at that address and that Van Deelen was afraid the wrong person may have been served.  Van Deelen then politely asked the lady if Mr. Stuart Spence lived there. She said 'yes'.  Van Deelen then politely asked the lady if Mr. Spence had worked at McDermott.  She replied 'yes'.  At that point, Van Deelen apologized for having bothered the lady and left.

4

11. At no time during the encounter with the lady was Van Deelen disrespectful. Van Deelen never raised his voice. The lady never refused to answer Van Deelen's questions. If the lady would have asked Van Deelen to leave, he would have immediately done so. Mrs. Spence has not presented an affidavit on behalf of the movants' claims that alleges any wrongdoing by Van Deelen.

12. It was within Van Deelen's civil rights to speak to Mrs. Spence. The Court had not previously directed Van Deelen to stay away from Mr. or Mrs. Spence. In fact, the Court declined to hear Van Deelen's explanation of what had occurred with Mrs. Spence when Van Deelen proffered testimony concerning their interaction during the 3/12/20 Plan Confirmation Hearing.

13. If Mr. Spence would have answered his phone or returned Ms. Moberg's or Van Deelen's calls, Van Deelen would not have had to go to his residence to see if he was the right person to have been served.

**Mr. Sussberg**

14. During the 3/12/20 hearing, a person now known as Mr. Sussberg sat directly across the isle between the two conference tables from Van Deelen.

15. Through Van Deelen's objection, the Debtor witnesses were made to testify in person instead of having their written statements adopted into the record. This was time consuming. As the witnesses testified and time proceeded, Van Deelen noticed Mr. Sussberg becoming more and more agitated. Finally, Mr. Sussberg, without any cue from Van Deelen, said to Van Deelen and all who could hear: "You are disgusting!" and other insults. Van Deelen looked at him and told him to be quiet. The Court heard this

5

exchange because the record will show that the Court told Mr. Sussberg and Mr. Van Deelen to 'hold it down' or words to that effect.

16.  After the hearing, Van Deelen did not follow Mr. Sussberg anywhere, including the restroom.  Like many at the end of the long hearing, Van Deelen needed to use the restroom.  As Van Deelen was entering the restroom, Mr. Sussberg was leaving the restroom.  Due to the unprofessional behavior exhibited by Mr. Sussberg towards Van Deelen during the hearing as detailed above, Van Deelen wanted to determine Mr. Sussberg's name so he could make a formal complaint against him.  Mr. Van Deelen said to Mr. Sussberg: 'May I have your name, sir?"  Mr. Sussberg angrily refused to give Van Deelen his name.  Instead, Mr. Sussberg again told Van Deelen: "You are disgusting!" He also told Van Deelen other things including: "You are a fool!" Mr. Sussberg is a young, stocky, man.  Van Deelen is a 70 year-old senior citizen.  Mr. Sussberg's words, tenor and posture caused Van Deelen to be afraid for his safety.  Van Deelen began to have heart palpitations and he remained near the restroom while Sussberg left and went down the hallway towards the elevators.  All of a sudden, Sussberg came rushing back down the hallway and towards the restroom area where Van Deelen was and angrily charged Van Deelen.  Mr. Sussberg then began calling Van Deelen names again.  Mr. Sussberg stood only inches away from Van Deelen, shouting at Van Deelen. Van Deelen was terrified by Mr. Sussberg's actions.   Mr. Sussberg eventually left and again went down the hallway towards the elevators.

17.  Van Deelen, terribly frightened, remained in the restroom area for a period of time until he hoped Mr. Sussberg had left.  Eventually Van Deelen looked down the hall toward the elevators and saw that Mr. Sussberg had in fact left.  Van Deelen was

extremely frightened and upset. So upset, in fact, that he could not locate his vehicle in the parking garage near the courthouse that he had used many times before. Van Deelen had to ask a garage employee for assistance in finding his car.

18. At no time did Van Deelen call Mr. Sussberg a 'pasty white fuck' or say 'I will have my way with your wife'. That Van Deelen would say those things is incredibly insulting and beyond belief.

19. Mr. Sussberg's comments to Van Deelen, of which he fails to inform the Court, violate Rule 14 of the Court's Rules of Etiquette:

*Avoid disparaging remarks and acrimony towards anyone, especially adverse parties and counsel, and discourage ill-will between the litigants. Counsel must abstain from unnecessary references to opposing counsel, especially peculiarities.*

20. The Court will note that, even though there were many persons who had attended the hearing within earshot from Sussberg and Van Deelen, Sussberg does not mention their names or produce affidavits from them substantiating his (false) account of his interaction with Van Deelen.

21. Still trying to determine Mr. Sussberg's identity, Van Deelen found Mr. Sussberg's photo on the Kirkland and Ellis website. Van Deelen then sent Mr. Sussberg an email stating that Van Deelen had identified him from the Kirkland and Ellis website. In an abundance of caution, even though Van Deelen recognized him from his photo, Van Deelen wanted to give Mr. Sussberg the opportunity to deny that he was the one sitting across from Van Deelen during the 3/12/20 hearing. (It was the Kirkland and Ellis employee sitting across from Van Deelen who told Van Deelen and others: "You [Van Deelen] are disgusting!") The email is respectful and contains no threatening language.

22.  If Mr. Sussberg would have given Van Deelen his name when Van Deelen politely asked for it after the hearing, Van Deelen would not have had to email Mr. Sussberg.

23.  Please see Exhibit 2, Van Deelen Affidavit.

**Other**

24.  Paragraph 10 of the movants' Emergency Motion states that Van Deelen was sanctioned by the District Court in *Michael Van Deelen v. City of Kansas City, Missouri*, 2006 WL 2077640 (W.D. Mo. 2006).  This was a non-bankruptcy case.  What the movants fail to tell this Court is that a significant amount of the sanctions were overturned on appeal.  Van Deelen has never fabricated evidence and  he never will.  On the other hand, the movants have fabricated evidence to support their Emergency Motion, including when they claim that Van Deelen called the Court a 'son of a bitch' during the Plan Confirmation Hearing.  Exhibit 2, Van Deelen Affidavit.

25.  Paragraph 18 of the movants' Emergency Motion claims that "Mr. Van Deelen has threatened physical violence against family members of counsel in these cases."  This statement is unsupported by any facts other than the false allegation that Van Deelen allegedly said that he was going to 'have his way' with Mr. Sussberg's wife.  The paragraph 18 statement states 'violence against family *members* (plural) *of counsel* (plural) *in these cases'* (plural).  What family members?  What counsel?  What cases?  The egregious manufacturing of false evidence by the movants in their Emergency Motion is beyond the pale.  Van Deelen has never threatened violence against family members of counsel or other persons in any case he has been involved with.  Exhibit 2, Van Deelen Affidavit.

26.  What is going on here?  It is no secret that Van Deelen plans to file suit against McDermott employees in Texas state court for their malfeasance relating to McDermott's bankruptcy and the events leading up thereto.  Other shareholders have indicated they may also file suit.  Van Deelen believes that the movants' Emergency Motion is an attempt to prevent Van Deelen from filing suit by having this Court enjoin him from doing so.

## Summary

27.  The movants apparently seek sanctions against Van Deelen for the following reasons:

A.  Van Deelen allegedly called the Court a 'son of a bitch' during the Plan Confirmation hearing held on 3/12/20.  This false allegation can be easily refuted by listening to the 3/12/20 audio clip from the Plan Confirmation hearing (time stamp 3:19:29 - 3:21:20).

B.  Van Deelen filed numerous documents in the instant action, which was his Constitutional right.

C.  Van Deelen was sanctioned by a Missouri District Court in 2006.  Not only was a significant portion of the sanction overturned on appeal, but a single resolved non-bankruptcy case from 14 years ago has no bearing on the instant action,

D.  After being unable to contact Mr. Spence by phone, Van Deelen went to Mr. Spence's believed residence, was told by his wife that Mr. Spence was not home, and then respectfully spoke to Mr. Spence's wife for the purpose of dismissing Mr. Spence from the subpoena he had been served if he was not the correct person to have been served.

E.  After Mr. Sussberg refused to give Van Deelen his name when Van Deelen asked him for it during the 3/12/20 Plan Confirmation Hearing, Van Deelen sent Mr. Sussberg a respectful, non-threatening, email seeking to confirm if Mr. Sussberg was the person seated across from him during the 3/12/20 Plan Confirmation Hearing.

F.  The movants allege, without any facts or proof, that "Mr. Van Deelen has threatened physical violence against family members (plural) of counsel (plural) in these cases (plural)."

G.  Mr. Sussberg has falsely alleged that Van Deelen called him a 'pasty white fuck' and said 'I will have my way with your wife' after the 3/12/20 Plan Confirmation Hearing had been adjourned.  Even though many people were milling around after the hearing, Mr. Sussberg does not produce one affidavit from a single witness (other than himself) discussing Van Deelen's alleged bad behavior.  Not only are his allegations patently false, but also Mr. Sussberg conveniently failed to tell the Court that he had violated the Court's rules of etiquette when told Van Deelen "You are disgusting!" during the 3/12/20 Plan Confirmation Hearing and after it had been adjourned; that he had told Van Deelen "You are a fool!" after the 3/12/20 Plan Confirmation Hearing had been adjourned; that he had angrily and physically charged Mr. Van Deelen, stopping just inches from Van Deelen's person after the 3/12/20 Plan Confirmation Hearing had been adjourned; and that he had refused to give Van Deelen his name when Van Deelen politely asked for it after the 3/12/20 Plan Confirmation Hearing had been adjourned.

28.  Van Deelen has attempted to contact the movants to resolve their Emergency Motion without the need for a hearing.  The movants have not returned the message left with the movants' assistant.  Exhibit 2, Van Deelen Affidavit.

WHEREFORE, for the reasons discussed herein, Van Deelen respectfully requests that this Court deny in its entirety the movants' Emergency Motion for Michael Van Deelen to Appear and Show Cause Why He Should Not Be Held In Contempt of Court and Prohibited from Further Contact With the Debtors, Their Officers, or Their Counsel.

Houston, Texas

March 18, 2020

Respectfully submitted,

Michael Van Deelen
Party In Interest
16215 Friar Circle
Spring, TX 77379
832-562-0723
michaelvandeelen@gmail.com

## CERTIFICATE OF SERVICE

I, Michael Van Deelen, do hereby certify that I caused a copy of the foregoing document, including Proposed Order, to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas on this 18th day of March, 2020.

Michael Van Deelen
16215 Friar Circle
Spring, TX 77379
832-562-0723
michaelvandeelen@gmail.com

001398

# EXHIBIT 1

# SPENCE PROOF OF SERVICE

... appear and testify at a Hearing or Trial in a Bankruptcy Case or Adversary Proceeding) (Page 2)          001399

# PROOF OF SERVICE
**(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)**

I received this subpoena for *(name of individual and title, if any)*:   __STUART SPENCE__
on *(date)* __Feb. 18, 2020__ .

[■] I served the subpoena by delivering a copy to the named person as follows:   __STUART SPENCE__

_____ on *(date)* __Wed., Feb. 19, 2020__ ; or

[ ] I returned the subpoena unexecuted because: _____

_____

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of $__71.00__ .

My fees are $_____ for travel and $_____ for services, for a total of $__95.00__ .

I declare under penalty of perjury that this information is true and correct.

Date: __February 19, 2020__

_____
*Server's signature*

__LISA G. MOBERG, PSC#12076__
*Printed name and title*

__4806 W. Walnut St.__
__Pearland, Texas 77581__
*Server's address*

Additional information concerning attempted service, etc.:

**1) Successful Attempt: Feb 19, 2020 @ 8:23 p.m. CST at HOME:** ███████████; ████████████
received by STUART SPENCE; Age: 65; Ethnicity: Caucasian; Gender: Male; Weight: 220; Height: 6'1"; Hair: White
I personally and successfully served STUART SPENCE, who willingly accepted service without incident at the listed
address.

13

Subpoena to Appear and Testify at a Hearing or Trial in a Bankruptcy Case or Adversary Proceeding (12/15)                    001400

# UNITED STATES BANKRUPTCY COURT

| Southern | District of | Texas, Houston Division |
|---|---|---|

In re McDermott International, Inc., et al.

*Debtor*

*(Complete if issued in an adversary proceeding)*

Case No.    20-30336

Chapter    11

_____

Plaintiff

v.

Adv. Proc. No. _____

_____

Defendant

## SUBPOENA TO APPEAR AND TESTIFY
## AT A HEARING OR TRIAL IN A BANKRUPTCY CASE (OR ADVERSARY PROCEEDING)

To:  Stuart Spence

*(Name of person to whom the subpoena is directed)*

■ **YOU ARE COMMANDED** to appear in the United States Bankruptcy Court at the time, date, and place set forth below to testify at a hearing or trial in this bankruptcy case (or adversary proceeding). When you arrive, you must remain at the court until the judge or a court official allows you to leave.

| PLACE | COURTROOM    400 |
|---|---|
| U.S. Bankruptcy Court 515 Rusk St., Houston, TX | DATE AND TIME 03/12/20   9:00 A.M. |

You must also bring with you the following documents, electronically stored information, or objects *(leave blank if not applicable)*:

_____

The following provisions of Fed. R. Civ. P. 45, made applicable in bankruptcy cases by Fed. R. Bankr. P. 9016, are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and 45(g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:  02/18/20

CLERK OF COURT

_____                    OR                    _____
*Signature of Clerk or Deputy Clerk*                                              *Attorney's signature*

The name, address, email address, and telephone number of the attorney representing *(name of party)*
Michael Van Deelen (party) _____ ,  who issues or requests this subpoena, are:

6014 Capella Park Drive, Spring, TX; michaelvandeelen@gmail.com; 832-562-0723

### Notice to the person who issues or requests this subpoena

If this subpoena commands the production of documents, electronically stored information, or tangible things, or the inspection of premises before trial, a notice and a copy of this subpoena must be served on each party before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

14

001401

EXHIBIT 2

VAN DEELEN AFFIDAVIT

15

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

In re:                                                    )
                                                          )
                                                          )   Case No. 20-30336
MCDERMOTT INTERNATIONAL, INC, *et al*                     )
                                                          )   Chapter 11
        Debtor(s).                                    )
                                                          )
                                                          )

### AFFIDAVIT OF MICHAEL VAN DEELEN IN SUPPORT OF HIS RESPONSE TO EMERGENCY MOTION FOR MICHAEL VAN DEELEN TO APPEAR AND SHOW CAUSE WHY HE SHOULD NOT BE HELD IN CONTEMPT OF COURT AND PROHIBITED FROM FURTHER CONTACT WITH THE DEBTORS, THEIR OFFICERS, OR THEIR COUNSEL

STATE OF TEXAS           §
                         §
COUNTY OF HARRIS         §

BEFORE ME, the undersigned authority, personally appeared Michael Van Deelen, who, being by me duly sworn and deposed, stated the following:

"My name is Michael Van Deelen, I am over 21 years of age, of sound mind, capable of making this Affidavit, and have personal knowledge of the facts stated herein.  In the following, I refer to myself as 'Van Deelen':

1.  Van Deelen did not call the Court a 'son of a bitch' during the 3/12/20 Plan Confirmation Hearing in the instant action or at any other time.  Van Deelen was sitting just a

16

few feet from the Court during the hearing. If Van Deelen would have called the Court a 'son of a bitch', he believes the Court would certainly have heard him do so.

2. Van Deelen subpoenaed Mr. Stuart Spence to testify during the 3/12/20 Plan Confirmation Hearing in the instant action. Van Deelen hired Ms. Lisa Moberg, a process server, to serve Mr. Spence. Mr. Spence accepted service on 2/19/20.

3. In reviewing the Proof of Service, Van Deelen noticed that the description of Mr. Spence given by Ms. Moberg stated that he was 65 years old with white hair. Van Deelen called Ms. Moberg who confirmed the description of Mr. Spence.

4. Van Deelen believed that Mr. Spence was in his early 50's and bald. Accordingly, Van Deelen thought that maybe the wrong person had been served, especially since the address of service was not the address given in public records as Mr. Spence's recent address. Van Deelen and Ms. Moberg tried several times to call Mr. Spence to ask if he was the right person to be served. Mr. Spence did not answer his phone or return the calls.

5. To rectify having possibly served the wrong person, Van Deelen went to the Proof of Service address and rang the bell. A middle-aged lady answered the bell. Van Deelen politely asked if Mr. Stuart Spence was home. The lady said 'no'. Van Deelen then **apologetically and very politely** told the lady that he had had a summons issued to Mr. Spence at that address and that Van Deelen was afraid the wrong person may have been served. Van Deelen then politely asked the lady if Mr. Stuart Spence lived there. She said 'yes'. Van Deelen then politely asked the lady if Mr. Spence had worked at McDermott. She replied 'yes'. At that point, Van Deelen apologized for having bothered the lady and left.

17

6. At no time during the encounter with the lady was Van Deelen disrespectful. Van Deelen never raised his voice. The lady never refused to answer Van Deelen's questions. If the lady would have asked Van Deelen to leave, he would have immediately done so.

7. The Court in the instant action had not previously directed Van Deelen to stay away from Mr. or Mrs. Spence. In fact, the Court declined to hear Van Deelen's explanation of what had occurred with Mrs. Spence when Van Deelen proffered testimony concerning their interaction during the 3/12/20 Plan Confirmation Hearing.

8. If Mr. Spence would have answered his phone or returned Ms. Moberg's or Van Deelen's calls, Van Deelen would not have had to go to his residence to see if he was the right person to have been served.

9. During the 3/12/20 hearing, a person now known as Mr. Sussberg sat directly across the isle between the two conference tables from Van Deelen.

10. At the 3/12/20 hearing, through Van Deelen's objection, the Debtor witnesses were made to testify in person instead of having their written statements adopted into the record. This was time consuming. As the witnesses testified and time proceeded, Van Deelen noticed Mr. Sussberg becoming more and more agitated. Finally, Mr. Sussberg, without any cue from Van Deelen, said to Van Deelen and all who could hear: "You are disgusting!" and other insults. Van Deelen looked at him and told him to be quiet. The Court heard this exchange because the record will show that the Court told Mr. Sussberg and Van Deelen to 'hold it down' or words to that effect.

11. After the hearing, Van Deelen did not follow Mr. Sussberg anywhere, including the restroom. Like many at the end of the long hearing, Van Deelen needed to use the restroom. As Van Deelen was entering the restroom, Mr. Sussberg was leaving the restroom. Due to the

18

unprofessional behavior exhibited by Mr. Sussberg towards Van Deelen during the hearing as detailed above, Van Deelen wanted to determine Mr. Sussberg's name so he could make a formal complaint against him. Van Deelen said to Mr. Sussberg: 'May I have your name, sir?" Mr. Sussberg angrily refused to give Van Deelen his name. Instead, Mr. Sussberg again told Van Deelen: "You are disgusting!" He also told Van Deelen other things including: "You are a fool!" Mr. Sussberg is a young, stocky, man. Van Deelen is a 70 year-old senior citizen. Mr. Sussberg's words, tenor and posture caused Van Deelen to be afraid for his safety. Van Deelen began to have heart palpitations and he remained near the restroom while Sussberg left and went down the hallway towards the elevators. All of a sudden, Sussberg came rushing back down the hallway and towards the restroom area where Van Deelen was and angrily charged Van Deelen. Mr. Sussberg then began calling Van Deelen names again. Mr. Sussberg stood only inches away from Van Deelen, shouting at Van Deelen. Van Deelen was terrified by Mr. Sussberg's actions. Mr. Sussberg eventually left and again went down the hallway towards the elevators.

12. Van Deelen, terribly frightened, remained in the restroom area for a period of time until he hoped Mr. Sussberg had left. Eventually Van Deelen looked down the hall toward the elevators and saw that Mr. Sussberg had in fact left. Van Deelen was extremely frightened and upset. So upset, in fact, that he could not locate his vehicle in the parking garage near the courthouse that he had used many times before. Van Deelen had to ask a garage employee for assistance in finding his car.

13. At no time did Van Deelen call Mr. Sussberg a 'pasty white fuck' or say 'I will have my way with your wife'. That Van Deelen would say those things is incredibly insulting and beyond belief.

4

19

14. Still trying to determine Mr. Sussberg's identity, Van Deelen found Mr. Sussberg's photo on the Kirkland and Ellis website. Van Deelen then sent Mr. Sussberg an email stating that Van Deelen had identified him from the Kirkland and Ellis website. In an abundance of caution, even though Van Deelen recognized him from his photo, Van Deelen wanted to give Mr. Sussberg the opportunity to deny that he was the one sitting across from Van Deelen during the 3/12/20 hearing. (It was the Kirkland and Ellis employee sitting across from Van Deelen who told Van Deelen and others: "You [Van Deelen] are disgusting!") The email is respectful and contains no threatening language.

15. If Mr. Sussberg would have given Van Deelen his name when Van Deelen politely asked for it after the hearing, Van Deelen would not have had to email Mr. Sussberg.

16. Van Deelen was sanctioned by the District Court in *Michael Van Deelen v. City of Kansas City, Missouri*, 2006 WL 2077640 (W.D. Mo. 2006). This was a non-bankruptcy case. The sanctions were reduced significantly on appeal. Van Deelen has never fabricated evidence and he never will.

17. Van Deelen has never threatened violence against family members of counsel or other persons in any case he has been involved with.

18. Van Deelen has attempted to contact the movants to resolve their Emergency Motion (Document 694) without the need for a hearing. The movants have not returned the message left with the movants' assistant.

5

20

Further Affiant sayeth not."

Michael Van Deelen
Affiant


SUBSCRIBED AND SWORN TO BEFORE ME ON THE 18th day of March, 2020.


_____
Notary Public, State of Texas

William Phongdara
(Print or Type Name)


My Commission Expires: 04/24/2022

WILLIAM PHONGDARA
NOTARY PUBLIC
STATE OF TEXAS
MY COMM. EXP. 04/24/22
NOTARY ID 13154754-8

6

21



## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

ENTERED
03/23/2020

| | | |
|---|---|---|
| IN RE: | § | |
| | § | **CASE NO: 20-30336** |
| **MCDERMOTT INTERNATIONAL, INC.,** *et* | § | **CHAPTER  11** |
| *al.*, | § | **(Jointly Administered)** |
| | § | |
| Debtors. | § | **DAVID R. JONES** |

## <u>ORDER</u>
### (Docket No. 694)

The Court has reviewed the Emergency Motion for Michael Van Deelen to Appear and Show Cause Why He Should Not be Held in Contempt and Prohibited from Further Contact with the Debtors, their Officers, or their Counsel [Docket No. 694].  The Court has also reviewed Mr. Van Deelen's response to the motion [Docket No. 701].  Since the filing of the motion, the Court is aware that Mr. Van Deelen came back to the courthouse to file a complaint against Debtors' counsel on the basis of an alleged threat made at or after the confirmation hearing in this case[1]. In addition, the Court has reviewed Mr. Van Deelen's conduct in other hearings before the Court in this case.

The focus of the emergency motion surrounds the recent confirmation hearing held in this case on March 12, 2020.  During the hearing, Mr. Van Deelen is alleged to have made certain disparaging remarks about the Court as well as threats toward Debtors' counsel.  Mr. Van Deelen denies that he made any disparaging remarks toward the Court and asserts that any threats toward counsel were made outside the courtroom and therefore outside the Court's jurisdiction. Mr. Van Deelen further asserts that he made no such threats.

In the movants' motion, it is alleged that Mr. Van Deelen called the Court a "son of a bitch."  Mr. Van Deelen denies that he made any such remark and that he was "sitting just a few feet from the Court during the hearing . . . [and] [i]f Van Deelen would have called the Court a "son of a bitch", the Court would certainly have heard him do so."  Mr. Van Deelen's denial is set forth in his sworn affidavit attached to his response [Docket No. 701].  Unfortunately for Mr. Van Deelen, the Court's staff did hear Mr. Van Deelen's statement and immediately reported it to chambers.  Moreover, although Mr. Van Deelen was facing away from the microphones located on counsel table, Mr. Van Deelen's statement is audible on the original audio with headphones.  While the Court was willing to overlook the insult, it cannot overlook a false statement.

The motion goes on to allege that Mr. Van Deelen made vulgar and threatening comments to Mr. Sussberg and his family.  Mr. Van Deelen denies under oath that any such comments were made.  Given that Mr. Van Deelen has demonstrated the propensity to make

---

[1]   When the courthouse security officer offered to take the complaint, Mr. Van Deelen declined to make an official report and left the building.

false statements under oath, the Court has grave concerns about Mr. Van Deelen's affidavit and gives it little weight under the circumstances. Moreover, given Mr. Deelen's prior conduct before the Court and reference to "shooting" during the confirmation hearing, the Court has concerns about Mr. Van Deelen's mental stability. The Court concludes that Mr. Van Deelen poses a legitimate risk to the safety of courthouse staff and litigants that oppose his position.

Mr. Van Deelen goes to great length to assert that the Court cannot sanction him for his conduct outside the courtroom and that no court order has been entered that he violated. Mr. Van Deelen is correct in that statement. However, the Court has the authority and the duty to protect those parties that appear before it. Further, the Court has a duty to ensure that the federal courthouse is a place of safety and order for all persons who enter. Accordingly, it is

**ORDERED THAT**:

1. Michael D. Van Deelen is prohibited from contacting the Court and its staff by any means. Any communication to the Court or its staff must be made in writing and filed with the Clerk of the Court.

2. Michael D. Van Deelen is prohibited from contacting Joshua Sussberg or any member of his family in any manner. Should Mr. Sussberg find it necessary to seek the assistance of law enforcement officials to protect his family and enforce this order, the Court requests that upon presentation of a copy of this order and a determination that a violation of this paragraph has occurred, such law enforcement officials should detain Mr. Van Deelen and transfer him to this Court for further proceedings.

3. A copy of this Order shall be delivered to the United States Marshal for further investigation of Mr. Van Deelen's conduct. Further, Mr. Van Deelen may not enter the federal courthouse except with the escort of a court security officer.

4. A copy of this Order shall be delivered to the United States Attorney for investigation of Mr. Van Deelen's conduct in this case.

5. The request for sanctions is denied.

6. Should Mr. Van Deelen wish to seek relief from this order or request a hearing, he may do so by pleading filed within fourteen days.

7. This order is effective upon entry.

**SIGNED: March 23, 2020.**

**DAVID R. JONES**
**UNITED STATES BANKRUPTCY JUDGE**

2 / 2

001410

# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

United States Courts
Southern District of Texas
F I L E D

MAR 24 2020

David J. Bradley, Clerk of Court

In re:

MCDERMOTT INTERNATIONAL, INC, *et al*

Debtor(s).

)
)
)
)
)
)
)
)

Case No. 20-30336

Chapter 11

## <u>PARTY IN INTEREST MICHAEL VAN DEELEN'S REQUEST FOR HEARING;</u>
## <u>PROPOSED ORDER</u>

In its Order (Docket 719) entered on 3/23/20, the court notified Party In Interest

Michael Van Deelen that he could request a hearing within 14 days of the entry of the

Order.  Plaintiff accordingly requests the earliest possible hearing date and time

consistent with the court's Order.

Van Deelen will seek, among other things, clarification of the following during

the hearing:

A.  The exact section of the audio made during the 3/12/20 Plan Confirmation

Hearing in which the court claims Van Deelen called him a son-of-a-bitch.  Plaintiff

further requests that the court play said portion of the audio during the hearing.

B.  Clarification on whether or not the court is ordering that Van Deelen is

prohibited from filing a civil lawsuit for assault and possibly other causes of action

against Joshua Sussberg in Harris County District Court.

C. Clarification on whether or not the court is ordering that Van Deelen is prohibited from filing a federal civil rights lawsuit against David R. Jones.

D. Clarification on the exact dates, times, places and circumstances in which Van Deelen has been disrespectful to court personnel.

E. Clarification on the qualifications and training the court has in diagnosing mental health issues.

F. Clarification on whether or not the court has ever heard Van Deelen say he was going to shoot someone. If the court claims it has ever heard Van Deelen say he was going to shoot someone, provide clarification on the exact dates, times, places and circumstances under which the court heard Van Deelen say those words.

Houston, Texas

March 23, 2020

Respectfully submitted,

Michael Van Deelen
Party In Interest
16215 Friar Circle
Spring, TX 77379
832-562-0723
michaelvandeelen@gmail.com

## CERTIFICATE OF SERVICE

I, Michael Van Deelen, do hereby certify that I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas on this 23rd day of March, 2020.

Michael Van Deelen
16215 Friar Circle
Spring, TX 77379
832-562-0723
michaelvandeelen@gmail.com

# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

|  |  |
|---|---|
| In re: | ) |
|  | ) |
| MCDERMOTT INTERNATIONAL, INC, *et al* | ) |
|  | ) |
| Debtor(s). | ) |
|  | ) |

Case No. 20-30336

Chapter 11

# ORDER

On _____, 2020, a hearing was held concerning clarification of the court's Order (Docket 719) entered on 3/23/20.

It is accordingly

ORDERED that :

A.  The exact section of the audio made during the 3/12/20 Plan Confirmation Hearing in which the court claims Van Deelen called him a son-of-a-bitch is _____.  The requested portion of the audio was/was not played during the hearing.

B.  Van Deelen is not prohibited from filing a civil lawsuit for assault and possibly other causes of action against Joshua Sussberg in Harris County District Court.

C.  Van Deelen is not prohibited from filing a federal civil rights lawsuit against David R. Jones.

D.  The exact dates, times, places and circumstances in which Van Deelen has been disrespectful to court personnel are as follows:

001414

E.  The court has no qualifications or training in diagnosing mental health issues.

F.  The court has never heard Van Deelen say that Van Deelen was going to shoot someone.

Houston, Texas

Dated: _____, 2020


_____
DAVID R. JONES
UNITED STATES BANKRUPTCY JUDGE

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

ENTERED
04/20/2020

| | | |
|---|---|---|
| IN RE: | § | |
| | § | **CASE NO: 20-30336** |
| **MCDERMOTT INTERNATIONAL, INC.,** *et* | § | **CHAPTER 11** |
| *al.,* | § | **(Jointly Administered)** |
| | § | |
| Debtors. | § | **DAVID R. JONES** |
| | § | |

<u>**ORDER**</u>
**(Docket No. 723)**

In its order entered March 23, 2020 concerning Michael D. Van Deelen, the Court provided in paragraph 6 of the order that if Mr. Van Deelen wished to seek relief from the March 23, 2020 order or request a hearing, he could do so by filing a pleading within 14 days of the order's entry date (Docket No. 719). The intent of the paragraph was to ensure that no ambiguity existed in terms of the Court's directives to Mr. Van Deelen and that a proper balance was achieved between public safety and court access.

On March 24, 2020, Mr. Van Deelen filed a pleading requesting a hearing (Docket No. 723). In his pleading, Mr. Van Deelen identifies six topics for which he seeks "clarification." No other relief is sought. The pleading does nothing more than seek to disrupt further the legitimate ends of the bankruptcy process and has no legitimate purpose. The request for hearing is denied.

**SIGNED: April 20, 2020.**

**DAVID R. JONES**
**UNITED STATES BANKRUPTCY JUDGE**

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

United States Courts
Southern District of Texas
F I L E D

**JUN 03 2020**

David J. Bradley, Clerk of Court

In re:                                          )
                                                )
MCDERMOTT INTERNATIONAL, INC, *et al*    )        Case No. 20-30336
                                                )
                Debtor(s).                      )        Chapter 11
                                                )
                                                )

## NOTICE OF FILING

Please take notice that Party In Interest Michael Van Deelen has filed in the Fifth

Circuit Court of Appeals the attached document which is related to the above-captioned

action.

Houston, Texas

June 3, 2020

Respectfully submitted,

Michael Van Deelen
Party In Interest
16215 Friar Circle
Spring, TX 77379
832-562-0723
michaelvandeelen@gmail.com

## CERTIFICATE OF SERVICE

I, Michael Van Deelen, do hereby certify that I caused a copy of the foregoing document

to be served by the Electronic Case Filing System for the United States Bankruptcy Court

for the Southern District of Texas on this 3rd day of June, 2020.

Michael Van Deelen
16215 Friar Circle
Spring, TX 77379
832-562-0723
michaelvandeelen@gmail.com

No. 20-20286

IN THE FIFTH CIRCUIT COURT OF APPEALS
NEW ORLEANS, LOUISIANNA

---

IN RE
MICHAEL VAN DEELEN

---

Original Proceeding to Case No. 20-30336 (DRJ)
Pending In The United States Bankruptcy Court
For The Southern District Of Texas
Houston Division
Honorable David Jones, Presiding

---

**PETITION FOR WRIT OF MANDAMUS**
AGAINST THE HONORABLE DAVID R. JONES,
JUDGE OF THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

Michael Van Deelen
Petitioner Pro Se
16215 Friar Circle
Spring, TX 77379
832-562-0723
michaelvandeelen@gmail.com

## CERTIFICATE OF INTERESTED PERSONS

The undersigned Petitioner certifies that the following listed persons

and entities as described in the fourth sentence of Fifth Circuit Court of

Appeals Rule 28.2.1 have an interest in the outcome of this case.  These

representations are made in order that the judges of this court may evaluate

possible disqualification or recusal.


Michael D. Van Deelen
Petitioner
16215 Friar Circle
Spring, TX 77379


The Honorable David R. Jones
Respondent
Bob Casey United States Courthouse
515 Rusk Avenue
Houston, TX 77002


Dated : June 3, 2020                         /s/ Michael Van Deelen
                                             Petitioner


## STATEMENT REGARDING ORAL ARGUMENT

Petitioner does not believe oral argument is necessary.


# TABLE OF CONTENTS

Certificate of Interested Persons                                    2

Statement Regarding Oral Argument                                   3

Table of Contents                                                   4

Table of Authorities                                                5

Jurisdictional Statement                                            6

Summary                                                             7

Statement of Facts                                                  9

      1. The Trial Court's Unlawful, Unconstitutional Permanent     10
      Injunction Issued Against Petitioner

      2. Other Discriminatory Acts of the Trial Court Against     15
      Petitioner

Issues Presented                                                    22

Relief Sought                                                       24

Reasons Why the Writ Should Issue                                   25

Certificate of Service                                              28

Certificate of Compliance                                           29


## TABLE OF AUTHORITIES

**Constitutional Amendments**

| | |
|---|---|
| 1st Amendment | 8, 22 |
| 5th Amendment | 8, 22 |
| 14th Amendment | 8, 22 |

**Statutes**

| | |
|---|---|
| 28 U.S.C. Section 1651(a) | 6 |
| Fed. R. Civ. Proc. Rule 65 | 22 |
| 18 U.S.C. Section 158(d) | 10, 15, 16 |
| 18 U.S.C. Section 3057 | 10, 15, 16 |
| 18 U.S.C. Section 152 | 15 |
| 18 U.S.C. Section 154 | 15 |
| 18 U.S.C. Section 157 | 16 |
| 11 U.S.C. Section 1129(3) | 16 |
| 11 U.S.C. Section 1129 (b)(1) | 16 |
| 8 U.S.C. Section 1292(b) | 26 |
| 42 U.S.C. Section 1983 | 26 |

**Cases**

| | |
|---|---|
| *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971). | 26 |


## JURISDICTIONAL STATEMENT

This Court has original jurisdiction to issue the requested writ of mandamus,

28 U.S.C. Section 1651(a).

COMES NOW Petitioner Michael Van Deelen and petitions the Fifth

Circuit Court of Appeals for a writ of mandamus to the Honorable David R.

Jones of the United States Bankruptcy Court for the Southern District of

Texas, Houston Division, and shows the following in support of his

petition.

## SUMMARY

Petitioner is representing himself as a Party In Interest during

McDermott International's Chapter 11 bankruptcy proceeding in the U.S.

District Court for the Southern District of Texas (case number 20-30336).

On March 23, 2020, the trial court (the Honorable David R. Jones), without

first affording Petitioner notice and a trial, issued a permanent injunction

against Petitioner which prohibited Petitioner from contacting the trial court

and its staff, prohibited Petitioner from contacting Joshua Sussberg, an

attorney for the debtors in the above-captioned case, or any member of his

family in any manner and prohibited Petitioner from entering the federal

courthouse in Houston without being escorted by a court security officer.

(Appendix 3).

The trial court's March 23, 2020, Order (Appendix 3) stated that

Petitioner could request a hearing on the trial court's Order, which Petitioner

did the following day, March 24, 2020.  (Appendix 4).  On April 20, 2020,

7

the trial court denied Petitioner's request for a hearing stating, "The pleading (Petitioner's request for a hearing) does nothing more than seek to disrupt further the legitimate ends of bankruptcy process and has no legitimate purpose." (Appendix 5).

Prior to the trial court's March 23, 2020, Order permanently enjoining Petitioner, there had been no preliminary hearings of any kind (e.g. - temporary restraining order, preliminary injunction) noticed or held on the matters included in the March 23, 2020, permanent injunction.

The trial court's denial of Petitioner's right to notice and a trial before its implementation of a permanent injunction was contrary to law and a violation of Petitioner's rights of equal access to the courts (First Amendment), due process (Fifth Amendment) and equal protection of the laws (Fourteenth Amendment).

Petitioner seeks a writ of mandamus from this Court quashing the trial court's illegal, unconstitutional, March 23, 2020, Order (permanent injunction).  In the alternative, Petitioner seeks a writ of mandamus from this Court ordering the trial court to grant Petitioner a trial on the actions prohibited by the trial court's March 23, 2020, Order.  Furthermore, should this Court order a trial on the actions prohibited by the trial Court's March 23, 2020, Order, Petitioner seeks a writ of mandamus disqualifying the

current trial court judge (the Honorable David R. Jones) from presiding over said trial.  As will be seen herein, the trial court's animosity toward Petitioner is so great that Petitioner is concerned that the trial court will simply continue to make unlawful, unconstitutional rulings during a trial on the actions prohibited by its March 23, 2020, Order.

## STATEMENT OF FACTS

As noted above, Petitioner is representing himself as a Party In Interest during McDermott International's Chapter 11 bankruptcy proceeding in the U.S. District Court for the Southern District of Texas (case number 20-30336).  Petitioner is essentially the only person advocating for the rights of shareholders during the proceedings.  (There has also been one, and only one, lawyer representing a small group of shareholders whose representation of said shareholders has been minimal.)  The McDermott bankruptcy was a prepackaged bankruptcy where the details of the bankruptcy had been worked out between McDermott and its creditors prior to the Chapter 11 filing.  Opposing Petitioner in the bankruptcy action was a literal army of lawyers representing McDermott and its creditors.

**The Trial Court's Unlawful, Unconstitutional Permananent Injunction Issued Against Petitioner**

Kirkland & Ellis is one of the firms representing and advising McDermott International in its bankruptcy case. Kirkland became upset with Petitioner because on February 27, 2020, Petitioner filed a pleading asking the trial court to order a criminal inquiry pursuant to 18 U.S.C. Section 158(d) and 18 U.S.C. Section 3057 into improper, criminal, activities pursued by McDermott and its advisors before and during the pendency of the bankruptcy proceedings.

During the Plan Confirmation Hearing held on March 12, 2020, Petitioner further angered Kirkland when he objected to the reading of Kirkland's expert witness reports favoring bankruptcy directly into the record. Instead, Petitioner made the experts testify during the hearing so that he could ask them questions. This took a lot of time. One of the Kirkland attorneys, Joshua Sussberg, was sitting next to Petitioner in the courtroom. The longer the testimony took, the angrier Mr. Sussberg appeared. Eventually, Mr. Sussberg began to glare at Petitioner and subsequently told Petitioner 'You are disgusting!" and made other insults to Petitioner. At the time, Petitioner did not know Mr. Sussberg's name. (Appendix 2, Appendix 2: Michael Van Deelen affidavit).

After the hearing was over, Petitioner went to the restroom.  As Petitioner was entering the restroom, Mr. Sussberg was coming out. Petitioner politely asked him for his name.  Mr. Sussberg would not give Petitioner his name.  He became very angry and once again told Petitioner 'You are disgusting!' and also told Petitioner 'You are a fool!'  Mr. Sussberg then went around a corner towards the elevators.  For some reason, Mr. Sussberg turned around and came storming back to the restroom area.  He aggressively charged Petitioner and stopped just a couple of inches from Petitioner and once again began to berate Petitioner.  Petitioner was very frightened.  Petitioner is a 70 year-old senior citizen and Mr. Sussberg is a muscular person who appears to be in his late 30's or early 40's.  (Appendix 2, Appendix 2: Michael Van Deelen affidavit).

Petitioner was determined to find the name of this person so Petitioner could complain about his terrible behavior, including his assault of Petitioner.  Petitioner got on the Kirkland website and found Sussberg's picture which identified him as Joshua Sussberg.  Petitioner then sent Mr. Sussberg a courtesy email asking him if he was the one who had sat across from Petitioner at the March 12, 2020, Plan Confirmation Hearing. Petitioner gave Mr. Sussberg until Wednesday, March 18, 2020, to reply. (Appendix 2, Appendix 2: Michael Van Deelen affidavit).

On March 17, 2020, attorneys for the debtor McDermott International, including Mr. Sussberg of Kirkland & Ellis, LLP, filed their 'Emergency Motion for Michael Van Deelen to Appear and Show Cause Why He Should Not Be Held In Contempt Of Court and **Prohibited From Further Contact With the Debtors, Their Officers, or Their Counsel** (emphasis added)' on behalf of debtor McDermott International. (Appendix 1). In their motion, which falsely accused the Petitioner of a host of improprieties, the defendants asked the trial court to "prohibit Mr. Van Deelen from contacting the Debtors, their current officers, directors, or employees, their counsel or other professionals, or any of their families in person or via telephone or electronic forms of communication...." (Appendix 1, para. 17). The motion also asked the trial court to order Petitioner (Van Deelen) **to appear** (emphasis added) and show cause why he should not be held in contempt of court and prohibited from further contact with the debtors, their current or former officers, directors, and employees, their counsel or other professionals and their families." (Appendix 1, para. 16). The motion had not been preceded by a request for a temporary restraining order or a preliminary injunction. In the motion, McDermott asked for a hearing on the motion on a date 'TBD'. (Appendix 1).

Petitioner believes Kirkland's motion was an attempt to intimidate Petitioner, color Petitioner in a false light in the eyes of the trial court and retaliate against Petitioner and frustrate Petitioner in his desire to complain about (or possibly even sue) Mr. Sussberg for his bad acts against Petitioner as described herein.

After being served the Kirkland motion, Petitioner filed and served his 'Party In Interest Michael Van Deelen's Response to Emergency Motion for Michael Van Deelen to Appear and Show Cause Why He Should Not Be Held In Contempt of Court and Prohibited From Further Contact With the Debtors, Their Officers, or Their Counsel', on May 18, 2020.  Said response denied the allegations of improper behavior raised in the Kirkland motion. (Appendix 2, Appendix 2 - Michael Van Deelen Affidavit).

On March 23, 2020, the trial court, without holding the requested hearing, signed and issued its Order (Appendix 3), which was **effective immediately** (emphasis added), denying McDermott's contempt request and its request to permanently enjoin Petitioner from contacting the Debtors, their current officers, directors, or employees, their counsel or other professionals, or any of their families in person or via telephone or electronic forms of communication, with the exception of Mr. Sussberg and his family. (Note: the Kirkland motion did not use the word 'permanent injunction', but

a plain reading of the motion makes it clear that a permanent injunction was what was being requested.)

However, without notice or trial, the trial court's March 23, 2020, Order permanently enjoined Petitioner 1) from contacting or associating with attorney Sussberg or members of his family in any manner; 2) from contacting the court and its staff 'by any means' and 3) from visiting the Houston federal courthouse without being escorted by courthouse security. The Order stated that Petitioner would be subject to arrest if he attempted to contact Mr. Sussberg or his family.  (Appendix 3).

The trial court's March 23, 2020, Order (Appendix 3) informed Petitioner that if Petitioner sought relief from the Order or if Petitioner wanted a hearing on the Order, Petitioner could request a hearing within the next 14 days.  On March 24, 2020, the day after the permanent injunction was issued by the trial court, Petitioner filed his 'Party In Interest Michael Van Deelen's Request for Hearing' seeking clarification of the March 23, 2020, Order and requesting a hearing.  (Appendix 4).

On April 20, 2020, in violation of its own March 23, 2020, Order, the trial court issued an Order which denied Petitioner's request for a hearing. (Appendix 5).  The April 20, 2020, Order denying Petitioner's request for a hearing stated, "The pleading (Appendix 5 - Petitioner's request for hearing)

does nothing more than seek to disrupt further the legitimate ends of the bankruptcy process and has no legitimate purpose." The trial court's animosity towards Petitioner could not have been made more clear.

### Other Discriminatory Acts of the Trial Court Against Petitioner

The trial court has consistently treated Petitioner as a second class citizen and persona non grata during the course of the proceedings to date, violated the law and Petitioner's constitutional rights of equal access to the courts, due process and equal protection of the laws and retaliated against Petitioner for Petitioner's attempted exercising of his right of equal access to the courts as follows:

A.  On February 27, 2020, Petitioner filed a motion which moved the bankruptcy court to order an investigation of McDermott and its advisors (which include Mr. Sussberg and his firm, Kirkland and Ellis) by the U.S. Attorney pursuant to 18 U.S.C. Section 158(d) and 18 U.S.C. Section 3057. The motion concluded:

"Based on the above, Van Deelen alleges that McDermott, certain members of its management and its advisors, violated 18 U.S.C. Section 152 when they made various false oaths and accounts to the bankruptcy court, including when they claimed that McDermott had to re-equitize the company as part of its bankruptcy plan and that certain documents filed with the court were accurate; violated 18 U.S.C. Section 154 when they failed to provide the U.S. Trustee documents which showed that they had previously concluded that the company did not have to file for Chapter 11 bankruptcy

and documents which showed that, once Chapter 11 bankruptcy was filed, the company did not have to re-equitize; and violated 18 U.S.C. Section157 when they filed documents with the bankruptcy court purporting to show that McDermott had to re-equitize the company in order to satisfactorily exit bankruptcy when they knew that the reason they claimed the need to re-equitize was so that they could be granted 7.5% of the company's new shares upon emergence from bankruptcy.

Van Deelen alleges that McDermott's bankruptcy plan has not been proposed in good faith and has been proposed by a means forbidden by law in violation of 11 U.S.C. Section 1129(3) because the plan calls for the cancellation of existing shares, the elimination of virtually all of the company's outstanding debt and the re-equitization of the company for the sole purpose of enriching McDermott's management and Board and not because said cancellation of shares, elimination of all debt and re-equitization of the company is necessary for the satisfactory emergence of the company from bankruptcy.

Van Deelen alleges that McDermott's bankruptcy plan discriminates unfairly and is not fair and equitable with respect to current shareholders in violation of 11 U.S.C. Section 1129 (b)(1) because it is not necessary to cancel the shares of the existing shareholders, to eliminate virtually all of the company's outstanding debt and to re-equitize the company in order for the plan to be viable. The plan calls for the cancellation of existing shares, the elimination of virtually all of the company's outstanding debt and the re-equitization of the company for the sole purpose of enriching McDermott's management and Board and not because said cancellation of shares, elimination of all debt and re-equitization of the company is necessary for the satisfactory emergence of the company from bankruptcy.

Van Deelen, pursuant to 18 U.S.C. 158(d) and 18 U.S.C. Section 3057, moves the court to refer for investigation the claims of McDermott, certain members of its management and its advisors (including Joshua Sussberg) that McDermott has to re-equitize the company in order to satisfactorily exit bankruptcy."

In violation of Petitioner's constitutional rights of equal access to the courts, due process and equal protection of the laws and in retaliation against Petitioner for Petitioner's attempted exercising of his right of equal access to the courts and in violation of local rule and custom and the Fed. R. Civ.

16

Proc., the trial court refused to calendar or hear Petitioner's motion even though Petitioner had requested the same pursuant to local rule and custom and the Fed. R. Civ. Proc.

B.  The McDermott Plan Confirmation hearing was held at 9:00 a.m., C.S.T., on March 12, 2020.  At approximately 5:00 p.m., C.S.T., on March 11, 2020, McDermott's attorneys, including Mr. Sussberg, filed and served the company's Modified Plan, which was several hundred pages long.  There was simply no way Petitioner and other parties to the bankruptcy proceedings could be prepared to study the Modified Plan in time for the Plan Confirmation hearing which was a mere 16 hours away.

At the very beginning of the Plan Confirmation hearing, Petitioner moved the trial court for a continuance so that Petitioner and the other parties would have time to study the Modified Plan before the trial court ruled on it.  In violation of Petitioner's constitutional rights of equal access to the courts, due process and equal protection of the laws and in retaliation against Petitioner for Petitioner's attempted exercising of his right of equal access to the courts and in violation of local rule and custom and the Fed. R. Civ. Proc., the trial court denied Petitioner's motion and proceeded with the Plan Confirmation Hearing.  In response to Petitioner's motion, the trial

court said something to the effect of, "You've already lost everything [as a McDermott shareholder]!  How could the new plan be any worse?"

C.  During the Plan Confirmation hearing, the trial court frequently yelled and screamed at the Petitioner and berated the Petitioner for Petitioner's respectfully asking to be heard during the proceedings.  The trial court, in an attempt to falsify the reporter's record, frequently loudly accused Petitioner of "talking over" (interrupting) him and threatened Petitioner with 'consequences', even though Petitioner had not interrupted him.  Evidence of this improper behavior by the trial court is available on the audio recording of the March 12, 2020, Plan Confirmation Hearing.  The trial court's actions were in violation of Petitioner's constitutional rights of equal access to the courts, due process and equal protection of the laws and in retaliation against Petitioner for Petitioner's attempted exercising of his right of equal access to the courts and in violation of local rule and custom and the Fed. R. Civ. Proc. and made in the attempt to chill further protected speech by the Petitioner.

D.  During the March 12, 2020, Plan Confirmation hearing, the trial court violated all appearance of impartiality when he told the audience of approximately 70 persons that the McDermott bankruptcy advisors, including Mr. Sussberg, were "the smartest people in the country" or words

to that effect.  On the other hand, the trial court has publicly told Petitioner

"You know nothing!" when discussing Petitioner's qualifications and

knowledge of the case in open court.

E.  In its March 23, 2020, Order, the trial court, aware that Petitioner

is a Phi Beta Kappa graduate of Stanford, has a Master's from M.I.T. and is a

member of Mensa (because Petitioner had told him so during a hearing in

which the trial court asked Petitioner about his qualifications) challenged the

Petitioner's "mental stability" by falsely stating that Petitioner referenced

"shooting" during the March 12, 2020, Plan Confirmation hearing.  The

record of the Plan Confirmation hearing will not show that Petitioner ever

threatened or mentioned that he had ever or was going to shoot someone.

The trial court's comment was false, vindictive and outrageous.  The trial

court's actions were in violation of Petitioner's constitutional rights of equal

access to the courts, due process and equal protection of the laws and in

retaliation against Petitioner for Petitioner's attempted exercising of his right

of equal access to the courts and in violation of local rule and custom and the

Fed. R. Civ. Proc. and made in the attempt to chill further protected speech

by the Petitioner.

F.  During the course of the proceedings, Petitioner asked the U.S.

Attorney to institute a criminal investigation of McDermott and its advisors

(which include Mr. Sussberg and his firm, Kirkland & Ellis) for possible criminal wrongdoing prior to and during the course of the bankruptcy proceedings in line with paragraph 'A' above. In an apparent retaliatory tit for tat move, in violation of Petitioner's constitutional rights of equal access to the courts, due process and equal protection of the laws and in retaliation against Petitioner for Petitioner's attempted exercising of his right of equal access to the courts and in violation of local rule and custom and the Fed. R. Civ. Proc. and in the attempt to chill further protected speech by the Petitioner, the trial court's March 23, 2020, Order asked the U.S. Attorney to investigate Petitioner for his "conduct in this case", without naming any specific alleged conduct the U.S. Attorney should investigate.

G. After Mr. Sussberg assaulted Petitioner on March 12, 2020, Petitioner approached a security guard in the courthouse, told him about the assault and who assaulted him and asked him to investigate if there could be a video record of the assault. The trial court's March 23, 2020, Order acknowledges that Petitioner spoke to the officer. In an apparent retaliatory tit for tat move, in violation of Petitioner's constitutional rights of equal access to the courts, due process and equal protection of the laws and in retaliation against Petitioner for Petitioner's attempted exercising of his right of equal access to the courts and in violation of local rule and custom and the

20

001438

Fed. R. Civ. Proc. and in the attempt to chill further protected speech by the Petitioner, the trial court's March 23, 2020, Order asked the United States Marshal to investigate Petitioner's conduct without naming any specific alleged conduct to be investigated.

H. The trial court's March 23, 2020, order accused Petitioner of calling the trial court a 'son of a bitch' during the March 12, 2020, Plan Confirmation Hearing. This accusation was false, fraudulent, vindictive and made in violation of Petitioner's constitutional rights of equal access to the courts, due process and equal protection of the laws and in retaliation against Petitioner for Petitioner's attempted exercising of his right of equal access to the courts and in violation of local rule and custom and the Fed. R. Civ. Proc. and in the attempt to chill further protected speech by the Petitioner.

There was an audio recording made of the March 12, 2020, Plan Confirmation Hearing. Nowhere on said audio can Petitioner be heard calling the trial court a 'son of a bitch'. Petitioner's 'Party In Interest Michael Van Deelen's Request for Hearing' filed and served March 24, 2020, asked the trial court to identify where on the audio tape of the March 12, 2020, Plan Confirmation Hearing Petitioner can be heard calling the trial court a 'son of a bitch'. (Appendix 4). Instead of providing this information to

Petitioner, the trial court denied Petitioner's request for a hearing in its April 20, 2020, Order, as we have seen.

## ISSUES PRESENTED

The trial court's March 23, 2020, Order (Appendix 3) permanently enjoining Petitioner from contacting the trial court and its staff by any means, from contacting Joshua Sussberg, an attorney for the debtors in the above-captioned case, or any member of his family in any manner and from entering the federal courthouse in Houston without being escorted by a court security officer was an abuse of discretion, contrary to law (Fed. R. Civ. Proc. Rule 65 and subsections) and violated several of Petitioner's Constitutional rights, including, but not limited to, Petitioner's First Amendment right of equal access to the courts, Petitioner's Fifth Amendment right of due process, Petitioner's Fourteenth right of equal protection of the laws and Petitioner's First Amendment right to be free from retaliation for his attempted exercising of his right of equal access to the courts.

The trial court did not hold a hearing on McDermott's Emergency Motion for Michael Van Deelen to Appear and Show cause Why He Should Not Be Held In Contempt of Court and Prohibited From Further Contact

With the Debtors, Their Officers, or Their Counsel even though one was requested. (Appendix 1). Instead, the trial court, without notice to Petitioner and without a hearing or trial, unlawfully issued what amounted to a permanent injunction against the Petitioner in its March 23, 2020, Order. (Appendix 3). The trial court's March 23, 2020, Order, which was effective immediately, gave Petitioner 14 days from the date of the Order to seek relief from the Order or to request a hearing. Petitioner filed a motion seeking relief and requesting a hearing on the very next day, March 24, 2020. (Appendix 4). But any chances for Petitioner to argue his case were dashed when the trial court's April 20, 2020, Order denied Petitioner's request for a hearing stating, 'The pleading (Petitioner's motion) does nothing more than seek to disrupt further the legitimate ends of the bankruptcy process and has no legitimate purpose.' (Appendix 5).

The McDermott motion (Appendix 1) did not request either a temporary restraining order or a preliminary injunction. Instead, the McDermott motion appears to have requested a permanent injunction. In its March 23, 2020, Order (Appendix 3), the trial court in fact permanently enjoined Petitioner as discussed herein and then denied (Appendix 5) Petitioner's March 24, 2020, request (Appendix 4) for a hearing seeking relief from the Order even though the trial court gave Petitioner 14 days

23

from March 23, 2020, to file his request for a hearing to seek such relief. From the time McDermott filed its motion (Appendix 1) to the time the trial court denied Petitioner's request for a hearing seeking relief (Appendix 5), Petitioner was not afforded a single hearing. Not one. Petitioner is left wondering what country he lives in.

## RELIEF SOUGHT

Petitioner seeks a writ of mandamus from this Court quashing the trial court's illegal, unconstitutional, March 23, 2020, Order (permanent injunction). In the alternative, Petitioner seeks a writ of mandamus from this Court ordering the trial court to grant Petitioner a trial on the actions prohibited by the trial court's March 23, 2020, Order. Furthermore, should this Court order a trial on the actions prohibited by the trial Court's March 23, 2020, Order, Petitioner seeks a writ of mandamus disqualifying the current trial court judge (the Honorable David Jones) from presiding over said trial. The trial court's animosity toward Petitioner is so great that Petitioner is concerned that the trial court will simply continue to make unlawful, unconstitutional rulings during a trial on the actions prohibited by its March 23, 2020, Order.

## REASONS WHY THE WRIT SHOULD ISSUE

This Court should issue the writ because, as seen herein, the trial

court's March 23, 2020, Order is unlawful and unconstitutional.  The

Petitioner will be damaged if he cannot visit with trial court personnel,

communicate with one of McDermott's bankruptcy lawyers (Mr. Sussberg)

and visit the federal courthouse without an escort.  Because the trial court's

records are public, Petitioner's reputation will be seriously damaged in the

public eye by all those who read the trial court's March 23, 2020, Order

which makes Petitioner appear to be a very unsavory person.

Furthermore, the trial court's March 23, 2020, Order calls for

Petitioner's arrest and subsequent loss of freedom should Mr. Sussberg

complain that Petitioner has contacted Mr. Sussberg or his family.  This is

especially concerning because Mr. Sussberg has already attempted to

deceive the trial court through the false allegations against Petitioner made

in McDermott's 'Emergency Motion for Michael Van Deelen to Appear and

Show Cause Why He Should Not Be Held In Contempt Of Court and

Prohibited From Further Contact With the Debtors, Their Officers, or Their

Counsel'.  (Appendix 1, Appendix 2, including Petitioner's Affidavit).

Petitioner fears that Mr. Sussberg will use the trial court's March 23, 2020,

Order as a means to continue to retaliate against Petitioner by having him

25

falsely arrested. Petitioner's freedom is now in the hands of a person (Mr. Sussberg) who has previously assaulted Petitioner. (Appendix 2, including Petitioner's Affidavit).

Petitioner has no recourse other than to seek this writ. The trial court is a federal actor and as such cannot be sued under the federal civil rights statute, 42 U.S.C. Section 1983. Neither can Petitioner file a Bivens action because such actions preclude declaratory or injunctive relief and Federal judges are immune from money damages. *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971).

An interlocutory appeal under 28 U.S.C. Section 1292(b) is not available because the March 23, 2020, Order does not involve a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation. Furthermore, the chance that the trial court would certify an interlocutory appeal challenging its unlawful and unconstitutional action toward the Petitioner is nil.

WHEREFORE, the premises considered, Petitioner prays that this Court grant the petition and order that an answer to the petition be filed by the respondents.


Dated this 3rd day of June, 2020.

Respectfully submitted,


/s/ Michael Van Deelen
16215 Friar Circle
Spring, TX 77379
823-562-0723

Petitioner Pro Se

## CERTIFICATE OF SERVICE

I certify that I have served copies of this petition on the respondent judge and all other parties to the action in the trial court.


Respectfully submitted,


/s/ Michael Van Deelen
16215 Friar Circle
Spring, TX 77379


## CERTIFICATE OF COMPLIANCE

I hereby certify that this document contains less than 6,000 words, not including appendices. I further certify that this document has been prepared in a conventional typeface no smaller than 14-point for text.


Dated: June 3, 2020                          /s/ Michael Van Deelen
                                             Petitioner

APPENDIX 1

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| **In re:** | ) | **Chapter 11** |
| | ) | |
| **MCDERMOTT INTERNATIONAL, INC.,** *et al.*,[1] | ) | **Case No. 20-30336 (DRJ)** |
| | ) | |
| **Debtors.** | ) | **(Jointly Administered)** |
| | ) | **(Emergency Relief Requested)** |

## EMERGENCY MOTION FOR MICHAEL VAN DEELEN
## TO APPEAR AND SHOW CAUSE WHY HE SHOULD NOT BE
## HELD IN CONTEMPT OF COURT AND PROHIBITED FROM FURTHER
## CONTACT WITH THE DEBTORS, THEIR OFFICERS, OR THEIR COUNSEL

> **Emergency relief has been requested. A hearing will be conducted on this matter on TBD at TBD in Courtroom 400, 4th Floor, 515 Rusk, Houston, TX 77002. If you object to the relief requested or you believe that emergency consideration is not warranted, you must either appear at the hearing or file a written response prior to the hearing. Otherwise the Court may treat the pleading as unopposed and grant the relief requested.**
>
> **Relief is requested not later than March 20, 2020.**

The above-captioned debtors and debtors in possession (collectively, the "Debtors")

respectfully state the following in support of this motion (this "Motion"):

### Relief Requested

1.        Michael Van Deelen has been engaging in harassing and abusive behavior

towards a former officer of the Debtors and towards counsel for the Debtors. From showing up at

Stuart Spence's home and rattling Mr. Spence's wife, to vulgar remarks both inside and outside

the courtroom on March 12, 2020, Mr. Van Deelen's behavior is disgusting and should not be

tolerated. Mr. Van Deelen is upset about the equity holders' treatment in the Debtors' plan of

---

[1]    A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://cases.primeclerk.com/McDermott.  The location of Debtor McDermott International, Inc.'s principal place of business and the Debtors' service address in these chapter 11 cases is 757 North Eldridge Parkway, Houston, Texas 77079.

reorganization.   That does not, however excuse his vulgar and threatening behavior towards individuals doing their jobs who are complying with the law, or their families.  The Debtors ask this Court to order Mr. Van Deelen to appear and show cause why he should not be held in contempt and be prohibited from further direct contact with the Debtors, their current or former officers, directors, and employees, and their counsel or other professionals and their families, and any other measures that this Court sees fit to impose to ensure a civil and professional proceeding.

## Jurisdiction and Venue

2.      The United States Bankruptcy Court for the Southern District of Texas (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  The Debtors confirm their consent, pursuant to rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), to the entry of an order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

3.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

4.      The bases for the relief requested herein are section 105(a) of title 11 of the United States Code (the "Bankruptcy Code") and the Court's inherent authority as set forth in *Chambers v. NASCO*, 501 U.S. 32 (1991).

5.      On January 21, 2020 (the "Petition Date"), each Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  A detailed description surrounding the facts and circumstances of these chapter 11 cases (the "Cases") is set forth in the *Declaration of David Dickson, President and Chief Executive Officer of McDermott International, Inc., in Support of the Chapter 11 Petitions* (the "Dickson Declaration") and the *Declaration of John R. Castellano, Chief Transformation Officer of McDermott International, Inc., in Support of the Debtors' First*

*Day Motions* (the "<u>Castellano Declaration</u>," together with the Dickson Declaration, the "<u>First Day</u> <u>Declarations</u>"), filed on January 22, 2020, and incorporated by reference herein.

**<u>Background</u>**

6.      Mr. Van Deelen is a self-described party-in-interest who filed numerous pleadings in these Cases including:

- Letter/Motion to Intervene and Access to Filing System [Docket No. 253]

- Motion for Appointment of Trustee or Examiner and the Earliest Possible Hearing Date [Docket No. 436]

- Motion to Appoint Trustee [Docket No. 441]

- Objection to Confirmation of Plan [Docket No. 510]

- Exhibit and Witness List [Docket No. 511]

- Notice of Expert Report [Docket No. 527]

- Expedited Motion for an Order Continuing the March 12, 2020 Plan Hearing [Docket No. 557]

7.      On March 12, 2020, the Court conducted a hearing on confirmation of the Debtors' plan of reorganization (the "<u>March 12th Hearing</u>").  During and after that hearing, Mr. Van Deelen made certain threatening and vulgar remarks to Joshua Sussberg ("<u>Mr. Sussberg</u>"), counsel for the Debtors.  The undersigned apologizes to the Court in advance for the nature of the language which follows.  During the hearing, Mr. Van Deelen can be heard on the audio recording calling the Court a "son of a bitch." (AUDIO CLIP, March 12, 2020 Hearing, 3:19:29-3:21:20).[2]  After conclusion of the March 12th Hearing, Mr. Van Deelen waited for Mr. Sussberg outside of the restroom and

---

[2]      This audio clip is an excerpt the Audio File attached to Docket No. 557 and available with a transcription of the interaction as well as the audio at the following link: https://youtu.be/XkyjeEEAkII.

called him a "pasty white fuck" and said "I'll have my way with your wife." Attached as **Exhibit A** is the affidavit of Joshua A. Sussberg, who witnessed and heard the out-of-court statements by Mr. Van Deelen (the "Sussberg Affidavit").

8.      Ordinarily, counsel would simply turn the other cheek to such remarks. However, Mr. Van Deelen also appeared unannounced at the home of Stuart Spence ("Mr. Spence"), former Chief Financial Officer of McDermott International, Inc.  Mr. Spence was on a conference call at the time and Mr. Spence's wife answered the door and was rattled by her interaction with Mr. Van Deelen.  Mr. Spence's affidavit describing this encounter is attached hereto as **Exhibit B** (the "Spence Affidavit").  Below is a photograph from Mr. Spence's doorbell camera.



*See* Exhibit 1 to the Spence Affidavit.  Appearing on Mr. Spence's doorstep is harassing and borders on stalking.

9.      In addition to these in-person interactions, Mr. Van Deelen has also sent an email to Mr. Sussberg asking him to confirm their seating positions during the March 12th Hearing:

4

**From:** Michael Van Deelen <michaelvandeelen@gmail.com>
**Date:** March 13, 2020 at 4:36:33 PM EDT
**To:** "Sussberg, Josh" <jsussberg@kirkland.com>
**Subject: [EXT] March 12, 2020, Plan Confirmation Hearing for Debtor McDermott
International (case number 20-30336)**

Mr. Sussberg:

I was at the above hearing and represented myself as a Party In Interest who opposed the
plan confirmation. You sat across the gap between the two conference tables at
approximately arms length from me. If you deny this, please forward said denial to me at
your earliest convenience, but no later than from 5:00 C.S.T. on Wednesday, March 18, 2020.

I recognize you from your picture on the Kirkland & Ellis website which is where I obtained
your email address.

Regards,

Michael Van Deelen

*See* Exhibit 1 to the Sussberg Affidavit. While facially a fairly innocuous inquiry, given Mr. Van

Deelen's pleadings and behavior in these Cases, the email takes on a different and unsettling color.

10.     Mr. Van Deelen has a history of sanctionable behavior. In 2006, Mr. Van Deelen

filed suit against the City of Kansas City, Missouri to determine the constitutionality of an

employment-related residency policy. *Michal Van Deelen v. City of Kansas City, Missouri*, 2006

WL 2077640 (W.D. Mo. 2006). The District Court upheld a prior sanctions order against Mr. Van

Deelen finding that "Van Deelen failed to comply with general rules governing proper courtroom

decorum and respect for the Court and the judicial proceedings which he had initiated. Throughout

the trial Van Deelen repeatedly interrupted and argued with the Judge, counsel for the City and

numerous witnesses. Van Deelen presented a voluminous amount of cumulative and irrelevant

evidence wasting valuable judicial resources. His flippant and disrespectful remarks impeded the

efficient resolution of his constitutional claims. Additionally, and perhaps most offensive, Van

Deelen fabricated evidence to support his claims. *Van Deelen v. City of Kansas City, Missouri,* 2006 WL 2077640 at *1 (W.D. Mo. 2006).

11.     This behavior is not new or different for Mr. Van Deelen.  Mr. Van Deelen's behavior is intended to threaten, harass and intimidate these individuals and their families.  His participation in this case should be limited to the protection of his interest as an alleged former shareholder of the Debtors.

## Argument

12.     Section 105(a) of the Bankruptcy Code permits this Court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).

13.     While Mr. Van Deelen's offensive conduct has been in-person rather than within a pleading, the Court still has the power to sanction and regulate such conduct.  "[A] federal court's inherent power to sanction bad faith conduct serves the dual purpose of covering the gaps where there are no applicable rules and also covering situation where 'neither the statute nor the Rules are up to the task.'"  *In re Cochener,* 360 B.R. 542, 569 (Bankr. S.D. Tex. 2007) (quoting *Chambers v. NASCO,* 501 U.S. 32, 50 (1991)).

14.     The Fifth Circuit has affirmed the bankruptcy court's power to issue sanctions under section 105 of the Bankruptcy Code, *see e.g. Placid Ref. Co. v. Terrebonne Fuel & Lube,* 108 F.3d 609 (5th Cir. 21997); and *Mooney v. Green Tree Serv., Inc.,* 340 B.R. 351 (Bankr. E.D. Tex. 2006).

15.     The Debtors understand Mr. Van Deelen's displeasure with the fact that the equity holders will not receive a distribution in this case.  The Debtors also believe that all parties to a case, even those out of the money, deserve to be treated with dignity and are entitled to due process

·

6

under the law. Mr. Van Deelen has been treated with respect and was afforded that process. Regardless, Mr. Van Deelen's conduct, at absolute minimum, rises to the level of bad faith. His conduct threatens violence against parties in the case and their families and is sanctionable under the Court's inherent power under section 105 of the Bankruptcy Code and pursuant to the Supreme Court's holding in *Chambers*.

### Prayer for Relief

16.     The Debtors ask this Court to order Mr. Van Deelen to appear and show cause why he should not be held in contempt of court and prohibited from further contact with the debtors, their current or former officers, directors, and employees, their counsel or other professionals and their families.

17.     The Debtors ask the Court to prohibit Mr. Van Deelen from contacting the Debtors, their current officers, directors, or employees, their counsel or other professionals, or any of their families in person or via telephone or electronic forms of communication and ask that this Court limit Mr. Van Deelen's contact to any such party to filings on the docket in these Cases.

### Emergency Consideration

18.     Pursuant to Local Rule 9013-1(i), the Debtors respectfully request emergency consideration of this Motion. Mr. Van Deelen has threatened physical violence against family members of counsel in these cases. Mr. Van Deelen's conduct is continuing and unlikely to cease absent Court intervention.

### Notice

19.     The Debtors will provide notice of this motion to: (a) the Office of the U.S. Trustee for the Southern District of Texas; (b) the United States Attorney's Office for the Southern District of Texas; and (c) any party that has requested notice pursuant to Bankruptcy Rule 2002. The



Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

WHEREFORE, the Debtors respectfully request that the Court enter the an order for Mr. Van Deelen to appear and show cause why he should not be held in contempt of court and prohibited or enjoined from contacting the Debtors, their current and former officers, directors, and employees, and their counsel and other professionals except for through pleading on this docket and for any other relief to which the Debtors are justly entitled.

Houston, Texas
March 17, 2020

/s/ Matthew Cavenaugh
**JACKSON WALKER L.L.P.**
Matthew D. Cavenaugh (TX Bar No. 24062656)
Jennifer F. Wertz (TX Bar No. 24072822)
Kristhy M. Peguero (TX Bar No. 24102776)
Veronica A. Polnick (TX Bar No. 24079148)
1401 McKinney Street, Suite 1900
Houston, Texas 77010
Telephone:     (713) 752-4200
Facsimile:     (713) 752-4221
Email:          mcavenaugh@jw.com
                    jwertz@jw.com
                    kpeguero@jw.com
                    vpolnick@jw.com

*Co-Counsel to the Debtors*
*and Debtors in Possession*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Christopher T. Greco, P.C. (admitted *pro hac vice*)
Anthony R. Grossi (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900
Email:          joshua.sussberg@kirkland.com
                    christopher.greco@kirkland.com
                    anthony.grossi@kirkland.com

-and-

James H.M. Sprayregen, P.C.
John R. Luze (admitted *pro hac* vice)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:     (312) 862-2200
Email:          james.sprayregen@kirkland.com
                    john.luze@kirkland.com

*Proposed Co-Counsel to the Debtors*
*and Debtors in Possession*

8


**Certificate of Service**

I certify that on March 17, 2020, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ Matthew D. Cavenaugh*
Matthew D. Cavenaugh



## Exhibit A

**Sussberg Affidavit**

# IN THE UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| MCDERMOTT INTERNATIONAL, INC., *et al.*,[1] | ) | Case No. 20-30336 (DRJ) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

**AFFIDAVIT OF JOSHUA A. SUSSBERG
IN SUPPORT OF DEBTORS' EMERGENCY MOTION
FOR MICHAEL VAN DEELEN TO APPEAR AND SHOW CAUSE WHY HE
SHOULD NOT BE HELD IN CONTEMPT OF COURT AND PROHIBITED FROM
FURTHER CONTACT WITH THE DEBTORS, THEIR OFFICERS, OR THEIR COUNSEL**

I, Joshua A. Sussberg, hereby declare under penalty of perjury:

1. I am over the age of 18 and competent to testify. I am the president of Joshua A. Sussberg, P.C., a partner of the law firm of Kirkland & Ellis LLP, located at 601 Lexington Avenue, New York, New York 10022, and a partner of Kirkland & Ellis International, LLP (together with Kirkland & Ellis LLP, collectively, "Kirkland"). I am one of the lead attorneys from Kirkland working on the above-captioned chapter 11 cases. I am a member in good standing of the Bar of the State of New York, and I have been admitted to practice in the Southern District of New York. There are no disciplinary proceedings pending against me.

2. I submit this Affidavit (the "Affidavit") in support of the Debtors' *Emergency Motion for Michael Van Deelen to Appear and Show Cause Why He Should Not Be Held in Contempt of Court and Prohibited From Further Contact with the Debtors, their Officers, or their*

---

[1] A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://cases.primeclerk.com/McDermott. The location of Debtor McDermott International, Inc.'s principal place of business and the Debtors' service address in these chapter 11 cases is 757 North Eldridge Parkway, Houston, Texas 77079.

Counsel (the "Motion").[2] Except as otherwise noted, I have personal knowledge of the matters set forth herein.

3.      I am authorized to submit this Affidavit, and, if I were called upon to testify, I could and would testify competently to the facts set forth herein.

## Interactions with Mr. Van Deelen

4.      On March 12, 2020, the Court conducted a hearing on confirmation of the Debtors' plan of reorganization (the "March 12th Hearing"). During and after the March 12th Hearing, Michael Van Deelen made certain false, threatening, and vulgar remarks to me.

5.      Mr. Van Deelen made false and misleading statements about me, Kirkland, and the Debtors on the record during the March 12th Hearing. During his closing argument, Mr. Van Deelen suggested that the Debtors' chapter 11 plan of reorganization could contain a provision allowing either the Debtors or Kirkland to "come out to [his] house and shoot [him]." Mr. Van Deelen also falsely stated on the record that I threatened him. Mr. Van Deelen also referred to the Court as a "son of a bitch." These statements can be heard on the Court's audio recording of the March 12th Hearing.

6.      After the conclusion of the March 12th Hearing, Mr. Van Deelen waited outside of the restroom to confront me. Mr. Van Deelen first asked for my name. Mr. Van Deelen did not indicate why he was attempting to personally identify me. I responded to Mr. Van Deelen that it "didn't matter" what my name was. Mr. Van Deelen then called me a "pasty white fuck" and said "I'll have my way with your wife."

7.      On March 12, 2020, Mr. Van Deelen also sent me an email asking me to confirm our seating positions during the March 12th Hearing. A copy of this email is attached to this

---

2    Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Motion.

Affidavit as **Exhibit 1**. I believe this email was a further attempt by Mr. Van Deelen to personally identify me.

8.      In light of the statements on the record at the March 12th Hearing and herein, I believe Mr. Van Deelen's behavior is intended to threaten, harass, and intimidate me, the Debtors' officers, and our families. Accordingly, I support the relief sought in the Motion.

Pursuant to 28 U.S.C. § 1746, I declare under the penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: March 17, 2020                    */s/ Joshua A. Sussberg*
_____
                                         Joshua A. Sussberg
                                         as President of Joshua A. Sussberg, P.C., as
                                         Partner of Kirkland & Ellis LLP; and as
                                         Partner of Kirkland & Ellis International LLP

3

## Exhibit 1

**Van Deelen Email**



Begin forwarded message:

**From:** Michael Van Deelen <michaelvandeelen@gmail.com>
**Date:** March 13, 2020 at 4:36:33 PM EDT
**To:** "Sussberg, Josh" <jsussberg@kirkland.com>
**Subject: [EXT] March 12, 2020, Plan Confirmation Hearing for Debtor McDermott International (case number 20-30336)**

Mr. Sussberg,

I was at the above hearing and represented myself as a Party In Interest who opposed the plan confirmation. You sat across the gap between the two conference tables at approximately arms length from me.  If you deny this, please forward said denial to me at your earliest convenience, but no later than 5:00 C.S.T. on Wednesday, March 18, 2020.

I recognize you from your picture on the Kirkland & Ellis website which is where I obtained your email address.

Regards,

Michael Van Deelen

The information contained in this communication is confidential, may be attorney-client privileged, may constitute inside information, and is intended only for the use of the addressee. It is the property of Kirkland & Ellis LLP or Kirkland & Ellis International LLP. Unauthorized use, disclosure or copying of this communication or any part thereof is strictly prohibited and may be unlawful. If you have received this communication in error, please notify us immediately by return email or by email to postmaster@kirkland.com, and destroy this communication and all copies thereof, including all attachments.

2

**Exhibit B**

**Spence Affidavit**

# IN THE UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| MCDERMOTT INTERNATIONAL, INC., *et al.*,[1] | ) Case No. 20-30336 (DRJ) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |

## AFFIDAVIT OF STUART SPENCE
## IN SUPPORT OF DEBTORS' EMERGENCY MOTION
## FOR MICHAEL VAN DEELEN TO APPEAR AND SHOW CAUSE WHY HE
## SHOULD NOT BE HELD IN CONTEMPT OF COURT AND PROHIBITED FROM
## FURTHER CONTACT WITH THE DEBTORS, THEIR OFFICERS, OR THEIR COUNSEL

I, Stuart Spence, hereby declare under penalty of perjury:

1.       I am over the age of 18 and competent to testify.  I am the former Executive Vice President and Chief Financial Officer of McDermott International, Inc.

2.       I submit this Affidavit (the "Affidavit") in support of the Debtors' *Emergency Motion for Michael Van Deelen to Appear and Show Cause Why He Should Not Be Held in Contempt of Court and Prohibited From Further Contact with the Debtors, their Officers, or their Counsel* (the "Motion").[2]  Except as otherwise noted, I have personal knowledge of the matters set forth herein.

3.       I am authorized to submit this affidavit, and, if I were called upon to testify, I could and would testify competently to the facts set forth herein.

---

[1]   A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://cases.primeclerk.com/McDermott.  The location of Debtor McDermott International, Inc.'s principal place of business and the Debtors' service address in these chapter 11 cases is 757 North Eldridge Parkway, Houston, Texas 77079.

[2]   Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Motion.

**Interactions with Mr. Van Deelen**

4.      At approximately 10:57 a.m. on February 27, 2020, Michael Van Deelen arrived at my private residence and knocked on the front door to my home.  Mr. Van Deelen's appearance was unannounced and I had never spoken to him or contacted him prior to February 27, 2020.  A photograph captured from my doorbell camera is attached hereto as Exhibit 1.

5.      Because I was on a conference call at the time, my wife answered the door.  Mr. Van Deelen spoke with my wife, purporting to do so to confirm he had my correct address for purposes of sending a subpoena.  Upon realizing the nature of Mr. Van Deelen's presence at our home, my wife became visibly shaken.

6.      Despite this interaction, I voluntarily testified at the hearing in the Debtors' chapter 11 cases on March 12, 2020.  In light of the statements on the record at that hearing and herein, I believe Mr. Van Deelen's behavior is intended to threaten, harass, and intimidate me.  Accordingly, I support the relief sought in the Motion.

Pursuant to 28 U.S.C. § 1746, I declare under the penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: March 17, 2020                    /s/ Stuart Spence
                                                        Stuart Spence

**Exhibit 1**

**Doorbell Camera Photograph**





## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| **MCDERMOTT INTERNATIONAL, INC.,** *et al.,*[3] | ) Case No. 20-30336 (DRJ) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) (Emergency Relief Requested) |

## ORDER TO SHOW CAUSE
### (Re: Docket No. _____)

Mr. Michael Van Deelen, Party-in-Interest, shall personally appear on _____ at

_____.m. in Courtroom 400, 4th Floor, 515 Rusk, Houston, TX 77002 and show cause why he

should not be held in contempt of court and prohibited from further contact with the Debtors, their

current and former officers, directors, and employees, and counsel and other professionals in these

Cases and their families.

Failure to appear at the time and date above will result in the Court issuing a bench warrant

for Mr. Van Deelen's arrest.

Dated: _____, 2020
Houston, Texas

_____
**DAVID R. JONES**
**UNITED STATES BANKRUPTCY JUDGE**

---

[3]    A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors'
claims and noticing agent at https://cases.primeclerk.com/McDermott. The location of Debtor McDermott
International, Inc.'s principal place of business and the Debtors' service address in these chapter 11 cases is
757 North Eldridge Parkway, Houston, Texas 77079.

APPENDIX 2


# UNITED STATES BANKRUPTCY COURT
# SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

United States Courts
Southern District of Texas
FILED

MAR 18 2020

David J. Bradley, Clerk of Court

|  |  |
|---|---|
| In re: | ) |
| | ) |
| | )      Case No. 20-30336 |
| MCDERMOTT INTERNATIONAL, INC, *et al* | ) |
| | )      Chapter 11 |
| Debtor(s). | ) |
| | ) |
| | ) |

### PARTY IN INTEREST MICHAEL VAN DEELEN'S RESPONSE TO EMERGENCY MOTION FOR MICHAEL VAN DEELEN TO APPEAR AND SHOW CAUSE WHY HE SHOULD NOT BE HELD IN CONTEMPT OF COURT AND PROHIBITED FROM FURTHER CONTACT WITH THE DEBTORS, THEIR OFFICERS, OR THEIR COUNSEL; PROPOSED ORDER

COMES NOW, Michael D. Van Deelen, a Party In Interest in the instant action and for his Response to Emergency Motion for Michael Van Deelen to Appear and Show Cause Why He Should Not Be Held In Contempt of Court and Prohibited from Further Contact With the Debtors, Their Officers, or Their Counsel states as follows:

1. Van Deelen did not call the Court a 'son of a bitch' as the movants claim in paragraph 7 of their emergency motion and in paragraph 5 of Exhibit A (Sussberg Affidavit). Van Deelen respectfully asks this Court to listen to that section of the audio in which movants claim Van Deelen calls the Court a 'son of a bitch' (3:19:29 - 3:21:20). Van Deelen was sitting just a few feet from the Court during the hearing. If Van Deelen would have called the Court a 'son of a bitch', the Court would certainly have heard him do so.

1



## The Law

2. Except for the falsely alleged profanity mentioned above, the other alleged

improprieties claimed of by the movants are alleged to have taken place when Court was

not in session, outside the courtroom and in violation of no Court order. The Court had

no jurisdiction over Van Deelen under such circumstances.

3. The Court does not have jurisdiction of Van Deelen's private actions unrelated

to the judicial proceedings under 11 U.S.C. 105(a). Section 105(a) authorizes the

bankruptcy court to issue any order necessary or appropriate to carry out the provisions of

the Code:

"The Supreme Court has taught that any grant of authority given to the bankruptcy courts
under § 105 must be exercised within the confines of the bankruptcy code." *Gouveia v.
Tazbir*, 37 F.3d 295, 301 (7th Cir. 1994) (citing *Norwest Bank Worthington v. Ahlers*, 485
U.S. 197 (1988)). Thus, courts may not use § 105 to create substantive rights unavailable
under the Code. *See Taylor v. United States (In re Taylor)*, 263 B.R. 139 (N.D. Ala.
2001) (note: on appeal to 11th Cir.); *MFS Telecom, Inc. v. Motorola, Inc. (In re Conxus
Communications, Inc.)*, 262 B.R. 893, 899 (D. Del. 2001); *Waugh v. Eldridge (In re
Waugh)*, 165 B.R. 450, 451 (Bankr. E.D. Ark. 1994); *see also In re One Times Square
Assocs. Ltd. P'ship*, 159 B.R. 695, 702 (Bankr. S.D.N.Y. 1993), *aff'd*, 165 B.R. 773
(S.D.N.Y.), *aff'd*, 41 F.3d 1502 (2d Cir. 1994) (§ 105 should be used sparingly and then
only to supplement, not supplant, the Code).

4. The Court may not issue a contempt of court order for behavior which does not

directly defy the Court or **which does not violate a previous court order**. (Note that

Appendix A to the Local Rules of the Southern District of Texas deals with Courtroom

Etiquette, not with behavior outside of the courtroom.)

5. The movants cite *Chambers v. NASCO*, 501 U.S. 32 (1991), in their argument

that the Court can sanction Van Deelen, but do not inform this Court that *Chambers* has

been superceded. There currently are no statutes, rules or procedures, either federal or

local, which gives the Court the ability to sanction a party's behavior that does not

directly defy the sanctioning court or is beyond the confines of a court order.  In *F.D.I.C. v. Maxxam, Inc.*, the district court in Texas sanctioned an attorney for misconduct that occurred in an administrative proceeding in Washington, D.C., a proceeding that was not overseen by the district court. 532 F.3d 566, 591 (5th Cir. 2008). Upon review, the Fifth Circuit held that the court's inherent power to sanction did not extend to the administrative hearing but rather only extended to situations in which "a party engages in bad-faith conduct [that directly defies] the sanctioning court." *Id.* at 591 (internal quotation marks omitted). Later, in *Positive Software Solutions, Inc. v. New Century Mortgage Corporation*, the Fifth Circuit, relying on its *Maxxam* decision, held that misconduct during arbitration was beyond the reach of the district court's inherent power, stating that the misconduct "was neither before the district court nor in direct defiance of its order." 619 F.3d 458, 461 (5th Cir. 2010).

     6. The movants also cite *In re Cochener*, 360 B.R. 542, 569 (Bankr., S.D. Tex. 2007) (quoting *Chambers v. NASCO*, 501 U.S. 32 (1991)), *Placid Ref. Co. v. Terrebonne Fuel & Lube*, 108 F.3d 609 (5th Cir. 21997 (sic)) and *Mooney v. Green Tree Serv. Inc.* 340 B.R. 351 (Bankr. E.D. Tex. 2006) to support their claim that this Court can sanction Van Deelen.  However, each of these cases involved actions inside the confines of the bankruptcy code or the violation of orders or procedures that the court had jurisdiction over and therefore do not apply to the instant case as seen above.



# The Allegations

## Mrs. Spence

7. Van Deelen subpoenaed Mr. Stuart Spence to testify during the 3/12/20 Plan Confirmation Hearing. Van Deelen hired Ms. Lisa Moberg, a process server, to serve Mr. Spence. Mr. Spence accepted service on 2/19/20. Exhibit 1.

8. In reviewing the Proof of Service, Van Deelen noticed that the description of Mr. Spence given by Ms. Moberg stated that he was 65 years old with white hair. Van Deelen called Ms. Moberg who confirmed the description of Mr. Spence.

9. Van Deelen believed that Mr. Spence was in his early 50's and bald. Accordingly, Van Deelen thought that maybe the wrong person had been served, especially since the address of service was not the address given in public records as Mr. Spence's recent address. Van Deelen and Ms. Moberg tried several times to call Mr. Spence to ask if he was the right person be served. Mr. Spence did not answer his phone or return the calls.

10. To avoid having possibly served the wrong person, Van Deelen went to the Proof of Service address and rang the bell. A middle-aged lady answered the bell. Van Deelen politely asked if Mr. Stuart Spence was home. The lady said 'no'. Van Deelen then **apologetically and very politely** told the lady that he had had a summons issued to Mr. Spence at that address and that Van Deelen was afraid the wrong person may have been served. Van Deelen then politely asked the lady if Mr. Stuart Spence lived there. She said 'yes'. Van Deelen then politely asked the lady if Mr. Spence had worked at McDermott. She replied 'yes'. At that point, Van Deelen apologized for having bothered the lady and left.

4

11. At no time during the encounter with the lady was Van Deelen disrespectful. Van Deelen never raised his voice. The lady never refused to answer Van Deelen's questions. If the lady would have asked Van Deelen to leave, he would have immediately done so. Mrs. Spence has not presented an affidavit on behalf of the movants' claims that alleges any wrongdoing by Van Deelen.

12. It was within Van Deelen's civil rights to speak to Mrs. Spence. The Court had not previously directed Van Deelen to stay away from Mr. or Mrs. Spence. In fact, the Court declined to hear Van Deelen's explanation of what had occurred with Mrs. Spence when Van Deelen proffered testimony concerning their interaction during the 3/12/20 Plan Confirmation Hearing.

13. If Mr. Spence would have answered his phone or returned Ms. Moberg's or Van Deelen's calls, Van Deelen would not have had to go to his residence to see if he was the right person to have been served.

**Mr. Sussberg**

14. During the 3/12/20 hearing, a person now known as Mr. Sussberg sat directly across the isle between the two conference tables from Van Deelen.

15. Through Van Deelen's objection, the Debtor witnesses were made to testify in person instead of having their written statements adopted into the record. This was time consuming. As the witnesses testified and time proceeded, Van Deelen noticed Mr. Sussberg becoming more and more agitated. Finally, Mr. Sussberg, without any cue from Van Deelen, said to Van Deelen and all who could hear: "You are disgusting!" and other insults. Van Deelen looked at him and told him to be quiet. The Court heard this

5

exchange because the record will show that the Court told Mr. Sussberg and Mr. Van Deelen to 'hold it down' or words to that effect.

16. After the hearing, Van Deelen did not follow Mr. Sussberg anywhere, including the restroom. Like many at the end of the long hearing, Van Deelen needed to use the restroom. As Van Deelen was entering the restroom, Mr. Sussberg was leaving the restroom. Due to the unprofessional behavior exhibited by Mr. Sussberg towards Van Deelen during the hearing as detailed above, Van Deelen wanted to determine Mr. Sussberg's name so he could make a formal complaint against him. Mr. Van Deelen said to Mr. Sussberg: 'May I have your name, sir?" Mr. Sussberg angrily refused to give Van Deelen his name. Instead, Mr. Sussberg again told Van Deelen: "You are disgusting!" He also told Van Deelen other things including: "You are a fool!" Mr. Sussberg is a young, stocky, man. Van Deelen is a 70 year-old senior citizen. Mr. Sussberg's words, tenor and posture caused Van Deelen to be afraid for his safety. Van Deelen began to have heart palpitations and he remained near the restroom while Sussberg left and went down the hallway towards the elevators. All of a sudden, Sussberg came rushing back down the hallway and towards the restroom area where Van Deelen was and angrily charged Van Deelen. Mr. Sussberg then began calling Van Deelen names again. Mr. Sussberg stood only inches away from Van Deelen, shouting at Van Deelen. Van Deelen was terrified by Mr. Sussberg's actions. Mr. Sussberg eventually left and again went down the hallway towards the elevators.

17. Van Deelen, terribly frightened, remained in the restroom area for a period of time until he hoped Mr. Sussberg had left. Eventually Van Deelen looked down the hall toward the elevators and saw that Mr. Sussberg had in fact left. Van Deelen was

extremely frightened and upset. So upset, in fact, that he could not locate his vehicle in the parking garage near the courthouse that he had used many times before. Van Deelen had to ask a garage employee for assistance in finding his car.

18. At no time did Van Deelen call Mr. Sussberg a 'pasty white fuck' or say 'I will have my way with your wife'. That Van Deelen would say those things is incredibly insulting and beyond belief.

19. Mr. Sussberg's comments to Van Deelen, of which he fails to inform the Court, violate Rule 14 of the Court's Rules of Etiquette:

*Avoid disparaging remarks and acrimony towards anyone, especially adverse parties and counsel, and discourage ill-will between the litigants. Counsel must abstain from unnecessary references to opposing counsel, especially peculiarities.*

20. The Court will note that, even though there were many persons who had attended the hearing within earshot from Sussberg and Van Deelen, Sussberg does not mention their names or produce affidavits from them substantiating his (false) account of his interaction with Van Deelen.

21. Still trying to determine Mr. Sussberg's identity, Van Deelen found Mr. Sussberg's photo on the Kirkland and Ellis website. Van Deelen then sent Mr. Sussberg an email stating that Van Deelen had identified him from the Kirkland and Ellis website. In an abundance of caution, even though Van Deelen recognized him from his photo, Van Deelen wanted to give Mr. Sussberg the opportunity to deny that he was the one sitting across from Van Deelen during the 3/12/20 hearing. (It was the Kirkland and Ellis employee sitting across from Van Deelen who told Van Deelen and others: "You [Van Deelen] are disgusting!") The email is respectful and contains no threatening language.

22. If Mr. Sussberg would have given Van Deelen his name when Van Deelen politely asked for it after the hearing, Van Deelen would not have had to email Mr. Sussberg.

23. Please see Exhibit 2, Van Deelen Affidavit.

**Other**

24. Paragraph 10 of the movants' Emergency Motion states that Van Deelen was sanctioned by the District Court in *Michael Van Deelen v. City of Kansas City, Missouri*, 2006 WL 2077640 (W.D. Mo. 2006). This was a non-bankruptcy case. What the movants fail to tell this Court is that a significant amount of the sanctions were overturned on appeal. Van Deelen has never fabricated evidence and he never will. On the other hand, the movants have fabricated evidence to support their Emergency Motion, including when they claim that Van Deelen called the Court a 'son of a bitch' during the Plan Confirmation Hearing. Exhibit 2, Van Deelen Affidavit.

25. Paragraph 18 of the movants' Emergency Motion claims that "Mr. Van Deelen has threatened physical violence against family members of counsel in these cases." This statement is unsupported by any facts other than the false allegation that Van Deelen allegedly said that he was going to 'have his way' with Mr. Sussberg's wife. The paragraph 18 statement states 'violence against family *members* (plural) *of counsel* (plural) *in these cases'* (plural). What family members? What counsel? What cases? The egregious manufacturing of false evidence by the movants in their Emergency Motion is beyond the pale. Van Deelen has never threatened violence against family members of counsel or other persons in any case he has been involved with. Exhibit 2, Van Deelen Affidavit.

26.  What is going on here?  It is no secret that Van Deelen plans to file suit against McDermott employees in Texas state court for their malfeasance relating to McDermott's bankruptcy and the events leading up thereto.  Other shareholders have indicated they may also file suit.  Van Deelen believes that the movants' Emergency Motion is an attempt to prevent Van Deelen from filing suit by having this Court enjoin him from doing so.

## Summary

27.  The movants apparently seek sanctions against Van Deelen for the following reasons:

A.  Van Deelen allegedly called the Court a 'son of a bitch' during the Plan Confirmation hearing held on 3/12/20.  This false allegation can be easily refuted by listening to the 3/12/20 audio clip from the Plan Confirmation hearing (time stamp 3:19:29 - 3:21:20).

B.  Van Deelen filed numerous documents in the instant action, which was his Constitutional right.

C.  Van Deelen was sanctioned by a Missouri District Court in 2006.  Not only was a significant portion of the sanction overturned on appeal, but a single resolved non-bankruptcy case from 14 years ago has no bearing on the instant action,

D.  After being unable to contact Mr. Spence by phone, Van Deelen went to Mr. Spence's believed residence, was told by his wife that Mr. Spence was not home, and then respectfully spoke to Mr. Spence's wife for the purpose of dismissing Mr. Spence from the subpoena he had been served if he was not the correct person to have been served.

E. After Mr. Sussberg refused to give Van Deelen his name when Van Deelen asked him for it during the 3/12/20 Plan Confirmation Hearing, Van Deelen sent Mr. Sussberg a respectful, non-threatening, email seeking to confirm if Mr. Sussberg was the person seated across from him during the 3/12/20 Plan Confirmation Hearing.

F. The movants allege, without any facts or proof, that "Mr. Van Deelen has threatened physical violence against family members (plural) of counsel (plural) in these cases (plural)."

G. Mr. Sussberg has falsely alleged that Van Deelen called him a 'pasty white fuck' and said 'I will have my way with your wife' after the 3/12/20 Plan Confirmation Hearing had been adjourned. Even though many people were milling around after the hearing, Mr. Sussberg does not produce one affidavit from a single witness (other than himself) discussing Van Deelen's alleged bad behavior. Not only are his allegations patently false, but also Mr. Sussberg conveniently failed to tell the Court that he had violated the Court's rules of etiquette when told Van Deelen "You are disgusting!" during the 3/12/20 Plan Confirmation Hearing and after it had been adjourned; that he had told Van Deelen "You are a fool!" after the 3/12/20 Plan Confirmation Hearing had been adjourned; that he had angrily and physically charged Mr. Van Deelen, stopping just inches from Van Deelen's person after the 3/12/20 Plan Confirmation Hearing had been adjourned; and that he had refused to give Van Deelen his name when Van Deelen politely asked for it after the 3/12/20 Plan Confirmation Hearing had been adjourned.

28. Van Deelen has attempted to contact the movants to resolve their Emergency Motion without the need for a hearing. The movants have not returned the message left with the movants' assistant. Exhibit 2, Van Deelen Affidavit.

WHEREFORE, for the reasons discussed herein, Van Deelen respectfully

requests that this Court deny in its entirety the movants' Emergency Motion for Michael

Van Deelen to Appear and Show Cause Why He Should Not Be Held In Contempt of

Court and Prohibited from Further Contact With the Debtors, Their Officers, or Their

Counsel.

Houston, Texas

March 18, 2020

Respectfully submitted,

Michael Van Deelen
Party In Interest
16215 Friar Circle
Spring, TX 77379
832-562-0723
michaelvandeelen@gmail.com

## CERTIFICATE OF SERVICE

I, Michael Van Deelen, do hereby certify that I caused a copy of the foregoing document,

including Proposed Order, to be served by the Electronic Case Filing System for the

United States Bankruptcy Court for the Southern District of Texas on this 18th day of

March, 2020.

Michael Van Deelen
16215 Friar Circle
Spring, TX 77379
832-562-0723
michaelvandeelen@gmail.com

# EXHIBIT 1

# SPENCE PROOF OF SERVICE

Subpoena to Appear and Testify at a Hearing or Trial in a Bankruptcy Case or Adversary Proceeding) (Page 2)

# PROOF OF SERVICE

**(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)**

I received this subpoena for *(name of individual and title, if any)*:   __STUART SPENCE__

on *(date)* __Feb. 18, 2020__ .

☑ I served the subpoena by delivering a copy to the named person as follows:   __STUART SPENCE__

_____

_____   on *(date)* __Wed., Feb. 19, 2020__ ; or

☐ I returned the subpoena unexecuted because: _____

_____

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of $ __71.00__

My fees are $ _____ for travel and $ _____ for services, for a total of $ __95.00__ .

I declare under penalty of perjury that this information is true and correct.

Date: __February 19, 2020__

_____
*Server's signature*

__LISA G. MOBERG, PSC#12076__
*Printed name and title*

__4806 W. Walnut St.__
__Pearland, Texas 77581__
*Server's address*

Additional information concerning attempted service, etc.:

1) Successful Attempt: Feb 19, 2020 @ 8:23 p.m. CST at HOME: ████████████, ████████████ received by STUART SPENCE, Age: 65; Ethnicity: Caucasian; Gender: Male; Weight: 220; Height: 6'1"; Hair: White I personally and successfully served STUART SPENCE, who willingly accepted service without incident at the listed address.

13


Subpoena to Appear and Testify at a Hearing or Trial in a Bankruptcy Case or Adversary Proceeding (12/15)

# UNITED STATES BANKRUPTCY COURT

_____Southern_____ District of _____Texas, Houston Division_____

In re McDermott International, Inc., et al.
_____
Debtor

Case No. _____20-30336_____

*(Complete if issued in an adversary proceeding)*

Chapter _____11_____

_____
Plaintiff

v.

Adv. Proc. No. _____

_____
Defendant

## SUBPOENA TO APPEAR AND TESTIFY
## AT A HEARING OR TRIAL IN A BANKRUPTCY CASE (OR ADVERSARY PROCEEDING)

To: Stuart Spence
_____
*(Name of person to whom the subpoena is directed)*

■ **YOU ARE COMMANDED** to appear in the United States Bankruptcy Court at the time, date, and place set forth below to testify at a hearing or trial in this bankruptcy case (or adversary proceeding). When you arrive, you must remain at the court until the judge or a court official allows you to leave.

| PLACE | COURTROOM 400 |
|---|---|
| U.S. Bankruptcy Court 515 Rusk St., Houston, TX | DATE AND TIME 03/12/20   9:00 A.M. |

You must also bring with you the following documents, electronically stored information, or objects *(leave blank if not applicable)*:

_____

The following provisions of Fed. R. Civ. P. 45, made applicable in bankruptcy cases by Fed. R. Bankr. P. 9016, are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and 45(g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: _____02/18/20_____

CLERK OF COURT

_____          OR          _____
Signature of Clerk or Deputy Clerk                          Attorney's signature

The name, address, email address, and telephone number of the attorney representing *(name of party)*
Michael Van Deelen (party)_____ , who issues or requests this subpoena, are:
6014 Capella Park Drive, Spring, TX; michaelvandeelen@gmail.com; 832-562-0723

### Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things, or the inspection of premises before trial, a notice and a copy of this subpoena must be served on each party before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

14

EXHIBIT 2

VAN DEELEN AFFIDAVIT

# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

In re:                                              )
                                                    )
                                                    )        Case No. 20-30336
MCDERMOTT INTERNATIONAL, INC, *et al*   )
                                                    )        Chapter 11
          Debtor(s).                                )
                                                    )
                                                    )

## AFFIDAVIT OF MICHAEL VAN DEELEN IN SUPPORT OF HIS RESPONSE TO EMERGENCY MOTION FOR MICHAEL VAN DEELEN TO APPEAR AND SHOW CAUSE WHY HE SHOULD NOT BE HELD IN CONTEMPT OF COURT AND PROHIBITED FROM FURTHER CONTACT WITH THE DEBTORS, THEIR OFFICERS, OR THEIR COUNSEL

STATE OF TEXAS          §
                        §
COUNTY OF HARRIS        §

BEFORE ME, the undersigned authority, personally appeared Michael Van Deelen, who, being by me duly sworn and deposed, stated the following:

"My name is Michael Van Deelen, I am over 21 years of age, of sound mind, capable of making this Affidavit, and have personal knowledge of the facts stated herein.  In the following, I refer to myself as 'Van Deelen':

1.  Van Deelen did not call the Court a 'son of a bitch' during the 3/12/20 Plan Confirmation Hearing in the instant action or at any other time.  Van Deelen was sitting just a

16


few feet from the Court during the hearing. If Van Deelen would have called the Court a 'son of
a bitch', he believes the Court would certainly have heard him do so.

2. Van Deelen subpoenaed Mr. Stuart Spence to testify during the 3/12/20 Plan
Confirmation Hearing in the instant action. Van Deelen hired Ms. Lisa Moberg, a process
server, to serve Mr. Spence. Mr. Spence accepted service on 2/19/20.

3. In reviewing the Proof of Service, Van Deelen noticed that the description of Mr.
Spence given by Ms. Moberg stated that he was 65 years old with white hair. Van Deelen called
Ms. Moberg who confirmed the description of Mr. Spence.

4. Van Deelen believed that Mr. Spence was in his early 50's and bald. Accordingly,
Van Deelen thought that maybe the wrong person had been served, especially since the address
of service was not the address given in public records as Mr. Spence's recent address. Van
Deelen and Ms. Moberg tried several times to call Mr. Spence to ask if he was the right person to
be served. Mr. Spence did not answer his phone or return the calls.

5. To rectify having possibly served the wrong person, Van Deelen went to the Proof of
Service address and rang the bell. A middle-aged lady answered the bell. Van Deelen politely
asked if Mr. Stuart Spence was home. The lady said 'no'. Van Deelen then **apologetically and
very politely** told the lady that he had had a summons issued to Mr. Spence at that address and
that Van Deelen was afraid the wrong person may have been served. Van Deelen then politely
asked the lady if Mr. Stuart Spence lived there. She said 'yes'. Van Deelen then politely asked
the lady if Mr. Spence had worked at McDermott. She replied 'yes'. At that point, Van Deelen
apologized for having bothered the lady and left.

17

6. At no time during the encounter with the lady was Van Deelen disrespectful. Van Deelen never raised his voice. The lady never refused to answer Van Deelen's questions. If the lady would have asked Van Deelen to leave, he would have immediately done so.

7. The Court in the instant action had not previously directed Van Deelen to stay away from Mr. or Mrs. Spence. In fact, the Court declined to hear Van Deelen's explanation of what had occurred with Mrs. Spence when Van Deelen proffered testimony concerning their interaction during the 3/12/20 Plan Confirmation Hearing.

8. If Mr. Spence would have answered his phone or returned Ms. Moberg's or Van Deelen's calls, Van Deelen would not have had to go to his residence to see if he was the right person to have been served.

9. During the 3/12/20 hearing, a person now known as Mr. Sussberg sat directly across the isle between the two conference tables from Van Deelen.

10. At the 3/12/20 hearing, through Van Deelen's objection, the Debtor witnesses were made to testify in person instead of having their written statements adopted into the record. This was time consuming. As the witnesses testified and time proceeded, Van Deelen noticed Mr. Sussberg becoming more and more agitated. Finally, Mr. Sussberg, without any cue from Van Deelen said to Van Deelen and all who could hear: "You are disgusting!" and other insults. Van Deelen looked at him and told him to be quiet. The Court heard this exchange because the record will show that the Court told Mr. Sussberg and Van Deelen to 'hold it down' or words to that effect.

11. After the hearing, Van Deelen did not follow Mr. Sussberg anywhere, including the restroom. Like many at the end of the long hearing, Van Deelen needed to use the restroom. As Van Deelen was entering the restroom, Mr. Sussberg was leaving the restroom. Due to the

unprofessional behavior exhibited by Mr. Sussberg towards Van Deelen during the hearing as detailed above, Van Deelen wanted to determine Mr. Sussberg's name so he could make a formal complaint against him. Van Deelen said to Mr. Sussberg: 'May I have your name, sir?" Mr. Sussberg angrily refused to give Van Deelen his name. Instead, Mr. Sussberg again told Van Deelen: "You are disgusting!" He also told Van Deelen other things including: "You are a fool!" Mr. Sussberg is a young, stocky, man. Van Deelen is a 70 year-old senior citizen. Mr. Sussberg's words, tenor and posture caused Van Deelen to be afraid for his safety. Van Deelen began to have heart palpitations and he remained near the restroom while Sussberg left and went down the hallway towards the elevators. All of a sudden, Sussberg came rushing back down the hallway and towards the restroom area where Van Deelen was and angrily charged Van Deelen. Mr. Sussberg then began calling Van Deelen names again. Mr. Sussberg stood only inches away from Van Deelen, shouting at Van Deelen. Van Deelen was terrified by Mr. Sussberg's actions. Mr. Sussberg eventually left and again went down the hallway towards the elevators.

12.  Van Deelen, terribly frightened, remained in the restroom area for a period of time until he hoped Mr. Sussberg had left. Eventually Van Deelen looked down the hall toward the elevators and saw that Mr. Sussberg had in fact left. Van Deelen was extremely frightened and upset. So upset, in fact, that he could not locate his vehicle in the parking garage near the courthouse that he had used many times before. Van Deelen had to ask a garage employee for assistance in finding his car.

13.  At no time did Van Deelen call Mr. Sussberg a 'pasty white fuck' or say 'I will have my way with your wife'. That Van Deelen would say those things is incredibly insulting and beyond belief.

14. Still trying to determine Mr. Sussberg's identity, Van Deelen found Mr. Sussberg's photo on the Kirkland and Ellis website. Van Deelen then sent Mr. Sussberg an email stating that Van Deelen had identified him from the Kirkland and Ellis website. In an abundance of caution, even though Van Deelen recognized him from his photo, Van Deelen wanted to give Mr. Sussberg the opportunity to deny that he was the one sitting across from Van Deelen during the 3/12/20 hearing. (It was the Kirkland and Ellis employee sitting across from Van Deelen who told Van Deelen and others: "You [Van Deelen] are disgusting!") The email is respectful and contains no threatening language.

15. If Mr. Sussberg would have given Van Deelen his name when Van Deelen politely asked for it after the hearing, Van Deelen would not have had to email Mr. Sussberg.

16. Van Deelen was sanctioned by the District Court in *Michael Van Deelen v. City of Kansas City, Missouri,* 2006 WL 2077640 (W.D. Mo. 2006). This was a non-bankruptcy case. The sanctions were reduced significantly on appeal. Van Deelen has never fabricated evidence and he never will.

17. Van Deelen has never threatened violence against family members of counsel or other persons in any case he has been involved with.

18. Van Deelen has attempted to contact the movants to resolve their Emergency Motion (Document 694) without the need for a hearing. The movants have not returned the message left with the movants' assistant.

Further Affiant sayeth not."

Michael Van Deelen
Affiant


SUBSCRIBED AND SWORN TO BEFORE ME ON THE 18th day of March, 2020.


Notary Public, State of Texas

William Phongdara
(Print or Type Name)

My Commission Expires: _04/24/2022_

WILLIAM PHONGDARA
NOTARY PUBLIC
STATE OF TEXAS
MY COMM. EXP. 04/24/22
NOTARY ID 13154754-8

6

21

# UNITED STATES BANKRUPTCY COURT
# SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | |
| | ) | Case No. 20-30336 |
| MCDERMOTT INTERNATIONAL, INC, *et al* | ) | |
| | ) | Chapter 11 |
| Debtor(s). | ) | |
| | ) | |
| | ) | |

# ORDER

On _____, 2020, a hearing was held concerning the Emergency Motion for Michael Van Deelen to Appear and Show Cause Why He Should Not Be Held In Contempt of Court and Prohibited from Further Contact With the Debtors, Their Officers, or Their Counsel. It is

ORDERED that the Emergency Motion for Michael Van Deelen to Appear and Show Cause Why He Should Not Be Held In Contempt of Court and Prohibited from Further Contact With the Debtors, Their Officers, or Their Counsel is denied in its entirety.

Houston, Texas

Dated: _____, 2020

_____
DAVID R. JONES
UNITED STATES BANKRUPTCY JUDGE

001492

# APPENDIX 3

ENTERED
03/23/2020

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | **CASE NO: 20-30336** |
| **MCDERMOTT INTERNATIONAL, INC.,** *et* | § | **CHAPTER 11** |
| *al.,* | § | **(Jointly Administered)** |
| | § | |
| **Debtors.** | § | **DAVID R. JONES** |

### ORDER
### (Docket No. 694)

The Court has reviewed the Emergency Motion for Michael Van Deelen to Appear and Show Cause Why He Should Not be Held in Contempt and Prohibited from Further Contact with the Debtors, their Officers, or their Counsel [Docket No. 694]. The Court has also reviewed Mr. Van Deelen's response to the motion [Docket No. 701]. Since the filing of the motion, the Court is aware that Mr. Van Deelen came back to the courthouse to file a complaint against Debtors' counsel on the basis of an alleged threat made at or after the confirmation hearing in this case[1]. In addition, the Court has reviewed Mr. Van Deelen's conduct in other hearings before the Court in this case.

The focus of the emergency motion surrounds the recent confirmation hearing held in this case on March 12, 2020. During the hearing, Mr. Van Deelen is alleged to have made certain disparaging remarks about the Court as well as threats toward Debtors' counsel. Mr. Van Deelen denies that he made any disparaging remarks toward the Court and asserts that any threats toward counsel were made outside the courtroom and therefore outside the Court's jurisdiction. Mr. Van Deelen further asserts that he made no such threats.

In the movants' motion, it is alleged that Mr. Van Deelen called the Court a "son of a bitch." Mr. Van Deelen denies that he made any such remark and that he was "sitting just a few feet from the Court during the hearing . . . [and] [i]f Van Deelen would have called the Court a "son of a bitch", the Court would certainly have heard him do so." Mr. Van Deelen's denial is set forth in his sworn affidavit attached to his response [Docket No. 701]. Unfortunately for Mr. Van Deelen, the Court's staff did hear Mr. Van Deelen's statement and immediately reported it to chambers. Moreover, although Mr. Van Deelen was facing away from the microphones located on counsel table, Mr. Van Deelen's statement is audible on the original audio with headphones. While the Court was willing to overlook the insult, it cannot overlook a false statement.

The motion goes on to allege that Mr. Van Deelen made vulgar and threatening comments to Mr. Sussberg and his family. Mr. Van Deelen denies under oath that any such comments were made. Given that Mr. Van Deelen has demonstrated the propensity to make

---

[1] When the courthouse security officer offered to take the complaint, Mr. Van Deelen declined to make an official report and left the building.

false statements under oath, the Court has grave concerns about Mr. Van Deelen's affidavit and gives it little weight under the circumstances. Moreover, given Mr. Deelen's prior conduct before the Court and reference to "shooting" during the confirmation hearing, the Court has concerns about Mr. Van Deelen's mental stability. The Court concludes that Mr. Van Deelen poses a legitimate risk to the safety of courthouse staff and litigants that oppose his position.

Mr. Van Deelen goes to great length to assert that the Court cannot sanction him for his conduct outside the courtroom and that no court order has been entered that he violated. Mr. Van Deelen is correct in that statement. However, the Court has the authority and the duty to protect those parties that appear before it. Further, the Court has a duty to ensure that the federal courthouse is a place of safety and order for all persons who enter. Accordingly, it is

**ORDERED THAT:**

1.      Michael D. Van Deelen is prohibited from contacting the Court and its staff by any means. Any communication to the Court or its staff must be made in writing and filed with the Clerk of the Court.

2.      Michael D. Van Deelen is prohibited from contacting Joshua Sussberg or any member of his family in any manner. Should Mr. Sussberg find it necessary to seek the assistance of law enforcement officials to protect his family and enforce this order, the Court requests that upon presentation of a copy of this order and a determination that a violation of this paragraph has occurred, such law enforcement officials should detain Mr. Van Deelen and transfer him to this Court for further proceedings.

3.      A copy of this Order shall be delivered to the United States Marshal for further investigation of Mr. Van Deelen's conduct. Further, Mr. Van Deelen may not enter the federal courthouse except with the escort of a court security officer.

4.      A copy of this Order shall be delivered to the United States Attorney for investigation of Mr. Van Deelen's conduct in this case.

5.      The request for sanctions is denied.

6.      Should Mr. Van Deelen wish to seek relief from this order or request a hearing, he may do so by pleading filed within fourteen days.

7.      This order is effective upon entry.

**SIGNED: March 23, 2020.**

DAVID R. JONES
UNITED STATES BANKRUPTCY JUDGE

2 / 2

001495

APPENDIX 4

# UNITED STATES BANKRUPTCY COURT
# SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

*United States Courts*
*Southern District of Texas*
*FILED*

**MAR 24 2020**

*David J. Bradley, Clerk of Court*

| | |
|---|---|
| In re: ) | |
| ) | Case No. 20-30336 |
| MCDERMOTT INTERNATIONAL, INC, *et al* ) | |
| ) | Chapter 11 |
| Debtor(s). ) | |
| ) | |
| ) | |

## PARTY IN INTEREST MICHAEL VAN DEELEN'S REQUEST FOR HEARING; PROPOSED ORDER

In its Order (Docket 719) entered on 3/23/20, the court notified Party In Interest

Michael Van Deelen that he could request a hearing within 14 days of the entry of the

Order.  Plaintiff accordingly requests the earliest possible hearing date and time

consistent with the court's Order.

Van Deelen will seek, among other things, clarification of the following during

the hearing:

A.  The exact section of the audio made during the 3/12/20 Plan Confirmation

Hearing in which the court claims Van Deelen called him a son-of-a-bitch.  Plaintiff

further requests that the court play said portion of the audio during the hearing.

B.  Clarification on whether or not the court is ordering that Van Deelen is

prohibited from filing a civil lawsuit for assault and possibly other causes of action

against Joshua Sussberg in Harris County District Court.

C.  Clarification on whether or not the court is ordering that Van Deelen is prohibited from filing a federal civil rights lawsuit against David R. Jones.

D.  Clarification on the exact dates, times, places and circumstances in which Van Deelen has been disrespectful to court personnel.

E.  Clarification on the qualifications and training the court has in diagnosing mental health issues.

F.  Clarification on whether or not the court has ever heard Van Deelen say he was going to shoot someone.  If the court claims it has ever heard Van Deelen say he was going to shoot someone, provide clarification on the exact dates, times, places and circumstances under which the court heard Van Deelen say those words.

Houston, Texas

March 23, 2020

Respectfully submitted,

*Michael Van Deelen*

Michael Van Deelen
Party In Interest
16215 Friar Circle
Spring, TX 77379
832-562-0723
michaelvandeelen@gmail.com

2

## CERTIFICATE OF SERVICE

I, Michael Van Deelen, do hereby certify that I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas on this 23rd day of March, 2020.

Michael Van Deelen
16215 Friar Circle
Spring, TX 77379
832-562-0723
michaelvandeelen@gmail.com

# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

In re:                                              )
                                                    )
                                                    )     Case No. 20-30336
MCDERMOTT INTERNATIONAL, INC, *et al*               )
                                                    )     Chapter 11
              Debtor(s).                            )
                                                    )
                                                    )

# ORDER

On _____, 2020, a hearing was held concerning clarification of the court's

Order (Docket 719) entered on 3/23/20.

It is accordingly

ORDERED that :

A. The exact section of the audio made during the 3/12/20 Plan Confirmation Hearing in

which the court claims Van Deelen called him a son-of-a-bitch is _____.   The

requested portion of the audio was/was not played during the hearing.

B. Van Deelen is not prohibited from filing a civil lawsuit for assault and possibly other

causes of action against Joshua Sussberg in Harris County District Court.

C. Van Deelen is not prohibited from filing a federal civil rights lawsuit against David R.

Jones.

D. The exact dates, times, places and circumstances in which Van Deelen has been

disrespectful to court personnel are as follows:

E. The court has no qualifications or training in diagnosing mental health issues.

F. The court has never heard Van Deelen say that Van Deelen was going to shoot

someone.

Houston, Texas

Dated: _____, 2020


_____
DAVID R. JONES
UNITED STATES BANKRUPTCY JUDGE

001501

APPENDIX 5

ENTERED
04/20/2020

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | CASE NO: 20-30336 |
| MCDERMOTT INTERNATIONAL, INC., *et* | § | CHAPTER 11 |
| *al.*, | § | (Jointly Administered) |
| Debtors. | § | DAVID R. JONES |
| | § | |

## ORDER
### (Docket No. 723)

In its order entered March 23, 2020 concerning Michael D. Van Deelen, the Court provided in paragraph 6 of the order that if Mr. Van Deelen wished to seek relief from the March 23, 2020 order or request a hearing, he could do so by filing a pleading within 14 days of the order's entry date (Docket No. 719). The intent of the paragraph was to ensure that no ambiguity existed in terms of the Court's directives to Mr. Van Deelen and that a proper balance was achieved between public safety and court access.

On March 24, 2020, Mr. Van Deelen filed a pleading requesting a hearing (Docket No. 723). In his pleading, Mr. Van Deelen identifies six topics for which he seeks "clarification." No other relief is sought. The pleading does nothing more than seek to disrupt further the legitimate ends of the bankruptcy process and has no legitimate purpose. The request for hearing is denied.

**SIGNED: April 20, 2020.**

DAVID R. JONES
UNITED STATES BANKRUPTCY JUDGE